1

1 <u>TRANSCRIBED FROM DIGITAL RECORDING</u>

2 IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
3 EASTERN DIVISION

4 JACQUES RIVERA,                        )
                                        )
5               Plaintiff,              )
   -vs-                                  )  Case No. 12 C 4428
6                                        )
                                        )  Chicago, Illinois
7 REYNALDO GUEVARA, et al.,              )  March 12, 2013
                                        )  9:43 a.m.
8               Defendant.              )

9
                    TRANSCRIPT OF PROCEEDINGS
10    BEFORE THE HONORABLE MARY M. ROWLAND, MAGISTRATE JUDGE

11 APPEARANCES:

12 For the Plaintiff:     MR. LOCKE E. BOWMAN, III
                         MacArthur Justice Center
13                       357 East Chicago Avenue
                         Chicago, IL  60611
14                       (312) 503-0844
                         E-mail:  1-bowman@law.northwestern.edu
15
                         MR. JONATHAN I. LOEVY
16                       MR. STEVEN E. ART
                         MR. ANAND SWAMINATHAN
17                       Loevy & Loevy
                         312 North May Street
18                       Suite 100
                         Chicago, IL  60607
19                       (312) 243-5900
                         E-mail: Jon@loevy.com
20                               Steve@loevy.com
                                 Anand@loevy.com
21 Transcriber:

22          KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                    Official Court Reporter
23               United States District Court
            219 South Dearborn Street, Suite 2144-A
24                 Chicago, Illinois  60604
                 Telephone:  (312) 435-5569
25       e-mail:  Kathleen_Fennell@ilnd.uscourts.gov

2

1    APPEARANCES:   (Continued)

2    For the individual
     Defendants:                MR. JEFFREY NEIL GIVEN
3                               The Sotos Law Firm, P.C.
                                550 E. Devon Avenue
4                               Suite 150
                                Itasca, IL  60143
5                               (630) 735-3300
                                E-mail: Jgiven@jsotoslaw.com
6
     For the Defendant
7    City:                      MS. EILEEN E. ROSEN
                                Rock Fusco & Connelly, LLC
8                               321 North Clark Street
                                Suite 2200
9                               Chicago, IL  60610
                                (312) 494-1000
10                              E-mail: Erosen@rockfuscoconnelly.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings heard in open court:)

2               THE CLERK:  12 C 4428, Rivera versus Guevara, et al.

3               THE COURT:  Sorry to keep you guys waiting.

4               MR. LOEVY:  Good morning, your Honor.  Jon Loevy for

5       the plaintiff.

6               THE COURT:  Good morning.

7               MR. BOWMAN:  Locke Bowman also here for the

8       plaintiff.

9               MR. SWAMINATHAN:  Anand Swaminathan for the

10      plaintiff.

11              MR. ART:  Steve Art for the plaintiff.

12              MR. GIVEN:  Good morning, your Honor.  Jeff Given on

13      behalf of the City.

14              MS. ROSEN:  No.

15              MR. GIVEN:  Oh, sorry.

16              THE COURT:  You're not Mr. Given?

17              MR. GIVEN:  Hard to keep them straight.

18              In this case, I am on behalf of the individual

19      defendants.

20              MS. ROSEN:  Good morning, your Honor.  Eileen Rosen

21      on behalf of the City.

22              THE COURT:  Ms. Rosen, thank you for knowing who's

23      here and why they're here.  I need you back in chambers.

24          (Laughter.)

25              THE COURT:  All right, people.  So here's my feeling.

1  Having litigated this, painfully litigated this myself, I

2  don't think that you have standing to challenge this subpoena,

3  okay?  So I'm not going to quash the subpoena.  However -- and

4  let me just ask you, do you care that it's on videotape?

5          MS. ROSEN:  Not at all.

6          MR. GIVEN:  No.

7          THE COURT:  Okay.  And you're paying for the video

8  taping?

9          MR. BOWMAN:  Yes, ma'am.

10          THE COURT:  Okay.  So do you need my help in figuring

11  out -- knowing that the subpoena is not going to be quashed, I

12  just don't think you have the ability to ask me to do that,

13  and I don't think I can do that unless the guy who got

14  subpoenaed is in here raising -- raising Cain about it.

15          Do you need my help in terms of how this is going to

16  go forward?

17          MS. ROSEN:  Apparently.

18          MR. BOWMAN:  Yes.

19          THE COURT:  Okay.  Because I know you're all

20  wonderful lawyers and well regarded.

21          So I'm really torn about it.  Tell me about

22  Mr. Lopez.  How old is he now?

23          MR. BOWMAN:  He's in his late 30s I believe at this

24  point.

25          THE COURT:  Okay.  And is he working?

5

1          MS. ROSEN:  Yes.  Well, at the post-conviction
2   proceeding, he testified that he was working, had a family
3   and --
4          THE COURT:  Okay.  So he's busy and he's got a life.
5          MS. ROSEN:  Yes.
6          THE COURT:  Okay.  Does he -- who's the lawyer?
7   Because they live in different cities.
8          MR. GIVEN:  She used to be in Cleveland, where
9   Mr. Lopez lives.  She then moved to Columbus for her job.
10          THE COURT:  Okay.
11          MR. GIVEN:  And she, I asked her briefly how she came
12   to be Mr. Lopez's lawyer.  She said he was a family friend.
13          THE COURT:  Okay.
14          MR. GIVEN:  That's all I know.
15          THE COURT:  I'd really rather get him here for the
16   trial.  I mean, I know that I don't have the authority to do
17   that, but that is -- seems way preferable to anything else.
18          MS. ROSEN:  That would be our preference, too, and,
19   quite frankly, I mean, I don't know that the door is closed on
20   that.
21          THE COURT:  Okay.
22          MS. ROSEN:  You know, he came here for the
23   post-conviction hearing.
24          THE COURT:  How did you guys arrange that?  I assume
25   the Center For Wrongful Convictions did that.

