IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUAN HERNANDEZ and ROSENDO HERNANDEZ, | ) <br> ) <br> ) Case No. 1:23-CV-1737 <br> ) <br> ) Hon. Judge Jeremy C. Daniel <br> ) <br> ) Magistrate Heather K. McShain <br> ) <br> ) <br> ) |
| PLAINTIFFS, | |
| vs. | |
| REYNALDO GUEVARA, *et al.*, | |
| DEFENDANTS. | |

## DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS' MOTION TO QUASH

Defendants Reynaldo Guevara, Joseph Miedzianowski, Geri Lynn Yanow, as Special Representative of Ernest Halvorsen and Robert DeGraff, deceased, Joel Bemis, Robert Biebel, and the City of Chicago ("Defendants"), by their undersigned attorneys, respond to Plaintiffs' Motion to Quash Defendant Officers' Subpoenas (Dkt. 126) and state:

### INTRODUCTION

Plaintiffs seek to quash Defendants Yanow, Bemis, and Biebel's subpoenas to the Illinois Department of Corrections ("IDOC") for phone recordings and written communications between Plaintiffs and several critical witnesses who Plaintiffs are relying on to demonstrate that they are innocent of, and were framed for, the 1997 murder of Jorge Gonzalez and attempted murder of Juan Carlos Cruz. (*See generally* Dkt. 58, First Am. Compl. ("FAC"); Ex. 1, Defs.' IDOC Subps.)[1] Plaintiffs have demonstrated no legitimate grounds to block this undeniably important discovery.

The underlying criminal investigation—and Plaintiffs' convictions—focused on five witness

---

[1] While Plaintiffs originally objected to the 15 calls (only 9 connected) between Rosendo and Luis Torres, Plaintiffs later withdrew that objection just prior to filing their Motion to Quash. (Ex. 2, 9/17 Email) Thus, only written communications, texts, video visits and videograms are at issue in the subpoena for Rosendo's communications. Plaintiffs are objecting to the entirety of the subpoena for Juan's communications.

identifications that Plaintiffs aver were manipulated by Defendants. (*See generally* FAC.) Yet discovery has so far demonstrated that only one eyewitness—Daniel Violante—contends his identification was mistaken. However, Violante was tampered with during the criminal proceedings by Plaintiffs and their family. (Ex. 3, POC Mot.). Defendants thus require any and all communications between Plaintiffs and Violante to assess the nature, scope, and frequency of their efforts to influence this witness's testimony.

Also, Defendants have subpoenaed all communications between Plaintiffs and eight alibi witnesses that Plaintiffs proffered in their criminal cases and in their Federal Rule of Civil Procedure 26(a) disclosures in this case to support their claims of innocence. In the same vein, Defendants have also subpoenaed Plaintiffs' communications with several witnesses who testified on their behalf during post-conviction proceedings. These include two witnesses who testified for the first time nearly 25 years after Plaintiffs' convictions that the so-called "real killer" was William Vilaro aka "Will Kill," and three others who supported Plaintiffs' new theory that Defendants Guevara, Bemis, and Miedzianowski were part of a criminal enterprise and framed Plaintiffs for Gonzalez's murder.

Finally, Defendants seek phone calls and written communications between Plaintiffs and six disclosed Fed. R. Evid. 404(b) witnesses against Guevara, as well as Juan's non-privileged and relevant communications with Northwestern University's Center on Wrongful Convictions and attorneys Dan Stohr and Greg Swygert who represented Plaintiffs in post-conviction proceedings.

Plaintiffs' motion to quash superficially downplays the communications, describing them as speculative and the subpoenas as a "fishing expedition." (Dkt. 126 at 1.)[2] But that position

---

[2] Plaintiffs misrepresent the *entirety* of the parties 37.2 negotiations. Defendants offered detailed reasons for the calls they requested. (Ex. 4, 6/19 Email.) They then asked Plaintiffs to inform Defendants if there were *any amount* of calls or time frames they would agree to. (Ex. 4, 6/19 Email; Ex. 5, 8/20 Email at 3.) When Plaintiffs failed to provide any proposal for months, Defendants advised Plaintiffs that they intended to issue the subpoenas as-is. (Ex. 5, 8/20 Email.)

2

contradicts well-established authorities, as well as the frequency with which plaintiffs in other cases have had the falsity of serious allegations of official misconduct exposed via recorded prison calls with witnesses, family members, and others with whom they discussed schemes to attribute their criminal convictions to police misconduct. Plaintiffs' position also completely ignores their own history of witness tampering in this very case. The desired communications are entwined with Plaintiffs' allegations of innocence and police misconduct—issues that are not merely relevant but critical to this litigation—and Plaintiffs admitted to discussing those issues on prison calls.

