IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JUAN HERNANDEZ and ROSENDO HERNANDEZ, | ) ) ) | |
| | ) | No. 1:23-cv-1737 |
| *Plaintiffs*, | ) ) | Hon. Jeremy C. Daniel |
| v. | ) ) | Magistrate Heather K. McShain |
| REYNALDO GUEVARA, *et al.*, | ) ) ) | |
| *Defendants*. | ) | **JURY TRIAL DEMANDED** |

**JOINT STATUS REPORT ON *MONELL* DISCOVERY
AND PLAINTIFFS' MOTION TO COMPEL (DKT. 121)**

The undersigned parties provide the update below concerning outstanding *Monell* discovery and the pending motion to compel (Dkt. 121).

**I.** ***Monell* Discovery**

1. During the July 9, 2025 hearing, the parties advised the Court that *Monell* discovery remained outstanding but expressed optimism that continued conferral would resolve the remaining disputes. Since then, the parties have engaged in good faith discussions and successfully narrowed the issues requiring judicial intervention.

2. The central focus of the conferral has been Interrogatory No. 2 from Plaintiffs' Third Set of Interrogatories to the City. That interrogatory seeks information regarding changes to the Chicago Police Department's policies, practices, and training programs from 1986 to the present, as related to the 13 categories of policies identified in Interrogatory No. 14 of Plaintiffs' First Set of Interrogatories. Specifically, Plaintiffs requested that the City identify and describe any changes during that time period, and further describe how CPD employees were informed of those changes, including the method and timing of such communications.

3.  The parties have reached agreement that the City will produce any responsive policy documents not yet produced for the narrowed period of 1992 to 2001. However, the parties were unable to reach agreement on whether the City must identify and describe the changes reflected in those policies.

4.  Plaintiffs' position is that Interrogatory No. 2, as narrowed, seeks basic and proportional discovery. Plaintiffs no longer request identification of changes across the entire 40-year span originally referenced, but have limited the request to the ten-year period of 1992–2001, and only with respect to changes the City believes occurred in the categories already identified in Interrogatory No. 14. This is not an onerous request. The City is best positioned to identify material changes to its own policies and procedures, and it necessarily must understand those changes if it intends to contest *Monell* liability. Producing policies without describing what changed and when—especially where such explanations are uniquely within the City's knowledge—fails to satisfy its discovery obligations and shifts the burden onto Plaintiffs inappropriately. Rule 33 does not permit a party to simply produce documents in lieu of answering an interrogatory when the information requested is known to the responding party. Plaintiffs are not requesting that the City conduct an exhaustive analysis of third-party documents or speculate as to the meaning of records it does not control. Rather, Plaintiffs seek a concise narrative description of changes the City itself implemented. That request is both reasonable and necessary for Plaintiffs to assess policy evolution and training practices relevant to their *Monell* claims. Accordingly, Plaintiffs respectfully request that the Court compel the City to provide a substantive response to Interrogatory No. 2.

5.  Defendant City's position with respect to the narrowed timeframe is that historically, in the Guevara cases the *Monell* time period has been limited to at most 5

years. The City informed Plaintiffs that it sees no reason to deviate from the maximum historical time frame ordered by the Courts in previous cases here. The City further informed Plaintiffs that in the spirit of compromise, while the City maintains its position that the *Monell* time period in this case is the five years leading up to Plaintiffs' arrests, which is roughly June 1992 to June 1997, and with the caveat that the City is not waiving its position regarding the applicable time period, the City will agree to produce not already produced written policies on the topics identified in Interrogatory No. 14 of Plaintiffs' First Set of Interrogatories based on the City's understanding of the written policies Plaintiffs' seek.

6. With respect to Interrogatory No. 2 of Plaintiffs' Third Set of Interrogatories which requests that the City "identify and describe any and all changes made" between 1992 and 2001 "to the Chicago Police Department's policies, practices, and training programs related to any of the policies and procedures identified in Interrogatory No. 14 [of Plaintiffs' First Set of Interrogatories]" which identifies 13 separate categories of topics plus subparts, the City explained that in its view the request is still burdensome at this stage of the litigation despite Plaintiffs agreeing to narrow their original 40 plus year request to 10 years, which includes 4 years after Plaintiffs arrest, and more importantly does not comply with Plaintiffs' representations to the Court and to the City that they were relying on previously produced *Monell* discovery from the other cases when they sought the City's agreement to complete *Monell* discovery in 60 days. In fact, Interrogatory No. 2 of Plaintiffs' Third Set of Interrogatories not only requests the City to identify all changes in policy but also requests the City to "describe how Chicago Police Department employees or agents were made aware of the changes identified above, including but not limited to how they were informed of the new policies and the dates on which all steps were taken to inform the officers of the policy change."

