# Exhibit 31

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 2 of 140 PageID #:19152
Case: 1:10-cv-01168 Document #: 485-18 Filed: 02/24/17 Page 2 of 140 PageID #:30857
11/29/16 AM

Judge Kennelly, November 29, 2016, 9:30 a.m., Fields v. City of Chicago, trial.

THE CLERK:  Case No. 10 C 1168, Fields v. City of Chicago.

THE COURT:  Good morning.

MR. LOEVY:  Good morning, your Honor.  Jon Loevy, Steve Art, Anand Swaminathan, Candace Gorman and Tony for Nathson Fields.

MR. NOLAND:

MR. MICHALIK:  Paul Michalik, Terry Burns and Dan Noland for the defendant City of Chicago and Brannigan.

MR. KULWIN:  Shelly Kulwin and Rachel Katz on behalf of Murphy.

THE COURT:  A couple of things we need to talk about. One of them was a note I got from a juror yesterday.  I won't give you the whole thing.  I won't read the whole thing. Basically, this person works with clients, has to schedule their appointments, she's been doing it after court.  She goes back to the office and so the question is do you think I need to push all my clients the week of December 16th by which I think she means the week of December 12th to come after 5:00 p.m. or will we be done by the 12th?  If we do go into the week of the 12/16, which again I think means the week of the 12th of December, will we still be done by 4:45?  Thank you. I just need to be able to let my clients know.  They come in

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 3 of 140 PageID #:19153
Case: 1:10-cv-01168 Document #: 485-18 Filed: 02/24/17 Page 3 of 140 PageID #:30858

every two to four weeks and can't work with anybody else.

I needed to talk to you today anyway about timing.

MR. LOEVY:  Your Honor, we hope to close our case on Wednesday.  We are going to call -- I'll tell you right now. We are going to call today our expert after Mr. Hawkins. We're hoping to squeeze Mr. Wharrie in and obviously we are slinking our witness exams a lot.  There are some depositions to read if we run out of witnesses today, we'd probably do Murphy.  Tomorrow is Kees, Murphy, I guess that would be, yeah, tomorrow, Kees, Murphy, Conyers and Andrea line is on stand by today as a short 15, 20 minute witness.  That's it.

THE COURT:  And the other excerpt is one that you would call in rebuttal only?

MR. LOEVY:  Yes.

THE COURT:  The statistician?

MR. LOEVY:  Yes.  And I am not sure -- I'll tell you putting our cards on the table.  Mr. Brasfield is not going to rely heavily on the statistics.  I have a feeling the stats are going to drop off.

THE COURT:  You will have a feel later.

So assuming those are the people that they end up calling, who is on the list on the defense side?

MR. MICHALIK:  Obviously, we have our expert Bernie Murray.

THE COURT:  Yeah.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 4 of 140 PageID #:19154
Case: 1:10-cv-01168 Document #: 485-18 Filed: 02/24/17 Page 4 of 140 PageID #:30899

MR. MICHALIK: We would probably be calling Daniel Brannigan, there are some witnesses that we would be reading in, Gerald Morris, Trammell Davis and Eugene Hunter. Then we might.

THE COURT: You mean writted in or reading?

MR. MICHALIK: Reading. Like we did last time.

MR. NOLAND: Mr. Sexton, Judge Hines.

MR. KULWIN: Are they not calling Hogan?

MR. NOLAND: Mr. Hogan, Mr. Poulos.

MR. KULWIN: Possibly, possibly Mr. Rueckert and we will be reading in excerpts from Ms. Langston.

THE COURT: Okay.

MR. LOEVY:

MR. MICHALIK: Also before I forget Mr. Maue. We may wiped up having to read in his trial testimony.

THE COURT: You are still working on --

MR. MICHALIK: Yeah.

MR. NOLAND: Judge, last time it was by video conference.

THE COURT: Yep.

MR. NOLAND: And he's down in southern Illinois.

THE COURT: Yeah.

MR. NOLAND: And if we could setup -- we could do that or a reading in.

THE COURT: For setting up the video conference, you

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 5 of 140 PageID #:19155
Case: 1:10-cv-01168 Document #: 1485-18 Filed: 02/24/17 Page 5 of 140 PageID #:30950

11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

4

09:43:09 need to be talking to Pam because Pam needs to be talking to the person who does that who needs to be talking to the prison. The way those things work is that the prisons, they have time slots, and because they're getting video conference requests from all over the place for, you know, prisoners doing settlement conferences and other things and you have to make sure that the time slot is available. You have to get it locked in.

MR. MICHALIK: There may be an issue with that regarding Mr. Maue and his ability to do that.

MR. KULWIN: And Jackie Clay.

THE COURT: Who?

MR. KULWIN: Jackie Clay.

THE COURT: I thought you were saying Jay Cutler.

MR. KULWIN: I wouldn't mind that, just so I could cross-examine someone easily.

THE COURT: Yeah, that would be shooting fish in a barrel.

Okay. So, look, I guess what I -- I guess what I am inclined to tell these people is that it's, A, it's difficult to predict because I don't know exactly how long any particular witness is going to take. I think it's reasonable to expect that the evidence and the arguments will finish by the end of next week.

MR. KULWIN: I think sooner.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 6 of 140 PageID #:19156
Case: 1:10-cv-01168 Document #: 485-18 Filed: 02/24/17 Page 6 of 140 PageID #:30901

11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

5

THE COURT: I don't want to predict too much. By the end of next week, in other words, by the 9th, and then what happens after that is up to the jury. It's the length of the deliberations which is up to them. And so the question of whether, you know, you're going to be still here the week of the 12th, there is a decent chance you will and the schedule will be largely up to the jury. If you're in deliberations, I have no problem with you stopping at 4:30 or 4:45 if you want, so you need to figure how much planning ahead you need to do. I want to keep it vague but keep some glimmer of light at the end of the tunnel.

Two other things. I got two early questions from Mr. Hawkins. I have two other questions, I don't know which, who are the men sitting next to the witness Earl Hawkins? We need to figure out how to deal with that. Or if or whether to deal with that. And then the other one I am just going to read to you. All the lawyers are showing statements and documents from several court dates and trials. Can we get the dates and what the trial was for? It's hard to keep up with what they are talking about. Maybe this was already said and I missed it, question mark.

I guess what I'd be inclined to say to them is that I'm going to try this on for you for sides. I'll read part of it. I think I can tell them we have all heard evidence that Mr. Fields had two criminal trials, one was in 2006 and one

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 7 of 140 PageID #:19157
Case: 1:10-cv-01168 Document #: 485-18 Filed: 02/24/17 Page 7 of 140 PageID #:30902

was from 2009 and a lot of the trials have been read from those two dates. I have tried to prompt the lawyers, is this from the '86 trial or the 2009 trial. There have also been various other proceedings where people have testified at various dates. It's really, as a matter of evidence law, it's not appropriate to go into the details of what those are. And you are just going to have to do your best to keep notes and remember as you are going along. That's what I am inclined to say. Does anybody have a better idea?

MR. KULWIN: I think that's fair, Judge.

THE COURT: Anybody have a problem with that or a better idea.

MR. KULWIN: The proceedings related to this case.

MR. LOEVY: Some of them aren't. I am going to impeach him this morning with his testimony at these other trials. I am pretty sure that's what this stuff is about.

THE COURT: This stuff is flying pretty fast. You have had testimony from depositions that were given in this test, you have testimony from the state proceeding, testimony from the earlier trial in this case.

MR. LOEVY: Okay.

THE COURT: There's at least five things out there, probably more. We had a couple yesterday with Mr. Hawkins where he had trials in various.

MR. LOEVY: That's going to happen this morning. I

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 8 of 140 PageID #:19158
Case: 1:10-cv-01168 Document #: 485-18 Filed: 02/24/17 Page 8 of 140 PageID #:30903

am going to impeach him -- should I say the name? I was just planning on saying, isn't it true you testified --

THE COURT: Just give dates.

MR. LOEVY: Got it.

MR. NOLAND: Judge, I have one thing to raise on that issue which would be consistent with the sidebar we had about confusing the 2013 hearing.

THE COURT: Yeah.

MR. NOLAND: With Sexton versus the 2014 hearing before the court. I would think the jury should know that the defendants were not involved in the 2013 hearing. It was a separate proceeding, 2014, because otherwise --

THE COURT: That doesn't matter as a matter of evidence law. I mean, it doesn't matter. To the extent the stuff is admissible, it's admissible and whether somebody was involved or not, it really -- it doesn't matter at least based on any objection that I have had to rule on yet. I am not really inclined to do that. The question was the way I read this question is these dates are flying fast and furious, I am having a hard time keeping up, can you kind of give me a key to the dates and I am going to basically tell them no, I can't give you a key. There's a bunch -- there have been a bunch of other proceedings in which people have testified. It's not appropriate as a matter of evidence law for me to give you a list of those. Just do your best to keep up. I probably had

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 9 of 140 PageID #:19159
Case: 1:10-cv-01168 Document #: 485-18 Filed: 02/24/17 Page 9 of 140 PageID #:30504

collectively to do a better job of remembering these things than any one person would.

MR. KULWIN: If you want, the it's up to them, address it in closing argument.

THE COURT: It may get addressed this closing argument. If you have a specific question about, you know, a particular witness, if you have a specific question about specific witnesses, what was the date on which the person testified, put that in questions and we will cover it.

Okay. So what else do we have to take up before we start?

MR. LOEVY: We are going to hand you a deposition for Beseth that has some calls you have to make.

THE COURT: For what who?

MR. LOEVY: The guy's name is Beseth, the investigator.

THE COURT: When do I have to read it by?

MR. LOEVY: For tomorrow.

THE COURT: You are giving me designations and objections, basically?

MR. LOEVY: This is the man who testified at the civil trial but has died since the civil trial. What you have are designations from his civil trial testimony.

THE COURT: And whose -- do I know who's designating the testimony? Is it everybody is designating some?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 10 of 140 PageID #:19160
11/29/16 AM
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 10 of 140 PageID #:30905
***REALTIME UNEDITED TRANSCRIPT ONLY***

9

MR. KULWIN: Everybody is designating some with objections going back and forth.

THE COURT: And it's testimony both from the previous trial in this case and from the deposition.

MR. LOEVY: We object to the deposition being read in addition --

THE COURT: You say that in here?

MR. LOEVY: Yes.

THE COURT: I'll deal with it later.

MR. KULWIN: What about the motion, Judge?

THE COURT: Oh, yeah. I'm open to suggestion.

MR. KULWIN: I think I'm always a big fan of the truth. Just say Mr. Hawkins is in witness protection and those are marshals.

MR. LOEVY: We object to that, your Honor.

THE COURT: What are we going to do?

MR. LOEVY: Let's just ignore the question.

MR. KULWIN: No. They might think he's incarcerated or something.

THE COURT: They know he is not incarcerated. He's testified like six times or maybe four that he is not incarcerated.

MR. LOEVY: Because that would, you know, open a can of worms, why is he in witness protection? It's more information than they need. There is a Marshall there. There

is a Marshall there.

MR. KULWIN:  I don't agree with that, Judge.

THE COURT:  So describe the can of worms.

MR. LOEVY:  Well, why is he in witness protection? That sort of feeds their theory that other El Rukns want to kill him because he testified against other El Rukns.  And, you know, we haven't finished our threat theory.

THE COURT:  Is fact that -- no, he was still in custody at the last trial.  Was there anybody who testified at the last trial who was out of custody?

MS. KATZ:  Yes.

THE COURT:  Who?

MS. KATZ:  Kees.

THE COURT:  No, he was still in could you say towed.

MR. KULWIN:  Jackie Clay.

THE COURT:  Clay.  Did he have marshals here?  Was he still --

MR. NOLAND:  No, he was not.

THE COURT:  He was not in any witness protection.  So it's a sui generis situation.  Lovely.

MR. LOEVY:  Because the inference would be he is in witness protection because he faces threats which we object to on its face, but also there could be an inference about Mr. Fields and the easiest way is just to ignore it.

MR. KULWIN:  I don't agree, Judge.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 12 of 140 PageID #:19162
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 12 of 140 PageID #:30907

THE COURT:  Explain why you don't agree.

MR. KULWIN:  Because I think that the jury could draw an inference that somehow he's done something wrong or that he's maybe -- he might be free, but he's under some kind of restriction and that there's something untrustworthy about him.  Who else walks into court with two federal marshals?

THE COURT:  I understand.  By telling them he's there because he is in the U.S. marshals witness security program, then the obvious question is going to be why, and so there is a can, whether it's a can of worms or a can of something else that has been opened.  How am I going to deal with that?

MR. KULWIN:  Think of a benign way of dealing with that, Judge, that's neutral.  You could just say that the two marshals are part of -- they're U.S. marshals who have assisted him in traveling to court as he's still participating in the relocation program.

MR. LOEVY:  Same problem, your Honor, same problem with the relocation.  The only point I would add is if there weren't jury questions, they would just have to wonder.  It's 99 percent of the trials.  The jury just has to wonder.

MR. KULWIN:  I think something that's neutral:

THE COURT:  What?

MR. KULWIN:  To me if I'm sitting here seeing two marshals, maybe they think they are protecting us from him because he is a killer.

THE COURT:  They saw me walk over right by the guy six times.  Maybe they figure I'm like Jon Wayne or something. I don't know.

MR. KULWIN:  You are tall and you look like Jon Wayne.

THE COURT:  That is about the worse example of sucking up to a judge I have ever heard in my entire life.  I would -- in my entire life.

MR. KULWIN:  I have no shame.

THE COURT:  Okay.  Raise your hand if you think I look like Jon Wayne.

MR. KULWIN:  I saw a picture in the paper recently, it was my Johnnie dep moment.

THE COURT:  That would be item number two.

MR. KULWIN:  The inference could be a juror could draw the inference that he is a dangerous person and that we don't want him to close to members or --

THE COURT:  Look, I'm concerned, you know, for many of the same reasons at the end of the first trial, after the end of the first trial, one of the reasons -- one of the bases on which I granted a new trial was my what I'll call just colloquially inappropriate sloughing off of a jury instruction.  It was to the instructions, so it was more that the jury had to deal with, but it just seems to me as a general matter if a juror is asking a question, that means

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 14 of 140 PageID #:13164
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 14 of 140 PageID #:30909

that there's something that there's likely to be speculation about. I don't know which way the speculation cuts. I can imagine it cutting any possible -- any number of ways. I would prefer to find a way to deal with it. And so that's what we are going to do. We are going to find a way to deal with it.

Look, as far as the can of worms is concerned, let me just see if I can grab something here.

I am going to read something here. What I am about to read is something I propose to tell the jury. I think it's accurate. I tried to write it in a way that's non--- sort of as benign as possible. I would say to the jury, if I can say the whole thing without breaking into a coughing fit which is not a foregone conclusion this morning. There was a question from the juror regarding who the gentleman were sitting by Mr. Hawkins during the testimony and the answer to that question is that they're federal marshals and they're there because Mr. Hawkins is a participant in a relocation program that was part of his overall agreement to cooperate with the federal government in connection with several federal El Rukn trials that you have heard some testimony about, none of those trials involve Mr. Fields and you are not to draw any inference for or against any party in the case based on what I just told you.

MR. KULWIN: Fine with us, Judge.

11/29/16 AM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 15 of 140 PageID #:13165
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 15 of 140 PageID #:30910

14

MR. LOEVY:  We don't want it, but you made the call and that's what it's going to be.

THE COURT:  Do we know if he's back there?

THE CLERK:  I don't know.

THE COURT:  I actually did not see them hanging around this morning.

MR. ART:  I saw one of the marshals earlier.

THE COURT:  Do we have other things that we need to talk about before Hawkins testifies?

(The jury enters the courtroom.)

THE COURT:  One final thing before we resume with Mr. Hawkins' testimony.  I had gotten a couple of notes or questions from jurors.  One of them has to do with scheduling. We will talk about that later today.  There is another one I will deal with after Mr. Hawkins is done.  There are a couple of questions for Mr. Hawkins that I am going to hold until the end of his testimony and we will will discuss with the lawyers.  There is one I am going to deal with here.

A juror handed a note to my clerk asking who are these guys over here sitting over to the side next to Mr. Hawkins.  So I am just going to tell you what the answer is. They are federal marshals.  They're there because Mr. Hawkins is involved in a relocation program.  That's part of his overall agreement to cooperate in connection with several federal El Rukn trials that you have heard some things about.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 16 of 140 PageID #:19166
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 16 of 140 PageID #:30911

None of those trials involve Mr. Fields and you are not to draw any inference in favor of or against anybody in this case.  I have now cleared up that issue.  Mr. Loevy, you are now on redirect.

MR. LOEVY:  Thank you, your Honor.

- - -

EARL HAWKINS, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  I want to ask a few questions about the grand jury statement.

Now, you told Mr. Kulwin that it was a very long statement and there were a lot of details.  Do you remember that question?

A.  Yes, sir.

Q.  The fact that Nate was involved in a murder, that was an important detail, correct?

A.  Yes.

Q.  And you said repeatedly that you never said he was involved in the Smith/Hickman murder?

A.  Yes.

Q.  But you were asked when he read it is this accurate, Nate did the Smith/Hickman, and you said yes, it is accurate, correct?

MR. KULWIN:  I'm sorry, Judge.  I didn't hear the question.  I apologize.

Case:1:23-cv-01737 Document#: 287-31 Filed: 04/06/26 Page 17 of 140 PageID #:19167
Case:1:10-cv-01168 Document#: 1185-16 Filed: 02/24/17 Page 17 of 140 PageID #:30912

16

THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. When?

THE COURT: There are too many its in there. Make it a little clearer.

