# Exhibit 33

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 2 of 164 PageID #:19365
Case: 1:10-cv-01168 Document #: 485-15 Filed: 02/24/17 Page 2 of 164 PageID #:31057
11/29/16 PM    ***REALTIME UNEDITED TRANSCRIPT ONLY***
1

Judge Kennelly, November 29, 2016, 1:30 p.m. call and then trial.

THE CLERK:  Case number 10 C 1168, Fields v. City of Chicago.

THE COURT:  All right.  Is everybody good to go?

MR. LOEVY:  We are, your Honor.

THE COURT:  You can get the witness back on the stand.  You can bring the jury in.

MR. LOEVY:  Could we get clarification if Mr. O'Callaghan is going to cross on the Monell?

THE COURT:  I don't think that Mr. O'Callaghan would be doing anything.  It would be Mr. Kulwin.

MR. KULWIN:  Good catch, Judge.

THE COURT:  I am as sharp as a tack.

MR. KULWIN:  I may have a few questions, yes, Judge.

MR. LOEVY:  We object to the tag team.

THE COURT:  Well, but you asked Mr. O'Callaghan a whole bunch of questions about record keeping practices, so I mean, you know, the testimony is -- I mean, it's primarily obviously directed towards the Monell claim, but there's certainly things that he says and issues about record keeping that might be pertinent to the claim against Mr. O'Callaghan too.  So the whole none duplication thing applies as it always does.  I am not going to preclude somebody from cross-examination.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 3 of 164 PageID #:19366
Case: 1:10-cv-01168 Document #: 485-13 Filed: 02/24/17 Page 3 of 164 PageID #:31058

MR. KULWIN: Judge, I have an emergency phone call that I have to take. You can start without me.

THE COURT: Seriously?

MR. KULWIN: It will only take two minutes, literally two minutes.

(The jury enters the courtroom.)

THE COURT: Do you understand you are still under oath?

THE WITNESS: Yes, your Honor.

THE COURT: Give it one second for everybody to get situated.

All right. Mr. Loevy, you can go ahead.

- - -

MICHAEL DAVID BRASFIELD, DIRECT EXAMINATION CONTINUED
BY MR. LOEVY:

Q. Mr. Brasfield, to orient you, you told us of the analysis you did just looking at the investigative files themselves to see if they complied with the policy, right?

A. Yes.

Q. And you also told us about your analysis of the permanent retention files themselves to make observations about whether they were the way you thought they were supposed to look, right?

A. Yes.

Q. I want to ask you now about a third area of analysis. Did

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 4 of 164 PageID #:19367
Case: 1:10-cv-01168 Document #: 485-33 Filed: 02/24/17 Page 4 of 164 PageID #:31059

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

3

Q. you do any comparison between these files that were found in the basement and their corresponding permanent retention files?

A. Yes, I did.

Q. Tell the jury about that.

A. Again, looking at the material that was in the basement file, there were a lot of unofficial reports that were not getting onto official forms and consequently not getting into the permanent retention files and roughly somewhere, 50 percent of those 89 files from the 80s did show the relevant information, the unofficial notes going into the official reports.

Q. How many basement files did you say you had?

A. The ones that I actually had to be able to compare to were only found in the first time period, so there were 27 in the.

Q. 27 corresponding permanent retention files?

A. Yes.

Q. So there were 400 some basement files?

A. 220 million if you want to call it a universe.

Q. That's what I'm getting at?

A. Yes.

Q. Then you found?

A. 23 in the first group and 27 in the second group.

Q. All right. Was that significant to you that 50 percent of the permanent retention official files were missing from the

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 5 of 164 PageID #:19368
Case: 1:10-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 5 of 164 PageID #:31040

investigative files?

A. Yes, I would expect there to be near 100 percent compliance.

Q. And is that consistent with your experience in other places, is that an unfair or unrealistic representation?

A. I don't feel in my experience at looking at other homicide foils and homicide investigations that I would expect that high of a deficiency.

Q. 50 percent struck you as an aberration?

A. Yes.

Q. Have you ever worked with or audited a department that performed that poorly?

A. Not in the case of homicide files, no.

Q. All right. Did you do the first line work to fill out the boxes, whether it was an inventory, non-inventory, et cetera?

A. No, I did not.

Q. Tell the jury who you relied on to do that?

A. Because of the sheer volume and I don't want to do that kind of stuff, the initial material review, not review, the material that was listed and documented put in the spreadsheet was done by people from your office.

Q. Staff hired by us, correct?

A. Yes.

Q. And did you then review the work that they had done to compile the chart, the box?

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 6 of 164 PageID #:19369
Case: 1:10-cv-01168 Document #: 485-19 Filed: 02/24/17 Page 6 of 164 PageID #:31641
11/29/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

5

A.  Yes, the discussion initially was it was the best utilization of my time because I value it is that that initial work would be done and then I would have the Bates numbers and the file numbers to go back and check and verify that that's the way they were.

Q.  And you also charged $300 an hour, right?

A.  That's correct.

Q.  So that is probably not the most efficient use of your time?

A.  It's not the most official and it's not the most enjoyable.

Q.  Did you spend a lot of hours making sure it was accurate?

A.  I did.

Q.  Tell the jury, approximately, what you did to do that and how long it took?

A.  Once the material was provided to me in electronic format, I went through the files, looked at the corresponding Bates numbers and if anything, it errs on the side of the city because I looked at to verify when it said that things were either to/from memos or handwritten notes or material that should have been in a permanent retention file, I verified that in fact what people that you had hired found was correct. I did not go a further step and see if I could find some more errors.

Q.  So you only caught errors going against you?

11/29/16 PM
Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 7 of 164 PageID #:19370
Case: 1:10-cv-01168 Document #: 185-33 Filed: 02/24/17 Page 7 of 164 PageID #:31042
***REALTIME UNEDITED TRANSCRIPT ONLY***

6

A.  Yes.

Q.  Is it acceptable in your field and your industry to rely on other people to do some of the data entry in this kind of work?

A.  Yes.

Q.  All right.  I want to talk about your fourth analysis, and that involves the criminal defense class?

A.  Yes.

Q.  Tell the jury what your fourth layer of analysis was?

A.  Well, part of the underlying issue here was whether material was getting discovered if it was going to go to the criminal defense attorney, and the most obvious way to determine that is to determine how many criminal defense files were available that correlated with information that was in basement files and were in permanent retention files.  So again people that were hired by you sought out the criminal defense attorneys and were able to eventually receive criminal defense attorney files for 27 cases in the first time period -- or 23 in the first time period and 27 in the second.

Q.  All right.  So it was your understanding that as many criminal defense files as possible were located to compare with the basement files, correct?

A.  Yes.

Q.  And by the way, your Honor, at this time we do move Plaintiff's Exhibit 307 into evidence under?


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 8 of 164 PageID #:19374
Case: 1:10-cv-01168 Document #: 485-19 Filed: 02/24/17 Page 8 of 164 PageID #:31043
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

7

THE COURT: 1006.

MR. LOEVY: Yeah, 1006.

THE COURT: We will talk about that at the end of the direct. Let's -- we will do a sidebar at the end of the direct to talk about it.

BY MR. LOEVY:

Q. All right. When you did this analysis of comparing the available criminal defense files to the basement files, what was your findings?

A. Well, in 90 percent of the time out of the 50 cases, 45 of them, they were investigating materials that were missing, approximately 80 percent.

Q. Before we leave that, I want to make sure I understand. So in the basement files, 90 percent of the time the criminal defense attorneys files did not have all the materials in the basement files?

A. That's correct.

Q. All right. Did you say -- what was the next number that you --

A. Approximately 80 percent, 40 of the 50 were missing the criminal defense files were missing handwritten notes that were present in the basement files that detectives or others had written down.

Q. How about GPRs and to/from memos?

A. Approximately 46 percent of the criminal defense files

11/29/16 PM
Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 9 of 164 PageID #:19372
Case: 1:10-cv-01168 Document #: 485-19 Filed: 02/24/17 Page 9 of 164 PageID #:31044
***REALTIME UNEDITED TRANSCRIPT ONLY***

8

were missing, general progress reports, that could be found in the basement files.

Q.   And how many of the criminal defense attorney's files showed evidence of having received the inventory?

A.   There were 36 percent of the cases, of the criminal defense attorneys even received an inventory, and I might also mention that only 20 -- 20 percent were missing to/from memos that were in the basement files too.

Q.   Now, you just said whether the criminal defense attorneys received it, but you don't actually know what they got and what they didn't get?

A.   No, in my report, I made very clear, I had no firsthand knowledge of what the criminal defense attorney received or when it was received.

Q.   You had to use as a proxy their file, correct?

A.   That's correct.

Q.   And you don't claim -- do you claim that this would be a perfect and, you know, unchallengeable procedure to guarantee exactly every document that they did or didn't have?

A.   No.

Q.   All right.  Overall, though, did you see evidence of a problem?

A.   I did.  There was a consistent pattern of the material that I reviewed that would show the types of things that were in the investigative file were not making into criminal

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 10 of 164 PageID #:19373
Case: 1:23-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 10 of 164 PageID #:31045

defense files.

Q. All right. You're familiar with the defense hired an expert named Mr. Murray, correct?

A. Yes.

Q. And he spent quite a few hours going over the same material, correct?

A. That's my understanding.

Q. All right. And there is -- it was detected that there was a problem with your analysis of the Octavio Anima file, was there not?

A. Yes.

Q. Tell the jury what the problem was?

A. In the spreadsheet that you see enlarged there, I made reference to Bates numbers, and in one of the -- in a particular case there was a range of pages where a digit was transcribed, and, for example -- I can given you the exact number. In any event, it was a typographical error, and it should have been what was, a 1 should have been a 2 or a 2 should have been a 1 so that the range instead of having a hundred and some pages missing, there were only seven or eight pages missing.

Q. How many pages is your document, sir, about 15?

A. It covers 439 different cases, so I don't know exactly how many pages there are.

Q. All right. You are not claiming it is completely free of

11/29/16 PM
Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 11 of 164 PageID #:19374
***REALTIME UNEDITED TRANSCRIPT ONLY***

10

all typos, are you?

A. No, it was an effort to impartially examine what was available.

Q. All right. Who is that on, the typo, was that on you or somebody else, who takes responsibility on that?

A. It's both on the initial typist, but it's also clearly on me, so.

Q. All right. Does that change your opinions at all that you were wrong about this Bates range?

A. No. In fact, even if the two possible things. Even if you completely removed that Octavia Anima case, it doesn't change the overall pattern of everything that I looked at. Secondly, there were things missing regardless of that one particular typographical.

Q. So notwithstanding the typo, there still were --

A. Yes.

Q. How about the Christopher people's file, this is the one from the 150 pages from the criminal defense lawyer. Do you want to give some context there?

A. That very clearly out of the 50 was one that should not have been included in the material for me to look at. It didn't represent a criminal defense file. There were documents there. But I didn't feel it would be fair to either side to say oh, well, this one, I don't like this one, I'll take it out. It was there, I looked at it, I did my process.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 12 of 164 PageID #:19375
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 12 of 164 PageID #:31047

Q. Has the defense or anybody else brought to your attention any other significant errors that you are aware of?

A. No.

Q. Does the fact that that mistake was made, does that change any of your overall opinions?

A. No, it does not.

Q. Does it affect your analysis of the blue column, the purple column, the blue versus purple column?

A. No, it does not.

Q. The defense expert also said that some of the documents that were missing from the criminal defense files were things like court attendance sheets, notes like VIN records, stuff that was administrative. Did that -- what's your opinion of that criticism?

A. I don't think that is an accurate or fair explanation. As I testified to before, you never know.

MR. NOLAND: Judge.

THE WITNESS: What is going to be.

MR. LOEVY: Mr. Brasfield, if you could hold on. There is an objection.

THE COURT: Any hear it.

MR. NOLAND: None disclosed.

THE COURT: Let me see the lawyers at sidebar. Bring the report.

(The following proceedings were had at sidebar outside the

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page: 13 of 164 PageID #:19376
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page: 13 of 164 PageID #:31048

hearing of the jury:)

THE COURT:  The question on the table has to do with material missing from criminal defense files?

MR. KULWIN:  It was actually the reason, he was talking about his review of Mr. Murray, our expert's report. They haven't disclosed any rebuttal from him with respect to any review.

THE COURT:  Actually, it was in the question.  It was in the question.  So why don't you word the questions in a different way.

MR. LOEVY:  I would be happy to stay away from it if they don't want to get into it.  If it's a disclosure issue, fine.  If they're going to do it on cross.  I'd be happy to stay away from the subject.

MR. NOLAND:  We are certainly going to ask him he didn't review the prosecutor's files and show him some of those things.  He's had that report for months and --

THE COURT:  Basically what you're saying is that he can't comment on the other side's criticism of his report?  I don't think I agree with that.

MR. NOLAND:  He didn't submit a rebuttal is all I'm saying, your Honor.  Yes.

THE COURT:  When was his dep taken in terms of the sequence between plaintiff's report, defendants' report, deposition, where did it fall?

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 14 of 164 PageID #:19377
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 14 of 164 PageID #:31049

MR. NOLAND:  We took his deposition before we disclosed our report.

THE COURT:  Okay.

MR. LOEVY:  I will stay away from it if they are not going to bring it up.  The criticism I thought they were going to do on cross is some of this stuff is benign.  If they are not going there, we are done with it.

THE COURT:  I think you can probably word the questions in a way that doesn't say the defendants' expert says this.  I mean, I am not sure is going to happen here, I suppose in theory somebody could say you did such a great job on cross on this guy, we are not going to call this person.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Okay.  You can proceed.

BY MR. LOEVY:

Q.  Some of the materials in the investigative files that were not evidenced in the criminal defense attorney's files was more significant than other materials, right?

A.  That is correct.

Q.  All right.  As far as any criticism that who cares if some of this stuff was left out of the criminal defense attorney's files, can you speak to that?  I am talking about administrative documents, notes about a VIN number on a car, that kind of thing.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 15 of 164 PageID #:19378
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 15 of 164 PageID #:31050
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

14

A. As I had previously testified to, oftentimes, you don't know what is important or what may have value either to prosecution or defense. Administrative things such as who appeared in court, you may discover later that the key part of a prosecution is that an officer was on the street and saw something, but in reality, you have the administrative document that said they were in court on that day. I mean, that's just an off-the-cuff example. But the administrative type material can be important, oftentimes, it is not. But until you have it or don't have it, you're in a quandary.

Q. All right. When you did your analysis, some of the materials that you listed as undisclosed were probably truly benign, right?

A. That's correct. Absolutely.

Q. You didn't attempting to through and sort oh, this page is blank or this page is not exculpatory page by page, right?

A. I tried to be as objective and just put down what the facts were.

Q. All right. Let's change topics then, sir.

Do you have any problem as a police practices expert with police officers having a policy of destruction of notes, and can you explain?

A. I don't have a problem. In fact, in my own career, I have shredded for lack of a better word notes, but it's in the context of having taken a two or three-word or two or

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 16 of 164 PageID #:19379
Case: 1:15-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 16 of 164 PageID #:31051
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***
15

three-line note that I may have scratched in the field and elaborating that on an official document when I am back in the office. If I happen to go out to a bodega and talk to Sam Smith at the bodega that may be a pencil note but when I come back in, it is on such-and-such a date at such-and-such a date on such-and-such a location, I interviewed whoever and this is the context that I learned while it's fresh in my mind. That is the official document. That reflects what was actually done. That scrap of paper then --

Q. So is there a national norm then that as long as you take the information and put it in a report, you don't have to preserve the notes, would you agree or disagree with that?

A. It could be either way. The key issue is the information that was garnered put into a form that is available for either review or discovery later.

Q. Which means in the official file, right?

A. Yes, in the official file.

Q. Would you have a problem with a policy that allowed you to disregard or destroy or withhold notes if it didn't go into an official report?

A. Absolutely.

Q. And would that be an aberration?

A. It would.

Q. You were asked some questions previously about show me a specific policy that, you know, from another city. Do you

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 17 of 164 PageID #:19380
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

16

remember being asked those questions?

A.   During a deposition, yes.

Q.   All right.  Do you have the Tallahassee policy from 1982?

A.   No, I do not.

Q.   Do you have the el pass owe policy from 1984?

A.   I have no files that contain historic policies and procedures from other jurisdictions.

Q.   Do you nonetheless have a familiarity request other policies and procedures?

A.   Yes.  From the start of my college education in science in the studying of policies of procedures and investigations and then more importantly through my professional practice of developing, not to go over the same ground, but I have visited other police departments, I have audited other police departments, I have reviewed their policies, I have looked in the popular literature at the time and of those eras and I actually was a commander in those eras and I am familiar with what was the way things were written.

Q.   All right.  Back quickly to the comparison you did between the criminal defense files and the basement files, why did you choose -- well, first of all, you have an understanding that the defense attorney did a different comparison, correct?

A.   Yes.

Q.   I'm sorry, the defense attorney hired an expert.  And what did the defense expert Mr. Murray compare the files to?

MR. NOLAND:  Objection.

THE COURT:  Same basis as the previous one?

MR. NOLAND:  Yes, Judge.

THE COURT:  Again, I need to see the lawyers at sidebar, please.  Bring the report.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  You did what I told you not to do.  The defense expert did this, the defense expert did that.  I told you not to word questions that way.

MR. LOEVY:  I apologize.

THE COURT:  Here's the deal.  I don't think that there's anything inappropriate or beyond -- or outside the scope of Rule 26(a)(2) and the part of Rule 37 that goes along with it for him to be able to respond to criticism by a defense expert, so either he gets to do it now or he is going to get to bring him on later.  Do you have a preference?

MR. LOEVY:  We do.

THE COURT:  I'm asking you, put him on in rebuttal to comment on what your guy said about him.

MR. NOLAND:  If that would be the ruling, then I would rather have him do it now.

THE COURT:  That would be the ruling.  Let's have him do it now.

(The following proceedings were had in open court in the

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 19 of 164 PageID #:19382
Case: 1:16-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 19 of 164 PageID #:31054
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***
18

presence and hearing of the jury:)

THE COURT: Okay. The objection is overruled. You can proceed.

BY MR. LOEVY:

Q. Just as foundation, what is your understanding of the analysis that the defense expert under took?

A. It is my understanding from reading his report and deposition that he looked at.

Q. Same basement files, right?

A. Same basement files.

Q. What did he compare them to?

A. He compared them to state's attorney's office files.

Q. You compared the same basement files to the criminal defense and then they compared them to the state's attorney's office files, right?

A. That's correct.

Q. And neither of one of you did what the other one did?

A. That's correct.

Q. Why did you choose to compare the basement files to the criminal defense files to determine what the criminal defense attorneys had?

A. I tried to keep it as straightforward as possible. The issue that I was asked to look at was material relevant to the investigation of homicides being given and made available to the criminal defense attorney. And the most straightforward

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 20 of 164 PageID #:19383
Case: 1:20-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 20 of 164 PageID #:31055

way to do that is to look at the criminal defense attorney's files.

Q.  All right.  You've already testified that 90 percent of the criminal defense attorney files were missing some materials from the basement file.  Do you have any knowledge as to what was in or wasn't in the state's attorney's files?

A.  No, I do not.

Q.  Let's talk about a few more areas.

You talked before lunch about why it's important to have policies governing the subpoena unit and the subpoena response unit.  Did the City of Chicago after they enacted the changes we talked about this morning, did they fix the subpoena unit problems?

A.  No, they did not.

Q.  Can you explain?

A.  The policies that were promulgated did nothing to establish guidelines or policies and procedures or training or follow up auditing or in worst case scenario, discipline for the successful operation of the subpoena services unit.  There was no checklist if you did a subpoena from a state's attorney's office, you do this, this, and this.  It becomes even more critically important to have that when you have a police department with a culture of parallel files of different sources of files.  You get a subpoena, and the staff with no training is supposed to determine, well, how do I

Case:1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 21 of 164 PageID #:19384
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 21 of 164 PageID #:31056

respond to this?  Do I send something in writing over to the gang squad because the gang squad may have had involvement in this but their records aren't included in the investigative file?  Do I send for things from the photo lab or from the crime lab?  You can say that an experienced employee would know that, but given the turnover and the fact that there is absolutely no evidence that I have seen of any type of guideline, of any training, of any policy or procedure as to how they will respond or what sources that they will examine to get the material.

