# Exhibit 34

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 2 of 140 PageID #:19529
Case: 1:10-cv-01168 Document #: 485-14 Filed: 02/24/17 Page 2 of 140 PageID #:36403

***REALTIME UNEDITED TRANSCRIPT ONLY***

1

Judge Kennelly, November 23, 2016, 9:30 a.m. call and case on trial, Fields v. City of Chicago.

THE CLERK:  Case number 10 C 1168, Fields v. City of Chicago.

THE COURT:  Good morning.

MR. LOEVY:  Good morning, your Honor.  Jon Loevy, Steve Art, Anand Swaminathan, and Candace Gorman on behalf of Nate Fields.

MR. NOLAND:  Good morning, your Honor.  Daniel Noland, Terry Burns and Paul Michalik on behalf of the city and Joe Murphy.

MR. KULWIN:  Good morning, your Honor.  Shelly Kulwin on behalf of Mr. O'Callaghan.  Ms. Katz had personal emergency.  She is not here.

THE COURT:  Is she okay?

MR. KULWIN:  I got a panic phone call that something happened with her apartment.

THE COURT:  Are you good to get the jury out?

MR. LOEVY:  We are.  We are going to have to address the witness protection, witness intimidation.  You said we were going to address that in the morning.  Remember, they were going to respond to that.

We do think they have opened the door to the CRs on O'Callaghan.  You told us to defer that.

THE COURT:  I told you to wait until the end of Mr.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 3 of 140 PageID #:19530
Case: 1:10-cv-01168 Document #: 485-14 Filed: 02/24/17 Page 3 of 140 PageID #:30404

Kulwin's examination.

MR. LOEVY:  We did.  And we want after Mr. O'Callaghan testifies shows the 155 feet.  It might makes sense.

THE COURT:  Feet?

MR. LOEVY:  In the hall the 155 feet.  There was a question about whether you'd show him 155 plus 80 but Randy Langston on the stand said I never showed 80.

THE COURT:  If I am going to show somebody 155 feet, there has to be some testimony at some point in time about 80 feet.  We are going to show people what 80 feet is too.  We are either going to do all of it or none of it.

MR. LOEVY:  Fine.

THE COURT:  Anybody have a problem?

MR. KULWIN:  Other than the problems expressed already, no.

THE COURT:  What's that?

MR. KULWIN:  I objected to the whole process, the hallway, different lighting.

THE COURT:  I can explain that.  This is something that's commonly done in courtrooms.  Mr. Kulwin you and I tried a case on the same side in which something like that was done.

MR. KULWIN:  You went out and measured the scene.

THE COURT:  We had an investigator who was not

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 4 of 140 PageID #:19531
Case: 1:10-cv-01168 Document #: 185-14 Filed: 02/24/17 Page 4 of 140 PageID #:30405

exactly a crack investigator.

MR. KULWIN: You did a good job measuring the scene.

THE COURT: So I'll explain all that. It's not intended to duplicate conditions under which people viewed anything. It's just simply intended to show you what 80 feet is and what 15 feet it so that we don't have you trying to measure this on your own.

MR. KULWIN: I will say, we are going to be file a motion, we are going to move to bar any designations of Mr. Beseth. He was the investigator. You made it pretty clear that if you published testimony from the state court trial, publish it, not just show what they read, but publish it. Mr. Loevy has beaten this horse into the ground with every witness has been out there. He took you out to the baseball field, he measured it exactly.

THE COURT: Don't worry about that. If somebody wants to actually read Baseth's testimony.

MR. KULWIN: I have a slight disadvantage on the witness protection.

THE COURT: Ms. Katz is working on it?

MR. KULWIN: Yes. She has all the designations.

THE COURT: Do you think you are going to get to lunch?

MR. LOEVY: Your Honor.

THE COURT: Do you think you are going to get to

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 5 of 140 PageID #:19533
Case: 1:10-cv-01168 Document #: 485-14 Filed: 02/24/17 Page 5 of 140 PageID #:30406

lunch?

MR. KULWIN:  I think I might.  I might not.

THE COURT:  What you were about to say.

MR. LOEVY:  The cross is now in the third day, he told us yesterday --

THE COURT:  You're going to complain that it's too long.  You lack standing.

MR. LOEVY:  He is now approaching.

THE COURT:  Or it's unclean hands or something like that.

MR. LOEVY:  He is preaching the line.  He told us yesterday he had an hour.

THE COURT:  This is interesting.  The interesting part about it is I can tell you precisely how long the examination was.  I apologize for not sending by the way the chart from last night.  The time that was charged for the plaintiff's examination of Mr. O'Callaghan and 332.minutes, what is that, 6 and a half hours, 5 hours and 32 minutes.  I'm sorry.  There's more.  Add 98 to that.  That would be 430. That's 7 hours and 10 minutes.

MR. LOEVY:  Your Honor, our point was.

THE COURT:  And I'm just going to tell you that Mr. Kulwin's examination has been so far 248, so.

MR. LOEVY:  Our point was, your Honor, he has twice now explained his canvass, twice explained the building.  I

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 6 of 140 PageID #:18533
Case: 1:10-cv-01168 Document #: 485-14 Filed: 02/24/17 Page 6 of 140 PageID #:30467

feel like there's a lot of redundancy. We have now covered every subject in the case and he told us yesterday he had within hour left.

THE COURT: I have been keeping track and doing my best to keep track of the subjects that have been covered. I will deal with motions or with objections on the ground of, you know, undo duplication, Rule 403 or whatever when I get them as I get them. I am not going to deal with those right now. I am just not.

MR. LOEVY: Your Honor.

THE COURT: And by the way, if what you're about to tell me is that somebody is trying to filibuster to get over, everybody has been filibustering in this case. Everybody has been filibustering in this case. And by the way, by raising this time now, you are using.

MR. LOEVY: We have two witnesses today.

THE COURT: Did you tell him you had one hour.

MR. KULWIN: I told him I might have an hour, I did not guarantee an hour.

MR. LOEVY: He didn't guarantee us. We have two witnesses.

THE COURT: Who?

MR. LOEVY: Bagdalek and Hickey.

THE COURT: Are those city people?

MR. KULWIN: Bagdalek is the one.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 7 of 140 PageID #:19534
Case: 1:10-cv-01168 Document #: 485-14 Filed: 02/24/17 Page 7 of 140 PageID #:30408

THE COURT: All right. I am not too worried about it.

MR. LOEVY: The representation was it was an hour.

THE COURT: Let's get the jury out here. If a question comes up before the break, the question comes up about this what I'll call witness protection issue, if Mr. Kulwin asks a question, make an objection, ask for a sidebar and I will have to rule on it then.

MR. KULWIN: It's not. Finally, Judge, did I hear you say you are leaving at 2:00?

THE COURT: Potentially, 2:00 or 3:00. The acting chief judge has declared the judge by 12:00. But he does not have authority over individual.

MR. KULWIN: It's great. Now I don't have to set up a Thanksgiving table or anything.

(The jury enters the courtroom.)

THE COURT: Everybody can sit down. Mr. O'Callaghan, you understand you are still under oath.

THE WITNESS: I do.

THE COURT: All right. Ladies and gentlemen, we are ready to resume with Mr. Kulwin's examination of Mr. O'Callaghan.

- - -

DAVID O'CALLAGHAN, CROSS-EXAMINATION CONTINUED
BY MR. KULWIN:


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 8 of 140 PageID #:19535
Case: 1:10-cv-01168 Document #: 1485-14 Filed: 02/24/17 Page 8 of 140 PageID #:36469
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

7

Q.  Thank you, your Honor and good morning.

Dave, let's start out, you were asked a number of questions about prosecution theories, was this your theory, was that your theory at the different trials.  Do you remember those questions?

A.  Yes.

Q.  Do you create theories for the prosecution?

A.  No.

Q.  Did you -- were you the one who developed the prosecutor's theory at the '86 trial?

A.  No.

Q.  Did you develop the prosecutor's theory at the 2009 trial?

A.  Not at all.  No participation, no.

Q.  You said, and I just want to clarify for the jury in case any of them are wondering, they may not be, but I want to be clear, you said a number of times that you were quote-unquote excluded from the 86 and 2009 trials.  Do you remember making those statements?

A.  Yes.

Q.  You didn't do anything wrong.  Can you explain to the jury what excluded means?

A.  When you're in a trial and you're going to be a witness, especially a police officer, the judge will in state court will say you're excluded, you're not to sit while A, B, C D testifies so then you come in separate, testify, and then most

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 9 of 140 PageID #:19536
Case: 1:10-cv-01168 Document #: 485-14 Filed: 02/24/17 Page 9 of 140 PageID #:30410

of the time you're excluded again. You are not allowed in the courtroom wheel all the witnesses are testifying. That's why I'm saying I don't know what each person said because I didn't view it.

Q. Okay. There was some questioning that occurred over the last couple days about some interview with Randy Langston and the state's attorney in I believe it's in 2000. Did you attend that interview?

A. No, I don't believe I did.

Q. Okay. Let's put it up on the board, Plaintiff's Exhibit 132.

THE COURT: Is this from the computer?

MR. KULWIN: The ELMO, please.

THE COURT: The ELMO. There you go.

MR. KULWIN: Thanks, Judge.

BY MR. KULWIN:

Q. Does this indicate who is at -- does this indicate who is at the interview right below -- right above where it says witness Randy Langston?

A. Yes, state's attorney Mark /PWOURS and David Kelley. I wasn't there.

Q. Okay. Thanks.

You were asked some questions -- you were asked all sorts of questions for a long, long time about different evidence that was introduced against Mr. Fields at his

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 10 of 140 PageID #:18537

criminal trial, the ability of the eyewitnesses to see, the photo array, any things that you did at the lineup, do you remember all of it, there were lots and lots of questions.  Do you remember all that?

A.  Yes.

Q.  Okay.  And it went on for a long time?

THE COURT:  Mr. Kulwin, enough of that.

BY MR. KULWIN:

Q.  Okay.  Mr. O'Callaghan, did you testify at Mr. Fields' criminal trial in 1986?

A.  I did.

Q.  And at my request, did you review your testimony from that trial?

A.  I ran through it, yes.

Q.  And in very brief summary points, can you tell -- give us a couple of the highlights from that trial, very brief?

THE COURT:  From his testimony?

MR. KULWIN:  From his testimony, your Honor.

THE WITNESS:  I would have been introducing the procedure that we discussed here, how the lineup photos were done, how the lineups were done, and then maybe also his statement, that would be very brief.

BY MR. KULWIN:

Q.  Let me see if I can refresh your recollection.  Did you talk about the photo array and the identification by the

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 11 of 140 PageID #:19538
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 11 of 140 PageID #:30412

witnesses?

A. That's what I just said.

Q. Okay. And their identifications in the lineup?

A. Yes.

Q. Identifying Mr. Fields?

A. Yes.

Q. Okay. Let me ask you a question. At the criminal trial concerning the issue of what you did with respect to the lineups and with respect to the photo array and with respect to the identification of Mr. Fields at his criminal trial where he was facing the death penalty, how many questions did Mr. Fields' criminal defense lawyer ask you at that trial?

A. If I recall correctly, Mr. Smeeton was his defense attorney and I don't believe -- he didn't cross me. The other attorney crossed me.

Q. Did he ask you none?

        MR. LOEVY: Objection, leading, your Honor.

        THE COURT: Overruled.

BY MR. KULWIN:

Q. Did he ask you any questions at all?

A. The best I recall -- I don't recall Mr. Smeeton crossing me. Only --

Q. Mr. Swano?

A. Mr. Swano is correct.

Q. And after Mr. Fields' lawyer didn't cross you at all,

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 12 of 140 PageID #:19539
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 12 of 140 PageID #:30413
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

11

Mr. Swano asked you some of the same questions at the criminal trial that Mr. Loevy has asked you here, correct?

A. Yes, they would have been basically the same type of questions.

Q. All right. Now, you were asked a couple of questions about this crossed out lineup and I erred and said it was in the permanent retention file. Let me show you what's marked as Defendant's Exhibit 58, if I can.

THE COURT: You say it's in evidence?

MR. KULWIN: It is.

THE COURT: Do you need your computer back then?

MR. KULWIN: Can we get the computer again, please?

While she is doing that, can I first have the ELMO, please?

THE COURT: Sure.

BY MR. KULWIN:

Q. I am putting up on the ELMO the cover of that exhibit. And is this the investigative file from the police department?

A. Yes, it's a jacket, homicide 84 meaning the 44th homicide of that year.

Q. Okay. And is all the information --

A. In our area, just our area.

Q. Based on your knowledge, was this information produced to the criminal defendant in the case?

A. Yes.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 13 of 140 PageID #:18540
Case: 1:13-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 13 of 140 PageID #:36414

Q. Okay. Now, can we pull it up?

MR. KULWIN: And now the computer, Judge.

Did I give you the right page? Yeah, that's the page.

Can you blow this up at the bottom?

BY MR. KULWIN:

Q. Now, this is where the photographer made the error. Was this document within -- this document is in the investigative file, right?

A. Correct.

Q. So last question on this point, none of the witnesses based on your recollection from all the documents you have reviewed have ever testified that they identified Ray Ferguson that you recall, correct?

A. Yes, they did not do that.

Q. All right. I want to go to a different topic that was spent some time on, and that's this matter of the Vaughn/White case.

Now, the Vaughn/White case is a separate, completely different case than the Smith/Hickman case?

A. Yes, it's just totally separate case, not interrelated.

Q. There's a lot of names and details. Let's start clarifying some things.

First of all, when did the Vaughn/White murders occur?

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 14 of 140 PageID #:18541
Case: 1:15-cv-01168 Document #: 185-34 Filed: 02/24/17 Page 14 of 140 PageID #:30415
***REALTIME UNEDITED TRANSCRIPT ONLY***

13

A.  I believe the date is 28 March 1985.  I could be off a day or two.

MR. KULWIN:  Can I use this thing?

THE COURT:  Yeah.

BY MR. KULWIN:

Q.  So when did the murders take place?

A.  If my memory serves me right, it's 28 March 1985, about 5:00 to 5:20 something in the morning.

Q.  Excuse my bad handwriting.

Okay.  Now, do you know who the lead detective was on the Vaughn/White case?

A.  I believe the lead detectives, it was about five out at the scene, but the key two would be liberty and /TKPWRERB ham I believe were the key guys that started that scene.

Q.  And after that, did someone else become the lead?

A.  As it progressed along, I would say Robertson and Kobel became the leads as it evolved and new information came forward.

Q.  That's Robertson and Kobel, Kobel?

A.  Yeah, they are involved right after and later.

Q.  Just answer the question.

Now, what did -- when did you get involved at all? When was the first time you got involved if you recall?

A.  I believe the night of the 29th.

Q.  March 29th?

A.  Yes.

Q.  Okay.  By the way, your initials are, do you use the O.?

A.  DOC, doc.

Q.  All right.

Now, let me show you what's been marked as Plaintiff's Exhibit 10 on computer, Judge?

THE COURT:  Okay.

MR. KULWIN:  Thank you, Judge.

BY MR. KULWIN:

Q.  Got it up there.  Can you see it okay?

A.  I do.

Q.  Okay.  Is this -- first of all, does this report relate to the Vaughn/White case?

A.  Yes.

Q.  And looking at this report, can you tell us what time, if it shows, the precise time when the murders occurred?

A.  28 March 85 between 0500 and 0521.

Q.  Okay.  Where is the 0500 to 052, where does it say?

A.  Right top, right-hand corner.

Q.  That's 5:00 a.m. to 5:21 a.m.?

A.  Correct.

Q.  Okay.  Now, according to the report, who are the detectives that went out to the crime scene?

A.  Al Grefsheim and Jerry Liberty.

Q.  And where do you see their names?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 16 of 140 PageID #:18543
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 16 of 140 PageID #:30417

A. They're at the bottom of the report, right there.

Q. Were you one of the detectives who went out to the Vaughn/White scene, murder scene that night -- that morning on March 28th?

        MR. LOEVY:  Objection, asked and answered, your Honor.

        THE COURT:  Sustained.

BY MR. KULWIN:

Q.  Does the report reflect that you were one of the detectives who went out on the scene that day?

        MR. LOEVY:  Same objection, your Honor.

        THE COURT:  Overruled.

BY MR. KULWIN:

Q.  What was the answer, sir?

        THE COURT:  Does the report reflect that you were one of the detectives that went out there?

        THE WITNESS:  It does not.

BY MR. KULWIN:

Q.  Now, you mentioned you conducted a lineup.  Plaintiff's Exhibit 104.

        Do you recognize this?

A.  I do.

Q.  What is it?

A.  This would be a lineup supp that there's eight subjects in the lineup and two potential offenders in this lineup at that

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 17 of 140 PageID #:18544
Case: 1:15-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 17 of 140 PageID #:30418

time were believed to be offenders.

Q. Okay. Let's blow that up.

This list of people, who are they?

A. Number one is council --

Q. Not their identity, as a group, who are they?

A. Two suspects and six fillers that we spoke about before, the type of people that come out of the lock up.

Q. In the lineup that's being conducted?

A. Yes.

Q. All right. Now, tell us what your role was in the lineup?

A. As I described before that, room, the viewing room, my role was to be with the little girl and the little boy who were viewing it at separate times.

Q. Okay. Let's stop you there for a second.

Now, in this group here, who -- blow this up again, please.

Who were the two suspects?

A. Number one, council Glenn who was Squeaky and number two g-l-e-n-n, Hughes, I take it back, I apologize, Jackson, who was known as Pumpkin on the street.

