# Exhibit 35

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 2 of 133 PageID #:19669
Case: 1:10-cv-01168 Document #: 485-32 Filed: 02/24/17 Page 2 of 133 PageID #:31504
12/01/16 AM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

1

Judge Kennelly, December 1, 2016.

THE COURT: Trial.

THE CLERK: Case number 10 C 1168.

MR. ART: Steve Art, Anand Swaminathan, Candace Gorman for the plaintiff.

MR. BURNS: Good morning, your Honor. Terry Burns, Dan Noland, Paul Michalik on behalf the City of Chicago and Joseph Murphy.

THE COURT: First of all.

MR. KULWIN: Hello, your Honor.

THE COURT: I'm sorry.

MR. KULWIN: It's okay. Shelly Kulwin, Rachel Katz on behalf of defendant O'Callaghan.

THE COURT: First of all, we have a little table that's on wheels, so we can move it if necessary, there is a screen up here which is the equivalent of the witness screen and then we got a better -- the thing was kind of cutting in and out yet, so I have a better wireless mic. So if we need to move that, it's fine. It's on wheels. We will just kind of sort that out when we get it.

That's number one. I've got I think everything that everybody filed on this witness protection issue, and there's, I guess there's different issues for different witnesses, so I want to just -- because we got such a late start with the jury yesterday, at the moment I just want to deal with it on

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 3 of 133 PageID #:19670
Case: 1:10-cv-01168 Document #: 485-32 Filed: 02/24/17 Page 3 of 133 PageID #:31505
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

2

Mr. Murphy, so that will be paragraph 7 of the -- paragraph 5 of the defendants' proffer and paragraph 7 of the plaintiff's response to that.

So am I right that -- Mr. Kulwin, do you have or Mr. Burns, do you have your submission in front of you guys there?

MR. KULWIN: Yeah.

THE COURT: Paragraph 5, am I right that paragraphs 1 through 5 have basically already come in for Mr. Murphy or not?

MR. BURNS: Page 5.

MR. KULWIN: Did it already come in through Mr. Murphy?

THE COURT: I don't remember.

MR. KULWIN: No.

THE COURT: It hasn't come in through his examination yet.

MR. ART: My memory is he got most of items 1 through 5 of defendants' proffer already in.

THE COURT: The way I am reading the reply filed by the plaintiff is that at this point there's really no objection to Mr. Murphy testifying to items 1 through 5 is that right?

MR. LOEVY: We have some confusion. Are you asking whether we covered this already with Murphy?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 4 of 133 PageID #:19671
Case: 1:10-cv-01168 Document #: 485-22 Filed: 02/24/17 Page 4 of 133 PageID #:31506
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

3

THE COURT:  No, I am asking the question that I am asking.  I'm looking at the response, the reply that was filed last night, paragraph 7.  With respect to paragraph 5, plaintiff has no objection to defendant Murphy telling the story about the arrest of Mr. Beseth and Mr. Swano, items 1 through 6.  You are okay with that?

MR. LOEVY:  Yes, your Honor.  I understand now.

THE COURT:  You have an objection to the rest of it, 7, 8, and 9.

MR. ART:  Yes.

THE COURT:  That's the way I'm reading it.

MR. LOEVY:  Got it.

THE COURT:  Actually, there isn't a 9.  I am not seeing 9.  It's just 7 and 8.

MR. ART:  Yes, that's my mistake.

THE COURT:  What you're telling me on that is that I made a ruling, it's document No. 550, which I have to pull out here, before the previous trial that that was inadmissible.  So on the defense side, do you agree or disagree that I made that ruling?

MR. BURNS:  Just one moment, your Honor.

MR. KULWIN:  You are talking --

THE COURT:  Items 7 and 8.  The plaintiff is saying that I made a ruling on that in document 550 prior to the previous trial.  Document 550 is an order dated March the 9th

12/01/16 AM
Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 5 of 133 PageID #:19672
Case: 1:10-cv-01168 Document #: 185-22 Filed: 02/24/17 Page 5 of 133 PageID #:31507
***REALTIME UNEDITED TRANSCRIPT ONLY***

4

of 2014.

MR. ART: Your Honor, the particular parts of that order we're referring to are on our response on page 2, at the top of page 2.

MR. BURNS: Judge, maybe I could obviate some of the discussion as at least as Mr. Murphy is concerned.

THE COURT: Go for it.

MR. BURNS: Mr. Murphy will testify as to the events that occurred at the playground.

THE COURT: You said at the playground?

MR. BURNS: At the playground.

THE COURT: That's the Swano incident.

MR. BURNS: That's this incident in the paragraph. He is not going to be testifying as to intimidation. He is going talking about what happened when he went there. He did receive a call, went to that location, found the two children there, found Beseth, found Swano, talked to them, asked what they had said, but he is not getting into a discussion that they were intimidating, that they were threatening, that they were saying things. So it's not intended for that purpose, your Honor if that helps.

MR. ART: I think we have agreement with what Mr. Burns is saying and that is what's covered in paragraphs 1 through 6.

THE COURT: So, yeah, that's what I'm talking about

paragraphs 7 and 8. It's the Jean Ball thing and the.

MR. ART: Morris relocation.

THE COURT: The relocation.

MR. BURNS: In regard to Jean Ball, Jean Ball was there. I think we heard yesterday that she is the wife of James Speights who was a general in the El Rukns. That would be the extent. We don't intend to go beyond that, your Honor. That was already elicited through testimony.

THE COURT: Didn't that come out earlier in the trial?

MR. LOEVY: There is no testimony that she is married to James Speights which we don't even believe is true. There is no foundation for that testimony.

THE COURT: I don't think it's contended that she is married. Common law doesn't mean this is what happens I tell people, she is not the common law wide, she is the common law wife.

MR. LOEVY: The girlfriend I guess is what they are saying.

MR. BURNS: We are going to, Mr. Murphy, the testimony he gave yesterday, we are not going beyond. If there is a belief that we are going to say that she was there threatening, we are not going to be saying that about Jean Ball, the wife, the common law wife, the friend of James Speights, however people wish to characterize it.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 7 of 133 PageID #:19674
Case: 1:10-cv-01168 Document #: 1485-22 Filed: 02/24/07 Page 7 of 133 PageID #:31509

THE COURT:  I know there was testimony about this earlier in the trial.

MR. KULWIN:  There was.

THE COURT:  From who?

MR. KULWIN:  I believe it was from Earl Hawkins. Incompetent read his 2009 trial testimony that James Speights was a general.

THE COURT:  No, but about this incident.

MR. KULWIN:  About Jean Ball, that incident.

THE COURT:  Maybe I just seen it in reports.  Was it in a report.

MR. KULWIN:  No.

MR. LOEVY:  I think they just keep saying it.  It's not testimony.

MR. KULWIN:  I think it came out.

MR. LOEVY:  You know where you saw it in the Beseth deposition, isn't it true you brought along James Speights the common law wife and he said I don't know who she is.  That's what you're probably thinking of.

THE COURT:  Maybe that's where I read it because I read it the night before last.

MR. BURNS:  What we were talking about was admitted in the last trial back in 2014, your Honor.

THE COURT:  This person named ball was there and that she was understood to be the common law wife.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 8 of 133 PageID #:19675
Case: 1:10-cv-01168 Document #: 485-22 Filed: 02/24/17 Page 8 of 133 PageID #:31510

MR. KULWIN: We have it right here, it was on page 1534.

THE COURT: Do you have a date?

MR. KULWIN: It's Exhibit A to our filing.

THE COURT: Do you have a date?

MR. BURNS: I believe, Judge, the date --

THE COURT: What was the page, Mr. Kulwin.

MR. KULWIN: 1534.

THE COURT: Got it. I'm looking at it. Thanks. I let it in at the last trial, I'm letting it in in this trial.

That leaves item number 8. What does Mr. Murphy have personal knowledge of regarding Morris' relocation?

MR. BURNS: He, and this was in conjunction with the state's attorney's office, asked to relocate Morris and his family. They did that on a Friday night. The testimony I anticipate that he will give in regard to intimidation was that Morris felt that he and his family were threatened and that's why the relocation occurred. I think Detective O'Callaghan talked about this, your Honor.

THE COURT: I am just asking about Mr. Murphy.

MR. BURNS: I know --

THE COURT: Mr. Murphy is going to say that he put in the request to the state's attorney's office.

MR. BURNS: They were requested by the state's attorney's office.

THE COURT:  That he was asked by the state's attorney's office to move Mr. Morris up to Milwaukee.

MR. BURNS:  To the witness victim program.  That's how it came to him.  He said we really were the ones to simply then moved him.

THE COURT:  And so the information he has about why that happened came from the state's attorney's office?

MR. BURNS:  Yes.

THE COURT:  It's hearsay.  You can't put that in.  So you can put in that he moved him up to Wisconsin but you can't put in why because the statement from the state's attorney's office is hearsay.  That's it.  I've ruled.

What else do I have to deal with before with he start?

MR. ART:  You just need to know that Mr. Wharrie is going to go on.  We are going to break in Mr. Murphy right now.

MR. LOEVY:  A couple things.  The new ink despite.  We found a reference in the transcript.  We resolved it.  We are going to handle it the way we handled it at the last trial.

THE COURT:  Look, if I don't have to worry about it, don't bother me with it.

Let's get the jury.

MR. BURNS:  Judge, if I say victim witness --

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 10 of 133 PageID #:19677
Case: 1:10-cv-01168 Document #: 1185-2 Filed: 02/24/17 Page 10 of 133 PageID #:31512
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

9

THE COURT:  Victim witness program is the official name of it and you are okay with using that term, yes.

MR. NOLAND:  Your Honor, may I speak with Mr. Murphy about the Court's ruling?

THE COURT:  Absolutely.  That's fine.

MR. NOLAND:  Thank you.

THE COURT:  Everybody have a seat.  I have a technical issue I have to deal with.

(The jury enters the courtroom.)

THE COURT:  Better today than yesterday.  I am going to give myself a pat on the back.  You see there is a different person up here.  We are interrupting Mr. Murphy's testimony.  That's my decision so we can keep things moving.

(Witness sworn.)

THE COURT:  Mr. Loevy, you can go ahead.

MR. LOEVY:  Thank you, your Honor.

- - -

LAWRENCE WHARRIE, DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Would you state your name for the record?

A.  Larry Wharrie.

Q.  What do you do for a living, sir?

A.  I am an attorney.

Q.  You are formerly a prosecutor, correct?

A.  Correct.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 11 of 133 PageID #:19678
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 11 of 133 PageID #:31513

Q. In the Cook County state's attorney's office?

A. Yes.

Q. And you were one of the prosecutors who prosecuted the murder case against Nate and Earl Hawkins back in '86, correct, sir?

A. That's correct.

Q. Let's talk about some of the evidence that got presented at that trial. I want to talk first about Randy Langston.

Now, you knew from the police reports that at one point when initially interviewed in 1984, Randy said there was one shooter, correct?

A. I believe that was in the report.

Q. All right. But by the time he testified at trial, he identified two shooter, Nate and Hawkins, correct?

A. That's correct.

Q. By question for you, sir, is was Randy saying there were two shooter by the time you started interacting with him or were you someone who was part of the process where he went from one to two?

A. I don't remember ever really talking to Randy Langston. My partner handled Randy Langston.

Q. So you had no involvement in whatever shift happened from one shooter to two, that had nothing to do with you?

A. I don't believe I talked with him to prepare him for trial.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 12 of 133 PageID #:19679
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 12 of 133 PageID #:31514
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

11

Q. So that had nothing to do with you, right?

A. That's correct.

Q. All right. Did you ever know that the notes from Randy Langston's interview taken by Detective Bogdalek had gone missing?

THE COURT: Do you want to put a time frame on that?

BY MR. LOEVY:

Q. Did you know back in '86 that there was a detective named Bogdalek who had taken notes of the initial interview with Randy Langston in '84?

A. I was aware of Bogdalek. He did write a report, maybe two pages long. I don't know if that's what you're referring to.

Q. Who did you depend on to make sure that you got all of the notes, the handwritten notes that under lied the reports?

A. We would order the reports throughout the normal course of business.

Q. And then would you depend on the police department to make sure that you had everything to turn over, right?

A. That's how it was done.

Q. As the prosecutor, it was your responsibility to turn over all potentially exculpatory information, correct?

THE COURT: This is my tech guy. In case you're wondering. Just pause for a second.

(Brief pause.)

THE COURT: Technical issue solved.

Go ahead, Mr. Loevy.  Sorry for the interruption.

BY MR. LOEVY:

Q.  I am being to move on to Gerald Morris.  Did you interact with Gerald Morris, sir?

A.  I may have interacted.  I just don't remember.  I don't think I put any of the eyewitnesses on for testimony.  That's my recollection.

Q.  You have had a chance to review the transcripts and your documents before you testified today, correct?

A.  I don't know that I reviewed the trial transcript.

Q.  But you have had -- you have taken some opportunity to refamiliarize yourself with the facts as you knew them, right?

A.  I did my best to refresh my memory from 30 some years ago.

Q.  Do you remember whether when Gerald Morris first got to the state's attorney's office, if he had the descriptions of the men, one was tall, short, black, dark, braids, that kind of level of description?  Were you part of those discussions?

A.  I believe there was a description in the police reports.

Q.  A description by Gerald Morris?

A.  I don't remember.

Q.  All right.  How about Richard Buckles, do you remember him being located shortly before trial?

A.  I remember the name Richard Buckles.

Q.  All right.  Do you remember how it was that after two years after the murder, he showed up as an eyewitness?

A. I thought Richard Buckles was somebody who had been interviewed early on.

Q. Let me show you Plaintiff's Exhibit 96. This is a police report memorializing the Richard Buckles's witness. Would you agree with that?

A. Yes.

Q. That's a report you would have had back then?

A. Yes.

Q. Does that refresh your recollection as to how Richard Buckles turned up as a witness in April of '86 before the June trial?

A. Yes, this would be his report.

Q. All right. Do you remember there being a two year gap between this guy Richard Buckles was found?

A. Well, this report is in 1986, so that would appear to be true.

Q. However, if you look at the first page, it's talking about the witness interaction in April of '85, correct, in the text?

MR. LOEVY: Your Honor, permission to publish defendants' 96.

THE COURT: All right. The jury can see it and Mr. Wharrie should be able to see it on the screen too.

THE WITNESS: Yes, now that I read the report, I think that's what I had read before coming here, that he had been interviewed in 1985.

12/01/16 AM

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 15 of 133 PageID #:19632
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 15 of 133 PageID #:31517
***REALTIME UNEDITED TRANSCRIPT ONLY***

14

BY MR. LOEVY:

Q. So was it your understanding that Buckles actually was located in '85, not in '86 as the prosecutor, was that the understanding you had?

A. Well, yes, if this report is correct, yes.

Q. You depended on the Chicago Police Department to give you the accurate information, correct?

A. Correct.

Q. But do you have any memory at all about a witness showing up at the last minute, Richard Buckles?  Either you do or you don't?

A. I'm sorry, I don't.

Q. All right.  Now, do you remember, this is Plaintiff's Exhibit 84-1  did anybody ever give you a document memorializing --

THE COURT:  Hold it still there.

MR. LOEVY:  Sure.  This is Plaintiff's Exhibit 84-1.

THE COURT:  Do you want to slide it up so he can see the top?

BY MR. LOEVY:

Q. This is a homicide lineup on May 18th, 85 signed by Sergeant Murphy of the Hawkins lineup.  Do you see that, sir?

A. Yes.

Q. Do you remember ever being told that witnesses in the case had identified a guy named Ray Ferguson instead of Earl

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 16 of 133 PageID #:19683
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 16 of 133 PageID #:31518

Hawkins?

A.  No, I do not.

Q.  That's something that would have stuck in your memory, right?

A.  Correct.

Q.  And can you state with a high degree of certainty that you never saw a document that Earl Hawkins was not identified?

A.  That's correct.

Q.  All right.  Your theory of the case was that Earl Hawkins was one of the two shooter, correct?

A.  Correct.

Q.  How many witnesses did you and your partner put on the stand that claimed to have seen Earl Hawkins come out of the breezeway, shoot him and run away?

A.  At the trial?

Q.  Yes, sir.

A.  I don't remember.  I think there was a couple.

Q.  Randy, Gerald and Richard all said that they saw Earl Hawkins do the shooting, correct?

A.  I'll take your word for it.

Q.  Those were the three guys.

A.  Okay.

Q.  But you do remember eyewitnesses came to the court and pointed at Earl as the shooter, correct?

A.  Correct.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 17 of 133 PageID #:19684
Case: 1:16-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 17 of 133 PageID #:31515

12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

16

Q. Did you have faith that those were legitimate identifications?

A. Yes.

Q. And did you place your faith in the police department to make sure that those were properly procured?

A. Yes.

Q. Did any witness or do you have any memory of Earl Hawkins having been a suspect in the case before Anthony Sumner in May of '85 put him into the crime, do you remember that at all?

A. Earl Hawkins?

Q. Yeah.

A. I don't think so. I don't remember.

Q. Your understanding of the case was always that it was a cold case until one day Anthony Sumner supposedly said, he got caught and he said it was me -- it was Earl Hawkins, two guys from Evanston and myself, right?

