# Exhibit 36

November 17, 2016, 12:30 p.m., no morning session; just afternoon, volume 4.

Realtime seems to be working great! Just in case, I'll keep my fingers crossed.

THE CLERK: Case number 10 C 1168, Fields v. City of Chicago.

THE COURT: Good morning. Good afternoon.

MR. LOEVY: Good afternoon, your Honor, Jon Loevy, Steve Art, Ann Swaminathan, Candace Gorman for our client Nathson Fields.

MR. BURNS: .

MR. KULWIN: Shelly Kulwin and Rachel Katz on behalf of Detective O'Callaghan.

MR. LOEVY: Your Honor, we are not going to do the field trip this afternoon. We would like to start the testimony. You had deferred the issue about the feet. Our preference would be to just move.

MR. KULWIN: Having said that, Judge, you said 12:29 have the transcript with the 80 feet. I've got it for you.

THE COURT: In fact, it is 12:29. Okay. I'll look at it. Since we are not going to deal with it right now, I'll look at it.

Did you have another issue, Mr. Kulwin, that you wanted to take up?

MR. KULWIN: No, that was it.

Case: 1:10-cv-01168 Document #: 283-36 Filed: 04/06/16 Page 3 of 215 PageID #:19803

THE COURT: Oh, that was it.

Get him on the witness stand.

MR. BURNS: Judge, if we may before you bring the jury out.

THE COURT: The jury is coming out.. that's why I asked if anybody has any issues.

MR. BURNS: It's the question as to Mr. Stainthorpe representing plaintiffs in cases against the City of Chicago. We asked.

THE COURT: I can't hear.

MR. BURNS: We have a concern that it would open up issues relative to his filing of other issues against the City of Chicago. Our purpose would be simply to ask does he file those without inviting or opening, if the Court believes we would be opening the door, to discussion as to other cases.

THE COURT: What exactly are you planning to ask him? Do you file lawsuits against the City of Chicago?

MR. BURNS: As part of that, yes, your Honor.

THE COURT: Yes, and then you move on or what?

MR. BURNS: Yes. We are not getting into the details.

THE COURT: It's one question?

MR. BURNS: It really is, Judge.

MR. LOEVY: We had wanted to ask him you had through your work some familiarity with the policies and practices,

Case: 1:23-cv-01737 Document #: 283-36 Filed: 04/06/26 Page 4 of 215 PageID #:19804

that's why sent a lot of subpoenas for the investigative and sent four of them because he wasn't getting investigative files back.  I am glad we are talking about it because I wanted to ask him isn't it true for why the policy got changed in the mid '80s, you had some involvement with the policy change.

As far as the issue about whether to ask him about whether he does suits against the City of Chicago, I guess I can live with the one question.  Does that open the door to what kind, I'm okay with with that.

THE COURT:  It doesn't open the door to him talking about the issue of other suits.

MR. BURNS:  As far as the other issue, that's being that hasn't been disclosed previously, his policies, practices, when they were changed from the City of Chicago.

THE COURT:  You know what, a question will be asked, you'll make an objection, we will rule on it:?

(The jury enters the courtroom.)

THE COURT:  Everyone can have a seat: We are ready to start.  Mr. Stainthorpe, remember you are still under oath.

THE WITNESS:  Yes.

- - -

JOHN STAINTHORPE, DIRECT EXAMINATION CONTINUED
BY MR. LOEVY:
Q.  Mr. Stainthorpe, Mr. Randy Langston.  Do you remember

Case: 1:23-cv-01737 Document #: 283-36 Filed: 04/06/26 Page 5 of 215 PageID #:19805

that?

A.   I do.  It was my partner who -- from Randy, yes, that was Tim who got that statement.

Q.   When you and him visited Randy on the south side?

A.   No.

Q.   That was Gerald?

A.   No.  Tim got the statement when he visited Randy in some institution.  I am not sure it was an institution, a prison or whatever, and then he had the affidavit, that was produced to the state, and I believe subsequently, possibly before, but I am pretty sure subsequently Tim and I went to see Randy when he's out on the street and we talked to him when he was out in the street on the south side.

Q.   And that's what you talked about yesterday?

A.   Correct.

Q.   All right.  And then you then communicated to the state's attorney what Mr. Laura and you had learned?

A.   That is correct.

Q.   And they communicated back to you in a manner that you described in that letter that you sent and confirmed?

A.   That's correct, yes.

Q.   And what did the state's attorney communicate back to you?

A.   They communicated.

        MR. BURNS:  Objection, your Honor.  Hearsay, your Honor.

Case: 1:23-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 6 of 215 PageID #:19806

THE COURT: For what purpose is this being offered?

MR. LOEVY: Because what the state's attorney sent back to him, not for the truth, they sent back the new Randy affidavit. I was just backing up to that where we left off.

THE COURT: The objection is overruled. Go ahead.

THE WITNESS: Yes. First of all, the arrest had orally told me that Randy gave me a new statement.

MR. KULWIN: I'll object to that, the oral statement.

THE COURT: I overruled the objection. Does everybody get it now? Go ahead.

THE WITNESS: Okay. So the state's attorney had it would me that, orally, I believe in a court appearance, that they had then gone out to reinvestigate -- to re-enter view Randy Langston, he had given another statement in which he denied his -- he contradicted his trial testimony, said that he could not see the faces of the shooters at the time of the shooting because they had masks on.

BY MR. LOEVY:

Q. And --

A. And Mr. Kelley told me that he was going to memorialize this in a written document. I never received that written document.

Q. Then you sent the letter?

A. I sent the letter, and I subsequently did get the written document memorializing Randy Langston's new statement.

MR. LOEVY: Your Honor, at this time, we move Plaintiff's Exhibit 131 into evidence. This is the letter that Mr. Stainthorpe described.

THE COURT: Is this the one sitting up here?

MR. LOEVY: It might be the copy.

THE COURT: Can I just look at it for a second? All right. It's admitted.

(Above-mentioned exhibit was received in evidence.)

BY MR. LOEVY:

Q. Did the state's attorney send something back?

A. Yes.

Q. What was that?

A. Sent back a written document that memorialized the new statement that Randy Langston had given apparently to the state's attorneys and their vectors in which he acknowledged that he could not see the faces.

Q. I'm going to show that document. That is Plaintiff's Exhibit 132 which is in evidence, your Honor?

THE COURT: Okay.

BY MR. LOEVY:

Q. Can you tell the jury or identify that this is the document you're talking about?

A. Yes, this is the document that I subsequently received from David Kelley.

Q. All right. And this memorialized a statement that the

11/17/16 PM
Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 8 of 215 PageID #:19808
***REALTIME UNEDITED TRANSCRIPT ONLY***

7

state's attorneys took with Randy Langston at his home, correct?

A. Yes.

Q. All right. And this paragraph here refers to what Randy, this is after Randy had gone back and forth about whether he did or didn't see the masks, correct?

A. Correct.

Q. What is his position as of February 29th, 2000?

A. His position as of that time was that the men who he saw doing the shooting wore masks at all times during the shooting and that so they were masked the entire time and then they ran back through the breezeway while still masked.

Q. Now, this -- now he's saying that he saw them in the get away car, does he not, that's how he saw their faces?

A. Well, I don't think it's entirely clear that he's saying that he saw their faces.

         MR. BURNS:  Judge, objection.

         THE COURT:  Time out.  Time out.  The answer is stricken.  I think he was just asking you to read it.  Put your question again.  The answer is stricken.  The jury is directed to disregard it.

         MR. LOEVY:  May I ask a different question, your Honor?

         THE COURT:  Yes.

BY MR. LOEVY:


         ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  He was asked why he had recanted -- why he had recanted, correct?

A.  That's correct.

Q.  Can you read his answer?

A.  Because at that time I did not want to be involved or be bothered with it anymore.

Q.  Did he in this statement in anyplace to your review of it say that he recanted earlier because of supposed threats by gangs or any other threats?

A.  No, not at all.

Q.  I'd like to turn your attention to another witness in the case, Gerald Morris.  Do you -- can you sort of summarize for the jury based on your review what Gerald Morris' role in the case was?

A.  Gerald Morris had testified at the trial, this is back in the mid '80s, that he had been in his apartment which was in the back of the building, of the CHA building.  And I think he said he was getting dressed and he heard shots.  He then looked out of the window with his girlfriend and saw two men running to a car that was parked on the street and at trial, he identified Nathson Fields and Earl Hawkins as those men.

Q.  All right.  When you interviewed Randy?

A.  We are talking about Gerald now.

Q.  I'm sorry.  I'm really bad with names.  We are talking about Gerald.

Was there an issue about from the first trial about when Gerald became identified as a witness? Was he identified early or later?

A. There was an issue about that because according to the police reports, he had first been identified as a witness more than a year after this had occurred. But Mr. Morris said in his testimony, I believe, said that he had talked to the police right away, so immediately after the incident be.

Q. When did you go see Gerald?

A. I went -- I saw him twice, both times in 1999, first time in June, second time I think in August.

Q. And this is 13 years after the criminal trial when you're working on the appeal, correct?

A. Well, no. Actually, at this point, the case -- I had -- we had prevailed in the post conviction. The state appealed that, it had been affirmed by the Illinois Supreme Court, and case had been remanded for a new trial.

Q. So you were investigating --

A. So at this point, I am investigating the case for the purposes of the new trial.

Q. When you went to see Gerald Morris, who went with you?

A. The first time I went with my partner, Tim lawyer, the same person that talked to Randy.

Q. Did the state give you Randy's -- Gerald's address?

A. No, they did not.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  Did you ask for it?

A.  I asked for it and they objected to giving it to me so we went ahead and found it ourselves.

Q.  How did you find it?

A.  In the phone book.

Q.  What did you do when you got his address?

A.  We went around to his house, and we talked to him.

Q.  And did he know you were coming?

A.  No, he did not.

Q.  As a defense attorney, is there anything unusual in knocking on somebody's door to talk to them without giving them prior notice you're coming?

        MR. KULWIN:  I am going to object, asked and answered and expert testimony.

        THE COURT:  It's not expert testimony.  So that part of the objection is overruled.  But you did ask this question, so that part is sustained.

        MR. LOEVY:  Okay.

BY MR. LOEVY:

Q.  Did Gerald express any reluctance to talk to you, do you remember any reluctance?

        MR. KULWIN:  Judge, I am going to object to leading.

        THE COURT:  Overruled.

        THE WITNESS:  He had no hesitation in talking to me at all.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01727 Document #: 283-36 Filed: 04/06/26 Page 12 of 215 PageID #:10012

BY MR. LOEVY:

Q.  All right.  What did you ask him, what did he tell you?

A.  I referred back to his trial testimony, I said, look, you were a witness at the trial of Nathson Fields, I now represent Nathson Fields, and can you tell me was this testimony accurate and correct.

Q.  What did he say?

A.  He said, no, it was.

Q.  What did he tell you about that?

A.  He told me that he actually could not see the faces of the people who were running through the parking lot or running to the parking lot, and that he actually was unable to identify who these people were, and I then, because I knew he had identified them at trial, so I said and also at a lineup, I believe, so I said to him, well, how did you make an identification then?  How did you identify these people.

Q.  And what did he say?

A.  He said by intuition.

Q.  All right.  And did he -- did he -- did you take notes during his statement?

A.  No.  During the statement, no.

Q.  All right.  What was the explanation for why he couldn't see the people well enough to make an identification?

A.  Because they were still wearing masks.

Q.  Which direction were they running from him?

A. They were running away from him. He said they were running on a diagonal, so not right below the building but on a diagonal to a car.

MR. LOEVY: Your Honor, may I ask Mr. Stainthorpe to come down and show on the diagram the direction.

THE COURT: That's fine. If others need to see, you can move to the other side of the courtroom.

BY MR. LOEVY:

Q. Mr. Stainthorpe, if you could orient the jury. The shooting happened in the front of the building, right?

A. Yes.

Q. This is the building?

A. Yes.

Q. Are you oriented?

A. Here is the shooting. Gerald Morris is somewhere back here, exactly how far over, I am in the sure.

Q. Somewhere back here?

A. Somewhere over here, so he can't see in the front. He can only see the back, and then.

Q. The tunnel goes through the building?

A. The tunnel goes like this, and then he said he saw the men running up on a diagonal over there.

Q. This is a parking lot with cars and you can't really see it in the picture?

A. That's correct.

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 14 of 215 PageID #:10914

Q. Did he say -- did he have any memory exactly where the car was all those years later or just a general idea?

A. My recollection is I thought he said it was on the street, but, you know what, I don't have a real clear recollection of that.

Q. The men would have been running away from him at that time, correct?

A. Yes, correct.

Q. Thank you. .

All right. Did you have any communications ^ with anybody before you went to see Gerald Morris in in other words, did you have -- did El Rukn, anybody associated with the El Rukn street gang communicate with you in any way before going to see him?

A. Absolutely not. I was going to see him because he obviously was an important witness and I wanted to see. Yeah, I wanted to see what he was going to say.

Q. All right. You did file the post conviction petition, correct?

A. I did.

Q. And what were some of the arguments you raised, do you recall?

A. So, initially, I filed two, I believe.

Q. Let's start with the first one.

A. Okay. So the first one is filed in 1991 shortly after I

got the case. There was a time limit. It had to be within six months of resolution of direct appeal. So the primary issues that I raised in that post conviction were allegations of ineffective assistance of counsel.

Q. Basically that the trial lawyer could have done a better job?

A. Exactly, both in terms of the guilt, innocence phase and also in terms of the sentencing phase.

Q. Any other arguments?

A. There were other arguments. There had been this somewhat bizarre proceeding in the -- at the trial where after the judge had found them guilty, the defense lawyers had brought a motion to appoint a special prosecutor alleging that they had been subjected to death threats, and.

Q. Mr. Stainthorpe, let me lead you here?

A. Yeah.

Q. The death penalty was unconstitutional, correct?

A. That was an allegation.

Q. And there was no evidence of guilt an allegation, correct?

A. That is correct.

Q. All right. Did you explain to Nate that you were trying to make arguments that would help him save, you know, win the appeal?

A. Oh, absolutely, yes.

Q. And was -- did you explain to him that you weren't going

to get a lot of chances for that?

A. You get one chance for post conviction. You can amend the post conviction, but that's it.

Q. All right. In the five years after Nate's conviction, did you ever raise the argument that the trial was corrupted?

A. Well, yes, I did, because.

Q. Before you got to the second petition. I'm saying until you got to the second petition when you filed the first one, was there any argument that there was any kind of problem with the bribe?

A. Oh, no. I was completely unaware of any allegation of a bribe at the time of filing the first petition.

Q. Did Nate give you every opportunity -- did you give Nate every opportunity to help you make arguments to save his life?

A. Oh, yeah. Obviously, as I said I went to talk to him, I would talk about the petition. I believe he had to verify the petition too.

Q. All right. Did you at any time have any knowledge that this was an argument that you could raise after talking to Mr. Fields?

A. No the at all.

Q. All right. Let's change topics, sir.

Your office represented -- how many people in your office at the time?

A. Of this?

Q. Yeah.

A. Probably around eight.

Q. All right. And there was another lawyer who represented another participant at the trial, correct? Do you remember George Carter?

A. Okay.

Q. Not at the trial, I'm sorry, another person who was accused of the crime, right?

THE COURT: Why don't you restate the question. Slow it down a little bit.

MR. LOEVY: All right.

THE COURT: And just ask clearer questions.

BY MR. LOEVY:

Q. Did anybody in your office represent anybody that had a connection to the case?

A. Yes.

Q. Who was that?

A. My partner at the time, Peter /SPHAO*EL, who was a member of the Federal Defender panel had represented in federal court, so different court system, George Carter, who.

THE COURT: That's the answer to the question. Ask another question.

BY MR. LOEVY:

Q. All right. Did you have -- did you coordinate defenses with George Carter's attorney in any way?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  No.

Q.  All right.  Let's talk about the subpoenas that you served prior to the retrial.

You got ready to do the retrial with Mr. Fields, correct?

A.  Yes, that is correct.

Q.  And you did some investigation?

A.  Yes.

Q.  Did you serve some subpoenas?

A.  I did.

Q.  Tell us what you did and why?

A.  Okay.  So the first subpoena actually dates from 1991.  So that's from when I was dealing with the post conviction petition.  And then subsequently after we had won the post conviction and it came back for a retrial, I sent three additional subpoenas.

Q.  What did -- really briefly, what is a subpoena?

A.  A subpoena is essentially a legal order to someone.  It's signed by either the clerk or the attorney, and it is a legal order to someone or an institution, to produce certain documents.

Q.  All right.  And what did you serve -- seek in serving those subpoenas?

A.  I sought every police report, memorandum, notes, informal notes, street files, detective files, running files.  I tried

to be as complete as possible in terms of asking for every document that conceivably pertained to Nathson Fields's case.

MR. LOEVY:  Your Honor, at this time we move Plaintiff's Exhibit 31 into evidence.  These are the subpoenas.

MR. BURNS:  Just a minute.

MR. NOLAND:  No objection, your Honor.

THE COURT:  Hang on one second.  I am now thinking that maybe the microphones at the tables have been turned back on.  Sorry.  I will turn those off.  What's the exhibit number again Mr. Loevy?

MR. LOEVY:  31.

THE COURT:  It's admitted.

(Above-mentioned exhibit was received in evidence.)

BY MR. LOEVY:

Q.  This is the subpoena you served, correct?

A.  This is the one from 1991.

Q.  All right.  And showing you the request, by the way, in your work at your office, you sometimes bring lawsuits against the City of Chicago, correct?

A.  That is correct.

Q.  And by doing that, you've gained some familiarity with the record keeping and file keeping practices of the department, correct?

A.  That is correct.

11/17/16 PM
Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 20 of 215 PageID #:19800
***REALTIME UNEDITED TRANSCRIPT ONLY***

19

Q. All right. Showing you what you sought, can you summarize for the -- that's basically what you answered, right, you sought every kind of name for what the investigative file is?

A. Correct. I knew the police officers and especially the detectives kept files under several, they called them several different things, so I tried to include every name that I had ever heard.

Q. All right. And turning you to page 4 of the same exhibit, you received this response on what date, sir?

A. Okay. No -- okay. Actually, I think it's June the 12th.

Q. In any event, a memo dated June the 10th?

A. June 12th, 1991, so I get a response to this subpoena, and it is from the commander of detective division Area 1 which says there are no documents on file at detective division Area 1 pertaining to the above subject.

Q. All right. What did you do when you got back that there are no such investigative files?

A. Well, at that point, I didn't pursue it further. At that point, I was dealing with the post conviction and nothing came up.

Q. Did you subsequently serve additional subpoenas?

A. Yes. So several years later when the case is now back for retrial, I served three additional subpoenas.

Q. And did you receive any -- did you receive the investigative file in response to those subpoenas, sir?

A.  I did not.

Q.  What did you get back?  Did you get back any new documents that you previously didn't have?

A.  Yes, I believe I got a photograph of -- that appeared to be of a lineup with someone holding up Mr. Fields' shirt.

Q.  All right.  Showing you Defendant's Exhibit 88, page 5, this is in evidence, your Honor?

       THE COURT:  Okay.

BY MR. LOEVY:

Q.  This is a copy of the photo you got back?

A.  Yes.

Q.  And this had not previously been disclosed?

A.  Correct.

Q.  Showing you the same exhibit, page 2, had the lineup photo been disclosed?

A.  You know what, I am not sure whether that had been disclosed.

Q.  If you are not sure, it's best to say you are not sure.

       Let's turn your attention back to the post conviction petition.  There is a reference in there, is there not, that you have had a chance to review to a high ranking for Mr. Fields.  Do you remember that reference?

A.  I do.

Q.  Having reviewed the document, correct?

A.  Yes.


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 22 of 215 PageID #:19802

Q. Do you have any personal knowledge about the El Rukns, whether an officer is high ranking or how high ranking an officer is?

A. I don't. I know very little about the El Rukns.

Q. All right. What was the outcome of the petition, that first one?

A. Well, the first -- it was amended. I amended it about a year later.

Q. And was that to include when you learned about the allegations of the bribe?

A. Yeah, because subsequently Judge Maloney, who was the trial judge who had presided over Nathson's case was indicted for taking a $10,000 bribe in the case and then returning it.

Q. All right. What year was that?

A. I think that was 92.

Q. And did you then catch your legal filings up to this new information?

A. That and another issue also.

Q. What was Nate's -- what did the Court do to your revised petition?

A. After some litigation, the petition was granted and so both the conviction and the death sentence were vacated.

Q. All right. Were you able to communicate that to Mr. Fields?

A. Yes.

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 23 of 215 PageID #:19903

Q. All right. Do you remember his reaction?

A. Well, I think he was very relieved.

Q. All right. But was he free of the charges?

A. No.

Q. There was a retrial pending, correct?

A. Well, actually, there's another step before that.

Q. What was the next step?

A. Okay. So the next step is that the state appealed Judge Dooling's decision to the Illinois Supreme Court. All death penalty cases, they don't go to the enter media appellate court, they go directly to the Illinois Supreme Court, so the state appealed Judge Dooling's decision to the Illinois Supreme Court. I represented Nathson during that appeal, did the oral argument and the Illinois Supreme Court affirmed Judge Dooling's decision vacating both the conviction and the sentence.

Q. All right. Were you getting paid for all this professional work, sir?

A. A little bit. I was still appointed via the capital resource center.

Q. And did there come a point where you were no longer getting paid by the capital resource center?

A. Yes. After the case was remanded to the Circuit Court of Cook County, the state decided that they were not going to pursue the death penalty anymore.

Q. And that meant you were not able to get money?

A. At that point, I could no longer be appointed as a capital defense lawyer because there was no death penalty, so at that point, my official appointment ended.

Q. All right. Were you able to keep working for free, sir?

A. Well, it was almost free, but I did want to keep representing Nathson in the case and we did enter into an agreement that he and his family would pay me to continue representing him, and so I actually represented him for quite a while.

Q. How much money was him and his family able to come up with?

A. $4,000.

Q. Was that commence rale with the market value of the services you were providing?

MR. KULWIN: Judge, I object, relevance.

THE COURT: Overruled.

THE WITNESS: I mean, I did a ton of work. It wasn't even close.

BY MR. LOEVY:

Q. Did you subsequently decide to withdraw?

A. Yes, sometime later, though, after I had represented him for quite a while.

Q. All right. Did you take steps to ensure that he got new counsel?

A.  Yes, I did.

Q.  Who did you introduce him to?

A.  He had contact with attorneys who were excellent attorneys at the University of Chicago, shell and Gene Snyder.

Q.  You mentioned the issue about Mr. Swano, Mr. Hawkins' attorney bribing the judge.  Did you take steps to investigate that as part of your amended post conviction petition?

A.  Well, I think the -- yes, but most of that was depending on the prosecution of Judge Maloney, so I made myself familiar with the information that came out.

Q.  As part of the reply brief that you filed, the reply to the petition that the jury read about yesterday, did you talk to Mr. Smeeton?

A.  I did talk to Mr. Smeeton.

Q.  And what did your investigation uncover with that?

        MR. BURNS:  Objection, your Honor?

        THE COURT:  Can I see the lawyers at sidebar, please.

  (The following proceedings were had at sidebar outside the hearing of the jury:)

        THE COURT:  What do you expect the answer to be?

        MR. LOEVY:  He talked to Mr. Smeeton, he prepared an affidavit, the affidavit confirmed that Nate had no involvement and he filed it as part of the petition.

        THE COURT:  This is filed in the PC?

        MR. LOEVY:  Exhibit C to the reply.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT:  Oh, reply to what?  The brief in front of the trial court.

MR. LOEVY:  I was told the reply in support of the PC.

THE COURT:  The trial court.  Okay.

MR. LOEVY:  I wasn't going to introduce the affidavit.

THE COURT:  Well, but you want to elicit from him what Mr. Smeeton told him.

MR. LOEVY:  Um-hmm.

THE COURT:  Okay.  And I guess what's the nature of the objection?

MR. BURNS:  First and foremost, your Honor, it's hearsay.

THE COURT:  Okay.  Is there some non-hearsay basis for which you think this is admissible?

MR. LOEVY:  Well, it supports his investigation, it completes the, you know, the investigation.

THE COURT:  The objection is sustained.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  All right.  The objection is sustained.

BY MR. LOEVY:

Q.  I am going to change topics, sir.

You mentioned yesterday that you went out to the

11/17/16 PM
Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 27 of 215 PageID #:19823
***REALTIME UNEDITED TRANSCRIPT ONLY***

26

scene and there was some measurements that you had referenced earlier?

A.  Yes.

Q.  I am going to show you the trial testimony of Mr. Smeeton's investigator, a man named Mr. Beseth.  This is page 512 of the trial testimony?

        THE COURT:  '86 trial?

        MR. LOEVY:  Yes, the first trial.

BY MR. LOEVY:

Q.  And just to refresh your recollection since you undoubtedly haven't memorized the transcript.  Since the day you made the plat, have you had occasion to measure the distance from the pitching mound in the baseball field to the corner of the breezeway.  The answer why is, yes, I have. What is that distance?  Answer, 155 feet, approximately.

