# Exhibit 37

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 2 of 164 PageID #:29017
Case: 1:10-cv-01168 Document #: 485-16 Filed: 02/24/17 Page 2 of 164 PageID #:30602

Judge Kennelly, November 28, 2016, Fields v. City of Chicago, trial, day nine.

THE CLERK: 10 C 168, Fields v. City of Chicago.

MR. LOEVY: Good morning, your Honor. Jon Loevy, Anand Swaminathan, Candace Gorman for the plaintiff.

MR. NOLAND: Dan Noland, Terry Burns and Paul Michalik for the city and Murphy.

MR. KULWIN: Shelly Kulwin.

THE COURT: The marshals came in this morning and advised me that Mr. Hawkins is here. I assume we are going to start with him.

MR. LOEVY: No, your Honor. We have a short witness, relatively short before him. We will.

THE COURT: What does relatively short mean?

MR. LOEVY: My exam is between a half an hour and 40 minutes.

THE COURT: Who is it?

MR. LOEVY: His name is Joe Bogdalek and it sets up some of --

THE COURT: Remind me where he fits in.

MR. LOEVY: He is a detective who interviewed some of the witnesses in the case. But it is important to our witness order. We did talk about Hawkins going in the morning but not necessarily first.

THE COURT: Okay. I am not seeing -- I don't think

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 3 of 164 PageID #:30018
Case: 1:10-cv-01168 Document #: 485-16 Filed: 02/24/17 Page 3 of 164 PageID #:30663
11/28/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

2

the marshals are here right now.  Mr. Kuhn, do you know where they are?

MR. KUHN:  No.

THE COURT:  If you are telling me an hour -- a half an hour to 45 minutes, I multiply.

MR. LOEVY:  I feel confident that my exam will be done in approximately 45 minutes, confident.  I am hoping for less.

THE COURT:  You are questioning Bogdalek about people that he interviewed, basically?

MR. LOEVY:  Yes.

THE COURT:  Who is doing?

MR. MICHALIK:  I am.

THE COURT:  Are you going to be longer than his examination?

MR. MICHALIK:  It may be longer, but a half an hour depending on what Mr. Loevy covers.

THE COURT:  And why is it important?  Basically, what's happening is I've got three marshals hanging around out here and a person who is being kept I'm assuming in somebody's jury room right now in the back.  Why is it important?

MR. LOEVY:  Two reasons, your Honor.  First of all, we are presently printing and clipping pages of Mr. Hawkins' outline.  That was unanticipated, but I did not get ready in time.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 4 of 164 PageID #:29019
Case: 1:10-cv-01168 Document #: 485-16 Filed: 02/24/17 Page 4 of 164 PageID #:30604

THE COURT: Okay.

MR. LOEVY: But the anticipated reason we did discuss it on Friday and I thought had an agreement that he would go in the morning but not first.

THE COURT: Okay.

MR. LOEVY: And we are setting up some testimony.

THE COURT: Okay. So I guess this means I need to rule on at least part of this issue about what's been briefed that the defendants responded to on Saturday. I need to ask this question. I looked -- this is a motion for curative instruction to bar future testimony about witness intimidation and the response to that. The response refers to anticipated testimony by Mr. Hawkins on this topic and I am talking about paragraph 6 on page 4.

Here is my question. It says defendants anticipate that Earl Hawkins will testify that during plaintiff's 1986 criminal trial, El Rukns including General James Speights, S-p-e-i-g-h-t-s, were trying to locate witnesses to threaten them to change their testimony, and what's cited there is not testimony from the previous trial in this case but rather testimony from one of the state court proceedings before judge /PWAOEBL I think it was.

Did Mr. Hawkins testify about this topic in the trial here last time?

MR. LOEVY: I can say confidently no, your Honor.

11/28/16 AM
Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 5 of 164 PageID #:29020
Case: 1:10-cv-01168 Document #: 1485-16 Filed: 02/24/17 Page 5 of 164 PageID #:30605
***REALTIME UNEDITED TRANSCRIPT ONLY***

4

MR. KULWIN: I asked Mr. Burns. He has the lead.

THE COURT: He is shaking his head.

MR. KULWIN: He is shaking his head.

MR. BURNS: He did not.

THE COURT: Is it because I said he couldn't or because it wasn't elicited from him? Does anybody know the answer?

MR. NOLAND: It was elicited from him at the proceeding you just described.

THE COURT: I understand. I am talking about my trials. That's the only one I care about at this point.

MS. KATZ: No.

MR. KULWIN: I don't think it was elicited.

THE COURT: Was there discussion about it ahead of time, was it covered by a ruling that I made? Everybody has to be a hundred percent sure on this.

MS. KATZ: Yes. I read it, your Honor, and there was no record to objections or any rulings before Mr. Hawkins got on the stand regarding witness intimidation.

THE COURT: So is the Speights -- how is the guy's name pronounced?

MR. KULWIN: Speights.

THE COURT: The following sentence in the defendants' submission says that, The defendants anticipate that there will be evidence introduced at trial through Robert Beseth,

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 6 of 164 PageID #:20021
Case: 1:10-cv-01168 Document #: 485-16 Filed: 02/24/17 Page 6 of 164 PageID #:30606

5

B-e-s-e-t-h, Joseph Murphy and Jackie Clay, that Bill Swanos brought Jean Ball with him when he tried to interview Eric and Randy Langston prior and Gerald Morris prior to plaintiff's 1986 trial and that the Jean Ball was the common law wife of James Speights, the El Rukn general who was attempting to locate witnesses and threaten them to change their testimony, and for that it cites testimony from the previous trial. So I take it that the defendants are anticipating introducing that again in this case.

MR. KULWIN: Yes.

THE COURT: Okay. So what do you expect Mr. Hawkins' testimony to be about this? I need to be you as specific as you humanly possibly can.

MS. KATZ: He is not going to be.

MR. BURNS: We don't anticipate that, your Honor.

THE COURT: Defendants anticipate that Earl Hawkins will testify that during --

MR. KULWIN: Judge, we wrote that extra sentence, I haven't talked to Mr. Hawkins, I haven't prepped him, I don't know, I read that, I anticipated that Mr. Burns was going to elicit that, but he is not.

THE COURT: You're not. Fine. Then I don't have to worry about that.

MR. LOEVY: That's one. Easy ones.

THE COURT: Good.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 7 of 164 PageID #:20022
Case: 1:10-cv-01168 Document #: 1485-16 Filed: 02/24/17 Page 7 of 164 PageID #:30607
11/28/16 AM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

6

09:37:03    MR. LOEVY:  We still have some other issues, your Honor, regarding the intimidation that we'd like to discuss.

THE COURT:  Does it concern Hawkins?

MR. LOEVY:  No.

THE COURT:  I need to talk to these marshals for a second.  I am just going to tell you if there is a problem logistically, then I am going to make you change the order.  Just sit tight for a couple minutes, I'll be right back.

    (The jury enters the courtroom.)

THE COURT:  Okay.  Everybody can have a seat.  Good morning.  I hope everybody had a wonderful holiday and a nice weekend.  We are ready with the next witness.  I want to give you a head's up.  We are going to stop a little early today.  We are going to stop at 4:10.

    We will break -- we will break for lunch around the normal time.

    (Witness sworn.)

MR. LOEVY:  May I proceed, your Honor?

THE COURT:  Yes.

                    - - -

    JOSEPH J. BOGDALEK, DIRECT EXAMINATION

BY MR. LOEVY:

Q.  Could you state your name for the record, please.

A.  Joseph J. Bogdalek, B-o-g-d-a-l-e-k.

Q.  What do you do for a living, sir?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 8 of 164 PageID #:20023
Case: 1:10-cv-01168 Document #: 285-16 Filed: 02/24/17 Page 8 of 164 PageID #:30668
11/28/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

7

A. I am a retired police officer.

Q. How long did you work for the Chicago Police Department?

A. 34 years.

Q. In that time, did you develop familiarity with the policies and practices of the approximated?

A. Yes.

Q. Let's turn your attention back to April of '84. You were one detectives that responded to the scene of the Smith/Hickman, correct?

A. Yes.

Q. And quite a few detectives back in April 1984, tried to solve that crime, correct?

A. Yes.

Q. Tell the jury approximately how many detectives worked on it in the aftermath of that crime, maybe about a dozen?

A. I was just thinking back. I would think maybe 8, 9.

Q. All right. How long did everybody work on the case after it occurred?

A. Myself and my partner worked on it for four days. I don't know how long the investigation went after that.

Q. But eventually it went dormant and cold, correct?

A. Yes, it did.

Q. All right. Your role was interviews, you conducted some of the interviews, correct?

A. Yes.

11/28/16 AM
Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 9 of 164 PageID #:30024
Case: 1:10-cv-01168 Document #: 485-16 Filed: 02/24/17 Page 9 of 164 PageID #:30609
***REALTIME UNEDITED TRANSCRIPT ONLY***

8

09:42:06 Q.  How many similar such interviews had you conducted over the course of your career?

09:42:10 A.  Numerous.  I don't recall.

09:42:13 Q.  Hundreds?

09:42:14 A.  A number.

09:42:14 Q.  If not thousands?

09:42:15 A.  Not thousands.  Hundreds.

09:42:17 Q.  Fairly common part of your job, correct?

09:42:19 A.  Yes.

09:42:19 Q.  How, to prepare for your testimony, you reviewed reports, correct?

09:42:24 A.  Yes.

09:42:24 Q.  Do you have any independent recollection of these interviews, sir?

09:42:31 A.  Independent recollection?

09:42:32 Q.  In other words, you read the reports, you can read what happened, right?

09:42:35 A.  Yes.

09:42:36 Q.  That's not the same thing as you sit here today you can pull up in your memory bank these actual interviews, right?

09:42:42 A.  I reviewed my reports, yes, those are actual interviews.

09:42:44 Q.  Right.  But you are not claiming to independently recall more than what's written on the page, are you?

09:42:49 A.  I can testify to what's on the page.

09:42:54 Q.  Yeah.  It's been 30 years, right?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 10 of 164 PageID #:20025
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

9

A.  30, 32 years, 34.

Q.  You know what happened because you can read the report but you?

A.  Yes.

Q.  You don't independently remember the events, right?

A.  I'd have to refer to my report to recall.

THE COURT:  I think you've gotten an answer, Mr. Loevy.

BY MR. LOEVY:

Q.  You know from reviewing your reports that you were working that day with a partner, right?

Q.  And what was that partner?

A.  Detective James Minogue.

THE COURT:  M-i-n-o-g-u-e?

THE WITNESS:  G-u-e.

BY MR. LOEVY:

Q.  And you spoke to people in a couple of apartments, correct?

A.  Yes.

Q.  Do you remember from reading the reports what apartments they were?

A.  Apartment 105 and apartment 106.

Q.  One of the people you spoke to, and this is plaintiff's 8614, if we could have the ELMO, your Honor?

THE COURT:  Yep.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 11 of 164 PageID #:29026
11/28/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

10

BY MR. LOEVY:

Q. One of these people you spoke to was a person named Minnie White, right?

A. Yes.

Q. And she basically told you she heard a couple of shots that she thought were fire crackers and she saw the victims on the ground and called the police?

A. Yes.

Q. Her daughter-in-law walked in the apartment and she could add nothing further?

A. Right.

Q. Why did you write down those seemingly benign and mundane details. It was all part of the investigation referring to her daughter-in-law walking into the apartment, she was interviewed later?

Q. That's your job, is it not, to talk to people, write down what they say and worry about later what becomes relevant and what's not relevant?

A. Repeat that again, please.

Q. Your job as a detective is to write down everything that people tell you, right?

A. Yes.

Q. You didn't know on this day if laugh he will right was going to turn out to be important or not important, right?

A. She was to be interviewed, yes.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 12 of 164 PageID #:20027
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 12 of 164 PageID #:30612

Q. All right. So you wrote it all down.

Now, you also knocked -- by the way, she -- Minnie White gave you her phone number, right, it looks like or somebody did, laugh he will Wright?

THE COURT: I think that's Lavette, L-a-v-e-t-t-e.

MR. LOEVY:

Q. Now, you also knocked on the Langston's door, right?

A. Yes.

Q. You know from your report you spoke to Sandra Langston?

A. Yes.

Q. Let's take a look at what your interview shows regarding Sandra Langston. And if you could read it, I'd appreciate it.

A. Langston, Sandra, was interviewed and related the following in essence but not verbatim. Just prior to the victims being shot, she was talking to the victim Jerome, Fuddy, Jerome Smith, I'm sorry, Fuddy from her second floor bedroom about Paul Haily getting out of jail.

After the conversation ended, the victim Smith said he was going to the front of the building at 706 East 39th Street and walked away.

Q. Let me stop you for a second.

Did she in fact tell you that immediately or shortly before the shooting, she out of her second floor bedroom window was talking to the victim Fuddy?

A. Yes.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 13 of 164 PageID #:20028
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 13 of 164 PageID #:30618

Q. All right. And then after that conversation ended, he did talk walk away to the front, he walked away to the front of 706 East 39th, right?

A. Yes.

Q. And that's -- there is a breezeway that goes through the building, right?

A. Yes.

Q. And then she also told you a short time later she heard three shots coming from the front of the building, right?

A. Yes.

Q. And then her mother came running up to her bedroom and told her the victims had been shot?

A. Yes.

Q. So she first added that she observed two male blacks following the victim Smith when he walked away from her bedroom window?

A. Yes.

Q. How did she describe the two mail blacks that were behind Fuddy?

A. She described -- oh, she described one, number one, mail black early 20s, light complexion and wearing a red ski mask hat and jacket, and a second one, light complexion and wearing a blue jacket.

Q. All right. That did not mean that these two men that were -- that she saw behind Fuddy were the murderers, right?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 14 of 164 PageID #:29029
Case: 1:15-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 14 of 164 PageID #:30614

A.  Right.

Q.  But if they were, they were in their early 20s and light reflected.  That did not watch someone like Mr. Fields, correct, for the record?  He is dark complected?

A.  That's the information she provided.

Q.  Whoever was following behind Fuddy that she remembered did not have the complexion that Mr. Fields did, correct?

A.  Correct.

Q.  You would describe him as dark complected for the record?

A.  Yes.

Q.  And if he was in his 30s then he also was not in his early 20s, obviously?

A.  I don't recall his age.

Q.  Now, it's not uncommon that people would volunteer information like, hey, I think I saw some people, here's my description, right?

A.  It's not uncommon?

Q.  Right.  People would try and be helpful sometimes, right?

A.  Yes.

Q.  And if this in fact is what she saw, this would have been before any shooting happened, she saw guys walking, right?

A.  Yes.

Q.  So if the shooting hadn't happened yet, that would have been a benign event to have no reason to stick in her mind, right?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 15 of 164 PageID #:20030
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 15 of 164 PageID #:30615

MR. KULWIN: Objection, Judge.

THE COURT: Objection sustained.

BY MR. LOEVY:

Q. All right. Here's some important questions.

Did you ever at any point learn from Sandra that she was married to Gerald Morris?

A. No.

Q. All right. That night when you were in the Langston's apartment, did Sandra's husband Gerald Morris ever mention at any point that he was in the window talking to Fuddy too?

MR. KULWIN: Judge, objection, lack of foundation.

THE COURT: Sustained. You got to lay the foundation.

BY MR. LOEVY:

Q. All right. Let's take a look?

THE COURT: Lay the foundation regarding the encounter to lay the point.

BY MR. LOEVY:

Q. Showing you page 329 of Gerald Morris' trial testimony, he was asked the following questions. You didn't speak to the police?

"ANSWER: I spoke to the police that night. No, but I mean at the time.

"ANSWER: No. Okay. Now, that night, then police came to your apartment and talked to Randy Langston, right?

"ANSWER:  Yes.

"QUESTION:  And you were there when they came and talked to Randy?

"ANSWER:  Yes, I was there.

You were the police who came to the Langston's apartment the night of the shooting and talked to Randy Langston, correct

A.  Talked to Randy Langston?

Q.  Yes.

A.  Oh, yes.

Q.  All right.  And there were other people present in the apartment, were there not?

A.  Yes.

Q.  And anybody who had relevant information, you wrote down that information, correct?

A.  Yes.

Q.  All right.  Did Gerald Morris at any time mention, did anybody else in the apartment mention they were actually in the window with Sandra at the time?

MR. KULWIN:  Judge, I am going to object as to which.

THE COURT:  Overruled.

THE WITNESS:  I did not talk to Gerald Morris.

BY MR. LOEVY:

Q.  All right.  Did Sandra ever mention that her husband Gerald was in the window with her?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  She did not mention anybody being in the window with her.

Q.  All right.  If she had, you certainly would have written it down, correct?

A.  Yes.

Q.  And during the course of this interview, are you confident that you asked the kinds of questions that would determine -- that were intended to determine who, what, where and when?

A.  Yes.

Q.  Now, you did work third shift, right?

A.  Yes.

Q.  So you would have been at night, right?

A.  We would have started at 4:30 roll call and real shift would have started about 5:00 o'clock.

Q.  When Gerald testified about police coming by that night, you were working the nights, right?

A.  When Gerald Morris came by?

Q.  No, the testimony I showed you said the police came that night and talked to Randy?

A.  Yes.

Q.  You were working nights, correct?

A.  Yes.

Q.  All right.  Take a look at Gerald's testimony on page 330. He said, did you then tell the police what you had seen earlier that day?

        "ANSWER:  I told them I had seen something, and they

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 18 of 164 PageID #:20033
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 18 of 164 PageID #:30618

said, all right, we will contact. And I didn't hear from them until a year later.

All right. And showing you his testimony at page 361 and 362, did you talk to some police later that night?

"ANSWER: Yes.

"QUESTION: Where was that?

"ANSWER: That was at my apartment.

"QUESTION: Did you tell the police what you had scene?

"ANSWER: Yes, I today them what I had seen and I today them this if they would pick anyone, then there was an objection. Did you indicate whether you could identify the guys if you saw them?

"ANSWER: Yes.

"QUESTION: What did you tell them?

"ANSWER: I told them I can identify someone.

"QUESTION: Did the police leave then?

"ANSWER: Yes. They said they would contact me

"QUESTION: You were still living in the building when they left?

"ANSWER: Yes. My question to you is that didn't happen

A. I did not talk to Gerald Morris.

Q. And if Gerald Morris, if anybody in that apartment had told you they had seen something, would you have written it down, right?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 19 of 164 PageID #:20034
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 19 of 164 PageID #:30615

A. Yes.

Q. And showing you page 46, Gerald claimed at the 2009 trial at lines 15 through 17, you spoke to that officer for approximately 10, 15 minutes that night?

"ANSWER: Yes. Do you see that

A. Yes.

Q. That wasn't true, was it?

A. No, I did not speak to Gerald Morris.

Q. And if you had, you would have made notes, right?

A. Yes.

Q. Let's look at Gerald's testimony from the first criminal trial about what he was doing shortly before the shooting. This is page 288. Gerald eventually became a witness against Mr. Fields, did you know that?

A. No.

Q. All right. This is page 288. Now, I want to direct your attention specifically to April 28th, 84, about 10:00 o'clock in the morning. Can you tell the Court where you were about 10:00 o'clock that morning?

"ANSWER: I was looking out the window talking to Fuddy.

"QUESTION: When you say you were talking to Fuddy who was Fuddy?

"ANSWER: That's Jerome Smith

"QUESTION: Was Fuddy a friend of yours?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 20 of 164 PageID #:20035
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 20 of 164 PageID #:30620

"ANSWER:  Yes

"QUESTION:  How long had you known Fuddy?

"ANSWER:  I had known him about five years

"QUESTION:  When you say you were looking occupant the window talking to Fuddy, would that be the window on the first floor or second floor of your apartment

"ANSWER:  Second floor.

"QUESTION:  And as you look out the window, what can you see?

"ANSWER:  I can see everything.

"QUESTION:  Is there a parking lot behind your building?

"ANSWER:  Yes.

"QUESTION:  Could you see the parking lot?

"ANSWER:  Yes

"QUESTION:  How long did you go talk to Fuddy?

"ANSWER:  A couple minutes.

"QUESTION:  And did you see where Fuddy went after you finished talking to him?

"ANSWER:  Yes, up the breezeway."

     Do you see that testimony?

