# Exhibit 38

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

1

Judge Kennelly, December 6, 2016, 1:30 p.m. call and trial.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  Everybody can have a seat.  I have allowed Mr. Kulwin to go into one topic, one additional topic on his direct.  Mr. Kulwin, you can go ahead.

MR. KULWIN:  Thank you, your Honor.

- - -

JACK HYNES, DIRECT EXAMINATION CONTINUED

BY MR. KULWIN:

Q.  Judge Hynes, I think you testified earlier this morning that after you were done looking at everything, you spoke with Mr. DiBenedetto about the Vaughn/White murder.  Do you remember I asked you about that?

A.  Yes, sir.

Q.  Did you tell Mr. DiBenedetto, did you provide information to Mr. DiBenedetto about your review of the Vaughn/White files?

A.  Yes, I did.

Q.  And did you discuss with him specifically the issue of eyewitnesses?

A.  Yes, I did.

Q.  Can you tell the ladies and gentlemen of the jury what you told Mr. DiBenedetto at that time?

A.  I told Mr. DiBenedetto that there were two young children

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 3 of 175 PageID #:20182
Case: 1:10-cv-01168 Document #: 485-25 Filed: 02/24/17 Page 3 of 175 PageID #:32613
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

2

in the apartment at the time of the murders that were I believe hiding in a bedroom or some room there, that they did see some stuff, but there were some problems with the identifications, misidentifications and the like, and I said that other than that, I didn't know of any witnesses to the offense.

Q. And as a result of that, is that reflected on your felony review thing where you say no eyewitnesses?

A. That's correct.

Q. And did that conversation occur before or after you wrote on here that charges were approved by Ernie DiBenedetto?

A. That conversation occurred before.

          MR. KULWIN: If I may have one moment.

          THE COURT: Okay.

          MR. KULWIN: I don't have anything further, your Honor.

          THE COURT: All right. Mr. Loevy.

                    - - -

          JACK HYNES, CROSS-EXAMINATION

BY MR. LOEVY:

Q. Isn't it true, sir, that the warrant and charges were approved on the Vaughn/White murder more than a month before you got involved?

A. The warrant may have been approved, but I don't know that the charges were approved.

Q.  All right.  But that would have had nothing to do with you, right, back in May?

A.  Correct.

Q.  All right.  Let's back up.

You learned about at some point you came to learn Sumner had lied about Nate's involvement in the murder, correct?

A.  In 1992, yes.

Q.  What was your understanding for why Sumner had lied on Nate?

THE COURT:  You are asking him what Mr. Sumner said about that?

MR. LOEVY:  Yeah.

THE WITNESS:  Again I think I memorialized that, I don't know if you have the statement there, but I memorialized it in the statement as to why he.

BY MR. LOEVY:

Q.  That's what I'm asking.

A.  Yeah.  And what he said was that he was confused or something to that effect and that he was mad at Nathson Fields because he had put his mother out of one of the houses.

Q.  All right.  You've reviewed all these documents to prepare for today, correct?

A.  I have reviewed what I have seen, yes, sir.

Q.  And Nate -- Sumner also told you that he had lied about

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 5 of 175 PageID #:29184
Case: 1:10-cv-01168 Document #: 485-39 Filed: 02/24/17 Page 5 of 175 PageID #:32615
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

4

another murder, correct?

A. Yes.

Q. And did you know why they were creating this statement in 1992 to correct some Sumner lies?

MR. KULWIN: Objection, Judge.

THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. Do you have any idea of the circumstances why Sumner was amending some of his stories?

MR. KULWIN: Objection, Judge, argumentative.

THE COURT: Overruled.

THE WITNESS: I don't know.

BY MR. LOEVY:

Q. All right. You were asked about -- by the way, when you took the statement for Sumner saying he had lied about Vaughn/White?

A. Yes.

Q. Why didn't you ask him, by the way, did you lie about the other murder you put Nate into?

A. I asked him about has he been truthful about everything else that he's testified to either to the U.S. attorneys, the state's attorneys or any local or federal law enforcement, and he said other than these two incidents, these were the only times he lied.

Q. All right. But you had to prove felony murder charges on

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 6 of 175 PageID #:20185
Case: 1:10-cv-01168 Document #: 485-29 Filed: 02/24/17 Page 6 of 175 PageID #:32616
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

5

Smith/Hickman based in part on this informant, correct?

A. Correct.

Q. So why didn't you say, Mr. Sumner, I need to understand if you lied about the other case you put Nate in why didn't you ask him that request he?

     MR. KULWIN: Objection, asked and answered.

     THE COURT: Overruled.

     THE WITNESS: I asked him about everything.

BY MR. LOEVY:

Q. I'm asking --

A. I didn't single out one particular crime or another.

Q. I understand but I'm asking why you didn't. Mr. Sumner, did you lie about Nate about the other crime you put him in?

A. I can't answer that, counsel. I don't know.

Q. All right. You were told that there were -- I'm showing you Plaintiff's Exhibit 77. These are your notes on Vaughn/White, correct?

A. That's correct.

Q. And your notes say no eyewitnesses, eye wits to the incident, correct?

A. Correct.

Q. And when you wrote into eye wits to the incident, did you believe that to be a true statement?

A. Based on what I learned, yes.

Q. All right. In fact, there were two eyewitnesses, correct?

A.  There were two young children who were there.

Q.  And those two young children had previously participated in lineups, correct?

A.  Correct.

Q.  And they had identified the wrong two men, correct?

A.  They had identified different people.

Q.  Different people than the known offenders, right?

A.  Different people.

Q.  And in fact, Mr. O'Callaghan was involved in those lineups, correct?

         MR. KULWIN:  Objection, lack of foundation, your Honor.

         THE COURT:  Lay the foundation.

BY MR. LOEVY:

Q.  You spoke with Mr. O'Callaghan about the Vaughn/White murders, correct?

A.  Correct.

Q.  And in fact, his name is right there, Detective O'Callaghan, right?

A.  That's correct.

Q.  Did he explain to you how the two children misidentified the wrong men during one of his lineups?

A.  I don't remember the details.

Q.  Did the eyewitnesses to Vaughn/White ever identify Sumner or Hawkins or Fields?

         ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 8 of 175 PageID #:20187
Case: 1:10-cv-01168 Document #: 1485-29 Filed: 02/24/17 Page 8 of 175 PageID #:32618
12/06/16 PM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

7

A.  Not that I know of.

Q.  Did you ask the detectives before we approve charges here, should we make sure that the kids can actually recognize Nate Fields?

A.  No.

Q.  How old were you in 1985?

A.  Different question, isn't it?

THE COURT:  You're under oath.

THE WITNESS:  That's why I went to law school.  29.

BY MR. LOEVY:

Q.  What year did you graduate law school?

A.  82.

Q.  So one of the first assignments in the state's attorney's office is usually felony review, correct?

A.  It's one of the progressions, not the first.

Q.  One of the -- one of the earlier steps, correct?

A.  One of the steps.

Q.  And oftentimes you have very young lawyers being asked to approve felony charges with experienced homicide detectives, correct?

MR. KULWIN:  Judge, objection to the general nature of the question.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  Now, you did no investigation of your own on

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 9 of 175 PageID #:20188
Case: 1:10-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 9 of 175 PageID #:32619

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

8

Vaughn/White, correct?

A.  No.

Q.  That is correct, right?

A.  That is correct.

Q.  You relied entirely on what Mr. O'Callaghan and Mr. Robertson told you, correct?

A.  That is incorrect.

Q.  Did you speak to the informants?

A.  I spoke to Ernest DiBenedetto.

Q.  The question was did you speak to the informants?

A.  No, I did not.

Q.  So everything you knew at the time was things you had been told, correct?

A.  Correct.

Q.  Did -- were you told that the two eyewitnesses had approved someone other than Nate for the murder?

          MR. KULWIN:  Objection, Judge, asked and answered.

          THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Did you consider for probable cause that the eyewitnesses had considered someone other -- had identified someone other than Nate?

          MR. KULWIN:  Same objection.

          THE COURT:  Overruled.

          THE WITNESS:  Is this in the Vaughn/White murders?

          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 10 of 175 PageID #:20489
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 10 of 175 PageID #:32620

12/06/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

9

BY MR. LOEVY:

Q.  Yeah.

A.  Yes.

Q.  All right.  You also approved charges for the Vaughn/White murder, correct?  I'm sorry, the Smith/Hickman, correct?

A.  Correct.

Q.  And these events were a long time ago, right?

A.  Correct.

Q.  And this is something you did every day at that period of your life?

A.  Yes.

Q.  And you said you were working these huge shifts, right?

A.  Correct.

Q.  One after another you'd go to these murders and approve charges or not approve charges, right?

A.  It wasn't every day we had a murder charge or one day after another, but there were other cases, murder cases that I worked on.

Q.  A lot of murders back in those days, right?

A.  Yes.

Q.  Are you saying that you actually remember everything you described in court this morning or you've reviewed the papers, you've reviewed your prior testimony and you're relating what you believe happened?

A.  I have an independent recollection of what occurred, but I

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page: 11 of 175 PageID #:20190
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page: 11 of 175 PageID #:32621
12/06/16 PM

***REALTIME UNEDITED TRANSCRIPT ONLY***

10

did review certain things.

Q. All right. But you do claim independent recollection?

A. Right.

Q. Did you review the charges -- did you approve the charges in the Vaughn/White case, sir?

A. I did.

Q. Okay. Do you remember being asked this question in October 2013 at page 25.

"QUESTION: On which case, both?

"ANSWER: I know I approved charges on the Smith/Hickman murder. I'm not sure if the charges approved charges on the other murder."

Did you give that answer, sir?

A. I did.

Q. That was accurate, right?

A. It was not accurate actually.

Q. Well, it was accurate that you weren't sure when you gave the answer, right?

A. Correct.

Q. You've since gone back at the papers and had a chance to refamiliarize yourself with the events, correct?

A. Correct.

Q. Now, you've spoken with the defense counsel to prepare your testimony, correct?

A. Correct.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 12 of 175 PageID #:20191
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 12 of 175 PageID #:32622
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***
                                                                    11

Q.  Mr. Kulwin?

A.  Yes.

Q.  How many approximate conversations have you had with Mr. Kulwin?

A.  I met with him once.

Q.  And how many conversations?

A.  Just one.

Q.  One substantive conversation?

A.  Yes.

Q.  All right.  You guys talked about the questions he was going to ask you, correct?

A.  He just asked me if I could relay what had occurred and I basically told him what happened.

Q.  All right.  Let's talk about the date you interviewed Nate Fields.  Do you remember what date that was?

A.  That was June 14th of 1985.

Q.  And you took notes on your felony review folder, did you not?

A.  I took some notes there, yes.

Q.  This is Plaintiff's Exhibit 77.  These are your felony review notes, correct?

A.  Yes.

Q.  And tell the jury why felony review prosecutors take felony review notes on their felony review jackets?

A.  It's a thumbnail sketch to allow the people in the grant

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 13 of 175 PageID #:20192
Case: 1:23-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 13 of 175 PageID #:32623
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

12

66 to have an idea what the case is about.

Q. All right. Because you might not -- you weren't going to be the next prosecutor in court, right?

A. No.

Q. You were the felony review guy before it gets to court?

A. Correct.

Q. All right. And then you didn't write this memo, if I understand, until about six weeks later, correct?

A. That's correct.

Q. This is the memo Mr. Kulwin showed you?

A. Yes.

Q. All right. And the six weeks that went by, I guess you said you were real busy, lots going on, right?

A. There were a lot of things going on, yes.

Q. All right. But one of the -- regardless of the reasons why the six weeks went by, by the time you wrote your memo, your memory was no longer as fresh as it would have been had it been a contemporaneous memo, right?

A. I had the notes to refresh my memory.

Q. All I asked was your memory wasn't as good six weeks later, right?

A. No.

Q. You did have Mr. O'Callaghan's police report, correct, when you wrote this memo?

A. I believe I looked at it.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 14 of 175 PageID #:20193
Case: 1:10-cv-01168 Document #: 1185-38 Filed: 02/24/17 Page 14 of 175 PageID #:32624

Q. All right. Showing you, for example, in Plaintiff's Exhibit 86-26, this sentence says, Fields went on to say that he is presently a member of the El Rukns and that he holds the title of ambassador. He states that his main duties are to keep records, pay bills as far as the utilities in the buildings owned by the nation. Do you see that?

A. Yes.

Q. Okay. Your memo, for example, tracks that pretty closely, does it not, in summary, Fields stated that he was an ambassador with the El Rukn street gang and his duties were to keep records and pay utility bills on the buildings owned by the El Rukns, correct?

A. That's what my memo says.

Q. Okay. So when you were creating your memo, one of the sources you relied on was Mr. O'Callaghan's police report, correct?

A. I relied on my notes.

Q. All right. But you also had the police report, right?

A. I did.

MR. KULWIN: Asked and answered, Judge.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Let's turn to the interrogation. To be clear, Nate denied any and all involvement in the Vaughn/White murder, correct?

A. That's correct.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 15 of 175 PageID #:29194
Case: 1:16-cv-01168 Document #: 185-39 Filed: 02/24/17 Page 15 of 175 PageID #:32625
12/06/16 PM                      ***REALTIME UNEDITED TRANSCRIPT ONLY***

14

Q. And he denied any and all involvement in the Smith/Hickman murder?

A. Right.

Q. He never wavered on that, correct?

A. Correct.

Q. Now, who brought up the Smith/Hickman murder, you or Nate?

A. I brought up the murder.

Q. All right. Are you sure about that?

A. Well, I mean, I asked him -- first I asked him if he knows why you're here, yeah, I'm here for the two.

Q. Because he had already been interviewed by O'Callaghan, right, by the time you got to him?

A. Yes.

Q. So your understanding was O'Callaghan had already asked him questions, right?

A. Correct.

Q. About Smith/Hickman, right?

A. Correct.

Q. All right. Who brought up the nickname Fuddy, your side or Nate's side?

A. I can't recall.

Q. All right. This is page 22 of your testimony at the same proceeding, line 17. Do you remember being asked these questions and giving these answers. At the time of this when you asked about these murders, the Smith/Hickman and

Vaughn/White, how did, for example, when you asked about the Smith/Hickman, how did you identify the crime to Mr. Fields? How did you phrase the question?

"ANSWER:  Well, I think I asked him if he was familiar, you know, with the murder that occurred over there at 706 East 39th Street involving a couple, you know.  I think disciples, I think it was Fuddy Smith, I might have used the nickname Fuddy Smith and Hickman Talman, Talman Hickman and he told you he was not aware, he was not involved."

Did you give those answers, sir?

A.  Yes.

Q.  You don't claim to remember 30 years later that he brought up the name Fuddy, do you?

A.  I don't.

Q.  You don't, right?

A.  Correct.

Q.  In fact, your belief is you would have been the one that asked him, that's what you said in 2013, correct?

A.  That's what I said in 2013.

Q.  All right.  Who brought up the name Talman Hickman, you, your side or Nate?

A.  What do you mean by side?

Q.  All right.  You and O'Callaghan are on one side of the table, right?

MR. KULWIN:  Object, Judge.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 17 of 175 PageID #:20196
Case: 1:10-cv-01168 Document #: 1185-38 Filed: 02/24/17 Page 17 of 175 PageID #:32627
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

16

01:54:31       THE COURT: Rephrase the question. No, you can answer that.

01:54:36       THE WITNESS: I did the questioning of Mr. Fields at that time.

BY MR. LOEVY:

Q. Okay. But you and Mr. O'Callaghan were on one side of the table literally, right?

A. No.

Q. And Mr. Fields was on the other side of the table, right?

A. Not correct.

Q. Where was Mr. O'Callaghan?

A. He was not next to me.

Q. All right. Do you remember that from memory or practice?

A. Memory.

Q. All right. Who was sitting next to you at the next interrogation you did?

A. What next interrogation?

Q. All right. In think event, who brought up George Carter's possible involvement, you or Mr. Fields, the name George Carter?

A. I asked him if he knew George Carter.

Q. Are you sure that before Nate said the name George Carter, you brought it up?

       MR. KULWIN: Asked and answered, Judge.

       THE WITNESS: I think I mentioned George Carter.


       ***REALTIME UNEDITED TRANSCRIPT ONLY***

12/06/16 PM

BY MR. LOEVY:

Q.  Do you remember being asked this question and giving this answer on page 14.

"QUESTION:  Did you ask him about his associations with Earl Hawkins and George Carter?

"ANSWER:  Yes."

Did you give that answer?

A.  Yes.

Q.  So it's not an I think, you did, right?

MR. KULWIN:  Judge, objection, not impeaching.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  In fact, your memo specifically says that Fields was questioned regarding his associations with Carter among others, right?

A.  Correct.

Q.  That would not have been unusual in a murder interrogation if a guy says I had nothing to do with it for the interrogator to say, well, how about George Carter, right?

A.  Correct.

Q.  Who brought up the Guerilla squad, you or Mr. Fields?

A.  I think he brought that up.

Q.  All right.  Do you remember being asked this question -- by the way, before -- can I withdraw that, your Honor?

THE COURT:  Fine.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 19 of 175 PageID #:20198
Case: 1:10-cv-01168 Document #: 1185-28 Filed: 02/24/17 Page 19 of 175 PageID #:32629
12/06/16 PM             ***REALTIME UNEDITED TRANSCRIPT ONLY***

18

BY MR. LOEVY:

Q. You are aware substantively on the witness stand that it's an issue for the defense that Mr. Fields supposedly brought up these topics, you are aware of that, right?

         MR. KULWIN:  I am going to object.

         THE COURT:  Argumentative, sustained.

BY MR. LOEVY:

Q. Have you discussed that with Mr. Kulwin?

A. No.

Q. All right.  This is page 10, line 21.  Well, for example, when you asked Mr. Fields about, for example, when you asked him about the Guerillas?

         "ANSWER:  Yes.

         "QUESTION:  The special unit?

         "ANSWER:  Yes

         "QUESTION:  Did you ask him about the Guerilla squad?

         "ANSWER:  I believe he volunteered that information

         "QUESTION:  Do you recall?

         "ANSWER:  Not specifically

          MR. KULWIN:  Objection, Judge.

         THE COURT:  Overruled.

BY MR. LOEVY:

Q. Did you give that answer, sir?

A. Yes.

Q. Wouldn't it be fair to say 30 years ago, you have no idea

         ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 20 of 175 PageID #:20199
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 20 of 175 PageID #:32650
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

19

in response to any of these questions whether you brought it up or he brought it up?

A. I am just trying to relate what I remember about the conversation.

Q. Who brought up this idea about officers or generals that -- this part here that he said the shootings are typically planned and executed by the higher-ups in the gangs such as the generals. Who brought that up? You don't remember, do you?

A. No.

Q. Who brought up that supposedly the Goon Squad was having, you know, isn't it true this was about retaliation with the Goon Squad, you don't remember that either, do you?

A. Once again, as I testified, I believe he was the one who gave me that information.

Q. But you don't remember, right?

        MR. KULWIN:  Objection, Judge.

        THE COURT:  Overruled.

        THE WITNESS:  That's the way I remember it.

BY MR. LOEVY:

Q. Who brought up Earl Hawkins?

A. I believe I did.

Q. Who brought up the address of the murders?

A. I did.

Q. Who brought up Hank Andrews?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 21 of 175 PageID #:20200
Case: 1:16-cv-01163 Document #: 1185-29 Filed: 02/24/17 Page 21 of 175 PageID #:32651

12/06/16 PM                      ***REALTIME UNEDITED TRANSCRIPT ONLY***

20

A.   I believe I did.

Q.   All right.  If Mr. Fields was asked, hey, isn't it true this shooting was about some retaliation with the Goon Squad and he had said no, couldn't that later be argued that it was incriminating because he was lying about the reason about the motive?

MR. KULWIN:  Objection, Judge, argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Isn't it true that was a question that a person in an interrogation room couldn't win with that question?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  By the way, there was no such shooting referenced in the statement about that the Goon Squads and the El Rukns supposedly were fighting over a shooting, correct?

A.   I don't understand your question, sir.

Q.   To this day, you've never been provided any corroboration by the detectives or anybody else that there really was a shooting that precipitated Fuddy's murder, correct?

A.   I am still not understanding your question.

Q.   Do you remember what Mr. Fields was asked about whether there was retaliation and the shooting that business?

A.   Sure.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 22 of 175 PageID #:20201
Case: 1:10-cv-01168 Document #: 1185-28 Filed: 02/24/17 Page 22 of 175 PageID #:32652

12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

21

Q. All right. Then the question is isn't it true O'Callaghan was never able to give you any proof that there was such a shooting?

MR. KULWIN: Objection, Judge, argumentative, calls for hearsay.

THE COURT: Overruled.

THE WITNESS: I don't know if there was a shooting or not.

BY MR. LOEVY:

Q. All right. Did O'Callaghan tell you that Randy Langston was a Goon Squad member?

A. Randy Langston?

Q. Yeah.

A. I don't recall that.

Q. He told you -- the eyewitnesses Randy Langston, Gerald Morris, that they weren't gang members, didn't he?

A. Correct.

Q. All right. And you now know that that wasn't true, right?

A. I don't know that.

Q. If that wasn't true, if Randy Langston and Gerald Morris were gang members, that might have been a piece of the puzzle you would have considered in approving charges, correct?

A. It could be.

Q. Especially if they were in the gang of the victim, right?

A. It could be.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 23 of 175 PageID #:20282
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 23 of 175 PageID #:32653

22

Q. But you do remember being told that they weren't gang members, correct?

A. Correct.

Q. You were asked about sometimes the state's attorney would give people money to relocate. Do you remember those questions?

