**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JUAN HERNANDEZ and ROSENDO HERNANDEZ,<br><br>*Plaintiff,*<br><br>vs.<br><br>REYNALDO GUEVARA, GERI LYNN YANOW, as special representative of the ESTATE OF ERNEST HALVORSEN and ROBERT DEGRAFF, JOSEPH MIEDZIANOWSKI, JOEL BEMIS, ROBERT BIEBEL, and the CITY OF CHICAGO<br><br>*Defendants.* | ) | Case No. 23 CV 01737<br><br>Hon. Jeremy C. Daniel<br><br>Magistrate Heather K. McShain<br><br>JURY DEMAND |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**CITY OF CHICAGO'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .....1

LEGAL STANDARD .....1

ARGUMENT .....2

I. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' "STREET FILES" AND *BRADY* VIOLATION *MONELL* THEORIES. .....4

A. History of "street files" in the *Jones* and *Palmer* litigation. .....5

B. CPD's written policies regarding recordkeeping. .....8

C. There is no evidence Defendants failed to document, suppressed or withheld exculpatory evidence. .....9

D. There is no evidence of a widespread practice of failing to document investigative information or suppressing or withholding exculpatory evidence. .....10

II. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE TO DISCIPLINE *MONELL* THEORY. .....13

A. Shane's opinion regarding CPD's EIS is insufficient to establish that CPD had a deficient EIS resulting in a dysfunctional disciplinary system. .....14

B. Shane's opinion that CPD failed to adequately investigate allegations of misconduct is based on a coded spreadsheet created by Plaintiffs' counsel of CR files from 1981-2017 and not the adequacy of a single investigation. .....15

C. Shane's opinion that CPD's internal affairs failures contributed to a "culture of impunity" is devoid of evidentiary support. .....18

D. Shane's reliance on "several high-profile scandals" over a period of decades to conclude there was a culture of impunity within CPD is insufficient to establish Plaintiffs' *Monell* claim based upon a failure to supervise or discipline. .....19

III. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FABRICATED AND SUGGESTIVE IDENTIFICATION *MONELL* THEORIES. .....20

A. There is no evidence of a widespread practice of fabricating or suggesting eyewitness identifications. .....21

1. There is no causal connection between CPD's express written policies and Plaintiffs' alleged constitutional injuries. .....21

2. Steblay cannot identify a single fabricated or suggestive identification from the all the eyewitness identification outcomes provided to her from other cases. .....22

3. Steblay's "possible" explanations for the City's purported higher than expected identification rates do not amount to an unconstitutional practice. .....24

IV. PLAINTIFFS FAILED TO IDENTIFY EVIDENCE WHICH A JURY COULD REASONABLY CONCLUDE CITY POLICY RATHER THAN ISOLATED INDIVIDUAL ACTION WAS THE CAUSE OF A CONSTITIONAL INJURY. .....28

V. SUMMARY JUDGMENT SHOULD BE GRANTED FOR THE CITY ON THE DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* AND IDEMNIFICATION. ......................................29

# CASES


*Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006) .................................................. 20

*Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997) ................................................. passim

*Black & Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL 5156873 (N.D. Ill. Sept. 8, 2006) .... 22

*Blackmon v. Jones*, 2025 WL 869045 (7th Cir. 2025) ............................................................... 20

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022) ............................................. 27

*Bryant v. Whalen*, 759 F. Supp. 410 (N.D. Ill. 1991) ................................................................ 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 2

*Connick v. Thompson* 563 U.S. 51 (2011) ................................................................................. 18

*First Midwest Bank v. City of Chi.*, 988 F.3d 978 (7th Cir. 2021)........................................... 4, 28

*Frake v. City of Chicago*, 210 F.3d 779 (7th Cir. 2000)............................................................. 28

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017) ........................................... 19

*Green v. Whiteco Indus.*, 17 F.3d 199 (7th Cir. 1994).................................................................. 2

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015)........................................................................... 25

*Iglesias v. Guevara*, No. 19-cv-06508, 2025 WL 3171611 (N.D. Ill. Nov. 13, 2025)................. 21

*Jackson v. Marion County,* 66 F.3d 151 (7th Cir. 1995) ............................................................... 3

*Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813 (N.D. Ill. Mar. 24, 2025).................. 4, 20

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ....................................................... 5, 6, 8

*JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270 (7th Cir. 1996) ....................................... 2

*Loeffel Steel Prods. v. Delta Brands*, 372 F. Supp. 2d 1104 (N.D. Ill. 2005) ............................. 22

*McTigue v. City of Chicago*, 60 F.3d 381 (7th Cir. 1995) ............................................................. 2

*Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152 (N.D. Ill. Mar. 12, 2024) ........... 11

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ................................................................. 29

*Ovadal v. City of Madison*, 416 F.3d 531 (7th Cir. 2005) ................................................ 2, 22, 29

*Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985)..................................................... 5, 6, 7

*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987)..................................................... 5, 7, 8

*Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997)...................................................................... 27

*Rios v. Guevara*, 22 CV 3973 (N.D. Ill. Dec. 5, 2025) ................................................................ 20

*Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018)............................................. 16, 17, 28

*Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659 (7th Cir. 2005) ....................... 2

*Rossi v. City of Chicago*, 790 F.3d 729 (7th Cir. 2015)......................................................... 17, 18

*Ruiz-Cortez v. City of Chi.*, 931 F.3d 592 (7th Cir. 2019) ............................................................ 29

*Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417 (N.D. Ill. June 11, 2015)..... 3, 16

*Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990) ..................................................................... 3

*Sommerfield v. City of Chicago*, 254 F.R.D. 317 (N.D. Ill. Nov. 3, 2008) .................................. 22

*Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sep. 30, 2023)....... 23

*Wragg v. Vill. of Thornton*, 604 F.3d 464 (7th Cir. 2010) ............................................................ 3

## RULES

Fed. R. Civ. P. 56(1)(a).......................................................................................................... 2

## INTRODUCTION

This case arises out of Plaintiffs' alleged wrongful convictions for the 1997 Jorge Gonzalez murder. (Dkt. 58, ¶1). Plaintiffs allege the City caused their alleged constitutional injuries due to the City's policies, practices, customs, and the actions of policy-making officials. (*Id.* ¶¶198, 208). Plaintiffs' *Monell* claim includes the following theories: as a matter of widespread municipal policies and practices, CPD (1) routinely fabricated and manipulated identification procedures; (2) systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in "clandestine files" that were withheld from the "State's Attorney's Office and criminal defendants" resulting in "Defendants [] conceal[ing] exculpatory evidence from Plaintiff[s]"; (3) routinely used illegal tactics, including torture, physical coercion, and psychological coercion; (4) routinely failed to investigate cases in which Detectives recommended charging an innocent person; (5) operated a dysfunctional disciplinary system; (6) condoned and facilitated a code of silence; (7) failed to track and identify officers who are repeatedly accused of serious misconduct; and (8) failed to adequately train Detectives and other officers. (*Id.* ¶¶137-39, 144-46, 150-51, 153).[1] Plaintiffs retained expert witness Dr. Nancy Steblay to support theory (1); Thomas Tiderington to support theory (2); and Dr. Jon Shane to support theories (5)-(7). The *only* evidence Plaintiffs developed to support these theories comes from their expert witnesses. However, these experts have adduced no evidence to prove these allegations, much less that any resulted in a violation of Plaintiffs' constitutional rights.