1    MR. BOWMAN:  That was -- that was arranged and

2  Mr. Lopez felt very strongly that it was important to come.

3    THE COURT:  Okay.

4    MR. BOWMAN:  And he came.

5    THE COURT:  Okay.

6    MR. BOWMAN:  My understanding from Ms. Adams is that

7  that was a very painful experience for him --

8    THE COURT:  Okay.

9    MR. BOWMAN:  -- and that it's one he does not care to

10  repeat.

11    THE COURT:  Okay.

12    MR. BOWMAN:  And that's -- you know, obviously none

13  of us wants to close the door; but I think that we have to

14  face the reality here, which is that at the end of the day,

15  none of us has the ability to compel him to come --

16    THE COURT:  Uh-huh.

17    MR. BOWMAN:  -- and I -- I'm not optimistic.

18    THE COURT:  Uh-huh.

19    MR. GIVEN:  Judge, if I can just add this.  When I

20  first reached out to Ms. Adams, she expressed that she would

21  fight even a deposition, that her marching orders from

22  Mr. Lopez was to fight the deposition, and, in fact, that's

23  changed.

24    She has not objected to this deposition.  She

25  accepted service on Mr. Lopez's behalf.  She has not moved to

1  quash the original subpoena, so there's no way to know what

2  will happen down the road, whether he will or will not come

3  back.

4          THE COURT:  Okay.  I -- so I'm inclined to, although

5  this is not really fair to him, but I'm inclined, first of

6  all, to give you more than -- are we on eight-hour rule or

7  seven-hour rule?  I should know that.

8          MS. ROSEN:  Seven.

9          THE COURT:  Yeah.  So I'm inclined to give you more

10  than that anyway.  I mean, nobody's asking for that, but I'm

11  trying to be fair in how we're going to do this dep.

12          I am concerned that if the jury -- I mean, I'm mostly

13  concerned about the jury, frankly, at this point, and if

14  they've got to watch this thing on video.  I was on a jury

15  once, and I had to watch video testimony.

16          So I would like them to get as much as a coherent

17  story as they can, and I don't -- do you agree that it's your

18  role, and I totally respect that, you know, the accusations

19  here are very serious against your clients so you're going to

20  go to the mat on this -- do you -- I mean, are you sort of

21  cross-examining this guy?

22          MS. ROSEN:  I don't think we are at all, Judge.  I

23  mean, he testified in the post-conviction proceeding that he

24  viewed photographs and picked out the person that he thought

25  did the crime through no coercion.  He viewed the first lineup

1  as he describes it and picked out Mr. Rivera.

2          He then was walking down the street and saw somebody
3  else and it dawned on him at that point that maybe he had the
4  wrong guy.  He viewed a second lineup and picked Mr. Rivera
5  again.  Had a conversation with a white-haired lady where he
6  tried to say it was wrong, but couldn't identify the woman as
7  a police officer, a lawyer, describes her as carrying a
8  Redweld.

9          The reference in the courtroom seems to be like he's
10 referring to, like, lawyers, you know, carry Redwelds.  He
11 wasn't even sure who it was that he tried to say it was wrong;
12 but in any event, viewed the second lineup.  They said to him
13 in response to the wrong comment don't be afraid, we'll
14 protect you, and then he views the lineup again and picks
15 Rivera and then knowingly testifies in court that it was a
16 lie.

17          He's adamant no police officer coerced him.  This is
18 all in the post-conviction.  He's adamant that nobody
19 threatened him.  They didn't tell him who to pick.  You know,
20 from our perspective, you know, we disagree whether or not
21 there was a first lineup or not.  We intend to probe that.  I
22 don't know that I'd call it a cross-examination.  I want more
23 detail about what he's saying.  It's not clear.  But I don't
24 think we intend -- I mean his testimony is I knowingly lied,
25 okay?

1          Well, I mean, if that's what happened, then that's

2    what happened, and I don't think we're going to say no you

3    didn't.

4          THE COURT:  Who put him on in the post-conviction?

5          MR. LOEVY:  We did.

6          MR. BOWMAN:  And, your Honor, he's our witness.

7          MR. GIVEN:  And, your Honor, let me also just add

8    with regard to the cross-examination question, which I would

9    not characterize what we intend to do as cross-examining him

10   at all.

11         Mr. -- from what we know, Mr. Lopez was first

12   contacted by a representative of Northwestern in February

13   of 2010, I believe.  Then from 2 --

14         THE COURT:  Does that all come in?  Kind of how he

15   became a witness who recanted?  Is that part of the trial in

16   this case?

17         MR. BOWMAN:  Well, you know, there -- in our

18   experience, there have been in the past occasions where that's

19   been an issue.  You know, whether it becomes an issue --

20         THE COURT:  You mean made an issue by the defendants,

21   or it's an issue that you want to put out there?