Beyond relevance, Plaintiffs tremendously exaggerate their privacy concerns by proclaiming that Defendants seek a "broad, blanket request for thousands of Plaintiffs' recorded communications while in IDOC custody, without any limitation by subject matter or timeframe." (Dkt. 126 at 2.) Contrary to that severe distortion, Defendants significantly narrowed the scope of their subpoenas to important witnesses with knowledge of the underlying events and/or Guevara's alleged misconduct, amounting to just 377 recorded calls out of a total of 12,852 available. Given the significance of the issues to be investigated outweighs any supposed privacy concerns raised by Plaintiffs, their motion must be denied.

## STANDARD OF REVIEW

Parties may seek discovery that is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In other words, "discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citation omitted). And relevancy is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *TIG Ins. Co. v. Giffin, Winning, Cohen & Bodewes*, No. 00 C 2737, 2001 WL 969037, at

*1 (N.D. Ill. Aug. 24, 2001) (*quoting Oppenheimer Fund, Inc.*, 437 U.S. at 351).

Federal Rule of Civil Procedure 45(a) allows a party to subpoena a non-party to produce documents or other "tangible things" in their possession, custody, or control. Fed. R. Civ. P. 45(a). "The scope of material that may be secured by Subpoena is as broad as that permitted under the discovery rules." *Coleman v. City of Peoria*, No. 15-cv-1100, 2016 WL 3974005, at *3 (C.D. Ill. July 22, 2016) (citations omitted). A party may move to quash or modify a subpoena only if they demonstrate that the information sought implicates a privilege or the party's privacy interests. *Id*. In determining whether to quash a third-party subpoena based on a party's privacy interests, courts weigh the relevance of the information sought with the strength of the privacy interest. *Pursley v. City of Rockford*, No. 18 CV 50040, 2020 WL 1433827, at *2 (N.D. Ill., Dec. 10, 2020).

## ARGUMENT

I. **Plaintiffs' Communications Are Plainly Relevant**

    a. **Plaintiffs' communications are relevant and discoverable.**

Courts routinely hold that recorded jail and prison calls are relevant and discoverable in §1983 litigation. *See, e.g.*, *Russell v. City of Chi.*, No. 20-cv-1163, 2022 WL 294765, at *3 (N.D. Ill. Feb. 1, 2022); *Rodriguez v. City of Chi.*, No. 18-cv-7951, 2021 WL 2206164, at *2–3 (N.D. Ill. June 1, 2021); *Velez v. City of Chi.*, No. 18 C 8144, 2021 WL 3231726, at *2 (N.D. Ill., July 1, 2021); *Prince v. Kato*, No. 18 C 2952, 2020 WL 7698373, at *4 (N.D. Ill. Dec. 28, 2020). This is particularly true where a plaintiff identifies individuals as witnesses with knowledge of their underlying claims and damages. *See Russell*, 2022 WL 294765, at *3.

Indeed, phone call evidence has been outcome-determinative in numerous §1983 cases. *See, e.g.*, Ex. 6, *Harris v City of Chi.*, 20-cv-04521, Dkt. 58, 59, 62, 95 (N.D. Ill., Mar. 1, 2022) (admission in jail recorded calls led to withdrawal of plaintiff's counsel and, in part, grant of summary judgment); *Bishop v. White*, No. 16 C 6040, 2023 WL 35157, at *13 (N.D. Ill., Jan 4,

4

2023) (jail call recordings resulted in dismissal of case for plaintiff's "abuse of the litigation process"); *Johnson v. Baltimore Police Dep't*, No. ELH-19-0698, 2022 WL 9976525, at *40 (D. Md., Oct. 14, 2022) (case dismissed as sanction after jail call recordings revealed that plaintiff procured false affidavits and attempted to influence witness testimony); Ex. 7, *Powell v. City of Chi.*, 22-cv-4123, Dkt. 25 (N.D. Ill., July 5, 2023) (voluntary dismissal of lawsuit with prejudice after plaintiff confronted with admissions in jail call recordings); Ex. 8, *Walker v. City of Chi.*, 21-cv-4231, Dkt. 256-1, at *4 (N.D. Ill. Oct. 21, 2023) (prison calls revealed Walker engaged in witness tampering with key witnesses).³