3

Again, reducing the time frame to a ten-year time period, does not change the burden in any meaningful way at this stage in the litigation. Plaintiffs got the City's and the Court's agreement to a 60-day time frame to complete *Monell* discovery based on their representation that they were going to rely on previously produced *Monell* discovery. In the City's view, Interrogatory No. 2 violates the agreement. For context, the City duplicates the policies at issue here:

   a. The documentation and preservation of information learned during a homicide investigation. This request includes but is not limited to the use, storage, location and preservation of police reports, notes, witness statements, general offense reports, general progress reports, supplementary reports, lineup reports, evidence logs, inventory reports, and any other means of recording information learned during a homicide investigation. This request includes but is not limited to the City's 1982, 1983 and 1986 Special Orders, and any subsequent orders or directives through 1993, related to the street files practice discussed in the *Jones v. City of Chicago* and *Palmer v. City of Chicago* cases.

   b. The use, creation, contents of, storage, location, movement, and preservation of homicide investigative files kept at Chicago Police Department Detective Areas, including but not limited to so-called permanent retention/RD files, area files, investigative files, official files, unit files, street files, running files, and clipboard files. This request includes but is not limited to the different types of documents, notes, or other investigative information kept in each such type of file, as well as the storage, retention, duplication, or copying of each such type of file and the movement, storage, preservation or copying of such files to other divisions and sections of the Chicago Police Department— such as the Records Division, the Evidence and Recovered Property Section, and the Police Documents Section of the Chicago Police Department—and the timing of such movements in homicide investigations.

   c. Responding to subpoenas from criminal defendants requesting all records concerning a homicide investigation, including policies, practices and customs for ensuring that exculpatory information favorable to the accused in a criminal investigation, which would tend to show that the accused was not guilty of a crime, or which would tend to undermine the credibility of any prosecution witness, is disclosed to suspects, criminal defendants, their attorneys, and prosecutors. This request includes but is not limited to the departments or personnel involved in processing such a subpoena request; the places within the Chicago Police Department from which documents, files, and information that would be produced in response to such a subpoena request; and the types of investigative documents that would be produced in response to such a subpoena request.

d. Witness interrogations and interviews in homicide investigations, including interrogations and interviews of witnesses, eyewitnesses, criminal suspects and other witnesses. This request includes acceptable and prohibited techniques (e.g., the use of force or coercion, threats, deception, etc.) during interrogations and interviews; the length of such interrogations and interviews; the ranks or titles of officers authorized to perform them; supervision of interrogations and interviews; documentation kept relating to such interviews and interrogations; and the administration of Miranda warnings and waivers.

e. The use and conduct of, documentation of, and supervision of identification procedures for actual or potential witnesses, such as show-ups, live/in person line-ups, photographic lineups/arrays, clothing line-ups, and single-photo identification procedures. This request includes but is not limited to the written and unwritten practices, procedures, customs, rules, and techniques for performing these identification procedures; inventorying of evidence resulting from an identification procedure; selection and use of live and photographic fillers; the minimum and maximum number of suspects and fillers; process for taking photographs used in a photo lineup; number of witnesses permitted to view a single lineup; instructions given to participants subject to identification procedures, including communication of information about suspects or defendants; any other communications with witnesses subject to identification procedures; documentation of identification procedures and their results (including selection of suspects, fillers, or no identification); and creation and preservation of documentation relating to any of the foregoing subjects.

f. The use of gangbooks (i.e., albums/compilations of mugshots or other photos, also sometimes referred to as photobooks) and conduct of gangbook identification procedures in homicide investigations. This request includes but is not limited to the written and unwritten practices, procedures, customs, rules, and techniques for creating, selecting, or compiling photographs for inclusion in gangbooks, deciding what gangbooks to show witnesses, performing gangbook identifications, communication of information about suspects or defendants to witnesses who view gangbooks, any other communication with witnesses who view gangbooks, reports written in connection with gangbooks, documentation of gangbook identification procedures, documentation of the selection of a suspect by a witness during a gangbook identification procedure, documentation of the selection of a filler by a witness during a gangbook identification procedure, documentation of the selection of no person by a witness during a gangbook identification procedure, and the preservation of gangbook photographs selected by a witness.

g. The use of confidential informants, anonymous calls, and confidential street sources, as those terms are used in the applicable police reports in these cases, by homicide detectives, including but not limited to any files, lists, databases, or any other Documents to document, track or store information about confidential informants, anonymous calls and confidential street sources, as those terms are used in the applicable police reports in these cases.