BY MR. LOEVY:

Q. When Mr. Hogan read the you statement, isn't it true Nate Fields committed the Vaughn/White murder with you and Sumner, your response was, yes, that's accurate, correct?

MR. KULWIN: Judge, I am going to object. That's not what the statement says. He misstated it.

THE COURT: You are talking about the grand jury statement.

MR. LOEVY: Yes, I am.

THE COURT: I think it makes more sense to just read it rather than paraphrase it, or at least that part of it. I am not talking about reading the obviously thing, obviously.

MR. LOEVY: Your Honor, I don't have the exact page. May I ask a question about it or would you like me to find it?

THE COURT: Go ahead and ask a question in the interest of time.

BY MR. LOEVY:

Q. What the grand jury statement was you, Mr. Sumner, and Mr. Fields committed the Vaughn/White murder, correct?

MR. KULWIN: Objection, Judge, that's not what it

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 18 of 140 PageID #:13168
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 18 of 140 PageID #:30913

says.

THE COURT:  Do you have a copy of it?

MR. KULWIN:  If he hands me his, I am show him.

THE COURT:  Does somebody have a copy of it?  Thank you.  Can Mr. Loevy borrow it so we can just ask the questions about it?

This was shown.

MR. LOEVY:  It wasn't shown.

THE COURT:  Okay.

THE COURT:  Go ahead and show it to the witness.  If you want to put it on the ELMO, you can do it so that he can see it.

MR. LOEVY:  Thank you.

THE COURT:  And I will take it off the jury's screens.  There you go.  Mr. Hawkins should be able to see this.

BY MR. LOEVY:

Q.  Can you see those three lines, sir?

A.  Yes, sir.

Q.  That's not true, is it?

THE COURT:  Why don't you read it since the jury can't see it.

BY MR. LOEVY:

Q.  At about the beginning of April 1985, Anthony Sumner, Nathson Fields and I were involved in the murder of Joe White

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 19 of 140 PageID #:19169
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 19 of 140 PageID #:30914

and DeeEggars Vaughn, correct?

THE COURT: Go to the next page because then there is an answer.

BY MR. LOEVY:

Q. The answer is on page 25. Is that accurate so far to the best of your recollection, Mr. Hawkins?

"ANSWER: Yes, sir."

My first question is it's not true that Mr. Fields was involved with you in the Vaughn/White murder, correct

A. I never said that.

Q. Okay. That's not true, though, right?

A. I never said that.

MR. LOEVY: Your Honor, the only question is if he was not involved.

BY MR. LOEVY:

Q. Can we agree he had nothing to do with the crime?

A. I said that all the time.

Q. When they said to you is that accurate that he was involved in a crime, you said to the grand jury that it was accurate, correct?

A. Sir, what do you want from me? I said he wasn't in it.

THE COURT: He is asking you about your testimony in the grand jury. That's what you are going to need to answer.

BY MR. LOEVY:

Q. You told the grand jury that he was, correct?

11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

19

A.  I didn't tell nobody nothing.

Q.  Are you saying that you made a mistake at the grand jury or you didn't understand the question or you intended to say that he was guilty?

        MR. KULWIN:  Objection, multiple questions.

        THE COURT:  Overruled.

        THE WITNESS:  I never said he was nowhere, so what are you talking about?

BY MR. LOEVY:

Q.  I want to focus on your intent.

A.  Okay.

Q.  At the time you gave that testimony?

A.  Okay.

Q.  Did you make a mistake or did you understand that the U.S. attorney wanted you to say he was involved and you said that's accurate?

A.  The USA attorney didn't tell me to say nothing, and no, I didn't make a mistake.  Maybe he spoke too soon, maybe I didn't see it, maybe because I was worried about me, it got past me.

Q.  It got past you?

A.  I said maybe.

Q.  All right.  Now, your grand jury statement was the thing that took a couple of years to prepare?

A.  Yes, sir.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 21 of 140 PageID #:19171
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 21 of 140 PageID #:30916
11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

20

Q. And you carefully edited it?

A. I edited it.

Q. And it involved a lot of crimes and a lot of criminals, correct?

A. Yes, sir.

Q. And that reference that we just read was the only place that Nate Fields had anything to do with all those crimes and all those criminals, correct?

A. If you say so.

Q. I'm asking you if that's true?

THE COURT: It was covered on direct, Mr. Loevy.

BY MR. LOEVY:

Q. Let's move to the testimony about the actual events that day that you talked about with the defense attorneys. Fuddy was not someone you actually knew well, correct?

A. Yes.

Q. Mr. Banks had to point out to you who Fuddy was, correct?

A. Yes.

Q. And if he hadn't pointed out to you who Fuddy was, you wouldn't have known who he was, correct?

A. Yes.

Q. All right. Let's talk about where you were -- if I understood your testimony, the team was put together, you, Carter, Andrews and Fields, that's the team, right?

A. Yes, sir.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 22 of 140 PageID #:19172
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 22 of 140 PageID #:30917

Q. And then you drove to the scene on the day of the supposed crime, the crime?

A. Yes, sir.

Q. All right. And I'm going to show you can you see the easel, sir?

A. Yes, sir.

THE COURT: If you need to move, just go ahead and move.

BY MR. LOEVY:

Q. You're familiar with the area, correct? You were familiar with the neighborhood, correct?

THE COURT: You drew a box and a line. The box is the building I take it?

MR. LOEVY: Yes.

BY MR. LOEVY:

Q. You're familiar with the neighborhood?

A. Somewhat.

Q. The Fort was nearby the building was?

A. Yes.

THE COURT: Mr. Loevy, you are going to have to move that back so the other lawyers can see it. Move it back to the space between the podium and your table.

MR. LOEVY: Does this work, your Honor?

THE COURT: Do your best to crane your neck, guys.

BY MR. LOEVY:


                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 23 of 140 PageID #:19173
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 23 of 140 PageID #:30918
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
22

Q.  This as the judge recognized, that rectangle is the building where Fuddy was shot, right?

        THE COURT:  Why don't you stand on the other side?  I know you're right-handed but whatever.

BY MR. LOEVY:

Q.  This street out in front of the building is what, sir?

        THE COURT:  What street is that?

BY MR. LOEVY:

Q.  The east-west street that the building is on?

A.  The building is supposed to be on the other side of the street.

Q.  Well, if this is north going up?

        THE COURT:  North is going up.

BY MR. LOEVY:

Q.  This is 39th Street, which is Pershing, correct, and this is what, the north south street?

A.  I told you I recognized him.  You want to draw it again?

Q.  I guess your memory matters.  Do you know the north south street?

A.  I don't know your drawing.

Q.  All right.  This is Langley, right?

A.  No.

Q.  All right.  There's another east-west street where you first identified Fuddy, correct?

A.  Yes.

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 24 of 140 PageID #:19174
Case: 1:16-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 24 of 140 PageID #:30919
***REALTIME UNEDITED TRANSCRIPT ONLY***

23

Q. What street was that?

A. Langley.

Q. When -- did you not tell Mr. Burns yesterday that you made the identification on Oakwood?

A. Oakwood, Langley, yes.

Q. Well, this is Langley and this is Oakwood?

A. No.

Q. I am going to represent to you that this is in my drawing?

A. Yeah, that's your drawing.

Q. This is Oakwood. And Oakwood and Langley intersect, correct?

A. Yes. That's what I said, sir.

Q. And your testimony has always been at the intersection of Oakwood and Langley is where you identified Fuddy for the guys, right?

A. Yes.

Q. You said that in 2009, correct?

A. Yes, sir.

Q. You said it in 2014?

A. Yes, sir.

Q. And you said it in 2012?

A. Yes, sir.

Q. Every time you have been asked the plan was you were up in your cars, you got to Oakwood and Langley and you pointed out to George and Nate, there's Fuddy, that's the guy you should

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 25 of 140 PageID #:13175
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 25 of 140 PageID #:30920
***REALTIME UNEDITED TRANSCRIPT ONLY***

24

Q. kill, correct?

A. Yes, sir.

Q. And showing you your testimony from the criminal trial, this is page 96?

THE COURT: That one of the jury can see, so I am going to put the jury's monitors on.

Are you done with the diagram you think now?

MR. LOEVY: I am going to go back to it in a minute, your Honor.

BY MR. LOEVY:

Q. You did testify at the trial that the identification was made on Oakwood?

A. Yes.

MR. KULWIN: Judge, asked and answered.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Now, showing you this map, which is a little better than my drawing I will acknowledge?

THE COURT: It's a photograph, so by definition, it's better than a drawing.

BY MR. LOEVY:

Q. Can you see the map?

A. Yes.

Q. This is the building, right?

A. That's the topographical. I never was on an airplane and

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 26 of 140 PageID #:19176
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 26 of 140 PageID #:30921
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

25

seen down like that.  I never seen it like that before.

Q. Fair enough.  You recognize in this picture that's the building that Fuddy was shot in front of?  Let me orient you. This is 39th Street going east-west.  There is Langley going north south, this is Oakwood at the bottom of the map?

THE COURT:  Bottom of the map going across from left to right is Oakwood?

MR. LOEVY:  Exactly.

BY MR. LOEVY:

Q.  This is Oakwood.  Can you point to the jury where you were at Oakwood and Langley where you pointed out Fuddy?

THE COURT:  Where he was or where Fuddy was?

BY MR. LOEVY:

Q.  No, where he was when he pointed out Fuddy?

THE COURT:  You can go down.

THE WITNESS:  I was right around here.

BY MR. LOEVY:

Q.  Okay.  This is where Fuddy was.  You're here at Oakwood and Langley?

A.  Oakwood and Langley, back here.  Somewhere around here, yes.

Q.  In fact, there was a stipulation --

THE COURT:  Just for the record.

THE WITNESS:  Stay close to the building, came up, you couldn't see me from over here, but we could see them from

over here.

BY MR. LOEVY:

Q.  This is the Lincoln center.  You say, guys, there's Fuddy, right?

A.  Yes.

THE COURT:  Just so the record is clear, he pointed to a spot just to the left of the building that's on the northeast corner of Langley and Oakwood.

MR. LOEVY:  Correct.

THE COURT:  Left on the diagram, on the photograph I mean.

BY MR. LOEVY:

Q.  Sir, isn't it true that that's more than 400 feet away, 500 feet away?

A.  I don't know what -- how far it is away.  You can see it.

Q.  Showing you stipulation from the second criminal trial?

MR. LOEVY:  Your Honor, we'd ask that this be put on the ELMO.  This is page 160.

THE COURT:  The jurors can see it.

BY MR. LOEVY:

Q.  It is stipulated between the parties that the shortest distance between Oakley Boulevard and the entrance to the breezeway of the building, which stood at 706 East 39th Street, as they existed on August 28, 1948 is 500 feet.  That was stipulated at Mr. Fields' trial.  Does that comport with

11/29/16 AM

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 28 of 140 PageID #:19178
Case: 1:15-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 28 of 140 PageID #:30928

***REALTIME UNEDITED TRANSCRIPT ONLY***

27

your recollection?

A.   Yes.

Q.   500 feet is ten times the length of this courtroom from where you're sitting to that wall, would you agree with that?

A.   I saw him.

Q.   500 feet is triple?

A.   500 feet, 500 feet.

Q.   Is triple the distance where the boys were playing baseball to the breezeway, correct?

         MR. KULWIN:  Objection.

         THE COURT:  Argumentative, sustained.  You will argue this later, Mr. Loevy.  You have the stipulation in from the trial.

BY MR. LOEVY:

Q.   The last question I want to ask is isn't it true that if you were on Oakwood, at best you could have seen a spec in front of that building?

A.   No.

Q.   You told Mr. Fields and Mr. Carter, that's the spec I want you to murder?

         MR. BURNS:  Objection, your Honor.

         THE COURT:  Sustained to the form of the question.

BY MR. LOEVY:

Q.   Yesterday, you walked through with Mr. Burns some details about a Charlie green and Minerva.  And a maroon Oldsmobile

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 29 of 140 PageID #:13172
Case: 1:23-cv-01168 Document #: 185-18 Filed: 02/24/17 Page 29 of 140 PageID #:30924
***REALTIME UNEDITED TRANSCRIPT ONLY***

28

and a radio. Do you remember answering those questions yesterday?

A. Yes, sir.

Q. Now, those were the questions you went over with Mr. Burns on Sunday, correct?

A. Yes, sir.

Q. If we had asked you those same questions last Friday before the meeting with burns, you would not have been able to give those same details?

A. Probably not.

Q. At the meeting, what you did you went over transcripts?

A. No, I needed my memory refreshing.

Q. They helped refresh your memory?

A. Yeah.

Q. Who was in the car when you were driving over to the murder, sir, who were you with?

A. Hank Andrews.

Q. Are you sure of that?

A.

MR. BURNS: Objection, your Honor.

MR. LOEVY: All right. Let me ask him another question.

BY MR. LOEVY:

Q. Do you remember testifying on October 1st, 1991, that you were in the car with Nate Fields on the way to the murder?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 30 of 140 PageID #:19180
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 30 of 140 PageID #:30925

A.   That's what I said?

Q.   Isn't it true you also testified on July 29th, 1996, that you, Nate, and Carter were in the same car and that Andrews was by himself?

A.   Yes.

Q.   Isn't it true you're making it up each time you tell the story?

A.   No.

Q.   So your testimony is that Mr. Fields hopped out of a car with Jackie Clay wearing a ski mask, ran up to Fuddy and shot him, basically?

A.   That's what happened.

Q.   And then they hopped into another car to make their get away?

A.   Yes.

Q.   So you're saying on a busy morning with people out, they jumped out of his own car and left his car at the scene?

A.   I never said that.

Q.   All right.  But you did just say he got out of his car in a ski mask, ran over and shot him?

A.   You said that.

Q.   Okay.  Did he leave his car at the scene?

A.   You said that.

Q.   Did he leave his car at the scene?

A.   No, I said they came from behind the building.  See them.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 31 of 140 PageID #:19181
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 31 of 140 PageID #:30926
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

30

The next time I seen them, they came through the breezeway. That's my testimony, sir.

Q. The idea was you picked people who weren't familiar with the neighborhood, right?

A. Correct.

Q. Because they didn't want to be recognized, right?

A. Correct.

Q. And they're supposed to wear masks, right?

A. Correct.

Q. And you gave them masks in your story, correct?

        MR. KULWIN: Objection to your story, Judge.

        THE COURT: Overruled.

        THE WITNESS: Yes.

        MR. KULWIN: Objection.

        THE COURT: I overruled the objection. I already did. You got a ruling.

        MR. KULWIN: Thank you.

BY MR. LOEVY:

Q. Did you see them jump out of Mr. Fields' car?

A. How can I see them jump out of a car and there is a building. I told you the next time that I seen him, don't try to confuse me, the next time I seen them they were running across the street.

        THE COURT: Stop, ask your questions slower, answer the question directly, don't volunteer. Or I am going to have

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 32 of 140 PageID #:19182
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 32 of 140 PageID #:30927

to strike testimony.

BY MR. LOEVY:

Q.  Did you see Mr. Fields and Mr. Carter jump out of the car?

A.  No, sir.

Q.  Did you testify yesterday that you did?

THE COURT:  The jury heard the testimony from yesterday.  You'll argue that later.

BY MR. LOEVY:

Q.  All right.  The team that was put together according to you is George Carter, Nate Fields, Hank Andrews and you?

A.  Yes, sir.

Q.  That was a week before the shooting, the generals and Jeff Fort who said put together the team, right?

A.  Yes, sir.

Q.  And that was always the team, Mr. Fields, you, Hank Andrews and George Carter, that's your testimony, right?

A.  What is you asking me.

Q.  That was always the team, right?

A.  Always what team?

Q.  Never mind.

MR. LOEVY:  May I move on, your Honor?

THE COURT:  I'd like you to.

BY MR. LOEVY:

Q.  All right.  Now, the idea was to pick guys who weren't familiar from the neighborhood, why did they pick you?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 33 of 140 PageID #:19183
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 33 of 140 PageID #:30928

A. Because they wanted me to pick out the guy who it was.

Q. But you didn't know the guy who it was?

A. I didn't know them that familiar, but Rodell was telling me that I knew him.

Q. All right. Wouldn't it have been better since you're well known in the building to have you not involved?

A. That was the plan.

Q. The plan was it didn't matter if you were known or not because you were going to be wearing masks isn't that true, sir?

A. You are making the plan.

Q. Who did make the plan?

A. I just told you who made the plan.

Q. Who made the plan?

A. We made the plan, the general in our offices in security with Jeff Fort. If you want to do something else, that's on you.

Q. All right. Were you wearing a mask that day?

A. No.

Q. Were you concealing yourself in the car?

A. Mostly I was down in the car like this, like this.

Q. Isn't that kind of suspicious looking?

THE COURT: Just for the record he's lunched down with his jacket kind of pulled up over the bottom of his face.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 34 of 140 PageID #:13184
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 34 of 140 PageID #:30925
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

33

Q. Don't you think that would draw attention to yourself?

MR. KULWIN: Objection, speculation.

THE COURT: Sustained and argumentative.

MR. KULWIN: And argumentative.

BY MR. LOEVY:

Q. It's your testimony if I understand it with Mr. Burns that Fuddy was standing outside the building for a good half hour before the shooting happened?

A. Yes, sir.

Q. Because the idea was that Rodell Banks supposedly called you and said he's out there and you then put everybody together and you went over there and he was still out there, right?

A. Yes, sir.

Q. And the whole time you were there, he was just standing outside the building, right?

A. Standing, people coming and going, talking to him, speaking to him.

Q. I want to focus on he was present in front of the building for the whole time, right in?

THE COURT: Who is the he?

MR. LOEVY: He being Fuddy Smith.

THE WITNESS: Yes.