Q.  All right.  Did you review testimony by Mr. Hickey that provided insight into this problem?

A.  A great deal of testimony from Mr. Hickey, yes.

Q.  And what did you conclude based on that?

A.  That he acknowledged as the city's expert in that field that what I had just testified to was the case, that there was no training, there were no guidelines, and in fact, material that I reviewed, that there were instances where there was confusion or question among staff as to what should be turned over or what shouldn't be turned over, and that none of that questioning was ever resolved or sent up the chain of command to decide what to do.

Q.  All right.  In addition to the lack of -- basically, did any of the new policies that got passed, did they govern the subpoena unit?

A.   No.

Q.   Was there a lack of policies there?

A.   There was a lack of policy.

Q.   All right.  Let's talk about the policies that were passed.  Did those solve the problem for the decentralized divisions you've just described?

A.   No, they did not address anything about a centralized record system process.  And I might add, the larger the organization gets, the more critically important it is to have a centralized record system.

Q.   How out of the norm is Chicago's deficiency in that regard?

A.   As I have said on several occasions, it is totally alien to my experience that the City of Chicago police department would have that type of system.

Q.   Did the policies leave too much or too little discretion to detectives as far as what to make into official files?

A.   Well, they used the term relevant and one of the depositions that I reviewed, I believe it was from a gentleman by the name of /STEUT I shall indicated that what might be important or relevant.

          MR. NOLAND:  Objection, your Honor.  I believe that's the subject of the discussion before the testimony.

          THE COURT:  Okay.  Well, the last part of the answer was not responsive, so I am going to strike the last part.  I

am going to strike the whole answer.  Why don't you put the question again.  The answer really wasn't responsive.

BY MR. LOEVY:

Q.  Did you see any evidence either way that the system in Chicago left too much discretion to police officers to decide what to put in the official file?

THE COURT:  That's just a yes or no.

THE WITNESS:  Yes.

BY MR. LOEVY:

Q.  Can you explain?

THE COURT:  Is this the issue where there is an objection?

MR. NOLAND:  Yes, the reference to a particular name.

THE COURT:  Bring the -- again, I need to talk to the lawyers at sidebar.  Bring the relevant ruling.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  Is this my ruling?  You're talking about.

MR. NOLAND:  The proffer.

THE COURT:  You are talking about the proffer.  This is not Jones Palmer?

MR. SWAMINATHAN:  No one knows that his reference to skive I shall testifying is him testifying in Jones and Palmer.  He is just saying a guy name skive I shall who is a commander said certain things.

MR. LOEVY:  In other words, that would have been outside the Jones proffer but we are not offering it for the Jones proffer.  It has nothing to do with the Jones proffer. He just said I looked at /STEUB itch's testimony.

THE COURT:  Who is is it I object I shall?

MR. SWAMINATHAN:  He is a command he were for the city.

THE COURT:  Testified in the Palmer case?

MR. SWAMINATHAN:  It was in the Palmer case.

MR. NOLAND:  It's the pre 83 policy, yes.

THE COURT:  Okay.  And what do you expect his testimony to be on this?

MR. LOEVY:  Just what he said.

THE COURT:  Say it again.

MR. LOEVY:  That there was too much discretion left to the detectives to decide what's in and what's out.

THE COURT:  And the problem with that is?

MR. NOLAND:  It was the pre 83 policy.  That was a decision a change the policy.  He is talking about a different policy before 83-1.

MR. MICHALIK:  It's misleading to discuss testimony before 83-1 comes out.

THE COURT:  Reword the question so it doesn't do that.

(The following proceedings were had in open court in the

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 25 of 164 PageID #:19388

presence and hearing of the jury:)

THE COURT: Okay. The question is going to be rephrased.

BY MR. LOEVY:

Q. All right. You looked at what happened in the City of Chicago after they tried to solve the problem of the Jones Palmer era, correct?

A. That's correct.

Q. And I believe you told us you think they did an inadequate job of solving that problem?

A. Yes.

Q. Did they solve the problem with having too much or too little discretion to detectives to decide what to memorialize?

A. No.

Q. They did not?

A. No.

Q. If you could explain a little bit about your reference to Mr. /STEUB itch?

A. They used what I would consider vague terminology and left it up to individual detectives to determine what was relevant and what they did with the information that they thought was relevant.

Q. And that's not in the norm in police practices?

A. No.

Q. You talked a little bit about training and just a few more

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 26 of 164 PageID #:19389
Case: 1:23-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 26 of 164 PageID #:31061

questions, really. But when they did these new policies and these new practices, did they do the kind of training that would be expected in your industry?

A. Not for a significant policy such as discovery in constitutional state crimes for individuals that and as evidenced by the information I had available to me, that was an inbreded cultural problem that needed very significant training, planning for the training in advance, training presented by high level commanders, perhaps even with an introduction by the superintendent that it encompass everyone that would have their hands-on an investigation, not just the major crimes detectives as I mentioned before. They should include bomb and arson, gang squad, anyone that has an investigative responsibility and to a lesser extreme, the patrol officer, and it should not be a one time deal. People transfer in and out. There are going to be questions arise in time. You have a major significant change in the culture as to well, does this mean this, does that mean that, there needs to be and often is additional follow-up training.

Q. As a 40-year law enforcement person, do you regard this as a significant change in the way of doing business?

A. Yes.

Q. Is a one-three-hour training of the detectives sufficient?

A. No.

Q. The last question is you described the culture as

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 27 of 164 PageID #:19390
Case: 1:15-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 27 of 164 PageID #:31062
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

26

ingrained.  Can you explain from a police practices standpoint how an organization can have culture resistance to change?

MR. NOLAND:  Objection, Judge, relevance.

THE COURT:  Overruled.

THE WITNESS:  For instance, when the requirement to read suspects their rights which goes back decades and decades and decades, that was not what police were used to doing and thought that it was going to let the bad guys get away.  It's a cultural thing that had to be totally turned around 180 degrees.  The same is true about, for instance, warning shots.  Anyway, warning shots.

MR. KULWIN:  I will object.

THE COURT:  Sustained.

MR. KULWIN:  I ask that it be stricken.

THE COURT:  That comment is stricken.

MR. LOEVY:  I'm finished.

THE COURT:  What did you say?

MR. LOEVY:  I'm finished.

THE COURT:  You're finished.

Mr. Noland.

- - -

MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION

BY MR. NOLAND:

Q.  Now, Mr. Brasfield, before lunch, you talked a lot about notes and that in the files you reviewed, you saw notes that

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 28 of 164 PageID #:19391

were not on general progress report forms, do you remember that testimony?

A. Yes, I do.

Q. And sometimes you might see it on the back of a piece of paper or something not on the official general progress report form, correct?

A. That's not what I testified to this morning, but, yes, I agree.

Q. All right. And now just recently after lunch, you've acknowledged that you would shred your own notes as a police officer after completing a report; isn't that true?

A. That's correct.

Q. And to you that's a perfectly acceptable practice, right?

A. In the context of my explanation of transferring the information in full onto official forms.

Q. So you would not give your notes to the criminal defense attorneys so he would have those notes in the courtroom in order to cross-examine you with what you wrote contemporaneously with your interview of somebody, correct, yes or no?

A. Yes.

Q. And you would not give those notes to the prosecutor so he could see what you wrote, he or she could see what you wrote down contemporaneously with your investigation; isn't that true?

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 29 of 164 PageID #:19392
Case: 1:23-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 29 of 164 PageID #:31064
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

28

A. That's true.

Q. And you have talked about a lot of criticism of Chicago's policy. We just heard that, correct?

A. Yes.

Q. Wouldn't you agree, sir, that in fact keeping notes, retaining notes permanently so that they're available in the criminal process is a better policy than your very own personal policy of shredding your notes; isn't that true?

A. No, it is not.

Q. Now, Mr. Brasfield, you were never personally assigned as a homicide detective is that true?

A. That's true.

Q. But you're aware that in the Seattle police department as with your practice, the Seattle police officers would shred their notes after completing a report, right?

A. In that era.

Q. Is that true?

A. That's true.

Q. And Mr. Brasfield, isn't it true that in all your time in Seattle, all those 20 plus years, you never did anything to change that policy; isn't that true?

A. No, that's not true.

Q. Isn't it true, Mr. Brasfield, that you didn't do anything to change the policy at Seattle of detectives who threw their notes away; isn't that true?

29

A.   That's not true.

Q.   Well, Mr. Brasfield, you were the chief of police in Fort Lauderdale; is that correct?

A.   That's correct.

Q.   And you don't even know what the policy was in Fort Lauderdale with respect to whether or not detectives could destroy their notes after completing a report; isn't that true?

A.   That's not entirely true, no.

Q.   At your deposition you told us you didn't know one way or the other what the policy was in Fort Lauderdale?

       MR. LOEVY:  Objection, page and line.

       THE COURT:  Sustained.  That's not the proper way to do it.

BY MR. NOLAND:

Q.   Page 327.  Line 10.  Isn't it true that you were asked these questions.

       "QUESTION:

       MR. LOEVY:  Objection to the characterization with respect to the policies.  Just the question and the answer.

       THE COURT:  Ask the questions.  Read the questions and answers, leave out the commentary.

BY MR. NOLAND:

Q.

       "QUESTION:  But what did they do with the actual notes?

       ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 31 of 164 PageID #:19394
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 31 of 164 PageID #:31066

11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

30

Did they throw them away?

"ANSWER: They were transcribed and the notes, I don't have an independent recollection right now what they were, what was done with them. So it's possible they were just thrown away. The information would have been contained in the file. It's possible. I said I have no independent recollection.

So the question is, it's possible that the notes in Fort Lauderdale that the detectives took after they electronically called them in and had them transcribed or typed them or did whatever that they did with them and put them in the file could have been thrown away?

"ANSWER: That could have been."

A. That's correct.

MR. LOEVY: Objection, not impeaching.

THE COURT: I am going to overrule the objection. When you read the things, say question and answer. You are not going to do it again, but when you do it say question and answer so the jury understands what's being read.

I am overruling the objection because it's a matter of weight.

MR. NOLAND: Thank you, Judge.

BY MR. NOLAND:

Q. Isn't it true that as the chief of policy, you didn't have a policy one way or the other with retention of notes in Fort

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 32 of 164 PageID #:19395
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 32 of 164 PageID #:31067
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

31

Lauderdale?

A.  The policy.

        MR. LOEVY:  Objection.

        THE COURT:  The question is did you have a policy?

        THE WITNESS:  We had a policy.

BY MR. NOLAND:

Q.  Page 328, line 1.  Isn't it true you were asked this question and gave this answer:

        "QUESTION:  And as chief of police, you didn't have a policy one way or the other?

        "ANSWER:  I don't recall what the policy.  I don't have it in front of me now."

            Isn't it truism objection, your Honor

        THE COURT:  The objection is sustained.  Not impeaching.  The jury is instructed to disregard.

BY MR. NOLAND:

Q.  Now, Mr. Brasfield, you acknowledged after lunch here that the key in all of this with respect to the review that you've done in your testimony here today is that the information is provided in the criminal justice process so that the prosecutors get the information and the information will be tendered to the criminal defense attorney; is that fair?

A.  The information that the police have are supposed to give to the prosecutor or the state's attorney's office, yes.

Q.  And it is true, isn't it, that if the police -- when the

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 33 of 164 PageID #:19396
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 33 of 164 PageID #:31068

11/29/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

32

Q. police provide the information to the prosecutor, the police have fulfilled their duty to disclose under generally accepted police practices; isn't that true?

A. If they disclosed everything that they have, yes.

Q. Yet, Mr. Brasfield, in this review you talked about with plaintiff's counsel, you did not even look look at the prosecutor's files in comparison to the 50 investigative files from the basement, did you?

A. That's correct.

Q. Now, Mr. Brasfield, you've talked about a lot about permanent retention files. Do you remember that testimony?

A. Yes.

Q. Now, Mr. Brasfield, you understand that at the Chicago Police Department there's a permanent retention file that has a supplementary reports and the case reports, that's correct?

A. That's correct.

Q. And there's also the investigative file that is maintained at the area while the investigation is ongoing; isn't that true?

A. That's one of the other files, yes.

Q. And the investigative files are available to get requested and subpoenaed in the criminal process by the prosecutors and the criminal defense attorneys; isn't that true?

A. There is though policy or practice that would indicate how it's supposed to operate.

Q. Well, it's supposed to operate in that the detectives, the special order requires that detectives be submit their information that they generated or received in an investigation into that investigative file for preservation, isn't that what it says? Isn't that what it says, yes or no?

A. That's what it says.

Q. Thank you.

And in this case, there is about 450 investigative files that are listed on this table that the plaintiff's attorneys gave you?

A. More than 29, yes.

Q. And by the way, you didn't prepare this, they prepared it, and provided it to you, correct?

A. That's correct.

Q. And but only on 50 of those 429 cases did they provide you with any criminal defense file is that true?

A. That's true.

Q. And on those criminal defense attorney's files, there were almost all of them general progress reports and other notes that were contained in those criminal defense attorneys files, true?

A. Those.

Q. Is that true or not, sir?

A. No.

Q. You were aware that information from the investigative

34

Q. files was produced in the criminal process, correct?

A. You'll have to rephrase that.

Q. There are -- you came across dozens and dozens of general progress reports that were in these criminal defense attorney's files that you reviewed; isn't that true?

A. There were general progress reports in some of the files that I looked at, yes.

Q. So that was evidence that attorneys were getting material from the investigative files, correct?

A. In some instances, yes.

Q. And in fact, it's your understanding that the practice at Chicago or the policy is that the general progress reports do not go into the permanent retention file, they go into the investigative file, correct?

A. That's correct.

Q. Now, with respect to these 50 or so criminal defense attorneys files that were provided to you, you didn't personally do anything to independently verify that they were complete or incomplete; is that right?

A. I verified --

Q. Sir; is that right?

A. I received.

Q. Sir; is that right?

A. Please ask the question again.

Q. Isn't it true, sir, that of the 50 criminal defense

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 36 of 164 PageID #:19399
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 36 of 164 PageID #:31071

attorney's files that were provided to you by the plaintiff's counsel, you did nothing to independently verify that they were complete or incomplete; isn't that true?

A.  I took them at face value.

Q.  And you don't know how many times those files changed hands from one attorney to another attorney to another attorney over the years, true?

A.  That's true.

Q.  And most of these files were between 15 and some in excess of 30 years old; isn't that right?

A.  That's possible.

Q.  And you don't know how many of these files were given to appellate lawyers, right?

A.  That's correct.

Q.  You don't know how many were given -- how many post conviction lawyers took those files, correct?

A.  All I know is they came from criminal defense attorneys.

Q.  And you didn't talk to any criminal defense attorneys and say, hey, is this file complete, true?

A.  That's true.

Q.  Mr. Loevy brought up with you the Christopher Peoples case, right, that was a case we talked about at your deposition?

A.  Yes.

Q.  And that was a file that was provided to you by the

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 37 of 164 PageID #:19400
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 37 of 164 PageID #:31072
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

36

plaintiff's counsel, right?

A.   That's correct.

Q.   I'm going to show you what the plaintiffs have marked as Plaintiff's Exhibit 383.  That is the criminal defense attorney's file that the plaintiff's attorneys provided to you; isn't that true?

A.   I believe so.

THE COURT:  Can you spell peoples?

MR. NOLAND:  It is p-e-o-p-l-e-s-.

THE COURT:  Thanks.

BY MR. NOLAND:

Q.   Sir?

MR. NOLAND:  Judge, could we have the computer?

MR. NOLAND:  If we could have 306-8.

THE COURT:  Is this in evidence?

MR. NOLAND:  This is Plaintiff's Exhibit.

THE COURT:  I understand.  That's not my question. Just focus on my question.  Is it in evidence?  Let me ask it a different way.  Is there an objection?

MR. LOEVY:  We do not object.

THE COURT:  Fine.  Then the jury will be able to see it.  306-10?

MR. NOLAND:  018, your Honor.

BY MR. NOLAND:

Q.   Sir, while Laura is pulling that up, the first page of

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 38 of 164 PageID #:19401
Case: 1:23-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 38 of 164 PageID #:31073

that document has the name of the attorney for Christopher

Peoples, his name is Gary Scanlon is that true?

A. That's correct.

THE COURT: I did it again. There's two defense tables. I put it on the wrong one. My mistake. Sorry about that. There you go.

BY MR. NOLAND:

Q. Mr. Brasfield, on the screen in front of you, that is page 17 of your attachment F to your report; is that true?

A. That's correct.

Q. And you prepared this page 17, correct?

A. I did.

Q. And this was officially based upon your review of the -- this spreadsheet on the demonstrative exhibit that plaintiff's counsel gave you, right?

A. Yes.

Q. And then you took that and did a file by file comparison of the documents that were in the investigative files from the police and the criminal defense attorney's files given to you, right?

A. That's correct.

MR. NOLAND: Laura, can you highlight the entire paragraph missing from criminal defense files.

BY MR. NOLAND:

Q. There's actually 288 pages in that Chicago Police

11/29/16 PM
Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 39 of 164 PageID #:19402
***REALTIME UNEDITED TRANSCRIPT ONLY***

38

Department file, correct, that you note on attachment F?

A. Yes.

Q. And I have added them up beforehand, I think we talked about it at your deposition, the documents you said were missing from the criminal defense attorney's files were about 250 pages or 257 pages; is that true?

A. I don't recall.

Q. Okay. But it was somewhere in that ballpark, does that sound about right?

A. I would say that's fair.

MR. NOLAND: Laura, if you could pull up Plaintiff's Exhibit 383, pages.

THE COURT: Is there any objection to this one?

MR. LOEVY: What is it, your Honor?

THE COURT: 383.

MR. LOEVY: Is it a file?

MR. NOLAND: It's the file that's in front of him.

MR. LOEVY: No objection.

THE COURT: Okay. Fine. So the 306 was -- 306 dot whatever was the page from the report, the 383 is the people's file.

MR. NOLAND: Thank you, Judge.

This would be base stamp pages 8651-52.

BY MR. NOLAND:

Q. So, sir, on the copy in front of you and on the screen, in

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 40 of 164 PageID #:19403
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 40 of 164 PageID #:31073

the middle of the document, there is a reference to the RD number for this case. That's the records division number; is that right?

A. Yes.

Q. And that would be H H 358668, that's the records division number relative to the homicide at issue relative to this Christopher people's case?

A. Yes.

Q. And that's one page. Can you go back to the other one, Laura? Under the subject line, Laura, could you highlight that?

BY MR. NOLAND:

Q. This is a request for prisoner to be held past next scheduled court call, right?

A. Yes.

Q. Again, the subject of this document is it request for prisoner to be held past court call, correct?

A. Yes.

Q. And again it's the same RD number that we just read, correct?

A. Correct.

Q. Now, isn't it true, Mr. Brasfield, that there isn't any other police report in that file, the criminal defense file that the plaintiff's attorneys gave you that has the records division number for the homicide at issue in that case?

A. I don't independently recall, but if that's what you indicated, yes.

Q. I'll represent to you that that is the case.

So when you received this file and you did your file by file comparison, you wrote down all those documents as missing from the criminal defense file that were inspect basement file, true?

A. That's correct.

Q. So you accepted at that time when you issued your report that this was a complete criminal defense file that the plaintiff's attorneys were supplying to you?

A. That's correct.

Q. And you didn't notice at all even though there's only two pages of requests to hold over a prisoner in that file that, say, hey, wait a minute, this file is incomplete, you didn't notice that?

A. I acknowledge that that was in error.

MR. NOLAND: Laura, could you pull up defense 245; page 270. Jon, this is from the prosecutor's file.

THE COURT: Any objection to this?

MR. LOEVY: No, your Honor.

THE COURT: Okay.

MR. NOLAND: Can you highlight the discovery receipt part, Laura? Thank you.

BY MR. NOLAND:

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 42 of 164 PageID #:19405
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 42 of 164 PageID #:31077

Q. So Mr. Brasfield, you understand this document and it's signed at the bottom by Gary Stanton; is that right?

A. The attorney in this case.

Q. Mr. Stanton was the public defender for Christopher Peoples?

A. That's correct.

Q. You understand this document that he signed to be acknowledging receipt of materials from the state's attorney's office, true?

A. That's true.

Q. And the first line says RD, two pages, right?

A. Yes.

Q. Now, that would be the case report for the case where the initial beat officers respond to the scene and report on what they saw, right?

A. It may.

Q. You don't know it, you don't know what the RD is?

A. I know what an RD is, yes, of course.

Q. Is it or it is not the case report that the beat officers did?

A. It may be, yes.

Q. And then the next line has supp report that's a page. Then if we go down, there's one, two, three, four, five -- six supplemental reports and they have the pages -- three pages and two pages and three and 14 and 14, correct?