Q. So you got Pumpkin is Jackson. And Glenn is Squeaky?

A. Yeah, his nickname was Squeaky on the street.

Q. I might have spelled this wrong. Anyway, you get the point, Squeaky. You got Pumpkin and Squeaky.

Do you recall what happened during the lineup?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 18 of 140 PageID #:18545
Case: 1:18-cv-01168 Document #: 185-34 Filed: 02/24/17 Page 18 of 140 PageID #:30415

17

A. Yes.

Q. Can you tell the ladies and gentlemen of the jury first of all who saw the lineup first?

A. The little girl, 12 year old.

Q. What was her name?

A. Sheree Vaughn.

Q. Okay. Tell us what happened?

A. Sheree came in, she did not pick out Squeaky, council Glenn. She looked at Jackson and then said he looks like one of the guys. She did not give straight out bang, that's him.

Q. Okay. And then by the way, does this report accurately summarize what happened at the lineup? I am going to show you the whole thing, but does it accurately summarize it?

A. Yes.

Q. All right.

A. Can you pop to page 2?

Q. Can you go to the next page. He wants to be sure. Can you blow that up, the whole thing. There you go?

A. Then I don't have to speak from my memory.

Q. You can read it. Take your time. Ready?

A. Yes.

Q. After Sheree Vaughn viewed the lineup in this Vaughn/White case, did Michael view the lineup?

A. Michael was 9 and that's --

Q. Tell us what happened when Michael viewed the lineup?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 19 of 140 PageID #:18546
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 19 of 140 PageID #:30420

A. Michael came in, looked at the lineup, hugged my leg, cried on it and said why did they do that to my mama. And then he picked out Pumpkin.

Q. Okay. Ready?

Okay. Now, when Sheree Vaughn looked at the lineup, did you do anything to try to convince her to be more firm in her identification?

A. No.

Q. When -- after Michael picked out one of the two fellows who were suspects in the lineup, did you try to convince him in any way to pick out the other suspect?

A. No, I did not.

Q. Now, after the lineup, let's now turn to Plaintiff's Exhibit 11. Before we do, let me ask you this question. After the lineup with Sheree and Michael on March 29th of the Vaughn/White case, it's on March 28th, did you, Dave O'Callaghan, have any further role in the Vaughn/White investigation?

A. Just executing what's called a consent to search to look for additional weapons that night.

Q. When you say that night, do you mean the night of March 29th?

A. After this lineup, we went out, yes.

Q. Okay. Other than that, after that night, March 29th?

A. Other than brief where Robertson handed this case to Jack

11/23/16 AM

Case:1:23-cv-01737 Document#:287-34 Filed:04/06/26 Page 20 of 140 PageID #:18547
Case:1:13-cv-01168 Document#:1185-14 Filed:02/24/17 Page 20 of 140 PageID #:30421

***REALTIME UNEDITED TRANSCRIPT ONLY***

19

Hines, very briefly, then that would be it.

Q. We will get back to that.

In between from March 29th until the meeting with Jack Hines, did you have any involvement in the investigation?

A. This was not my case, no.

Q. Now, let's go to Plaintiff's Exhibit 11, if we could.

Can you see it okay?

A. I'm sorry.

Q. All right. What is this, if you know?

A. This is the top of the supplementary report, and I notice the bottom is 31 March. This is a report prepared by detective Robertson, the top tells you you're lining up.

Q. So this is the homicide, the Vaughn/White murder that took place on March 28th between 5:00 and 5:21 a.m. and at the bottom some of the detectives who are on there, correct?

A. Correct.

Q. Is that your signature on this report?

A. No, Jon probably signed my name.

Q. Okay.

MR. LOEVY: Objection to the last part, your Honor.

THE COURT: Overruled. The answer can stand.

BY MR. KULWIN:

Q. All right. Now, if we can turn to page 4 of the report.

In the middle, six paragraphs down, page 4. You're on page 3, I believe. Can you go to the next page. No, it is

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 21 of 140 PageID #:18548
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 21 of 140 PageID #:30422

20

page 4.  I apologize.

I meant page 3.  I apologize, in the middle, page 3. Right here, the middle paragraph where it says felony review. Can you blow that up.

BY MR. KULWIN:

Q.   Now, does it indicate that a state's attorney was called to the lineup on the 29th at that time?

A.   Yes.

Q.   And who was the state's attorney who was called?

A.   On that day, it was assistant state's attorney Cesario.

Q.   Okay.  And what does it indicate assistant state's attorney did?

A.   He interviewed and logged the two children.

Q.   So when you say interviewed and logged, he interviewed Sheree and Michael Vaughn and made a report for the state's attorney's office?

A.   Yes, he would have.

Q.   Now, on that same page -- actually, on the next page, page 4, at the bottom, was felony review from the state's attorney's office contacted after the lineups that Sheree and Michael Vaughn participated in?

A.   This is referenced in this, but I don't know which date we are talking about here.

Q.   Okay.  Does it indicate that detective -- do you see it?

A.   Other state's attorneys became involved in this case, yes.

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 22 of 140 PageID #:19549
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 22 of 140 PageID #:30423
***REALTIME UNEDITED TRANSCRIPT ONLY***

21

Q. Okay.  Can you tell us, there's ASA j-a-k-a-l-s-k-i, came and then he wept to the super ASA b-a-b-b-i-t, and then what was the report on whether or not the state was going to pursue charges on Pumpkin and Jackson?

A.  It says rejected charges against Robert Jackson due to uncorroborated identification made by Michael Vaughn.

Q.  So you have so far in this Vaughn/White report, you have ASA Cesario involved, ASA Babbit and ASA Jack?

        MR. LOEVY:  Objection, asked and answered and relevance.

        THE COURT:  He hasn't asked it yet.

BY MR. KULWIN:

Q.  Does this report indicate at that time that Anthony Sumner is one of the suspects in the Vaughn/White murders?  Go to page 1, please.  Can you blow it up.

A.  At that time, he's marked as wanted for questioning.

Q.  Now, according to the report, I think if you look at page 3 again, and if you can go to this next to the bottom paragraph where it says Sheree Vaughn.  Does the report indicate whether Sheree Vaughn was shown a photo array of the potential suspects in the Vaughn/White murders that took place on March 28th, 1985, on the day that the state's attorneys were also there?  Does it indicate that?

A.  It indicates that a photo array was completed with Anthony Sumner being in it.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 23 of 140 PageID #:19550
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 23 of 140 PageID #:30424
11/23/16 AM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

22

Q. Okay. And does it indicate what Vaughn said about that at the time?

A. Okay. All right. I got it. He can read the smaller one.

Anthony Sumner a/k/a sundown looked like one of the offenders in this case.

Q. Now, you were asked a number of questions -- you can take that down, please.

BY MR. KULWIN:

Q. So just to be clear, on March 29th already Anthony Sumner is a suspect in the Vaughn/White murders and the Cook County state's attorney's office based on this report, if you can tell, is aware of that knowledge, according to this report, the state's attorney, the Cook County state's attorney?

A. No, I believe this report indicates on 31 March, not 29th.

Q. I'm sorry. March 31. I apologize?

A. On 31 March, yes.

Q. My mistake, Dave. Thank you for correct can me.

A. Happy to.

Q. I'm sure you are.

Now, you were asked a number of questions by the plaintiff's lawyer about Plaintiff's Exhibit 199. When Clarence Glenn and Robert Jackson were apparently interviewed in this case.

First of all, if you look at the bottom, what's the date of the report?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 24 of 140 PageID #:19551
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/26/17 Page 24 of 140 PageID #:30425

A. This is another report submitted on 31 March 1985 and detectives Markham and hood are responsible for this report.

Q. There is more investigation going on.

Are you on this report?

A. I don't believe so.

Q. Did you have any involvement in these interviews that are reflected here?

A. No.

Q. Okay. Let's go to Plaintiff's Exhibit 108. What's the -- what's this 108? Why don't you let him look at the whole thing first. Can you take that down for a second? Can you clear it so I can look at the whole thing?

A. I got it.

Q. You got it.

What's this?

A. This is another supplementary report the night of the investigation by Robertson and Kobel and it's referencing an interview with a subject I know.

Q. Rodell Banks?

A. Rodell Banks, yes.

Q. Are you listed -- what's the date of it? I'm sorry?

A. Eighth of April, 1985.

Q. Okay. Hold on a second. Are you listed as one of the detectives on that report?

A. Not on this page, no.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 25 of 140 PageID #:18552
Case: 1:13-cv-01168 Document #: 185-14 Filed: 02/24/17 Page 25 of 140 PageID #:30426

Q.  On any of the pages?

A.  I doubt it.

Q.  Well, let's turn.  Turn to the next page, please.  That's the second page.  Look at the bottom?

A.  No, this is Robertson and Kobel.

Q.  Okay.  So that's April.  Were you involved in any of the activity that's reflected in the report?

A.  No.

Q.  Okay.  Let's go to -- by the way, in this report, can you go down to page 2?  Can you go down to the third paragraph, this is an interview with Rodell Banks.  And if you can highlight according to banks where it says both Sumner and Hawkins.  Can you highlight all that, please, all the way down to the bottom, all the way across.

It says both Sumner and banks, both Sumner and Hawkins according to banks are no longer El Rukns because of their smoking cocaine, both are considered outsiders, Sumner was separated from the gang for eight months and Hawkins has been separated from the gang for about six months.  Do you see that?

A.  I do.

Q.  Now, you didn't participate in this interview, right?

A.  I did not.

Q.  Okay.  If that's accurate, then by the time -- tell me if I've got this right, by 1986 when Mr. Hawkins was going to

trial in front of Judge Maloney, he wouldn't -- according to banks anyway, he wouldn't have been in the El Rukns? That's what this seems to imply?

A. Yes, or suspended. Yes.

Q. Do you know whether in 1986, June and August, Nathson Fields was still in the El Rukns?

A. Yes.

Q. Now, let's going to Plaintiff's Exhibit 78. Do you see this? Go down to the bottom too as well, please.

What's 78?

A. What is it?

Q. Yeah, what is it?

A. Chicago --

Q. Hold it. Uncover it, please.

A. This is a lineup supplementary prepared reference a lineup that occurred on 25 April 1985 and was conducted by detective Robertson.

Q. Okay. Is your name on the -- as one of the detectives?

A. I was never ever involved in this lineup, did not know about it until --

Q. All right. Just answer the question.

A. The answer is, no, I don't believe my name is on this report anywhere.

Q. And were you involved in any of the activity reflected on it?

A.  I was not, definitely not.

Q.  Okay.  What's the date?

A.  25 April 1985.

Q.  Okay.  Let's go now to Plaintiff's Exhibit 109.  Can I see the whole thing first?  The whole thing.

Do you recognize this now anyway while it's sitting in front of you?

A.  Yes.

Q.  What is this?

A.  This is another supplementary report that's recording in custody of Robert Lee Jackson and council Glenn and that date is 27 April '85.

Q.  Okay.

A.  Okay.

Q.  Is your name listed -- are you one of the detectives listed as being involved in any activity reflected in this report?

A.  No, I am not involved.

Q.  Were you involved in any of the activity?

A.  At this point, no.

Q.  Okay.  Now, in this report, if you look at page 4 -- page 3, I'm sorry.  Go to page 3, please.  If we go to the paragraph right after investigation, yeah, just do the paragraph after investigation.

Does the report indicate that the state's attorney

was called to speak with Vaughn, the Vaughn children?

A. Yes, it says ASA Luchsinger responded to area one.

Q. For the court reporter, I'm going to spell it. L-u-c-h-s-i-n-g-e-r.

And if you look on page 4, if you go to the third paragraph, actually, if you go to the top three paragraphs, let's blow the whole three paragraphs up.

To confirm, you're not at the area at this time, you are not involved in this, your name is not on the report do I have it right?

MR. LOEVY: Objection, asked and answered.

THE COURT: Sustained.

BY MR. KULWIN:

Q. Now, does this indicate that ASA Luchsinger is talking to Ms. Sheree Vaughn about why she now states that Pumpkin, Robert Jackson is one of the offenders and they responded that she was afraid for her safety and that of her brothers so she did not want to identify him.

And then it goes on, Luchsinger asked why she was able to make that identification now and she related she wants the offenders punished for what they did to her mother and Joe.

Go down if you can at the bottom, we talked about ASA Luchsinger, right here, ASA Luchsinger asked Michael why he did not identify Squeaky in the lineup of the murders. He

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 29 of 140 PageID #:13556
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 29 of 140 PageID #:30450

said he thought he identified Squeaky as well as Pumpkin. ASA Luchsinger reviewed the case, ASA Luchsinger at this time approved an arrest warrant for the charge of murder on both Jackson and Glenn. If you go down to the next page, please in the paragraph on the bottom, does it indicate that ASA Luchsinger then confers with other assistant state's attorney about the case concerning Jackson and Glenn?

A. Let me just read.

Q. It has to do with the comparison of the palm prints. It says Durnbach?

A. Dennis Durnbach.

Q. Luchsinger confers with his supervisor Durnbach. Is it fair to say that the state's attorney as you no he are reviewing all the evidence to present to the detectives in deciding whether there's sufficient evidence to bring charges?

MR. LOEVY: Objection, leading, your Honor.

THE COURT: Sustained.

BY MR. KULWIN:

Q. Now, this report, 109, indicates that a number of steps, I am not going to go through all of them to save time, but a number of investigative steps continued on after April 27th or during April 27th, but certainly between March 31st and 27th regarding the investigation of the Vaughn/White murders which took place on March 28th, 1985. Were you involved in any of the stuff that's reflected in these reports? Were you the

11/23/16 AM

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 30 of 140 PageID #:18557
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 30 of 140 PageID #:30451

***REALTIME UNEDITED TRANSCRIPT ONLY***

29

detective involved at all?

A.  No, I was not.

        MR. LOEVY:  Asked and answered, your Honor.

        THE COURT:  Overruled.

BY MR. KULWIN:

Q.  What was the answer?  I'm sorry?

        THE COURT:  He said no.

        MR. KULWIN:  Thank you, Judge.

BY MR. KULWIN:

Q.  Now, to be clear, when did the Smith/Hickman murders take place?

A.  April 28th, 1984.

Q.  Okay.  So Smith/Hickman is 4/28/84, right?

A.  4/28/84, yeah.

Q.  And Vaughn/White 3/28/85.

        Okay.  Now, when was -- was Nathson Fields in custody, in the Chicago Police Department's custody in March of 1985?

A.  No, sir.

Q.  Was he a suspect in the Vaughn/White murders in March of 1985?

A.  No, sir.

Q.  Did you ever conduct a lineup of any kind with Nathson Fields relating to the Vaughn/White case?

A.  Never.

Q. Are you aware of any report anywhere that indicates that any such lineup with Nathson Fields relating to the Vaughn/White case exists?

A. None exists because none occurred.

Q. Now, Dave, have you heard Mr. Fields in prior hearings in this case, however, testify that there was such a lineup?

A. Yes, I have.

Q. Did Mr. Fields indicate that that lineup took place on the day he was arrested?

MR. LOEVY: Objection, your Honor.

THE COURT: I need to see the lawyers at sidebar, please.

MR. KULWIN: Sure.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: I am trying to recall. Did this come up during Mr. Fields' examination?

MR. LOEVY: No.

THE COURT: You have a 608(b) problem. What's the purpose you are offering this for, Fields made a false statement at an earlier point in time?

MR. KULWIN: Different story.

THE COURT: You have a problem, 608(b).

MR. KULWIN: Thank you, your Honor.

(The following proceedings were had in open court in the

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 32 of 140 PageID #:19559
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 32 of 140 PageID #:30433
11/23/16 AM

31

presence and hearing of the jury:)

THE COURT:  Okay.  Rule 608(b), the objection is sustained.  The jury is directed to disregard the testimony about the prior testimony by Mr. Fields.

You can proceed.

BY MR. KULWIN:

Q.  Let's go to Plaintiff's Exhibit 72, August 31st, 1985.

A.  Okay.

Q.  Got it?

A.  Front page, yes.

Q.  All right.  Can you go through slowly each page.  You know what, I am going to give it to you so you can look at it.  A little faster.  Stay on page 1, if you could.  I am going to give you my copy.  Actually, do you have another copy?

BY MR. KULWIN:

Q.  I am handing you what's been marked as Plaintiff's Exhibit 72, it's a supplemental report dated August 31st, 1985.  What case does this relate to?

A.  This is Robertson's supp on well, Joseph white but it's also Ms. /AO*ER Vaughn.

Q.  Were you involved in any way in the Vaughn/White investigation on August 31st, 1985?

A.  No, this is a compilation of --

Q.  Hold on a second.  I am going to ask you a question.

Were you involved?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 33 of 140 PageID #:13560
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 33 of 140 PageID #:30434

32

A. No, this was their case.

Q. Okay. Hang on.

A. The answer is no.

Q. Okay. Good.

All right. What is the purpose of this report based on your experience as a detective?

A. This would be a report that indicates over a period of time that Earl Hawkins and Nathson Fields were actually taken into custody.

Q. Okay. Now, if you go to the last page, on the bottom, please, I want to go through some things.

On the left, it has names of Sergeant Murphy, you, detective Kobel, detective Robertson. On the right, what are the G S stand for?

A. Gang specialist Richardson, gang specialist I'm sorry gang specialist castle and blacked out would be Tommy Richardson, gang specialist Dan Brannigan and gang specialist Richard /KOL /SREUTS, R. Coluzzi.

Q. Was it part of the pattern -- was it part of the practice of the area one detectives whenever they did a summary report clearing an investigation after the suspects were arrested to list on the reports every detective who even had any minimal contribution to the case?

MR. LOEVY: Objection, leading, your Honor.

THE COURT: Overruled. It is leading. Don't do

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 34 of 140 PageID #:18561
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 34 of 140 PageID #:30435
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

33

that.  You can answer this question, though.

THE WITNESS:  It was the practice of most of us to give credit to everybody.

BY MR. KULWIN:

Q.  Your name is on the report.  Can you go to the front page, please.

MR. LOEVY:  Asked and answered, your Honor.

THE COURT:  Overruled.

BY MR. KULWIN:

Q.  Is that your signature at the bottom?

A.  No.

Q.  Okay.  Now, you were asked a number of questions about a meeting that you had with Jack Hines on June 14th, 1985, after Mr. Fields had been arrested and identified in a lineup and had given you an interview.  Do you remember those questions?