A. Correct.

Q. That's how you understood it?

A. Correct.

Q. You never knew or to this day didn't know that Earl Hawkins was a suspect before Sumner said that, did you?

A. I don't believe so.

Q. Because that would have changed the dynamic of the case, wouldn't it have?

A. Well, I don't know what you mean.

12/01/16 AM

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 18 of 133 PageID #:19685
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 18 of 133 PageID #:31520

***REALTIME UNEDITED TRANSCRIPT ONLY***

17

Q.  In other words, if law enforcement was saying to Sumner we know it was you and Earl, that would have been different than the theory you presented in court, right?

A.  Yeah, I didn't know anything about Earl Hawkins.

Q.  That would have been different than the theory you all presented, right?

A.  Correct.

Q.  All right.  Did you know that in 1984 -- well, I'll strike that.  I'll come back.

Now, one part of the case, the reason why the eyewitnesses were looking at Nate's photo was because Sumner claimed that Nate confessed, right?

A.  Correct.

Q.  And do you remember from looking at the reports what Sumner was claiming the alleged confession was?

A.  From Nathson Fields?

Q.  Right.

A.  He confronted Nathson Fields about it and Fields acknowledged that it was a good exercise.

Q.  It was a good exercise, right?

A.  Correct.

Q.  That was the words that was in the supposed confession?

A.  That's what I recall.

Q.  All right.  And this confession supposedly was heard by Anthony Sumner alone just the two of them, right?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 19 of 133 PageID #:19686
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 19 of 133 PageID #:31521
12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

18

A.  I believe you're right.

Q.  Take a look at the criminal trial, page 437 and see if that confirms your memory.

        MR. KULWIN:  Could we have a page, please?

        THE COURT:  He just said 437.

        MR. KULWIN:  Thank you, your Honor.

BY MR. LOEVY:

Q.  It's true, is it not, Mr. Wharrie, that the case you put on was Mr. Sumner testified that he was alone with Fields, just the two of them, Fields pulled him away in private to say it was a good exercise?

A.  Correct.

Q.  And obviously Anthony Sumner had a motive to lie at the time he was giving that testimony, right?

        MR. KULWIN:  Objection, Judge.

        THE COURT:  Overruled.

        THE WITNESS:  Not that I know of.

BY MR. LOEVY:

Q.  Well, he had been arrested for murdering, among other people, Joe White and Dee Eggars Vaughn, right?

A.  Correct.

Q.  And he was making deals to save himself, correct?

A.  There was initially there was not a deal with him.

Q.  All right.  But was he testifying without a deal?

A.  Initially, he was giving information without a deal

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

12/01/16 AM
Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 20 of 133 PageID #:19687
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 20 of 133 PageID #:31522
***REALTIME UNEDITED TRANSCRIPT ONLY***

19

because we didn't know what he was involved in.

Q. When he gave up his good friend Earl Hawkins and said my friend Earl Hawkins committed a murder, was he being given assurances that he would get benefits in return?

A. When he was talking about Earl Hawkins?

Q. Yeah. Focusing on the time period when Anthony said, all right, all right, police, my buddy Earl Hawkins committed the murder with two guys from Evanston and my landlord?

MR. KULWIN: Objection, argumentative.

THE COURT: Overruled.

BY MR. LOEVY:

Q. At that point in time, was it your understanding as the prosecutor that Sumner was being promised benefits in exchange for cooperating?

A. I don't believe that there was still an agreement with him. We told him that we would give him consideration, so I guess to a certain extent, you know, there was some agreement, but I don't think there was anything set in terms of what his agreement would be.

Q. All right. But as far as evidence as a prosecutor, he has a motivation to lie under those circumstances, correct?

MR. KULWIN: Objection, asked and answered.

THE COURT: Overruled. Please answer.

THE WITNESS: I wouldn't call it a motivation to lie. I would say that that's something that you take into

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 21 of 133 PageID #:19688

consideration, though.

BY MR. LOEVY:

Q. Sure. And that's why you have to corroborate it with things like eyewitnesses, right?

A. Correct.

Q. And there was something unusual about, though, the circumstances by which Mr. Sumner's claim that Nate confessed was documented, wasn't there?

        MR. BURNS: Objection, form of the question.

        THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. Do you remember anything unusual about the circumstances under which Mr. Fields' supposed confession to Sumner was documented?

A. I don't remember.

Q. All right. Take a look at Defendant's Exhibit 70. Is this a document you remember? This is the notes, the GPR notes dated May 14th, 85, submitted May 14th, 86, of a conversation Joe Murphy had with Anthony Sumner.

        My first question is you are looking at it, do you remember this?

A. Yes.

Q. All right. Now, take a moment and refamiliarize yourself with it. Mr. Wharrie, I am not going to ask you questions about the substance. Can I ask you a question?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 22 of 133 PageID #:19689
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 22 of 133 PageID #:31524

A.  Sure.

Q.  Having refamiliarized yourself generally with what this document is, do you have a recollection that there was an issue about the memorialization of the confession that Nate supposedly gave to Sumner?

A.  Not, no -- not then.

Q.  Wouldn't you have expected that there would be a police report memorializing that Sumner was claiming Nate confessed?

A.  There could be.

Q.  All right.  When you dealt with the Chicago Police Department a lot, right?

A.  Correct.

Q.  Was it your experience with the practices of the Chicago Police Department that if someone was going to claim that another man confessed to murder, that the police department might not make a police report?  I'm saying the Chicago Police Department.

A.  I would think they would.

Q.  Okay.  Was it the practice of the Chicago Police Department in your experience to create police reports when one man was claiming another man confessed to a murder in a capital murder case?

        MR. BURNS:  Objection, foundation, your Honor.

        THE COURT:  Overruled, given the limitation to his own experience when he was prosecuting cases.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 23 of 133 PageID #:19690
Case: 1:19-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 23 of 133 PageID #:31525

THE WITNESS:  I'm sorry.  Could you repeat that?

BY MR. LOEVY:

Q.  You prosecuted a lot of cases, right?

A.  Correct.

Q.  And you had a lot of cases involving the Chicago Police Department, correct?

A.  Correct.

Q.  Was it the practice of the Chicago Police Department ordinarily to create police reports when one man was claiming another man confessed in a capital murder case?

A.  Correct.

Q.  Okay.  Can you ever think of an exception in your entire career where in a capital murder case based around a confession, there was no police report?

A.  Well, this is a police report here.

Q.  Well, I'm talking about a supp report that is official, signed, and submitted.  You understand the difference, right?

A.  I do.

Q.  This is a GPR.  This is a notes, correct?

A.  Correct.

Q.  So now let's get back to my question.  Have you ever in your entire career prosecuted another case, a murder case with a confession where there wasn't an official police report documenting a confession?

        MR. BURNS:  Objection, your Honor?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 24 of 133 PageID #:19691
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 24 of 133 PageID #:31526
12/01/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

23

THE COURT:  Overruled.

THE WITNESS:  I can't say that I recall ever.

BY MR. LOEVY:

Q.  That would be extraordinarily unusual, wouldn't it?

A.  Like I said, I don't think I ever had that before, yes.

Q.  That happened in this case, didn't it?

A.  Yes, if this is the only statement.  If this is the only report that reflects that statement.

Q.  All right.  And this GPR notes, this does not get submitted through records and date stamped, correct?

A.  I am not sure what you're saying.

Q.  Official police reports when they're created, they're created by the end of tour of duty, correct?

A.  Yes.

Q.  And then they get submitted to records where they're date stamped, correct?

A.  Correct.

Q.  Then they become part of the official file?

A.  That's correct, I follow you.

Q.  GPRs, not so much, right?

A.  Correct.

Q.  Did you have concerns that this GPR dated May 14th, 85, but submitted May 14th, 86, was back dated after the fact?

A.  I don't think I noticed that.

Q.  It is true, is it not, that you cannot prosecute a murder

Case: 1:16-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 25 of 133 PageID #:31527

case without giving the other side some piece of paper reflecting a confession if you're going to use a confession, right?

A. You would have to give them everything.

Q. But let's say you wanted to have a murder trial and you wanted to try Nate and say that Sumner said he confessed, you couldn't put on that case without giving the defense some piece of paper saying that he confessed, right?

A. If it existed, yes.

Q. Well, I mean, if the police department had done an investigation and had supposedly taken a murder confession, your job as the prosecutor would have been to give paper to Nate saying somebody is claiming to have confessed, right?

A. Correct.

Q. So isn't it true that in April '86 in the lead up to Nate's trial, you all realized that there was no paper memorializing the supposed confession?

A. I don't recall. There was a gap where I was not there for court every day.

Q. Isn't it true that this document that I showed you, Defendant's Exhibit 70, wasn't produced to Nate until April of '86 shortly before the murder trial?

A. Like I say, I don't know. I was reassigned out to the south suburbs, so I didn't have anything to do with the file for a period of time.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 26 of 133 PageID #:19693
Case: 1:16-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 26 of 133 PageID #:31528

12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

25

Q. All right. You did live the case for at least a year or more, right?

A. Initially, I had the case.

Q. All right. That's what I'm getting at.

A. Yeah, initially, I had the case. That's correct. At some point, I got transferred out of 26th and California to be the supervisor out in the south suburbs, in Markham, I believe that was the summer of '85.

Q. Weren't you one of the trial lawyers, though, at Nate's trial?

A. I ended up coming back to try it.

Q. I see, so you had left and come back to try the case?

A. Right.

Q. Okay. In all of your interactions with this case, have you ever heard of a man named Derrick Kees?

A. With this case?

Q. Yes.

A. Well, I know who Derrick Kees is.

Q. Right. But do you remember Derrick Kees being part of the hit team?

A. On this case?

Q. Right.

A. No.

Q. In all of your interactions with Anthony Sumner, did you interact with Anthony Sumner, by the way?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 27 of 133 PageID #:19694
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

26

A.  Yes.

Q.  You debriefed him at some length, correct?

A.  I would interview him after he was debriefed by the police for the purposes of putting him in like a grand jury or for testimony.

Q.  You were that guy, right?

A.  That's right.

Q.  All right.  So you had extensive interactions with Anthony Sumner?

A.  Early on, yes.

Q.  And leaving aside the timing of it, you gave -- you interviewed him and got information from him, right?

A.  I pretty much had the information.  I would talk to him to prepare him for testimony.

Q.  And then you put him on at the grand jury and then you put him on at trial?

A.  I put Anthony Sumner in the grand jury a couple times and I put him on during the course of this trial.

Q.  All right.  So you -- based on that foundation of having talked to Anthony Sumner, did Anthony Sumner ever tell you that Derrick Kees, Earl Hawkins, Harry Evans, and himself were part of a hit team to murder Fuddy Smith?

A.  I never heard that.

Q.  That's something memories aside you would know if you heard that, wouldn't you?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 28 of 133 PageID #:19695
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 28 of 133 PageID #:31550

A.  Sure.

Q.  Because Anthony Sumner always said he had nothing to do with this murder, right?

A.  This one here, yes, you're right.

Q.  And Harry Evans had nothing to do with this murder, right?

A.  That's correct.

Q.  And Derrick Kees, you never even heard of as related to this murder, correct?

A.  Not to this one.

Q.  Do you know at one point Derrick Kees started claiming that he was part of the hit team?

        MR. KULWIN:  Judge, I am going to object. Argumentative.

        THE COURT:  Rephrase the question.

BY MR. LOEVY:

Q.  Whenever Derrick Kees said what he said, that was after you were no longer involved, right?

A.  I left the state's attorney's office in 1987.  I don't believe I had any contact with Derrick Kees.

Q.  All right.  Let's talk about the last area.  You have gotten some familiarity in the course of our litigation with the street file, correct?

A.  That's correct.

Q.  This is Plaintiff's Exhibit 1, your Honor.

        THE COURT:  Okay.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 29 of 133 PageID #:19696
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 29 of 133 PageID #:31551

12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

28

BY MR. LOEVY:

Q. Now, you have had an opportunity be to look through it and review it, correct?

A. Correct.

Q. You are quite sure, are you not, that this information, this file -- let me strike that. This file was not available to you back when you tried the capital murder case, correct?

A. That's correct.

Q. And the procedure was you would send a subpoena to the police department for documents, right?

A. I think initially it would just be a matter of just ordering the police report. I don't know that we would subpoena it in the first instance.

Q. All right. But eventually -- first you'd ask for the materials, right?

A. Correct.

Q. And then would you send a subpoena or you wouldn't?

A. In this case, I believe I saw that there was a subpoena issued at some point.

Q. All right. So the state's attorney's office issued a subpoena compelling the police department to produce all its material?

A. Correct, it wasn't me, but somebody else did. I saw that.

Q. All right. And the reason that you want all the material is because you have a constitutional duty to turn over all

29

exculpatory information to the criminal defendant, correct?

A.  Absolutely.

Q.  And that's something you took very seriously?

A.  Yes.

Q.  And as a prosecutor, you had no intention of trying a case where the rules weren't abided by, right?

A.  Correct.

Q.  But you couldn't physically go to the police department and get the stuff and find it in the files, right?

A.  No, we had no access to it.

Q.  Who did you depend on to make sure you got access to all the material, the police department, right?

A.  Yes.

Q.  All right.  At some point, Mr. Smeeton was raising an objection that he wasn't getting the street file, wasn't he, at the trial?

A.  I believe that came up, yes.

Q.  He was saying, look, all you've given me are eight pages of benign GPRs from the date of the murder, I know there has to be more.  He was telling the judge that, right?

A.  Correct.

Q.  So you then specifically requested to the police department, we have to turn this over, give me any street files that exist, correct?

A.  During the trial?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 31 of 133 PageID #:19698
Case: 1:16-cv-01168 Document #: 185-22 Filed: 02/24/17 Page 31 of 133 PageID #:31553

12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

30

Q.  Well, when Mr. Smeeton was complaining that he wasn't getting the investigative materials, it became your responsibility to answer the court, right?

A.  Yeah, and I believe that's when somebody from my office subpoenaed the records and I think it came back the same way with the eight pages you were talking about.

Q.  But not Plaintiff's Exhibit 1, right?

A.  That's correct.

Q.  But when the defense attorney complained, the judge looked at you and said give them the file, right?

A.  We didn't hold that there was any other file.  It was already subpoenaed.  That was what was returned.  What we had -- we had what the defense had.  We gave the defense what we had.

Q.  I understand.  I am not blaming you.  The judge, though, as the prosecutor, looked to you, right?

A.  Well, he would have -- he probably asked us if there was anything else.  If I was even there at the time.  Like I say, during these preliminary -- these day-to-day dates leading up to the trial, I was not in the courtroom.  I came back to actually do the trial, so a lot of these preliminaries I don't believe I was even present.

Q.  All right.  Did you interact with Detective O'Callaghan?

A.  At one point?

Q.  At any point.

          ***REALTIME UNEDITED TRANSCRIPT ONLY***

A.   He was -- he was the detective I believe on this case.

Q.   And you put him on the stand to testify at the trial, didn't you?  You were the attorney?

A.   I may have.  I don't remember.  Like I say, I haven't reviewed a trial transcript.

Q.   All right.  And you also interacted with Sergeant Murphy, correct?

A.   That's correct.

Q.   All right.  After Mr. Smeeton alleged that he wasn't getting the investigative materials, did you ask the police officers with whom you interacted, hey, are there more materials?

A.   I don't remember.  I'm sure we would have.

Q.   I mean, you would have had to have, right?

A.   If there was a request, if there's anything more, I'm sure we would have done that.

Q.   That would have been the protocol to talk to the police officers and say is there anything more, right?

A.   Correct.

A.   All right.  You didn't get -- although you don't remember the conversations, you do know you didn't get anything more, correct.

A.   Did not get anything more.

Q.   And you've now had a chance to review the material and it's correct?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 33 of 133 PageID #:19700
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 33 of 133 PageID #:31555

12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

32

A.  Yes.

Q.  It being Plaintiff's Exhibit 1?

A.  Well, I think so.  I mean, I have been given what I believe to be that.

Q.  Yeah.  In other words, I am not going to go through it now, the jury has seen it, but you have no doubt that if this had been made available to you, you would have turned it over to Mr. Fields, right?

A.  Absolutely.

Q.  Because it is potentially exculpatory, correct?

A.  Potentially.

Q.  And it would have been your responsibility to turn it over to Mr. Fields?

A.  Correct.

Q.  All right.  There were?

MR. LOEVY:  Your Honor, may I have a quick sidebar to show you?

(The following proceedings were had at sidebar outside the hearing of the jury:)

MR. LOEVY:  I want to be on the careful side.  This is testimony that I'd like to read to him.

THE COURT:  This is from the trial?

MR. LOEVY:  Yes.

THE COURT:  The '86 trial.

MR. LOEVY:  The reason I brought it over is because

***REALTIME UNEDITED TRANSCRIPT ONLY***

it wasn't in front of him.

THE COURT: It's not testimony.

MR. LOEVY: Exactly.

THE COURT: It's a discussion between the lawyers. It starts right here?

MR. LOEVY: Yes.

THE COURT: Do you want to look over my shoulder? It's a question about Derrick Benson?