        When you went to the scene, did you rely and review that distance from the pitcher's mound to the breezeway?

A.  Yes, and that seemed accurate.

Q.  All right.  I want to change topics again, sir.

        You have subsequently learned in preparing to talk about these issues at this trial that a new file showed up in 2010, 2011, correct?

A.  That is correct.

Q.  You have had a chance to review it and look through it carefully?

A.  I have.

        MR. LOEVY:  That's Plaintiff's Exhibit 1, your Honor.

BY MR. LOEVY:

Q.  That's the investigative file.

        Had you had access to this investigative file during your preparation of the criminal defense for Mr. Fields?

A.  The majority of it, no.  There is I think one police report in there that I did have.

Q.  All right.  But the file itself, was that made available to the defense?

A.  No.

Q.  All right.  Let's talk about some of the things in it.

        First of all, can you describe generally what this investigative file is that showed up?

A.  Well, it appears to be notes, memoranda, inform at reports for the most part, so not formally written on Chicago Police Department forms that relate to the investigation of the Smith/Hickman murders.

Q.  Is there any reference to Mr. Nathson Fields anywhere in the investigative file?

A.  There is not.

Q.  All right.  If you had had access to this file during the investigative stage of preparing for the retrial,would you have been able to investigate the leads and material within it?

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 283-36 Filed: 04/06/26 Page 20 of 215 PageID #:10820
11/17/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

28

A.  I would have certainly I would have attempted to and the file contains a lot of leads in terms of alternate suspects.

Q.  Let's talk about it and let's go more question and answer.

A.  Sure.

Q.  So I don't get one-sided here.

Let's take a look at the documents related to Ricky Baldwin's brother.  You didn't know who Ricky Baldwin was back when you represented Mr. Fields, correct?

A.  I don't believe I did.

Q.  All right.  Showing you a copy of Plaintiff's Exhibit 1, page 104?

MR. LOEVY:  The investigative file is in evidence, your Honor.

THE COURT:  Okay.

BY MR. LOEVY:

Q.  Describe --

THE COURT:  This is 104, you said?

MR. LOEVY:  It's 1, page 104.

THE COURT:  Page 104 of Exhibit 1.

MR. LOEVY:  Correct.

BY MR. LOEVY:

Q.  This is a to from memo, correct, to from?

A.  Yeah, okay.

Q.  It does not bear a date, does it?

A.  It does not.

11/17/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

29

Q.  All right.  I am going to turn your attention to the first paragraph, and I'll make you read it instead of me.  Can you read it.

A.  Okay.  No time to leave a supp.  We interviewed Langston, James, male, black, age 14, of '706 East 39th Street, apartment 106.  He witnessed the murders.  He was playing baseball across the street from the scene.

A.  He said that the offenders were wearing skull caps pulled over their faces to conceal their identity.  He saw the offenders fleeing in a blue Cadillac.  He said the car went south on Langley and then went on 39th.  He said that there were four men in the car.  The person sitting -- it says setting, I think it's sitting next to the driver in the front seat was the brother of Ricky Baldwin, a/k/a, Rick dog, who was murdered last summer.  File number R. D. Number, see our notes for more details.

Q.  Okay.  So this person, this Langston brother was claiming that somebody in the car was a brother of Ricky Baldwin, correct?

A.  Yes.

Q.  The second paragraph here says that the detectives showed photos, probably to Mr. Loevy there, of two of the Baldwin brothers, Shawn and Paul, correct?

A.  Yes.

Q.  And he did recognize Shawn as one of the Baldwins, but not

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01727 Document #: 283-36 Filed: 04/06/26 Page 31 of 215 PageID #:10831

Q. the bald win brother he was talking?

A. Not the person in the car, right.

Q. You did not have any of this information back during the criminal defense, right?

A. I don't believe I did.

Q. All right. Let's take a look at another page here. This is also in the file. Be this is page 106. I'm sorry. I am going to go straight to page 145 first.

This is would it be fair to characterize this as a note, a handwritten note in the file?

A. It appears to be.

Q. It says they got an anonymous tip, right?

A. Yes.

Q. It says the guy driving the car was early -- was Ed Stewart with Darryl Baldwin and Chico, correct?

A. Yes.

Q. And then it got further information, right?

A. Correct.

Q. So that is at least two people claiming that one of the Baldwin brothers might have been involved in the shooting, correct?

A. Yes.

Q. And then showing you the same exhibit, Page 91, a different note on a different page, girlfriend of offender, Jimmy green in Baldwin's home is Linda Smith and additional

information including sister of Jerome Smith, right?

A.  Yes.

Q.  Do you have any idea why they were calling Jimmy green the offender in the Baldwin home at this time?

A.  Well, it looks like he had been charged in it.

        MR. KULWIN:  Objection, your Honor.

        THE COURT:  Yeah, the objection is sustained.  Asking why somebody else wrote something.

BY MR. LOEVY:

Q.  But you have no knowledge, correct?

A.  I do not.

Q.  Okay.  Let's take a look at page 106 of the same document, and -- sorry, different document.

        Describe what this is.  It's called a general progress report.  It looks like it's undated and it's signed by minute owe, does it not?

A.  Yes.

Q.  What is a general -- wait.  Sorry.  It's dated up here in typing, May and April 1984?

A.  Yes.

Q.  What is a general progress report?

A.  So this was the form that was created to -- that detectives were supposed to memorialize their more informal notes with respect to an investigation.

Q.  All right.  Let's take a look at the first paragraph.  Can

you read that paragraph?  This also relates obviously to the Smith/Hickman homicide?

A.  Correct.  The following information was provided to the R. D.S, reporting detectives, by Mr. David m-i-n-n-i-f-i-e-l-d, male black age 26 who was the utility janitor at Dearborn homes, 2960 south federal, phone number.  On 29th of April 84 at 2010 hours he received an on anonymous phone call from a youthful male black.  The Caller said he saw a phone number on television, phone number, for persons with information regarding this homicide.  The Caller told motion in limine that Edward Stewart was driving the car used in the murder and that Stewart was in the company of Darryl Baldwin and Chico. He also said that Stewart was living with Olivia Wallace at 4716 south Cottage Grove, apartment 220.  He had no further information.

Q.  Now, at the bottom, it looks like this detective minute owe did some investigation.  Can you read the last sentence there?

A.  Yeah, it says s-t-e-w-a-r-s, photo, and also in the file, there is not a record for Darryl Baldwin in the alpha file.

Q.  All right.  And there were some photos in the file, for example, of Paul Baldwin, correct?

A.  Yeah, the other two Baldwin brothers.

Q.  But apparently, they could not find a photo of Darryl Baldwin?

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 34 of 215 PageID #:19834

A.   That's what this appears to indicate.

Q.   Did you see anything in the file that anybody took that lead anything further trying to find a photo of Darryl and show it to anybody?

A.   No.  as far as I recall, there's nothing in that investigative file that shows any further investigation with respect to that.

Q.   If you had received this information back in 1999, what would you have done?

A.   I would have attempted to investigate this.  This obviously was potentially exculpatory information as providing a version of events that contradicted the state's version of events.

Q.   Is alternate suspects the kind of thing that could be useful to a criminal defense attorney?

A.   It certainly could, that could be -- if it pans out, that could be a viable form of defense.

Q.   All right.  Taking a look at this paragraph here, the one immediately above it, Edward Stewart was allegedly the driver?

A.   Yes.

Q.   To summarize it, there's some background information, and somebody has asked for his alibi it looks like.  On the date of his murder he was in his apartment and went to work, works at McDonald's, he began his sift at 10:30, that's what it says, correct?

A. Correct.

Q. It also says we could not verify his alibi because McDonald's was closed that day?

MR. KULWIN: Your Honor, I apologize. Our screens don't -- they just went out.

THE COURT: Out out? Is it possible that you brushed against the switch?

MR. KULWIN: Anything is possible, Judge. I didn't mean to.

THE COURT: Both of yours went out?

MR. KULWIN: They both went out.

THE COURT: That suggests it's not a wire or something. No slight intended to the people on that side of the table. They need to see it more importantly than you.

Go ahead, Mr. Loevy.

MR. LOEVY:

BY MR. LOEVY:

Q. There is this sentence here, we could not verify his alibi. McDonald's was closed. Do you see that?

A. I do.

Q. There was some ambiguity as to whether McDonald's was closed during the time of his alibi or closed when they checked?

MR. KULWIN: Objection, your Honor.

THE COURT: Overruled.

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 36 of 215 PageID #:19936
11/17/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

35

THE WITNESS: Yes, I agree. That's an ambiguous statement.

BY MR. LOEVY:

Q. Do you see anything in the file anywhere else that anybody did anything else to determine whether Edward Stewart had a viable alibi or not?

A. I didn't see anything.

Q. All right. There were other alternative suspects identified in this investigative file, were there not?

A. There were.

Q. Do you remember reviewing the documents that you did receive learning about a shooting of a man named Delbert Edwards the night before somebody assassinated Fuddy Smith?

A. Yes.

Q. And this was in the police reports, was it not, that were provided to Mr. Fields?

A. There was some information about that incident in a police report, yes.

Q. Taking a look at Plaintiff's Exhibit 1, page 79, I am going to show you what was disclosed in the police report that was provided to Mr. Fields. Delbert Edwards was interviewed and he reported that he was shot at by members of the Goon Squad and that he reported this to the police. Do you see that?

A. I do see that.

Q. And that they were arrested on April 27th, the day before the murder at about 1530?

A. Correct.

Q. And further information that he spent the night, he didn't get up the next day until 11:30 and then he heard the shootings, correct?

A. That's correct.

Q. From his father who picked him up at his aunt's and then his family verified Delbert had an alibi?

A. Yes.

Q. All right. But as that was disclosed to Mr. Fields?

A. That was disclosed.

Q. All right. I'd like to show you a note in the file and ask you whether this was disclosed to Mr. Fields. This is coming from Plaintiff's Exhibit 1 again, the page number is 69.

      It looks like a handwritten note that's written on the back of a scrap paper here, correct?

A. Okay. Yes.

Q. Here's the back. That's what I was showing you.

A. Okay.

Q. All right. It starts out by describing Lawrence and Marshall as the Edwards brothers, right?

A. Yes.

Q. And then it says that they were -- that somebody heard

them talking about killing Fuddy because of the shooting night, right?

A.  Yes.

Q.  Then it says this person saw them about 9:00 o'clock in the stairwell, Lawrence, one of Delbert's brothers, said he was going to get the gun, and that they would put on masks and Lawrence said he wouldn't live through the night and Marshall said he won't be jumping on you anymore.  That's what this note says, correct?

A.  That's correct.

Q.  Is that materially different than what was in the police report that was provided to Mr. Fields?

A.  Yes, it's a lot of additional information and I would have liked more information too.  I would have wanted to know where that information came, which I don't think is shown on that -- on those notes.

Q.  Showing you a copy of page 115 from the same file, this is the report of the shooting from April 27th, and it does contain names of suspects, does it not?

A.  Oh, yeah, this is the report of the shooting the prior night, and that does -- that shows the victim, Delbert Edwards, and it has the names of the alleged shooters.

Q.  Paul Haily and Chundell Leaks.  This was also in the investigative file, correct?

A.  Yes.

Q.  And it was not in the official file that was provided to Mr. Fields, correct?

A.  I don't believe so.

Q.  Okay.  Showing you page 117 c-h-U.N. d-e-l-l-leaks of the continuing narrative, they learned that the victim had been shot by two subjects name Paul Hailey and Chundell Leaks. Victim said he had been having problems with these subjects who are members of the black gangster Goon Squad and because of other pending court cases against other members of the gang, something I can't make out.  Do you see that, sir?

A.  Yes.

Q.  That's an independent motive having nothing to do with the case against Mr. Fields isn't that true, sir?

        MR. KULWIN:  Objection, leading.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.  What would you have done with that information, sir?

A.  I would have attempted to investigate it because it -- it is another version of the events and if that version of the events was the actual version, it would significantly under cut the case against Mr. Fields.

Q.  Showing you page 106 again, this is the GPR that was in the file, the investigative file that's dated May 1st the other anonymous call that alleged that Lawrence and Marshall Edwards were the killers was checked out.  Both were

39

interviewed and stated they were home at the time of the
shooting in the company of their family members.  Those photos
and descriptions are in the file.  Do you see that?

A.  I do.

Q.  As a criminal defense attorney, were you required to
accept that the police checked it out and that they therefore
didn't have to tell you about it?

A.  Not at all, no.

Q.  Can you explain?

A.  I would want to check it out.  And it also doesn't seem
like there was much checking of the alibi.

MR. BURNS:  Objection.

THE COURT:  Overruled.  He's explaining the answer.

BY MR. LOEVY:

Q.  I am going to show you another document from the file,
this is Plaintiff's Exhibit 1, page 98.  Another GPR created
by someone it looks like named Davis and it is dated 29th of
April, the day after the shooting or so.  Can you read this
GPR?

A.  Yeah, R. O., reporting officer, received a phone call from
a male black who stated that Rodell Banks was the person who
had shot the people on 39th Street.  This caller refused to
give any, I think it's any further information about himself
and banks, call received at 1305 hours, then it's dated April
29th.

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 41 of 215 PageID #:19941

Q. All right. Why is that valuable information in the preparation of Mr. Fields' criminal defense?

A. Very much so, because, again, it provides an ultimate version of what occurred.

Q. Who was Rodell Banks, do you remember from reviewing the documents that he was an El Rukn?

A. I do remember that, and, yes, and also in this file is his rap sheet.

Q. And his photographs, correct?

A. And his photo.

Q. All right. Do you know what the police did to investigate from reviewing the files or any indication that they did to investigate that an El Rukn named Rodell Banks was the shooter?

A. Other than pulling his rap sheet which is in the file, I didn't see anything else.

Q. Is that the kind of information that you as a criminal defense attorney would have made use of?

A. Absolutely, and, you know, the rap sheet is interesting too.

Q. All right. Because it's a long rap sheet, is it not?

A. Well, it has --

THE COURT: It's a yes or no question.

THE WITNESS: It wasn't long, but it was significantly --

MR. BURNS:  Objection.

THE COURT:  The answer is stricken.

BY MR. LOEVY:

Q.  Let's take a look at another rap sheet for a man named Earl Hawkins that was also in the investigative file.  This is page 125.

This is a Chicago Police Department rap sheet from the era, correct?

A.  Yes.

Q.  I guess they have to type them as they went in pre computers, correct?

A.  Yes.

Q.  It's hard to make out the Bates stamp on this page, but I will show you the second page.

A.  Yes.

Q.  When was this inquiry made regarding Earl Hawkins?

A.  Well, it's dated April 27th.

Q.  Which is the date --

THE COURT:  Of what year?

THE WITNESS:  I'm sorry of 1984.

BY MR. LOEVY:

Q.  Which is the day before the shooting, correct?

A.  That's correct.

Q.  And this is in the investigative file for a shooting that happened the 28th?

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 43 of 215 PageID #:10843

A. Correct.

Q. So it either was pulled the day before or somebody didn't roll the same, one of the two things?

A. True.

Q. All right. Why is it -- let me show you another -- first of all, is there any explanation anywhere in the official file or in this investigative file for why Earl Hawkins, they were pulling his rap sheet in April 84?

A. I don't believe so.

Q. All right. I'm going to show you another rap sheet of a man named William Doyle also in the investigative file. Can you see that, sir?

A. I do.

Q. This is page 127, same exhibit.

Also pulled on the same day, April 27th, do you see that?

A. That's what it says, yeah.

Q. All right. Showing you page 121 from the same file, can you tell the jury what William Doyle's nickname was?

A. His nickname was sundown.

Q. So sometime very close to the shooting, there's evidence that the police suspected or had some reason to be looking at Earl Hawkins and a man named sundown in their investigation, correct?

A. Yes.

11/17/16 PM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

43

Q. Now, it looks like from this note going back to page 127 that they quickly or that they were able to rule out Doyle as a suspect, this note here, does it not?

A. Yeah, apparently he is in jail.

Q. He was in prison at the time?

A. Right.

Q. So that leaves Earl Hawkins and someone named sundown who is not Mr. Doyle, correct?

A. Yes.

Q. Who was another man from your knowledge of the case whose nick named sundown?

A. Anthony Sumner.

Q. Is there any indication anywhere in this file why the police suspected Hawkins and sundown right after the murder?

A. I don't believe so.

Q. Have you ever seen any piece of paper, either in the unofficial file or the official file that explains that?

A. No.

Q. Why is it significant that the police suspected Earl Hawkins and sundown of this murder before May of 1985?

MR. BURNS: Objection, your Honor.

THE COURT: Basis?

MR. BURNS: Foundation.

THE COURT: Why don't you rephrase the question. Why is it significant, how.


***REALTIME UNEDITED TRANSCRIPT ONLY***

BY MR. LOEVY:

Q.  If you had been apprised that the police department was actually considering Hawkins and sundown maybe as suspects before May of '85, what would you have done as his criminal defense attorney?

MR. BURNS:  Objection, your Honor.  Speculation, argumentative.

THE COURT:  Overruled.

THE WITNESS:  I would have wanted to explore why those people were suspects immediately after the murder when the other evidence in the case indicated they didn't become suspects until the evidence I had didn't indicate they became suspects until over a year later in 1985.

BY MR. LOEVY:

Q.  And in 1985, that's when Sumner got arrested, correct?

A.  Yes.

Q.  And he started talking to the authorities, right?

A.  Yes.

Q.  And the trial that was presented against Nate in 1986 was the -- what was the state's theory of the case about how Sumner came forward with this information?

A.  The evidence as far as Mr. Fields was concerned was that -- how was it.

THE COURT:  You're asking how it was presented at the '86 trial, right.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 46 of 215 PageID #:19846

MR. LOEVY: Right.

BY MR. LOEVY:

Q. Was it presented at the '86 trial as if Sumner had said, guys, take out your pads, I'll tell you about a crime, or was it presented as the police said to Sumner, we have -- we suspect you in this very murder, what do you have to say about that, do you understand the difference between the two I'm asking you?

MR. KULWIN: I am going to object on the form of the question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Can you explain how it was presented that Sumner came to be giving the authorities this information?

A. That -- I'm sorry.

THE COURT: You're fine.

THE WITNESS: I understand that Sumner would have been arrested then said, look, I have all this information about various crimes that have been committed.

BY MR. LOEVY:

Q. All right. If you had known that in fact the police suspected sundown of the very crime that he gave the information about, would that have changed cross-examination of these things had they in 2009?

A. Yes, most certainly, because it had indicated that

Case: 1:10-cv-01168 Document #: 283-36 Filed: 04/06/26 Page 47 of 215 PageID #:19843

Sumner's statement that --

MR. BURNS: Objection.

THE WITNESS: Fields.

MR. LOEVY: Mr. Stainthorpe, there is an objection.

THE WITNESS: I'm sorry. I didn't hear it.

MR. BURNS: Your Honor, speculate.

THE COURT: I don't agree that it's speculative. He's asking what he would have done if he had been given this information. Go ahead, Mr. Loevy.

BY MR. LOEVY:

Q. I asked Mr. Stainthorpe to explain it.

A. Because it provided information that Sumner who was eye tempting to deflect blame from himself when he in fact had been a suspect in the murder and was attempting to deflect the blame and put it on Mr. Fields.

Q. Was that very different than anything that had been given to Mr. Fields in 1986?

A. Very much so, yes.

Q. May I have a moment, your Honor?

MR. LOEVY: We have no further questions, your Honor.

THE COURT: Go ahead, Mr. Burns.

- - -

JOHN STAINTHORPE, CROSS-EXAMINATION

BY MR. BURNS:

Q. Good afternoon, Mr. Stainthorpe.

47

A.   Good afternoon.

Q.   Mr. Stainthorpe, you testified under questioning by Mr. Loevy that some of the work that you do is actually civil rights work where you file cases against the City of Chicago and against the police department; is that correct?

A.   Yes, that is.

Q.   Now, let me take you back in time.  You told us about the post conviction petition.  Do you remember that, that's why you became involved, true?

A.   Yes.

Q.   What is a post conviction petition?  Could you give us some idea of what that's about just so the ladies and gentlemen of the jury understand that a little better?

A.   So a post conviction petition is a mechanism under Illinois law where after someone who has been convicted in a criminal case and who's direct appeals have been denied can raise additional issues attempting to under cut either the conviction or the sentence.

Q.   So part of your job, if I understand correctly when you were retained, was to go out, gather information about the incident itself which would have been the shooting that occurred on April 28th of 1984, correct?

A.   Yes.

Q.   And to try to interview witnesses, correct?

A.   Yes.

Q.  Gather records, including attorney's files and information that they had in their possession, correct?

A.  Yes.

Q.  And I'm talking about specifically the trial attorneys who defended the allegations before Judge Thomas Maloney, correct?

A.  Correct.

Q.  Now, one of the attorneys was a Jack Smeeton, correct?

A.  Yes.

Q.  Jack Smeeton represented Nathson Fields?

A.  Correct.

Q.  Did you get his files?

A.  No.

Q.  William Swano represented Earl Hawkins; am I correct?

A.  Yes.

Q.  Did you get his file?

A.  No.

Q.  Counsel had asked you some questions about information that was contained in the -- what you referred to the police working file.  Do you remember that?

A.  I think he referred to it as investigative file.

Q.  Well?

A.  Didn't he?

Q.  Let's call it the file that was produced later was not produced in 1984?

A.  Yes got it.

Q.  Whether we call it the investigative or working, but you do understand what we're referring to?

A.  I do.

Q.  Good.

And one of the issues that he began to talk to you about, he raised James Langston, something about Rick dog Baldwin, do you remember that?

A.  Yes.

Q.  He also talked about a Gerald Green and a report from Detective Minoque, M-i-n-o-q-u-e.

THE COURT:  Thanks.

BY MR. BURNS:

Q.  Do you remember that discussion?

A.  Yes.

Q.  And he also referenced this report, if I may, just to refresh your recollection, he showed you this report moments ago.  Do you remember seeing that, sir, and I'll show you page 2?

A.  Yes.

Q.  And this deals with an incident that happened the night before April 28th, 1984?

A.  Yes.

Q.  That date being April the 27th, 1984, correct?

A.  Yes.

Q.  And that was a shooting involving Delbert Edwards,

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 51 of 215 PageID #:19851

correct?

A.  Yes.

Q.  So this -- that information if I understood your testimony correctly, this might have involved some type of retaliation by members of the Goon Squad to members of the El Rukns?

A.  Yes.

Q.  And you said that would be information that you'd want to know about, correct?

A.  Yes.

Q.  And yet that information that you're talking about is contained in the police reports, the very police reports that you have told the ladies and gentlemen of the jury that you had reviewed as part of your analysis and investigation in order to prepare the post conviction petition isn't that also correct?

A.  Yes.

Q.  And may I show --

A.  Some of it is.  I think there's additional information.

Q.  Allow me to show me, if you would.

        MR. BURNS:  This is Exhibit 60, counsel.

        THE COURT:  60.

        MR. BURNS:  Yes, sir.

BY MR. BURNS:

Q.  And as you can see, this report that was prepared in 1984 following the murders of Smith and Hickman references this

Q. incident, doesn't it, an incident that happened the day involving Goon Squad members, Delbert Edwards, do you see that information?

A. Yes.

Q. And it talks about Cleveland Ball providing that information?

A. Yes.

Q. And on the following page, if I may, there is information at the very bottom regarding Delbert Edwards, correct?

A. Correct.

Q. All right. So let me ask you this to begin with you. Did you interview Delbert Edwards?

A. No.

Q. All right. What about Cleveland Ball?

A. I don't know about Cleveland Ball, but I don't have a recollection of that.

Q. So this would have been information that could have been helpful you told the ladies and gentlemen of the jury, but you did not speak to either of those gentleman, though this information was known to you as part of the police reports that you had?

A. Yeah --

Q. You have answered the question.

A. I am unsure about Cleveland Ball.

THE COURT: He said he is unsure about Cleveland

Ball.

BY MR. BURNS:

Q.   Let me ask you about James Langston.  Do you remember that name?

A.   I do.

Q.   Mr. Langston would have been an important witness; is that correct?

A.   Yeah.

Q.   Now, you didn't even try to find him, did you?

A.   I think I -- I think he was deceased by the time I got involved.

Q.   Really?

        MR. BURNS:  Judge, may I refresh his recollection?

        THE COURT:  Go ahead.

        MR. BURNS:  Thank you.

        THE COURT:  By the way, you don't need to ask permission to do that.  Just go ahead.

        MR. BURNS:  Thank you, Judge.

        THE WITNESS:  Okay.

BY MR. BURNS:

Q.   So I am correct in my question that you don't think you ever tried to find him actually?

A.   Correct.  I think I might have known he was dead.

Q.   But you don't know?

A.   I don't have a memory of everything from back then, that's

true.