A.  Yes.

Q.  All right.  Showing you page 318 and 319, when you were looking out the window, was anybody looking out the same window, you were?

"ANSWER:  Yes, that's my girlfriend.  I was looking out the window with her.

          "QUESTION:  What was her name?

          "ANSWER:  Sandra Langston.

          "QUESTION:  Sandra Langston lived in the same apartment?

          "ANSWER:  Yes

          "QUESTION:  106

          "ANSWER:  Yes

          "QUESTION:  Randy Langston lived there?

          "ANSWER:  Yes

          "QUESTION:  Eric Langston?

          "ANSWER:  Yes James Langston

          "ANSWER:  Yes

          "QUESTION:  And you lived there?

          "ANSWER:  Yes

          "QUESTION:  Was Sandra speaking with Fuddy?

          "ANSWER:  Yes.

          "QUESTION:  Was she leaning out the window?

          "ANSWER:  Yes.

          "QUESTION:  Were you leaning out the window?

          "ANSWER:  Yes, both of us.

          "QUESTION:  So both of you were looking out the window but you were talking to Fuddy?

          "ANSWER:  I was talking to Fuddy.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 22 of 164 PageID #:20037
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 22 of 164 PageID #:30622

"QUESTION:  She had no conversation with Fuddy; is that correct?

"ANSWER:  Yes.

"QUESTION:  And there was nobody else in the playground or parking lot at that time?

"ANSWER:  No.

"QUESTION:  Now after Fuddy left and went into the breezeway, you went to get a T-shirt on or a shirt?

"ANSWER:  No, I stayed in the window.

"QUESTION:  For how long?

"ANSWER:  Oh, about  couple of minutes

"QUESTION:  And after a couple minutes, you say you saw the defendants in this case?

"ANSWER:  Yes.

     Do you see that testimony, sir?

A.  Yes.

Q.  This is inconsistent with what Sandra Langston told you, isn't it?

     MR. KULWIN:  Judge, I would object.

     THE COURT:  Sustained.  It's argumentative.

BY MR. LOEVY:

Q.  There is no doubt in your mind that Sandra never mentioned that Gerald was next to her when she was having the conversation with Fuddy, correct?

     MR. KULWIN:  Objection, asked and answered.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 23 of 164 PageID #:20038
11/28/16 AM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

22

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Sandra, never, no.

BY MR. LOEVY:

Q.  So doubt?

A.  No doubt.

Q.  Did you know two years later that Gerald was going to be substituted for Sandra as the witness?

MR. KULWIN:  Judge, I am going to object.

THE COURT:  Sustained to the form of the question.

MR. KULWIN:  Ask to strike.

THE COURT:  I sustained the objection.  That's all I need to do.  I have advised the jury about a million times that questions aren't evidence.

BY MR. LOEVY:

Q.  All right.  Showing you pages 319 and 320 of Gerald Morris's testimony, now, after Fuddy left and went into the breezeway, you went to get a T-shirt or a shirt?  I think we read this, sorry.

That's -- yes, we read this.

Then the next page, well, this question we did not read.  How much time passed from the time Fuddy went into the breezeway until you saw these two fellows?  Then on page 32?

"ANSWER:  I'd say about a good five minutes.

"QUESTION:  About five minutes passed after Fuddy went out into the breezeway, correct?

"ANSWER:  Yes

"QUESTION:  During that five minutes, did anybody else walk along that sidewalk?

"ANSWER:  No

"QUESTION:  The only other two people that you saw were the two people that you've identified in court today, and that was Mr. Fields and Hawkins?

"ANSWER:  Yes."

Do you see that testimony, sir?

A.  Yes.

Q.  Did Sandra tell you that a full five minutes went by between when she saw those two men were walking behind Fuddy and when the shots were fired?

A.  She just said a short time.  That was it.

Q.  And then finally, showing you page 350 and 351, did injure sister, I'm sorry, I'm not sure of the relationship, did Sandra Langston stay in that win do he for five minutes or by the window.

"ANSWER:  After I left?

"ANSWER:  No.  From the time Fuddy left until the five minutes passed that you saw, you say these two men, did Sandra Langston also stand by that window for five more minutes?

"ANSWER:  Yes, she stood there.

"QUESTION:  Did you talk to her?  Did Fuddy talk to her?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 25 of 164 PageID #:20040
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 25 of 164 PageID #:30625

24

"QUESTION: Were you talking to Sandra? The answer is um-hmm. Do you see that testimony

A. Yes.

MR. KULWIN: Judge, objection as to what's inconsistent.

THE COURT: Objection sustained. Form of the question.

BY MR. LOEVY:

Q. All right. Showing you Mr. Morris' testimony at page 292, this is where he makes at trial. Did you see anyone or anything unusual as you sat in that window after Fuddy left?

"ANSWER: Yes. What did you see? I seen two mails walk right behind him.

"QUESTION: Did you see where they were coming from?

"ANSWER: No, I didn't.

"QUESTION: Where is the first place you saw them?

"ANSWER: Entering from the parking lot

"QUESTION: Which way were they walking when you first saw them?

"ANSWER: Walking in the same direction Fuddy was going. Did you see that testimony, sir

A. Yes.

Q. And then on page 298, while you were in the next room getting your shirt on, what happened?

"ANSWER: I heard several gunshots, I looked out the

side window and I seen the same defendants running back out. None of that was told to you that night, correct

A.  Correct.

Q.  All right.  Let's fast forward a year.  O'Callaghan picks up the investigation.  Did you know that the case was being reinvestigated in 1985, a year later?

A.  No, I did not.

Q.  Did Mr. O'Callaghan ever come to you and ask you any questions about why in your report you had said it was Sandra and she hadn't mentioned Gerald?

A.  No.

Q.  Were you at all involved in the switch from Sandra to Gerald?

MR. MICHALIK:  Objection, your Honor.

THE COURT:  Sustained to the form of the question.

BY MR. LOEVY:

Q.  Did you have any involvement a year later when Gerald went to court and said I was the one in the window with Sandra?

MR. KULWIN:  Judge, I am going to object to argumentative on all of this.

THE COURT:  Overruled on that question.  You can answer.

THE WITNESS:  No.

BY MR. LOEVY:

Q.  All right.  You were in the Langston's apartment, correct?

A.  Yes.

Q.  The window in the back of the Langston's apartment, you can't see the shooting, correct?

A.  I don't recall.

Q.  All right.  Showing you page 295 of Gerald's testimony.  I am going to show you what's been marked as people's Exhibit 15 for identification, Gerald.  It's also a picture of your apartment.

"ANSWER:  Yes.

"QUESTION:  And do you see in the window that you -- where you were when you were talking to Fuddy?

"ANSWER:  Yes.

"QUESTION:  Is that the same window you saw the two individuals walk by?

"ANSWER:  Yes

"QUESTION:  Would you circle that window, please, now, do you see the entrance to the breezeway

"ANSWER:  Yes.  You see that testimony

A.  Yes.

Q.  I'm going to show you Plaintiff's Exhibit 219E which is also state Exhibit 215, no, state Exhibit 15.  This is the Langston's window in the very back of the building, is it not? Does that refresh your recollection?

A.  I don't recall it.

Q.  But you do recall from looking at your reports that

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 28 of 164 PageID #:20043
Case: 1:23-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 28 of 164 PageID #:30628

whatever they were claiming to have seen, it was in the back, not the front of the building, correct?

A.  In the report, it was from a bedroom window.

Q.  All right.  You also interviewed Randy Langston, correct?

A.  Yes.

Q.  And did you take notes?

A.  Yes.

Q.  And he did tell you what he was doing when he heard the shots, correct?

A.  Yes.

Q.  And you have read the reports to refresh your recollection?

A.  Yes.

Q.  What did Randy tell you on the night of the shooting he was doing when the shots happened?

A.  Randy related that he was playing baseball across the street from 706 East 39th Street with his brother James and a friend by the name of Carlos.

Q.  Playing baseball, right?

A.  Yes.

Q.  Are you good at what you do?

A.  I'm sorry?

Q.  Are you good at what you do or did?

A.  Am I good?

Q.  Yeah.

A. I'm confident in what I do.

Q. All right. Did you get that detail right?

A. Playing baseball?

Q. Yeah.

A. Playing baseball across the street, yes.

Q. That's the kind of thing you would have taken care to record accurately, correct?

A. Yes.

Q. Because he could later become an eyewitness and then it would become very important what he was doing, right?

A. Yes.

Q. If he had said I was getting ready to play baseball and I was standing on the sidewalk, would you have written that down?

A. I would have written down whatever he told me.

Q. All right. Let's look at what he did tell you and what you did write down. This is Plaintiff's Exhibit 86, page 14. Randy was interviewed and related the following. He was playing baseball across the street from 705 East 39th with his brother James and friend Carlos when he observed a man with a read ski masks shooting at the victims. That's the first half of what he told you, correct?

A. Yes.

Q. Now, I want to smoke us on the a man. Is there any doubt in your mind that Randy told you he saw one and only one

shooter?

A.   He said a man.

Q.   That's an important detail, correct?

A.   Yes.

Q.   And there is no doubt in your mind that he did not say he saw two shooters, correct?

A.   He never mentioned a second shooter, a second person.

Q.   And that was the night of the shooting?

A.   Yes.

Q.   If he had said I saw two people, what would you have written down?

A.   It would have been written down as two people.

Q.   All right.  You also interviewed James Langston, correct?

A.   Yes.

Q.   All right.  You have seen the investigative file in this case, have you not, at your deposition,you were shown the investigative file?

        THE COURT:  Holding up Exhibit 1.

        MR. LOEVY:  Plaintiff's Exhibit 1.

BY MR. LOEVY:

Q.   You're familiar with the investigative file, correct?

A.   The investigative file?

Q.   All right.  At your deposition, you were shown it, right?

A.   I don't recall.

Q.   All right.  Showing you a copy of Plaintiff's Exhibit 1,

Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 31 of 164 PageID #:30651
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

30

the memo, this is Plaintiff's Exhibit 1, page 104.  This is a memo from you and your partner minute owing and Bogdalek, correct?

A.  Yes.

Q.  And it's not dated, is it?  I will give you a copy so you have the whole thing in front of you you said no time to leave a supp, you were referring to a supplementary report, correct?

A.  My partner wrote this, yes.

Q.  All right.  It said that James Langston age 14 was interviewed because he witnessed the murders, right?

A.  Yes.

Q.  He said I was playing baseball across the street?

A.  Yes.

Q.  He said the offenders were wearing masks to cover their faces to conceal that I have identity and he saw them flee in a blue Cadillac, right?

A.  Yes.

Q.  He saw the men in a car, right?

A.  Yes.

Q.  The person in the front seat was the brother of Ricky Baldwin who was murdered last summer, right?

A.  Yes.

Q.  It says see our notes for more details, right?

A.  Yes.

Q.  Now, that was a genuine lead, was it not?


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 32 of 164 PageID #:20047
11/28/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

31

A.  Yes.

Q.  Was that the kind of information that the policies and practices of the police department required you to transfer from the street file into supplementary reports?

A.  Yes.

Q.  Now, that information about one of the people being in the car being related to a guy named Ricky Baldwin was murdered, that did not make it into the supp report, did it?

A.  No, it did not.

Q.  And the supp report is what gets produced to the criminal defendants, correct?

A.  Yes.

Q.  That was important information, was it not, what you wrote in the memo, what you and why your partner wrote in the memo?

A.  What my partner wrote in the memo, yes.

Q.  You have no explanation for why this important information did not get in the supp report, do you?

A.  The information was investigated.

Q.  Okay.  You have no explanation for why it didn't get into the supp report, did it?

A.  No, it should have gone.  In retrospect, it should have been in the report.

Q.  In the mid '80s, did the policy and practice of the police department require to you withhold this investigation?

A.  We didn't withhold it.  We investigated.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 33 of 164 PageID #:20048

Q.  Isn't it the practice in the mid '80s was you were allowed to keep that information into an investigative file until you determined if it was going to make it into a supp report at the time, correct?

A.  Repeat that again.

Q.  At the time, say in 1984, it was your understanding that the practice of the department was you were allowed to keep information like this in memos and investigative files without putting into the official reports until you determined whether or not it was going to be part of your case or not, right? That was the practice?

A.  One more time with that, please.

Q.  Sure.

There was -- the department had practices and policies regarding murder investigations, right?

A.  Yes.

Q.  Okay.  And the practice at the time, 1984, permitted you to leave the kind of information that we have been talking about in memos and not put it into supp reports until such time as you decided who was going to be prosecuted, correct?

MR. MICHALIK:  Objection, Judge.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Until it was investigated, yes.  We did investigate this information.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 34 of 164 PageID #:20049
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 34 of 164 PageID #:30654

Q. Let's talk about that.

You were responsible for tracking down some of the leads in the investigative file, correct?

A. Yes.

Q. Now, you went and found photos of the Baldwin brothers, right?

A. Yes.

Q. Because you know from the records that James was saying that one of the Baldwin brothers got murdered so the suspects were the other Baldwin brothers, somebody had seen a Baldwin brother in the get away car, right?

A. Yes.

Q. All right. You could only find photos of which two Baldwins, do you know from the records?

A. Paul and Sean Baldwin.

Q. Which Baldwin whose photo you couldn't find?

A. Whose -- which we couldn't find at the time?

Q. Yes.

A. Those were the only two we could find.

Q. Sean and Paul, you found their photos?

A. Yes.

Q. Tell the jury which Baldwin photo you couldn't find, it was Darryl, wasn't it?

A. Darryl's name was not brought up. We couldn't find anything on Darryl. That was brought up later in the

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 35 of 164 PageID #:29050
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 35 of 164 PageID #:30635

investigation.

Q. You did not show any witnesses Darryl Baldwin's photo, correct?

A. If we jump ahead to when Darryl was brought into the investigation, we could not find a photo.

Q. All right. All I'm asking you is James Langston ruled out Sean and Paul, right?

A. Yes.

Q. Okay. James Langston was not shown a photo of Darryl, that's all I'm asking, correct?

A. Yes.

Q. And he never was, to your knowledge, right?

A. Not to my knowledge, no.

Q. And so we'll never know if Darryl Baldwin was the guy James saw in the get away car, correct?

A. One more time.

Q. There is no way to know if the guy James saw, the Baldwin brother James saw in the get away car was Darryl Baldwin, right?

     MR. MICHALIK: Objection, Judge.

     THE COURT: Rephrase the question.

     MR. LOEVY: I will just move on it, your Honor.

BY MR. LOEVY:

Q. You also followed up some leads about the Edwards brothers. Do you remember that?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 36 of 164 PageID #:20051
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 36 of 164 PageID #:30636

11/28/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

35

A.  Yes.

Q.  Do you remember why the Edwards brothers were suspects?

A.  There was an anonymous tip on the Edwards brothers, anonymous tip meaning there was no one to get back to with the information.  We check out the information, the information was that someone overheard a conversation, do you want me to read it off this?

Q.  The gist was that Delbert Evans had been shot, was it the night before Fuddy was murdered, right?

A.  Delbert Edwards?

Q.  Yeah, different Edwards brother, different Edwards --

A.  I -- I am not sure about how that investigation went.

Q.  The point was somebody heard Lawrence and Marshall in a stairwell saying they were going to get a gun, put on masks and kill Fuddy, correct?

A.  Yes.

Q.  All right.  So that was a live lead, right?

A.  Yes, it was.

Q.  That didn't make it into the supp report, did it?

A.  It was in our GPR report.

Q.  The fact that --

        MR. KULWIN:  Objection.  Can the witness finish the answer?

BY MR. LOEVY:

Q.  The fact that --


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT:  Yeah, don't cut off the answer.

BY MR. LOEVY:

Q.  Are you saying this was in a GPR, sir?

THE COURT:  Do you remember what you were going to say at this point?

Okay.  Just proceed.

BY MR. LOEVY:

Q.  This was not in any GPR, the fact that Lawrence and Marshall were overheard talking about murdering Fuddy, that was not in the GPR, was it?

A.  Not the entire -- not the entire conversation, no.

Q.  I mean, nothing about the fact that they were going to get masks and a gun and shoot Fuddy went into a GPR, did it?

A.  We did check out that tip.

Q.  The question was did it get into a GPR?

A.  Our final result, the investigation, yes.

Q.  The final result --

A.  We checked out the anonymous tip.

Q.  All right.  Tell the jury what you did to determine whether Marshall and Lawrence were overheard in a stairwell saying they were going to get Fuddy the night before the shooting?

A.  Okay.  Once we received this information, we obtained pictures of the two Marshall and Lawrence Edwards brothers for purposes of identification so we'd know who we were talking to

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 38 of 164 PageID #:20053
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 38 of 164 PageID #:30638
11/28/16 AM                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

37

when we went out looking for them.  The question was about their whereabouts on the date and time regarding this information.  We were able to obtain photos of them, we were able to locate them, we interviewed them, we talked to them in different -- at different times when we went up to their apartment and they told us each one told us that they were with family members at the time.  We were able to verify that information after they told us who they were with, Lawrence was with his mother, Barbara at 5132 south Lowell and Marshall was with his grandmother, fan /AOE /TKAPBZ worth and a cousin and another aunt I believe and they were in an apartment.  We talked to them, they said yes, he spent the night with us when this incident went down.

Q.  And then you determined that it was a dead lead, you're saying?

A.  Yeah, there was no one to get back to.  Because it was an anonymous tip, there was no one else --

Q.  I just asked if it was a dead lead.

MR. KULWIN:  Could he finish?

THE COURT:  The answer was extremely nonresponsive. The answer is stricken.  The jury is directed to disregard it.

Please answer the questions directly.

Ask the question again if you'd like to.

BY MR. LOEVY:

Q.  All right.  You're saying, if I understand it, that

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 39 of 164 PageID #:20054
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 39 of 164 PageID #:30639

because the man's mother and grandmother said he was with us, you considered the lead date dead?

A.   At that point, yes, there was no more information.

THE COURT:   The answer is yes.   Thank you.

BY MR. LOEVY:

Q.   All right.   If you considered that a checked out lead, why didn't you put in a supp report, we talked to the mother, we talked to the grandmother, they have an alibi, and produce that supp report in the criminal justice system, why didn't you make a police report?

A.   We made out a report.   I don't know if it's called fireman or GPR saying that we followed up on this information.

Q.   All of that is in the street file, correct?

A.   I don't know if it's in there.

Q.   Everything you just described to the jury from memory, should that have been in an official supp report?

A.   An official supp report?

Q.   Right.   If you could focus on that question, sir.

A.   Well, what I am trying to say is it was put in a report, not in a supp report, though.

Q.   Okay.   At the policies and practices at the time, should the information you just described to the jury, was there a rule that that had to go into a supp report that was going to be produced to the criminal defendants?

A.   It should have been put in a supp.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. All right. And it was not, correct?

A. Yes.

Q. Correct?

A. Yes.

Q. All right. I am going to show you Plaintiff's Exhibit 1, page 106. Without belabor organize because the jury has heard about Edward Stewart, do you remember how he was a suspect in the crime?

A. Yes, anonymous tip.

Q. All right. And he told you he worked at McDonald's, right?

A. That is correct.

Q. And you wanted to verify that his alibi, he said during the shooting he was working at McDonald's, right?

A. Yes.

Q. And you couldn't verify his alibi because McDonald's was closed when you checked, right?

A. That is correct.

Q. All right. And so that was the end of checking out the alibi, wasn't it?

A. Could you lower that down a little? Just a little?

Q. I'll give you the whole page.

A. Okay.

Q. The question pending was when you called McDonald's and McDonald's was closed you made no further attempt to

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 41 of 164 PageID #:20056
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 41 of 164 PageID #:30641

corroborate Mr. Stewart's alibi, correct?

A. We did make an attempt, making a phone call. McDonald's at 30 plus years ago wasn't a 24/7 operation, so he would not have been there. Somebody picked up the phone and said it was closed.

Q. We established that.

THE COURT: The question is if you did anything else after that.

THE WITNESS: Yes, we put information here on the first of May, on our general progress report, information for all the watches, that's everybody in the area that would be looking into this investigation because we were going on our days off and the information there was for anybody to check on there.

BY MR. LOEVY:

Q. All right. You didn't do anything else?

A. And I don't know if it was done.

Q.