A. Yes.

Q. Who would typically be the one that would help them move and relocate, the state's attorneys have vectors that did that?

A. Yes.

Q. I mean, there was people whose job it was to do that, right?

A. Sometimes, yes. I mean, it depends on the manpower.

Q. All right. But it would not typically be the lead detective in the case, correct?

A. It varied from one situation to the next.

Q. But not typically, right?

MR. KULWIN: Judge, objection, asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't know that there's any typical when it comes to relocation.

BY MR. LOEVY:

Q. All right. You were asked if you heard prior to 92 that Sumner had recanted. Do you remember that?

A.  Yes.

Q.  You're quite sure that the first time anybody told you was 1992, right?

A.  From what I recall, yes.

Q.  And if anybody had known in the '80s, 88, 89, then you would have wanted to have known that, right?

A.  Correct.

Q.  All right.  You were asked Nate Fields if he was treated well by the police.  Why did you ask that?

A.  I always ask that.

Q.  All right.  And was there a concern on your part?

A.  No.

Q.  All right.  He was held overnight for a crime that he contends he didn't commit, correct?

A.  I don't know what he contends, sir.

Q.  Well, you do know that.  You spoke to him, right?

A.  Yeah.

Q.  He told you I had nothing to do with the crime, right?

A.  All right.

Q.  He was forthcoming with information, though, was he not?

A.  Yes.

Q.  You said he didn't seem surprised.  Was that going from memory?

A.  He, you know, just the conversation like I say, he was calm, he was alert, there was no surprise, no outbursts or

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 25 of 175 PageID #:20204
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 25 of 175 PageID #:32635
12/06/16 PM              ***REALTIME UNEDITED TRANSCRIPT ONLY***
                                                                    24

anything like that.

Q.  No outbursts, but you're not intending to imply like he knew you were going to charge him with Vaughn/White, did he?

A.  I don't know what he knew.

Q.  All right.  But is that the implication you're trying to give, that he expected to be charged with Vaughn/White?

MR. KULWIN:  Objection.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  As the felony review prosecutor, you're aligned with the prosecution, correct?

A.  I am there to determine if there is evidence for probable cause.

Q.  And one of the things you have to do to make that determination is rely on what's told to you, correct?

A.  Yes.

Q.  And the reason you have to do that is because you don't speak necessarily to the witnesses, right?

A.  Depending on the case, sometimes you do, sometimes you don't.

Q.  Did you speak to Randy Langston?

A.  No, I did not.

Q.  Did you speak to Gerald Morris?

A.  No, I did not.

Q.  Did you speak to Eric Langston?

A.   No, I did not.

Q.   So when you decided there was probable cause to approve murder charges against Nate, would it be fair to say that you were relying entirely on Mr. O'Callaghan?

A.   That's not correct.

Q.   All right.  Randy Langston, Gerald Morris, Eric Langston,a and your interview with Nate where he told you that he had nothing to do with it.  What else factored into your probable cause decision?

A.   Well, I knew that the felony review assistance along with the gang prosecution unit had interviewed these witnesses.

Q.   These witnesses?

A.   I spoke to the supervisor, had spoken to witnesses, I knew that the --

Q.   Can we restrict it?

         MR. KULWIN:  Judge.

         THE COURT:  Complete the answer.  He's answering the question you asked him.  Complete the answer.

         THE WITNESS:  I knew that Ernest DiBenedetto was aware of that.

BY MR. LOEVY:

Q.   That's on Vaughn/White, right?

A.   That's on both cases.

Q.   Okay.  Smith/Hickman, Ernie DiBenedetto hadn't spoken to Randy Langston or Gerald Morris or any of those people either,

***REALTIME UNEDITED TRANSCRIPT ONLY***

right?

A. I don't believe he personally spoke to them.

Q. All right. Were you -- was it represented to you by the police officers that the identifications by these eyewitnesses were legit?

A. That they made positive identifications.

Q. Right. But were they represented to be legitimate positive identifications?

A. I don't know what you mean by the term.

Q. In other words, I could say you did it, right? Anybody could say anything. Did the police officers satisfy you that they hadn't been coached, they hadn't been led, they had legit mately identified nature?

MR. KULWIN: Objection.

THE COURT: Overruled.

THE WITNESS: Once again, this was an ongoing investigation and there were other people looking at this before me.

BY MR. LOEVY:

Q. I'm only asking about you because you are the one who approved the charges, right, sir?

A. Yes.

Q. Did Mr. O'Callaghan in communicating with you assure you that these eyewitnesses were legitimately identifying Nate Fields, yes or no?

A. Yes.

Q. And when you decided to approve charges, at least in part, you relied on the fact that eyewitnesses pointed the finger at Nate and said he did it, right?

A. Correct.

Q. And in addition to the eyewitnesses, you had Anthony Sumner, right?

A. Yes.

Q. But the police had not come for probable cause charges based on Sumner alone before they had the eyewitnesses, correct?

MR. KULWIN: Objection, Judge.

THE COURT: The question is difficult to understand. Why don't you rephrase it.

BY MR. LOEVY:

Q. All right. The police came for charges after they had Sumner plus the eyewitnesses to corroborate, correct?

A. Yes.

Q. All right. When they just had Sumner without the eyewitnesses, they did not seek murder charges, that's the point I'm trying to make. That's true, right?

A. That's my understanding.

Q. Sumner alone was not sufficient to have probable cause for murder, correct?

A. Well, I can't answer that in a vacuum, sir.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 29 of 175 PageID #:20208
Case: 1:10-cv-01168 Document #: 1185-28 Filed: 02/24/17 Page 29 of 175 PageID #:32659
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

28

Q.  Showing you Plaintiff's Exhibit 133, page 12, this is the evidence -- this is in evidence, your Honor.

THE COURT:  What's the exhibit number again?

MR. LOEVY:  133.

THE COURT:  Thanks.

MR. LOEVY:  Page 12.

BY MR. LOEVY:

Q.  Can you tell the jury what we're looking at here?

A.  This looks like a grand jury indictment account.

Q.  All right.  And it's hard to read, but it says that the following people without justification shot and killed the victims, right?

A.  Yes.

Q.  Okay.  And Nate Fields is on there, right?

A.  Yes.

Q.  But he is on there in handwriting, right?

A.  Correct.

Q.  Tell the jury who it originally said shot and killed Talman Hickman?

A.  I can't see that.

Q.  All right.

MR. LOEVY:  May I approach, your Honor?

THE COURT:  That's fine.

BY MR. LOEVY:

Q.  It says Earl Hawkins and George Carter, doesn't it?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 30 of 175 PageID #:20200
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 30 of 175 PageID #:32640
12/06/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

29

02:07:16    A.  I can't really tell.

02:07:32    Q.  Can you see the screen?  It's blown up a little bit?

02:07:35    A.  A little too much.

02:07:36    Q.  All right.  This is Carter here at the bottom, right?
02:07:40    That looks like Carter, would you agree?

02:07:41    A.  It looks like it, yes.

02:07:43    Q.  And this sure looks like Earl, doesn't it?

02:07:45    A.  It does.

02:07:47    Q.  So are you the one who scratched out Earl Hawkins and
02:07:50    George Carter and wrote in Nathson Fields as the shooters?

02:07:53    A.  No.

02:07:54    Q.  Do you know who did?

02:07:56    A.  No.

02:07:57    Q.  Do you know why it used to say Earl Hawkins and George
02:08:00    Carter were the shooters?

02:08:02    A.  I know at one time, I believe they were charged before
02:08:06    Nathson Fields was charged.

02:08:07    Q.  It doesn't say -- it says that they actually shot and
02:08:11    killed, correct?

02:08:13        MR. KULWIN:  Judge.

02:08:15        THE COURT:  Sustained.

02:08:16    BY MR. LOEVY:

02:08:20    Q.  Let's just talk briefly about the interrogation then.  Did
02:08:24    you explain to Nate that you were a prosecutor and not a
02:08:27    defense attorney?

A.  Correct.

Q.  Were you confident he understood what you were saying?

A.  Yes.

Q.  And did you explain he had a right to talk to you without a lawyer?

A.  Yes.

Q.  And were you confident you communicated that?

A.  Yes.

MR. LOEVY:  Your Honor, my colleagues tell me that it wasn't on the jury's screen.

THE COURT:  Maybe that thing isn't working.  I'll let you put it backup.

MR. LOEVY:  Thank you, your Honor.

THE COURT:  You're right.  I had the jury monitor turned off.  For some reason that thing isn't working down there.  Maybe it's coming back on.

Okay.  So this is what he was pointing to earlier when he was trying to make out the names.

All right.  The jury will have all these exhibits back during the deliberations.

BY MR. LOEVY:

Q.  Without lawful justification unintentionally and knowingly shot and killed and that's where it says Earl Hawkins and George Carter you believe, correct, sir?

A.  It looks like it.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 32 of 175 PageID #:29211
Case: 1:10-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 32 of 175 PageID #:32642

THE COURT: All right. You can go ahead. Thanks for catching me on that.

BY MR. LOEVY:

Q. All right. You believe you communicated in clearly understandable language that he did not have to talk to you about these murders without a lawyer, correct?

A. Correct.

Q. He nonetheless chose to do that, correct?

A. That's correct.

Q. And he told you, according to your memo, that he was basically the guy in charge of paying the bills and keeping the upkeep of the building, correct?

A. Yes.

Q. He told you the murders and such were planned by the higher-ups in the organization and he had nothing to do with it, correct?

A. Correct.

Q. And he was very firm about that, correct?

A. That's what he said.

MR. LOEVY: I have no further questions, your Honor.

THE COURT: Mr. Kulwin.

- - -

JACK HYNES, REDIRECT EXAMINATION

BY MR. KULWIN:

Q. Mr. Hynes, you were just shown this document. Judge

Hynes.  133-12 and 13 and 14 and 15.  I want to go over those for a second, if I may, Judge.

Now, you didn't put anybody in front of the grand jury on any of these murders, right?

A.  Correct.

Q.  Do you know who did?

A.  No.

Q.  Okay.  Now, this appears that this is a form murder charge that actually?

MR. LOEVY:  Objection, leading, your Honor.

THE COURT:  Sustained.

BY MR. KULWIN:

Q.  Are you aware that in fact Mr. Carter and Mr. Hawkins were charged in the murder of Talman Hickman and Jerome Smith?

A.  Well, I knew that Hawkins was charged in both murders.  I also knew that Hawkins and Carter were charged in the Smith/Hickman murder.

Q.  So you don't know whether the prosecutor who put this in front of a grand jury just simply used the Carter Hawkins form and put it in front of the grand jury?

A.  No.

THE COURT:  I will just remind the jury as I have done about a dozen times that questions are not evidence.

BY MR. KULWIN:

Q.  Another document that's in the file is this one, 113-11.

First of all, let me just zoom out on this for a second.

Have you seen forms like this before?

A.  Yes.

Q.  What is it?

A.  It's a charging form that would be filled out by the assistant state's attorney at some point during the grand jury process setting forth the charges and the particulars set forth on that form.

Q.  It says TQ on the top, who is TQ?

A.  That would be Tim Quinn.

Q.  And what was his position?

A.  He was supervisor of grant 6 of.

Q.  And right there it says Larry Wharrie?

A.  Yes.

Q.  At the bottom it says -- and then it lists four separate murder charges, correct?

A.  Correct.

Q.  At the bottom it says see attached indictment for co-defendant.  Use same language.  Do you see that?

A.  Yes.

Q.  And of course, with the co-defendant, that's exactly what he did, he used the same language, right, that's what it says?

A.  Yes.

MR. LOEVY:  Objection, your Honor.

THE COURT:  Overruled to that particular question.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 35 of 175 PageID #:20214
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 35 of 175 PageID #:32645
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

34

BY MR. KULWIN:

Q.  This is PX 113-12.  And PX?

        THE COURT:  PX means Plaintiff's Exhibit.

        MR. KULWIN:  Sorry about that, Judge.

BY MR. KULWIN:

Q.  Plaintiff's Exhibit 113-13, right?

A.  All right.

Q.  And then Plaintiff's Exhibit 113-14, right?

A.  Yes.

Q.  And then Plaintiff's Exhibit 113-15, right, same language each time, right?

A.  Yes.

Q.  Now, you were asked some questions about who brought up what first.  Do you remember those questions?

A.  Yes.

Q.  Okay.  Now, in your memo, though, you note this. Detective O'Callaghan also informed witnesses on both cases had been previously interviewed by assistant state's attorney's from gang crimes unit and felony review, I then read all the available reports, right?

A.  Yes.

Q.  And in the reports it did show in fact that lot of the witnesses in both these cases at least in the Vaughn/White case in particular had been interviewed by assistant state's attorney in the gang crime unit?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 36 of 175 PageID #:20215
Case: 1:10-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 36 of 175 PageID #:32646

MR. LOEVY: Objection.

THE COURT: Sustained.

BY MR. KULWIN:

Q. Do you recall that's what the report indicated, sir?

A. That's what I recall.

Q. Now, then in your report, you say, when you say that you were questioning in your report, it says Fields was then questioned regarding his association with Earl Hawkins and George Carter who were previously charged with the murders. Right? You specifically note that he was questioned about a specific topic?

A. Yes.

MR. LOEVY: Objection, leading, your Honor.

THE COURT: Stop leading, please.

BY MR. KULWIN:

Q. Okay. Immediately before the guerrilla, I'll point your attention to the bottom of page one of your report.

A. Yes.

Q. Okay. Now, right before it says in summary, is there anything in there that says Fields was questioned right before in summary on the bottom, the last paragraph, sir, in the bottom?

A. In summary, Fields stated.

Q. Before you read that, I apologize, does it say Fields was questioned about it right there or does it just say in

36

summary?

MR. LOEVY:  Objection, your Honor.

THE COURT:  I think we can all read what it says. Let's get to an actual question.

BY MR. KULWIN:

Q.  Sorry about that.

THE COURT:  Okay.

BY MR. KULWIN:

Q.  What does it say, can you read for it us what it says Mr. Fields said in summary?

A.  In summary, Fields stated that he was an ambassador with the El Rukn street gang and that his duties were to keep records and to pay utility bills on the buildings owned by the El Rukns.

Q.  Keep going on the next page, what does he say he said, Mr. Fields said?

MR. LOEVY:  Objection, your Honor.  It does not say that.

THE COURT:  It says he said.  So, yeah, it does.

BY MR. KULWIN:

Q.  Go ahead?

A.  He said that he was an original member of the Blackstone Rangers in the '60s and that now he is an El Rukn trying to rise through the organization by showing his loyalty to the gang.  He went on to deny any involvement in either the March

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 38 of 175 PageID #:20217
Case: 1:21-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 38 of 175 PageID #:32648

28th, 1985, double murder or the April 28th, 1984 double murder. He said shootings are typically planned and executed by higher-ups in the gangs such as generals. Fields said that there is a group within the El Rukns known as the gorillas who handled special assignments such as hits for large drug transactions.

Q. Let me stop you right there for a second. This information that you put in here, where did it come from before he put it in the memo?

A. That came from Mr. Fields.

Q. Okay. Now, go on, the in ex paragraph?

A. Fields was then questioned regarding his association with Earl Hawkins and George Carter who were previously charged with the murders. Fields said he knew Earl Hawkins because he is a general in the El Rukns and he knew Hawkins rode with Anthony Sumner. He also stated that he knew George Carter who was also a general in the El Rukns, and he knew Carter rode with Henry Andrews. Fields also said he heard that Jerome Smith, AKA Fuddy was a member of the Goon Squad disciples and that he was shot in retaliation for the shooting of two El Rukns by the disciples. Fields said this was all he knew of the incident.

Q. Let me stop you right there. Where did this information come from?

A. From Mr. Fields.

12/06/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***
Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 39 of 175 PageID #:20218
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 39 of 175 PageID #:32649

38

Q. Now, you were asked a bunch of questions whether 30 years later can you remember who said did you bring it up, did he bring it up, is this memo the best record of how the conversation went as far as you can recall?

A. As far as I can recall.

Q. Okay. You were asked some questions about how you remember how Mr. Fields looked or how he reacted, look at the last paragraph. Can you read that one for us?

A. During the entire conversation, knowledge that the entire was alert, calm and sober. He was not handcuffed during my conversation with him. Though threats or promises were made to Fields and no force of any kind was used against him.

Q. Is that a true statement at the time you wrote it?

A. Yes.

Q. So, again, you were asked these questions -- I'll withdraw that question.

Now, you were asked some questions about whether or not the first time you saw charges, approved charges against Nate Fields was after he was arrested, do you remember those questions? Let me withdraw that. That was a poor question.

You were asked some questions about whether you had approved charges before June 14th, 1985. You were asked those questions?

A. Yes.

Q. Judge Hynes, was the first time that Mr. Fields was

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 40 of 175 PageID #:20219
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 40 of 175 PageID #:32650

arrested and in custody June 14th, 1985, to the best of your knowledge?

A. I am not sure I understand that.

Q. Okay. When was the first time -- when you were presented the opportunity whether or not you were going to approve charges or not, how long after that request was made had Mr. Fields been arrested, if you know?

A. I believe the day before he was stopped for a traffic violation.

Q. Okay. And, of course, you were asked asked some questions about whether or not you interviewed witnesses. Do you remember those questions?

A. Yes.

Q. In this case, you interviewed the main witness, didn't you, Nathson Fields?

A. Yes.

Q. You were asked some questions on whether you relied, whether the only thing you relied on or one of the main things you relied on was whether or not O'Callaghan told you it was a quote-unquote legitimate identification. Do you remember those questions?

A. Yes.

Q. Were you advised whether by Detective O'Callaghan, were you advised whether Mr. Fields had been placed in lineups that night?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 41 of 175 PageID #:20220
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 41 of 175 PageID #:32651
12/06/16 PM

***REALTIME UNEDITED TRANSCRIPT ONLY***

40

A.  Yes.

Q.  What did he tell you about what happened at the lineups?

A.  He said he was identified by three eyewitnesses, positively identified.

Q.  By the way, did you ever hear of any evidence that during the interview, during the lineups, Detective O'Callaghan came around out of the viewing room, into the lineup room, stood in front of the people using the lineup, picked up Mr. Fields' sleeves while a cameraman took pictures of the entire thing, did you ever hear anything like that?

        MR. LOEVY:  Objection, foundation.

        THE COURT:  Overruled.

        THE WITNESS:  No.

BY MR. KULWIN:

Q.  Did Mr. Fields that very night say to you at any time, listen, by the way, this lineup I was just in was really weird, can I talk to you about that, did he say that?

        MR. LOEVY:  Objection.

        THE COURT:  Sustained.

BY MR. KULWIN:

Q.  Did he bring up -- you said you were alone for him for several minutes after the detectives left, right?

A.  Yes.

Q.  Did he relate to you anything unusual while the detectives were out of the room about what happened during the lineup in

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 42 of 175 PageID #:20221
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

41

Q. which he was positively identified?

A. No.

Q. You were asked some questions about what side of the table you were on and which side of the table you're aligned, do you remember those questions?

A. Yes.

Q. Judge Hynes, when you're an assistant state's attorney in felony review and you're reviewing information, did you understand at that time the seriousness of the job that you had?

MR. LOEVY: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. KULWIN:

Q. Did it matter that you had only been out of law school for three years, did that affect your ability to perceive the seriousness of the job that you had?

A. No, it did not.

Q. Did you feel after three -- how many cases had you been on felony review before you had that case?

A. Well, I don't know. You know, probably hundreds.

Q. Were you the type of prosecutor who just said, gosh, I don't really know what I'm doing, I think I'll just rely on these experienced detectives?

THE COURT: The objection is sustained.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 43 of 175 PageID #:20222
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/26/17 Page 43 of 175 PageID #:32653
12/06/16 PM         ***REALTIME UNEDITED TRANSCRIPT ONLY***

42

BY MR. KULWIN:

Q.  Did you rely on your own ability, training as a lawyer, training as a state's attorney and the seriousness of the position that you held in determining whether serious charges should be brought in this case?

MR. LOEVY:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. KULWIN:

Q.  You were asked some questions about whether or not Mr. Fields firmly denied that he was ever involved in either of those murders, do you remember those questions?

A.  Yes.

Q.  And whether he voluntarily spoke to you without a lawyer. Do you remember those questions?

A.  Yes.

Q.  Sir, in your experience, was it unusual for people to say I'll talk to you without a lawyer, that happened?

A.  Yes.

Q.  Okay.  And sometimes they admitted the crime and sometimes they denied the crime?

MR. LOEVY:  Objection.

THE COURT:  Sustained.

BY MR. KULWIN:

Q.  Did the fact that Mr. Fields was denying the crime in your

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 44 of 175 PageID #:20223
Case: 1:10-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 44 of 175 PageID #:32654
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

43

view based on all the evidence that you had seen with respect to Smith/Hickman make you think I shouldn't approve charges here?

MR. LOEVY: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: No.

MR. KULWIN: If I may have a moment, your Honor.

(Brief pause.)

BY MR. KULWIN:

Q. You were asked some questions, sir, about whether the information from Anthony Sumner was sufficient to approve charges. In the Vaughn/White case, what was the -- what was the office relying onto approve the charges?

A. Well.

THE COURT: You can't ask that question that way. It's covered by a prior ruling.

MR. KULWIN: Judge, I put it the wrong way.

BY MR. KULWIN:

Q. On another topic, to your knowledge, can final approval for charges, felony charges, be brought against somebody while -- before they're arrested, before they're in custody? Do you know?