## LEGAL STANDARD

A movant who shows there is no genuine dispute as to any material fact is entitled to

[1] Regarding theories (3), (4) and (8), Plaintiffs have not offered a shred of evidence, through an expert witness or otherwise, to support these theories. Therefore, summary judgment should be granted as a matter of course with respect to theories (3), (4) and (8).

summary judgment as a matter of law. Fed. R. Civ. P. 56(1)(a). While the court in evaluating a summary judgment motion construes all facts and reasonable inferences in the light most favorable to the non-moving party, only factual disputes that might affect the outcome under the governing law will preclude summary judgment. *JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 272 (7th Cir. 1996). To defeat a motion for summary judgment, Plaintiffs must offer more than a mere scintilla of evidence. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). They cannot prevail by simply resting on the pleadings or speculation and conjecture. *Id.* at 669. Plaintiffs bear the burden of proof and must affirmatively demonstrate the presence of a genuine issue of material fact that requires a trial to resolve. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the moving party does not have the ultimate burden of proof on a claim, it suffices for the movant to direct the Court to the lack of evidence as an element of that claim. *Green v. Whiteco Indus.*, 17 F.3d 199, 201 (7th Cir. 1994).

**ARGUMENT**

In Count V of Plaintiffs' First Amended Complaint, Plaintiffs seek to hold the City liable for Plaintiffs' convictions pursuant to *Monell.* (Dkt. 58, ¶¶197-208). To establish §1983 municipal liability, Plaintiffs must show (1) they suffered a deprivation of a federal right; (2) resulting from an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority; which (3) was the proximate cause of their injuries. *Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005). Municipal liability can attach three ways: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) 'a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a [*de facto* policy by] custom or usage with the force of law'; or (3) the act of a person with final policy making authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

Plaintiffs have not developed any evidence that any of the City's express policies were unconstitutional or that they were directly injured by a person with final policymaking authority. Thus, the City analyzes Plaintiffs' *Monell* claim under a "widespread practice" theory only.

The Supreme Court has cautioned that *Monell* concerns where the municipal policy itself causes plaintiff's injury, and it is not to be used to impose *respondeat superior* liability. *Bd. Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). A municipality may not be liable under §1983 because it employs a tortfeasor, rather plaintiff must identify a *specific* municipal "policy" or "custom" that caused injury. *Id.* A plaintiff asserting a *Monell* claim based on a "widespread practice" theory, must establish a pattern of similar deprivations that are so "permanent, well-settled, and widespread as to constitute custom or usage" with the force of law. *Wragg v. Vill. Thornton*, 604 F.3d 464, 468 (7th Cir. 2010). Plaintiffs must establish the specific violations relied upon as pattern evidence are genuinely attributable to a *de facto* policy rather than isolated incidents. *Jackson v. Marion Cnty.,* 66 F.3d 151, 152 (7th Cir. 1995). A custom "implies a habitual practice of a course of action that characteristically is repeated under the circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990). Demonstrating policymakers could, or should, have been aware of unlawful activity because it occurred more than once is not enough; they must demonstrate the practice was so pervasive acquiescence was apparent and amounted to a policy decision. *Id.* at 543. Even if plaintiff establishes an injury, that, alone, is insufficient to prove a *Monell* claim. *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015). Under any theory, plaintiff must demonstrate that the City was "deliberately indifferent" to the "known or obvious consequences" of the alleged policy and the existence of a direct causal link between the municipal policy and the constitutional injury. *Brown*, 520 U.S. at 400, 407.

First, the Court need not reach the merits of Plaintiffs' *Monell* claims unless Plaintiffs first establish an underlying constitutional violation. *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (a plaintiff must first prove deprivation of a federal right "*before* municipal fault, deliberate indifference, and causation come into play"). If Plaintiffs fail to establish a violation of a federal right, the City is entitled to summary judgment on the *Monell* claims. Because Plaintiffs fail to establish a constitutional violation (*see* Def. Officers' Mem. Mot. Summ. J., Guevara's Mem. Mot. Summ. J., Miedzianowski Mem. Mot. Summ. J.), Plaintiffs' claims against the City fail as a matter of law.

## I. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' "STREET FILES" AND *BRADY* VIOLATION *MONELL* THEORIES.

Plaintiffs allege the City had notice of widespread practices by officers of not recording investigative information in police reports, not maintaining proper investigative files, and not disclosing investigative materials to prosecutors and criminal defendants resulting in *Brady* violations – the "clandestine street files" theory. (Dkt. 58, ¶¶138-39, 203). Although Plaintiffs have retained Tiderington to support these theories, they failed to identify sufficient evidence to find the City had a *de facto* policy of failing to document or withholding exculpatory evidence in violation of *Brady* resulting in a violation of their constitutional rights.

Plaintiffs may attempt to make a comparison to other Guevara-related reversed-conviction cases in which the Court has denied the City's summary judgment motion with respect to the "street files" claim, including *Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813, at *35-37 (N.D. Ill. Mar. 24, 2025); *Iglesias v. Guevara*, 19-cv-6508 (dkt. 338, at 9-12); and the consolidated cases of *Solache v. City*, 18-cv-2312 and *DeLeon-Reyes v. Guevara*, 18-cv-1028 (Ex. A, 10/1/25 Tr., at 10). However, the facts in each of those cases as it pertains to the *Brady* claim are distinguishable in one important respect. Each plaintiff alleged that a specific document was withheld from them—

in *Johnson*¸ it was a lineup report (dkt. 328, at 22-23)[2]; in *Iglesias*, it was handwritten notes (dkt. 253, at 23); and in *Solache/Reyes*, it was polaroid photos (*Solache* dkt. 758, at 10). Here, Plaintiffs have not identified any document that was created and withheld by Defendant Officers. Rather, their "street files" claim is based on an alleged failure to document. Further, while the Court in *Johnson* noted that the *Jones* and *Palmer* litigation "made the City aware that its dual file or street file system was either leading to the suppression of evidence or created a significant risk of suppression of evidence," 2025 WL 903813, at *37, the practice of maintaining multiple files could not, at least in the present case, have caused officers to not document investigative steps.

### A. History of "street files" in the *Jones* and *Palmer* litigation.

Because Plaintiffs and their expert purport to draw a similarity between speculative claims that they did not receive information and the file in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), as well as Seventh Circuit's subsequent decisions in *Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ("*Palmer I*") and *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987) ("*Palmer II"*), a brief background is necessary.

In *Jones*, a case about a 1981 prosecution, plaintiff alleged CPD officers withheld exculpatory evidence in a "street file." *Jones*, 865 F.2d at 995. He discovered that during the investigation, detective Frank Laverty uncovered problems with the victim's identification of Jones, which he documented in a memorandum and placed into a file, termed a "street file," that contained detectives' notes. *Id.* at 989-90. At the time of Jones's prosecution, notes were not labeled, as they are now, with a Records Division ("RD") number unique to each investigation. *Palmer I*, 755 F.2d at 566. Instead, CPD required detectives to document all pertinent information for an investigation in case or supplementary reports. *Id.* Pursuant to that policy, Laverty also

---

[2] Here, the criminal defense attorney was present for the lineup procedures. (*See* Def. Officers' 56.1 ¶50).

memorialized the exculpatory information in a supplementary report. *Jones*, 856 F.2d at 991. That report, however, was rewritten by another detective, excluding the exculpatory information. *Id.* Thus, because of the other detective's wrongdoing, the documented evidence only existed in the "street file," which was not disclosed to Jones. *Id.* at 996.