22         MR. BOWMAN:  It's not -- it may -- you know, I don't

23   know how this is going to play out, your Honor.  It may be

24   important for us to tell that piece as part of what we would

25   see as our presentation of this witness who is most definitely

1   our witness.

2          THE COURT:  Yeah.

3          MR. BOWMAN:  This guy is very clear that he recanted

4   his -- I mean, there is some murkiness about the lineups and

5   the photo arrays and so forth and so on, and each side has its

6   views on that.  Our view is that he supports our position that

7   there was a fabrication here and a concealment of a lineup.

8   But putting that aside --

9          THE COURT:  Yes.

10         MR. BOWMAN:  -- and just focusing on what's

11   undeniable, he tells the white-haired lady and a mustached

12   police officer, who, you know, Guevara has a mustache, that

13   his identification of our client was wrong.  He tells them

14   that undeniably, and that --

15         THE COURT:  And that's in the post-conviction.

16         MR. BOWMAN:  -- fact is not revealed, and all of this

17   is testified about at the post-conviction.

18         MR. GIVEN:  Judge, may I, please?

19         THE COURT:  You may.

20         MR. GIVEN:  Number one, what he just told you is not

21   true.  Mr. Lopez did not say he also told the mustachioed man.

22   He said I told the silver-haired lady, and then I saw her go

23   off and talk to somebody, and I don't know what they talked

24   about.

25         But more importantly to the point of this

1 │ cross-examination and the nature of the background of our
2 │ desire to question Mr. Lopez.
3 │ So they find him in February of 2010.  From February
4 │ of 2010 through June of 2010, we don't know how many times
5 │ they get together and talk with him, but we do know in June
6 │ of 2010 they come up with an affidavit that they used in the
7 │ post-conviction.  Mr. Lopez signs an affidavit that is part of
8 │ the post-conviction proceedings.
9 │ Then we don't know how many times they talked to
10 │ Mr. Lopez from the point of the affidavit to the point in time
11 │ when they fly him out for the post-conviction hearing --
12 │ THE COURT:  Right.
13 │ MR. GIVEN:  -- which they put him on.  They had an
14 │ opportunity to examine him for whatever amount of time that
15 │ they want, under oath, and they do that.
16 │ We, on the other hand, win.  So now this case comes
17 │ up.  I reach out -- I'm told that Mr. Lopez is represented by
18 │ counsel, so -- and they gave me the wrong contact information,
19 │ but I find her anyway.
20 │ So I talk to her and I ask can we have a chance just
21 │ to talk to Mr. Lopez?  She says absolutely not.  He's tired of
22 │ everything.
23 │ I said, well, my client never had a chance to talk to
24 │ him, formally or informally.  She says, well, I won't agree to
25 │ an in -- I said, okay, fine.  I'd like to then work on taking

1  his deposition.

2         She said, well, I'm going to fight your deposition.

3         I said, well, I hope that doesn't come to that, but

4  I'm going to try to cooperate with you.  We'll take his --

5  where would you like his deposition?  Would you like it in

6  Columbus?  Would you like it in Cleveland?  She tells me in

7  Cleveland.

8         THE COURT:  Right.

9         MR. GIVEN:  I issue the subpoena and, by the way,

10 this notion that there was a manic race is just absurd; and by

11 the way, once I did serve the subpoena in January, it wasn't

12 until last week that they came out with this, oh, well, we

13 need to depose him first.  It was always can you give me a

14 date that works for you?  And they said, sure, we'll get back

15 to you and never did.

16         So when you talk about cross-examining, the truth is

17 I want to interview this man because I don't know so many

18 things about what he has done, what he said, at the different

19 times that he said it.  I don't know about his interactions

20 with the plaintiffs, now plaintiffs in the case, so I don't

21 view it as a cross-examination at all, and he's as important

22 to our case as he is to theirs.

23         MR. BOWMAN:  But, but, your Honor, he is -- he is

24 going to be called.  If he is available, if he will come, he

25 is going to be called in our case.  We are the plaintiff.  We

1  have the burden of proof.

2      THE COURT:  Yeah, I know about the burden.  I'm

3  concerned about the burden.  What do you want to say?

4      MS. ROSEN:  The only thing I want to add, Judge, is,

5  you know, Mr. Given raised the point this subpoena was issued

6  and served in January, and we were -- the date that we

7  selected was inconvenient for Mr. Lopez.  We reached out to

8  plaintiff's counsel and asked them to provide us a date.

9      They did not say at that time no, he's our witness.

10  We think we should go first.  None of that conversation was

11  had.  We repeatedly asked for dates, and it wasn't until last

12  week, now six weeks or eight weeks later, that this issue

13  comes up.

14      You know, the rules, we noticed him, we subpoenaed

15  him.  I've never had a scenario where, you know, a couple

16  months after a subpoena gets served, the other side says,

17  well, it's our witness and we get to go first.

18      THE COURT:  Yeah.

19      MS. ROSEN:  Now, I appreciate that, you know, there's

20  a possibility that he's not going to come to trial and there's

21  the concern about how the evidence gets presented; but in

22  federal court, we don't have evidence depositions.  They're

23  all for one.  We read deposition transcripts in all the time.

24  We make video presentations all the time.  Nobody wants it to

25  be disjointed.

1       Like Mr. Givens said, we're not interested in

2   cross-examining him.  We want his story, and we don't have his

3   story in full.