Here, Plaintiffs claim that Defendants framed them for the Gonzalez murder and Cruz attempt murder, and that they manipulated witnesses to falsely identifying them. (*See generally* FAC.) In support, they have disclosed **over 200 witnesses**, (Ex. 9, Pls.' 26(a) Discl.), many who appear in Juan's IDOC records on his Inmate Telephone Number List Requests. (*Compare* Ex. 9 with Ex. 10, PAN List.) And many of these witnesses testified at Plaintiffs' trials and/or signed sworn affidavits—produced in this case and during post-conviction proceedings. (*See, e.g.*, Ex. 11, Affs. of Fields, Pacheco, Bandomo, Rock, Gutierrez, Cabrera, Suastegui, and Vasquez; Ex. 12, Trial Test., *People v. Rosendo Hernandez*, Torres, Lopez, and Pinkston; Ex. 13, Trial Test., *People v. Juan Hernandez*, Solis and Solia; Ex. 14 Sopron Letter.)

Plaintiffs also stated in responses to interrogatories about conversations they had about the underlying events and damages:

> Plaintiff responds that he has spoken to many different people over the years, including his parents and siblings, and his criminal, post-conviction and civil attorneys, about his wrongful conviction, his innocence of the crime, and the impact of his wrongful conviction, including during his 25 years of wrongful incarceration. He cannot tally up or identify with any specificity each such conversation with each such person.

---

³ *Walker* also involved written correspondence that provided evidence of witness tampering.

(Ex. 15, Pls.' Am. Interrog.) Defendants are not speculating that the communications have relevant information. Rather, Plaintiffs' admissions to freely discussing this case with numerous people show that the subpoenaed communications have information about their claims of innocence, their interactions with Defendants, and their claimed damages. *See Russell*, 2022 WL 294765, at *3 (finding Russell's identification of individuals as witnesses who have knowledge of his claims and defenses, coupled with admissions to speaking with them during his incarceration weighed in favor of disclosure). Thus, the communications are indisputably relevant.

    b. **Plaintiffs have a history of witness tampering.**

Further, Defendants' concerns about witness tampering are well-founded and a review of Plaintiffs' communications with witnesses will yield key information.

In 1998, Plaintiffs were members of the Spanish Cobras street gang. Daniel Violante on the other hand was a member of a rival gang, the Maniac Latin Disciples ("MLD"). At the same time Plaintiffs were incarcerated and awaiting trial for Gonzalez's murder, a high-ranking MLD, Oscar Soto, was incarcerated for the murder of a Cobra. To get charges dropped against Plaintiffs, their parents Esther and Rosendo Sr., conspired with Sheila Soto—the mother of Oscar Soto—to obtain recantations from the witnesses in Plaintiffs' and Soto's cases. (Ex. 3, POC Mtn. at 2.)

As part of this conspiracy, Violante—the only eyewitness to recant here—was ordered by two members of his own gang to sign an affidavit stating his initial statements to police were untrue. (*Id.* at 2.) Violante understood that in exchange for his recantation, recant affidavits would be obtained from the witnesses against Soto. (*Id.*)[4] Given this history, Defendants are entitled to discover Plaintiffs' communications with the key witnesses in this case.

---

[4] In addition to Violante, there is evidence that MLDs went to the Gonzalez's family home to try to intimidate witnesses Maribel and Jesus Gonzalez into changing their testimony. (Ex. 16, Memo.)

### c. Defendants have a particularized need for the calls they seek.

Defendants dramatically narrowed their request to only communications with witnesses having the *utmost* relevance to this case. And as demonstrated below, Plaintiffs' claim that many of these witnesses have ***no relationship*** to the facts or circumstances of this case is utter sophistry.

### 1. Witnesses with knowledge of the underlying case.

It is well-established that communications with witnesses with knowledge of Plaintiffs' claims are highly relevant and discoverable. *See Russell*, 2022 WL 294765, at *3 (Russell's own "identification of these individuals as people who possess discoverable information indicates that his recorded conversations with them are likely relevant."). Here, Defendants' subpoenas request Plaintiffs' communications with 14 witnesses with knowledge of Plaintiffs' underlying claims:

> **[1]** Daniel Violante was with Gonzalez and his family on the day Jorge was murdered. (*See e.g.* Ex. 17, Violante Trial Test.) Violante told police that Plaintiffs were the shooters. (*Id.*) At the behest of Plaintiffs' family, gang members intimidated Violante into executing a recant affidavit. (Ex. 3, POC Mtn.; Ex. 18, Cert. Stmt. Conv. Rosendo & Esther Hernandez.) After the witness intimidation came to light, Violante evoked the signed affidavit and testified consistently with his statements to police at Plaintiffs' criminal trials that Plaintiffs were the shooters. (Ex. 17, Violante Trial Test.) About 25 years later, he testified during post-conviction proceedings that Plaintiffs were not the shooters. (Ex. 19, Violante PC Testimony.)
>
> **[2]** Abraham Gutierrez testified in Juan's criminal trial about his "tense" relationship with Plaintiffs and signed multiple affidavits in 2000 and 2013 to the effect that two Chicago Police Officers forced him to act as an informant against Plaintiffs, which led to Plaintiffs' insertion into the investigation. (Ex. 11.)
>
> **[3]** Manuel Suastegui testified in Plaintiffs' post-conviction proceedings and signed an affidavit in 2022 claiming that, while incarcerated at Dixon Correctional Center, Manuel and Juan discussed allegations that they were both framed by Guevara, and that there was an overlap of witnesses in their cases. (Ex. 11).
>
> **[4]** Eddie Cabrera, a fellow Cobra, was Juan's cellmate at one point, and a witness for the prosecution in the witness tampering case against Juan's parents. He provided an affidavit in 2021 and testified at Juan's post-conviction hearing that the police produced a false letter with Cabrera's fake signature and that he had no knowledge of witness tampering. (Ex. 11.)

7

**[5]** Rosa and **[6]** Sophia Solis gave statements to police in the underlying investigation and testified at Juan's criminal trial about his purported alibi. (Ex. 13.)

**[7]** Jeanine Gomolinski, the manager of Kraft Bowl on the night of the murder, was listed as a potential alibi witness in Rosendo's criminal trial. Rosendo later claimed ineffective assistance of counsel because of his defense attorney's failure to call her as a witness.

**[8]** Luis Torres and **[9]** Carlos Lopez were fellow Cobras who testified at Rosendo's trial about his purported alibi. (Ex. 12.)

**[10]** Valerie Pinkston testified at Rosendo's criminal trial about his purported alibi. (Ex. 12.)

**[11]** Jennifer Pinkston signed an affidavit in 2000 attesting to Rosendo's alibi. (Ex. 11.)

**[12]** Desiree Bandomo *née* Dones and **[13]** Nelson Pacheco testified at Plaintiffs' post-conviction hearing that they picked up William Vilaro near the crime scene around the time of the Gonzalez murder, and that he was acting frantic and claiming he had just shot an MLD. (Ex. 11.)

**[14]** Alexandria Dones is believed to be related to Desiree and dated Juan before his incarceration, and "maintained a friendship [with him] as he tried to cope in a prison environment," so she likely also knows about this "real killer" and discussed this theory with Juan. (Dkt. 126 at 8.) (Ex. 11.)

Plaintiffs have asserted in their 26(a) disclosures that 10 of these 14 witnesses "may have information about the police investigation . . . witness interviews, lineups, and false documents implicating Plaintiffs in the crimes, Plaintiff's criminal proceedings and the Defendants' misconduct."[5] (Ex. 9, Pls.' 26(a) Discl. at 2.) Thus, Defendants are entitled Plaintiffs' communications with these key witnesses. *See, e.g.*, *Russell*, 2022 WL 294765, at *3 (defendants entitled to phone calls with narrow set of key witnesses).

### 2. Witnesses' allegedly having knowledge of Guevara's misconduct.

Defendants' subpoenas also request Plaintiffs' communications with four Rule 404(b)

---

[5] The 10 disclosed witnesses are Violante, Gutierrez, Suastegui, Rosa and Sophia Solis, Torres, Lopez, Pinkston, Bandomo, and Pacheco. (Ex. 9, Pls.' 26(a) Discl. at 2.)

8

witnesses against Guevara: Robert Almodovar, Johnny Flores, William Dorsch, and Sam Perez. Plaintiffs listed these witnesses in their Rule 26(a) disclosures as having knowledge of Defendants' misconduct. (Ex. 9, Pls.' 26(a) Discl.)[6] In addition, two other witnesses, Randy Liebich and Matt Sopron, are individuals that have claimed they were wrongfully convicted, filed similar lawsuits for those convictions, and are represented by the same Plaintiffs' attorneys—Loevy & Loevy.[7]

Plaintiffs' contend that Liebich and Sopron are merely friends that Juan made in prison with no connection to this case. (Dkt. 126 at 8.) But that is belied by the letter Sopron authored in support of Plaintiffs' innocence. (Ex. 14, Sopron Letter.) In that letter, Sopron states that Plaintiffs discussed their case at length with Sopron and that Sopron knew "their story pretty good." (*Id.*) Plaintiffs additionally used the statements of Almodovar, Perez, and Dorsch during post-conviction proceedings in support of their claims of misconduct against Guevara. (*See* Ex. 20, PC Petition.) In addition, Almodovar and Flores filed lawsuits against Guevara alleging similar claims of misconduct as Plaintiffs.[8] Further, Dorsch and Perez have testified against Guevara as 404(b) witnesses. (*See* Ex. 9, Pls.' 26(a) Discl.; Ex. 20, PC Petition.)