    h. Obligations under *Brady v. Maryland*, including but not limited to training related to ensuring that exculpatory information favorable to the accused in a criminal investigation, which would tend to show that the accused was not guilty of a crime or which would tend to undermine the credibility of any prosecution witness, is disclosed to suspects, criminal defendants, their attorneys, and prosecutors.

    i. Investigations of Chicago police officers for misconduct contrary to City of Chicago policies, and/or discipline of Chicago police officers who were found to have engaged in misconduct contrary to City of Chicago policies.

    j. The method and manner by which supervisors monitor, report, and/or discipline subordinate Chicago Police Department police officers for potential violations of departmental rules or state/federal laws. This includes the chain of supervision, who is responsible for the supervision, and what the scope of responsibility is for each supervisor that supervises police officers.

    k. Evaluations of police officers, including but not limited to any annual or periodic performance reviews or evaluations, standards for evaluating the work performed by Chicago police officers, how those standards are communicated to Chicago police officers, how the evaluations are used to improve officer performance and/or correct deficient performance.

    l. Obligation of police officers to report instances of misconduct contrary to City of Chicago policies, and procedures for doing so.

    m. Giving sworn testimony in criminal cases, civil cases, and/or investigations of misconduct.

7. It will take considerable effort for the City to "identify and describe any and all changes made" to each of these policies listed above and to "describe how Chicago Police Department employees or agents were made aware of the changes identified above, including but not limited to how they were informed of the new policies and the dates on which all steps were taken to inform the officers of the policy change." And Plaintiffs already have much of the information through designated Rule 30(b)(6) testimony that the parties have agreed to use in this case. Despite the fact that this request violates Plaintiffs' agreement to rely on previously conducted *Monell* discovery, the City agreed to produce all the policies. Plaintiffs can use them

to identify changes in policy. Based on the procedural posture of this case, the City believes this is a reasonable compromise.

##  II.  Pending Motion to Compel (Dkt. 121)

8. Pursuant to the Court's directive (Dkt. 230), the parties conferred regarding the outstanding issues raised in Plaintiffs' pending motion to compel (Dkt. 121). The discussions focused on three issues: (1) a document search-and-production certification; (2) Defendant Miedzianowski's personnel file; and (3) documents Plaintiffs believe to be missing from the Garza homicide file.

9. The parties reached agreement on the first issue. The City confirmed it would produce a certification that it has conducted a reasonable search for, and produced all documents related to, the Gonzalez homicide investigation. The parties, however, remain at an impasse on the second and third issues.

Joseph Miedzianowski Personnel File

10. Plaintiffs' position is that the City's inability to locate or account for Defendant Miedzianowski's personnel file remains unresolved. This issue has been pending before the Court for months, and the City has offered no new information that would explain the file's disappearance. Although the City speculated that the file may have been transferred to federal prosecutors, no evidence supports that claim, and the records produced by federal agencies in response to Plaintiffs' *Touhy* requests do not include any personnel file. The City further represented that the individual who last signed out the file has since retired and that efforts are being made to contact him and see what happened to the file. That investigation is ongoing. Given the gravity of the allegations against Defendant Miedzianowski and the importance of his personnel file to the claims at issue in this case, Plaintiffs believe it is critical to preserve the

ability to pursue further efforts to locate this file. In light of the upcoming deposition of AUSA Netols and the ongoing investigation by the City into what became of the file, Plaintiffs respectfully request that the Court continue the matter as to the personnel file.

11. Defendant City's position is that they were finally, today, able to make contact with the individual who had signed out Miedzianowski's personnel file to ask him if he remembered why he was asked to sign out the file. He informed the City's counsel that he has no recollection of why he was asked to sign out the file. He did provide the City's counsel with additional information related to the individual who requested that he sign out the file. The City is trying to determine if that individual is still employed with the City. The City will provide Plaintiffs with the results of its investigation in that regard. With respect to Plaintiffs' reference to the *Touhy* response, the City does not believe that what Plaintiffs were provided represents all of the investigative materials from the Miedzianowski criminal investigation based on the fact that the documents recently produced contain a different case identification number than the documents the parties previously possessed that they know come from the Miedzianowski prosecution. Regardless, the City believes that the parties will be addressing the documents recently produced as well as those previously in the parties' possession in greater detail with AUSA Netols at his upcoming deposition.