BY MR. LOEVY:

Q. Did he not disappear for ten minutes, did he? He was out

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 35 of 140 PageID #:13185
Case: 1:20-cv-01168 Document #: 185-18 Filed: 02/24/17 Page 35 of 140 PageID #:30950
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

34

there the whole time, right?

A. Yes, sir.

Q. He did not shortly before the shooting come walking through a breezeway by himself, did he?

A. No, sir.

Q. And you said he was by himself for most of that time?

A. Yes, sir.

Q. He was not with Talman Hickman until the very last minute?

A. What are you talking about?

Q. Who is the other guy that got killed?

A. Talman Hickman.

Q. Talman Hickman showed up at the very last second, right?

A. Yes.

Q. All right. So you can say definitively that Talman Hickman and Fuddy did not walk out together shortly before the shooting, correct?

A. No, I did not say that.

Q. I'm saying you say that didn't happen, right?

A. No, I'm saying Fuddy was standing out there and the other guy walked up.

Q. At the last second, right?

A. Yes.

Q. Okay. Now, let's talk a little bit about the bribe testimony you did yesterday. The conversations that you claim Mr. Fields were part of -- strike that.

Your attorney, Mr. Swano, was the one who made the bribe, correct?

A.  Yes, he was a major part of it, yes.

Q.  And Mr. Fields had his own attorney, right?

A.  Yes.

Q.  And you claim that Mr. Swano talked about the bribe in Mr. Fields' presence, if I understood your testimony yesterday?

A.  Yes.

Q.  In the bull pen is where you testified that happened, correct?

A.  One of the places.

Q.  And in fact, when you first told the story, you said the discussions were when he visited you in the basement at the jail, correct?

A.  That was one of them.

Q.  This is your testimony from the April 14th hearing in this case, page 2705.

     "QUESTION:  Isn't it true, Mr. Hawkins, that when you first -- when you told this story before about the discussions with Mr. Swano, you testified that Mr. Swano visited you in the basement of the jail with Mr. Fields to talk about the bribe isn't that correct?

A.  Yes, sir.

Q.  That was your first story.  You changed it to the bull pen, didn't you?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 37 of 140 PageID #:13187
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 37 of 140 PageID #:30932

11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

36

MR. KULWIN:  Objection.

MR. BURNS:  Objection.

THE COURT:  Sustained.  Argumentative.

BY MR. LOEVY:

Q.  Now, as far as the time frame, you have no idea when these conversations took place, correct?

A.  What do you mean?

Q.  Do you have any time frame when these conversations took place, the time frame that Mr. Fields supposedly heard about the bribe?

A.  When we were going to court, what are you talking about?

Q.  Did you ever have these conversations at Cook County?

A.  Yes, that's where we were at.

Q.  Isn't it true Mr. Fields and you were in different divisions?

A.  Yes.

Q.  You were in six, he was in one?

A.  You got it backwards.

Q.  You were in one, he was in six?

A.  Yes.

Q.  Different.

All right.  Did Swano ever tell you he was working with the judge to keep the money?

A.  No.

Q.  Your testimony on March 18th, 1993, lines 14, 4 through

14?

MR. KULWIN: I'm sorry, what was the date?

MR. LOEVY: 3/18/1993.

MR. KULWIN: Can I see the transcript?

THE COURT: Show it to him.

MR. KULWIN: What case it's from?

THE COURT: Actually, this is probably an appropriate place to deal with a question one of the jurors asked. There was a question that one of the jurors asked, it really wasn't a question for the witness, I'll paraphrase it. The lawyers are showing statements from or talking about statements from several court dates and trials. Can we get the dates and what the trials were for. It's hard to keep up with what they're talking about. Maybe I missed something.

So here's the answer to that question. So you've heard that there were two criminal trials of Mr. Fields. 1986 and 2009. And when questions have been asked about those, I have tried to kind of pop in if the lawyers haven't identified them to identify which criminal trial it is.

There have been other occasions on which various witnesses have testified on matters relating to the issues that we have here. There's a whole bunch of them. And as a matter of evidence law, it's really not appropriate for me to be going into for the lawyers to be going into exactly what the proceeding involved. So you're just going to have to do

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 39 of 140 PageID #:19189
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 39 of 140 PageID #:30934

your best to keep notes and whatnot.

I will tell you this.  It's been my consistent experience over the quick math, 17 years I have been a judge, about the same, 18 years that I was a lawyer before that, that 12 of you will do way better than one of you at remembering things.  That's why we have 12 jurors as opposed to one.

MR. KULWIN:  Judge, I'd like to be heard on this.

THE COURT:  Let me see you at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  By the way, you have blown way through 20 minutes.  How much more do you have?  You told me 20 yesterday.

MR. LOEVY:  I was trying to compress it to finish by the day.

THE COURT:  Life, one of the other things that life has taught me, that most lawyers I give them overnight, they shorten up.  They shorten it.

MR. LOEVY:  No.

THE COURT:  So you're the exception that disproves the rule.

MR. KULWIN:  Shorter if I have more time.

THE COURT:  What's the -- will the me look at this. This is testimony from what proceeding?

MR. LOEVY:  You told me not to read the trial name.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 40 of 140 PageID #:13190
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 40 of 140 PageID #:30955

THE COURT: U.S. v. Maloney. What's the question?

MR. KULWIN: My point is we weren't given any notice that he was going to pull this transcript out. Had he given me in I notice, I would have gone and searched the transcript. I don't know if this is the whole context or not. He could have six pages later clarified it. I think it's unfair.

THE COURT: Wow. That objection is overruled.

MR. KULWIN: Okay.

THE COURT: I got to say something more about this. Everybody knows about this witness' prior testimony. I'll just say this. Okay? These were, I'm looking at the transcript from the Maloney trial, it's leading questions by Mr. Hogan, Mr. Hogan being the lawyer who spent the most time than anybody in the entire world with this witness, they are leading questions from Mr. Hogan. I mean, I think you can be relatively comfortable.

MR. NOLAND: Judge, I would like to bring out at the last trial the Court barred, this Court, you barred us from getting into prior consistent statement of both Hawkins in July of '87 that he told the FBI and Pat Deedee that Fields was surprised of the bribe. Mr. Loevy just stated that isn't it true the first time you told this story was in 2014. That is incorrect. I think that has opened the door to this statement. It has two references in there that prior to the trial, that he, Swano, talked to him about the bribe, he told

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 41 of 140 PageID #:13121
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 41 of 140 PageID #:30936

Fields.

THE COURT: Show me.

MR. NOLAND: I highlighted both for the Court.

THE COURT: We can all look at it. The doctor said it's likely just my asthma.

So really, the one thing -- the one part in here that would potentially be admissible on this theory is the statement on the second full paragraph on page 2 of this 302 involving an interview on July 1, 1997, Defense Exhibit 113 that Hawkins advised that based on his prior experience with Swano who represented him on other cases he told Fields and Carter that Swano probably asked for 20,000 for the judge and would probably keep 5,000 for himself. It's a commission.

MR. LOEVY: Mr. Noland said that I said the first time he ever told anybody, and I don't know if he is being precise with his question, you have the realtime, I guess I would want to know.

THE COURT: Let me look at it. I am glad I looked at that. I think actually Mr. Noland let me say two things. What the questions involved that Mr. Loevy asked was isn't it a fact that the first time you told the story about Mr. Fields being told about the bribe, you said that it happened in the basement of the jail. So he didn't say that the first time he told the story about Mr. Fields knowing that the bribe was 2014. I don't see that in the transcript. So there's no

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 42 of 140 PageID #:19192

basis for a prior consistent.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: You can proceed.

BY MR. LOEVY:

Q. The question was did Swano tell you that he was working on the judge trying to keep the money?

A. Yes, that came up before.

Q. Why did you say no a minute ago?

MR. BURNS: Objection, your Honor?

THE COURT: Sustained. Leave it for argument.

BY MR. LOEVY:

Q. All right. Another time you told the story, you claimed the judge kept the money until the verdict isn't that true, sir?

A. Yeah.

Q. Is that true that the judge kept the money until the verdict?

A. When I found out that he gave the money back, I thought the verdict was in.

Q. All right. Another time you told the story, the judge gave it back two days into the trial, isn't it true?

MR. KULWIN: Judge, I am going to object to foundation. We don't have a foundation.

THE COURT: Sustained.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 43 of 140 PageID #:19103
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 43 of 140 PageID #:30958
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
42

BY MR. LOEVY:

Q.  Isn't it true you testified on October 29th, 19991, that the judge gave the bribe money back two days into the trial, did you give that testimony?

A.  Yes, sir.

Q.  Was that true?

A.  I thought it was, yes.

Q.  All right.  That's different than the other stores stories is it not?

THE COURT:  Same, argumentative.

BY MR. LOEVY:

Q.  Did Swano ever say he was going to come up with the bribe money from his own pocket?

A.  No, I never heard that.

Q.  This is your testimony on 3/18/1993 at page 1680.

    "QUESTION:  Did Swano ever tell you that he was going to come up with 6,000 out of his own pocket?

    "ANSWER:  Yeah."

     Did you give that testimony, sir?

A.  Yes.

Q.  When Swano told you that the money was giving the money back, who was present for this conversation, sir?

A.  When he said he was giving the money back?

Q.  The judge was going to give the money back, who was present?

A.   Me and Swano and probably Jack sweeten.

Q.   Do you remember saying in 2013 that George Carter was present?

A.   Yes.

Q.   Was he present?

A.   I thought he was.

Q.   His case had been severed long before, correct?

A.   Long before.

Q.   Right.

A.   No, it wasn't long before.

Q.   Was George Carter present when the bribe was talked about or not, sir?

A.   No, not that I remember.

Q.   Okay.  Do you remember giving this testimony in August 2013 at page 188, line 19: At some point during the trial, later on in the trial, did you later -- did Swano give you some bad news?

        "ANSWER:  Yes.

        "QUESTION:  Where did you talk to Swano?

        "ANSWER:  In the bull pen

        "QUESTION:  Who was present for that conversation?

        "ANSWER:  Nathson Fields, George Carter.

        "QUESTION:  What, if anything, did he tell you?

        "ANSWER:  He said I got some bad news for you.

        "QUESTION:  What did he say?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 45 of 140 PageID #:19195
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 45 of 140 PageID #:30940

"ANSWER: I said what are you talking about? He said the judge -- he want to give the money back. I said what?

Did you give that testimony, sir?

A. Yes, sir.

Q. You're making this up as you go along?

MR. KULWIN: Objection.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Do you recall whether there was a problem with getting the bribe money together?

A. Yes, sir.

Q. What was the problem?

A. That he wanted to make sure that it was for all his men, that's my knowledge.

Q. What's that?

A. He wanted to make sure that it was for everybody, that was in the situation.

Q. Swano didn't have any money, right?

A. I don't know what Swano had.

Q. He didn't have the bribe money, wasn't that the problem?

A. You are talking about getting him the money, yes.

Q. Wasn't that a problem that Swano didn't have the bribe money, there was some kind of delay, do you remember that, yes or no?

MR. KULWIN: Or I don't recall either.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 46 of 140 PageID #:18196
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 46 of 140 PageID #:30941

THE COURT: The question is -- no, do you remember that?

MR. KULWIN: Okay.

THE COURT: It would have to be yes or no.

THE WITNESS: Your question?

BY MR. LOEVY:

Q. Was there some kind of unexplained delay in getting the money? Do you remember that being part of the story?

A. It took time to get the money together and we got it to him when we could, yes.

Q. The criminal case got continued to June 11th, 1986, and there was still no money, correct?

A. Okay.

Q. I'm asking. Is that what happened?

A. Okay.

Q. Is that what happened?

A. Okay.

Q. No okay is ambiguous. I'm asking you?

MR. KULWIN: Judge, I am going to object. Argumentative.

THE COURT: Well, it may be argumentative, but it's right. So you need to answer it yes or no or I don't know: Those are the possibilities.

THE WITNESS: I don't know.

BY MR. LOEVY:


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 47 of 140 PageID #:19197
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 47 of 140 PageID #:30942

11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

46

Q.  Isn't it true you testified on March 18th, 1993, at page 1553, lines 20 as follows:

       "QUESTION:  Now, once again, was your case continued from May 12th until June 11th?

       "ANSWER:  Yes.

       "QUESTION:  In that intervening period, sir, in May and June, were there continuing conversations about trying to get the money to Bill Swano?

       "ANSWER:  Yes."

       Do you remember that testimony, sir?

A.  Yes, sir.

Q.  Isn't it true you had to decide whether you were going to pick a jury or a bench before you knew there was going to be a bribe?

A.  I don't understand the question.

Q.  The money hadn't been gathered yet, correct?

A.  Okay.

Q.  So the bribe hadn't been paid, correct?

A.  Yes, sir.

Q.  So you had to choose jury or a bench before you knew if there was going to be a bribe, correct?

A.  No, sir.

Q.  If there hadn't been any money, how could it have been paid?

A.  The plan could have been in the making, they just didn't

       ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case:1:23-cv-01737 Document#:287-31 Filed:04/06/26 Page 48 of 140 PageID #:19198
Case:1:10-cv-01168 Document#:1185-16 Filed:02/24/17 Page 48 of 140 PageID #:30943

put the money on there.

Q.   Was that the plan --

A.   That's what I thought was going on.

Q.   But you knew no bribe had been paid at the time that the criminal trial started, correct?

A.   I don't understand your question.

Q.   At the time the trial started, you knew that although you had a plan, no bribe had been paid, correct?

A.   I still don't understand.  You're saying before the trial started?

Q.   Right.  The trial started --

THE COURT:  He's asking whether the bribe was paid before the trial started.

THE WITNESS:  That's --

THE COURT:  Yes or no?

THE WITNESS:  Before the trial started, if it's a bribe, it would have to be paid before the trial started.

THE COURT:  He's asking whether it was.

BY MR. LOEVY:

Q.   You said there was a plan.  I'm asking did the plan happened before the trial started?

A.   As I remember, yes.

Q.   Okay.  Do you remember this testimony, this is page 181 of the 2013 proceeding.

"QUESTION:  Did you have additional conversations with

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 49 of 140 PageID #:13199
***REALTIME UNEDITED TRANSCRIPT ONLY***

48

El Rukns on still trying to get the money together?

"ANSWER: Yes.

"QUESTION: Again, was your case --

THE COURT: Slower, please.

BY MR. LOEVY:

Q. Again, was your case continued once more from June 11th, to June 16th? Your answer yes. Did the case get continued to the next date, June 17th?

"ANSWER: Yes.

"QUESTION: At that point you elected to either take a bench trial or a jury trial?

"ANSWER: I don't think so

"QUESTION: Well, the first time that your case was called that morning was Swano even there?

"ANSWER: I don't think so. I think they had to wait on it.

"QUESTION: Did he finally appear to court on June 17th?

"ANSWER: Yes.

"QUESTION: On that day, did you finally take or elect to take a bench trial finally?

"ANSWER: Yes, sir.

"QUESTION: Did Fields take a bench trial on that date as well?

"ANSWER: Yes, sir."

***REALTIME UNEDITED TRANSCRIPT ONLY***

Did you give that testimony, sir

MR. KULWIN:  I object.

MR. LOEVY:  That has the date.

THE COURT:  Overruled.

THE WITNESS:  Yes, sir.

BY MR. LOEVY:

Q.  The date was June 17th, correct?

A.  Okay.

Q.  Now, when do you claim that you and Mr. Fields learned that Maloney was giving the money back?

A.  We was in trial already.

Q.  The trial had already started, right?

A.  Yes.

Q.  So according to you, no, I'm sorry, this is your testimony in this court before Judge Kennelly on April 2014 at page 267, line 19.

"QUESTION:  Just to clarify in my mind, when was it that you first learned that the money had been given back by Judge Maloney at the time of the bribe?  When was the first time you learned?

"ANSWER:  A couple of days before the trial.

"QUESTION:  Before the trial began or when?  And then Judge Kennelly said he just said a couple of days before the trial.

"QUESTION:  Okay.  And then Mr. Burns asked you

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 51 of 140 PageID #:18301
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 51 of 140 PageID #:30946

50

MR. KULWIN:  May I have a page, please, Judge?

MR. LOEVY:  2679 and 2680.

THE COURT:  That's what he said.

MR. LOEVY:  The question again was the money for the bribe had been returned, though, correct, sir?  Yes, sir.  Did you give that testimony in this court.

THE WITNESS:  Yes, sir.

BY MR. LOEVY:

Q.  All right.  Was it true?

A.  No, sir.

Q.  Did you intentionally give untruthful testimony in May 2014?

A.  No, sir.

Q.  If the money had been given back once the trial -- before the trial began, as you testified in 2014, then would you have known that the heat was on, correct?

A.  What's your question, sir?

Q.  Once the money was given back, then would you have known that you have a problem, right?

A.  Yes.

Q.  All right.  And if the money was given back before the trial and if that was true that it was given back before the trial, then when you make an election, you knew you should have stayed away from Judge Maloney, correct?

A.  What's your question, sir?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 52 of 140 PageID #:18302
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 52 of 140 PageID #:30947

Q. The reason the money coming back was a problem because that would suggest you're in more trouble, right, he's going to convict, right?

A. That could be one way looking at it.

Q. All right. But you knew before the trial started that he was giving the money back, didn't you?

A. No.

Q. And you knew before you had to elect a jury or bench that he had given the money back, correct?

A. No.

Q. But that is what you testified to under oath in 2014?

A. Yes.

Q. When was Mr. Fields arrested, sir?

A. I don't know.

Q. Why did you tell Mr. Kulwin yesterday that --

A. Because I thought.

Q. Mr. Kulwin said isn't it true he was arrested in June 85 and you said yes, sir?

MR. KULWIN: Objection, Judge. I don't think I said that.