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 43 of 164 PageID #:19406
Case: 1:16-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 43 of 164 PageID #:31078
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

42

A. That's correct.

Q. Are any of those supplementary reports in that file in front of you, sir?

A. I would have to look through them.

Q. I will represent to you that they are not in there?

A. You represent that, I will accept that.

MR. NOLAND: Laura, can you go to the next page?

BY MR. NOLAND:

Q. And the next page of this document, page 271, defendants' 245, again has 8 more supplementary reports with the pages listed on them, correct?

A. That's correct.

Q. Again, it's signed by Gary Stanton as receiving them, right?

A. That's correct.

MR. NOLAND: Can you go to the next page, Laura.

BY MR. NOLAND:

Q. Even more supplementary reports to Mr. Stanton that aren't in that file?

A. That's correct.

Q. Do you see the CS P R. About four lines down, do you know what that is?

A. I don't recall right off the top of my head the CS P R.

Q. Isn't it true it's the crime scene processing report?

A. Yeah.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 44 of 164 PageID #:19407
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 44 of 164 PageID #:31079
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

43

Q. Are you aware it's the crime scene processing report?

A. I was not aware --

MR. MICHALIK: Laura, can you highlight the GPRs 73.

BY MR. NOLAND:

Q. What does this signify, Mr. Brasfield?

A. That the public defender, Mr. Stanton, received 73 pages of GPRs.

Q. And you didn't notice at all when you were preparing your report and reviewing the spreadsheet that all of these documents that had been provided to Mr. Stanton, the public defender, were missing from his file; is that correct?

MR. LOEVY: Objection. There is no foundation. He didn't have this document. No foundation.

THE COURT: Rephrase the question.

BY MR. NOLAND:

Q. Wouldn't you have liked to have had this discovery receipt before you made the representation in your report that the Chicago Police Department withheld all of these documents from Mr. Stanton? Wouldn't you have liked to have had that?

A. It certainly would have been helpful.

Q. You wouldn't have made that mistake, would you, of missing dozen and dozens of pages in your report, wouldn't you?

A. I acknowledged --

Q. Sir, would you have made that mistake?

A. I wouldn't have made that mistake.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 45 of 164 PageID #:19408
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 45 of 164 PageID #:31080
11/29/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

44

Q. Would this mistake have been made to you on the spreadsheet by counsel if you had had this discovery receipt?

A. No.

Q. Sir, it was incumbent upon you as an expert before you came in here and gave testimony to look at those prosecutor's files before making any claim of what the Chicago Police Department did or did not produce in any of these cases; isn't that true?

A. No, it is not.

MR. NOLAND: Laura, are you pull up Plaintiff's Exhibit 306-011.

BY MR. NOLAND:

Q. Mr. Brasfield, referring your attention to another case, you looked at a case called people v. James Crockett,; is that true?

A. Yes, I did.

Q. And c-r-o-c-k-e-t-t, and this is a document you prepared as attachment F to your report with respect to the allegedly missing from criminal defense file pages, true?

A. That's correct.

Q. And this file had -- this investigative file had 159 pages, right?

A. That's correct.

Q. And by the way, Mr. Brasfield, you refer to these as the basement files, correct?

A.   Street files, basement files.

Q.   Mr. Brasfield, isn't it true that these files were put into the Chicago Police Department, a basement for storage purposes in the year 2012 when the CPD reorganized its areas from areas 1, 2, 3, 4, and 5 to areas north, central, and south, right?

A.   I have no personal knowledge as to how they were moved or who moved them or why they were moved.

Q.   And Mr. Brasfield, I'll represent to you that in the missing from criminal defense file section of your report here, that there is approximately 107 pages that you contend are missing, right?

A.   I haven't added them up, but that looks to be a fair amount.

Q.   And included in this list of documents you say are missing are supplementary reports, all of the general progress reports, correct?

A.   I'm sorry.  Would you ask the question again?

Q.   Sure.

       Included in the documents you say are missing are a number of supplementary reports and a number of general progress reports, right?

A.   That's correct.

Q.   Mr. Brasfield, I'm going to show you Plaintiff's Exhibit 359 which is the criminal defense file that plaintiff's

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 47 of 164 PageID #:19410
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

46

counsel provided to you for this case. Mr. Brasfield, I put flags on that exhibit which I provided to you which identified a couple of police reports that are in this file.

A. All right.

Q. If I could point you out the pages. The first page is Bates stamped 43388, and then the next one, the next report would be 43392. And then there's also an arrest report for Mr. Crockett of 43116.

In reference to those pages, Mr. Brasfield, isn't it true that there aren't any other Chicago Police Department supplementary reports or arrest reports in that particular file in front of you?

A. Without going through the several hundred pages, I had no way of telling.

Q. Okay?

MR. NOLAND: Laura, can you pull up plaintiff's 359, page 43647.

BY MR. NOLAND:

Q. Now, Mr. Brasfield, this was the state, the people of the State of Illinois's answer to discovery in this Crockett case that was provided to you, true?

A. I imagine I will be answering some of your questions here. I'm taking you at your word and what you are putting in front of me, but I don't specifically recall this document as we are speaking. It's argumentative, but.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 48 of 164 PageID #:19411
Case: 1:23-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 48 of 164 PageID #:31063
11/29/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

47

Q. Sir, if you don't understand one of my questions or if you think I'm being too argumentative, please let me know and I'll rephrase it.

A. No. Ask your question for me, please, again.

MR. NOLAND: Laura, can you just show Mr. Brasfield the whole document so he can see.

BY MR. NOLAND:

Q. Do you know what this -- first of all, this page, this document was given to you, right?

A. It may have been, yes.

Q. Well, in the bottom right-hand corner here you have the Bates range of the criminal defense files and this page starts with 43647. This was in a Bates range that you represented in your report that you received?

A. Yes, yes.

Q. All right.

MR. NOLAND: Laura, go back to the whole document so Mr. Brasfield can see it.

BY MR. NOLAND:

Q. Mr. Brasfield, do you know what this document is?

A. It's labeled an answer to discovery from the -- it's people of the State of Illinois, it begins and then three defendants here.

Q. Do you know what the significance of this document is in the criminal courts here in Cook County?

A.   It would be a -- probably an appeal situation.

Q.   Appeals?

A.   I don't know.

Q.   You don't know what this document is.

Sir, I'll represent to you that this document, and you let me know if you disagree, that the people, the prosecutors in the case are required during the case to identify their witnesses and other information on the answer to discovery to provide that to the criminal defense attorney in advance of the trial?

A.   Yes, I understand.

Q.   Is your recollection refreshed?

A.   Yes.

Q.   Thank you.

And, sir, your understanding is that the names of the witnesses, civilian witnesses and police officers that the prosecutors get and put in these answers to discovery are based upon the police reports that are supplied to them by the police department?

A.   That would be one source, yes.

Q.   First of all, we have several witnesses, Kevin McElroy m-c-E-l-r-o-y, Heywood Bobo b-o-b-o, and Tyrone Carr c-a-r-r-on the first page.  Do you see that?

A.   Yes.

Q.   Mr. Brasfield, I'm going to represent to you that those

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

couple of police reports in the file, the criminal defense file that's in front of you right now, that if you get all the names of witnesses and police officers in those reports, the only ones that could be found are the highlighted names on this answer to discovery. Okay? I'm just going to represent that to you. I know -- you didn't do this analysis, did you?

A. I'm sorry. You got two questions going on here.

MR. LOEVY: We accept the representation.

THE COURT: Ask another question.

BY MR. NOLAND:

Q. Did you conduct any analysis of the answer to discovery on this Crockett case to see whether all the names in here could have been derived from the police reports that are in the criminal defense file provided to you?

A. No, as I testified, I have looked at what material was -- the pages that were in the criminal defense files.

Q. Mr. Brasfield, assume hypothetically that these names that I have highlighted are the only names that are found in that criminal defense file that show up on this answer to discovery that the people filled out and gave to the criminal defense attorney?

MR. LOEVY: Your Honor, we do object to the assumption . It hasn't been supplied -- we have no way to check it.

THE COURT: Finish the question.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 51 of 164 PageID #:19414

BY MR. NOLAND:

Q. Accepting that -- I'm asking you to accept that hypothetically and that the other names that are not highlighted on this document are found nowhere in that criminal defense file. Okay? Those are the hypothetical facts I'd like you to assume.

A. All right.

Q. Isn't it true, sir, that this would be evidence that the criminal defense file supplied to you by the plaintiff's counsel is incomplete because the state's attorney's clearly would have gotten these names from police reports supplied to them by the police department?

MR. LOEVY: Objection.

THE COURT: Is this going to be connected up with another witness? That's my question to you.

MR. NOLAND: It would be through our expert.

THE COURT: Okay. Then I'll overrule the objection. I remind the jury that a question is not evidence.

All right. Go ahead and answer.

THE WITNESS: That your hypothetical, I would assume that because there are names here, they must have come from an investigative file, is that your question?

BY MR. NOLAND:

Q. That's the point. Would you agree with that?

A. In your hypothetical, yes.

Q.  Thank you.

Because the prosecutors aren't -- I mean, in your experience, they are not just making up names out whole cloth as having relevant information to an investigation and supplying it to the criminal defense attorney, correct?

MR. LOEVY:  Objection, your Honor.

THE COURT:  What's the basis for the objection?

MR. LOEVY:  Form of the question and foundation and argumentative.

THE COURT:  Sustained.

BY MR. NOLAND:

Q.  So presuming my hypothetical is true, Mr. Brasfield, which you just acknowledged, that would mean that the information on this chart that was supplied to you and on your attachment F that you typed out would be inaccurate because the criminal defense attorney actually had other police reports that are not in that file in front of you, correct?

A.  You would have to have the state's attorney's file to determine that.

Q.  Okay.

MR. NOLAND:  Judge, could I switch the ELMO, please?

THE COURT:  Sure.  There you go.

BY MR. NOLAND:

Q.  I'm showing the witness what's been marked as Defense Exhibit 203, page 7.  What is this document, Mr. Brasfield?

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 53 of 164 PageID #:19416
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

52

A.   The subpoena duces tecum.

        MR. LOEVY:  We do object to the state's attorney's files, no foundation for this witness.

        THE COURT:  I don't know what it is and I'll wait until I get a question.

BY MR. NOLAND:

Q.   Actually --

        THE COURT:  Go ahead and ask a question.

BY MR. NOLAND:

Q.   This is a document from the investigative files that plaintiff's counsel supplied to you, correct?

        MR. LOEVY:  I stand corrected, your Honor.

        THE COURT:  There you go.

BY MR. NOLAND:

Q.   Mr. Brasfield, isn't this a document that you said was missing from the criminal defense attorney's files that were given to you?

A.   Given the volume of material here, I would have to take the time to look and cross-check.  Again, to move things, if you're telling me that that's what's in there, then I'll accept it as an honest question.

Q.   I appreciate that for all of us, Mr. Brasfield.

        Sir, this is a subpoena from the --

        MR. NOLAND:  Laura --

BY MR. NOLAND:


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 54 of 164 PageID #:19417
Case: 1:16-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 54 of 164 PageID #:31089
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

53

Q.  I'll just point here, from a man named Jon Dillon of the state's attorney's office, correct?

A.  Yes.

Q.  D-i-l-l-o-n, and this is a document that on this spreadsheet here that plaintiff's counsel told you was missing and you accepted was missing investigative material, correct?

A.  Yes, I assume that's correct.

Q.  Mr. Brasfield, a subpoena at the Cook County state's attorney's office that they created can't be missing investigative material that the police department withheld from the state's attorney's office, correct?

A.  I'm sorry.  You will have to ask that again.

Q.  A subpoena that the state's attorney's office prepared themselves is not investigative material of the police department; isn't that true?

A.  That would be -- normally, that would be the case.

Q.  Under what -- and the police department can't withhold from the prosecutor a document that the prosecutor created, correct?

A.  If a police agency receives copies of legal documents, including subpoena duces tecum or arrest warrants or whatever are generally included in the investigative file in my experience.

Q.  And the prosecutor has a copy, in your experience, the prosecutor has a copy of the subpoena that he wrote and spent

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 55 of 164 PageID #:19418
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 55 of 164 PageID #:31090
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

54

to the police department, right?

A. You would hope so.

Q. And I'll show you another one of these pages or another subpoena.

A. I recognize the name there.

Q. I didn't catch that?

THE COURT: Different Noland?

MR. NOLAND: That's a different Nolan.

THE COURT: Yours has a D.

BY MR. NOLAND:

Q. I'm showing you what's been marked as Defense Exhibit 287, this is another page and I'll represent to you that it's on this spreadsheet that plaintiff's attorneys and your he have says is missing investigative material from the police department?

A. Yes.

Q. This subpoena here from my namesake Dan yelled Nolan public defender on behalf of the defendant Tyrone Brown is a subpoena from the public defender to the police department, correct?

A. Yes.

Q. And once again, a subpoena created by the public defender is not investigative material of the police department, true?

A. I found a number of these types of documents in the basement files.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. And you included them on this spreadsheet, or you and the plaintiff's counsel, as missing investigative material of the police department isn't that true, what's on this spreadsheet?

A. That's correct.

Q. And I've got several more subpoenas and there are a bunch of subpoenas that you included just like these ones on this chart, correct?

A. That's correct.

          MR. LOEVY: Object to relevance, your Honor.

          THE COURT: Overruled.

BY MR. NOLAND:

Q. Mr. Brasfield, some more documents you included on your chart are a series of Illinois state crime lab reports from several of the files; is that true?

A. Yes.

Q. In this exhibit I'm showing you on the ELMO it is marked defendants' 246, page 20. And there is a cc in the bottom left of this document, correct?

A. Yes.

Q. And who is the cc to?

A. Assistant state's attorney David winter.

Q. And there are -- I have several pages, approximately 10 or 15 of similar Illinois state police reports in my hand. You would agree that there's several Illinois state police reports with cc's to the prosecutors that you've included on this

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 57 of 164 PageID #:19430
Case: 1:16-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 57 of 164 PageID #:31092

11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

56

table as missing investigative material of the Chicago Police Department, true?

A.   That's correct.

Q.   Mr. Brasfield, what's a cc mean?

A.   In the old days, a carbon copy, but a copy.

Q.   That means a copy of this report is being supplied to the assistant state's attorneys, correct?

A.   It was intended to be routed there, yes, that's correct.

Q.   And isn't it true, Mr. Brasfield, you don't have any knowledge that the Illinois State Police, by the way, is the Illinois State Police the same thing as the Chicago Police Department?

A.   No.

Q.   The Illinois state police has a crime lab is your understanding, right?

A.   That's correct.

Q.   And in Chicago at least as of 1995 and onward, Illinois State Police handles the forensic, most of the forensic responsibilities for crimes occurring in Chicago, right?

A.   That's my understanding.

Q.   And do you have any evidence, Mr. Brasfield, that the Illinois State Police scientists when they say that they're ccing a prosecutor are lying?

A.   No, it would be my belief and understanding that if it said it was routed there, that's where it would be routed.

***REALTIME UNEDITED TRANSCRIPT ONLY***

57

Q. But, again, these are materials that you were saying?

MR. LOEVY: Objection, your Honor, asked and answered.

THE COURT: Sustained.

BY MR. NOLAND:

Q. Showing you the next group of documents, Mr. Brasfield. This would be Exhibit 266, page 130. It's a several page document. I am just showing the first page.

Mr. Brasfield, isn't it true that this document I am showing you is a felony review blue back from the state's attorney's office?

A. I think that's the common terminology they use.

Q. And once again, Mr. Brasfield, I'll represent to you that this document is on the spreadsheet that the plaintiff's attorneys provided, gave to you and that you guys identified as missing investigative material?

A. Yes.

Q. As with the subpoena, Mr. Brasfield, the Chicago Police Department can't withhold documents from the state's attorney's office that the state's attorney's office actually created, right?

A. They can withhold documents.

Q. So you're saying this document?

THE COURT: I think it was an issue with the phrasing of your question.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 59 of 164 PageID #:19432
Case: 1:23-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 59 of 164 PageID #:31094

MR. NOLAND: Thanks, Judge.

BY MR. NOLAND:

Q. Isn't it true that the prosecutors would be in possession of their own felony review blue back, right?

A. I agree with that, yes.

Q. And so this isn't a document that the police department could be withholding from the prosecutors because the prosecutors have it, right?

A. From the prosecutors, but if it's subpoenaed from another source, then that would be a different matter.

Q. You have no evidence with respect to that particular document that the prosecutors withheld it from the criminal defense attorney, do you?

A. No, I do not.

Q. And you don't have any evidence that there was some subpoena that the police department didn't comply with and not provide that particular document to the criminal defense attorney, do you?

A. Not in this particular case, no.

Q. Thank you.

Now, Mr. Brasfield, I am going to show you another document, a representative document. This one has got the Bates stamp defendants' 244, page 120. This is a statement of Jerome h-o-l-m-e-s, correct?

A. Yes.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 60 of 164 PageID #:19423
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 60 of 164 PageID #:31095

Q. And Mr. Brasfield, there are dozens and dozens of pages in the criminal defense attorney's files that have been identified -- strike that.

There's dozens and dozens the pages from the investigative files that you and the plaintiff's counsel have identified as missing investigative material on this spreadsheet, correct?

A. Yes.

Q. And these -- this page in front of you that's up on the screen in front of jury and similar documents, this is a document created by the assistant state's attorney from felony review who goes to the police department and takes statements from witnesses; isn't that true?

MR. LOEVY: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Correct.

THE COURT: The answer can stand.

BY MR. NOLAND:

Q. Isn't it true, Mr. Brasfield, that the prosecutor, the assistant felony review prosecutor who goes out to the police department and takes statements like these brings the originals of those statements back to his or her office after taking them, correct?

A. I have no independent knowledge of how that works.

Q. Okay. But if -- assuming hypothetically that is the way

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 61 of 164 PageID #:19434

it works, then the prosecutors would be in possession of all of these documents as well?

MR. LOEVY: Objection to the relevance, your Honor, because every document is handled that way.

THE COURT: When you say all of these, you need to specify what all of these are.

MR. NOLAND: Thank you, Judge.

THE COURT: You mean similar documents like this one.

MR. NOLAND: Yes, the Court phrased it a lot better than I did.

THE WITNESS: That if it is the practice of the state's attorney or the prosecutor that generates these documents and they take them back to their office, they would be in possession of them if that's your question.

BY MR. NOLAND:

Q. That is my question.

So once again, these wouldn't be documents that the police department withheld from the prosecutors because the prosecutors created them and have them, right?

A. I can't agree with that.

Q. It's the prosecutor's duty in the criminal justice materials to provide the materials, the prosecutor receives from the police on the case to the criminal defense attorney, right?

A. That's correct.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 62 of 164 PageID #:19425
Case: 1:19-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 62 of 164 PageID #:31097

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

61

Q. So if the prosecutors had these statements, it was incumbent upon -- strike that.

If the prosecutors had these statements, these felony review statements that the prosecutor prepared, it would be the prosecutor's duty to provide that to the criminal defense attorney, right?

A. I have to answer that question in the context of what I examined, and that if a centralized homicide investigation.

MR. NOLAND: Judge.

THE WITNESS: Contains documents.

THE COURT: Finish the answer.

BY MR. NOLAND:

Q. Please, Mr. Brasfield.

THE COURT: You can finish the answer.

THE WITNESS: The police department should turn over everything that they have to the state's attorney's office. There will be duplicative items in there. There may be material that the state's attorney already has, but if you get to a system where you have to pick and choose, well, I think .prosecutor already has this so I don't need to send it, the next step is, well, they probably have this, but I don't need to send it. The simple, keep it simple process is send everything that you have in your files to the prosecutor.

BY MR. NOLAND:

Q. Mr. Brasfield, the point is that it's the duty of the

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 63 of 164 PageID #:19426
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

62

Q. prosecutor to provide it to the criminal defense attorney, correct?

A. Yes.

MR. LOEVY: Objection, asked and answered, your Honor.

THE COURT: Overruled. He can answer.

BY MR. NOLAND:

Q. So this would be evidence that the criminal defense files you were supplied are incomplete because you didn't find these felony review state's attorney's documents in those criminal defense files, isn't that fair, yes or no?

A. I.

Q. Yes or no, sir?

A. Ask me the question once more, please.

Q. Isn't it fair that if the -- these documents, these felony review witness statements that we are talking about, you're saying that some of them -- you didn't find them in the criminal defense files, correct?