A.  Yes.

Q.  After -- and you also testified that Mr. Fields met with you and then Mr. Hines.

After the interviews with Mr. Fields, did you and detective Robertson meet with Jack Hines in his felony review capacity?

A.  Yes.

Q.  Okay.  What case were you -- and were you both -- what were you presenting to Mr. Hines at that time?

A.  I was presenting the Hickman Smith double and Jon would

have given him a brief synopsis of the Vaughn/White case which was already a long time.

Q. What was the purpose of presenting that information to assistant state's attorney Jack Hines?

A. The Cook County state's attorney's office is the only one who has authority to approve murder charges, so that would be the purpose.

Q. Now, you were asked a number of questions about whether or not -- whether you briefed the state's attorney about Anthony Sumner's possible involvement in the Vaughn/White case. Do you remember those questions that Mr. Loevy asked you in this case? Do you remember being asked those questions?

A. I am not sure, but probably.

Q. Okay. Let me ask you this question. At the time that you were meeting with Jack Hines on June 14th, 1985, based on all of your reviews of the Vaughn/White reports, to the best of your knowledge, was the Cook County state's attorney, based on your knowledge aware of the implication of Anthony Sumner in the Vaughn/White case?

MR. LOEVY: Objection. Leading, your Honor, and asked and answered.

THE COURT: Sustained. Well, not as to leading, but foundation.

BY MR. KULWIN:

Q. Okay. Did you have knowledge by June 14th, 1985, this is

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 36 of 140 PageID #:19563
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 36 of 140 PageID #:30437
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

35

a yes or no answer?

A.  Okay.

Q.  Yes or no, did you have knowledge by June 14th, 1985, where the Cook County state's attorney's office knew that Anthony Sumner had been at least implicated possibly in the Vaughn/White case?

A.  Yes.

Q.  What was the basis for your knowledge, the basis, don't tell me your knowledge, the basis for it?

A.  Okay.  There was a report.

Q.  Okay.

THE COURT:  You can ask the question.

MR. KULWIN:  Thank you, Judge.

BY MR. KULWIN:

Q.  Based on that, were you aware whether Jack Hines and the Cook County state's attorney's office were already aware that Anthony Sumner had been implicated as a potential suspect in the Vaughn/White case on June 14th, 1985?

A.  Yes.

Q.  Okay.  What were you aware of?

A.  I was aware that Jack had went through all the reports and that Anthony Sumner, one of those reports we just went over listed Anthony Sumner as wanted for questioning.  The Rodell Banks report I think it was.

Q.  All right.  Now, you were asked a number of questions

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 37 of 140 PageID #:18564
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 37 of 140 PageID #:30438
11/23/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

36

about how anybody could continue -- could think that Mr. Fields could have possibly been one of the offenders in the Vaughn/White case given the testimony of the children that they had only seen two people committing the crime.  Do you remember that, those questions?

A.  I do.  I do.

Q.  First of all, do you remember the testimony of how the children saw the murder without getting into too much detail?

A.  Yes.

Q.  Okay.  Can you tell us what that was, what that testimony was?

A.  The little ones were hiding behind a door and cracked it open and get a view like this.

Q.  Like four to six inches, I think?

A.  I believe that's the testimony.

Q.  Was there any testimony at all that it was impossible that a third person could have been somewhere else in the room or outside or assisting?

        MR. LOEVY:  Objection, your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  No.

BY MR. KULWIN:

Q.  Are you familiar with the concept called felony murder?

A.  Yes.

Q.  What's felony murder?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 38 of 140 PageID #:18565
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 38 of 140 PageID #:30435
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

37

MR. LOEVY:  Objection to relevance, your Honor.

THE COURT:  Sustained.

BY MR. KULWIN:

Q.  In June 1985, were you aware that Anthony Sumner had given inaccurate information to the authorities about Mr. Fields' involvement in the Vaughn/White case?

A.  In 1985?

Q.  Yes.

A.  Definitely not.

Q.  When was the first time that that information came out, years, short?

A.  In 1991 I believe that's the first -- that Sumner's gave it up, yes.

Q.  Okay.  And prior to that, when was the earliest time or later time that it came up?

A.  Okay.

Q.  If you know?

A.  Yeah, Earl Hawkins was the first.

Q.  When? When? Not who. When, approximately?

A.  1990, 91, right in that pocket.

Q.  All right.  Thank you.

You were asked a number of questions about Michael Arbuckle.  Do you remember those questions?

A.  I do.

Q.  I believe the question was did the confidential informant

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 39 of 140 PageID #:18566
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 39 of 140 PageID #:30740
***REALTIME UNEDITED TRANSCRIPT ONLY***

38

Q. quote-unquote blow up the theory that Nathson Fields could be involved in the Vaughn/White murders in August 1985? Do you remember those questions?

A. I remember them.

Q. And you were shown a report indicating that a CI had made some statements. Can we look at Plaintiff's Exhibit 72 at page 4, please. Page 4, please. This part here, confidential informant?

BY MR. KULWIN:

Q. It talks about a confidential cooperating informant who was interviewed and it goes on in Milwaukee, Wisconsin. Do you remember being asked questions about that?

A. I do.

Q. Now, if you go down to the bottom of that page, right there, felony review, blow that up, please, does it indicate whether the Cook County state's attorney felony review unit had been advised of that very information about the confidential informant and still approved charges against Nathson Fields for those murders?

A. Yes.

Q. And the confidential informant's information, if you know, confirms what Sumner had told the Cook County state's attorney's office, that he had been involved in those murders, correct?

A. This report indicates -- you're asking me.

11/23/16 AM

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 40 of 140 PageID #:18567
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 40 of 140 PageID #:30341

***REALTIME UNEDITED TRANSCRIPT ONLY***

39

Q.  I'm asking you if the report confirms information -- I'll withdraw it?

A.  Do you understand what I'm saying?

Q.  I do understand.  I'm withdraw the question.

Now, you were asked some questions about whether it wouldn't have been important or right or fair to protect the criminal defendants' rights, in this case, Mr. Fields, to provide the identity of the confidential informant.  Do you remember those questions?

A.  Yes.

Q.  Sir, to your knowledge, are the police required to turn over the identities of confidential informants?

A.  They are not.

Q.  Why not?

A.  Well, confidential informants are kind of in a protected status.  That's it.  He's confidential, so there is a system for people to get the identification of that informant.

Q.  Put another way, they're confidential?

MR. LOEVY:  Objection.  Leading, your Honor.

THE COURT:  Sustained.

THE COURT:  There is no way it was --

MR. KULWIN:  Thanks, Judge.  You are ahead of me.

BY MR. KULWIN:

Q.  Let me ask you this question.  Is there a way for a criminal defendant, if you know, based on your experience, for

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 41 of 140 PageID #:18568
Case: 1:16-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 41 of 140 PageID #:30742

11/23/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

40

a criminal defendant to obtain the identity of a confidential informant if they think it's important to their defense?

A. Yes.

Q. How do you know? Do you know? So how do you know? Is it based on your experience?

A. Yes.

Q. What's the way a criminal defendant can get the identity of a confidential informant if they think it's important to their defense?

A. The basics are they go to a judge and they asked for an in camera hearing and then the judge would decide whether or not he's going to release the identity of a confidential informant and order such a thing.

Q. Now, is there -- based on your review of the -- well, you were asked a whole bunch of questions about whether there were any CPD, CPD, are there any Chicago Police Department reports reflecting the fact that Michael Arbuckle was this confidential informant and was cooperating with the police? Do you remember those questions?

A. I do.

Q. Okay. First, yes or no?

A. Okay.

Q. Yes or no, do you know whether there are such reports?

A. Do I know? I'm making a supposition. No, I do not know if there's something identifying Michael Arbuckle separate

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 42 of 140 PageID #:18560
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 42 of 140 PageID #:30443

then this inference here.

Q. Are you aware --

MR. KULWIN: Judge, I am going to lead on this one.

THE COURT: Okay.

BY MR. KULWIN:

Q. Do you know whether Michael Arbuckle was being used as a confidential informant in other investigations relating to El Rukn gang task force?

A. That I do know.

Q. And do you know whether other reports relating --

MR. LOEVY: Objection to relevance, your Honor.

THE COURT: Can I see you at sidebar? I need to refresh my memory on something.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: Okay. Again, I confess my memory is not perfect. I believe I excluded this during.

MR. KULWIN: I couldn't remember.

THE COURT: At some earlier point.

MR. LOEVY: You made the point you needed to make.

THE COURT: I am going to sustain the objection.

MR. KULWIN: Okay, Judge.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: Hang on one second. I just need to look

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 43 of 140 PageID #:18570
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 43 of 140 PageID #:36744

back here. So the questions and answers about other investigations are excluded. The jury is directed to disregard them.

BY MR. KULWIN:

Q. Now, Dave, there were some questions about cases or things involving street files. Do you remember those questions that you were asked?

A. Yes.

Q. Okay. With respect to in any files of other cases that have nothing to do with Mr. Fields, were you involved in the maintenance or disposition of any of those files? Is that part of your job?

A. No, that's a records keeping, people in the office. That's not me.

Q. Were you involved in providing information to the Cook County state's attorney's office or criminal defendants and all those other cases, hundreds of cases, were you involved in any of that?

A. No, that's an administrative duties, not mine.

Q. Okay. Showing you Plaintiff's Exhibit 1, this is Plaintiff's Exhibit 1 which I believe they referred to as the street file. I am going to hand it over to you.

As part of the proceedings in this case, in this case, you've seen this file before?

A. I saw this file when Mr. Noland presented it to me back in

2010 or 11.

Q. Okay. Was that the first time you saw the file?

A. It was. I never knew of its existence before.

Q. Okay. Can I have it back, please.

Could I have that too?

A. You sure can.

Q. Thanks.

Did you take any action whatsoever to prevent the disclosure of any information that's in that file from getting disclosed to Mr. Fields during his criminal prosecution in 1986 or thereafter?

A. No.

Q. Who was responsible for producing any and all information generated by detectives in a police investigation to the Cook County state's attorney's office? Who was responsible?

MR. LOEVY: Asked and answered, your Honor, several times.

THE COURT: Sustained.

BY MR. KULWIN:

Q. You were asked some questions, I believe, about a lawsuit that was filed by I believe Mr. Fields relating to that file, I believe in the 1990s sometime. Do you remember those questions?

A. I believe it was 1989, yes.

Q. Okay. Were you served with that lawsuit?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 45 of 140 PageID #:13572
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 45 of 140 PageID #:36746

A. I was.

Q. What did you do when you were served with the lawsuit? What did you do go ahead. What did you do?

A. What did I do?

Q. What did you do?

A. I'm required to submit a response that I received such a subpoena.

Q. I'm sorry?

A. I'm required to submit to the department that I've been handed notice of that lawsuit.

Q. Okay. So whenever a policeman is sued or gets an official notification of legal notice, they are not allowed to handle it on their own?

MR. LOEVY: Objection, your Honor.

THE COURT: Overruled.

BY MR. KULWIN:

Q. Is that right?

A. It would be totally improper, you are right.

Q. And did you -- and so I'm sorry, you answered that question.

Okay. Are you allowed to investigate the allegations of it on your own?

A. No.

Q. Who does?

A. We have internal affairs or the office of professional

standards, they investigate the police.  I can't investigate myself.

Q.  Okay.  Just a few more, Dave.

A.  Okay.

Q.  Dave, there have been allegations in this case against you that you took actions in 1985 solely to make a case against Nathson Fields when you should have known he was innocent. Did you do that?

A.  No, I did not.

Q.  There were allegations that you recommended to the Cook County state's attorney's office that Nathson Fields be prosecuted for a murder you knew he couldn't commit based on the evidence.  Did you do that?

A.  The opposite.  I recommended charges of what I believe he committed.

Q.  There were all sorts of allegations that you purposely suggested to witnesses who they should identify in lineups and in photo arrays.  Did you ever do that?

A.  No, sir.

Q.  Did you coerce any witness in this case?

A.  It's not my style, no.

        MR. LOEVY:  Objection.  Opens the door, your Honor.

        THE COURT:  The answer is stricken.  The question was did you coerce any witnesses in this case.

        MR. KULWIN:  I apologize, Judge.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT:  You can answer the question.

THE WITNESS:  My answer is no and I understand.

BY MR. KULWIN:

Q.  Without getting into details, between 1986 and 2009, did you learn other information -- let me -- you were asked if you had any remorse about anything you did in this investigation. Between 1986 and 2009, did you learn additional information that?

MR. LOEVY:  Objection, your Honor.  That's been covered either yesterday or the day before.

THE COURT:  Let me hear the question.

BY MR. KULWIN:

Q.  Did you learn any additional information between 1986 and 2009 that kept you from having any remorse about the steps you took to recommend prosecution of Nathson Fields?

MR. LOEVY:  Objection, your Honor, that subject was covered.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Yes.

BY MR. KULWIN:

Q.  What?

MR. LOEVY:  Objection, your Honor.  Asked and answered.

MR. KULWIN:  Yeah, I don't think he understood the question.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 48 of 140 PageID #:13575
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 48 of 140 PageID #:30749

THE COURT: Well, it was an extremely convoluted question.

MR. LOEVY:

MR. KULWIN: It was a rotten question. Let me ask it. I am going to ask it in a different way.

BY MR. KULWIN:

Q. It's a yes or no. You were asked some questions whether you had any remorse about the steps you took in 1986 based on your investigation, based on what you knew in June 1985 about recommending to the Cook County state's attorney's office that charges be brought against Nathson Fields. Do you remember being asked that question?

A. I do.

Q. Did you learn information, without getting into the details between 1986 and 2009 that gave you confidence that you had done the right thing in 1986?

A. Yes.

Q. Did you ever pursue any charges of any kind against Nathson Fields solely out of malice or ill will towards Nathson Fields?

A. I did not.

Q. You were asked a number of questions about whether you were aware that Nathson Fields had repeatedly denied his involvement in these murders. Do you remember those questions?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 49 of 140 PageID #:13576

Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 49 of 140 PageID #:30450

A.  I do.

Q.  Did Earl Hawkins repeatedly deny his involvement in these murders for several years before he finally confessed?

MR. LOEVY:  Objection, your Honor.  He was a criminal defendant.  He wasn't saying anything.

MR. KULWIN:  He asked, Judge.

MR. LOEVY:  He wasn't making statements.

THE COURT:  Hang on.  The objection is sustained.

BY MR. KULWIN:

Q.  Is it common in your experience?

MR. LOEVY:  Objection, your Honor.  He opened the door.

THE COURT:  Let me hear the question.

BY MR. KULWIN:

Q.  Is it common in your experience, detective, that many individuals deny their involvement in a crime?  Is that self-evident?

THE COURT:  That's kind of a truism.

MR. KULWIN:  Is that self-evident?

THE WITNESS:  I may answer?  Yes.

BY MR. KULWIN:

Q.  Does that give you any information one way or the other about whether they're guilty or not?

THE COURT:  The fact that somebody denied something.

BY MR. KULWIN:

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 50 of 140 PageID #:18577
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 50 of 140 PageID #:36451
11/23/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***
                                                                          49

Q. They denied it and they still deny it, they must be not guilty. Does that give you any indication at all as a detective in the Chicago Police Department?

A. It does not.

MR. KULWIN: If I may have a moment, your Honor.

THE COURT: Yes.

MR. KULWIN: Your Honor, at this time, I have no further questions.

THE COURT: Mr. Noland, Mr. Burns, any questions?

MR. NOLAND: No questions, your Honor.

THE COURT: Mr. Loevy.

- - -

DAVID O'CALLAGHAN, REDIRECT EXAMINATION

BY MR. LOEVY:

Q. Sometimes people deny being involved in crimes and that's why detectives investigate, correct?

A. It's one of the reasons, yes.

Q. All right. And you're saying when you got the assignment and the tip from Murphy about who they thought did it, you are saying with a hundred percent certainty that you did not go back and pull the investigative file from the sergeant's office, yes or no?

A. Okay. The file that.

Q. Yes or no?

A. Yes, yes, that file you are holding up.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. I thought you just said that you never -- when Mr. Kulwin was asking you, not two minutes ago, that you knew never of this file's existence, did I misunderstood you?

MR. KULWIN: Objection as to which file.

THE COURT: We are talking about Exhibit 1?

MR. LOEVY: We are talking about Exhibit 1. This is the original. He held up .copies, the street files.

THE WITNESS: The notes.

BY MR. KULWIN:

Q. The file?

A. That he gave me, absolutely, I did not know of them until Mr. Noland brought them to my attention.

Q. All right. Then you can say with a hundred percent certainty that when Sergeant Murphy told you to reopen the investigation, you did not go to the sergeant's office and read about the Edwards brothers, the Baldwin brothers and all the leads, right?

MR. KULWIN: I am going to object, Judge, because those leads are in the police reports.

MR. LOEVY: Objection, your Honor.

THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. Tell the jury yes or no when you got the assignment to investigate this murder whether you pulled open the sergeant's file cabinet and read what all the detectives had done before

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 52 of 140 PageID #:13579
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 52 of 140 PageID #:30453

you got involved?

MR. KULWIN: Objection, asked and answered, and assumes a fact not in evidence.

THE COURT: Overruled.

MR. KULWIN: Something's file.

THE COURT: Overruled. You can answer.

THE WITNESS: Okay.

THE COURT: I think if I might, is the question that after he was asked to reopen the investigation, did he go look at that file?

MR. LOEVY: Yes, that's the question.

THE COURT: Then that's the simple way of asking it. That's the question.

THE WITNESS: No, I didn't have that file.

BY MR. LOEVY:

Q. If your task was to conduct a legitimate investigation, what sense did it make not to -- well, let me back up.

You were not involved in the original investigation, right?

THE COURT: Of?