MR. LOEVY: Right. And this is the --

THE COURT: I am looking at pages 157 and 158. Go ahead. Tell me what you are going to tell me.

MR. LOEVY: The gist is that the judge says, I don't care what you think, I just arrested your 11-year-old son because he wasn't here, and what I'd like to suggest is there's alternate reasons why people don't want to participate in the court process other than threatening witnesses.

THE COURT: Let me process that for a second. Now let me read it. Okay.

MR. KULWIN: Judge, the only admissibility of the trial transcript is materiality. Other than that, it's pure hearsay. All of these statements are pure hearsay. They are not admissible. And he's trying to draw an argumentative inference from it that doesn't exist. He doesn't know what's going on in the mind of the mother, he doesn't know if she's been threatened or not threatened. He doesn't know anything

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 35 of 133 PageID #:19702
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

34

any of that.

THE COURT:  I don't think it's comparable enough. I'm excluding it.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Okay.  You can proceed.

MR. LOEVY:  I have no further questions, your Honor.

THE COURT:  Mr. Burns.

MR. BURNS:  Thank you, your Honor.

                        - - -

LAWRENCE WHARRIE, CROSS-EXAMINATION

BY MR. BURNS:

Q.  Good morning, Mr. Wharrie.

A.  Good morning.

Q.  So it's clear for us, would you tell us how long or when you first became an assistant state's attorney and then tell me when you left.

A.  I started in the state's attorney's office in 1978 and I left in August 1st, 1987.

Q.  Now, in May of 1985, what was your assignment at that time?

A.  At that time, I was in the gang prosecution unit of the state's attorney's office at 26th and California.

Q.  And who was the chief of the unit?

A.  Earn /AOE /TKAO*EB.

12/01/16 AM
Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 36 of 133 PageID #:19708
***REALTIME UNEDITED TRANSCRIPT ONLY***

35

Q.   Now, you said just so we can understand what happened, you were involved, you told me, or you told the ladies and gentlemen of the jury early on in this case, the Smith/Hickman prosecution; is that correct?

A.   That's correct.

Q.   And you said at some point your position as a member of the gang crimes unit at the state's attorney's office changed, am I also correct?

A.   That's correct.

Q.   Where did you go?  Were you still in the office?

A.   I was still in the office.  I received a promotion.  I was made the supervisor of the sixth municipal district out in Markham and that was in I want to say approximately August of 1985, so shortly after this started, I went to Markham.

Q.   Now, at the time the case was tried in 1986, that was June of 1986; am I correct?

A.   Correct.

Q.   What was your position within the state's attorney's office then?

A.   I was still in Markham, I believe.

Q.   And what does the responsibility entail being the supervisor of the Markham state's attorney's office?

A.   There's approximately 30 cities and villages on the south side that makeup the sixth municipal district, any and all cases misdemeanors and felonies would go to the Markham

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 37 of 133 PageID #:19704
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 37 of 133 PageID #:31555

courthouse.  I supervised lawyers who were in about seven or eight courtrooms from minor traffic and misdemeanors through three felony courtrooms trying serious felonies.

Q.  So from -- again, what was the start, August of 1985?

A.  I believe it was August of '85 when I transferred to Markham.

Q.  All right.  And from that time until the time that this case started, did you remain in the position as the chief of the state's attorney's office in the sixth municipal district, Markham, Illinois?

A.  Correct.

Q.  Now, let me take you back in time, if I may.

You said that in June of 1985, that you were assigned to the gang crimes unit; am I correct?

A.  Correct.

Q.  And in May of 1985, did you have occasion to be assigned by Mr. /TKAO*EB, am I saying that name correctly?

A.  Correct.

Q.  So go to east Cleveland, Ohio?

A.  That's correct.

Q.  All right.  And what was the purpose in why you were sent to east Cleveland, Ohio?

A.  Sergeant Brannigan was in east Cleveland, Ohio.  They had five people in custody believed to be El Rukns, one of whom was James walker.  He had a pending arrest warrant.

Q.  Generally, then, just describe what your role was.

A.  I was asked if I would go out there and see if -- to see if there would be any statements taken from any of the five people that were there.

Q.  All right.  Did you learn or come to learn that one of the people that was there was an Earl Hawkins?

A.  Correct.

Q.  Was Earl Hawkins then detained or arrested or was he ultimately released from east Cleveland, Ohio police department?

A.  He was released.

Q.  And what about an Anthony Sumner, did you come to learn that he was in at least detained by the east Cleveland police department?

A.  Correct.

Q.  And that was following some type of raid in a home out in east Cleveland, Ohio?

A.  That's correct.

Q.  Was Anthony Sumner held on an arrest warrant?

A.  No.

Q.  Were there any charges against Anthony Sumner?

A.  No.

Q.  Was Anthony Sumner free to leave at any time that he wished?

A.  In east Cleveland?

Q. Yes, sir.

A. I don't know if he was free to leave when they were talking to him. I don't know if he was free to leave, but he wasn't under arrest.

Q. He began to cooperate at that time, didn't he?

A. Correct.

Q. He was under no obligation at that time to cooperate is that true?

A. Correct.

Q. In fact, the information that he provided to you was unknown to at least the gang crimes unit or at least the state's attorney's office; is that correct?

A. Correct.

Q. At that time once he agreed to cooperate, May 10th, 1985 in east Ohio, he said he wished to cooperate is that true?

A. At some point, yes.

Q. At some point that was over the time while still in east Cleveland, Ohio; am I correct?

A. Correct.

Q. Did he turn to Chicago to your knowledge?

A. Yes.

Q. I am talking about Anthony Sumner?

A. Yes.

Q. And did he return to Chicago and then come to the state's attorney's office?

12/01/16 AM

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 40 of 133 PageID #:19707
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 40 of 133 PageID #:31542

***REALTIME UNEDITED TRANSCRIPT ONLY***

39

A.  Yes, the following Monday, which would have been May 13th, he was brought to the Cook County state's attorney's office.

Q.  And, again, this is after he indicated that he wished to cooperate; is that correct?

A.  He was cooperating regarding the one case of James walker.

Q.  And did you come to learn that he actually was providing additional information?

A.  Sometime after he was brought back, he started providing information on more cases.

Q.  Now, were you involved in this matter involving Anthony Sumner and the information he was providing?

A.  I was involved.

Q.  Was this a task force between the Chicago Police Department, the Cook County state's attorney's office, and the United States attorney office?

A.  There were people.

Q.  I'm sorry?

A.  Yeah, there were people assigned from the Chicago Police Department, yes.

Q.  All right.  Were you present when Anthony Sumner was brought do the Cook County state's attorney's office on May 13th, 1985?

A.  Yes.

Q.  Were you present then the following day when he was also present, again Anthony Sumner at the Cook County state's

Q. attorney's office on May 14th, 1985?

A. Yes.

Q. And at that time was he being debriefed by Sergeant Murphy of the Chicago Police Department?

A. Yes.

Q. And Sergeant Murphy was conducting interviews of him, to your knowledge, about his knowledge of the El Rukns is that true?

A. Correct.

Q. Were you present at times during the course of that day in which these interviews were taking place?

A. I would talk to him from time to time.

Q. Talk to Anthony Sumner?

A. Correct.

Q. Was Mr. /TKAO*EB present during this time?

A. He would have been -- he would have been on the floor. I don't know if he participated in any of those or not. I don't remember.

Q. I'm not suggesting he conducted the interviews, but was he present for at least portions of those interviews?

A. Well, he would have been present on the floor. He would have known what was going on at the time with these interviews.

Q. All right. And there was also, if I recall, isn't it correct there was an attorney from the United States attorneys

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 42 of 133 PageID #:19709
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 42 of 133 PageID #:31544
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

41

office during the time of these interviews; isn't that correct?

A. One of the assistant U.S. attorneys came over at some point during that week, correct.

Q. And was that on May the 14th, 1985?

A. It could have been.

Q. May 14th, 1985, was the only day that Joseph Murphy interviewed or debriefed, as it's been referred to, Anthony Sumner; isn't that correct?

A. I believe so. I think he was only interviewed one or two days at 26th Street.

Q. Now, you were asked testimony about your involvement in the prosecution. You came back to prosecute the case against Nathson Fields and Earl Hawkins; is that correct?

A. That's correct.

Q. And the theory of the prosecution was this was a gang retaliation murders regarding or involving narcotics trafficking; is that true?

A. That's correct.

Q. So at this point in time, there are some questions relative to information that was available to you. Do you recall that by counsel a short time ago?

A. Yes.

Q. And you told the ladies and gentlemen of the jury that you were responsible for preparing Anthony Sumner to give

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 43 of 133 PageID #:19710
Case: 1:10-cv-01168 Document #: 1185-35 Filed: 02/24/17 Page 43 of 133 PageID #:31545

testimony at a trial?

A.  Correct.

Q.  You said your partner was that Randy Rueckert?

A.  Correct.

Q.  He was responsible, as I understood your testimony, for preparing the witnesses, including Mr. Langston; is that correct?

A.  Correct.

Q.  There was a question asked of you as to --

MR. BURNS:  May I see Defendant's Exhibit 70, your Honor, that was shown earlier?

THE WITNESS:  I have some up here.

MR. BURNS:  I think you are going to see things work on the computer screen or the screen before you.

BY MR. BURNS:

Q.  Do you see this, sir?

A.  Yes.

Q.  Tell the ladies and gentlemen of the jury what that is?

A.  That's what they refer to as a general progress report.

Q.  And does it say general progress report, I'm looking to the upper left-hand corner, what does that say specifically there?

A.  General progress report.

Q.  Beneath that?

A.  Detective division/Chicago police.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 44 of 133 PageID #:19714
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 44 of 133 PageID #:31546
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

43

Q. And if you continue below, offense classification, do you see that?

A. Correct.

Q. This is a report that is generated by a member of the Chicago Police Department to document the interview that he had of Anthony Sumner on May the 14th, 1985; am I correct?

A. Correct.

Q. And this is the report that you had and was tendered as part of the discovery to the defense team, including Mr. Fields' attorneys, for the 1986 trial before Judge Maloney isn't that correct?

A. Correct.

Q. Now, in regard to that -- I am going to keep that up there for a moment. If we could look very briefly at the lower portion. There is information contained in there and I know you've looked at that earlier, but would you take a look at that again?

A. Correct.

Q. That's highlighted. This is information Mr. Sumner was providing about a conversation that he had previous to May 14th, 1985, with Nathson Fields about Mr. Fields' involvement in the Smith/Hickman murders; is that correct?

A. That's correct.

Q. And there is a reference in there in the conversation, and if you'd read that for us. It begins with, he told.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 45 of 133 PageID #:19712
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 45 of 133 PageID #:31547

A. He told Fields that he.

Q. He being, excuse me, he being whom? Who is the he?

A. That would be Fields.

Q. Is that Sumner?

A. Sumner, I'm sorry. The he is Sumner.

Q. All right.

A. He told Fields that he had heard about the Fuddy shooting.

Q. And continue.

A. Fields at first smiled and then said, yeah, it was a good exercise.

Q. And this is the report in which the information from Anthony Sumner about this Smith/Hickman murders was documented is that true?

A. Yes, that's correct.

Q. You were present, you told us, at times or throughout the time that Anthony Sumner was present at the state's attorney's office on May 14th, 1985, correct?

A. Say that again.

Q. Were you present during Mr. Sumner's interviews at the state's attorney's office on May 14th, 1985?

A. Yes.

Q. The comment that you have just read, and I want referenced again, yeah, it was a good exercise, did you hear that statement made by Mr. Sumner on May 14th, 1985, when you were present during his interview at the state's attorney's office?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 46 of 133 PageID #:19712
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 46 of 133 PageID #:31548

12/01/16 AM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

45

A.   Yes, I believe so.

Q.   The prosecution theory was this was a gang retaliation murders?

A.   Correct.

Q.   The hit team that was involved as part of your theory of prosecution involved four people; am I correct?

A.   Correct.

Q.   Two of those people were George Carter and Nathson Fields; is that correct?

A.   Correct.

Q.   And those were the two shooters who shoot and killed Jerome Fuddy Smith and Talman Hickman is that also correct?

        MR. LOEVY:   Objection to the foundation, your Honor. Talking about the theory of the case.

        THE COURT:   Rephrase the question.  He wasn't present.

BY MR. BURNS:

Q.   On your theory of the case and the information that had been gathered, was it the state's prosecution theory the two shooters involved in the murder of Smith and Hickman were Nathson Fields and George Carter?

A.   No.

Q.   Okay.  What was the theory?

A.   The theory was that it was Nathson Fields and Earl Hawkins.

Q. And that was based on the information that you had received to that point in time; is that correct?

A. That's correct.

Q. And there were two other individuals who were involved. What were those person's names who were involved under the theory of prosecution the state advanced?

A. Henry Andrews and George Carter.

Q. Thank you.

And before we leave -- before we leave Exhibit No. 70, if you could just take one more look at that, Mr. Wharrie, was that report ever challenged by the defense during the course of the trial in 1986?

MR. LOEVY: Objection to challenge, your Honor.

THE COURT: Sustained. It's vague.

BY MR. BURNS:

Q. Let me be more specific, was the report itself, Exhibit No. 70, was it ever questioned as to when it was prepared during the trial in 1986?

A. Not that I recall.

Q. Thank you.

Now, there was a question that was posed to you relative to a lineup and a lineup involving a Mr. Earl Hawkins. Do you remember that questioning a short time ago?

A. Correct.

Q. And I would like, if I may, to ask that Exhibit 57, let me

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 48 of 133 PageID #:19715
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 48 of 133 PageID #:31550

be specific as to the date, pages 19 and 20.

Are you able to see those?

A.  I can see them, about you they are not very legible.

Q.  Take a minute and draw it near.

THE COURT:  Would it be easier if he had a hard copy to look at maybe?

MR. BURNS:  I can approach, if I may, your Honor.

THE COURT:  Part of is just bad xeroxing.

MR. BURNS:  May I approach, Judge?

THE COURT:  Sure.

BY MR. BURNS:

Q.  This is the same report.

A.  Okay.

Q.  Mr. Wharrie, am I correct that this two-page report that you have just reviewed, Defendant's Exhibit 57, pages 19 and 20, is a supplemental or supplementary police report prepared by members of the Chicago Police Department?

A.  Correct.

Q.  And is it in fact a report that references the lineup that was conducted involving Earl Hawkins; is that correct?

A.  Correct.

Q.  It also referenced the fact that Earl Hawkins was identified in that lineup on May 18th, 1985; is that correct?

A.  Correct.

Q.  Bear with me just for a moment, your Honor.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 49 of 133 PageID #:19716
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 49 of 133 PageID #:31551
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

48

THE COURT:  Okay.

(Brief pause.)

BY MR. BURNS:

Q.  I would like to direct your attention now, if I may, you said that you presented Anthony Sumner at trial before Judge Maloney in June of 1986; am I correct?

A.  Correct.

Q.  And was it just before the trial started that the defendants waived their right to a jury trial and elected to proceed to a bench trial before Judge Maloney?

A.  Correct.

Q.  In regard to Anthony Sumner, during the time that you were with him and prepared in terms of debriefing and asking what he knew about the Smith/Hickman murders, did he ever tell you he had ever been mistreated by any members of the Chicago Police Department?

A.  No.

Q.  And were you confident based upon your interaction with him when you saw him in east Cleveland as well as in the state's attorney's office when he returned to Chicago that he had not been mistreated?

MR. LOEVY:  Your Honor, objection, opens the door.

THE COURT:  Hang on a second.  Well, if it does, it does.  I don't think there is anything objectionable about the question.  We will worry about what happens later.  Go ahead,

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 50 of 133 PageID #:19717

49

you can proceed.  Why don't you rephrase it, Mr. Burns.

MR. BURNS:  Sure.

BY MR. BURNS:

Q.  Based on your interaction with Mr. Sumner, were you satisfied that there was no suggestion by him that he had been mistreated by members of the Chicago Police Department?

A.  Correct.

Q.  Now, he testified at trial.  And during the time that he testified, you were the one who put him on the witness stand and asked him questions?

A.  Correct.

MR. BURNS:  Judge, may I use the ELMO for the purpose of this?

THE COURT:  Sure.

BY MR. BURNS:

Q.  Mr. Wharrie, I'm going to ask you a series of questions with regard to the questioning of Mr. Sumner at the time of the trial before Judge Maloney and the answers that he gave to you.  So if you would read along as we do this.

A.  Do you want me to read it?

Q.  I will read it for you.  Please ensure that what I am reading is accurate and that that was the testimony during the 1986 trial by Anthony Sumner, at least in relevant portion.  Is that agreeable?

THE COURT:  Just go ahead.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 51 of 133 PageID #:19718
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 51 of 133 PageID #:31553

MR. BURNS:  Thank you, your Honor.

BY MR. BURNS:

Q.  Question, your Honor.  This would have been by you. Mr. Sumner, I would like to direct your to on or about April 28, 1984.  Were you familiar or did you have knowledge of a shooting involving a Fuddy, a Jerome Smith and a Talman Hickman?

"ANSWER:  Yes.