Q. In any event, that information could have been helpful to you, correct?

A. What information?

Q. Information about James Langston?

A. Yeah.

Q. So let's talk a little bit more, I'd like to if I may for a moment, about the petition that you filed before judge Deborah Mary Dooling who is the criminal court judge?

A. It started off with one judge and moved to another.

Q. Eventually it ended up in front of Judge Dooling; am I correct?

A. Yes.

Q. And before Judge Dooling, you filed a petition and then an amended petition?

A. I think the initial petition was in front of another judge, but I am not entirely sure.

Q. When did you file the first amended petition?

A. The amended petition?

Q. Yes.

A. I think that was 92.

Q. Would it be September the eighth, 1992?

A. That sounds like it could well be correct.

Q. And the basis of that amended petition was the bribe to Judge Maloney, correct?

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

54

A.   That and there was another issue also.

Q.   Ineffective assistance of counsel still remained?

A.   No, there was an issue about Sumner.

Q.   So you included that and Judge Dooling without an evidentiary hearing ruled in favor of Mr. Fields, correct, on the petition?

A.   That timing is incorrect.

Q.   Let me ask you.  Let me slow down if you think it's incorrect.  We will make sure we clarify.

          The petition you filed was in September of 1992, you've told us, correct?

A.   Yes.

Q.   Judge Dooling did rule on the petition, correct?

A.   Quite a while later I think.

Q.   Well, we are going to get to it.  The question is did she rule on it?

A.   Eventually.

Q.   Eventually.

          In fact, it was ruled upon, I believe, in September of 1996?

A.   That sounds right.

Q.   And Judge Dooling granted the petition, correct?

A.   Yes.

Q.   And she granted the petition and vacated the conviction of Mr. Fields?

          ***REALTIME UNEDITED TRANSCRIPT ONLY***

A. Correct.

Q. And gave him a new trial?

A. Correct.

Q. And she did that based on the information, solely on the information of the bribe; isn't that correct?

A. Yes. Yes, it was based on that issue, that's true.

Q. She said the trial was corrupted, no one could have a fair trial under those circumstances; am I correct?

A. Yes.

Q. And I think we talked -- she did that without even the need for an evidentiary hearing?

A. Well, by that time Jim Maloney had been convicted.

Q. I'm sorry. My question is -- I'm probably not being as clear as I should be. She did that without the need to conduct an evidentiary hearing?

THE COURT: It's a yes or no question.

THE WITNESS: Yes, there was no evidentiary hearing.

MR. BURNS: Let me just have one moment, your Honor.

THE COURT: Okay.

(Brief pause.)

MR. BURNS: Thank you, Mr. Stainthorpe.

THE COURT: Mr. Kulwin.

MR. KULWIN: Yes, your Honor. Could I have just one second .

- - -


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 57 of 215 PageID #:19857

JOHN STAINTHORPE, CROSS-EXAMINATION

BY MR. KULWIN:

Q.  Good afternoon, Mr. Stainthorpe.

A.  Good afternoon.

Q.  Mr. Stainthorpe, you testified that you visited Gerald Morris in Milwaukee to interview him; is that correct?

A.  That's correct.

Q.  And did I hear you right that when you first started your investigation, you asked the assistant state's attorneys where Mr. Morris was?

A.  I asked --

Q.  Did you ask him that?

A.  That was --

Q.  Did you ask him?

A.  Excuse me.  That was part of a much broader request.

        THE COURT:  So that would be yes, you asked him that. You might have asked him other things, but you asked him that.

        THE WITNESS:  I'm sorry, Judge.  That's a yes.

        THE COURT:  That's a yes.  Go ahead.

BY MR. KULWIN:

Q.  And they would not tell you where he was, correct?

A.  That's correct.

Q.  And they told you why they wouldn't tell you where he was, didn't they?

A.  They represented --

Q.  Sir, the question is they told you why they wouldn't tell you where he was; isn't that correct?

A.  I don't think they were accurately telling me why.

MR. KULWIN:  Judge, I move to strike.

THE WITNESS:  I don't think they did tell me why.

THE COURT:  Why don't you rephrase your question. Did they give you a reason why?

BY MR. KULWIN:

Q.  They gave you a reason why?

A.  They did give me a reason.

Q.  And the reason was that they didn't want you to know where he was because he was afraid of the El Rukns; isn't that true?

A.  That's what they said.

Q.  Okay.  Now, you went up to Milwaukee with another fellow; isn't that right?

A.  With Mr. Lohraff, correct.

Q.  And he is a private investigator, correct?

A.  No, incorrect.

Q.  What is he?

A.  He is an attorney.

Q.  Okay.  In any event, so the two of you drive up to Milwaukee, correct?

A.  Yes.

Q.  And you find Mr. Morris, correct?

A.  That's correct.

Q.  You don't give him any advance warning, correct?

A.  Yes.

Q.  Because you want to take him by surprise, correct?

A.  I want to talk to him.

Q.  Sir, the question was?

A.  No, I don't want to take him by surprise.  I want to talk to him.

Q.  Sir, didn't you say yesterday that one of the reasons you don't contact people is that you want to surprise them so that you can get them to talk to you?

A.  No, I don't think I ever used the word surprised.

Q.  Well, you want to -- you don't want to give them notice because you are afraid if you give them notice, they might not talk to you; isn't that right?

A.  I know that if you just go up and try to talk to someone, it's much more likely you are going to get them to talk to you.

Q.  My question is, sir, you don't give them any notice because you are fearful if you call them up and say, hey, I'm an attorney, I want to talk to you about your testimony in a criminal trial, they'll say no?

      MR. LOEVY:  Judge, asked and answered.

      THE COURT:  I think it's been covered sufficiently at this point.  ^ .

BY MR. KULWIN:


           ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.   And so you show up at Mr. Morris' home, right?

A.   Correct.

Q.   And you knock -- you and another fellow, right?

A.   I didn't.

Q.   You and another fellow, right?

A.   Meaning Mr. Lohraff, right.

Q.   You knock on the door?

A.   We may have rung the doorbell.

Q.   The doorbell, he opens the door, right?

A.   I don't recall actually the exact sequence of events there.

Q.   Somebody opened the door, correct?

A.   We were at his home and we came into contact with him. Exactly how that happened, I am not sure.

Q.   So you might have not gone into his home?

A.   I know I didn't go into his home.

Q.   So you ran into him out in front?

A.   That might be.  Either I rang the bell or, yeah.

Q.   It's possible, I just want to be sure, I want to get clear the context of where you spoke with him.  It's possible, sir, you didn't find him at home and you went looking for him around the premises and you found him somewhere around the premises?

A.   No, I don't think so.

Q.   So as you sit there today, you don't know how or where you

60

found him?

MR. LOEVY:  Objection, your Honor.

THE WITNESS:  I do.

THE COURT:  He's answered the question.

BY MR. KULWIN:

Q.  You know where you found him?

A.  I know that we met with him at his home, but not inside his home, outside his home.

Q.  Where outside his home did you find him?

A.  I think the front porch.

MR. LOEVY:  Object to relevance, your Honor.

THE COURT:  Overruled.

BY MR. KULWIN:

Q.  So you go up to his house and he is sitting on his front porch, right?

A.  No, I don't think that's true.

Q.  Why don't you tell me what was he doing on the front porch, sir?

A.  Well, he wasn't -- I don't have any recollection of him sitting on the front porch.  I came into contact with him outside his house, not inside his house, and at that point, I talked to him.

Q.  And since he was outside of his house, you recognized him somehow, correct?

A.  Well, I asked him, are you Gerald Morris.

Q.  Okay.  And he said, yes, I am?

A.  He did.

Q.  And then you said, oh, nice to meet you, I'm John Stainthorpe, I represent Nathson Fields?

MR. LOEVY:  Objection, relevance, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Something along those lines.  I probably gave him my card.  I wanted him to know who I was.

MR. KULWIN:  Judge, I move to strike anything other than yes or no.

THE COURT:  Overruled.

BY MR. KULWIN:

Q.  All right.  And then after you introduced yourself and give him your card, you introduce your partner, Mr. Lohraff; is that right?

A.  He probably introduced himself.

Q.  Okay.  But the key, though, is, sir, you told him that you there to represent Nathson Fields, correct?

A.  Yes, absolutely.

Q.  And you wanted to talk to him about his testimony, correct?

A.  That's correct.

Q.  The testimony that helped put Nathson Fields behind bars, correct?

A.  Yes.

Q.  And at the time, Nathson Fields was still in the El Rukns, wasn't he?

A.  I don't think he was, actually.

Q.  Well, would you --

A.  You know what, I don't even know.

Q.  Okay.  Well, it's important.

        Are you aware that Mr. Fields has testified that --

        THE COURT:  No, I am going to stop you right there. That's for argument.

        MR. KULWIN:  All right, Judge.

BY MR. KULWIN:

Q.  In any event, and as soon as Mr. Morris hears that you're with Mr. Fields, he says, sure, I'll talk to you, what do you want to know?

        MR. LOEVY:  We move to strike.  There is no evidence that Mr. Fields was still in the El Rukns.

        THE COURT:  That's not the pending question.

        THE WITNESS:  Can you repeat it?  I have forgotten what you asked.

BY MR. KULWIN:

Q.  Let me put it a different way.

        You have approached Mr. Morris out of the blue and after you tell him, I'm representing Nathson Fields and I want to talk to you, he says, no problem?

A.  Yes.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 64 of 215 PageID #:19864

Q. He doesn't say -- well, we won't get into what he doesn't say.

All right. Then he is extremely cooperative, right?

A. Very.

Q. Yeah, you want to ask him a question, sure, what do you want to know, he says that, right, something like that?

A. Yeah, I asked him questions and he answered them.

Q. Yeah, and as you're sitting there, you've got your buddy taking notes the whole time, right?

A. No, no one was taking notes.

Q. Really?

MR. KULWIN: Can I have one second?

THE COURT: Can I see the lawyers at sidebar, please.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT: So I am going to say this now so that I don't have to say it later in front of the jury.

THE WITNESS: The little common dear after the answers has got to stop, the really and all has got to stop. I am going to give you a little bit of unsolicited advice as somebody who has talked to a couple, 3,000 jurors, the demeanor, I'm just going to tell you, I am saying this to help you out is counter productive. It is. I'm just telling you.

(The following proceedings were had in open court in the presence and hearing of the jury:)

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 65 of 215 PageID #:19865
11/17/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

64

MR. KULWIN:  I lost my train of thought there for a second.

BY MR. KULWIN:

Q.  Mr. Stainthorpe?

THE COURT:  The last question I think was whether Mr. Morris was cooperative.

MR. KULWIN:  Actually, I think I was a little past that.  Was somebody taking your notes.

THE COURT:  You are absolutely right.  That's true.

BY MR. KULWIN:

Q.  So and I forgot what your answer was.  Nobody was taking notes?

A.  No, what I said is while we were talking to Mr. Morris, no one was taking notes.

Q.  But someone ultimately took notes?

A.  After the conversation ended, yes, we did -- we went back to the car and we did take notes.

Q.  So there was no contemporaneous?

MR. LOEVY:  Objection, asked and answered, your Honor.

THE COURT:  I haven't heard the whole question yet.

BY MR. KULWIN:

Q.  There was no contemporaneous taking of the notes while he was actually speaking?

A.  That's correct.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

65

MR. LOEVY:  Objection.  Asked and answered.

THE COURT:  The objection is overruled.

THE WITNESS:  Correct.

BY MR. KULWIN:

Q.  And then you wrote up an affidavit of that interview, correct?

A.  Yes.

Q.  And if I understand it correctly, you wrote it up not based on the notes that you folks took but based on your memory, correct?

A.  It was based both on the notes and my memory, yes.

Q.  Do you recall giving testimony in this case in a prior hearing on April 18th, 2014?

A.  Okay.

Q.  And you were under oath at the time?

A.  Sure.

Q.  Were you asked this question.

MR. KULWIN:  I'm sorry, page 1897.

BY MR. KULWIN:

Q.  Those are notes and based upon those notes then you prepared the affidavit; am I correct??

"ANSWER:  No.  I actually -- the affidavit was based on my recollection of the interview with Mr. Morris."

I'm sorry, I stand corrected.  The end of the notes. I'm sorry.  I withdraw the objection.  I was wrong.

BY MR. KULWIN:

Q. Now, did I understand you correctly that you had no familiarity with the El Rukns or you had no contact with them before you interviewed Mr. Morris?

A. I had no contact with them, with the El Rukns, I never had any contact with the El Rukns.

Q. My question was did I understand you right you had no familiarity with the El Rukns or no contact with them?

A. I generally knew about the El Rukns.

Q. All right. During your interview, you never asked Mr. Morris why he was in Milwaukee, correct?

A. I don't recall ever asking him that.

Q. Or why he suddenly left Chicago where he was born and raised and moved to Milwaukee, you never asked him that either?

        MR. LOEVY:  Objection, your Honor, relevance.

        THE WITNESS:  I had no --

        THE COURT:  The answer can stand.  Go ahead.  Finish the answer.

        THE WITNESS:  I had no information that he had left suddenly.  I didn't know anything about the circumstances under which he had left Chicago.

BY MR. KULWIN:

Q. When you were interviewing him, you knew he had been in Chicago, correct?

                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  Clearly.

Q.  And so just to be clear, you didn't ask him --

MR. LOEVY:  Objection, your Honor.  Asked and answered.

THE COURT:  Sustained.  It's been covered.

BY MR. KULWIN:

Q.  Now, when you were talking to him, you had the opportunity to ask him anything you wanted that you thought was germane to your investigation, correct?

A.  Yeah, I think so.

Q.  Okay.  Now, if we can look at -- I'm sorry.

MR. KULWIN:  Can I have one second, Judge?

THE COURT:  Sure.

  (Brief pause.)

MR. KULWIN:  May I put this up?  It's Plaintiff's Exhibit 42.

THE COURT:  I assume there is no objection.

MR. LOEVY:  No objection.

THE COURT:  That's fine.

BY MR. KULWIN:

Q.  Now, this is the affidavit that you wrote a couple months after the interview of Gerald Morris that you took in 1999, correct?

A.  Yes, it is.

Q.  Now, there's nothing in the affidavit, is there, that

Detective O'Callaghan coerced Mr. Morris into saying anything is that true?

A.   There's nothing -- right, there's nothing in there about O'Callaghan coercing someone to say something, that's true.

Q.   In fact, there's nothing in there that says that Detective O'Callaghan even suggested to him who to pick isn't that right?

A.   I disagree with that.

Q.   Well, is there a statement anywhere that says Detective O'Callaghan influenced me on who to pick out of the pictures?

A.   I viewed his comment as saying by intuition as indicating that O'Callaghan had indicated to him who to pick out, that's what I thought he meant.

          MR. KULWIN:  I move to strike that, Judge.

          THE COURT:  Restate the question again, Mr. Kulwin.

          MR. KULWIN:  Sure.

          THE COURT:  I just struck the answer.

          MR. KULWIN:  You are asking her?

BY MR. KULWIN:

Q.   You didn't write in the affidavit anywhere that Gerald Morris told you Detective O'Callaghan told me who to pick out of the picture?

          THE COURT:  The question is whether the words appear in the substance in the affidavit.

          THE WITNESS:  That is correct.  Those words do not

          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 70 of 215 PageID #:19870

69

appear.

BY MR. KULWIN:

Q.  Okay.  Now, at the time that you were doing your investigation, and I don't want to be repetitive in any way, you were gathering information for this -- let me take that back.

One of the things that you were doing was to gather information to support the post conviction ruling?

MR. LOEVY:  Objection, asked and answered.

THE WITNESS:  This is beyond that.  Approximate.  C is --

THE COURT:  I'll let the answer stand.  Go ahead.

BY MR. KULWIN:

Q.  This is for some other investigatory purpose?

A.  This is for the retrial.

Q.  So at that time you were thinking you were going to be representing him at the retrial?

A.  Yes.

Q.  Okay.  And while you were talking to him, you could have asked him anything you wanted about the lineups isn't that right that he witnessed?

A.  Yeah, I think so.

Q.  And there's nothing in this affidavit that says that you -- that he told you anything about the line ups?

MR. LOEVY:  Objection, improper impeachment, your

70

Honor.

THE COURT: Sustained. Well, no, I don't think that that's what it's being offered for. I changed my mind. Overruling the objection.

THE WITNESS: That's correct. There is nothing about the in-person line ups.

BY MR. KULWIN:

Q. And you talked to him about the line ups, didn't you?

A. I have no recollection of that. It's possible I did, but I have no recollection.

Q. But certainly had he told you at that time something extremely bizarre or unusual happening in the lineup, you would have written that down, correct?

MR. LOEVY: Objection, your Honor. That's improper impeachment.

THE COURT: Overruled.

THE WITNESS: Yes, I think I would.

BY MR. KULWIN:

Q. And you would have included it in your affidavit?

A. I think I would have.

Q. Now, when you were talking to Mr. Morris, he told you that before the trial he met with the state's attorneys several times; isn't that true?

A. I don't recall that.

Q. That's fair. That's fair.

MR. KULWIN: I'm going to refresh his recollection, Judge.

THE COURT: Can I ask you a question? Somewhere in here we have to take a break. When you are going to do a change of subject, let me know.

MR. KULWIN: It's getting close to that, Judge.

BY MR. KULWIN:

Q. Mr. Stainthorpe, let me show you what I believe are the notes of Mr. Lohraff?

A. Laurel.

Q. I think it's Defense Exhibit 380, if not it's J. MSN Y 009060. Could you take a look at that? I have highlighted the bottom and I think it goes over to the next page.

A. Okay. Yeah, those notes would indicate we did ask him that.

MR. LOEVY: Objection, your Honor. That wasn't the question. Those aren't his notes.

THE COURT: There wasn't a question pending, so whatever he said is stricken. Now you can ask a question. You just asked him to take a look at it.

MR. KULWIN: I know.

BY MR. KULWIN:

Q. I want to be sure I'm right here.

So you did talk to him during the interview about him meeting with the state's attorneys before the trial, correct?

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 73 of 215 PageID #:19873

A.  It appears so.

Q.  Okay.  And you're familiar with the term pre trying a witness, aren't you, Mr. Stainthorpe?

A.  Pre trying?

Q.  Yes; you have heard that before, haven't you?

A.  No, I haven't, actually.

Q.  Okay.  Have you tried cases?

A.  Yes.

Q.  Okay.  What -- when you try cases, do you interview your potential witness?

THE COURT:  Why don't you use the word preparing.

THE WITNESS:  I absolutely prepare witnesses.

BY MR. KULWIN:

Q.  You prepare?

A.  Yes.

Q.  Back in the day we called it that.

Okay.  Anyway, so you prepare the witnesses, right?

A.  Yes.

Q.  And there's nothing wrong with that, right?

A.  It's your duty.

Q.  Right.

And so when Mr. Morris told you that he went over his testimony several times with the state's attorney about what he saw and where he stood and all those things, you viewed that as they were preparing him for trial, correct?

Case: 1:20-cv-01703 Document #: 283-36 Filed: 04/06/26 Page 74 of 215 PageID #:19874
11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

73

A. They clearly were preparing him for trial, yes.

Q. Not that they were trying to influence or intimidate or coerce him or tell him what to say, correct?

A. Yeah, I would agree.

Q. All right. Because if you had thought that's what it was, it would have been in the affidavit, true?

A. If he said that that's what was happening, yes.

THE COURT: Are we at the subject change?

MR. KULWIN: Yes.

THE COURT: We are going to take a 10-minute break. The jurors can come with me.

(Short break.)

(The jury enters the courtroom.)

THE COURT: All right. Everyone can have a seat.

Mr. Kulwin, you can go ahead.

MR. KULWIN: Thanks, Judge.

BY MR. KULWIN:

Q. Mr. Stainthorpe, going back to the affidavit?

MR. KULWIN: Judge, can you turn on the computer?

THE COURT: I did. Oh, I put defense 2, my mistake, I have the wrong table.

MR. KULWIN: I think it's Plaintiff's Exhibit 42.

THE COURT: There you go.

BY MR. KULWIN:

Q. Now, Mr. Stainthorpe, in paragraph 7, you say that -- you

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 75 of 215 PageID #:10875

recorder a long time after the shooting, Detective O'Callaghan showed me four photographs to see if I could identify anyone. Do you see that?

A. Yes.

Q. In the notes of the -- when you met with him and Mr. Lohraff took notes, he didn't make any notation of that; is that correct?

A. I believe that's correct accurate, yes.

Q. And in paragraph 9, you put down after I picked out a photograph, O'Callaghan said that's him, right?

A. Right.

Q. That's not in the notes either?

A. I think that's correct also.

Q. All right. Now, yesterday, you spent some time talking to counsel about Mr. Beseth's map, do you remember that?

A. No.

Q. Or you used -- you used some calculations that Mr. Beseth had done on the map; isn't that right?

A. I was familiar with the -- yes, the distance that he apparently had measured back in 1984 or something.

Q. I think it was 1985, but close enough?

A. Okay.

Q. It's a long time ago, a long, long time ago?

A. Correct.

Q. And you used the specific measurement of 155 feet, right?

11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

75

A.  Yeah, that's what was his testimony.

Q.  Okay.  Now, did you ever during your investigation review Mr. Buckles' testimony?

A.  I'm sure I did.

Q.  And do you recall that Mr. Buckles said something a little bit different about where Randy was standing?

A.  I don't recall those details, no.

Q.  Okay.  But you certainly reviewed Randy Langston's testimony; isn't that right?

A.  Yes.

Q.  ?

        MR. KULWIN:  Judge, can you ask the jurors if it's big enough for them?

        THE COURT:  The jurors aren't seeing it because when I turn it off -- it's big enough.

BY MR. KULWIN:

Q.  Now, this is testimony from --

        THE COURT:  Do you have a page number?

        MR. KULWIN:  Yes, it's page 162.

        THE COURT:  Thanks.

BY MR. KULWIN:

Q.  And there's this question, and Fuddy and Talman were right at the edge of the breezeway?  Yes.  And I just want to skip down now to the bottom.

        Now, isn't it true that from where you were standing,

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

meaning Randy Langston, to the edge of that breezeway, was a good hundred feet or more?

A.  Okay.  Now I see it, yes.

Q.  And Mr. Langston says, no.  Well, you tell me how far it was.  And Mr. Langston says it was about from here where I'm standing about to the end of this courtroom.  And then the next question is from there to the end of the courtroom?

"ANSWER:  Yes.

"QUESTION:  Let me walk to the back of the courtroom and tell me is this about the view you had, about this far away?

"ANSWER:  No, it was a little bit farther.

"QUESTION:  A little farther.  Tell me when.

"ANSWER:  About to the end of that -- back to the wall, to the end of the wall.

"QUESTION:  About this far?

"ANSWER:  Yes.

And then the court says, a distance of '80 feet

A.  That's Judge Maloney.

Q.  I don't know.  I am just telling you what that is.

A.  Judge Maloney.

Q.  Okay.  Do you see that testimony?

A.  I do.

Q.  Are you saying Judge Maloney was saying something different than what it was?

A.  He may have been.

Q.  Do you know?

A.  I don't know.  I know he was a fairly corrupt judge.

Q.  I guess my question on that one was he was the fact finder?

A.  He was.

Q.  He wasn't trying to influence a jury by saying 80 feet?

A.  True.

Q.  And you have been to 26th Street, right?

A.  Yes.

Q.  And you know the size of the smaller courtrooms?

A.  It was not a smaller courtroom.

Q.  I do know that?

A.  Because I know Judge Maloney's courtroom back then.

Q.  And you know the size of the other courtrooms?

A.  Yes.

Q.  And are they bigger than this one?

A.  Yes.

Q.  You think the courtrooms at 26th and California are bigger than this courtroom, seriously?

A.  Yes.

Q.  In any event, he said 80 feet, right?

A.  Judge Maloney did, yes.

Q.  Now, Beseth, who got the interview who used the 155-foot distance, he got that when he was out interviewing

Mr. Langston with bill Swano; is that correct?

A.  I don't know that.

Q.  Isn't it true that Mr. Swano and Mr. Beseth went out to interview Mr. Langston at his home in July of '85?

A.  That may well be true, but I don't know that.

Q.  Well, I thought you reviewed the transcripts of the trial, didn't that come out?

A.  A long time ago.

Q.  Did that come out, do you recall that?

        MR. LOEVY:  Asked and answered, your Honor.

        THE COURT:  Sustained.

BY MR. KULWIN:

Q.  And at that point in time, Mr. Swano and Mr. Beseth approached Mr. Langston and told them they were a state's attorney and a police detective; isn't that right?

A.  I don't know that.

Q.  So you didn't see that in the transcript either when you were reviewing it?

A.  I may well have seen that in the transcript.

        MR. LOEVY:  Objection, your Honor.  Actually, that's not in the transcript.

        THE COURT:  You don't get to testify, so you can put up the transcript at some point.  So the comment is stricken. The objection is overruled.

        MR. KULWIN:  If I am in error, I apologize.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 80 of 215 PageID #:10880

BY MR. KULWIN:

Q. Now, you learned -- did you learn that after Mr. Morris signed your affidavit, he signed another affidavit? Are you aware of that?