A. Pardon.

Q. You don't know if anything else was done?

A. No.

Q. This supp report, this was not in the official file, correct?

MR. MICHALIK: Objection, Judge. Vague as to official file.

THE COURT: Rephrase the question, please.

BY MR. LOEVY:

Q. The supp report -- the GPR we are talking about that you have been describing, that was in Plaintiff's Exhibit 1, the investigative notes, correct, if you know?

A. All this information was turned in.

THE COURT: Do you know what file it was kept in? That's the question.

THE WITNESS: No. It would have been -- this would have been in the investigative file that's kept in our office.

BY MR. LOEVY:

Q. It would not have been in the permanent retention file that's given to defendants?

A. I don't know if it was.

Q. Was it the practice at the time?

A. The practice was to turn in our reports to our supervisor who would read them and approve them and then have someone place them into the investigative file.

Q. All right. At some point you got a subpoena to testify at Mr. Fields' criminal trial, correct?

A. Yes.

Q. He was trying to call you for the defense, right?

A. Yes.

Q. He wanted to impeach Randy Langston, correct?

MR. MICHALIK: Objection, Judge.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 43 of 164 PageID #:20058
Case: 1:21-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 43 of 164 PageID #:30543

42

THE COURT: Sustained.

BY MR. LOEVY:

Q. Was it your understanding --

MR. LOEVY: May I?

THE COURT: Yes.

BY MR. LOEVY:

Q. Was it your understanding the reason the defense wanted to call you at the trial was to impeach the eyewitnesses at trial, was that your understanding?

A. I don't know what their intentions were.

Q. All right. In preparing for the trial, you reviewed the file, correct?

A. I reviewed the file that was given to me, provided to me by the state's attorney's office, yes.

Q. And you had already told the jury that Randy, when he gave you a description, you took notes, correct?

A. Yes.

Q. And Randy told you looking at the rest of your report that as they rolled up the mask over the face and ran away, right, the one guy?

A. Yes.

Q. And what Randy told you he saw you wrote down, correct?

A. Yes.

Q. So when you got subpoenaed for Nate's criminal trial, why didn't you bring those notes with you?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 44 of 164 PageID #:29059
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 44 of 164 PageID #:30654

A.   I didn't have copies of the notes.

Q.   They were missing, weren't they?

A.   I didn't have a copy.

Q.   They were missing, weren't they?

A.   I learned later they were missing, yes.

Q.   All right.  This is your testimony at the April 2004 proceeding?

THE COURT:  By him?

MR. LOEVY:  By him.  Page 1609 through.

MR. KULWIN:  Judge, I am going to object.  I don't think there is anything impeaching.

THE COURT:  May I see it?

MR. LOEVY:  15 through 24.

THE COURT:  Thank you.  It's consistent.  The objection is sustained.

BY MR. LOEVY:

Q.   When you got to court, you also noticed that the state's attorney file in court was missing that memo you had written about James Langston, correct, the one we talked about with the description of the Baldwin brothers?

A.   The only --

Q.   That's true, right?

A.   Yes.

Q.   All right.  So you knew that the state's attorney at the criminal trial did not have all the documents, didn't you?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 45 of 164 PageID #:20060
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 45 of 164 PageID #:30645

MR. MICHALIK:  Objection, your Honor, foundation.

THE COURT:  Yes, sustained.

BY MR. LOEVY:

Q.  All right.  You reviewed the file that the state's attorney had relating to the case, correct?

A.  I reviewed the file, the document that he handed me to review and that was a copy of the supplementary report.

Q.  And they handed you a copy of the investigative file at the state's attorney's office, correct?

A.  No, well, they handed me a copy of the supplementary report.

Q.  This is page 954 of the March proceeding in this case, lines 9 through 21.

"QUESTION:  Does that refresh your recollection as to whether or not you reviewed the investigative file?

"ANSWER:  I reviewed a file that the state's attorney's office gave me.  That's the file I reviewed.

"QUESTION:  You reviewed the investigative file; is that correct?  You noticed that your handwritten notes were missing isn't that correct?

"ANSWER:  I guess my handwritten notes were missing.

"QUESTION:  Were your partner's handwritten notes missing as well?

"ANSWER:  I believe so.  I believe my supp was the only report in there.

"QUESTION:  And the two from memo was not in there either?

"ANSWER:  No."

Did you give those answers, sir?

A.  Yes.

Q.  All right.  So you knew the state's attorney did not have all the documents, correct?

MR. MICHALIK:  Objection, Judge, foundation.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Did you tell anybody that your notes and memo were missing?

A.  No, I did not.

Q.  And the reason you didn't tell anybody that your notes and memo were missing is because it was perfectly consistent with the police department's practices at the time that all the stuff was not getting turned over isn't that true?

MR. MICHALIK:  Objection, Judge.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Would you repeat the question, please?

BY MR. LOEVY:

Q.  The reason you didn't bother owe strike that.

The reason you didn't raise with anybody that your notes and memo were missing was because it was your understanding of the practices at the time that the detectives

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 47 of 164 PageID #:20062
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 47 of 164 PageID #:30647

46

didn't have to turn over stuff like that; isn't that true?

A.  No.  I read --

THE COURT:  The answer is no.  The answer can stand.
Proceed.

BY MR. LOEVY:

Q.  At some point a few years later, you got notice that Nate
had filed a lawsuit from death row, correct?

A.  From death row?

Q.  He filed a lawsuit, right?

A.  Yes.

Q.  Because he got convicted, right?

A.  Yes.

Q.  You were one of the detectives he named?

A.  Yes.

Q.  And you read the complaint?

A.  The complaint?

Q.  You read the complaint that he was making against you,
correct?

THE COURT:  The lawsuit, did you read the lawsuit,
that's the question.  Complaint is the term for the lawsuit.

THE WITNESS:  I was made aware of, yes, regarding
information missing, yes.

MR. LOEVY:  May I have a moment, your Honor?

THE COURT:  Yes.

   (Brief pause.) Bogdalek

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 48 of 164 PageID #:20063
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 48 of 164 PageID #:30648

BY MR. LOEVY:

Q.  Prior to the disappearance of your notes, where had you been keeping them?  Where was the original version of your notes?

A.  I turned them in to my supervisor.

Q.  That's the sergeant's office?

A.  The sergeant's office along with the original report.

Q.  Okay.  Where in the sergeant's office were your original notes, your Randy Langston notes?

A.  I turned them in and he -- the policy was for me to turn my supplementary report.

Q.  The where question?

A.  To the supervisor who would sign it and then he'd have somebody put them into the investigative file, log them in into the investigative file.

Q.  That's in the file cabinet in the sergeant's office, right?

A.  Yes.

Q.  Sergeant Murphy was one of the sergeants at the time, correct?

A.  Sergeant Murphy was a sergeant in the area at the time, yes.

Q.  All right.  You did not destroy your notes, did you?

A.  I destroyed my notes, yes.

Q.  I thought you said you gave them to the sergeant?

A.  No, no, no, I gave them after the originals.  After a time passed, I destroyed.

Q.  You did not destroy the originals, right?

A.  No, I turned them in.

Q.  Is there -- are you certain that you turned them into the sergeant, sir?

        MR. KULWIN:  Objection, argumentative, Judge.

        THE COURT:  Sustained.  You have asked the question.

BY MR. LOEVY:

Q.  That's the last time you saw your notes when you gave them to the sergeant?

A.  Yes.

Q.  Who has access to the file in the file cabinet there?

A.  Supervisors.  Actually, any detective working could go into the investigative file if he was looking for something.

Q.  Could Detective O'Callaghan have access to the file with the notes?

        MR. MICHALIK:  Objection.

        MR. KULWIN:  Objection, Judge, calls for speculation.

        THE COURT:  The objection is sustained.

BY MR. LOEVY:

Q.  All right.  Any detective who was working on the case could do it, right?

A.  Yes.

Q.  All right.  When did you discover that your notes were the

original conversation with Randy were missing?

A.  When I went to trial, the first day of trial, at the sixth, is that when the trial was?

Q.  How did you discover on the first day of trial that your Randy Langston notes were missing?

A.  I was handed information, documents by the state's attorney's office and my notes were not in there.

Q.  All right.  Who did you report that to?

A.  No one.

Q.  Did you bring that up with Sergeant Murphy?

A.  No, I did not.

Q.  Were you concerned that your original notes had gone missing?

A.  No, because I knew --

Q.  The question was were you concerned?

A.  No.

Q.  You did understand Nate was being prosecuted for capital murder, correct?

A.  Yes.

Q.  Did you have an understanding that Randy Langston's testimony was pretty much the key to the case?

        MR. MICHALIK:  Objection, Judge.

        THE COURT:  It's a yes or no.  Did he have that understanding?  You can answer.

        THE WITNESS:  Yes.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/28/16 AM
Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 51 of 164 PageID #:20066
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 51 of 164 PageID #:30651
***REALTIME UNEDITED TRANSCRIPT ONLY***

50

BY MR. LOEVY:

Q. All right. You did testify at the trial, right?

A. Yes.

Q. And you testified you couldn't recall if Randy told you it was one shooter, did you not?

A. Yes.

Q. Actually, you did recall it was just one shooter?

A. Yes, a man.

Q. Why did you say if you couldn't recall it was one shooter if you knew he told you one shooter?

A. That was my mistake.

Q. All right. When you read -- I want to fast forward again to the CR file, the complaint that was filed against you. When he filed the lawsuit and you read it?

A. Yes.

Q. All right. You understood that he was attaching transcript pages that he did not get all of the notes and files, correct?

A. I wasn't aware that he didn't get them all.

Q. You read the complaint, right?

A. Yes.

Q. And you had to respond to the lawsuit, right?

A. Yes.

Q. And what was -- you were one of the people who was accused of not turning overall the exculpatory information, correct?

11/28/16 AM
Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 52 of 164 PageID #:20067
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 52 of 164 PageID #:30652
***REALTIME UNEDITED TRANSCRIPT ONLY***

51

A.  Yes.

Q.  And what was your response?

A.  My response, I made out an affidavit and I stated that I did not intentionally or deliberately withhold any information exculpatory or not related to the files.

Q.  And showing you Plaintiff's Exhibit 2, page 120, this is your statement, correct?

A.  Yes.

Q.  All right.  Were you using words very carefully when you said you did not intentionally and deliberately withhold anything?

        MR. MICHALIK:  Objection, Judge.

        THE COURT:  Rephrase the question.

MR. LOEVY:

Q.  All right.  You knew when you wrote this response that the accusation was he didn't get all the notes and he didn't get all the files, right?  You knew that?

A.  Yes, I was responding to --

Q.  You knew that?  And when you knew that, you also knew that it was false to say that things were withheld from him, that things were not withheld, right?

        THE COURT:  Put the whole question.

        MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  You understood the allegation was that you didn't give him

***REALTIME UNEDITED TRANSCRIPT ONLY***

everything, right?

A.   That I didn't give him everything?

Q.   Right?

A.   That was the allegation.

Q.   And you understood that you hadn't given him everything, right?

A.   There was my missing notes, yes.

Q.   So you probably should have acknowledged that you didn't give him everything, correct?

A.   There was no policy or thinking as to what to do if there is something missing.

Q.   Isn't it true that the policy at the time permitted you to withhold it and for that reason you thought there was nothing wrong with this response?

          MR. MICHALIK:  Objection, Judge.

          THE COURT:  Sustained.

          MR. LOEVY:  All right.  I have no further questions, your Honor.

          THE COURT:  Mr. Michalik.

                         - - -

          JOSEPH J. BOGDALEK, CROSS-EXAMINATION

BY MR. MICHALIK:

Q.   Good morning, Mr. Bogdalek?

A.   Good morning.

Q.   Let start out with talking a little bit about your career

          ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/28/16 AM

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 54 of 164 PageID #:20069
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 54 of 164 PageID #:30654

***REALTIME UNEDITED TRANSCRIPT ONLY***

53

with the police department.  You said that you are retired from the Chicago Police Department?

A.  Yes, I am.

Q.  And when did that take place?

A.  The year 2004.

Q.  So that was over 12 years ago?

A.  Yes.

Q.  When did you start with the police department?

A.  September of 1970.

Q.  Did you start as a patrolman?

A.  Yes, I did.

Q.  And eventually you became a detective?

A.  Yes.

Q.  When did you become a detective?

A.  1981.

Q.  Where were you assigned at that time?

A.  The area one violent crimes unit located at 51st and Dan Ryan expressway.

Q.  Were you a detective at the area one violent crimes in 1984?

A.  Yes.

Q.  How long did you remain a detective?

A.  Until 1988.

Q.  What happened at that time?

A.  I was promoted to sergeant in 1988.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 55 of 164 PageID #:20070
Case: 1:23-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 55 of 164 PageID #:30655
11/28/16 AM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

54

Q. And did you retire as a sergeant?

A. Yes, I did.

Q. Okay. You were asked some questions about the policies and practices of the police department regarding what is turned over to prosecutors and criminal defense attorneys. Do you recall those questions?

A. Yes.

Q. All right. Do you have knowledge of what the entire scope of documents are that the police department is required to turn over to prosecutors and criminal defense attorneys?

A. All notes, case reports.

Q. So it's not just limited to the permanent retention file, correct?

A. No.

Q. It's other materials that are developed by detectives during their investigation?

A. Yes.

Q. I am going to direct your attention to Saturday, April 28, 1984. Were you working that day?

A. Yes, I was.

Q. You told us you were working with your partner, Detective Minogue?

A. Yes.

Q. And you were working the third watch?

A. Yes.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 56 of 164 PageID #:20071
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 56 of 164 PageID #:30656
11/28/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
55

Q. And could you briefly explain what the watch system is to the ladies and gentlemen of the jury?

A. The watch system is broken down into three different watches. I worked the third watch. There's a roll call starting a half hour before each watch, so that particular day I started at 4:30. And at roll call, that is your shift starts at 5:00 and goes to 1:00 in the morning followed by the midnight shift, it goes from 1:00 until 9:00, and then the day shift would go from 9:00 to 5:00: There is a half hour if you come in early or before that.

Q. The midnight shift is also referred to as the first watch?

A. Yes.

Q. The day shift would be the second watch?

A. Yes.

Q. And then the night shift which you worked on was the third watch?

A. Yes.

Q. At some point on April 28, 1984, you said you and your partner were assigned to investigate the Smith/Hickman murders, correct?

A. Yes.

Q. Describe how that assignment came to be?

A. Well, we walked into the office at 4:30 and the sergeant briefed us on a double murder that occurred earlier in the day and he wanted us to go out there to start canvassing the area,

56

start knocking on doors, looking for witnesses, anything to consist in the investigation.

Q. What did you and Detective Minogue do at that time?

A. We proceeded to 706 East 39th and started canvassing the area.

Q. Were you able to find any witnesses who had information about the Smith/Hickman murder?

A. Yes, we did.

Q. How many?

A. Four.

Q. And as part of your -- this was all part of your assignment on the evening of April 28th, 1984?

A. Yes.

Q. And you already mentioned those four witnesses that you talked to, correct?

A. Yes.

Q. That was Minnie White, Randy Langston, Sandra Langston and Gerald Langston?

A. Yes.

Q. If I could have Defendant's Exhibit 57, pages 13 to 14.

        MR. MICHALIK: Judge, can you flip?

        THE COURT: I thought I did.

BY MR. MICHALIK:

Q. All right. I think you were shown this before. This is a copy of the supplementary report that you prepared regarding

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 58 of 164 PageID #:20073
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 58 of 164 PageID #:30658
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

57

the interviews of Minnie White and the Langstons?

A.  Yes.

Q.  It's dated April 30, 1984?

A.  Yes.

Q.  Can you tell the ladies and gentlemen of the jury how you prepared this report?

A.  The report was prepared off my notes I had taken after I interviewed each one of them.

Q.  And what was your practice with respect to converting your notes into a GPR?  I mean, into a supplementary report, excuse me?

A.  My standard procedure is take my notes, transcribe them onto my supplementary report.  Whatever was in my notes went onto that report.

Q.  Is there any information that is contained in one of your notes that you do not put into a supplementary report?

A.  I'm sorry.  Could you rephrase the question?

Q.  Sure.  Is there any information that you would have in your notes that you do not convert into the supplementary report?

A.  Anything that was in my notes was going into my report.

Q.  All right.  Now, I'm not going to go through this again. You've already gone through this in detail as to what you recorded here, but starting with Minnie White, I just wanted to ask you where did that interview take place?

A. Apartment 105 at 706 East 39th Street.

Q. Okay. Did you interview her in the apartment?

A. Yes.

Q. And was anyone else present when you interviewed Minnie White?

A. My partner.

Q. All right. How did that interview take place with you and your partner?

A. Questions were asked, information was taken, I took notes, and do you want me to read?

Q. No. Did both you and Detective Minogue talk to Minnie White at the same time?

A. Not at the same time, no. I think it's just one handling the interview.

Q. Okay. And you also talked to the Langston family members?

A. Yes.

Q. And that took place still on the evening of April 28, 1984?

A. Yes.

Q. Where did that -- where did those interviews take place?

A. Apartment 106, 706 East 39th Street.

Q. Was Gerald Morris present at any point when you and Detective Minogue interviewed the Langstons in that apartment?

A. No.

Q. If he was, that would have been noted in your notes?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 60 of 164 PageID #:20075
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 60 of 164 PageID #:30660

A. He would have been interviewed, tried to interview him, attempt to interview him.

Q. Do you have any knowledge of any other detectives who spoke to Gerald Morris on the evening of April 28, 1984?

A. No, I do not.

Q. All right. You also had gone through this report about the information that was provided by the Langstons. Can you briefly describe how that interview process took place.

A. In this particular process, we each interviewed, myself and my partner, separately, we interviewed the three Langstons. I interviewed one and he was interviewing another one in different areas of the apartment.

Q. You personally interviewed each of the three Langstons?

A. Yes.

Q. When you interviewed any of those three Langstons, was anyone else present other than you and that particular?

A. Just myself and the Langston that I was talking to.

Q. You were asked some questions about the information that was provided to you by Sandra Langston. Do you recall that?

A. Yes.

Q. All right. When Ms. Langston was providing you information, what did you do with that information?

A. Jotted it down, took the information that she was telling me, yes.

Q. You wrote down exactly what she was telling you?

A.  Yes.

Q.  Do you know if Sandra was telling you everything that she knew about her observations that day?

            MR. LOEVY:  Objection, foundation.

            THE WITNESS:  I do.

            MR. MICHALIK:  The question was do you know?

            THE COURT:  Overruled.  You can answer.

            THE WITNESS:  Okay.  I believe that everything she was telling me she was being truthful with me.

BY MR. MICHALIK:

Q.  All right.  Would you have anyway to know if she was leaving out some of the details of what happened that day?

            MR. LOEVY:  Objection.

            THE COURT:  Sustained.

BY MR. MICHALIK:

Q.  Okay.  You interviewed Randy Langston as well?

A.  Yes.

Q.  And, again, whatever information Randy provided you, you wrote that down in your notes and converted it into the supplementary report?

A.  Yes.

Q.  Again, do you have anyway to know whether Randy Langston was telling you everything about what he had observed that day?

            MR. LOEVY:  Same objection.


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 62 of 164 PageID #:20077
11/28/16 AM           ***REALTIME UNEDITED TRANSCRIPT ONLY***

61

THE COURT:  I permitted that question on the other witness.  I will permit it here.  Go ahead.  Do you know whether he was telling you?

THE WITNESS:  I believe what he was telling me, he was being truthful.

BY MR. MICHALIK:

Q.  And then you also interviewed James Langston that day as well?

A.  Yes.

Q.  And again everything that James told you, you recorded in your notes and converted it into the supplementary report?

A.  Yes.

Q.  All right.  In looking at the supplementary report, go to the top, there's some additional information that is provided for each of the witnesses that you interviewed on April 28, 1984, correct?

A.  Yes, on the second page or the first page?

Q.  First page and the second page.  There's contact information?

A.  Yes.

Q.  Of all of those witnesses, true?

A.  Yes.

Q.  So that I think you told us that James had provided information about what he observed that morning, correct?

A.  Yes.

Q.  So that James was an eyewitness to the events?

A.  Yes.

Q.  And you included his contact information in your supplementary report?

A.  Yes.

Q.  You've got his address and his phone number?

A.  Yes.

Q.  Why do you include that information in a supplementary report?

A.  Well, James is an eyewitness and if any other detectives or investigators were looking into this matter and they needed to talk to him for more information, it had his contact information to make it easier for them to locate and find and talk to him.