A. That's a hard question to answer in a hypothetical.

Q. I'm sorry?

A. It's a hard question to answer in a hypothetical.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 45 of 175 PageID #:20224
Case: 1:10-cv-01168 Document #: 1185-38 Filed: 02/24/17 Page 45 of 175 PageID #:32655

44

Q. All right.

MR. KULWIN: I don't have any other questions, Judge.

THE COURT: Was there going to be a recross?

MR. LOEVY: Just one.

THE COURT: Okay.

- - -

JACK HYNES, RECROSS-EXAMINATION

BY MR. LOEVY:

Q. Given the seriousness of the probable cause determination, you as the felony review prosecutor necessarily had to have in place quite a bit of trust in the detective who was telling you that these identifications were legit, can we agree on that?

A. I trusted the detectives.

MR. LOEVY: No further questions, your Honor.

THE COURT: Do any of the jurors have any questions for the witness? Thanks. You're excused.

THE WITNESS: Thank you, Judge.

THE COURT: Please call the next witness.

MR. MICHALIK: Defense calls Robert Evans. Be.

MR. KULWIN: Your Honor, can we be heard at sidebar real quick?

THE COURT: No. I am pretty sure I know what it's about. It's going to wait until a break. The break is going to be at about 3:00.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 46 of 175 PageID #:20225
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 46 of 175 PageID #:32656

02:26:57    MR. KULWIN: All right. Thanks.

02:26:58    THE COURT: Judges are mind readers just so you know.

02:27:01    It's pre-employment qualification. You have to go through a

02:27:04    test.

02:27:31    (Witness sworn.)

02:27:31                            - - -

02:27:31            ROBERT EVANS, DIRECT EXAMINATION

02:27:31    BY MR. MICHALIK:

02:27:44    Q. Good afternoon. Could you please state and spell your

02:27:46    name for the record?

02:27:47    A. My name is Robert Evans, last name is spelled Evans.

02:27:51    Q. You previously were a member of the Chicago Police

02:27:55    Department?

02:27:55    A. I was.

02:27:56    Q. When did you start with the police department?

02:27:58    A. I was hired on as a civilian back in 1968 as a police

02:28:03    cadet and then in 1971, in July, I went on the job as a sworn

02:28:11    police officer.

02:28:11    Q. As a patrolman?

02:28:14    A. Yes, sir.

02:28:15    Q. Did you eventually become a detective?

02:28:16    A. That was in August of 1982.

02:28:18    Q. All right. In August of 1982, where were you assigned as

02:28:23    a detective?

02:28:23    A. I was assigned to area one violent crimes.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 47 of 175 PageID #:20226
Case: 1:23-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 47 of 175 PageID #:32657

Q. Now, we've heard about area one violent crimes. Are there different detective units at area one at that time?

A. At that time, there were two different detective units.

Q. What were they?

A. Violent crimes and property crimes.

Q. What would the homicide fall under the violent crimes of the detective division?

A. Yes, it did.

Q. Were you assigned to area one violent crimes in April of 1984?

A. I was.

Q. How long did you remain as a detective with the Chicago Police Department?

A. I was promoted to sergeant in December of 1986.

Q. Did you eventually receive another promotion?

A. I was promoted then to lieutenant in December of 1988.

Q. How long did you serve as a lieutenant?

A. For approximately 12 years.

Q. Okay. Did you then get another promotion?

A. I was promoted to captain in the year 2000.

Q. Any further promotions?

A. I was promoted commander in 2005.

Q. How long did you serve as a commander with the Chicago Police Department?

A. For three years.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 48 of 175 PageID #:20227
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 48 of 175 PageID #:32658

Q. Did you retire as a commander?

A. Yes, I did.

Q. When was that?

A. November of 2008.

Q. Sir, I'd like to take you back in time to April 28, 1984, a Saturday morning. Were you working that day?

A. Yes, I was.

Q. Were you working as a violent crimes detective at area one?

A. I was, yes.

Q. Did you have a partner that day?

A. Steven Hood.

Q. What, if anything, happened around 10:15 or 10:30 that morning?

A. We were on our way back into the station and we heard what is referred to as an all call broadcast.

Q. What is an all call broadcast?

A. An all call broadcast would be an emergency situation where the dispatcher would send the call out to a number of radio zones across the city for any -- for responses from any units that would hear the call.

Q. What was the information that was provided in that all call on the morning of April 28, 1984?

A. The call was two men shot on the street at 706 East 39th Street.

Case:1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 49 of 175 PageID #:20228
Case:1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 49 of 175 PageID #:32659

Q. Did you do anything after you got that call?

A. Yes, we proceeded to the scene directly.

Q. Okay. Can we see Defendant's Exhibit 1 H.

MR. MICHALIK: Judge, this is in evidence.

THE COURT: I'll flip it so the jury can see it.

BY MR. MICHALIK:

Q. Can you describe what you see here on Exhibit 1 H, please?

A. That appears to be the 706 East 39th Street building with a number of people out in front.

Q. Does this reflect the scene at 706 East 39th Street when you arrived on the morning of April 28, 1984, in response to the all call?

A. Yes, there were several police uniformed police units already at the scene, but the crowd, this accurately depicts the size of the crowd, in fact, it probably even got bigger.

Q. Okay. And that was you and Detective Hood who responded to that scene?

A. Yes, sir.

Q. All right. Now, what did you and Detective Hood first do upon arriving at the scene?

A. When you get a call of that nature, we try to render first aid if at all possible.

Q. Were you able to do so?

A. No, it appeared that both of these individuals had been shot in the head.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 50 of 175 PageID #:20239
Case: 1:15-cv-01168 Document #: 185-29 Filed: 02/24/17 Page 50 of 175 PageID #:32660

12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

49

Q.   What did you do next?

A.   Well, an ambulance arrived shortly after that and we realized that there was -- both these individuals had passed away.

Q.   Were there any other Chicago Police Department personnel at the scene when you arrived?

A.   Yes, we utilized them to control the access to the crime scene because this actually was before the days of crime scene tape, now it seems to be everywhere, but we had to use physical bodies to keep people back from the crime scene at that time.

Q.   And you used actual police officers to cordon off the crime scene area?

A.   Correct.

Q.   Did you do anything to preserve the scene?

A.   Well, what we try to do is make sure that everything is as it was when we -- when it first occurred, and we then contacted the crime lab unit would come and process for any evidence on the scene.

Q.   Did you and your partner conduct any sort of an investigation at the scene?

A.   Yes, we did.

Q.   What did you do?

A.   We interviewed several people, we noted exactly who was on the scene itself, we contacted our office, sergeant McCrae was

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 51 of 175 PageID #:20230
Case: 1:20-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 51 of 175 PageID #:32681
12/06/16 PM       ***REALTIME UNEDITED TRANSCRIPT ONLY***
50

working that day, and he responded to the scene with additional detectives.

Q. Did you and the other detectives canvass the area?

A. Yes, we did.

Q. All right. And do you have any recollection of approximately how many different individuals you talked to at the scene?

A. A countless number.

Q. Were any --

A. Sometimes people are reluctant to speak to the police given the circumstances.

Q. Were any of them willing to give you information?

A. Some were.

Q. Now, if you talked to someone at the scene who was unable or unwilling to provide you with information, would you write that down?

A. There's no need to.

Q. Why not?

A. It would be a waste of time first of all.

Q. If you talked to someone who said he or she did have some information, would you interview that person?

A. We would attempt to, yes.

Q. All right. You said that some other detectives were assigned to this scene?

A. Yes, there were.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 52 of 175 PageID #:20231
Case: 1:23-cv-01168 Document #: 185-29 Filed: 02/24/17 Page 52 of 175 PageID #:32662

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

51

Q. And there was VanBerschot, Carol and Fields?

A. Correct.

Q. And sergeant McCrae also came out to the scene?

A. Yes, he did.

Q. Now, I'd like to ask you some questions about your reporting responsibilities. As the first detectives who arrived at the scene, did you have any particular responsibilities with respect to report preparation?

A. Our responsibility was to prepare the initial crime scene report.

Q. And that's because you were the first detectives at the scene?

A. Yes, sir.

Q. And did you have that responsibility for the Smith/Hickman murders?

A. Yes, we did use.

        MR. MICHALIK:  If I could see Defendant's Exhibit 60.
BY MR. MICHALIK:

Q. All right.  Do you recognize what's on the screen as Defense Exhibit number 60?

A. Yes, I do.

Q. What is it?

A. It looks like the front page of our supplementary report regarding the Hickman Smith double homicide.

Q. And this is what you referred to earlier as the scene

report?

A.  Correct.

Q.  Who prepared this report?

A.  I did.

Q.  Who typed it up?

A.  I did.

Q.  What is the date of this report?

A.  The date of report is the 28th of April 1984, the day the incident occurred.

Q.  And when is the date that you typed it up?

A.  It was the 28th of April.

Q.  Did you sign this report?

A.  I did.

Q.  Is that your signature reflected in the lower left-hand corner on the first page of Exhibit 60?

A.  It is.

Q.  Did your partner sign the report as well?

A.  Yes, he did.

Q.  And that's Steven Hood?

A.  Correct.

Q.  And then finally, did a supervisor approve and sign this report?

A.  Yes, sergeant braid b-r-i-n-GE.

Q.  And his signature is reflected in the lower right-hand corner?

A.  Correct.

Q.  And it looks like the report was approved on April 28, 1984?

A.  Yes, it was.

Q.  At what point during your shift on April 28, 1984, did you prepare this report?

A.  That was at the end of our shift.

Q.  All right.  I'd like to go through some of the details of the report.

First off, in preparing a report like this, is there any particular format that Chicago detectives were supposed to follow?

A.  Yes, there is a homicide format that we follow.

Q.  Is that homicide form generally provide various lists of information that are to be included in a scene report?

A.  Yes, it does.

Q.  Did you follow those guidelines in preparing this particular report?

A.  Yes, we did.

Q.  All right.  If we start off on the first page here, it looks like the first section is victim.  And there are two victims listed?

A.  Yes.

Q.  All right.  What information is included in that particular section?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 55 of 175 PageID #:20234
Case: 1:15-cv-01163 Document #: 1185-29 Filed: 02/24/17 Page 55 of 175 PageID #:32605

A.   The names of the victims, the sex, race, age, date of birth, address, telephone number, marital status, employment status, Social Security number, and the Chicago police department identification records number.

Q.   All right.   What is the Chicago Police Department identification records number refer to?

A.   When someone is arrested by the Chicago Police Department and fingerprinted and photographed, they receive a Chicago Police Department records number.

Q.   Okay.   So these individuals both had some previous contact with the Chicago Police Department?

A.   Correct.

Q.   All right.   If we could go to the next page, 60-2.

All right.   The next section I want to ask you about, sir, is the section that says wanted.   Do you see that?

A.   Yes, I do.

Q.   At the top of this second page.

All right.   This information here, what is that based on?

A.   That's based on the individuals that we spoke with at the scene who gave us a description of people that were involved in the shooting.

MR. MICHALIK:   If we could see Plaintiff's Exhibit 21, please.

BY MR. MICHALIK:

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 56 of 175 PageID #:20235
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 56 of 175 PageID #:32666

12/06/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***

55

Q. All right. For the record, this is Plaintiff's Exhibit 21 which is 8 pages of general progress reports. The first page here, does this contain your writing?

A. Yes, it is.

Q. So you were using these GPR forms in April of 1984 when you were investigating this particular double homicide?

A. Correct.

Q. All right. If I could take a look at page 7, 21-7.

BY MR. MICHALIK:

Q. Can you tell me what this particular page is?

A. That looks like it was prepared by detective Jon VanBerschot.

Q. And that's also on the general progress report?

A. Correct.

Q. Looking at the top third of this particular exhibit, do you see that there, sir?

A. Yes, I do.

Q. What information does that reflect?

A. A description of the offender is given by Eric Benson.

Q. All right. Eric Benson's name here is on the second from the bottom line that we are seeing on the cut out?

A. Correct.

Q. And he's listed to be nine years old?

A. Yes.

Q. Does this information reflect -- does this particular

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 57 of 175 PageID #:20236
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 57 of 175 PageID #:32667
12/06/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

56

section of the GPR reflect information that was obtained by Detective VanBerschot?

A.  Yes, it does.

Q.  And according to this note, what does Eric Benson tell Detective VanBerschot that he saw?

A.  The individuals came from behind, each had a gun, and each shot one of the victims in the back of the head.

Q.  Did Eric Benson provide Detective VanBerschot with any description of the individuals he saw?

A.  He said that one had long hair down to the neck, he gave a clothing description as well.

Q.  And looking over here, does it also say that one of the offenders had earrings in the right ear?

A.  Correct.

Q.  If we could now see Plaintiff's Exhibit 21-5, please.

BY MR. MICHALIK:

Q.  Do you recognize the writing on this particular page?

A.  I believe that's my partner's.

Q.  All right.  And that was Detective Hood?

A.  Detective Hood.

Q.  All right.  Toward the bottom, do you see a reference here, at the very bottom to a Cleveland Ball?

A.  Yes, I do.

Q.  Did you and Detective Hood speak to Cleveland Ball on April 28, 1984?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 58 of 175 PageID #:20237
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

57

A.  Yes, we did.

Q.  And was Mr. Ball the source of the information that is shown in the bottom third of this particular note?

A.  It is.

Q.  Did Mr. Ball provide a description of the shooters?

A.  Yes, he did.

Q.  What did he is?

A.  He said that it the one in the blue jogging suit was five, 11, 23 years of age medium build and had a red skull cap.

Q.  Did he provide a description of the other offenders?

A.  Yes, that an individual was wearing a red and blue jacket and he had a dark skull cap.

Q.  All right.  Mr. Baldwin told you and Detective Hood that the offenders were wearing skull caps, correct?

A.  That is correct.

Q.  Did Cleveland Ball ever tell you and Detective Hood that the offenders were wearing ski masks?

A.  No.

Q.  According to Mr. Ball, there were four offenders?

A.  Yes, sir.

Q.  According to Mr. Ball, two were in the car and two got into the car?

A.  Correct.

Q.  Did Mr. Ball describe what type of car it was?

A.  Mr. Ball said it was a two-door blue 79 Cadillac coupe

***REALTIME UNEDITED TRANSCRIPT ONLY***

DeVille.

Q. It was a two-door coupe DeVille?

A. Correct.

Q. If I could go back to the scene report, page 60-2, Defendant's Exhibit 60-2.

BY MR. MICHALIK:

Q. Let's go back to the section that says wanted. Could you please read what your report says as to the description of the wanted offenders.

A. Wanted, four offenders.

Number one, a male black, 21 to 25 years of age, five-foot ten to six feet, medium build, last seen wearing a blue jogging suit and a red skull cap.

Number two, male black, 20 to 24 years of age, five-foot seven to foot foot nine, medium build, last seen wearing a Clark colored jacket and a dark colored skull cap. Hair worn long and had an earring.

Three and four subjects unknown. Both stayed in the vehicle described below.

Q. The information as to offenders number 1 and No. 2, they're unknown, correct?

A. Correct.

Q. But these descriptions are based on the information that was provided to you and Detective VanBerschot by witnesses Eric Benson and Cleveland Ball?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 60 of 175 PageID #:20239
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 60 of 175 PageID #:32670

A.  Correct.

Q.  And all of that information is reflected here in the supplementary report?

A.  It is.

Q.  If we could go to the next section of the supplementary report, wanted vehicle.  Why is that section included in a scene report?

A.  Well, this vehicle was seen, the offenders were seen entering the vehicle and the individuals involved in the murder along with their compatriots were driving in this 1979 Cadillac coupe DeVille, medium blue in color, license number was unknown.

Q.  And what was the source of that information?

A.  That was the information that we got from the people we interviewed.

Q.  Including Cleveland Ball?

A.  Cleveland Ball, correct.

Q.  Incidentally, let me ask you this, sir, when you were preparing your supplementary report in the evening of April 28, 1984, did you have available to you your notes, GPRs, and the GPRs from Detective VanBerschot?

A.  Everybody at the scene submitted their notes and we compiled the report based upon those.

Q.  If we could look at some of the other sections in this supplementary report.  In particular, we see the date and time

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 61 of 175 PageID #:20240
Case: 1:23-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 61 of 175 PageID #:32671
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

60

here at the bottom of page 2.

A. Yes, sir, that was Saturday April 28th at approximately 10:17 hours.

Q. And that reflects the time of the shooting, correct?

A. Yes, it does.

Q. All right. If we could go to page 3 of this report. At the very top, weather and lighting, what did you report were the weather and lighting conditions at the time of the shooting?

A. That it was warm, high in the '60s, and sunny, and it was good natural lighting.

Q. Going down a little bit, I don't want to spend time on all of these sections, but I do want to ask you about the next one toward the bottom of the page. It says personnel assigned. Do you see that, sir?

A. Yes.

Q. And I think it continues onto the next page. For the record, this is Defendant's Exhibit 60-3 and 4.

Whose names are included in the section designated personnel assigned?

A. Anyone from the Chicago Police Department assigned to the scene or happened on the scene, we got their information.

Q. All right. In looking at the list of personnel at the scene, does it indicate anywhere that sergeant -- then Sergeant Murphy was at the scene during the investigation on

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 62 of 175 PageID #:20241
Case: 1:16-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 62 of 175 PageID #:32672
12/06/16 PM  ***REALTIME UNEDITED TRANSCRIPT ONLY***

61

April 28, 1984?

A.  No, sir.

Q.  Does it indicate whether or not Detective O'Callaghan was one of the detectives who was assigned to the scene on April 28, 1984?

A.  No, sir.

Q.  Okay.  Continuing on looking at page 4 of Exhibit 60, it indicates witnesses and there are two that are listed there.  Do you see that?

A.  Yes, I do.

Q.  Okay.  And they are Eric Benson and Cleveland Ball?

A.  Correct.

Q.  You've told us about them already.  Just a couple of quick questions.

Under I can Benson in parentheses it says I-oral, do you see that there?

A.  Yes, I do.

Q.  What did you mean by that?

A.  Eye meaning eyewitness as opposed to a circumstantial witness and oral, he gave an oral statement.

Q.  You said as opposed to a circumstantial witness, is that what you got designated for Cleveland Ball where you have parentheses circumstance, c-i-r-c-oral?

A.  Correct.

Q.  What does that mean, circumstantial witness?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 63 of 175 PageID #:20242
Case: 1:15-cv-01168 Document #: 185-29 Filed: 02/24/17 Page 63 of 175 PageID #:32673
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

62

A.  Circumstantial witness would be someone that would perhaps hear a gun so the and see somebody running as in this case it was with Cleveland Ball.

Q.  Thank you.

Now, the next section it is labeled interview.  Do you see that there?

A.  Yes.

Q.  All right.  What is included in that section of a scene report?

A.  Individuals that gave us information or told us what they had -- what they saw and were willing to be identified.

Q.  And if we look at page 4 going onto page 5 of the scene report, you have seven individuals listed there?

A.  Correct.

Q.  Were all of those individuals persons that were interviewed at the scene?

A.  No, they were not.

Q.  All right.  How many were from the scene?

A.  The first five and the last two were interviewed elsewhere.

Q.  All right.  Is there any indication anywhere on this scene report that any of the detectives talked to a young man named Cornell Jefferson?

A.  No, sir.

Q.  All right.  If we could go to page 60-7 please.

12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

63

About halfway down in the report, there's a paragraph here that says the reporting detectives, by the way, is that you and Detective Hood?

A.  Yes, it's referring to myself and my partner.

Q.  It says that you proceeded to the forensic institute.  Do you see that there?

A.  Yes, sir.

Q.  What is the forensic institute?

A.  It's also known as the morgue and that's where anyone who is murdered, suspicious deaths, things like that, people die in a hospital for an unknown reason, they would be taken to the forensic institute.

Q.  All right.  According to the report here, it says that you and Detective Hood did a cursory examination of the victims?

A.  That's correct.

Q.  What does that mean?

A.  This was prior to the formal autopsy that was going to be held.

Q.  All right.  Then the next line indicates there would be a more thorough examination at the time of the autopsy?

A.  Correct.

Q.  Did you attend the autopsy?

A.  No, we did not.  Area one was at the time was one of two areas in the city that had detectives actually assigned to the morgue or the forensic institute because of the number of

***REALTIME UNEDITED TRANSCRIPT ONLY***

bodies that were being handled every week.

Q. If we could go back to page 6 of the report, please.

Let me ask you something else about the interview with Cleveland Ball. You can highlight that section.

You told us a little bit about Cleveland Ball and the description of the offenders, and the car, but he provided some additional information as well, correct?

A. Yes, he did.

Q. And he provided some information about the Goon Squad?

A. Yes, sir.

Q. What did he tell you about the Goon Squad?

A. That the day before, an incident involved this young man by the name of Delbert Edwards from another building in the area there, 730 East 39th Street, was involved with some Goon Squad members. his younger brother actually got into some squabble with these Goon Squad members and that Delbert Edwards came out and fired a gun at those gang members.

Q. Before that conversation with Cleveland Ball, had you ever heard of the Goon Squad before?

A. I had not, no.

Q. Had you known Delbert Edwards before hearing that name from Cleveland Ball?

A. I did not, no.

Q. All right. This appears to involve an incident that occurred the day before the shooting which would have been

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 66 of 175 PageID #:20245
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 66 of 175 PageID #:32676

65

April 27th?

A. Correct.

Q. Why did you include this information in your report?

A. Well, it was a possible lead.

Q. Did Cleveland Ball provide you with any further information about the getaway car?

A. Just the fact that it went north on Langley which is runs adjacent to the murder scene and away from the murder scene itself.