In analyzing the City's liability, the Seventh Circuit found the policy at issue was the maintenance of "street files." *Id.* at 995. The Court found because CPD maintained detective notes and memoranda *without an RD number* and Laverty's supplementary report was destroyed, CPD's record keeping practices left a source of exculpatory information unavailable to Jones. *Id.* at 995. The Court held there was sufficient evidence for the jury to conclude the policy of maintaining "street files" created the *opportunity* for the constitutional violation to occur. *Id.* at 995-96. Critically, and contrary to Plaintiffs' assertions here, the Court did not find CPD's practice of maintaining "street files" was designed to secrete exculpatory information. To the contrary, Laverty intended the exculpatory evidence to be known – that is why he documented it, both in his memorandum and in a supplementary report. *Id.* at 991.

In 1982, due to *Jones*, the *Palmer* plaintiffs brought a class action against the City challenging the constitutionality of CPD's alleged practice of concealing exculpatory material in criminal investigations and lodged in the department's informal "street files." *Palmer I*, 755 F.2d at 564-65. Plaintiffs sought a preliminary injunction to (a) prevent defendants from continuing their alleged practice of withholding exculpatory evidence in "street files;" and (b) preserve all existing "street files." *Id.* at 566. While the District Court granted the preliminary injunction, the Seventh Circuit overruled, warning that "the Federal courts have no business whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's Office, *absent a clear and defined constitutional violation*." *Id.* at

562, 578 (emphasis added). The Court found neither class of plaintiffs, those convicted of a felony (subclass A) or those awaiting trial for felony charges in Cook County Circuit Court (subclass B), presented any evidence of an actual constitutional violation. *Id.* at 571. Still, to address the class plaintiffs' claim that they could not establish a constitutional violation if the evidence was in CPD's hands, the *Palmer I* Court granted plaintiffs' request to preserve all "street files" for the subclass A plaintiffs, *Id*. at 572, who were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II*, 806 F.2d at 1317. Notwithstanding their search of each file, they did not uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any").

Nevertheless, class counsel filed a petition for §1988 attorneys' fees. *Palmer II*, 806 F.2d at 1316. The District Court granted the petition, but the Seventh Circuit again reversed, emphasizing the class-plaintiffs did not prevail. *Id.* at 1321, 24. While recognizing the District Court initially granted the injunction, the Seventh Circuit explained "this court threw it out," clarifying that plaintiffs only success was to obtain a discovery order directing the City to retain its "street files" so convicted class members could inspect them for exculpatory information. *Id.* at 1320-21. The Court observed, however, that such an order "is worthless if discovery turns up nothing; indeed, it is worse than worthless because then the party has incurred an expense without obtaining any benefit from it," making clear that despite reviewing each file, plaintiffs could not find anything to substantiate their allegations, stating "they went on a fishing expedition, and the pond was empty." *Id.*

Here, there is no evidence that any documents were withheld from Plaintiffs. The Investigative File relating to the Gonzalez murder was in the CCSAO's possession. (SOF ¶87). The CCSAO inventory of discovery identifies all the investigative material tendered to the defense.

(*Id.*). Plaintiffs developed no evidence that a widespread "street files" practice resulting in concealed material exculpatory evidence persisted after 1983.

**B. CPD's written policies regarding recordkeeping.**

CPD revised its recordkeeping practices in the early 1980s. (SOF ¶¶5-14); *Jones*, 856 F.2d at 991, 995-96; *Palmer II*, 806 F.2d at 1316, 1324. In 1983, CPD issued Detective Division Special Order 83-1 ("S.O. 83-1"), making clear its policy to "conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised...." (*Id.* ¶10). S.O. 83-1 mandated "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved." (*Id.*). S.O. 83-1 defined the Investigative File as a "criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated or received by any detective during the course of such investigation" and instructed that it "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney, and the assigned Department members with a comprehensive account of the subject criminal case." (*Id.* ¶11).

CPD also created a new note-taking practice—General Progress Reports ("GPRs")—that are preprinted forms used to record detectives' "handwritten notes and memoranda including inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation." (*Id.* ¶12). Each GPR has a designated place for the RD number, such that all handwritten notes for any investigation are

tracked together. (*Id.*). Per S.O. 83-1, GPRs are maintained in the Investigative File. (*Id.* ¶¶12, 25). Original copies of the case and supplementary reports (signed in ink) are maintained in the RD file also often referred to as the "permanent retention file." For homicides, both files are maintained permanently.

**C. There is no evidence Defendants failed to document, suppressed or withheld exculpatory evidence.**

Plaintiffs allege Defendants failed to document, suppressed or withheld the following in violation of *Brady*: (1) evidence of alternate suspects; (2) Violante's eyewitness description; (3) evidence of Plaintiffs' alibis; and (4) Defendant Officers' misconduct, including that they manufactured identifications and engaged in a criminal conspiracy to traffic narcotics.[3] (*See* Def. Officers' Mem. Mot. Summ. J., Guevara's Mem. Mot. Summ. J., Miedzianowski Mem. Mot. Summ. J.). Additionally, Tiderington opines that Defendant Officers failed to document investigative information pertaining to: (1) Guevara's pattern and practice of misconduct; (2) Miedzianowski's and Guevara's widespread criminal conspiracy; (3) handwritten interview notes of an anonymous call; (4) handwritten interview notes with Maniac Latin Disciples; (5) contemporaneous notes of Guevara's and Halvorsen's interactions with eyewitnesses; (6) other investigative steps taken by detectives; and (7) interview notes of Plaintiffs or alibi witnesses. (SOF ¶ 54). First, Plaintiffs failed to establish that Defendant Officers failed to document exculpatory information. (*See* Def. Officers' Mem. Mot. Summ. J., Guevara's Mem. Mot. Summ. J., Miedzianowski Mem. Mot. Summ. J.). Second, Tiderington admits that his opinion that any GPRs and/or notes that were created but not turned over was "speculation." (SOF ¶55). Accordingly, Plaintiffs cannot show any of these materials existed and were withheld or destroyed

---

[3] In response to Defendant Officers' discovery requests, Plaintiffs also refer generally to "notes," "physical evidence," "reports" and "other records," with no specificity. (*See* Def. Officers' Mem. Mot. Summ. J.)

and therefore, lack evidence to support their *Brady* theories resulting from the City's alleged "street files" practice.

**D. There is no evidence of a widespread practice of failing to document investigative information or suppressing or withholding exculpatory evidence.**

Plaintiffs' recordkeeping practices and report writing *Monell* theory rests on Tiderington, who should be barred. (*See* Mot. Bar Tiderington).[4] Even with Tiderington, this theory fails because his opinions do not establish a policy and practice of maintaining and concealing exculpatory evidence. He never identified any "clandestine street file" in this case (or any other) and his opinions regarding the City's report writing are speculation. Tiderington lodges criticisms against CPD record keeping in general but fails to tie any to a widespread practice of withholding exculpatory evidence. Plaintiffs never developed evidence to establish a causal link between their alleged constitutional violations and this theory or evidence that the City was deliberately indifferent to such a practice. *Brown,* 520 U.S. at 400.