4       THE COURT:  Okay.  Here's what I'm going to do.  I

5   really appreciate what you're saying, if I thought this man

6   was going to come to testify, I wouldn't -- I would have no --

7   there would be no issue here, okay?  You would get to do your

8   job.

9       You noticed it up.  It is kind of a first come, first

10  serve in this world, but I am really concerned that they have

11  the burden, okay, and he is going to be probably the most

12  important witness in the case.

13      I mean, you guys all have dogs in the fight, and so

14  your -- your client and your clients, whoever the jury likes

15  and believes is going to be obviously very significant; but

16  this is the only third-party person who's going to come in and

17  say anything.

18      I appreciate your presentation, Mr. Given, but when I

19  hear you talking, I hear you wanting to -- I know you don't

20  want to go after Mr. Lopez, I mean, I'm sure you're going to

21  treat him with all respect, but I do hear you wanting to cast

22  some suspicion on how they found him in February and then

23  somehow they came up with an affidavit --

24      MR. GIVEN:  Judge, that's not true at all.

25      THE COURT:  -- in June.

1          MR. GIVEN:  That is not true at all.

2          THE COURT:  So let me just -- so I'm going to do

3     this.  I'm going to allow you to present him as your witness,

4     okay?  I'm going to allow you to go first, but they get every

5     opportunity to have him as a witness at trial.

6          I mean, I can't -- I'm not -- you don't get

7     six-and-a-half hours and then get 45 minutes at the end.

8     That's not happening.

9          So I would be -- you know, I would like to split it

10    pretty even.  I would like it to be five and five.  That's

11    really arduous for the witness.  And I'm sure this

12    Ms. Whatever her name is is going to have a fit, and she has

13    every right to.  I'd rather keep it four and four.

14         MR. BOWMAN:  We can live with three-and-a-half and

15    three-and-a-half, Judge.

16         THE COURT:  Can you live with three-and-a-half and

17    three-and-a-half?  Because I don't want to draw a motion to

18    quash from her, but I want you guys to each have your

19    opportunity.  You absolutely have a right to that, and I hope

20    that you can let them lay out that story and then you can go

21    in and fill in those holes.

22         MS. ROSEN:  Well, your Honor, can I interrupt for

23    just a second?

24         THE COURT:  Yes.

25         MS. ROSEN:  If the basis of your ruling is because

1  this is going to be trial presentation, then their questioning

2  has to be direct questions.  They can't lead him through the

3  story because they wouldn't be allowed to lead him through the

4  story in front of a jury.

5          THE COURT:  Well, do you -- I mean, aren't we in a

6  situation where this has to be trial testimony?  I mean, I'm

7  not ruling that it's trial testimony, but I'm being told that

8  this is it.  This guy doesn't want to cooperate, and we --

9  he's going to have to be in the courtroom somehow.

10         MS. ROSEN:  Well, I don't know that that's -- I don't

11  know that -- A, I don't know that that's definitive that he's

12  not coming.

13         THE COURT:  Okay.

14         MS. ROSEN:  But if the premise of your ruling is

15  you're concerned that he's not coming and that the jury needs

16  to hear a coherent story, then this deposition has to be taken

17  that way, and they should not be allowed to lead him through

18  it.  Then they should ask like --

19         THE COURT:  Do you hear her?

20         MS. ROSEN:  -- a trial presentation.

21         MR. LOEVY:  We are aware of the rules of evidence.

22  You know, there are rules governing depositions.  There are

23  rules governing testimony, and we will certainly do it in a

24  way that we believe will be admissible at trial.

25         MR. GIVEN:  Which doesn't answer the question, Judge.

1        In fact, they cite Judge Kendall, which was a

2   somewhat inapposite situation, but Judge Kendall even told

3   them in the case that they cited in their brief that they

4   could not ask leading questions.  Very simple, no leading

5   questions, not what Mr. Loevy said.

6        THE COURT:  Wait, I thought they cited Judge Valdez?

7        MR. BOWMAN:  Yeah, and she said no such thing.

8        MR. GIVEN:  Okay.  Well, in fact, then let me go back

9   because this -- this notion of this race, our respective

10  offices, this is now the --

11       THE COURT:  I don't care about -- I don't care about

12  the race, Mr. Given.  I mean, I really -- I appreciate that

13  you guys are really passionate about this case.  I'm just

14  trying to treat Mr. Lopez with respect and also preserve the

15  testimony for a jury that's going to have a really hotly

16  contested dispute to resolve, okay?

17       So I just want to be, you know, one of the reasons I

18  got out of litigating myself is because I got sick of that

19  kind of stuff, so I'm really -- I don't need to hear anything

20  more about it.

21       MR. GIVEN:  Okay.

22       THE COURT:  I want you all to kind of inject a little

23  more professionalism back into your communications just

24  because I can tell things are getting very hot, and that's

25  okay, but it's not -- none of that is going to make any

1   difference to me, okay?  I just want this testimony to come

2   out in as coherent a fashion as it can come out for the jury,

3   for both of your people, for both of your clients.

4          Go ahead.  I know you want to say something.

5          MS. ROSEN:  I just want to be clear on whether or

6   not they -- it's clear to them that they have to elicit the

7   testimony in the way that they would be required to elicit the

8   testimony in court.

9          THE COURT:  Well, I will tell you if you come in with

10  a video where that isn't happening, you're not going to get to

11  introduce it, so, I mean, you live with your -- you know, make

12  your bed and you lay in it.  And I don't know who's the judge?