Put simply, the *only* connection Plaintiffs have to these witnesses is their shared allegations of their alleged wrongful incarcerations and/or misconduct against Guevara. It is not a question of whether Juan talked about his case with these witnesses, but rather if Juan talked about *anything other than* his case with them.

### 3. Witnesses' knowledge of Guevara and Miedzianowski's alleged conspiracy to extort and frame Juan.

Defendants subpoenaed Plaintiffs' communications with Fred Rock, Sam Perez and Jondalyn

---

[6] IDOC call logs show that Juan had 47 calls with Liebich, 59 with Sopron, 23 with Perez, 5 with Almodovar, and 12 with Flores. While Juan attempted to call Dorsch, there are no "connected" calls, Defendants still seek any written correspondence between Juan and Dorsch.
[7] *Liebech v. DelGiudice*, No. 1:20-cv-02368; *Sopron v. Cassidy*, 19 CV 8254.
[8] *Almodovar v. Guevara*, No. 1:18-cv-02341; *Flores v. Guevara*, 1:23-cv-01736.

9

Fields.[9] Rock and Fields testified and produced affidavits in Plaintiffs' post-conviction proceedings, detailing Juan's dealings with Defendants Guevara, Bemis, and Miedzianowski, and their alleged conspiracy to frame Juan. (Ex. 11.) Plaintiffs also disclosed Perez as having knowledge of this scheme. (Ex. Ex. 9, Pls.' 26(a) Discl.) These are critical witnesses because Plaintiffs allege these dealings provided Guevara with the motive to frame them. (Dkt. 58 at 14.)

### 4. Non-privileged communications with advocates.

Defendants' subpoenaed Juan's communications with Northwestern and attorneys Swygert and Stohr who represented Plaintiffs in post-conviction proceedings. Juan had 82 calls with Northwestern and 10 with Dan Stohr over non-privileged lines. It also requests two recorded calls with Melissa Segura, a journalist who wrote an article on the brothers.[10] These individuals' *only* connection to Plaintiffs are the claims at issue in this litigation. Not only is it probable they discussed this case, but there is a good chance it is the *only* thing they discussed.

## II. Defendants' Subpoenas Are Carefully and Reasonably Tailored to Capture Relevant Communications and thus Proportional to the Needs of the Case.

Defendants narrowly tailored their subpoenas. Before issuing the subpoenas, Defendants subpoenaed IDOC for Plaintiffs' master files, which included call logs that showed that Juan made 12,852 calls to 96 individuals from October 27, 2018, to July 14, 2022. 6,957 of those calls connected and were recorded totaling 1,455 hours and 10 minutes.[11] Defendants then subpoenaed only a sliver of these records—just 377 of Juan's calls with 12 witnesses totaling 77 hours, 30 minutes, and 25 seconds. No matter how the data is sliced, Defendants' requests are narrow.

---

[9] Juan had 123 calls with Fields.
[10] https://www.buzzfeednews.com/article/melissasegura/brothers-allege-they-were-framed-to-protect-police-drug-ring
[11] As noted above, Plaintiffs are not contesting the calls sought by Defendants for Rosendo. (Ex. 2, 9/17 Email Corr.) Therefore, the only portion of the IDOC subpoena at issue for Rosendo is the written communications.



Despite this indisputable data, Plaintiffs wildly misrepresent Defendants' requests. They claim Defendants are seeking 1,065 recordings that cover 25 years amounting to 500 hours of total call time. (Dkt. 126 at 1, 4, 12–13.) Plaintiffs simply cooked the numbers. For instance, they failed to consider that over half of those calls never connected. And while Plaintiffs claim the requests cover 25 years, IDOC's retention period is only 10 years for recorded calls. (Ex. 4, 6/19 Email.)[12]

Plaintiffs also cite four cases[13] to support their argument that quashing Defendants' subpoenas "[are] entirely consistent with repeated rulings in this district quashing the same sort of vastly broad subpoena for recorded prison calls and communications here."[14] (Dkt. 126 at 12.) But in all four of those cases, the defendants requested *all* phone recordings before even obtaining the plaintiff's call logs.[15] That is obviously not the case here, and in general, courts required the defendants to obtain the plaintiff's call logs *first*, and then draft a more particularized subpoena

---

[12] IDOC has also represented that it only retains calls for five years. Defendants are still trying to discern which representation, 10 or 5 years, is correct. If it is 5 years, there will be even less calls at issue.