## Garza Homicide File

12. Plaintiffs' position is that the files produced to date appear incomplete. Plaintiffs have identified such documents that appear to be missing to the City. On that point, Plaintiffs recently learned that Detective Moser, one of the original investigators, testified in another matter just last week that documents went missing from his investigative file after he turned it over to then-Commander Phil Cline and that he had a separate "running file." It is Plaintiffs'

understanding that the parties did not get to finish questioning Detective Moser, and that the deposition is being continued. That testimony raises serious questions about the integrity and completeness of the file and underscores the need to determine what documents were removed, by whom, and why. In response, Plaintiffs requested that the City confirm whether it has taken any steps to determine the whereabouts of missing materials, including asking all individuals who had access to the file—particularly Mr. Cline—about its contents and any changes. The City refused to do so. While the City has represented to the Court that it conducted a "diligent search," Plaintiffs respectfully submit that a truly diligent search must include efforts to determine who accessed the file, when, and whether documents were removed. That is especially true where the file pertains directly to a murder investigation in which the defendants in this case may have been involved. Plaintiffs believe that the City's blanket refusal to question individuals, including those in key supervisory roles such as Mr. Cline, is unreasonable. Plaintiffs are not demanding that the City interview every person ever listed in the file; rather, they are asking the City to investigate a credible claim of document removal by focusing on those who clearly had custody or supervisory control over the file. Anything less falls short of the City's discovery obligations and leaves a substantial evidentiary gap on a critical issue. As such, Plaintiffs request the Court continue the matter as to the Garza homicide file and direct the City to identify and interview custodians and those with supervisory control of the file for the whereabouts of missing documents.

13. Defendant City's position is that Plaintiffs are misrepresenting the parties Rule 37 discussions on the completeness of the Garza investigative file and records division file. As the City reported at the last status, it had each detective division area search for any additional documents and produced no records responses from each detective division area. Based on that

9

production and Plaintiffs' representations to the City and this Court, the City believed that Plaintiffs were satisfied with the City's search. Last Friday, August 1, Plaintiffs raised for the first time their claim that they obtained testimony in an unrelated case, that does not involve Defendant Guevara or any of the other Defendant Officers in this case, that the "files" are incomplete. Specifically, Plaintiffs stated in the August 1 email:

> Detective Moser testified in another case yesterday that he was aware of reports and other documents that went missing from his file for the Garza homicide investigation after he provided that file to Phil Cline. As such, Plaintiffs want to ensure that *all individuals who touched that file, including Mr. Cline, have been asked about the whereabouts of documents.* Please provide that confirmation. (emphasis added).

14. In response, the City made clear that Defendants object to Plaintiffs doing discovery in another unrelated case when fact discovery in this case has been closed for months. The City also made it clear that it disagrees with Plaintiffs' understanding of Detective Moser's testimony. Upon receipt of Plaintiffs' email last Friday, the City obtained a rough draft of Detective Moser's deposition testimony. By way of background, Detective Moser is a defendant officer in another unrelated case and none of the defense lawyers in this case were at his deposition. A review of the rough draft of the deposition transcripts makes clear that after some very confusing questions and answers that do not even make clear precisely what file he was referring to, or when or why he was looking for it, Detective Moser testified, "I can't remember if the file wasn't there or if there were parts missing." And his description of the "running file" indicated that the documents contained therein were duplicates. Thus, he did not say that he was aware of missing reports or documents from the Garza investigative file or records division file. In fact, he was not even given the files in this case to review to opine on whether he believed documents were "missing." And thus, in response to Plaintiffs request on August 1 that the City "ensure that *all individuals who touched that file, including Mr. Cline, have been asked about the*

10

*whereabouts of documents,*" the City responded that the request was not only based upon a faulty premise but also unreasonable. The City explained that its counsel reviewed the first 200 pages of the 1492-page investigative file and identified at least 38 police officers referenced in just the first 200 pages that might have "touched" the file. In the City's view, Plaintiffs' request based upon the mischaracterization of testimony taken in another case after the close of fact discovery and without notice to any of the defense counsel here that the City interview over 38 police officers who may have "touched" the file to ask about the whereabout of unidentified documents is not proportional to the needs of the case. To the extent, Plaintiffs here intend to rely on any additional testimony from Detective Moser, if in fact more testimony is obtained, Defendants here object to the use of that testimony in this case where fact discovery is closed.

RESPECTFULLY SUBMITTED,

/s/ Alyssa Martinez
*Attorney for Plaintiffs*

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Quinn Rallins
Alyssa Martinez
Loevy & Loevy
311 North Aberdeen St,
Chicago, IL 60607
(312)243-5900
alyssa@loevy.com

/s/ Eileen Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Andrew J. Grill
Austin G. Rahe
Catherine M. Barber
Lauren M. Ferrise
Theresa B. Carney
Rock, Fusco & Connelly
333 West Wacker Drive Ste, 19th Floor
Chicago, IL 60606
312-494-1000
erosen@rfclaw.com