THE COURT: Overruled.

BY MR. LOEVY:

Q. You said yes, sir, right?

A. Okay. A little while after me, I knew that.

Q. But you didn't know the answer even though you said yes,

sir, correct?

A.  I don't know the answer to a lot of stuff you're saying I'm saying yes, sir.

Q.  All right.  How about the questions he was asking you about the prosecution memos.  Do you know exactly when you saw the prosecution memos, was it before you testified, after you testified, you don't know the sequence, do you?

A.  No, sir.

Q.  So when you asked you yesterday, isn't it true you had already given all of your testimony and you already locked it in before you saw the prosecution memos, why did you say yes, sir to those questions?

THE COURT:  There is no human being that could have understood all of the words that you said so quickly.  If you want to ask the question, slow it down.

BY MR. LOEVY:

Q.  You have no idea at what point you saw the prosecution memos, right?

A.  That's the question?

Q.  Yes.

A.  How do you know I know I did?

Q.  I thought you told me that three questions ago?

A.  I didn't tell you that.  You made it up.

Q.  Do you know the timing of when you saw the prosecution memos?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 54 of 140 PageID #:18204
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 54 of 140 PageID #:30945
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

53

A.  No, sir.

Q.  Okay.  Then we have established that.

Yesterday, when Mr. Kulwin started asking you questions, he was saying to you isn't it true, sir, that you didn't see the prosecution memos until after you had already put Nate in the story, you said yes, sir, didn't you?

A.  Yes, sir.

Q.  Okay.  You said that even though you had no idea what he was talking about, didn't you?

A.  I knew exactly what he was talking about.

Q.  Okay.  Same questions for when you first told O'Callaghan that he was not involved in Vaughn/White.  Do you remember what year it was that you first told O'Callaghan that Nate was not involved in the Vaughn/White murder?

A.  No, sir.

Q.  Then why did you testify yesterday?

A.  Because it refreshed my memory, he refreshed my memory.

Q.  Is it still refreshed?

A.  Yes.

Q.  What year was it?

A.  I don't know, 78, 91, somewhere between there.

Q.  All right.  Let's talk about your memory of the events of your capital murder trial.

Do you remember how you were identified -- how the witnesses identified the people in the get away car?

MR. KULWIN:  Judge, I am going to object.  This has been asked and answered, gone over and outside the scope.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Mr. Kulwin asked you some questions about Randy Langston and James Speights.  Do you remember those questions from yesterday?

A.  Yes, sir.

Q.  Isn't it true that the police were talking to you before the retrial but they needed an explanation for why Randy's testimony was all over the board?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Sustained.  It was covered.

BY MR. LOEVY:

Q.  Mr. Kulwin asked you isn't it true you solved like 20, 30 murders, do you remember those questions?

A.  Yes, sir.

Q.  Some of those murders you actually knew about and some of them you didn't, isn't that true, sir?

A.  Some of them I had firsthand knowledge and some of them I had second knowledge.

Q.  Some of them they read you that grand jury statement and you said yes, sir?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Sustained.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 56 of 140 PageID #:18206
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 56 of 140 PageID #:30951
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
55

BY MR. LOEVY:

Q. All right. Let's talk about your sentence and the calculations. Do you remember when Mr. Kulwin was asking you those questions yesterday about in this and that and this and that. Did you know into he was talking about?

A. I knew exactly what he was talking about when he was talking about my sentence.

Q. In 2014 when you testified in this court, what was your understanding of your out date?

A. September 2016.

Q. All right. You allowed the Court and the participants to have the impression that it was 2027, didn't you?

A. That's not my fault.

Q. Did you discuss with the attorneys in the context of your testimony whether there's going to be something in it for you?

A. No, sir.

Q. It didn't come up at all?

A. No, sir.

Q. You did get a sentence break, did you not?

         MR. BURNS:  Objection?

         MR. LOEVY:

         THE WITNESS:  Yes, sir.

BY MR. LOEVY:

Q. You're saying you never talked about it with them?

         THE COURT:  The objection to the previous question is

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 57 of 140 PageID #:13207
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 57 of 140 PageID #:30952

overruled.

BY MR. LOEVY:

Q. You say that when the attorneys were saying it was 2027?

MR. KULWIN: Could you.

BY MR. LOEVY:

Q. When Mr. Burns was saying in --

A. I tried to, but they kept saying let's go. I knew what it was.

Q. Did you explain that to Mr. Burns?

A. I tried to explain it to anybody that was in any of these hearings before we started, sir.

Q. That's the critical part. Before we even started, did you try to explain that to Mr. Burns?

A. Yes, sir.

Q. Tell me what you remember about that?

A. As I was explaining to people.

THE COURT: I need to see the lawyers at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: Okay. So you're now 40 minutes which is double the estimate and the only reason it's 40 as opposed to 50, your treading on thin ice because you are essentially inviting him to bring out that there was a prior trial in the case. That's number one. Actually that's number two.

No. 3 is that you are repeating the direct and just

***REALTIME UNEDITED TRANSCRIPT ONLY***

because a subject was covered on cross doesn't mean you get to repeat the direct over again. So I am going to ask you again, or I guess fool me once, shame on me or you, fool me twice shame on me or I don't know which way that works, whatever, how much more do you have?

MR. LOEVY: Less than five minutes even before you said that. I am at the very end. This is an important subject for this reason. In 2014, Mr. Burns said you're in until 2017. Yesterday, Mr. Kulwin said you knew the whole time you were getting out in 2016. Those are 100 percent opposite positions and it's a real problem. One of them is very wrong.

MR. KULWIN: Well, I am going to say.

THE COURT: Go ahead.

MR. KULWIN: I want to say that's completely wrong. Thing number one is what Mr. Burns brought out was I guess at the 2014 trial, I wasn't here, when -- what was the out date.

THE COURT: Yesterday, he said 2016.

MR. KULWIN: What he thought was, that's what he believed. Okay? And that's what led to the problem because you were saying 2025 and he's going no, I think it's 2016. It's right on the transcript. He was under a belief different from what all the lawyers were telling him. I made that perfectly clear.

MR. BURNS: Just so we have the transcript from that

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 59 of 140 PageID #:19209
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 59 of 140 PageID #:30954

***REALTIME UNEDITED TRANSCRIPT ONLY***

58

prior proceeding.

THE COURT: Page 2679.

MR. BURNS: We did have a discussion. He was talking about the 2016 release. The Court at that time, and you had some concerns about going into other matters and what was happening, so we stopped the testimony and did not get into an explanation at that time. That's what I believe the transcript represents.

THE COURT: Wow, okay. I am going to say something that lawyers say. The fact that I am not responding to that does not mean I agree with what you said because I don't.

Here's the deal. We are getting off the field here. You now have five minutes.

MR. LOEVY: Yeah.

THE COURT: Okay.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: Okay. Proceed.

BY MR. LOEVY:

Q. All right. Sir, since 1996, you have not cooperated against any people except Nate Fields, correct?

A. Yes, sir.

Q. And in 1994 or 1996, your out date was 2027, correct?

A. As I told you many times and anybody else that's been listening, my understanding of my out date was September 2016.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 60 of 140 PageID #:18310
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 60 of 140 PageID #:30955
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

59

Q. No, but that's after it got reworked, your deal got reworked in 2009, right?

MR. BURNS: Objection, argumentative, your Honor?

MR. LOEVY: No.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Your deal got reworked in 2009 --

A. I told you, sir, my understanding -- my out date.

Q. Different question. Different question, sir. Your deal got reworked when you testified against Mr. Fields in 2009, right?

A. Yes.

Q. And that's when you believe your out date became 2016, right?

A. No.

Q. You believed you were out sooner than 2016 before your deal got reworked in connection with that testimony?

A. I'm not saying that.

Q. Your deal got reworked before you gave the deposition in 2013, correct?

A. Yes.

Q. And after both of those times, after both those reworkings, your out date was 2016, correct?

A. It was always 2016.

Q. Then why did it get reworked twice if it was always 2016.

***REALTIME UNEDITED TRANSCRIPT ONLY***

I don't understand.  Maybe you can explain?

MR. KULWIN:  I object.  He is conflating --

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Do you understand the question?

A.  I understand crystal clear.  What is your answer?

Q.  If your out date was always 2016, then why was the deal reworked in 2009 when you testified at the criminal trial and why was it reworked again in 2013 when you testified at his deposition?

A.  I don't know.

Q.  The answer to that is because they cut your time both times isn't it true?

MR. KULWIN:  Objection, Judge.  Misstates the evidence.

MR. LOEVY:  Objection, Judge, argumentative.

THE COURT:  Both objections are overruled.

THE WITNESS:  So your question?

BY MR. LOEVY:

Q.  They cut your time when you agreed to testify against Nate, right?

MR. KULWIN:  Objection, foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, they took off a few years.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 62 of 140 PageID #:18312
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 62 of 140 PageID #:30957

Q. All right. Let's talk about your parole hearing when Mr. Kulwin was asking you those questions yesterday, he said that isn't it true that your first real parole hearing was 2014? Do you remember him asking those questions?

A. Yes.

Q. Do you have any idea what he is talking about?

A. Yes.

Q. Why did you not have a real parole hearing in 2012?

A. Why didn't I have a real parole, because you have to do a certain amount of time before you're eligible for parole.

Q. All right. So if this was your parole that mattered, by the way, this is the first parole hearing that mattered after your deal was reworked, correct?

A. No --

MR. KULWIN: Objection, Judge.

THE COURT: Sustained, confusing.

BY MR. LOEVY:

Q. In 2013, they erased your state time so all you had left was federal time, correct?

MR. KULWIN: Same objection, Judge.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. In 2014 --

THE COURT: Again, I think this was covered, this point was covered sufficiently on direct.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 63 of 140 PageID #:19313
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 63 of 140 PageID #:30958

BY MR. LOEVY:

Q. All right. Just two more questions.

In 2014 when you knew you were having an important parole hearing, did you say to the defendants a couple of months after you testified in this hearing I need you to keep your commitment?

A. Probably so.

Q. Tell me what you remember about that.

A. I told them that the time that he said they're cutting off my sentence hasn't caught up with me yet.

Q. And that you needed their help?

A. I needed what you said that you were going to do to do, the time.

MR. BURNS: Objection.

THE COURT: What's the objection?

MR. BURNS: Misstates facts, your Honor.

THE COURT: He is answering the question.

MR. BURNS: The question calls for it. We discussed it yesterday.

MR. LOEVY: No, your Honor.

THE COURT: Which defendants are you talking about? That's the question.

BY MR. LOEVY:

Q. O'Callaghan and Murphy or just O'Callaghan?

A. What are you talking about?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 64 of 140 PageID #:19314
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 64 of 140 PageID #:30955

THE COURT:  For crying out loud.

MR. LOEVY:  Can we read back his answer?

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  It's not a deal, it's an order.  It's not a deal.  I don't require your agreement and I am not asking for your agreement.  You just made the exact same mistake that I had to instruct the jury on yesterday.  You had Mr. Murphy doing something for Mr. Hawkins.  I had to instruct the jury on that yesterday because you admitted that you blew it and you did blow it.  Now I am going to have to instruct them again and you're done.

MR. LOEVY:  Thank you.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  All right.  As I said yesterday, I am going to say it again with regard to Mr. Murphy, there is no -- Mr. Murphy did not write any letters or do anything for Mr. Hawkins with regard to the parole board in 2014.  That's a fact you are to take.

Recross based on the redirect.

MR. KULWIN:  Can I have one second, Judge?

- - -

EARL HAWKINS, RECROSS-EXAMINATION

BY MR. KULWIN:

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 65 of 140 PageID #:18315
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 65 of 140 PageID #:30960
11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

64

Q.  You were just asked a whole bunch of questions about your out date and people cutting you a deal.  Do you remember those questions just now?

A.  Yes, sir.

Q.  Okay.  The out date that you're talking about is your federal out date, correct?

        MR. LOEVY:  Objection, your Honor, covered on his last exam.

        THE COURT:  I am going to let you do a couple of questions about this because I cut Mr. Loevy off at a fairly early stage for repeating the direct and I am going to cut you off at a fairly early stage for repeating the question.  I am going to let you have a couple questions, so make them good ones.

        MR. KULWIN:  It's a good one.

BY MR. KULWIN:

Q.  The out date that you're referring is your federal out date?

A.  Yes, sir.

Q.  And that never changed the entire time we are talking about; is that correct?

        MR. LOEVY:  Objection.

        THE WITNESS:  Yes.

        THE COURT:  Overruled.

BY MR. KULWIN:


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 66 of 140 PageID #:18216
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 66 of 140 PageID #:30961

Q. Now, let's talk about the deals after that that was reducing your time, the three years. Do you remember those questions, right?

A. Yes, sir.

Q. That's as counsel well knows, that's the state?

MR. LOEVY: Objection, your Honor.

THE COURT: What's the objection?

MR. LOEVY: He said as counsel well knows.

MR. KULWIN: I'll take that.

THE COURT: No, you don't have to take it back. It's stricken.

MR. KULWIN: Okay.

THE COURT: It's improper. The jury is directed to disregard it. I am just telling everybody right now. The next time somebody does something like that, I don't care who it is, there's going to be a price to pay. That's it. Everybody get that? I want to make sure everybody is looking at me.

MR. KULWIN: Got it.

BY MR. KULWIN:

Q. The three years off that you were asked about in 2009, et cetera, that was the state prosecutors making your deal for state time, correct?

A. Yes, sir.

Q. Okay. And that was in return for cooperation in

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 67 of 140 PageID #:18217
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 67 of 140 PageID #:30962

11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

66

Q. proceedings in 2009 and in 2013 relating to state proceedings relating to Mr. Fields, correct?

A. Yes, sir.

Q. Okay. Now, your grand jury statement that you were asked about so we're clear, you walked into the grand jury preparing for one year with Mr. Hogan and federal and state investigators, right? Do you remember that?

A. Why he is.

Q. Okay. And it was a lengthy statement, true, 36 pages, correct?

A. Yes, sir.

Q. And Mr. Hogan read the statement, right?

MR. LOEVY: Objection. This was covered, your Honor.

THE COURT: Overruled.

BY MR. KULWIN:

Q. Correct?

THE COURT: Let's get to it.

MR. KULWIN: I'm getting to it right now.

THE WITNESS: Yes, sir.

BY MR. KULWIN:

Q. And I want to show it to you, he read -- he read you three full pages of testimony, I want to show it to you, sir, about a variety of matters including one sentence concerning Vaughn/White before he asked you is that correct, two full pages. Let me check this.

MR. KULWIN:  Hold on for a second, Judge.

I apologize.

BY MR. KULWIN:

Q.  By the time he got to the Vaughn/White statement, which was one sentence, he had already been reading for 22 pages is that right, sir?  Can you just take a look at that?  About 22 pages before he even mentioned Vaughn/White, correct?

A.  Yes.

Q.  Okay.  And then before he said am I right so far, he read a full another page about other matters as well where he says is this accurate so far?  Do you see that?  Here's where you first mention Vaughn/White on page 23, and then he goes through a whole page on 24 before he says to you is that accurate so far, do you see that, sir?

A.  Yes.

Q.  Now, with respect to all the photos that you were shown and all this other stuff where you could see 500 feet, let me ask you this, Fuddy Smith was out in front of '709 that day, wasn't he?

A.  706.

Q.  706, right.  Fuddy Smith got shot in the back of the head in front of 706 that day, right?

A.  Yes, sir.

Q.  You were there that day, right?

A.  Yes, sir.

11/29/16 AM

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 69 of 140 PageID #:18319
Case: 1:03-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 69 of 140 PageID #:30964

***REALTIME UNEDITED TRANSCRIPT ONLY***

68

Q. You were asked some questions about whether you got the details of when the bribe was and all that stuff when you testified in 2014. But you gave testimony perfectly consistently in 2013 in another proceeding, didn't you?

THE COURT: Just ask the question.

MR. KULWIN: Sure.

BY MR. KULWIN:

Q. Do you remember this question and answer in a proceeding that took place on the 21st day of August 2013 in a proceeding relating to Mr. Fields.

MR. LOEVY: Page?

MR. KULWIN: 181.

MR. LOEVY: Thank you.

BY MR. KULWIN:

Q.

"QUESTION: Did he finally appear to court on June -- I'm sorry.

"QUESTION: Well, the first time your case was called that morning was Swano there?

"ANSWER: I don't think so. I think they had to wait on him.

"QUESTION: Did he finally appear to court on June 17th?

"ANSWER: Yes

"QUESTION: On that date did you finally take or elect

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 70 of 140 PageID #:18320
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 70 of 140 PageID #:30905

to take a bench trial finally?

"ANSWER:  Yes, sir.

"QUESTION:  Did Fields take a bench trial on that date as well?

"ANSWER:  Yes, sir

"QUESTION:  In fact, you recall the jury being assembled outside as you were waiving the jury trial?

"ANSWER:  Yes, sir

"QUESTION:  Did you both waive jury together?

"ANSWER:  Yes

"QUESTION:  Did you talk to each other in the bull pen on June 17th of '86?

"ANSWER:  Yes.

"QUESTION:  And were you constant, did you also talk in the bull pen on June 16th, 1986?

"ANSWER:  Yes.

"QUESTION:  On June 17th, 1986, before you went out and waived the jury trial, did you talk to Swano when he finally appeared on that day?

"ANSWER:  Yes

"QUESTION:  What did he tell you that made you want to take a bench trial?

"ANSWER:  He said he got the money and got to talk to the judge.  He said he got, he could make it work.

"QUESTION:  Was Fields present when Swano told you this

11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

70

in the bull pen?

"ANSWER:  Yes.