A. That's correct.

Q. Isn't it in fact true, sir, that that would be some evidence that the criminal evidence files, because it's the prosecutor's responsibility to provide those statements in the prosecutor's possession to the criminal defense attorney, isn't that fair?

A. As I testified.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 64 of 164 PageID #:19437
Case: 1:23-cv-01768 Document #: 185-19 Filed: 02/24/17 Page 64 of 164 PageID #:31699

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

63

Q.  Isn't that fair?

A.  Yes.

Q.  Thank you.

        Showing the witness Exhibit defense 210, page 58.
Mr. Brasfield, this is another document.  Strike that.

        What is this document?

A.  It's a post mortem examination report.

Q.  It's the autopsy?

A.  It's the autopsy report.

Q.  The autopsy of the murder victim in this particular case,
right?

A.  Yes.

Q.  And there's a number of post mortems that you identify on
this table and as missing investigative material from the
Chicago Police Department, right?

A.  Yes.

Q.  And are there -- are Chicago police officers doing the
post mortem?

A.  They should be attending them.

Q.  Okay.  Are Chicago police officer writing these reports?

A.  No.

Q.  These reports are done by the coroner, right?

A.  That's correct.

Q.  And, Mr. Brasfield, wouldn't you expect that in my murder
case that a minimally competent criminal defense attorney

***REALTIME UNEDITED TRANSCRIPT ONLY***

would make sure to have the post mortem report on the cause of death before that criminal defense attorney defended their client in the courtroom, wouldn't you expect that?

A. I would expect that.

Q. And if they didn't have that post mortem, wouldn't you expect that they would try to get it, true?

A. I would expect that to be the case.

MR. LOEVY: Objection to relevance, your Honor.

THE COURT: Overruled. It goes to weight.

BY MR. NOLAND:

Q. I am not going to put them on the screen because they are crime scene photographs that you have contended are missing from the criminal defense attorney files. Just as a representative sample, I'm showing a stack that's about three or four inches thick. I represent to you that these are crime scene photographs on this table that you and the plaintiff's attorneys have prepared and suggested is missing investigative material?

A. Yes.

Q. Do you accept that representation?

A. Yes.

Q. Same question on the crime scene photographs, sir. Wouldn't you expect a criminal defense attorney, minimally competent, would obtain crime scene photographs of the dead bodies and the crime scene before they march into a courtroom

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 66 of 164 PageID #:19429
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

65

Q. before a jury and try to defend that case, wouldn't you expect that? Yes or no? Yes or no, sir?

A. Yes, with an explanation.

Q. Wouldn't you expect that that the prosecutor needs to prove -- one of the things a prosecutor needs to prove is that somebody, in a homicide case, somebody was killed, right?

MR. LOEVY: Objection to relevance, your Honor.

THE WITNESS: Yes.

THE COURT: Overruled.

BY MR. NOLAND:

Q. And wouldn't the way to do that, you don't bring the body in, the dead body into the courtroom, do you, sir?

A. Not under normal circumstances, no.

Q. And so the way it's done is that photographs of the victims are shown to the jury just like this jury has seen in this case, right?

A. Depending on the judge's ruling, yes.

Q. Well, the judge might exclude them in case they're too gruesome, right?

A. That's one possibility, yes.

Q. But the point is is that the prosecutor has to get these crime scene photographs before the trial on a murder case in order to prove their case in court isn't that fair?

A. That would be part of a criminal defense attorney's process, I would think.

Q. And the prosecutor, right?

A. I would hope.

Q. May I have them?

A. Please.

Q. But, again, you're contending that all these pages are missing investigative materials from the criminal defense files, right?

A. I'm contending that they were not in the criminal defense files that I looked at.

Q. And that's it, right, that's all you're doing is that you had a criminal defense attorney file on the one hand, you had a police investigative file on the other, and all you're saying is, well, this piece of paper is not in this pieces of paper, so I'll put it on this chart, right?

A. That's correct.

Q. And you were make -- you were really not thinking at all of whether or not that document in '99.9 percent likelihood was the in the possession of that prosecutor at the time of the trial, you didn't take that into account at all, did you?

MR. LOEVY: Objection to the suggestion that 99 percent, your Honor. We have been accepting the representations, but we don't accept that one.

THE COURT: The answer can stand. Sustained as to the form of the question. What what understood of the objection.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 68 of 164 PageID #:19431
Case: 1:23-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 68 of 164 PageID #:31103
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

67

BY MR. NOLAND:

Q. Mr. Brasfield, I think you characterized it as a mistake with respect to the Anima case, do you remember that?

A. Yes.

THE COURT: Let's pause. Let's take our mid afternoon right here. We are going to break for ten minutes. I will be right back out.

(The jury leaves the courtroom.).

THE COURT: Since you are being questioned by the other side's lawyer, you can't discuss your testimony, but you can take a break.

THE WITNESS: Thank you, sir.

THE COURT:

(The jury enters the courtroom.)

THE COURT: Okay. Everybody can have a seat. Mr. Noland, you can go ahead.

MR. NOLAND: Thank you, your Honor.

BY MR. NOLAND:

Q. Mr. Brasfield, to pick up what we were talking about, you did a side by side comparison of the police investigative file on the one hand and then the criminal defense attorney's file and then the documents that were not in the investigative file and in the criminal defense file were labeled missing investigatory?

A. That's correct.

Case:1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 69 of 164 PageID #:19432
Case:1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 69 of 164 PageID #:31104

Q. So the point I was making, you weren't doing any qualitative analysis of the documents to think, you know what, this document more than likely would have been in the criminal defense attorney's files so that the criminal defense attorney's files given to me have to be complete, you weren't making that analysis, correct?

A. No.

Q. Mr. Brasfield, I'd like to talk to you about the Anima case that Mr. Loevy brought up with you.

MR. NOLAND: Laura, can you bring up Plaintiff's Exhibit 306, page 19. Thanks, Judge.

BY MR. NOLAND:

Q. Mr. Brasfield, I'm showing you the portion of the Anima file that I showed you at your deposition o-c-t-a-v-i-a, when I brought this issue to your attention. Do you remember that?

A. Yes, I do.

Q. And what we had talked about at the deposition is that you were contending in your report that there were 110 pages from the police investigative file that were not in the criminal defense attorney's file, right?

A. It's reflected in the spreadsheet, yes.

Q. And that we had actually found in there that about 100 of those pages actually were in the criminal defense attorney's files and you guys missed it, right?

A. That there was a typographical error in the spreadsheet.

Q. And so you testified that that was a typographical error. I'm showing you Plaintiff's Exhibit 306, page 19 up on the screen. And this is the document that is attachment F to your report, right?

A. Yes.

Q. And you typed up this report personally, right?

A. I did.

Q. And it was while you were doing the file by file comparison, right?

A. Yes.

Q. And I've highlighted for you that I'll represent to you the pages that you said were not in the criminal defense attorney's file and that were in fact were and that the typographical error had been made?

A. That's correct.

Q. You typed in Lee's report page 82189-91, correct?

A. Correct.

Q. And that's under the phrase missing from criminal defense attorney file. Could you highlight that one?

A. That's correct.

Q. And then you typed in arrest report 82192, correct?

A. Correct.

Q. And then you typed in computer screen shot, correct?

A. Yes.

Q. And then you typed in criminal history report and you gave

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 71 of 164 PageID #:19434
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 71 of 164 PageID #:31106
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

70

the number 82194, right?

A.  I typed all of those.

Q.  And that number 82194 is the number of the basement file that you couldn't find in the criminal defense attorney's file, right?

A.  It was not on the spreadsheet, yes.

Q.  And so what you -- and you said that you were conducting a case by case comparison yourself, right?

A.  Yes.

Q.  Now, Mr. Brasfield, what's up on the screen before the jury, that's quite a long typo, isn't it?

A.  Well, the typo represents, as I've said, on the spreadsheet itself, I had that it was missing Bates pages 173 to 2 something and in the back it should have been 2 something to 2 something.

Q.  The typo was on the spreadsheet, right?

A.  It was an error, I admit that.

Q.  The typo was on the spreadsheet?

A.  Yes.

Q.  And when you were doing your case by case analysis then and you typed in leads report 82189 and so and so on, you were representing that you were looking at those two files side by side and you were confirming that those pages were not in the Anima file?

A.  That's what I should have been doing, yes.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 72 of 164 PageID #:19435
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 72 of 164 PageID #:31107
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

71

Q. But for this particular case, it's pretty evidence, Mr. Brasfield, you didn't do that case by case analysis at all, did you?

A. That's not correct. I did.

Q. Mr. Brasfield, if you did a case by case analysis yourself of this Anima case, how could you possibly include all of the information that's highlighted on the jury that's in front of them, how could that have happened?

A. I hate to admit it, but I made a mistake.

Q. So you thought that you saw LEADS report in the criminal defense file and you typed it in?

A. I typed it in. This is my magic fingers on the computer. I did it.

Q. And then you thought that you saw that arrest report 82192 in that file and you typed it in?

A. That's correct.

Q. And you thought that you saw that computer screen shot in the criminal defense file?

A. Yes.

Q. As you're sitting there comparing the files one next to the other?

MR. LOEVY: Judge, asked and answered, your Honor.

THE COURT: Sustained.

BY MR. NOLAND:

Q. Mr. Brasfield, isn't it in fact true that you didn't do

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 73 of 164 PageID #:19436
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 73 of 164 PageID #:31108

any case by case comparison of any of these cases, you just accepted this spreadsheet that the plaintiff's attorneys gave to you and regurgitated it onto your paper?

A. That is not correct.

MR. NOLAND: Judge, if I may go back the ELMO, please.

THE COURT: Okay.

BY MR. NOLAND:

Q. Mr. Loevy had talked to you about something called a court attendance report and you acknowledged with Mr. Loevy that you included on this table and the plaintiff's attorneys did a number of those court attendance sheets as missing investigative material, correct?

A. That's correct.

Q. And just at the top, that's a court attendance report for a detective Harrington who was required to show up in court for this particular case, right?

A. That's correct.

Q. And I think you acknowledged that this is purely administrative document that is not investigative in nature, correct?

A. No, I think what I said was is that it's intended as an administrative document but could be used in some investigative value to establish either a lead as to who might have been possibly involved in the case that was not disclosed

or to either provide an alibi or discredit an alibi.

Q. Mr. Brasfield, I just highlighted what it states on there. Trial in progress, correct?

A. Yes.

Q. So this is a detective actually showing up in court while the trial is proceeding. That's what it appears to be, right?

A. Yes.

Q. And so is it your testimony that you want the Chicago Police Department detectives and officers when they show up in court and do their paperwork proving that that they're supposed to fill out a court attendance report and turn it into their supervisors, right, so they can get paid?

A. That's correct.

Q. And then you want them to also walk over to the criminal defense attorneys and say, hey, by the way, I know you saw me in court and hey, that's me?

A. That's not what I am saying. It should be included in the centralized investigative file.

Q. The point is it's not created until the time of trial, so it couldn't have been produced to the criminal defense attorney because they're at trial, it's created at trial, right?

A. It's part of the record.

Q. Mr. Brasfield, I'm showing you a packet of documents from the relative to the murder of Melvin Rodriguez which is one of

the cases.  This is a document in a series of documents you stated are missing investigative material.  It's Bates number D-221-003.  I'm going to show you the date of this document,May 2000.  And I'm going to represent to you that -- I'll show it to you if you'd like that this packet all deals with investigation in this particular homicide in the year 2000.  Do you want to take a look at that?

A.  I have done a quick scan of it, yes.

Q.  On the first page, does that indicate when the homicide occurred?

A.  I don't see it on the first page, right.

Q.  I thought I saw it on there.  If I could take a look at it.

A.  It may be.

Q.  Just right here, above name prisoners wanted for the investigation of a homicide from 1 July 1985.  Do you see that?

A.  I see that.  I am not arguing with it.  It just says investigation of a homicide from 1 July 1985.  If that means that's when a homicide occurred.

Q.  Okay.  I'll represent to you, Mr. Brasfield, that this is the Ruben Avalez, I don't know if you remember that name, the Rube Avalez criminal defense attorney's file that the plaintiff's counsel gave you and you put on your spreadsheet. Do you remember that name?

11/29/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

75

A.   It's possible.  There were a lot of names.

Q.   Now, isn't it true, Mr. Brasfield, that the criminal defense attorneys that the plaintiff's attorneys supplied to you was relative to a trial of Mr. Ruben Avalez that occurred in the mid 1980s, do you remember that?

A.   I would have to look at my documents.  Again, if what you're telling me is correct, then I'll just say yes.

Q.   Okay.

A.   Otherwise, if this was a criminal trial, I would be saying I have to look at my records.

Q.   I think we all appreciate that.  Thank you.

A.   All right.

Q.   And the point I'm making is that the file given to you was from a criminal prosecution in the mid 1980s and the packet of documents in front of you which you state are missing from the criminal defense attorney's file were created about 15 years later.  Okay?

A.   All right.

Q.   Do you have that?

     Mr. Brasfield, isn't it true that documents created 15 years after the fact couldn't have been withheld from a criminal defense attorney 15 years before in 1987?

A.   Sure.

Q.   So if you had thought about it at all before putting it on this spreadsheet in your report, you would have said, wait a

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 77 of 164 PageID #:19440
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

76

minute, these documents were created after the fact so there is no way they could have been in the criminal defense attorney's file, correct?

A.   No, that's not correct.  What I tried to do herewith this spreadsheet is to provide information that both sides can take a look at and you can weigh the value, you can evaluate what you want with it.  I strictly looked at what was in the investigative file and what was in the criminal defense file. That's just the objective process.

Q.   Without any thought one way or another of whether or not the stuff in fact was withheld by the police from the criminal defense, right? ; am I correct? I'm sorry.  I didn't get the answer?

A.   I'm sorry.  Ask the question again.

Q.   That is without any thought whatsoever before stating that it's missing investigative material in your report that in fact it was withheld from the police department from the criminal defense attorney, without thinking about that at all?

A.   That's correct.

Q.   Thank you.

In fact, you don't have any personal knowledge on any of these 50 cases at issue that any of the documents were withheld from the Chicago Police Department from these criminal defense counsel, correct?

A.   I can draw some generalized inferences which I did.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. I'm asking you, you said you don't have any specific knowledge that any specific piece of paper in any of these 50 or 51 cases was actually withheld by the police department from anybody in the criminal process, true?

A. I stated.

Q. That's it, yes or no, sir?

A. Yes, I've stated that in my report.

Q. I'm sorry. Did you say yes?

THE COURT: Okay. Enough. Next question.

MR. NOLAND: Thank you, Judge.

BY MR. NOLAND:

Q. Mr. Brasfield, you've talked about to/from memoranda?

A. Yes.

Q. And you identified some to/from memoranda in your report as missing from the file, files.

Showing you a series of these. One is Exhibit D 230-129. And you will see this is a September 23rd, 2014, subpoena in this particular case; is that right?

A. Yes.

Q. And so similar to my last question to Mr. Brasfield, and there is a packet of these, these documents that were created well after the criminal defense attorney's files -- well after the criminal trials could not have been in the criminal defense attorney's files at the time of the criminal prosecutions, correct?

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 79 of 164 PageID #:19442
Case: 1:16-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 79 of 164 PageID #:31114
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

78

A. But they also represent --

Q. Is that true, sir?

A. To your specific question, which is -- yes.

Q. But another specific question, you put them on the table and in your report as missing investigative material, correct?

A. That's correct.

Q. Now, Mr. Brasfield, you talked about the Jones and Palmer case a little bit about Mr. Loevy, correct?

A. Yes.

Q. And you talked about the process by which special order 83-1 went into place in about January 1983, correct?

A. Yes.

Q. And you talked about how then with the Court and the plaintiff's attorneys the special order was revised pursuant to some of the Court's comments and that was done four months later in May of 1983 by the police department, correct?

A. That's correct.

Q. Mr. Brasfield, you've also talked about, I think you referenced something called a murder book, right?

A. Yes.

Q. So you've seen or at least in Seattle or some other jurisdictions that investigative detectives would have a murder book on a particular homicide, right?

A. Yes.

Q. Now, a murder book is simply another way of saying that

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 80 of 164 PageID #:19443
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 80 of 164 PageID #:31415

the file on that case in that particular jurisdiction?

A. That's police parlance generally speaking for that.

Q. And certainly in that murder book there could be documents such as a crime lab type document, they might have a DNA analysis in the recent times, not in the old times or some type of other document that might have some source documents elsewhere, correct?

A. That's correct.

Q. But if it was in the murder book and referenced in the murder book that the prosecutors and the criminal defense attorneys would know, oh, hey, the crime lab did a report on this case, it's right here in the file, you know, maybe they have some additional source documents I might want to get, correct?

A. No, that's not correct. My response to your original question was physical evidence. Obviously, you are not going to have shells from a gun or blood splatter, clothing, but you'll actually have a report from the crime lab.

Q. Sir, in fact, if you had an example of say if the Marine patrol unit was involved in a particular case and there was a reference to it in the murder book, that the prosecutor would know, hey, you know, there could be some other documents over at the marine patrol unit that I might want to grab; isn't that true?

A. Not in the types of murder investigations that I'm

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 81 of 164 PageID #:19444
Case: 1:16-cv-01163 Document #: 185-19 Filed: 02/24/17 Page 81 of 164 PageID #:31116
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

80

familiar with.

Q. Mr. Brasfield, at your deposition at page 201, line 9, isn't it true that you were asked this question and gave this answer?

"QUESTION: So that the prosecutor will be able to read that in the murder book and then they could also contact the Marine patrol unit to see if they had any additional documentation; is that correct?

"ANSWER: That would be how -- that would be how it would normally work."

MR. LOEVY: Objection.

BY MR. NOLAND:

Q. That question was asked and that answer was given?

A. Yes.

MR. LOEVY: We object, your Honor. It's not impeaching.

THE COURT: It's a question. The objection is overruled.

THE WITNESS: I would have to see it in the context.

MR. NOLAND: Sir.

THE COURT: I overruled the objection. He said he would have to see it in the context.

BY MR. NOLAND:

Q. The question was that was asked --

THE COURT: You are going to have to show it to him.

There is a potential Rule 106 issue.

MR. NOLAND:  Okay.

THE WITNESS:  This section here?

BY MR. NOLAND:

Q.  Yeah, I read from you beginning at line 9 to 13.  That's what I just read to you?

A.  That would be an accurate recounting of what I said at that part of the deposition in the context of the entire deposition.

Q.  Thank you, sir.

Just one question.  Did you rely -- I am going to show you Exhibit F of your report.  Is there a case in here called Fulton?

A.  In the attachment F which is the investigative base?

Q.  I'm showing you, yes, attachment F where you list on pages 2 and 3, that's where you list the table of contents of the 50 or so files that you compared?

A.  And the name you were asking?

Q.  Fulton.

A.  I don't see it initially.

Q.  Thanks.

MR. NOLAND:  If I may have a moment, your Honor.

THE COURT:  Sure.

(Brief pause.)

MR. NOLAND:  Thank you, Mr. Brasfield.  Thank you,

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 83 of 164 PageID #:19446
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
Case: 1:13-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 83 of 164 PageID #:31118

82

your Honor.

THE COURT:  Mr. Kulwin.

- - -

MICHAEL DAVID BRASFIELD, CROSS-EXAMINATION

BY MR. KULWIN:

Q.  Mr. Brasfield, a detective conducting a homicide investigation isn't required to take notes in your opinion?

MR. LOEVY:  Objection, your Honor.  That subject was covered.

MR. KULWIN:  No, Judge.

MR. LOEVY:  Notes was covered.

THE COURT:  The objection is overruled to this particular question.  The rule of duplication applies.  I'll see where it goes.

BY MR. KULWIN:

Q.  Let me start over.

Mr. Brasfield, a detective in a homicide investigation isn't required to take notes as he gathers information, correct?

A.  It depends on the agency.

Q.  Okay.  But you agree that some detectives have super memories and they can remember stuff, it looks in their mind and then they can keep it in their mind until they write a written report, correct?

A.  It's theoretically possible, yes.

Q. And you actually believe that yourself; isn't that true?

A. I don't think it's the best practice.

Q. But you agree it can be done, right?

A. It can be done.

Q. Okay. And in fact, isn't it true that at times when a detective is talking to somebody, if someone says during the course of their statement that they happen to remember seeing such and such standing on a corner, they would lock it into their memory, they being the detective, and by the time they left to do a follow-up report if they were going to do one, they would have that, correct?