BY MR. LOEVY:

Q. Of Smith/Hickman, you had nothing to do with Smith/Hickman, right?

A. No -- you're correct. No, I did not.

Q. So when Sergeant Murphy gave you the assignment, he didn't

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 53 of 140 PageID #:13580
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 53 of 140 PageID #:30454

know anything about it, right?

A. Correct.

Q. All right. And then what sense does it make if you're actually legitimately investigating not to go into the sergeant's office and pull all of the notes and read about the crime?

A. So you're asking me -- here, I had enough files and notes and reports to investigate that crime.

Q. You had your four suspects and that was enough, wasn't it?

MR. KULWIN: Objection, argumentative, Judge.

THE COURT: Sustained.

MR. KULWIN: And asked and answered.

BY MR. LOEVY:

Q. All right. You said when the complaint came up years later that you had -- you were -- that information was withheld. You did understand the complaint was that the Chicago Police Department was withholding a street file, correct?

MR. KULWIN: Judge, I am going to object. It was asked and answered. Beyond the cross.

MR. LOEVY: Your Honor.

THE COURT: Hang on a second. I'll allow this as a preliminary to the follow-up question.

BY MR. LOEVY:

Q. You did understand that the allegation Mr. Fields was

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 54 of 140 PageID #:19581
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 54 of 140 PageID #:30455

making was that he had only gotten eight pages of notes and he wanted the rest of the file, right?

A. I understand he made a complaint that I withheld exculpatory information, yes.

Q. Did you understand what I just said back when you were accused in the early '80s?

A. Say it again and I'll probably agree with you.

Q. Did you understand that the nature of Mr. Fields' complaint was I only got eight benign pages of notes and there's got to be more, there's got to be a street file, did you have that subjective understanding when you were sued?

MR. KULWIN: Judge, I'll object. Lack of foundation. He looked through the entire lawsuit and that's what the lawsuit says.

MR. LOEVY: That's why I asked the question.

THE COURT: The objection is overruled. You said early '80s, I think late 80 he is.

BY MR. LOEVY:

Q. Do you understand the question?

A. Can I answer what my understanding was, yes.

Q. How about my question, yes or no, did you understand that what Mr. Fields was saying in his lawsuit was I've read about street files, I didn't get the street file, I want the street file. Did you have that understanding, yes or no?

A. My understanding is yes and no.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 55 of 140 PageID #:19582
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 55 of 140 PageID #:30456

Q. All right. And you're saying the rules of the Chicago Police Department, as you understood them, prohibited you from doing any investigation into whether or not a street file had been withheld?

A. Prohibited me from investigating myself, when that complaint came in, I'm out.

Q. Well, you did sign a piece of paper, you typed up a memo saying I'm not aware of any exculpatory information being withheld and you signed your name to it, right?

MR. KULWIN: Judge, I am going to object, argumentative and misleading.

MR. LOEVY: No.

THE COURT: It was covered in direct. I am sustaining the objection.

BY MR. LOEVY:

Q. All right. When you said you weren't allowed to do an investigation because you were out, you nonetheless independently had to write a memo describing your activities, right, that was your role of it?

THE COURT: In other words, when you got the lawsuit.

BY MR. LOEVY:

Q. Yeah, you weren't the investigator, but you did have a role, right, in the lawsuit?

A. I had a role as far as accepting the lawsuit and making a short denial that I withheld any exculpatory information .

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 56 of 140 PageID #:18583
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 56 of 140 PageID #:30457

After that.

Q. Are you saying the rules prohibited you from investigating before you signed that denial?

A. Oh, yes. Once I got that lawsuit.

Q. Okay. How did you --

A. The answer is yes.

Q. Then how did you?

A. With exclamation, yes.

Q. How did you sign your name to a denial that information had been withheld if you didn't do the investigation and you didn't know?

A. I don't know how many ways to go around this. Look, there's procedures. If I was to do what you're suggesting, I would have been suspended big time for interfering in an internal investigation that's basically naming me as part of that investigation.

Q. All right.

A. Is that clear enough?

Q. Let's talk about the Vaughn/White investigation that came up this morning.

A. All right.

Q. If I understand what you told Mr. Kulwin, before Sumner's confession came in, the detectives that worked on the case got the wrong two guys, right?

          MR. KULWIN: Objection, Judge. Right as his

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 57 of 140 PageID #:13584
Case: 1:23-cv-01168 Document #: 185-34 Filed: 02/24/17 Page 57 of 140 PageID #:30458
***REALTIME UNEDITED TRANSCRIPT ONLY***

56

confession came in and what time, foundation.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Before Sumner's confession came in, you and the other detectives got the wrong two guys, correct?

A. I partook -- I didn't get those guys. Here, if you're laying it on me, detective brought them in, I partook in lineups.

Q. You collectively, the detectives had the wrong two guys, right?

MR. KULWIN: Judge, I am going to object to collective.

THE COURT: Rephrase.

BY MR. LOEVY:

Q. You personally participated in a lineup where at least one of the wrong men was identified, that is true, yes or no, sir?

MR. KULWIN: Argumentative and misleading.

THE COURT: Overruled.

THE WITNESS: Yes, the wrong man was identified in that.

BY MR. LOEVY:

Q. And you were there, you were part of it, right?

A. The first lineup, yes.

Q. All right. Then I return to the question, before Anthony Sumner's tip came in, you and the other detectives

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 58 of 140 PageID #:13585
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 58 of 140 PageID #:30459
11/23/16 AM

collectively got the wrong two guys, can we agree on that?

MR. KULWIN: Object to the collectively, Judge, and the other detectives.

THE COURT: Overruled.

THE WITNESS: The wrong two guys were arrested and then released, yes.

BY MR. LOEVY:

Q. All right. That was my next question. After Sumner's tip came in, those two guys got let go, correct?

A. I don't know because I didn't -- I wasn't involved. I don't know how the decision was made, so I wasn't part of that.

Q. And then the detectives got the wrong going to again, correct?

A. Are we speaking on this?

Q. Yeah, in Vaughn/White, after you let the other two guys go, then you got Mr. Fields, the wrong guy?

MR. KULWIN: Objection.

BY MR. LOEVY:

Q. Correct?

MR. KULWIN: Asked and answered.

THE COURT: Sustained. It's argumentative. Save it for argument.

BY MR. LOEVY:

Q. Nate was innocent?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 59 of 140 PageID #:18586
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 59 of 140 PageID #:30460
11/23/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

58

MR. KULWIN: Objection, argumentative.

THE COURT: Same.

BY MR. LOEVY:

Q. This business about the door cracked four to six information. Do you remember those questions from Mr. Kulwin?

A. I do.

Q. Okay. There was never any question in the original investigation that the people had seen two and only two, correct?

MR. KULWIN: Objection, lack of foundation of his knowledge.

THE COURT: Overruled. The reports just like you covered on your examination.

BY MR. LOEVY:

Q. That's true, isn't it, sir?

A. The initial report they named two offenders.

Q. And every report thereafter named two offenders, correct?

A. I believe you're correct.

Q. Because the two kids said we saw two men tie up our parents, we saw one of them stab them, we saw one of them shooting them, always two men, right?

MR. KULWIN: Objection, argumentative, asked and answered.

THE COURT: It was covered sufficiently on direct.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 60 of 140 PageID #:13507
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 60 of 140 PageID #:30461
11/23/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

59

Q. All right. The state's attorney would not approve the charges based on the uncorroborated identifications you told Mr. Kulwin, correct?

A. Yes.

Q. Okay. Why are uncorroborated -- if the girl or the boy said that's the guy who he did it, why is that not enough, to your understanding? Is an eyewitness identification enough to make a murder charge?

MR. KULWIN: Objection as to how many, Judge.

THE COURT: Overruled.

THE WITNESS: I can answer it?

THE COURT: Yes.

THE WITNESS: Okay.

THE COURT: The question is is an eyewitness identification enough to make a murder charge?

THE WITNESS: In some instances, but that's not my decision again. They make the decision.

BY MR. LOEVY:

Q. In any event, the detectives, it wasn't you, but the other detectives on the investigation went back and got identifications from both kids?

MR. KULWIN: Objection as to relevancy since it wasn't him.

THE COURT: Overruled. It was all covered this morning.

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 61 of 140 PageID #:18588
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 61 of 140 PageID #:30462
***REALTIME UNEDITED TRANSCRIPT ONLY***

60

BY MR. LOEVY:

Q. They did. They went back and got better IDs after it got rejected?

A. They did.

Q. Now, you told Mr. Kulwin a little bit ago if I heard you correctly that before Sumner confessed that Mr. Fields was not involved, Hawkins confessed a year earlier, did you just say that to Mr. Kulwin?

A. I said I believe that Hawkins was the first to bring that up. As I sit here today, I believe Hawkins was number one, and then Sumner is number two.

Q. And you told Mr. Kulwin you believed it was 1990 that Hawkins was number one, right?

MR. NOLAND: Objection, mischaracterized the testimony.

THE COURT: Then he'll remember that it's wrong. He asked him if that's correct.

BY MR. LOEVY:

Q. That's what you told him 1990, right?

A. I believe my answer was somewhere 89, 90, and then I am guessing to the exact date. I don't know the exact date.

Q. Because the reason you're guessing on the exact date is because you never created a police report that sawed Hawkins admitted Fields was involved, did you?

MR. KULWIN: Judge, asked and answered, I ask to be

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 62 of 140 PageID #:13589
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 62 of 140 PageID #:30463
***REALTIME UNEDITED TRANSCRIPT ONLY***

61

heard.

THE COURT: The objection is sustained. It was covered on direct examination.

BY MR. LOEVY:

Q. But under what circumstances did Earl Hawkins tell you in either 89 or 90 that Nate was not involved in Vaughn/White a year before Sumner disclosed it?

MR. KULWIN: Judge, I am going to object.

THE COURT: The objection is sustained. It assumes facts not in evidence.

BY MR. LOEVY:

Q. Did Hawkins tell you in '89, 90, that Fields was innocent?

THE COURT: May I see the lawyers at sidebar, please?

(The following proceedings were had at sidebar outside the hearing of the jury:)

MR. LOEVY: Your Honor, this is new. This is brand new. This is the first I have ever heard.

THE COURT: I haven't talked to you yet. Can you articulate your objection?

MR. KULWIN: My objection is that O'Callaghan.

THE COURT: Talk louder.

MR. KULWIN: I think he is concerned that this involved the OCDETF thing and when that investigation came out.

THE COURT: Bull in the China shop, Mr. Loevy.

You're yanking the door, you're pulling it off the hinges, you're throwing it down the stairs, you're putting lighter fluid on it, you're then lighting the lighter fluid, then you're crushing the ashes and saying the door is gone. I understand that it may be something different. You do not want to open this door. I am sustaining the objection.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: You can proceed.

BY MR. LOEVY:

Q. After Hawkins admitted that Fields was involved, Sumner admitted the same thing in 1991 you're saying?

A. I believe around those dates, sometime around those dates.

Q. And that's when you learned that Sumner had a grudge against Nate Fields because he was his landlord and he had kicked him out, right?

MR. KULWIN: Objection, asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. When you learned that Sumner had a grudge against Mr. Fields, did you consider that vis-à-vis the semiautomatic where Sumner was also the source?

A. Then, no.

Q. Let's talk about Randy Langston.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 64 of 140 PageID #:19591
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 64 of 140 PageID #:30465
11/23/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

63

MR. KULWIN: Judge -- I'll wait.

THE COURT: Wait for the question.

BY MR. LOEVY:

Q. Yesterday, Mr. Kulwin went through a report with you where Randy Langston observed one man. Do you remember those questions from Mr. Kulwin?

A. From both of you, I believe.

Q. In 1984, sir?

MR. LOEVY: May I have the ELMO, please, your Honor?

THE COURT: Yes. There you go. What's the exhibit?

MR. LOEVY: It is 8614.

BY MR. LOEVY:

Q. This is the original report from the day or so after the murder, right?

A. Why he.

Q. Randy Langston observed a man with a red mask, correct?

A. I see that.

Q. Okay. Now, here's my question. When you knocked on Randy's door a year later, did you know that Randy had only seen one shooter?

A. That report was in my hands, so, yes.

Q. All right. If Randy had told the detectives a year earlier that he had only seen one shooter, how was he able to identify two shooters?

A. This would require people say they didn't see any shooters

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 65 of 140 PageID #:13592
Case: 1:16-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 65 of 140 PageID #:30466

***REALTIME UNEDITED TRANSCRIPT ONLY***

and a year later they say I saw the whole thing.

Q.  That happened to you all the time, huh?

A.  That's what they would call it, cold case, yes, people who are reluctant come forward later.

Q.  Randy wasn't reluctant, was he, he gave his name, he gave his address, he said I saw a shooter, he cooperated in '84, he just only saw one shooter?

MR. KULWIN:  Objection, that was ten questions.

BY MR. LOEVY:

Q.  He wasn't answering, so I kept talking, my fault?

MR. KULWIN:  Objection.

THE COURT:  I object to everybody objecting to everybody else's objections objecting back and forth personally, but, you know.  So why don't we ask a question.

BY MR. LOEVY:

Q.  When Randy Langston told you that there wasn't one shooter, there was two shooters, did you conclude that he was lying in '84 or that he was mistaken in '84, which one?

MR. KULWIN:  Objection, Judge.  It's argumentative question.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I would have concluded that he was reluctant in '84, so I wouldn't call him a liar.  I mean, that's a harsh word.

BY MR. LOEVY:

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 66 of 140 PageID #:18593
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 66 of 140 PageID #:30467

Q. So he was only willing to cooperate with the police with one of the two shooters, I'll tell them about one but I won't tell them with the other?

MR. KULWIN: Objection.

THE COURT: The objection is sustained. It's argumentative.

BY MR. LOEVY:

Q. Did you consider when you're looking at probable cause and you're looking at the value of Randy Langston's identification, did you consider that maybe he didn't get that good a view if he only saw one shooter?

A. My opinion he got a great view from the shooters.

Q. Tell us how the conversation went between you and Randy where he went from one shooter to two shooters?

THE COURT: What conversation are we talking about?

BY MR. LOEVY:

A. The very first conversation where he's going from one shooter to two shooters, tell us what happened.

A. I have to go over the facts again.

Q. No, I'm saying you understood that was significant if an eyewitness transfers from one shooter to two shooters, that's a big deal in your investigation, correct?

A. It could be, yes.

Q. All right. And then you didn't memorialize any explanation for why he was changing from one shooter to two

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 67 of 140 PageID #:13594
Case: 1:15-cv-01168 Document #: 185-14 Filed: 02/24/17 Page 67 of 140 PageID #:30468

11/23/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

66

shooters, correct, in your report?

A.  Give a big explanation, you're correct.

Q.  You didn't give any explanation, did you?

A.  No.

Q.  So tell us what you remember -- by the way, do you remember the conversation?

A.  I remember some basics.

Q.  All right.  What was Randy's explanation for why he was changing from one shooter to two shooters from your memory, sir?

A.  I didn't ask for a big explanation.  He just told me he saw two guys, he indicated that he was going to be able to identify at least two subjects and I leave it at that.

Q.  You understood at Mr. Fields' at his criminal trial has to cross-examine Randy Langston?

A.  I assume so.

Q.  And to do that he needs you to memorialize the details, right?

A.  Look, every detail.

Q.  Every detail?

A.  Could not be memorialized.

Q.  Let's talk about the car.  Did Randy when you were talking to Randy, did he tell you that the car was located on the side of the building where he described it in court yesterday, the side front?

A.  I don't recall the specifics.  That side front, I don't recall that.

Q.  All right.  And the reason you don't recall is because it's been too gosh darn long, right?

MR. KULWIN:  Judge, I am going to object asked and answered.

BY MR. LOEVY:

Q.  And that's why you wrote police reports?

MR. KULWIN:  Objection.

THE COURT:  Sustained to the first question.

BY MR. LOEVY:

Q.  Let's take a look at what Randy told you back on May 20th, 1985.  This is plaintiff's 86, page 17.

A.  Okay.

Q.  He stated that the two then fled through the breezeway to the parking lot, did he not?

A.  Yes.

Q.  And the reason you wrote it down is because that's your job, right, to record details like that?

A.  That detail, yes, I recorded it.

Q.  The parking lot is behind the building, is it not?

A.  You are right.

Q.  And that is an illustration, is it not, why if you write down the details then someone on the stand can be cross-examined if they change their story, right?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 69 of 140 PageID #:18596
Case: 1:16-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 69 of 140 PageID #:30470
11/23/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

68

MR. KULWIN: Objection, asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Another reason why writing down details is important is that locks them in and they can't change later, right?

MR. KULWIN: Objection, asked and answered.

THE COURT: Sustained. Covered on direct.

BY MR. LOEVY:

Q. You talked to Mr. Kulwin about Carlos Willis, Cleveland Ball, Torrence White, all the various witnesses, do you remember that?

A. I spoke to him about the other three who viewed the lineup, yes.

Q. How many guys out there said that the people were wearing masks and how many said they weren't wearing masks, do you remember?

A. I would say those six for sure and maybe some more. Those six for sure otherwise I wouldn't bring them to the lineup.

Q. Randy said they were wearing a mask, right?

MR. KULWIN: Objection, misstates the evidence and there is no basis.

MR. LOEVY: Objection, your Honor.

THE COURT: So first of all, I don't need the second part of that. Let me see you at sidebar for a second. I want to elaborate.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 70 of 140 PageID #:18597
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 70 of 140 PageID #:30471

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: Look, redirect examination does not mean that you get to recover all of the points just so you get the last word on it. If there's anything that has been covered beyond sufficiently in this case it's Randy Langston with this witness. I am going to sustain the objection on that reason unless you have something really specific that you think came up new during cross. I mean, redirect isn't to repeat direct. It just isn't.

MR. LOEVY: Your Honor, I worked hard to make new points.

THE COURT: What's the new point?