"QUESTION:  I want to direct your attention to approximately two days after April 28th of 1984.  Did you at that time have any conversations with anybody with respect to that shooting?

"ANSWER:  Yes.

"QUESTION:  Who did you talk to on that day?  A couple days after the shooting, who did you talk to?

"ANSWER:  Earl Hawkins.

"QUESTION:  Does Earl Hawkins have a nickname?

"ANSWER:  Yes.

"QUESTION:  What is his nickname?

"ANSWER:  Monday sewer.

"QUESTION:  And is that the name that he had within an organization?

"ANSWER:  Yes.

"QUESTION:  How long had you known Earl Hawkins?

"ANSWER:  About 12 years, 10 years.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 52 of 133 PageID #:19719
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 52 of 133 PageID #:31554

"QUESTION:  Do you see him in court today?

"ANSWER:  Yes."

   Continuing to the lower portion, question by you.

"QUESTION:  Where did this conversation take place between you and Mr. Hawkins a couple days after the shooting?

"ANSWER:  At his house.

"QUESTION:  Where did he live at that time?

"ANSWER:  6416 Kenwood.

"QUESTION:  Is that a building that is owned and operated by the El Rukns?

"ANSWER:  Yes.

"QUESTION:  On what floor of that building did this conversation take place?

"ANSWER:  Third floor.

"QUESTION:  And who was present besides you and Mr. Hawkins, if anybody, at that time?

"ANSWER:  Just me and him.

"QUESTION:  What do you recall saying to him and him saying to you in that conversation relative to the shooting of Fuddy two days earlier?

"ANSWER:  He told me they had got Fuddy.  They had seen him -- rode around until they seen him and then as he was walking towards the building, they parked the car, two guys got out.  They shot him, got back in the car, drove off.

"QUESTION:  Did he tell you who they were?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 53 of 133 PageID #:19720
Case: 1:15-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 53 of 133 PageID #:31355
12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

52

10:42:03   "ANSWER:  Yes.

10:42:05   "QUESTION:  What did he -- excuse me.  Who did he say

10:42:10   did it?

10:42:11   "ANSWER:  Carter.

10:42:13   "QUESTION:  What is Carter's first name, if you know?

10:42:17   "ANSWER:  George.

10:42:18   "QUESTION:  And where does George Carter live, or where

10:42:22   did he live on or about April 1984, if you know?

10:42:28   "ANSWER:  He stay in Evanston.

10:42:31   "QUESTION:  Who else did he say was involved out of

10:42:35   these four?

10:42:36   "ANSWER:  S-u-d-d-l-e-m-a-n, Hank

10:42:41   Q.  What is Suddleman's real name?

10:42:44   "ANSWER:  Hank.

10:42:45   "QUESTION:  What is Hank's last name?

10:42:47   "ANSWER:  I don't know.

10:42:49   "QUESTION:  Do you know where Hank was living in April

10:42:51   of 1984?

10:42:53   "ANSWER:  Somewhere in Evanston.

10:42:56   "QUESTION:  Who else was involved out of the four

10:43:00   people?

10:43:00   "ANSWER:  And Fields, HUKM.

10:43:05   "QUESTION:  What did you call him?

10:43:10   "ANSWER:  HUKM.

10:43:17   "QUESTION:  Can you spell that?


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

12/01/16 AM

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 54 of 133 PageID #:19721
Case: 1:13-cv-01165 Document #: 1185-22 Filed: 02/24/17 Page 54 of 133 PageID #:31356

***REALTIME UNEDITED TRANSCRIPT ONLY***

53

"ANSWER: H-u-k-a-m-.

"QUESTION: Do you know Fields?

"ANSWER: Yes.

"QUESTION: How long have you known Fields?

"ANSWER: About the same time, about 12 years.

"QUESTION: Do you know his first name?

"ANSWER: Yes.

"QUESTION: What is it?

"ANSWER: Nathson.

"QUESTION: Do you see him in court?

"ANSWER: Yes.

"QUESTION: Would you point him out?

"ANSWER: Right there."

Do you recall those questions and the answers by Mr. Sumner during the trial in June of 1986?

A. Yes.

Q. Did you continue to ask further questions of him beginning, question by Mr. Wharrie.

"QUESTION: Did Mr. Hawkins go into detail and describe to you in this conversation how the shooting went down?

"ANSWER: Yes.

"QUESTION: And what was that? What did he say?

"ANSWER: They rode around until they seen him. And then when they seen him, parked the car down the street.

"QUESTION: Did he tell you where they parked the car?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 55 of 133 PageID #:19722
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 55 of 133 PageID #:31557
12/01/16 AM

54

"ANSWER:  Down the street.

"QUESTION:  Did he tell you what happened after that?

"ANSWER:  What happened after that?

"QUESTION:  And they parked the car.

"ANSWER:  Two guys got out.  Carter and Fields got out and met the guys.  He walked up under the breezeway.

"QUESTION:  And then what happened?

"ANSWER:  Then they shot him.  Then they got back in the car and drove off."

Do you recall that testimony being given by Mr. Sumner during the trial in June of 1986?

A.  Yes.

Q.  Question by Mr. Wharrie:

"QUESTION:  Did Mr. Hawkins talk to anybody else just prior to the shooting?

"ANSWER:  Yes.

"QUESTION:  And who was that?

"ANSWER:  He said he had talked to Jeff.

"QUESTION:  And who is Jeff?

"ANSWER:  Jeff Fort.

"QUESTION:  And who is Jeff Fort?

"ANSWER:  The leader of the El Rukns.

"QUESTION:  What did he tell you Jeff Fort told them?

"ANSWER:  Told him don't be involved directly because peoples in the neighborhood knew him, and get somebody else

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 56 of 133 PageID #:19723
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 56 of 133 PageID #:31358

that is not known in the neighborhood to do it."

Do you recall those questions and answers of Mr. Sumner regarding a conversation he had with Earl Hawkins?

A. Yes.

Q. Now, continuing.

This was questioning by you of Mr. Sumner.

"QUESTION: Let's go back to 1983. Was Nathson Fields well known in the area of 39th and Langley?

"ANSWER: No.

"QUESTION: Had Nathson Fields been in the area of 39th and Langley or even in the area of Chicago for the time before April of 1984?

"ANSWER: No.

"QUESTION: Now, the same day that you talked to Earl Hawkins, approximately April 30th, 1984, did you also talk to Nathson Fields on that day?

"ANSWER: Yes.

"QUESTION: And where did that conversation take place?

"ANSWER: 39th Street, in the Fort.

"QUESTION: On 39th, at the Fort, who is the Fort?

"ANSWER: The mosque, headquarters.

"QUESTION: The headquarters of what?

"ANSWER: The headquarters of the El Rukns.

"QUESTION: Who was present besides yourself and Nathson Fields when you talked to him on that day?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 57 of 133 PageID #:19724
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 57 of 133 PageID #:31755
12/01/16 AM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

56

"ANSWER: What, in the room where he was at?

"QUESTION: Yes. Was anyone else present besides you and Fields when you were talking to him?

"ANSWER: No.

"QUESTION: Do you recall what you said to him and what he said to you during the course of that conversation?

"ANSWER: Yes.

"QUESTION: What was said?

"ANSWER: I told him that I had heard about Fuddy getting shot down in 39th Street and he had something to do with it, and he said that, quote, it was a good exercise."

Do you recall that testimony being given during the trial before Judge Maloney in June of 1986?

A. Yes.

Q. And that was testimony by Mr. Sumner, am I also correct?

A. Correct.

MR. BURNS: May I have just one moment, Judge?

THE COURT: Yes.

MR. BURNS: Thank you. (Brief pause. (.

MR. BURNS: Just one final question, if I may.

BY MR. BURNS:

Q. The information that was presented that we just read to the ladies and gentlemen of the jury, that was the same information that Mr. Sumner was telling you during the time that you met with him in order to prepare to give testimony at

***REALTIME UNEDITED TRANSCRIPT ONLY***

12/01/16 AM
Case:1:23-cv-01737 Document #:287-35 Filed:04/06/26 Page 58 of 133 PageID #:19725
Case:1:10-cv-01168 Document #:1185-22 Filed:02/24/17 Page 58 of 133 PageID #:31560
***REALTIME UNEDITED TRANSCRIPT ONLY***

57

trial; is that correct?

A. Correct.

MR. BURNS: I have no further questions. Thank you, your Honor.

THE COURT: Mr. Kulwin.

- - -

LAWRENCE WHARRIE, CROSS-EXAMINATION

BY MR. KULWIN:

Q. Mr. Wharrie, you said that you tried the Smith/Hickman murder trial, double murder trial at 26th and California with another person, correct?

A. Correct.

Q. And that was typical in the state's attorney's office at that time, correct?

A. We usually tried all of them in pairs.

Q. Right.

It was a trial team?

A. Correct.

Q. And you'd split up the witnesses?

A. Correct.

Q. And one attorney would take some witnesses and the other attorney would take others?

A. Correct.

Q. Usually?

A. Yes.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 59 of 133 PageID #:19726
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 59 of 133 PageID #:31561

Q.  Who was your trial partner on that case?

A.  Randy Rueckert.

Q.  And had you worked with him before?

A.  Yes.

Q.  Was he your trial partner in other cases as well, if you recall?

A.  I don't remember.

Q.  Okay.  Now, you said that Mr. Rueckert was handling the eyewitnesses?

A.  Correct.

Q.  At any time did Mr. Rueckert ever come to you and say the witnesses, the eyewitnesses have been threatened or coerced by O'Callaghan, maybe we shouldn't use them?

        MR. LOEVY:  Objection, your Honor.

        THE COURT:  What's the basis?

        MR. LOEVY:  First of all, it's hearsay, second of all, it's argumentative.

        THE COURT:  Overruled.

        THE WITNESS:  No.

BY MR. KULWIN:

Q.  At any time -- now, you were asked some questions by counsel, by both counsel about a hit team.  Do you remember those questions?

A.  Yes.

Q.  The word hit in your mind as an experienced gang

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 60 of 133 PageID #:19727
Case: 1:16-cv-01168 Document #: 185-22 Filed: 02/24/17 Page 60 of 133 PageID #:31362
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

59

Q.  prosecutor and state's attorney means killing somebody, correct?

A.  Yes.

Q.  It doesn't mean driving around thinking about it?

MR. LOEVY:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. KULWIN:

Q.  People who make a plan to go kill somebody, they enter no a conspiracy to kill somebody, that's something that they do, right?

A.  Correct.

Q.  But the actual people who do the shooting and go to the shooting, they're guilty of murder, they're a hit team, right?

A.  Correct.

Q.  And in this case, there was never any question that the actual hit team who did the shooting and the driving away were, one of the shooter was Fields, right?

A.  Correct.

Q.  And there was Hawkins?

A.  Correct.

Q.  And there was Carter?

A.  Yes.

Q.  I'm standing in front of everybody.  I apologize.

And then there was Andrews, right?

A.  Right.


***REALTIME UNEDITED TRANSCRIPT ONLY***

12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

60

Q.  Now, you just heard your presentation of Mr. Sumner's testimony back in 1986 and you put him on the stand, right?

A.  That's right.

Q.  And he said that Hawkins told him that Carter?

          MR. LOEVY:  Objection, your Honor.  This was covered by Mr. Burns.

          THE COURT:  Sustained.

BY MR. KULWIN:

Q.  Now, when you proceeded to trial on the Smith/Hickman murder, you presented evidence that you believed was sufficient to prove Nathson Fields guilty beyond a reasonable doubt?

          MR. LOEVY:  Objection.

BY MR. KULWIN:

Q.  That was your position, correct?

          THE COURT:  Basis?

          MR. LOEVY:  His opinion is not --

          THE COURT:  Sustained.

          MR. KULWIN:  Judge, if I could be heard on that.  I'm not asking necessarily whether that's true, his view of it is important, relevant to probable cause.  That's why it's relevant.

          THE COURT:  I will see you at sidebar.  The jury is directed to disregard the attorney's comments.

          MR. KULWIN:  Yeah, I apologize.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 62 of 133 PageID #:19729
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 62 of 133 PageID #:31564
12/01/16 AM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

61

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  So state the argument.

MR. KULWIN:  The argument is, Judge, he is a prosecutor, he believes the evidence at that point in time is sufficient to be proof beyond a reasonable doubt.  I want to elicit from him that that's a higher standard.

THE COURT:  It's an opinion on probable cause, basically?  It's an opinion that's relevant on the issue of probable cause.

MR. KULWIN:  Yeah, on the issue of probable cause.

THE COURT:  What do you want to show me?

MR. ART:  This is a motion in limine ruling ruling that prohibiting the prosecutors from discussing the issues of probable cause, the ultimate issues of materiality for precisely the reasons the jury has to determine them on an objective standard.

THE COURT:  Document No. 550, 3/19/14, item 1C.  Let me read it to myself.  Let me look at it.  You should read it, bottom of the previous page.

MR. KULWIN:  I don't think I am violating that.

THE COURT:  Based on what you just told me, that's the exact opinion you are eliciting.  You are eliciting his opinion on whether it was proof beyond a reasonable doubt to essentially prove that it was sufficient for probable cause.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 63 of 133 PageID #:19730
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 63 of 133 PageID #:31585
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

62

The Court wishes to reemphasize, however, its ruling was pursuant to Rules 401 and 403 regarding the inadmissibility opinions regarding the credibility of various witnesses and on the ultimate issue of probable cause. I think that's probably referring back to an earlier ruling as well just to reemphasize.

Look, guys, I am going to tell you, this is one of my big problems in this case on both sides, all sides, I guess all sides, is the constant request for me to revisit stuff that was extensively briefed, extensively ruled on. I am sticking with the prior ruling. I am sustaining the objection.

MR. NOLAND: Judge, during the trial, there were rulings made with respect to allowing Mr. Sexton to testify.

THE COURT: This isn't Mr. Sexton. This isn't Mr. Sexton.

MR. NOLAND: Okay.

THE COURT: Did this guy to testify about this at the previous trial?

MR. LOEVY: No, Mr. Sexton shouldn't have testified --

THE COURT: I don't know. Again, I just point out to you that the last line is any doubts that counsel may have regarding the parameters of the court's ruling in this regard are to be resolved by seeking particularized guidance from the

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 64 of 133 PageID #:19731
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 64 of 133 PageID #:31566

12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

63

Court before attempting to introduce the evidence.  The objection is sustained.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

        THE COURT:  The objection is sustained.  The jury is directed to disregard the question as well as the discussion that was had before the sidebar.

BY MR. KULWIN:

Q.  Now, at the trial in 1986, the defense put on certain witnesses, correct?

A.  Correct.

Q.  They did not put on?

        MR. LOEVY:  Objection, your Honor.  The defense had no obligation to put on anything.

        THE COURT:  Let me hear the question and then I'll rule on it.

BY MR. KULWIN:

Q.  They did not put on a woman by the name of Sandra Langston in your defense?

        MR. LOEVY:  Same objection, your Honor.

        THE COURT:  Okay.  So I am instructing the jury that a defendant in a criminal case doesn't have an obligation to put on any witnesses at all.  With that understanding, I am going to let you ask the question.

BY MR. KULWIN:

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 65 of 133 PageID #:19732
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 65 of 133 PageID #:31567
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

64

Q. Correct?

A. I believe that's true.

Q. And they also did not put on James Langston, correct, in the trial as opposed to the death sentence hearing, correct?

A. Correct.

Q. Now, in addition to the GPR that Mr. Burns showed you, there was a supplemental report that did indicate that a confidential informant had supplied information to the police indicating that there were several suspects in the case. Do you remember that?

A. Yes.

Q. Okay. And I'm showing you --

MR. KULWIN: If I may have the ELMO, Judge.

THE COURT: Yes.

MR. KULWIN: Thank you.

THE COURT: I think it's on actually.

BY MR. KULWIN:

Q. Plaintiff's Exhibit 86 at Bates number 9544. Let me zoom in there a little bit.

THE COURT: It's like scratching your fingers on the chalkboard.

BY MR. KULWIN:

Q. Do you see that, sir?

A. Yes.

Q. And that's referring, even though it doesn't say his name,

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 66 of 133 PageID #:19733
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 66 of 133 PageID #:31568
12/01/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

65

that's referring ultimately to what was disclosed to the defense being Anthony Sumner, true?

A.  Correct.

          MR. LOEVY:  Objection to foundation, your Honor.

          THE COURT:  Overruled.

          MR. KULWIN:  If I can have a moment, Judge.

          THE COURT:  Okay.

   (Brief pause.)

          MR. KULWIN:  No further questions.

          THE COURT:  Redirect.

          MR. LOEVY:  Thank you, your Honor.

                         - - -

          LAWRENCE WHARRIE, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  Mr. Burns asked you if your theory of the case was that Carter and Fields was the shooter or Hawkins and Fields was the shooter.  Do you remember those questions?

A.  Yes.

Q.  You guys went with Hawkins and Fields, didn't you?

A.  Correct.

Q.  You asked the -- and you had to pick between Sumner saying it was Hawkins and Carter and the four eyewitnesses who were saying they saw supposedly Hawkins and Fields, right?