A. That does sound right, yes.

Q. He signed one a year after -- he signed one -- your affidavit was signed before you ever filed a lawsuit, right?

A. Before Mr. Fields.

Q. This lawsuit?

A. Oh, sure, this was -- the criminal case was still pending.

Q. Right.

And your affidavit is --

THE COURT: Back to the computer.

MR. KULWIN: I will go faster.

THE COURT: You don't have to keep pulling it down. It just makes the light go on.

BY MR. KULWIN:

Q. Your affidavit is nine sentences, true?

A. Well, hold on. Yes.

Q. Have you seen the affidavit that Mr. Morris signed in 2011, do you recall seeing that?

A. I probably have not seen that.

Q. Can I show it to you to see if it refreshes your recollection?

A. Sure.

Q.  Have you seen these?

A.  Okay.  I can tell you this does not look familiar.

Q.  Okay.  I just want do clarify something on this affidavit that you got from Randy Langston -- that was gotten from Randy Langston in August of 1999.  All right?

A.  Okay.

Q.  That was obtained by Mr. Low; is that correct?

A.  Yes.

Q.  And that was obtained while Mr. Langston was in prison?

A.  I believe so.

Q.  And we heard testimony from -- in this case that there's a lot of gang culture in these prisons, you are aware of that, right?

A.  Well, I haven't heard that testimony in this case, but I will absolutely agree with you.

        MR. LOEVY:  Object to relevance, your Honor.

        THE COURT:  Overruled.

BY MR. KULWIN:

Q.  And so while Mr. Langston is being visited by Mr. Fields' attorney in prison, he's living in an atmosphere that infested with gangs, right?

        MR. LOEVY:  Objection.

        THE COURT:  Sustained.  The objection is sustained.

BY MR. KULWIN:

Q.  Now, after he gives this affidavit, though, and -- pardon

Case: 1:20-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 82 of 215 PageID #:19082
11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

81

me.

This affidavit, the last time Randy Langston had opined or testified about what he saw had been at the death sentence hearing before this affidavit, right?

A. Okay. So the affidavit is 99. I don't think that's accurate.

Q. So there was testimony between the death sentence hearing and the affidavit?

A. In a different proceeding.

Q. Okay?

MR. KULWIN: Can I have a moment, Judge?

THE COURT: Sure.

BY MR. KULWIN:

Q. I want to be clear about something. Maybe the time frame. Maybe I have the time frame wrong.

You know there was a trial in '86?

A. Yes.

Q. And then there was a death sentence hearing, correct?

A. Yes.

Q. And then there was a new trial in 2009, correct?

A. In this case, yeah.

Q. In Mr. Fields' case, right?

A. Right, right.

Q. And you had -- you filed post conviction proceedings, but there wasn't an actual evidentiary hearing, correct?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.   That's correct.

Q.   So there was no testimony that Mr. Langston gave under oath in a hearing between the time he testified at the death sentence and the time you got your affidavit from him in 1999?

A.   I don't think that's accurate.

Q.   You are aware?

        THE COURT:  He has now said it twice.  Are you going to go onto something else or what?

        MR. KULWIN:  Judge, if we could be heard about something.  I have a feeling that we might get into something I am not aware -- I am concerned about something, Judge, real quick.

        THE COURT:  All right.

   (The following proceedings were had at sidebar outside the hearing of the jury:)

        THE COURT:  He might be right or he might be wrong.  It's what he's saying.

        MR. KULWIN:  I want to ask him.  I'm worried will he say it's the innocence hearing.

        THE COURT:  So don't ask him.

        MR. KULWIN:  Okay.

   (The following proceedings were had in open court in the presence and hearing of the jury:)

BY MR. KULWIN:

Q.   In any event, sir, the affidavit that you got is

consistent with what Mr. Langston was saying in the death penalty hearing, correct?

A.  Yes, the sentencing hearing portion, yes.

Q.  It's inconsistent with what he testified to at trial?

A.  Yes.

Q.  And inconsistent with what he testified in 2009, correct, under oath?

A.  Yeah, you know, I am not familiar with his testimony in 2009.

Q.  All right.  And without telling me what the proceeding is, the affidavit is consistent with what his testimony was at whatever proceeding you think occurred during that time period?

A.  You know, I haven't looked at that, his testimony from that other proceeding, so I am not comfortable in making an evaluation as to that.

Q.  You don't know.  It may be?

MR. LOEVY:  Objection, your Honor.  Asked and answered.

THE COURT:  Sustained.  That's as good as it's going to get Mr. Kulwin.  I am now telling you to move on.  I am not asking you to move on.

MR. KULWIN:  If I could have a moment, Judge.

THE COURT:  Yes.

(Brief pause.)


***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM  ***REALTIME UNEDITED TRANSCRIPT ONLY***

84

MR. KULWIN:  No further questions, Judge

THE COURT:  Redirect.

- - -

JOHN STAINTHORPE, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  When you went to see Gerald Morris who asked a lot of questions by Mr. Kulwin?

A.  Yes.

Q.  He could have slammed the door in his face?

A.  Yes.

MR. KULWIN:  Judge, objection.

THE COURT:  Hang on a second.

THE COURT:  Put the question again.

BY MR. LOEVY:

Q.  If he had slammed the door in your face, what would you have done?

MR. KULWIN:  Objection, Judge.  Calls for speculation.

THE WITNESS:  I might have tried to ask him again to talk to me, but if he didn't want to talk to him, that was his choice.

BY MR. LOEVY:

Q.  But he did speak to you?

A.  He spoke to me on two different occasions.

Q.  And to state the obvious he was no longer a young man in

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

85

his 20s by now?

MR. KULWIN: Objection, Judge, that's argumentative.

THE WITNESS: Overruled.

BY MR. LOEVY:

Q. How old would he have been 13 years after the trial, do you remember his age?

A. I think mid to late 30s.

Q. You were asked some questions about whether there was anything in the affidavit that you created that suggests that there was suggestiveness. Do you remember those questions /#-6R7B89S judge, that's not what the request question was. It was did it say that?

THE WITNESS: Yes.

THE COURT: Okay. Well, put the question in a different way.

BY MR. LOEVY:

Q. All right. The affidavit -- can you read paragraph 7, please?

THE COURT: Hang on a second. Let me just get the ELMO backup here. There you go. Paragraph 7.

THE WITNESS: Okay. Paragraph 7, a long time after the shooting, Detective O'Callaghan showed me four photographs to see if I could identify anyone.

THE ATTORNEY:

Q. All right. Showing you defendants' demonstrative No. 2,

***REALTIME UNEDITED TRANSCRIPT ONLY***

the photographs of Mr. O'Callaghan's suspects, is that suggestive if he showed him the four people he believed were involved in the crime?

          MR. KULWIN:  I am going to object.

          THE COURT:  Sustained.  It's a matter for argument at this point.

BY MR. LOEVY:

Q.  There is nothing in this affidavit that should be read that there wasn't suggestive?

          MR. KULWIN:  Objection, your Honor.

          MR. LOEVY:  There was a lot of questioning on this.

          THE COURT:  I tell you what, so, A, don't talk over each other, and B, if I want a response to an objection, I will ask for one.  The objection is overruled.

          Put the question again.

          THE WITNESS:  Yeah.

BY MR. LOEVY:

Q.  All right.  You were asked a series of questions by Mr. Kulwin?

          THE COURT:  Let me put the question.  Is there anything in the affidavit that should be read that there wasn't suggestion, that is a yes or no question, please answer it yes or no.

          THE WITNESS:  No.

BY MR. LOEVY:


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  How about number 9, sir, can you read that paragraph?

A.  After I picked out a photograph, O'Callaghan said, that's him, right.

Q.  All right.  Is that suggestive?

MR. KULWIN:  Same objection.

THE COURT:  Sustained.  Leave it for argument.

BY MR. LOEVY:

Q.  You were asked a series of questions about whether you included certain things from your partner's notes in the affidavit.  Do you remember those questions?

A.  Yes.

Q.  Approaching with a copy of Defendant's Exhibit 380, your Honor.

THE COURT:  Okay.  Is that the notes?

MR. LOEVY:  These are the notes.

BY MR. LOEVY:

Q.  There are quite a few other things in the notes that are not in the affidavit, too, correct, sir?

A.  Yes.

Q.  Can you read the fourth paragraph from the bottom, the one that says?

MR. KULWIN:  Judge.

BY MR. LOEVY:

Q.  Said he talked?

MR. KULWIN:  Judge, I object.  I don't think the

notes are in evidence.  I think that we were asking --

MR. LOEVY:  I can have him refresh.  Sorry.

THE COURT:  Ask it in a different way then.

BY MR. LOEVY:

Q.  All right.  Looking -- let's take it from the bottom up.
Looking at the last line, do you see that?

A.  Yes.

Q.  Okay.  Does that refresh your recollection about what
Gerald told you about how he had been prepared by the state's
attorney's?

A.  Yes.

Q.  What did Gerald tell you about having been prepared by the
state's attorneys?

A.  That he had been corrected many times with maps, photos,
et cetera.

MR. KULWIN:  Judge, I object and move to strike.  I
don't think he says that his memory was exhausted on the
point.  I don't think it was really used for refreshing
recollection.  It was leading.

THE COURT:  Okay.  Let me talk to you all over here.

(The following proceedings were had at sidebar outside the
hearing of the jury:)

THE COURT:  So look, you went into the notes and
there was something in the notes that wasn't put in the
affidavit, so he's going to get to put in that there was other

***REALTIME UNEDITED TRANSCRIPT ONLY***

stuff in the notes that wasn't in the affidavit. If that requires him to read from it, he is going to be permitted to read from it. And the objection, if there is one, is overruled.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT: Okay. All right. The objection is overruled. You can proceed.

BY MR. LOEVY:

Q. All right. There's a lot of things in the notes that aren't in the affidavit, correct, sir?

A. Correct.

Q. How about the sentence before it, what was also in the notes that Gerald told you?

A. By state's attorneys at 26th Street, what to say, not to say at trial.

Q. All right. And then moving up two bullet points above, what were you told by Gerald about O'Callaghan?

A. That he said he talked to O'Callaghan a few days after the murder, definitely within one week.

Q. And then how many times did he talk to O'Callaghan after that?

A. He talked to him 10 to 12 times.

Q. All right. You didn't put that in the affidavit either?

A. Correct.

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

90

Q. Two bullet points up, what did it tell you about Gerald telling you about the El Rukns and the Goon Squad?

A. That the El Rukns in the other groups in the buildings, in the neighborhood had a truce, but we, meaning Fuddy and Gerald Morris, didn't go to the meetinging.

Q. So that in fact he told you there was a truce between the El Rukns and the Goon Squad, correct?

A. Correct.

Q. Okay. Backing up two more bullet points, does he --

THE COURT: The point has been made at this point.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. You were asked some questions about Randy Langston's affidavit and whether there are gangs. Do you have a copy of it in front of you, sir?

A. No.

Q. Bringing you a copy of plaintiff's 43, where was Randy Langston when you -- when your partner took that affidavit from him 12 or 13 years after the criminal trial?

A. He was at the Paris work camp in Paris, Illinois.

Q. Do you have any reason to believe that anybody that knew about the case was in the Paris work camp in Paris, Illinois?

MR. KULWIN: Objection, Judge, calls for speculation.

THE COURT: Hang on a second. The objection is sustained.

***REALTIME UNEDITED TRANSCRIPT ONLY***

BY MR. LOEVY:

Q.  All right.  You were asked some questions about an affidavit by Gerald Morris that you hadn't seen.  Do you recall that?

A.  Correct.

Q.  Approaching with a copy of Plaintiff's Exhibit 24.  If you could just review that.  Is there anything at all inconsistent with what Gerald put in that affidavit that was inconsistent with what you were told?

A.  So there's two affidavits here.  There is --

Q.  It's basically the same story, is it not, sir?

A.  Well, you know what, I can't say that.

Q.  You'd have to review it?

A.  I'd have to review.

        MR. LOEVY:  Your Honor, I'd like permission to move on.

        THE COURT:  Yes.

BY MR. LOEVY:

Q.  I'd like to finish asking but questions about.  Mr. Kulwin read you testimony that Randy estimated it was 80 feet away.  Do you remember that testimony?

A.  Apparently, yes.  Well, Judge Maloney he agreed.

Q.  Leaving aside what Judge Maloney said.  When you went and used 155-foot estimate as opposed to Randy's best estimate from the witness stand about how far he was, why did you

choose to use the estimate to the ball field instead of Randy's eyeballing to the end of the courtroom?

A. Because the distance from the ball field, which was I believe still there when we went there, to the entrance to the building appeared to be 155 feet. That appeared to be accurate.

Q. All right. When you were asked about the James Langston notes, do you remember Mr. Burns asking you about that?

A. Yes.

Q. Now, you had some information about James Langston at the time before you got the concealed file, correct?

A. Yes.

Q. But did you know that James Langston was having to have seen Ricky Baldwin's brother driving away from the shooting?

A. I don't believe I was ever aware of that.

Q. So even though you could have talked to James Langston, would you have responded differently if you had actually known this additional information?

A. Well, that was additional information I could have used, but I think -- I think James wasn't around.

MR. BURNS: Objection to speculation, your Honor.

THE COURT: Overruled. It's something he testified to at least five times this afternoon.

BY MR. LOEVY:

Q. Moving to the last subject, Delbert Edwards. There was a

suggestion in the questioning that Delbert Edwards was an El Rukn. Do you remember that question by Mr. Burns?

A. Actually, I don't.

Q. All right. Do you have any knowledge that Delbert Edwards was an El Rukn in any way at all?

A. No, none whatsoever. In fact, I think he denied being a gang member.

Q. All right?

MR. LOEVY: I have no further questions, your Honor.

THE COURT: Anything based on the redirect?

MR. KULWIN: I do, Judge.

MR. BURNS: Your Honor, I have nothing. Thank you.

THE COURT: Go ahead, Mr. Kulwin.

- - -

JOHN STAINTHORPE, RECROSS-EXAMINATION

BY MR. KULWIN:

Q. Just a couple points, sir.

First, on the question of -- on the question of why you used the 155 feet as opposed to the 80 feet, you said you thought it was more accurate, right?

A. Yes.

Q. Okay. You mean the measurement was more accurate?

A. From -- yeah, the measurement from the ballpark to the entrance of the building would be more like 155.

Q. But that would assume that Mr. Baldwin?

94

A.  That's the measurement I was using.

Q.  But in fact, page 157, but in fact, sir, Mr. Langston testified as follows.

        "QUESTION:  Where were you standing?

        "ANSWER:  We were standing along the sidewalk."

        That's what he testified to, right, under oath?

A.  Well, he said he was in the field across the street along -- yeah, along the side of that field.

Q.  No?

A.  That was next to the sidewalk.

Q.  Let me read it to you again?

        THE COURT:  He's looking at the further up on the page part that you have highlighted there.

        MR. KULWIN:  That's my fault.

        THE WITNESS:  But the --

        MR. KULWIN:  That's me again.

BY MR. KULWIN:

Q.  Let's just stop from the top so we can go slow.  He testified so you were in a field across the street from the breezeway where the shooting took place; is that correct?

        "ANSWER:  Yes

        "QUESTION:  How long had you been out there before this happened?

        "ANSWER:  We had been out there for 20 minutes

        "QUESTION:  You were standing there in the grassy area


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

on the field?

"ANSWER:  No

"QUESTION:  Where were you standing?

"ANSWER:  We were standing along the sidewalk."

A.  That was the testimony, yeah.

Q.  And just real quick, one other point ^  you were asked some questions about what was in the notes that wasn't in the affidavit.  Do you remember those questions just now?

A.  Yes.

Q.  Okay.  You put in what you believed were the most important points in the affidavit?

A.  The crucial issue was that he could not ID the people and that's -- I pointed to the crucial issues, yes.

MR. KULWIN:  Move to strike, Judge.

THE COURT:  Overruled.

BY MR. KULWIN:

Q.  And just to be clear, there was nothing in the notes about him showing four photos, right?

A.  Correct.

Q.  And nothing in the notes of the interview that were taken in 1999 that indicated that he ever said that Mr. O'Callaghan said that's right after he picked out Mr. Fields or anyone else, correct?

A.  True.  That's correct.

MR. KULWIN:  Nothing else.


***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT:  Anything else?

MR. LOEVY:  No, your Honor.

THE COURT:  Do any of the jurors have any questions for the witness?  I do not see anybody writing.  You are excused.

THE WITNESS:  Thank you.

THE COURT:  While somebody is getting the next witness, can I see the lawyers at sidebar just to talk about scheduling.  If somebody can go get the next witness.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  So do we know if Mr. Langston is here.

MR. LOEVY:  I don't think he is coming until 2:30 I was told.

THE COURT:  So based on what all you guys told me yesterday we need to put him on at 3:00, so you are going to need to tell somebody at your table to be out there waiting for him and to tap you on injure shoulder and to stop.

MR. LOEVY:  My exam is less than half an hour.

THE COURT:  I don't care.  3:00 o'clock.

MR. LOEVY:  Got it.  We will take a break?

THE COURT:  No.

(The following proceedings were had in open court in the presence and hearing of the jury:)

(Witness sworn.)

11/17/16 PM              ***REALTIME UNEDITED TRANSCRIPT ONLY***

97

                              - - -

               KEVIN DUFFIN, DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Sir, if you would state and spell your name for the record, please.

A.  Kevin Duffin, D-u-f-f-i-n.

Q.  And who is your employer?

A.  City of Chicago, Chicago Police Department.

Q.  What is your rank with the department?

A.  I am a commander of detectives.

Q.  And that's a very high rank, is it not?

A.  Yes, sir.

Q.  In fact, there's not too many above that, is there?

A.  No.

Q.  All right.  Let's talk about your involvement in this case.  You were not involved back in the day that it happened, right?

A.  In the early '80s?

Q.  Right.

A.  No, sir.

Q.  You got involved later?

A.  Yes, sir.

Q.  At some point in either 2010 or 2011, it came to your attention that a file had surfaced relating to the old murder, right?

               ***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  Yes, sir.

Q.  And as the commander, was it troubling to you that a file that related to the old murder investigation had gone missing for more than 20 years?

MR. MICHALIK:  Object, Judge.

THE COURT:  Overruled.

THE WITNESS:  At the point that I became aware, I was not commander, sir.

BY MR. LOEVY:

Q.  Okay.  Thanks for that clarification.  What was your rank at that time?

A.  At that time I was the lieutenant assigned to Area 1.

Q.  All right.  But back to the question, it was nonetheless troubling to learn that an investigative file relating to a murder case that had been tried twice had showed up whereas it had not been previously known of?

A.  Yes, sir.

Q.  And it's a big deal, an investigation file in a murder case, right?

A.  Yes, sir.

Q.  So you decided to conduct an investigation to discover where the file had been for the intervening 25 years, correct?

A.  Yes, sir.

Q.  And when was this investigation that you commenced, late 2011, would you say?

Case: 1:20-cv-01727 Document #: 283-36 Filed: 04/06/26 Page 100 of 215 PageID #:19900

99

A. Late fall of 2011, yeah.

Q. Why did you conduct an investigation into the missing file?

A. To ascertain if we could determine where, who found it and where.

Q. Who found it.

All right. Did you speak to everybody who you thought might have access to the missing file?

A. Yes, sir.

Q. And do you recall, as you just alluded to, that there was an issue that nobody found the unfound file?

THE COURT: Can you rephrase that?

BY MR. LOEVY:

Q. All right. You had a little trouble determining who found the missing file, right?

A. Yes.

Q. Did you speak to Sharon Colby?

A. Yes, sir.

Q. Why did you choose Sharon Colby to talk to?

A. She was one of the detectives that worked on the file room.

Q. Did she have any answers as to who found this file?

A. She did not, no.

Q. How about Karen Willis, did you talk to her?

A. Karen Williams?

Q. Yes. Thank you?

A. Yes, I did.

Q. Why did you pick her?

A. She also worked on the files.

Q. Did she have any answer as to who found it or where they found it?

A. No, sir.

Q. How about Sam brown?

A. Yes, sir.

Q. Who is Sam brown?

A. Sam brown was also a detective assigned to filing.

Q. And did he have any answers?

A. He had no recollection either.

Q. John /PO*Z and detective owe Brian, same thing?

A. Same thing.

Q. Those are people you thought might have information but they had none, right?

A. Correct.

Q. Did you talk to all the people who worked around the files, sir?

A. To the best of my knowledge, those were the only people that had access to the files at that time frame.

Q. You didn't leave anybody out?

A. No, sir.

Q. Were you able to determine a single thing at the

Case: 1:23-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 102 of 215 PageID #:19902

conclusion of your investigation as to where this file had been for the last 25 years?

A. None of the aforementioned people could recall having located that file.

Q. If you couldn't find the person who found it then you couldn't find where the person who found it found it, correct?

A. Correct.

Q. So you were unable to determine whether the file had been for the previous 25 years?

A. Yes, sir.

Q. Now, you had a hunch where the file had been, had you not?

A. Yes, sir.

Q. Because the department had a place where it kept files like this, right, sir?

A. Yes, sir.

Q. And your hypothesis was perhaps the file was sitting in a file cabinet at the Area 1 police department, right?

A. Yes, sir.

Q. Because in that file cabinet at Area 1, where was that file cabinet, sir?

A. At what point?

Q. At the point, say, back in the '80s?

A. I have no knowledge as to where it was bang in the '80s.

Q. The file cabinet might have been moved?

A. Yes, sir.

11/17/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

102

Q.  But this was the file cabinet that was in the detective's division, right?

A.  Yes, sir.

Q.  And your hypothesis was that this investigative file was probably sitting in a drawer in chronological order in the file cabinet where the investigative files are kept, correct?

A.  Yes, sir.

Q.  And you have no reason, as you sit here today, to believe that that's not exactly where the file was, do you?

A.  No, sir.

Q.  Did you check and see if the file cabinet where this file was had other files that had not been turned over?

A.  No, sir.

Q.  Let's turn back to the mid '80s.  Was it the policy and practice of the Chicago Police Department to turn over investigative files like this?

        MR. MICHALIK:  Objection, foundation.

        THE COURT:  Lay the foundation first.

BY MR. LOEVY:

Q.  When did you first become a Chicago police officer, sir?

A.  14th of June, 14th of June 1982.

Q.  All right.  So you were a member of the Chicago Police Department in the 1984, 85, 86 time period, correct?

A.  I was a patrolman assigned to the Englewood district, yes, sir.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. Were you familiar with the policies and the practices of the Chicago Police Department at the time?

A. I was familiar with patrol division policies and practices.

Q. All right. Did you have any knowledge about whether the Chicago Police Department had a policy and practice to turn over investigative files like this in 1984?

A. I have no knowledge to that.

Q. Do you know having -- you've subsequently become a detective, correct?

A. I was a sergeant of the detective and a lieutenant of the detectives.

Q. Does that mean you are a detective or you just supervise detectives?

A. I just supervise detectives.

Q. Tell the jury what year you were a sergeant of the detectives?

A. I went to the detective division in November of 1999.

Q. And when did you get promoted to lieutenant?

A. In October of 2010.

Q. So you are familiar with the policies and the practices of the police department as they pertained to detective business, correct?

A. From the late '90s through current day, yes.

Q. All right. Let's talk -- changing topics, let's talk

about what detectives do.  They solve crimes, correct?

A.  Yes, sir.

Q.  They gather information is that a fair summary?

A.  Yes, sir.

Q.  And that information in the course of a criminal
investigation has to be turned over to the criminal justice
system in criminal cases, correct?

A.  Yes, sir.

Q.  So it has to be written down, right?

A.  Memorialized, yes, sir.

Q.  A big part of the detective's job is to take notes, would
you agree with that?

A.  Yes, sir.

Q.  Tell the jury why detectives have to take notes?

A.  To refresh their memory when they memorialize the case.

Q.  In other words, the detective doesn't know if they're
going to go to court in two days or 20 years, right?

A.  Yes, sir.

Q.  Would you agree with me that for that reason the a
critical part of a detective's responsibility to be a very
good chronicler of details?

A.  Yes, sir.

Q.  Would you also agree that when you start a criminal
investigation, you don't know what fact is going to be
relevant ten months from now?

Case: 1:23-cv-01737 Document #: 283-36 Filed: 04/06/26 Page 106 of 215 PageID #:19906

A.  Yes, sir.

Q.  And that means you have to write everything down because you don't know in advance what's going to turn out to be pertinent and what's not, correct?

A.  That's correct.

Q.  And sometimes in these investigations, detectives work with each other, work with other detectives, correct?

A.  Yes, sir.

Q.  Is that a reason why you also have to write things down?

A.  Yes, sir.

Q.  Can you explain?

A.  Well, if two different detectives are working on it and one detective develops information that the other one doesn't have, then he can refer back to his notes.

Q.  All right.  And then the notes are supposed to turn into reports, are they not?

A.  Yes, sir.

Q.  Explain to the jury what that means.

A.  Detectives write closing supplementary reports, well, if they close the case, a closing supplementary reports that documents the entire investigation from inception to the end.