Q.  If we could see Plaintiff's Exhibit 1, page 104.

All right.  You were asked some questions about this to/from memo.  Do you recall that?

A.  Yes.  Yes.

Q.  Who prepared that memo?

A.  My partner, James Minogue, Detective Minogue.

Q.  It has some information that was attributed to Mr. Langston and Mr. Loevy asked you some questions about that.  Do you recall?

A.  Yes.

Q.  According to James Langston, he says that he saw the get

away car, correct?

A.  Yes.

Q.  And what did James Langston tell you about that get away car and the direction that it was traveling?

A.  Did he tell me?  He didn't.

Q.  Sorry.  Thank you.

What information is reflected that was provided by James Langston concerning the direction of the get away car?

A.  The offenders were fleeing in a blue Cadillac, the car went south on Langley, then west on 39th Street.

Q.  All right.  So according to this information that was provided by James Langston, he said that the car was going south on Langley, which would be going toward the scene where the shooting occurred, correct?

A.  Yes.

Q.  And that it made a right turn to go west down 39th Street?

A.  Yes.

Q.  All right.  According to the memo, James Langston also suggested that the person that he saw in the passenger seat of the get away car was the brother of Ricky Baldwin?

A.  Yes.

Q.  You were asked some questions about that.  I just want to follow up on what did you do to investigate that information?

A.  Myself and my partner after the interviews were complete, we went into our area, area 51st and -- I call it area, our

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 65 of 164 PageID #:29080
Case: 1:10-cv-01168 Document #: 485-16 Filed: 02/24/17 Page 65 of 164 PageID #:30605

police station, 51st and Wentworth, and we went through our alpha files which are arrest files that we keep at the time, arrest records.

Q.   Why would you check the alpha file if you were looking for Baldwins?

A.   We were looking for any Baldwins, last name of Baldwins that could maybe give us some more information, maybe get some photos or something like that on where they might reside.

Q.   Were you able to find any information regarding any Baldwins in the alpha file?

A.   Yes, we did.

Q.   What did you find?

A.   We found two photos, I'm sorry, we had to go down to 1121 south state to obtain the photos.  There were two photos found.  One on a Sean Baldwin and one on a Ricky, not Ricky, Sean and Paul Baldwin.

Q.   And I think you told Mr. Loevy that at that time, there were no other photos available of any other Baldwin brothers?

A.   No, there were none on our files, no.

Q.   What, if anything, did you do with those two photos that Mr. Loevy showed you?

A.   We obtained copies of the photos from our ident section. Then we took them to 106 I'm sorry, apartment 106 at 706 East 39th Street, the apartment of James Langston and looking for him to show him the photos to see if it would help us

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 66 of 164 PageID #:20081
Case: 1:13-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 66 of 164 PageID #:30666
11/28/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

65

identify, if either one of these two Baldwins were the person he saw in the car.

Q.   When did all of this take place?

A.   Later that night.

Q.   Still?

A.   The same day.

Q.   April 28, 1984?

A.   April 28, yes.

Q.   All right.  Were you able to find Mr. Langston that evening?

A.   Yes, we located him in the apartment at 106 East 39th Street.

Q.   Did you show the photos to James?

A.   Yes, I did.

Q.   What did he say?

A.   He identified the one photo of Sean Baldwin, he says, yeah, that's a Baldwin, but he's not the one that was in the car.  He was unable to identify the other person, the other Baldwin, but he said that person was not in the car either.

Q.   So just to wrap up, according to James Langston, either Paul Baldwin nor Sean Baldwin was the person he was saying he saw in the get away car?

A.   Yes.

Q.   All right.  You were asked some questions about your investigation of the Edwards brothers.  Do you recall that?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 67 of 164 PageID #:20082
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 67 of 164 PageID #:30667

66

A.  Yes.

Q.  All right.  This was the note that Mr. Loevy showed you before?

A.  Yes.

Q.  All right.  And you said that this was an anonymous tip, correct?

A.  Yes.

Q.  Was it common for the Chicago Police Department back in the 1984 time frame to get anonymous tips?

A.  Yes, it was.

Q.  What would detective do with anonymous tips?

A.  We'd check them out, whatever information, names, anything that could help us, check out the tip, we'd investigate it.

Q.  This particular tip is about Lawrence and Marshall Edwards, Lawrence Edwards and Marshall Edwards, correct?

A.  Yes.  Yes.

Q.  What did you and Detective Minogue do to investigate this anonymous tip?

A.  We checked our files, alpha files to see if there were any previous -- they had been previously arrested, anything that can help us, photos, addresses, where they could they be located, physical descriptions, and we were able to in our files find some information.

Q.  And I think you told Mr. Loevy that you were able to track down the Edwards brothers at some point and talk to them,

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 68 of 164 PageID #:20083
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 68 of 164 PageID #:30668

correct?

A. Yes.

Q. And they both provided you with alibis?

A. Yes.

Q. When you talked to the Edwards brothers, did you talk to them at the same time or separately?

A. No, we had them separated when we talked to them.

Q. Were they cooperative with you when you talked to them?

A. Yes.

Q. And they provided you their alibis?

A. Yes.

Q. As you told us before, those alibis were checked out by you and Detective Minogue?

A. Yes.

Q. If I could see Plaintiff's Exhibit 1, page 106. I think you referred putting that information in a general progress report on checking out the alibi of the Edwards brothers?

A. Yes.

Q. Looking at this, is this the general progress report that you were referring to regarding the Edwards brothers?

A. At the very bottom, yeah.

Q. Okay. So you did reflect this in a general progress report?

A. Yeah, the paragraph above.

Q. Is that the paragraph that you're referring to?

A. Yes.

Q. It says that the other anonymous call that alleged that Lawrence and Marshall Edwards were the killers was checked out.

A. Yes.

Q. You were also asked a little bit about investigator Edward Stewart. Do you recall that question and that testimony?

A. Yes.

Q. Let's back up a little bit. If I could have Exhibit 1, page 145. This tip regarding Edwards Stewart was another anonymous tip?

A. Yes.

Q. Is this the anonymous tip that you were referring to that's reflected on Exhibit 1, page 145?

A. Yes.

THE COURT: He said yes.

BY MR. MICHALIK:

Q. Okay. Where did this tip come -- can you explain how this anonymous tip came to the attention of the police department?

A. David minute fold called into our office, he is a janitor that works at C H building at 2960, m-i-n-n-i-f-i-e-l-d, he's the janitor in a CHA building at 2960 south State Street. He called our office stating that he had received some information from an anonymous caller that he described as being a mail black, a youthful male black who told him that he

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 70 of 164 PageID #:20085
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 70 of 164 PageID #:30670
11/28/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

69

saw a phone number on television to call if they had any information regarding this double murder investigation. So he called the number and it turns out the number belonged to Mr. Winfield.

Q. Just so we're clear about the hes and all that. Mr. Minute field contacted the police department?

A. Yes.

Q. About an anonymous tip that he had received?

A. Yes.

Q. And the anonymous tipster called a telephone number that the tipster saw on the television and it turned out to be Mr. Mini field's number?

A. Yes.

Q. What was it that Mr. Mini field relayed to you regarding this anonymous tip?

A. This came in late at night, and we did not get involved in this until the very next day, so we went out and we spoke to him personally.

Q. Let me stop you there. What dates are you talking about here?

A. I don't recall the exact date, but --

Q. Was it April 28th, the first day of your investigation?

A. It was the 29th the call came in and it would have been the 30th.

Q. Thank you?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 71 of 164 PageID #:20086
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 71 of 164 PageID #:30671

A.  According to the note here.

Q.  Please continue with what Mr. Mini field told you that was the information provided to him by the anonymous tipster?

A.  He started off basically with the information I told you about, how he got the tip and in the tip itself it said that the guy driving the car was Edward Stewart and also in the car was a Darryl Baldwin and somebody by the name of Chico.

Q.  So this anonymous tipster told Mr. Mini field that there were three suspects in this vehicle, correct?

A.  Yes.

Q.  All right.  What else did you learn from Mr. Mini field about the tip?

A.  That he went on to say that the information that he received, that the subject Edward Stewart was living with his girlfriend Olivia Wallace at 4716 south Cottage Grove.

Q.  All right.  What, if anything, did you do with this information that was provided to you by Mr. Mini field from this anonymous tip?

A.  With all the information we had on Edward Stewart, Darryl Baldwin, and Olivia Wallace, we went back to our alpha files to see if we could find anything, any identification about them, where they might be living, had they ever been arrested before, had photos of them for purposes of identification to know if they were the people we were talking to and we were able to find some information on Edward Stewart, Olivia

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 72 of 164 PageID #:29087
Case: 1:15-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 72 of 164 PageID #:30672

11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

71

10:49:49  Wallace, there was nothing on Darryl Baldwin, and there was a
10:49:53  third person by the name of Chico.

10:49:57  Q.  What did you do next in terms of investigating it
10:50:01  anonymous tip?

10:50:01  A.  We went down, we got photos of them, of the people, the
10:50:04  photos that were available on the two and then we went to
10:50:07  Olivia Wallace's apartment.

10:50:09  Q.  Were you able to find Ms. Wallace?

10:50:11  A.  Yes.

10:50:11  Q.  Was she willing to talk to you?

10:50:13  A.  Yes.

10:50:13  Q.  And what, if anything, did she tell you?

10:50:16  A.  Well, we asked her if she knew Edward Stewart and she says
10:50:22  yes.

10:50:22  Q.  What did she say?

10:50:24  Did she provide you with any information in addition
10:50:27  to that?

10:50:27  A.  Yes, she told us Edward Stewart was living on the west
10:50:30  side of Chicago, provided us with an address of 1255 north
10:50:34  central, she said that -- we asked her if she knew Darryl
10:50:41  Baldwin and Chico.  She said she knew who Darryl Baldwin was
10:50:47  and he lived at 3833 South Langley.  Chico, she was not that
10:50:53  familiar with.  She couldn't provide -- she gave an address of
10:50:58  area 40th and Drexel.

10:51:00  Q.  Did she provide?


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 73 of 164 PageID #:20082
Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 73 of 164 PageID #:30673

A. She said they all hung together, all three of them hung together, but she had not seen Edward since the first of the year, and she -- that's about it on that.

Q. She told you that she had not seen Edward Stewart since January 1984 or thereabouts?

A. That's correct, yes.

Q. Did she provide you any information regarding the type of car that Mr. Stewart had?

A. Yeah, we asked her what kind of car he had, and she said he had a 1973 Camaro.

Q. Not a blue Cadillac?

A. No.

Q. All right. What did you do next in investigating this anonymous tip?

A. After talking to her, we went out to 1255 north central on the west side of Chicago looking for Edward Stewart.

Q. Were you able to find Mr. Stewart?

A. Yes, we did.

Q. And where did you find him?

A. We found him at 1255 north central in an apartment.

Q. That was the address that Olivia Wallace provided to you?

A. Yes.

Q. Was Mr. Stewart willing to talk to you?

A. Yes.

Q. Was he uncooperative in any way?

11/28/16 AM
Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 74 of 164 PageID #:20089
Case: 1:16-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 74 of 164 PageID #:30674
***REALTIME UNEDITED TRANSCRIPT ONLY***

73

A. No, he wasn't.

Q. What did Edward Stewart tell you?

A. Well, we asked him what he was doing on the date and time in question about the time the murder occurred and he said he was -- he worked in downtown Chicago at the McDonald's at Chicago and water tower, I believe that's Chicago and state and he said he left for work from his apartment, his apartment now was 700 block of north central, that he got on the el, took the el down to where he worked, started working at 10:30, and.

Q. And you told Mr. Loevy before that you attempted to verify Mr. Stewart's alibi by calling that McDonald's's right?

A. We did contact that McDonald's and we got no information, it was closed. They said they were closed and there wasn't a 24/7 operation.

Q. Did Mr. Stewart tell you anything else that was helpful to your investigation of this anonymous tip?

A. Yes, we asked him what kind of car he drove.

Q. What did he tell you?

A. He told us that he drove a white 1973 Camaro.

Q. And that matched the information that was provided to you by Ms. Wallace again, correct?

A. Yes.

Q. So in addition to an alibi, there was additional information suggesting that this anonymous tip was incorrect

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 75 of 164 PageID #:20090
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 75 of 164 PageID #:30675

about Mr. Stewart's vehicle?

A.   Yes.

Q.   Did Mr. Stewart say anything about Darryl Baldwin?

A.   He had not seen Darryl Baldwin in about seven or eight months.  And he hadn't seen Chico in a while either.

Q.   So if I understand it correctly, Mr. Stewart told you he had not seen Darryl Baldwin in seven or eight months?

A.   Yes.

Q.   And Olivia Wallace said she hadn't seen him since the beginning of the year?

A.   Yes.

Q.   Did you do anything to attempt to find any information out about Darryl Baldwin independently of what these witnesses were telling you?

A.   We went to the address that Olivia supplied at 3833, it's a highrise CHA building, 16 floors, 16 stories, and we were able to make no contact with him.

Q.   Now, you told us before that sometimes when you were looking for a witness, you would go to the alpha file.  Do you recall that testimony?

A.   Yes.

Q.   Did you do that for Darryl Baldwin?

A.   Yes, we did.

Q.   What did you find?

A.   We did not find any information on him.

Q. So what did that mean regarding Mr. Baldwin if there was no information in the alpha file?

A. That we weren't able to find him, locate him.

Q. To there was no arrest record for Darryl Baldwin in the alpha file?

A. No.

Q. And he hadn't been seen by these two witnesses?

A. Yeah, seven or eight. There's nothing to corroborate the tip on Darryl Baldwin being in the car.

Q. Did Mr. Stewart provide you any information about Chico?

A. He hadn't seen Chico in a while and Chico lived in the area, 40th and Drexel.

Q. Did he know Chico's real name?

A. No, he did not.

Q. Did Mr. Stewart provide you with any sort of information about the type of car that either Darryl Baldwin or Chico owned?

A. As far as he knew, neither one of them had a Cadillac.

Q. If I could just briefly see Plaintiff's Exhibit 1, page 106.

I think we looked at this before, Mr. Bogdalek. Is this a general progress report that reflects all of the information that you just explained to the ladies and gentlemen of the jury regarding the investigation of Edward Stewart and the anonymous tip that was provided through

11/28/16 AM
Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 77 of 164 PageID #:20092
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 77 of 164 PageID #:30677
***REALTIME UNEDITED TRANSCRIPT ONLY***

76

Mr. Mini field?

A.  Yes.

Q.  If I could have Exhibit 2, page 120.

Mr. Bogdalek, you were asked some questions about this report that you prepared in response to the lawsuit that was filed by Mr. Fields.  Do you recall those questions?

A.  Yes.

Q.  According to this, it says that the under signed, and that would be you, correct?

A.  That is correct, yes.

Q.  Did not intentionally and deliberately suppress any written notes which contained any information or which contained exculpatory information/evidence relative to this or any investigation.  That's what you said?

A.  Yes.

Q.  Did you intentionally or deliberately suppress any written notes which contained any information which contained exculpatory information or evidence regarding your work on the Smith/Hickman case?

A.  No.

Q.  Were you aware of anyone else who suppressed or withheld any materials regarding the Smith/Hickman case?

A.  No.

Q.  So that affidavit was true back then and it's true today?

A.  Yes.

Q.  Now, during your investigation of the Smith/Hickman homicides in April and May of 1984, did the name of Anthony Sumner ever come up?

A.  No.

Q.  Did any witness or anyone else ever suggest to you at the time that Anthony Sumner was involved in the Smith/Hickman murders?

A.  No.

Q.  During your investigation, did anyone suggest that someone with the nickname sundown was involved in the Smith/Hickman murders?

A.  No.

Q.  During your investigation, did the name Earl Hawkins ever come up?

A.  No.

Q.  Did anyone ever suggest to you that Earl Hawkins was involved in these murders?

A.  No.

Q.  Did you know Nathson Fields prior to your investigation work in 1984?

A.  No.

Q.  Did you ever hear of the name Nathson Fields prior to that time?

A.  No.

Q.  Did Mr. Fields name ever come up during your 1984

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 79 of 164 PageID #:20094
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 79 of 164 PageID #:30675
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

78

Q. investigation of the Smith/Hickman murders?

A. No.

Q. Did you ever prepare a note or a report suggesting that Mr. Fields was involved in the Smith/Hickman murders?

A. No.

Q. Did you ever prepare a note or report that any witness told you that Mr. Fields was not involved in the Smith/Hickman murders?

A. No.

MR. MICHALIK: If I can have a moment, your Honor.

THE COURT: Sure.

MR. MICHALIK: Thank you. That's all I have.

THE COURT: Mr. Kulwin.

MR. KULWIN: Yes, your Honor.

- - -

^ WITNAME, CROSS-EXAMINATION

BY MR. KULWIN:

Q. Good morning. Detective, I want to ask you some questions about your interview of Sandra Langston if I could. I believe that plaintiff's 86 and defendants' 57 are the same.

So I want to put up first?

MR. KULWIN: Could I have the ELMO, Judge?

THE COURT: Sure.

MR. KULWIN: Thanks.

BY MR. KULWIN:

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 80 of 164 PageID #:20085
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 80 of 164 PageID #:30680

11/28/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

79

Q.  Now, this is the to/from memo that you wrote about your interview of Sandra Langston.  Do you see that?

A.  Yes, my partner wrote that, yes.

Q.  Your partner, and that was Detective Minogue?

A.  Detective Minogue, yes.

Q.  Now, if you notice, what does it say that Sandra Langston saw while she was standing in the window?  Start from the top. Sandra Langston said she was talking to Fuddy just before the shooting.  She was speaking to from her second floor bedroom window.  He walked into the breezeway.  She saw two male blacks, description, red ski hat, white jacket (sic) should be blue ^ , light complexion.  She then heard shots, right?  Was that what Ms. Langston told your partner according to this?

A.  Yes.

Q.  Now, if we could look at your report that was produced to the defendants?

        MR. KULWIN:  Can I switch to the computer, Judge?

        THE COURT:  Yes.

BY MR. KULWIN:

Q.  Can you blow up Sandra Langston?

BY MR. KULWIN:

Q.  Okay.  Now, this is the report that you wrote after your interview -- recording -- transcribing or summarizing your interview with Sandra Langston when you interviewed her, correct?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 81 of 164 PageID #:20096
Case: 1:15-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 81 of 164 PageID #:30681

A.  Yes.

Q.  Okay.  It says here Sandra was interviewed and related the following, just prior to the victim being shot, she was talking to the victim, Jerome Fuddy Smith from her second floor bedroom window about Paul hailly getting out of jail. After the conversation ended, Smith said he was going to the front of the building and walked away.  A short time later she heard three shots coming from the front of the building.

If you flip up here, she goes, she first added that she had observed the two male blacks, she had observed two male blacks following victim Smith when he walked away from her bedroom window, that's what it says?

A.  Yes.

Q.  Am I reading it right that what she's telling you is that she is talking to Fuddy, he walks into the breezeway, and then she sees two male blacks following him, is that what this says?

MR. LOEVY:  Objection, asked and answered.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Yes.

BY MR. KULWIN:

Q.  Okay.  Now, in addition going back to the -- in this document here, she says that the man was wearing a red ski mask hat?

A.  Yes.

Q.  Hat.

Once again, she says red ski hat, right?

A.  Yes.

Q.  Okay.  There's nothing about a mask being pulled over the men's face, right?

A.  No.

Q.  If I could turn your attention now to Gerald Morris' testimony from the trial, page 232, I apologize.  It might be -- 232 and 233, and this is Gerald Morris' testimony in the trial.  It says, and did you see anything unusual as you sat in the window after Fuddy left?  And then he says, yes.  What did you see?  I seen two males walk right behind him.  Did you see where they were coming from?  No, I didn't.  Where is the first place you saw them?  Entering the parking lot.

Okay.  So Mr. Morris' testimony is completely consistent with this, correct?

MR. LOEVY:  Objection.

THE COURT:  Sustained.

BY MR. KULWIN:

Q.  Now, this permanent retention file, I think counsel, Mr. Loevy commented that this permanent retention file, that's turned over?