Q. All right. And the murder scene was on 39th?

A. Correct.

Q. All right. If we could go back to page 7 of the scene report, please.

All right. I am going to ask you about one of the witnesses that you previously listed or that you had interviewed, I had you had say. An individual named Louis Carter?

A. Yes, sir.

Q. Did you and Detective Hood investigate someone by the name of Louis Carter as part of the investigation on April 28, 1984?

A. We did.

Q. All right. This is a man named Louis Carter, correct, not George Carter?

A. No, this is Louis J. Carter, sir.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 67 of 175 PageID #:20246

Q. All right. How did Louis Carter come to your attention?

A. Louis Carter was driving his father's vehicle which happened to be a blue coupe DeVille Cadillac which is similar as the wanted vehicle.

Q. That was the wanted vehicle you had listed earlier in the report, correct?

A. Correct.

Q. Did you talk to Louis Carter?

A. Yes, we did.

Q. Where did you talk to him?

A. We talked to him in the gang crimes unit at 51st and Wentworth, it's just downstairs of our headquarters.

Q. All right. Had he been stopped and brought in?

A. Yes, he was brought in by members of the gang crimes unit.

Q. Who was present when you talked to Louis Carter?

A. Me and my partner.

Q. All right. What, if anything, did Louis Carter tell you?

A. He told us that he was at his sister's house, which is at 625 east 38th place, then he went and dropped some friends off at 40th and federal, and from there he went to pick up his mother at 652 west Garfield which Garfield was 5500 south, 652 would be about union, and they brought his mother back to his sister's house.

Q. So in other words, Louis Carter provided you with an alibi for his whereabouts at the time of the shooting on April 28,

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 68 of 175 PageID #:202447
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 68 of 175 PageID #:32678
12/06/16 PM
***REALTIME UNEDITED TRANSCRIPT ONLY***
67

1984?

A. Correct.

Q. Can you explain to the ladies and gentlemen of the jury how you as a detective would go about checking someone's alibi in the 1984 time period?

A. One thing we would always do would be first of all interviewing the people individually, not collectively. It would be one-on-one, and we would then ask them open-ended questions and have them explain to us exactly what they did, for example, in this case, we would say, you know, what did you do today, and from the time they got up until the time that the police had them, which is another point too because back in 1984, there was though such thing as instant communication, nobody could whip out a cell phone or text somebody or instant message somebody. If somebody was in police custody, they had no communication with anyone else other than the police.

Q. So if I understand it, you would ask open-ended questions to have the alibi witness provide independent information corroborating what it was that the suspect was telling you?

A. Correct. And then we would go and talk to the individuals and in this case, his mother and talk to her individually as well, and she would --

Q. Let me ask you about that in a minute?

A. Sure.

Q.  I just have a question about the general process.  When you would interview the alibi witnesses, would you do so by person or by telephone?

A.  Always in person especially in homicide cases.

Q.  Now, could you tell us what you did to verify Louis Carter's alibi?

A.  We spoke with Louis Carter's mother and she gave us the same information that Louis did.

Q.  So you were able to verify his alibi?

A.  We were.

Q.  All right.  If we could look at the bottom of page 7 of this supp report and at the top of the next page, page 8.  There is a paragraph here regarding an individual named Delbert Edwards.  Do you see that there?

A.  Yes, I do.

Q.  He was the individual that was mentioned by Cleveland Ball?

A.  Yes.

Q.  And Delbert and his younger brother got into some sort of scrap with the Goon Squad?

A.  Correct.

Q.  What, if anything, was done to look for Delbert Edwards by you and your partner?

A.  Well, detectives, other detective went and left a business card at Delbert Edwards's apartment.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 70 of 175 PageID #:20249
Case: 1:16-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 70 of 175 PageID #:32680
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***
69

Q.  Did you eventually speak to Delbert Edwards?

A.  Yes, we did.

Q.  When did that take place?

A.  That took place at area one, his father, Delbert Edwards's brought him into the area.

Q.  When did that take place?

A.  That took place sometime after we got back and after we spoke to Mr. Carter.

Q.  You talked to Delbert Edwards?

A.  Yes, we did.

Q.  Who was present at the time?

A.  My partner and myself.

Q.  What did Delbert tell you?

A.  He said that because of the trouble that was happening with the day before which we checked out and it turned out that actually Delbert Edwards was the one that was shot at, it wasn't the other way around, and his father brought over to his aunt's house at 51st and low, which was actually not too far from our station.

Q.  All right.  So he also provided an alibi for his whereabouts at the time of the shooting?

A.  Yes, he said he didn't get up until 11:30.

Q.  What, if anything, did you do to check out Delbert Edwards's alibi?

A.  We went over and spoke to his aunt at 51st and local.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 71 of 175 PageID #:20250
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 71 of 175 PageID #:32681

Q. Did his alibi check out?

A. It did.

Q. If I could now see Defendant's Exhibit 57, pages 11 and 12.

We are now looking at what was marked as Defendant's Exhibit 57, pages 11 and 12. Do you recognize what that is?

A. Yes, I do.

Q. What is it?

A. It's a supplementary report regarding the Hickman Smith double homicide.

Q. And does this reflect an interview conducted by you and Detective Hood on April 30, 1984?

A. That's correct.

Q. Who was interviewed at that time?

A. Carlos Willis.

Q. Where did you interview Mr. Willis?

A. I believe it was at his house.

Q. Okay. What, if anything, did Carlos Willis tell you regarding the Smith/Hickman incident?

A. Well, that he was across the street when he saw what happened regarding the shooting.

Q. Okay. He saw the shooting?

A. Correct.

Q. Did he tell you anything else about what he saw after the shooting?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 72 of 175 PageID #:20251
Case: 1:03-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 72 of 175 PageID #:32682
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

71

A. That the individuals ran back through the breezeway as they call it and ran away from the scene. The door slammed and squeal of the tires as the car peeled away from the car.

Q. Mr. Willis told you that he saw the two offenders fleeing through the breezeway, correct?

A. Correct.

Q. Did he ever tell you at any time that either of the offenders was wearing a ski mask?

A. He did not, no.

Q. If he did tell you that, would that have been reflected in this supplementary report?

A. Absolutely.

Q. You indicated that he heard the car door slam and the squeal of tires?

A. Yes, sir.

Q. Did he ever see the vehicle that he heard?

A. No, he did not.

Q. The car never came back toward him on 39th Street?

A. No, sir, it did not.

Q. Now, at this time, you had been investigating the Smith/Hickman murder for three or four days. Did you have any specific individuals in mind at that time as suspects in these homicides?

A. No named individuals, no.

Q. All right. If I could see Plaintiff's Exhibit 1, page

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 73 of 175 PageID #:20252
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 73 of 175 PageID #:32683

104. Locking at what was Plaintiff's Exhibit 1-104, it's a to from memo that is reportedly put in evidence. Do you see that there?

A. Yes, I do.

Q. Do you recall seeing this memo in 1984?

A. To tell you the truth, no, I don't recall it, this particular memo.

Q. All right. According to this memo, there's some information provided by James Langston regarding the Baldwin brothers?

A. Correct.

Q. Did you and Detective Hood investigate any of this information about the Baldwin brothers in the -- the Baldwin brother in the passenger seat?

A. We did not.

Q. Why not?

A. Because Detectives Minogue and Bogdalek were following up on that angle.

Q. Okay. According to the information reflected this this memo, James Langston said that he saw the car go south on Langley, then west on 39th. Do you see that there?

A. I do.

Q. Was that the same information that you had obtained from witnesses that you talked to?

A. No, that's contrary to what we were told by two other

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 74 of 175 PageID #:20253
Case: 1:10-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 74 of 175 PageID #:32684

12/06/16 PM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

73

people.

Q.  And you were told what by two other people?

A.  That they never saw the car come north on 39th Street, so it went north on Langley away from the murder scene.

Q.  Would that be Cleveland Ball and Carlos Willis?

A.  Correct.

Q.  All right.  After the first week of May 1984, did you have any further involvement in the investigation of the Smith/Hickman murders?

A.  No, sir.

Q.  Why not?

A.  Well, we ran down all the leads that we had and when the case became cold, we just moved onto the other cases because there was plenty of them to do.

Q.  Okay.  If I could see Plaintiff's Exhibit 21-7?

        THE COURT:  Are you changing topics here?

        MR. MICHALIK:  I am.

        THE COURT:  We are going to take our break here.  We will break for ten minutes and then resume.  I will be right back out.

  (The jury leaves the courtroom.) .

        THE COURT:  Okay.  Do we have something to discuss?

        MR. KULWIN:  Judge, I believe Mr. Kuhn is here.

        THE COURT:  Well, why don't you all talk to him and figure out what the story is.  (Short break.


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 75 of 175 PageID #:20254
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 75 of 175 PageID #:32685
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

74

THE COURT:  Can somebody give me an update.

MR. LOEVY:  The government, Mr. Kuhn, has given us a document that's single spaced and about 15 pages.  Mr. Kuhn doesn't have personal knowledge, but he believes that Mr. Hogan believes that this is the document that was taken by the cooperators.

THE COURT:  Okay.

MR. LOEVY:  We haven't read it, obviously.

THE COURT:  Yeah, of course.

MR. LOEVY:  And we do oppose the introduction of this memo now.

THE COURT:  That's really not the question on the table at this point.

MR. LOEVY:  All right.  Sorry, I guess I don't know what the question is.

THE COURT:  The question on the table at this point had to do with the assertion of the deliberative process privilege.

MR. KULWIN:  There's two issues on the table.  One is the assertion of deliberative process.  What Mr. Kuhn just advised us is that the government will waive the deliberative process privilege to the extent that Mr. Hogan can talk about or the ultimate conclusion he derived from participating in discussions about whether or not --

THE COURT:  That is way too cryptic for me to get.

No, I want to hear from the lawyers in my case. That's what I want to hear from.

MR. KULWIN: As I understand it, the government is saying that Mr. Hogan is free to discuss his participation in the discussions of the Rule 35 motion. Its purpose.

THE COURT: Now I understand. Thank you.

MR. KULWIN: Things of that nature. What they're saying, if I understand it correctly, what he can't say is and then Zack Farden said this or Gary Shapiro said that or whatever. He can't talk about that.

THE COURT: He can't talk about the discussions in other words.

MR. KULWIN: He can talk about his personal knowledge that he derived from it.

THE COURT: We will deal with that later.

MR. KULWIN: Number two, the other issue I believe with respect it this was.

THE COURT: This document?

MR. KULWIN: Yes. I was going to elicit from him, what prompted this was.

THE COURT: From Mr. Hogan?

MR. KULWIN: Yes, Mr. Hogan. I apologize, your Honor. From Mr. Hogan, you know, what was taken because there's been all this discussion about a pro memo, wags it the pros memo, he is going to say, no, what was it? X, Y, and Z.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 77 of 175 PageID #:29256
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 77 of 175 PageID #:32687
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

76

What was the date of that document? X, Y, and Z. They oppose.

THE COURT: I'll hear from Mr. Loevy why he opposes it.

MR. KULWIN: That's what they said this morning.

THE COURT: Okay. So are you in a position to address this now, Mr. Loevy?

MR. LOEVY: What I will address, your Honor, is on November 18th, during the trial, we got a letter from the U.S. Attorney's Office from Mr. Kuhn on behalf of the United States saying it has been further determined that the production of any prosecution or other internal United States attorney's office memos obtained by Derrick Kees, Trammell Davis, Earl Hawkins, Jackie Clay, Eugene Hunter will not be authorized. Prosecution memos --

THE COURT: You're reading from something I take it.

MR. LOEVY: Yeah.

THE COURT: Thank you, Mr. Art.

MR. LOEVY: In other words, we have now called every witness that we could have cross-examined and the guy that states asserted this privilege.

THE WITNESS: All the witnesses are now gone. We can't corroborate from this this is what they saw, what they didn't saw. We can't ask them questions about it. The United States can't waive the privilege right before the examination

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 78 of 175 PageID #:20257
Case: 1:13-cv-01168 Document #: 1185-38 Filed: 02/24/17 Page 78 of 175 PageID #:32688
12/06/16 PM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

77

of Mr. Hogan because the first four examinations --

THE COURT:  We will deal with this later.  Assuming Mr. Hogan hits the stand.

MR. KULWIN:  I don't believe he will.

THE COURT:  If he does, you have to avoid this topic. I am going to get the jury.  We will talk at the end of the day about how and when.

MR. KULWIN:  Thank you.

(The jury enters the courtroom.)

THE COURT:  Okay.  Everybody can have a seat. Mr. Michalik, you can go ahead.

MR. MICHALIK:  Thank you.

BY MR. MICHALIK:

Q.  If I could have Plaintiff's Exhibit 21, page 7.

Mr. Evans, we previously talked about this document. This was the GPR that was prepared by Detective VanBerschot?

A.  Correct.

Q.  And this is one of the pages you had that you relied on in preparing your supplementary report?

A.  That is correct.

Q.  If we could go down to the bottom half of this memo.  Do you see here where there is a reference in quotes to Goon Squad?

A.  Yes, sir.

Q.  And then the line below that refers to Fuddy's friends?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 79 of 175 PageID #:20258
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 79 of 175 PageID #:32689

A. Correct.

Q. Okay. And then there is a line here about the goons. Could you read that, please?

A. Goons trying to take over the league, Black Gangster Goon Squad also fighting El Rukns.

Q. All right. So as of April 28, 1984, the police at least had some information that Fuddy's gang was in a dispute with the El Rukns?

A. Correct.

Q. Okay. Everybody knows what Plaintiff's Exhibit No. 1 is by this time.

In April of 1984, how long had you been working as a homicide detective in area one?

A. Approximately two years.

Q. All right. During the course of this work in area one as a homicide detective, did you become familiar with the El Rukn street gang?

A. Yes, sir.

Q. All right. As of April 28, 1984, were you familiar with an individual named Earl Hawkins?

A. Yes, sir.

Q. What was your familiarity with Earl Hawkins at that time?

A. Earl Hawkins was a member of the upper echelon of the El Rukns and he was thought to be involved in a number of homicides.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 80 of 175 PageID #:20259
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 80 of 175 PageID #:32690

12/06/16 PM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

79

Q. All right. If I could have Plaintiff's Exhibit 1-1 and 1-2 side by side.

MR. MICHALIK: If I may approach, your Honor?

THE COURT: Sure.

BY MR. MICHALIK:

Q. I'm going to show you a photograph that corresponds with plaintiff's exhibit 1-1. I'd ask you to take a look at that.

A. That's a photo of Earl Hawkins.

Q. All right. If you could flip it over, there's some writing on the back.

A. The writing is in my script on Earl Hawkins is what it says, Hawkins, Earl.

Q. Thank you.

If I could see plaintiff's 1-125 and 126. Do you recognize what this document is, sir?

A. This is commonly referred to as a rap sheet, but it's a criminal sheet on Mr. Earl Hawkins.

Q. Okay. Now, during the course of your investigation of the Smith/Hickman homicides in April and early May of 1984, did any witness or person that you interviewed suggest that Earl Hawkins was involved in the murders?

A. No, sir.

Q. Do you recall ever showing anyone this photograph of Earl Hawkins?

A. No, sir, I never did.

Q.  Did you develop -- did you ever develop any information in April and early May 1984 that Earl Hawkins was involved in the Smith/Hickman shootings?

A.  No, sir.

Q.  As of April 8, 1984, were you familiar with an individual named William Doyle?

A.  Yes, sir.

Q.  Was that due to your work as apparently area one homicide detective?

A.  Y-yes, it was.

Q.  What was your familiarity with William Doyle?

A.  That he was also a high ranking member of the El Rukns and he was also thought to be involved in a number of homicides.

Q.  If I could have plaintiff's exhibit 1-41 and 42 side by side.

MR. MICHALIK:  If I may approach.

THE COURT:  Okay.

BY MR. MICHALIK:

Q.  Mr. Evans, do you recognize this photograph which corresponds to the Plaintiff's Exhibits that are on the screen?

A.  Yes, it's the photograph, the Chicago Police Department photograph of Mr. William Doyle and that's my script on the back, Doyle, William.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 82 of 175 PageID #:20261
Case: 1:10-cv-01168 Document #: 1185-28 Filed: 02/24/17 Page 82 of 175 PageID #:32692
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

81

Q.  Thank you.

If I could see Plaintiff's Exhibit 1-127 and 128, please.

Sir, do you see this document?

A.  Yes, I do.

Q.  What is it?

A.  It's a criminal history of a Mr. William Doyle.

Q.  All right.  And it looks like actually page 128 is the first page of this rap sheet?

A.  Correct.

Q.  And 127 is the second page?

A.  Yes, it is.

Q.  There's some writing at the bottom of the second page which is Plaintiff's Exhibit 1-127.  Do you see that there, sir?

A.  I do.

Q.  Do you know whose writing that is?

A.  That's my script.

Q.  If I could see Plaintiff's Exhibit 1-121.

All right.  If we look at the bottom here -- well, can you tell us what these are that reelected in this exhibit?

A.  There's actually two different documents.  The first top one is an arrest card typically used to keep a file on individuals who are arrested in the Chicago Police Department through this manner.

82

Q.  If we could see the bottom one, please.  Is this also an arrest card for someone?

A.  It is for the gang crimes unit.  They used it to keep their individual.

Q.  Who is the individual that's referenced in this card?

A.  William Doyle.

Q.  All right.  Do you see here for nickname, there's something written in there.  Do you see that, sir?

A.  Yes, I do.

Q.  All right.  And that says sundown?

A.  Yes, it does.

Q.  You told us before that you were familiar based on your work as an area one homicide detective with William Doyle, correct?

A.  Correct.

Q.  Were you familiar with his nickname of sundown?

A.  I was not, no.

Q.  During the course of your investigation of the Smith/Hickman homicides in April and early May of 1984, did you develop any lead or information that William Doyle was involved in the Smith/Hickman murders?

A.  No, sir.

Q.  Do you recall ever showing this photograph of William Doyle to any witness?

A.  No, sir, we did not.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 84 of 175 PageID #:20263
Case: 1:10-cv-01168 Document #: 1185-28 Filed: 02/24/17 Page 84 of 175 PageID #:32694
12/06/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

83

Q. Is there any reason why you wouldn't show a photograph of William Doyle or Earl Hawkins to any other witnesses that you were talking to?

A. We had no foundation to do so.  They were not named and if you were to show just an individual photo like that, you would taint a future identification.

Q. So you would not show a photograph to a witness unless he first brought up the name of a suspect?

A. That is correct, and at that time, if I would show it, I would show it in a photo array, not just an individual photo, I would show photos of like looking individuals along with the suspect.

Q. Thank you.

     Just a few more questions, sir.

     During your examination of the Smith/Hickman murders in late April and early May of 1984, did the name of Anthony Sumner ever come up?

A. No, sir.

Q. Did any witness or anyone tell you that Anthony Sumner was involved in the Smith/Hickman murders?

A. No, sir.

Q. Did anyone ever suggest to you that someone with the nickname of sundown was involved in the Smith/Hickman homicides?

A. No, sir.


          ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. Did you know Nathson Fields prior to April 28, 1984?

A. No, sir.

Q. Did you know of him?

A. No, sir.

Q. Did the name of Nathson Fields ever come up at any time during your investigation of the Smith/Hickman murders in April and May 1984?

A. No, sir.

Q. Did you ever prepare a report or note suggesting that Mr. Fields was involved in the Smith/Hickman homicides?

A. No, sir.

Q. Did you ever prepare a note or report indicating that Mr. Fields was not involved in the Smith/Hickman homicides?

A. No, sir.

MR. MICHALIK: If I can have a moment, your Honor?

THE COURT: Sure.

(Brief pause.)

MR. MICHALIK: No further questions.

THE COURT: Mr. Kulwin, do you have any questions?

MR. KULWIN: No.

THE COURT: Mr. Loevy.

MR. LOEVY: Thank you.

- - -

ROBERT EVANS, CROSS-EXAMINATION

BY MR. LOEVY:

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 86 of 175 PageID #:20265
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 86 of 175 PageID #:32696
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

85

Q. All right. Mr. Evans, you performed a canvass of the building, correct?

A. A canvass of the area.

Q. Showing you a copy of plaintiff's 194-43. Back on the ELMO then, your Honor?

THE COURT: Yes. There you go.

BY MR. LOEVY:

Q. This is the way you do a canvass report, right?

A. This is -- this is the report.

Q. It's a GPR, right?

A. Pardon me?

Q. It's a GPR?

A. It's a GPR, right.

Q. Which you took notes on, right?

A. Correct.

Q. And if you talked to Martha Robinson, you wrote down her name and information and the fact that she heard two gunshots, correct?

A. Correct.

Q. And if you talked to Dorothy Benson, a female black, no phone, heard four shots, looked out the window, two boys lying, you wrote that down, right?

A. I did.

Q. That's how you were trained, right?

A. Pardon me?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 87 of 175 PageID #:20266
Case: 1:10-cv-01168 Document #: 1185-28 Filed: 02/24/17 Page 87 of 175 PageID #:32697
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

86

Q. That's how you were trained, that if you were a police officer interviewing people who had any information, you'd write it down, right?

A. That depends.

Q. All right. The kind of information we see on this report, were you trained to write that down, sir?

A. The names and addresses, absolutely.

Q. You did it for Minnie White here on page 48 here as well, the woman who called the police, right?

A. No, that's not my handwriting.

Q. I'm sorry. Hood was your partner?

A. He was, yes.

Q. All right. So that's his handwriting?

A. It appears to be, yes.

Q. All right. You said you searched for physical evidence, things -- the crime lab came out, correct?

A. Correct.

Q. There was no blood or footprint evidence or any other forensic evidence ever connecting Nate to this crime, correct?

A. Not to my knowledge.

Q. All right. You said you get your reports done by the end of the shift, is that what you said?

A. No, sir. We do the report at the end of our investigation and it took us absolutely a lot longer than the regular shift.