Tiderington has two global criticisms: CPD routinely failed to (1) document information, and (2) disclose the documents and information learned (SOF ¶31),[5] relying on the accuracy of two spreadsheets (Atts. E & F) created by Plaintiffs' legal team based on information gathered from investigative and RD files ("homicide files") from 1991-1998 Area 5 homicide investigations and a small subset of criminal defense files. (*Id.* ¶¶33-34). Tiderington admits he was not involved in the spreadsheets' creation, including deciding how to categorize or code entries, rendering any conclusions he draws devoid of evidentiary meaning. (*Id.* ¶¶34, 36). Nor does he have any expertise in statistical analysis. (*See* Mot. Bar Tiderington). And while Plaintiffs provided him the

---

[4] Tiderington provided opinions on the *Monell* claim, as well as the police investigation in 17 other Guevara cases. (SOF ¶30). His *Monell* opinions in all the cases are the same, and he has provided deposition testimony in each of the cases. (*Id.*). Any reference to "report" herein refers to his *Hernandez* report.

[5] The Report does not assess policies and practices on photo arrays/lineups, thus Plaintiffs forfeit the argument. (*Id.* ¶32).

files from the spreadsheets, he did not review them, opting instead to "spot-check" them. (*Id.* ¶¶34, 36, 41). Despite this, Tiderington relied on Plaintiffs' spreadsheets and his haphazard review of the files to claim CPD routinely did not disclose documents from investigative files. Yet Tiderington conceded investigative files *are* formal files that *are* turned over by CPD. (SOF ¶61). Critically, he did not identify any investigative files of the 475 files (1991-1995) and 344 files (1995-1998) that were completely missing from a criminal defense file (other than from files he eliminated from his analysis because they were incomplete) (*Id.* ¶¶62, 65), dooming Plaintiffs' claims regarding the systemic suppression of "clandestine street files."

Tiderington's opinion also fails to establish a practice of withholding exculpatory evidence because he never reviewed the corresponding CCSAO files. (SOF ¶49). In affirming the district court's grant of detectives' summary judgment on plaintiff's *Brady* claim, the Seventh Circuit explained that *Brady's* disclosure obligations rests primarily with the prosecution. *Mims v. City of Chicago*, 155 F.4th 970, 975 (7th Cir. 2025). "Put another way, a criminal defendant generally cannot establish a *Brady* violation by pointing to a police failure to disclose exculpatory evidence if the prosecutor was aware of that evidence or obtained it from another source." *Id.* Further, "a criminal defendant [ ] who later becomes a plaintiff in a civil suit under §1983 faces an additional hurdle when seeking damages for a *Brady*-based due process violation by a police officer" because "negligent conduct does not offend the Due Process Clause." *Id.* Therefore, it is necessary to know what documents the CCSAO possessed to determine if the police withheld any documents. Yet Tiderington concedes, despite knowing of the availability of CCSAO files since his deposition in *Solache/Reyes* in 2022, he has *never* reviewed any CCSAO files to determine if any of the materials he claims were not in the CCPDO files were, nevertheless, contained in those files. (SOF

¶49). Thus, Tiderington is missing a link in the chain because without evaluating the CCSAO files, he cannot establish CPD withheld documents.

Tiderington's opinion also fails to establish exculpatory materials were withheld as a widespread practice because his opinions are derived from only 64 CCPDO files associated with the 1995-1998 homicide files (none were obtained from 1991-1995), of which he only reviewed ten. (SOF ¶¶48, 70-71). His review is insufficient to draw any reliable conclusions. If there was any doubt, to obtain a large number of files in discovery in *Solache/Reyes*, plaintiffs retained Dr. Allison Harris, who opined a much greater number of files are necessary to draw conclusions about CPD practices. (*Reyes v. Guevara*, 18 cv 1025, Dkt. 469, ¶¶1, 6, 12). She determined 154 CCPDO files from the 1995-1998 dataset were required to produce a statistically significant result at 99% confidence level and margin of error of 5%, and 132 files to produce a statistically significant result at 95% confidence level and 5% margin of error. (*Id.).* Tiderington reviewed less than half, proving, according to Reyes's and Solache's own expert, that his analysis was insufficient to draw any statistically significant result.

For his "failure to document" opinion, the relevant claim against Defendant Officers, Tiderington cites *Jones* and other examples he claims he found while spot-checking the spreadsheet, but regarding the "other examples," he explained "the police report would attribute statements to a witness but then there were no notes" (SOF ¶¶50-51), thereby acknowledging the statements were, in fact, documented. And, as explained, *Jones* is not an example of failure to document and regardless is too remote (1981) to establish a *Monell* practice in 1997. *Velez v. City of Chicago,* No. 18-cv-8144, 2023 WL 6388231, at *23 (N.D. Ill. Sept. 30, 2023); *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1148-50 (N.D. Ill. 2022) (reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim). And

Tiderington gives 8 RD numbers as so-called examples in a section titled "Missing or Incomplete Inventory Sheets" but that section does not address missing documentation at all. (SOF ¶52). Rather, it purports to identify files with inventory sheets that do not appear to be contemporaneously updated, contain illegible or no dates at all, do not identity the person who entered the document on the sheet or has vague entries. (*Id.*). Tiderington concedes handwritten notes in the file not written on GPRs do not constitute a constitutional violation, and this criticism was limited to whether CPD's policies that handwritten notes should be taken on GPRs were being followed. (*Id.* ¶59). Further, he claims the spreadsheets confirm his opinion that officers regularly failed to document information, but he cannot possibly have done any analysis of the spreadsheets himself. (*Id.* ¶51). And the spreadsheets do not even purport to tally instances of a "failure to document." (*Id.* ¶35). In short, none of the report's data supports his conclusion of a routine failure to document. (*Id.* ¶56).

Lastly, Tiderington's opinions fall short of establishing the requisite notice and causation. Plaintiffs' burden is to present evidence that proves the City was deliberately indifferent to the constitutional rights of the criminal defendants. *See Brown*, 520 U.S. at 411. If Plaintiffs cannot establish evidence of one constitutional violation, and Tiderington provides none, they fall woefully short of proving a *pattern* of violations necessary to establish their widespread practice claims. *Thomas v. Cook Cnt. Sherrif's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009) (no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, it is clear "it must be more than one instance, or even three").

## II. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FAILURE TO DISCIPLINE *MONELL* THEORY.

Plaintiffs, relying entirely on Shane, allege that their constitutional injuries were caused by CPD's "dysfunctional disciplinary system" and failure to supervise and discipline CPD officers

who engaged in investigative misconduct. (Dkt. 58, ¶146). Shane opines generally that CPD "failed to properly conduct investigations of police misconduct in accordance with nationally accepted standards, and that their failure would be expected to contribute to police officers [] engaging in practices that are outside the scope of accepted industry standards." (SOF ¶88). Specifically, Shane opines that from 1985 to 2001 1) CPD did not have an early intervention system ("EIS") that effectively identified patterns of misconduct and prevented the misconduct from recurring; 2) CPD failed to adequately investigate allegations of misconduct, preventing officers from being held accountable for their misconduct; 3) CPD's internal affairs failures (opinions 1 and 2) contributed to a culture of impunity; and 4) several high-profile scandals over a period of decades reflect that a culture of impunity existed within CPD. (*Id.* ¶¶89, 93, 101, 109). Shane's opinions should be barred. (*See* Mot. Bar Shane). But, even if the Court permits Shane to testify, Plaintiffs' claim still fails because he does not establish the City had a widespread practice of failing to supervise or discipline.