13  Gottschall?

14         I mean, she's not going to let you bring in a story

15  that's leading.  She's just not going to let you do that.

16  She's a very experienced trial judge.  So you'd be stupid to

17  do that, but take that at your own risk.

18         MR. LOEVY:  Exactly.

19         THE COURT:  So here's the order:  I'm going to allow

20  the plaintiff's counsel to go first.  I'm going to limit him

21  to half of the time, okay?  Him or her.  We seem to be hims.

22         If you -- if the witness agrees to eight hours and

23  you go four and four, that's fine.  If the witness won't agree

24  and you go seven hours, I mean it's three-and-a-half and

25  three-and-a-half, whatever it is.  You get half the time, and

1   you get half the time, okay?

2        If you can get him to ten hours, that's fine with me,

3   I mean, but that's got to be fine with him obviously.

4        Do you need anything else?

5        Mr. Given, do you want to say anything?  Because you

6   look really irritated.

7        MR. GIVEN:  No, I'm -- I'm curious -- the problem is

8   this is an ongoing thing between our offices, not just in this

9   case -- and by the way, your Honor, I think we've been very

10   professional in dealing with our disagreements on this.

11        One of my frustrations is throughout over the course

12   of three or four different cases now, the plaintiffs' lawyers

13   keep telling us, well, it's not notice of deposition that

14   counts, it's service of deposition, and the subpoena.

15        So we serve a subpoena, and then they say, well, no,

16   that actually it doesn't count either, so what I was -- what I

17   was ultimately going for was thinking about asking your

18   Honor --

19        THE COURT:  Yeah.

20        MR. GIVEN:  -- was in moving forward in this case and

21   other cases, I'm struggling to know now what defines when it's

22   my dep versus their dep?  Do I have to call them up and say,

23   by the way, I'm thinking of issuing a subpoena for a witness

24   but I want to know if you think it's your witness or he's more

25   your witness than my witness?

1      Because honestly, Judge, there's a lot Mr. Lopez says
2   I actually would like to see bolstered.  The fact that he says
3   in the PC that officers did not coerce him, force him, suggest
4   to him or anything else, that's very helpful for us.
5           THE COURT:  Yeah, of course.
6           MR. GIVEN:  So I don't want to attack him at all.  I
7   want him to tell his story again truthfully and so this -- I
8   don't know going forward how, in light of today, what I'm
9   supposed to do in issuing subpoenas anymore and whose dep --
10          THE COURT:  Well, I think --
11          MR. LOEVY:  Can I speak?
12          THE COURT:  Of course, there's nothing -- I'm going
13  to let you speak in a minute.  There's nothing I can say about
14  your other cases, obviously.
15          I will tell you I think this is a very peculiar or
16  unique set of circumstances, okay?  I mean generally witnesses
17  are pretty clearly defined whose side of the aisle they're
18  sitting on, so I hope this particular issue isn't coming up in
19  all five of your cases or four of your cases.
20          It's not up to Mr. Loevy, I mean, whatever he says
21  about, well, the deposition, the notice rules or the subpoena
22  rules, really not his decision, so I wouldn't -- I wouldn't
23  give that much weight.
24          I think we have a particular circumstance, and I'm
25  telling you if I thought this was a witness who was just

1    coming here, you know, and you guys were doing pretrial prep,

2    dep, you know, discovery kind of thing, I would not be ruling

3    this way, okay?

4           But I think this is significant because you have very

5    strong message from the counsel that this guy wants to be done

6    with this, and he does not want to be bothered with this and

7    we, as a court, don't have power to drag him here.  Much my

8    preference to drag him here if I could.

9           So I hope that this ruling doesn't impact any of your

10   other interactions in other cases.  I think it's a pretty

11   narrow set of circumstances.

12          Mr. Loevy, do you want to say something?

13          MR. LOEVY:  Only if Mr. Given would like to talk

14   about other cases, you know, we have a different view on what

15   he's saying.

16          THE COURT:  No, I don't want to hear about other

17   cases.

18          MR. LOEVY:  All right.

19          THE COURT:  I mean, that's just not -- I don't need

20   to hear that.

21          Okay.  I'm kind of hoping that the thing we talked

22   about last time got worked out.

23          MS. ROSEN:  It's in the process, Judge.

24          THE COURT:  Okay.

25          MS. ROSEN:  There is -- I've gone back to my client,

22

1    and the only way to determine what lineup reports were
2    prepared at any point in time prior to 1996 or so, it requires
3    a manual hand search through all of those files because none
4    of it's put on computer --
5             THE COURT:  Yeah, of course.
6             MS. ROSEN:  -- until '96 or so.
7             So we had discussions about that.  That was my
8    suspicion.  It's now been pretty much confirmed that that's
9    the case.
10            We had discussions last week about it.  In those
11   discussions when we talked about the universe of files that we
12   were going to pull to look at, plaintiff said that whatever
13   universe we agreed to, whether it be by category or time, that
14   that would be it.  So if we agreed to, say, a two-year period
15   of time, we find, you know, one report or none report or ten
16   reports, that's it, defendants couldn't go beyond that because
17   that was the agreement that we reached, and we'd all have to
18   live with what we found.
19            Based on that representation, I have done a little
20   more investigating into this issue sort of more globally to
21   try and ascertain what information is out there about the
22   percentages that occur in research about filler
23   identifications to try and figure out what's a fair --
24            THE COURT:  Sample.
25            MS. ROSEN:  -- sample.