[13] **[1]** *Simon v. Northwestern*, 15-CV-1433, 2017 WL 66818 (N.D. Ill. Jan. 6, 2017); **[2]** *Pursley*, 2020 WL 1433827; **[3]** Pl. Ex. H, Dkt. 126-8, *Montanez v. Guevara*, No. 17 CV 4560, Dkt. 158 (N.D. Ill. Jan. 7, 2020); **[4]** Pl. Ex. J, Dkt. 126-10, *Ezell v. City of Chi.*, No. 18 CV 1049, Dkt. 230 (N.D. Ill. Sept. 2, 2020).

[14] Plaintiffs cite two other cases that do not bear on this specific matter. Pl. Ex. I, Dkt. 126-9, *Maysonet v. Guevara*, 18 CV 2342, Dkt. 108 (N.D. Ill.) (quashing subpoena requesting plaintiff's *co-defendants' IDOC recordings*, not plaintiff's own IDOC recordings); Ex. 21, *Gonzalez v. Guevara*, No. 22-cv-6496, Dkts. 140, 170 (N.D. Ill.) (permitting the defendants to obtain *some* of plaintiff's phone recordings).

[15] *Simon*, 2017 WL 66818 at *2 (subpoena for *all non-privileged audio tapes of recorded phone calls* during entirety of incarceration.); *Pursley*, 2020 WL 1433827, at *2 (subpoena for all calls during incarceration.); Pl. Ex. J, Dkt. 126-10 *Ezell* (subpoena sought any and all records throughout entirety of incarceration.)

11

*second*.[16]

Here, Defendants followed these courts' guidance. They obtained the call logs and then tailored their requests for recordings between Juan and relevant witnesses. But Plaintiffs keep shifting the goalposts in "steadfast defiance" to any request for recordings contrary to the requirement that the parties negotiate in good faith. *Ezell v. City of Chi.*, No. 18 C 1049, 2020 WL 996518, at *1 (N.D. Ill. Mar. 2020) (internal citations and quotations omitted).

Finally, Plaintiffs admit there are witnesses included in Defendants' subpoenas that are relevant but argue they are "hardly useful because Defendants have not established that there even are any communications between Plaintiffs and most of them." (Dkt 126 at 10.) Of note, IDOC does not keep "logs" of written communications, so there is no way to know these communications exist without first requesting them. And if there are written communications with these witnesses, they would be highly relevant—as Plaintiffs concede. That the records might not exist is not a basis to quash Defendants' subpoenas for Plaintiffs' written communications.

### III. Plaintiffs' Minimal Privacy Interests Are Outweighed by the Need for Discovery

Plaintiffs claim that Defendants' request for communications invade their privacy interests because they only cover Plaintiffs' communications with friends and family about the struggles of incarceration. (Dkt. 126 at 2, 8.) Initially, district courts identify a §1983 plaintiff's privacy interest in recorded jail and/or prison calls as *minimal*. *See, e.g.*, *Pursley*, 2020 WL 1433827, at *2; *Coleman*, 2016 WL 3974005, at *3; *Rodriguez*, 2021WL 2206164, at *2–3. But there can be no legitimate dispute that the privacy interest at stake is indeed minimal given Plaintiffs' concession that they were aware their phone calls were recorded and monitored and that IDOC provides notice

---

[16] *Simon*, 2017 WL 66818 at *2 (subpoena modified to request plaintiff's calls with his counsel and his investigators.); *Pursley*, 2020 WL 1433827, at *4 (defendants permitted to review logs and submit more tailored request.)

to inmates that it screens and monitors all written communications during incarceration.[17]

Next, Plaintiffs' arguments that their communications were limited to the struggles of incarcerated life contradicts their own sworn testimony. In their responses to interrogatories Plaintiffs admit they have "spoken to many different people over the years . . . about [their] wrongful conviction, [their] innocence of the crime, and the impact of [their] wrongful conviction, including during his 25 years of wrongful incarceration." (Ex. 15, Pltfs.' Amend. Inter.) Further, even if Plaintiffs' communications were solely about the difficulties of incarcerated life, this information is discoverable and relevant to the type or extent of harm the Plaintiffs underwent relevant to evaluating their damages.