"QUESTION:  Was Carter present?

"ANSWER:  Yes.

"QUESTION:  Did you then come out and waive jury trial?

"ANSWER:  Yes.

"QUESTION:  Did Fields waive jury trial?

"ANSWER:  Yes."

     Did you give those answers in 2013 in a state proceeding involving Mr. Fields back then?

A.  Yes, sir.

Q.  Now, more to the point -- oh, did you give the answers, right?  You gave the answers?

A.  Yes, sir.

Q.  More to the point, Mr. Fields, any question in your mind that the El Rukns?

     THE COURT:  You said Mr. Fields, you mean Mr. Hawkins.

BY MR. KULWIN:

Q.  Mr. Hawkins, I apologize.

A.  No problem.

Q.  Thank you.

     Mr. Hawkins, is there any question in your mind, any dispute whatsoever in your mind that the El Rukns provided $10,000 to Bill Swano to bribe Judge Maloney?


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 72 of 140 PageID #:18322
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 72 of 140 PageID #:30967

MR. LOEVY: Objection, covered.

THE COURT: Sustained.

BY MR. KULWIN:

Q. You were asked a number of questions about how this happened, what happened. In the 2009 hearing, Mr. Hawkins?

MR. KULWIN: Can I have the ELMO, Judge?

THE COURT: Yes.

MR. LOEVY: What page?

MR. KULWIN: 9.

BY MR. KULWIN:

Q. You were asked questions about whether you were familiar with the 706 building, whether you were familiar with Fuddy. You were asked those questions. Did you give this truthful testimony on?

MR. LOEVY: We object to scope, your Honor.

THE COURT: Let me see -- hang on a second. The scope objection is overruled.

BY MR. KULWIN:

Q. Did you give this testimony on February 25th, 2009, in a criminal trial -- in the criminal trial, people v. Nathson Fields.

"QUESTION: Okay. Specifically back in the spring of 1984, were you familiar with the address of 706 East Pershing?

"ANSWER: Yes.

"QUESTION: How were you familiar with that address?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 73 of 140 PageID #:19323
Case: 1:16-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 73 of 140 PageID #:30968

"ANSWER: I've been living around there all my life and I had a daughter that was born in the building.

"QUESTION: Would you be in the area of that address on a fairly regular basis back in 1984?

"ANSWER: Yes, sir.

"QUESTION: Were you involved in the narcotics, sale of narcotics back in 1984 in that area?

"ANSWER: Yes, sir.

"QUESTION: What type of narcotics did you sell back then?

"ANSWER: Codeine syrup.

"QUESTION: Was that on behalf of the El Rukns street gang?

"ANSWER: Partly, yes.

"QUESTION: Now, back in the spring much 1984, were you aware of another gang that basically hung out in the area?

"ANSWER: Yes.

"QUESTION: What gang was that?

"ANSWER: The Goon Squad."

MR. LOEVY: I object to scope.

MR. KULWIN: I am getting to it.

THE COURT: Then let's get to it.

BY MR. KULWIN:

Q. "QUESTION: Did you know who the leader of that gang was?

73

"ANSWER:  Fuddy

"QUESTION:  Do you know his real name?

"ANSWER:  Jerome Smith."

          THE COURT:  Okay.  Based on that, the scope objection is overruled.

BY MR. KULWIN:

Q.  You knew who Fuddy Smith was back then, right, back in '84?  You knew who Fuddy Smith was?

A.  Yes.

Q.  You were asked questions about whether Nate Fields was there or not, how he came in his own car.  In that same proceeding, did you give this testimony in February 2009:

          THE COURT:  This is also from the criminal trial?

          MR. KULWIN:  Yes, your Honor.

          THE COURT:  I am putting it up on the jury's monitor.

          MR. KULWIN:  Thank you, your Honor.

BY MR. KULWIN:

Q.

          "QUESTION:  Let me stop you for a minute.  When you saw George Carter coming running towards your car

          THE COURT:  Page number?

          MR. KULWIN:  I'm sorry, Judge, page 42, the February 2009 criminal proceeding, people v. Fields.

          THE COURT:  Okay.

BY MR. KULWIN:

Q.

"QUESTION: Let me stop you for a minute. When you saw George Carter coming running towards your car after the shooting, was his mask still on?

"ANSWER: Yes.

"QUESTION: Tell the judge how the mask was on his head?

"ANSWER: Rolled up on his head.

"QUESTION: When Nathson Fields came back to the car after the shooting, where was his mask on his face?

"ANSWER: Rolled up on his head.

"QUESTION: Could you see their faces when they ran to the car?

"ANSWER: Yes."

That was truthful testimony, correct, sir?

A. Yes.

Q. You were asked some questions about an alleged pros memo that you allegedly saw back when you were about to testify in the RICO trials against the El Rukns. Do you remember those questions?

A. Yes, sir.

Q. You don't know that it was a pros memo. That's just something counsel came up with, you don't know what it was?

MR. LOEVY: Objection, your Honor, scope, argumentative and form.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 76 of 140 PageID #:19326
Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 76 of 140 PageID #:30971
11/29/16 AM                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

75

THE COURT:  The comment is stricken.

MR. KULWIN:  Okay.

MR. KULWIN:  I'll rephrase it.

BY MR. KULWIN:

Q.  You don't know that it was really a pros, you don't remember that, do you?

MR. LOEVY:  Objection, scope.

THE COURT:  Overruled.  But it's --

MR. KULWIN:  I'll get right to it, Judge.

THE WITNESS:  He showed me -- do you do, when I'm in the cell, they said do you want to see these papers, I don't want to see them papers, we will just slide them under your door, no, I don't want to see them.

BY MR. KULWIN:

Q.  You don't know whether it was a pros memo one way or the other?

A.  That's what they say it was.  They same.

THE COURT:  The question is do you know what it was?

BY MR. KULWIN:

Q.  Do you know?

A.  No, sir.

Q.  And you didn't look at them?

A.  No, sir.

Q.  And when you were asked about how you could say that you knew it was after you had already cooperated, you don't know

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 77 of 140 PageID #:18327
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 77 of 140 PageID #:30972
***REALTIME UNEDITED TRANSCRIPT ONLY***

76

the specific dates of when you saw that or when you cooperated, you don't know the specific dates like May 15th, 1982 or things like that, right, you don't remember those dates; is that fair?

A.  No.

Q.  But you do remember that when that document came out, you had already cooperated, already provided information, and that that had nothing to do with anything?

A.  Yes, sir, that's what I believe.

MR. KULWIN:  May I have one moment, Judge?  Your Honor, at this time we have no further questions.

MR. BURNS:  I have none, your Honor.  Thank you.

MR. LOEVY:  Will you permit four questions, your Honor?

THE COURT:  Okay.  Four.

- - -

EARL HAWKINS, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  You did -- you were told that these papers that they were showing you were prosecution memos, that's what you just said, right?

MR. KULWIN:  Objection.

THE COURT:  Sustained.

MR. KULWIN:  Argumentative.

THE COURT:  Sustained.  That is not a correct

statement of what he said.

BY MR. LOEVY:

Q. What did they tell you the papers were?

MR. KULWIN: Objection, asked and answered, Judge.

THE COURT: Well, based on the recross, no. He can answer the question.

THE WITNESS: Who is they?

MR. LOEVY: Does that not count as my question.

THE COURT: You just gave the statement about what these other guys --

THE WITNESS: I thought he was saying what the prosecutors.

THE COURT: The other guys at the MCC.

THE WITNESS: They were saying they were some kind of papers from the U.S. Attorney's Office, yes.

BY MR. LOEVY:

Q. Weren't you at least a little bit curious to see what those papers might be?

MR. KULWIN: Objection, argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Mr. Kulwin asked you, read you several pages of transcript testimony from the April 2000 proceeding about the bribe. Do you remember those questions that he just asked you and read you the two pages of questions?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 79 of 140 PageID #:19329
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 79 of 140 PageID #:30374
***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT: Just ask the question.

BY MR. LOEVY:

Q. The only response was yes, yes, yes, yes, yes, yes, yes, and yes, sir?

MR. KULWIN: Objection.

BY MR. LOEVY:

Q. That's literally the only thing you said?

A. Pretty much.

THE COURT: All right. I have a couple of questions from the jurors that were handed to me. I've got those. Are there other questions that anybody has? I think I see -- nobody is writing. Let me see the lawyers at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: Just two questions. Number one, what date and month were you released from prison, anybody have a problem with that? He said it, but I'm not sure it's entirely clear. The second one says I'll quote it, I think this was probably written out yesterday just to be clear because it was handed to me this morning.

Regarding your appearance here today and your statement, I made a commitment and that was part of it. To whom did you make the commitment and for what reason? Basically, I think what I'd ask him is you testified yesterday regarding your appearance here to testify today that you made

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 80 of 140 PageID #:13330
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 80 of 140 PageID #:30975
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

a commitment and this is part of it.  Who did you make the commitment to and what was it?  Does anybody have a problem with either one of those?

MR. LOEVY:  We do.  Because this witness is so suggestible and leadable, he did say it in the context of O'Callaghan the first time and he gave an answer.

THE COURT:  Okay.  That objection is overruled.

MR. KULWIN:  Judge, one other thing, I apologize.  Mr. Loevy just made a representation that all he said was yes yes yes yes.  He didn't.  He specifically said he got the money, he got to talk to the judge, he said he got, he could make it work.

MR. LOEVY:  That's not what I said.

MR. KULWIN:  That misstates what he said.  I should at least be --

MR. LOEVY:  Page 183, I'm sorry, your Honor.

THE COURT:  Go ahead.

MR. LOEVY:  Before he says that, I heard him start reading on page 181 and he stopped right around George Carter.

MR. KULWIN:  No, I stopped all the way over here.

THE COURT:  Look, the answer is no.  You read the testimony, he said something about it, it's been covered.

MR. LOEVY:  All right.

(The following proceedings were had in open court in the presence and hearing of the jury:)


***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT: Okay. Two questions. What was -- what date and what month -- when were you released were prison, what month, what year?

THE WITNESS: December 17th, 2014.

THE COURT: Thank you. Yesterday, you were asked some questions about why you were appearing here today. You said something along the lines of I made a commitment and this is part of it. Do you recall that?

THE WITNESS: Yes, sir.

THE COURT: The question is who did you make the commitment to?

THE WITNESS: I guess when I was cooperating Mr. . Nobody can hear what you are saying commitment to whom?

THE WITNESS: When I agreed to cooperate, that's what --

THE COURT: Who were you making the commitment to is the question.

THE WITNESS: Whoever I agreed to cooperate, the state and federal government, I guess.

THE COURT: All right. I think that covers it. Follow-up based on those two questions?

                              - - -

EARL HAWKINS, REDIRECT EXAMINATION

BY MR. LOEVY:

Q. You were gesturing that way when you said who you made the

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 82 of 140 PageID #:19232
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 82 of 140 PageID #:30397

commitment to?

THE COURT:  Well, he was gesturing that way and I asked him to explain the answer, he explained the answer.

BY MR. LOEVY:

Q.  These are the gentlemen you were cooperating with?

A.  Yes.

MR. KULWIN:  Objection.

MR. BURNS:  Judge.

THE COURT:  The objection is sustained.  It's all covered.

MR. KULWIN:  A follow-up on that, Judge, to clarify.

THE COURT:  I just sustained the objection.  Are we now going to have follow up on questions on which I sustained objections and didn't permit answers?  Go ahead.  Let's see if you can ask a question, a sustained objection as I have told the jury multiple times, questions are not evidence.  The jury is not to consider questions on which I sustained objections.  So if you think that there's testimony that you need to follow up on, please feel free to get up.

MR. KULWIN:  That's fine, Judge.

THE COURT:  Please feel free to get up.

MR. KULWIN:  No thanks.

THE COURT:  The witness is excused.  We are going to take a break because we have so discuss some things before the next testimony.  We will probably for probably about 15

minutes.

(The jury leaves the courtroom.).

THE COURT:  Do you want to make a record on anything, Mr. Kulwin?

MR. KULWIN:  No, I've made my record to the best I can make it.

THE COURT:  In terms of what your questions were that you wanted to ask.  That's what I'm talking about.

MR. KULWIN:  No.  I withdrew my question, Judge. That's what I did.

THE COURT:  The next witness is who?

MR. LOEVY:  Mr. Brasfield, plaintiff's expert on Monell.

THE COURT:  We need to deal with this thing that you submitted yesterday that's called Plaintiff's Proffer Relating Jones and Palmer.  That's going to come up during the direct, right?

MR. LOEVY:  Correct, Judge.

THE COURT:  So let me hear from the defense on this. I think it would probably make sense, because it's in numbered paragraphs, I think it would probably make sense for you to start off by going through and telling me which parts do you have an objection to and then we'll go back through them.

MR. LOEVY:  Your Honor, may we suggest that our expert be present so hear so he can hear what the rulings are

and know what he can say and what he can't say.

THE COURT:  That's a fair point.  He is an expert.
He is in the room.

MR. LOEVY:  Mr. Brasfield.

THE COURT:  Just have a seat, but listen.  Mr.
Noland, go ahead.

MR. NOLAND:  Judge, I guess just for the record, this
is the fourth time I think they have made one of those
proffers.  It seems like they're trickling it out.

THE COURT:  You know what, I am treating this as the
universe.  This thing -- this document is the universe.  I'm
not really dealing with the previous ones, to the extent there
were any.  I know there's been discussion about it before.  I
am treating this as the universe of what they intend to
present.

MR. NOLAND:  So it looks like on the proffer on page
2, the third and fourth line, they say the city officials were
aware that.

THE COURT:  Which paragraph number was this?

MR. NOLAND:  Paragraph 1.  That Jones could not have
committed the murder.  I think that should be may not have
committed the murder.  It was potentially exculpatory
evidence.

The next line.  Laverty's information was placed in a
so-called --

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 85 of 140 PageID #:19235
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 85 of 140 PageID #:30980
11/29/16 AM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

84

THE COURT:  Slow down.

MR. NOLAND:  Laverty's information was placed in a so-called street file which the CPD did not turn over to prosecutors in the criminal defense.  My recollection was that Mr. Hickey had stated that the understanding was that the memo had been provided to the -- I think somebody named Dee and it wasn't turned.  You know what?  I'll waive that.

THE COURT:  Okay.

MR. NOLAND:  Waived.

The next line as far as in spring of '82, Laverty learned Jones was on trial for murder.  He told his commander that than an innocent person was being prosecuted and his commander did nothing.  Laverty informed Jones' criminal defense attorney.  I think we are going beyond what's necessary for the -- their notice argument, Judge, so I think a lot of the details and I think that's going to be a lot of our arguments hereafter.  Jones filed a Section 1983 lawsuit.  Again --

THE COURT:  This is paragraph 2?

MR. NOLAND:  Yeah, paragraph 2.  I think that is unnecessary as well.  I think the jury -- as far as there was litigation with respect to this incident I think is what the Court had previously allowed.  So I would object to that entire sentence.

And then paragraph 3 we would object to as far as of

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 86 of 140 PageID #:18236
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 86 of 140 PageID #:30981

the CPD initiating disciplinary proceedings against Laverty.

THE COURT: Keep going.

MR. NOLAND: Paragraph B, or section B, paragraph 4, they're talking again about the specifics of Palmer class action, I think that the litigation was filed regarding -- and as far as the policies and practices of suppressing investigative materials and street files, we believe that would open the door to the result in Palmer 2 which was that there was no policy and practice, there was a single case and Palmer 2 found it. Basically, too much detail.

THE COURT: What do you think would be an appropriate amount of detail?

MR. NOLAND: I think what the Court has already allowed, which was that there was litigation that the city changed its policy, the superintendent had the city change its policy during the litigation as a result of the detectives maintaining their notes and so I think that is I think what should be allowed. And that is why they changed their policy without saying what the -- and that there was this issue in the Jones case is acceptable too which I think the Court has allowed before.

Then they get into a lot of detail about days after the suit was filed, a federal judge order the city to preserve all the street files. And the department notice and et cetera. I think as far as the order preserving the street

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 87 of 140 PageID #:18237
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 87 of 140 PageID #:30982

files for that time, it's probably okay.  So no objection to that, but it would go into the general, the policy was changed as a result by the superintendent.

The next line.

THE COURT:  Hang on a second.  So sentence 2 of paragraph 5 says that the superintendent then issued a departmental notice instructing that all notes be preserved. Is there something wrong with that sentence?

MR. NOLAND:  That's okay.

THE COURT:  It's the following sentence?

MR. NOLAND:  It's the following sentence.

THE COURT:  The Court's order was amended in '82 when the Court learned that the detectives were circumventing the order and they were instructed to preserve all street files. Let me ask, what was the amendment in September of '82?  Can I ask plaintiff's counsel?

MR. ART:  So the amendment in '82 is the Court reacting to the teletype.

THE COURT:  I'm asking something way more specific. What was changed about the order?  This is a preliminary injunction or the TRO, whichever it was?

MR. ART:  Right.

MR. SWAMINATHAN:  You're asking the difference from the original 84?

THE COURT:  How was the order amended, that's the

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 88 of 140 PageID #:18288
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 88 of 140 PageID #:30988
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

87

question?

MR. SWAMINATHAN:  The TRO was amended to make it essentially a little more broad to say not just street files, it's like street files plus any locations in which street files may exist.  It was just --

THE COURT:  Okay.  Keep going, Mr. Noland.  You don't have to talk about that one.

MR. NOLAND:  Paragraph 6, as far as the specifics of the federal judge's finding on March 31st, 1983, we believe all of that would is improper and would open the door and require us to respond with Palmer 2 because specifically.