A. If they did a follow-up report in a timely manner, within a short period of time.

Q. Right.

So the answer is yes, you don't have a problem with a detective talking to a witness?

MR. LOEVY: Objection, asked and answered, your Honor.

THE COURT: Sustained.

BY MR. KULWIN:

Q. Now, did I hear you correctly that you said you spent 150 hours preparing your report?

A. Somewhere in that -- not preparing the report, but in reviewing the material.

Q. So you spent 150 hours in reviewing the material and then

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 85 of 164 PageID #:19448
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 85 of 164 PageID #:31120
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

84

writing the report?

A.  I billed, if I recall, somewhere in that area.

Q.  I just want to get the time right.  Are you saying that between the time you first got the assignment from the plaintiff's lawyers until the time you reviewed everything and wrote the report, it was 150 hours?

A.  I was contacted by the attorney's office sometime in December and I believe the date of my report is March 15th.  So I spent the time looking at material and writing my report.

Q.  All right.  And that was 150 hours is that your testimony?

A.  Billable hours.  I am pretty sure I spent a lot more time on it than that.

Q.  Okay.  Well, do you remember giving a deposition in this case in June of this year and being asked these questions and giving these answers?

        MR. LOEVY:  Page?

        MR. KULWIN:  Page 265, line 13.

BY MR. KULWIN:

Q.      "QUESTION:  And so you had to squeeze it in, right?

        "ANSWER:  I indicated that I spent approximately 60 hours on the case."

        Go to the next page, page 266.

        "QUESTION:  Now, the 60 hours that you spent, how many hours did you spend actually reviewing the file before you reached your conclusion?

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 86 of 164 PageID #:19449
Case: 1:16-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 86 of 164 PageID #:31121
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
85

"ANSWER:  I can't give you a break down of how much it was because the work was simultaneously, I was looking at the files and working on my report, so I can't give you how much of it was this and how much of it was that."

Were those questions asked and did you give those answers?

A.  Yes.

Q.  All right.  Now, did I hear you correctly, sir, that part of the basis for your opinions about what other -- that Chicago is so different from other police reports is that in your career, you've audited police departments?

A.  That's correct.

Q.  But the fact of the matter is, sir, I don't believe -- you've never audited any police department on the issue of whether -- how they're properly maintaining their files and disclosing it in criminal cases; isn't that true?

A.  That's correct.

Q.  The only audits?

A.  I misunderstood your question.  I thought you asked did I testify in a criminal case on that.  No, I have reviewed procedures and processes and discoveries in various cities.

Q.  My question -- maybe ships passing in the wind here.  Let me be clear.

You've told the jury that part of the basis of your opinion here is the auditing work you've done, right?

A.  Yes.

Q.  But the fact of the matter is, sir, that you have never, you've never conducted any independent audit of any police department on the issue of their disclosure of information in criminal cases; isn't that true?

A.  I'll refer back to my testimony.  I have visited and audited engaged to look at the delivery of police services which included record keeping and discovery processes.

Q.  All right.  Going back to your deposition of June of this year starting at page 319, line 24?

     "QUESTION:  Okay.  And I want to be clear.  Your testimony is that those other major cities, though, the way they do it is every piece of information they get during a homicide investigation is documented, put in a file and turned over to either the defense attorneys or the prosecutor.  Do I understand that correctly?

     "ANSWER:  I'm saying that is the general practice.

     "QUESTION:  Was that what was going on in New York and Baltimore and all the places you did audits on?

     "ANSWER:  My familiarity with the way it was done --
I'm sorry.  My familiarity with the way it was done was that was the desire.  Whether it occurred on each, I did not do and have not done an independent audit of the New York police department's homicide unit."

     Then it goes on.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 88 of 164 PageID #:19451
Case: 1:15-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 88 of 164 PageID #:31123
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***
87

MR. LOEVY:  Your Honor, that's not impeaching.

MR. KULWIN:  I am not done.

THE COURT:  I am going to wait until he is done.

BY MR. KULWIN:

Q.  Okay.  So you say in your resume you did some auditing, you did auditing of police department?

A.  Yes.

Q.  Was it Baltimore or Oxford?

THE COURT:  Say the question, answer.

BY MR. KULWIN:

Q.  Question, wasn't it Baltimore or Oxford, where else?

"ANSWER:  I think there were six cities.

"QUESTION:  Yeah, Baltimore, Oxford.  Can you tell me, it would help me out besides Baltimore and Oxford.

THE COURT:  Oxnard?

BY MR. KULWIN:

Q.  Sorry, Judge.  Seattle, Memphis, Oxnard, Baltimore, a city in Ohio, I'll have to find it in here.  It goes on.  We'll get back to it, but just let's stick with Baltimore, Oxnard, and the city in Mississippi.  Where is Oxnard, is that in Mississippi?

"ANSWER:  It's Oxnard, California.

"QUESTION:  Oh, sorry, I'm confused.

"ANSWER:  An area outside of Los Angeles.

"QUESTION:  How big is Oxnard?

***REALTIME UNEDITED TRANSCRIPT ONLY***

"ANSWER: As I recall at the time, it was maybe in the couple hundred thousand.

"QUESTION: All right. All right. Now, I want to be clear. You were asked to audit these city's police departments like in --

"ANSWER: It was part of a federal grant process to examine delivery of police services. And so in part of that, as part of the team, we would meet with the chief of police, we would meet with community leaders, we would look at the functioning and organization and staffing levels and budgetary appropriations for the organization.

"QUESTION: In any of these cities, did you -- did you investigate or audit their disclosure of information in criminal cases?

"ANSWER: No."

MR. LOEVY: Objection, your Honor. Not impeaching. That's a discrete number of cities.

THE COURT: Sustained.

BY MR. NOLAND:

Q. In any of these -- in any of these investigations --

THE COURT: Sustained. I want to say it given your facial reaction, given the question you asked at 3:39 in the afternoon. That is not impeaching. The jury is directed to disregard the reading from the deposition.

MR. KULWIN: I will ask a different question.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 90 of 164 PageID #:19453
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 90 of 164 PageID #:31425
11/29/16 PM                  ***REALTIME UNEDITED TRANSCRIPT ONLY***
89

BY MR. KULWIN:

Q.   In any of these investigations that you did, any audits that you did, in any audits that you've done in your career that you're referencing, did you look at or audit or try to analyze whether they were fulfilling these -- these cities were disclosing their disclosure obligations in homicide cases?

A.   It was part of my what my duties and responsibilities as a specialist in records in discovery to look at that.  But it was a minor, the overall was the delivery of police services to public housing, which included that process.

Q.   All right.  Now going back to your deposition, page 322, line 5.  In any of these investigations, did you look at or audit or try to analyze whether they were fulfilling their disclosure obligations in homicide or other criminal cases?

         "ANSWER:  No, that was not part of the mandate

         MR. LOEVY:  Objection, your Honor.  The mandate is talking about the federal mandate.

         THE COURT:  Overruled.  Did he read that particular question and answer correctly?

         THE WITNESS:  Yes.

BY MR. KULWIN:

Q.   Now, if I understand it correctly, one of the ways that -- there are two legs to the information that you've employed in determining that Chicago is an anomaly in how they handle

Q.   their information and gather it and disclose it to -- in criminal cases, am I right?  Two legs, right?

A.   Which two legs?

Q.   Well, one is you go to a bunch of conferences that you attend with other police chiefs, right?  That was one of the legs, right, that you told me about?

THE COURT:  He thinks you're saying line, you're saying less, right?

BY MR. KULWIN:

Q.   I'm sorry, legs.

A.   I'm sorry.

Q.   Let me do it again.  My fault.

As I understand it from earlier testimony you've given, there are two legs that you rely on in determining that Chicago was an anomaly vis-à-vis production of information to criminal defendants than other cities?

MR. LOEVY:  Objection, your Honor.  Given the entire testimony, it's improper.  He's got to show him --

THE COURT:  I think that question can be answered. The objection is overruled.

BY MR. KULWIN:

Q.   Mr. Brasfield, do I have it?

A.   I am sorry.  You're losing me here.

Q.   Okay.  As I understand it, let me see if I can help you out.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 92 of 164 PageID #:19455
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 92 of 164 PageID #:31127

You attend certain conferences of police chiefs, right?

A.  I have over the years.

Q.  And that's one of the ways that you concluded how other police departments handle their -- that's one of the ways on which -- that you've articulated in your report the standard is of how they handle their disclosure of information, correct?

A.  I don't believe that's in my report.

Q.  Well, I guess maybe I'm not asking the question accurately.  Let me see if I can try it again.

You went to a bunch of conferences in which police chiefs talked about best practices, including the chief of police of Chicago, and you're basing your knowledge here in part that all major police departments fulfill your professional standard that you've articulated in your report based on what you've learned in those conferences is that right?

MR. LOEVY:  Objection, compound, your Honor.

THE COURT:  Overruled.

THE WITNESS:  I think that's entirely a misrepresentation of my testimony.

BY MR. KULWIN:

Q.  Okay.

A.  Or in my deposition.  I described --

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 93 of 164 PageID #:19456
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/26/17 Page 93 of 164 PageID #:31128
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

92

THE COURT:  I think you have answered the question.
Ask another question.

BY MR. KULWIN:

Q.  Let me go back to your deposition and I'll ask you this question.

MR. LOEVY:  Line and page number?

MR. NOLAND:

MR. KULWIN:  I am getting there.  Line 4, page 336.

BY MR. KULWIN:

Q.

"QUESTION:  I understand that and I'm going to leave this topic and go onto another topic, same topic, but another area.  All I'm trying to get at, sir, was, you know, you went to a bunch of conferences in which police chiefs talked about best practice including the chief of police of the City of Chicago and you're basing your knowledge in part that all major police departments fulfill your professional standard that you've articulated in this report based in part on what you've learned at those conferences about best practices?

"ANSWER:  That was a leg of it."

A.  That was a leg of it.

Q.  That's what I asked you.  That was a leg of it?

A.  The statement was yours, but the leg of it was mine.

Q.  All right.  Now, the fact is, though, sir, when you went to these conferences that you're talking about that you're

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 94 of 164 PageID #:19457
Case: 1:20-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 94 of 164 PageID #:31429

basing your conclusions that this is all these other cities do it, you don't have any written material from any of those conferences that substantiate your view; isn't that right?

A. You're totally misrepresentation my testimony.

Q. Sir, can you answer my question? Do you have any written material from any of those conferences that you attended that substantiate that they told you that these are the best practices at these conferences? Do you have anything like that?

A. I indicated that I had gone to conferences in response to a question of how I formed my opinion. That was an insignificant portion of it. No, I don't have any documents from that.

Q. All right. And you can't name one police chief as you're sitting there today from any major city who stood up and said, yeah, we produce a hundred percent of everything that we get in a criminal investigation, we turn it over to the criminal defendants?

MR. LOEVY: Objection to the question, your Honor. Relevance.

THE COURT: Overruled.

MR. LOEVY: Same with the hundred percent.

THE COURT: Overruled. Goes to weight.

THE WITNESS: You're talking about a very minor portion of what I based my opinion on. I've said in my

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 95 of 164 PageID #:19458

deposition that among dozens of things, I also go to conferences and talk to police chiefs informally, discuss various issues that are on the front burner at the time, whether they're use of force, police pursuits, whatever.

BY MR. KULWIN:

Q. Sir, the question is at these conferences that you went to, no police chief that you can name as you're sitting there today said, yeah, we do a hundred percent disclosure, you can't name one, can you?

A. When we -- I would.

Q. Sir, the question was can you?

A. I would not.

Q. Can you is the question?

A. I will not.

Q. Not will you not, you couldn't isn't that true, you couldn't name one particular one; isn't that true?

A. That's not true.

Q. Okay. Do you remember this question. Page 332 at line 14. At line 24. No, no, no, first answer my question. Did anyone say -- I'm sorry. Line 14. Page 332.

"QUESTION: I'm going to get to the rest of the information, but I'm focusing on these conferences. In these conferences

"ANSWER: Okay.

"QUESTION: Nobody that you can identify, not one chief

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 96 of 164 PageID #:19459
Case: 1:16-cv-01168 Document #: 185-19 Filed: 02/24/17 Page 96 of 164 PageID #:31431
11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

95

of police that you can identify stood up and said this is how we're dealing with disclosure of investigative information in criminal cases, we do it X, Y, and Z, and we have 100 percent compliance rate. Nobody said that, correct?

"ANSWER: What was the discussion?

"QUESTION: No, no, no. First answer my question. Did anyone say that?

"ANSWER: I can't give you names of particular individuals, but because it was such a hot topic of court cases and disclosure, that was an item of discussion and we would, people would give their horror stories of what happened when they failed to do it and why it was so important that we all as a professional group changed our ways

MR. LOEVY: Objection.

BY MR. KULWIN:

Q. That was the question and that was your answer; isn't that true?

MR. LOEVY: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. KULWIN:

Q. And in fact, what they were telling you, what you were hearing at these conferences from these police chiefs, was, look, we have successes, we've got failures, we're doing our best, that's what you heard. You didn't hear a hundred

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 97 of 164 PageID #:19460
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

96

percent, right?

A.   That's not what I stated.

          MR. LOEVY:  Objection.

BY MR. KULWIN:

Q.   What?

A.   That's not what I stated.

          THE COURT:  The answer can stand.

BY MR. KULWIN:

Q.   So you never heard a hundred percent, right?

A.   I answered the question the best I can.

Q.   Now, another one of the legs, another one of the legs that you relied on for your conclusion that Chicago is an anomaly on how major cities disclose information that they gather in criminal cases is the federal government's funding of various institutions isn't that right?  Information you get from that isn't that true?

A.   The information I get from literature either produced by the federal government or funded by the federal government, I think that that was the context of my answer.

Q.   All right.  So another leg is the federal government has expended a tremendous amount of money, the national institute of justice, the bureau of justice statistics, the bureau of justice administration, the FBI, the whole alphabet of soup of agencies and universities to examine the rise of violent crime and strategies to address it.  You look at that literature,

***REALTIME UNEDITED TRANSCRIPT ONLY***

right?

A. Yes.

Q. And that's one of the bases for your conclusions, that literature, that Chicago is an anomaly in how they deal with their disclosure of information, right?

A. I'm sorry. You are losing me. My statement in my deposition is what it was.

Q. I know that. But my question is, my question is that one of the things that you say that you rely on in your report to reach the conclusion that you've given the jury that Chicago is an anomaly are these statistics and things of that nature from all these different federal agencies, right?

A. That it forms a basis of knowledge about how things are done in the United States in police agencies.

Q. All right. But you're not saying that this work by the Department of Justice substantiates your standard of a hundred percent disclosure of all information gathered in a homicide investigation, those agencies research doesn't substantiate that at all, does it?

A. In the context of the question that I was asked during the deposition as to what I form my opinion on was how other law enforcement agencies respond to discovery requests and that it was based on centralized records keeping, accurate indexing, and full disclosure, all of which was not the case that I had seen in Chicago.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 99 of 164 PageID #:19462
Case: 1:18-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 99 of 164 PageID #:31134

Q. Right. And my question to you, sir, is one of the bases for that opinion is all this information from these federal agencies and you don't have any information from those agencies that substantiates that conclusion; isn't that right?

A. I disagree with how you're presenting that.

Q. All right. Here's the question from your deposition?

MR. LOEVY: Page?

MR. KULWIN: Page 338.

BY MR. NOLAND:

Q.

"QUESTION: You just said, you just said that a key leg of your conclusion was that the Department of Justice was doing all these investigations about violent crimes and police chiefs all over the country were aware of it. Okay? But there were -- there's, but you're not saying that any of these, that this work by the Department of Justice substantiates your standard that it's a hundred percent disclosure a hundred percent of all the information?

"ANSWER: That's the goal, and that -- that's --

"QUESTION: That's the goal?

"ANSWER: And

"QUESTION: That's the goal?

"ANSWER: Close from a practical standpoint that your cases and the way you operate are conducted in that manner."

It's a goal

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 100 of 164 PageID #:19463
Case: 1:13-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 100 of 164 PageID #:31135
11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

99

MR. LOEVY:  Objection, your Honor.  That's an unintelligible question.

THE COURT:  Sustained.

BY MR. KULWIN:

Q.  As you sit there today, sir, can you name any departments, any police departments that you gleaned from looking at this Department of Justice information that reaps this hundred percent disclosure rule?

MR. LOEVY:  Objection to this hundred percent.  This was the subject of a motion in limine.

THE COURT:  Sustained.  You can't word the question that way.

BY MR. KULWIN:

Q.  Sir, if I understand it, if I understand it, sir, in your professional opinion, the issue in this case is that Chicago doesn't maintain their records appropriately and as a result of that, that leads to failure to disclose everything which leads to problems, that's what we're talking about, right?

A.  That's a major portion of it, yes.

Q.  Okay.  And as you said before, you think it's an anomaly to other cities doing that same stuff, right?

A.  That's what I stated.

Q.  Okay.  But you haven't done an analysis or a comparison of any major city with a similar in size of population and the number of homicides as Chicago that were occurring between

Q. 1983 and 2006 to come to that conclusion, correct?

A. That I haven't done a study?

Q. Yeah, you have not done any study of any major city of similar size as Chicago with the same type of number of homicides between 1983 and 2006, you have done no comparison between Chicago and those cities on that issue, have you?

A. I testified to the fact that during the time period that we are discussing here for both time periods, I was aware of and familiar with policies and procedures in other states, other cities in average cities included.

Q. But you've done no such analysis isn't that true?

A. I was not hired to do an analysis and I did not do an analysis, but I can very comfortably and faithfully say that I am familiar with the policies and procedures of those jurisdictions and that they are not consistent with the way the City of Chicago does it.

Q. Let me break that down. I don't care about just what you retained here. Never in your?

MR. LOEVY: Objection, your Honor. Asked and answered.

MR. KULWIN: Sorry, Judge.

THE COURT: Yeah, if you want to go beyond the report.

MR. KULWIN: No.

THE COURT: No, because you just are about to.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 102 of 164 PageID #:19465

That's the way your question is being worded.

MR. KULWIN: Sorry, Judge.

THE COURT: I will read back to you what you said.

MR. KULWIN: No, I got it.

THE COURT: Let me break it down, I don't care just about what you were retained for in your report, never in your entire, dot, dot, dot.

BY MR. KULWIN:

Q. Okay. Sir, you've not done an analysis of any comparison that's similar in size of population and similar in the number of homicides that were occurring from 1983 to 2006 that you compared to Chicago to come to the conclusion that Chicago is an anomaly on that issue?

MR. LOEVY: Same objection, your Honor.

THE COURT: Can I see the lawyers at sidebar, please.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: The way you worded the question, it's a universe of one. Way city of similar population with a similar number of homicide during the period of 1983 to 2006, means it's a universe of one. What would the other city be?

MR. KULWIN: I don't know. New York?

THE COURT: No.

MR. KULWIN: Los Angeles.

THE COURT: Much bigger population, smaller number of

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 103 of 164 PageID #:19466
Case: 1:13-cv-01168 Document #: 285-39 Filed: 02/24/17 Page 103 of 164 PageID #:31158

homicides, a smaller number of homicides in the second one.
It's a universe of one, so I am going to sustain the
objection.

    (The following proceedings were had in open court in the
presence and hearing of the jury:)

        THE COURT:  The objection is sustained.

BY MR. KULWIN:

Q.  Sir, in the city where you were chief of police, Seattle,
they had a about what, 55 homicides a year?

A.  I was not the chief of police in Seattle.  I was the
assistant chief in Seattle.  I was the chief of police in Fort
Lauderdale, Florida.

Q.  So when you were assistant chief of Seattle, they had
what, 55 homicides a year?

A.  I think the all time record might have been pushing 100,
but on average, somewhere, I haven't looked at it recently,
but that's probably a ballpark figure.

Q.  Ballpark, as of June of 2016, isn't that what you thought
it was, 50, 55?

A.  I believe that's what I testified to.

Q.  Okay.  And Fort Lauderdale, and I think that Fort
Lauderdale you thought had maybe 10 or 20?

A.  They were -- I have gone back and checked and probably
closer to the 20, 25 range.

Q.  Okay.  And when you were the sheriff, maybe one in a bad

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 104 of 164 PageID #:19467
Case: 1:13-cv-01168 Document #: 2185-39 Filed: 02/24/17 Page 104 of 164 PageID #:31189

year?

A.  Yeah, that's true.

Q.  And the Seattle detectives while you were out there, each detective was handling maybe two or three homicides per year, correct?