MR. LOEVY: The point is about masks or not masks, I want to list the people that said masks, list the people that said not masks. Isn't it true a bunch of people said not masks. Your Honor, I will finish well before lunch.

THE COURT: First of all, again as I said to both sides, that if it doesn't take very long, it's admissible. What's your point, Mr. Kulwin.

MR. KULWIN: If he is going to do that, he has to put the report in front of him because he is misrepresenting that everybody said there were masks. He is relying on the testimony from the trial. He's not relying on what the reports say. And so he's purposely misleading the record in

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 71 of 140 PageID #:19598
Case: 1:18-cv-01168 Document #: 185-14 Filed: 02/24/17 Page 71 of 140 PageID #:3047

my view, it's a misleading argumentative question and he has gone over it time and time again. All I questioned was on what -- is there anything in the reports that say people are wearing masks, so he can cross-examine and say are the reports wrong, are they inaccurate.

THE COURT: Are you relying on the reports, are you relying on the trial testimony?

MR. LOEVY: He tells us he remembers every witness. If he is going to say I don't remember what the witnesses were wearing, that's even more relevant. He knows who was wearing and masks and who weren't and if he doesn't remember, that's even better because with Mr. Kulwin he is bang bang bang bang.

THE COURT: I am going to let you do it if you just get right to the point. Okay?

MR. LOEVY: Yeah.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: Okay. The objection is overruled. You can proceed.

BY MR. LOEVY:

Q. List the witnesses who said they were wearing masks, sir?

MR. KULWIN: Judge, at what point?

MR. LOEVY: At any point.

THE COURT: At any point.

THE WITNESS: List the witnesses who said they were

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 72 of 140 PageID #:18592
Case: 1:23-cv-01168 Document #: 185-34 Filed: 02/24/17 Page 72 of 140 PageID #:30473

wearing masks?

BY MR. LOEVY:

Q. Yes.

A. At any time?

Q. Yes.

A. I would have to go through each of my reports to see who had.

Q. You don't remember?

A. --

MR. KULWIN: Judge.

THE WITNESS: Should I answer or no, Judge?

THE COURT: Go ahead. Go ahead.

THE WITNESS: At any time, several of them said they were wearing masks and pulled them off. You know what --

BY MR. LOEVY:

Q. Which?

A. The question.

Q. The question is which, which men, which boys said he was wearing masks?

MR. KULWIN: At what point, Judge?

MR. LOEVY: At any point, your Honor?

THE COURT: Okay.

THE WITNESS: At any point, I would say they indicated at times the subjects had masks.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 73 of 140 PageID #:13600
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 73 of 140 PageID #:30471
11/23/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

72

Q.   Which witnesses said that, sir?

A.   I use the six for sure in my report.

Q.   Which six, names, names, please?

A.   Okay.   Names, Eric Langston, Randy Langston, Gerald Morris, Torrence White, Carlos Willis, and Eric Benson.   Here, I don't know verbatim that they said oh, they had masks.   What I remember is they said they saw faces,.   I don't know how to answer your question.   I apologize.   It's kind of a --

Q.   Your memory is not perfect, right?

        MR. KULWIN:   Judge, I am going to object. Argumentative.   Sustained.

        THE COURT:   Sustained.

        MR. KULWIN:   We will stipulate.

        THE COURT:   Please, don't do that.

        MR. KULWIN:   Okay.

        THE COURT:   The objection is sustained.

BY MR. LOEVY:

Q.   For example, when you talked about Inetta Watts with Mr. Kulwin yesterday it sounded like that happened, you know, in a very firm recent memory, didn't it?

A.   That's because it's still imbedded in my memory.

Q.   We will talk about that in a minute.

        Let's talk about Gerald Morris for a bit.   Actually, before we do, let's talk about James Langston.   He was one of the boys who said there was a mask, correct?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 74 of 140 PageID #:18601
11/23/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

73

A.  Correct.

Q.  And he was one of the Langstons who says the masks got lifted you, you discussed that with Mr. Kulwin, right?

A.  I don't know.  If you say it occurred, I'll agree with you.

Q.  I am just asking for your memory, sir?

THE COURT:  Let's just get to the question.  Let's not go over what was asked earlier this morning.

BY MR. LOEVY:

Q.  If Mr. Langston said he lifted up a mask, did your report indicate who he saw?

A.  My report?

Q.  Yes.

A.  No.

Q.  Okay.  Showing you Plaintiff's Exhibit 1104, this is a memo from the street file,James Langston was interviewed, he was playing baseball, and this is the guy who said he saw the brother of Rick's Baldwin, correct?

A.  Reading along where you're reading, paraphrasing.

Q.  If James Langston saw the man in the car without his mask on, why didn't you put in his report that he saw somebody who was not one of your four suspects?

MR. KULWIN:  Judge, I am going to object.  Lack of foundation.  He never talked to --

THE COURT:  Lay the foundation, please.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 75 of 140 PageID #:19602
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 75 of 140 PageID #:30476
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

74

BY MR. LOEVY:

Q.  James Langston was one.  Of the people in the report, this is Plaintiff's Exhibit 8614?

MR. KULWIN:  Judge, could we have a date of the year that interview took place.

THE COURT:  It's at the top of the page.  April 30th of '84.

THE WITNESS:  I got it.

BY MR. LOEVY:

Q.  Do you remember talking to Mr. Kulwin about James Langston either yesterday or the day before?

MR. KULWIN:  I object to that.  I asked him about the 84 investigation.  Mr. Loevy.

MR. LOEVY:  Objection, your Honor.

MR. KULWIN:  It's leading and argumentative.

THE COURT:  The objection is overruled.

THE WITNESS:  Okay.

BY MR. LOEVY:

Q.  You did talk about James Langston yesterday when you went over your investigation with Mr. Kulwin, right?

A.  Okay.

Q.  So isn't it true that James Langston claimed that the person in the car was someone other than your four guys?

A.  In this report, yes.

Q.  Okay.  Why didn't you include that in your police report?

11/23/16 AM

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 76 of 140 PageID #:13603
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 76 of 140 PageID #:30497

***REALTIME UNEDITED TRANSCRIPT ONLY***

75

MR. KULWIN: Objection, lack of foundation as to whether he ever talked to James Langston.

THE COURT: Overruled.

THE WITNESS: I will give you two key reasons. One, James Langston had to be discounted and covered by prior detectives and the second key reason is I'm starting an investigation with new, fresh evidence and I am not going to go back over and question other investigators, go over the whole case again. I knew what I had in my hands.

BY MR. LOEVY:

Q. All right. You said that you did this canvass, right, for your new investigation?

A. Yes.

Q. And you told us that sometime -- you were part of the special operations unit, right?

A. At that point, I was an area one detective division --

Q. Earlier, earlier in your career, you were a member of special operations or was it later?

A. No, special operations unit was when I was a patrolman back in 19 -- I'm sorry.

THE COURT: Back in the 19 what?

THE WITNESS: 70s.

BY MR. LOEVY:

Q. All right. Sir, you did tell Mr. Kulwin that because of the gang situation, sometimes people were are reluctant to

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 77 of 140 PageID #:18604
Case: 1:13-cv-01168 Document #: 185-34 Filed: 02/24/17 Page 77 of 140 PageID #:3047
11/23/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

76

Q.  talk to the police, right?

A.  Yes.

Q.  You said that one of the ways you would combat that is take the kids, put them on the hood of the car, handcuff them?

A.  I think Judge Kennelly told me not to go into that or stopped me.

THE COURT:  It was discussed.

MR. LOEVY:  I heard it.

THE WITNESS:  It was discussed, okay.

BY MR. LOEVY:

Q.  And is it your explanation that if you took the kids, handcuffed them, put them on the hood of the car that facilitated them giving you information?

MR. KULWIN:  Objection, Judge.  Argumentative, misstates his testimony.

MR. LOEVY:  That's exactly what it was.

THE COURT:  Overruled.  Overruled.  You can cover it on recross if you want to.

MR. KULWIN:  Okay.

THE WITNESS:  I can speak, Judge.

THE COURT:  The question is whether that would facilitate those people giving you the information.

THE WITNESS:  The context that I put that in -- if a guy came up to me whispered in my ear, I know who did it, I know who did it, then I would nod him down the street, I would

either do it myself or a patrol officer or somebody put him on the wall or over the car, cuff him up so that the rest of the neighborhood would think that that guy was being arrested rather than he was being an informant or a witness. That would be one such tactic, and others would be once I have an indication I have a witness.

BY MR. LOEVY:

Q. Let's stick with this one?

MR. KULWIN: Objection.

THE COURT: No, because it was a nonresponsive answer. Ask the question again.

BY MR. LOEVY:

Q. When would you do that, put guys on the hood or the wall and cuff them, would you get their permission to do that?

A. Yes.

Q. All right. Because without permission, obviously, you can't do that to witnesses, right, you can't cuff them and handcuff just to get information, right?

A. Yeah, that would be a normal procedure, no.

Q. You say you canvassed the whole building, correct?

A. I would say that we intended to canvass the whole building. Do we always get every single apartment, no, responses.

Q. All right.

A. There would be no responses.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 79 of 140 PageID #:18606
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 79 of 140 PageID #:30480

Q. There was no canvass report created, correct?

A. There was though canvass report, well, it's understood, yes, I canvassed the building. Somewhere in that report says you went back to 706, I spent and I testified two days canvassing.

Q. All right. Here is my question?

A. Yes.

Q. There is not one witness in your report that was not also identified by the detectives back in 1984 except for Gerald Morris, that is true, right?

A. I don't know. Maybe you're right.

Q. Can you name any witness that you spoke to that was not just a reinterview of the people you spoke to in 1984?

A. Either or circumstantial, I don't know. The answer is I don't know. You're right in that the key of that scene became a hard key of my follow-up, yes.

Q. You said when you would interview people, sometimes people would say I heard shots, but I didn't see anything but I didn't write that down. Did you tell that to Mr. Kulwin?

A. I didn't use the term I didn't write that down. I did say that people would say, yeah, I heard the shots, but I didn't see anything, yes.

Q. But I thought you said then you didn't bother to put that in your report?

A. Not in my reports, correct.

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 80 of 140 PageID #:18607
***REALTIME UNEDITED TRANSCRIPT ONLY***

79

Q. All right. So I just want to establish that. If someone -- if you knocked on a door and the person said Ms. Gorman, did you see anything, I heard shots, but I didn't see anything, that's not information, you would have memorialized?

A. Not always. In some reports -- it's circumstantial, but it was in prior reports anyway.

Q. You didn't do that in this case in any event, correct?

A. I did not.

Q. All right. Let's talk about Inetta Watts. It sounds like you're claiming a very firm memory of this, correct?

A. I do.

Q. All right. Now, she cooperated with the police in 1984, did she not?

A. I believe Ms. Watts was interviewed in 1984. I believe you're correct.

Q. She gave her phone number, you know that too?

A. Sure.

Q. The 1984 detectives before you got there, they had photographs, correct, in the investigative file?

A. I don't know what they had on the scene.

Q. Do you know if they showed her Earl Hawkins's photo?

A. You are going to ask for my opinion?

Q. Do you know?

THE COURT: Do you know?

THE WITNESS: Okay. I am going to be short and don't

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 81 of 140 PageID #:18608
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 81 of 140 PageID #:30482

get in trouble.

BY MR. LOEVY:

Q. Being short doesn't help?

A. No, no, I am not going to state one way or the other. No.

Q. Page 86, page 6. This is the original 1984 report. Somebody memorialized a canvass, would you agree with me that they are talking about people they interviewed?

A. I am.

Q. It looks like Inetta Watts told hood and Evans I heard numerous shots, looked out her window and saw two men she knew from the building laying on the sidewalk, correct?

A. You are talking the victims here, yes.

Q. All right. Hood and the guys who took this original report had no way to know either way whether that was going to turn out to be pertinent or not, right? They couldn't have known in advance, right?

A. Couldn't have known in advance.

Q. That this was going to turn out to be pertinent?

A. No, I don't know what they knew, right.

Q. Right. But the fact is Inetta Watts in 1984 told those detectives that she didn't see the shooting, correct?

MR. KULWIN: Objection, Judge. That's not what it says.

THE COURT: You can answer the question.

THE WITNESS: I don't know.

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 82 of 140 PageID #:18608
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 82 of 140 PageID #:30483
***REALTIME UNEDITED TRANSCRIPT ONLY***

81

BY MR. LOEVY:

Q.  When you read this report and knocked on Ms. Watts' door, you knew that she had already told the police she didn't see the shooting, right?

        MR. KULWIN:  Objection, Judge.  Argumentative.

        THE COURT:  He's already answered the question.

BY MR. LOEVY:

Q.  All right.

A.  Thanks.

Q.  Now, you've interviewed I think you told Mr. Kulwin thousands of people over your career, correct?

A.  Yes, that would be true.

Q.  And Mr. Kulwin showed you the summary of your report from the Inetta Watts interview.  Do you remember reading that to the jury?

A.  I remember Inetta Watts interview, yes.

Q.  All right.  And are you claiming you actually remember this interview or are you saying you can read it like we can all read it?

A.  I'm saying both.

Q.  All right.  You say you did show Watts the photos, right?

A.  The entire stack.

Q.  All right.  Now, I want to ask this question about whether you have any proof, and by proof, let me explain my definition.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 83 of 140 PageID #:13610
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 83 of 140 PageID #:30484

A. Okay. I'll be careful here.

Q. Evidence, documents, anything other than your memory, okay, do you understand what I mean by proof?

MR. KULWIN: I am going to object. Asked and answered.

THE COURT: Let me hear the question and then I will rule on it.

BY MR. LOEVY:

Q. Do you understand what I mean by proof?

THE COURT: Any documentation?

MR. LOEVY: Yes.

BY MR. LOEVY:

Q. Or other proof?

A. Yes.

Q. Do you have any proof that you showed Ms. Watts more than Mr. Hawkins' photo?

A. Yes.

Q. Okay. What proof is that?

A. Put it into my reports that I had a stack of 20 to 25 photos she looked at and the other witnesses.

Q. All right. I am going to show you your report. And you show me where it says 20 to 25 photos?

MR. KULWIN: Judge, could we have the whole report?

THE COURT: Hand him the whole report.

MR. LOEVY: Sure.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 84 of 140 PageID #:18611
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 84 of 140 PageID #:30485
11/23/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***
83

BY MR. LOEVY:

Q. I am going to hand you your original report. This is the 17th page.

A. Okay.

THE COURT: The reference to Ms. Watts is on page 17?

MR. LOEVY: Yes. They are numbered on the bottom left corner.

THE WITNESS: Okay.

MR. LOEVY: I will publish it while we're looking.

THE COURT: You're asking him to look for where it says 20 to 25.

MR. LOEVY: Or look on the screen, whichever is his preference.

THE WITNESS: Where are we at? In this paragraph?

BY MR. LOEVY:

Q. What I'm saying is while going through -- where does it say stack?

A. Here, they then looked through a stack of photos.

Q. Okay.

A. Stack.

Q. Right.

A. All right.

Q. The 20 to 25, that's memory more, correct?

A. Yes.

Q. All right. I am going to show you document -- Plaintiff's

Exhibit 442, page 85. This is from one of the basement files. This is an example of the kind of document you create when you do a photo array, correct?

A. On occasion, yes.

Q. Okay. This is proof, right?

MR. KULWIN: I object, argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. If someone is making an identification, what photos you showed is actually the proof, right, that's the evidence?

MR. KULWIN: Your Honor, objection, asked and answered, argumentative.

THE COURT: I think the topic was covered sufficiently on direct.

BY MR. LOEVY:

Q. Okay. Let's talk about your interview with Ms. Watts. Now, you claim that she was very, very afraid if I understand?

A. Extremely I think was the word I used.

Q. Now, she did involve her daughter, correct?

A. She told me her daughter was there, I believe, at the time.

Q. So you're interviewing her and she said my daughter can help too, let's get her involved, right?

A. She allowed me -- her daughter, if I remember correctly,

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 86 of 140 PageID #:19613
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 86 of 140 PageID #:30487
11/23/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

85

her daughter did not live in town at that time, so I did make a phone contact and I was going to try and catch up with her later when there was time.

Q. So Inetta Watts facilitated you involving her daughter in this murder?

A. Involving her in the murder?

Q. Well, the murder investigation.

A. She provided me information leading me to believe her daughter may have some information, yes.

Q. Would you agree that's inconsistent with the notion that she was superterrified to be involved?

MR. KULWIN: Objection, Judge, argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Looks like on page 3 of the same report, Ms. Watts allowed me to speak long distance with her daughter Angela Watts. Arrangements are being setup to interview Angela Watts in person at a later date. Do you see that?

A. I do.

Q. Okay. Did Ms. Watts make those arrangements so that you could talk to her daughter about your murder investigation?

A. I don't believe I ever caught up with Angela Watts or got to follow up on that issue.

Q. Okay. Now, are you claiming that Ms. Watts identified Hawkins' photo when you were talking to Mr. Kulwin? Do you

11/23/16 AM

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 87 of 140 PageID #:18614
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 87 of 140 PageID #:30488

***REALTIME UNEDITED TRANSCRIPT ONLY***

86

remember the thing about she stopped at the photo?

MR. KULWIN:  Objection, asked and answered, argumentative.

MR. LOEVY:  No, your Honor.

THE COURT:  Okay.  Hang on a second.  Rephrase the question.

BY MR. LOEVY:

Q.  When you were describing the thing about she pointed at the photo and closed her windows, do you remember that testimony?

A.  Closed the blinds, yes.

Q.  Are you claiming she identified Earl Hawkins as the shooter?

MR. KULWIN:  Objection, Judge, claiming?

THE COURT:  Overruled.  Is that what you're saying happened?

THE WITNESS:  Saying she would not -- can I answer it?

THE COURT:  Is that what you're saying.