A.  Well, we had to select between whether or not Hawkins was telling Sumner exactly everything how it went down.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 67 of 133 PageID #:19734
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 67 of 133 PageID #:31565
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

66

Q. You couldn't go with both theories, right, you had to pick one?

A. Correct.

Q. And if Sumner was telling the truth, then all four of your eyewitnesses misidentified the shooter, right?

A. Well, when you say Sumner, Sumner was just reiterating what Hawkins told him.

Q. All right. If he was testifying truthfully that Hawkins told him that, that all four of your eyewitnesses would have made misidentifications of Hawkins, correct?

MR. KULWIN: Objection, argumentative.

THE COURT: Overruled.

THE WITNESS: Repeat that, please.

BY MR. LOEVY:

Q. If Sumner was truthfully testifying to what Hawkins told him and the jury believed that, then all four of your eyewitnesses misidentified Hawkins as one of the shooter?

A. If you believe that theory, you're correct.

Q. If they misidentified Hawkins, they sure were not going to credibly identify the other going to?

MR. KULWIN: Objection, Judge. Argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You were talking about east Cleveland and Nate was not in east Cleveland, right?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 68 of 133 PageID #:19735
Case: 1:16-cv-01168 Document #: 185-2 Filed: 02/24/17 Page 68 of 133 PageID #:3157

12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

67

A.  No, he was not.

Q.  In fact Nate Fields name never came up in east Cleveland, correct?

A.  You're right.  Correct.

Q.  So there was some conversations with Anthony Sumner, he was saying what he was saying, and Nate Fields never came into any scenario in east Cleveland, correct?

A.  Correct.

Q.  Did he write down what he told you?

A.  Who?

Q.  Sumner.

A.  In east Cleveland?

Q.  Yes.

A.  No, I didn't take notes.

Q.  All right.  This is page 823 of the April 2014 hearing. This is page 823.  May I show you?

A.  Sure.

Q.  The middle of the page there.  It does say you took notes of your meetings with Mr. Sumner, correct?

A.  I said I would make notes before I would present him to the grand jury.

Q.  All right.  Where are the notes now?

        MR. KULWIN:  Objection, not impeaching, Judge.

        MR. LOEVY:  I didn't impeach, your Honor.

        THE COURT:  Okay.  That's not why it was introduced,

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 69 of 133 PageID #:19736
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 69 of 133 PageID #:31571
12/01/16 AM              ***REALTIME UNEDITED TRANSCRIPT ONLY***

68

11:03:53   in other words.  The objection is overruled.

11:03:54   BY MR. LOEVY:

11:03:55   Q.  Where are those notes now, sir?

11:03:56   A.  I have no idea.

11:03:57   Q.  All right.  And when you went before the grand jury, you did misspeak, correct?

11:04:01   A.  Correct.

11:04:02   Q.  And some of the stories Sumner were telling you in Cleveland were obviously untrue?

11:04:13        MR. KULWIN:  Objection, stories, Judge, and obviously.  Argumentative.

11:04:18        THE COURT:  Sustained as to the phrasing of the question.  Choose a different word.  Time for argument is argument at the end of the case, not now.

11:04:27   BY MR. LOEVY:

11:04:29   Q.  He did tell you, quote, some other wild stories, end quote, correct?

11:04:34   A.  Correct.

11:04:35   Q.  And some of his explanations made no sense at all, correct?

11:04:41   A.  Correct.

11:04:42   Q.  And you were asked about the confession.  Mr. Burns read you the testimony about Hawkins supposedly confessing to Anthony Sumner, do you remember that testimony?

11:04:56   A.  Yes.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 70 of 133 PageID #:19737
Case: 1:13-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 70 of 133 PageID #:31572

Q. Now, there was also testimony on cross-examination that Anthony Sumner was claiming that like seven different El Rukn generals confessed to him always in private to other crimes, right?

A. I don't know.

Q. You don't remember that either way?

A. No.

Q. All right. The story that was read to you or the allegations that were read to you that Sumner said on the stand, Nate -- Hawkins told you this, Hawkins told me that, Hawkins told me that, do you remember that testimony Mr. Burns just read?

A. Yes.

Q. None of that was admissible against Mr. Fields at his trial because it was hearsay vis-à-vis Mr. Fields isn't that true?

A. I don't know if they -- well, are you talking about as far as rules of evidence?

Q. Yes.

A. I would say that's probably true.

Q. This was a joint trial where Fields and Hawkins were being tried together?

A. Yes.

Q. And it was a bench trial, so the judge received some evidence that was admissible against only certain people and

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 71 of 133 PageID #:19738
Case: 1:23-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 71 of 133 PageID #:31578
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

70

other evidence that wasn't admissible against others, right?

A. Yes.

Q. So all that story about what Hawkins told Sumner is pure hearsay vis-à-vis Nate?

MR. KULWIN: Objection, Judge.

THE COURT: Overruled.

THE WITNESS: I mean, I don't recall the ruling, but that could be possible what you're arguing there. I mean, that could have been the case.

BY MR. LOEVY:

Q. What was admissible against Nate was his supposed confession?

MR. KULWIN: Objection to supposed, Judge, argumentative.

THE COURT: Overruled.

THE WITNESS: Correct.

BY MR. LOEVY:

Q. All right. You don't know if the story -- the allegations that Mr. Burns read to you that Sumner said were Mr. Sumner's original story, do you?

A. Well, original story, I don't know what you mean.

Q. I mean, he talked about it multiple times over a series of a week, correct?

A. That's the only one I remember him stating.

Q. No. I'm saying he was interviewed outside of your

Q. presence, wasn't he?

A. Well, yes.

Q. By other law enforcement officers, correct?

A. Yes.

Q. And you don't know what happened in those interviews that you weren't part of, correct?

A. Of course not.

Q. So you don't know either way whether maybe law enforcement said, hey?

        MR. KULWIN: Judge, I am going to object. Calls for speculation.

        THE COURT: Let me hear the whole question.

BY MR. LOEVY:

Q. You don't know either way whether the details were suggested to Sumner and he adopted them or Sumner came forward with them?

        THE COURT: Sustained. Argumentative.

BY MR. LOEVY:

Q. You told Mr. Burns that O'Callaghan never said the witnesses were threatened, correct?

A. Correct.

Q. You stand by that?

A. I don't -- yeah. Who are you talking about, Sumner?

Q. The witnesses.

        MR. BURNS: Objection, your Honor?

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 73 of 133 PageID #:19740
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 73 of 133 PageID #:31575
12/01/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

72

MR. KULWIN:  Objection, Judge.

BY MR. LOEVY:

Q.  Mr. Burns asked you --

THE COURT:  Go ahead.

BY MR. LOEVY:

Q.  Specifically if O'Callaghan told you the witnesses were threatened and you said no, correct?

MR. BURNS:  Objection, your Honor.

THE COURT:  Well, the jury has heard the prior testimony.  If it's -- why don't you just ask your question.

BY MR. LOEVY:

Q.  You were asked by Mr. Burns about gang retaliation theory, that was your theory at trial, right?

A.  Correct.

Q.  Now, isn't it true that there was not one scrap of paper or corroboration by anybody other than a corroborator that was claiming that there was a problem between the El Rukns and the Goon Squad?

MR. KULWIN:  Objection, argumentative, Judge.

MR. LOEVY:  No.

THE COURT:  Rephrase the question.

BY MR. LOEVY:

Q.  There was no Goon Squad witness, Gerald Morris, Randy Langston, any other Goon Squad member who ever gave any information that there was any problem between the Goon Squads

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 74 of 133 PageID #:19741
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 74 of 133 PageID #:31576

and the El Rukns; isn't that true?

A.  My recollection was that there was -- there was some problem.  Yeah, a beef between the two.

Q.  And that was all coming from Anthony Sumner, correct?

A.  I don't know if it was all coming from him.  I just don't remember what the source was.

Q.  All right.  Would you dispute or do you have a memory either way that not a single Goon Squad member ever in a piece of paper or at trial corroborated this theory?

A.  I don't know.

Q.  You were asked about a hit team and he asked you if guys get in a car, here's my question to you, sir.  If four guys get into a car with guns with the intention of going to assassinate somebody, that would be a hit team, wouldn't it?

        MR. KULWIN:  Objection, argumentative, covered in direct.

        THE WITNESS:  Yes.

        THE COURT:  Overruled given the cross.

BY MR. LOEVY:

Q.  Your answer?

        THE COURT:  He said yes.

        THE WITNESS:  Yes.

BY MR. LOEVY:

Q.  It would still be a hit team, won't it?

A.  They'd all have the same responsibility.


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 75 of 133 PageID #:19742
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 75 of 133 PageID #:31577
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

74

Q. All right. You were asked if you had any reason to have confidence that Mr. Sumner had been mistreated by the Chicago police officers. Do you remember that?

A. Yes.

Q. Isn't it true there were reasons why you would have lack of confidence why Chicago police officers might have mistreated witnesses during the '80s?

MR. BURNS: Objection, your Honor.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You were asked if there was a police report and this is Plaintiff's Exhibit 86, this is what Mr. Kulwin showed you about this, there was a cooperating information -- individual who had supplied information relative to this case. Do you see that?

A. Yes.

Q. That is not documented in murder confessions the way police document murder confessions, is it?

A. No.

Q. That does not say Nate Fields confessed to Anthony Sumner that he did it, correct?

A. Correct.

Q. All right. You were shown a police report by Mr. Burns dated May 21st documenting that Hawkins was identified. Do you remember seeing that document?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 76 of 133 PageID #:19742
Case: 1:15-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 76 of 133 PageID #:31578
12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

75

A.   Yes.

Q.   That's May 21st.  But the document that identified Ferguson was dated when?  There is it is at the top.

A.   May 18th.

Q.   All right.  You were asked some questions about when Mr. Fields and Mr. Hawkins elected a bench trial.  Do you remember that question?

A.   Yes.

Q.   Isn't it true that during the trial you came to learn of the bribe?

A.   Correct.

Q.   And you did not tell Mr. Fields' attorney, did you?

A.   No.

Q.   You were asked if you had the GPR report during discovery and you said that you did?

A.   Yes.

Q.   But you didn't get it until April '86 isn't that also true?

A.   I don't know.

Q.   All right.  Showing you a copy plaintiff's 86-11, this is an official supp report on a different subject, correct?

A.   Yes.

Q.   And the official supp reports, if it's submitted on the 30th of April, 1984 will have a date stamp of when it's received, correct?

12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

76

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 77 of 133 PageID #:19744
Case: 1:16-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 77 of 133 PageID #:31575

A. Yeah, okay.

Q. Can you read the date stamp that this April 30th report was received by the police department?

A. May 1st, 1984.

Q. All right. GPRs bear no such stamp, correct?

A. I don't know.

Q. Showing you a copy of Plaintiff's Exhibit 12 which is also Defendant's Exhibit 70, just confirm, there is no date stamp on that document, correct?

A. There is not.

Q. All right. You told Mr. Burns that you believe you heard Sumner say that Nate confessed. Do you remember that?

A. Say that again.

Q. Would it be fair to say you are not exactly sure anymore you were actually there when Sumner said Nate confessed it was a good exercise or are you sure, either way?

A. I know that he told me.

Q. At some point preparing for trial, right?

A. My recollection is that I knew that early on. That's my recollection.

Q. Do you have any notes?

MR. KULWIN: Objection, Judge, asked and answered.

THE WITNESS: No.

MR. KULWIN: On direct.

THE COURT: Sustained.

***REALTIME UNEDITED TRANSCRIPT ONLY***

BY MR. LOEVY:

Q. You did say you had notes in preparing for the grand jury?

MR. KULWIN: Objection, Judge.

THE COURT: The question that you just asked that I sustained the question to, you asked that exact question during direct and I sustained it. You are re-asking it on redirect.

MR. LOEVY: Understood.

BY MR. LOEVY:

Q. Mr. Sumner during these debreifings made an allegation that too much force was used against him, correct?

A. When?

Q. He later claimed that during the debriefings in Cleveland more force than was appropriate was used on him, correct?

A. What are you talking about?

Q. At trial, didn't he -- wasn't he impeached with the fact that he was making this allegation that there was too much force used against him?

A. Are you talking about the statement he made to the defendants' lawyers?

Q. Right. And we have already covered that at this trial, so I am just asking when you were present?

MR. KULWIN: Judge, I'm going to object.

THE COURT: Overruled. Finish the question, please.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 79 of 133 PageID #:19746
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

78

Q. When you were present, none of that happened, correct?

A. Correct.

Q. And you were in and out of the rooms, correct?

A. Correct.

Q. But obviously if you had seen too much force, you would not have permitted that, correct?

A. Correct.

MR. LOEVY: All right. I have no further questions, your Honor.

THE COURT: Mr. Burns, anything else?

MR. BURNS: I would, Judge. Before I do, I need to discuss.

THE COURT: Sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: Yes.

MR. BURNS: I want to be careful, Judge, counsel asked a question of Mr. Wharrie that he knew about the bribe. I believe that opens the he was told there might be a bribe that was being passed on behalf of both individuals. I'm concerned now that I'd like to ask the question --

THE COURT: Why would him opening the door to that be -- why would his knowledge about the bribe and failure to tell Fields about it open the door to what he was told about the purpose of the bribe? I don't get it. It doesn't make sense

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 80 of 133 PageID #:19747
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 80 of 133 PageID #:31582
12/01/16 AM            ***REALTIME UNEDITED TRANSCRIPT ONLY***
79

to me.

MR. BURNS:  I'm saying that he's raised the issue.

THE COURT:  Yeah, I don't understand why that would open the door to this underlying statement.

MR. BURNS:  I would like to ask him, you did know the bribe was being passed, you had been told the bribe was being passed on behalf of both.

THE COURT:  Who was he told that by?

MR. BURNS:  It was coming through information that they had from the FBI that was involved in this through the state's attorney's office and he as the prosecutor in that case was made aware of that, that they had received the information, Michael Roland (phonetic) who was the direct supervisor made him aware of this.

MR. LOEVY:  It's hearsay.  He was told by some unknown declarant that it was on behalf of both and it doesn't go to anything, and therefore what?  Therefore what?  So he knew.

THE COURT:  What is the therefore what?

MR. KULWIN:  He's raised the inference to the jury that you knew about this alleged bribe and you never told Nate Fields or Nate Fields never had the opportunity to withdraw from the alleged conspiracy or to make a note of it or raise it later on, and you held that back.

THE COURT:  Okay.  What about that?


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 81 of 133 PageID #:19748
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 81 of 133 PageID #:31568

12/01/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

80

MR. LOEVY: That's actually consistent with him saying, I didn't tell Nate. Why would he tell Nate's attorney if Nate was allegedly involved in it? The FBI is investigating it.

THE COURT: I think that's Mr. Kulwin's point. In other words -- in other words, you asked two questions. You asked did you learn about the bribe? Answer, yes. Did you tell Mr. Fields' attorney? Answer, no. Arguably that leaves the jury with the impression that there was something he withheld from Mr. Fields during the trial of the case, and so what he is being asked to do is explain why didn't you tell Mr. Fields' attorney.

MR. LOEVY: Well, even if it was purely Hawkins, they're co-defendants, you couldn't tell --

THE COURT: Mr. Loevy, this is where your carelessness gets the better of you. Here's what's going to happen. This is going to be done extremely carefully. Okay? So it's going to be was there a reason, was there a reason why you didn't tell Mr. Fields' attorney about the bribe? If he says no, that's the end. If he says yes, then you're going to ask him a leading question, was it the reason and what you had been told was that the bribe had been passed on behalf of both of the defendants?

You understand he will answer yes to that question? I'm assuming you do.

MR. KULWIN:  Yes.

THE COURT:  That's the way you're going to do it.

MR. KULWIN:  It seems to me that Mr. Loevy by raising this about wild stories that Sumner told the police about all sorts of El Rukn --

THE COURT:  That was his words, it was somebody else's words.  He quoted that.

MR. KULWIN:  That's true.  But the inference is that Sumner is a nut job and none of the stuff --

THE COURT:  If people do not think that Sumner has been covered -- what I do want to put in?  Just tell me.

MR. KULWIN:  That it was corroborated by a number of other witnesses.

THE COURT:  That's argumentative.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Okay.  Mr. Burns, you can go ahead.

- - -

LAWRENCE WHARRIE, CROSS-EXAMINATION

BY MR. BURNS:

Q.  Mr. Wharrie, I'm going to ask you a very direct question.  Listen closely to it.  Counsel asked you were you aware of a bribe.  Do you remember that question?

A.  Yes.

Q.  And he asked you that you didn't tell Mr. Fields about it.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 83 of 133 PageID #:19750
Case: 1:16-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 83 of 133 PageID #:31585

Do you remember that question?

A. Yes.

Q. Is there a reason you did not tell Mr. Fields or his counsel about the bribe, yes or no?

A. Yes.

Q. And what was the?

MR. KULWIN: No.

THE COURT: Leading question, employees.

MR. KULWIN: Sorry, Judge.

THE COURT: Don't apologize.

BY MR. BURNS:

Q. And was the reason that that was not shared with the attorneys for Mr. Fields that Mr. Fields was involved in that bribe?