Q.  That's the end of the investigation.  But as the investigation is progressing, they are supposed to create supplementary reports, correct?

A.  Yes, progress reports.

Case: 1:20-cv-01727 Document #: 283-36 Filed: 04/06/26 Page 107 of 215 PageID #:29903

Q. Well, supplementary reports or progress report?

A. A progress report is a type of supplementary report.

Q. I thought a general progress report is notes, right, handwritten notes, supposed to be on general progress reports?

A. Semantics here, general progress notes are handwritten notes.

Q. Notes, right?

A. A progress report is a computerized report that comes out when they enter the report into the CRIS system.

Q. All right. A supplementary report is when we think of police reports, official police reports, they're supplementary reports, right?

A. There are multiple times of supplementary reports. There can be evidence supplements, progress supplements, lab supplements.

Q. All I'm getting at, maybe we are getting semantic, a detective take a lots of notes, right?

A. Yes.

Q. And they take the pertinent stuff in the notes and create police reports?

A. Yes.

Q. And that's a big part of the job, right?

A. Yes.

Q. All right. Now, once the information is gathered, it has to be disclosed to the criminal justice system. We already

talked about that, right?

A.  Yes.

Q.  That's important both to make sure that the right -- the victim gets justice and the right guy is prosecuted, right?

A.  Yes.

Q.  And it's also important to the rights of the accused, right?

A.  Yes, sir.

Q.  Let's talk about the Chicago Police Department's policies and practices as far as what's supposed to be memorialized.

        Isn't it true that if someone is an eyewitness to the event, it's important to create a document that records what they saw, all the details?

A.  Yes, sir.

        MR. MICHALIK:  Objection, vagueness as to time frame.

        THE COURT:  I can't hear you.

        MR. MICHALIK:  Vagueness as to time frame.

        THE COURT:  Yeah.  You need to set.

BY MR. LOEVY:

Q.  Do you have any reason to believe that the policies in the mid '80s were different from when you were a supervisor?

        THE COURT:

BY MR. LOEVY:

Q.  About documentation of pertinent information?

A.  No, sir.


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  You believe they are consistent, do you not?

A.  Yes, sir.

Q.  All right.  Then let's talk about --

THE COURT:  You can proceed.

BY MR. LOEVY:

Q.  If a person is investigating a murder, and they come across a person who purports to be an eyewitness, what's supposed to happen if that person has information about what the guy looked like?

A.  The detective would write that down.

Q.  They would write down, for example, whether they were white or black, whether they had braids, whether they were tall or short, any information available, right?

A.  Absolutely.

Q.  Now, you have any hesitation that any description an eyewitness should provide should be documented in writing?

A.  I'm not sure I understand the question.

Q.  It doesn't make sense.  There is no way a detective would not write down a description of a witness if an eyewitness had a description?

A.  No.

Q.  You agree with me, right?

A.  Yes, I agree with you.

Q.  And certainly the detective should write down the description of the eyewitness before the detective shows him

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

109

photographs of the suspects, you would agree with that, too, right?

A.  Yes.

Q.  Can you think of any reason why a detective would want to show the eyewitness a suspect before they memorialized what the eyewitness was claiming the guy looked like?

A.  If an eyewitness knew a suspect but didn't know his name -- like a street name or something, I could envision a detective might show a photo before taking the physical description.

Q.  Any other scenario?

A.  No.

Q.  All right.  Well, let's go back to the one you identified.  If the person -- if an eyewitness said I saw Candace shoot the person, you should write down I know the person and I saw they did it, right?

A.  Yes, sir.

Q.  Is there any equivocation, any exception that says if an eyewitness says I know the guy who did it, I know who did it that the detective has to memorialize that?

A.  No.

Q.  You agree with me, right?

A.  Yes.

Q.  That ensures the fairness of the process, correct?

A.  Yes.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. How about suspects in the murder. If eyewitnesss or other witnesses give the detectives suspects who might have done it, do the detectives have to write that down?

A. Yes, sir.

Q. They have to write do you know who is a suspect, right?

A. Yes.

Q. And they have to write down why that person is a suspect, right?

A. Yes.

Q. Why is that so important?

A. To further the investigation.

Q. You don't know two years from now if new information is going to come and people are going to change I didn't remember stories, right?

A. Yes.

Q. You have to lock them in, right?

A. Yes.

Q. Tell the jury what it means to look somebody in with a report?

A. As simple as it sounds, you're locking in that statement that night that that person gives you because sometimes down the road, witnesses change their version for one reason or another.

Q. And the person who is accused of a crime has a right to confront the witness with the fact that they changed their

version, right?

A. Absolutely.

Q. Did the policies in the Chicago Police Department require the detective to write down the original version?

A. Yes.

Q. How about confessions, if somebody supposedly confesses to a crime, does that have to get written down?

A. Yes.

Q. Does that get documented in a police report?

        MR. MICHALIK:  I am going to object to the relevance.

        THE COURT:  Overruled.  You can answer.

        THE WITNESS:  I'm sorry.

BY MR. LOEVY:

Q. For example, if Anthony Sumner gave a confession or said that somebody else gave a confession, is that the kind of information that goes in a police report?

A. Yes, sir.

Q. How about if Anthony Sumner said my buddy Earl Hawkins committed a crime, is that the information that would go in a police report?

A. Yes, that would go in a police report.

Q. You can say yes and we can agree that that is an absolutely firm requirement of the Chicago Police Department to memorialize that information?

A. Yes, sir.

11/17/16 PM              ***REALTIME UNEDITED TRANSCRIPT ONLY***

112

Q.  As soon as practical as possible, correct?

A.  Yes, sir.

Q.  Are you familiar with the change in the Chicago Police
Department's policies and practices in 1983 or is that
something you're not familiar with?

A.  Change as to what?

Q.  When special order 83.1 was enacted, is that something you
have familiarity with?

A.  I am not sure.

        MR. LOEVY:  All right.  I have no further questions,
your Honor.  Thank you.

        THE COURT:  Mr. Michalik.

        MR. MICHALIK:  Thank you, your Honor.

                         - - -

        KEVIN DUFFIN, CROSS-EXAMINATION

BY MR. MICHALIK:

Q.  Good afternoon, commander.

A.  Good afternoon.

Q.  Let's go through your background a little bit more.  I
know you talked about it in bits and pieces.  Can you tell the
ladies and gentlemen of the jury when you started with the CPD
and when your assignment was?

A.  14, June 1982 was my appointment date and out of the
academy I was assigned to the Englewood district.

Q.  What was your rank at the time?

                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  He was a patrolman.

Q.  How long did you work as a patrolman for the police department?

A.  Until 1996 at which time I was promoted to sergeant.

Q.  And where were you -- where was your first assignment as a sergeant?

A.  I was back in Englewood.

Q.  Okay.  Did you have a different position after you were a sergeant?

A.  For the next two years until 98, I was a tactical sergeant in Englewood and in '98, I became the Area 1 saturation team sergeant.

Q.  And for the ladies and gentlemen of the jury, can you explain what Area 1 is?

A.  The city's divided, back then it was 25 police districts and there were five different areas, Area 1 based at 51st and Wentworth, it encompassed the 7th, eighth, 9th, 2nd and 21st districts on the south side of Chicago.

Q.  All right.  Now, you talked a little bit the detectives.  Are there different kinds of detectives that work in Area 1?

A.  Yes.

Q.  What are they, if you can just briefly explain.

A.  Well, we have detectives who work exclusively in homicides, detectives who work on robberies, detectives who work on burglaries, detectives who work on sex crimes and

11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

114

detectives who work on youth related crimes.

Q. All right. And you told us that your current rank is commander?

A. Yes, sir.

Q. And when were you promoted to that position?

A. In February of 2014.

Q. Okay. You were asked some questions about files and supplementary reports and the CRIS system. Could you explain to the ladies and gentlemen of the jury what the CRIS system is?

A. CRIS is a automated computer system where the detectives type -- well, they used to type the reports on pieces of paper. Now it's all computerized. It goes, the name of the system is the CRIS system. I forget what the acronym stands for.

Q. Do you know when the CRIS system was first adopted by the police department?

A. I want to say in 2000, 2001.

Q. So back in 1985, and 1986, in that time frame and then 1984, this CRIS system did not exist?

A. No, sir.

Q. Do you know how police officers would prepare their reports prior to the CRIS system?

A. Manual typewriter.

Q. Now, this first -- this file that you were talking about,

***REALTIME UNEDITED TRANSCRIPT ONLY***

Exhibit 1, which Mr. Loevy has right here, this first came to your attention in 2011?

A.   Late spring of 2011, yes.

Q.   All right.  And what were you told about this file?

A.   I was told by commander Walsh, who was the commander of Area 1 at the time that that file was going to be the subject of some litigation.

Q.   All right.  Were you told at that time that this file had been missing for a period of time?

A.   No, sir, I was not.

Q.   Were you told any details at all about this file?

A.   No, sir, not at that time.

Q.   Did anyone ever tell you that this file had been hidden?

A.   No, sir.

Q.   All right.  When you were told that this file might become the subject of litigation, what, if anything, did you do with it?

A.   I secured it in my office.

Q.   And why did you do that?

A.   I was told that counselors from Dykema would be contacting me and I figured it was the prudent thing to do, I would keep it in my office for ease of access.

Q.   Did attorneys eventually come to your office to look at these files?

A.   Yes.

Case: 1:23-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 117 of 215 PageID #:19903

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  Did attorneys besides attorneys from Dykema come to look at this file?

A.  Yes.

Q.  Do you remember anyone, Ms. Gorman, coming to look at this file?

A.  Yes, sir.

Q.  You were also asked some questions regarding your investigation into this particular file and where it had been found?

A.  Yes.

Q.  Okay.  Were you able to determine where the file had been before it was found in 2010?

A.  I was not able to determine that, no.

Q.  Okay.  Your understanding was, though, that the file was found in 2010?

A.  Yes, sir.

Q.  And it was your belief that it was found at Area 1?

A.  Yes, sir.

Q.  Do you have a belief as to who it was that found this file?

A.  I believe it was probably detective Sam Riley.

         MR. LOEVY:  Objection, foundation.

BY MR. MICHALIK:

Q.  Why do you believe that?

A.  Sam was the primary ^  file guy at that time, so.


         ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01703 Document #: 283-36 Filed: 04/06/26 Page 118 of 215 PageID #:10918

Q.  And when you say at that time, you mean in May or June of 2010?

A.  Yes.

Q.  I know you talked to a lot of other file persons or people who had access to the filing system at Area 1?

A.  Yes, sir.  I did, yes.

Q.  Why was it that you thought it was Sam as opposed to anyone else?

A.  Well, like I said, Sam was the primary guy, the other people, Karen Williams, Sharon Colby, if Sam was off for some reason or if he was on vacation, they would fill in, but it just seemed statistically that the odds were that he was the one that found it.

Q.  I think you told Mr. Loevy that you had talked to Sam brown as part of your investigation?

A.  I did.

Q.  And Mr. Brown told you that he did not recall if he was the person who found this file, correct?

A.  He could not recall, yes, sir.

Q.  Do you find it unusual or did you find it unusual in the investigation that Mr. Brown was unable to tell you whether he was the person that found this file?

A.  No, sir.

Q.  Why not?

A.  Sam routinely pulled 20, 30 files a day, made copies and

sent them out, so the fact that one didn't stick out in his mind, I didn't find that surprising at all.

Q. Do you recall when it was that you had asked Sam if he had ever found this file?

A. I'm sorry. I didn't --

THE COURT: When did you ask him?

BY MR. MICHALIK:

Q. When did you ask him if he found the file?

A. Late fall of 2011.

Q. And you were asking him about a file that someone had found in May or June of 2010?

A. 18 months prior, yes.

Q. In 2010, at Area 1, where was the file cabinet where you believe this file was found?

A. Second floor.

Q. Did anything happen in 2012 that caused that file cabinet to be moved from the second floor at Area 1?

A. Yes, sir.

Q. What was that?

A. In March of 2012, there was a consolidation of detective areas. I previously said there had been five detective areas, they were consolidated down to three in March of 2012, resulting in Area 1 absorbing some of the districts and open investigations from area 4 and area 5, so due to that, we inherited a lot more files.

Q.  So if Area 1 no longer existed, what was it called?

A.  It was referred to as area central.

Q.  Where was area central located?

A.  51st and went worth.

Q.  That's where Area 1 was prior to that?

A.  Yes, sir.

Q.  Where was the file cabinet moved?

A.  Shortly after the consolidation, it was moved down to the basement of the building at 51st and Wentworth.

Q.  Were there any other file cabinets that were moved from the second floor down to the basement at area central?

A.  Multiple file cabinets, yes.

Q.  Were there file cabinets moved to the basement from the other areas that were sending their files to area central?

A.  Yes, sir.

Q.  Why would they put it in the basement?

A.  Because we had room down in the basement.

Q.  Were the file cabinets moved down into the basement so they could be hidden?

A.  No, sir.

Q.  Were you ever told to keep the existence of the file cabinets in the basement a secret?

A.  No, sir.

        MR. MICHALIK:  Can I can have a moment, your Honor.

        THE COURT:  Sure.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

120

(Brief pause.)

MR. MICHALIK:  I have no further questions, your Honor.  Thank you.

THE COURT:  Mr. Kulwin.

MR. KULWIN:  Yes.

- - -

KEVIN DUFFIN, CROSS-EXAMINATION

BY MR. MICHALIK:

Q.  Commander Duffin?

A.  Yes.

Q.  A couple questions.  You were asked some questions about policemen locking people in written reports.  Do you remember those questions?

A.  Yes, sir.

Q.  Okay.  So like when a detective is interviewing a suspect, it's important for them to write down -- put in the report what the suspect says, correct?

A.  Yes, sir.

Q.  Okay.  And, sir, as a commander or supervisor of detectives, have you ever encountered a situation in your experience where a suspect of a double murder who has been arrested and brought to the police station is not asked about the double murder by the policemen?

A.  I can't imagine that, no.

Q.  That could never occur, right?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  Right.

Q.  And you were asked a bunch of questions about GPR that sometimes are notes, right?

A.  Yes.

Q.  Progress reports.  Is it fair to say that a detective can put information that he gathers in an investigation directly into a supplemental report without having to fill out a written GPR?

A.  I wouldn't say it's completely impossible, but it would be very rare.

Q.  Okay.

        MR. KULWIN:  Nothing else.

        THE COURT:  Redirect.

                        - - -

            KEVIN DUFFIN, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  Why is that?

A.  Why is what?

Q.  You just answered the question if you make a GPR, you say it's supposed to be in a report and you said it would be very, very rare.  What's the protocol?

A.  Well, I mean,depending upon the type of crime, if you're investigating a broken car window, someone's car window was broken and you are calling the victim and he has no information on the offender, I would imagine that detective

could put that right -- he wouldn't need to do GPRs, it's a telephone interview and he is typing his report as he talks.

Q.  Let's keep it to murders and serious crimes?

A.  All crime is serious.  Murder, I can't imagine it would happen, no.

Q.  You were asked about the file cabinets moving into the basement so I understand, you're saying the file cabinets moved into the basement but after this file was found, right?

A.  Yes.

Q.  So when the file was found, the file cabinet was still in the detective's division, right?

A.  On the second floor of 51st and Wentworth, yes, sir.

MR. LOEVY:  No further questions.

THE COURT:  Anything based on the redirect?

MR. MICHALIK:  No, your Honor.

MR. KULWIN:  No your Honor.

THE COURT:  Do the jurors have questions? .  Sidebar.

THE COURT:  Do we know if Mr. Langston is here?

MR. LOEVY:  He is not here.  We have witnesses we can fill up the afternoon.

THE COURT:  The question is why did you have a hunch, close quote, that the file was in the file cabinet in the basement of Area 1 and what is the basis of your hunch.  Does anybody have a problem.  I think the word was used in the question and he adopted it with his answer.

***REALTIME UNEDITED TRANSCRIPT ONLY***

MR. LOEVY: I have no objection.

THE COURT: Okay. ^ open court.

THE COURT: The question was asked by one of the lawyers whether you had a hunch where the file had been and you said you had a hunch that it had -- you responded that it you thought it had been in the detective definition at Area 1. Why was it that you thought that when this all came about?

THE WITNESS: Well, it only seemed to make sense. It was a case that had been -- I believe it was originally from area 3 which was consolidated into Area 1. It was an Area 1 investigation, and.

THE COURT: So it was logical that that's where it would be.

THE WITNESS: Yes.

THE COURT: I know these numbers change from time to time. It might have been originally area 3, but eventually that became part of Area 1 which is where the file was found?

THE WITNESS: Yes, sir.

THE COURT: Any follow up based on that.

MR. LOEVY: Briefly.

BY MR. LOEVY:

Q. Nothing about your investigation gave you any reason to believe that the file wasn't exactly where it belonged, right?

A. Nothing, no.

MR. LOEVY: I have no further questions.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 125 of 215 PageID #:10925
11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

124

- - -

                    ^ WITNAME, RECROSS-EXAMINATION

BY MR. LOEVY:

BY MR. MICHALIK:

Q.  When you say it was exactly where it was where it belonged you are talking about in 2010?

A.  Yes, sir.

          MR. MICHALIK:  All right.

          THE COURT:  You are excused.  Please call the next witness.

          MR. LOEVY:  Your Honor, we call Officer Melean.

          THE COURT:  There is another witness coming this afternoon, that if that person comes in, we are going to interrupt the testimony and put this on pause.  I am basically asking them to have somebody keep an eye on whether the person gets here.  Just so you know, the reason why we're going to get a witness from another room is that typically the rule is witnesses are testifying about facts don't listen to the testimony of other witnesses unless they are parties to the case.  We have a little room across the hall where people wait.

     (Witness sworn.)

          THE COURT:  All right.  You can proceed.

                    - - -

          FREDERICK MELEAN, DIRECT EXAMINATION


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

125

BY MS. GORMAN:

Q.   Good afternoon, Sergeant.

A.   Lieutenant.

Q.   Congratulations on the promotion.

A.   Thanks.

Q.   Lieutenant, could you state your name?

A.   Lieutenant Frederic Melean, M-e-l-e-a-n.

Q.   Obviously, you're an employee of the Chicago Police
Department in your uniform.  How long have you been an
employee of the police department?

A.   Almost 24 years.

Q.   I want to draw your attention to the period of 2005 to
2010 when you were the administrative sergeant for records?

A.   Yes.

Q.   Is that correct?

     That was from February of 2005 to April of 2010?

A.   Yes.

Q.   And as part of your many duties as an administrative
sergeant, you were in charge of the subpoena unit isn't that
correct?  Or you were a supervisor over the subpoena unit?

A.   Yes, I was one of the supervisors, correct.

Q.   And subpoenas would come in seeking criminal records from
homicides and other crimes; is that correct?

A.   All kinds of crimes.

Q.   And the subpoenas would come in either from state's

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

attorneys, prosecutors, or they'd come in from defense attorneys; is that correct?

A. Correct.

Q. And if there was a problem with a subpoena, if someone that had filed a subpoena with the police department ran into a problem, you were sometimes the person that would be contacted; isn't that correct?

A. Occasionally, yes.

Q. Occasionally.

And just so that the jury knows, it's a requirement when there is a subpoena to provide the materials as part of the criminal justice system; isn't that correct?

A. Yes.

Q. Now, I'm drawing your attention to January of 2006, the subpoena came into your unit. Do you recall that?

A. I didn't receive a subpoena myself, but I recall getting a fax from an attorney.

Q. This is exhibit, Plaintiff's Exhibit 36.

THE COURT: The computer?

MS. GORMAN: This has been admitted.

THE COURT: I just need to know, is it the computer or the ELMO?

MS. GORMAN: It's the computer.

THE COURT: Got it. Thanks.

MS. GORMAN: It's been admitted.

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

127

            THE COURT:  36.

BY MS. GORMAN:

Q.  Do you see this subpoena?

A.  Yes, I do.

Q.  It's dated January 27th, 2006?

A.  Correct.

Q.  And it's a subpoena from ^ Jean ^ Gene Snyder, one of the attorneys for Nathson Fields; is that correct?

A.  That's correct.

Q.  And if you look at page 3 of the subpoena, I'm sorry, page 4 of the subpoena, there's a rider, a document request.  Do you see that?

            THE COURT:  She's getting to it.  There we go.

            THE WITNESS:  Yes, I see it.

BY MS. GORMAN:

Q.  Thank you.

            And the subpoena was seeking, if we look in the first paragraph, all police records, reports, notes, and street files relating to R. D. F-151922, the homicide of Jerome Smith and Talman Hickman.  Do you see that?

A.  Yes.

Q.  And it was also seeking another RD number Y 322288; is that correct?

A.  That's correct.

Q.  Can you explain to the jury what an RD number is?


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  RD number is a number assigned to a case report generated by the Chicago Police Department.

Q.  And then the files are kept in that numerical order by year?

A.  Everything is referred to the RD number, correct.

Q.  Okay.  And F was for the year; is that correct?

A.  That's correct.

Q.  And so 1984, this was 1984 murder and that's why the letter F was used?

A.  If that was the date, yes, I don't recall the dates.

Q.  And 1985 was G and et cetera.

The second request was for all reports, notes, or street files relating to Earl Hawkins, Randy Langston, Eric Langston, Gerald Morris, Anthony Sumner, witnesses in this incident or defendant Nathson Fields, do you see that?

A.  Yes.

Q.  And then the third part of the request was for all letters or other correspondence from or to Nathson Fields.  Do you see that?

A.  Yes.

Q.  And sometime in February of 2006, there was a complaint from Ms. Snyder; isn't that correct?

A.  I recall getting a phone call because I was given a fax with my name on it, so I don't recall the phone conversation, but I do remember receiving a fax with my name spelled

incorrectly, but I was the only one close to that.

Q. So that came to your attention?

A. Correct.

Q. And Ms. Snyder was complaining because she had filed a subpoena seeking all of these records and she was not getting what she was looking for; is that correct ^ ?

A. I believe there is a problem with one of the reports.

Q. With one of the reports?

A. I don't recall which report, about you she had a problem obtaining a report. I don't recall which one.

Q. She was having a problem -- she was having a problem getting the documents that she was seeking; isn't that correct?

A. She had a problem getting reports. I don't recall which ones, though.

Q. Okay. What did you do when you got Ms. Snyder, attorney Snyder's complaint?

A. She sent me a fax and then when I received the fax, I gave it to my subpoena unit supervisor and told her to take care of it.

Q. Did you try to locate the file?

A. Myself, no.

Q. Okay. Did you do any follow up to see if the file was ever found for her?

A. No.

Q. Why not?

A. Well, because I gave it to my supervisor and she was a good person and she handles all the jobs and I didn't hear back from Ms. Snyder, so I assumed it was completed.

Q. You have no recollection of being able to find the file that Ms. Snyder was complaining about, do you?

A. No, I didn't look for the file myself.

Q. You have no recollection about producing anything to Ms. Snyder in response to the subpoena, do you?

A. No, I didn't produce anything myself.

Q. Do you have any independent recollection of your correspondence and phone calls with Ms. Snyder?

A. No, just if it was addressed to me, so I must have told her just to fax what she needed directly to me and I would hand it to the subpoena unit.

Q. You know from the records in your division that the subpoena came through at that time; isn't that correct?

A. What I heard -- I don't get every subpoena that came to the records division, so I wouldn't know that a particular subpoena came that day unless there is a problem with the civilian supervisor that they would contact me.

THE COURT: Ms. Gorman, you need to find a good spot to take a pause. If you want to finish this sub topic, we will do that. I believe the other witness is here.

MS. GORMAN: Thank you.

131

BY MS. GORMAN:

Q. Lieutenant Melean, in 2006, your division had a computer system isn't that correct for keeping track of the records of subpoenas?

A. Yes, it did.

Q. Did you look through that computer system to refresh your recollection about the subpoena?

A. No, I never looked in the access database myself. That was the subpoena unit's job.

Q. Did you try to look through that access base at the time?

A. No, I didn't have the access database on my computer in my office.

Q. Do you know if the access database had 2006 files at that time?

A. According to my previous testimony, I had asked database supervisor if they could find the data that was stored and he said he could not.

Q. And do you know why they could not?

A. No.

Q. Didn't they tell you that the records were -- that the 2006 records were lost?

A. He just said they couldn't find it, so I had no idea what he meant by that.

MS. GORMAN:  I think I should.

THE COURT:  Yeah, okay.

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

132

          MS. GORMAN:  Save this.

          THE COURT:  My apologies.  We are going to need to pause to get another witness.  You can go back to the room that you were in before.

          MR. MICHALIK:  Your Honor, if I could just explain to him.

          THE COURT:  Yeah, explain it to him outside the room, but explain it to him.  Thanks.

     (Witness sworn.)

          THE COURT:  Mr. Loevy, you can go ahead.

          MR. LOEVY:  Thank you, your Honor.

                              - - -

          ERIC LANGSTON, DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Sir, could you state your name for the record.