MR. LOEVY:  Objection, same subject covered already.

THE COURT:  I haven't heard the question yet.  Go ahead and ask the question.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 83 of 164 PageID #:20098
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 83 of 164 PageID #:30688
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

82

BY MR. KULWIN:

Q. Is it your understanding, detective, that the permanent retention file with your police reports, including this interview with Ms. Langston would be turned over to the defense?

MR. LOEVY: Objection, your Honor, that subject was covered.

THE COURT: You have to ask the question in a different way.

MR. KULWIN: Okay. Sure. Bad question?

THE COURT: Yes.

BY MR. KULWIN:

Q. Detective, you're familiar with the -- are you familiar with the term permanent retention file?

A. Yes.

Q. Okay. Are you familiar with whether those reports that are in the are turned over in the criminal justice system as Mr. Loevy would say to the defendant to your knowledge?

A. I am not -- I am not sure.

Q. One way or the other?

A. No.

Q. Let me ask you this question. Are you aware that the defendants never called Sandra Langston to testify at Mr. Fields' trial? Are you aware of it one way or the other?

A. No.

Q. Now, you were asked some questions about James Langston. Are you aware that James Langston was called by Mr. Fields as a witness in his death penalty hearing? Were you aware of that?

A. No.

Q. Were you aware that at the time of his trial, Mr. Fields' counsel was fully aware of James Langston's testimony, are you aware one way or the other? You don't know?

A. I don't know.

Q. Now, you were asked some questions about what Randy Langston said he was doing that day. You also spoke with Carlos Willis; is that correct?

A. I did not speak with Carlos Willis.

Q. Okay. That would be Detective Hood and Evans?

A. I would assume.

Q. You don't know.

You mentioned that there were a number of detectives working on this investigation, right?

A. Yes.

Q. Was a detective J. /SRAPLer shot one of them?

A. Yes.

Q. Okay. And would he have interviewed people that you didn't interview perhaps?

MR. LOEVY: Objection to foundation, your Honor.

THE COURT: Sustained.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 85 of 164 PageID #:20100
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 85 of 164 PageID #:30685
11/28/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

84

BY MR. KULWIN:

Q.  If you know?

        THE COURT:  The objection is sustained.

BY MR. KULWIN:

Q.  Let me show you the investigative file.

        MR. KULWIN:  If I may approach, Judge.

        THE COURT:  Sure.

BY MR. KULWIN:

Q.  This is page 7604.  Have you ever seen this?  This is the investigative file, detective?

        MR. LOEVY:  Your Honor, could we have an exhibit?  I'm sorry.  That's not an exhibit.

        THE COURT:  Plaintiff's 1?

        MR. KULWIN:  I believe this is plaintiff's 194.

        MR. LOEVY:  The page.

        THE COURT:  What page are you showing him?

        MR. KULWIN:  Showing him the one I just told you, 7604.

        MR. SWAMINATHAN:  194-what?

        MR. KULWIN:  I don't have a --

        THE COURT:  Just show it to Mr. Loevy so he can see it.  All right.  Go ahead.

BY MR. KULWIN:

Q.  Do you see the signature at the bottom there, right there?

A.  Murphy.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 86 of 164 PageID #:20101
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 86 of 164 PageID #:30686

Q. Right there?

A. Vanner shot.

A. Yes.

Q. Is that detective /SRAPBDer shot's signature, to the best of your knowledge?

A. That's his name.

Q. All right. Does it indicate whether he interviewed someone by the name of Eric Benson in the top?

MR. LOEVY: Relevance, your Honor.

THE COURT: I can't hear you.

MR. LOEVY: Relevance.

THE COURT: This is going to be covered in some other way. I am going to sustain the objection. It's not that it's irrelevant. It's just going to be covered in some other way. The objection is sustained. Or it needs to be covered in some other way I should say.

MR. KULWIN: I can cover it with someone else.

BY MR. KULWIN:

Q. You were asked about whether or not you put important details down in your reports, right?

A. Yes.

Q. So if someone was wearing a mask over their face and the witness told you that they were wearing a mask over the face, that's an important detail that you would write down in the report if someone said a man was wearing a mask over his face?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 87 of 164 PageID #:20102
Case: 1:16-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 87 of 164 PageID #:30687

A.  Yes.

Q.  And with respect to James Langston?

        MR. LOEVY:  Objection, your Honor, James Langston was covered.

        THE COURT:  Hang on.  I haven't heard a question yet. I have a pretty good recall of what was covered.

BY MR. KULWIN:

Q.  With respect to James Langston on the ELMO, he advised you, correct me if I'm wrong, that the man -- one of the shooters rolled their mask up over their face?

A.  Yes.

Q.  Okay.  And Randy Langston also told you the exact same thing?

A.  Yes.

Q.  And you had no knowledge one way or the other whether Sandra Langston wanted to be involved as being a witness in this case, did you?

        MR. LOEVY:  Objection.

        THE COURT:  Sustained.

        MR. KULWIN:  If I may have a moment, Judge.

        THE COURT:  Yep.

    (Brief pause.)

        MR. KULWIN:  Nothing further, Judge.

        THE COURT:  I am really hoping to finish this witness before the break.  Proceed with the redirect.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/28/16 AM
Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 88 of 164 PageID #:20103
***REALTIME UNEDITED TRANSCRIPT ONLY***

87

- - -

^ WITNAME, REDIRECT EXAMINATION

BY MR. NOLAND:

BY MR. LOEVY:

Q.  You were asked whether Sandra Langston didn't testify at the criminal trial?

A.  Repeat the question.

Q.  You were asked whether Sandra Langston didn't actually testify at Nate's criminal trial?  All right.  Isn't it true that Sandra Langston, if she was called to describe who was outside the window shortly before Fuddy was shot, she would have had to acknowledge that those two people were light complected?

        MR. KULWIN:  Objection, argumentative.

        THE COURT:  It's been covered sufficiently on the direct, so the objection is sustained.

BY MR. LOEVY:

Q.  You were asking?

A.  Yes.

Q.  When Mr. Kulwin was showing you Gerald's testimony, that was June of '86, that was more than two years later, correct /STKPHR-FRPLTS?

A.  Gerald?  I didn't talk to Gerald.

Q.  Gerald was the guy whose transcript he showed you, that was from June of '86?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 89 of 164 PageID #:20104
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 89 of 164 PageID #:30685

THE COURT:  The question is do you agree that 86 is two years after 1984, that's the question.

THE WITNESS:  Yes.

BY MR. LOEVY:

Q.  That's why it's important to contemporaneously record contemporaneous details, right?

A.  Yes.

Q.  And you were asked if James was called at trial and Mr. Kulwin asked you isn't it true that Mr. Fields was fully aware of James's testimony, do you remember that question?  He just asked you a minute ago?

MR. KULWIN:  I think the objection was sustained when I asked it, Judge.

THE COURT:  Just ask a question.

BY MR. LOEVY:

Q.  All right.  Mr. Fields was not fully aware that James Langston was claiming that he saw the men and one of them was the brother, was he?  He wasn't fully aware of that because it wasn't in the report, correct?

MR. MICHALIK:  Objection, Judge.  Speculation.

THE COURT:  I am going to sustain the objection not for that reason.  I am going to sustain it under 403 because it was covered sufficiently on direct.

BY MR. LOEVY:

Q.  You told Mr. Kulwin that James rolled the mask up over his

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 90 of 164 PageID #:20105
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 90 of 164 PageID #:30650
11/28/16 AM
***REALTIME UNEDITED TRANSCRIPT ONLY***

89

face. James told you who he saw when the mask was off the face, right?

A. James told me who he saw?

Q. Yeah. It was the brother of the Baldwin, right?

A. With the mask?

Q. No. He said I saw the guy's face and it was a brother of a Baldwin, right?

MR. KULWIN: Objection, Judge, misstates the report and the testimony. It's argumentative.

THE COURT: Put the question again.

BY MR. LOEVY:

Q. All right. James and Randy told you the exact same story, right, one man, mask rolled up, correct?

A. Yes.

Q. Okay. Were they -- it's possible then that they were just before you got there talking about recollection?

MR. KULWIN: Objection,.

THE COURT: The objection is sustained. It's speculation.

BY MR. LOEVY:

Q. James and Randy's story tracked each other, correct?

MR. KULWIN: Objection, asked and answered.

THE COURT: Covered sufficiently, I agree. Sustained.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 91 of 164 PageID #:20106
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 91 of 164 PageID #:30691
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

90

Q. You were asked about Mr. Hawkins. First of all, Nate's name did not come up any time in 1984, correct, during the entire investigation?

A. No, it did not.

Q. All right. Mr. Hawkins' name did, though, didn't it?

A. No.

Q. Showing you the investigative file, and this is the page?

THE COURT: Page number?

MR. LOEVY: I don't have a page number. I'll show Mr. Kulwin.

THE COURT: Show it to counsel then.

BY MR. LOEVY:

Q. Take a look and identify for the jury what it is. It's a rap sheet?

A. It's a rap sheet, yes.

Q. Of Mr. Hawkins?

A. Yes.

Q. What's the date stamp on it?

A. Date stamped on the 27th of April 1984.

Q. I'll represent to you that comes from the official investigative file that suggests that Mr. Hawkins was a suspect originally, correct?

MR. KULWIN: Objection, Judge, as to what is suggests. Calls for speculation.

THE COURT: Hang on a second.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 92 of 164 PageID #:20107
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 92 of 164 PageID #:30692

MR. MICHALIK: And as to where it comes from.

THE COURT: Well, so what document -- what exhibit are you saying that it came from?

MR. LOEVY: It's Plaintiff's Exhibit 1, pages 25, 26 is from the investigative file.

MR. KULWIN: Your Honor. Sorry. I apologize. I'm sorry. That was my fault.

THE COURT: All right. So rephrase the question and I'll determine at that point whether to sustain the objection or not.

BY MR. LOEVY:

Q. Would you agree that this document from the investigative file suggests that Hawkins had something to do -- that the police thought Hawkins had something to do with the murder as far back as the day of the murder?

MR. KULWIN: Objection, Judge.

THE COURT: Sustained.

BY MR. LOEVY:

Q. This document reflects that in the investigative file Hawkins' rap sheet was pulled on or about the date of the murder, correct?

MR. KULWIN: Objection, Judge.

THE COURT: He can answer that.

BY MR. LOEVY:

Q. Correct?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 93 of 164 PageID #:20108
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 93 of 164 PageID #:30698

A. According to the date. I have no knowledge of Mr. Hawkins.

THE COURT: You are referring to that date stamp that's in a rectangle at the bottom?

MR. LOEVY: Yes.

THE COURT: I am asking him.

THE WITNESS: Yes.

BY MR. LOEVY:

Q. You can read it better than I can. What does it say?

THE COURT: What does say it say in that box.

THE WITNESS: Issued on inquiry, issued April 27, 1984.

BY MR. LOEVY:

Q. And the reason people pull rap sheets is so they can get photographs, right?

A. Yes.

Q. And this is in fact a photograph of Earl Hawkins, is it not?

THE COURT: What exhibit is this from?

MR. LOEVY: These don't have a Bates number. It's the actual exhibit from Exhibit 1.

THE COURT: The question is is that a photograph of Earl Hawkins.

THE WITNESS: I don't know what Earl Hawkins looks like.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 94 of 164 PageID #:20109
Case: 1:16-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 94 of 164 PageID #:30694

11/28/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

93

THE COURT:  That's the answer.  Go ahead.  Ask another question.

BY MR. LOEVY:

Q.  The reason people pull rap sheets is so they can get photographs to show witnesses?

A.  Yes.

Q.  So if this photograph and rap sheet was in the investigative file, it is a fair assumption that at least some police officer thought that Mr. Hawkins' photograph in 1984 should be shown to witnesses, correct?

MR. KULWIN:  Argumentative.

THE COURT:  The same question I sustained an objection to, I'm sustaining it again.

BY MR. LOEVY:

Q.  Do you know if any witness identified Mr. Hawkins in 1984?

A.  I have no idea.

Q.  Do you know why Mr. Hawkins' photo was pulled back in '84?

A.  No, I do not.

Q.  There is no document in the file explaining why Hawkins, his photograph and rap sheet were pulled back in April 84, is there?

A.  No.

Q.  You have never seen any document or explanation for that, have you?

A.  No, I have not.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 95 of 164 PageID #:20410
Case: 1:16-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 95 of 164 PageID #:30695
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

94

Q.  You were asked about Gerald Morris and whether he was present when you interviewed Sandra.  You don't have an actual recollection of the interview, correct?

MR. MICHALIK:  Objection, asked and answered.

THE COURT:  Sustained.  Covered sufficiently.

BY MR. LOEVY:

Q.  All right.  There were 12 Langston brothers and sisters. Do you remember that?

A.  I have no knowledge how many there were.

Q.  You didn't write down every brother and sister if they weren't claiming to be a witness, right?

A.  I just talked -- the people I talked to, the Langstons I talked to, the.

MR. LOEVY:  The question.

THE COURT:  He's answered the question.  Ask another one.

BY MR. LOEVY:

Q.  Isn't it true that you only wrote down people who were claiming to be witnesses?

A.  We only talked to four people that day, that might.

Q.  How do you know you didn't talk to the other 8 Langston brothers and sisters?

A.  I have four documented that's who I talked to on that particular day.

Q.  And you wrote down the names and information from people

that day who were claiming to be witnesses, correct?

MR. KULWIN: Objection, Judge, argumentative and asked and answered.

THE COURT: Asked and answered, sustained.

BY MR. LOEVY:

Q. Let's talk about the Baldwin brothers. The investigative stems you described to Mr. Michalik, you don't actually remember doing those steps, right?

A. Which one?

Q. When you were telling them you went here, then we went here, we talked to that person, you don't actually remember that, do you?

A. Yes, I remember. From the reports.

Q. All right. So you're inferring what happened because you can read the reports, correct?

MR. MICHALIK: Objection.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Correct?

A. Yes.

Q. But you don't remember it, right?

A. I was -- I do -- I remember what I read in the reports.

Q. And you know you wouldn't have written it down if it wasn't true, right?

A. It would have to be true.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 97 of 164 PageID #:20142
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 97 of 164 PageID #:30697
11/28/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

96

Q. That's why police officers document things, so that years later they can say what happened, correct?

MR. KULWIN: Objection, Judge, argumentative, asked and answered.

THE COURT: Asked and answered, sustained.

BY MR. LOEVY:

Q. All right. You talked to Mr. Michalik about the Baldwin's alibi. Isn't it true you never spoke to the Baldwins?

A. No, we did not speak to the Baldwins.

Q. So you are not claiming that you did a comprehensive investigation to rule out the Baldwins, are you?

MR. MICHALIK: Objection,argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. The people that were identifying the Baldwins, that was in 1984, correct?

A. Yes.

Q. That was more than a year before O'Callaghan got reinvolved, correct?

A. Yes.

Q. Now, Mr. Michalik asked you questions about this GPR and the investigative file. This is Plaintiff's Exhibit 1-106. This GPR contained the information you talked about in court today about Olivia Al was and Eric Stewart and Chico, et cetera?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 98 of 164 PageID #:20113
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 98 of 164 PageID #:30698

A.  Yes.

Q.  That's how you were able to testify as you did this morning, correct?

A.  Yes.

MR. KULWIN:  I am going to object on the same topic.

THE COURT:  The point has been covered sufficiently, more than sufficiently at this point.

BY MR. LOEVY:

Q.  All right.  Do you have any explanation for why this GPR was not turned over in the criminal case?

A.  No, I don't.

Q.  Should it have been turned over?

A.  It should have been turned over.

Q.  Was it the policies and practices of the police department at that time to turn over documents of this type?

MR. KULWIN:  Object, asked and answered, beyond the scope.

THE COURT:  I don't know that it's beyond the scope, and I don't recall if it was asked.  So that's the question.  Is it the policies and practices of the police department at that time to turn over reports like this?

THE WITNESS:  The GPR, what are you talking about?

THE COURT:  The GPR.

THE WITNESS:  Yes.

BY MR. LOEVY:

Q. You were asked about a tip you got from a janitor who worked at the CHA building, do you remember that?

A. Yes.

Q. And the explanation for the phone number that didn't make much sense how they got the phone number?

A. It was different.

Q. Yeah. But obviously, a witness like a janitor might have relevant information, right?

A. Which he shared with us, yes.

Q. And he might have a reason to try to muffle where it came from, right?

A. I don't know what his intentions were.

Q. All right. Are you supposed to turn over all of that kind of information to the criminal defendant?

A. We investigate it and it was put on a GPR, we turned over GPR in, it should have.

Q. It should have. The system, in other words, the system doesn't really contemplate that the police check it out, decide it has no value, and then not turn it over, correct?

        MR. KULWIN: Objection, asked and answered.

        THE COURT: Sustained. May I see the lawyers at sidebar. /STPH*FPLT sidebar.)

        THE COURT: I am not going to trot out your word filibustering. Just because a couple of questions were asked on cross does not mean you get to redo the direct, and it does

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 100 of 164 PageID #:20115
Case: 1:13-cv-01168 Document #: 285-16 Filed: 02/24/16 Page 100 of 164 PageID #:30750

11/28/16 AM                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

                                                                    99

not mean you get to ask this question for the 1500th time.  I am.

MR. LOEVY:  I am about done.

THE COURT:

 (The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Proceed.

BY MR. LOEVY:

Q.  All right.  You were asked by Mr. Michalik if you put your notes in the supp reports, correct?

A.  Yes.

Q.  And looking at the notes on James Langston, you were asked if you transfer all of your notes in the supp report, correct?

A.  My notes, yes.

Q.  The notes didn't get into the supp report, could we agree on that?

MR. KULWIN:  Objection, asked and answered.

THE COURT:  I think this was covered on direct.  I am going to sustain the objection.

MR. LOEVY:  I have no further questions, your Honor.

MR. MICHALIK:  Just one, your Honor.

                                - - -

                    ^ WITNAME, RECROSS-EXAMINATION

BY MR. LOEVY:

BY MR. MICHALIK:


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. Mr. Bogdalek, referring to your notes and your supplementary report, why didn't you tell anyone about the notes that were missing at the state's attorney?

MR. LOEVY: Objection, your Honor. Scope. I didn't talk about that at all.

THE COURT: Overruled.

THE WITNESS: Why didn't I turnover my notes?

BY MR. MICHALIK:

Q. No. Let me ask the question again. Why didn't you tell anyone that you didn't see your notes when you were -- noticed that they were missing from the file at the state's attorney's office?

A. Because everything that was ^  in my notes would have been -- it's my common practice, my procedure is to take the information from the notes and transcribe it onto the supp.

Q. So everything from the notes was in the supp?

A. Yes.

MR. LOEVY: Objection.

MR. MICHALIK: No further questions.

MR. KULWIN: Two questions, Judge.

- - -

^ WITNAME, RECROSS-EXAMINATION

BY MR. LOEVY:

BY MR. KULWIN:

Q. Former detective Bogdalek, the date of the murder as

recorded in your report is what date?

A.  The 28th of April.

Q.  Okay.  And the date on Mr. Hawkins' rap sheet that Mr. Loevy with a referring to was what date?

A.  An inquiry was made on April 27th, 1984.

MR. KULWIN:  Thank you.  Nothing further, your Honor.

MR. LOEVY:  May I ask about that?

THE COURT:  I'll see what the question is.

- - -

^ WITNAME, REDIRECT EXAMINATION

BY MR. NOLAND:

BY MR. LOEVY:

Q.  In those days it was a manual stamp that you turned the date over, correct?

A.  I don't recall exactly.  You mean like a rubber stamp.

Q.  Where you literally had to physically change the date over, correct?

A.  I believe so.

MR. LOEVY:  I have no further questions.

THE COURT:  Do any of the jurors have any questions for the witness?  I don't see anybody writing.  Oh, I see one. (Sidebar) .

THE COURT:  Did he check out Edward Stewart's alibi the next day when McDonald's open up again? .

THE COURT:  All right.  There was this questions

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 103 of 164 PageID #:20118
Case: 1:13-cv-01168 Document #: 1285-16 Filed: 02/24/17 Page 103 of 164 PageID #:30703
11/28/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
                                                                            102

about he had wart Stewart said he had worked at the McDonald's and you said you tried to call the McDonald's and they were closed.  The question is did you check out the next day when they opened up, just answer yes or no and then I'll ask you why.