Q. All right. I thought you said you did it at the end of

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 88 of 175 PageID #:20267
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 88 of 175 PageID #:32698

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

87

Q.  your tour of duty?

A.  Pardon me?

Q.  I thought you said it at the end of do you remember of duty?

A.  At the end, sir.

Q.  Showing you plaintiff's 94, this is your April 28th report?

A.  Correct.

Q.  It has a Bates stamp of April 30th, right?

A.  I don't know where that stamp came from.

Q.  It does have an April 30th Bates stamp?

A.  It does, yes.

Q.  Is it the policy -- are you familiar with the policies and practices of the Chicago Police Department?

A.  Some, yes, not all.

Q.  All right.  Back in the '80s, was it the policy of the police department that after you did a police report like this one, your Honor supposed to hold it until you were done investigating or you were supposed to submit it as it was created?

A.  No, we submitted it immediately that day.

Q.  All right.  Then that's what I got confused on.  I thought you said end of tour you submit it, right?

A.  At the end of our tour, I mean, our tour isn't over until this investigation -- until we take it as far as we can.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. I probably got --

A. I'm sorry. Maybe I wasn't clear on that.

Q. I was using the fancy police work tour of duty. I think I screwed it up. I mean end of shift?

A. We went overtime. When sergeant binge /AOE signed it, it says 2150, that's 9:50 people. Our shift ended at 5:00 o'clock.

Q. The point is and the only point I was trying to make is when you have a police report, you get it submitted as soon as possible, right?

A. Absolutely.

Q. And if this information in the report had to change, you do a different report, right?

A. Yes.

Q. All right. Sorry about the tour of duty confusion.

Was this your uniform practice when you were a detective to make sure you submitted your reports promptly?

A. Absolutely.

Q. Have you ever heard of an official police report, the official original version with signatures going missing?

A. Official signatures?

Q. Yeah, a real original police report, have you ever heard of those going missing in your career?

A. No, I really haven't. No.

Q. How many years were you a police officer?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A.  37 years, three months and 20 days.

Q.  Some people talk about their prison sentences like that, you know.

A.  I am not talking about marriage now.

THE COURT:  My strong advice to you is stop right there.

BY MR. LOEVY:

Q.  You said the reports don't reflect anybody interviewing Cornell Jefferson, correct?

A.  My report, no, I didn't.

Q.  Of course, none of the reports from 84 reference Gerald Morris, correct?

A.  Not that I know of, no, sir.

Q.  And none of the reports from 84 reflect the participation by Richard Buckles, correct?

A.  Not that I am aware of.

Q.  The people you spoke to had the car going north on Langley, correct?

A.  Yes, sir.

Q.  So if we can get the map real fast, wherever the car was, it was on this north south street, right?

A.  I believe that -- is that Langley, sir?

Q.  Building, Pershing, Langley, north south?

A.  Okay.

Q.  Everybody you talked to had the car driving away from the

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 91 of 175 PageID #:20270
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 91 of 175 PageID #:32701
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

90

vacant lot, correct?

A. Correct, away from the murder scene.

Q. Away from the murder scene?

A. Yes, sir.

Q. All right. You were asked this question about the El Rukns. Who was the source of this information here? Can you tell from --

MR. KULWIN: Judge.

MR. LOEVY: This is plaintiff's 21.

MR. KULWIN: Can we have Mr. Loevy's handwriting taken off.

THE COURT: Do you have another copy?

MR. LOEVY: I don't.

THE COURT: It's his handwriting. Everybody knows it's his handwriting. Go ahead.

MR. LOEVY: Thank you.

BY MR. LOEVY:

Q. Can you tell from the note whose the source of this information?

A. The source of the information for me was detective VanBerschot.

Q. But who did he get it from?

A. I don't know, sir.

Q. I mean, shouldn't you be able to tell from the document who is claiming it was El Rukns?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 92 of 175 PageID #:20271
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 92 of 175 PageID #:32702
12/06/16 PM         ***REALTIME UNEDITED TRANSCRIPT ONLY***

91

A.  You can tell.  I can't, sir.

Q.  You have looked and tried, right?

A.  I don't know who.

Q.  You've looked and tried, right?

A.  No, I didn't look and try.  I got it from Detective VanBerschot.

Q.  Take a look and see if you can tell who the source of the information is.  All I know is you tried before trial?

A.  No, I can't.

Q.  Because you have looked at it, right?

A.  Right.

Q.  And you cannot make sense of where that information came from, correct?

A.  It came from Detective VanBerschot.

Q.  All right.  You were asked about Louis Carter and his alibi, correct?

A.  Yes, sir.

Q.  And this is page 98 of Plaintiff's Exhibit 2, 58.  Now, you properly documented in a supp report that he had an alibi, right?

A.  Yes, sir.

Q.  And then it got turned over to the criminal defendant, correct?

A.  Pardon me?

Q.  If it's in an official -- it's supposed to go into an

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 93 of 175 PageID #:20272
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 93 of 175 PageID #:32703
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

92

Q. official supp report is it's a matter for everybody to see and review, right?

A. Okay.

Q. That's the way you're supposed to do it, right?

A. Okay.

Q. You are not supposed to check out people's alibis in parallel files that don't go into the supp report, would you agree with that?

A. Oh, correct.

Q. What's that?

A. Correct.

Q. Okay. Correct.

Now, we took a look at a supp report where Eric Benson gave a description, I believe a man had hair or an earring. Do you remember that supp report or the GPR you saw?

A. Right.

Q. Why did the GPR description not make it into Plaintiff's Exhibit 186, page 7 and 8 of your report?

A. It didn't make it on that page, but it made in the page of the offenders.

Q. You're talking about the composite description?

A. Correct.

Q. All right. At the beginning, your report has that list of people wanted for the murder, correct?

A. Yes, sir.

Q. And that report does not attribute the information to Eric Benson, correct?

A. Not in that section, no, sir.

Q. So how would -- let's say Eric Benson came to trial and someone wanted to cross-examine him, wouldn't it have made sense to put Eric Benson's description in Eric Benson's description?

THE COURT: You mean in Eric Benson's section of the report?

MR. LOEVY: Exactly. Thank you, your Honor.

THE WITNESS: Eric Benson's description is in the report.

BY MR. LOEVY:

Q. All right. For the record, can we agree that Eric Benson's description is not in the section titled Eric Benson?

A. That's correct.

Q. The description is in a separate GPR, right?

A. Yes. It's also on the supplementary report.

Q. All right. Delbert Edwards, you said you checked out his alibi, right?

A. Correct.

Q. He was a victim of the shooting, right?

A. Correct.

Q. And that whole Edwards scenario had nothing to do with the El Rukns, correct?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 95 of 175 PageID #:20274
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 95 of 175 PageID #:32705

A.  As far as I know, yes.

Q.  And you did not check out the other Edwards' brothers alibis, did you?

A.  No, sir.

Q.  All right.  Showing you Plaintiff's Exhibit 1-69, did you know at the time that these other Edwards brothers were overheard plotting to kill Fuddy?

A.  I did not, no.

Q.  Is this the kind of information that's supposed to be in a supp report?

A.  It could be.

Q.  But it also could be in a parallel file that doesn't get in the supp reports?

A.  I don't understand what you mean about parallel file.

Q.  Well, you do presently understand that this note was found in a parallel file in 2011, right?

A.  Correct.

Q.  In fact, you were one of the people who had to answer the lawsuit about whether information was being withheld, right?

A.  I was, yes.

Q.  And you said no information was being withheld, right?

A.  Not by me, no, sir.

Q.  You now know that these notes were withheld, right?

A.  From my understanding, they found this information.

Q.  Okay.  Then that's what I meant by a parallel file that

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 96 of 175 PageID #:20275
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 96 of 175 PageID #:32706
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

95

Q. was not produced?

A. Okay.

Q. Did the rules and regulations of the police department permit detectives to create parallel files and maintain them and not produce the information like this?

A. No.

Q. All right. Cleveland Ball, you had a description here in the GPR of -- you attributed this description to Cleveland Ball as opposed to eye net at that Watts or --

A. I believe that's from Cleveland. See, I didn't prepare that, that was my partner Steven Hood.

Q. All right. So you don't know if this is --

A. I believe it is Cleveland Ball.

Q. You believe it is, but that's a guess, right?

A. You know at the time that we were doing this, he was sitting across the table from me when I was typing the report. I would have verified all the information that's in the report with my partner before I put it on paper.

Q. The only thing I'm asking you, sir, is it's not clear whose description that is. That's a guess, right?

A. I guess you could guess that, yes.

Q. Now, why didn't that description, jogging suit, skull cap, jacket, make it into the report when you summarized what Cleveland Ball saw?

A. The description, I think we just gone over this with the

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 97 of 175 PageID #:20276
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 97 of 175 PageID #:32767
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

96

other individual, that those descriptions go into the allotted section of the report.

Q. And that's the way the police department policies and practices works?

A. Back in 1984 it did, yes.

Q. Let's say Cleveland Ball came to court and for my hypothetical, I pick out him in a lineup, are you with me?

        MR. KULWIN: Judge, I object to hypotheticals.

        THE COURT: Overruled.

BY MR. LOEVY:

Q. Are you with me?

A. Go ahead.

Q. He comes to court and he says that was Nate Fields. Nate Fields wants to say, hold on a second, you just described a guy that's 23 and I'm 31.

A. I see it.

Q. Then Cleveland Ball could say based on this report, I didn't describe anybody. You can't attribute that composite description to me, right?

A. No, because we got the information from Cleveland Ball.

Q. All right. But it would really depend on Mr. Fields getting the notes also, right?

A. Well, the GPR that has Cleveland Ball's information on it is something that he got, I believe.

Q. And you'd like to hope in most cases it gets there, right?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 98 of 175 PageID #:20277
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 98 of 175 PageID #:32708

A. Yeah, exactly.

Q. But did the policy require you to put it into the supp report and attribute it to the person?

MR. MICHALIK: Objection, Judge.

THE COURT: Overruled.

THE WITNESS: The policy of the police department?

BY MR. LOEVY:

Q. Right, back then?

A. The practice at the time was to do exactly how we prepared that report.

Q. In other words, the one description at the beginning attributable to no witness, this is page 14, sort of a one description, right?

A. Are you talking about number 1 or No. 2?

Q. Both of them. One description for the whole report, right?

A. That's a description of two of the wanted.

Q. That's the only description in the report, correct?

A. Correct.

Q. And you're saying that that description was given by Martha Robinson, Kenya Robinson, Inetta Watts, Willie Langston, Eric Benson, Cleveland Ball, everybody gave that description?

MR. MICHALIK: Objection, Judge.

THE COURT: Overruled.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 99 of 175 PageID #:20278
Case: 1:10-cv-01168 Document #: 1185-39 Filed: 02/24/17 Page 99 of 175 PageID #:32769
12/06/16 PM                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

98

BY MR. LOEVY:

Q.  Did everybody give that description?

A.  I don't recall.

Q.  You are not claiming everybody gave the same description, are you?

A.  I would never do that, no.

Q.  But this is not an aberration, this is the way it's supposed to be documented, one description, don't attribute it to any witness?

        MR. KULWIN:  Objection, Judge.  Asked and answered.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  You said that Mr. Fields, you'd hope, would get the GPRs, right?

A.  Pardon?

Q.  You said the reason you felt you weren't worried about the GPR being in the description of the GPR is because you thought the GPRs went to the criminal defendants, correct?

A.  They should go to everybody.

        MR. KULWIN:  Objection.

        THE COURT:  Hang on a second.  There was an objection.  It's overruled.  Now ask another question.

BY MR. LOEVY:

Q.  They didn't always go, did they?

A.  I don't know that.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  Showing you Plaintiff's Exhibit 1-98, this is a GPR saying Rodell Banks was the shooter.  Do you see that?

A.  I do.

Q.  That didn't make it into a supp report, did it?

MR. MICHALIK:  Objection, foundation.

THE COURT:  Well, I am going to sustain the objection on the ground it's been sufficiently covered by other witnesses.

BY MR. LOEVY:

Q.  All right.  Showing you 194-43, this is a note that you took?

A.  Correct.

Q.  And it describes a woman named Kenya Robinson, right?

A.  11 year old.

Q.  And she's an eyewitness apparently, right?

A.  She heard some gunshots and she saw two people running.

Q.  Where does it say that in the supp report that she could -- an 11 year old was out there who saw the offenders well enough to give a description of what they were wearing?  It's not in your supp report, is it?

A.  The information that she gave is in the supp report.

Q.  And you're talking about generally, is this what you mean the information that she gave?

A.  Correct.

Q.  I thought you said Cleveland Ball gave that information?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 101 of 175 PageID #:20280
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 101 of 175 PageID #:32791

MR. KULWIN:  Objection, Judge, argumentative.

THE COURT:  Sustained.  For the record, Mr. Loevy was pointing to the first two paragraphs on page 2 of what exhibit?

MR. LOEVY:  194-14.

THE COURT:  Thanks.

BY MR. LOEVY:

Q.  All right.  Would you agree, though, sir, being familiar with your own report, that there is no summary of what Kenya Robinson supposedly said other than this on page dash 16, Kenya Robinson, 11 years of anal of this address heard four gunshots and saw two subjects run north from under the breezeway and then west around the building, correct?

A.  Correct.

Q.  That's the sum total of the information in your report?

A.  In the supplementary report, correct.

Q.  And if someone in Mr. Fields' shoes received only your supp report, he would know would he that there was an 11 year old who was claiming to have seen this, this being the GPR?

A.  If the only thing he had to look at was the supp report.

Q.  Right.

THE COURT:  I don't think there was -- was that your answer or were you asking a question back?

THE WITNESS:  Yes.

THE COURT:  I wasn't clear whether there was a

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 102 of 175 PageID #:20281
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/16 Page 102 of 175 PageID #:32712

03:45:11   question mark at the end.  There wasn't.  Go ahead.

03:45:12   BY MR. LOEVY:

03:45:13   Q.  Carlos Willis, you've looked at his report, correct?

03:45:16   A.  Correct.

03:45:16   Q.  In fact, you've looked at a lot of these reports to

03:45:19   prepare for your testimony today, correct?

03:45:21   A.  I did.

03:45:22   Q.  That was how you were able to refresh your recollection?

03:45:24   A.  As best I could.

03:45:26   Q.  When you're testifying about I did this, then I did this,

03:45:29   then I did this, would it be more accurate to say you reviewed

03:45:32   the reports and you believe you did this?

03:45:33   A.  What do you mean I believe I did this?

03:45:36   Q.  In other words, are you claiming an independent

03:45:38   recollection of all of these interviews?

03:45:40   A.  No, absolutely not.

03:45:41   Q.  It's been way too many years to remember this stuff,

03:45:44   right?

03:45:44   A.  Correct.

03:45:44   Q.  To if I was to tell you Kenya Robinson's interview vest

03:45:48   Inetta Watts interview, no way you could remember those

03:45:51   interviews, right?

03:45:51   A.  Correct.

03:45:51   Q.  Because you did this too often at your job?

03:45:54   A.  Unfortunately, you're right.

Q. You've now looked at the Carlos Willis report?

A. I have.

Q. And there is no indication in the Carlos Willis report that he gave -- had any ability to give a description, would you agree?

A. Other than the fact that he was across the street.

Q. I'm saying a description?

A. And saw what happened.

Q. He had no description of the offenders faces, hair, nothing like that, correct?

A. He might have given. I am not quite sure.

Q. If he had, you would have written it down, right?

A. It would have been, exactly. I don't see anyone here.

Q. All right. So there would have been no reason to put him in a lineup, would there?

MR. MICHALIK: Objection, Judge.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Let's talk about the Hawkins photo and the Hawkins report. This is your handwriting on the back of Earl Hawkins, right?

A. It is.

Q. So you were the one who requested Earl Hawkins's photo, right?

A. I don't know that to be a fact.

Q. Well, tell the jury why you guys -- what this means, issued on inquiry April 27th?

A. Whenever you would request a criminal history on someone, they would Bates stamp it, hand stamp it.

Q. And this one sometimes they forgot to turn it over a day, didn't they?

A. Evidently.

Q. Because that should say April 28th, you believe?

A. It should or later.

Q. When you requested the rap sheet, the reason you guys would do that is so that you could get a photograph of the suspect, correct?

A. We would also request a photograph.

Q. All right. And you would request a photograph if you had some reason to believe that the person might be involved, right?

A. Well, also to identify who you are talking to if you have to go out and speak with them.

Q. All I'm saying is at some point, you had to have some reason to believe Earl Hawkins had something to do with this sometime around April 28th, 1984, correct?

A. No.

Q. You didn't pull the photograph of everybody in the universe, did you?

A. He was an El Rukn general. We had information that the El

Rukns were involved.

Q. And by information, you're talking about that one report reference that is unattributable to anybody that said something about an El Rukn, correct?

MR. KULWIN: Objection, argumentative.

THE COURT: Overruled. The answer correct -- the answer said correct. The answer can stand.

THE WITNESS: Correct.

BY MR. LOEVY:

Q. All right. There is also not one word in the file anywhere about why somebody thought Hawkins was a suspect, do we agree on that?

A. In the file, meaning --

Q. Anywhere written down, not one word?

A. As far as our investigation goes?

Q. As far as any piece of paper you've ever seen ever?

A. Not that I know of.

Q. And that there's no GPR, there's no report, there's no note, nothing that explains why on April 28th, Earl Hawkins was a suspect, do we agree?

MR. KULWIN: Objection, asked and answered.

THE COURT: Sustained. You covered it.

BY MR. LOEVY:

Q. And the reason you pulled the photograph is to show people, correct?

A.  I said I'm not sure whether or not I did pull the photograph.

Q.  Well, it's your handwriting on the back of the photograph, right?

A.  There's no doubt, that is my handwriting.

Q.  And you talked to people who at least saw something, correct?

A.  Yes.

Q.  And if any of those people had identified Earl Hawkins as the suspect, you would have written that down, right?

A.  I would have.

Q.  And is there any doubt in your mind that if you had photographs available of possible suspects and you had witnesses who had seen something, you would have shown the witnesses the photographs?

A.  Well, like I described before, I would have shown a photo array with an individual that was suspected of this crime in the photo array.  I wouldn't show it one-on-one, no.

Q.  But you showed either individually or in a group, did anybody identify Earl Hawkins in 1984?

A.  No.

Q.  You were also apparently pulled the photo of someone named sundown, correct?

A.  I didn't know that nickname.

Q.  Well, you don't know either way whether you know that,

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 107 of 175 PageID #:20286
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/16 Page 107 of 175 PageID #:32767

Q.  would that be more accurate?

MR. MICHALIK:  Objection, Judge, argumentative.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  Do you remember the question?

A.  Whether or not I pulled a photograph of someone named sundown?

Q.  Showing you Plaintiff's Exhibit 121, Doyle's nickname was sundown, correct?

A.  It shows it on there, yes, sir.

Q.  All right.  So you're not saying 30 years ago I remember I didn't know his nickname was sundown, did you?

A.  I didn't remember the nickname at all.

Q.  You might have known Hawkins and sundown in 1984, correct?

MR. KULWIN:  Objection, argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Is there any indication in the file why the police were looking for Hawkins and sundown?

A.  Is there any indication that they were looking for him?

Q.  Why they were?

A.  Not to my knowledge, no.

Q.  Is there any indication why they were looking for someone named Doyle whose nickname was sundown?

A.  Not to my knowledge, no.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 108 of 175 PageID #:20287
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/16 Page 108 of 175 PageID #:32718

Q.  Is that consistent with the policies and practices of the police department that there wouldn't be a recording of why the police were looking for a Hawkins and sundown?

MR. MICHALIK:  Judge, if I could be heard on this issue.

THE COURT:  Take the document off the screen.  Bring it to sidebar, please.

(The following proceedings were had at sidebar outside the hearing of the jury:)

THE COURT:  Yes, sir.

MR. MICHALIK:  Here is the problem that I see with this line of questioning.  It's not so much the document but this whole line of questioning as to whether -- I deliberately did not ask him very specific questions as to why the detectives would have just automatically suspected El Rukns.  On this line of questioning, I think I am going to ask you any reason why a detective investigating a murder at that location without any other information would suspect El Rukns.

THE COURT:  After he said about six times because he was asked six times that he doesn't know why this was done, why this was pulled.

MR. KULWIN:  He didn't say that, Judge.  He said --

THE COURT:  Go ahead.  I'm listening.

MR. KULWIN:  He said it three or four times.  But his initial answer was because we had information that the El

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 109 of 175 PageID #:20288
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 109 of 175 PageID #:32739

Rukns were involved and then another answer because he was an El Rukn general and another answer was because the El Rukns from dealing drugs there.  He said all of those things.

THE COURT:  Let me go look.

So the gist of what he said was he pulled the photo because he was an El Rukn general and he had information that El Rukns were involved, there was a question along the lines of, is that a reference to that one reference in the report that doesn't attribute it to anybody, he says correct.  And then Mr. Loevy asked him a series of questions about is there anything written down anywhere that explains this and he basically says no to that several times.

MR. MICHALIK:  There is nothing written down.

THE COURT:  What are you expecting his answer to be to the question that you want to ask.

MR. MICHALIK:  I don't want to go beyond any rulings about El Rukns in general, and so when I ask him why, I am not exactly sure what he is going to say.