### A. Shane's opinion regarding CPD's EIS is insufficient to establish that CPD had a deficient EIS resulting in a dysfunctional disciplinary system.

Shane opines CPD lacked any meaningful EIS capable of identifying patterns of misconduct and preventing it from recurring, consistent with national standards and generally accepted police practices from 1985 to 2001. (SOF ¶89). But, according to the City's rebuttal expert, Ian Adams, Shane's opinions rest on two premises the evidence does not support: (1) early intervention systems were standard practice during 1985-2001, and (2) such systems, if implemented, would have prevented the misconduct at issue. (*Id.* ¶92).

The historical record indicates that early intervention systems were nascent, experimental and unproven during 1985-2001. (*Id.* ¶188). In fact, in 1999, only 27% of law enforcement agencies had an EIS, half of which had been created since 1994, and only 56% of agencies with

500-999 sworn officers had or planned to have an EIS. (*Id.*). Moreover, the effectiveness of an EIS on reducing citizen complaints remains unproven, in part, because even as of 2025, no consensus exists on the proper indicators and associated thresholds. (*Id.* ¶190). Shane's opinion also assumes a complaint-based EIS would have reliably identified the officers in this case before their most serious misconduct occurred, which is not necessarily true. (*Id.* ¶91). And even if complaint-based indicators could identify at-risk officers, the empirical evidence does not demonstrate that EIS would produce measurable reductions in misconduct. (*Id.* ¶190). In fact, Shane concedes that while the goal of EIS is to predict future misconduct, he is unaware of any scientific support that any particular datapoints ensure EIS's predictive quality. (*Id.* ¶90). Thus, Plaintiffs cannot establish that CPD had a deficient EIS resulting in a dysfunctional disciplinary system based on a practice that was only beginning to be adopted by *some* agencies in the late 1990s and 2000s, that failed in its earliest implementations and whose effectiveness remains unestablished. (*Id.* ¶92).

**B. Shane's opinion that CPD failed to adequately investigate allegations of misconduct is based on a coded spreadsheet created by Plaintiffs' counsel of CR files from 1981-2017 and not the adequacy of a single investigation.**

Shane's opinion that from 1985-2001, CPD did not adequately investigate allegations of misconduct is based on his review of a spreadsheet, compiled by Plaintiffs' counsel, of 1,663 Complaint Register (CR) files from a "cross section of CPD internal affairs records" ranging from 1981-2017 and does not differentiate between CRs initiated prior to Plaintiffs' 1997 arrests and those initiated after. (SOF ¶¶93, 94, 99). First, Shane's reliance on a spreadsheet that aggregates data coded by Plaintiffs' counsel from CR files that span a thirty-six-year period of time which includes hundreds of CRs initiated decades before (1981) and decades after (2017) Plaintiffs' arrests are too remote to establish a practice pursuant to *Monell*. *Velez,* 2023 WL 6388231, at *23;

see *also Brown*, 633 F. Supp. 3d at 1148, 1150.[6] Shane's failure to differentiate between CRs initiated long before or after Plaintiffs' 1997 arrests render any conclusions he draws immaterial to City policies in 1997. Moreover, even if the dataset was not too remote, Shane sets forth no standards to ensure the dataset he relied upon was statistically significant. (SOF ¶97). From 1981-2017 there were 281,489[7] total CR files initiated against police officers within the CPD. (SOF ¶98). Not only does Shane fail to ensure his sample was statistically significant but, based on Dr. Harris' standards, Shane's review is insufficient to establish the City's practices. (*Reyes*, Dkt. 469, at ¶¶10-13).

Further, his Report is devoid of any analysis that draws the conclusion that misconduct occurred and went unaddressed. (SOF ¶100). In fact, Shane admitted he did not conduct an individual review of the 1,663 CR files that comprised the dataset to determine the adequacy of those investigations. (*Id.* ¶95-96). Shane's conclusion regarding purported deficiencies in the CR investigations, drawn solely from the coded spreadsheet, does not create a genuine issue of fact that officer misconduct was so widespread across CPD that it amounted to a *de facto* policy of failing to discipline. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1071 (N.D. Ill. 2018) (granting summary judgment on failure to discipline *Monell* theory where expert offered no sufficient methodological basis that an officer engaged in misconduct, the City failed to discipline in response to complaints, or misconduct about which City officials knew); *Saucedo*, 2015 WL 3643417, at *4 (statistics on CRs filed against a particular officer without any evidence those investigations were faulty, flawed, or unfair is "insufficient to support a *Monell* claim"); *Bryant v. Whalen*, 759 F. Supp. 410, 424 (N.D. Ill. 1991) (evidence of unsustained complaints, without

[6] Shane renders no opinions in his 119-page report that criticizes the City's written policies on discipline. (SOF ¶88).
[7] This number excludes data from 2011-2015, as the corresponding reports are not publicly available.

evidence those complaints had merit, insufficient to establish municipal liability). Given Shane could not say a single outcome was wrong, his opinion does not support that there was a dysfunctional disciplinary system. "Typically, experts in this area offer an analysis of the CR files they have reviewed and why they think the investigator erred." *Rivera*, 319 F. Supp. 3d at 1070 (N.D. Ill. 2018). In fact, a review of Defendant Officers' CRs show by the time of Plaintiffs' arrests in July 1997, Defendant Guevara had 13 CRs initiated against him (3 sustained); Defendant Halvorsen 1 CR; Defendant DeGraff had 12 CRs (2 sustained); Defendant Miedzianowski had 17 CRs (2 sustained); Defendant Bemis had 25 CRs (2 sustained); and Defendant Biebel had 3 CRs. (SOF ¶¶114, 116-130). Shane's failure to compare officer disciplinary histories in any way before Plaintiffs' 1997 arrests, does not support Shane's conclusion that CPD "knew or should have known that misconduct allegations were accruing [against Defendant Officers]." (*Id.* ¶¶91, 99).

Finally, a myopic focus on Defendant Officers' alleged conduct would impermissibly conflate their conduct with whether a genuine widespread practice existed within CPD in 1997. This would run afoul of the Supreme Court's admonition that courts should not convert *Monell* claims into *respondeat superior* liability. *Brown*, 520 U.S. at 403. As the Seventh Circuit commented, "[T]he gravamen [of a *Monell* claim] is not individual misconduct by police officers…but *widespread practice* that permeates a critical mass of an institutional body." *Rivera*, 319 F. Supp. 3d at 1071. "In other words, *Monell* claims focus on institutional behavior." *Rossi*, 790 F.3d at 737. A limited focus on CR files of Defendant Officers defeats Plaintiffs' claim because "a practice may not be widespread if it took place two, three or four other times." *Black v. City of Chicago*, 18-cv-6518, 2022 WL 425586, at *5 (N.D. Ill. Feb. 11, 2022). Although "there is no clear consensus as to how frequently [conduct] must occur to impose *Monell* liability," a plaintiff still must demonstrate "that there is a policy at issue rather than a random event." *Thomas*,

604 F.3d at 303. The alleged misconduct must go beyond "individual misconduct by police officers (that is covered elsewhere under § 1983) [to] a *widespread practice* that permeates a critical mass of an institutional body." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (emphasis in original); *Bryant*, 759 F. Supp. at 412 ("Statistics of unsustained complaints of excessive force, without any evidence that those complaints had merit, will simply not suffice to establish municipal liability under § 1983"). Plaintiffs thus fall short of their burden to demonstrate a widespread practice of failing to discipline CPD officers that amounts to a *de facto* policy. *Connick v. Thompson* 563 U.S. 51, 61 (2011).