1          Now, there is this issue, though, Judge.  Originally,

2    right, we came here on our motion for protective order to --

3          THE COURT:  Yes.

4          MS. ROSEN:  -- to strike the requests to admit, and

5    then there was some interrogatories propounded on the topic of

6    production, and the way that that was all styled at that time

7    was produce any report within the 20 years of 1988.

8          Now through discussions that we've been having so

9    that I can figure out what we'd be willing to agree to, even

10   if we were to find a report where a filler was identified, now

11   I'm being told, well, we take the position that there should

12   have been more, so one is not enough.

13         And we'd be free to argue in that scenario that, you

14   know, if you do a hundred lineups, we expect that 10 percent

15   should be filler identification, so if you don't come up with

16   10 percent, then we're going to argue there's a flaw in your

17   practice.

18         If that's where we're going, and that's not how I

19   understood the discovery on the front end, but if that's where

20   we're going, then that sort of changes what I'm willing to

21   agree to because that's a different kind of inquiry.

22         THE COURT:  Okay.  I'm regretting I asked, but go

23   ahead.

24         MR. LOEVY:  Thank you, your Honor.

25         From plaintiff's perspective, it's obviously a very

1  important issue in the case.  The issue that you identified

2  with Mr. Lopez was whether there was a first lineup where he

3  picked the wrong guy.  We believe what the evidence is going

4  to show is when they did lineups and the suspect picked the

5  wrong guy, they didn't document it.

6          THE COURT:  I know your theory.

7          MR. LOEVY:  So what we intend to do is take a sample

8  of a time period, and we're frankly prepared to do out toward

9  infinity at our expense.  For example, if this happened in

10  1988, we proposed to them how about if we look at '88, '87 and

11  '86.

12          There's only 5 to 800 murders in any given year, so

13  it's a finite amount of data.  It would take, you know, days,

14  but probably not weeks, to review those murder files.

15          THE COURT:  They have law students, you know.

16          MR. LOEVY:  Exactly.  We've got an army of

17  assistants.  But in a matter of days, but not weeks, we could

18  review a given year and say you know what?  Was it 800

19  murders?  A quarter--

20          THE COURT:  Well, this seems like a trial issue.  I

21  mean, you're going to have what you have, right?  And they're

22  going to argue to the jury this is ridiculous.  You know, they

23  should have had more filler IDs than they have.

24          And you're going to argue to the jury no, this is the

25  national average or whatever evidence you're going to present.

1  I don't know that this is a discovery issue.

2          MS. ROSEN:  No, but it dictates this notion of, you

3  know, how far we look, right?  Because there's going to be --

4  if it's 800 homicides in a year, not all 800 have lineups,

5  so --

6          THE COURT:  Right.

7          MS. ROSEN:  Let's say you only have -- out of that

8  800, you only have 400 lineups.

9          THE COURT:  But that's all coming in.  We looked at

10  400 files.

11          MS. ROSEN:  Right, but on any given year, like in

12  year 1988, you can have two filler reports, let's say.  In

13  1987, you can have 20.  In 1986, you could have ten.

14          If they're going to take the position that the

15  percentage should be higher, then just the averages dictate to

16  me how far I need to look.  That's the question.

17          The question is how far do I need to look?  And I'm

18  not prepared, as we stand here today, to say I'm going to

19  agree to two years without knowing more about what the rates

20  are and the variables.  That's all I'm saying.

21          MR. LOEVY:  And here's our point.  In response,

22  though, we should agree before we start doing the

23  investigation.  Let's say we've started with a two-year period

24  and it broke our way.

25          Let's say in that two-year period there was two

1    fillers, and we have social science that says, hey, they
2    should do fillers at almost the same rate as they do real
3    ones.  And the defendants say, well, boy, this one didn't play
4    well for us, let's go back two more years.  And that one
5    doesn't play well for them.  And then they, say you know what?
6    We want to keep going.  Oh, five years ago, there was a whole
7    bunch of fillers.  Now we like that universe.
8            We want to avoid that scenario.  We are willing to be
9    flexible about the time period chosen as long as it's done
10   blind.  We want it to be -- them to have a unilateral option
11   to say, boy, we'd like them to roll the dice again, so --
12           THE COURT:  Well, I feel like you're getting a lot
13   because you're getting to dig into these files, okay?  I'll
14   just tell you, even though I'm not supposed to give advisory
15   opinions, and I'm probably way out of my -- but if they come
16   back to me and say we, the City, want to go through another
17   hundred files, am I really going to not let them do that?  No,
18   I'm not.
19           MR. LOEVY:  Can we have the right?
20           THE COURT:  I mean, I'm just warning you that if you
21   guys agree to two years, which, I don't know, seems sensible
22   or you agree to three years and they come back -- they're
23   fighting the burden of it -- they come back and say, gee, we
24   want to take on more burden and look at two more years --
25           MR. LOEVY:  What if they said --

1       THE COURT:  -- does it sound like I'm going to say

2   no, you can't do that?  It's their files.

3       MR. LOEVY:  What if they didn't even ask you, your

4   Honor?  What if they said the two years broke reasonably well

5   our year -- our way.  They're going to unilaterally look at

6   two years before that, decide whether they want to disclose it

7   or not and say you know what?  This makes our hand better.

8   Plaintiffs, we'll disclose it.  If it makes their hand worse,

9   they don't disclose it.