But to allay Plaintiffs' privacy concerns, Defendants did not request *any* communications between Plaintiffs and their family members. Rather, the request was tailored to specific individuals with knowledge of Plaintiffs' claims. (*Supra* at 7-10.) While there may be irrelevant calls in the targeted net Defendants cast, that does not serve as a basis to prohibit Defendants from obtaining this relevant discovery. *See Coleman*, 2016 WL 3974005, at *4 (relevant phone calls cannot be identified without listening to the recordings); *Velez*, 2021 WL 3231726, at *2 ("The inescapable fact is that litigants often come away empty handed from discovery . . . But the indisputable reality as common-sense dictates is that one can't know which specific items sought will turn out to be significant until they all are produced and reviewed.")

At the end of the day, the analysis is straightforward: as courts hold time and again, the *minimal* privacy interests maintained by Plaintiffs of their recorded calls are far outweighed by the broad scope of discovery and Defendants' particularized need for the calls in this case. *Russell*, 2022 WL 294765, at *3. Given the high level of relevance these witnesses have to this case and

---

[17] https://idoc.illinois.gov/communityresources/electronicmessagingservices.html (stating that "[a]ll messages will be screened and monitored…")

Plaintiffs' history of witness tampering, Defendants' need for the calls between Plaintiffs and the witnesses could not be more particularized or acute. *See Rodriguez*, 2021WL 2206164, at *2–3 (plaintiff's knowledge that calls were monitored, relevance of the witnesses, and tailoring of the subpoena outweighed minimal privacy interest).

### IV. Monitored Calls With Counsel Are Not Privileged

Plaintiffs contend Defendants' subpoenas encompass privileged calls with attorneys Dan Stohr and Greg Swygert. (Dkt. 126 at 14.) Yet, *every* court in this circuit that has considered the issue has held that attorney-client privilege does not apply to *monitored and recorded* calls made while incarcerated. *See, e.g.*, *Pursley*, 2020 WL 1433827, at *4 (attorney-client privilege waived when individuals speak with their attorneys on calls they know are being recorded); *Prince*, 2020 WL 7698373, at *3 (plaintiff waived privilege by knowingly talking with counsel on recorded line.)

Plaintiffs speculate they had "significant difficulty accessing any unrecorded line" because of COVID such that even the recorded communications were privileged. (Dkt. 126 at 15.) But they cite nothing to support this assertion, and "[t]he fact that an unrecorded, confidential conversation was more difficult for Plaintiff to arrange does not mean he lacked access to such a call, or that he faced an insurmountable 'impediment.'" *Bishop*, 2020 WL 6149567, at *8 (internal citation omitted). As a result, this conclusory assertion fails to establish a legitimate justification for quashing Defendants' subpoenas.

### V. Plaintiffs' Burden Arguments Are Unfounded

Plaintiffs' last-ditch effort to quash the subpoenas revolve around claims they are untimely and impose an undue burden. (Dkt. 126 at 12–13.) First, Plaintiffs lack standing to object to a third-party subpoena based on burden. (Ex. 22, *Liebech v. Guevara*, 20-cv-2368, Dkt. 134 ("The burden Rule 45 requires the Court to consider however, is that of the subpoena recipient, not that of the parties to the case."); *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 187 (N.D. Ill. 2013)

14

(burden objections fall on subpoena's recipient).

Second, as argued above, Plaintiffs misrepresent the number of subpoenaed communications. (*Supra* at 10-11.) Third, it is insincere to prevent Defendants from obtaining communications with vital witnesses because of their numerosity when Plaintiffs have produced ***approximately 24,000 pages*** in records related to the underlying case—not including Plaintiffs' production of hundreds of thousands of pages related to *Monell* and 404(b) evidence. Plaintiffs do not get to pick-and-choose evidence that is discoverable simply because it may be unfavorable to them.

Finally, Plaintiffs' misplaced claims that Defendants' subpoenas are untimely or that Defendants' caused delay are not well taken.[18] Because of previous court rulings, Defendants first sought Plaintiffs' call logs to determine what calls may be relevant. After receiving those logs, Defendants served the IDOC subpoenas in question on Plaintiffs on June 6, 2024, *four* months before the close of fact discovery. (Ex. 2, 9/17 Email Corr. at 2.) Plaintiffs objected and requested a 37.2 conference, which was held June 19. (Ex. 4, 6/19 Email Corr.) During the conference, Defendants requested that Plaintiffs inform them of any witnesses or time limits they would agree to. (*Id.*) After this request went unanswered for over two months, Defendants informed Plaintiffs they intended to serve their subpoenas as-is on August 20, 2024, over two months before the close of discovery. (Ex. 5, 8/20 Email Corr.) Plaintiffs did not file their motion to quash until *nearly a month later*. (Dkt. 126.) The simple fact is Defendants diligently pursued this discovery.