THE COURT:  When you say Palmer 2, I just want to make sure -- I understand what you're talking about.  Which -- you're talking about one of the Court of Appeals?

MR. NOLAND:  Yes, 806 F.2d 1360.

THE COURT:  Which one is that?  Is that the one that's partially affirmed and partially overturned in the preliminary injunction?

MR. NOLAND:  No.

THE COURT:  That's the later one?

MR. NOLAND:  It's the later one where the Court said the claim depends on there being exculpatory material in the street file and there isn't any.

THE COURT:  Keep going.

MR. NOLAND:  And the argument on that would be --

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 89 of 140 PageID #:19239
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 89 of 140 PageID #:30984

their argument is this comes in as to notice. And the city -- the superintendent, of course, the policy was changed and they now about the litigation in '82 and '83. However, they also now that the plaintiffs weren't finding anything in these alleged street files so the plaintiffs are trying to make it seem like there's this incredibly, giving notice that the city was on notice that there was an epidemic of withholding their street files when that's not the case.

To continue, so that would be paragraph 6.

Paragraph 6B as to what the commanders interpreted. This is all -- these are all things happening in advance of the policy being rewritten for 83-1 and then 83-2. So to us it's irrelevant. That all these details will confuse the jury as to what they're being called upon here, whether or not after 83-1, whether or not there was a practice of withholding exculpatory material.

THE COURT: Pause for a second. So are you talking -- are you talking about paragraph 7 yet? Or you are not to paragraph 7?

MR. NOLAND: That was paragraph 6.

And it would be the same thing with respect to paragraph 7 because the Court's finding, the District Court's finding was overturned and so this insufficient -- the city was on in the that its policy before owe.

THE COURT: When was it overturned? What was the

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 90 of 140 PageID #:18240
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 90 of 140 PageID #:30985

11/29/16 AM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

89

date?

MR. NOLAND: November of '86. However, the litigation was ongoing and the city wasn't on in the of any other cases in that litigation and the appeal was filed in '84 as to that ruling. And so the city was actually -- they're trying to say the city was on notice of this epidemic of the pre 83-1 policy when in fact the opposite is true, the facts in the litigation developed that there wasn't. It was simply the Jones case, so this leads a misimpression and misleading facts for the jury. So that would be paragraph 7.

THE COURT: Can I ask this question? There's special order 83-1 and then there's special order 83-2. Right?

MR. NOLAND: Yes, sir.

THE COURT: Both of which Hickey -- somebody testified about it?

MR. NOLAND: Hickey testified about it.

THE COURT: When was 83-2 adopted?

MR. NOLAND: May of '83.

THE COURT: Did Hickey testify about the background for the change from 83-1 to 83-2?

MR. NOLAND: Yes, he did. He explained that it was in conjunction with discussions relative to the litigation with the corporation counsel's office, the plaintiff's attorneys, I think -- and the -- I can't remember. I think specifically he probably would have said that people in the

police department.

THE COURT: Okay. Have you covered what you needed to cover?

MR. NOLAND: Yes, your Honor.

THE COURT: All right. So, look, we had a lot of discussion about this. I am going to tell you what you can do and what you can't do.

I'm going through this proffer as you've written it.

Paragraph 1 on page 2, I am not going to get into a fight over may versus could in terms of whether Jones may or may not have committed the murder, could, I am not going to micro manage it to that level of detail.

The first three sentences I think are all appropriate and admissible. I don't think the fourth sentence that reads, in spring 1982, Laverty learned Jones was on trial for murder, he told his commander that an innocent person was being prosecuted and his commander did nothing. I don't think that's necessary. I am excluding that under 403.

The last two sentences are fine because they are admissible to show notice as I have previously ruled. That topic is admissible, so the two sentences about telling Jones' criminal defense attorney and declaring a mistrial and the charges being dropped, those are appropriate.

As far as paragraph 2 is concerned, I think it goes into too much detail regarding what the lawsuit said. I think

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 92 of 140 PageID #:18242
Case: 1:10-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 92 of 140 PageID #:30987

you can bring out that in 1983, Mr. Jones filed a civil lawsuit challenging the practices that had been -- you know, he claimed to have been exposed in that case, period.

Paragraph 3 about disciplinary proceedings against Laverty, I don't see that as admissible. I don't think it's relevant. Even if it is relevant, it's unfairly prejudicial and gets us off into a side track. That's excluded.

Paragraph 4, now we have flipped over to Palmer, I think that on the first -- that on that sentence or first sentence on that, I think the way it needs to be elicited is that there was a class action lawsuit alleging a policy and practice rather than it was filed to challenge the policy and practice, it's a lawsuit alleging a policy and practice of suppressing investigative materials. The second sentence is fine, city policy makers had notice and participated in the lawsuit.

In terms of paragraph 5, days after the lawsuit was filed, give a date. You know it. It's a court order. You know what the date is. Let's give a date than the day after the lawsuit was filed. The first two sentences are fine. On whatever date the judge ordered that the CPD preserve all street files and the superintendent issued a departmental notice instructing that all notes be preserved. I'll just point out that the second sentence is already coming in I think through Hickey.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 93 of 140 PageID #:19243
Case: 1:16-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 93 of 140 PageID #:30968
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

92

I think that the amendment of the order, it's really inconsequential for purposes of this and certainly the reasons for it I don't think are terribly significant and so -- and it gets us off into a side track, so I am excluding the third sentence of paragraph 5.

Paragraph 6 and 7, I am basically going to collapse into one thing.  Because I don't really think it's either necessary or appropriate to get into the details of the judge's findings in the case.  I just want to look at one thing.  Hang on a second.

The details of the judge's findings in the case, so the stuff about how there was a finding that how people were applying it in an improperly restricted way and what commanders were doing, how official reports from sometimes prepared and so on, I don't think any of that is necessary.  However, I do think that -- I think if I didn't say this, I at least hinted it pretty strongly in the order that I entered previously on this topic, the written order, that I think that you're entitled to bring in that there was -- that there was a determination by a judge that special order 83-1 was insufficient to accord criminal defendants the full rights to which they were entitled.  But I do not think that the specifics of that are relevant.  I mean, I think that you can then -- you have a basis to link that up with Hickey's testimony that in May of '83, there was a further amendment

based on he testified, discussions with plaintiff's counsel, so you can put in the first sentence of paragraph 7, not the rest of it, not paragraph 6, and I continue to believe and I am again ruling that what happened on the appeals is not relevant because this is all being admitted for the purpose of showing notice. And there was no finding on appeal until 1986 besides. So there you go.

All right. Is everybody clear enough on all of that?

MR. LOEVY: I think so, your Honor.

THE COURT: All right. So take 10 minutes and then we will resume.

MR. LOEVY: Thank you.

MR. KULWIN: Thanks, Judge.

(Short break.)

(The jury enters the courtroom.)

THE COURT: All right. Everybody can have a seat. The next witness is on his way up.

(Witness sworn.)

THE COURT: Mr. Loevy, you can go ahead.

- - -

MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION

BY MR. LOEVY:

Q. Sir, if you'd state your name for the record.

A. Michael David Brasfield.

Q. What is your profession?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 95 of 140 PageID #:18245
Case: 1:16-cv-01163 Document #: 185-18 Filed: 02/24/17 Page 95 of 140 PageID #:30950

A.  I am retired from law enforcement after about 40 years and I occasionally do an expert witness and consulting work.

Q.  Let's focus on your law enforcement career.  Tell the jury a little bit about your history.

A.  As briefly as I can, I started in law enforcement in a small agency in Washington state in 1968.  After a year there, I transferred to the Seattle police department on January -- in January of 1969.  I stayed with the Seattle police department until my retirement in January of 1995.  About 26 years.  While I was with the Seattle police department, I served as a patrol officer, tock an exam and eventually became a detective, served in a number of investigative units within the police department.  I then was promoted to sergeant.  I served in a number of positions as a sergeant including internal affairs and vice and prosecution enforcement.  I was eventually promoted in 1978 to lieutenant and I was assigned at the time the city of Seattle had a contract to provide all law enforcement training statewide in the statewide police academy and I became a commander of that.  We train law enforcement officers from approximately 130 different agencies, provided them with the basic tools to become police officers.

I was promoted to captain in 1980.  I was in command of both the downtown commercial water front business precinct. I was then transferred to the command of the internal

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 96 of 140 PageID #:13246
Case: 1:23-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 96 of 140 PageID #:30991

investigation section and I held that position for a couple of years, investigated everything from officer involved shootings to police misconduct, including felony accusations and allegations against officers.

After the two years there, I was requested and was assigned to be the commander of the university district, the University of Washington, and a number of other universities were and I stayed there for the two years. He was then in the city of Seattle captain is the highest civil service rank. I was tapped to become a major and was put in charge of the instructional service division. And in the inspectional services definition, among many other things, we reviewed, wrote, modified policies and practices throughout the department including homicides, homicide investigations. We also conducted audits and inspections of units throughout the police department.

Q. Let me slow you down there for a second?

A. Yes, sir.

Q. You were talking about your ranks. Did you achieve ranks all the way up to assistant chief and chief?

A. Yes.

Q. Tell the jury about that?

A. After I served as commander of the inspector services division, I was promoted to assistant chief which is one step below the chief of police and my responsibilities were as

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 97 of 140 PageID #:13247
***REALTIME UNEDITED TRANSCRIPT ONLY***

96

assistant chief with the administrative services and that included the records bureau, the maintenance of the subpoena services, and a number of other units including 911 dispatch services.

Q. All right. Did you eventually become a police chief?

A. I did. After retiring in January of '95, I was contacted by the city of Fort Lauderdale Florida and in June or July of 1995, I was selected to be the police chief there. And I served in that capacity until I decided it was time for a second retirement and I left as chief of police in Fort Lauderdale in 2001.

Q. After that?

A. I returned to Washington state. I kind of sat in the retirement cabin for a little while and got bored and there was an upcoming election for sheriff of Jefferson County, Washington, predominantly a rural area. I had never been involved officially in politics. And decided to run for sheriff. I was elected. I completed my first term, ran for reelection, was successful and started grooming a replacement and about halfway through my second four-year term, I decided to retire and my successor was appointed to fill that position.

Q. Now, you have some associations and memberships. Can you just summarize that?

A. I was granted life membership with the international

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 98 of 140 PageID #:18248
Case: 1:23-cv-01737 Document #: 1185-16 Filed: 02/24/17 Page 98 of 140 PageID #:30998

associations of chiefs of police, life membership with the police executive research forum, life membership with the national sheriff's association,as well as a number of state organizations.

Q. And in that capacity, do you have the ability or the opportunity to interact with other agencies and become familiar with other police departments policies and practices?

A. Yes, both in the process of writing policies and practices and implementing them and monitoring them in the city of Seattle as well as as a chief and as a sheriff, I have regular and significant interaction with other agencies.

Q. And you mentioned audits, and I cut you off at audits. Briefly, did that give you experience and opportunity to learn about other police departments too?

A. Yes.  I was while on active duty, I participated in a federal grant to inspect and provide audit information on the delivery of police services to a number of cities nationwide on the delivery of police services in public housing, and that process, my portion of the team was to look at their records keeping and their delivery of information to outside request errs.

Q. So that was actually the area of your expertise was record keeping documentation and transmitting that stuff to outside?

A. In that particular project, yes.

Q. You also mentioned training.  Did that also in your

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 99 of 140 PageID #:18349
Case: 1:23-cv-01168 Document #: 185-18 Filed: 02/24/17 Page 99 of 140 PageID #:30994
***REALTIME UNEDITED TRANSCRIPT ONLY***

98

training capacity, did that give you experience with other departments too?

A. Yes, one of the processes at training both at the entry level police officer deputy training is to look at their policies and practices. You have an academy class, three academy classes with officers from multiple agencies, you have to become familiar with their policies and procedures and tailored the training to reflect what they need to do in theirs. In that process, you're looking at their policies and practices and there's not too many agencies that I am aware of when you're doing policies like when I was at inspection services or the chief or the sheriff, you are not always hoping to reinvent the wheel. You are looking to see what some of the other agencies are doing nationwide.

Q. You said you actually worked in records division for a time, correct?

A. As an assistant chief, I absorbed that division, yes.

Q. Supervising?

A. Yes.

Q. And that would include homicide files as well, right?

A. Yes.

Q. When you were the chief in Fort Lauderdale, did that give you jurisdiction over the policies and practices including what you've called high risk policies and practices?

A. Yes. When I describe high risk policies, things that have

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 100 of 140 PageID #:19250
Case: 1:23-cv-01168 Document #: 185-18 Filed: 02/24/17 Page 100 of 140 PageID #:30595

11/29/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

99

the opportunity or the potential for significant impact either budgetarily or legal liability and, in some instances, police pursuits and use of deadly force that either citizens or officer's lives are in danger.

Q. All right. Were you a detective -- did you have supervision over detective over the course of your career?

A. Yes, I had that opportunity both as a sergeant and as a captain and as a chief and as a sheriff.

Q. Have you investigated as a detective homicides?

A. I have investigated traffic homicides, traffic fatalities for hit and runs. You have situations where you have a fatal crash, you may or may not have a suspect at the scene, you have to assemble the files.

Q. All right. And as a suspect in charge of internal investigations and the assistant chief in Seattle, did you regularly oversee and review detective doing homicide investigations?

A. Yes.

Q. Is that a subject about which you have great familiarity?

A. I am.

Q. All right. Let's talk about this real briefly, the Washington state Attorney General homicide investigation tracking system.

A. The Washington state Attorney General instituted because of dissatisfaction statewide with clearances of homicide

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 101 of 140 PageID #:19251
Case: 1:13-cv-01168 Document #: 285-18 Filed: 02/24/17 Page 101 of 140 PageID #:30596

11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

100

investigations and inconsistent procedures for homicide investigations created what the acronym was HITS, homicide investigation tracking system.  It consisted of 10 or 12 practitioners, the number varied from time to time including what we call in Washington State prosecuting attorneys, police investigators, and we would review problematic homicide cases from around the state that were either coming to a dead end or not seeming to have a coordination in the investigation.

Q.  All right.  In summary then, is the subject of policies and practices about documenting and disclosing investigation materials, is that something you have expertise in, sir?

A.  Yes, sir.

Q.  All right.  Since you've retired, you mentioned you do some expert witness stuff?

A.  Yes.

Q.  Some consulting.

About how many cases have you been involved with?

A.  I have actually been retained somewhere between 120 or 130.  However, the distinction is how many I have been deposed Oregon to trial on.

Q.  So let's break that down.  Sometimes you get retained and you get a fee to review materials?

A.  Right, that's correct.

Q.  What's your first step when you get retained?

A.  I ask for copies of certain documents relative to the

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 102 of 140 PageID #:19252

litigation, whether it is the criminal -- the civil complaint, any depositions that have already been taken, any statements, any police reports, that type of thing and review them.

Q.  Then you do a review?

A.  Yes.

Q.  Does it matter who hires you as far as the opinion and the money, explain?

A.  No, looked recently, about 60 to 66 percent of the cases have been for governmental entities, for cities, counties, state agencies, police departments.  The other 40 have been for plaintiff's cases where someone is suing the agencies.

Q.  If a lawyer calls you and says they want you to review the facts of the case, does that mean you automatically are going to take their side or testify for them?

A.  No, depending on whether I had experience with the attorney or the law firm in the past, I may agree to take a quick look at some material to see if it's something that I thought I could honestly be engaged in.  Oftentimes, I'll look at the material and indicate I appreciate what you're trying to do here, but I am not going to be a very good witness for you because I don't feel that what was done was correct.

Q.  All right.  So you'll only do the cases where you believe it was correct?

A.  Yes.

Q.  Do you generally charge an hourly rate to review materials

in these cases?

A.  I do.

Q.  So you get paid that rate either way regardless of whether you have good news or bad news for the attorney?

A.  That's correct.

Q.  All right.  In this case, you did a lot of work, did you not?

A.  I did.  This was one.  Most time consuming.

Q.  How many hours would you say you've spent in this case?

A.  Somewhere between 100 and 150, perhaps.

Q.  Hours?

A.  Yes.

Q.  And what is your hourly rate?

A.  $300 an hour.

Q.  Is that commensurate with the hourly rate of people in your industry?

A.  Yes, it is.

Q.  Has your rate stayed the same Oregon up overtime?

A.  I initially started out probably eight or nine years ago at $250 an hour and four or five years ago I raised it to 3, but it's been that way.

Q.  In addition to this case with the 100 to 150 hours, have you had or cases to study the policies and practices of the Chicago Police Department?

A.  I have.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 104 of 140 PageID #:19254
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 104 of 140 PageID #:30599

11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

103

MR. NOLAND:  Objection.

THE COURT:  I need to ask you about this at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  Where are you going with this?  Is it just yes or no?  Are you going to ask him details?

MR. LOEVY:  I was going to ask him you have spent how many hours, I believe he would say 4 to 500 hours looking at the Chicago's policies and practices.  Your Honor had a little discussion about what this opens to and how far.  If they want to say, isn't it true you did a bunch of cases against Chicago, we are going to say, well, those cases say this and that.  Just talk about, hey, I spent 4 to 500 hours looking at the city's policies and practices.

THE COURT:  I understand.

Articulate the objection, Mr. Noland.

MR. NOLAND:  The objection is that that would I think be a not disclosed opinion as to us as which is things he relied on in the Fields case and what's in the Fields report.  I told Mr. Loevy it was unlikely I would be asking him about other cases that Mr. Loevy's firm has hired Mr. Brasfield on relative to the City of Chicago.

THE COURT:  Okay.  I am going to exclude it at this point.  If you think that there's something that's covered on cross that opens the door, then you'll tell me before the

***REALTIME UNEDITED TRANSCRIPT ONLY***

redirect.