A.  No, it was a much smaller homicide unit, so they were carrying a larger caseload than that.

Q.  This question, page 317.  In the city that has an average -- to line 17.  We were talking about Seattle.  In a city that has about an ample 50, it 55, you got two or three homicides per detective, right?

      "ANSWER:  On ample on active cases, two or three

A.  Active cases.

      MR. LOEVY:  Objection.

      THE COURT:  The objection is overruled.

BY MR. KULWIN:

Q.  You don't even recall the number of detectives, homicide detectives you had in Fort Lauderdale, correct?

A.  I don't recall what my answer was in the deposition.

Q.  Do you recall now what -- you don't recall, do you recall now?

A.  No, there are probably 10 or 12.

Q.  So they were handling maybe one or two per year of homicides, right?

A.  They were handling more than that.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. If you had 10 or 12 and you only had 20 to 25 homicides per year that are active cases per year, maybe one or two?

A. As a group. I won't argue the point with you.

Q. Finally, sir, you were asked some questions about, you know, how an investigation goes and I think you referred to some be novelest bar /ET or something, it's like a novel, you never know how it's going to end, right, wasn't that your analogy?

A. That was an analogy, yes.

Q. Okay. So one question I have for you is when you were reviewing all these files, you didn't take any notes, right?

A. I took -- I think I testified in the deposition that as I did any of my cases, I do my work on a computer, I maintain what I am doing there and it is a living document.

Q. But the living document is actually the report that you're writing, that's the living document, the novel in this case, right?

A. Yes.

Q. So you have all these investigative reports, you've got your okay report to plaintiff's counsel on Fields v. City of Chicago, you've got it in your report format, you're starting with that, right?

A. Yes.

Q. Okay. Then you've got all the files that you're looking at and what you're doing is you are not going through the

Q. files and saying this one or that one, you're just typing into the report, right?

MR. LOEVY: Objection to the form of the question.

MR. KULWIN: I will rephrase it if you want, Judge.

MR. LOEVY: I will withdraw the objection.

THE COURT: Okay.

BY MR. KULWIN:

Q. You are not actually creating a document that just analyzes what's in what, right?

A. I'm looking at the electronic versions on the split screen of the material that I've -- depending on the case that I'm looking at and then I'm typing in whatever is relevant at the time.

Q. Right into what's going to be the final report, correct?

A. If I understand your question, yes.

Q. And the last point on that, sir, on this novel idea, you agree, sir, that criminal investigations take twists and turns, right?

A. Yes.

Q. And it's easy to look back as a detective to another detective's work and go, wow, he should have done this and he should have done that and why didn't he see that and why didn't he see that, hindsight is 20/20, isn't it sir?

A. That's not what I testified to.

Q. I'm not asking what you testified to. I'm asking, you're

11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

106

an expert; isn't that true?

A.  Hindsight is 20/20?

Q.  Yes.

A.  Yes.

Q.  Any detective or any expert or any lawyer can look back at what a detective did 30 years ago and said he made this mistake, that mistake and this mistake; isn't that right?

A.  Individually, that's certainly true.  As an aggregate when you look at dozens of cases or hundreds ever cases, that's a different matter with different detectives.

MR. KULWIN:  If I may have a second.

(Brief pause.)

MR. KULWIN:  Nothing else, your Honor.  Thank you.

THE COURT:  Redirect.

MR. LOEVY:  Thank you, your Honor.

- - -

MICHAEL DAVID BRASFIELD, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  You were just asked if it's easy to look back and look at a detective's work and say they should have done this, they should have done that.  My question, sir, is are you able to look a back at detectives and say they should have done this and should have done that if they don't document and memorialize things?

A.  No, it makes it extremely possible.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. You were asked if having a high homicide load causes problems, is that?

MR. KULWIN: Objection, Judge, I didn't ask him that.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Is it a valid excuse not to document things if you have a caseload of homicides?

A. No.

Q. Is that too much to expect from a municipality with a high level of homicides that they document things?

A. I would -- as I have said before, it becomes even more critically important that procedures and processes are in place and centralized record keeping.

Q. You were asked about your report being a living document. Are police reports supposed to be living documents that can be edited as the facts come in, or are they supposed to be set, finalized and submitted?

A. They are not supposed to be manipulated, if I understand your question correctly.

Q. In other words, let's say you have an event that happens on Monday and you have another event that happens on Thursday and another happens on next Tuesday, are you allowed to keep your report unwritten as a living document until you see where it's going or are you supposed to submit at each event?

MR. KULWIN: Leading and argumentative.

***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT: Overruled.

THE WITNESS: You're supposed to put the information as close to the time that you gathered it or learned of it and then you put it in there.

BY MR. LOEVY:

Q. You were asked about some detectives might have super memories. Is there an exemption to the need to document things for detectives who believe that they themselves can remember things?

A. Absolutely not.

Q. Can you explain?

A. You are not -- no one has an infallible memory and even if one had Carnac the Magnificent and was able to absolutely recall things, they have to document to put in the report so that it's available for others to see it any time. I'm sorry about the poor analogy. But the detective can get hit by a bus and if he's got three weeks' worth of information in his wonderful memory it does no one any good.

Q. And memories do fade?

MR. KULWIN: Objection, he is not an expert.

THE COURT: Overruled as to what he is talking about.

BY MR. LOEVY:

Q. If I can have the ELMO?

THE COURT: You've got it.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 110 of 164 PageID #:19473
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/16 Page 110 of 164 PageID #:31145
11/29/16 PM         ***REALTIME UNEDITED TRANSCRIPT ONLY***

109

Q. 8625. This is a police report for Nathson Fields dated June the 17th and then submitted July the 7?

MR. KULWIN: Objection, Judge to the premise. That's inaccurate. It's a misstatement of the evidence.

MR. LOEVY: Just ask the question.

BY MR. LOEVY:

Q. If a police officer does an interview on June 13th of an important witness, a suspect in a homicide case, is it consistent or inconsistent with police practices to rely on your memory and not create the police report until four days later with no notes?

A. I would expect the report to be done the same day and even if it entailed unpaid overtime that before they went home for the night, that would be written up.

Q. How universal is that expectation?

A. That's an expectation on the front line supervisor, sergeants, lieutenants, captains, commanders.

Q. How universal in the country as a law enforcement expert is that?

A. That's common practice. That's my experience.

Q. All right. You were asked about, you said you spent a range of 100 to 150 hours on the case?

A. Yes.

Q. And how many of those 100 to 150 hours in the case, you did other things than review the file?

A. Yes.

Q. Tell the jury what else you did besides review the file?

A. I reviewed at least three or four portions because sometimes the depositions, for instance, with Mr. Hickey, were done over several days, and so there were hours and hours worth of transcribed depositions that I reviewed. The policies and procedures that I have reviewed, case.

Q. Drafting the report as well?

A. Drafting the report, yes.

Q. You estimated you spent about 60 hours on the files. Was that a sufficient amount of time to accomplish the project that you accomplished?

A. In the parameters that I had, yes.

Q. All right. Returning to Mr. Noland's questions, if there were 57, 745 criminal defense file pages and 88,290 basement file pages for a total of about 140,000, I'll ask you to assume that, did you do a page by page audit of all 140,000 pages?

A. No.

Q. How much would that have cost for you to look through every page and see if it should be in or out and putting thought into every page?

A. I can't even begin to imagine how many weeks or months that would have taken.

Q. All right. You have come to learn that the defendant

spent quite a bit of time and money doing that audit, correct?

A.  Yes.

Q.  And they have confronted you with some of the mistakes you made, correct?

A.  Yes.

Q.  All right.  After having been confronted with those pages that should have been on one side of the line and you put them on the other side of the line, does that change anything about your opinions?

A.  No, it does not.

Q.  In fact, several hundred pages out of a sample size that bad, is that a terrible rate of error?

        MR. KULWIN:  Objection, leading.

        THE COURT:  Overruled.

        THE WITNESS:  Well, I would prefer to have no errors, obviously, but it's not significant in the pattern that I was observing.

BY MR. LOEVY:

Q.  Talk about that for a minute, if you would, sir.  They showed you examples of specific pages that shouldn't have been on.  Tell me about the broader patterns you saw.

A.  In the individual cases that I looked at, there were very specific listing of individuals who were identified as possible suspects or alternative suspects in the investigation, that there were witnesses that had information

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 113 of 164 PageID #:19476

that was not followed up on, or that there was contradictory information, for instance, a witness seeing someone but was too far away to identify them or they were wearing masks.

Q. All right. That kind of pattern, was that evident notwithstanding the fact that some of the court records should have been listed as produced and not produced?

MR. NOLAND: Objection, argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Mr. Noland asked you if you were lying about having performed the case by case analysis. Do you remember that question?

A. Yes, I do.

Q. Were you lying, sir?

A. No.

Q. Tell the jury what you did to do that review, sir, where you were, provide some context.

A. I have a home office set up with a couple of computers and an iPad and as I have the material electronically, I open up the files, I look at them, I as thoroughly as I try to be put that material there, I'll start a spreadsheet, I'll start a list of material reviewed, I'll start a list of bibliography and as I am getting more information and it's kind of like a homicide investigation, as you're getting more information, you're adding to it, and you eventually finish and develop

your product.  That's the way I do it.

Q.  All right.  You said this morning that you started at 90 percent of the investigative files were missing -- the criminal defense files were missing investigative materials, did I get that right?

A.  Yes.

Q.  Even after the examples that they pointed out at your deposition, what is the number of criminal defense files that were missing investigative material, what percentage?

A.  100 percent.

Q.  So the fact that they were able to provide you some examples of files, of documents that you thought were missing but weren't missing, did that change the overall number of files that were missing documents?

A.  No, when you're looking at all of these files and you take out either, you know, one and, for instance, in Anima, there were still pages that were missing, but you can even say, okay, I am going to give the city the absolute benefit of the doubt and throw the case away, it doesn't change my opinion.

Q.  You did the 60-hour job which was obviously a rough way of doing it?

A.  Yes.

        MR. KULWIN:  Objection, objection, argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 115 of 164 PageID #:19473
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/17 Page 115 of 164 PageID #:31130

Q. If I understood your answers to Mr. Kulwin and Mr. Noland, you were saying you weren't actually considering each page and say was -- you know, let me look at the context of a page. It was just yes or no, is it in one file, is it in the other file, is that a fair summary?

A. Yes.

Q. Even though you did it in very rough page and didn't analyze the page, was it still a useful exercise?

A. Yes, it was.

Q. You were asked about the 50 criminal defense attorneys foils and those were the files that could be located, correct?

A. Yes.

Q. If more could have been located?

MR. NOLAND: Objection, Judge, foundation as to that last statement.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Is your any understanding there was any cherry-picking at all as far as criminal defense files weren't given to you? If they were located, you were supposed to get them?

MR. NOLAND: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. LOEVY:

Q. All right. You admitted you didn't interview defense

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 116 of 164 PageID #:19479
Case: 1:10-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 116 of 164 PageID #:31151

attorneys. You did not interview these 50 defense attorneys, right?

A. That's right.

Q. All right. You were asked if a document that was created 15 years later could have been withheld. Do you remember that question?

A. I believe so.

Q. All right. Of course in Mr. Fields' case, if he was convicted in '86 and he had a retrial in 2009, a document that was created 15 years later very well could have been withheld and been material, correct?

A. Yes.

Q. You don't know going into an investigation what's going to be material and what's not, right?

A. Correct.

Q. That's why you need processes that work?

A. Yes.

Q. All right. You were asked about Mr. Noland put on the screen, there was a bunch of names and he asked you isn't it true some of these names were in the police reports, do you remember that question?

A. Yes.

Q. You did not analyze all the police reports and all the names in these 140,000 files, correct?

A. No, I did not.

Q. And you never purported to, correct?

A. No.

Q. The fact that a name is in a police report, does that mean that all the exculpatory information relating to the name that's also in the investigative file has been given to the criminal defendant?

A. No, absolutely not.

THE COURT: Hang on.

MR. NOLAND: Objection, argumentative. It misstates --

THE COURT: Everybody was talking at the same time. I'll just look at what you said. Overruled. It wasn't attempting to paraphrase a question.

BY MR. LOEVY:

Q. For example, document number 8609 has a reference to a Delbert Edwards, correct?

A. Yes.

Q. And the jury has seen these do you mean. But just because Delbert Edwards is in the official file does not mean that the defense attorney is getting a copy of plaintiff's 1-69 from the investigative file with additional information, correct?

A. That's absolutely correct.

Q. So is it sufficient just to put a name in a police report?

A. No.

Q. Now, you were asked about court attendance sheets. And

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 118 of 164 PageID #:19481
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

117

you were asked isn't it true some of them might not be helpful, right?

A. Yes.

Q. You were also asked isn't it true that if it happened in court it couldn't possibly be exculpatory, do you remember that?

A. Yes.

Q. Let me give you a hypothetical. Let's say in Nate Fields case in 1986, there was a court attendance sheet that showed O'Callaghan was present in court on a day he wasn't scheduled to be there but Randy Langston was there?

MR. KULWIN: I'm going to object to the nature. There is no basis for that question.

THE COURT: I am going to say it's beyond the scope of the report. You'll argue it later.

BY MR. LOEVY:

Q. May I ask then, there are ways in which even administrative documents might turn out to be exculpatory, right?

A. Absolutely.

Q. And that's why everything should be turned over?

A. Yes.

Q. All right. You were asked about the Crockett file. Do you remember those questions?

A. Yes.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 119 of 164 PageID #:19482
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/17 Page 119 of 164 PageID #:31434
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

118

Q. I am going to move to the end here.

You were asked about criminal defense attorney files having subpoenas. Do you remember those questions?

A. Yes.

Q. Does the fact that the Chicago Police Department has documents that are in the state's attorney's file mean that they are not withholding anything?

A. Would you rephrase? I'm sorry. Say that again.

Q. I'm going to show you Plaintiff's Exhibit 312105. This is from the sees he will Robinson file?

A. Yes.

Q. Do you remember examples where criminal defendants sent subpoenas c-e-c-i-i-l, sent documents directly to the Chicago Police Department?

MR. KULWIN: Judge, I am going to object here for a second on this particular document and ask to take it off the ELMO and ask to be heard.

MR. LOEVY: Your Honor, I will withdraw it. I don't want to waste any more time.

THE COURT: Fine.

BY MR. LOEVY:

Q. All right. Now, you were asked a lot of questions of your comparison between blue and green which is the investigative files and the defense files?

A. That is correct.

Q.  Let's say you got everything wrong on the comparison between the criminal defense files and the investigative files, do you understand my hypothetical?

A.  Yes, I do.

Q.  Does that have anything to do with the opinion you gave, the blue problem, all the problems with the investigative files as a stand alone problem, does that have any effect on that at all?

A.  Absolutely none.

Q.  How about your analysis on the permanent retention files, do any of the typos and missing documents have any effect on any of the opinions you've given here in court about the problems with the permanent retention files?

A.  No, they do not.

Q.  Does it have any problem that the stuff in the investigative files wasn't getting into the permanent retention files?

A.  It has absolutely no effect on it.

Q.  And as far as the problems they showed you that some. Documents you thought had been withheld from the criminal defense attorneys files weren't, you understand that the state's attorney, they have done a similar review of the state's attorney's documents, correct?

A.  I am aware of that.

Q.  If 60 percent of the files from the state's attorney's

11/29/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

120

office did not have material from the basement files, is that an acceptable percentage?

A.  No, it's not.

Q.  Okay.  Let me confer for a moment?

   (Brief pause.)

        MR. LOEVY:  Your Honor, we would want to admit 307, if there's any additional information from the witness.

        THE COURT:  No it's not a foundational.  Anything else, Mr. Noland?

        MR. NOLAND:  Just quickly, Judge.

                         - - -

        MICHAEL DAVID BRASFIELD, RECROSS-EXAMINATION

BY MR. NOLAND:

Q.  Mr. Loevy, was asking you about a color, the blue color thing with the permanent retention files and your opinions?

A.  The blue was the investigative files.

Q.  Okay.  And the investigative files about whether or not there are notes not on a GPR form in those types of files, is that the blue section?

A.  I'm sorry.  Say that again.

Q.  What is the blue section?

A.  The blue section is the investigative files.

Q.  But you are not saying?

A.  The basement files, mischaracterized basement files.

Q.  That wasn't the section dealing with the comparison with

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 122 of 164 PageID #:19485
Case: 1:18-cv-01168 Document #: 285-19 Filed: 02/24/17 Page 122 of 164 PageID #:31457

the criminal defense files, correct?

A. I'm sorry. Say that again.

Q. I'm sorry. I was confused with the question with plaintiff's counsel and probably my fault.

What I'm asking you is that the comparison with the -- the only comparison you made with respect to whether or not documents were missing from criminal defense files were on those 50 cases that you and I spent some time with, right?

A. Yes.

Q. So all the other opinions you've given with respect to permanent retention files and anything else and investigative files, you're not offering any opinion that anything from those files were withheld in those criminal cases; am I correct? You are just giving an opinion about the compliance or non-compliance with the special order, right?

A. I've testified what I testified to. The material, when we were looking at the criminal -- when I was looking at the criminal defense files, whether they contained or did not contain documents. I also testified that I looked at the investigative files as a stand alone process, what was in it, what wasn't in it, I looked at the permanent retention files, what was in it, what weren't in it, and then a comparison between the investigative file and the basement file so the permanent retention file.

Q. And my question was that the only aspect of your review

related to what the CPD produced or didn't produce had to do with the comparison with those 50 criminal defense files, correct?

A.  Not entirely.

Q.  Isn't it true that you had no basis to say that in any of those -- nothing to evaluate with with any of the files other than those 50 files, you have the 400 or so?

MR. LOEVY:  Objection, scope, your Honor.

THE COURT:  Hang on a second.  Let me hear the whole question.

BY MR. NOLAND:

Q.  That anything was withheld from criminal defense attorneys in those cases?

THE COURT:  Hang on a second.  I am going to sustain the objection under Rule 403.

MR. NOLAND:  Nothing else.  Thanks, Judge.

THE WITNESS:  Thank you.

MR. KULWIN:  Nothing else, Judge.

MR. LOEVY:  We could try to call the next witness, your Honor.

THE COURT:  Well, do you have any more questions based on the redirect?

MR. LOEVY:  No.

THE COURT:  Do any of the jurors have any questions?

We are definitely going to start with the next

***REALTIME UNEDITED TRANSCRIPT ONLY***

witness.

THE COURT:  Let me see the lawyers at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  Okay.  I am going to read these.  What did you mean by this -- the early part of miss testimony, what did you mean by this case herewith Mr. Fields was the driving file, the word is driving.  I honestly don't remember it.

MR. LOEVY:  I don't understand the question.

THE COURT:  You referred to the -- the juror thought he said something along the lines the case herewith Mr. Fields was the driving file.  I really don't --

MR. BURNS:  Early on when you were identifying files, you identified Fields first.

MR. LOEVY:  I was trying to say was it typical of the others or do they mean running file?

MR. KULWIN:  I think -- the way I take it, what I heard was that it was like the driving thing that led to his retention and why he was.

THE COURT:  Maybe I will just ask him a leading question about that.

The second question, were the other files, the basement files that he looked at, were they all homicide files, anybody have a problem with that?

MR. NOLAND:  No.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 125 of 164 PageID #:19488
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 125 of 164 PageID #:31480

THE COURT: You stated that there was not enough police training for constitutional safeguards for individual, will you elaborate on constitutional safeguards for individuals, what individuals?

MR. KULWIN: Can I have that one again?

THE COURT: Just look at it.

MR. KULWIN: There was not enough police training for constitutional safeguards, what individuals? You can ask that, Judge.

THE COURT: Okay. Fine.

Who is the next witness?

MR. LOEVY: Andrea Lyon.

MR. NOLAND: The only point I was trying to make at the end, the last objection you sustained, what I was trying to get at was a motion in limine, he couldn't say anything other than the criminal defense files and those other 400 or so he looked at that anything was withheld. We had a motion in limine on that.

THE COURT: It wasn't what it sounded like to me, so I overruled it.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: I think it was somewhere early in your direct examination, I think a question may have been asked that referred to Mr. Fields' case as kind of the driving file.

Is it fair to say that what prompted you to be retained in this case was the Fields matter?

THE WITNESS: Yes.

THE COURT: Okay. The other basement files that you looked at, were they all homicide cases?

THE WITNESS: Yes.