BY MR. LOEVY:

Q.  I want a yes, no, was she claiming he was a witness -- I'm sorry, he was a shooter?

A.  I'm not climbing that, what you just said.

Q.  You did say to Mr. Kulwin that that was a big part of your probable cause, Ms. Watts' identification, right?

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 88 of 140 PageID #:18615
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 88 of 140 PageID #:30485
***REALTIME UNEDITED TRANSCRIPT ONLY***

87

A. In my mind, yes.

Q. Did you also consider that when she was interviewed a year earlier all she said was she heard shots and saw the victims?

MR. KULWIN: Objection, asked and answered, Judge.

MR. LOEVY: I'm asking.

THE COURT: If I want a response. I will ask for it. Hang on a second. Overruled. You can answer the question.

THE WITNESS: As I think I just stated, people come forward later, yes, this woman reconsidered. I believe this woman when I interviewed her. That's the best I can tell you, that she was helping me and I believed her. I believed her to be a sincere, nice woman providing information while not getting herself killed or jeopardized.

BY MR. LOEVY:

Q. Or her daughter?

A. I'm sorry.

Q. Or her daughter? I will withdraw it, your Honor?

A. I was really concerned with Ms. Watts then.

Q. All right. You did show Inetta Watts your photographs in the building, correct?

A. Yes.

Q. Okay. Then how do you remember that you didn't show Carlos Willis, Cleveland Ball and Torrence White your photographs in the building?

A. Because I remember.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 89 of 140 PageID #:18616
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 89 of 140 PageID #:30490
11/23/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

88

Q.  All right.  Do you have any proof other than your memory?

A.  I think -- well, I don't want to get in an argument, so whatever you consider proof could be them saying I didn't show it to them until the 16th.  I am not going to argue with you.

Q.  Now, you did say you wouldn't have put Carlos Willis in a lineup unless you had some reason to believe he saw it, correct?

A.  Yeah, that would be a waste of time.

Q.  And Carlos was unable to provide you a description, correct?

A.  He was unable to make an identification, you're correct.

Q.  He was unable to provide a description, correct?

        MR. KULWIN:  Objection, argumentative, lacks foundation, lacks basis.

        THE COURT:  Overruled.

        THE WITNESS:  I don't know that he was part of the initial compilation of witnesses, so the answer is I don't know whether Carlos Willis was able to provide.

BY MR. LOEVY:

Q.  I asked you, was Carlos Willis able to give you any description?

A.  I don't recall.

Q.  Okay.  Obviously, if he had, you would have written it down, right?

        MR. KULWIN:  Judge, objection, argumentative.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 90 of 140 PageID #:18617
Case: 1:10-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 90 of 140 PageID #:30491

THE COURT: Sustained. It's been covered sufficiently.

BY MR. LOEVY:

Q. Then why did you put Willis in a lineup if he couldn't give you a description?

A. Because he saw faces.

Q. All right. Why did you put Cleveland Ball in -- Eric Benson in a lineup if he couldn't give you any description?

MR. KULWIN: Objection, lack of foundation.

THE COURT: It's been covered sufficiently. Overruled. Sustained, rather.

BY MR. LOEVY:

Q. You mentioned -- by the way, you mentioned the composite description that was in 1984, that's what was mentioned, right?

A. Yes.

Q. To give the jury some context, the original police report did not attribute any description to any witness, correct?

MR. KULWIN: Judge, I am going to object. It's argumentative.

MR. LOEVY: No -- sorry.

THE COURT: You can ask that as a lead-in question because it has been covered quite extensively.

BY MR. LOEVY:

Q. Do you remember the question, sir?

A.  I kind of got your gist.

Q.  The gist was that the original detectives did not attribute any description to any particular witness, right?

A.  One and only one, I would say you're -- from my knowledge, I would say you're correct.  No particular person.

Q.  Right.  And of the 12 people, all it says is at the beginning here, wanted, and two descriptions, right?

A.  Correct.

Q.  This is page 864?

A.  But it does not say, for example, Carlos Willis said this or Randy Langston said that, there's no attribution to this, right.

A.  You're correct.

Q.  So there's no way from reading this report you know this all came from one person or sort of like we'll do an average, you just can't tell from reading the report?

        MR. KULWIN:  Objection, Judge.  Argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  This description without attribution does not --

        MR. KULWIN:  Objection, argumentative.  Not attribution.

        THE COURT:  Rephrase the question.

BY MR. LOEVY:

Q. This composite description, can we call it a composite description?

A. If that's the term you like.

Q. It does not describe Mr. Fields, does it? For example, Mr. Fields was in his 30s?

MR. KULWIN: Judge, can he answer the question?

THE COURT: Yeah, if you are going to pose a question, either withdraw the question or let him answer.

MR. LOEVY: Can I withdraw it?

THE COURT: Yes.

BY MR. LOEVY:

Q. Mr. Fields was in his 30s, correct?

A. Yeah, I would assume he was probably about 30 back then, he is 60 now, right?

Q. Yes. So 21 to 25, 24, that does not describe Mr. Fields, does it?

A. I wouldn't say that.

Q. Same with Mr. Hawkins, he also was over 30?

A. As I sit here right now, I can't remember the birthdays. I'll go along with whatever you tell me his birthday was at that time.

Q. If we are going to go from five, seven to six feet, male black, sort of medium, that would describe probably 75 to 85 percent of the building, would you agree?

MR. KULWIN: Objection, Judge, calls for --

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 93 of 140 PageID #:18620
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 93 of 140 PageID #:30494
11/23/16 AM

***REALTIME UNEDITED TRANSCRIPT ONLY***

92

THE COURT:  Hang on a second.

MR. KULWIN:  Lack of foundation.

THE COURT:  Overruled given the testimony about the canvass.

BY MR. LOEVY:

Q.  Do you remember the question?

A.  Am I answering, Judge?

THE COURT:  Go ahead.

THE WITNESS:  Okay.  You jumped from five seven on one guy to six-foot.  General descriptions, you're correct, general descriptions can cover a multitude of people of multitude.

BY MR. LOEVY:

Q.  My question was --

A.  Not excluding somebody.

Q.  75 to 85 percent of the people, maybe more or less than 75 percent of the people would fit this description?

A.  Statistically, no, because somebody could be five two, somebody could be six nine.

THE COURT:  Ask another question.

BY MR. LOEVY:

Q.  The reason I said five seven to six feet, it's not mixing them so much as if anybody was anywhere between five seven and six feet, they arguably would fit these descriptions?

MR. KULWIN:  Judge, objection.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 94 of 140 PageID #:13621

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Let's talk about Gerald Morris.

A.  Okay.

Q.  The meeting in Milwaukee you talked about with Mr. Kulwin to set the context, this is after Mr. Fields' new trial, his criminal retrial had been granted, correct?

A.  It yeah, I believe so.

Q.  That was the point.  You needed Gerald to testify at the retrial, right?

MR. KULWIN:  Objection, Judge, argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  You also knew by the time of this meeting that Mr. Morris had signed that affidavit for Stainthorpe and Lafferty, correct?

A.  I knew on the way up there, yes.

Q.  All right.  And in the affidavit, he had said essentially I can't be a witness at the retrial because I didn't see them, correct?

MR. KULWIN:  Objection, asked and answered.

THE COURT:  Sustained.  Just get to the question. New question.

BY MR. LOEVY:

Q.  The reason for the meeting was he had communicated he

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 95 of 140 PageID #:18622
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 95 of 140 PageID #:30496

94

didn't want to be part of the case anymore, correct?

A. The document you pointed out, that's the reason for the meeting.

Q. And you now going into it that he was saying he didn't want to be involved, didn't you?

MR. KULWIN: Objection, asked and answered, argumentative.

THE COURT: Overruled.

THE WITNESS: I knew what was on that document, yes.

BY MR. LOEVY:

Q. And you told Mr. Kulwin that it was Sexton, Prawiec, DiCiolla, Kelly and yourself, correct?

A. No.

Q. Who else was there?

A. You're saying DiCiolla, but neither was not there. He is a supervisor in that office. So it was David Kelley, Brian Sexton, myself, and the Cook County state's attorney investigator Robert Prawiec and then a Milwaukee detective by the name of David baker, I believe, who was there for part of it or brought him there. I don't know if he sat in on the interview or not.

Q. All right. That's the preface. Let get to the new part now.

A. Okay.

Q. You knew going into that meeting there was going to be a

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 96 of 140 PageID #:13623
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 96 of 140 PageID #:30497
***REALTIME UNEDITED TRANSCRIPT ONLY***

95

dispute later about whether the affidavit he signed was legitimate, correct?

MR. KULWIN: Objection, argumentative. Calls for speculation.

THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. The reason you were going and the reason for the meeting was because if Gerald was going to testify at the criminal retrial, the affidavit was going to be a problem, right?

A. I am going to touch --

THE COURT: The a yes or no question.

THE WITNESS: Say this again, yeah, because I am worried about saying things.

THE COURT: You know what, that needs to stop too.

THE WITNESS: I'm sorry, Judge.

THE COURT: The responses are yes or no.

THE WITNESS: I got it, I got it. Go ahead.

BY MR. LOEVY:

Q. When you went to the meeting, you understood that the affidavit Mr. Morris had signed was going to create a potential problem for the retrial, correct?

A. Yes.

Q. And that was talked about at the meeting, correct?

A. In a restaurant?

Q. Yes.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 97 of 140 PageID #:18624
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 97 of 140 PageID #:30498
11/23/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

96

A.  Yes.

Q.  Now, you after the meeting, the state's attorney created a summary that Mr. Kulwin read to you, correct?

A.  The investigator created that summary, Bob Prawiec.

Q.  Now, Morris' signature is on the one that Stainthorpe got, right?

A.  Yes.

Q.  Morris' signature is not on the state's attorney's summary, correct?

A.  Yes, because that was created later.

Q.  Okay.  Why if the whole point was to go there and talk about what we said we were going to talk about, why didn't you ask Gerald to put his signature on a document that supported your version of reality?

MR. KULWIN:  Judge, I am going to object to version of reality.

THE COURT:  Rephrase the question.  It's argumentative as phrased.

BY MR. LOEVY:

Q.  You told Mr. Kulwin?

THE COURT:  Why didn't you ask him to put his signature on the report, that would be a non-argumentative question.

BY MR. LOEVY:

Q.  Well, the report wasn't created until after, right, sir?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 98 of 140 PageID #:13625
Case: 1:16-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 98 of 140 PageID #:30495

A.  It was.

Q.  So why didn't you ask Mr. Morris to sign a piece of paper that was consistent with what you just described to Mr. Kulwin yesterday?

A.  I didn't.  The state's attorney and Prawiec were doing the interview.  I didn't.  That's all I can say.  I didn't ask him to sign anything.

Q.  And you heard nobody in your presence ask him to sign anything?

A.  Not that I recall.

Q.  Did Mr. Morris indicate he'd be willing to sign anything that supports the version you described to Mr. Kulwin yesterday?

A.  I don't recall that actually being discussed.

Q.  It's not uncommon to ask witnesses to sign statements, is it?

A.  I don't know if it is.

Q.  Did he refuse?

A.  Can it can be done, yes, uncommon is kind of general. Yeah.

Q.  You described to Mr. Kulwin, this is 24 B, this is the affidavit that Stainthorpe took with his sworn signature, correct?

A.  Yes.

Q.  This is the affidavit you guys brought with you to the

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 99 of 140 PageID #:18626
Case: 1:10-cv-01168 Document #: 1185-34 Filed: 02/24/17 Page 99 of 140 PageID #:30500
11/23/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

98

meeting, right?

A. Yes.

Q. And if I understood your description, by the way, of the memo, the summary memo is the one you went through with Mr. Kulwin, right? It doesn't exactly say he didn't see the member, does it?

MR. KULWIN: Judge, I am going to object. It says what it says. I object, argumentative.

THE COURT: I am going to sustain the objection. Honestly, folks, it just dawned on me that we haven't taken a break for that. I sincerely apologize. We are going to take a break right now. My mistake.

(Short break.)

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: Mr. Loevy, you can go ahead.

MR. LOEVY: That you were.

BY MR. LOEVY:

Q. All right. We were talking about Gerald Morris's affidavit and the meeting you had with him in Milwaukee in 2000. And if I understood your description of the protocol, the idea was Gerald was supposed to underline the parts that weren't true?

MR. KULWIN: Objection, Judge, the document says what it says.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 100 of 140 PageID #:19627
11/23/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

99

MR. LOEVY:  No.

THE COURT:  Underlying doesn't say anything.

BY MR. LOEVY:

Q.  Now, remember when you described for Mr. Kulwin that you had Mr. Morris under line parts that weren't true?

A.  I didn't have -- the others did this thing.

Q.  Tell the jury?

A.  Go ahead.

Q.  Tell the jury what -- what these under lines mean.

MR. KULWIN:  Judge can he show him the exhibit?

THE COURT:  The whole thing is on there.

BY MR. LOEVY:

Q.  The summary that the state's attorneys created?

THE COURT:  You know what, you have a question pending.  You either want that question answered or you are starting new.

BY MR. LOEVY:

Q.  Can you answer?

A.  I apologize.  Ask me the question again.

Q.  All right.  Sir, the protocol was that when you and Sexton were there, he was supposed to underline the parts that weren't true, right?

MR. KULWIN:  Objection, Judge, misstates the protocol.

THE COURT:  He is asking a question.  It doesn't

misstate anything. The objection is overruled.

THE WITNESS: From looking at this, I don't think that's correct.

BY MR. LOEVY:

Q. Take a look at the state's attorney statement that goes with it. You have it in front of you, it's 24 24 B.

A. This document. Go ahead.

Q. The second full paragraph explains what the underlining is supposed to mean, right?

A. Gerald was asked -- do you want me to read this or no?

Q. You can read it to yourself and then just tell the jury what the underlining was supposed to mean. Have you refreshed your recollection?

A. Yes, I can read it and refresh. Gerald stated that most of the statements was not what he had told the attorneys earlier.

Q. What do these under lines mean, sir?

A. Well, I would say -- here. If you are going to ask me to go through this document.

Q. Sir, it says Gerald was then asked to underline those parts of the statement that he never told the attorneys, correct? Wasn't that what you discussed with Mr. Kulwin?

A. I'm saying that what this report says and a previous line says most. So, yeah, this could be --

Q. This report, 24 B, goes with -- this is the second page,

it's Gerald's affidavit with underlining on it, correct?

A.  Correct.

Q.  And wasn't the idea that Gerald was supposed to underline the parts that weren't true?

A.  Or what he had not told the attorneys.  There's true and -- never mind.

THE COURT:  He's answered.

BY MR. LOEVY:

Q.  Gerald did not at any point sign anything that says my underlining means anything, can we agree on that?

A.  I'll take your word for it.

Q.  All right.  Let's see what he underlined.

On April 28th, 84, he lived at 706 building.  That's true, isn't it?

A.  It is.

Q.  And he underlined it, right?

A.  Yes.

Q.  In the morning of April 28th, the gunshots, do you see that?

A.  Yes.

Q.  Now, in the morning is underlined, right?

A.  Yes.

Q.  And that's true, isn't it?

A.  To the facts, yes.

Q.  All right.  Running towards a car which was on Langley, is

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 103 of 140 PageID #:19630
Case: 1:13-cv-01168 Document #: 285-34 Filed: 02/24/17 Page 103 of 140 PageID #:30504

that your opinion, is that true?

A.   Yes.

Q.   These men had masks on the entire time that I saw them and I could not see their faces.  That's underlined, isn't it?

A.   That is.

Q.   Now, Gerald did not under line I did not see these men before I heard the shots, nor did he under line I do not know who these men that I -- I do not know who these men were that I saw running away, correct?

A.   You're correct on what's on this document.

Q.   He was not denying the parts that were not underlined, right?

A.   I am not saying what the protocol was or was not.  I am answering your questions what's underlined.  I don't know what the protocol was, whether misunderlined, underlined.

Q.   The protocol according to 24 B was Gerald then underlined the parts of the statement that were not what he had told the attorney earlier.  That's what the memo says, right?

A.   That could be both, you're right.  You're right.  That's what that means means.

Q.   When you met with Gerald, you have a good memory of this meeting, right?

A.   I have a good meeting.

Q.   This is the meeting where he ran up and hugged you according to you?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 104 of 140 PageID #:19631
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 104 of 140 PageID #:30505

MR. KULWIN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  He did.

BY MR. LOEVY:

Q.  All right.  So he was not denying that he didn't see these men before he heard the shots, nor that he doesn't know who they were?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Sustained.  It's been covered sufficiently at this point.

BY MR. LOEVY:

Q.  He also told you a long time.after the shooting O'Callaghan showed me four photographs to see if I could identify anyone.  He told you that at the meeting, didn't he?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Overruled.  That's not an argumentative question.

THE WITNESS:  He did not.  This is their document that they typed up.

BY MR. LOEVY:

Q.  The state's attorneys also documented a reason why Gerald, they claimed Gerald signed the affidavit, correct?

A.  Are we going back to possible Prawiec's report?

Q.  Yes.  It says Gerald said he signed the piece of paper without really reading it because he just wanted them to

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 105 of 140 PageID #:19632
Case: 1:13-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 105 of 140 PageID #:30506

leave.  That's what the state's attorney wrote down as the reason he notarized this affidavit, right?

A.  The investigator wrote that, not the state's attorney.

Q.  Now, my question is based on your interactions with Gerald, was he the kind of guy that would sign a sworn statement just because he wanted people to leave him alone?

MR. KULWIN:  Objection, calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  In this instance, yes.

BY MR. LOEVY:

Q.  He was -- this is the guy we described as weak and timid and mild, right?

MR. KULWIN:  Objection, asked and answered.

THE COURT:  Overruled.

THE WITNESS:  This is a guy I used as part of my description of Gerald.

BY MR. LOEVY:

Q.  Let take a look at Plaintiff's Exhibit 219 E.  This is a photograph of Gerald's window, is it not?

A.

THE COURT:  You mean the one that's circled up there?