THE COURT: The jury is directed to disregard the question completely. Let me see you again at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: Oh, my God. I gave you the wording on it.

MR. BURNS: I thought I was trying to --

THE COURT: You aren't even close.

MR. LOEVY: Your Honor.

THE COURT: Hold on one second. So just to be real clear, I know you guys ordered the realtime feed, I got what I

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 84 of 133 PageID #:19751
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 84 of 133 PageID #:31586

told you to ask was exactly what you told me, what would the evidence be, you said that he had been told that the bribe had been passed on behalf of both defendants.  So I said is the reason you didn't tell Mr. Fields' attorney was that you had been told that the bribe had been passed on behalf of both defendants.  That's the question you can ask him.  You asked something different from that.  Were you told that Fields was involved in the bribe.  It's something different.  It's completely different.  That's -- so I'm going to give you one more try.  If you botch it, it's excluded.

MR. LOEVY:  Your Honor, we would like to be heard if we could.

THE COURT:  You have been heard.  You have been heard.

MR. BURNS:  May I have one moment, Judge.

(The following proceedings were had in open court in the presence and hearing of the jury:)

BY MR. BURNS:

Q.  Following up on the last question, and was the reason was because you had been told the bribe had been passed on behalf of both defendants, yes or no?

A.

THE COURT:  It's either yes or no.  It's a yes or no question.  You're going to have to answer it that way.

THE WITNESS:  Yes.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 85 of 133 PageID #:19752
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 85 of 133 PageID #:31587

***REALTIME UNEDITED TRANSCRIPT ONLY***

84

MR. BURNS:  Thank you, your Honor.

THE COURT:  Anything else, Mr. Burns?

MR. BURNS:  No.

THE COURT:  Mr. Kulwin?

MR. KULWIN:  Yes, Judge.

- - -

LAWRENCE WHARRIE, RECROSS-EXAMINATION

BY MR. KULWIN:

Q.  Mr. Wharrie, you were asked some questions, it's worse being a witness than being a lawyer?

A.  Yes, it is.

THE COURT:  That's always been true, by the way.

BY MR. KULWIN:

Q.  You were asked some questions about whether the only documentation that there would say -- that the motive for the shooting or that there was no written documentation that the motive for the shooting was a conflict between the Goon Squad and the El Rukns.  Do you remember those questions?

MR. LOEVY:  Objection, your Honor.

THE COURT:  I actually sustained an objection to that question.  Just get to the question you are going to ask.

BY MR. KULWIN:

Q.  There was a written documentation -- let me show you Plaintiff's Exhibit 86.  This is a statement --

MR. KULWIN:  Can I have the ELMO?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 86 of 133 PageID #:19753
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 86 of 133 PageID #:31588
12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
85

THE COURT:  You have it.

BY MR. KULWIN:

Q.  This is a statement made by Mr. Fields --

MR. LOEVY:  Reject that characterization, your Honor.

THE COURT:  Rephrase the question.  Actually, this --
if you go backup to the top.

MR. KULWIN:  Sure.

THE COURT:  Just rephrase the question.

MR. KULWIN:  Can I zoom back in, your Honor.

THE COURT:  Yes.  I wanted to get the jury to get a
policemen memory of what they were looking at.

BY MR. KULWIN:

Q.  Isn't it true you had a police report in the permanent
retention file that had a transcribed statement by Mr. Fields
in which he says he was asked about the motive, this is Mr.
Fields talking now, and stated that he did not know for sure
but that two members of the El Rukns had been shot by members
of the Goon Squad of the disciples.  He stated that Fuddy was
a known member of the disciples.  You had that as part of the
information before trial, correct?

A.  Correct.

Q.  And lastly, on this point, not to beat it into the ground,
but on this point of a hit team, four guys who get in a car
and get a bunch of guns to go assassinate somebody and don't
do it are not liable if the next day four other guys get no a

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 87 of 133 PageID #:19754
Case: 1:15-cv-01168 Document #: 185-22 Filed: 02/24/17 Page 87 of 133 PageID #:31585
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

86

car with a bunch of guns and actually go out and murder the people, right?

MR. LOEVY:  Objection, relevance, your Honor, why.

THE COURT:  Phrased that way, I am going to let you ask it.  Objection sustained.

MR. KULWIN:  I will rephrase.

MR. LOEVY:  Actually, it's covered on direct.

THE COURT:  Hang on.  Go ahead and ask the question.

BY MR. KULWIN:

Q.  The four guys who get into a car and actually shoot the guy, are they responsible under the law as the hit team for the double murder?

A.  Correct.

Q.  If the four -- if four other guys get into a car and drive around and think about it but never do it, they're not responsible under the law?

MR. LOEVY:  Same objection, not relevance.

MR. KULWIN:  It's responding to his statement.

THE COURT:  Responsible under the law was not part of the question.  The objection is sustained.  Let me just get you over at sidebar for a second so I can tell you what I see the real problem is.  I apologize.

MR. KULWIN:

THE COURT:  I'm poll apologizing to them not to you

(sidebar.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 88 of 133 PageID #:19755
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 88 of 133 PageID #:31590
12/01/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

87

THE COURT:  The question you asked as you know is a completely complicated question about accountability and conspiracy law.

MR. KULWIN:  Okay.  Too complicated.  Thanks, Judge.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  I apologize to lawyers only rarely. Let's put it that way.

MR. KULWIN:  It's always welcome.

I have nothing else, your Honor.

THE COURT:  Mr. Loevy.

- - -

LAWRENCE WHARRIE, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  You have no personal knowledge about the bribe, correct?

A.  Correct.

Q.  You were asked questions about whether there's any documentation.  Focusing specifically on whether any witness other than the police officers and the cooperators, no Goon Squad member said that there was any shooting between the El Rukns and the Goon Squads, correct?

MR. KULWIN:  I'll object, covered already.

THE COURT:  Yes, he did.

MR. LOEVY:  I don't have any further questions.

THE COURT:  Do any of the jurors have any questions

for the witness.  I do not see anybody writing.  You just raise your hand and waive.  I will apologize again that we didn't do a break.  I'm so sorry.  We are taking our break.

(Short break.)

(The jury enters the courtroom.)

THE COURT:  Mr. Murphy, you can come back up.

Mr. Murphy, do you understand that you are still under oath.

THE WITNESS:  Yes, I do.

THE COURT:  Let me do what's necessary to flip on the wireless mic.  It should be working now.  Mr. Loevy, you can go ahead.

- - -

JOSEPH MURPHY, DIRECT EXAMINATION CONTINUED

BY MR. LOEVY:

Q.  When we broke yesterday afternoon, you told us that you always promised that if they get into trouble, you'll support them at their parole hearings?

MR. BURNS:  Objection, mischaracterizing the testimony.

THE COURT:  Overruled.

THE WITNESS:  Could you repeat the question again?

BY MR. LOEVY:

Q.  What did you say you promised your cooperators, vis-à-vis their parole when they first agreed to cooperate?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 90 of 133 PageID #:19757
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 90 of 133 PageID #:31592
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***
89

A.  I told them I couldn't make any promises to what would happen to their sentence if they were found guilty or anything like that, but I would bring to the attention of the prosecutors and the state's attorneys in this case or the federal attorneys.

Q.  Didn't you say last night, parole specifically?

MR. KULWIN:  Objection.

MR. BURNS:  Objection.

THE COURT:  He has to finish his answer.

THE WITNESS:  I would bring my attention to them and if there was need be if there were other judicial hearings or parole hearings, I would bring the attention to those members of their cooperation as long as it's been truthful.

BY MR. LOEVY:

Q.  All right.  Are you going to honor your promise to Derrick?

A.  I was never asked to.

Q.  Are you going to when owes's up for parole, keep your promise if he is up for parole?

MR. BURNS:  Objection, your Honor?

THE COURT:  Overruled.

THE WITNESS:  If I am asked to, I will.

BY MR. LOEVY:

Q.  Have you ever intervened on any other murders's parole on their behalf?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 91 of 133 PageID #:19758
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 91 of 133 PageID #:31598

12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

90

A.   I have never been asked to.

MR. BURNS:  Objection to the form of the question, your Honor.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   Have you ever done it?

MR. KULWIN:  Objection, asked and answered.

THE COURT:  Well, the question was if every had.  He said he had never been asked to.  I am going to let him ask the question, have you ever done it or not.

THE WITNESS:  No.

BY MR. LOEVY:

Q.   Do you have they understanding with Derrick whether he asks you if you will support him?

A.   I made that offer to him when he cooperated with us back in 89 or 88, I believe.

Q.   Is it your understanding presently that Derrick Kees has an understanding that in connection with his testimony, you're going to help him with his parole next year?

MR. KULWIN:  Objection, argumentative, asked and answered.

THE COURT:  Rephrase the question.

BY MR. LOEVY:

Q.   Do you have an understanding with Derrick that when he's up for parole next year, you're going to help him?

A.   Well, as I mentioned, I made that -- I made that promise to him back in '88 or 89.  I haven't had any conversation with Derrick Kees since 1988 or 89.

Q.   All right.  Have you talked to anybody on his behalf?

A.   No, sir.

Q.   How about the information that Derrick provided yesterday. I want to talk to you about that specifically.

     Now, one of the things he told you was I overheard four people confess, right?

A.   Derrick Kees?

Q.   Yeah.

A.   I believe so.

Q.   Now, a jail house confession by somebody who is looking for a deal, that has limited probable cause value, would you agree?

     MR. KULWIN:  Objection, Judge, jail house confession, argumentative and misstates the evidence.

     THE COURT:  Overruled.  You can answer.

BY MR. LOEVY:

Q.   Mr. Kulwin was in a jail house, a correctional facility, correct?

A.   When he had the conversation?

Q.   No, when you're interacting with him?

A.   Oh, when I was interacting with him?

Q.   Yeah.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 93 of 133 PageID #:19760
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 93 of 133 PageID #:31595
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

92

A.  Yes, he was under arrest.

Q.  So this is literally the equivalent of a jail house snitch trying to make a deal for himself by implicating other people, correct?

MR. KULWIN:  Judge.

THE COURT:  Overruled.

THE WITNESS:  I don't believe so.

BY MR. LOEVY:

Q.  Do you believe for probable cause value, for someone who was in the kind of predicament be that Derrick Kees was in, he would makeup something to help himself, could we agree on that?

A.  I don't believe so.

Q.  All right.  And isn't it true that if he wanted to be credible for probable cause purposes e-has to put himself into the crime?

MR. KULWIN:  Judge, I am going to object, it calls for speculation and argumentative.

THE COURT:  Rephrase the question.  It's a little confusing I think.

BY MR. LOEVY:

Q.  All right.  There is a big difference between someone saying, hey, I was in a booth once five years ago and someone confessed to me, that's A, and, hey, I was in a booth once and someone confessed to me but I'll put myself in the crime.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 94 of 133 PageID #:19761
Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 94 of 133 PageID #:31596

***REALTIME UNEDITED TRANSCRIPT ONLY***

Those are two very different things?

MR. KULWIN:  Same objection, Judge.

THE COURT:  Out -- overruled.  I was writing out on something.  Overruled.

THE WITNESS:  Are these hypotheticals you are giving me?

BY MR. LOEVY:

Q.  Yes.

A.  I don't know.  All I would do is present those statements -- it's not my decision.

Q.  All right.  For probable cause purposes, would you agree there's a big difference between A, I was in a booth once and some guy confessed to me and I want a deal and, B, I was in a booth once, some guy confessed to me, I want a deal and I was part of the crime, B is a more serious story, right?

MR. KULWIN:  Judge, I am going to object, argumentative.

MR. LOEVY:  He hasn't answered yet, your Honor.

THE COURT:  The objection at this point is argumentative.  I am going to sustain the objection.

BY MR. LOEVY:

Q.  All right.  Mr. Kees did put himself into the story, correct?

MR. KULWIN:  Objection to story.

THE COURT:  Overruled.  Actually, no, use a

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 95 of 133 PageID #:19762
Case: 1:10-cv-01168 Document #: 1185-32 Filed: 02/24/17 Page 95 of 133 PageID #:31597
12/01/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

94

non-loaded word.  It's a question, not your closing argument.

BY MR. LOEVY:

Q.  All right.  You understand we don't agree whether Mr. Kees was there?

MR. KULWIN:  Objection, Judge, what he agrees to.

THE COURT:  I told you to reword the question.  You don't have to get his permission to do it.  You have your direction from me.

BY MR. LOEVY:

Q.  Mr. Kees put himself in the scenario by claiming that he, Hawkins, and Evans, he, Kees, Hawkins and Sumner were actually the hit team, that's what he told you, right?

A.  Initially, they intended to kill the victim.

Q.  They got in a car with guns and set out to kill them but then Derrick had to take a pee, right?

A.  Well, it's more than that.  I don't think I can answer that yes or no.

Q.  You have talked to Anthony Sumner about it, right?

MR. KULWIN:  Objection, foundation, Judge.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. LOEVY:

Q.  You talked to Anthony Sumner about this crime in great detail, correct?

A.  Yes.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 96 of 133 PageID #:19763

Q. It is a true statement that Anthony Sumner never once, ever told you that Derrick Kees, Earl Hawkins, Harry Evans and himself were involved in a plot to kill Fuddy, that's true, isn't it?

A. I don't recall.

Q. Well, you would have made a note if that happened, wouldn't you have? Sir, are you saying --

A. I just don't recall that.

Q. Let's slow down here.

Mr. Fields went on trial at which Anthony Sumner pointed his finger and said he confessed, right?

A. Yes.

Q. And you're saying you don't recall whether Anthony Sumner ever told you that he was involved in the murder?

MR. KULWIN: Judge, I am going to -- it's argumentative, Judge.

THE COURT: Overruled.

THE WITNESS: I just don't recall if I heard it from Kees and Sumner. I just can't recall. I know I heard it from Kees for sure.

BY MR. LOEVY:

Q. If Anthony Sumner told you that he actually was part of the murder plot, would you have written that down and given it to Nate Fields?

A. I would have given it to the state's attorney.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 97 of 133 PageID #:19764
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 97 of 133 PageID #:31599
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

96

Q. All right. So if you didn't give it to the state's attorney, can we have a high degree of confidence that Anthony Sumner never told you that?

A. Again, I don't recall.

Q. All right. I am going to show you your notes from your conversation with Anthony Sumner.

A. Okay.

Q. It's Defendant's Exhibit 70. Please tell us if Anthony Sumner ever told you he was involved in the crime with Derrick Kees?

A. No.

Q. What's that?

A. Not in this.

Q. Do you have other notes, sir?

A. No.

Q. That's the only notes you ever -- of your conversation with Anthony Sumner; is that correct?

A. Yes, sir.

Q. And you did not write down that Anthony Sumner said he was involved in the plot, did you?

A. He may have --

Q. It's a yes, no, question.

A. He may have told me later.

        MR. LOEVY:  Objection, your Honor, that is not the question.

THE COURT:  Hang on a second.  The question is whether you wrote it down.  The answer is stricken as nonresponsive.  If you want to put the question again, go ahead.

BY MR. LOEVY:

Q.  Isn't it true you've only had one and only one conversation with Anthony Sumner about this crime?

A.  That's true.

Q.  And that one and only one conversation is memorialized in your note, correct?

A.  True.

Q.  Tell the jury if Anthony Sumner ever told you that he, Derrick Kees, Earl Hawkins and Harry Evans set out to kill Fuddy?  Did he tell you that?

A.  Not that I recall.

Q.  Are you saying that -- if it's not in your notes, it's possible he told you that and you didn't write it down, is that a possibility, sir?

A.  I may have heard that later on in the other trials.

Q.  I'm talking about your meeting with Anthony Sumner?

A.  On the 14th of May?

Q.  That was the only debriefing you had with Anthony Sumner, correct?

A.  No, that's correct.

Q.  All right.  Are you saying to the jury that it's possible

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 99 of 133 PageID #:19766
12/01/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

98

Anthony Sumner told you he was involved in the murder and you declined to write that down, is there any possibility of that?

A.  No, not on that day.

Q.  Can we say conclusively that the one and only one occasion that you debriefed Anthony Sumner he did not mention that he, Harry Evans, Earl Hawkins and Derrick Kees set out to kill Fuddy?

MR. KULWIN:  I object, misstates the evidence, argumentative.

THE COURT:  Objection.  The objection is overruled.

THE WITNESS:  One more time, please.

BY MR. LOEVY:

Q.  Can we say with certainty that on the one and only one occasion you interviewed Anthony Sumner, he did not tell you that he, Harry Evans, Earl Hawkins and Derrick Kees were part of a team that went out to try to murder Fuddy?

A.  That's correct.

Q.  May I have it back, please?

A.  Yes, sir.

Q.  Earl Hawkins also never once told you that Anthony Sumner, Harry Evans, Earl Hawkins and Derrick Kees went out in a car with the intention of murdering Fuddy; isn't that correct?

A.  I don't recall.

Q.  Would you have written it down?

A.  I may have been part of the discussions.  I just don't

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

recall that.

Q. All right.

A. He may have said it --

Q. Have you ever heard Earl Hawkins say that Anthony Sumner was involved in the murder, you would have taken a note, wouldn't you have, sir?