A.  Eric Langston.

Q.  Where do you live, Mr. Langston?

A.  158 south ridge way.

          THE COURT:  All right.  Now I am going to undo what I just said.  I don't want you all the way up on that microphone.  Here is some water.  It looks like you have a scratchy throat.  If he gave an actual address, the address is stricken.  Just so the jury knows why we did that, as of the last five years, we don't put actual addresses on the record anymore.  Just city and state.

          ***REALTIME UNEDITED TRANSCRIPT ONLY***

BY MR. LOEVY:

Q. Who do you live with?

A. What?

Q. Who do you live with?

A. My wife and kids.

Q. What do you do for a living?

A. I work.

Q. What's your job?

A. I work at an laundry company.

Q. Laundry company. What days of the work do you work, sir?

A. Tuesday through Friday.

Q. Was today a workday?

A. Yes.

Q. Was it an imposition on your schedule to have to be here?

A. Yes.

        MR. NOLAND: Objection, relevance.

        THE COURT: Overruled.

BY MR. LOEVY:

Q. You were subpoenaed to testify, correct, sir?

A. Yes.

Q. Do you want to be here?

A. No.

Q. Do you know Mr. Fields?

A. No, I don't.

Q. Have you ever met the man in your life?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01728 Document #: 283-36 Filed: 04/06/26 Page 135 of 215 PageID #:19935
11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

134

A. No.

Q. Are you receiving any kind of benefit or anything being here good for you?

A. No.

Q. Do you wish this case would just go away?

A. Yes.

Q. All right. Turning your attention back to April 28th, 1984, that's the day that those men were murdered in your building. Do you remember that, sir?

A. Yes.

Q. How old were you then?

A. Probably like 11.

Q. 11 you say is your memory?

A. Yes.

Q. All right. Where were you living at the time?

A. 706 East 39th Street.

Q. And who were you living with at the time?

A. My mama.

Q. And some of your other family too, do you remember?

A. My mama and the rest of my family.

Q. All right. Do you remember which apartment you lived in?

A. Yes.

Q. Which apartment was that?

A. Apartment number 106.

Q. All right. And I want to show you this building here.

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

135

Was it -- was your apartment in the back of the building or the front of the building?

A.   It was in the back.

Q.   All right.  What drew your attention to the fact that somebody had shot somebody that day?

A.   I didn't know because I was already looking, I was looking out the window.

Q.   All right.  Sir, did you hear gunshots?

A.   Yes.

Q.   Do you have an exact memory 30 years later about who was running where, up down, sideways?

A.   No.

Q.   Were you outside at the time of the shooting?

A.   No, I wasn't.

Q.   When you heard gunshots, what did you do?

A.   I looked out the window.

Q.   What did you see?

A.   I went out.

Q.   Yeah?

A.   I saw some car guy in a car with ski masks.

Q.   Did you see guys running?

A.   Later on I saw the guys with ski masks running.

Q.   Did you ever see their faces?

A.   No, I could not.

Q.   Why didn't you see their faces?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  They had ski masks.

Q.  Do you remember if they were going north, south, east, west or right or left?

A.  No.

Q.  Did you ever interact with them face to face?

A.  No.

Q.  Did you ever see them without their masks?

A.  No.

Q.  At some point later, did you end up interacting with the police?

A.  Yes.

Q.  Did you ever tell the police or anyone else that you could identify people with masks, the people you've seen?

A.  Yes.

Q.  You told them?

A.  No, that I said that I saw them with masks, but I couldn't identify them.

Q.  All right.  Did you ever tell anybody any reason to believe you could pick out who did that murder?

A.  No.

Q.  Did the police ask you to help them identify the murder?

A.  Yes.

Q.  What did you tell them?

A.  I didn't know.

Q.  What do you mean?  What did you tell them?

A. I said I didn't know who did it, they had masks on. I couldn't see their faces.

Q. Did the police accept that answer?

A. No.

Q. Were you shown photographs?

A. Yes.

Q. What do you recall about that? Were you able to pick out any photographs?

MR. KULWIN: Objection, Judge, multiple questions.

THE COURT: I'm sorry.

MR. KULWIN: Multiple questions. He had one pending and started another one.

MR. LOEVY: I did, your Honor.

THE COURT: Ask one.

BY MR. LOEVY:

Q. Were you able to pick out any people from the photographs?

A. No.

Q. Why not?

A. Because I didn't know who it was.

Q. All right. Showing you a copy of Plaintiff's Exhibit 8628, this is in evidence.

THE COURT: 86-28 I assume?

MR. LOEVY: Yes, your Honor.

BY MR. LOEVY:

Q. This is a police report dated June 17th, 1985?

MR. LOEVY:  Your Honor, the ELMO.

THE COURT:  You will be able to see this on your screen there.

BY MR. LOEVY:

Q.  That's your name, Eric Langston, right?

A.  Yes.

Q.  Showing you the second page, and this is a report create the by Detective O'Callaghan on the 17th of June 1985.  I would like to read you this sentence.  Eric Langston viewed the lineup and positively identified the subject Nathson Fields as one of the subjects who shot the victims.  Do you see that?

A.  Yes.

Q.  Are you able to identify anybody as the one who shot the victims?

A.  No.

Q.  Did you see the shooting?

A.  No.

Q.  Did you ever tell the police that you identified Nathson Fields as the one who saw that shot the victims?

A.  No.

Q.  Do you remember if the police seemed interested in particular suspects?

A.  I don't recall.

Q.  You don't recall how it went down?

11/17/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

139

A.  No.

Q.  All right.  Did they come try to get you to testify?

A.  Yes.

Q.  And what did you tell them when it came time to go to court?

A.  That I didn't want to go to court.

Q.  Why did you tell them you didn't want to go to court?

A.  Because I didn't know who did it.

Q.  Did you explain to the adults, you were a kid then still?

A.  Yes.

Q.  Although a couple years later?

A.  Yes.

Q.  Did you explain to the adults that you didn't want to go to court because you didn't know who committed the murder?

A.  Yes.

Q.  Were they accepting that for an answer?

A.  No, they was not.

Q.  Were you -- were you scared?

A.  Very.

Q.  Was it scary to have to go to court, point your finger and somebody and say they committed a murder if you didn't in fact know they committed a murder?

A.  Yes.

        MR. KULWIN:  Judge, I am going to object.

        THE COURT:  The objection is overruled.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

140

BY MR. LOEVY:

Q. Did it scare the heck out of you?

A. Yes.

Q. Did you go to court?

A. Yes.

Q. Did you ever have to testify at a trial about whether or not you saw Mr. Fields?

A. Yes.

Q. In fact, that was at the sentencing after he had been convicted, right?

A. Yes.

Q. Did you tell the truth?

A. Yes.

Q. And the truth was you never saw anybody without masks?

A. No.

Q. All right, do you remember being steered toward any particular suspects?

MR. KULWIN: Judge, I am going to object. Asked and answered.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Do you remember, sir?

A. What was that?

Q. Do you remember if the police were trying to steer you to any particular suspects?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  No.

Q.  All right.  Do you remember being asked these questions at a prior hearing in this case in 2004?

MR. KULWIN:  Page, please?

MR. LOEVY:  This is page 2596, lines 7 through 18.

BY MR. LOEVY:

Q.

"QUESTION:  I'm going to show you a picture of the lineup.  First I'm going to ask you what happened during the lineup.  Do you remember?

"ANSWER:  They were trying to get me to pick out who did it and I couldn't tell them who did it because the person who did it had a ski mask on

THE COURT:  I am going to make a suggestion.  First of all, no human being can understand what you're saying because you are saying it too quickly.  I am going to turn off the jury's monitor, he will be able to see it.

BY MR. LOEVY:

Q.  Mr. Langston?

MR. NOLAND:  Your Honor, I am going to object.  Is it to --

THE COURT:  Overruled.  There is no question pending at this second.

BY MR. LOEVY:

Q.  Can he sue it?

11/17/16 PM

142

A.  Yes.

Q.  Isn't it true on a prior occasion in 2014, you were asked questions, correct?

A.  Yes.

Q.  And isn't it true that your answer when asked what happened during the lineup, do you remember, was they were trying to get me to pick out who did it and I couldn't tell them who did it because the person I thought did it had a ski mask on.  So he kind of like coerced me.

        "QUESTION:  Did Detective O'Callaghan say anything to you before you went into the lineup?

        "ANSWER:  Yes.

        "QUESTION:  What did he say to you?

        "ANSWER:  He was telling me the guy they wanted to get, and I guess that guy was Mr. Fields."

        Did you give those answers, sir

A.  Yes.

Q.  Is that consistent with your recollection?

A.  Yes.

Q.  Would you have been able to make an identification without help from the police about who you were supposed to pick?

A.  No.

Q.  Did anybody ever threaten in any way in connection with anything having to do with this case, sir?

A.  No.

Case: 1:20-cv-01727 Document #: 283-36 Filed: 04/06/26 Page 144 of 215 PageID #:19944

Q.  Did you ever have any contact with any gang members about whether you were or weren't going to testify?

A.  No.

Q.  Was this a memory from your childhood, this court case, keep coming back?

A.  Yes.

Q.  All right.  Is it a pleasant memory?

A.  No.

MR. LOEVY:  I have no further questions, your Honor.

THE COURT:  Mr. Kulwin.

MR. KULWIN:  Thank you, your Honor.

- - -

ERIC LANGSTON, CROSS-EXAMINATION

BY MR. KULWIN:

Q.  Mr. Langston, originally police detectives came to see you -- were on the scene right after the murders.  Do you remember that back in 1984?  There were a bunch of policemen investigating?

A.  No.

Q.  After the people got shot and killed in 1984, did police come to the building to investigate?

A.  Yes.

Q.  Okay.  In 1984, you weren't in your apartment -- well, let me take that back.

Is the apartment you lived in one floor or two

floors, the apartment you actually lived in?

A.  It had a first and second floor.

Q.  The apartment did?

A.  Yes.

Q.  All right.  So when you heard the shots, you ran upstairs?

A.  No, I was already upstairs.

Q.  Let me just see.  I know it's a long time ago.

Let me refresh your recollection?

THE COURT:  Never mind.

MR. KULWIN:  What?

THE COURT:  Never mind.

BY MR. KULWIN:

Q.  This is your testimony, Mr. Langston, from the sentencing hearing a long time ago.

THE COURT:  You don't get to talk up there.  Just so you know, you can put that on the screen if you want and he'll be able to see it.  The jurors are not turned on.

MR. KULWIN:  I didn't realize that, Judge.  I apologize.

BY MR. KULWIN:

Q.  Does that refresh your recollection, Mr. Langston?

A.  Yes.

Q.  That you went upstairs after you heard the gunshots?

A.  Yes.

Q.  Now, you saw when you looked out the window a blue

Cadillac, remember?

A. No.

Q. You don't remember?

A. No.

Q. Okay. Judge, I am going to put this up and we will look at it.

THE COURT: Sure.

BY MR. KULWIN:

Q. This is another page from your sentencing hearing testimony many years ago. You could look at the question line 16. Do you see that?

A. Yes.

Q. Okay. Does that refresh your recollection that you when you looked out the window, you saw a blue Cadillac?

A. No.

Q. I am going to leave it up, Judge, if the jury can see it?

THE COURT: No, but if you are asking for them to.

MR. KULWIN: Yes.

MR. LOEVY: We object.

THE COURT: The reason I overruled the other objection by Mr. Kulwin and the reason I am overruling this one is Rule 801(d) 1-A, so I am going to put it up so the jury can see it. Just one second. All right. There you go.

BY MR. KULWIN:

Q. Mr. Langston, do you remember being asked these questions

under oath at the sentencing hearing.

"QUESTION:  At first I was looking in a playground and then I saw two men running.

"QUESTION:  The two men that you saw run, where did they run to?

"ANSWER:  A blue Cadillac

"QUESTION:  Where was this Cadillac parked?

"ANSWER:  On Langley."

Do you remember that testimony?

A.  No.

Q.  That was a long time ago, a year after the murder occurred when your memory of it was a lot fresher than it is today, right?

A.  Okay.

Q.  And then I think I heard you say, then you saw the two men after you saw them running from the Cadillac, you saw them running back to the Cadillac?

A.  Yes.

Q.  Here's my question for you, Mr. Langston.  You were 10, 11 years old at the time?

A.  Yes.

Q.  And all of a sudden you hear gunshots, right?

A.  Yes.

Q.  Okay.  And then you run upstairs to look out the window, right?

A.  Yes.

Q.  And so you saw the men running to the car after the gunshots, right?

A.  Yes.

Q.  You couldn't have seen them running from the car before the gunshots, right?

A.  No.

Q.  Isn't that right?

A.  No.

Q.  That is right?

A.  That is right.

Q.  There you go.

Now, when you were looking at the men as they ran to the blue Cadillac, you could see how big they were, right?

A.  No.

Q.  You couldn't see -- like one man was tall and one man was short?

A.  No.

Q.  You saw?

MR. KULWIN:  Can I have one second, Judge?  I apologize.  I lost my place.

(Brief pause.)

MR. KULWIN:

Q.  Now, when you were looking out your window, at one point after the man ran to the car, you saw them take their ski

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. masks off, didn't you?

A. No.

Q. Let's go back to your testimony from the trial 30 plus years ago under oath, the sentencing hearing under oath, page 1217. Here was the question, sir.

MR. KULWIN: So the jury can see it, Judge.

BY MR. KULWIN:

Q. When the two men got into the car, did they take their ski masks off?

"ANSWER: Yes. Do you remember that

A. Yes.

Q. That's what happened, isn't it?

A. Yes.

Q. Now, when the police came in 1984, you didn't talk to them, you didn't talk to any police right after the murders occurred, right?

A. No.

Q. And as you said just a moment ago, it was a pretty scary event, you didn't want to talk to them?

A. No.

Q. You didn't want to be involved at all with it?

A. No, I did not.

Q. And you certainly didn't want to testify at any trials, that's for sure, right?

A. Right.

149

Q.  But a year after the shootings, a year later, another detective, another couple detectives came to see you.  Do you remember that at your home?

A.  No.

Q.  You don't remember that?

A.  No.

Q.  Was it a Detective O'Callaghan and a submit /AOE came to your house and talked to your brother at the time?

A.  I remember O'Callaghan.

Q.  Okay.  And he -- and he asked you at some point if you would come down and see a lineup, right?

A.  Yes.

Q.  And you told him before he asked you that what you had seen that day, right?

A.  Yes.

Q.  All right.  The men had run to the car with masks?

A.  Ski masks on.

Q.  And they took their masks off and got in the car?

A.  Right.

Q.  And so -- and you felt comfortable enough to talk to him and go down with him to look at these line ups, right?

A.  Right.

Q.  Yeah.

        Now, when you looked -- and you looked at a lineup with Mr. Fields in it.  Now you know his name is Mr. Fields.

11/17/16 PM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

150

Q. You looked at a lineup with some guys in it, right?

A. Right.

Q. And Mr. Fields was one of them?

A. Right.

Q. And Mr. O'Callaghan was with you in the viewing room, right?

A. Yes.

Q. And then after you got done looking, he asked you who you saw and you pointed him out, right?

A. Yes.

Q. Now, after that happened, about a month later your family moved from the 706 building to Sawyer street. Do you remember that?

A. Yes.

Q. 1533 --

THE COURT: Old dresses are not a problem.

BY MR. KULWIN:

Q. 1533 Sawyer, do you remember that?

A. Yes.

Q. And a couple of folks came to see you and wanted to talk to you about what happened while you were living there. Do you recall that?

A. Yes.

Q. And they said, one guy said he was a state's attorney and the other guy said he was with the police. Do you recall

***REALTIME UNEDITED TRANSCRIPT ONLY***

03:32:57 that?

A. Yes.

Q. And they took you and your brother out to the ball field?

A. Yes.

Q. You recall that, right.

And later you found out that going to wasn't a state's attorney and the other guy wasn't a policeman, they were Mr. Swano and some other guy?

MR. LOEVY: Objection, leading, your Honor.

THE COURT: Overruled.

BY MR. KULWIN:

Q. Right?

A. Yes.

Q. And it was Bill Swano who put you on the stand at the sentencing hearing when you testified, right, when you were about 11?

A. Yes.

Q. And a number of years later when you were in your early 20s, 1999, you had occasion to talk to a guy named Dave Kelley, assistant state's attorney Dave Kelley. Do you remember that?

A. Yes.

Q. He asked you, Mr. Langston, how come after identifying Mr. Fields you testified at the sentencing hear. Do you remember him asking you that?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  No.

Q.  Okay.  And didn't you tell Mr. Kelley at that time because the El Rukns scared the shit out of me?

A.  No.

Q.  You don't remember that?

A.  No.

Q.  Okay.  Well, you testified in a prior proceeding in this case.

        MR. KULWIN:  Page 2604, line 18.

BY MR. KULWIN:

Q.  There was another proceeding in this case that you testified to, right?

A.  What was that?

Q.  There was another --

        THE COURT:  You've been here before, right.

        THE WITNESS:  Yes.

BY MR. KULWIN:

Q.  And you didn't want to be --

        MR. LOEVY:  Objection, your Honor.  This isn't proper impeachment.

        THE COURT:  Can I see it, please?  Can somebody just hand it to me.

        MR. KULWIN:  Sure.

        THE COURT:  What page am I looking at?

        MR. KULWIN:  2604.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

153

THE COURT:  Thank you very much.

The objection is overruled.

MR. KULWIN:  Am I allowed to put this up on the screen, Judge, or no?

THE COURT:  Yes, same Rule 801(d) 1-A.

BY MR. KULWIN:

Q.  This was back in 2014.  Do you remember being asked these questions in 2014 and isn't it in fact true that in 1999, ten years later, you talked to assistant state's attorney by the name of David Kelley isn't that right that, about this case? True.  And isn't it true that you told Kelly that the testimony you gave in August 1986 when Mr. Goodman showed it to you, in fact, you gave it because they scared the shit out of you, the El Rukns, and you answered, true, right?  That's what you said, right?

A.  Yes.

Q.  Now, at the time you testified at the sentencing hearing, Mr. Langston, you were still living at the 706 building where the murders had occurred, right?

A.  Yes.

Q.  And the 706 building was about a block away from the El Rukn Fort, right?

A.  Yes.

Q.  And when you went to that sentencing hearing, your brother Larry brought you down to that court hearing, correct, your

***REALTIME UNEDITED TRANSCRIPT ONLY***

154

brother Larry, do you remember that?

A.  No.

Q.  And he had just gotten out of the penitentiary, do you recall?

A.  Yes.

Q.  Okay.  Let me see if I can show you something.

        THE COURT:  On this one you are refreshing his recollection, so I am going to take that down the screen.  You can still do it on his screen.

BY MR. KULWIN:

Q.  Can you see it on your screen?

        THE COURT:  You have to put it up there.  It's pretty hard to see it.

        MR. KULWIN:  That would be difficult.  That would be a miracle.

        THE COURT:  I have turned off the jury's screen, so you can still do it on the ELMO.

BY MR. KULWIN:

Q.  I am going to show you if I can the testimony again from your examination when you were in this proceeding in this court.  Why don't you look at this for a second and I'll move it up.

        THE COURT:  It's that one that's at line 14 there.

        MR. KULWIN:  Yeah.

        THE COURT:  Look at that.  The question is does that

refresh your recollection about how you got to court?

THE WITNESS:  Yes.

BY MR. KULWIN:

Q.  It does, right?

A.  Yes.

Q.  Your brother Larry brought you?

A.  Yes.

Q.  And Larry had just gotten out of the penitentiary a couple months earlier, right?

A.  Yes.

Q.  And when you were looking out the window at the blue Cadillac, you were about a hundred feet away?

MR. LOEVY:  Objection, your Honor, no foundation, memory of the Cadillac.

THE COURT:  Overruled.

THE WITNESS:  What was that?

BY MR. KULWIN:

Q.  I'm sorry.

So the shooting takes place, you run upstairs, you look out the window, the Cadillac where the men got into the car was about a hundred feet away?

A.  Probably a little farther.

THE COURT:  Probably a little farther is what he said.

BY MR. KULWIN:


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  Let me go back to this and see if this helps you out?

THE COURT:  You are not refreshing his recollection because he didn't -- you can do it --

MR. KULWIN:  Impeachment.

THE COURT:  I can't tell you what to do.  I am going to tell you what you can do.

BY MR. KULWIN:

Q.  Going back to that hearing you testified to before, that prior hearing, do you remember?

MR. LOEVY:  Can we get the date on that, your Honor?

MR. KULWIN:  Yes.

THE COURT:  Not the date, just the page number.

MR. KULWIN:  You mean the page or the date.

THE COURT:  He wants the page number.

MR. KULWIN:  Page 2593.

THE COURT:  The page is all we need.

MR. KULWIN:  Okay.

BY MR. KULWIN:

Q.  How far away was that -- line 22.  How far away was that car from you?  Probably like a hundred feet.  Do you remember that question and answer?

A.  No.

Q.  Okay.  In any event, so it was about -- there was a ball field across the yard from where you lived, right?

A.  Yes.

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

157

Q.  You played on that field, right?

A.  Yes.

Q.  Played baseball?

A.  Yes.

Q.  So it was about the distance from home plate to a little bit past first base?

A.  A few feet further than that.

Q.  A few feet further?

        MR. KULWIN:  If I may have a moment, Judge.  I don't have anything else, Judge.

        MR. MICHALIK:  No questions, your Honor.

        THE COURT:  Redirect?

        MR. LOEVY:  Yes, your Honor.

                        - - -

        ERIC LANGSTON, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  All right.  Sir, you were asked questions about your testimony at the sentencing.  That was quite a bit of time ago, correct?

A.  Yes.

Q.  Your memory was firmer back then than it is now?

A.  Yes.

Q.  I am going to show you from the same hearing your testimony at page 1223.  Did you give this testimony.  Do you recognize the person that you picked out of the lineup as

        ***REALTIME UNEDITED TRANSCRIPT ONLY***

somebody you saw that night?

THE COURT: Hang on. Given the way you are doing this, the jury is entitled to see it. It's not just refreshing. Now it's up there.

BY MR. LOEVY:

Q. Did you recognize the person that you picked out of the lineup as somebody you saw that night -- I'm sorry.

THE COURT: You got the wrong next page there.

MR. LOEVY: Yes.

THE COURT: I don't think you would have given the answer five to that question.

MR. LOEVY: Thank you.

BY MR. LOEVY:

Q. Not the night, the morning. Shooting?

"ANSWER: No.

"QUESTION: Did somebody tell you who to pick out?

"ANSWER: Yes

"QUESTION: Who did?

"ANSWER: O'Callaghan."

Do you remember that testimony?

A. Yes.

Q. Would you have been able to pick out without help from the police officers?

A. No.

Q. Now, Mr. Kulwin showed you a question and answer about

11/17/16 PM

seeing the guys in the car without their ski masks.  Do you remember him asking you those questions?

A.  Yes.

Q.  Okay.  Showing you the same page but backing up, this is page 1317,

MR. KULWIN:  I'm sorry, what page?

MR. LOEVY:  1317.

BY MR. LOEVY:

Q.  The questions he asked you are here at lines 17 through 19 when the men got into their car, did they take their masks off.

When the men turned around and looked when they got in the car with the ski masks still on?

"ANSWER:  Yes.

"QUESTION:  Could you tell if there was anybody in the car?

"ANSWER:  Yes.

"QUESTION:  How many people could you see in the car?

"ANSWER:  Three

"QUESTION:  Do you remember anything or see the faces of the people that were in the car from your window looking across the playground from the car on Langley?

"ANSWER:  No.

"QUESTION:  When the two men got into the car, did they take the ski masks off?  That's the answer you gave.  From

where you were situated looking across the play lot from the car on Langley, could you see their faces once they got in the car?

"ANSWER: No."

Is that the full context of your testimony

A. Yes.

MR. KULWIN: Judge, I am going to object to the phrase full context.

THE COURT: Overruled. The answer can stand. He said yes.

BY MR. LOEVY:

Q. You were not making these identifications the day after the shooting, were you?

A. No.

Q. At least a year went by?

A. Yes.

Q. You were asked some questions about whether it scared the heck out of you to give these identifications.

Was it scary to you, did it scare the S out of you to go to court, point your finger at somebody that you didn't know?

A. Didn't know, right. Yes.

Q. Did any El Rukns contact you ever?

A. No.

Q. Did you ever receive any threat at all?

Case: 1:10-cv-01168 Document #: 283-36 Filed: 04/06/16 Page 162 of 215 PageID #:10962

A.  No.

Q.  Did anybody ever bother you about this except white guys with suits and ties?

A.  No.

Q.  Now, Mr. Kulwin started asking you questions about Mr. Swano and the state's attorney and the ball field.  Do you remember those questions he was asking you?

A.  Yes.

Q.  You said yes to everyone of those questions?

A.  Yes.

Q.  Who is Mr. Swano?

A.  He was a detective.

Q.  He was a what?

A.  I think he was a detective.

Q.  You have no idea who Mr. Swano?

A.  No.

Q.  Why did you say yes to his questions?

        MR. KULWIN:  Judge, I am going to object.