THE WITNESS:  No.

THE COURT:  Why?

THE WITNESS:  We were off the next two days.  We left.

THE COURT:  You left it for somebody else to do?

THE WITNESS:  Yes.

THE COURT:  Any follow up based on that?

MR. KULWIN:  No.

MR. LOEVY:  No.

THE COURT:  The witness is excused.  We are going to take a break.  We will resume in 10.

(Short break.)

(The following proceedings were had in open court outside the presence and hearing of the jury:)

THE COURT:  Ready to resume.

MR. BURNS:  Your Honor, one question.  Do we anticipate that we will then finish the testimony of Mr. Hawkins prior to your lunch break?

THE COURT:  No.  Not at this point.

MR. BURNS:  All right.

THE COURT:  I am going to break at 12:30.  I am not going to go past 12:30.

MR. BURNS:  Then over lunch, we will address and save you time.

THE COURT:  What do you mean?

MR. BURNS:  It's relative to and maybe we should talk just to the side outside of his presence, Mr. Loevy.

MR. BURNS:  Very quickly, Mr. Hawkins is represented by Mr. Stetler, Mr. Stetler said he would make Mr. Hawkins available to both plaintiff and defendant.  We went over there yesterday and had an opportunity to meet with him.  Mr. Loevy.

THE COURT:  Here here in the building?  You got open?  You said over here.

MR. BURNS:  Over here in this building, yes.

THE COURT:  Yesterday?

MR. BURNS:  Yes.

THE COURT:  You mean at the U.S. Attorney's Office is that right?

MR. BURNS:  Yes.

THE COURT:  Okay.

MR. BURNS:  So Mr. Loevy advised us that he was denied that opportunity and that may be some of the questioning.  Mr. Stetler is here.  It's our understanding that he wasn't denied the opportunity, that he was given that opportunity and didn't do it.  Before this gets too messy in

front of jury, I think that's a matter that we need to discuss, especially because Mr. Stetler, his counsel is here, and actually arranged for it.

MR. LOEVY: Your Honor, may I tell what I was going to elicit?

THE COURT: Yes.

MR. LOEVY: We were asked -- we were told that he was willing to meet. We asked that there be one meeting with the defense and the plaintiff were there together, we asked that that be personally communicated to Mr. Hawkins. That was refused, which is fine, that's his prerogative. That's one thing I would like to cross-examine him. There is not going to be a joint meeting, but if you want to interview him separately, but you can't impeach him. If he says something inconsistent, that's the only way you will meet with him. That's relevant, that's cross-examinable.

MR. BURNS: I think in response to suggest that he was denied the opportunity, he was given the opportunity.

THE COURT: I mean, if somebody says I was denied the opportunity, then I'll make him ask a more specific question. He wasn't given an opportunity that he found acceptable is what it boils down to.

MR. KULWIN: I would like to inquire of Mr. Stetler.

THE COURT: You don't. I am bringing the jury in.

MR. KULWIN: I can ask him --

THE COURT: You can do anything you want. I am bringing the jury in.

(The jury enters the courtroom.)

THE COURT: The jurors and everybody else can have a seat.

(Witness sworn.)

THE COURT: Mr. Loevy, you can go ahead.

MR. LOEVY: Thank you, your Honor.

- - -

^ WITNAME, DIRECT EXAMINATION

BY MR. NOLAND:

BY MR. LOEVY:

Q. If you would state your name for the record?

A. Earl Hawkins.

Q. How old are you, sir?

A. 61.

Q. And you were a general in the El Rukn organization back in the '80s, correct?

A. Yes, sir.

Q. Approximately how many members of the organization were there?

A. Different at different times. Mostly 700 to a thousand, probably.

Q. There was about 20 to 25 generals, correct, during the mid '80s?

A.   Somewhere around there, yes.

Q.   And that's the highest rank?

A.   Yes.

Q.   They are the ones closest to Jeff Fort and the trusted inner circle?

A.   Yes.

Q.   In the organization you had the role of enforcer, correct?

A.   At one time.

Q.   You testified at Mr. Fields' second trial on cross-examination, you testified in his second criminal trial, correct?

A.   Yes, sir.

Q.   And you were asked on cross-examination how many murders you have been involved in.  Do you recall that?

A.   Yes, sir.

Q.   What was your answer?

A.   Six.

Q.   Do you remember being asked these questions and this is your testimony in 2009 at page 100, lines 8 through 12.

        A lot of them, yes.  Over 50?  No.  Over 40?  No, no ma'am.  30?  No.  How many?  I'd say 10 to 15.  That's within the years 66 and 85?  Yes, ma'am.  You did then between 83, 81 and 85?  Ma'am, I said you did ten between 81 and /# will 5?  Yes, ma'am, planning.  Before that?  Huh?  Before that, how many did you do?  Five, ten do you see that?


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 108 of 164 PageID #:20123
Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 108 of 164 PageID #:30708

A.  Yes.

Q.  You also testified that you pled guilty to about ten murders, correct?

A.  Yes.

Q.  And at the trial as cross-examination, you were requested to name the people you pled guilty to murdering, correct?

A.  Yes.

Q.  Who did you plead guilty to murdering?

A.  .I don't understand your question.  Which time?

Q.  Who did you plead guilty to murdering?

A.  Williamer /OL free man, and other people, I guess.

Q.  Lemont timber /HRAPB?

A.  No.

Q.  This was all part?

A.  No.

Q.  Showing you your second criminal trial testimony from Mr. Hawkins' trial?

        THE COURT:  From Mr. Fields' trial.

BY MR. LOEVY:

Q.  I'm sorry, Mr. Fields' trial, starting in the middle those acts were in fact you pled guilty to conspiracy to murder Patrina Thomas?

        "ANSWER:  Yes, ma'am.

        "QUESTION:  You pled guilty to conspiracy to murder l-a-m-o-n-t, Lamont Timberland,

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 109 of 164 PageID #:20124
Case: 1:13-cv-01168 Document #: 285-16 Filed: 02/24/17 Page 109 of 164 PageID #:30709

"ANSWER:  Yes, ma'am.

"QUESTION:  You pled guilty to conspiracy to murder Barnett Hall,

"ANSWER:  Yes, ma'am.

"QUESTION:  You pled guilty to conspiracy to murder Eugene Harrison?

"ANSWER:  No.

"QUESTION:  You did plead guilty to conspiracy to murder George Thomas?  Yes.  You pled guilty to Willie Bibbs?  Yes, ma'am.  Conspiracy to murder Chalmers Tyler?  Yes, ma'am.  Conspiracy to murder Melvin Ewing?  Yes, ma'am.  Conspiracy to murder Ronald Bell?  Yes, ma'am.  You also pled guilty to a number of murders?  Yes, ma'am.

MR. KULWIN:  Judge, I am going to object.  It's not impeaching.

THE COURT:  Overruled.  Did he accurately read that?  Did he read it accurately.

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

BY MR. LOEVY:

Q.  All right.  You were also asked at the trial, the criminal trial, if you pled guilty because you were guilty.  Do you remember being asked that?

A.  Yes.

Q.  Do you remember what your answer was?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 110 of 164 PageID #:20125
11/28/16 AM ***REALTIME UNEDITED TRANSCRIPT ONLY***

109

A. No, but I can tell you right.

Q. What's your answer right now?

A. I wasn't guilty.

Q. Do you remember being asked this question page 80, lines 19 to 24. There came a time when you pled guilty to the indictment?

"ANSWER: Yes, ma'am

"QUESTION: And you did plead guilty because you were guilty?

"ANSWER: Pretty much, yes, ma'am

MR. KULWIN: Object, not impeaching.

MR. LOEVY: First of all, it's in the criminal trial.

THE COURT: It's in the criminal trial. Honestly, the answer to his question here got a little garbled. I'm seeing what's in the realtime, so I am going to let it stand. Was that your testimony from the criminal trial?

THE WITNESS: Yes, sir.

THE COURT: Okay. Thank you.

BY MR. LOEVY:

Q. One of the murders you committed was Joe White and D Edwards Vaughn?

A. Yes.

Q. Who committed those murders?

A. Me and Anthony Sumner.

Q. Just the two of you?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 1111 of 164 PageID #:20126
Case: 1:13-cv-01168 Document #: 285-36 Filed: 02/24/17 Page 111 of 164 PageID #:30731

11/28/16 AM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

110

A. Yes.

Q. Not Nate Fields?

A. I never said that.

Q. Why did you and Sumner go to the white's home that night?

A. To rob them.

Q. What were you looking for?

A. Money and cocaine.

Q. Were you using drugs on a daily basis during the whole first half of the 1980s, sir?

A. Yes.

Q. Were you and Sumner using cocaine together every single day?

A. Probably so.

Q. And you were also taking heroin to come down?

A. Sometimes, yes.

Q. You were cross-examined at Mr. Fields' criminal trial about your drug abuse, correct?

A. Yes.

Q. How did you get into Mr. White's home?

A. Anthony Sumner knew him and he let us in.

Q. You forced your way in with a gun, didn't you?

A. He let us in.

Q. All right. This is page 2687 of the April -- do you remember testifying at the hearing in this case in April 2014? This is lines 15 through 24.

MR. BURNS: Hang on one second.

BY MR. LOEVY:

Q.

"QUESTION: And you knocked on the door and Mr. White answered; is that correct in an answer I believe so. And Sumner said he wanted to buy cocaine; is that correct in

"ANSWER: Yes, sir.

"QUESTION: Sometime later you pulled out a gun, correct?

"ANSWER: Yes, sir.

"QUESTION: And you said where is the drugs and the money we want the drugs and the money; is that correct, sir? Answer answer yes, sir. That was the testimony you gave, correct?

A. Yes.

Q. All right. And Mr. White begged you not to hurt them, correct?

A. Yes.

Q. And you told them you weren't going to hurt that couple, correct?

A. Yes.

Q. And then you tied up Mr. White's wife, DEA Vaughn, right?

A. Yes.

Q. And Mr. Vaughn was?

A. Yes.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 113 of 164 PageID #:20128
Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 113 of 164 PageID #:30728

Q. And then what did you do after they were tied up and -- they were defenseless when they were tied up, correct?

A. Yes.

Q. Okay. What happened next?

A. They was tied up, we were searching the house for the money and the cocaine, and we stepped in the hallway and then I came, after Sumner came back in, there was some rustling, he went back in.

Q. He stabbed him 30 times, didn't he?

A. Yes, he was stack him.

Q. What did you do when Anthony Sumner stabbed these people 30 times?

A. Shot both of them.

Q. Where did you shoot them?

A. In the head.

Q. How many times?

A. Once or twice.

Q. Why did you do that, sir?

A. To kill them.

Q. You had no idea their kids were watching, correct?

A. No.

Q. You had no idea, right?

A. No, I had no idea of that.

Q. That was lucky for them, correct?

MR. BURNS: Objection?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 1114 of 164 PageID #:20129
Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 114 of 164 PageID #:30734

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  The reason you killed the wife is because you didn't want to be any witnesses, correct?

A.  Yes.

Q.  Did you find any drugs and money?

A.  Yes.

Q.  How much did you steal?

A.  $700 and some -- maybe a half ounce of cocaine or something.

Q.  All right.  What month and year was that, sir?

A.  March.

Q.  March '85?

A.  Yes.

Q.  After that you and Sumner went on the run, right?

A.  Yes, sir.

Q.  The goal was to escape from the police?

A.  Yes, sir.

Q.  And where did you go first?

A.  What do you mean where did we go first?

Q.  Where did you flee?

A.  We need from the house.

Q.  What city did you go to?

A.  We were in Chicago.

Q.  Okay.  When you left Chicago, where did you go to?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  We went to Milwaukee and Cleveland.

Q.  And Cleveland?

A.  Yes.

Q.  The law caught up to you in east Cleveland, right?

A.  Yes.

Q.  Were you arrested in east Cleveland?

A.  Yes, sir.

Q.  Who were the law enforcement officers that arrested you at that house in east Cleveland?

A.  Some east Cleveland police officers and one I recognized was a Brannigan.

Q.  That's a Chicago police officer?

A.  Yes.

Q.  They raided the house where you were, right?

A.  Yes, sir.

Q.  And they started asking you questions, right?

A.  Yes, sir.

Q.  They were asking you about cold cases from back in the neighborhood by the Fort, weren't they?

A.  When they came into the house and they were searching us, they asked me questions about some.

Q.  They started after they were done searching you, they started interrogating you, correct?

A.  No, I don't remember it like that.

Q.  Did you talk about the Vaughn/White murder with them in

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 116 of 164 PageID #:20131
Case: 1:23-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 116 of 164 PageID #:30716
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

115

Q.   east Cleveland?

A.   No.

Q.   Were they asking you about murders?

A.   Yes.

Q.   Were they asking you about the Smith/Hickman murder?

A.   Yes, they might have mentioned it.

Q.   Back in Cleveland?

A.   Yes.

Q.   Tell us what you remember.

A.   They said your boy, your boy flipped on you, so we got you, something like that in that lines.

Q.   All right.  Can you explain to me in context with the Smith/Hickman, they were saying we got you on Smith/Hickman?

A.   With murders, period.

Q.   I'm asking about Smith/Hickman.  What did they ask you about Smith/Hickman?

A.   I told you what they said sir.

Q.   What did you understand it to mean when they said your boy flipped on you on Smith/Hickman?

A.   He didn't say Smith/Hickman.  He said your boy flipped on you, we got you.

Q.   What did they ask you about Smith/Hickman murders?

A.   They say your boy flipped on you, we got you.

Q.   Did you understand that to mean you were going down for the Smith/Hickman murders?

A. No.

Q. You knew who your boy was Sumner, right?

A. Yes.

Q. You weren't talking to the police, right?

A. No, sir.

Q. About any murders they were asking about, right?

A. No, sir.

Q. Anthony Sumner did start talking, didn't he?

A. Yes, sir.

Q. He decided he was going to flip to save himself, right?

A. He decided he was going to flip.

Q. And that hurt you, did it not?

A. He disappointed me.

Q. You and Anthony were very, very close at the time, weren't be you?

A. Yes.

Q. Like brothers?

A. All of us was called brothers.

Q. You and Anthony in particular were like brothers, correct?

A. I don't understand your question. I just told you all of us was like brothers.

Q. I am not asking about all of you. I am asking you about you and Anthony?

A. If you have more than one brother, what's up?

Q. Very good.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 118 of 164 PageID #:20133
Case: 1:10-cv-01168 Document #: 285-16 Filed: 02/24/17 Page 118 of 164 PageID #:30738

117

Let's -- how quickly did the police bring up the Smith/Hickman crime?

MR. BURNS: Objection, your Honor. Foundation.

THE COURT: Why don't you just ask when.

BY MR. LOEVY:

Q. All right. When did they bring up Smith/Hickman?

A. I thought it was when we got back to Chicago.

Q. All right. Your legal problems started when Sumner started talking, correct?

A. Yes, sir.

Q. He implicated you in a number of murders, right?

A. Yes, sir.

Q. And in the Smith/Hickman case, he came to claim that you had confessed to him about having killed Fuddy Smith, correct? That was your understanding?

A. Could you ask that question again?

Q. Sure.

Did you come to have an understanding that Sumner was claiming, although he wasn't involved in the Smith/Hickman murder, you confessed to him of having done it?

A. Be yeah, I told him about it, if you want to use confess, okay.

Q. I am not getting what you did. What Sumner was claiming. He was claiming you confessed?

A. You said confessed. I told him about it.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 119 of 164 PageID #:20134
Case: 1:13-cv-01168 Document #: 2185-16 Filed: 02/24/17 Page 119 of 164 PageID #:30719

Q.  He wasn't involved in the murders?

A.  Not then, no.

Q.  All right.  And do you know if the police brought up Smith/Hickman to Sumner or if Sumner brought up Smith/Hickman to the police?

MR. KULWIN:  Objection.

THE COURT:  It's a question does he know.  You can answer the question.  Do you know who brought it up first between the police and Sumner?

THE WITNESS:  I don't know.

BY MR. LOEVY:

Q.  All right.  And you came to understand that his claim was that you told him you did it with two guys -- two El Rukns from Evanston and his landlord Nate Fields, correct?

A.  Yes.

Q.  How quickly did you come to understand that Sumner was claiming you committed that crime with the two guys from Evanston and his landlord?

A.  Probably when I got arrested and they were telling me about it.

Q.  When you got arrested?

A.  Yes.

Q.  Back in May 1985, right?

A.  Yes.

Q.  All right.  Sumner's landlord was also your landlord,

Q.  correct?  Sumner's landlord was also your landlord, correct?

A.  What did you ask me?

Q.  Sumner's landlord was Nate Fields, right?

A.  He answered the property?

Q.  Did you understand the question?

A.  Yes, sir.

Q.  Okay.  Sumner's landlord was your landlord, correct?

A.  Yes, sir.

Q.  Every month he would collect the rent, correct?

A.  Who?

Q.  Nate Fields?

A.  That don't make him the landlord.

Q.  Every month Nate Fields would collect the rent, right?

A.  Correct.

Q.  He was the building manager, correct?

A.  Correct.

Q.  He would do the maintenance work around the building, correct?

A.  He would collect the rent.

Q.  He did maintenance work around the building too?

A.  He would collect the rent, sir.

Q.  All right.  Did you know of Sumner's problem with the rent?

A.  They didn't pay his rent sometimes?

Q.  Yeah.

A.  Probably so, yes.

Q.  Showing you Plaintiff's Exhibit 7, page 2, this is a statement from Anthony Sumner, murder of Joe White and DEA Vaughn which occurred on May 28 -- by the way, this statement was made on January 3rd, 1992.  Murder of Joe White and DEA Vaughn which occurred on May 28th, 1985 at 1016 east 41st place in Chicago.  The statement of the buy the murders happened is correct except that Nathson Fields was not involved in the murders.  That's true, is it not?

A.  Yes.

Q.  The reason I put Nathson Fields in the murder was I was confused and afraid Nathson Fields had put my family out of one of the El Rukn buildings and I did not like it.  My question to you, sir, is did Sumner tell you that, that he put Fields into the Vaughn/White murder because he had put him out and he didn't like him?

A.  Not that I remember, no.

Q.  The first time I told anybody that Fields was not involved, and it goes on and says was later.  But I want to focus on this part here.  I did not like him.  Did you have any knowledge that he didn't like nature Fields?

        MR. BURNS:  Objection?

        THE COURT:  Overruled.

        THE WITNESS:  Not that I remember.

BY MR. LOEVY:


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. All right. When the police started asking you about Smith/Hickman, they asked you about a lot of murders, didn't they, by the way?

MR. KULWIN: Judge, can we get a foundation as to when?

THE COURT: Yes.

BY MR. LOEVY:

Q. When do you recall the police asking you about murders?

A. After I got arrested in May of 1985.

Q. Okay. They were asking you about a lot of murders, right?

A. You could say that, yes, sir.

Q. All right. One of the murders they asked you about was the Smith/Hickman murder, right?

A. Yes.

Q. And you denied any involvement, correct?

A. Yes.

Q. And you told them you could put me in a lineup because I had nothing to do with it, right?

A. I don't think I told them to put me in a lineup.

Q. You said I don't oppose a lineup, right?

A. No matter if you oppose it or not, you get in one.

Q. All right. Showing you 86, page 18. This is a police report that you didn't prepare dated May 20th, 1985 memorialized the interaction with you. It says that on May 18th you were placed under arrest . Is that accurate, sir?

A.  Yes, sir.

Q.  That would be four days after the raid in Cleveland, wouldn't it?

A.  Okay.

Q.  Wouldn't it?

A.  Okay.

Q.  So were you not arrested for those whole four days?

A.  Yes, sir.

Q.  Were you for the four days before May 18th, you were free to leave?

A.  I didn't say that.  I said I was arrested.

Q.  You were arrested on May 18th, correct?

A.  I was arrested on May 18th, yes.

Q.  Okay.  May 14th is when the house was raided in east Cleveland, correct?

A.  Okay.

Q.  Correct?

A.  Yes, sir.

Q.  Okay.  Were you free to leave between May 14th and May 18th?

A.  Yes.

Q.  Why didn't you?

A.  I did.

Q.  No.  Before they arrested you, why didn't you leave?

A.  What do you mean before they arrested me?

Q.  Earl Hawkins was asked, allowed to place several calls to your attorney.  Do you remember that happening?

A.  Yes.

Q.  Hawkins was informed of his constitutional warnings and denied being involved in any -- in these two homicides that would probably be Smith/Hickman and Vaughn/White.  Did you deny it?