THE COURT:  Ha ha.  Yeah.  Have you talked to him?

MR. MICHALIK:  No.

THE COURT:  Okay.  I'll take your semi educated guess on what he is going to say.

MR. KULWIN:  My semi educated guess and Paul can hit me in the head if I'm wrong.

MR. MICHALIK:  My guess is because of the location of

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 110 of 175 PageID #:20289
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/16 Page 110 of 175 PageID #:32720

03:53:50 that, 706 right down the street from the Fort, you would automatically.

03:53:56 THE COURT: Assume it was maybe an El Rukn was involved.

03:54:00 MR. LOEVY: I he has already been asked because Hawkins was an El Rukn general and I had information, so what additional relevant information is missing? That's our point, your Honor.

03:54:09 MR. KULWIN: It's --

03:54:11 MR. LOEVY: He has been asked and he answered it.

03:54:13 MR. KULWIN: That's their version of reality. We have a different version of reality.

03:54:16 THE COURT: So here's the way I put it to you. I think that you can ask is there some -- was there some reason why you would have been pulling Mr. Hawkins' photo, and you don't know what the answer is going to be, if it's something I excluded, you want to start again on Monday. Seriously, I'm telling you, you're going to wing a question at him you told me right here, both of you told me you do not know the answer to the question, you are going to wing a question to him, I don't think any door has opened far enough to violate a motion in limine. You act at your peril.

03:54:55 MR. KULWIN: Five seconds to bring him over to sidebar. It's done all the time that way you avoid all that and you can find out exactly what he is going to say. They

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 1111 of 175 PageID #:20290
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 111 of 175 PageID #:32721
12/06/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

110

did open the door.  And he should be entitled to testify.

MR. LOEVY:  He already has been voir dired.  You asked the question.  He was asked the question he said he was because he was an El Rukn general.

THE COURT:  Okay.  So what you're telling me is you want me to send the jury out.

MR. KULWIN:  You don't have to do that.

THE COURT:  I am not going to bring a witness over to sidebar.

MR. KULWIN:  Yeah.

THE COURT:  You may have seen that done.  I haven't.  I am not going to do it.  You want me to send the jury out so I can do this?  It's a yes or no?  Just say yes or no.  It's a yes or no question.  Answer it yes or no.

MR. KULWIN:  I think a voir dire.

THE COURT:  You want me to send the jury out so I can voir dire him.  That's the only way to voir dire him.

MR. KULWIN:  Yes.

THE COURT:  Just say it.

MR. LOEVY:  The jury looks very bored.

MR. KULWIN:  Because your examination is boring.

(The following proceedings were had in open court in the presence and hearing of the jury:)

THE COURT:  We will deal with the issue we had at sidebar after the conclusion of the cross.

Go ahead, Mr. Loevy.

MR. LOEVY: Thank you, your Honor.

BY MR. LOEVY:

Q. All right. Fair to say that based on memory alone, you can't remember anymore exactly why Hawkins and sundown's photos were pulled, that's probably true, isn't it?

THE COURT: I'm sorry?

MR. KULWIN: I withdraw it. I apologize.

THE WITNESS: Correct, other than the fact owe that was El Rukn territory.

BY MR. LOEVY:

Q. Were you showing the witnesses the photos that you had pulled of these El Rukns, Mr. Hawkins and sundown?

A. No, I said before and I'm saying again, I did not show any photographs.

Q. And you said because if you showed an eyewitness a photograph, that could taint them?

A. If you don't do it correct, the photo array, it possibly could.

MR. LOEVY: I have no further questions, your Honor.

THE COURT: And based on what he answered, I don't think you need the sidebar. We don't need a further sidebar at this point.

MR. MICHALIK: Agreed, your Honor.

THE COURT: That's fine.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:13-cv-01168 Document #: 185-29 Filed: 02/24/17 Page 113 of 175 PageID #:32723

12/06/16 PM               ***REALTIME UNEDITED TRANSCRIPT ONLY***

112

MR. MICHALIK:  Very briefly.  Do you have questions?

MR. KULWIN:  Am I allowed to ask?  He's first anyway.

THE COURT:  Yeah, go ahead.  Hand him a note.

MR. KULWIN:  Am I allowed to ask afterwards?

THE COURT:  You are forgetting something.  Okay.

MR. KULWIN:  You first.

- - -

ROBERT EVANS, REDIRECT EXAMINATION

BY MR. MICHALIK:

Q.  If I could have defendants' 60-4 back up on the screen, please.

We are looking at a page from your scene report, correct?

A.  Correct.

Q.  You were asked some questions about Eric Benson and Cleveland Ball.  And how anybody could tell that they were the individuals who provided the description that you included in the wanted section of the report.  Do you remember those questions?

A.  Yes.

Q.  All right.  If we look over here, you have them listed as witnesses?

A.  Correct.

Q.  And then right below that, you have some individuals identified as interviewed, do you see that there?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 1114 of 175 PageID #:29292
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 114 of 175 PageID #:32724

A.  I do.

Q.  All right.  And Eric Benson is identified as an eyewitness?

A.  Correct.

Q.  And would that be an indication that he was one of the individuals who provided you with a description?

A.  Correct.

Q.  And there are only two witnesses listed here, true?

A.  Correct.

Q.  And that's Eric Benson and Cleveland Ball?

A.  Yes.

MR. MICHALIK:  Your Honor, if I could have one moment.

THE COURT:  Okay.

(Brief pause.)

BY MR. MICHALIK:

Q.  One last question from me.  The eight pages of GPRs that we were talking about?

A.  Yes.

Q.  Have you ever been told that those were not ever provided to Mr. Fields?

A.  I was not, no.

MR. MICHALIK:  All right.  No further questions, Judge.

MR. KULWIN:  No.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 115 of 175 PageID #:20294
Case: 1:13-cv-01168 Document #: 185-29 Filed: 02/24/16 Page 115 of 175 PageID #:32745
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

114

MR. LOEVY:  Just one.

THE COURT:  One recross examination croak.

BY MR. LOEVY:

Q.  This description, the composite description on the ELMO?

THE COURT:  I got to switch it back the ELMO.  It was on the computer for a second.  Just a second.

BY MR. LOEVY:

Q.  Of a man who appeared as young at 20 or 21, do you see that?

A.  Yes.

Q.  That does not describe someone who is in their 30s, would you agree with that?

MR. KULWIN:  Objection, asked and answered, outside the scope.

THE COURT:  Argumentative.  Sustained.

MR. LOEVY:  I have no further questions.

THE COURT:  Any of the jurors have questions for the witness?  I see none.  You're excused.

THE WITNESS:  Thank you.

THE COURT:  All right.  Next.  Is it a live witness, are we reading something?

MR. KULWIN:  We are reading two things, Judge.

THE COURT:  Okay.  What is it we are reading?

MS. KATZ:  Gerald Morris.  There's two transcripts that we are going to be reading.  We will start with the first

one.

THE COURT:  Got it.  Can I just see you quickly at sidebar?  I want to tell the jury what transcripts, but I want to ask you at sidebar first.

MS. KATZ:  Sure.  (Brief pause) .

THE COURT:  As I understand it the first one you are requesting to read from is Mr. Morris' criminal trial.

MS. KATZ:  Yes.  And to give you a head's up, we are going to be using an Elmo for one exhibit.

THE COURT:  Got it.  It's on the ELMO; again, this is just somebody reading testimony and somebody reading questions and answers not the actual witnesses.  Go ahead.  This is.

MS. KATZ:  This is the direct of Mr. Rueckert.

THE COURT:  You mean by Rueckert.  I don't think he was a witness,.

- - -

GERALD MORRIS, DIRECT EXAMINATION

BY MS. KATZ:

Q.  Mr. Witness, I am going to ask you to keep your voice up so everyone can hear us.

A.  Okay.

Q.  Tell us your name and spell your last name for the court reporter?

A.  My name is Gerald Morris, Morris.

Q.  How old are you, Gerald?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 117 of 175 PageID #:20296
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 117 of 175 PageID #:32727

A.   23.

Q.   Gerald, I want to direct your attention to April of 1984. Can you tell the Court where you were living in April of 1984?

A.   I was living on 38 east Pershing road, 706 building.

Q.   Is that the building at the corner of Langley and Pershing road?

A.   Yes.

Q.   What apartment are you living in at that building?

A.   106.

Q.   And that's the front or the back of the building?

A.   That's in the back of the building.

Q.   How many floors did your apartment have?

A.   Two.

Q.   Now, I want to direct your attention specifically to April 28th, 1984, about 10:00 o'clock in the morning.  Can you tell the Court where you were at about 10:00 o'clock that morning?

A.   I was looking out the window, talking to Fuddy.

Q.   When you say you were talking to Fuddy, who was Fuddy?

A.   That's Jerome Smith.

Q.   And was Fuddy a friend of yours?

A.   Yes.

Q.   How long had you known Fuddy?

A.   I had known him about five years.

Q.   When you say you were looking out the window talking to Fuddy, would that be the window on the first floor or the

second floor of your apartment?

A. Second floor.

Q. And as you look out of that window, what can you see?

A. I can see everything.

Q. Is there a parking lot behind your building?

A. Yes.

Q. Could you see the parking lot?

A. Yes.

Q. How long did you talk to Fuddy?

A. A couple of minutes.

Q. And did you see where Fuddy went after you were finished talking to him?

A. Yes, up on the breezeway.

Q. All right. Gerald, I'm going to ask you to take a look at this drawing which has been marked as People's Exhibit No. 5. Do you recognize what that is a drawing of?

A. Yes.

Q. And what is that a drawing of?

A. That's a map of the Ida B. Wells homes.

Q. Do you see the building where you live in?

A. Yes, 706.

Q. Do you see the apartment you live in?

A. Yes.

Q. Would you come down here and put an X on the apartment you lived in?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 119 of 175 PageID #:20298
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 119 of 175 PageID #:32729

A. Yes.

Q. Now, you testified there was a parking lot in your building; is that correct?

A. Yes.

Q. Do you see that parking lot?

A. Yes.

Q. Would you point to the parking lot?

A. Right here.

Q. The big area right there?

A. Yes.

Q. You say you were in a window of your apartment. Can you put maybe a couple of lines indicating a window in the apartment you were looking out of?

A. Here is the window here.

Q. Put an X. That's fine.

Is that the window you were talking out of to Fuddy?

A. Yes.

Q. All right. And you say you saw Fuddy go to the breezeway. Can you draw a line where you saw Fuddy go?

A. The breezeway is like this.

Q. You can sit back down.

I'm going to show you what has been marked as Defendant's Exhibit 388 for identification.

THE COURT: Everybody agrees that's the thing that he was referring to during the trial?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 120 of 175 PageID #:20299
Case: 1:13-cv-01168 Document #: 185-29 Filed: 02/24/17 Page 120 of 175 PageID #:32730

MS. KATZ:  Correct, your Honor.

BY MS. KATZ:

Q.  Do you recognize what is -- this is a picture of?

A.  That's my -- yeah, that's my building.

Q.  Do you see your apartment in there?

A.  Yes.

Q.  Do you see the window in that exhibit where you were talking to Fuddy?

A.  Yes.

Q.  At this point, would you come down.

THE COURT:  Again, as with the last witness, everybody agrees that he came down and is going to point to whatever he is about to point to there.

MS. KATZ:  Thank you, your Honor.

BY MS. KATZ:

Q.  Circle the window you were talking to Fuddy from.

May the record reflect, Judge, the witness has circled the window, the second floor of this window Defendant's Exhibit 388.

Now, as you look at that picture right now, is there anything different about that picture, the condition of your apartment in that particular picture than from April 14th?

A.  Yes.

Q.  What's different?

A.  We got boards up there now, but we had windows.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 121 of 175 PageID #:29300
Case: 1:23-cv-01168 Document #: 285-29 Filed: 02/24/26 Page 121 of 175 PageID #:32731

Q.   There are boards in the window in this picture?

A.   Yes.

Q.   And there were windows are glass in the windows when you were there?

A.   Yes.

Q.   Except for that, does this clearly and accurately depict your apartment -- the apartment you looked in?

A.   Yes.

Q.   Judge, I would ask this picture be admitted into evidence at this time.

Now, Gerald, after Fuddy went around the corner, did you stay in the window?

A.   Yes.

Q.   And did you see anyone or anything unusual as you sat in the window after Fuddy left?

A.   Yes.

Q.   What did you see?

A.   I seen two males walk right behind him.

Q.   Do you see -- did you see where they were coming from?

A.   No, I didn't.

Q.   Where is the first place you saw them?

A.   Entering from the parking lot.

Q.   All right.  Which way were they walking when you first saw them?

A.   Walking in the same direction Fuddy was going.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 122 of 175 PageID #:20301
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 122 of 175 PageID #:32732

Q.  Would that be toward you?

A.  Yes.

Q.  Can you see these people's faces?

A.  Yes.

Q.  Can you describe these two guys?

A.  Yes, the light skinned one he had on the red jacket and the dark skinned one, he had on all blue.

Q.  Now, you said they were light skinned and dark skinned. Were they both black?

A.  Yes.

Q.  The light-skinned guy, how tall is he?

A.  He was taller than the dark skinned guy, about five, nine.

Q.  How tall would you say the dark skinned guy was?

A.  About five, six.

Q.  Now, was the light-skinned guy heavier or skinnier than the dark skinned guy?

A.  Skinnier.

Q.  Could you see how these guys wore their hair?

A.  Yes, they had braids in their hair.

Q.  Both of them?

A.  Yes.

Q.  Could you see whether or not either one of these people had hair on their face?

A.  Yes, the dark skinned one had a beard and the other one had a little beard, he didn't have that much.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 123 of 175 PageID #:20302
Case: 1:13-cv-01168 Document #: 185-29 Filed: 02/24/16 Page 123 of 175 PageID #:32733

04:07:42  Q.  How close did these people get to you?

04:07:45  A.  About five feet.

04:07:47  Q.  And were you still in the second floor window when you saw them?

04:07:50  A.  Yes, I was still there.

04:07:52  Q.  Did you see where these guys walked to?

04:07:55  A.  Yes, they walked up under the breezeway too.

04:07:58  Q.  I'm going to ask you to come off the witness stand again with this pen mark the entire route you saw them walk.

04:08:09  A.  All right.  They walked about like this in front of the place.

04:08:13  Q.  May the record reflect, Judge, the witness has placed a purple line on people's Exhibit No. 5.  It would be the top most line in this picture.

04:08:23       I'm going to show you what has been marked as Defendant's Exhibit 389 for identification.

04:08:45       Gerald, is that also a picture of your apartment?

04:08:49  A.  Yes.

04:08:49  Q.  And do you see in there the window that you were in when you were talking to Fuddy?

04:08:53  A.  Yes.

04:08:54  Q.  Is that the same window you saw the two individuals walk by?

04:08:57  A.  Yes.

04:08:58  Q.  Would you circle that window, please.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 124 of 175 PageID #:20303

Now, do you see in there the entrance to the breezeway?

A. Yes.

Q. All right. Where in this particular picture is the entrance to the breezeway?

A. Right here.

Q. All right. Can you write like a B on the entrance to the breezeway? May the record reflect, Judge, Defendant's Exhibit 389 the witness has circled the second window from the right on the second floor and he has placed the letter B on the farthest left-hand portion of the picture.

Is that the corner you saw Fuddy go around?

A. Yes.

Q. Is that also the corner you saw these other two guys go around?

A. Yes.

Q. Judge, I would ask that these be admitted into evidence.

Gerald, I'm going to ask you to stand up and look around the courtroom. Do you see the two guys in court today you saw walk past your window?

A. Yes.

Q. Would you point them out, please?

A. Right there and right there.

Q. What did this guy have on when he walked by the window, the defendant, Earl Hawkins?

A.  He had on a red jacket and blue jogging pants.

Q.  And when you say Nathson, for this guy, Nathson Fields what did he have on when he walked by the window?

A.  All blue.

Q.  May the record reflect, Judge, the witness has identified both defendants in open court.

Gerald, after you saw the defendant Hawkins and Fields walk by your window, where did you go?

A.  I went to the next room to get my shirt.

Q.  Were you going to go somewhere after you got your shirt?

A.  Yes, I was going to go downstairs and talk to Fuddy.

Q.  While you were in the next room getting your shirt, what happened?

A.  I heard several gunshots and I looked out the side window and I seen the same defendants run back out.

Q.  Now, when they walked past you the first time, did they have anything in their hands?

A.  No.

Q.  When they ran by you the second time, did they have anything in their hands?

A.  Yes.

Q.  What did they have in their hands at that time?

A.  They had guns.

Q.  Did each one of them have guns?

A.  Yes.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 126 of 175 PageID #:20305
12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

125

Q.   Could you see where they were running?

A.   Yes, to a car.

Q.   Where was the car parked?

A.   The car was parked on Langley.

Q.   Do you see where the car was parked on people's Exhibit No. 5 there?

A.   Yes.

Q.   Would you point to it, please?

A.   Right here.

Q.   Judge, may the record reflect the witness is pointing to a purple X on people's No. 5.

     Did you see what the two guys did when they got to their car?

A.   Yes.

Q.   What is the first thing they did?

A.   The light skinned one, he tossed his car into the gun and he climbed in first, and then the dark skinned one stood around and owned the door, held the door while the other one gets in.

Q.   What did the dark skinned guy do after the light-skinned guy got in the car?

A.   He looked around.

Q.   And then what did he do?

A.   Then he got in the car and the car drove off.

Q.   Were those the same two guys you seen by go by your front

window?

A.  Yes.

Q.  Did you see what the car did after they got in?

A.  Yes, it took off.

Q.  Which way did it go?

A.  It went up Langley.

Q.  When you say up, are you talking about to the top of that picture there?

A.  Yes.

Q.  That would be north, right?

A.  Yes.

Q.  What did you do, Gerald, after the car drove off?

A.  I had ran downstairs and went outside and I seen Talman first.

Q.  When you say Talman, who are you talking about?

A.  Talman, I don't recall his last name.

Q.  Talman Hickman?

A.  Yes, Hickman, and I had went around the corner and I seen Fuddy laying down there.

Q.  What did you do after you saw Talman and Fuddy laying down there?

A.  Well, I had ran to the Ida B. Wells and I was telling everybody that Fuddy and Talman had got shot.

Q.  Did you talk to some police later that night?

A.  Yes.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 128 of 175 PageID #:29307
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 128 of 175 PageID #:32708
12/06/16 PM ***REALTIME UNEDITED TRANSCRIPT ONLY***

127

Q. Where was that?

A. That was at my apartment.

Q. Did you tell the police what you had seen?

A. Yes.

Q. Did you indicate whether you could identify the guys if you saw them?

A. Yes.

Q. What did you tell them?

A. I told them that I can identify someone.

Q. Did the police leave then?

A. Yes, they said they would contact me.

Q. Were you still living in the building when they left, correct?

A. Correct.

Q. When is the next time you were contacted by the police, Gerald?

A. A year later.

Q. Now, Gerald, when is the next time you were contacted by the police?

A. A year later.

Q. Do you remember the month?

A. It was -- no, I can't recall the month.

Q. Well, when the police contacted you, did they ask you to do anything?

A. Yes, they asked me to come look at some photos.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 129 of 175 PageID #:20208
Case: 1:15-cv-01168 Document #: 185-29 Filed: 02/24/17 Page 129 of 175 PageID #:32739

Q. Did you go with the police somewhere?

A. Yes.

Q. Where did you go?

A. I came here.

Q. And did the police show you anything when they got you here?

A. Yes, they showed me some photos.

Q. Approximately how many photos did they show you?

A. About 20 to 25.

Q. Did you identify any photos from that group?

A. Yes.

Q. How many?

A. Three.

Q. All right. Do you see pictures -- do you see the guys in court today that you identified pictures of?

A. Yes.

Q. Are they the same two guys you identified?

A. Yes.

Q. After you made those identifications, were you contacted by the police again?

A. Yes.

Q. When was that?

A. May 16th, 1985.

Q. Well, the next time the police contacted you, Gerald, what did they ask you to do?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 130 of 175 PageID #:20309
Case: 1:15-cv-01168 Document #: 1185-29 Filed: 03/24/17 Page 130 of 175 PageID #:32740

A.  They asked me to look at a lineup.

Q.  All right.  Did you look at a lineup?

A.  Yes.

Q.  Where was that?

A.  That was at area one.

Q.  And when you looked at the lineup, did you identify anybody from the lineup?

A.  Yes.

Q.  Who did you identify from the first lineup?

A.  I can't recall his name.

Q.  Do you see him in court today?

A.  Yes.

Q.  Which guy did you identify from the first lineup, right?

A.  Right here, the light skinned.

Q.  The light skinned person?

A.  Yes.

Q.  May the record reflect, Judge, the in court identification of Earl Hawkins.

A couple days after the lineup, were you contacted by police again?

A.  Yes.

Q.  Did you look at another lineup?

A.  Yes.

Q.  Did you identify anybody in that lineup?

A.  Yes.

Q. Do you see that person in court today?

A. No.

Q. A while after that, did the police contact you again?

A. Yes.

Q. What did they ask you to do the third time they contacted you?

A. To look at another lineup.

Q. Did you go somewhere to look at that lineup?

A. Yes.

Q. Where did you go?

A. To area one.

Q. To look at a lineup on that day?

A. Yes.

Q. Did you identify anyone from that third lineup?

A. Yes.

Q. Do you see that person in court today?

A. Yes.

Q. Would you please point him out?

A. Yes, right here.

Q. The dark skinned guy?

A. Yes.

Q. May the record reflect, Judge, again the identification of Nathson Fields.

Gerald, did anyone tell you to identify -- to identify from those lineups?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 132 of 175 PageID #:29341
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 132 of 175 PageID #:32742

A.   No.

Q.   Gerald, I'm going to show you what has been marked as Defendant's Exhibit 390.

Do you recognize what is in this photo?