### C. Shane's opinion that CPD's internal affairs failures contributed to a "culture of impunity" is devoid of evidentiary support.

Shane describes "a culture of impunity" as "an organizational environment where misconduct by personnel is tolerated, ignored, or insufficiently addressed, thereby allowing adverse behavior to persist without meaningful consequences" but does not support it. (SOF ¶102). At his deposition, Shane testified that a "culture of impunity" is a culture that pervades the organization leading officers to believe they can get away with adverse behavior because 1) supervisors are "not going to look;" 2) the community is apathetic and not going to report it; or 3) substandard investigations are going to allow them to get away with it. (*Id.* ¶103). But Shane concedes that deficient internal affairs investigations do not necessarily lead to what he describes as a "culture of impunity" and he could not identify any research to support this conclusion. (*Id.* ¶105). And his report does not discuss supervisors "not going to look" or community apathy. (*Id.* ¶104). Finally, Shane admits that the variables he created and used to code the data from the CR files was designed to measure "culture of impunity." (*Id.* ¶107). Thus, Shane's "culture of impunity" depends entirely on the evidentiary foundations of Opinions 1 and 2, for which the data and methodology is unreliable. (*See* Mot. Bar Shane). Additionally, "culture of impunity" is an

interpretative conclusion, rather than empirical finding. Shane conceded that he could not identify, and does not, in his report, cite to any studies that support his conclusions that the variables he used to code the data from the CR files measure a "culture of impunity." (*Id.* ¶107). Furthermore, Shane provides no analysis of alternative explanations for the patterns he claims to observe. (*Id.* ¶108). Whether an expert has adequately accounted for obvious alternative explanations is relevant to determining whether the expert testimony is sufficiently reliable to be considered by the trier of fact. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 787 (7th Cir. 2017) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment). For instance, his opinion regarding the alleged bias against externally initiated complaints fails to consider that internal complaints come with officer-witness testimony and documentation unavailable for external complaints, internal complaints are pre-screened by supervisors who already believe misconduct occurred, the allegation category composition differs between internal and external complaints, and external complaints face inherent evidentiary challenges. (SOF ¶108).

### D. Shane's reliance on "several high-profile scandals" over a period of decades to conclude there was a culture of impunity within CPD is insufficient to establish Plaintiffs' *Monell* claim based upon a failure to supervise or discipline.

Lastly, Shane opines that from 1985-2001, the repeated high-profile scandals over the decades reflect that a culture of impunity within CPD. (SOF ¶109). He further opines, without citation to any evidentiary support, that unnamed City officials and CPD leadership have been aware of these problems, "yet meaningful reforms have been slow, ineffective, or entirely absent." (*Id.* ¶110). Shane relies upon a series of incidents from the 1970s to the present, which he concedes he identified in large part from conversations with Plaintiffs' counsel, the substance of which he was instructed not to divulge. (*Id.* ¶¶111-112). *Velez,* 2023 WL 6388231, at *23; s*ee also Brown*, 633 F. Supp. 3d at 1148, 1150 (noting that reports concerning events substantially before or after

the events at issue were "immaterial" to *Monell* claim analysis). Moreover, Shane fails to perform any analysis that permits him to generalize from the most extreme cases to department-wide conclusions about organizational culture (SOF ¶113), and therefore, his opinions cannot be used to establish that the "high-profile scandals" detailed in this portion of his report caused Plaintiffs' constitutional violations.

## III. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FABRICATED AND SUGGESTIVE IDENTIFICATION *MONELL* THEORIES.

In Count V, Plaintiffs allege that the City violated their due process rights due to an alleged widespread practice and custom of fabricating eyewitness identifications and obtaining eyewitness identifications using manipulated photographic or live lineup procedures. (Dkt. 58, ¶201). Plaintiffs have failed to identify sufficient evidence for a reasonable jury to find that the City had a *de facto* policy of fabricating eyewitness identifications or using unduly suggestive identification procedures in 1997. In the analogous Guevara-related reversed-conviction case of *Johnson v. Guevara, et al.*, this same District held that § 1983 claims based on unduly suggestive identification procedures are not actionable. *Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813, at *35 (N.D. Ill. Mar. 24, 2025); *Blackmon v. Jones*, 2025 WL 869045, at *2 (7th Cir. 2025); *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006)). Thus, the Court held that because plaintiff's argument regarding this widespread practice relies on unduly suggestive identification procedures being actionable under § 1983, it fails as a matter of law. *Id.* Similarly, in another Guevara-related reversed-conviction case, *Rios v. Guevara*, this Court, in ruling on defendants' motion to reconsider summary judgment, found that plaintiff's claim that Guevara violated his 14th Amendment rights by using coercive and suggestive identification procedures "is exactly the type of claim barred by *Blackmon*." Dkt. 243, *Rios v. Guevara*, 22 CV 3973, at 4 (N.D. Ill. Dec. 5, 2025) (relying on *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025). And in another Guevara-

related reversed-conviction case, *Iglesias v. Guevara*, the Court granted summary judgment in favor of defendant officers on plaintiff's unduly suggestive identification claim, finding defendants were entitled to qualified immunity. *Iglesias v. Guevara*, No. 19-cv-06508, 2025 WL 3171611, at *10-11 (N.D. Ill. Nov. 13, 2025). The City is entitled to summary judgment on Plaintiff's *Monell* theory based on the City's eyewitness identification procedures. Regardless, there is no evidence to support Plaintiffs' claim that the eyewitness identifications were unduly suggestive or fabricated in this case, as Defendants demonstrate. (*See* Def. Officers' Mem. Mot. Summ. J; Guevara's Mem. Mot. Summ. J.; Miedzianowski Mem. Mot. Summ. J.).

### A. There is no evidence of a widespread practice of fabricating or suggesting eyewitness identifications.

Plaintiffs cannot demonstrate that the City had notice of a widespread practice of fabricating eyewitness identifications or using unduly suggestive identifications procedures.

#### 1. There is no causal connection between CPD's express written policies and Plaintiffs' alleged constitutional injuries.

To start, CPD's written policy required detectives during investigations to "preserve and record information and materials obtained, including that which might aid in the defense of the accused." (SOF ¶21). This policy of thoroughly and accurately documenting their investigation steps in a homicide investigation was communicated to detectives during the relevant time frame. (*Id.* ¶20). Additionally, CPD detectives were trained in identification procedures, including photo identifications, show ups, and lineups, and CPD had a policy mandating that when a lineup was conducted, a supplementary report was to be completed. (*Id.* ¶¶15-16). General Order 88-18 stated that "whenever possible [lineups] should consist of at least five persons" if there is only one suspect, and all subjects of a lineup "should generally be the same height and weight and should have similar hair and skin color." (*Id.* ¶16). Under CPD policy, completed lineup supplementary

reports are included in the Records Division file. (*Id.* ¶18). Plaintiffs have not shown how CPD's written policies about eyewitness identification procedures were "the proximate cause of his injury." *Ovadal,* 416 F.3d at 535.