10       THE COURT:  Well, I don't -- I'm not worried about --

11   if they do that, then I'm going to be mad.

12       MR. LOEVY:  All right.

13       THE COURT:  But I don't think they're going to do

14   that.  I think they're going to talk to you and try to work

15   out an agreement, and they need your law students.

16       MR. LOEVY:  Well --

17       THE COURT:  She's not spending whatever she's paid an

18   hour looking through these files, so I'm not worried about

19   that, but I'm not going to say -- you're not even asking me to

20   rule, so I should shut my mouth, but I don't feel like you

21   guys agreed to two rules and that's it, set in stone from now

22   to eternity.

23       If they want to go further, going further is a

24   benefit to them, I mean, it may be.  It may not be.  Going for

25   them might hurt them more, but if they want to go further,

1 | it's their files.

2 | MR. LOEVY: Can we go further if we don't like the
3 | two years?

4 | MS. ROSEN: No one's -- let me just be clear right
5 | now. We haven't agreed -- I haven't agreed to anything.

6 | THE COURT: Yeah, I understand.

7 | MS. ROSEN: So, you know, but we're just trying to
8 | get all the ground rules here because they --

9 | THE COURT: I mean, it's their burden objection. So
10 | when you say to me can we go further, that's a different
11 | equation.

12 | MR. BOWMAN: Well, Judge, I think the principal
13 | concern is that there be transparency.

14 | THE COURT: Of course.

15 | MR. BOWMAN: And if there -- if they decide to go
16 | look at, you know, a hundred more files, we want to know up
17 | front that that decision --

18 | THE COURT: That seems fair to me.

19 | MR. BOWMAN: -- actually been made.

20 | MR. LOEVY: That's what I'm saying to me.

21 | MS. ROSEN: Your Honor, I've never said that I would
22 | go looking at files -- I don't even -- I mean, as we sit here
23 | now, we're going to have to come up with a list of all the
24 | homicide files --

25 | THE COURT: Yeah.

1     MS. ROSEN:  -- in a given year.  They're going to

2  know what files there are.

3     THE COURT:  Well, that seems fair to me.  So if you

4  guys agree to two years or three years or whatever it is and

5  you're not happy with the results, whatever side, you know,

6  you're going to talk about that.  You're not going to go

7  behind closed doors and look at another year and then pop up

8  and say, oh, by the way, we did another year.

9     But I'm not going to bind them to whatever they

10  agreed to out of the box, but there should be transparency in

11  the process.  But they're going to need your help anyways.

12  They're not -- they don't have the person power to go and do

13  that without you, I would think.

14     Okay.  I'm not going to ask any more.  Good-bye.

15     Should I set a status, or will you just notice up a

16  motion?

17     MR. BOWMAN:  We'll find our way back.

18     THE COURT:  Okay.  I'll see you.

19     MR. LOEVY:  Thank you.

20     THE COURT:  See you in the spring.  Good luck.
   (Which were all the proceedings heard.)
21                     CERTIFICATE
   I certify that the foregoing is a correct transcript from
22  the digital recording of proceedings in the above-entitled
   matter to the best of my ability, given the limitations of
23  using a digital-recording system.

24  /s/Kathleen M. Fennell          April 12, 2013
   _____    _____
25  Kathleen M. Fennell              Date
   Official Court Reporter

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 5.1.1
### Eastern Division

Jacques Rivera

                Plaintiff,

v.                                 Case No.: 1:12−cv−04428

                                 Honorable Joan B. Gottschall

Reynaldo Guevara, et al.

                Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, March 12, 2013:

       t finds good cause to extend the deposition to 8 hours in this matter. Mailed notice(gel, )MINUTE entry before Honorable Mary M. Rowland: Motion and Status hearing held on 3/12/2013. Defendant's Motion for a Protective Order Quashing Plaintiff's Deposition Subpoena of Orlando Lopez [51] is denied because of lack of standing. Mr. Lopez's deposition to be conducted in Cleveland, Ohio on a mutually agreed date. Deposition to be video taped with expenses of video taping and Court Reporter to be paid by Plaintiff. Because Plaintiff has burden of proof and, at this point, Mr. Lopez is unwilling to appear for trial, Plaintiff will have the first opportunity to question Mr. Lopez. The parties to split the time allowed for the deposition evenly so that Defendants have the same amount of time to question Mr. Lopez. The Cour

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JACQUES RIVERA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) |
| | ) |
| REYNALDO GUEVARA, | ) Case No. 1:12-cv-04428 |
| STEVE GAWRYS, DANIEL NOON, | ) |
| JOHN GUZMAN, JOSEPH FALLON, | ) The Hon. Joan B. Gottschall |
| JOSPEPH SPARKS, PAUL ZACHARIAS, | ) |
| GILLION MCLAUGHLIN, JOHN | ) Magistrate Judge Rowland |
| LEONARD, EDWARD MINGEY, | ) |
| RUSSEL WEINGART, and the ESTATE | ) |
| OF ROCCO RINALDI, Chicago Police | ) |
| Detectives; and the CITY OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' MOTION FOR A PROTECTIVE ORDER QUASHING PLAINTIFF'S**
**DEPOSITION SUBPOENA TO ORLANDO LOPEZ**

Defendants, by and through their undersigned attorneys, pursuant to Federal Rule of Civil

Procedure Rule 26(c), hereby move for the entry of a protective order quashing Plaintiff's

Subpoena for Deposition to witness Orlando Lopez. In support thereof, Defendants state as

follows:

INTRODUCTION

1.      On January 30, 2013, counsel for the Individual Defendants issued a subpoena for

the deposition of Orlando Lopez to take place on February 28, 2013. (Attached as Exhibit A.)