## CONCLUSION

For the reasons stated herein, Defendants request this Court deny Plaintiffs' Motion to Quash.

Dated this 9th day of October 2024      Respectfully Submitted,

/s/ Theresa B. Carney      /s/ Allison L. Romelfanger
THRESEA B. CARNEY      ALLISON L. ROMELFANGER, Attorney No.
*One of the Attorneys for the City*      6310033

---

[18] Defendants intend to seek an extension of the discovery deadline and will provide this Court with a detailed analysis of their discovery efforts.

*Of Chicago*

Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
333 West Wacker Dr., 19th FL
Chicago, IL 60606
(312) 494-1000
tcarney@rfclaw.com

/s/Molly Boekeloo
Molly Boekeloo
*One of the Attorneys for Reynaldo Guevara*

Whitney Hutchinson
Steven B. Borkan
Timothy P. Scahill
Graham P. Miller
Misha Itchhaporia
Emily E. Schnidt
Molly Boekeloo
Borkan & Scahill, Ltd
20 S. Clark Street, Suite 1700
Chicago, IL 60603
(312) 580-1030
mboekeloo@borkanscahill.com

*One of the Attorneys for Defendants Geri Yanow, as Special Representative of Ernest Halvorsen deceased and Robert DeGraff deceased, Robert Biebel and Joel Bemis*

James G. Sotos
Josh M. Engquist
Jeffrey R. Kivetz
Allison L. Romelfanger
Kyle T. Christie
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd, Suite 1240A
Chicago, IL 60604
P: (630) 735-3300
aromelfanger@jsotoslaw.com

/s/ Brian Gainer
BRIAN GAINER
*One of the Attorneys for Joseph Miedzianowski*

Brian Gainer
Lisa M. McElroy
Johnson & Bell, Ltd
33 W. Monroe, Suite 2700
Chicago, IL 60603
(312) 372-0770
gainer@jbltd.com

16

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2024, I electronically filed the foregoing **Defendants' Joint Response to Plaintiffs' Motion to Quash** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed in the below service list:

| *Attorneys for Plaintiff* | *Attorneys for Reynaldo Guevara* |
|---|---|
| Steven E. Art | Misha Itchhaporia |
| Anand Swaminathan | Graham P. Miller |
| Sean Starr | Emily E. Schnidt |
| Annie D. Prossnitz | Timothy P. Scahill |
| Jonathan I. Loevy | Steven B. Borkan |
| Arthur R. Loevy | Whitney N. Hutchinson |
| Daniel J. Stohr | Molly Boekeloo |
| Isabella Aguilar | Borkan & Scahill, Ltd |
| Loevy & Loevy | 20 S. Clark Street, Suite 1700 |
| 311 North Aberdeen St, Suite | Chicago, IL 60603 |
| (312)243-5900 | (312)580-1030 |
| steve@loevy.com | mitchhaporia@borkanscahill.com |
| anand@loevy.com | gmiller@borkanscahill.com |
| sean@loevy.com | eschndit@borkanscahill.com |
| prossnitz@loevy.com | tscahill@borkanscahill.com |
| jon@loevy.com | sborkan@borkanscahill.com |
| arthur@loevy.com | whutchinson@borkanscahill.com |
| dan@DanStohr.com | mboekeloo@borkanscahill.com |
| aguilar@loevy.com | |

| *Attorneys for City of Chicago* | *Attorneys for Joseph Miedzianowski* |
|---|---|
| Eileen E. Rosen | Brian P. Gainer |
| Theresa Carney | Lisa M. McElroy |
| Catherine Barber | Johnson & Bell, Ltd |
| Austin Rahe | 33 W. Monroe, Suite 2700 |
| Andrew Grill | Chicago, IL 60603 |
| Jessica Zehner | 312-372-0770 |
| Lauren Ferrise | gainerb@jbltd.com |
| Rock Fusco & Connelly, LLC | mcelroyl@jbltd.com |
| 333 W. Wacker Drive, 19th Floor | |
| Chicago, IL 60606 | |
| (312)494-1000 | |
| erosen@rfclaw.com | /s/ Allison L. Romelfanger |
| tcarney@rfclaw.com | *One of the attorneys for Geri Yanow* |
| cbarber@rfclaw.com | *as Special Representative for Halvorsen & DeGraff,* |
| arahe@rfclaw.com | *deceased, Bemis & Biebel* |
| agrill@rfclaw.com | |
| jzehner@rfclaw.com | |
| lferrise@rfclaw.com | |