MR. LOEVY: Got it.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: Okay. You can proceed.

BY MR. LOEVY:

Q. All right. Let's turn to your role in this case. What did you review as part of forming opinions?

A. I looked at the depositions of the city's representative, Mr. Hickey, I've looked at policies and procedures of the Chicago Police Department, I've looked at records that have been found or located or retained in the Chicago Police Department, I've reviewed other depositions and other court material.

Q. All right. Let's focus on the files that got found. Can you tell the jury what your understanding is what the files were?

A. Well, which files?

Q. The files from the basement.

A. Okay. What are commonly referred to as the basement files. You want me to give the background?

Q. Yes, please.

A. There were literally hundreds of files that were located in the basement of I believe area one pertaining to homicide investigations. They ranged in time period from I believe as

105

early as the 1940s up through 2000s.  They were files that had not previously been disclosed.

MR. NOLAND:  Objection, your Honor.  Move to strike.

THE COURT:  Well, the last sentence I am going to strike not because it's right or wrong but because it's not responsive to the question.

MR. LOEVY:  All right.

THE COURT:  Let's proceed on a question by question basis.

BY MR. LOEVY:

Q.  You're undertaking part of it was to examine some of those files, correct?

A.  That's correct.

Q.  All right.  Of those files from the basement, how did you determine your sample, tell the jury what your sample was?

A.  Well, the first -- the case in point here was one of the driving, Mr. Fields' case, but also to pick out two groups of files.  A group of files that would represent a time period roughly three years before and after Mr. Fields' first trial and a second group of files that would as closely as possible correspond to his second trial.  That time period -- the first time period was from 1983 to 1986.  The second time period was from 1999, I believe, to 2006, somewhere in there.

Q.  All right.  It was on both sides of both criminal trials, right?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 107 of 140 PageID #:19257
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 107 of 140 PageID #:31002
11/29/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

106

A.  Yes.

Q.  Six-year time periods?

A.  Yes, six and seven.

Q.  Just to lead you through it, it was your understanding that the Fields file was disclosed many years after the fact, the Fields investigative file, correct?

A.  That's correct.

Q.  And the Fields file was among some file cabinets that had other files, correct?

A.  Yes.

Q.  And then one of the questions was whether the materials in these investigative files had been disclosed to the criminal justice system, that was one of the things you looked at?

A.  That's correct.

Q.  Did you analyze those files, the sample you just told us about?

A.  Yes, I did.

Q.  And that was part of your opinions in this case, correct?

A.  Yes.

Q.  All right.  Let's back up and tell the jury turning to your opinions, do police departments have systems, are they supposed to have systems for turning over exculpatory evidence and can you explain?

A.  Yes.  What's commonly referred to as Brady v. Maryland, which back I believe in 1963, but the process that officers

learn and more importantly, commanders and administrative police agencies and sheriff's office develop systems so that they have a as much as possible a consistent foolproof process of delivering information, all information pertaining -- that could be potentially useful to the prosecutor in determining or the state's attorney in determining whether they want to file charges and to the -- eventually if charges are filed to the criminal defense attorney.

Q.  In your experience, do all modern police departments have a responsibility to create such systems that work?

A.  Yes.

Q.  And you said documenting information.  Are detectives supposed to document all potentially relevant information?

A.  Yes.

Q.  Can you explain?

A.  When a detective is developing leads, developing information, whether it's in the field, on the phone, face to face interviews, they gather, as you can well imagine, all sorts of information.  Oftentimes, you don't know the relevance of that information at the time.  So when someone tells you that they were either in a place or not in a place at a certain time, that's the kind of information you want to document.  If they give you information about physical evidence, a description of a car, a description of an individual, information about something that they observed,

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 109 of 140 PageID #:19259
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/16 Page 109 of 140 PageID #:31004
11/29/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

108

all of those kinds of things, as well as physical evidence, obviously, should be documented.

Q. Why is it important or necessary to document seemingly benign details?

A. Because if you -- it's much like if you picked up a who done it novel, you don't know until you get towards the end what the eventual solution is, if you will, or the outcome and oftentimes, in fact, the times I'm familiar with, if you picked up what's commonly referred to in police parlance as a murder book, you see a number of different investigative tracks or leads. They go off in different directions.

Q. All right. So it is important to document everything?

A. Yes.

Q. Is that universal and throughout the country?

A. In any that I have been familiar with, it is. With perhaps one exception.

Q. And who does -- what's that one exception?

A. Chicago Police Department.

Q. Does Chicago stand out as an aberration in your review for how well or poorly they do that job?

MR. NOLAND: Objection, your Honor. Foundation.

THE COURT: Overruled.

THE WITNESS: In my opinion, based on the material that I have had access to and reviewed, they have done a very, very poor job of doing it through the years.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 110 of 140 PageID #:19260
Case: 1:23-cv-01168 Document #: 1185-18 Filed: 02/24/16 Page 110 of 140 PageID #:31005

BY MR. LOEVY:

Q. I'm saying compared to other departments?

A. Compared to others, in not only my personal experience but in my reading and in my visits and my audits of other agencies and all over the 40-year period of time, the best way of doing that is a centralized file, centralized records system. As soon as you split that off, then you start getting more and more information in different units in different files and it becomes harder.

Q. Let me break in there.

So is it a standard in modern police departments to have a single centralized place?

A. That's correct.

Q. And you started to explain why that's important. By the way, single centralized place where stuff relating to homicide investigations is kept?

A. Right.

Q. Explain why that's important.

A. Well, your technical term of stuff is as good as any. You need to be able for a half a dozen reasons, one is the integrity of the investigation. Everything has to be in one location. You're likely to have numerous detectives or specialty lab individuals, gang squad, bomb and arson, they're all under different chains of command oftentimes in different agencies. All that information has to come to a central

Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 111 of 140 PageID #:31006

point.

From a purely administrative standpoint, it's critical because you have to be able to have a supervisor and a chain of command all the way up to the superintendent or the chief knowing that the investigation is thorough and complete. And you can't do that by sending for records here or sending for records there.

Very important is for the discovery process to be able -- let me back up one. Is to present to a prosecutor or a state's attorney a complete and thorough investigation, not one that just says this person did it, this is the evidence we have, wield's like to see charges on it. There has to be an opportunity for the prosecutor, the state's attorney to look at all of the other things.

Q. And is that -- is one way modern police departments do that is to keep everything in one place?

A. Yes.

Q. All right. How about an index, is that a necessary part of a functioning process?

A. Absolutely. It becomes even more critical if an agency should choose not to have centralized records. Then it is very important, but there has to be a central index too.

Q. All right. And then as far as training for subpoenaed processing and stuff like that, is that important and expected?

11/29/16 AM
Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 112 of 140 PageID #:19262
Case: 1:13-cv-01168 Document #: 285-18 Filed: 02/24/17 Page 112 of 140 PageID #:31007
***REALTIME UNEDITED TRANSCRIPT ONLY***

111

A. Yes.

Q. All right. Let's talk about the early '80s in the City of Chicago. Is it your understanding that the City of Chicago was put on notice for lack of a better word that there was a problem in the early '80s?

A. Yes, they were.

Q. Can you summarize for the jury?

A. There were a couple of lawsuits that had allegations contained in them from the superintendent on down were aware of that indicated that there were separate street files and that the information was not being shared.

Q. All right. Let me focus you on April 1982 and a boy named George Jones. Can you briefly summarize what that was?

A. Yes. There was I believe a 12 year old girl who was murdered. Her brother was also assaulted in the attack.

Q. Without getting the facts of the murder, how did that put the city on notice that there was a street file problem?

A. That information, there were representatives of the police department, high level command officials in the police department that participated in the litigation, and ignoring for a moment just the news media, but the formal notification of the process in the legal system.

Q. And in that Jones case, how was it that it came to the city's attention that there was a problem, there was a detective named Laverty and what did he disclose?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 113 of 140 PageID #:19263

A. Detective Laverty discovered or unearthed in the court of his investigation information that would have cleared or seriously impeded any decision to prosecute young Mr. George Jones, and he wrote it up in an informal process that ended up in an investigative feel. That investigative file, the contents of what detective Laverty put in there that would have cleared George Jones was never disclosed to the defense attorney.

Q. And then did Laverty do something in response?

A. When he -- when he completed his information and submitted it, he had been -- received some reassurances that the prosecution, the information would get to the state's attorney.

Q. Did he then inform the process, the justice system participant?

A. Yes, he did.

Q. What did he inform them?

A. He went to the -- he saw in the paper the prosecution in fact was proceeding, and he went to the public -- the criminal defense attorney and shared with him or her the information about George Jones.

Q. And about the street file practice?

A. And the street file practice.

Q. And then was there some litigation in '82 and '83 alleging a policy and practice of suppressing investigative materials

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 1114 of 140 PageID #:19264
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

113

in street files?

A.   There was a case referred to by the Palmer case where a group of people alleged in court that there was a practice within the Chicago police of doing just what had happened with the George Jones case, and that became part of a legal suit.

Q.   All right.  And then on April 20th, 1982, shortly after that lawsuit was filed, did a federal judge enter any orders?

A.   Yes.

Q.   Tell the jury about that.

A.   There was a direction, order from the court, that all documents would be maintained and retained.

Q.   All right.  And was there a reason from the Jones case to conclude that the policymakers had notice and participated in the lawsuit, the city's policymakers?

A.   Yes, they were called upon to testify and gave testimony and were very officially and clearly put on notice.

Q.   And then just to draw your attention to a finding in February 3rd, 1983, did the judge make a ruling that -- by the way, did the city enter -- create a special order in response to this litigation?

A.   Yes.

Q.   What was that special order?

A.   82-1, that they would preserve.

        THE COURT:  82-1?

        MR. LOEVY:  82-1, was the first one which they


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

preserved stuff.

BY MR. LOEVY:

Q. And then?

A. The subsequent one, which was to retain and not dispose of and make available investigative files.

THE COURT: Just put numbers on these.

MR. LOEVY: The second one was 83.1, correct.

THE WITNESS: 83.1, yes.

BY MR. LOEVY:

Q. Did the judge make a finding that 83.1 was insufficient to afford criminal defendants the full rights to which they were entitled?

A. Yes.

THE COURT: As we discussed, you need to put the date on that. It was a couple of questions ago.

THE WITNESS: Sorry.

BY MR. LOEVY:

Q. Do you have the date there before you, sir?

A. I don't have it right in front of me, no.

Q. It looks like the lawsuit was filed --

THE COURT: You can ask a leading question on the date of the judge's order.

BY MR. LOEVY:

Q. February 3rd, 1983.

A. I believe that's correct.

Q.  4/20/82?

A.  April 20th, 1982.

THE COURT:  Was what?

MR. LOEVY:  When was the judge's order?

MR. SWAMINATHAN:  The judge's order was the same date.

BY MR. LOEVY:

Q.  4/20/82?

THE COURT:  It needs to be testimony.

THE WITNESS:  It was --

THE COURT:  Excuse me.  Ask a question, please.

BY MR. LOEVY:

Q.  What was the date of the order?

A.  The date of the order was April 20th, 1982.

Q.  All right.  After the order of the court was entered to improve the system and the city enacted these policies, did you see evidence that the problem persisted?

A.  Yes, I did.

Q.  And let's focus, for example on the investigative file in this case.  Did you review the investigative file that was not disclosed to Mr. Fields in this case?

A.  I did.

Q.  And was that evidence that the problem continued and can you explain, please?

A.  Yes, over the course of two criminal trials and appeals,

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 117 of 140 PageID #:19267
Case: 1:13-cv-01168 Document #: 285-18 Filed: 02/24/17 Page 117 of 140 PageID #:31012
11/29/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***
116

there were at least six or seven formal either subpoenas or written requests for disclosure of investigative file in the Fields case. And each time the city or the police department's response was that there was no such material available. And in fact the city at one point initiated an internal investigation to determine if there was an investigative file and they produced a document, a written conclusion that there was no investigative file.

Q. What were the hallmarks of this investigative file file, the field's investigative file, actually, it was the Smith/Hickman investigative file that was outside the general orders?

A. When it was eventually discovered in 2010 or 11, that it contained specific types of documents that were -- that were described in the litigation as not to have been in that format.

Q. What kind of documents were those?

A. They were to and from memos between detectives and between chain of command, there were -- sorry.

Q. Were notes --

A. Yeah, handwritten notes were contained in it, notes were not put onto official format and those documents -- even where they were were not submitted.

Q. How about inventories or lack thereof and things not in supp reports?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 118 of 140 PageID #:19268

A.  The inventory were required by the general orders and the supplemental reports were not as required by the policies.

Q.  All right.  Did you see evidence when you reviewed that sample of files from the basement that the Smith/Hickman file was typical or atypical of other investigative files?

A.  In my review of the portions of the basement files as I previously described, I found them to be consistent with or the Hickman/Smith discovery files were similar.

Q.  And the same kinds of things you just talked about were evident in the other files as well?

A.  Yes.

Q.  All right.  You did analyze those files, correct?

A.  I did.

Q.  And tell the jury how exhaustive your analysis of those files was.

A.  Do you want me to describe the total number of files?

Q.  However you want to describe what you did when you got those files.

A.  I mentioned earlier and discussed the fact that I took a sample from the six-year time period, 83 to 89 and the second year time period from 1999 to 2006, pulled out all of the ones, the homicide investigation files for that time period, then looked at the investigative file itself to determine what it contained, what it did not contain.  I looked at the permanent retention files that the city used or supposedly

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 119 of 140 PageID #:19269
Case: 1:13-cv-01168 Document #: 185-18 Filed: 02/24/17 Page 119 of 140 PageID #:31014

used to provide discovery.

Q.  So let me make sure I understand.  You had a basement file that referred to an investigation and then you had also the corresponding official file, right?

A.  That's correct.

Q.  All right.  Then continue.

A.  And that I would prefer to and the city does as a permanent retention file that supposedly has everything about the homicide case, but only if it's on an official supplementary report on arrest report, a lab report, that type of thing, but permanent retention file after review, I can go no that if you want later.

Q.  Well, we are going to talk about your review.  Basically, you described you did a stand alone of the investigative file?

A.  Yes.

Q.  And then you did a comparison with the permanent retention?

A.  I looked at the permanent retention files by themselves.

Q.  Okay.

A.  So I looked at the investigative files, I looked at the permanent retention files and then I looked and compared.

Q.  So that's a third thing?

A.  The permanent retention files as to what was, what they had in them that were reflected, did they reflect what was of substantive value in the investigative file.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 120 of 140 PageID #:19270
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 120 of 140 PageID #:31015

Q. So the third thing then was a comparison between the investigative files and the permanent retention files?

A. Yes.

Q. Was there a fourth analysis you did?

A. Yes.

Q. Tell us about that.

A. Also, through material provided to me, the criminal defense files that corresponded with where there were criminal defense files that corresponded with the investigative files and the permanent retention files. So I looked at those as a stand alone process to see what was in there from as it pertained to what was actually in the investigation and in the permanent retention files. And then finally, in the fifth step was to compare what was in the criminal defense files and the permanent retention files.

Q. All right. Based on that review, did you make any findings about whether the practice that was supposed to have stopped with the Palmer/Jones litigation persisted through and continuing through Mr. Fields' trial?

A. Yes.

Q. What was that finding?

A. In my professional opinion that the practices that were the City of Chicago and the Chicago Police Department and its command staff was aware of in as early as 1982 but should have been much earlier than that was continuing and no substantive

changes, and in fact, evidence that there was no change at all.

Q.  In refresh your recollection last answer, you said that the command and the policy makers should have been aware before the Jones litigation in '82.  Can you explain?

MR. NOLAND:  Objection.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  At this time, your Honor, plaintiff would move to introduce Plaintiff's Exhibit 307 which is his summary chart of the basis of his opinions.

THE COURT:  It's a demonstrative?

MR. LOEVY:  Yes, your Honor.

THE COURT:  Okay.  Go show it to him.

MR. NOLAND:  I'm sorry.

THE COURT:  Yeah.  That's fine.

MR. NOLAND:  Subject to our prior, the court's ruling.

THE COURT:  If I already ruled, I already ruled.

This is -- you heard me use the word demonstrative. It's a big legal word.  What this means is this is used to illustrate testimony.  It's not part of the evidence.  You're not going to actually have it back there.  It's used to illustrate testimony.  If you want to take notes on it, do that because you won't actually have --

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 122 of 140 PageID #:19272
Case: 1:23-cv-01168 Document #: 285-18 Filed: 02/24/17 Page 122 of 140 PageID #:31017

MR. LOEVY:  Actually, your Honor, after he lays the foundation.

THE COURT:  For now, it's a demonstrative exhibit.

MR. LOEVY:  We do intend to move it into evidence after he lays the foundation for it.

THE COURT:  We will worry about that when we have to worry about it.

MR. LOEVY:  Can we ask Mr. Brasfield to come down and explain it.

THE COURT:  The deal is he needs to keep his voice up.  Which side are you going to have him stand on, right here?

MR. LOEVY:  What do you prefer?

THE COURT:  You stand here so you are closer to the mic.  Counsel can move down in order to see.

MR. NOLAND:  Thank you, your Honor.

BY MR. LOEVY:

Q.  Let's start with the middle column.  Can you explain to the jury what we are looking at?  Your Honor, may we put it on the ELMO too?

THE COURT:  Either way.  I don't care.

MR. LOEVY:  The computer, your Honor.

THE COURT:  Computer.

THE WITNESS:  This rainbow effect here, this blue section here that has a number of columns in it are the

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 123 of 140 PageID #:19273
Case: 1:13-cv-01068 Document #: 185-18 Filed: 02/24/17 Page 123 of 140 PageID #:31018

investigative file information and some of it, it's just housekeeping, referring to what the lawyers call Bates numbers that are stamped on the bottom of pages to identify things. But one of the first things they did does the basement file contain an inventory.