THE COURT: Okay. And then the last question is you made, you gave some testimony along the lines of there wasn't enough training involving constitutional safeguards for individuals. And the question is who are the individuals you are talking about? Are you talking about defendants in criminal cases?

THE WITNESS: That would be part of the group, yes.

THE COURT: Okay. Follow-up based on that, Mr. Loevy?

MR. LOEVY: No, your Honor.

THE COURT: Anybody else?

MR. NOLAND: No, your Honor.

THE COURT: You are excused.

THE WITNESS: Thank you, your Honor.

THE COURT: Please call the next witness.

MR. SWAMINATHAN: Plaintiff calls Andrea line.

THE COURT: Come on up.

(Witness sworn.)

- - -

11/29/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

126

ANDREA LYON, DIRECT EXAMINATION

BY MR. SWAMINATHAN:

Q.  Good afternoon, could you please state your name.

A.  Andrea Lyon, L-y-o-n.

Q.  Please tell the jury what you do?

A.  I am the dean of the Valparaiso university law school.

Q.  What does that position entail?

A.  A lot of things.  I run the law school, I teach, set policy, fund raise, deal with personnel issues, there is seems to be at least one crises a day seems to be part of it.

Q.  Do you loss have a private practice?

A.  I have some cases that I work on.  I wouldn't call it a business.  My students work with me.

Q.  What kind of cases do you work on?

A.  Right now I have one that is in state post conviction and one that is in state appeals court.

Q.  When you say state post conviction, are these criminal cases?

A.  Yes, they are both criminal cases.

Q.  Criminal cases in an appeals phase?

A.  Correct.

Q.  Do you have experience doing criminal trials?

A.  I do.

Q.  How many -- let me ask you, do you have experience doing homicide trials?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 128 of 164 PageID #:19491
Case: 1:13-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 128 of 164 PageID #:31163
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

127

A.  I do.

Q.  Approximately how many homicide trials do you think you've done?

A.  It's actually I know the number, it's 138 murder trials that I have defended.

Q.  And when did you first begin doing homicide trials?

A.  Now I have to tell my age.  1979.

MR. KULWIN:  Judge, I am going to object to all of this on relevancy grounds based on what we were surprised for the purpose of this witness.

THE COURT:  I think you're pretty close to getting to the point tip point, Mr. Swaminathan.

MR. SWAMINATHAN:  All right.

BY MR. SWAMINATHAN:

Q.  When you started doing outside cases were you working at the Cook County public defender's office?

A.  I was.

Q.  When you worked there, did you work in the homicide division?

A.  I did.

Q.  What position did you hold there?

A.  I was one of the members of the task force and then I was a supervisor and then I was the chief.

Q.  When you worked there, did you become familiar with the file keeping practices?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 129 of 164 PageID #:19492
Case: 1:13-cv-01168 Document #: 1185-33 Filed: 02/24/17 Page 129 of 164 PageID #:31464
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

128

A. Yes.

Q. And what was the practice?

A. The practice was you kept absolutely every piece of paper.

MR. KULWIN: Judge, I am going to object on this and ask to be heard.

THE COURT: Okay.

(The following proceedings were had at sidebar outside the hearing of the jury:)

MR. KULWIN: We were told, we were told -- we were told that the only purpose for this witness was to come in and say I worked on this specific file that I remember I got this stuff or didn't get this stuff. They have now tried to shoe horn her as an expert in criminal defense and now they are trying to get her to give an expert opinion on the practices of the public defender's office and what their retention policies is, it wasn't disclosed, it has never been disclosed and my view of it is they are it's highly prejudicial, undisclosed.

MR. LOEVY: Both side disclosed a number of Monell witnesses. We deposed just about every state's attorney they disclosed. They didn't disclose Ms. Lyon. She is barely listed on the pretrial order. She is a witness in the case.

MR. BURNS: She is disclosed.

THE COURT: Let me look at it.

MR. MICHALIK: Page 7, Judge.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 130 of 164 PageID #:19493
Case: 1:15-cv-01168 Document #: 285-33 Filed: 02/24/17 Page 130 of 164 PageID #:31465

MR. BURNS: She was disclosed here.

THE COURT: What were you going to show me, Mr. Michalik?

MR. MICHALIK: It was that page and I'll also represent the only document that was produced, there was no criminal defense file produced in the Fulton case for which she has been disclosed. The only document was an unsigned undated petition of the post conviction. So any testimony as to policies, practices, of the public defender goes far beyond the scope of anything that was disclosed here.

MR. LOEVY: The only thing I would add is they disclosed, how many states attorneys have they disclosed?

MR. SWAMINATHAN: 20 to 25.

MR. LOEVY: We deposed a lot of them. They disclosed 25 Monell witnesses, we disclosed roughly the same number B yeah, but I mean people make judgments about who to depose based on what the disclosure is and the way I'm reading that disclosure was that she was disclosed as somebody who was going to testify about a particular case and now she's been asked a question about policies and practices. My view of this is it's not admissible on direct. It may be admissible on redirect depending on what the cross is about whatever. But you can't do it on direct.

MR. LOEVY: All right.

MR. SWAMINATHAN: The state's attorneys, they have

disclosed for specific cases that they have said in their depositions and we expect them to say they are not going to have they have any knowledge about the specific cases. Instead, they are going to testify about the practices in the department because they don't have any memory of the specific files they have been disclosed for so really each of the people they have identified.

THE COURT: You don't -- starting to walk away --

MR. SWAMINATHAN: Given that context, she is essentially doing the same thing, the only difference being they don't know exactly what she is going to be saying because they chose not to depose her.

THE COURT: Look, what I'm saying is that you cannot ask this question in this way. I don't know exactly what she's going to testify to. My understanding is she is going to say that certain documents weren't in the file that she reviewed as post conviction attorney. Right? Did I basically the primary thrust of her testimony? Whether you can get this in in some other way in the context of, you know, what is it that make her think that the file is complete, I don't know, I am going to have to wait until I see it. But there you go.

MR. KULWIN: I want to be heard on that point. I'm very sorry.

THE COURT: Is there going to be a question on cross, do you have any idea if the file is complete.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 132 of 164 PageID #:19495
Case: 1:10-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 132 of 164 PageID #:31487

MR. KULWIN: No, I am not going to ask her that. I don't think that they can now set her up with the answer was stricken and them announcing do you know whether in this file this stuff was in there, they can ask that, but they can't say how down and then she is going to know that the policy of the public defender's office.

THE COURT: It's going to be what happened.

MR. SWAMINATHAN: She is going to explain for this file why she has a complete file, she wept and got the file, she went to the police department, and now with regard to this file, the basement file.

MR. MICHALIK: What I am hearing.

THE COURT: What time is it right now?

MR. KULWIN: 4:40.

THE COURT: We are going to stop here. We are not even close to finishing her direct.

MR. SWAMINATHAN: Five to seven minutes.

THE COURT: Let's see where we get.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: All right. The objection is sustained. The last question and answer are stricken. The jury is directed to disregard it. Mr. Swaminathan, you can go ahead.

BY MR. SWAMINATHAN:

Q.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 133 of 164 PageID #:19496
Case: 1:10-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 133 of 164 PageID #:31468

MR. KULWIN:  We have a question in the back from a juror.

THE JURY:   I got up to 1979 with some.  I couldn't hear.

THE COURT: Okay.  You can't do that.  If you have -- I am going to say it again.  I said at the beginning of the trial.  If you have a question, ask it then.  And it's completely appropriate, it's completely appropriate for a juror to ask I missed something, can you please repeat this.  That's completely appropriate because sometimes miss things.  The lawyers have been working with these for a long time.  You guys are getting it all cold, that's just fine.  I need you to do it in the way I described is you can write it out.  Go ahead.

BY MR. SWAMINATHAN:

Q.  I want to turn to the present day.

A.  Sure.

Q.  At some point did you become aware that there was a file, a street file that was not disclosed to Mr. Fields long after his criminal trial?

A.  I did.

Q.  Okay.  And did you become aware that there were other homicide files that were possibly in the same location as where Mr. Fields' street file was located?

A.  Yes.

Q. Okay. And did you learn that one of those files related to a case of yours?

A. I did.

Q. What was that case?

A. I represent Jon Fulton in the post conviction criminal case that I referred to earlier.

Q. And what is he charged with?

A. He's actually been convicted of murder. That's the --

Q. Approximately when was the crime for which he's been charged?

A. 2003.

Q. Okay. And do you have a file, a file that you keep related to Mr. Fulton's case?

A. I do.

Q. Now, you said that you're his post conviction lawyer which means you did not represent him at the original criminal trial, correct?

A. That's right.

Q. Approximately when was that trial?

A. That was in 2003. I started representing him, I believe it was 2011.

Q. Okay. And how do you end up with the file for Mr. Fulton?

A. Once I started representing him and I got a release from him and then I went to all the lawyers that had represented him previously, trial lawyers, appellate lawyers, and got the

files from them to begin working on the post conviction petition.

Q. Okay. And did those attorneys then give you their files?

A. They did.

Q. Did any of them withhold their files?

A. No.

Q. Did any of them tell you they're not giving you the complete files?

A. No, they wouldn't.

Q. What is your understanding of the completeness of the file you have?

A. I believe I have --

THE COURT: As compared to what is the request yes.

BY MR. SWAMINATHAN:

Q. In other words, do you have you have a complete set of all the material from the prior attorneys that were representing Mr. Fulton?

A. I do.

Q. And did you take any other steps to ensure that you had a complete file other than speaking to criminal defense attorneys?

A. I did. After I filed the post conviction petition and therefore was in court and could issue a subpoena, we issued a subpoena, well a number of subpoenas, one of them was to the Chicago Police Department for a full set of the police reports

just to double-check.

Q.  And what was in that set of police reports?

A.  The same police reports I received previously.  There was no difference.

Q.  Okay.  Now, later on you obtained a file that was found in the same basement or the same area where Mr. Fields' street file was found, correct?

A.  That's correct.

Q.  So that was not in response -- the subpoena that you September to the Chicago Police Department?

A.  That's correct.  It was quite a few months after that.

Q.  Were any of the materials in that new file in the file, materials you got from the Chicago Police Department when you issued your earlier subpoena?

A.  You mean the basement file?

Q.  That's correct.

A.  There were about 12 pages or so that I had never seen.

Q.  Okay.  Now, let me take a step back.  At some point you basically had a file that consisted of all the materials from the criminal defense attorneys previously plus the material you got from the police department?

A.  Correct.

Q.  In response to your subpoena, correct?

A.  Yes.

Q.  And then subsequently you got a copy of the basement file,

correct?

A. Right.

Q. Okay. Now, that basement file, what did you do with that file?

A. I sat down and compared it page by page to see if there was anything new in there that I hadn't seen before and as I said, there were about a dozen pages that were totally new.

Q. Okay. Those pages that were totally new, did they contain information that was also new to you?

A. Some of them did, yes.

Q. Okay. Up say it was approximately 12 pages?

A. That's my memory, correct.

Q. If I may hand you a document. This is Plaintiff's Exhibit 638-145. Can you tell the jury what this document is? Can you tell me what this is?

A. This is part of the file that I received once the basement file was produced to me and this is a page that was brand new to me.

Q. Okay. And is this one of the pages that you then identified as being a page you did not receive previously?

A. That's correct.

Q. Okay. I'd like to show it to the jury.

MR. NOLAND: Let me see it.

THE COURT: From the ELMO? It's on.

MR. SWAMINATHAN: From the ELMO.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 138 of 164 PageID #:19501
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/16 Page 138 of 164 PageID #:3513

BY MR. SWAMINATHAN:

Q.   Plaintiff's Exhibit 638-145, this is what's on the document.  So this is the document you're referring to?

A.   It is.

Q.   Can you tell me if -- what is new about this document?

A.   Well, everything.  There's a different RD number which is the number by which the Chicago Police Department keeps track of cases, there was a plate number of a car, there was a date, there was a name I hadn't heard of before, there were two phone numbers I hadn't heard of before, reference to a car, nobody knew anything about.

Q.   Is this information that was -- that you ended up putting to use in some way?

A.   We have been investigating it, yes.

Q.   Tell us about what you did or what was actionable about this?

A.   After we received this, we issued a subpoena based on the new RD number and received some police reports in response to that regarding the incident with this car.  Would you like me to describe that?

Q.   Please.

A.   So what had happened was there was some kind of a car accident involving the car with these plates and then apparently, according to the police report, the man was driving the car was disrespectful or otherwise unkind to the

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 139 of 164 PageID #:19502
Case: 1:13-cv-01168 Document #: 185-19 Filed: 02/24/16 Page 139 of 164 PageID #:3517

11/29/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

138

woman whose car he hit whereupon her son, it was a Hispanic name, I am not remembering the name, I'm sorry, got out of the car and hit the person who was driving the car, like physically hit him, and ended up charged with a battery and I think some other car related charges, but I am not certain.

Q. Why is that important to you in the context of your defense of Mr. Fulton?

A. Well, it's very interesting to me that this occurred on the right date in a similar neighborhood close by to where the homicide had occurred that these were witnesses that I knew nothing about and it appeared that it was a lead possibly to some other evidence and definitely needed to be followed up on.

Q. Do you think that this is a potentiality alternate suspect or did you consider this a potentiality gnat suspect?

A. I did and I still do.

Q. I am going to show her Plaintiff's Exhibit 638-86 can you tell me what that document is?

A. That's also a document that I had not seen in the police reports before.

Q. It is one.  Documents you identified -- strike that.

Is this information that you believe was important to your defense of Mr. Fulton?

A. Yes.

Q. And did you put it to some use?  Strike that.  Let me ask

139

you a different question. In what way is this important information to you?

A. This, Mr. Fulton's case is, our position was wrongly convicted as a result of a false confession obtained from him when he was 18 years old and a senior in high school after four entire days of interrogation.

MR. KULWIN: Objection to four --

THE WITNESS: And this photograph shows.

THE COURT: Hang on. When you hear an objection, as you know, as you know, you stop talking.

THE WITNESS: Sorry, Judge.

THE COURT: Overruled. It's the only way that relevance can be explained. Let's get to the point. Go ahead and continue your answer.

THE WITNESS: And so the photograph of my client looking like he was in distress or disarray or under dressed in the area or et cetera would have been relevant or helpful in the defense of the trial itself.

BY MR. SWAMINATHAN:

Q. Okay. I am not going to show you additional documents. Were there other documents as well that you put to use that you found in the basement file that you didn't previously have?

A. Yes.

Q. Okay. And you say you put them to use . What -- strike

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 141 of 164 PageID #:19504
Case: 1:13-cv-01168 Document #: 285-39 Filed: 02/24/17 Page 141 of 164 PageID #:35176

that.

What is the type of material that was in those other documents that was important to you that you put to use?

A. Some of it was not particularly important. Some of it was, there was a report regarding an interview with one. Eyewitnesses that had some details in it that were not in another report. The fact that this eyewitness existed was known, but that these other statements had been made was not known, and this is something that could have been followed up on and used in the original trial as well.

There were many items of this nature.

Q. Was the basement file material that you expected to have been available to your client available at his original trial?

MR. MICHALIK: Objection.

THE COURT: I need a basis.

MR. MICHALIK: Foundation. And improper opinions.

THE COURT: I didn't hear the second part.

MR. MICHALIK: It's an opinion. It's a legal opinion.

THE COURT: Overruled. I don't agree.

BY MR. SWAMINATHAN:

Q. You can answer.

A. Yes it's what I expected to receive.

MR. SWAMINATHAN: Nothing further.

THE COURT: We are going to stop here. Tomorrow same

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 142 of 164 PageID #:19505
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/17 Page 142 of 164 PageID #:3517

as today.  Be ready at 9:30.  We will probably start a few minutes after that.  Don't discuss the case with each other or anyone else.  I will take the jury out and be right back.

(The jury leaves the courtroom.)

THE WITNESS:  Judge, would it be at all possible to take my cross at nor time?  I'm very booked tomorrow.  I can cancel the counsel of deans meeting if I need to.

THE COURT:  You're the boss, right?

THE WITNESS:  Actually not there, the president of the university is there.  I am the boss otherwise.

MR. LOEVY:  Your Honor, we have asked the defendants if there is a possibility they might not cross her, they are going to think about that, so that's also in the mix.

THE COURT:  That's what any lawyer would say in this situation is that I would think about it.  I think I have to assume there's going to be some cross.

THE WITNESS:  Judge, I will be back here at 9:30 unless I hear differently from counsel.  Have a good evening, sir.

THE COURT:  The jurors reminded me on the way out that I forgot to give them the whole thing about scheduling. I'll remember to do that in the morning.

MR. KULWIN:  Which one, Judge?

THE COURT:  The question that they had asked about scheduling and how long the trial is going to go.  I will deal

with that in the morning.

The things that I have on my list that I need to deal with would be number one -- hang on a second. The emails regarding Kees, number two, the intimidation issue, No. 3, if I have to deal with it, stipulations about non-present reports in certain files.

On the Kees thing, so what's the issue? You think you haven't gotten something that should be turned over?

MR. SWAMINATHAN: The issue with Kees the government and Mr. Kees, we got a response back. The response with regard to counsel's answers were we think fine. We don't have any quibble with that. In terms of the responses of Mr. Murphy and Mr. O'Callaghan themselves, we have some concerns. The answers are very sparse.

THE COURT: Can I see them?

MR. SWAMINATHAN:

MR. SWAMINATHAN: Yes.

THE COURT: Just pop it on the ELMO. This one is Mr. Murphy's response.

THE COURT: At no time did defendant Murphy or defendants' attorneys ask Mr. Hogan or anybody at the U.S. Attorney's Office to offer any benefit to Kees. I assume what you're telling me is that's not comprehensive enough. What do you think it should include?

MR. SWAMINATHAN: The issue is that you had said,

***REALTIME UNEDITED TRANSCRIPT ONLY***

report anything regarding Kees.  This is a narrow version of that, which may be totally innocuous.  Our question to them was could you just confirm that this is actually a complete response to what Kennelly ordered you to do, the judge ordered you to do, everything regarding Kees, can you make that representation.

THE COURT:  I am trying to remember.  Was there a written order on this or was it verbal?

MR. KULWIN:  Oral.

THE COURT:  So I can go back and look at what I said.

MR. SWAMINATHAN:  You did issue an order.

THE COURT:  There is an order.  I thought there was.

MR. NOLAND:  The court -- judge, you identified four questions.

THE COURT:  Here it is.  I think this is it.  Any communications by defendants or their counsel regarding Kees with any agency of the government, any attorney for the government, Kees or his attorney from the date of the 2014 trial and this case to the present.  That's what I directed.

So as I'm reading that and as I'm looking at the answer, the answer refers to a number of conversations, but kind of the clean up at the end was there was no offer of a benefit to Kees.

MR. SWAMINATHAN:  And just to be clear.

MR. NOLAND:  Your Honor is reading it correctly.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 145 of 164 PageID #:19508
Case: 1:13-cv-01165 Document #: 285-19 Filed: 02/24/17 Page 145 of 164 PageID #:35180

MR. SWAMINATHAN: Everything above that is communications that counsel is representing to us which we have no problem with. This is the only sentence that refers to Mr. Murphy.

THE COURT: Let me just ask this question. Is the correct reading of the answer that Mr. Murphy had no communications regarding Mr. Kees or any agency of the government, any attorney for the government, Mr. Kees or his attorney?

MR. NOLAND: Yes, your Honor.

THE COURT: There you go.

MR. NOLAND: You --

THE COURT: Yes is good enough. There you go. There is your answer.

MR. SWAMINATHAN: The other issue.

MR. NOLAND: Other than there was an email we attached, which we produced it.

MR. SWAMINATHAN: The other issue with Mr. O'Callaghan, it's loosely related to Mr. Murphy. Basically, the issue is we got this single document produced to us.

THE COURT: I think somebody showed this to me the other day.

MR. SWAMINATHAN: This was probably in the packet you got.

THE COURT: Yeah, it looks like what happened is that

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 146 of 164 PageID #:19509
Case: 1:13-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 146 of 164 PageID #:35181
11/29/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

145

Mr. Hogan sent Mr. Brannigan, Mr. O'Callaghan and Mr. Murphy a copy of the government's motion to reduce Mr. Kees's sentence.

MR. SWAMINATHAN: Yes. So this is the single communication we have in which O'Callaghan or Murphy is communicating with anyone from the federal government or Mr. Kees.

THE COURT: Right.

MR. SWAMINATHAN: So potentially the understanding is they only have a single communication, in this case to Mr. O'Callaghan's personal email address in the last two and a half years. That's possible. We said could you just confirm that he did a proper search because when we look at his response.