MR. LOEVY:  Yes, your Honor, I'll represent that circle was created at the criminal trial.  It's state's 15.

THE COURT:  Do you know if that's a photo of the window?

***REALTIME UNEDITED TRANSCRIPT ONLY***

THE WITNESS:  I don't.

BY MR. LOEVY:

Q.  Showing you 219 F, this also has a window circled, right?

THE COURT:  Well, more like a square.

BY MR. LOEVY:

Q.  A square?

A.  I see the markings, yeah.

Q.  Showing you the building, do you see this part jutting out on the middle of the south part of the building?

A.  That would be the north part of the building.

Q.  I'm sorry, north part, you're exactly right.

A.  Okay.

Q.  If you look at those photographs, Gerald's window is on the north part of this jutting out part?

MR. KULWIN:  Judge, can I see that?

THE COURT:  Point it out.

BY MR. LOEVY:

Q.  Here is the jutting out part?

THE COURT:  Okay.

BY MR. LOEVY:

Q.  Would you agree based on the photographs that this is the building -- this is more of the building here, this is where it goes straightaway, this is the jutting out part of the building?

A.  I'll agree that's the jutting part of the building.

Q. All right. Then if Gerald's window was in fact on the north end of the jutting out part, there is no way he could have seen a car in the southwest corner, would you agree with that?

MR. KULWIN: Objection, argumentative.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Physically impossible?

A. If the car was there, I am going to assume that you're showing the right apartment, that car was not on the very southwest corner in my opinion. In my opinion, I think the car was in a different position.

Q. You weren't there, right, during the shooting, you don't know where the car was?

MR. KULWIN: Objection.

THE COURT: You can answer.

THE WITNESS: I wasn't at the shooting scene, no.

BY MR. LOEVY:

Q. If the car was where Randy Langston described it yesterday, then it would be physically impossible for Randy Morris to see the car?

MR. KULWIN: Objection, argumentative, Judge.

THE COURT: Overruled.

THE WITNESS: Gerald Morris.

BY MR. LOEVY:

Q.  Yes.

A.  I'm assuming -- here, if you showed things up by the front of the building, no, in the back of the building, yes.

Q.  Where do you believe the car was, sir?

A.  I would believe from everybody in a compilation again, in a compilation, I believe, that the car is.

THE COURT:  I tell you what, let me hold it.

THE WITNESS:  Here's the front of '706, I believe the car would have been either right in this slot or right out onto street because they had to make it through the tunnel to get to the car and then out, so if you want me to answer on Randy Langston or no?

BY MR. LOEVY:

Q.  The path you just described, people in front of the building at the baseball field, they would not have had a view of the car where you described it, would you agree?

A.  No, I wouldn't.

Q.  You think someone standing anywhere on the ball field, I will put you on any corner you want, would have been able to make out a get away driver from the car where you just described it behind the building?

A.  First a double question.  First is could they observe the car fleeing, second, they did not make out the get away driver, nobody could make out that get away driver.

Q.  Randy testified that he saw the man in the car, did he

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 109 of 140 PageID #:19636
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

108

Q.   not?

A.   He did not see the get away driver.

Q.   Passenger, passenger?

A.   Okay.

Q.   Passenger.

A.   Yes.

Q.   All right.  But that's physically impossible, is it not?

A.   No.

Q.   All right.  When Gerald -- when you guys wanted Gerald to come back to Chicago and testify, you described with Mr. Kulwin the trip you took to go get him, correct?

A.   I'm sorry.  Which trip and when?

Q.   When it was time for Mr. Fields' criminal retrial, you guys needed Gerald Morris's testimony, correct?

A.   Tell me what we're talking about Milwaukee again?

Q.   No.  Before the criminal retrial, you were retired in 2005, right?

A.   2009, yeah, I retired June of 2005.

Q.   And you came out of retirement to make a trip to go get Gerald in Missouri, right?

A.   I never came out of retirement, no.

Q.   All right.  In 2009, you went to Missouri to go get Gerald?

          THE COURT:  Just get to the question, please.

          MR. LOEVY:  That was the question.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT: Honestly, all this background has been covered more than sufficiently during the direct examination.

BY MR. LOEVY:

Q. And this was -- this was the trip for our time frame when he got held out of work and got fired?

MR. KULWIN: Judge.

THE COURT: Get to the question. That's what I said. You covered what you just talked about more than sufficiently during the direct examination. I am now saying that for the second time. There will not be a third.

BY MR. LOEVY:

Q. Did he agree to come without a subpoena, voluntarily?

A. I don't know. I doubt it. Otherwise, we wouldn't be subpoenaing him.

Q. All right. Let's talk about you were asked some questions by Mr. Kulwin about whether you were trying to make a case against Mr. Fields. It was important for the task force to succeed to get convictions, correct?

A. It's important for the task force to follow their leads and do their job.

Q. And you wanted to get convictions, correct?

A. Eventually, of course, if you do your job, you're hoping that it results in a proper conviction.

Q. All right. I am going to show you Plaintiff's Exhibit 109, page 4. This is something Mr. Kulwin showed you. This

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 111 of 140 PageID #:19638
Case: 1:13-cv-01168 Document #: 285-34 Filed: 02/24/16 Page 111 of 140 PageID #:30512

is something Mr. Kulwin showed you this morning.

A. Okay. We are back to the --

Q. Back to Vaughn/White?

A. Okay.

Q. The state's attorney asked Sheree why she was not saying Pumpkin was one of the offenders and she responded she is afraid for her safety and that of her brother so she didn't want to identify him. The state's attorney asked why she's able to make the identification now, and she related that she wants the offenders punished for what they did to her mother and Joe. Do you see that, sir?

A. You are reading correctly.

Q. What was going on there was Sheree had not originally identified Pumpkin but then later after the state's attorney wouldn't approve charges, they went back to her and then she identify Pumpkin?

MR. KULWIN: I object, Judge, closing argument. It's argumentative.

THE COURT: Overruled.

THE WITNESS: I wasn't part of this, and apparently you're correct.

BY MR. LOEVY:

Q. All right. So isn't it true that when the state's attorney inserted was an excuse that she hadn't made the identification because she was afraid for her safety?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 112 of 140 PageID #:19639
Case: 1:13-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 112 of 140 PageID #:30513

MR. KULWIN:  Objection.

THE COURT:  The objection is sustained.

BY MR. LOEVY:

Q.  That was not an uncommon explanation for why witnesses were changing their stories, was it?

MR. KULWIN:  Objection, Judge.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  You were asked about whether you were excluded from court this morning, Mr. Kulwin asked you those questions. And you said you had no participation in shaping the prosecutor's theory.

May I have the permanent retention file back?

THE COURT:  Yes, it's right up here.

MR. LOEVY:  Thank you.

BY MR. LOEVY:

Q.  The prosecutors when they put the trial on of Mr. Fields, they used your police reports basically for the script of the trial, right?

MR. KULWIN:  Objection, Judge.  How he knows.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Do you know at trial what theory the state put on at Mr. Fields' trial?

A.  In 2009?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 113 of 140 PageID #:19640
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 113 of 140 PageID #:30514

Q. Yeah, and in 2006.

A. Now I do. I did not before.

Q. I'm sorry. In '86 what they did was they put on Randy Langston, they put on Gerald Morris, and they put on through you Eric Langston saying that they identified Mr. Fields commit the murder, right?

A. We are back to 86?

Q. Yes.

A. I believe those people testified.

Q. And that's how the system works, the state's attorneys take the police reports, they look at the investigation, and then they try to prove it in court, right?

MR. KULWIN: Objection, Judge. He is not an expert on how the state's attorney works.

MR. LOEVY: He was this morning.

THE WITNESS: They completed it, then the rest of the investigation, could be completed by their office. A compilation of people doing their work, yes.

BY MR. LOEVY:

Q. You were asked about whether you were cross-examined by at the criminal trial. Do you remember Mr. Kulwin asking you that?

A. The 198 of one?

Q. Yes.

A. Yes.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 1114 of 140 PageID #:19641
11/23/16 AM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

113

Q. You can't cross-examine somebody if you don't have their notes?

MR. KULWIN: Objection.

THE COURT: Overruled. You can ask the question.

BY MR. LOEVY:

Q. To cross-examine someone effectively you need their notes, right?

A. Are you talking about my notes?

Q. Yes.

A. I'm sorry. They had my report. I was cross-examined to the best of my memory on the lineups and the identification procedures.

Q. All right. You told Mr. Kulwin that you believed these area files were produced to Mr. Fields. Do you remember testifying to that this morning?

A. I believe I testified that there's a system in which files are sent over and I didn't do it.

Q. I thought specifically Mr. Kulwin asked you, isn't it true you know that the area file would the lineup report scratch out was produced to Mr. Fields and you said yes, didn't you?

A. I believe that's part of the grouping. I believe you're right.

Q. But really what the accurate thing to say is that is just a wild guess on your part, correct?

A. No.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 115 of 140 PageID #:19642

Q.  Isn't it true the area file didn't show up until this litigation even after the street file in 2011?

A.  No.

Q.  How do you know, sir?  Where was the area file?  I'll ask the latter question, your Honor.

Where was the area file?

A.  You are separating files here, correct?

Q.  Sir, I am asking you about the area file?

A.  My answer is the area file would be the file that was in the area office in downtown.  Anyway, that area file with all the key reports and stuff was turned over.  That's my recollection.

Q.  You were asked if you showed Andrew's photo to anybody and your memory was that you did, Hank Andrews?

A.  Andrews was in that stack also of 20 to 25, yes.

Q.  Other than your memory, do you have any proof or evidence that Andrews's photo was shown to anybody, do you understand the question?

MR. KULWIN:  Asked and answered.

THE COURT:  You have covered sufficiently what evidence there is regarding what was in the stack of photos. The objection is sustained.

BY MR. LOEVY:

Q.  You said that the reason you took that photo of Mr. Fields was in case he tried to come to court and have a suit and

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 116 of 140 PageID #:19643
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 116 of 140 PageID #:30517

Q. you'd have a tattoo -- you'd have a photo of his tattoo?

A. We are talking about the gang tattoo, correct.

Q. Your answer was in case he tried to show up in court and put a on a suit and act like a nice person?

A. That would be my purpose, yes.

Q. Did he not have a right to put on a suit?

            MR. KULWIN: Objection, Judge. Argumentative.

            THE COURT: Overruled.

            THE WITNESS: Did he not have the right to put on a suit?

BY MR. LOEVY:

Q. Did you want him to come to court with an El Rukn T-shirt?

A. I don't care he comes to court.

Q. You wore a suit, didn't you, sir?

A. I did.

Q. And he had a right to wear a suit, too, didn't he?

A. That's fine too.

Q. All right. You said the state's attorney approved the charges but you represented to the state's attorney that these identifications were legit, didn't you?

A. Yes, I did.

Q. And the state's attorney relied on your representation, didn't he?

A. I would say that's in his consideration, yes.

Q. You told Mr. Kulwin that you went to look for Mr. Fields

from May 18th to June 10th and remember he asked you all those date ranges? Do you remember his questioning?

A. Yes, I remember that.

Q. Do you have any proof that you ever went to see Nate Fields looking for him, any proof?

A. Proof?

Q. Yes?

A. Did I document every visit, no.

Q. Sir, the question is do you have any proof?

A. No, I am not going to say I can sit here and produce proof, dates, times, I went there and other went there.

Q. All right. Do you have any -- all right. The lineup room. You were not in the room with the witnesses, is that my understanding of what you told Mr. Kulwin?

A. You are mistaken totally.

Q. Which witness room were you in with the witnesses or with the suspects?

A. Witnesses, behind the wall as I said ten times.

Q. So the people that were looking at the lineup, they are interacting with you, right?

A. Yes.

Q. All right. This tentative identification that you described you showed the photos and they said it could be the guy, right?

MR. KULWIN: Judge, page?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 118 of 140 PageID #:19645
Case: 1:18-cv-01168 Document #: 285-34 Filed: 02/24/21 Page 118 of 140 PageID #:30519
11/23/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

117

MR. LOEVY:  All the tentative identifications.

MR. KULWIN:  It wasn't -- lack of foundation.

THE COURT:  You're referring to the identifications where a particular person said this might be the person, it looked like the person.

MR. LOEVY:  Exactly.

THE COURT:  That's what he's referring to.  Go ahead and ask the question.

BY MR. LOEVY:

Q.  If some people tentatively, say they tentatively identified Earl Hawkins?

MR. KULWIN:  I am going to object.  These are not the photos.  This is a lineup question.  He knows it's not right.

MR. LOEVY:  It's a question.

MR. KULWIN:  Sorry.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Let's say hypothetically someone said, all right, this could be the guy on the left.  Okay?  Are you saying they're also saying it couldn't be this guy?

A.  To a hypothetical here, not what occurred.  The answer is hypothetically, this is a photo lineup, I know what occurred in this lineup and it was a positive identification, so that's -- I don't know what else I can say.

Q.  Let me ask you about a few more subjects.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 119 of 140 PageID #:19646
Case: 1:13-cv-01168 Document #: 285-34 Filed: 02/24/17 Page 119 of 140 PageID #:30520
11/23/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

118

You asked Mr. Kulwin -- you were asked by Mr. Kulwin about?

THE COURT: Execution me. Go ahead.

BY MR. LOEVY:

Q. That you heard from five El Rukns about information about Mr. Fields, correct? Do you remember that question?

A. Did we use a specific number?

Q. I said five.

A. Okay.

Q. Two of them were Anthony Sumner and Earl Hawkins, correct?

A. Yes.

Q. And the other three are the three that your counsel and I talked about in opening statement, correct?

A. Yes.

Q. And they're going to testify in this trial, correct?

A. I don't know who is going to testify for sure or not.

Q. All right. Let's talk about Earl Hawkins. You told us -- and I am going to bring your attention back to the parole letter you wrote for Earl. Do you remember what we are talking about there?

MR. KULWIN: Judge, this is outside the scope of cross. I didn't go into this at all.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You told Mr. Kulwin that you do not make promises to

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 120 of 140 PageID #:19647
Case: 1:13-cv-01168 Document #: 185-34 Filed: 02/24/16 Page 120 of 140 PageID #:30521

witnesses, didn't you tell him that multiple times?

A. Did I answer the question that way, yes.

Q. Yes.

And that's important to you never to make a promise to a witness, right?

A. We are talking about promises that I can't make to a witness such as what a judge will decide.

Q. All right. If you don't make promises to witnesses, why did you make a solemn promise to Earl Hawkins that you were going to give him consideration if he ever came up for parole?

A. We are playing semantics. If I made a promise to Earl Hawkins, I made a promise to Earl Hawkins that at any time it became necessary, I would speak before a judge, either a state court judge or a federal judge or any other body such as a parole board or other as to the extent of his cooperation, but.

Q. That was a promise then, right?

A. Yeah.

Q. A solemn promise?

A. I would consider I gave my word on that, yes.

Q. Why didn't you write a letter to the parole board in 1999 the first time early came up?

A. I don't know if I did. Are you saying there was one? I don't know that that existed.

Q. Why didn't you write a letter to the parole board in 2001?

120

A.   I didn't know he had a parole hearing in those years.

Q.   He had a parole hearing in 2003, 2004, 2007, and 2009?

MR. KULWIN:   Lay a foundation that he knows that.

BY MR. LOEVY:

Q.   Plaintiff 212, your Honor, is Mr. Hawkins' parole records?

THE COURT:   Just ask the question.  I think you have made the point.

BY MR. LOEVY:

Q.   The first and only time you wrote a letter for Earl Hawkins was two and a half months after he provided testimony that was favorable to you in the hearing in this case, correct?

A.   After he testified here, yes.

Q.   How did you learn that he was having a parole hearing two and a half months after he testified in your case?

A.   I was notified.

Q.   Who notified you, sir?

A.   The U.S. Attorney's Office.

Q.   Had they notified you in 2011, 2012, 2009?

A.   I don't believe so.

Q.   What were the circumstances where the U.S. Attorney's Office was telling you two and a half months --

THE COURT:   Ask a more focused question.

BY MR. LOEVY:

Q.   What were the circumstances that the U.S. Attorney's

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 122 of 140 PageID #:19649
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 122 of 140 PageID #:30523

Office was telling you a parole hearing was coming up?

THE COURT:  You need to ask a more focused question.
What were the circumstances, even I don't understand.

BY MR. LOEVY:

Q.  Is it a coincidence or is it not a coincidence that he provides the testimony, you write a letter?

A.  It's not a coincidence.

Q.  It's not a coincidence?

A.  I don't believe so.  I believe it stems back from 1988, and I was asked to do so and I did so to keep my word back from '88, 89.

MR. LOEVY:  I have no further questions, your Honor.

THE COURT:  Mr. Kulwin.

- - -

DAVID O'CALLAGHAN, RECROSS-EXAMINATION

BY MR. KULWIN:

Q.  Let start, Dave.  Mr. Loevy just asked you a bunch of questions about how the only witness that you found in your 85 investigation that wasn't in '84 was Gerald Morris.  Do you remember that question?

A.  I do.

Q.  That's false, isn't it?

MR. LOEVY:  Your Honor, it was a question.

MR. KULWIN:  It was a --

THE COURT:  I need to see you at sidebar.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 123 of 140 PageID #:19650
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 123 of 140 PageID #:30524

11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

                                                                    122

12:19:36    (The following proceedings were had at sidebar outside the hearing of the jury:)

12:19:41    THE COURT:  Okay.  Everybody and I expect you to pass this onto your fellow people on your teams is now on notice that you are going to get one, one more improper statement in front of the jury and then I am going to start imposing penalties, monetary penalties.  I am going to strike your comment.  You are not supposed to do that.  It's incorrect.  I am going to instruct the jury that it's incorrect because it is.  It was a question.  And it's stricken and so that's your first one.  That's your first one.