A. Well, Hawkins eventually says he was involved in the murder.

Q. All right. Sir, you have no notes anywhere in existence reflecting that Derrick Kees, Earl Hawkins, Harry Evans and Anthony Sumner supposedly wept out to murder them from Earl Hawkins conversation; isn't that true?

A. Not that I recall.

Q. How about Harry Evans, did Harry Evans ever admit that he was part of this hit team?

A. I don't recall that either, sir. Those were years later, those interviews.

Q. Now, the confession that Kees attributed to Nate, that was the, yeah, it's a good exercise confession, right?

A. Who are we talking about, Kees or who?

Q. Obviously, the original confession that Anthony supposed got from Nate at a secret meeting in the Fort was what?

A. He said that.

Q. Said what?

A. That it was good -- Sumner told me that he met I believe

***REALTIME UNEDITED TRANSCRIPT ONLY***

it was the same day of the shooting but later on, he met Mr. Fields over at the Fort.

Q. Just the two of them were having a private conversation?

A. He only mentioned himself and Mr. Fields.

Q. And you saw his testimony this morning. He said it was a private conversation, just the two of them, right?

A. I saw what?

Q. His testimony was read this morning through Mr. Wharrie. Do you remember that?

A. Yes, yes, it appears so.

Q. And what you're claiming -- what was the exact words that implicated Mr. Fields when they had that conversation?

A. The exact words, I quote it was, I believe, yeah, it was a good exercise.

Q. Now, you're talking to Derrick Kees some four years later, right?

A. About four or five years later.

Q. And Derrick is now trying to be useful to law enforcement, right?

A. He's decided to cooperate. Actually, he decided to cooperate before that.

Q. Okay. Well, when did he decide to start cooperating?

A. Strike that. I was thinking about Hawkins. Kees decided to cooperate in I think it was --

Q. March 89, right?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 102 of 133 PageID #:19769

A.  89 we met him.

Q.  When Kees was talking to you about, you know, ways he could be -- he was talking to you about ways he could be useful to law enforcement, correct?

A.  Well, there was an initial meeting I had with Kees along with Detective O'Callaghan.

Q.  All right.  Did you say to Kees or did O'Callaghan say to Kees in your presence, hey, did Nate say it was a good exercise?

A.  Well.

Q.  Can you answer that question?

A.  There's different conversations.  That's what I'm trying to point out.  We're talking about -- I just need some clarity.

        MR. KULWIN:  Objection.

BY MR. LOEVY:

Q.  At any conversation, did you ever say or hear O'Callaghan say to Mr. Kees, hey, did Nate say it was a good exercise?

A.  I don't recall.

Q.  All right.  If Kees was asked, hey, did Nate say it was a good exercise, what was Kees' response, yes?

        MR. BURNS:  Objection, form of the question, your Honor.

        THE COURT:  Sustained.

BY MR. LOEVY:


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 103 of 133 PageID #:19770
Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 103 of 133 PageID #:31605
12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

102

Q.  All right.  The confession that Kees later claimed Nate gave, was it a different location with different people, correct?

A.  That Kees provided us?

Q.  Yeah.

A.  Yes.

Q.  And it was the exact same words, wasn't it?

A.  Yes.  Well, there were others that said that later too.

MR. LOEVY:  Your Honor, I move to strike that.

THE WITNESS:  I'm sorry.  I'm sorry.

THE COURT:  The follow-up comment is stricken.  The jury is directed to disregard it.  It was not responsive to the question.

BY MR. LOEVY:

Q.  When you say there were others, those were cooperating witnesses who were getting huge breaks on their deal -- actually, nobody said it was a good exercise.  Who else said it was a good exercise?

A.  Hawkins.

Q.  He got a big break on his deal to say it?

A.  No.

MR. KULWIN:  Objection, Judge.

MR. LOEVY:  May I ask a question, your Honor?

THE COURT:  I got to deal with the objection first.  The objection is overruled.  The answer no can stand.

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 104 of 133 PageID #:19771
12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

                                                                          103

BY MR. LOEVY:

Q. Hawkins never said he heard Nate say it was a good exercise, did he?

A. Yes, he did.

Q. And is there a report on that, a note?

A. I think he mentioned it to us later, but he just said it yesterday.

MR. LOEVY: Your Honor, can we focus on the question, your Honor.

THE COURT: He is not asking about testimony at the trial. The question is is there a report or a note on that. That's the pending question.

THE WITNESS: I think there is somewhere.

BY MR. LOEVY:

Q. There should be, right?

A. Well, yes, there is a note somewhere.

Q. That says Earl Hawkins said that Nate gave that confession?

MR. KULWIN: Your Honor, I object. I'd like to be heard.

THE COURT: Okay. Maybe I'm missing something. Let me see you at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: I have been told many times by the court

reporter that happen that the sidebar are virtually incomprehensible and it's largely because everybody is talking at once and people aren't talking towards the microphone. We actually tweak up the microphone and it's still not working. What's your point, Mr. Kulwin.

MR. KULWIN: My point, Judge, I will talk slowly, ask is that there are probably written reports as part of the federal investigation that are probably filled with all sorts of other things, that would be my guess, none of that was part -- that would be my reasonable belief, okay. They were not -- you cannot get grand jury material, I don't believe, from the federal government on all this stuff. The inference is wrong. It's unfair. You can't tell witnesses you can't talk about all the other murders, you have to be very, very careful what you say but if you're asked is there one report about this anywhere written down, he doesn't know what to do.

THE COURT: The question on the table has to do with Hawkins making a statement about whether Mr. Fields made this good exercise comment is that right?

MR. LOEVY: Yes, and there is no such report and we have his notes, we have his Hawkins debriefing notes, pages, dozens of pages. I am not opening the door to anything to say, there is no note and no report that this new story Hawkins said on the stand or he might have heard that, there is nothing remotely in basis in his objection. It's a limited

question, isn't it true there are no notes or report that reflects this. And why would that open the door to anything? Why would that open the door to oh, there's a lot of notes, there's a lot of reports.

THE COURT: Mr. Kulwin.

MR. KULWIN: Is Mr. Loevy representing that he reviewed every 302 that every FBI agent and every ATF agent wrote on this case in the El Rukn investigation? If he is, that's one thing. But --

THE COURT: Wait a second. Wait a second. He's asking the guy a question. He's asking the guy a question. Honestly, he's asked it four times and he hasn't gotten an answer yet. He basically heard Hawkins say that. The question is did he write it down anywhere. That's the way you are going to have to rephrase it. Did he write it down anywhere?

MR. KULWIN: Did he write it?

THE COURT: That's how you're going to have to rephrase it. Okay.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

MR. LOEVY: May I continue, your Honor?

THE COURT: Go ahead.

BY MR. LOEVY:

Q. Are you claiming, sir, that Hawkins in your presence said

that Nate confessed it was a good exercise?

A.  Yes, sir.

Q.  Okay.  Would you -- did you create a police report?

A.  No, sir.

Q.  Did you create a note?

A.  Yes, sir.

Q.  Where is that note?

A.  At that time I was with -- assigned with the U.S. Attorney's Office and we had conversations throughout, I think it started in '88, 89, and we prepared notes there.

Q.  All right.  And we have those notes at this trial, do we not?

A.  I don't know.  Do we?

Q.  Have you reviewed the trial exhibits?

A.  Not all of them.

Q.  Have you reviewed your notes to see that there is or is not this statement that you are attributing to Hawkins?

A.  No.

Q.  But you're saying they should be in your notes, right?

        MR. BURNS:  Objection, your Honor.

        THE COURT:  Overruled.  He's testified.

BY MR. LOEVY:

Q.  Is that true, they should be in your notes?

        MR. BURNS:  Objection?

        THE COURT:  That's the question I just sustained an


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 108 of 133 PageID #:19775
Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/16 Page 108 of 133 PageID #:31610

answer to.

MR. LOEVY:  I thought you said overruled.  I misheard you, I apologize.

THE COURT:  Sustained.

THE COURT:  I misspoke.  I said overruled.  I meant to say sustained.  You heard me right.  I said it wrong.

BY MR. LOEVY:

Q.  Let's he talk about?

THE COURT:  One of those rare times I apologize to the lawyer.  The jurors probably picked up on that.

MR. LOEVY:  It's probably my fault for not reading your mind.

THE COURT:  You are supposed to be able to read my mind.

BY MR. LOEVY:

Q.  The other piece that Derrick Kees provided in court was oh, I remember this one time that Nate told me in September 1983 that he wanted to join the hit team or words to that effect.  Do you remember him saying that yesterday?

A.  Yes.

Q.  Isn't it true that 2013, some 25 or 8 years after the conversation supposedly took place was the first time Derrick Kees ever made an allegation that oh, yeah, Nate told me in September 1983 that he wanted, he loved what you all are doing with the chief and he wanted a part of it?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 109 of 133 PageID #:19776
Case: 1:23-cv-01168 Document #: 285-22 Filed: 02/24/26 Page 109 of 133 PageID #:31611

MR. KULWIN:  Objection, Judge, lacks foundation.  How would he know.

THE COURT:  Sustained.  You are not going to be able to ask that question that way.

BY MR. LOEVY:

Q.  You are no not aware of any prior time Derrick said that before 2013, correct?

A.  I believe he did say that.

Q.  Where and when, sir?

A.  It was in our interviews.

Q.  Would that be in your notes?

MR. KULWIN:  Can he finish the question, Judge?

THE COURT:  Finish the answer.  It was in the notes, he said.  Go ahead and finish your answer.  The question was with where and when did he say it?  You started to say it was in your notes or interviews or something along those lines.

BY MR. LOEVY:

Q.  In your notes?

A.  We had a number of interviews with him throughout 1988.

Q.  Showing you Defendant's Exhibit 171, these are your notes dated May the 4th, 1989, right, sir?

A.  The first page is.

Q.  All right.  There's other notes, right?

A.  Yes, sir.

Q.  All right.  Show me or tell the jury where it says that

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 110 of 133 PageID #:19777
Case: 1:23-cv-01168 Document #: 1185-22 Filed: 02/24/26 Page 110 of 133 PageID #:31612
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

109

Nate wanted to join the team?

MR. KULWIN:  Can we have the date of the notes, Judge?

THE COURT:  It's Defendant's Exhibit 171 as Mr. Loevy said a second ago dated May 4th, 1989.

MR. KULWIN:  Sorry, Judge.  I apologize.

THE WITNESS:  This.

BY MR. LOEVY:

Q.  It doesn't say it, does it, sir?

A.  It doesn't say it, no, no, but there were other conversations with him.

Q.  But this was the first one, May 4th, 1989, right?

A.  With?

Q.  With Derrick Kees?

A.  With Derrick Kees, yes, sir.

Q.  And he told you his sorry that he was part of the hit team and Nate confessed to him, right?

A.  Yes, sir.

Q.  And he did not tell you, oh, yeah, there was a time in 1983 that Nate said I want to join the hit team and I want to be part of what you all were doing, he didn't tell you that when he told you the story the first time, right?

A.  Not the first time, no, sir.

Q.  In fact, this note on May the 4th, 1989, is not day one, is it?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 1111 of 133 PageID #:19778
Case: 1:23-cv-01168 Document #: 285-22 Filed: 02/24/17 Page 111 of 133 PageID #:31618

A.  That --

Q.  Day one was March 1989, right?  This is more like day 45?

MR. KULWIN:  Objection, Judge.  No foundation.

THE WITNESS:  Could you show me those notes?  March 89.

BY MR. LOEVY:

Q.  By May 89, Derrick had been cooperating for close to two months at the MCC, right?

MR. KULWIN:  Objection, Judge.

THE COURT:  What's the basis for the objection.

MR. KULWIN:  No foundation.  Just ask him if he knows.

MR. LOEVY:  Objection, your Honor.

THE COURT:  If you don't know, you can just say you don't know.

THE WITNESS:  I don't know the question.

THE COURT:  Okay.  Ask the question again.

BY MR. LOEVY:

Q.  Derrick started being a cooperating witness in March 89, right?

A.  I am not sure of the exact date.

Q.  All right.  Leaving aside the exact date, he got taken to the MCC where he and the other cooperators interacted on the sixth floor for two years, correct?

MR. KULWIN:  Objection, Judge, lacks foundation, he

was taken to the MCC.

MR. LOEVY:  Objection to the speaking objection, your Honor.

THE COURT:  The objection is overruled.

THE WITNESS:  As I best recall, he wasn't put in the MCC right away.  I think he was sent out to Rock County.

BY MR. LOEVY:

Q.  It's your recollection that I am asking.  He was sent somewhere?

A.  He was sent off to Rock County I think in Wisconsin.

Q.  All right.  Now, you were asked last night about the email and you did say that you didn't know there was an issue with Derrick Kees' sentence break coming through?

A.  The email that I received about the --

Q.  Right?

A.  The motion.

Q.  The government sent you a copy of the motion to cut Derrick Kees' sentence by 12 years?

A.  Yes, sir.

Q.  And you got that on November 17th, the day the trial started?

A.  Yes, sir.

Q.  And you didn't know there had been an issue, right?

A.  Yes, I had no idea.  I thought he was going to come in like he did the last time to testify.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 113 of 133 PageID #:31615

Q.  If the email and showing you again Plaintiff's Exhibit 1001, if the email is dated at 3/25 sending you a copy of the government's motion asking to cut Kees' sentence in exchange for his testimony, you responded at 4:53 that same afternoon, right?

A.  Yes, sir.

Q.  O'Callaghan probably got off the stand around 4:45?

MR. KULWIN:  Objection, Judge, as to when O'Callaghan got off the stand.

MR. LOEVY:  Established.

MR. LOEVY:  Were you in court?

THE COURT:  I am sustaining the objection anyway.

BY MR. LOEVY:

Q.  You didn't suggest in your response that there was any uncertainty or unclarity on your part about why the government was filing this motion, did you?

A.  It was clear in my mind why they were filing the motion, because there was a problem having Derrick Kees.

THE COURT:  You need to --

THE WITNESS:  I'm sorry.  Please ask the question again.

BY MR. LOEVY:

Q.  I am going to switch to another Kees topic?

A.  Yes, sir.

Q.  Now, you took information from Derrick Kees, correct?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 114 of 133 PageID #:19781
Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 114 of 133 PageID #:31616
12/01/16 AM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

113

A.  Yes, sir.

Q.  Were you working for the Chicago Police Department?

A.  Detailed to the U.S. Attorney's Office.

Q.  All right.  Did you create a Chicago police report detailing your conversations with Derrick Kees about the Smith/Hickman murder?

MR. KULWIN:  Objection, I am going to object and ask to be heard.

THE COURT:  Okay.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  I try not to be like some of my colleagues that use phrases over and over again but it happens.  Anybody watch Seinfeld, remember the serenity now?

Here is my question:  When a Chicago police officer is detailed to a federal task force, is he required to prepare Chicago police reports?  My hunch would be no.  The hunch is just kind of based on 35, four years of experience, 35 let's say.

MR. LOEVY:  I don't know.  I guess you know the answer to that question and -- he took a note in 1989 suggesting that Anthony Sumner was involved in the murder, Nate at the time was on death row.  I don't care who is signing his paychecks.  He is still working for the Chicago Police Department, he took notes, he didn't give them to the

state's attorney, he gave them to a different law enforcement, that's not discharging your braid obligation.

THE COURT: Hold on a second. We are talking about just to back up a second here, what we are talking about is what he learned about what in 1989 again?

MR. LOEVY: Derrick Kees told him Anthony Sumner was involved in the murder plot. That's extremely exculpatory.

THE COURT: Got it. All right. So I don't -- honestly, but I think the problem with the question is that it suggests that preparing a Chicago police report was some intermediate required step. I mean, I don't really see a problem with the subject matter. You are going to have to leave that part out of it because my pretty strong sense, again, just from past experience, is that when one of these officers is detailed to a federal task force, the paper flow goes to the federal task force, it doesn't get put in the CPD file.

MR. LOEVY: That's our point.

THE COURT: I understand. But your point, as you just described it to me, sir, is that he didn't do what was necessary to get this information to Mr. Fields or his defense attorney. Okay?

MR. LOEVY: Yes.

THE COURT: You can make that point. You cannot make the point that he did not prepare a quote Chicago police

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 116 of 133 PageID #:19783
Case: 1:13-cv-01168 Document #: 285-22 Filed: 02/24/16 Page 116 of 133 PageID #:31618

report.  If that's not clear, there is nothing more I can do.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

            THE COURT:  All right.  The objection to the question is sustained.  You can proceed with another question as we discussed.

BY MR. LOEVY:

Q.  All right.  One of the problems with the case was that Hank Andrews had a white car isn't that true, sir?

A.  At what time?

Q.  The witnesses who saw the bad guys drive away saw a blue car, right?

A.  Yes, sir.

Q.  And Hank had a white car, right?

A.  He had a blue car, Cadillac.

Q.  Sorry, blue.  He had a white car?

A.  He had a blue Cadillac.

Q.  I'm sorry?

            MR. KULWIN:  Objection.

            THE COURT:  He's answered your question.  Now ask another one.

BY MR. LOEVY:

Q.  All right.  You needed an explanation for how his blue car became white, right?

            MR. BURNS:  Objection to the form of the question,

your Honor?