        THE COURT:  Sustained.  You can argue it.

BY MR. LOEVY:

Q.  He is an attorney, all right, sir, did you know that?

A.  No.

Q.  All right.  Are you someone who sometimes says yes if you are not sure?

A.  No.

11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

162

Q.  All right.  You got me there.

MR. LOEVY:  I have no further questions.

MR. KULWIN:  Just a few.

THE COURT:  Mr. Kulwin, anything else?

MR. KULWIN:  Sorry, I do.

- - -

ERIC LANGSTON, RECROSS-EXAMINATION

BY MR. KULWIN:

Q.  Mr. Langston, Mr. Loevy just read you a bunch of testimony from that sentencing hearing, right?

A.  Yes.

Q.  That's the sentencing hearing that you told assistant state's attorney Kelly you gave that testimony because the El Rukns scared the shit out of you remember?

MR. LOEVY:  Objection.

THE COURT:  What's the objection?

MR. LOEVY:  He said we just saw that.  It's improper impeachment.  It's the same point.

THE COURT:  Sustained.  It's repeating the cross.

MR. KULWIN:  Okay.

BY MR. KULWIN:

Q.  He also asked you?

THE COURT:  We will be taking a break.  I want to finish this witness before we do.

MR. KULWIN:  I just have a couple questions if I can

***REALTIME UNEDITED TRANSCRIPT ONLY***

find the point.  You apologize, Judge.

(Brief pause.)

BY MR. KULWIN:

Q.  You were asked some questions about whether or not you knew who Mr. Swano was.  Do you remember that?

A.  Yes.

Q.  But before you testified here you said you had no idea who he was, is that your testimony?

A.  Yes.

Q.  In a prior proceeding in this case, didn't you tell?

MR. LOEVY:  Page?

MR. KULWIN:  Page 2601.

BY MR. KULWIN:

Q.  In a prior proceeding, you were asked some questions by one of plaintiff's other attorneys, a fellow by the name of Mr. Goodman.  Do you remember that?

A.  Yes.

Q.  And he had met with you before your testimony and gone over it with you, right?

A.  Yes.

Q.  Okay.  And do you remember him asking you this question and you giving this answer: And when the police came at that time, you knew the lawyer and the investigator, you knew that they weren't the police isn't that true?  And you said, yes. You knew that they represented one of the defendants in the

case isn't that true?  Yes.  In fact, they told you that, didn't they?  Yes.  You gave that testimony under oath in a proceeding in this case isn't that right when Mr. Goodman asked you?

A.  Yes.  Yes.

Q.  So it all happened a long time ago, right, Mr. Langston?

A.  Yes.

Q.  And it was a very scary incident, right?  You have to say yes?

A.  Yes.

MR. KULWIN:  That's all I have, sir.  Nothing else, Judge.

THE COURT:  Non-repetitive.

- - -

ERIC LANGSTON, REDIRECT EXAMINATION

BY MR. LOEVY:

Q.  All the times you have come to court, 2006, 2014, have you ever, ever claimed that you could identify Mr. Fields and Mr. Hawkins as the murderers?

A.  No.

MR. LOEVY:  I have no further questions.

THE COURT:  Do any of the jurors have any questions for the witness?

Thanks.  You were excused.  You can step down.  We will take a break for ten minutes.  If we can have the

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01703 Document #: 283-36 Filed: 04/06/26 Page 166 of 215 PageID #:19266
11/17/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

165

previous witness back on the stand when we resume.

   (Short break.)

        THE COURT:  We've got lieutenant Melean, right?

        THE WITNESS:  Melean.

        THE COURT:  My apologies.  You are still under oath.
Do you understand that?

        THE WITNESS:  Yes.

        THE COURT:  You can have a seat as can everybody
else.  Ms. Gorman, you can go ahead.

                          - - -

                ^ WITNAME, DIRECT EXAMINATION

BY MR. NOLAND:      Continued

BY MR. LOEVY:

Q.  Detective Melean, we started off with me asking you about
the 2006 database records.  Do you remember that?

A.  Yes.

Q.  Do you recall your testimony in the earlier proceeding in
which you said that those records from 2006 were lost?

A.  Yes, when I asked the database guy, he told me he could
not find them.

Q.  That all of the 2006 records were lost?

A.  I believe so, yes.

Q.  I'd like to to you about the Chicago Police Department
policies and practices for responding to a homicide subpoena?

A.  Yes.

11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

166

Q.  How would you go about ensuring that all documents pursuant to a subpoena for a homicide ^  got produced?

A.  For a some side calls?

Q.  Some side?

A.  The division would fill it out, send it back to the subpoena unit and send it to court.

Q.  The subpoena unit would send the request to the detectives?

A.  Correct.

Q.  To fulfill the subpoena?

A.  Yes.

Q.  Were there any checks and balances to make sure that everything was tendered?

A.  Not that I am aware of.  I didn't get too many complaints, no.

Q.  I'm sorry?

A.  Not that I am aware of.

Q.  If everything was tendered, people wouldn't know if they had everything?

A.  If somebody didn't have what they wanted, they would have contacted us and seen what was wrong with the subpoena, yes.

Q.  Why do you send the subpoenas to the detective division? Why doesn't the people working under you just go to the warehouse and get it themselves?

A.  It's been the policy and procedures since before I got

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01703 Document #: 283-36 Filed: 04/06/26 Page 168 of 215 PageID #:10968

***REALTIME UNEDITED TRANSCRIPT ONLY***

there.

Q. So you send the subpoenas to the detectives and they give you whatever they give you?

MR. MICHALIK: Objection, misstates the testimony.

THE COURT: It's a question. The objection is overruled.

THE WITNESS: Can you repeat that, please?

BY MS. GORMAN:

Q. So you would send a subpoena to the detective unit and then the detectives would send you whatever they felt like sending you; is that correct?

A. Not whatever they felt like sending me, whatever was in the subpoena.

Q. Do you know how they kept their files in the detective units?

A. No.

Q. Do you know if they have multiple files for homicide?

A. I am not part of the detective division. I don't handle that.

Q. Do you know if they pick and choose which documents are going to be tendered?

A. No, I don't know any of that.

Q. Do you know if the detective -- if the detective unit copies everything that they're supposed to file in response to a subpoena?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  Once again, I am not part of the detective division, so I don't know the procedure.

Q.  In other words, the Chicago Police Department's homicide subpoena system depended on the detectives to be honest and complete; isn't that correct?

A.  I believe it was every job to do their job to the best of their ability.

Q.  My question is about the homicide, the subpoena unit depended on the detectives to be complete and honest; isn't that correct?

A.  That's correct.

         MS. GORMAN:  I have nothing more.

         THE COURT:  Mr. Michalik.

                        - - -

              ^ WITNAME, CROSS-EXAMINATION

BY MR. MICHALIK:

Q.  Thank you, your Honor.  Good afternoon, lieutenant. Backup just a little bit.

         Could you tell us and the ladies and gentlemen of the jury when you first started with the Chicago Police Department?

A.  7/7/92.

Q.  Was that 1992?

A.  1992, sorry.

Q.  Eventually you became a sergeant as you told Ms. Gorman?

11/17/16 PM  ***REALTIME UNEDITED TRANSCRIPT ONLY***

169

04:05:14  A. Yes.

04:05:14  Q. In 1999?

04:05:16  Q. And you became a lieutenant?

04:05:17  A. Yes.

04:05:17  Q. And when did that take place?

04:05:20  A. I think it was October 2010.

04:05:21  Q. What is your current assignment as a lieutenant?

04:05:23  A. I am the tactical lieutenant for the 22nd district.

04:05:28  Q. 22nd district on the south side?

04:05:31  A. Yes, correct.

04:05:32  Q. Let's go back to 2006. At that time, I think you said you were .administrative sergeant of the records inquiry section is that accurate?

04:05:40  A. That's correct.

04:05:40  Q. Can you tell the ladies and gentlemen of the jury exactly what is the records inquiry section?

04:05:47  A. At that time, it was a section that was a multitude of functions, they had many various units, subpoena section, FOIA, administration, numerical, gun registration, records processing, data entry, and latent print examiners, there's many.

04:06:08  Q. And as the administrative sergeant, you were a supervisor overall of those different areas?

04:06:13  A. Yes, we had civilians who supervised all of them.

04:06:18  Q. Was the records inquiry section part of the records

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01727 Document #: 283-36 Filed: 04/06/26 Page 171 of 215 PageID #:19971

division?

A.  Yes.

Q.  And you said that the subpoena unit was part -- under that whole umbrella?

A.  That's correct.

Q.  Where was your office located in 2006?

A.  In 2006, my office was located on the first floor in the back of the unit.

Q.  And where was that?

A.  3510 South Michigan.

Q.  Is that police headquarters?

A.  Yes, it is.

Q.  As the administrative sergeant for the records inquiry section, what was your role with respect to the subpoena unit?

A.  With respect to the subpoena unit, we had a civilian supervisor, detective Martin who handled the day-to-day operations and my role just came if anything went wrong or she wasn't there, somebody had a complaint, it might be forwarded to my attention and then I would take care of it.

Q.  How long did you hold the position of administrative sergeant for records inquiry section?

A.  A little over five years.

Q.  During that time period, how many people worked in the subpoena unit?

A.  I'd say approximately eight.

Q.  Were they full-time employees?

A.  Yes, they were.

Q.  Did they work five days a week?

A.  Correct.

Q.  So do you have any idea how many subpoenas were served on the Chicago Police Department on a weekly basis in 2006?

A.  Not offhand, but it's many.

Q.  All right.  So you had eight individuals working five days a week, eight hours a day doing nothing but responding to subpoenas to the Chicago Police Department?

A.  That's correct.

Q.  Did you actually process any subpoenas yourself when you were the administrative sergeant?

A.  No, I did not.

Q.  You just oversaw the people who did that work?

A.  That's correct.

Q.  I think you said that sometimes there might be a problem and you would have to get involved?

A.  That is correct.

Q.  If there was a problem with a subpoena and somebody said I want to talk to a supervisor, you might have been one of those people?

A.  That's correct.

Q.  Now?

          MS. GORMAN:  Objection to time period.

11/17/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

172

THE COURT:  Do that with the next question.

BY MR. MICHALIK:

Q.  All right.  So you're talking about the time frame of 2005 to 2010 when you were the administrative sergeant?

A.  That's correct.

Q.  When the subpoena unit responded to a subpoena, would there be someone assigned to go through each and every page of whatever it was that was being produced in response to the subpoena?

A.  No, that would be the subpoena officer, yes, they would go through the subpoena for sure.

Q.  Would anyone go through whatever ^ was being produced and pull things out?

A.  No.

Q.  So whatever materials were being received by the subpoena unit, that's what would be forwarded to whoever it was that was requesting that?

A.  That's correct.

Q.  You talked a little bit to Ms. Gorman about how the subpoena unit would respond to a subpoena for a homicide file. Do you recall that testimony?

A.  Yes.

Q.  All right.  So let's start.  The subpoena comes in to the subpoena unit, correct?

A.  Correct.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. All right. What happens at that point if it's a homicide file?

A. A copy of the subpoena is sent directly to the detective division.

Q. Is the detective division part of the records division?

A. No.

Q. Okay. What if any role did the detective division play in responding to subpoenas involving homicide files?

A. They would send whatever they had back to the subpoena section and the subpoena section would take whatever they had and forward it out.

Q. So the detective division would contact whoever it was that they were looking for a homicide file and then send whatever they got to the subpoena unit?

A. Correct.

Q. Now, Ms. Gorman also asked you some questions about a contact that you had from an attorney ^ Jean ^ Gene Snyder. Do you recall those questions?

A. Yes.

Q. All right. And Ms. Snyder brought some type of a problem to your attention, true?

A. True.

Q. Did you respond to whatever it was that Ms. Snyder was requesting?

A. Yes, I did.

Q.  How did you know that?

A.  Because once she gave the fax ^  once I found out that I had the fax that had my name on it, although it was spelled incorrectly, it was my name and it was me, I was sure that the spoken was handled appropriately.

Q.  After that ^  contact with Ms. Snyder, did she ever get in touch with you again about any further problems she was having?

A.  No.

Q.  Did you ever learn from anyone in the subpoena unit that Ms. Snyder was continuing to have problems with whatever it was that she was requesting?

A.  No.

Q.  Going back to the process of responding to a subpoena for a homicide file, when that file would come in from the detective division, would it be the original file or it would be a copy of a file?

A.  A copy.

          MR. MICHALIK:  If I may have a moment, your Honor.

          THE COURT:  Sure.

          MR. MICHALIK:  No further questions.  Thank you.

          THE COURT:  Mr. Kulwin, anything?

          MR. KULWIN:  No, Judge.

          THE COURT:  Redirect, Ms. Gorman.

          MR. LOEVY:  Yes, very briefly.


               ***REALTIME UNEDITED TRANSCRIPT ONLY***

175

                              - - -

                ^ WITNAME, REDIRECT EXAMINATION

BY MR. NOLAND:

BY MS. GORMAN:

Q.  Lieutenant Melean, Ms. Snyder was complaining because she didn't get all of the files from the Fields, from the Hickman Smith murder?

A.  I believe there was a problem with one of the case reports.  I don't recall which file it was, but, yes.

Q.  She never got this file, did she?

A.  I have no idea.

Q.  You have no idea, don't you.  Because the records people would send the request to the homicide -- to the detectives and they would send whatever they wanted back to her isn't that correct?

          MR. MICHALIK:  Object to the form.

BY MR. LOEVY:

Q.  And that's what you would produce?

          THE COURT:  Rephrase the question.

BY MR. LOEVY:

Q.  The records?

          THE COURT:  You got two questions in there.

BY MR. LOEVY:

Q.  The records people would send the request to the homicide -- to the detective division isn't that correct?


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  Correct.

Q.  And then the detectives would send something back to you?

A.  Yes.

Q.  And that's what you would produce isn't that correct?

A.  That's correct.

Q.  And you understand that Ms. Snyder never got this file; isn't that correct?

A.  I did not know she never got the file.

MS. GORMAN:  Thank you.  I am done.

THE COURT:  Mr. Michalik.

MR. MICHALIK:  No.

THE COURT:  Do the jurors have any questions?

(Sidebar.

THE COURT:  The question is who filled the request at the detective division, is it the detective or anybody else?  I'll ask him if he knows.  I'll lay the foundation.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  So the question is do you know -- at the detective division, do you know who type of personnel fills the request that is sent to the detective or.

THE WITNESS:  No, I believe they had their own person in place.

THE COURT:  But you don't know exactly who that would be.

***REALTIME UNEDITED TRANSCRIPT ONLY***

THE WITNESS:  I don't know exactly what it is right now.

THE COURT:  Well, back at the time in question here when this particular subpoena came in, do you know whether the person on the other end filling the request would have been a detective or somebody other than a detective?

THE WITNESS:  I believe at that time it was an officer.

THE COURT:  An officer.  Follow-up questions?

MR. LOEVY:  No, your Honor.

MR. MICHALIK:  No.

THE COURT:  Thanks.  You are excused.

Next witness, please.

MR. LOEVY:  Your Honor, the next witness is going to be a reader and perhaps the Court could explain this is trial testimony from 1986 of a witness.  Carlos Willis.

THE COURT:  What's going to happen next is that some of the testimony from the 1986 criminal trial is going to be read to you and it's the testimony of Carlos.

MR. LOEVY:  Carlos Willis.

THE COURT:  Carlos Willis and so the gentleman at the podium is going to ask the questions that the lawyer asked in the 19 '86 trial and the gentleman on the witness stand is going to read the answers that Mr. Willis gave at the trial, so I am not going to swear them in because all they are doing

is reading testimony.  Can you identify what you are

/#12K3W4R-7 my name is same h-e-p-p-e-l-l, my name is /KAOEUL

b-u-l-l-o-c-k, he is the witness.

   THE COURT:  Go ahead.

         - - -

    CARLOS WILLIS, DIRECT EXAMINATION

BY MR. HEPPELL:  (Reading:)

Q.  Sir, I want you to state your name and spell your last name for the record?

A.  Carlos Willis, w-i-l-l-i-s.

Q.  Where do you live?

A.  3846, south Langley.

Q.  That's in the City of Chicago?

A.  Yes.

Q.  How old are you?

A.  16.

Q.  Are you in school?

A.  Yes.

Q.  What school?

A.  When Dell Phillips.

Q.  What grade are you in?

A.  11th.

Q.  Did you go out for any sports?

A.  Yes.

Q.  What sports?

A.  Baseball.

Q.  Who did you live with on Langley?

A.  My grandmother.

Q.  How long have you lived at that address?

A.  I have been living there all my life.

Q.  Calling your attention to April 28, 1984, did you have cakes to be near the baseball field located across from 706 East 39th Street?

A.  Yes.

Q.  What were you doing there?

A.  We was getting ready to play baseball.

Q.  Who else was there with you that you remember?

A.  Randy Langston.

Q.  Anybody else?

A.  I think his little sister Marcia.

Q.  Where were you standing at that time, across the street?

A.  Standing right by the personal, by the mailbox.

Q.  Now, did you know a person by the name of Fuddy?

A.  Yes.

Q.  Do you know his name?

A.  No.

Q.  How long had you known Fuddy?

A.  About two years.

Q.  Do you know a person by the name of Tom?

A.  No.

Q. Did you see Fuddy that morning?

A. Earlier in the day.

Q. Where was he standing?

A. Under the building.

Q. While you were standing at the baseball field, did you hear anything unusual?

A. Yes.

Q. What did you hear?

A. I heard gunshots.

Q. How many shots did you hear?

A. About six.

Q. Which direction did you go after you heard the shots? What did you do after you heard the shots?

A. I ran south.

Q. Would that be south along what street?

A. Langley, going towards Oakwood.

Q. Where was Randy Langston at that time?

A. I don't know.

Q. After you heard shots, did you have occasion to look back towards the building?

A. Yes.

Q. When you looked back towards the building, what did you see?

A. I seen one man going under the building.

Q. When you say under the building, where was he going?

A.  Through the breezeway.

Q.  Could you see that man's face?

A.  No.

Q.  Why not?

A.  Because he had something on, a ski mask.

Q.  Where was the ski mask?

A.  It was on his head.

Q.  Now, after the shots, did you return back to the building sometime later that day?

A.  Yes.

Q.  Did you speak with police officers either that day or the next day?

A.  The next morning.

Q.  Where did the police officers come to?

A.  To my house.

Q.  And did you tell them what you have just told to the judge?

A.  Yes.

Q.  Now, calling your attention to about a year later, May 1985, did the police once again come to your house?

A.  Yes.

Q.  Do you know the name of the officer that came to your house on that day?

A.  Yes.  His name was O'Callaghan.

Q.  Now, what, if anything, did you do when Detective

Q.  O'Callaghan came to your house that day in May of 1985?

A.  Well, he asked us to go down to the police station.

Q.  He asked you to go to the police station?

A.  Yes.

Q.  Did you go to the police station?

A.  Yes.

Q.  Who else went with you?

A.  My grandmother.

Q.  What's your grandmother's name?

A.  Evelyn Custer.

Q.  When you went to that police station, what did you do?

A.  He showed up, he showed us a lineup of men.

Q.  And were you able to identify anybody in that lineup?

A.  No.

Q.  Now, I would like to show you what's been previously marked as Defense Exhibit number 6.  Do you recognize this photograph, what's shown in this photograph?

A.  Yes.

Q.  What is that?

A.  That's the men in the lineup.

Q.  Is that the same lineup that you saw?

A.  Yes.

Q.  After you indicated that you couldn't identify anybody, what did Detective O'Callaghan say to you?

A.  He kept telling me to look at this one man.

11/17/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

183

Q. Which man was that?

A. The one on the left end.

Q. Would you please place an X over that man's head. May the record reflect the witness has placed an X over the defendant, Earl Hawkins.

How many times did he ask you to look at that one man?

A. About five or six.

Q. Was your grandmother present at that time?

A. Yes.

Q. What else did he say to you about identifying that man?

A. I kept asking me to look at him to make sure that I know him. I told him I didn't see him and I didn't know who did it, so I couldn't identify him.

Q. Was there any conversation about section 8 housing?

A. Yes.

Q. Who was that conversation with?

A. With my grandmother and O'Callaghan.

Q. You were in the same room when that was going on?

A. Yes, in my house and at the police station.

Q. Now, in April of 1984, you knew Randy Langston, right?

A. Yes.

Q. Was he a member of any gang?

A. Not that I know of.

Q. Do you know anybody by the name of Gerald Morris?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  No.

Q.  How about Richard Buckles?

A.  Yes.

Q.  Is Richard Buckles a member of a gang?

A.  I don't think so.

Q.  I would like to show you what's been marked as Defense Exhibit number 1.  Do you recognize what's shown in that photograph?

A.  Yes.

Q.  What's shown in that photograph?

A.  This shows the baseball park where we were playing and the building.

Q.  Do you see the direction in which you ran after you heard the shots?

A.  Yes.

        MR. NOLAND:  This would be the cross-examination by Mr. R-u-e-k-k-e-r-it, the assistant state's attorney.

BY MR. NOLAND:

Q.  Carlos, where you live is known as the Ida B. Wells housing project, right?

A.  Yes.

Q.  You're right across Langstonly from that 706 building, correct?

A.  Correct.

Q.  Now, you say that Fuddy was a member of the Goon Squad?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  Yes.

Q.  You know that because you were a member of the Goon Squad?

A.  No.

Q.  You're familiar with the El Rukns, aren't you?

A.  Yes.

Q.  You know where the El Rukn temple is, don't you?

A.  Yes.

Q.  In fact, if you stand out in front of your building, you can see the El Rukn temple, can't you?

A.  No.

Q.  If you walk to the corner of Langley and 39th Street, you could see it, couldn't you?

A.  Yes.

Q.  You could see it from the baseball field, right?

A.  Yes.

Q.  You were living in those Ida B. Wells project buildings when this murder happened, right?

A.  Yes.

Q.  How did you know Fuddy was in the Goon Squad?

A.  Because I know you still live in that same building today, right ^  .

A.  Yes.

Q.  You can still see the El Rukn temple if you walk to the corner of Langley and 39th Street, right?

A.  Yes.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:20-cv-01727 Document #: 283-36 Filed: 04/06/26 Page 187 of 215 PageID #:19283

Q.  How far would you say your building is from the corner of 39th and Langley?

A.  It's about half a block.

Q.  Now, you remember talking to the police after this incident, don't you?

A.  Yes.

Q.  You told the police you saw two men out there shooting, right?

A.  No.

Q.  Do you remember talking to Robert Evans and detective hood?

A.  No, just O'Callaghan.

Q.  You don't remember talking to detectives hood and Evans?

A.  It was somebody with them, but I do know who they was. They didn't tell me their names.

Q.  In April of '84, right after the shooting, did you talk to some detectives?

A.  The next morning.

Q.  You told them what you had seen, didn't you?

A.  Yes.

Q.  Do you remember telling them you saw two guys out there shooting?

A.  No.

Q.  Do you remember telling them after the shooting you saw both men run back the way they came through the breezeway?

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

187

A. No.

Q. Do you remember telling them after a short time, you heard a car door slam and the squealing of tires?

A. No.

Q. Do you remember telling them after the shooting you stood together for several minutes with Randy Langston?

A. No.

Q. You do remember going to look at a lineup, though, don't you?

A. Yes.

Q. That's after you talked to O'Callaghan, right?

A. Right.

Q. By the way, Carlos, have you ever been in that El Rukn building at 39th and Drexel?

A. No.

Q. You don't spin records for the El Rukns on Friday nights?

A. No.

Q. Do you remember talking to O'Callaghan in April of this year?

A. No.

Q. At your apartment?

A. No.

Q. With your grandmother present?

A. No.

Q. And sergeant Murphy present?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  No.

Q.  Do you remember that conversation?

A.  No.

Q.  You don't telling them you pun records for the El Rukns?

A.  No.

Q.  Who's the first person that contacted you about this case?

A.  O'Callaghan is the one that kept coming over to my house.

Q.  How about Wednesday of last week?

A.  I wasn't home.

Q.  Didn't you get a subpoena?

A.  My grandmother did.

Q.  You didn't?  I'm sorry I didn't hear the answer?

A.  No.  My grandmother got it.

        MR. NOLAND:  Thank you.

        THE COURT:  Now you are doing the redirect examination from the trial?  /#12K3W4R-6 correct.

                        - - -

        CARLOS WILLIS, REDIRECT EXAMINATION

BY MR. NOLAND: (Reading)

Q.  This man drove you to court and home from court; is that right?

A.  Yes.

Q.  That was all that he did?

A.  Right.

Q.  He never interviewed you about the case?

A.  No.

Q.  You first were interviewed by Mr. Smeeton and myself when you were brought to court; is that right?

A.  Yes.

Q.  Prior to that you had been interviewed by the police?

A.  Right.

Q.  Mr. O'Callaghan?

A.  O'Callaghan.

Q.  And then the day after the shooting, you were interviewed by the police also, right?

A.  Yes.  ^  end of deposition.

THE COURT:  Is that it?