A.  Yes, sir.

Q.  You stated you did not need your attorney present during any lineups as you didn't do anything.  Did you say that?

A.  Probably so.

Q.  Later you pled not guilty to the crime, correct?

A.  Yes, sir.

Q.  And you've always been very clear that you did not shoot Fuddy Smith, correct?

A.  Yes, sir.

Q.  You went on trial for this crime in June 1986, right?

A.  Yes, sir.

Q.  You were tried simultaneously with Nate Fields, right?

A.  Yes, sir.

Q.  And did you get convicted?

A.  Yes, sir.

Q.  What was the sentence?

A.  Death.

Q.  Did that scare you, sir?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 125 of 164 PageID #:20140
Case: 1:13-cv-01768 Document #: 1185-16 Filed: 02/24/17 Page 125 of 164 PageID #:30725

A. Yes, sir.

Q. After you got convicted and sentenced to death, did you do some rethinking about whether maybe you should make some deals to testify against other people?

MR. KULWIN: Objection as to when, Judge.

THE COURT: He said after. That's sufficient.

THE WITNESS: Your question?

BY MR. LOEVY:

Q. After you got sentenced to death, did you start rethinking whether maybe you should cooperate to save yourself?

A. I said I better come up with something quick because they serious. That's what I thought.

Q. And by come up with something quick, you understood what they wanted from you was to testify against other people, correct?

A. Probably more than my knowledge of other crimes, yes.

Q. They wanted you to testify against other people, correct?

A. We hadn't reached that stage yet.

Q. All right. You initiated the possibility of being a cooperator, correct?

A. Yes.

Q. How did you do it?

A. Wrote Lieutenant Brannigan a letter.

Q. I am going to show you Plaintiff's Exhibit 69. That is your handwriting, is it not?

A.   Yes.

Q.   And this is the letter that you wrote, correct?

A.   Yes.

Q.   Dear Daniel, I write in hope -- I write you in hope that in best interest of you and I can talk hoping you and I can come to some mutual understanding that can benefit us both I am sure before February 2.  That's your letter, correct?

A.   Yes, sir.

Q.   What was the significance of February 2nd?

A.   Probably when the death.

Q.   This is your testimony at the April 2004 hearing.  Do you remember being asked this question, page 2692?

          THE COURT:  April 2000 what year?

          MR. LOEVY:  This is the April 2014 hearing in this case.

          THE COURT:  You said 2004.  That's why I asked.

          MR. LOEVY:  Thank you.  This is lines 13 through 19.

     "QUESTION:  I hope we can come to some mutual understanding that can benefit us both before February 2.  Is that what you wrote?

     "ANSWER:  Yes.

     "QUESTION:  Was February 2nd the date set for your execution if you recall?

     "ANSWER:  No.  I don't recall."

       Did you give that answer, sir?


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  Yes.

Q.  It's hard to remember dates years later, is it not?

A.  Sometimes, yes.

Q.  All right.  Who came to see you in response to that letter?

A.  Lieutenant Brannigan.

Q.  Who else?

A.  Jack Hines, some people from the state's attorney's office.

Q.  Murphy came as well, didn't he?

A.  Yes, lieutenant Murphy, yes.

Q.  And Mr. O'Callaghan, correct?

A.  Yes.

Q.  And at that time you discussed the possible of cooperating by testifying against other people, correct?

A.  Yes.

Q.  And the first thing you wanted was to get off death row, correct?

A.  Yes.

Q.  And they told you if you're going to get off death row, you're going to have to prove yourself very useful to them, correct?

A.  Pretty much.

Q.  And then you began a two-year process of negotiations and interviews, correct?


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

A. Yes.

Q. You were held at the MCC, the federal building, federal jail?

A. Yes, sir.

Q. That's right down the street from here, correct?

A. Yes, sir.

Q. And sometimes you would during this two-year process, you would be at the Dirksen building, this building?

A. Yes, sir.

Q. During those two years, you would be interacting with Mr. O'Callaghan and Mr. Murphy?

A. If that's what you want to call it.

Q. Interacting?

A. Yeah.

Q. You got a better word?

A. Yeah, they was investigating me, they were interviewing me.

Q. You understood at the time your role was to help them make as many cases as possible against as many people as possible, correct?

A. My role was to tell them what I knew about crimes that I was involved in.

Q. All right. By their objective, was it not?

A. You can ask him them about their objective.

Q. I am asking you about your understanding?

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 129 of 164 PageID #:20144
Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 129 of 164 PageID #:30729
11/28/16 AM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

128

A.  Yes, sir.

Q.  Did you understand they wanted to make as many cases against as many El Rukns as possible?

A.  They wouldn'ted from me information that I had.

Q.  All right.  In exchange, you got off death row, right?

A.  Eventually, yes.

Q.  And the conditions got considerably better than they were at Menard, correct?

A.  Yes.

Q.  They put money in your commissary, right?

A.  Yes.

Q.  About $60 a month?

A.  Yes.

Q.  And they bought clothes for your family, correct?

A.  Bought me clothes, yes, I guess clothes for my family, yes.

Q.  Do you remember being asked that same question in April 2014, this is page 2697, lines 20 through 24.  Or 22 through 24.  Sometimes they bought clothes for your family, correct?

       "ANSWER:  No.  Did you give that answer, sir

A.  Yes.

Q.  When you were in the federal custody, you got to make long distance calls to your friends and family patched through the U.S. Attorney's Office?

A.  Yes.

Q. That's the kind of thing that's not allowed at Menard, right?

A. No.

Q. So you had a lot more freedom during those two years than you did at Menard?

A. What do you mean freedom.

Q. Menard it's 23 hours a day locked in a cell, correct?

A. Okay.

Q. Once you became a cooperator, your life and living improved substantially, correct?

A. It all depends how you look at it. I'm still locked up.

Q. You were allowed -- in prison, you weren't allowed to have sex with your girlfriend, correct?

A. If you could sneak and do it, yes.

Q. How are you going to sneak and have sex at Menard under 23 hours a day in a locked cell?

A. When you come out, you go into the visiting room, and the officers might leave off to do something, you can sneak and have sex with somebody who was with you.

Q. On death row, they let you have sex; that's your testimony?

A. They didn't let you. I said you could sneak it.

Q. Did you sneak sex on death row, sir?

A. No.

Q. You sneaked sex once you got in the Dirksen building,

***REALTIME UNEDITED TRANSCRIPT ONLY***

didn't you?

A.  In the MCC, yes.

Q.  And in this building, didn't you also get opportunities to have sex?

MR. KULWIN:  Objection, Judge, I'd like to be heard.

THE COURT:  Okay.  Let me see the lawyers at sidebar.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  You got an issue.  Let's let Mr. Kulwin talk first.

MR. KULWIN:  In my view, Mr. Loevy is about to go into all the alleged improprieties in the El Rukn investigation.  If he wants to do that, then in my view I am entitled to go into all the indictments and all the convictions and how all those convictions were confirmed and affirmed and all that was thrown out.  Because -- first of all, there was no sex.  I know that case inside out and backwards.  He didn't get any sex in the U.S. Attorney's Office.  He didn't.

THE COURT:  It was phone sex, right?  Whatever he got was phone sex?

MR. LOEVY:  No, he was allowed to have sex with his girlfriend.  In U.S. v. Boyd he said it and at the criminal trial, he said it.

In response to his prior concern, I'm asking what

benefits did you get to cooperate.  I don't see any doors being opened and --

THE COURT:  Let me -- I'm sorry.  I'm looking at your notes here.  He testified in the criminal trial in 2009.

MR. LOEVY:  7616.

THE COURT:  Let me just look at that.

MR. LOEVY:  Sure.

THE COURT:  Well, see your girlfriend in the office is different from having sex with her.

MR. LOEVY:  But here is the Boyd testimony.

THE COURT:  Hang on a second.

MR. LOEVY:  The Boyd testimony --

THE COURT:  Hang on a second.  This is from page 76 of I don't know what.

MR. LOEVY:  The criminal trial.

THE COURT:  Okay.  Another perk you got, you had sex with your girlfriend in the Everett Dirksen building?

"ANSWER:  Yes, ma'am.

"QUESTION:  You were taken from the MCC?

"ANSWER:  Yes, ma'am.

"QUESTION:  You were allowed to see your girlfriend in an office?

"ANSWER:  Yes, ma'am.

"QUESTION:  In the Dirksen building?

"ANSWER:  Yes, ma'am."

Case: 1:13-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 133 of 164 PageID #:30733

That came out at the 2009 trial?

MR. LOEVY:  Yes.

THE COURT:  The theory on which that opens up all the El Rukn prosecutions is what?

MR. KULWIN:  In my view, if he can impeach him with that, we should be able to say the jury has heard all of that and -- the whole theory behind impeaching him is to say that with this jury he is non-credible.  If he is non-credible.

THE COURT:  Is there any mystery about the fact that -- this was in 2009?

MR. LOEVY:  Right.

THE COURT:  What was the trial at which Mr. Fields was convicted after this testimony was given pray tell?

MR. KULWIN:  It was before this.

THE COURT:  This is testimony from a 2009 trial which is by definition admissible in this case.  That's what I am being told.  That was testimony from the 2009 trial.  What am I missing?  You need to tell me what I am missing.  Hang on.  You need to tell me what I am missing.  Is there anything?  I want an answer.  I am going to sit here until hell freezes over until I get an answer.  Am I missing anything?

MR. KULWIN:  I don't believe you are missing anything.

THE COURT:  So what's the theory on which this opens up the door to what federal courts found ten years later or

five years later or five years before?  What's the theory?
Yes or no?

MR. KULWIN:  My theory is that he was having sex as part of a cooperator in the El Rukn investigation, and in my view, and you may disagree, but in my view, it opens the door to, okay, you cooperated with the federal government, allegedly had sex, 29 people were convicted.

THE COURT:  Okay.  So the theory of relevance -- you are going to have to articulate it, Mr. Kulwin.  It's not good enough.  Right now you have not preserved the point.  If you want to preserve the point, you are going to have to articulate it.

The 29 people, none of whom are Mr. Fields, got convicted, so the theory on which that's relevant in this trial is what exactly?

MR. KULWIN:  It's relevant to show -- it rehabilitates his credibility.  All that rehabilitates it and therefore it's admissible.

THE COURT:  Okay.  Classic 403.  It doesn't. However, you get to ask about the 2009 trial and not about the Boyd testimony.

MR. LOEVY:  Got it.

THE COURT:  Got it?

MR. LOEVY:  And as long as we are at sidebar, we should raise something else.  He was cross-examined at the

criminal trial by Ms. Con years about the fact that he testified in nine different federal trials, RICO trials. That was part of the trial. I am going to elicit what's part of the trial. He gave the same story each time about the Smith/Hickman scenario. He was called on to do it and he did it.

THE COURT: You're bringing out the fact that he testified about this in nine other criminal trials?

MR. LOEVY: It was brought out at the criminal trial.

THE COURT: Hell freezes over, Mr. Loevy. I want direct answers to questions because I'm sitting here wasting the jury's time right now.

MR. LOEVY: The answer is yes.

THE COURT: You are bringing out -- how are you going to bring it out? I want to hear it right now so I can save the sidebar.

MR. LOEVY: At the criminal trial --

THE COURT: Go get your notes so we can go over it quickly.

MR. LOEVY: There is some chance, your Honor, that this would not come up before the lunch break.

THE COURT: That's fine. I want to talk about it. We are here. An argument that it's related. Okay. If it's that far down, you are not getting to it before lunch. We will talk about it at the break.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 136 of 164 PageID #:20151
Case: 1:10-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 136 of 164 PageID #:30736

135

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Okay.  You can proceed.

BY MR. LOEVY:

Q.  When you were a cooperator, you were given the perk of being permitted to have sex with your girlfriend, correct?

THE COURT:  I told you the way that you were going to do this, Mr. Loevy.  So let's do it.

BY MR. LOEVY:

Q.  Isn't it true you were asked the following questions and the following answers at Mr. Fields' criminal trial.

THE COURT:  Thank you.

BY MR. LOEVY:

Q.  Page 74, lines 12 -- no.  It's page 76.

THE COURT:  Let's get everything off of there except the single page that you were going to put up that you showed me at sidebar.

MR. LOEVY:  I found it, your Honor.

THE COURT:  Okay page 76 from the 2009 trial.  Okay. Go ahead.

BY MR. LOEVY:

Q.  All right.  Line 10.  Let's move on to something else. Another perk you got, you had sex with your girlfriend in the he have Everett Dirksen building?

"ANSWER:  Yes, ma'am.

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 137 of 164 PageID #:20152
Case: 1:13-cv-01165 Document #: 1185-16 Filed: 02/24/17 Page 137 of 164 PageID #:30757

"QUESTION: You were taken from the MCC, right?

"ANSWER: Yes, ma'am.

"QUESTION: You were allowed to see your girlfriend in an office?

"ANSWER: Yes, ma'am.

"QUESTION: In the Dirksen building?

"ANSWER: Yes, ma'am."

Did you give those answers at the criminal trial?

A. Yes.

Q. Were they true?

A. I didn't have sex in the Dirksen building with any girlfriend. It was the MCC.

Q. This is the Dirksen building?

A. At the MCC.

Q. I asked you if this is the Dirksen building?

THE COURT: I will take judicial notice that this is the Dirksen building.

BY MR. LOEVY:

Q. You also struck up with a relationship with a female paralegal for the government, correct?

A. Yes.

Q. And that was a perk that was not available on death row, correct?

A. Yes.

Q. And all things considered, the agreement to testify

against others worked out pretty good for you, did it not?

MR. BURNS: Objection, your Honor?

THE WITNESS: Yes.

THE COURT: Overruled.

BY MR. LOEVY:

Q. You were involved in quite a few murders?

A. Yes.

Q. And you did not get sentenced to life in prison, did you?

A. No, sir.

Q. In fact, you're free today, aren't you?

A. Yes, sir.

Q. Now, pursuant to your plea deal, original plea deal, you got 42 years on each of two counts in the state case, correct?

A. Yes, sir.

Q. I am talking about the original plea deal when you agreed to testify against El Rukns, that was your original sentence, right?

A. When I first found out?

Q. You became a cooperator in exchange for which you got a plea deal, right?

A. Yes, sir.

Q. In that plea deal, that was what I'll call the original plea deal, okay, do you understand what I mean?

THE COURT: In other words, on day one?

BY MR. LOEVY:

Q.  On day one?

        MR. BURNS:  Judge, vague, foundation would probably help on this matter?

        THE COURT:  Dates you mean?

        MR. BURNS:  Dates and keeping perspective.

        THE COURT:  Dates.

BY MR. LOEVY:

Q.  When was your original plea deal?

A.  You keep on saying 42 years.  I got 60 years.  That's what I am trying to get you.

Q.  You got 60 years on the federal case?

A.  Okay.

Q.  Right?

A.  Yes, sir.

Q.  And your original deal was 60 years on the federal and 8 four years on the state, correct?

A.  42 years, yes.

Q.  42 years on each of two counts, right?

A.  Each of two counts?

Q.  That's the question?

A.  There's two counts and I got 42 years on both of them is that what you say.

Q.  For a total of '84 years?

A.  I didn't total it 8 four years.  You can total it up.

Q.  This is your testimony from the criminal trial, Mr.

Fields' criminal trial.  This is page 6, lines 7 through 11. Do you remember being asked this question: You understand that each sentence of 42 years in the Illinois Department of Corrections will be consecutive to each other for a total of '84 years in the Illinois Department of Corrections?

"ANSWER:  Yes, sir."

Did you give that testimony

A.  Yes, sir.

Q.  Was it true?

A.  Basically, yes.

Q.  Now, at some point after you testified in these RICO trials, you came to believe that the deal was bad for you, correct?

A.  Yes, sir.

Q.  And you didn't want to stay in prison for that long, did you?

A.  No, sir.

Q.  So you filed a motion to vacate your guilty plea, correct?

A.  Yes, sir.

Q.  And the basis of the motion is that you had been promised you would do less time than what was in the written agreement, correct?

A.  Yes, sir.

Q.  And your point in this motion to vacate was you'd been given a side deal that you were only supposed to get 20 years

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 1441 of 164 PageID #:20156

notwithstanding what it said in the paper, correct?

A.  Not a side deal.

Q.  Well, it was a deal?

A.  That's my understanding from the front.

Q.  Right.  But it wasn't in the paper?

A.  That was my understanding from the front is that what we going to get for murder, they said 35 to 20 years.

Q.  All right.  Let me just -- so I understand.

The paper said you're doing 8 four years, right, the written thing you signed?

A.  42 years, yes.

Q.  Consecutive twice, right?

A.  Yes.

Q.  All right.  And you said, well, you guys had an understanding with me that I was only supposed to do 20, that was the basis of your motion to vacate the plea, right?

A.  Yes, sir.

MR. BURNS:  Objection, your Honor, foundation.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  And had there been a side agreement that was not reflected in the written agreements --

THE COURT:  Why don't you take the word side of this since it caused an issue before.

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 142 of 164 PageID #:20157
Case: 1:10-cv-01168 Document #: 1185-36 Filed: 02/24/17 Page 142 of 164 PageID #:30742

Q. Had there been an oral understanding that you were only going to do 20 years, not the 84?

A. That was my understanding.

Q. All right. And when you testified at various trials, you were able to stand there and said look I'm in there for 8 four years, I'm credible, right?

MR. BURNS: Objection to the form.

THE COURT: Sustained.

BY MR. LOEVY:

Q. It made you a more credible witness?

MR. KULWIN: Objection, argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. You also were cross-examined at Mr. Fields' criminal trial that you wrote in your motion to vacate that Mr. Hogan, the government lawyer you were working with had threatened you, correct?

A. Yes, okay.

Q. Okay. What was the government's threat?

A. You cooperate or you go back to where you was at.

Q. And that's when you started raising concerns about cooperating, correct?

A. Yes.

Q. And they told you we're going to send your butt right back to death row, you can fend for yourself, right?

A.  Yes.

Q.  Now, to get your plea deal and avoid the death penalty, you had to deliver a lot for your end of the bargain, correct?

A.  Pretty much.

MR. LOEVY:  Your Honor, this is the point where we said we were going to skip.  Let me move ahead.

THE COURT:  Okay.  Actually, no, let's talk about this at sidebar now.  You found what you were looking for?

MR. LOEVY:  I found what I was looking for.

(The following proceedings were had at sidebar outside the hearing of the jury:)

MR. LOEVY:  Should I do a proffer, your Honor?

THE COURT:  Go ahead.

MR. LOEVY:  All right.  He had to testify against a lot of guys, he ended up testifying at 10 civil El Rukn trials, this is testimony from the criminal trial.

THE COURT:  Okay.

MR. LOEVY:  And one of the men was Fields.

THE COURT:  One of which men was Fields?

MR. LOEVY:  One of the ten men he testified against.

THE COURT:  That's not exactly -- yeah, you're going to have to word that more carefully.  He can't just kind of go flipping around unless you want to put in incorrectly that your guy was a defendant in a federal case.

MR. LOEVY:  All right.  We will be careful about

that. Focus on the period before you became a cooperator, this is when you went out to the sixth floor. I guess that's what I'm asking right there.

THE COURT: He testified in ten RICO trials, whatever the number was.

MR. LOEVY: And that he had this opportunity beforehand to hangout with the other witnesses, clay, hunter, Kees.

MR. KULWIN: My point is that opens the door to what happened at the RICO trials.

THE COURT: You want to put in and the defendants were found guilty in the RICO trials.

MR. KULWIN: Absolutely.

THE COURT: Is there any problem with that? Honestly, I am not so sure it didn't go in at the last trial. I am looking at Mr. Noland who I can see is doing a mental inventory here.

MR. NOLAND: Honestly, Judge, I don't recall.

MR. LOEVY: I don't think what I just said opens the door to what happens at the trial.