A.   That is my building.

Q.   Is that your apartment?

A.   Yes.

Q.   You testified you went in a different room to get a shirt. Do you see that window in that room?

A.   Yes.

Q.   Would you circle that window, please.

THE COURT:  Again, it's agreed that this is what the person did.

MS. KATZ:  May the record reflect, Judge, that the witness has placed a circle around the window, top right, in Defendant's Exhibit 390.

BY MS. KATZ:

Q.   Is that the window you saw the people running to the car from?

A.   Yes.

Q.   Gerald, I'm going to show you what has been marked as Defendant's Exhibit 391 for identification.  Do you recognize what that is a picture of?

A.   The parking lot, yes.

Q.   What is that a picture of?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 133 of 175 PageID #:20342
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/16 Page 133 of 175 PageID #:32743

A.  The parking lot.

Q.  Do you see on there where the car was parked you said you saw these guys running to?

A.  Yes.

Q.  Would you draw a square on that picture where you saw the car?  Judge, may the record reflect the witness has placed a large square around the car that is parked right in the middle of this exhibit.

     Do you see here, Gerald, the car to the parking lot where these guys were walking when you say you saw them?

A.  Yes, they was coming this way.

Q.  Just draw a line with an X or an arrow.  I'm sorry. Judge, may the record reflect the witness has placed an X right-hand side of Defendant's Exhibit 391.

     Gerald, does this picture accurately depict the way the area looked when you saw them on April 28th?

A.  Yes.

Q.  Again, there are boards in the windows of this apartment, previous exhibit.  When you saw them on April 28th.  I'm sorry.  When you lived there, were there boards on the windows or glass?

A.  There was glass.

Q.  So except for that, this looked the same way?

A.  Right.

Q.  Gerald, I'm going to show you what has been marked as

Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 134 of 175 PageID #:32744

12/06/16 PM     ***REALTIME UNEDITED TRANSCRIPT ONLY***

133

people's Exhibit No. 18 for identification.  Do you recognize what that is a picture of?

A.  That is a picture of the lineup.

Q.  Which lineup is that?

A.  This is the first lineup.

Q.  Do you see the person in there that you identified?

A.  Yes.

Q.  Would you place an X over his head.

Judge, may the record reflect the witness has placed an X over the first person to the left in this lineup, the picture of Earl Hawkins.

I show you what has been marked as People's Exhibit No. 19 for identification.  Do you recognize what that is a picture of?

A.  Yes, this is a third lineup.

Q.  All right.  Is that the way the lineup looked when you looked at it?

A.  Yes.

Q.  Do you see the person in there you identified?

A.  Yes.

Q.  Would you place an X over his head, please?  Judge, may the record reflect the witness has placed an X over the person under number 1 in People's Exhibit No. 19.

Gerald, I'm going to show you what is depicted as People's Exhibit No. 1 for identification.  Do you recognize

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 135 of 175 PageID #:20344
Case: 1:23-cv-01168 Document #: 1185-29 Filed: 02/24/76 Page 135 of 175 PageID #:32745
12/06/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***
                                                                          134

04:19:50   that?

04:19:50   A.  Yes.

04:19:51   Q.  What is depicted in that photo?

04:19:53   A.  Fuddy and Talman.

04:19:55   Q.  Is that the way you saw Fuddy and Talman that day when you
04:19:59   went down there?

04:20:00   A.  Yes.

04:20:00   Q.  I want to show you what has been marked as People's
04:20:05   Exhibit No. 20.  Do you recognize who is in that photo?

04:20:08   A.  Yes.

04:20:09   Q.  Who is that?

04:20:10   A.  That's Fuddy.

04:20:11   Q.  Finally, People's Exhibit No. 21 for identification, do
04:20:17   you recognize who is in that photo?

04:20:18   A.  Yes, that is Talman.

04:20:18                          - - -

04:20:18           ROBERT EVANS, CROSS-EXAMINATION

04:20:18   BY MR. HEPPELL:  (Reading:)

04:20:36   Q.  Mr. Morris, my name is Bill Swano.  I met you in July of
04:20:39   1985.  Do you remember that?

04:20:41   A.  Yes.

04:20:42   Q.  May I call you Gerald?

04:20:46   A.  Go ahead.

04:20:46   Q.  How long have you known Fuddy?

04:20:48   A.  Five years.

Q. And from the building where you lived, you knew Fuddy?

A. No, through another friend of mine.

Q. And you knew that Fuddy was the leader or the head of the Goon Squad?

A. Yes.

Q. And you were a member of the Goon Squad?

A. I was.

Q. How long have you been a member?

A. I really can't remember.

Q. Well, a couple of years?

A. I can't remember.

Q. A month, two months, a year, two years, do the best you can.

A. About three years.

Q. And you have a cousin by the name of Randy Langston?

A. That is my brother-in-law.

Q. He was also a member of the Goon Squad?

A. Yes.

Q. Now, when you were living in this apartment, what was the apartment number?

A. I think 106.

Q. How long had you been living there?

A. I was about a month.

Q. It wasn't your family's apartment, it was the Langston's apartment?

A. Right.

Q. And it is your testimony that you had lived there for a month?

A. Yes.

Q. Or did you just stay there sometimes?

A. Just lived there for a month. I came to move there with them. It was about a month.

Q. You had actually moved your clothes and everything in?

A. Um-hmm, about a month.

Q. About a month?

A. Um-hmm.

Q. And then how long did you live there after the shooting incident?

A. About two months after, I guess.

Q. Were you employed in April of '84?

A. Uhn-uhn.

Q. Are you employed now?

A. Uhn-uhn.

Q. Now, you testified that you were speaking with Fuddy; is that right?

A. Yes.

Q. How long had you been looking out the window before you saw Fuddy that day?

A. I was looking out for a long time.

Q. Well, when you say a long time, how long?

A.   A couple -- about a couple minutes at the most.

Q.   Two minutes?

A.   Yes.

Q.   And during that two minutes, did you see other people out in the parking lot and in the playground?

A.   No.

Q.   The only person you saw was Fuddy is that right?

A.   Fuddy, yes.

Q.   Now, you were on the second floor, correct?

A.   Correct.

Q.   Was Fuddy downstairs on the sidewalk?

A.   Yes.

Q.   And how long did you talk to Fuddy?

A.   About a couple of minutes.

Q.   What did you talk about?

A.   I asked him was Paul, did Paul get out of jail and he said no.  That's when he went around the front to stand and see to wait for him.  I told him I would be down as soon as I got through ironing my shirt.

Q.   Do you know Paul's last name?

A.   No.

Q.   Paul had been arrested the day before regarding the shooting incident, correct?

A.   Correct.

Q.   And that shooting incident involved a person by the name

Q. of Delbert Edwards, correct?  Paul had been shooting at Delbert Edwards the day before, correct?

A.  I don't know what he was charged with.

Q.  Paul's last name was Paul Bailey; is that correct?

A.  I don't recall his last name, just know the first name.

Q.  Paul lived in the same apartment as Fuddy did, correct?

A.  Correct.

Q.  And they were good friends?

A.  Right.

Q.  Other than asking Fuddy whether Paul had gotten out of jail, what else did you talk about during that conversation?

A.  That's all.

Q.  Now, that conversation took place in two minutes?

A.  Yes.

Q.  When you were looking out the window, was anybody looking out the same window you were?

A.  That's my girlfriend, I was looking out the window with her.

Q.  What was her name?

A.  Sandra Langston.

Q.  And Sandra Langston lived in that same apartment?

A.  Yes.

Q.  106?

A.  Yes.

Q.  Randy Langston lived there?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 140 of 175 PageID #:20319
Case: 1:13-cv-01168 Document #: 185-29 Filed: 02/24/17 Page 140 of 175 PageID #:32750

12/06/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

139

A.  Yes.

Q.  Eric Langston?

A.  Yes.

Q.  James Langston?

A.  Yes.

Q.  And you lived there?

A.  Yes.

Q.  Was Sandra speaking with Fuddy as you were?

A.  No, she was just standing out there.

Q.  She was standing near the window?

A.  Yes.

Q.  Was she leaning out the window?

A.  Yes.

Q.  Were you leaning out the window?

A.  Yes, both of us.

Q.  So both of you were hanging out the window but you were talking to Fuddy?

A.  I was talking to Fuddy.

Q.  And she had no conversation with Fuddy; is that correct?

A.  Yes.

Q.  And there was nobody else in the playground or the parking lot at that time?

A.  No.

Q.  Now, after Fuddy left and went into the breezeway, you then went to get a T-shirt on or a shirt?

***REALTIME UNEDITED TRANSCRIPT ONLY***

A. No, I stayed in the window.

Q. Well, for how long?

A. Oh, about a couple of minutes.

Q. How much time passed from the time Fuddy went into the breezeway until you saw these two fellows?

A. I'd say about a good five minutes.

Q. About five minutes past after Fuddy went out the breezeway, correct?

A. Yes.

Q. During that five minutes, did anybody else walk along that sidewalk?

A. No.

Q. The first time you saw these two people, as you were looking out the window, was when they were approximately down from the window, right?

A. Yes.

Q. And that was the first time you laid eyes on them that day?

A. Um-hmm.

Q. And of course, you were what, about 25 feet up?

A. No, I was -- I'd say five feet from the ground.

Q. About five feet from the ground?

A. Um-hmm.

Q. And you were looking down, so you could see the tops of their heads?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 142 of 175 PageID #:20321
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 142 of 175 PageID #:32452

A. You could see it straight as they walked in.

Q. And they didn't stop and talk with you, did they?

A. No.

Q. They walked right by?

A. Right.

Q. And then after that, you went and got your shirt?

A. Yes.

Q. Where did Sandra go?

A. I don't remember. I can't remember where she went to.

Q. Did Sandra stay in the window?

A. I can't remember where she went to.

Q. When you left the window, was Sandra still there?

A. I can't remember where she went to.

Q. You can't remember if she was still in the window?

A. No, I can't.

Q. How much time passed then after you went to get your shirt until you heard shots?

A. I can't remember that.

Q. Well, was it like five or ten minutes?

A. I can't remember that.

Q. Was it a short time?

A. I'd say a good five minutes.

Q. After the two men walked under your window and into the breezeway, how long did you remain looking out the window?

A. After they walked up under the breezeway, I got out the

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 143 of 175 PageID #:20322
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 143 of 175 PageID #:32733

window.

Q.   Right after they walked by?

A.   Right after they walked by and went up under the breezeway.

Q.   Now, you had your own bedroom?

A.   Yes, me and her, yes.

Q.   Showing you Defendant's Exhibit 390.  Is your bedroom -- was your bedroom, is it shown by one of those windows?

A.   Right here, that is my bedroom.

Q.   Indicating the circled window.

     And is that the room that you went in to get your shirt?

A.   Yes.

Q.   And is that the room that you were in that you heard shots?

A.   Yes.

Q.   And then you looked out that window and you saw men running towards Langley, correct?

A.   Yes.

Q.   Now, as they were running, their backs were to you, correct?

A.   Correct.

Q.   You could see the back of their head?

A.   I could see, yes.

Q.   And they had already passed this portion of the building

Q.  running towards Langley; is that right?

A.  Yes.

Q.  Now, did you see anybody in the car over on Langley?

A.  No, it was too far off.

Q.  You couldn't see anybody in that car?

A.  No, it was too far for me to really see.

Q.  So when you went to the second lineup and identified George Carter, you couldn't say whether or not he was in that car, can you?

A.  No, not really.

Q.  You can't say George Carter was in the car?

A.  No.

Q.  The car was too far away for you to see who was in it, correct?

A.  Yes.

Q.  Now, these men ran in a straight frontal running motion, right, they didn't run backwards?

A.  No.

Q.  And the men that got in the car were at the car when you say they opened the door and turned in your direction?

A.  Yes.

Q.  Now, Talman and Fuddy were friends of yours, right?

A.  No, not Talman.  Fuddy was.

Q.  Fuddy was a good friend of yours, right?

A.  Right.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 145 of 175 PageID #:20324
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 145 of 175 PageID #:32755
12/06/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

144

Q. He was the head of the gang that you were in, right?

A. Yes.

Q. And in addition to being the head of the gang, he was a good friend of yours?

A. Yes.

Q. And after the shooting, you went down and saw these two men lying on the sidewalk or lying on the front of the building?

A. Yes.

Q. And the police arrived?

A. Not right then, no.

Q. Well, eventually the police arrived.  You were there when the police came there?

A. No, I had left and went through Ida B. Wells.

Q. You didn't wait for the police?

A. No.

Q. You had, according to your testimony, witnessed possibly the two perpetrators of this crime and you didn't wait to tell the police?

A. No, not then, no.

Q. You didn't call the police?

A. I didn't have a phone to call the police.

Q. But you didn't go to a pay phone to call the police?

A. No.

Q. You didn't call them.  Why?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 146 of 175 PageID #:20325
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 146 of 175 PageID #:32756

A.   Because I didn't have a phone.

Q.   Well, you went over to another CHA housing after the shooting, right?

A.   Um-hmm.

Q.   And did you come back to the building then?

A.   Yes, I came back.

Q.   And when you came back, were the police still there?

A.   Yes, they were still there.

Q.   And they were looking for witnesses?

A.   That night they came.

Q.   Well, I'm talking about that day.

A.   That day, not right then, no.

Q.   Were they gone by the time you came back?

A.   No, they were still there.  There was nobody looking for no witnesses right then.

Q.   Did you go up to the police when you came back after going over to the other project and telling them you seen two men?

A.   No.

Q.   Did you tell them you saw two men running into a car?

A.   No.

Q.   Did you tell them you saw two men running with guns into a car?

A.   No.

Q.   You didn't speak to the police?

A.   I spoke to the police that night.


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

Q.  No, but I mean, at that time?

A.  No.

Q.  Okay.  Now, that night then, police came to your apartment and talked to Randy Langston, right?

A.  Yes.

Q.  And were you there when they came and talked to Randy?

A.  Yes, I was there.

Q.  Did you hear Randy tell the police that he had seen one man with a red ski mask, did you hear Randy Langston tell the police that?

A.  No.

Q.  Did you hear what Randy had to say to the police?

A.  No, I wasn't paying no attention to what Randy had to say to the police.

Q.  Did you then tell the police what you had seen earlier that day?

A.  I told them that I had seen something and they said that, all right, we will contact, and I didn't hear from them until a year later.

Q.  Do you remember the names of the officers that you told that to?

A.  No, I can't recall.

Q.  Was it the same officers that were speaking to Randy Langston?

A.  Yes, they were the same.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Q. Does Detective Minogue, does that ring a bell with you as the detective that was speaking to you that night?

A. I can't remember.

Q. If you saw him again, would you remember him?

A. No, if it's been too long, I don't think I will.

Q. When the police spoke with you that night, did they talk to Sandra also?

A. I can't remember.

Q. Did they speak with Eric or James?

A. I can't remember.

Q. Now, you have been provided housing or lodging from the state's attorney's office, correct?

A. Correct.

Q. Did you also receive some sort of job from the police department or through the police?

A. No, Dave told me where they was hiring and told me to go down and check it out.

Q. Dave O'Callaghan?

A. Yes.

Q. The officer that is in the back or was here earlier?

A. Yes.

Q. He tried to help you get a job?

A. He had told me where they was hiring.

Q. And that was in May of 1985, right?

A. Um-hmm.

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 149 of 175 PageID #:20328
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/16 Page 149 of 175 PageID #:32739
12/06/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***
148

04:32:06   Q.   Well, do you know how much money you've received?

04:32:10   A.   No, I do not.

04:32:12   Q.   Now, you testified that you saw a lineup on May 16th, 1985?

04:32:17   A.   Yes.

04:32:18   Q.   Is that the date that you saw the lineup or is that the date the police came and first talked to you after the initial day?

04:32:24   A.   No, that's -- I saw photos on May 16th.

04:32:28   Q.   May 16th, you saw photos?

04:32:30   A.   Yes.

04:32:30   Q.   And did O'Callaghan show you those photos?

04:32:33   A.   Yes.

04:32:34   Q.   And did he tell you that he had information as to who the four people were that had done the killing?

04:32:39   A.   Uhn-uhn.

04:32:40   Q.   Did he show you Earl Hawkins's photographs?

04:32:43   A.   No, I had to pick it out.

04:32:45   Q.   Did you pick out a photograph of George Carter?

04:32:49   A.   I don't know George Carter.

04:32:49   Q.   Well, did you identify anybody in that group of photos as somebody that was in the car?

04:32:56   A.   Yes, I had.

04:32:58   Q.   So you did identify somebody then as somebody that was sitting in the car, correct?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 150 of 175 PageID #:20329
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 150 of 175 PageID #:32760
12/06/16 PM

***REALTIME UNEDITED TRANSCRIPT ONLY***

149

A.  Um-hmm.

Q.  But you just testified now that the car was too far away and you couldn't see who was in the car?

A.  Yes, it was too far away.

Q.  It was what?

A.  It was too far away for me to see.

Q.  Well, if that is the case, how did you pick out a picture of the man who was in the car if you hadn't seen anybody in the car?

A.  I don't know.

Q.  You don't remember?

A.  Uhn-uhn.

        MR. HEPPELL:  This is reflects cross-examination by Mr. Fields' attorney Mr. Smeeton.

        THE COURT:  Still in the 1986 trial?

        MR. HEPPELL:  Correct.

BY MR. HEPPELL:

Q.  Mr. Morris, when you say you spoke to detectives the night of this incident, they were white detectives?

A.  Yes.

Q.  And they spoke with Randy too that night?

A.  Yes.

Q.  Well, you don't recall whether they talked to James or sandy also?

A.  Uhn-uhn.


            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 151 of 175 PageID #:20339
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 151 of 175 PageID #:32761

Q. And the names Minogue and Bogdalek ring no bell to you as the officers you talked to?

A. No.

Q. You did not tell those police officers that night or give them a description of the people that you saw, did you?

A. No.

Q. You didn't describe in detail to those detectives the circumstances or what you saw out your window that night, did you?

A. No, I didn't.

Q. Did you hear Randy telling the detectives everything that he saw?

A. No.

Q. You didn't hear it?

A. No, I can't remember.

Q. You don't remember?

A. No.

Q. You told these detectives, I know something, but you didn't tell them what it was and they didn't ask you any questions about what you knew, what you saw, or who you saw?

A. No, they didn't.

Q. And you testified that you picked out a photo of George Carter on May 16th of '85 as being in the car. You testified you really couldn't see it?

A. Right.


                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 152 of 175 PageID #:20331
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 152 of 175 PageID #:32762

Q. And not only that you did pick out his photo, but on May 16th, 1985, you picked George Carter out of a lineup and identified him as being in that car, didn't you?

A. Yes.

Q. But you really couldn't see him because he was too far away?

A. Yes.

Q. Did somebody tell you to pick Carter out of that lineup?

A. No.

Q. You did that on your own?

A. Yes, I went in and picked George Carter.

Q. And you said that was the man that was sitting in the car?

A. Yes.

Q. And when you say the two men you've identified as the defendants got in the car, did you see the ski masks?

A. No, I didn't see the ski masks.

Q. Could you see the guns?

A. Yes.

Q. You saw them throw the guns in the car?

A. Yes.

Q. So you could see their hands?

A. Yes.

Q. When you saw Detective O'Callaghan in May, I believe you said the first time you saw him in May, like the 16th or so of '85, did he knock on your door?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 153 of 175 PageID #:20332
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 153 of 175 PageID #:32763

A. No, I wasn't around there. I had moved.

Q. Where were you?

A. I was in the Ida B. Wells.

Q. You were in the Ida B. Wells at that time?

A. Um-hmm.

Q. When O'Callaghan came to your door, did he knock on the door?

A. My door?

Q. Yes.

A. Yes.

Q. Had you talked to him, to Mr. O'Callaghan prior to that day when you talked to him for the first time?

A. No, that was the first time I seen him.

Q. First time you seen him?

A. Yes.

Q. Do you know how he found you?

A. No, uhn-uhn.

Q. When he knocked on your door, who were you home with?

A. Me and my girlfriend.

Q. When you saw the lineup wherein Mr. Fields stood up, was there anybody else down at the police station when you viewed that lineup?

A. Yes, but we were in separate rooms.

Q. Who else was down there?

A. It was me, Randy, and Eric.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 154 of 175 PageID #:20233
Case: 1:10-cv-01168 Document #: 1185-29 Filed: 02/24/16 Page 154 of 175 PageID #:32764

Q.  Do you know who looked at the lineup first?

A.  I think I looked at it first.

Q.  Were you able to see the people who stood in the lineup?

A.  It was a three -- it was a three-way glass like.

Q.  Probably two-way?

A.  Two-way.

Q.  How many people stood in the lineup?

A.  I can't remember.

Q.  Do you remember who the police officer was that stood with you when you did that lineup, looked at the lineup with Mr. Fields in it?

A.  Stood with me?

Q.  Yes.

    Let me ask you.  Was Dave O'Callaghan with you when you viewed the lineup with him and Nathson Fields?