**2. Steblay cannot identify a single fabricated or suggestive identification from the all the eyewitness identification outcomes provided to her from other cases.**

Plaintiffs' identification theories rest entirely on their disclosed eyewitness identification procedures expert, Nancy Steblay, Ph.D. (SOF ¶131), who the City argues should be barred. (*See* Mot. Bar Steblay). However, should the Court permit Steblay to testify, Plaintiffs' claim still fails because Steblay's opinions do not establish a policy and practice of improperly fabricating eyewitness identifications or using unduly suggestive identification procedures.

Steblay did not provide a report specific to the present case. Rather, Steblay provided a letter stating that her opinions for this case adopted in whole her expert reports disclosed in *Sierra v. Guevara*, *Iglesias v. Guevara*, and *Johnson v. Guevara*, including all of their data and attachments. (SOF ¶132). In those cases, Plaintiffs' law firm[8] provided Steblay with spreadsheets that purportedly document eyewitness identification outcomes from Chicago identification procedures reported in homicide files from 1989 to 2005 that Steblay relied on to determine the purported rate of eyewitness identifications that were positive for the suspect. (*Id.* ¶¶134, 141). Four of the datasets Steblay included in her reports include the year 1997. (*Id.* ¶141). The positive identification rate she reported for those datasets ranged from 55% to 70%. (*Id.* ¶141). Because

---

[8] "Where an expert based [his] opinion on information supplied by another, the [courts] must focus on the reliability of the expert's foundation." *Black & Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL 5156873 at *1 (N.D. Ill. Sept. 8, 2006)). Expert opinions based on facts and material prepared by the party's lawyer are not reliable. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. Nov. 3, 2008) ("This conclusion follows from a number of separate but related principles, perhaps the most critical of which is the partisan role lawyers play in our adversary system.").

Steblay did not prepare a report specific to this case, Plaintiffs provided no evidence as to what positive identification rate applies to purportedly establish a policy in this case.

While Steblay concluded that the rate of positive identifications was higher than expected, she did not conclude in any of her reports the existence of *any* evidence of any lineup coercion, manipulation, or outright falsification. (*Id.* ¶¶171-75). Indeed, Steblay failed to identify even one instance of a fabricated lineup identification. (*Id.* ¶171) ("There's no way to know that [any of the eyewitness identifications were fabricated[9]] from my data set"). Nor do any of her reports identify any instance of a lineup that is unconstitutionally suggestive. (*Id.* ¶177). In fact, Steblay testified that she did not and could not identify any instance where the witness was steered to the suspect in an identification procedure. (*Id.* ¶164) ("I didn't look at the files in order to identify specific cases, no."). Steblay did not evaluate whether any witnesses had been intentionally manipulated by the police, or that any suspect identifications made were not based on the witnesses' true memory. (*Id.* ¶173). Nor did Steblay look in the court record to see if any of the CPD lineups were challenged as suggestive. (*Id.* ¶177). Instead, she opines only that the rate of suspect identifications for CPD[10] is higher than what would be expected based on aggregated data collected from 11 field studies, which was 41%. (*Id.* ¶141). While a debate about suspect identification rates may be an interesting topic for further academic research and discussion, it is not evidence from which a

[9] In fact, Judge Chang recently determined in another *Monell* alleged eyewitness fabrication case involving Steblay that her opinions were not relevant to fabrication. *Velez,* 2023 WL 6388231, at *23 n.10 ("Because this case involves fabrication claims (not suggestive identification), Dr. Nancy Steblay's expert report is not probative for summary judgment purposes. The Court does not rely on Dr. Steblay's report for summary judgment analysis and thus need not address the City's challenge to Dr. Steblay's opinion.").

[10] Because Steblay relies on her report in other cases for the present case, it is unclear which dataset, and consequently which percentage of suspect identifications, Plaintiffs are claiming apply to this case. For instance, her most recent report in *Johnson* includes datasets from (1) *Velez*, which she purports resulted in a 55% suspect identification rate for homicide files from 1996-2000; (2) *Rivera*, which she purports resulted in a 55% suspect identification rate for homicide files from 1995-1997; (3) *Rodriguez*, which she purports resulted in a 70% suspect identification rate for homicide files from 1995-1998; and (4) *Iglesias*, which she purports resulted in 70% suspect identification rate for homicide files from 1989-1998. (SOF ¶141).

reasonable jury could infer that the City had a systemwide policy and practice of having CPD officers intentionally fabricate or suggest witness identifications. Notably, Steblay does *not* opine that CPD had a widespread practice of fabricating witness identifications. (*Id.* ¶171). She similarly does not opine that any identifications in the CPD datasets she was provided in other cases were false as a result of an unduly suggestive identification procedure. (*Id.* ¶173). And Plaintiffs' speculation and conjecture that CPD might have had such practices is not enough at the summary judgment stage. *Carmody v. Bd. of Tr. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("[I]nferences 'that are supported by only speculation or conjecture will not defeat a summary judgment motion.'").

**3. Steblay's "possible" explanations for the City's purported higher than expected identification rates do not amount to an unconstitutional practice.**

Steblay's other commentary also does not create a question of fact sufficient to permit Plaintiffs to proceed with a *Monell* claim against the City based on either a fabrication or suggestibility theory. Steblay opines that possible explanations for the increase in suspect identification rates for CPD are: (a) familiar (non-stranger) perpetrator identifications; (b) lineup structure, including lineup size and multiple suspects; (c) first identification vs. repeated procedures among single-suspect stranger-perpetrator lineups; (d) suggestion from lineup administrators; (e) fewer filler selections recorded; (f) lineup quality; and (g) the eyewitness has been shown a showup or single photo of the suspect prior to the lineup. (SOF ¶145). Importantly, Steblay does not opine that these factors necessarily resulted in the difference between the CPD identification rate and the identification rate from the 11 field studies she considered, but rather, that they are *possible* factors. (*Id.* ¶146).

Further, Steblay opines that factors (a) Familiar Perpetrators and (c) Repeated Identifications are "confounds," meaning that there can be "multiple explanations for an outcome,

so that the exact explanation cannot be te[st]ed apart from the other." (*Id.* ¶147). Additionally, in conducting her analysis, Steblay excluded (a) Familiar Perpetrators, (b) Multiple Suspect Identifications, and (c) Repeated Identifications from the total number of CPD lineups because those categories were not included in the field studies and adding those in here would "potentially inflat[e]…suspect identification rates." (*See* Mot. Bar Steblay). Thus, as more fully discussed in the *Daubert* Motion, because Steblay excluded factors (a)-(c) from her analysis, Plaintiffs cannot claim that these factors in any way contributed to the allegedly high rate of suspect identifications for Chicago. (*Id.*).

Regarding factor (d) Suggestion from Lineup Administrators, Steblay admits that such so-called suggestion may be unintentional, and that suggestive behavior can occur outside the awareness of the administrator and the witness. (SOF ¶160). Based on this logic, Plaintiffs seem to suggest that every eyewitness identification ever conducted where the lineup administrator knows the suspect (also known as a "non-blind" lineup) is unconstitutional, because administrators are not infallible to their unconscious behaviors. Such a finding cannot stand. *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015) ("[C]riticism of police methods does not by itself establish a constitutional violation."). Furthermore, Steblay concedes that it is possible that a witness in a non-blind lineup can make an identification based on their true memory and that all suspect identifications from a non-blind lineup are not inherently inaccurate. (SOF ¶162). Additionally, Steblay, relying on the datasets in other cases that were prepared by Plaintiffs' law firm of purported CPD identifications, assumes that every lineup was conducted by a non-blind administrator because CPD did not have a policy to administer lineups in a blind fashion (wherein the administrator does not know who the police suspect is) during the relevant time period. (*Id.* ¶161). However, she did not independently verify that the lineups in those datasets from other

cases were not all non-blind. (*Id.*). Steblay conceded that it is possible that some of the lineups in the datasets from the other cases were conducted by detectives who did not know which participant was the suspect. (*Id.*). Thus, Plaintiffs cannot claim that non-blind administrators contributed to the rate of allegedly high suspect identifications in Chicago. Finally, Steblay admitted that she did not know whether police departments used blind lineups as a matter of policy during 1989-1998. (*Id.* ¶152).