The date was rescheduled at Mr. Lopez's counsel's request. Despite repeated attempts to seek a

mutually agreeable date from Plaintiff's counsel, rather than provide dates Plaintiff's counsel has

now, just today, issued his own deposition subpoena for Mr. Lopez. (Attached as Exhibit B.)

Defendants respectfully request that this Court strike Plaintiff's untimely deposition subpoena

and allow Defendants to proceed with their subpoena.

ARGUMENT

2.      Orlando Lopez is a critical witness in this case.  He was the 12-year old boy who identified Plaintiff as the shooter of Felix Valentin to police and testified at the criminal trial. Lopez has since recanted that identification.   He testified in Plaintiff's post-conviction proceedings that he lied when he identified Plaintiff.  He further testified that his false testimony was <u>not</u> the result of pressure from police, the prosecutor or anybody else.  His recantation led to the decision to vacate Plaintiff's murder conviction and the State not seeking a re-trial.

3.      Appreciating the importance of Mr. Lopez's testimony to the allegations of wrongful conduct alleged against Defendants, once discovery commenced in this action attorneys for the Individual Defendant Officers issued a subpoena on January 30, 2013 for Mr. Lopez's deposition pursuant to F.R.C.P. 45.  (See also, F.R.C.P. 30(b)(a party who wants to depose a person by oral examination must give reasonable written notice to every other party).

4.      Upon receiving the subpoena, Mr. Lopez's attorney contacted Attorney Given and stated that the date on the subpoena for the deposition, February 28, 2013, would not work.  She asked that it be rescheduled to March 15, 2013.  Mr. Given relayed that information to all counsel in this action on February 6, 2013.  (See Email exchange, attached as Exhibit C). Plaintiff's counsel, Locke Bowman was the only one of Plaintiff's eleven attorneys to respond. He indicated first that he couldn't yet commit to March 15, because of other commitments, (see Email attached as Ex. D); then that he had a conflict with that date.  (See Ex. C)

5.      Since then, rather than just arbitrarily picking another date, Attorney Given has made repeated requests for dates from Plaintiff's counsel that would be convenient for the deposition to proceed since it would require the parties travel to Cleveland, Ohio for the

2

deposition. All requests went unanswered. (See Exhibit C) Then, yesterday (March 7, 2013), Mr. Bowman asked that the deposition of Mr. Lopez be discussed along with other matters the parties were addressing in a conference call later that day. (*Id.*)

6.     During that conference call, for the very first time, Plaintiff's counsel indicated that it was their belief that despite the fact that Defendants "won the subpoena race" (thereby acknowledging that Defendants had Mr. Lopez under subpoena) to take the deposition of Mr. Lopez, since Plaintiff intends to call Lopez in his case-in-chief, he is entitled to take the lead on Lopez's deposition. Plaintiff's counsel sought Defendants' agreement in proceeding in this fashion, however Defendants would not agree as there was no authority offered by Plaintiff for proceeding as he suggested. Although Plaintiff's counsel indicated they intended to file a motion on this issue, they instead issued their own alternative subpoena today, (March 7, 2013), for the Lopez's deposition to take place on April 15, 2013.

7.     Upon a motion of a party and a showing of good cause, Federal Rule of Civil Procedure 26(c)(1) authorizes a court to issue a protective order to "protect a party or person from annoyance, embarrassment, oppression, undue burden or expense including…forbidding the disclosure or discovery." Whether to enter a protective order is within the sound discretion of the court, and the predominant question is whether "good cause" exists. *Felling v. Knight*, 211 F.R.D. 552, 554 (S.D.Ind. 2003). To establish good cause a party must submit "a particular and specific demonstration of facts, as distinguished from stereotyped and conclusory statements. *Id.*

8.     Defendants request an Order quashing Plaintiff's subpoena for Mr. Lopez and further order that Defendants' be allowed to proceed with their subpoenaed deposition for Mr. Lopez. Indeed, the Court should adopt one of Plaintiff's counsel's position taken under similar

circumstance in another case, "[i]t seems to us that the only fair way to proceed is to let the party that first properly serves each witness with a deposition subpoena control the deposition of that witness." (January 28, 2013 Steve Art letter, in *Awalt v. Marketti*, 11 C 6142, attached as Exhibit E.)

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Honorable Court grants their Motion for a Protective Order quashing Plaintiff's subpoena to Orlando Lopez for deposition and further order that deposition proceed pursuant to Defendants' subpoena at the earliest mutually agreeable date.

Date: March 7, 2013

Respectfully Submitted,

DEFENDANT CITY OF CHICAGO

*/s/Stacy A. Benjamin*
One of its attorneys
Eileen E. Rosen
Stacy A. Benjamin (06255621)
Erin N. Bybee
ROCK FUSCO & CONNELLY, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60602
312-494-1000

DEFENDANT POLICE OFFICERS

*/s/ Jeffrey N. Given*

James G. Sotos
Elizabeth A. Ekl
Jeffrey N. Given No. 06184989
Elizabeth K. Barton
THE SOTOS LAW FIRM, P.C.
550 East Devon, Suite 150
Itasca, Illinois 60143
(630) 735-3300