BY MR. LOEVY:

Q. That's a yes, no, question?

A. That's a simple yes, no, and as I said that's Bates numbers. If it did not, there's reference to that.

Is the inventory complete? If there is an inventory in the investigative file, I mean, that's good in and of itself, but is the inventory actually reflect what is there, what should be there?

Then we have the examples of items that were missing from the inventory, so as I'm looking at that and making notes to myself as to whether, okay, is this item in there, if it's not in there, what is it? Put a list on that.

Are there handwritten notes in the file? The handwritten notes themselves may or may not be important as to their actual content, but what is very important is are they supposed to be in there as handwritten notes? That's a violation of policy as to how they're in there. So it's two-fold. One is the substantive value, if you will of the material, but also demonstrating adherence to a policy.

And then I gave examples of specifics so that you can

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 124 of 140 PageID #:19274
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 124 of 140 PageID #:31019

look those up.

Are there to/from memos.  This is again the same thing, the policies and procedures indicate that they are supposed to be in there, are they in there, if yes, no, what were they.

And then I gave again the Bates numbers a reference so that with the sheer volume of this being able to go back, look through and identify them.

BY MR. LOEVY:

Q.  If you could turn to the stand then.

A.  Thank you.

Q.  All right.  Now, when you did the analysis in the blue column there, you weren't actually comparing the investigative files to any other files?

A.  No.

Q.  Just looking at them themselves?

A.  As a stand alone.

Q.  Did you draw any conclusions about the investigative files?

A.  I did.

Q.  Tell the jury what your findings were?

A.  That the information that I was seeing in these basement files, particularly investigative files, were in my mind from a professional standpoint evidence that the things that were supposed to have changed that should have been done and

accomplished after the city was put on notice were continuing.

Q. Let's talk about the example you gave about handwritten notes. Now, they're supposed to take notes, but they're supposed to be on GPRs, right?

A. General progress reports, yes.

Q. The jury has already heard testimony about what a GPR is. Just real quickly?

A. Just that your information that you made heaven forbid written on the back of a business card or a McDonald's order slip is put into a general progress report so that it's formalized.

Q. All right. And was there evidence based on your review that the department's rule change that all notes had to be taken on general progress reports, was that being followed?

A. No, it was not based on the material I looked at.

Q. What was the statistical analysis for the period 83 to 89, in what proportion of the cases was that policy not being followed?

A. I found that 82 percent of the cases that I looked at, they were not being followed.

Q. And then for the later time period?

A. From the 1999 to 2006, 61 percent.

Q. How about the existence of two from memos, those were memos that were not on official supp reports; is that correct?

A. That's correct.

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 126 of 140 PageID #:19276
Case: 1:13-cv-01168 Document #: 285-18 Filed: 02/24/17 Page 126 of 140 PageID #:31021

Q. And that policy too was supposed to change with the policy change, right?

A. That's correct.

Q. Did you see evidence that it did change? Did or didn't?

A. It did not.

Q. Tell the jury.

A. The initial period from 1983 to 1989, 43 percent of the files that I reviewed continued to show unofficial informal memorandums and that the 1999 to 2006 time period, that 17 percent of the files continued to show these supposedly not to occur to/from memos.

Q. Does that suggest to you whether the system was or wasn't working from a supervisory perspective?

A. From a supervisory, either a first line supervisor or as an auditor within the department or as the superintendent, it would give me a clear indication that it just wasn't working.

Q. All right. Have you seen that level of failure at other departments around the country?

A. No, I have not.

Q. All right. What percentage of the basement files had evidence of violations of the policies and the special orders that were put into place?

A. 100 percent.

Q. All right.

MR. LOEVY: Your Honor, if I could have the witness

step down again to talk about the next column.

THE COURT: That's fine.

BY MR. LOEVY:

Q. Tell us about the purple and what this represents?

A. The City of Chicago police department has -- had a permanent retention file that was supposed to be the go to, this is where if you want to know what happened in a particular homicide and you want it for discovery purposes, this is where it's going to be. It's in the permanent retention file. So as I looked at that as a stand alone process looking for the same types of things, whether there were inventory sheet as required, what types of documents that were supposedly in there were or were not, and also regardless of how the City of Chicago interpreted permanent retention file were there actually substantive information in the investigative file that was not getting into the permanent retention file.

Q. Well, before we talk about the comparison, let's talk about just the purple?

A. Yes.

Q. So tell the jury what the Fields were.

A. We have again does the permanent retention file have an inventory, the investigative file inventory complete, does it have items missing? I'm sorry to block your view. You probably can't see it. Again, I talked about the Bates

***REALTIME UNEDITED TRANSCRIPT ONLY***

numbers. Are there general progress reports from the basement files in the permanent retention file? And, again, I have to acknowledge that the City of Chicago didn't feel that it was necessary, but they weren't in there and I made a note of it. And are there handwritten notes in the permanent retention file? If so, and then describe what they were and where they were. Are there to/from memos in the basement files that are in the permanent retention file and yes or no and where appropriate, identify those.

And then in general observations about some of those individual permanent retention file.

Q. All right. Would you resume the stand, please.

Did you reach any conclusions regarding the permanent retention file?

A. Yes.

Q. How many permanent retention files did you look at?

A. There were a total of there were a total of 249 files overall and as far as permanent retention file, they were on the light number.

Q. And did you form any conclusions about the city's policies and practices after you performed the analysis you did to the permanent retention file?

A. I did.

Q. Can you describe to the jury what those were?

A. First and foremost if the City of Chicago police

department is going to use the permanent retention file as a representation of the homicide investigation, it failed miserably. What I found in there is a single story line. It's what I would refer to as a charging document that after a detective or detectives have completed a homicide investigation, they have gone down their various paths and looked at all the various possibilities and eliminated suspects and so forth, they just have a clean copy. It's not the murder book that you would expect to find that would show that an anonymous caller said Bob Smith did it, but we interview witnesses and determined that he had an alibi and so on and so forth. All the permanent retention file is this is the arrest report, this is some lab reports, this is --

Q. Why we think this guy did it?

A. Yes.

Q. And is that aberrational, different, unlike other cities that you have reviewed and audited?

A. Yes.

Q. How does it work in places that are functioning legitimately?

MR. NOLAND: Objection, argumentative.

THE COURT: Overruled.

THE WITNESS: You go into any homicide investigative file either cold, just by looking at the book, or physically into various agencies, you see a document that starts out with

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 130 of 140 PageID #:19280

the call from 911 or the discovery of whatever the gathering of information inevitably, not inevitably, but quite often in homicide initial investigations, there might be multiple suspects, and somebody thinks, well, this person had a domestic problem or the person was -- had a bad debt or problems with the neighbor and so you have all of these various avenues that you have to investigate, and then you either eliminate them and document why they were eliminated and there's other information that you're developing. Oftentimes, again, as I said earlier that initially may not seem like it's important at all, but you have to document it and put it in the file. This is obviously for a number of reasons as I said before.

You have detectives or individuals from throughout the police department that may have worked on a case, and they have to go to a central location, to a central document to be able to see what's been done and what hasn't been done and that needs to be done.

BY MR. LOEVY:

Q. You mentioned in your analogy you used a little bit ago about a novel. Would a plot twist fit in your analogy on the way an investigation is supposed to be documented in a permanent retention file?

MR. NOLAND: Judge, I object based on foundation and not disclosed.

THE COURT:  Rephrase the question, please.

BY MR. LOEVY:

Q.  All right.  In the investigative files you're talking about from other jurisdictions, is it always linear, start to finish?

THE COURT:  Sorry.  Something happened.

THE WITNESS:  No, it's not.

BY MR. LOEVY:

Q.  Can you explain?

A.  It can go off on tangents.  I have seen investigations where literally weeks, if not months, can go into what in good faith was thought to be a legitimate line of investigation only determined for whatever reason that the individual that was thought to be the best suspect was in fact not.

Q.  And in other jurisdictions, is all that stuff in the permanent file?

A.  Yes.

Q.  And is that true in Chicago?

A.  No.

MR. NOLAND:  Judge, objection.

THE COURT:  Let me see the lawyers at sidebar, please.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  So while we are at it, I am holding

myself in contempt for my cell phone going off, when I fine myself at some later amount.

MR. NOLAND:  I think he's gone well beyond the permanent retention file discussion from his report where he said 34 and 35 where he is talking about perform rather than this whole issue we just talked about for the last several paragraphs as far as the investigation and a study of the permanent retention files.

THE COURT:  So you want -- let me just -- is it, A, starting on page 34?

MR. SWAMINATHAN:  Judge, this is also part of it.

THE COURT:  Let me look at it.  I think this is fairly within the scope two paragraphs that precede the letter that had an A on paragraph 34. Essentially what he's saying -- the way I'm getting it at least is what he saw is that the permanent retention file basically tended to contain information that supported the conclusion of the investigation and it's supposed to include more than that, and I think that's essentially what these two paragraphs say, so I overrule the objection.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Okay.  The objection is overruled.  You can proceed.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 133 of 140 PageID #:19283
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 133 of 140 PageID #:31028

Q.  Do you remember the question?

A.  No.

Q.  You were saying in other jurisdictions and the plot twist thing?

A.  Yes.  As I described or paraphrased.

        THE COURT:  Let me be more specific.  The two preceding questions were in other jurisdictions is all that stuff in the permanent file?  You said yes.  And then there was a question is that true in Chicago?  Answer, no.  And then I think he was going to ask you to explain.

BY MR. LOEVY:

Q.  Can you explain that?

A.  The structure and the practice based on the material that I have reviewed here is that there is an eventual determination of who the police feel is the person that did the crime.  And oftentimes, there is a reverse engineering of the plot.

        MR. NOLAND:  Objection.

        THE COURT:  Yeah, let's get more directly to the point here.

BY MR. LOEVY:

Q.  All right.

        THE COURT:  Ask a more leading question, if you would.  You understand from the sidebar where we are going here, Mr. Loevy?

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 134 of 140 PageID #:19284

MR. LOEVY:  I think it's been covered too.

THE COURT:  Fair enough.

BY MR. LOEVY:

Q.  Who does that protect if you do it the proper way and document everything?

A.  Well, it protects the integrity of the criminal justice system as a whole, it protects the -- it provides legal protection for the individual who is eventually charged so that the criminal defense attorney has a fair opportunity to provide and mount a defense, and it provides I think in fairness to the victims.

Q.  Is that something that other jurisdictions take seriously and do effectively?

A.  Yes.

Q.  Does Chicago meet up to that standard?

A.  No, in my opinion Mr. .  Are you changing topics?

MR. LOEVY:  Yes.

THE COURT:  We are going to stop for lunch.  I have one very short case at 1:30.  We should be able to start within a few minutes of 1:30.  I will take the jury out. (The jury leaves the courtroom.)

THE COURT:  Okay.  Anything we need to discuss?

MR. LOEVY:  Your Honor, we had some issues whenever your Honor is ready to talk about them.  We still have the intimidation issue that's hanging out there.  We have a couple

11/29/16 AM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

134

of new issues too.

THE COURT:  Just tell me what they are and we are not going to talk about them now.  Just tell me what they are.

MR. LOEVY:  The first issue is you ordered the discovery on Mr. Kees's deal and you ordered them to give us their emails and such.  We have written them an email saying we think there are some gaps and deficiencies and to my knowledge, they haven't yet responded; is that correct?

MR. ART:  That's correct.

MR. LOEVY:  At some point we are being to want to raise with the Court, there are some holes in the production and we want to talk about that with your Honor.

THE COURT:  Kees is testifying tomorrow, right?

MR. LOEVY:  Correct.

THE COURT:  We will talk about that at the end of the day.  Just be prepared to talk about that at the end of the day.

MR. LOEVY:  Other issue, your Honor, is yesterday a photograph was put on the screen by Mr. Kulwin that was not in the pretrial order --

MR. ART:  Mr. Burns.

MR. LOEVY:  I'm sorry.  I cannot tell these people apart.

MR. KULWIN:  He continue tell me and Mr. Burns apart.

MR. LOEVY:  I keep saying defense counsel.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 136 of 140 PageID #:19286
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 136 of 140 PageID #:31051
11/29/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

135

12:32:05    THE COURT:  You mistook me for Jon Wayne.

12:32:08    MR. KULWIN:  You do look like Jon Wayne.

12:32:11    THE COURT:  There you go between.

12:32:13    MR. LOEVY:  There was a photograph in the pretrial order.

12:32:15    THE COURT:  What was the photo?

12:32:16    MR. LOEVY:  There was a photo with some initials on it of where Mr. Hawkins was and where Mr. Langston was.

12:32:25    MR. SWAMINATHAN:  It's Defendants' Exhibit 384.

12:32:26    MR. LOEVY:  It was not an original exhibit.  We also don't think we got it in discovery.  We are still checking that, but we would ask, I don't know if you want to talk about the issues now but we want no more new exhibits and no more new photographs, because it's late.

12:32:43    THE COURT:  Go ahead, Mr. Noland, that's fine.

12:32:44    MR. NOLAND:  If you like now.

12:32:45    THE COURT:  On this point.  It looks like --

12:32:48    MR. NOLAND:  We had told the plaintiffs that those exhibits were actually just the copies of the Plaintiff's Exhibit 219 so our 388 through 391 are Plaintiff's Exhibit, a part of Plaintiff's Exhibit 219.  They have it.

12:33:03    THE COURT:  I think he said this was 384, though.

12:33:06    MR. NOLAND:  I don't think it was.

12:33:08    THE COURT:  It wasn't 384.

12:33:09    MR. NOLAND:  384 is a photo that was used at the

certificate of innocence proceeding with the plaintiff's counsel, and so all the photos -- they were parties to that proceeding.

MR. LOEVY: Parties to the proceeding, but it wasn't on the pretrial order, so we were was surprised by it.

THE COURT: How are you harmed? That's the question.

MR. LOEVY: We want it to stop. At least if they are going to show something that's not in the pretrial order, show me before they put it on the screen. That's all I'm asking.

THE COURT: That doesn't sound unreasonable.

MR. NOLAND: All right, Judge.

MR. LOEVY: We have been working together on stipulations, your Honor. There is a Buckles police report and the Murphy GPR that are not in the Chicago Police Department's files, and we're hopeful and remain hopeful we are going to come to a stipulation, but if we don't, we have asked the city to bring a record keeper here tomorrow who can talk knowledgeably about those topics so we don't want there to be any surprise that we do have a record keeper to say we have looked and these things are not in the files.

THE COURT: Okay.

MR. LOEVY: Then there is the intimidation issue.

THE COURT: That's it?

MR. LOEVY: That's it. That's my issue.

MR. KULWIN: I don't understand.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 138 of 140 PageID #:19288
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 138 of 140 PageID #:31033

11/29/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

137

THE COURT: It's the same issue that I've put off several times and I talked about it several times. There may not be much more to talk about.

Who is up after this witness?

MR. LOEVY: Mr. Wharrie the next witness?

MR. ART: No.

MR. LOEVY: Who is the next witness?

MR. ART: Lyon.

MR. LOEVY: Andrea Lyon.

THE COURT: We are going to close out the intimidation issue to the extent that there's anything more to talk about at the end of the day. We will deal with this Kees issue that you mentioned at the end of the day. The photo thing I've dealt with. The stipulations, you'll tell me when you have something to talk about.

MR. ART: A juror left his notebook in the front row.

THE COURT: I'll get it. Thanks.

MR. MICHALIK: Judge, we just had an issue with respect to Andrea Lyon, they let us know a couple of days ago that they were intending to call her and we are uncertain for the basis on which they are doing so. To our knowledge.

THE COURT: I'm listening.

MR. MICHALIK: She was disclosed as someone who would testify with about one of the files.

THE COURT: Go ahead.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 139 of 140 PageID #:19289

MR. MICHALIK: She was identified as a witness regarding.

THE COURT: Did she testify at the other trial?

MR. MICHALIK: No.

THE COURT: I don't remember.

MR. MICHALIK: She was identified as a witness who was going to testify about the people v.

THE COURT: People v.?

MR. MICHALIK: People v. Fuller which was one -- full ton, I'm sorry, f-u-l-t-o-n, and that was one of the basement files that Mr. Brasfield has not relied upon, so that's the only basis that we can think of that she would testify about.

THE COURT: What's that?

MS. GARVEY: She is going to testify about the full ton case, she was disclosed about the full ton case. She was one of our Monell cases.

THE COURT: In other words, she is going to say I was his lawyer, I was this person's lawyer, I didn't get the stuff, something like that.

MR. SWAMINATHAN: We identified specific pages for them that she says she did not receive. She is going to testify about her case, what those pages were she hadn't received.

MR. KULWIN: I guess the question is --

MR. MICHALIK: Our understanding is that she was post

Case: 1:23-cv-01737 Document #: 287-31 Filed: 04/06/26 Page 140 of 140 PageID #:19299
Case: 1:13-cv-01168 Document #: 1185-18 Filed: 02/24/17 Page 140 of 140 PageID #:31035

conviction counsel on that case, so I don't know how she could testify as to what was or was not in the criminal defense file.

MR. SWAMINATHAN:  She will be able to lay a foundation for all of that.

THE COURT:  If she can't lay the foundation, you will make the proper objection at the proper time and I will rule on it.  I can conjure in my own mind what it is likely she will say and you will argue it to me at the appropriate time.

MR. MICHALIK:  Okay.

THE COURT:  See you at 1:30.

(The trial was adjourned at 12:35 p.m. until 1:30 p.m. of this same day and date.)

***REALTIME UNEDITED TRANSCRIPT ONLY***