THE COURT: Who is the owe, this is Mr. O'Callaghan at this point?

MR. SWAMINATHAN: This is Mr. O'Callaghan now.

THE COURT: It says Mr. O'Callaghan advised that to the best of his recollection he's had no communications with anyone in the federal government, Kees and/or Kees's attorneys during the relevant period, had anything concerning Kees's testimony in this matter and/or benefits he may or may not have received as a result of testifying in this matter.

MR. SWAMINATHAN: So on this one all we said.

THE COURT: Are you ever going to get anything better than the best of his recollection.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 147 of 164 PageID #:19519

MR. SWAMINATHAN: The issue only is to the best of his recollection, does that mean he conducted some diligent search, that's all we asked.

THE COURT: I think you've got an answer to the interrogatory. That's that issue. I'm scratching that off the list.

On the intimidation thing, so I have previously said multiple times, I've lost count at this point, if it was introduced at the criminal trial one or two, then what was introduced at the trial comes in. On Mr. Hawkins, I dealt with it already. Mr. Hawkins is now on and off the witness stand.

And so then the other specific item that's discussed in the motion that was filed called motion for curative instruction and to bar future testimony has to do with this quote-unquote witness protection program issue regarding Mr. Morris. Didn't I deal with that?

MR. LOEVY: No, your Honor.

THE COURT: I didn't deal with it?

MR. LOEVY: I no.

THE COURT: Tell me what it is that you're asking me to do.

MR. LOEVY: Document docket 550 was your order on the motion in limine.

THE COURT: Um-hmm.

Case: 1:13-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 148 of 164 PageID #:35163

11/29/16 PM  ***REALTIME UNEDITED TRANSCRIPT ONLY***

147

MR. LOEVY:  And you said each defendant proposes to testify regarding El Rukn intimidation of witnesses and others and you quite clearly said that they are barred from providing this testimony from the stand, it does not bar all such evidence.  No defendant is allowed to talk about El Rukn witness intimidation.  On direct Mr. Kulwin asked Mr. O'Callaghan, first question Mr. O'Callaghan, at the time based on your experience, was Mr. Morris in a dangerous situation? That is so far beyond what you permitted at trial for the purpose you permitted at trial.  Mr. Morris' testimony at trial was what it was.  You can't ask him and I'll put it on the screen.

THE COURT:  Go ahead.

MR. LOEVY:  I apologize.

THE COURT:  This is the rough transcript.

MR. LOEVY:  This is rough transposed to a memo.

MR. KULWIN:  This redirect?  Is this redirect, recross?

THE COURT:  Whose examination is this?

MR. LOEVY:  This is Mr. Kulwin's.

MR. ART:  Direct.

THE COURT:  Well.

MR. KULWIN:  Which direct?

MR. LOEVY:  I went first and then he went.

THE COURT:  Mr. Kulwin's initial examination of Mr.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 149 of 164 PageID #:19512
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/16 Page 149 of 164 PageID #:35184

O'Callaghan?

MR. LOEVY:  That's my understanding.

MR. ART:  Yes.

MR. LOEVY:  So here is your order, your Honor.  I'll let you read that.  I'll show you the order.

THE COURT:  Hang on a second.  The first question, Mr. O'Callaghan, at the time based on your experience, was Mr. Morris in a dangerous situation?

"ANSWER:  Yes.

"QUESTION:  Based on your experience at the time, without getting far afield, you understand?

"ANSWER:  I understand

"QUESTION:  What was the danger that he was in?  There was a sidebar.  I assume at the sidebar, you shut it down because after the sidebar there's no more questions asked about it.  I'm sorry.  I don't remember what I said at the side war.  The next question is you were asked a lot of questions about trips you made up to Milwaukee regarding Mr. Morris and his family.  Do you remember those questions?

"ANSWER:  Yes.

"QUESTION:  Was the purpose of those trips to assist him in the move with his family as part of the witness protection that the state's attorney's office was running?

"ANSWER:  Yes."

Okay.  Now I get it.  Okay

MR. LOEVY:  May I show you the order then, this is the motion in limine that we claim they blew right past.

THE COURT:  That's the thing you just referred to.

MR. LOEVY:  Yes.

THE COURT:  Docket No. 550 which is from March of 2014.

MR. LOEVY:  Yes.

THE COURT:  Let me hear from Mr. Kulwin.

MR. KULWIN:  Can you put the transcript backup?

THE COURT:  That previous page.

MR. LOEVY:  Steve, give me the whole thing.  We've got it.

MR. KULWIN:  This is enough.  Not to bore the court with the orphan who cries I'm sorry after they murder their parents, look at the question that precedes it.  Now, you were asked a lot of questions about whether Mr. Morris got a specific threat from the El Rukns before he was placed in that program.

THE COURT:  I see where you're reading.  So what you're saying was that there was questioning on Mr. Loevy's examination before this?

MR. KULWIN:  Absolutely.  He spent an inordinate amount of time.  I'll tell you, Judge, I don't have the photographic memory of some people.  I can't tell you chapter and verse.  There is no way I go into that unless he goes

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 151 of 164 PageID #:19514
Case: 1:23-cv-01168 Document #: 285-19 Filed: 02/24/26 Page 151 of 164 PageID #:35186

into, you don't have any evidence of specific threats, you took him out there because it was a benefit, all this other stuff. And it was invited, there was a sidebar, they leave out what's in the sidebar, and then the next question is, you were asked a lot of questions about trips you made up to Milwaukee, which he was. Do you remember those questions? Was the purpose of those trips to assist him in a move as part of the witness protection, yes, no objection. Obviously, it was --

THE COURT: Presumably that's because I made a ruling at the sidebar, although I have to say I don't know because I don't have the sidebar. Sidebar.

MR. KULWIN: I don't have the sidebar.

MR. LOEVY: Do you have the sidebar, Steve?

MR. ART: I have the whole transcript here.

THE COURT: Just pop it up on the screen there for a second. All right. Flip it over to the next page. Slide it down, slide it down so I can see the rest of it. Some of that is kind of garbled. Flip over to the next page. Yeah, so it -- it looks like what I -- what I did at the sidebar is I side you're not going to be able to go into the reasons that Mr. Kulwin wasn't going to be able to go into whatever reasons why Mr. Morris was and what was referred to as a witness protection program, and that's where I cut it off. I would cut him off in the middle of a sentence if he started trying

151

to give the reasons.  Flip over to the next page for a second.

Yeah.

MR. ART:  Do you want to see the start of the testimony?

THE COURT:  No, you have refreshed my memory well enough.

MR. LOEVY:  Our position is, it's a very clear motion in limine ruling.  He can talk about what happened at trial, he can talk about there were or weren't threats, which is what I called O'Callaghan, there were no threats.  What they weren't supposed to say tell the jury which doesn't go to a claim or defense, why Gerald was in reasonable fear.  If you wanted to revisit that, your Honor, he could have.  He blew right past it.

THE COURT:  Time out, though, I am going to say the same thing to you that I said about eight times to Mr. Kulwin in overruling his objections, I cut it off.  A question is not evidence.  And so I cut it off.

MR. LOEVY:  Your Honor, the testimony continues.

THE COURT:  In terms of the reasons, that's what I cut off.  That's where you drew the line.  That's where I drew the line.  If I drew the line in the wrong place, that's why God invented courts of appeal.  That's it.  I am really honestly not going to revisit this at this point in time.

MR. LOEVY:  There is still the representation.

***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT: Is there any other witness who is going to testify about Morris?

MR. KULWIN: Yes, Judge.

THE COURT: Who?

MR. NOLAND: Brian Sexton.

MR. KULWIN: And Jack Hines -- well, at the last trial, Judge, you had Mr. Hines testify about what he called witness protection but was victim witness. You also asked Ms. Conyers on cross-examination testify in her experience, it was not rare that it happened, that victims and witnesses were relocated. I wanted to elicit both of that. Because what the defendant -- what the plaintiff has done is and what they're trying to do in my view and I know your patience on this is justifiably thin, so I will be short, is they have made this argument to the jury that Mr. O'Callaghan -- that Mr. O'Callaghan has threatened these witnesses, coerced them, that they live in fear of him. Okay? And that the whole -- or if it's not that, then he's making these trips up to Milwaukee trying to bribe him with appliances and gifts. It's false, it's miss representative, and I can't -- I'm entitled to defend against that. When he says it's not part of any claim, that's part of his whole case. His entire case is that either O'Callaghan had no reasonable basis to not recommend but to present the case for probable cause to the state's attorney because assuming everything was totally legit, on the up and

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 154 of 164 PageID #:19517
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/17 Page 154 of 164 PageID #:3159

up, he should have said, there's not enough here, I got to get more before I go to him, or alternatively, assuming the argument that what he had was enough, he shouldn't have done it because he knew it was all phony because he had coerced him or bribed him to get it. That is his case and I should be able to respond and he's made that case over and over and over again with every witness. With Randy Langston, you were afraid of him. With Eric Lange, you were scared of them. And on and on.

THE COURT: Last word.

MR. LOEVY: Thank you, your Honor.

THE COURT: Keep it short.

MR. LOEVY: We disagree with him, but the evidence is in. O'Callaghan said way more than we wanted about threats. Gerald, his wife and children were put into the witness protection program and we still are asking you to correct that as a factual matter.

THE COURT: Here is the deal. When are we expecting to see Mr. Sexton or Mr. Hines.

MR. KULWIN: In our case. Sexton is in their case.

THE COURT: Stop. I am asking Mr. Burns a question. I have to preface everything. Mr. Murphy is is going to testify about this too.

MR. BURNS: If he is asked a question that he deals with the Milwaukee trip, this is where it comes from, so

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 155 of 164 PageID #:19518
Case: 1:13-cv-01168 Document #: 1185-19 Filed: 02/24/17 Page 155 of 164 PageID #:35190

Mr. Loevy would control that.

THE COURT:  Here is what I am going to direct.  Are you calling Mr. Murphy?

MR. LOEVY:  Yes.

THE COURT:  When?

MR. LOEVY:  Tomorrow if we get to him and we are hoping to.

THE COURT:  And are you calling Mr. Sexton?

MR. LOEVY:  Unlikely because we are going to have to finish our case.

THE COURT:  Are you calling Mr. Hines.

MR. LOEVY:  Probably not, same reason.

THE COURT:  There's three people that's been identified and only three people that this issue is going to come up.  I am going to tell you guys to do the same thing I told plaintiff to do on a number of things.  I want a proffer, this is what we propose to have Murphy testify about, this is what we propose to have Hines testify about, this is what we propose to have Sexton testify about this, and if -- and then I need some sort of little short justification, it can be repeating what you just told me, but I need it in one place so I don't have to draw together 14 places that we have talked about this.

MR. KULWIN:  Do you want it typed or do you want it orally?

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 156 of 164 PageID #:19519

THE COURT: No, like every time I have asked for this from the plaintiff, I need it in writing.

MR. KULWIN: Sure, Judge.

THE COURT: I apologize in advance to Ms. Katz. She didn't catch it.

MS. KATZ: I did. I thought I put it in writing, but I didn't apparently.

MR. KULWIN: It's not just Ms. Katz.

MR. LOEVY: Still unresolved is our request that you tell the jury that Gerald Morris, his wife and his children were not placed into the witness protection program. There was no good faith basis to ask that, it's not true and the jury has been lied to.

THE COURT: Look, I mean, I'm collecting my thoughts to just give me a minute. I am reasonably certain that if you were to ask Mr. Sexton and Mr. Hines both of whom were assistant state's attorneys at the relevant time whether Cook County state's attorney's office had anything called a witness protection program they would say no. I am equally certain that if you were to ask them whether the Cook County state's attorney's office had a victim witness program, they would say yes and I am reasonably certain and pretty close to a moral certainty that they would say that that was a program sometimes used to relocate witnesses, you know, who were for whatever reason concerned about their safety. Okay? I am

confident of this. I know this because I lived in that world not as much as some of the people in this room did but enough to know. Okay? So honestly, I'm not -- I don't think that's an appropriate instruction. Now, if once all of the evidence on this is in, okay, I need everybody's attention here for a second.

MS. KATZ: Sorry.

THE COURT: Thank you. Once all of the evidence on this is in, you know, after I make whatever rulings I make, after I get the proffer about Mr. Murphy and Mr. Hines and Mr. Sexton and that testimony comes in, you can revisit this before closing argument to talk to me about what people should and shouldn't be able to say and that is the next time I am going to deal with that part of it. Okay? So the second -- actually, the second to the next time. The next time is when I rule on this proffer and then the last time, the second and last time is going to be when you're making a motion, if you make it before closing argument.

So now we're going to move on to the next thing, which I don't think there is anything else.

MR. LOEVY: I don't think there is, your Honor.

THE COURT: Okay. You guys got any issues for me?

MR. KULWIN: The proffer is just to explain what they are going to say about witness protection, right.

THE COURT: It's really what they are going to say

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 158 of 164 PageID #:19521
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/17 Page 158 of 164 PageID #:35193

about this issue as it relates to Morris.

MR. KULWIN: We got it.

THE COURT: This issue as it relates to Morris.

MS. KATZ: Okay.

THE COURT: But if there's going to be -- if you're intending to elicit some testimony that goes beyond Morris specifically and what this program was in the Cook County state's attorney's office, I want to see that too.

MR. KULWIN: We will do that.

MR. LOEVY: Are we talking about witness, threats, intimidation.

THE COURT: I am talking about what I am talking about. Now we are moving onto the next issue for crying out loud. Do you have other issues.

MR. LOEVY: No, your Honor.

THE COURT: Thanks. Stop talking.

THE COURT: Do you have other issues.

MR. KULWIN: One other issue.

THE COURT: What?

MR. KULWIN: It deals with Derrick Kees.

THE COURT: Derrick Kees.

MR. KULWIN: Derrick Kees, Judge. Derrick Kees is going to testify, I think, I'm getting calls, I believe Mr. Kees I have been surprised is here tonight and I believe.

THE COURT: Here here as in what?

MR. KULWIN: Here in this building.

THE COURT: I haven't seen the marshals lurking in the back hallway.

MR. KULWIN: He wouldn't be in the back hallway. I believe he comes through the U.S. Attorney's Office. I think he is in lock up.

THE COURT: He is still in custody.

MR. KULWIN: He is still in custody. Anyway, and I believe if he is going to get out of here needs to go on first thing in the morning, so I am communicating that. But that's not my purpose. I just thought I would advise you of that. That's what I heard.

THE COURT: People -- we are going to finish with Ms. Lyon first. Are we okay with putting Kees on after that?

MR. LOEVY: We burned with Hawkins.

THE COURT: So Kees is the next witness.

MR. KULWIN: The question becomes about this Rule 35. I imagine that the plaintiff is going to cross him on the Rule 35.

THE COURT: Well, I don't think you have to imagine that.

MR. KULWIN: Well, you know. Whatever. So I imagine that, and the question I want is guidance on what's allowed in the --

THE COURT: Well, ask me something specific.

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 160 of 164 PageID #:19523
Case: 1:13-cv-01168 Document #: 285-19 Filed: 02/24/17 Page 160 of 164 PageID #:35135

11/29/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

159

MR. KULWIN: I want to go into the Rule 35. I want to show it to him, how he got it.

THE COURT: Ask me something specific. What is it -- the document is not going to go into evidence. Okay? So what is it you want to go into about it?

MR. KULWIN: This is a Rule 35 motion that the government gave you, provided you. You're a lawyer, asked them to file it, they filed it on your behalf, correct and who signed it, okay? All right. You know, and who is the signature line and all that stuff. And, you know.

THE COURT: Has it been ruled on yet?

MR. KULWIN: Yeah. What I'm concerned is that they're going to make it look like or try to, those guys over there, and he'll point over to us, we're somehow behind it. I don't want that to happen.

THE COURT: Now we are down to hand gestures are unfairly prejudicial.

MR. KULWIN: Yes, they are.

THE COURT: The record will reflect laughing by Mr. Kulwin and by the judge even though I am laughing on the inside.

MR. KULWIN: With all seriousness --

THE COURT: Honestly, are you going to argue that there's something inappropriate with him eliciting that it was the U.S. government that moved for the reduction in sentence?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-33 Filed: 04/06/26 Page 161 of 164 PageID #:19524
11/29/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

160

That's a question.  Just answer it.

MR. LOEVY:  The answer is no.

THE COURT:  Okay.  I think it's completely appropriate for you to elicit that it was the U.S. government that moved for the reduction of the sentence.

MR. KULWIN:  And that I want to show him the document, I want to show him who signed it.  Okay?

THE COURT:  Who signed it?

MR. KULWIN:  Farden and Yonan.

THE COURT:  Okay.

MR. KULWIN:  Because that's important to me.

MR. ART:  The Rule 35 motion is not signed by Hogan.

MS. KATZ:  Jason --

THE COURT:  I read it.

MR. KULWIN:  Jason Yonan, I saw it.

MR. KULWIN:  I want that in evidence.

MR. LOEVY:  Your Honor, the inference here is that the government has some interest in helping and we do have the email copying O'Callaghan and Murphy where William Hogan sends the Rule 35 and Joe Murphy says, thanks for the help.

MR. KULWIN:  Right.

MR. LOEVY:  Thanks for the help.

THE COURT:  Nothing wrong with you bringing that up. What we don't want them to suggest -- by the way, this Rule 35 motion was filed during our trial.  What Mr. Kulwin is milling

around the edges is edges is the government has reasons to do it. We wanted to bar Kees, your Honor disagreed, but we certainly want to cross-examine on it and Mr. Kulwin should not be allowed to suggest this is unrelated to his clients.

MR. KULWIN: Hold the phone, Judge. If they are going to say -- first of all, it was Mr. Murphy, not my client that said thanks for the help. The purpose why the government did it is highly relevant because they want to make it look like we went to the government and said, help us out in the civil case, we're hurting here.

THE COURT: You are not going to get any of this out of Mr. Kees; am I correct? Mr. Kees -- is there any possibility on God's green earth that Mr. Kees has some insight because he is, if I can borrow a phrase, Carnac The Magnificent into what the government's motivation was?

MR. KULWIN: No.

THE COURT: So it's not going to come out of Mr. Kees. I assume that you are going to attempt to do is elicit this from Mr. Hogan.

MR. KULWIN: Absolutely.

THE COURT: Am I right?

MR. KULWIN: Yes.

THE COURT: When is Mr. Hogan going to testify?

MR. KULWIN: In our case.

THE COURT: Not yet?

MR. KULWIN: Not yet.

THE COURT: I will address at that point in time or before that point in time exactly what can be testified to or not. It's unlikely that you are going to be able to go into some whole chapter and verse on that. It's almost certain that I am going to permit you to elicit from Mr. Hogan that this -- assuming it's true, is this a decision made by the U.S. Attorney's Office, did you get any input from any of the defendants in this case, did you get input from any of the defense lawyers in this case, was this a decision that was made at the U.S. Attorney's Office based on what you considered to be the merits, those are all going to be proper questions because you're entitled to attempt to disassociate that motion from the defendants in this case.

On the other hand, the plaintiff is entitled to elicit that Mr. Kees is getting a benefit for his testimony in this case because that's exactly what the motion says. Okay? So it says that.

MR. KULWIN: But that's -- I don't -- we can do this later.

THE COURT: I'm just giving you the parameters. None of this is going to come in. None of the government's motivation is properly admissible through Mr. Kees. If it's admissible, the extent it's admissible is going to be from somebody who knows.

MR. KULWIN: At that point, then, Mr. Loevy should be precluded from putting this thing under his face and say the reason you got this, it says right in your motion was because they wanted to give you a benefit for testifying in this case. He shouldn't be allowed to do that without me being able to say, yeah, the reason they wanted to do that was because what?

THE COURT: Those are two different things, Mr. Kulwin, and I know that you know the rules of evidence well enough to understand the distinction. I mean, what he understood is that he was getting a benefit that was based on the testimony he's given in the case. That is perfectly admissible what the government's motivation was, you can't get in through him, period.

Now, is there any other topics we need to talk about.

MR. LOEVY: Not from the plaintiff.

MR. KULWIN: Not until Mr. Hogan is going to testify.

THE COURT: I want some lead time on it.

MR. KULWIN: Absolutely.

THE COURT: Okay.

MR. LOEVY: Thank you.

(The trial was adjourned at 5:15 p.m. until 9:30 a.m. on November 30, 2016.)

***REALTIME UNEDITED TRANSCRIPT ONLY***