12:20:23    (The following proceedings were had in open court in the presence and hearing of the jury:)

12:20:24    THE COURT:  Okay.  You heard me during the trial tell the lawyers make objections, ask questions, don't make comments except when it's opening and closing.  What was just done there was a comment.  It's improper, it's stricken.  I warned the lawyers at sidebar that that is to stop immediately.  So now ask a question.

BY MR. KULWIN:

Q.  Dave, was Gerald Morris the only person or was Torrence White another?

A.  Was Torrence White new?

Q.  Yes.

A.  Yes.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 124 of 140 PageID #:19651
Case: 1:10-cv-01168 Document #: 285-34 Filed: 02/24/16 Page 124 of 140 PageID #:30525
11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

123

Q.  Okay.  And what evidence did Torrence White ultimately provide in your investigation with respect to Earl Hawkins and Nathson Fields, what did he ultimately provide?

A.  He ultimately provided that he was unable to make an identification, but he made a little statement in there too.

Q.  Okay.  So you found a new witness that went against the entire theory?

        MR. LOEVY:  Objection, leading, your Honor.

        THE COURT:  Overruled.

BY MR. KULWIN:

Q.  The entire theory Mr. Sumner had provided, do I understand that correct?  Isn't that true?

A.  Yes.

Q.  Now,  you were asked some questions about why you put cuffs on people when you're doing an investigation.  Do you remember that?

A.  Yes.

Q.  Let's be crystal clear, it had nothing to do with trying to force people to give testimony; is that correct?

        MR. LOEVY:  Objection, leading, your Honor.

        THE COURT:  Overruled.

BY MR. KULWIN:

Q.  ; is that correct?

A.  That is absolutely correct.

Q.  Tell the jury why, although I think they know, tell the

jury why you would ever in an investigation put cuffs on a witness, potential witness.  Go ahead.

A.  I'm answering?

Q.  You're answering.

A.  As I think I kind of stated already, it would be a tactic even with an informant, my known informants that I would roll up on them, cuff them, drag them off the street to a safe place, and therefore protect the fact that they're cooperating with me or giving information, so it's for their safety.  It's like a big show out in the street, all the eyes are on you.

Q.  Okay.  You were asked a series -- and when you did that, the witness, the potential witness wanted you to do that to protect them, do I understand you correctly?

THE COURT:  The objection to leading is sustained.

BY MR. KULWIN:

Q.  Let's go to defendants' Exhibit 181.  You were asked a number of questions?

THE COURT:  You might want to zoom that out a little bit.

MR. KULWIN:  Sorry, Judge.  Thank you.

BY MR. KULWIN:

Q.  You were asked a number of questions about what Gerald Morris said up in 1999.  The first thing I got to ask you, were asked why didn't you get Gerald to sign an affidavit to lock him in.  Do you remember that question?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 126 of 140 PageID #:19653
Case: 1:13-cv-01168 Document #: 1185-14 Filed: 02/24/17 Page 126 of 140 PageID #:30527

A. Yes, it was 2000.

Q. 2000. You were asked that.

When you're confident that a witness is telling you the truth and is going to keep telling him the truth, do you need to lock him in with an affidavit?

A. No.

Q. Did Gerald Morris years later after you didn't lock him in walk into a courthouse at 26th and California, raise his hand and swear under oath that Nathson Fields was the killer?

A. I believe you're correct.

Q. Did you do anything in 2001, 2, 3, 4, 5, 6, 7, 8 to get Gerald Morris to stick with his story?

A. No, I really didn't even know where Gerald was then.

Q. Now, you were asked some questions about, gosh, the purpose of writing every little note down is so the criminal defense attorney can cross-examine you at the trial about your investigation. Do you remember that, do you remember those questions?

A. I do.

Q. In this very case, in this very criminal case, 1986, with all the police reports, did Nathson Fields' attorney ever get up to cross-examine you about anything?

MR. LOEVY: Objection, asked and answered on the first.

THE COURT: Sustained.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 127 of 140 PageID #:19654
Case: 1:13-cv-01168 Document #: 185-34 Filed: 02/24/16 Page 127 of 140 PageID #:30528
11/23/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

126

BY MR. KULWIN:

Q. Did he need notes to cross-examine you when you have police reports to say exactly what you did? You can answer it.

A. No, I don't believe so.

Q. You were asked some questions about -- you were asked some questions about whether the protocol at the meeting in Milwaukee was that Gerald was supposed to underline what wasn't true. Do you remember that -- those questions? Do you remember the questions?

A. Yes.

Q. Okay. But it really says, though, what it says is that Gerald was then asked to underline those parts of the statements that he never told to the attorneys when he first talked to them. Isn't that what it says?

A. Yes.

Q. It doesn't say anything about it's not true?

        MR. LOEVY: Objection, your Honor.

        THE COURT: Finish the question.

BY MR. KULWIN:

Q. It doesn't say anything about he is not underlying because it's not true, does it?

        THE COURT: The objection is overruled. You can answer.

        THE WITNESS: No, it does not.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 128 of 140 PageID #:19655
Case: 1:10-cv-01168 Document #: 1285-14 Filed: 02/24/17 Page 128 of 140 PageID #:30529

BY MR. KULWIN:

Q. You were asked some questions about are you sure that you were in the witness room during the lineups involving Mr. Fields. Do you remember those questions?

A. Yes.

Q. Did anybody, to your knowledge, ever testify, anybody, Gerald Morris, Randy Langston, Eric Langston, Eric Benson, Carlos Willis, Torrence White that while they were viewing the lineup of Nathson Fields, you were standing there picking his shirt up to show the tattoo, are you aware of any of them?

MR. LOEVY: Objection, your Honor. I didn't ask about the shirt and he covered this last time.

THE COURT: Sustained.

BY MR. KULWIN:

Q. Are you aware of any witness who saw you in the lineup room with Nathson Fields?

MR. LOEVY: Beyond the scope.

THE COURT: Overruled.

THE WITNESS: They couldn't because I was in the room with them.

BY MR. KULWIN:

Q. And are you aware of anyone saying that?

A. No.

Q. You were asked some questions about whether Mr. Fields has a right to wear a suit at court. Do you remember those

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 129 of 140 PageID #:19656
Case: 1:23-cv-01168 Document #: 1185-34 Filed: 02/24/26 Page 129 of 140 PageID #:30530

questions?

A.  Yes.

Q.  Was your testimony about why you took the tattoo, somehow you saying that criminal defendants don't have rights to wear suits?

A.  No.

Q.  Explain to the jury why you take a picture of a tattoo and how it relates to wearing a suit.

A.  I take the tattoo or scars or other issues to prove that a subject had such a tattoo or other markings at that time for trial later.

Q.  You were asked some questions about Inetta Watts and her daughter.  Do you remember those questions?

A.  Yes.

Q.  Okay.  In the interview, does Ms. Watts give you the phone number of her daughter as you recall?

A.  No, I think she called her.

Q.  She called her for you.

     Where was her daughter?

A.  Her daughter was somewhere out of state, I believe.

Q.  What was the purpose of having her call her daughter, if you recall?

A.  I asked her to.

Q.  Okay.  And she said okay?

A.  She did.

Q.  Did you ever ultimately get any agreement from her daughter to come and testify for anything?

A.  No.

Q.  When you were asked whether or not Ms. Watts was purposely jeopardizing her daughter's safety by giving you her phone number, is that what you understood Ms. Watts to be doing?

A.  No.

Q.  What did you understand her to be doing?

A.  I understand Ms. Watts to possibly be giving me a second lead that may be feasible.

Q.  That Ms. Watts' daughter might know something about who killed the people, not that she's going to volunteer to be a witness, do I understand that correctly?

        MR. LOEVY:  Objection, leading.

        THE COURT:  Sustained.

        MR. KULWIN:  If I may have a moment, Judge.

        THE COURT:  Yes.

   (Brief pause.)

BY MR. KULWIN:

Q.  Mr. Loevy, do you still have that Plaintiff's Exhibit 86 up there?

A.  That's the Bob Prawiec report?

Q.  No, no, no, no.  That's the full police report?

A.  The stack of all reports.

Q.  Do you have the stack?

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 131 of 140 PageID #:19658
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 131 of 140 PageID #:30532
11/23/16 AM                  ***REALTIME UNEDITED TRANSCRIPT ONLY***
130

A.  Sure.

Q.  Last point.  Real quick.  I think you have mine actually; yeah, you've got yours.  That one.

Mr. Loevy asked you some questions about your interview with James Langston.  Do you remember those questions?  Do you remember him asking --

THE COURT:  Just ask the question, please.

THE WITNESS:  The answer --

BY MR. KULWIN:

Q.  Mr. O'Callaghan?

A.  He asked me those questions.

Q.  Okay.  You never interviewed James Langston, did you?

A.  You're correct.

Q.  James Langston was interviewed in 1984?

A.  Correct.

Q.  That's what the police reports reflect, right?

A.  Correct.

Q.  And if I can have that back for a second.

And what James Langston?

MR. LOEVY:  Objection to relevance and scope, your Honor.

THE COURT:  When I hear the question, I'll decide whether to sustain it.

BY MR. KULWIN:

Q.  What James Langston said at the time in 1984 was that he

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 132 of 140 PageID #:19659
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 132 of 140 PageID #:30533

heard six shots, saw a man wearing a ski mask and then rolled it up over his face as he ran through the breezeway?

THE COURT:  The objection is sustained.  Rule 403.

BY MR. KULWIN:

Q.  You were asked a series of questions about did you put your opinions or theories or anything like that in your police reports by writing notes.  Do you remember those questions?

MR. LOEVY:  Objection, asked and answered.

THE COURT:  Just ask a question, please.

BY MR. KULWIN:

Q.  Sir, is it proper for police officers to write theories and opinions in their police reports about what they think of the witnesses?

MR. LOEVY:  Objection, your Honor.  It's been covered.

THE COURT:  Overruled.  It's a yes or no question.

BY MR. KULWIN:

Q.  Yes or no?

A.  No.

THE COURT:  Anything non-repetitive?

MR. KULWIN:  I have nothing.

THE COURT:  Anything none repetitive.

MR. LOEVY:  No.

THE COURT:  One of the jurors already handed me.  I got that.  I have a couple the lawyers can go over to sidebar.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 133 of 140 PageID #:19660
Case: 1:13-cv-01168 Document #: 285-34 Filed: 02/24/17 Page 133 of 140 PageID #:30534

11/23/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

132

Then we will break for lunch after we finish the juror questions and whatever follow up is needed.

One thing I will tell you is that there is at least a possibility that the cafeteria may be closed today.  There was some suggestion that they might close early.  I did not get any definitive word on that.  My advice to you is if you are going to the cafeteria, take your jacket with you so if the cafeteria is closed, you can go straight outside and you don't have to come back out.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  Okay.  What was final disposition on 1989 lawsuit against Detective O'Callaghan.

MR. LOEVY:  It was dismissed, your Honor.

THE COURT:  Is there a problem with that?

MR. LOEVY:  No.

THE COURT:  Okay.  Is he going to know the answer? Does he have any knowledge of the answer?

MR. KULWIN:  No.

THE COURT:  I am not going to ask it then.  When did you last work at area one detective group, any problem with that?

MR. LOEVY:  No.

THE COURT:  Are you aware of any time information or notes were intentionally withheld from a subpoena.  That is no

11/23/16 AM
Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 134 of 140 PageID #:19661
Case: 1:13-cv-01168 Document #: 1185-14 Filed: 02/24/16 Page 134 of 140 PageID #:30535
***REALTIME UNEDITED TRANSCRIPT ONLY***

133

way on God's green earth that I am ever going to ask that question.

No.

How often are fillers picked in a lineup or rather how often are known false IDs made in a lineup. I am loathe to get into percentages. Does anybody have a problem with me not asking that.

MR. LOEVY: No, your Honor.

THE COURT: Was Fields' photo shown to Inetta Watts in '85.

MR. LOEVY: Yes.

THE COURT: That's the only one I am going to ask on that page. There were actually -- one question this handcuffing tactic, I got a smile when I read this, didn't this tactic ever back fire since the people in the neighborhood would eventually know that it's a tactic? That is a pretty good question. Does anybody have a problem.

MR. KULWIN: No.

THE COURT: It is kind of a good enough question, he ought to get it asked.

When something is changed on a police report, specifically crossing out of the word identified is it policies and practices that the person that crossed it out should initial it.

MR. KULWIN: Relevance.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 135 of 140 PageID #:19662
11/23/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

134

THE COURT: He may know from experience. Two questions about that there were police reports that had your signature, were there police reports of somebody else signing your name, one said is that normal and allowed policies and practices of the department, why would you allow somebody else to sign your name to a report that you don't know about, I think that's really the same question. Then there's did you ever see the reports that have your name typed on it and which you didn't sign, anybody have a problem with those?

MR. LOEVY: No.

MR. KULWIN: At what time.

THE COURT: Yeah, I'll fix it. I'll fix all of these when I ask them.

These questions have to do with the traffic stop that led to Mr. Fields' coming, getting arrested and brought in. What was the traffic violation, who were the officers that stopped him, were you aware of the violation, the nature of the violation. Does anybody know the answers to those questions? Speeding?

MR. KULWIN: There was an exhibit, speeding, it was a patrol officer.

MR. LOEVY: Of all the random things to ask.

THE COURT: You see it all the time. I am going to ask that then.

I'm okay to ask about what happened to the lawsuit.

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 136 of 140 PageID #:19663
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 136 of 140 PageID #:30537
11/23/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

135

MR. KULWIN:  No.

THE COURT:  No, I am not going to ask them.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Okay.  So, again, for the jurors, I am going to ask some but not all of the questions.  Don't try to speculate to the answers on questions I am not asking and I am rephrasing some of them.

So let me just start in here.

So the first question has to do with the stack of photos shown to Inetta Watts on May, I think it was May 20th of 1985.  Was there a photo of Mr. Fields in that stack?

THE WITNESS:  Yeah, the date was different, but, yes.

THE COURT:  The date is wrong.

THE WITNESS:  Yes.

THE COURT:  Whenever it was --

THE WITNESS:  Yes, sir.

THE COURT:  Second question has to do with this tactic about handcuffing people to get them to speak to you without fear.  So the question is wouldn't this eventually back fire because people in the neighborhood would figure out it was a tactic?

THE WITNESS:  No.

THE COURT:  Okay.  There you go.

Next question has to do with you recall there was the

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 137 of 140 PageID #:19664
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/16 Page 137 of 140 PageID #:30538

11/23/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

136

one report or maybe there was one, where it was the Ferguson report where identified is crossed out.  Is it the normal practice when somebody crosses that out that they are supposed to initial it or anything like that in your experience? ?  In other words, initial the cross out so you know who crossed it out?

THE WITNESS:  No, I don't know that, Judge.

THE COURT:  The next couple of questions have to do with the reports that have your name and a signature but it's not your signature.  Do you know what I am talking about?

THE WITNESS:  Yes, I do, Judge.

THE COURT:  On those situations, does that mean that you -- that you didn't actually see the report with your name on it or did you see it before, did you see it later, how did that work?

THE WITNESS:  It would be probably later.  Otherwise, if I was to see it, I would have signed it myself personally.

THE COURT:  All right.  So then the next question is was it normal or sort of standard practice of the department for one person to sign another detective's name?

THE WITNESS:  Yes, for overtime, yes.

THE COURT:  State it again.

THE WITNESS:  To avoid overtime, ten detectives can't stand around.

THE COURT:  That answered the follow-up question, so

Case: 1:23-cv-01737 Document #: 287-34 Filed: 04/06/26 Page 138 of 140 PageID #:19665
Case: 1:13-cv-01168 Document #: 285-14 Filed: 02/24/17 Page 138 of 140 PageID #:30539
11/23/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

137

I don't need to ask the follow-up question.

The last one has to do with when Mr. Fields was picked up, you said it was on a traffic stop. Do you know who the officer were that stopped him?

THE WITNESS: Yes, there's an arrest slip.

THE COURT: Were they detectives or patrol officers?

THE WITNESS: They were both.

THE COURT: Okay. Both.

THE WITNESS: It's my understanding, Judge, both.

THE COURT: Do you know what the nature of the traffic violation was? Do you remember as you sit there is this.

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: The initial stop, no, I don't, Judge.

THE COURT: All right. Any follow-up based on that.

MR. LOEVY: No.

MR. KULWIN: I just have one, Judge. Just one question.

- - -

DAVID O'CALLAGHAN, RECROSS-EXAMINATION

BY MR. KULWIN:

Q. Can you explain what you mean about the signatures to avoid overtime, what do you mean?

A. During the course of the night, the city has a budget, so

during the course of the night, many of us work on it and I was a supervisor, so if I allowed ten detectives to sit around until a report was generated and then all sign off, that's 10 hours and 10 hours and 10 hours, they're out. One person generates a report and it's common practice for one detective to sign other detective's names.

THE COURT: Okay.

- - -

DAVID O'CALLAGHAN, REDIRECT EXAMINATION

BY MR. LOEVY:

Q. So that's yes that reports are supposed to get submitted right aayou don't want to wait until the next shift?

A. You're incorrect. If you work 24 hours, you better go home and get some sleep before you write a multipage report, no.

Q. The idea was to get them submitted as fast as possible, that's why you signed each other's names?

A. Right. When it could be, I guess.

THE COURT: All right. We are breaking for lunch. We will start back in an hour. We won't -- we will go for -- it kind of depends on how long the next witness is. It might be earlier. I will be right back out for the lawyers.

(The jury leaves the courtroom.)

THE COURT: Anything before we break for lunch? Anything before we break for lunch.

***REALTIME UNEDITED TRANSCRIPT ONLY***

MR. LOEVY: My colleagues pointed out, your Honor, that I was doing a lot of this and there is with the pointing.

THE COURT: Well, you were indeed.

MR. LOEVY: Could we have the record reflect.

THE COURT: No, not now. Too late. See you. See you in an hour.

(The trial was adjourned at 12:40 p.m. until 1:40 p.m. of this same day and date.)