THE COURT: Overruled. I mean, I think the problem with your question is you just said had generally as opposed to one time or another.

BY MR. LOEVY:

Q. Did anybody check Hank's white car to see if there was blue paint underneath it?

A. I don't recall.

Q. Wouldn't that have made sense if the police were saying that Hank's car wasn't the right color because he painted it, all you had to do was look under the paint, right?

A. Is that your question?

Q. Yes.

A. No, sir.

Q. All right. Let's talk about Anthony Sumner's cooperation. Now, he also told you that Nate was involved in the murder of Joe White and Dee Eggars Vaughn, correct?

A. Along with himself.

Q. Yep. But the problem was the kids only saw two people commit the murder, right?

A. They could only view two people.

Q. I mean they watched their parents being tied up and stabbed by two offenders?

A. They had a limited view of what they could see.

Q. The original police report didn't say anything about a

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 118 of 133 PageID #:19785
Case: 1:13-cv-01168 Document #: 285-22 Filed: 02/24/17 Page 118 of 133 PageID #:31620
12/01/16 AM                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

117

Q. limited view, did they?

A. I believe they did, sir.

Q. All right. Isn't it true that what Sumner described was three men actually participating in the crime, stabbing, shooting, tying, that's what Sumner's description was, right?

A. He said that -- I believe he said that he tied up Joe and Nathson tied up Dee Eggars.

Q. And then early shot them in the head?

A. Well, I think -- no, early stabbed them.

Q. Earl stabbed them. They each claimed the other one stabbed them, right?

A. No, no, I think that -- I think that Earl said that he stabbed them and shot them.

Q. All right. But in any event, the kids saw two people do this crime, right? Right?

A. They only saw two.

Q. All right. Did that give you reason to doubt whether maybe Sumner was lying about Nate Fields being the third guy?

A. No, sir.

Q. When did Hawkins first tell you that Nate was not involved in that crime?

A. The first time I learned it was.

Q. The question was when did Hawkins first tell you, not when you learned it.

          MR. KULWIN: Judge, I object. It assumes that he

talked to Hawkins before Hawkins --

THE COURT: I object to the objection as overruled. Assumes facts not in evidence.

THE WITNESS: Ask the question again, please.

THE COURT: When did Hawkins first tell you, not when you learned it. When did he first tell you as opposed to when you first learned it.

THE WITNESS: I don't recall, sir. I don't recall when he first told me.

BY MR. LOEVY:

Q. Were you disturbed that Mr. Fields had been arrested and prosecuted or, you know, charged with a double murder if he had nothing to do with it?

A. Of course.

Q. Did that cause you to question maybe the same guy who lied about him about that crime is lying about him about the other crime?

A. No, because we had cooperating evidence in the other crimes.

MR. LOEVY: Your Honor, we'd move to strike the second part of that.

THE COURT: Everything after no is stricken.

BY MR. LOEVY:

Q. You did have other corroborating evidence in the form of eyewitness identifications, right?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 120 of 133 PageID #:19787
12/01/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

119

A.  At that time.

MR. KULWIN:  Foundation, at what time?

THE COURT:  Yeah.  You got to set a time.  As of when, in other words.

BY MR. LOEVY:

Q.  When Nate went on trial for capital murder, the only corroboration for Anthony Sumner was some kids who saw Earl Hawkins supposedly and Nate Fields do the shooting?

MR. KULWIN:  I am going to object.  Argumentative.

THE COURT:  Overruled.  Overruled.  He can answer.

BY MR. LOEVY:

Q.  Do you remember the question?

A.  No.

Q.  In 1986 when Nate went on trial for capital murder, the only corroboration you had for Anthony Sumner was those kids who were saying that they saw Earl and Nate with the masks from the distance as the shooters, right?

A.  I believe there were three witnesses.

Q.  The eyewitnesses, right?

A.  Yes, sir.

Q.  Now, I want to talk to you about your interview of Anthony Sumner.  You don't dispute that there was only one and one debriefing, correct?

A.  Correct, sir, with me.

Q.  With you?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A. Yes, sir.

Q. And what was the date of your one and only one interview with Anthony Sumner?

A. 14 May 85.

Q. Was the subject of the Smith/Hickman murder discussed during that briefing?

A. Yes, sir.

Q. And that is then the only time you've ever spoken to Anthony Sumner about that subject was also May 14th, right?

A. That I personally spoke to him, yes, sir.

Q. Yes.

Were you taking notes when he was telling you about the Smith/Hickman murder?

A. Yes, sir.

Q. Were you taking notes as he's telling you the details?

A. Yes, sir. Well, not initially. I had him tell me the story a couple times first.

Q. And then you wrote it down after the conversation?

A. The initial conversations, it's always better to talk to someone first before you are writing down notes. Subsequently, I did write down notes when I was talking to him afterwards a number of times and went over the account with him.

Q.

MR. LOEVY: Your Honor, if you would entertain it,

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 122 of 133 PageID #:19789
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

121

this would be a better place to take a break.

THE COURT: I can't because it would basically require shaving 15 minutes off our day. I have another case that's up at 1:30 that's probably going to take 10 minutes. Sorry.

BY MR. LOEVY:

Q. I am going to show you a copy of Defendant's Exhibit 72. If you could turn to page 11, which is tabbed for you.

THE COURT: That would be my suggestion actually is just keep them.

THE WITNESS: Okay.

THE COURT: It's not a criticism. You're going to be looking at stuff.

THE WITNESS: Okay, sir.

BY MR. LOEVY:

Q. If you could turn to page 11 and 12.

A. Hang on one second, please.

THE COURT: I might suggest that after the lunch break or even now the more felicitous way of doing this would be to put it on the screen. That's the whole reason --

BY MR. LOEVY:

Q. Can you see the screen, sir?

A. Yeah, I can see the screen.

THE COURT: Let me put the ELMO on. Yeah, you can see the screen. I think it's going to be easier probably for

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 123 of 133 PageID #:19790
Case: 1:23-cv-01168 Document #: 1185-22 Filed: 02/24/26 Page 123 of 133 PageID #:31625

12/01/16 AM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

122

Q. you to look at the screen.  If you want to go closer to it, that's fine.

THE WITNESS:  I can see it.  Thank you.

BY MR. LOEVY:

Q. All right.  Sir, these are your notes, are they not, sir?

A. Yes, sir.

Q. And at the deposition, you denied these were your notes, correct?

A. I denied they were my notes?

Q. You submitted an the errata sheet correcting your testimony saying you got confused, but that they were your notes, correct?

A. Yeah, these are my notes.

Q. And you corrected your sworn testimony by the errata sheet, correct?

A. I don't recall that.  I know that these are my notes I am looking at.  That's my handwriting.

Q. All right.  Let's walk through your notes of the Sumner interview on -- this is your notes of May 14th, 1985, correct?

A. Yes, sir.

Q. All right.  Talman Hickman, Jerome Fuddy, 706 East 39th Street, 28th of April, 017 hours.  Do you see that?

A. Yes, sir.

Q. It looks like you had access to the file at the time you were interviewing Anthony Sumner?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 124 of 133 PageID #:19791
Case: 1:10-cv-01168 Document #: 1185-22 Filed: 02/24/16 Page 124 of 133 PageID #:31626
12/01/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

123

A. I didn't have that information at the time.

Q. This is an RD number, isn't it?

A. Yeah, I called the office to find out that information.

Q. The question was this is an RD number, isn't it, your Honor?

A. Yes, sir, that is an RD number.

Q. All right. And it shows Nathson Fields, George Carter as the shooter, Hank Andrews as the driver, Earl Hawkins as the setup. You're claiming this is what he told you, right?

A. That's what he told me.

Q. A couple of days after the shooting, he had a conversation with Hawkins at this location?

A. Yes.

Q. Earl got Fields and Carter?

A. Yes.

Q. Now, tell the jury where in your notes it says that Nate Fields confessed to him, the good exercise confession.

A. That was in the subsequent interview.

Q. I asked where it is in your notes?

A. In this note?

Q. On May 14th, 1985, that Sumner told you that Nate confessed?

A. It's in the other note I gave you.

Q. Not in the in your notes?

MR. BURNS: Objection?


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 125 of 133 PageID #:19792
Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 125 of 133 PageID #:31627

MR. KULWIN: Objection, Judge, asked and answered.

THE COURT: Sustained.

BY MR. LOEVY:

Q. Is it in Defendant's Exhibit 72 that Nate supposedly confessed to this murder?

A. This exhibit, no.

Q. These are your notes, are they not?

MR. KULWIN: Objection, asked and answered, Judge.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Let's take a look at your general progress report, Defendant's Exhibit 70. You created this as well, right?

A. Yes, sir.

Q. And you're saying you created this on the same day you created Defendant's Exhibit 70?

A. Same day, same evening or afternoon.

THE COURT: Mr. Loevy, why don't you retrieve those documents.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. The purpose of general -- may I, sir?

A. Yeah, I got some on the floor.

Q. That's okay.

The purpose of general progress reports is for police

detectives to take notes, correct?

A.  Yes, sir.

Q.  In fact, the old rule was you're allowed to take notes on scraps of paper and when they did the new special order, detectives are required to take notes directly on the general progress reports, correct?

A.  No, you're incorrect.

Q.  Were you here when lieutenant Duffin and Mr. Hickey testified?

A.  Not Duffin.

Q.  Were you here for Hickey, though?

A.  Yes, sir.

Q.  Do you disagree with the suggestion that the reason GPRs were created was so that detectives are supposed to take their notes directly into GPRs, was that the practice?

A.  No, you can take your notes on other paper.

Q.  So the special order in the terms of the special order required notes to be taken in the GPR, correct?

A.  I don't -- you can take notes in the GPRs.

Q.  The question was if the special order required it?

A.  No, it doesn't require.  I mean, it suggests maybe to do it, but that's not the only way you can take notes.  That's what I'm trying to explain.

Q.  All right.  You created this general progress report after the fact, didn't you, sir?

Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/17 Page 127 of 133 PageID #:31629

MR. BURNS:  Objection.

THE COURT:  Overruled.

MR. BURNS:  Foundation, your Honor.

THE COURT:  Overruled.

THE WITNESS:  After the fact?

BY MR. LOEVY:

Q.  Yes?

A.  The interviews that I conducted on 14 May 85.

Q.  You took your notes which is Defendant's Exhibit 72?

A.  Yes.

Q.  And you rewrote them as a general progress report, correct?

A.  I had another interview with him and went over it slowly, I wanted to get the information on who the offenders were and get that out to my team.

Q.  Sir, you did say you had one and only one interview with Anthony Sumner, did you tell that jury this, did you?

A.  No.  I had --

Q.  That's your answer.  You had more than one interview with Anthony Sumner, sir?

A.  The only time I interviewed him was on 14 May 85 when --

Q.  All right.  Let's take a look at the first line of your notes.  It says, a couple of days after the shooting, he had a conversation with Hawkins at 6416 Kenwood, correct?

A.  Yes.

Q. Let's take a look at your GPR report. It says, quote, a couple of days after shooting, he had a conversation with Earl Hawkins at his apartment located at 6416 south Kenwood, correct?

A. Yeah, but then I go into the narrative.

MR. KULWIN: Objection.

THE COURT: He can only do one part of it at a time. The objection is overruled.

BY MR. LOEVY:

Q. That's what it says, right?

A. That's what it says.

Q. What you did was you took your notes, a couple of days after the shooting, he had a conversation with Hawkins, and you rewrote them into the GPR, a couple of days after the shooting, he had a conversation with Earl Hawkins at his apartment located at Kenwood, correct? You rewrote your notes?

A. Incorrect.

Q. All right. And then the next line says, Hawkins related that he got Nathson Fields and George Carter to shoot Fuddy because they were not known in the enabled. They used pseudonym vehicle and a blue Cadillac. Do you see that?

A. Yes, sir.

Q. Let's look at the original note. Lot less detail, right? Earl got Fields and Carter. Right? That's what it says?

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 129 of 133 PageID #:19796
Case: 1:13-cv-01168 Document #: 1185-22 Filed: 02/24/16 Page 129 of 133 PageID #:31651
12/01/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

128

A.   Yes, sir.

Q.   What was in all the white space that's been whited out on this note, if you know?

MR. BURNS:  Objection?

MR. KULWIN:  I'll object, Judge.

THE COURT:  So you have to lay the foundation first that something was whited out in other words.

BY MR. LOEVY:

Q.   I guess that's a question.  In your notes throughout all the other paragraphs follow closely, correct?

THE COURT:  You are talking about the spacing between the various bullet points.

THE WITNESS:  It's just the way I took the notes.

BY MR. LOEVY:

Q.   The question was the bottom half, there is no spacing, correct?

A.   Listen, that's the way I take the notes.

Q.   Can you answer the question, sir?

MR. KULWIN:  Objection.  He is answering the question.

THE COURT:  He is not.  The question was what the spacing was at the bottom.

THE WITNESS:  Are you saying I whited out things or something?

MR. LOEVY:  Objection, your Honor.  We ask to strike


***REALTIME UNEDITED TRANSCRIPT ONLY***

that.

THE WITNESS:  I'm sorry.

BY MR. LOEVY:

Q.  The question is isn't it true there is a dash with nothing on paper and then below this there is three lines that don't have text.  Can we agree on that?

A.  Yes, that's in that note.

Q.  All right.  The next line of the original note says Fuddy had shot James, an El Rukn two or three weeks earlier.  Do you see that?

A.  Yes, sir.

Q.  And on the rewritten note, Hawkins said --

MR. KULWIN:  Objection to rewritten, Judge.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Hawkins said he was across the street at 706 east 39th while Carter and Fields shot Fuddy and a friend.  Stayed in the vehicle, that's what it says?

A.  That's not a rewritten note.  I would have to say no.

Q.  All right.

A.  On everything.

Q.  At the bottom here, it says the hit ordered by Earl through general banks in your original note, right?

A.  Yes, sir.

Q.  Okay.  In your rewritten note, it doesn't say that, does

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 131 of 133 PageID #:19798
Case: 1:15-cv-01168 Document #: 185-22 Filed: 02/24/17 Page 131 of 133 PageID #:31633

12/01/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

130

it?

MR. KULWIN:  Objection to rewritten.  The witness has already said it wasn't.

THE COURT:  Rephrase --

THE WITNESS:  I have to say no.

THE COURT:  Rephrase the question.  Excuse me.  I'm talking.  Rephrase the question.

BY MR. LOEVY:

Q.  You had one and only one interview with Anthony Sumner isn't that correct, sir?

A.  No, that is incorrect.

Q.  Do you remember being -- giving testimony in this case at a hearing in April 16th, 2014, and being asked this question and giving this answer.  This is page 1550, lines 15 to 20.

"QUESTION:  Now you said you only met with Mr. Sumner on one day; is that correct?

"ANSWER:  Well, the only time I ever interviewed him about one case, any case was 14 May 1985.

"QUESTION:  You did meet Mr. Sumner on other occasions?

"ANSWER:  No, I didn't.  I saw him a couple times but I never spoke to him about any cases

"QUESTION:  So this was your only interview of Mr. Sumner?

"ANSWER:  Yes.  Yes, ma'am.

Did you give that answer, sir

***REALTIME UNEDITED TRANSCRIPT ONLY***

12:29:25              MR. BURNS: Objection, Judge, not impeaching

12:29:27   BY MR. LOEVY:

12:29:27   Q. This was your only interview of Mr. Sumner, yes, ma'am?

12:29:31              THE COURT: What's the objection?

12:29:32              MR. BURNS: .

12:29:34              THE COURT: The objection is overruled.

12:29:35              THE WITNESS: I said I interviewed him that one day. It wasn't I went and talked to him one time. I interviewed him one day throughout the day.

12:29:46              MR. LOEVY: All right.

12:29:47              THE COURT: We will stop there.

12:29:48              MR. LOEVY: Can I ask one more question?

12:29:50              THE COURT: Yeah.

12:29:51   BY MR. LOEVY:

12:29:51   Q. Was he changing his story throughout the day?

12:29:54   A. No, I was getting a better version of it talking to him.

12:29:57   Q. Better?

12:29:58   A. I was getting a clearer account of what's going on.

12:30:00   Q. Like the fact that Nate confessed, it got clarified?

12:30:04              MR. BURNS: Objection, your Honor.

12:30:04              THE COURT: Sustained. Argumentative.

12:30:06         We are going to break for lunch right here. I have one other case as I said at 1:30. I'm hoping it will take five or ten minutes. There is a chance it might take a little bit more than that. Be ready to go at 1:35 or so. (The jury

Case: 1:23-cv-01737 Document #: 287-35 Filed: 04/06/26 Page 133 of 133 PageID #:19800
Case: 1:13-cv-01168 Document #: 185-22 Filed: 02/24/17 Page 133 of 133 PageID #:31685

leaves the courtroom.)

THE COURT:  Anything we got to talk about before stopping?

MR. LOEVY:  Not from plaintiff, your Honor.

THE COURT:  Okay.  Fine.  See you at -- be ready to go at about 1:35 just like I told the jury.

(The trial was adjourned at 12:30 until 1:35 p.m. of this same day and date.)