MR. LOEVY:  That's it, your Honor.

THE COURT:  Okay.  You can step down.

Next witness.

MR. LOEVY:  Your Honor, at this time plaintiff calls Mr. O'Callaghan.

(Witness sworn.)

THE COURT:  Have a seat.

- - -

DAVID O'CALLAGHAN, DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Sir, if you would state your name for the record, please.

A.  David O'Callaghan, that's O'Callaghan.

Q.  And you are a former Chicago police officer, correct?

A.   Yes, sir.

Q.   All right.  I want to shoot your attention forward to err
I can Langston.  You did investigate the Smith/Hickman
homicide, correct?

A.   Yes, sir, I did.

Q.   And in the process you developed some eyewitnesss against
Mr. Fields and Mr. Hawkins, correct?

A.   That would be correct.

Q.   And one of the eyewitnesss you developed was Eric
Langston, correct?

A.   Yes, he was among them.

Q.   That was the man who was in court an hour ago?

A.   Yes, sir.

Q.   Did you remember him?

A.   Yes, I remembered him.

Q.   All right.  Do you remember his relationship to Randy
Langston?

A.   I think they were Eric and Randy, they were brothers.
Correct.  I'm sorry.  You asked me his relationship to Randy,
brothers.

Q.   Thank you.

     Do you remember how old Eric was at the time?

A.   I believe he was -- I know he said 10 or 11, but I believe
he was about 15.

Q.   14 sound right?

A. It's right in that area, yes.

Q. All right. And do you remember where Eric Langston was at the time of the shootings?

A. Eric Langston?

Q. Yes?

A. I believe he was in his apartment.

Q. He was indoors at the time of the shooting, correct?

A. I believe that's what he just said, yes.

Q. Is that how you remembered it?

A. I'd have to look at all my reports, but, yeah, probably, it would say that.

Q. You got an eyewitnesss ID from a guy who was inside, didn't you?

A. Yes.

Q. And his apartment in fact was in the back of the building, wasn't it?

A. Back and the side, yes.

Q. Do you remember where his apartment was, sir?

A. Yes.

Q. Now, what description did Eric Langston give you of the two men he saw shooting the victims prior to you showing him photos in a lineup?

A. I didn't take a full description that day, just indicated that he would be able to identify them.

Q. I didn't ask you if you took a full description. I said

11/17/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

192

what description was Eric Langston able to provide you of the shooters before you showed him the pictures of your suspects?

A.  I didn't take a description.

Q.  So, in other words, he was unable to describe anything, wasn't he?

MR. KULWIN:  Objection, argumentative, Judge.

THE COURT:  Overruled.

THE WITNESS:  I didn't ask key questions because I knew I was going to bring him to a different location later, so the answer is, no, I didn't ask all those questions.

MR. LOEVY:  Your Honor, I'd ask that that be stricken.

THE COURT:  Stricken as nonresponsive.  Put the question again if you'd like.

BY MR. LOEVY:

Q.  If Eric was able to tell you before you showed him the picture if the perpetrator was white or black?

A.  I didn't ask at that time.

Q.  Was Eric able to tell you if the person was tall or short?

A.  I didn't ask at that time.

Q.  How about if he had facial hair or a beard?

A.  I did not ask at that time.

Q.  Was it a real good idea to show him Mr. Fields' picture before you asked him for a description?

A.  It was a perfect idea.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  Where are your notes, sir, of what Eric told you before you showed him the photo and the lineup?

A.  I didn't take notes of those interviews on that day for my own reasons.

Q.  The answer is there are no notes?

A.  There are no notes from that day, you are correct.

Q.  You are going to have to go off your memory, right, you are going off your memory of what he told you, you don't have notes?

A.  As I told you, I didn't ask him the questions.  My memory is I spoke to him, made arrangements later.

Q.  I think we are talking past each other.  I asked you you're going off your memory, right?

        MR. KULWIN:  I am going to object.  The question is argumentative.

        THE COURT:  No, it's not.  The objection is overruled.  ^ .

        THE WITNESS:  I'm going off my police reports that I submitted in the following dates.

BY MR. LOEVY:

Q.  And you know from your police reports that there is no description, right?

A.  From my police reports?

Q.  Yes.

A.  From -- okay.  The answer is I knew descriptions and I did

Case: 1:23-cv-01737 Document #: 283-36 Filed: 04/06/26 Page 195 of 215 PageID #:19995

not take full statements that day.

Q. All right. I will -- you didn't take any statement that day, did you?

A. On May 14th and 15?

Q. Correct.

A. No, I did not.

Q. All right. All I'm saying, sir, is do you have an independent recollection of talking to Eric Langston all these years later?

A. I do.

Q. So as you sit here today, you can remember the conversation with Eric?

A. Pretty good, as I told you, it wasn't much of a conversation. I remember speaking to the two --

Q. It's more of a yes, no, question. Do you remember it or you don't?

A. I remember meeting the Langston boys.

Q. All right. For example, you had a chance to review your reports, right?

A. I have reviewed them, yes.

Q. And you know what they say, right?

A. Basically.

Q. So I guess with that clarity, are you saying you know what happened because you read about it or are you saying as you sit there on the witness stand, you can remember the

Case: 1:23-cv-01733 Document #: 283-36 Filed: 04/06/26 Page 196 of 215 PageID #:19996

conversation, you remember the questions you asked him, which is it?

A.   The way your question is, the answer would be I didn't ask him the loaded questions, so I can remember not asking him the questions.

Q.   Do you think -- so you made an intentional decision prior to showing Nate's photograph, you said to yourself, I'm not going to ask him to tell me what the guy looked like, that was a decision you made?

MR. KULWIN:  Judge, I am going to object to the question implying that he only showed him Nate's photograph.

THE COURT:  Overruled.

MR. LOEVY:  Objection to argumentative.

THE COURT:  Overruled.  I don't want a speaking objection.  Just give me a short version.

The objection is overruled.

BY MR. LOEVY:

Q.   It sounds like you made an intentional decision not to take a statement before you showed the pictures?

A.   I made an intentionality decision not to take statements or show photos on the dates of May 14th and 15th, yes.

Q.   Prior to showing Nate in a lineup, you made an intentional decision not to write what the kid had told you?

A.   That's incorrect, sir.  That's incorrect.

Q.   You didn't write down what the kid told you as far as a

description prior to Nate's lineup, right?

A. Your reference is incorrect.

Q. Okay. What description did he provide and where is it written?

MR. KULWIN: Judge, I am going to object as asked and answered.

THE COURT: Overruled.

THE WITNESS: Descriptions were in the initial reports. I didn't repeat a summation of everybody's reports that I had. I didn't go into detail as to description. He already gave me a photo ID of Nate.

BY MR. LOEVY:

Q. All right. Let's move forward. It's a good idea when you are interviewing people like the Langstons not to have people together?

A. Yes.

Q. You should separate them?

A. Yes.

Q. Now, when you interviewed Randy Langston's little brother Eric and Gerald Morris were also present for that interview isn't that true, sir?

A. That's another incorrect statement on your part.

Q. Do you remember giving testimony at the trial in 1986 and being asked these questions and giving these answers on page 272 and 273 at line 20: Is?

Case: 1:23-cv-01737 Document #: 283-36 Filed: 04/06/26 Page 198 of 215 PageID #:19998

197

"QUESTION:  Now when you interviewed Randy Langston on the 16th, that was at the state's attorney's office?  And your

"ANSWER:  That's correct

"QUESTION:  And was Gerald Morris also present?

"ANSWER:  He was up there, yes

"QUESTION:  Was Eric Langston also present?

"ANSWER:  Yes, sir."

The question is did you give those questions under oath, sir?

A.  I'll just answer as you read that, the answer is yes, the inference is wrong.

Q.  Okay.  But you did give those answers under oath?

A.  Yes, as you read them correctly, yes.

Q.  Now, your report records -- showing you Plaintiff's Exhibit 86, page 28.  This is a report you signed and authored, correct?

A.  Yes.

Q.  Dated the 17th of June 1985?

A.  That's correct.

Q.  Now, Eric Langston is never -- no police officer written down any description by Eric Langston until after the date Nate is arrested on June 17th, 85, that is a true statement, right?

A.  I don't know that.  I'd have to see every single report again.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. Would it surprise you that Eric Langston had never given any description prior to June? Yes or no, sir?

A. No, I don't know. I just don't know. I'm sorry.

Q. Isn't it true, sir, that of every single witness who was outside that day, not a single one of them was able to provide a single descriptor about what those men looked like, that's true, isn't it?

A. On the day of the shooting?

Q. Yes. When the police came by the day of the shooting, not one of the six witnesses who came forward and gave their names and addresses was able to give a single description, that's true, isn't it?

A. That's absolutely false.

Q. Tell me which witness described the victims that day?

A. First of all, I don't have the scene. I didn't get involved in this case until 1985.

Q. I just asked -- you said it was false?

A. The answer is false because if you look at the supplementary reports that were generated on that day, descriptions were taken by other detectives called the scene detectives, there might be a half dozen of them on that day, and police officers that did provide descriptions at least two of the offenders.

Q. We will get back to that because it's getting late in the day. Your understanding is there was eyewitnesss at the scene

Q. who provided descriptions before they were shown photos?

A. A year before, more than a year before, yes.

Q. All right. Let's talk about Eric. He was indoors, correct? We talked about that. He gave you an identification of the shooter, right?

A. Shooters and passenger of the car, if I remember correctly, but I'd have to review all my reports.

Q. Showing the report I showed you previously, Eric Langston viewed the lineup and positive?

MR. KULWIN: Judge, can I get a page?

MR. LOEVY: This is the following page, 8629.

MR. KULWIN: 86?

THE COURT: Page 29.

BY MR. LOEVY:

Q. Eric Langston vowed the lineup and positively identified the subject Nathson Fields as one of the subjects who shot the victim. Do you see that?

A. Yes, I wrote that.

Q. And Eric would say at the time of the shooting at an apartment behind the building; is that correct?

A. That's correct.

Q. Did you help Eric Langston identify the shooter?

A. In so many words, absolutely not.

Q. Eric identified other suspects for you, didn't he?

A. I believe so.

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

200

Q.  He identified Mr. Hawkins and Mr. Carter, right?

A.  That's correct.

Q.  So he was three for three on the suspects, right?

A.  He was three out of four, nobody ever identified Hank Andrews, none of them.

Q.  We will talk about that tomorrow, sir.  Who did Eric identify as the short?

A.  He identified Fields and Hawkins, I believe.

Q.  All right.  So Eric misidentified Hawkins, right?  That's true, isn't it?

        MR. KULWIN:  Judge, can he answer the question?

        THE WITNESS:  I don't believe that's totally truism.

THE ATTORNEY:

Q.  All right.  Eric as part of your lineup procedure said he was the shooter?

A.  He named him as one of the shooters.

Q.  And you later in the trial heard Hawkins say I wasn't one of the shooters, right?

A.  I was excluded, no, I don't, I can't answer that question.

Q.  All right.  What is your understanding as you sit here today of who the shooters were?

A.  My understanding is that Hawkins was out front as the look out.

Q.  I asked the shooter?

        MR. KULWIN:  Judge.


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01723 Document #: 283-36 Filed: 04/06/26 Page 202 of 215 PageID #:20002

201

THE WITNESS:  My answer is that as you sit here today, Carter and Mr. Fields were the shooters.

BY MR. LOEVY:

Q.  Can we agree that you procured a misidentification as Hawkins as the shooter from Eric Langston?

A.  We can agree that I showed a photo array and followed the leads and the identifications.

Q.  All right.  Eric was indoor and he identified a shooter, correct?

A.  Shooters, yes.

Q.  And he also identified a get away car driver, right?

A.  No, you're wrong on that issue totally.

Q.  He did not identify George Carter as the guy in the car?

A.  He identified George Carter as the passenger of the car.

Q.  All right.

A.  And getting out of the car, he let the other two in the back seat, nobody was able to identify the driver of that car.

Q.  All right.  You used the same 14 year old eyewitness to both identify the shooter in the front of the building and the get away passenger in the back of the building, right, same boy?

A.  I think -- I think they identified him in the back, so as the shooters is running away from the scene.

Q.  The question was the same boy identified the shooter who shot the -- the shooting that happened in the front and the

driver that was parked in the back, right, the same boy?

A.  I think you are misstating.  George Carter was not identified by them as a shooter that day.

Q.  No, George was identified as someone in the car, right?

A.  Someone was -- he became a front seat passenger, yes.

Q.  And the car was behind the building, right?

A.  To my information, yes.

Q.  So it's pretty impossible for somebody to have both identified the shooter who is in the front?

        MR. KULWIN:  Objection, argumentative, Judge.

        MR. LOEVY:  I will withdraw it, your Honor.

BY MR. LOEVY:

Q.  Now, Eric would not come to court and give that identification, would he, at the criminal trial, he didn't want to do it?

A.  George Carter?

Q.  No?

A.  Which Carter are we talk about?

Q.  When, said you got to come to court, you got to identify the men that you saw, right?

A.  I did not.

Q.  Did you speak to Eric Langston prior to the trial?

A.  No, that would be handled by the state's attorney's.

Q.  So why is it the detectives wouldn't talk to witnesses before trials?

11/17/16 PM             ***REALTIME UNEDITED TRANSCRIPT ONLY***

203

A.  I am not going to say never ever.

Q.  You talked to quite a few of the witnesses before the trials, didn't you?

A.  I may have.

Q.  All right.  Now, Eric in any event did not want to testify at trial, correct?

A.  I don't think any of them were too happy about testifying in that trial.

Q.  Yeah.  Would you be happy to testify at a trial about somebody you didn't see?

        MR. KULWIN:  Objection, your Honor.  Argumentative.

        THE COURT:  Sustained.  The objection is sustained.

        MR. LOEVY:  We ask that the answer be stricken too, your Honor.

        THE WITNESS:  I didn't answer.

        MR. LOEVY:  When he said anybody would be unhappy.

        THE WITNESS:  I didn't say that.

        MR. LOEVY:  I will move on.

        THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Now, when Eric didn't come to trial, you testified at trial, correct?

        MR. KULWIN:  Objection.

        THE COURT:  You have to rephrase the question, please.

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/17/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

204

BY MR. LOEVY:

Q.  You testified at Nate's trial, didn't you?

A.  I did, both of them.

Q.  And you testified to the Court that you had procured an identification from Eric Langston of Nathson Fields, didn't you?

A.  Both times, yes.

Q.  All right.  Take can a look at your testimony from June 18th, 1986, this is page 268, line 8:.  Isn't it true you gave the following testimony:

          Who viewed the lineup, if you recall?

          "ANSWER:  The same three parties, Randy Langston and Gerald Morris and Eric Langston.

          "QUESTION:  Did they follow the same procedure in viewing the lineup as you used when the lineup was conducted on Earl Hawkins?

          "ANSWER:  Yes

          "QUESTION:  And by that I mean they viewed it separately?

          "ANSWER:  They did

          "QUESTION:  Did you say anything to these individuals prior to them viewing the lineup?

          "ANSWER:  I just told them that they are not to speak to each other and moved them to separate rooms

          "QUESTION:  Did any of the three make an identification

                 ***REALTIME UNEDITED TRANSCRIPT ONLY***

of Nathson Fields at that time?

"ANSWER: And you said they did and the question was who did they identify?

"ANSWER: They identified Mr. Fields as one of the shooters

"QUESTION: All of them? Your answer was yes, they did, correct

A. That's correct.

Q. At Mr. Fields' capital murder trial, you took the stand and put your credibility behind that identification, didn't you?

A. As I do in all cases.

MR. KULWIN: Objection, Judge, argumentative.

THE COURT: Overruled. He said as I do in all cases. The answer can stand.

BY MR. LOEVY:

Q. And you asked the judge to accept the premise that Eric Langston had legitimately identified Nate Fields, didn't you?

A. Yes, because he did.

MR. LOEVY: I have no further questions, I guess, your Honor. I am not done with the witness.

THE COURT: Are you changing topics at this point?

MR. LOEVY: Yes.

THE COURT: We are pretty close to 4:45. We are going to stop for the day. Remember tomorrow slightly earlier

***REALTIME UNEDITED TRANSCRIPT ONLY***

start time, 9:00 o'clock.  Don't discuss the case.  (The jury leaves the courtroom.)

THE COURT:  Okay.  Since you're being questioned by the other side's lawyer, you cannot discuss your testimony with anyone.  Do you understand?

THE WITNESS:  I remember all those rules, yes, sir.

THE COURT:  Anything anybody needs to take up?

MR. LOEVY:  Something important from plaintiff, your Honor.

MR. KULWIN:  I'll yield.

MR. LOEVY:  All right.  Here is the issue, your Honor.

THE COURT:  You people don't have to be standing up unless you really desperately want to.

MR. LOEVY:  We received notification today that the federal government has filed a motion to get a sentence reduction for Derrick Kees.  I haven't yet read the motion.

THE COURT:  Okay.

MR. LOEVY:  We are not asking your Honor to do anything right now.  We haven't read it.  I would like to point out that this is a civil case, this is a witness in a civil case getting a benefit to testify.  In my view that is no different than if we had given Derrick Kees $10,000 to testify to our story.  This is not a plea bargain in context.  He is getting a sentence break.

11/17/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

207

THE COURT:  Okay.

MR. LOEVY:  To testify.

THE COURT:  What are you asking?

MR. LOEVY:  We are going to be asking you to bar him.

THE COURT:  I've dealt with that motion I think three or four times in this case.

MR. LOEVY:  Well.

THE COURT:  Maybe most of them before you were in it.

MR. LOEVY:  The only difference is before they could say it was in connection with the certificate of innocence proceeding and the State of Illinois was involved, now this is a civil matter.

THE COURT:  Whatever the arguments were made, I believe that the basis on which I denied the motion every time it's been presented to me and I think -- I've written a lot of stuff in this case.  I think that one of these was in writing, but I am not a hundred percent positive.  I don't think that's an appropriate remedy.  It's a matter to take up on cross-examination.

MR. LOEVY:  All right.  Then, your Honor, what we would ask is a complete and total and full disclosure of, you know, how is it that the federal government negotiated a plea agreement for Derrick Kees in a case that the federal government is not a party to the undisputed and sole benefit of these parties.

                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 283-36 Filed: 04/06/16 Page 209 of 215 PageID #:20400

THE COURT:  Do we know what the motion says?

MR. LOEVY:  I know the title is the motion to reduce sentence.

THE COURT:  All right.  Hang on a second.  Let me see if I can pull it up, just a second.

MR. KULWIN:  Judge.

THE COURT:  Let me see if I can pull it up here.  Just a second.

MR. KULWIN:  Sure.

THE COURT:  K-e-e-s?

MR. ART:  Do you want the case number, your Honor?

THE COURT:  No, it's easier to pull it up by his name.  Derrick do we think?

MR. ART:  That's right.

MR. KULWIN:  K-e-e-s-.

THE COURT:  I've got it.  I am going to assume it's at the end.  It's a relatively safe assumption.

Okay.  It's docket number 5867.  Let me take a look at it.  Well, just to be clear about it, the motion specifically says that the sentence reduction is being granted because of his anticipated testimony in this trial.  The government anticipates -- I am reading from page 2.

The government anticipates that Kees will soon testify again in a Section 1980 trial in which El Rukn gang member Nathson Fields was convicted of murder in 1986 alleges

that he was framed by law enforcement.  The trial before Judge Kennelly began on Monday, November 13th, 2016.

Kees has agreed to provide truthful testimony in that trial to show that Nathson Fields was not framed and in fact participated in the murder.  Because of this additional act of substantial assistance did not become useful to the government until long after his initial sentencing and because its usefulness could not have reasonably been anticipated by Kees through this motion, the government seeks a reduction in sentence from Kees pursuant to Rule 35 asking to reduce it, his federal sentence, from whatever it was before to 12 years, so that he will be eligible for release in approximately November 2021, the equivalent of his one-third federal parole date.

You can read it yourself.  It's about -- it's a pretty long motion actually.  It goes through a lot of history.  I'm guessing it's maybe in front of a judge who is different from the one who sentenced him originally.  It's about a 19-page motion with about 30 pages of exhibits.

MR. LOEVY:  Your Honor, we do intend to file something, we hope you will at least hear what we have to say.

THE COURT:  File what you are going to file.  Do we know -- are you calling him?

MR. LOEVY:  We would call him if you don't bar him.

THE COURT:  If I don't bar him, you will call him.

***REALTIME UNEDITED TRANSCRIPT ONLY***

MR. LOEVY:  None of us wants a situation where we find out later about deals or understandings or agreements.  I think we can -- we won't do it on the spot but to fully disclose every communication between this table and the federal government and, you know, how -- well, you get the idea.

THE COURT:  So, look, okay.  Does anybody on the other side want to talk about this at all?  So the thing that I think that I have on the table is a -- is a request for discovery, I guess is what I would call it, request for discovery of any communications between any person or associated with the defense team and federal government regarding Kees.

MR. LOEVY:  Yes, at a minimum.

THE COURT:  There you go.  Does anybody have an objection to me telling you to respond to that kind of request in fairly short order?

MR. KULWIN:  Well, I guess before I say anything, Judge, I would say that Mr. Walsh and.

THE COURT:  Who is Mr. Walsh.

MR. KULWIN:  Tom Walsh from the civil division and Mr. Kuhn sent an email to all parties some time ago, a couple weeks ago, and said that all benefits that were given, every single benefit that was given to Mr. Kees that was going to be given -- that had been or will be given prior to his testimony

will be disclosed by the federal government.  They'll show them everything that there is.  So I think that that cuts to the heart of they can cross-examine them all about it.

THE COURT:  Like I say, I have given some comments about the request to bar.  I understand I'm going to get a motion.  That's not what I'm asking right now.

MR. KULWIN:  You want to know all.

THE COURT:  Would you like me to repeat myself.

MR. KULWIN:  No, I don't have a problem with any of my professional communications.

THE COURT:  What does that mean?

THE WITNESS:

MR. KULWIN:  Well, I have been friends with Jim Kuhn for a long time.  About his health, his kids.

THE COURT:  Anything you all want to say, Mr. Noland or Mr. Burns.

MR. NOLAND:  We'd like to take a look at the motion.

THE COURT:  What I'm entertaining right now is an oral motion by Mr. Loevy asking to serve a discovery request by letter, I assume, he is asking for any communications between anybody associated with the defense.  You will word it however you want.  And anybody associated with the federal government related to Mr. Kees.

MR. NOLAND:  I don't think we have any communication.  We sent a letter months ago asking for --

Case: 1:23-cv-01737 Document #: 283-36 Filed: 04/06/26 Page 213 of 215 PageID #:20013

212

THE COURT:  You can serve that request.  And it's answerable within 24 hours after you serve it.

MR. LOEVY:  Thank you, your Honor.  Owe we object.

THE COURT:  As far as the rest of it is concerned, you will file whatever motion you are going to file when you file it and I will deal with it.

MR. LOEVY:  Thank you.

THE COURT:  I will ask people if they want to respond to it.

MR. KULWIN:  I have something unrelated.  It goes to Mr. O'Callaghan's testimony.  It goes to the whole motion in limine idea, Judge.

THE COURT:  The whole motion in limine idea?

MR. KULWIN:  The motion in limine.  This is how I understand, Mr. Noland correct me if I'm wrong because I read the transcripts a lot of times.  At the second and -- the second trial, I think the ruling was was that the way the malicious prosecution claim was structured, this came up before --

THE COURT:  I am just going to tell you that if you're going to talk to me about a ruling you made, you need to do me the favor of showing it to me, particularly if it's something that's made in the course of the transcript.  If it's a written ruling, I can pull it up very easily.  If it's a transcript, I need to see it.

MR. KULWIN:  We will need to get it to you early.  It really is -- the summary of it is and we will get that to you tomorrow before court, the summary is that my understanding is that the lawyers Sexton and Hogan can talk about the benefits -- can talk the information the informants gave, the El Rukn informants, but Murphy, Brannigan and O'Callaghan couldn't testify what they knew.  It had to come in through Hogan and Sexton.

At the damages trial, though, you did allow Mr. O'Callaghan to testify to show no malice that between 86 and 09 when he was prosecuted again, he knew about the informants and now we're in a combined proceeding and I'm a little -- that's why Mr. Noland and I the other day, he was saying you can't do this and I was saying I intended to and you said you better not do anything in violation.  We will get you the orders.   That's my recollection.

THE COURT:  I can't comment one way or the other until I know -- like I say, do me the favor of showing me what I said.

MR. LOEVY:  If it's a motion to reconsider.

THE COURT:  I don't know if it's a motion to reconsider.  The way it's being referred to is it's not a motion to reconsider.  I don't know one way or the other and I am done talking about it.

What else?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 283-36 Filed: 04/06/26 Page 215 of 215 PageID #:20905

MR. LOEVY:  Nothing from plaintiff.

THE COURT:  9:00 o'clock, ready to go.  Thanks.