THE COURT: I will let you put in that the defendants got convicted at those trials, but that's it. We are not going -- this is not going to be -- and there was another trial.

MR. KULWIN: I understand.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 145 of 164 PageID #:20160
Case: 1:13-cv-01168 Document #: 285-16 Filed: 02/24/17 Page 145 of 164 PageID #:30745

THE COURT:  It's one question.

MR. KULWIN:  Jury trials and they were convicted.

THE COURT:  No, they were convicted at trials.  Okay?  You are not -- I mean, because I know what you want to do with this.  What you want to do is that ten juries believed the guy.

MR. KULWIN:  No.

THE COURT:  Yeah, you do.

MR. KULWIN:  That's a danger, but that's not what I want to do.

THE COURT:  Just so I am being clear, you are not going to be able to make that argument.

MR. KULWIN:  I am not.  What I want to be able to do is you got this great deal to make stuff up.

THE COURT:  That was.

MR. KULWIN:  To make stuff up and, you know, so here they should be able to hear that they were jury trials, you were cross-examined and they were convicted.

MR. LOEVY:  I thought he said that's what he wouldn't do.

THE COURT:  You have to leave the jury out of it.  You were cross-examined at those trials and the people were convicted.  Was anybody convicted?  Has anybody gotten off?  I don't know.

MR. LOEVY:  Actually, that's not true.  George Carter

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 146 of 164 PageID #:20161
Case: 1:13-cv-01168 Document #: 285-16 Filed: 02/24/17 Page 146 of 164 PageID #:30746

11/28/16 AM    ***REALTIME UNEDITED TRANSCRIPT ONLY***

145

was acquitted.  He was acquitted.

MR. NOLAND:  He was convicted of RICO conspiracy. The conviction was vacated and conspiracy to commit murders. The conviction was vacated.

THE COURT:  I am worry about that later.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Okay.  You can proceed.  We are going to break for lunch at 12:30, by the way.

BY MR. LOEVY:

Q.  All right.  To get your plea deal and avoid the death penalty, you had to deliver a lot on your end of the bargain?

A.  Pretty much.

Q.  You had to testify against a lot of guys and help them make a lot of cases, right?

A.  Pretty much.

Q.  You ended up testifying at like 10 federal trials, correct?

A.  Yes.

Q.  And later, as part of a different deal, you also testified against Mr. Fields, correct?

A.  Okay.

Q.  All right.  Let's focus on the time period after you agreed to become a cooperator.  When they moved you to the MCC, you were based there for a few years.  We covered that,

correct?

A.   Yes.

Q.   That was on the sixth floor, right?

A.   Yes, sir.

Q.   You were housed with the other cooperators, correct?

A.   Yes, sir.

Q.   Derrick Kees, right?

A.   Yes, sir.

Q.   Eugene hunter?

A.   Yes, sir.

Q.   Jackie Clay?

A.   Yes, sir.

Q.   And trammel Davis?

A.   No, sir.

Q.   He was not there?

A.   Trammel?  I might stand corrected.  I don't know.

A.   That was a question?

Q.   Yes.  Was trammel Davis there?

A.   No, sir.

Q.   It was clay, hunter, Kees, and you?

        THE COURT:  Is that right?

        THE WITNESS:  Yes, sir.

BY MR. LOEVY:

Q.   All right.  And clay, hunter, Kees, those three guys, they were also making deals to cut their time in exchange for

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 148 of 164 PageID #:20163
Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 148 of 164 PageID #:30148

testifying against other El Rukns, correct?

A.  Yes, sir.

Q.  And there was absolutely nothing to stop the four of you from comparing notes and getting your stories reconciled, correct?

A.  Other than not trusting each other, I guess not.

Q.  In other words, you were free to collaborate without the law present, correct?

A.  We would be out sometimes for recreation at the same time, yes, sir.

Q.  And they had the same objective you did, correct?

A.  I don't know what objective they had.

Q.  Their objective was to prove as useful as possible to law enforcement?

A.  You ask them that then.

Q.  Was that your objective?

A.  Yes, sir.

        MR. BURNS:  Objection, argumentative.

        THE COURT:  Asking him that question is not argumentative.  The objection is overruled and the answer can stand.

BY MR. LOEVY:

Q.  At some point you all got access to the prosecutor's memos, correct?

A.  Who is you all?


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:13-cv-01168 Document #: 1185-16 Filed: 02/24/17 Page 149 of 164 PageID #:30749

Q.  Let's start with you.  You got access?

A.  To what?

Q.  The prosecutors' memos that laid out the theory of the cases?

A.  No, sir, I don't remember that.

Q.  You got them from Eugene hunter?

A.  I don't remember that.

Q.  You got them from Derrick Kees?

A.  I just told you I don't remember.

Q.  And Kees got them from Hogan's office?

A.  I just told you I don't remember that.

Q.  Do you remember testifying in the United States v. Boyd case, this is June 22nd, 1993 at page 648.  This is your testimony.  This is 1993.  What was said by each persons present on the subject of this document?

       "ANSWER:  To the best of my recollection, Eugene, that's Eugene hunter, right

A.  Yes, sir.

Q.  Was telling Jackie Clay they got some papers out of Hogan's office, Hogan was the U.S. Attorney's Office, right?

A.  Yes, sir.

Q.  He was just telling you that he was relating that to Jackie Clay and I overheard him.  I think he was maybe in the law library or the record room or something like that?

A.  Yes, sir.


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 150 of 164 PageID #:20165
Case: 1:23-cv-01168 Document #: 185-16 Filed: 02/24/26 Page 150 of 164 PageID #:30750

Q.  Do you remember anything else that was said on the subject on that occasion?

"ANSWER:  No.

"QUESTION:  Do you have any other information concerning that document?

"ANSWER:  Then Ricky Kees told me that he had got it.

"QUESTION:  Ricky told you that he got it from Hogan's office?

"ANSWER:  He got it from Hogan's office.  I had told Eugene and Jackie got some paper out of Hogan's office.

Do you remember those answers, sir?

A.  Yes, sir.

Q.  And what you were talking about was documents that belonged to the prosecutor, correct?

A.  Yes, sir.

Q.  And those documents laid out the facts of the cases that you were going to testify in, correct?

A.  I don't know what they laid out.  They were some papers from Hogan's office.

Q.  How did you as a prisoner get your hands-on the prosecutor's papers?

A.  For the first time, I told you I did not have it.  I told you I heard them, I overheard them talking about they had them.  I didn't have them, sir.

Q.  Let's change topics.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 151 of 164 PageID #:20166
11/28/16 AM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

150

You -- during this two year process, the idea was to create a grand jury statement, correct?

A. Yes, sir.

Q.

MR. LOEVY:  Actually, I am going to save that topic since we only have six minutes.  Let me ask you a few more questions.

BY MR. LOEVY:

Q. You made a series of plea deals over time, correct?

A. Yes, sir.

Q. They kept cutting your time and cutting your time and cutting your time?

MR. KULWIN:  Objection, lack of foundation.

THE COURT:  Sustained to the form of the question.

BY MR. LOEVY:

Q. All right.  Your time -- you're free now, right?

A. Yes, sir.

Q. And that's the result of multiple deals you made with the government, correct?

A. Yes, sir.

Q. And in 2009, you made a deal to testify against Nate Fields if they cut your time even further, right?

A. Made a deal to testify about Smith and Hickman and he was involved.  Directly him, yes.

Q. But you weren't quite free yet?

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/28/16 AM

A.  I wasn't free at all.  You free or you ain't.

Q.  They cut your time, didn't they?

A.  Okay, but you ain't free.

Q.  The question was did they cut your time?

A.  No, that wasn't your question.  Your question was I free.

THE COURT:  Put another question, please.

BY MR. LOEVY:

Q.  Then in April 2014, they wanted you to testify against Mr. Fields again, right?

A.  They wanted me to testify in court proceedings, yes.

Q.  All right.  And you weren't going to do it without getting something back, were you?

A.  Mostly they were already intact.

Q.  You weren't going to do without getting something back?

MR. BURNS:  Objection.

THE COURT:  Overruled.  The answer is nonresponsive. Put the question again, please.

BY MR. LOEVY:

Q.  You weren't going to do it unless you got some benefit, were you?

MR. BURNS:  Objection, your Honor.

THE COURT:  Overruled.

THE WITNESS:  So what you asking me?

BY MR. LOEVY:

Q.  In April 2014 when the defendants wanted to call you to

testify at a hearing in Nate's case, you told them you weren't going to do it unless there was something in it for you, correct?

A.  Pretty much.

Q.  What would they put in if for you?

A.  I told you I did a deal in 2009 and 2014, I think they said they might take a couple years off.

Q.  You were freed later that year, weren't you, sir?

A.  Yes, I got freed later that year.

Q.  That's because they wrote letters on your behalf, didn't they?

          MR. BURNS:  Objection, your Honor.

          THE COURT:  Sustained to the form of the question.

BY MR. LOEVY:

Q.  They wrote letters on your behalf saying that you should be free, didn't they?

          THE COURT:  Let's define the they.

BY MR. LOEVY:

Q.  Mr. O'Callaghan and Mr. Murphy after you testified in April 2014 wrote letters asking the parole board to free you, didn't they?

          MR. BURNS:  Objection, your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Yeah, they gave that, but that ain't the reason I got free.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 154 of 164 PageID #:20169
Case: 1:13-cv-01168 Document #: 185-16 Filed: 02/24/17 Page 154 of 164 PageID #:30754
11/28/16 AM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

153

MR. LOEVY:  Your Honor.

THE COURT:  The last part of the answer is stricken as nonresponsive.  The jury is directed to disregard it.

BY MR. LOEVY:

Q.  You were free inside the year, weren't you?  You were free in 2014, weren't you?

A.  Yes, that's when I was released.

Q.  Were you appreciative that they wrote those letters for you?

A.  As I told you, I tried to tell you before, they letters they didn't have anything to do with.

THE COURT:  The answer is stricken.  The jury is directed to disregard it.  We are going to break for lunch.  I have very short cases at 1:30, maybe 5, 10 minutes.  Be ready to go at 1:35.

(The jury leaves the courtroom.).

THE COURT:  So I just want to make clear to the witness the last two rulings I made.  So you're not in a position to testify from personal knowledge about why the parole board let you out.  That's why I struck those answers.  Just listen.

THE WITNESS:  I didn't say anything.

THE COURT:  Yeah, well, you were about to.  So you're not to give that testimony again.  I have excluded it.  There's been prior discussion about it.  And I have excluded

it from both sides, testimony about why the parole board did what they did. So that's why I have excluded it. Do you understand what I'm telling you?

THE WITNESS: What you are saying I have to say?

THE COURT: Nobody is going to ask you a question that calls for you to say why the parole board let you out because why the parole board did something just like you said when somebody was asking what Mr. Kees's motivation is, you don't know what the parole board's motivation is from my personal knowledge that you have so it's not proper testimony so you have now volunteered it twice. I have struck it both times. I have expecting you not to volunteer it again.

THE WITNESS: When did I volunteer it, sir?

THE COURT: The last two answers. Some day you will see the transcript and you will find out. You may not discuss your testimony with anyone over the break. Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: Okay. So what issues, if any, do we have to take up?

MR. LOEVY: There is the issue of the intimidation, your Honor. This would be a good time to talk about it if it's okay with you or whenever you want to talk about it. We should resolve it.

THE COURT: I thought it sort of came up that -- I

mean, I have made it clear more times than a human being can count at this point that if something came out at the 1986 or 2009 trial it was. Defendants were not going to introduce anything through Mr. Hawkins about any intimidation of witnesses so that kind of closed out that issue for this witness. Is there something that I missed?

MR. LOEVY: No, not for this witness. But we still want to be heard on the last witness O'Callaghan.

THE COURT: We will do that at some other point. We will do it at the end of the day.

MR. LOEVY: That's fine.

MR. KULWIN: Judge, for fear of antagonizing you, I am not familiar with the ruling that Mr. Hawkins can't say his understanding.

THE COURT: Yeah, I'll tell you what it is. It's called the hearsay rule. His understanding comes from something that somebody else told him.

MR. KULWIN: Right.

THE COURT: That's called hearsay.

MR. KULWIN: Right.

THE COURT: There is no basis for him to testify about it.

MR. KULWIN: Well, two points, Judge. If he knows from his own calculation, which is what he knows.

THE COURT: That's not what he was saying. He was

saying that's not why they let me out. I'll quote to you what he said twice. Those letters didn't have anything -- okay. So the question was Mr. O'Callaghan and Mr. Murphy after you testified in April 2014 wrote letters asking the parole board to free you didn't they? Objection by Mr. Burns. Overruled.

"ANSWER: Yeah, they gave that but that ain't the reason I got free. Question further down the page, were you appreciative that they wrote those letters for you?

"ANSWER: As I told you, as I tried to tell you before, they letters didn't have anything to do with. Okay. That is testimony about why someone else did something which he cannot give

MR. KULWIN: What he'll testify to, Judge, I anticipate, although I haven't talked to him and I don't know is he knows the guidelines inside and out, he knows when he was eligible for parole, he knows that was his out date and that's why he got out, not because of what the parole board thought or didn't think. By his calculation he was going to get out either way, number one.

THE COURT: I don't know perhaps you didn't hear what I said . He was -- the testimony he gave, the thrust of it was to say why the parole board did what they did. I am not saying that the question -- what did you understand your out date to be, of course he can testify to that just like Mr. Fields could have testified adds to what he understood his out

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 158 of 164 PageID #:20173
Case: 1:13-cv-01168 Document #: 285-16 Filed: 02/24/17 Page 158 of 164 PageID #:30758
11/28/16 AM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

157

date was going to be if he got a particular sentence. Okay? He can't testify about why the parole board acted as it did.

MR. KULWIN: But here's the problem. I understand the problem. Now.

THE COURT: We did have a discussion about this by the way. I have read it recently. We talked some months ago about, you know, the possibility of somebody calling somebody from the parole board to testify about why they did what they did.

MR. KULWIN: And that's still up in the air.

THE COURT: I understand. But that's the person who knows.

MR. KULWIN: Right. But here's the thing, Judge. Mr. Loevy has now told the jury that the reason the parole board let him out.

THE COURT: He did not tell the jury that. What was the question?

MR. KULWIN: The question was those letters is why -- I think the question was almost those letters are why you got out and you're appreciative of that.

THE COURT: Let me look through the testimony and I'll see if there's anything like that in here. He did not ask anything like that. I am going to read you the questions and answers. There is nothing even close.

MR. KULWIN: All right.

THE COURT: This is why realtime was the world's greatest invention. Okay? In 2014, the defendants.

MR. KULWIN: For the with.

THE COURT: The wheel is up there somewhere too. Realtime is in the top five. In April 2014 when the defendants wanted to call you to testify at a hearing in Nate's case, you told them you weren't going to do it unless there was something in it for you, correct?

"ANSWER: Pretty much.

"QUESTION: What would they put in -- it should be it for you.

"ANSWER: I told you I did a deal in 2009 and 2014. I think they said they might take a couple years off.

"QUESTION: You were freed later that year, weren't you, sir?

"ANSWER: Yes, I got freed later that yeah.

"QUESTION: That's because they wrote letters on your behalf? Objection, your Honor. Sustained to the form of the question.

"QUESTION: They wrote letters on your behalf saying that you should be free, didn't they? The Court, define the they. Mr. O'Callaghan and Mr. Murphy after you testified in April 2014 wrote letters asking the board to free you? Mr. Burns, objection, your Honor. Overruled. The witness, yeah, I gave that, but that ain't the reason I got free. It

Case: 1:13-cv-01168 Document #: 1385-16 Filed: 02/24/26 Page 160 of 164 PageID #:30760

continues from there. The exact reason why I sustained the objection to Mr. Loevy's question is because the question asked him to speculate why the parole board did what it did so I sustained the objection.

MR. KULWIN: I hear you, Judge.

THE COURT: He hasn't testified to anything.

MR. KULWIN: All right. Judge, look, I'm making my record. My record is --

THE COURT: You're -- honestly, you're making a false record. I'll quote back to you what you said. I'll quote back to you what you said.

MR. KULWIN: I am not trying to make a false record, judge.

THE COURT: The question -- this is Mr. Kulwin, the question, right, but here's the thing, Judge, Mr. Loevy has now told the jury that the reason the parole board let him out. The Court, he did not tell the jury that. What was the request? Mr. Kulwin, the request was those letters is why I think the question was almost those letters or why you got out and you're appreciative of that. That's the record that you were trying to make is incorrect. So what's your next point?

MR. KULWIN: I haven't finished that point.

THE COURT: Finish that point.

MR. KULWIN: My point is that given the question that you sustained followed up by the other two questions you read,

that in my view, it would be nearly impossible for the jury not to conclude that the reason he got out early was because of the letters of O'Callaghan and Murphy. That's my objection, that's my point and I believe --

THE COURT: What do you think you should be able to do in response to that?

MR. KULWIN: First of all, I would like you to instruct him that he can explain it and why did you get out? Under my deal, under the guidelines, I was first really eligible for parole for the first time in 2014, all these other dates were meaningless. I was going to get out one way or another based on that and those letters didn't do nothing for me.

THE COURT: Okay. Every bit of that except the last sentence, those letters didn't do nothing for me are questions that you can appropriately ask which I said to you about ten minutes ago now. He can testify about what his understanding was of the deal. He can testify about what his understanding was of his out date. He can testify about what his understanding was of you know when he was eligible for parole. That is all perfectly appropriate. The thing he cannot do is why the parole board did what it did. That is the line. I have drawn that line consistently and I am drawing it again now. You are blurring two distinct things. Number one, whether particular evidence is admissible and number two, what

reasonable inferences can be drawn from evidence. Okay? A person can't testify about hearsay unless there is an exception which there isn't for this. Okay? So he can't say that's why the parole board let me out. That's not why the parole board let me out. However, it's a distinct and separate question whether a lawyer can argue later that based on these events, it's pretty clear from the circumstances why the person got out. That's why I'm letting Mr. Loevy ask the questions about the letter being written, that's why I'm letting you ask the questions about what his understanding was of his out date. The thing that can't be put in through him or through Mr. Fields or through anybody I don't think other than somebody from the parole board is why the parole board acted as it did because that's somebody else's action.

MR. KULWIN: Okay. Fine. But then he also asked are you appreciative. I should be able to ask him based on your understanding did the layers matter and he can say based on my understanding, they didn't mean anything.

THE COURT: I will now tell you for I think the sixth time in the last 15 minutes, no, you may not. No, you may not.

MR. BURNS: Judge, may I raise a concern?

THE COURT: Yes, sir.

MR. BURNS: Mr. Loevy and now I think this is probably the second time has suggested to the jury that

Case: 1:23-cv-01737 Document #: 287-37 Filed: 04/06/26 Page 163 of 164 PageID #:20178
Case: 1:15-cv-01168 Document #: 285-36 Filed: 02/24/17 Page 163 of 164 PageID #:30763

Mr. Murphy wrote a letter on behalf of Mr. Hawkins at the time of his parole hearing. That is not true. Mr. Murphy never authored a letter and I am concerned about the suggestion now that has been put before that's in part when I stood up, Judge, and went to object.

THE COURT: Say objection assumes facts not in evidence. You just said objection, your Honor. I mean, I'm supposed to guess on that one. So it was Mr. O'Callaghan and Mr. Brannigan.

MR. LOEVY: May I speak to that?

THE COURT: Am I right?

MR. BURNS: Yes, sir.

THE COURT: I have seen the letters.

MR. LOEVY: If that's true and I have no reason to doubt it, but I really screwed up, I shouldn't have say Murphy wrote a letter if he didn't write a letter.

THE COURT: I will correct it after the break.

MR. LOEVY: Thank you.

THE COURT: I will correct it after the break that there was -- I mean, he said yes, so he was wrong too. The witness said yes. I will say that there was a question shortly before the break, the question was whether Mr. O'Callaghan and Mr. Murphy wrote letters asking the parole board to release -- grant Mr. Hawkins parole, and the answer was yes, that was incorrect as to Mr. Murphy. Mr. Murphy did

not write a letter.

MR. MICHALIK:  Thank you, your Honor.

MR. LOEVY:  Thank you.

(The trial was adjourned at 12:35 p.m. until 1:35 p.m. of this same day and date.)