A.  Yes.

Q.  And Dave O'Callaghan was also with you when you viewed the lineup of George Carter, picked Carter out, wasn't he?

A.  No.

Q.  He wasn't there?

A.  No, he wasn't there.

Q.  Do you know who was?

A.  No, I can't remember who was with me.

Q.  What did the people in the lineup do?

A.  They stepped forward and stepped back.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 155 of 175 PageID #:20234
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/16 Page 155 of 175 PageID #:32765

Q.  When they stepped forward, how far did they step forward?

A.  Not that close.

Q.  I'm sorry?

A.  Not that close.

Q.  How far -- did you stand with your face right up near the window?

A.  No.

Q.  I'm sorry?

A.  No.

Q.  How far from the wall where the window was were the people that were standing in the lineup?

A.  I don't know.

Q.  About five feet, ten feet?

A.  I don't know.

Q.  Could you show in the courtroom here from where you are to where the chairs are or where to where the lawyer is or how far?

A.  I would say right, about right there to where I'm standing.

Q.  To where?

A.  To them chairs to where I am.

Q.  A distance of about eight or nine feet.

When you say the people in the lineup stepped forward, how far did they step forward?

A.  About up to the typewriter and back.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 156 of 175 PageID #:20225
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/16 Page 156 of 175 PageID #:32766

Q. About four feet from the window or halfway to the window?

A. Halfway to the window.

Q. And when you looked at photographs on or about May 16th of '85, you weren't able to make a positive identification of either Mr. Hawkins or Mr. Fields, were you?

A. No.

Q. And did the length of time that had passed make it -- the year that had passed make it difficult for you to recognize those people?

A. Ain't nothing made it difficult.

Q. Well, did the faces look different in the picture than the people you saw?

A. No.

Q. What was your hesitancy of being able to positively identify the people in the pictures? Was it something different about the pictures than the people you saw that day?

A. No, it wasn't nothing different.

Q. So the people in the pictures, they didn't look the same then as the people that you saw in the streets that day?

A. Uhn-uhn, the clothes possibly, but not the faces.

Q. Well, if their faces were the same, but you still could not make a positive identification, could you?

A. No, I requested lineups.

Q. What did you say when you saw the pictures?

A. I asked them, can I see a lineup to make a positive

***REALTIME UNEDITED TRANSCRIPT ONLY***

identification.

Q. What did you say about the pictures?

A. What did I say about?

Q. Before you identified the lineup, did you say something about the people in the pictures?

A. No.

Q. Or didn't you say anything at all?

A. I looked at the pictures and I pointed them out and I asked the officers, can I see a lineup to make positive identification.

Q. Now, when you say you were looking out the window talking to Fuddy, you say the window slides open?

A. Yes.

Q. So when the window slides open, is half the window then exposed?

A. Um-hmm.

Q. How wide are those windows?

A. I would say like three feet.

Q. So when you opened the windows, there was about a foot and a half opening then?

A. No.

Q. Well, how big was it?

A. It was big enough for your body to fit out of it.

Q. Yet if it was just big enough for you yet you and Sandra Langston were both hanging out that window, right?

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 158 of 175 PageID #:20237
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 158 of 175 PageID #:32768

A. She was standing up.

Q. I'm sorry?

A. She was standing up in the window with me. I was leaning over. She was standing in the window.

Q. Well, when you testified on direct examination, you were both leaning out the window, you were mistaken then?

A. Yes, I was.

Q. So now only you are hanging out the window and she was not?

A. She wasn't hanging out the window.

Q. You testified that the offenders, the two people you seen previously, when they ran to the car, were they running?

A. Yes, they were running.

Q. When they got to the car, one of the people opened the door?

A. Yes.

Q. Is it your testimony that -- before they got in the car, they stopped and they turned around and looked back in your direction?

A. No, they didn't stop and turn around. They kept going. The heavy set one had the door open while the other one jumped in.

Q. Well, you weren't able to see their faces then as they got in the car?

A. Yes, as they were running past. They were pulling their

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 159 of 175 PageID #:20338
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 159 of 175 PageID #:32759

12/06/16 PM            ***REALTIME UNEDITED TRANSCRIPT ONLY***

158

masks off.

Q.  They were pulling them off as they ran by you?

A.  Yes, as they ran by.

Q.  Well, you were looking directly out at the car, right?

A.  Yes, from the back window, right.

Q.  From the side window?

A.  Yes, the back window.

Q.  And is this the window where your bedroom is?

A.  Yes.

Q.  And you can't see them until they get in front of your window; is that correct?

A.  Yes, that's correct.

Q.  And once they get in front of your window, you are behind them isn't that correct?

A.  Yes.

Q.  So you are looking at the backs of their heads, correct?

A.  Not really.

Q.  Not really?

A.  No.

Q.  Well, could you see their faces as they ran by you on the side window?

A.  No, I couldn't see them, but I knew it was them.

Q.  You couldn't see their faces then?

A.  Yes.

Q.  And you couldn't see their faces as they got in the car

            ***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 160 of 175 PageID #:20239
Case: 1:13-cv-01163 Document #: 1185-29 Filed: 02/24/17 Page 160 of 175 PageID #:32370

either, could you?

A.  Yes.

Q.  Well, when they got to the car, they had to have turned around to look for you to see them, didn't they?

A.  I knew it was them.

Q.  But you didn't see their faces, you knew it was them because you saw them before, is that what you're saying?

A.  They had on the same thing that they had on when they walked past, that's how I knew it was them.

Q.  But you didn't see their faces this time, did you?

A.  No, I didn't see their faces.

Q.  Did you tell Fuddy when you were talking with him that you were going to come down and meet with him downstairs, you had to get your shirt?

A.  Yes.

Q.  Did he say he would meet you downstairs?

A.  Yes, said he would be standing in front.

Q.  Was there anything in particular that you and him had to discuss?

A.  Not really.  I was asking him about had he seen Paul, and he said Paul hadn't gotten out of jail yet, and that's what he was standing under the breezeway for, to wait for Paul.

A.  I probably was going to mention it, yes.

Q.  So you told him I'll come downstairs to meet you?

A.  Yes.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 161 of 175 PageID #:20340

Q.  But instead of going right to your bedroom and getting your shirt to go down and see him, you stood staring out the window for five more minutes?

A.  Yes.

Q.  And during that five minutes, nobody out of that big complex happened by your window but you say these two men?

A.  Right.

Q.  And then after these two men happened to come by, five minutes later, that's when you went to get your shirt and go down and see Fuddy?

A.  Yes.

Q.  And when you viewed the lineup where you said you picked out -- strike that.  Earl Hawkins, was Carlos Willis down there?

A.  No.

Q.  Do you know Carlos?

A.  Yes, I know him.

Q.  Was Eric Benson down there?

A.  No.

Q.  Do you know him?

A.  No, I don't know Darryl Benson.

Q.  I'm sorry?

A.  No.

Q.  You don't know Eric Benson?

A.  Uhn-uhn.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 162 of 175 PageID #:20841
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 162 of 175 PageID #:32472

Q. Do you know Torrence White?

A. We probably call him by a different name.

Q. Do you know Richard Buckles?

A. Yes, I do, Richard.

Q. Did you see Richard that day?

A. No, I didn't see him.

Q. How do you know Richard?

A. Through Fuddy.

Q. Richard is a member of the Goon Squad, right?

A. Yes, he was.

Q. Now, Randy's brother, James, he is not; is that correct?

A. No.

Q. And Carlos Willis, he was not a member of the Goon Squad either, was he?

A. He was.

Q. When was he?

A. I can't recall the day that he was, but he was.

        MS. KATZ:  That's the end of 1986.

        THE COURT:  That's where we are going to stop.  Okay. Thanks.

        We'll resume at -- let me just check quickly.  Yeah, we'll resume about the same time tomorrow, 9:30, 9:35. Somewhere in there.  Don't discuss the case with each other or anybody else.

    (The jury leaves the courtroom.).


                ***REALTIME UNEDITED TRANSCRIPT ONLY***

THE COURT: Is the 2009 Morris testimony about that same length, longer or shorter.

MS. KATZ: I think it's a little bit shorter. I think Mr. Sexton gets through a little faster and the print is actually bigger, so it should take a little less time. That's my anticipation.

THE COURT: That took exactly 45 minutes.

MS. KATZ: Sam, yeah?

MR. HEPPELL: Yeah.

THE COURT: Or 44, I guess.

So just kind of reviewing the bidding on where we are then, so tomorrow you've got to finish the Morris testimony and then what else?

MR. BURNS: Davis.

THE COURT: Davis testimony. You have Hunter, I mean, I am going to do my best to get through it tonight. Davis testimony. Do you have a sense how long that is?

MR. NOLAND: Davis is about 20 minutes.

THE COURT: 20 minutes.

MR. NOLAND: That's a video, your Honor.

THE COURT: That's a video, that's right. Hunter assuming it's all read would be how long, about? Hunter? Longer or shorter than Davis? Laura, longer.

MR. LOEVY: But shorter than Morris.

THE COURT: What else after that?

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 164 of 175 PageID #:20342
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 164 of 175 PageID #:32474

12/06/16 PM      ***REALTIME UNEDITED TRANSCRIPT ONLY***

163

MR. NOLAND:  The experts, Mr. Murray, Mr. Noble, and Ms. Roberts.

THE COURT:  And then Mr. Hogan?

MR. KULWIN:  No.  And then we would hope to read Sandra Langston depending on how you rule.

THE COURT:  Langston testimony.

MR. KULWIN:  We are going to submit -- as soon as we get theirs.

THE COURT:  I don't have anything on that yet right?

MR. KULWIN:  Remember.

THE COURT:  You talked about it early this morning. I don't remember what.

MR. KULWIN:  They are going to give their designations and objections on availability.

THE COURT:  Just remind me on that.  Sandra Langston, is the issue going to be an availability issue?  That's the one with the availability issue potentially?

MR. KULWIN:  Yes.

MR. ART:  Yes.

MR. LOEVY:  We haven't fully investigated.  We got notice last night.

THE COURT:  Then we have Maue.

MR. MICHALIK:  Correct, Judge.

THE COURT:  I am not saying all tomorrow.  We have Maue and Hogan.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 165 of 175 PageID #:20344
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/16 Page 165 of 175 PageID #:32475

MR. MICHALIK:  Poulos.

THE COURT:  Poulos and Hogan.  Who am I missing?

MR. KULWIN:  We are still working on possibly Mr. Rueckert, but we haven't -- Mr. Rueckert, but we haven't been able to talk to him or missing phone calls or whatever. That's the latest I have heard.

THE COURT:  That covers the universe?

MR. KULWIN:  That covers my universe.

THE COURT:  Okay.  All right.

MR. KULWIN:  I have charted it out, Judge, my rough guess is depending on what Mr. Loevy does, Thursday or Friday morning.

THE COURT:  Well, not Friday morning, but Friday afternoon.

MR. KULWIN:  Friday afternoon.  So we are definitely not doing Friday morning?

THE COURT:  Well, I'm still, you know -- I'm supposed to be at this other thing.  It's really going to kind of depend on where we are and how badly we need it.  That's what it's going to boil down to.  I think the odds are I am going to tell you we are starting at noon or something like that.

Okay.  So I guess we need to at some point here finish off these two Hogan issues.  On Maue, there's another one where there is an availability -- there's an admissibility question on the prior testimony or there was something

discussed about this this morning.

MR. ART: He is the one in southern Illinois.

THE COURT: All right. When are we going to talk about that?

MR. MICHALIK: You asked us to put something in writing, Judge. We could talk about it.

THE COURT: No, put something in writing.

So we got these two Hogan issues. So Hogan, I mean, you might have gotten to him today, but now you are going to do a whole bunch of other stuff before you get to him.

MR. KULWIN: Right.

THE COURT: I think the thing to do then is let's -- including experts, you are going to do experts before you get to Hogan.

MR. MICHALIK: Yes.

MR. KULWIN: He is going to be the last witness.

THE COURT: Let's figure we are going to talk about Hogan either right before the lunch break or right after the lunch break tomorrow.

MR. KULWIN: Okay.

THE COURT: That will give everybody a chance to process these documents, think about these documents. Can I keep these copies?

MR. KULWIN: Yes.

MR. LOEVY: Yes.

***REALTIME UNEDITED TRANSCRIPT ONLY***

MR. ART: You can keep those, Judge.

MR. KULWIN: The government made those for you.

MR. ART: Mr. Kuhn mentioned that he wanted the documents he showed to be under the protective order until whatever is decided.

THE COURT: Okay, under a protective order.

MR. LOEVY: We want to talk about an issue, too, when it's our turn.

THE COURT: Okay.

MR. LOEVY: The issue is Kuhn. Mr. Kulwin and I have now had about three conversations with I him and each time he tells us the first thing which is.

THE COURT: That's a start.

MR. LOEVY: No, you'd be surprised, your Honor.

THE COURT: He tells you the same thing which is.

MR. LOEVY: He has been told that Murphy's notes are not in the possession.

THE COURT: Oh, we are back to the notes?

MR. LOEVY: Yes, because during that time period, there was no live investigation by which they would have received those notes and if called to testify, he would say we did not -- I have been told, he has no personal knowledge, he would say I have been told that the U.S. Attorney's Office did not accept these notes. Now, he hasn't checked.

THE COURT: Did you see he tell you who he is told

this by?

MR. LOEVY: No.

THE COURT: Three guesses and the first don't count.

MR. LOEVY: A guy named Deady.

MR. KULWIN: Yeah.

THE COURT: Deady was involved in the very early stages.

MR. KULWIN: It was Bogart to Deady to Hogan.

MR. LOEVY: What we have here that I would like to tender to you is a proposed stipulation.

THE COURT: Deady is still around?

MR. KULWIN: Yeah, he represented.

THE COURT: I seen him recently.

MR. KULWIN: He represented a fellow in the city thing with the patronage years ago. I can't remember his name.

THE COURT: The city thing with the patronage. That doesn't narrow it down.

MR. KULWIN: Sorich. The Sorich going to. That could cover a lot of territory. He's very active.

MR. LOEVY: Your Honor, Mr. Murphy testified that the reason he doesn't have these original notes with the redactions is because he gave them to time U.S. Attorney's Office. That's inconsistent with what we were told.

THE COURT: Say what you just said again.

***REALTIME UNEDITED TRANSCRIPT ONLY***

MR. LOEVY: Sure. Remember, the issue.

THE COURT: Just tell me again. I didn't hear it largely because I was coughing.

MR. LOEVY: Sorry. Mr. Murphy had original notes that, remember how --

THE COURT: I know what the notes, that's the thing with the little dashes in it and whatnot.

MR. LOEVY: And the missing stuff. And we said where are your original notes and he said several things. One of the things he said was he put them in the investigative file, another thing he said was I gave the originals to the U.S. Attorney's Office. Well, I guess then I may stand corrected on that. I thought he said he gave them to the U.S. Attorney's Office. All right.

THE COURT: I have no memory.

MR. ART: He said the first thing Mr. Loevy said. He said that he gave the notes to another law enforcement agency or the state's attorney's office, one or the other, and then there was representations made by attorneys during his examination that they were -- the originals were likely in the possession of the U.S. Attorney's Office.

THE COURT: That's how we got off on this whole thing.

MR. ART: Right.

THE COURT: There was this whole reason we got into

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 170 of 175 PageID #:20349
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 170 of 175 PageID #:32780

this whole thing with the U.S. Attorney's Office. I wouldn't have thought of that on my own. Are we talking about Murphy?

MR. BURNS: Murphy said at the time the notes were prepared, the GPR was prepared, the people who were present including representatives from the U.S. Attorney's Office, state's attorney's office and law enforcement all wanted copies and he made those notes of the GPR available for the purpose of coping. He said he didn't know where they went from there. As far as the other, I mean, we could probably get a rough transcript or get the transcript to you so you could look at that.

THE COURT: Do that.

MR. BURNS: More specifically.

THE COURT: Do that so we are not guessing.

MR. KULWIN: I have gotten confused about these notes because there's so many different dates. Let me just make sure we are all on the same proverbial page. I believe what we are talking about is lieutenant Murphy's notes while he's in the state's attorney's offices in the gang crimes while they're debriefing Anthony Sumner and what we have heard so far.

THE COURT: It's a multi page document where he was going through various events.

MR. KULWIN: Right. And I believe the accurate facts are and I think we have heard testimony about this, I am not a

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 171 of 175 PageID #:29350
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 171 of 175 PageID #:32781

hundred percent, is that at that time, it would have been Deady, definitely not Hogan, he wasn't involved then, Deady was probably there, I believe Brannigan testified that Deady was there, Brannigan remembered he was there, he testified he was there, he went out to get a drink of water every once in a while, blah, blah, blah, I believe Wharrie testified that he was there, I'm pretty sure that Wharrie testified that he was part of that debriefing and then you had other law enforcement people. So the debriefing there were a lot of cases at that time. Murphy was, I believe -- I believe the testimony was that he came in at one point, he went out, and those are the notes at issue. And I believe -- I believe Mr. Burns represented it correctly as to what's going on with that.

As far as where the U.S. attorney comes in, I believe for purposes of this case, I could stand corrected me, I will leave it to anybody that wants to correct me, is that at some point, Dan, you can correct me if I'm wrong, at some point in other litigation involving the U.S. Attorney's Office, these notes, copies of these notes were made. And then retained in the U.S. Attorney's Office. Where the U.S. Attorney's Office got the copies of the notes, I think is up in the air. I don't know. And what Mr. Kuhn also said is that it's his understanding that they didn't have these original notes, but he also said that he hasn't looked through all 482 boxes. I think he's just looking it could be one of the places.

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 172 of 175 PageID #:20351
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 172 of 175 PageID #:32782

THE COURT: He is getting information from somebody else that he didn't have this. It might be worthwhile just somebody asking Mr. Kuhn who did you get that information from.

MR. KULWIN: I'm pretty confident.

MR. LOEVY: Could we get him here to put it on the record.

THE COURT: Can I not be involved in everything in this case? That's my request. Can you like ask him first?

MR. LOEVY: Your Honor, he told us the information on the stipulation.

THE COURT: I know. Now it's a different question. Where did you get this information from?

MR. KULWIN: Sure.

THE COURT: He probably didn't general right it on his own. Where did you get this information from so we can figure out how to deal with it.

MR. KULWIN: Okay.

THE COURT: If he won't tell you, he won't tell you, then ask him to come.

MR. KULWIN: I'm sure he'll tell us, Judge. I have no doubt.

MR. LOEVY: I guess, your Honor, what we don't want to do is the trial to end without it having been resolved.

THE COURT: I am not even seeing the light at the end

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 173 of 175 PageID #:20252
Case: 1:13-cv-01168 Document #: 285-29 Filed: 02/24/17 Page 173 of 175 PageID #:32783

of the tunnel at this point.  I am not even sure there is an end of the tunnel.  I am told there is an end of the tunnel.  There is a rumor that there is a light, but I am not seeing either one of them.

MR. KULWIN:  I can --

MR. LOEVY:  We are hopeful.  But our issue on the notes is there is original notes he had possession of them.  We want to cut off his testimony or suggestion or --

THE COURT:  What's the his?

MR. LOEVY:  Murphy.  Murphy took the notes, they're original and they're important.  That's our position.

MR. KULWIN:  A different point and the reason I am not willing to stipulate to what they proposed aside from the fact that I think it's inaccurate is maybe it's probably just me, but I don't think that this is a material issue.  I think that this is an issue for the plaintiff, they want to make a big deal of it.  There is zero evidence that the originals --

THE COURT:  There's plenty of stuff that comes into evidence that isn't critical.

MR. KULWIN:  Right.

THE COURT:  There's plenty of stuff that people stipulate to that isn't critical .  That's usually the stuff they stipulate to, the stuff that isn't critical.  I can imagine somebody coming up with, you know, some other way of dealing with this, in other words, you could come up with

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 174 of 175 PageID #:20353
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 174 of 175 PageID #:32784
12/06/16 PM       ***REALTIME UNEDITED TRANSCRIPT ONLY***

173

something that everybody agrees that a diligent search has been made for the originals of Mr. Murphy's notes and they can't be located without being attributed, that might be a possibility, they can't be located which means they aren't anywhere, but I'm not sure why you have to put it in the U.S. Attorney's Office.  But I'll say this.

Number one, I want you to collectively gather Mr. Murphy's testimony so I can see it.

MR. LOEVY:  Right.

THE COURT:  Point me to where it is.

Number two, think about the alternative I proposed or maybe another alternative.

No. 3, I can't force somebody to stipulate about something, so you need to be thinking of what plan B is.

MR. LOEVY:  What we want to do.

THE COURT:  You probably are thinking about it.  I just want you to -- you don't have to tell me.  Just be thinking about it.

MR. LOEVY:  Will do.

THE COURT:  Anything else before we go?

MR. LOEVY:  Yes.  An expert tomorrow, Mr. Murray, gave us a supplemental supplement.

THE COURT:  A supplemental supplement?

MR. LOEVY:  Yes on November 3rd, 2016.  We'll file it.  I haven't read it.  Your Honor, in fairness to the

Case: 1:23-cv-01737 Document #: 287-38 Filed: 04/06/26 Page 175 of 175 PageID #:20354
Case: 1:13-cv-01168 Document #: 1185-29 Filed: 02/24/17 Page 175 of 175 PageID #:32785

defense, we have not yet given this to them.

THE COURT: Okay. Then everybody can look at it and talk about it in the morning. Let me just skim it real quick. It's pretty short.

Okay. I guess my preference would be -- I mean, it's basically a page and a half. My preference would be that you could file something so we don't have to take time out of the jury on that. That's my preference. Do what you want to do.

MR. ART: Thanks, Judge.

THE COURT: Talk to you tomorrow. Thanks.

MR. KULWIN: Thanks, Judge.

(The trial was adjourned at 5:00 p.m. until 9:30 a.m. on December 7, 2016.)