As to factor (e) Fewer Filler Selections Recorded, Steblay comments that there are far fewer instances in the datasets from the other cases where a witness identified a filler in a lineup as compared to the rate in the field studies. (*Id.* ¶165). However, that opinion is based on pure speculation. CPD's practice was to record filler identifications, which were non-identifications, as negative identifications, given that the witness failed to identify the suspect in the lineup, and thus filler identifications were included in negative identifications. (*Id.* ¶166). Despite this, Steblay speculates that there are too few negative identifications in the datasets from the other cases (when compared to the field studies) to include both categories, filler identifications and negative identifications. (*Id.* ¶167). Steblay's speculation is not evidence that the City had a widespread practice of fabricating identifications or conducting constitutionally impermissible suggestive identifications. *Carmody,* 893 F.3d at 401. As explained, Steblay cannot identify in the datasets from the other cases any fabricated eyewitness identification or one that is not based on the witness's true memory. (SOF ¶¶171, 174).

With respect to factor (f) Lineup Quality, Steblay discusses the possibility that CPD lineups are biased in favor of the witness identifying the suspect based on a study she conducted that included CPD lineups from 2004 to 2005. (*Id.* ¶169). Yet the lineups in this case were conducted in 1997. Steblay admitted in her deposition that she did not assess whether the datasets from the

other cases included any purportedly biased lineups. (*Id.* ¶170). Her opinions as to lineups conducted in 2004-2005 are not relevant here as they are too remote in time from the underlying misconduct alleged in 1997 to be relevant in establishing a pertinent practice or custom. *Velez,* 2023 WL 6388231, at *23; s*ee also Brown*, 633 F. Supp. 3d at 1148-50 (noting that reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim analysis). Certainly, she cannot conclude that there was a widespread practice in 1997 from data collected in 2004-2005.

Lastly, as to factor (g), whether any witness has shown a show-up or single photo of the suspect prior to the lineup, Steblay's opinion is irrelevant to this case. There is no evidence that show-up identification occurred in this case or that any witness was shown a single photo of Plaintiffs before the lineups, so this alleged widespread practice could not have caused Plaintiffs' constitutional rights to be violated. (*See* Def. Officers' SOF ¶¶34-46, 49-61). Steblay's opinion on this point, therefore, is irrelevant. In any event, Steblay acknowledges that it is possible to correctly identify the suspect in a show-up. (SOF ¶149).

Even if any of the above were sufficient to establish an unconstitutional practice – which none of it is – Plaintiffs still failed to adduce evidence of the requisite level of culpability to hold the City liable. In addition to evidence of the alleged widespread practice, to succeed on a *Monell* claim, Plaintiffs must establish that the City was on notice of an alleged widespread practice and was deliberately indifferent to resulting constitutional violations. *Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997) (stating that before liability can attach, the municipality must be on notice that their practices were so obviously deficient and so likely to result in constitutional injury). Plaintiffs failed to adduce any evidence that the City was on notice regarding any of the

alleged deficiencies that Steblay discusses, much less have reason to believe any would result in violation of any criminal defendant's constitutional rights.

Nor is there sufficient evidence to show deliberate indifference. Establishing deliberate indifference is a high bar. *First Midwest Bank*, 988 F.3d at 987. "Negligence or even gross negligence on the part of the municipality is not enough." *Id*. Rather, Plaintiffs must prove it was obvious that the City's action would lead to constitutional violations and that the municipality consciously disregarded them. *Id.* At most, Steblay faults the City for failing to follow the recommendations in the publication entitled "Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence" published by Wells, G.L., *et al*., which is often referred to as the "2020 White Paper" that sets forth "best practices" for lineups based on the current research and describes "pristine conditions" for lineups. (SOF ¶180). Yet, "[t]he existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000).

## IV. PLAINTIFFS FAILED TO IDENTIFY EVIDENCE WHICH A JURY COULD REASONABLY CONCLUDE CITY POLICY RATHER THAN ISOLATED INDIVIDUAL ACTION WAS THE CAUSE OF A CONSTITIONAL INJURY.

Plaintiffs have not developed evidence that a City policy, as opposed to individual action by Defendants, was the moving force of their injury based on any of their *Monell* theories. "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. Plaintiffs cannot establish that any injury they suffered was caused by City policy, and that any widespread practice "caused the [constitutional] violation, [nor that] the custom or policy [was] 'the moving force behind it.'" *Rivera*, 319 F. Supp. 3d at 1056. Plaintiffs also failed to establish a causal nexus

between their claims and an alleged City policy. Plaintiffs fault Defendants for a myriad of misconduct but developed no evidence that they were motivated by an alleged policy, developing no evidence of Defendants' motivation at all. Thus, Plaintiffs cannot prove any municipal action caused their injuries. *Ruiz-Cortez v. City of Chi*., 931 F.3d 592, 599 (7th Cir. 2019) (policy did not cause plaintiff's injury where evidence indicated officer was motivated by own decision to engage in misconduct). This absence of a causal link prevents Plaintiffs from drawing an inference the City's policies "[were] the proximate cause of his injury." *Ovadal*, 416 F.3d at 535.

Likewise, Plaintiffs cannot establish that any lack of training or supervision was the "moving force" that caused a constitutional deprivation. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016). The facts do not show that City "policymakers were aware of, and acquiesced in, a pattern of constitutional violations" which is required to hold a municipality liable for failure to train. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 397 (1989). Here, there is no evidence of a widespread practice by CPD officers of failing to disclose exculpatory information or fabricating eyewitness identifications, or a failure to supervise or discipline CPD officers, which policymakers could have been aware of and condoned. Therefore, there is no evidence of City policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct...." *Brown*, 520 U.S. at 40. Accordingly, the City is entitled to summary judgment.

## V. SUMMARY JUDGMENT SHOULD BE GRANTED FOR THE CITY ON THE DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* AND IDEMNIFICATION.

Plaintiffs bring *respondeat superior* (Count XI) and indemnification (Count II) claims against the City. Claims for *respondeat superior* and indemnity are derivative liability claims that depend on prevailing against at least one individual defendant. *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). "Because the individual defendants are entitled to summary judgment in their favor, the claims against [the City] must fail as well." *Id*. *Respondeat superior* liability is also

limited to state-law claims, so to the extent the state law claims against Defendants are dismissed, so are the *respondeat superior* claims.

The City requests this Honorable Court grant its motion for summary judgment, in full.

Dated: April 6, 2026

Respectfully Submitted,

/s/ Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Theresa Berousek Carney
Catherine M. Barber
Sabrina A. Scardamaglia
Lauren M. Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
erosen@rfclaw.com