**STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| JUAN HERNANDEZ and ROSENDO HERNANDEZ | ) ) ) | Case No. 23 CV 01737 |
| Plaintiff, | ) ) ) | Hon. Jeremy C. Daniel |
| vs. | ) ) ) | Magistrate Heather K. McShain |
| REYNALDO GUEVARA, GERI LYNN YANOW, as special representative of the ESTATE OF ERNEST HALVORSEN and ROBERT DEGRAFF, JOSEPH MIEDZIANOWSKI, JOEL BEMIS, ROBERT BIEBEL, and the CITY OF CHICAGO Defendants. | ) ) ) ) ) ) ) ) ) | JURY DEMAND |

**DEFENDANT CITY OF CHICAGO'S
LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant City of Chicago, by its undersigned attorneys, and pursuant to Local Rule 56.1(a)(3), hereby submits this Statement of Material Facts in Support of Its Motion for Summary Judgment.

**PLAINTIFFS' *MONELL* CLAIMS**

1. Plaintiffs Juan and Rosendo Hernandez's *Monell* claim includes the following theories: that as a matter of widespread municipal policies and practices, Chicago police officers (1) "routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate," (Plaintiffs' First Amended Complaint (Dkt. 58, hereinafter "Plaintiffs' FAC", at ¶ 137); (2) "systemically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, or other information," in "clandestine files" that were withheld from the "State's Attorney's Office and

criminal defendants" resulting in "the named Defendants [] conceal[ing] exculpatory evidence from Plaintiff[s]"" (*Id.* at ¶¶ 138-39); (3) "routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses," (*Id.* at ¶ 144); (4) "routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime," (*Id.* at ¶ 145); (5) "operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct," (*Id.* at ¶ 146); (6) "condoned and facilitated a code of silence within the Chicago Police Department," (*Id.* at ¶ 150); (7) "fail[ed] to track and identify officers who are repeatedly accused of serious misconduct." (*Id.* at ¶ 151) and (8) "failed … to provide adequate training to Chicago police detectives and other officers in many areas[.]" (*Id.* at ¶ 153).

2.      Plaintiffs' "street files" *Monell* theory is that CPD had a "policy and practice of suppressing exculpatory and/or impeaching material in clandestine files" and that such policy and practice "was alive and well at all relevant times, including at the Area Five Detective Division during the investigation [of the Gonzalez murder.]" (Plaintiffs FAC, Dkt. 58 at ¶¶ 140, 143).

3.      Plaintiffs' failure to discipline theory is that CPD "operated a dysfunctional disciplinary system," "almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct," and "condoned and facilitated a code of silence."  (*Id.* at ¶¶ 146, 150).

4.      Plaintiffs' eyewitness manipulation theory is that CPD "routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate." (*Id.* at ¶ 137).

2

## THE CITY'S POLICIES AND PRACTICES

### *Policies regarding the creation, maintenance and production of police report*

5.      The "R.D." number is the Records Division number, which is assigned to each case that has been referred to the detective area for investigation.  The number is assigned in a numerical sequence.  (Ex. 1, Deposition of James Hickey, *Kluppelberg v. Burge,* N.D. Ill., 13-CV-03963 (part I dated 7/29/14), at 113:16-24).

6.      The Records Division File ("RD File") would contain the General Offense Case Report, and any and all supplemental reports that are created.  This file is physically maintained in the Records Division.  This file is sometimes referred to as the "Permanent Retention File" as that stamp is affixed to each page of the file by Records Division personnel for records maintained by the Records Division that are required to be kept permanently, such as homicide files or other files that do not have a statute of limitations.  (Ex. 2, Deposition of James Hickey, *Rivera v. Guevara,* N.D. Ill, 12-CV-4428 (part II dated 6/10/14), at 189:21-190:2; 192:2-20; 194:6-7; Ex. 3, Deposition of City's Rule 30(b)(6) witness, Commander Eric Winstrom, in consolidated cases of *Solache v. Guevara,* N.D. Ill., 18-CV-2312, and *DeLeon-Reyes v. Guevara,* N.D. Ill., 18-CV-1028 (hereinafter "Solache/Reyes"), at 176:22-177:8).

7.      The RD File's historical mission was to preserve the original case report and any original supplementary reports generated with that RD number.  It was never intended to include miscellaneous police reports, such as notes (or subsequent to 1982, General Progress Reports ("GPRs")).  (Ex. 2, Hickey Dep in *Rivera* (part II dated 6/10/14), at 192:2-20; Ex. 3, Winstrom Dep in *Solache/Reyes,* at 176:22-177:8).

8.      Prior to 1982, CPD maintained what were commonly referred to as "working files" but also known as "running files" or "street files" which were manila folders which normally

3

contained photocopies of reports, criminal history statements, photographs, mugshots and memorandums requesting assistance on investigations. (Ex. 1, Hickey Dep in *Kluppelberg* (part I dated 7/29/14), at 106:3-22).

9. Detective Division Notice 82-2 ("DDN 82-2"), was issued on April 20, 1982, and formally identified the "working files, street files, running files" as "Investigative Files" and mandated their preservation. "Investigative Files" were defined as "any document or group of documents the subject of which relates to criminal incidents and which are maintained and stored under Detective Division control within a unit." DDN 82-2 did not cover documents that were not maintained or stored under the control of the Detective Division. (Ex. 4, Detective Division Notice 82-2, AR-L 4430-32, at ¶ II; Ex. 5, Deposition of James Hickey in *Rivera* (part I dated 5/6/14), at 80:19-81:10).

10. Detective Division Special Order 83-1 ("S.O. 83-1"), issued on January 13, 1983, made clear that CPD's policy was to "conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused [were] not compromised [],"(Ex. 6, S.O. 83-1, AR-L 4433-37, at ¶ III), and was "designed to institutionalize the control of all [Detective Division] violent crime field investigation documents and files, which previously may have been referred to as working files, running files, or detective's personal files and notes[]" and expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense is preserved." (Ex. 6, S.O. 83-1, at ¶ I, II).

11.     S.O. 83-1 defined the Investigative File as a "criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated or received by any detective during the course of such investigation." S.O. 83-1 instructed that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney and the assigned Department members with a comprehensive account of the subject criminal case." (Ex. 6, S.O. 83-1, at ¶ VI.A; Ex. 1, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 169:20-170:1).

12.     S.O. 83-1 mandated that the Investigative File be maintained in the "Investigative File Case Folder," specifically described as "an 8 ½" x 11" case folder complete with two (2) two-hole metal punch fasteners designed to secure all documents relating to the subject criminal case." The Investigative File is also required to contain an Investigative File Inventory Sheet that lists each document contained within the file. To standardize note taking, CPD created GPRs, which are preprinted forms that detectives use to take notes. Detectives use GPRs to document "handwritten notes and memoranda (the investigative work-product) including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation." (Ex. 6, SO 83-1, at ¶¶ IV.B, IV.D, IV.E; Ex. 1, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 170:7-9).

13.     Detective Division Special Order 83-2 ("S.O. 83-2"), issued May 2, 1983, was issued to improve on the procedures set forth in S.O. 83-1 where possible, and was specifically "designed to institutionalize the control of all violent crimes field investigation documents and files, which previously may have been referred to as Street files, working files, running files, or detectives personal files and notes." The language of S.O. 83-2 reinforced CPD's long standing, though

5

unwritten, policy that everyone has an obligation to pass on information. (Ex. 7, SO 83-2, JR-L 196560-64, at ¶ I; Ex. 1, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 233:21-234:3).

14. Detective Division Special Order 86-3 ("S.O. 86-3"), issued May 19, 1986, was issued to further clarify the directions to the Detective Division regarding the creation and maintenance of Investigative Files, mandating "periodic, unscheduled inspections of the subject files be completed to ensure compliance." (Ex. 8, S.O. 86-3, AR-L 4438-40, at ¶ VI).

### *Policies regarding identification procedures*

15. CPD detectives were trained on identification procedures, including photo identifications, show ups, and lineups. (Ex. 9, Detective Division Training Materials from 1988-1996 at bates Foster 30(b)(6) 000039-46; Ex. 10, Deposition of Lt. John Foster, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses, from multiple Guevara cases dated June 29, 2022 (hereinafter "Foster Dep"), at 160:17-21; 281:3-20; 282:13-17).

16. On September 23, 1988, CPD issued General Order ("G.O.") 88-18 regarding lineup procedures, effective the next day, September 24, 1988. (Ex. 11, G.O. 88-18 at bates Foster 30(b)(6) 000003-4). Detectives were trained, and G.O. 88-18 mandated, that when a lineup is held, a supplementary report will be completed. (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ J; Ex. 9, Training Materials at Foster 30(b)(6) 000043). G.O. 88-18 stated: "<u>In no case will a lineup be conducted without a Supplementary Report being completed</u>." (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ II.J) (emphasis in original). G.O. 88-18 also stated "whenever possible, [lineups] should consist of at least five persons" if there is only one suspect, and all subjects of a lineup "should generally be the same height and weight and should have similar hair and skin color," (*Id.* at Foster 30(b)(6) 000003, ¶ II.G), and it required that when detectives wrote a supplementary report of a lineup, it will include, among other things, "the name, rank and star number of the person

6

photographing the lineup." (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ II.J.9; Ex. 10, Foster Dep, at 311:12-15).

17.      G.O. 88-18 required that "either an evidence technician or an authorized member of the Detective Division take two photographs of any formal lineup which results in the identification of a suspect." (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ II.H) (emphasis in original).

18.      Under CPD policy, completed line up supplementary reports are included in the Records Division File. (Ex. 3, Winstrom Dep in *Solache/Reyes*, at 176:13-177:22; Ex. 12, CPD General Order 83-5, at Foster 30(b)(6) 000001-2, ¶ II.J).

19.      CPD published Standard Operating Procedures ("SOP") for the detective division in 1988, which incorporated all of the former detective division special orders. (Ex. 13, CPD Detective Division Standard Operating Procedures from 1988, RFC-Hernandez 031143-31352; Ex. 3, Winstrom Dep in *Solache/Reyes*, at 46:3-23; 122:6-25). The 1988 SOPs were in effect until 1992, and detectives were trained on the SOPs. (Ex. 3, Winstrom Dep in *Solache/Reyes*, at 124:6-9; 130:12-24).

20.      In 1992, CPD published an updated Standard Operating Procedure (the 1992 SOP), which incorporated all of the former detective division special orders. (Ex. 14, CPD Detective Division Standard Operating Procedures from 1992, RFC-Hernandez 031353-31562). The 1992 SOPs were in effect until 1998, and detectives were trained on the SOPs. (Ex. 3, Winstrom Dep in *Solache/Reyes*, at 44:5-17, 124:6-125:4; 130:12-24).

21.      The 1992 SOP required detectives to "preserve and record information and materials obtained, including that which might aid in the defense of the accused." (Ex. 14, 1992 SOPs, at RFC-Hernandez 031508 ¶18.1(B); Ex. 3, Winstrom Dep in *Solache/Reyes*, at 126:8-13). Detectives

7

were trained to thoroughly and accurately document their investigation steps in a homicide investigation. (Ex. 3, Winstrom Dep in *Solache/Reyes*, at 74:17-21).

### *Policies regarding the Complaint and Disciplinary Process*

22.     In January 1993, CPD issued G.O. 93-3 regarding "Complaint and Disciplinary Procedures." (Ex. 15, CPD General Order 93-3, at Guevara-L 031073-031166). G.O. 93-3 required all members to comply with Department Rules and Regulations, directives and orders. (*Id.* at ¶ I). G.O 93-3 further stated that "Prompt, thorough investigations will be conducted into allegations of misconduct []" and went on to set forth the rights, responsibilities and procedures for conducting investigations relative to disciplinary matters. (*Id.* at ¶¶ I, II).

23.     In 1995, when CPD's Office of Professional Standards would receive a complaint about a department member, that complaint would receive a CR number, to allow for CPD to track all complaints. (Ex. 16, Deposition of Lt. Joseph Bird, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses dated 12/22/21 (hereinafter "Bird Dep"), at 49:17-50:6). Each complaint would also be given a category code describing the allegation of misconduct. (*Id.*; Ex. 17, Complaint Category Tables AR-L 155269-155270).

24.     CPD also implemented the Summary Punishment Action Request system, otherwise known as "SPARS," which was an "effective discipline mechanism that supervisors had, that would allow for immediate correction of less serious transgressions." (Ex. 16, Bird Dep, at 132:8-19). A supervisor would take action immediately and notify the officer that the conduct that occurred was not acceptable. (Ex. 16, Bird Dep, at 132:19-21).

25.     In March 1983, CPD issued G.O. 83-3 titled "Personnel Concerns," which was in place until November 1997 (Ex. 18, CPD General Order 83-3, Guevara-L 030351-030354). This policy established the Personal Concerns Program for Department members, which sought "early

8

identification of members who engage in conduct which is contrary to the goals of the Department." (*Id.* at ¶ III).

26. G.O. 83-3 also created the "Behavioral Alert System" which sought to "identify Department members whose behavior indicates that future disciplinary or performance problems may result unless correct action [was] taken." (Ex. 18, G.O. 83-3, Guevara-L 030351-030354, ¶ V). It included seven "performance data" that CPD considered to be behavioral alert indicators, including 1) all excessive force complaints; 2) complaint and disciplinary history; 3) repeated incidents of medical roll use; 4) repeated instances of minor transgressions within a twelve month period; 5) a significant reduction in a member's performance; 6) poor Department traffic safety record; and 7) significant deviations from the member's normal behavior. (Ex. 18, G.O. 83-3, Guevara-L 030351-030354, ¶ V.B).

27. If an officer refused to comply with the Personnel Concerns program, a supervisor would initiate a CR for violation of a direct order. (Ex. 16, Bird Dep, at 130:19-25).

28. In November 1997, CPD issued G.O. 97-10 titled "Behavioral Intervention System" which introduced the Departments Behavioral Intervention System, and expanded the behavioral intervention indicators to include "two or more sustained Complaint Register Investigations within a twelve month period." (Ex. 19, General Order 97-10, Guevara-L 031265-031272, ¶ V.B.6).

## PLAINTIFFS' *MONELL* EXPERT, THOMAS TIDERINGTON

29. Plaintiffs retained Thomas Tiderington to provide opinion testimony on Plaintiffs' *Monell* claim as well as the police investigation in this case. (Ex. 20, Tiderington Report in *Juan and Rosendo Hernandez v. Guevara*, herein after "Hernandez Brothers", at p. 1).

30. Tiderington has been retained to provide opinion testimony in seventeen cases involving defendant Guevara, *Solache/Reyes, Sierra, Iglesias, Maysonet, Gomez, Johnson, Daniel*

*Rodriquez, Alfredo Gonzalez, Gecht/Kwil/Hernandez, Martinez/Kelly/Tinajero, Gamalier Rivera* and this case. (Ex. 20, Tiderington Report in *Hernandez Brothers*, at p. 1). His opinions in each of the cases with respect to each Plaintiff's *Monell* claim in each of the cases are consistent with his opinions in this case and rely upon the same materials. (*Id.*).

### Tiderington's opinions related to Plaintiffs' Monell claim

31. According to Tiderington, as it relates to Plaintiffs' *Monell* claim, he opined on the "Chicago Police Department's (CPD) policies and practices governing how information learned during homicide investigations was to be documented, stored and disclosed." (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 3). Tiderington has two global criticisms. (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 32). The first is what he describes as a routine failure to document information. (*Id.*). The second is a routine failure to disclose the documents and information learned. (*Id.*).

32. Tiderington's Report does not assess CPD's policies and practices related to photo arrays/lineups. (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 32-68).

33. Tiderington prepared a report in this case which relied on the accuracy of the spreadsheets created and provided to him by Plaintiff's counsel, Loevy & Loevy, in the *Solache/Reyes* cases and in the *Sierra* case, based on information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files") (also collectively referred to as "homicide files") from homicides that were investigated by Area 5 detectives of the Chicago Police Department ("CPD") from 1991-1998. (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 4, Attachments E and F; Ex. 21, Tiderington Dep from Solache/Reyes dated 10/6/22, 388:20-24; Ex. 22 Tiderington Dep from Sierra dated 12/8/2022, 367:12-368:1).

10

***Data provided to Tiderington by Plaintiffs' counsel***

34.       Tiderington was first provided a spreadsheet based on information gathered from the homicide files from homicides investigated by Area 5 detectives of CPD from 1995-1998 in the *Solache/Reyes* case.  (Ex. 20, Tiderington Report, p. 52 and Attachment E; Ex. 23, Tiderington Dep from *Johnson* dated 9/20/23, at 224:18-225:14; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 399:24-400:1).   He was then provided a spreadsheet based on information gathered from the homicide files from homicides investigated by Area 5 detectives of CPD from 1991-1995 in *Sierra*.  (Ex. 20, Tiderington Report, p. 52 and Attachment F; Ex. 23, Tiderington Dep from *Johnson* dated 9/20/23, 231:11-23).  Tiderington does not know exactly who or how many people worked on the spreadsheet and was not involved in the decision-making or creation of the spreadsheet.  (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 389:1-23).

35.       Both the *Solache/Reyes* spreadsheet and the *Sierra*[1] spreadsheet are attachments to Tiderington's report in this case, Attachments E and F respectively.  (Ex. 20, Tiderington Report, p. 4 and Attachments E and F).  The *Solache/Reyes* spreadsheet tallies 28 datapoints and the *Sierra* spreadsheet tallies 17 datapoints, but neither tally instances of a "failure to document." (*Id.* at Attachments E and F).

36.       Tiderington does not know how the coders determined that the inventory sheets were incomplete.  He testified that he "didn't look at 277 [files], [to determine if the inventory sheets were complete] but that's something that was spot-checked and is reflected in the spreadsheet." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 503:13-504:1; Ex.

[1] Tiderington's report erroneously refers to the 1991-1995 spreadsheet as the spreadsheet he was provided in this case when in fact it was the spreadsheet provided to him by Loevy & Loevy in the *Sierra* case which he incorporated in this report. (Ex. 20, Tiderington Report, Attachment F (title of documents reads: *Sierra v. City of Chicago, Guevara, et al.*, 1991-1995 Summary of Homicide Files).

11

20, Tiderington Report in *Hernandez Brothers*, Attachment E, column titled "Are significant documents missing from Investigative File Inventory").

37. Tiderington received the spreadsheets in "hard copy large pages," and if he received it electronically, it was only in PDF format. (Ex. 23, Tiderington Dep from *Johnson* dated 9/20/23, 234:12-24). Tiderington could not remember if he received the spreadsheets in excel format, but he stated he did not manipulate the data and he did not do his own calculation. (Ex. 24, Tiderington Dep from *Sierra* dated 12/8/22, 284:11-285:9; 286:15-20).

38. The *Solache/Reyes* spreadsheet (for the years 1995-1998) is 53 pages long and contains 349 rows and 28 columns of data for a total of 9772 separate cells of data. (Ex. 20, Tiderington Report, Attachment E). The *Sierra* spreadsheet used for this case (for the years 1991-1995), is 69 pages long and contains 496 rows and 17 columns of data for a total of 8,432 separate cells of data. (Ex. 20, Tiderington Report, Attachment F).

39. The spreadsheets, and Tiderington's opinions, are based on 475 investigative files and 496 RD Files ranging from 1991-1995, and 344 investigative files and 341 RD Files ranging from 1995-1998, and Tiderington does not know how many of those files from 1995 overlap. (Ex. 20, Tiderington Report, pp. 47-48; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 513:21-514:1; Ex. 23, Tiderington Dep from *Johnson* dated 9/20/23, 237:21-239:7). Tiderington was provided the investigative files and the RD files that the spreadsheets are based on. (Ex. 20, Tiderington Report, Attachment B; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 389:24-390:21; Ex. 24, Tiderington Dep from *Sierra* dated 12/8/22, 307:14-16).

40. There are no GPRs in RD files by design. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 515:12-23).

41.     Of the 344 investigative files he was provided in *Solache/Reyes*, he "spot-checked several of them" but he does not know if he has an exact number, he "probably looked at every one of the files, but some in greater detail than the others" meaning he "skimmed through each of the files." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 401:10-402:7). Of the 475 investigative files he was provided in *Sierra* case, he "did spot checks on probably 30 or 40 cases." (Ex. 24, Tiderington Deposition from *Sierra* dated 12/8/22, 285:11-19).

42.     Tiderington did not utilize "any great methodology" in the *Solache/Reyes* case deciding which files to spend more time with – "if something caught [his] interest, or … if it was something unusual, [he] spent more time on that." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 403:1-8). In Tiderington's review of the *Solache/Reyes* files, there was no "specific reason or rhyme or methodology in determining whether [Tiderington was] going to look at one file in greater detail than the other, but [his] goal was not to become familiar with each of the 300 files." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:14-19).

43.     He doesn't "think it would have been humanly possible" to become familiar with each of the investigations that underlie the 344 files he reviewed because each of the files contained "many, many pages," sometimes hundreds of pages. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:20-405:7).

44.     Tiderington believes anything in an investigative file can be exculpatory but did not do any analysis of the information in the file that led him to conclude the information was exculpatory. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 527:21-528-9).

45.     The 344 investigative files that provide the basis for the spreadsheet in *Solache/Reyes* (1995 to 1998) are 55,474 pages in total. (Ex. 24, Tiderington Report in *Sierra*,

13

Attachment B, ¶ 64).  The 341 RD files that provide the basis for the spreadsheet in *Solache/Reyes* are 24,422 pages in total.  (Ex. 24, Tiderington Report in *Sierra*, Attachment B, ¶ 64).

46.     Tiderington skimmed through all of the 341 RD files he was provided in *Solache/Reyes* and took a closer look at 15 to 20 of them.  (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 514:2-11).

47.     The 475 investigative files that provide the basis for the spreadsheet in *Sierra* (1991 to 1995) are 74,607 pages in total.  (Ex. 24, Tiderington Report in *Sierra*, Attachment B ¶ 68).  The 496 RD files that provide the basis for the spreadsheet in *Sierra* are 27,603 pages in total.  (Ex. 24, Tiderington Report in *Sierra*, Attachment B ¶ 67).

48.     In addition, Tiderington based his opinion on whether CPD had a pattern and practice of not disclosing material exculpatory evidence to criminal defendants on 64 criminal defense files from the Cook County Public Defender's Office (hereinafter "CCPDO files") associated with the 1995-1998 investigative files and RD Files (the *Solache/Reyes* dataset).  (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 51-53; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 596:9-599:21). He thinks he went through each of the CCPDO files but did not review in detail every document that was contained in the files.  (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 406:11-18). No CCPDO files were obtained for comparison for the corresponding 1991-1995 investigative files and RD files (the *Sierra* dataset). (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 52).

49.     Tiderington learned the corresponding CCSAO files from the 1995-1998 files had been previously produced to Plaintiffs Solache and Reyes.  (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 659:12-660:6).  Tiderington never reviewed, and as recently as November 2025, has never asked to review, any files from the Cook County State's Attorney's

14

Office (hereinafter "CCSAO files") that corresponded with any of the investigative files and RD Files from 1991-1998 to determine if any of the materials that he claims were not in the CCPDO files were contained within the CCSAO files. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 658:7-24; Ex. 25, Tiderington Dep from *Daniel Rodriquez* dated 11/5/2025, 221:2-222:8).

### *Failure to document*

50.     At his deposition in *Solache/Reyes*, Tiderington identified *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.), as an example of a failure by CPD officers to document information. (Ex. 24, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 420:3-17; 422:23-423:2).

51.     Tiderington testified that he found other examples of CPD officers' alleged failure to document information while "spot-checking" the information in the spreadsheet.  (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 423:3-424:1).  He determined that CPD officers were not documenting information from spot-checking data in the spreadsheet for cases "where the police report would attribute statements to a witness, but then there were no notes." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 424:2-20).

52.     The 8 RD numbers of cases listed at page 49 of Tiderington's report are in the section titled Missing or Incomplete Inventory Sheets.   (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 48-49).  In the report, those 8 RD numbers are cited as examples of why inventory sheets were "not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.)." (*Id.* at p. 49).

15

53. Tiderington references "failure to document" four times in his report, three times in connection with his opinions related to the underlying investigation in this case. (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 10, 15, 17). Tiderington's reference to "failure to document" in his opinions related to CPD's policies and practices uses the phrase "failure to document" in the heading only. (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 32). He identified no examples of a failure to document in his report. (Ex. 20, Tiderington Report in *Hernandez Brothers*, generally).

54. With respect to the Gonzalez homicide investigation, Tiderington's Report concludes Defendant Officers failed to document (i) "Guevara's pattern and practice of misconduct;" (ii) "that Miedzianowski and Guevara were part of a widespread criminal conspiracy;" (iii) "contemporaneous handwritten notes relating to [the anonymous] call;" (iv) contemporaneous handwritten notes related to the interview of" "several Maniac Latin Disciples on the evening of June 28, 1997;" (v) "contemporaneous notes of any of the numerous interactions that Guevara or Halvorsen had with [the eyewitnesses];" (vi) "investigative steps that appear that have been taken by the detectives;" and (vii) "notes of the interviews of Juan or Rosendo, or the various alibi witnesses the Defendants interviewed." (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 65-67).

55. Tiderington admitted that his opinion that GPRs or notes were created and not turned over was "speculation." (Ex. 26, Tiderington Dep from *Hernandez Brothers* dated 1/27/26, 335:6-336:4).

56. Tiderington's Report does not identify data that establishes a routine failure to document. (Ex. 20, Tiderington Report, *generally*).

*Street files*

57.     Tiderington's opinion that "All relevant information in unofficial documents is not transcribed in official reports" is based on his inference that "unofficial documents" must exist because there are no notes in files he believes should contain notes. (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 49-51; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 509:23-513:1). In his review, he has never seen those files or "unofficial documents." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 513:7-20).

58.     Tiderington defines "unofficial documents" as "perhaps the street files [referring to the *Jones* case] or documents that officers believe are personal information versus [sic] and information that perhaps they keep in their desk and not in either the investigative file or permanent file." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 511:3-11).

59.     In Tiderington's opinion, handwritten notes that are not written on GPRs that are included in the investigative file does not constitute a violation of a criminal defendant's constitutional rights. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 491:2-17). His criticism of the use of handwritten notes not on GPRs is limited to whether CPDs policies were being followed. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 491:17-20).

60.     Tiderington opines that the City's policies were inadequate to address the street files problem. (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 47).

61.     Tiderington's understanding of the phrase "street file" are files that were used that were not considered a formal file that would have to be turned over to prosecuting attorneys or criminal defendants. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 438:21-439:6). Investigative files are considered formal files that are to be turned over by the CPD to prosecuting

17

attorneys or criminal defendants.  (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 439:7-441:2).

62.     Tiderington's opinion that CPDs policies were inadequate to address the street files problem is based on his review of 344 separate Area 5 homicide investigations for the period 1995-1998 and 475 separate Area 5 homicide investigations for the period 1991-1995 that are documented in the investigative files and RD files produced.  (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 47-48).

63.     He concluded that the street files problem still existed because he concluded CPDs policies were not being complied with.  (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 47-50).

64.     He also concluded based on the files that criminal defense files show that "important investigative materials" are regularly withheld.  (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 51).

65.     Tiderington's Report does not identify any investigative files that were completely missing from a criminal defense file (other than from files that he eliminated from his analysis because the criminal defense file was incomplete).  (Ex. 20, Tiderington Report, generally; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 441:6-22, 442:7-14, 598:1-599:13).

### *Failure to disclose*

66.     There are redacted documents contained in the CCPDO files, including redactions of full pages, and Tiderington's report assumes that the redacted documents are not police documents, but he also agrees that information relevant to his analysis could have been redacted. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 599:22-601:10, 607:14-613:6, 616:14-617:4).  Tiderington was told by Plaintiffs' counsel in *Solache/Reyes* that police reports

were not redacted from the CCPDO files. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 607:14-608:1).

67. Tiderington agrees that some of the CCPDO files were missing entire investigative files, otherwise contained no police documents or so few that he treated the files as being incomplete, and that some of the files may not be complete because they were likely transferred to private criminal defense attorneys. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 441:6-22; 598:1-599:13).

68. Tiderington agrees "if the materials or the majority of materials that [he has] identified as being withheld because [he] didn't find them in the [CCPDO] files, if they, in fact, are there and redacted for some reason, then, obviously, that would change [his] opinions[.]" (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 612:22-613:6).

69. Tiderington has no understanding of where or how the CCPDO maintained their 1995-1998 files. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 613:7-16).

70. Tiderington states "My comparison of the investigative files to corresponding defense attorney files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files." (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 24; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22,601:11-18).

71. There were 64 CCPDO files that had corresponding CPD investigative files ("companion files"). Tiderington did not personally compare page by page the 64 CCPDO files to the companion files; he "spot-checked several cases, and it was consistent with what the analysis was." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 601:19-601:7). Tiderington

19

personally compared under 10 of the 64 sets of companion files. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 603:4-8).

72.     If Tiderington had reviewed the CCSAO files that corresponded with the investigative files, RD files, and CCPDO files, and "found out that the materials [he] identified in [his] report as being withheld [were] actually contained in the Cook County State's Attorney's files" he agrees that it "would have been proper and reasonable conduct on the part of the investigators." (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-18).

73.     Tiderington provides six cases that he claims are "[e]xamples of relevant information in police files that was withheld from criminal defendants but should have been disclosed," which he also describes as "examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate that the information withheld from criminal defendants included investigative material that should have been disclosed." (Ex. 20, Tiderington Report, pp. 54-58).

74.     Tiderington identified some of the examples of CCPDO files which were missing documents from the investigative files on his own and some were pointed out to him by Plaintiff's counsel, but he cannot identify which cases were pointed out by Plaintiff's counsel for closer review. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 663:1-24).

75.     Tiderington testified that when he says "withheld," he means generally that criminal defendants did not receive them. (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 592:24-593:10).

76.     In one example in his report, the Kim Mathis case, Tiderington alleges that Terry Mathis, the criminal defendant's sister, being a potential witness to the crime was not disclosed, yet Tiderington conceded at his deposition that the public defender's file shows that "the defense

attorney was in contact with the criminal defendant's sister." (Ex. 20, Tiderington Report, pp. 54-55; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 591:7-13; 591:24-592:9). Defendants' *Monell* expert, Bernard "Bernie" Murray, agrees that the public defender's file contains an extensive diary of the public defender's interviews with Terry Mathis. (Ex. 27, Bernie Murray's Expert Report in *Hernandez Brothers*, p. 18-19).

77.　　In another example in Tiderington's report, the Ardell Clemons case, Tiderington alleges that "[t]he investigative file includes several documents that could have been relevant to the defense but were not in the public defender's file," and more specifically that there were documents of potential alternative suspects that were not in the CCPDO file, yet concedes that he did not review the CCSAO file to determine if those documents were contained in it and ignored other documents from the file that the criminal defendant had called CPD and admitted to the crime and also subsequently confessed to the officers in Key West, Florida. (Ex. 20, Tiderington Report, p. 55; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-18, 660:23-662:8). Defendants' expert Murray found the documents Tiderington alleged were missing in the CCSAO file, specifically a GPR located at CCSAO 53045 [sic] and the lease at CCSAO 53426. (Ex. 27, Murray Report in *Hernandez Brothers*, p. 19; Ex. 28, GPR, CCSAO 53316; Ex. 29, Lease, CCSAO 53426).

78.　　In yet another example in his report, the Oscar Soto case, Tiderington alleges that GPRs from the investigative file are not in the CCPDO file and that arrest reports of two alternative suspects that were also suspects in another case but were not identified in the lineup in the Soto case, were in the investigative file but not the CCPDO file. Yet, Tiderington agrees that the CCPDO file contains two supplementary reports related to those two suspects and he does not know what is contained in the redacted pages of documents in the CCPDO file. (Ex. 20,

21

Tiderington Report, pp. 55-56; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 669:24-672:11, 671:3-11). Murray states that the public defender's file for the Soto case is incomplete because the CPD files were 158 pages, and the produced public defender's file contains only 112 pages, 47 of which are redacted, 28 of which are photographs, 2 are blank, 2 are copies of envelops, and 33 pages are subpoenas. (Ex. 27, Murray Report in *Hernandez Brothers*, pp. 19-20).

79. In another example in his report, the Guy Rainey case, Tiderington alleges detectives did not disclose all of the names and mugshots they obtained of potential suspects when detectives requested numerous photographs of individuals with the documented nickname "Little", but Tiderington admits that he only assumed that the alleged mugshots of individuals nicknamed "Little" were compiled to conduct photo arrays. In the same file, Tiderington alleges that detectives did not disclose a handwritten note in the investigative file with Donnie Morris' name on it that says "Kevin Haas pull file to see if he is still wanted" because alternative suspects should be disclosed. Yet, Tiderington agrees that Kevin Haas was a detective at Area 5 in charge of record keeping investigative files and was not a suspect, and that Donnie Morris was not a suspect as documents in the file show that it was disclosed that Donnie Morris was with his nephew, Cedric Morris, when Cedric Morris was shot. (Ex. 20, Tiderington Report, pp. 56-57; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 672:11-23, 673:2-674:17, 674:22-677:4).

### *Training*

80. Tiderington's Report states that there was inadequate training and monitoring/auditing to ensure compliance with the special orders, referencing Special Order 83-1. (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 46; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:1-10).

22

81.     Tiderington's report does not address any training that was done after CPD issued the 1986 directive or the 1988 SOP.  (Ex. 20, Tiderington Report, p. 46; Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:11-483-23).

82.     The only information Tiderington has about training that was done on the 1986 directive or the 1988 SOP is based on his memory of the testimony of James Hickey and Eric Winstrom, two of the City's Rule 30(b)(6) witnesses.   (Ex. 21, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:10-485:10).

83.     Hickey testified that detectives, youth officers, sergeants, lieutenants, and exempt commanding officers in the Bureau of Investigative Services were provided training on the 1982, 1983 and 1986 police orders establishing investigative files.  (Ex. 5, Hickey Dep in *Rivera* N.D. Ill, 12-CV-4428 (part I dated 5/6/14), 54:12-55:7, 56:1-7).

84.     Winstrom testified that detectives were trained on the SOPs, and more specifically that they were required to report all substantive or relevant information learned in an investigation, and notetaking.  (Ex. 3, Winstrom Dep dated 12/17/21, 130:12-131:18; 145:13-21).  Detectives also received role call training when 86-3 became effective for 5 or 7 straight days, which advised them of the order and its contents.  (Ex. 3, Winstrom Dep, 152:3-24).  New detectives received training on the 86-3 police and SOPs in pre-detective training, including the purpose of notes, the circumstances in which they needed to take notes, that notetaking was a useful tool that could help them write accurate reports, that they should never destroy their notes, the information to include in supplementary reports for violent crimes cases, including homicides.  (Ex. 3, Winstrom Dep, 152:25-154:14; 166:7-168:18).

*Tunnel vision*

85.     Tiderington references the term "tunnel vision" thirteen times in his report, including using the term twelve times in connection with his opinions related to the underlying investigation in this case. (Ex. 20, Tiderington Report in *Hernandez Brothers*, pp. 3, 9-13, 19-21). Tiderington's reference to "tunnel vision" in his opinions related to CPD's policies and practices states that a single, centralized repository is "one of the critical ways that detectives avoid tunnel vision." (Ex. 20, Tiderington Report in *Hernandez Brothers*, p. 35).

86.     Tiderington's Report does not identify data that establishes "tunnel vision". (Ex. 20, Tiderington Report).

*The Files in this case*

87.     The investigative file in this case, including all of the GPRs from the criminal investigation, the supplementary reports and the lineup reports are in the CCSAO file for the prosecution of the Jorge Gonzalez murder. (Ex. 31, CCSAO 002014-2074, 2145-72; Ex. 32, Margaret Wood Deposition, 5/28/25, 83:20-84:22). The "State Inventory of Discovery" dated 8/2/99 indicates that the CCSAO tendered the following to the defense: GOCR (2pp), Wilder/Calder Supp (1p), Det. Supp. Jun. 28 (7pp), Det. Supp. Jun. 28 (3pp), Cause of Death Supp (2pp), Det. Supp. July 1 (8pp), Line-Up Supp. Re: Juan (2pp), Line-Up Supp re: Rosendo (2pp), Det. Supp. Oct. 28 (2pp), Juan's CB, Rosendo's CB, Juan's IR, Rosendo's IR (2pp), Fel. Rev. Summary of Juan's oral (4pp), Fel. Rev. Summary of Rosendo's oral (4pp), CB print our and photo of victim, E.T. reports (4pp), Inventory slips: 1824189, 1824190, 1824191, 8189192 (4pp), Firearm examiners report of 10/2/97 (2pp), Firearm examiner's report of 4/20/98, (2pp), serology report (1p), Fired bullet worksheet (1p), Laboratory worksheet (1p), Investigative File inventory sheet (1p). Vict. IR (1p), Stop order request (Juan), CB Report w/ photo (Juan), Juan CB 10449-

24

157, Letter from Bulls media office, Rosendo stop order request, Rosendo CB Report w/ photo, Rosendo CB # 10549061, GPRs (5pp), Victim Gonzalez Med's (10pp), Victim Cruz Med's (14pp), Protocol etc. (13pp), Trans. of Violante's 7/29/97 G.J. (12pp), Trans. of Violante's 6/3/98 G.J. (40pp), Trans. of Violante's 12/30/98 G.J. (33pp), Violante's recant w/ IDs (3pp), 911 tape log (1p), 911 tape, SAO Invest. Repts. of Def. Wit. Interviews: V. Pinkston (2pp), J. Gomolinski (1p), L. Torres (1p), R. Macias Solis (2pp), F. Mendez (2pp), S. Solis (1p), report re: C. Lopez (1p), report re: R. Gonzalez (1p), report re: C. Rivera (1p), and GJ trans. of true bill. (Ex. 33, CCSAO 000459-462). The "State Inventory of Discovery" also indicates that the CCSAO made the following photos and documents available for inspection to the defense: 9 photos of Juan's body inspection/tattoos, 5 photos of Rosendo's body inspection/tattoos, 24 E.T. photos of scene/vict/line-ups, 12 B&W CPD photos from photo array, 30 morgue photos, 2 polaroids of O's used in GJ testimony of Violante, CCJ visitor records for both Defendants and Inventoried Fired Evidence. (*Id.* at CCSAO 000463) See also, "State Inventory of Discovery" dated 8/18/97, 9/22/97, 10/21/97, 4/17/98 with lists of additional police reports tendered to the defense. (*Id*. at CCSAO 000487-492)

## PLAINTIFFS' *MONELL* EXPERT, DR. JON M. SHANE

88.     To support their *Monell* theory that CPD failed to supervise and discipline problem officers, Plaintiffs retained Dr. Jon M. Shane who opined CPD "failed to properly conduct investigations of police misconduct in accordance with nationally accepted standards, and that their failure would be expected to contribute to police officers [] engaging in practices that are outside the scope of accepted industry standards." . (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 1, 12-14). His report is 119-pages long. (*Id*., generally). The report contains no criticisms of the City's written policies on discipline. (*Id*.).

25

**"*Early Intervention Systems*"**

89.      Dr. Shane reached four global opinions for the time period of 1985-2001: his first opinion is that CPD lacked any meaningful early intervention system ("EIS") capable of identifying patterns of misconduct and preventing it from recurring, consistent with national standard and generally accepted police practices from 1985 to 2001. (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 12, 32-51; Ex. 35, Dr. Shane's deposition dated 1/22/26, 194:15-195:7).

90.      Dr. Shane testified that the goal of an EIS is to measure the success of an individual coupled with whether that officer repeats the behavior by looking at the volume, frequency and type of complaints.  (Ex. 35, Dr. Shane's deposition dated 1/22/26, 197:17-199:12). Dr. Shane also testified that he is unaware of any scientific studies to ensure that EIS maintains its predictive qualities. (Ex. 35, Dr. Shane's deposition dated 1/22/26, 222:18-224:9).

91.      Dr. Shane concluded that CPD "knew or should have known that misconduct allegations were accruing [against Defendant Officers]." He did not review or compare any officer disciplinary histories. (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 12, 134-144). Dr. Shane assumed that a complaint-based EIS would have reliably identified the officers involved in this case before their most serious misconduct occurred. (*Id.* at pp.32-51; Ex. 36, Dr. Ian Adams Report, 2/13/26, p. 29).

92.      Defendant's rebuttal expert, Ian Adams, opined that "Dr. Shane's [EIS] opinion rests on two premises that the evidence does not support: (1) that early intervention systems were standard practice during 1985-2001, and (2) that such systems, if implemented, would have prevented the misconduct at issue." (Ex. 36, Dr. Ian Adams Report, 2/13/26, p. 27).

26

*"Inadequate Investigations of Alleged Misconduct"*

93.        Dr. Shane's second opinion is that from 1985 to 2001, CPD did not adequately investigate allegations of misconduct.  (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 13, 51-82; Ex. 35, Dr. Shane's deposition dated 1/22/26, 225:14-226:4).

94.        Dr. Shane's analysis was based on a dataset compiled by Plaintiffs' counsel of 1,663 Complaint Register ("CR") files from a "cross section of CPD internal affairs records" ranging from 1981 to 2017, which includes a total of 13,554 allegations contained within the 1,663 CR files.  (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 29-30; Ex. 35, Dr. Shane's deposition dated 1/22/26, 225:14-226:14).

95.        Of the 1,663 CR files Dr. Shane was provided, he randomly selected 30 CR files "to review, and inspect for accuracy by matching the variables in the data set to the information contained in the CR file." (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 30-32; Ex. 35, Dr. Shane's deposition dated 1/22/26, 226:5-229:1).  Dr. Shane concluded that a random selection of 1.8% was sufficient sample to review for accuracy.  (Ex. 35, Dr. Shane's deposition dated 1/22/26, 227:2-15).  Based on his review of the 30 CR files he concluded that the remaining 1,633 CR files were properly and accurately coded.  (Ex. 35, Dr. Shane's deposition dated 1/22/26, 228:11-229:1).

96.        Dr. Shane disclosed a "rebuttal opinion" wherein he stated he reviewed an additional 29 files.  (Ex. 34, Dr. Shane's Report dated 3/6/26, p. 1).

97.        Dr. Shane did not establish intercoder reliability to reach his opinions.  (Ex. 36, Dr. Shane's deposition dated 1/23/26, 247:10-18; Ex. 37, Dr. Ian Adams Report, 2/13/26, p. 8). Dr. Shane did not set forth any standards to ensure that the dataset he based his opinion on was statistically significant. (Ex. 34, Dr. Shane's Report dated 10/3/25, *see generally*).

27

98.	From 1981 to 2017 there were 281,489 CRs initiated against police officers within the Chicago Police Department city-wide.[2] (Ex. 36, Dr. Shane's deposition 1/23/26, 231:16-332:5; see CPD Annual Reports, https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/).

99.	Dr. Shane analyzed CR files for Defendant Officers which covers 1981-2017 but did not separate the CR files for Defendant Officers, or CRs that were initiated prior to Plaintiffs' arrest. (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 29-30, 51-82).

100.	Dr. Shane does not conduct any analysis that shows misconduct occurred and went unaddressed at CPD. (Ex. 34, Dr. Shane's Report dated 10/3/25, generally; Ex. 36, Dr. Shane's deposition dated 1/23/26, 325:5-326:13, 371:16-372:23).

*"Culture of Impunity"*

101.	Dr. Shane's third opinion is that from 1985 to 2001, the Chicago Police Department's failure internal affairs system contributed to a culture of impunity. (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 13, 82-91; Ex. 35, Dr. Shane's deposition dated 1/22/26, 230:8-16).

102.	Dr. Shane defined a "culture of impunity" in policing as "an organizational environment where misconduct by personnel is tolerated, ignored, or insufficiently addressed, thereby allowing adverse behavior to persist without meaningful consequences." (Ex. 34, Dr. Shane's Report dated 10/3/25, p. 82).

103.	Dr. Shane testified that when he uses the phrase "culture of impunity," he understands it to mean a type of culture that "pervades the organization" which allows officers to

---

[2] This number excludes data from 2011-2015, as the corresponding reports are not publicly available on the CPD Annual Reports website.

believe that "they can get away with adverse behavior because either supervisors are not going to look, the community is apathetic and is not going to report, that investigations will be substandard and they're largely going to be able to get away with the things that they did." (Ex. 35, Dr. Shane's deposition dated 1/22/26, 179:16-180:2).

104.    Dr. Shane's report does not analyze or discuss how allowing supervisors not to look or the community's apathy leads to a "culture of impunity." (Ex. 34, Dr. Shane's Report dated 10/3/25, *see generally*).

105.    Dr. Shane testified that deficient internal affairs investigations do not necessarily lead to a "culture of impunity" and he could not identify any research that supports the conclusion that deficient internal affairs investigative systems create a culture of impunity. (Ex. 35, Dr. Shane's deposition dated 1/22/26, 184:1-17, 186:10-13).

106.    Dr. Shane based his third opinion on the data extracted from the 1,663 CR files as well as data from earlier studies taking place in Chicago, finding that his data is consistent with the earlier studies. (Ex. 35, Dr. Shane's deposition dated 1/22/26, 230:17-231:5).

107.    Dr. Shane created variables to code the CR files reviewed to "be able to measure whether or not a culture of impunity existed." (Ex. 35, Dr. Shane's deposition dated 1/22/26, 102:18-103:4; Ex. 37, Dr. Ian Adams Report, 2/13/26, pp. 8-10). Dr. Shane does not cite any studies to support his conclusion that the variables he used to code the CRs are sufficient to "measure whether or not a culture of impunity existed." (Ex. 35, Dr. Shane's deposition dated 1/22/26, 102:18-103:4, 103:11-104:12).

108.    Dr. Shane does not provide any analysis for the patterns he claims to observe, including his opinion related to bias against externally initiated complaints. (Ex. 34, Dr. Shane's Report dated 10/3/25, p. 59; Ex. 37, Dr. Ian Adams Report, 2/13/26, p. 33). Dr. Shane also does

not account for several key differences between internal and external complaints: internal complaints include officer-witness testimony and documentation unavailable in external complaints; internal complaints are pre-screened by supervisors who suspect misconduct; allegation categories differ between internal and external complaints; and external complaints inherently face evidentiary challenges. (Ex. 37, Dr. Ian Adams Report, 2/13/26, p. 33).

### *"High-profile scandals"*

109.     Dr. Shane's fourth and final opinion is that from 1985 to 2001, the repeated high-profile scandals over the decades reflect a culture of impunity within the Chicago Police Department.  (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 14, 91-118; Ex. 35, Dr. Shane's deposition dated 1/22/26, 231:6-11).

110.     Dr. Shane opined that "[b]oth city officials and CPD leadership have been aware of these problems, yet meaningful reforms have often been slow, ineffective, or entirely absent," but provides no evidentiary support to support this conclusion. (Ex. 34, Dr. Shane's Report dated 10/3/25, p. 91).

111.     Dr. Shane based his final opinion by recounting different events that have occurred since the 1970s by using the internet to "look[] for studies or published works that dealt with these sorts of things over a period of time." (Ex. 35, Dr. Shane's deposition dated 1/22/26, 231:12-232:2).

112.     At his deposition, Dr. Shane's testified that final opinion was supported, in large part, by conversations with Plaintiffs' counsel which he was directed not to divulge under the attorney-work product privilege. (Ex. 35, Dr. Shane's deposition dated 1/22/26, 190:1-191:16).

113.     Dr. Shane's report does not contain any representative analysis to generalize these extreme, "high-profile scandals" to conclude there was a culture of impunity within the Chicago

Police Department. (Ex. 34, Dr. Shane's Report dated 10/3/25, *see generally*; Ex. 37, Dr. Ian Adams Report, 2/13/26, p. 33).

> ***Defendant Officers' CR Files that pre-date Plaintiffs' July 1997 arrests***

114.     By the time of Plaintiffs' arrests in July 1997, Defendant Guevara had thirteen CRs initiated against him; Defendant Biebel had three CRs; Defendant Miedzianowski had seventeen CRs; Defendant Halvorsen had one CR; Defendant DeGraff had twelve CRs; and Defendant Bemis had twenty-five CRs. (Ex. 38, Defendant Officers' complaint histories).

115.     A CR can result in one of four outcomes: (1) unfounded (the allegation was found to have not occurred); (2) exonerated (the conduct occurred but was lawful); (3) not sustained (the allegation is unable to be proved or disproved); and (4) sustained (the allegation is more likely than not, true).  (Ex. 34, Dr. Shane's Report dated 10/3/25, pp. 24-25).

116.     In 1986, three allegations in CR No. 152902 against Defendant Guevara were sustained for failing to make a proper notification that he was the victim of a battery, releasing a prisoner without proper authorization, and making a false statement, resulting in a two-day suspension without pay.  The allegations that Guevara failed to make the proper notification that he was the victim of a battery and that he released a prisoner without proper authorization were made by a supervisor.  (Ex. 39, CR File 152902, at RFC-Hernandez 001151-53).

117.     In 1986, two allegations in CR No. 150473 against Defendant Guevara for excessive force and verbal abuse were sustained, resulting in the City's Office of Professional Standards (OPS) recommending a 5-day suspension.  Although the Chief Administrator for OPS did not uphold the sustained CR for excessive force, he did for verbal abuse, and Defendant Guevara was reprimanded.  (Ex. 40, CR No. 150473, CCSAO *Reyes/Solache* PC Documents 10032, 10040).

118. In 1996, in a CR initiated against 150 Chicago police officers after CPD was notified by the Illinois Secretary of State that those officers had suspended driver's licenses for not having paid parking tickets or traffic infractions, one allegation in that CR (CR No. 220046) against Defendant Guevara for allegedly having a suspended driver's license because he had failed to pay a parking ticket was sustained. (Ex. 41, CR No. 220046, RFC-Hernandez 001578, 001585, 001596; Ex. 38, Defendant Officers' complaint histories, at RFC-Hernandez XXX).

119. Before Plaintiffs' arrests in 1997, Defendant Biebel had three CRs initiated against him, none of which were sustained, which include (i) CR No. 156137, one allegation for damaging a door while executing a search warrant was exonerated, one allegation for damaging personal property while executing a search warrant was not sustained, and one allegation for searching without a warrant was unfounded; (ii) CR No. 153256, three allegations for striking, knocking down, and kicking a complainant were not sustained; and (iii) CR No. 194728, one allegation for verbal abuse was not sustained. (Ex. 42, CR File 156137, at RFC-Hernandez 001261-1262; Ex. 43, CR File 153256, at RFC-Hernandez 001207-1208; Ex. 44, CR File 194728, at RFC-Hernandez 001340-1341).

120. Before Plaintiffs' arrests in 1997, Defendant Halvorsen had one CR initiated against him, CR No. 157627 which contained one allegation for excessive force that was not sustained. (Ex. 38, Defendant Officers' complaint histories, at RFC-Hernandez XX; Ex. 45, CR File 157627, at RFC-Hernandez 001394-1305).

121. In April 1988, one allegation in CR 158585 was sustained against Defendant DeGraff for failure to secure a CR number within the proscribed time as dictated by Department directives after learning of alleged misconduct. No disciplinary action was taken against DeGraff. (Ex. 46, CR 158585, at RFC-Hernandez 0038210, 3833-3834).

122.     In November 1989, one allegation in CR 170144 was sustained against Defendant DeGraff for disseminating Department records which was not part of his official duties. It was recommended that DeGraff be suspended from the Chicago Police Department for 10 days. (Ex. 47, CR 170144, at RFC-Hernandez 006600, 6603-6604).

123.     In November 1983, eight allegations in CR 132767 were sustained against Defendant Miedzianowski for disrespect to a person (four allegations), verbal abuse, failure to identify himself as an officer, unlawful display of a weapon, and making a false report. In April 1985, a hearing was held in front of the Police Board who found there was insufficient evidence to sustain the charges against Miedzianowski, and all charges were dismissed. (Ex. 48, CR 132767, at RFC-Hernandez 003310-3311, 3324, 3335-3337).

124.     In July 1984, three allegations in CR 139277 were sustained against Defendant Miedzianowski for "disrespect to or maltreatment of any person, while on or off duty," one allegation for action which brings discredit upon the Department, one allegation for physical altercation, one allegation for making a dales report and one allegation for failure to report a violation were all sustained. Eight additional allegations in CR 139277 were not sustained. It was recommended that Miedzianowski be suspended for thirty days. In February 1985, a hearing was held in front of the Police Board who found there was insufficient evidence to sustain the charges against Miedzianowski, and all charges were dismissed. (Ex. 49, CR 139277, at RFC-Hernandez 003438, 3440, 3451-3452, 3639-3642, 3644-3646).

125.     In June 1993, two allegations in CR 200899 were sustained against Defendant Bemis for (i) "disrespect to or maltreatment of any person, while on or off duty" and (ii) "disobedience of an order or directive, whether written or oral," resulting in the recommendation of a ten-day suspension from OPS. Bemis was ultimately suspended for five days. (Ex. 50, CR

200899, at RFC-Hernandez 008377, 8379, 8383; Ex. 38, Defendants Complaint Histories, at RFC-Hernandez 000595).

126.     In May 1993, two allegations in CR 201494 were sustained against Defendant Bemis for (i) misuse of a department vehicle and failure to report damage to a department vehicle, and (ii) falsifying a police report. Bemis received a three-day suspension. (Ex. 51, CR 201494, at RFC-Hernandez 07298-7299, 7333, 7349; Ex. 38, Defendants Complaint Histories, at RFC-Hernandez 000595).

127.     Before Plaintiffs' arrests in 1997, Defendant Miedzianowski's non-sustained CRs include: (i) CR No. 1522792, two allegations of threatening behavior, four allegations of physical abuse, one allegation of planting evidence, one allegation of verbal abuse, one allegation of destruction of property and one allegation of monetary theft were not sustained; (ii) CR No. 154127, one allegation of false arrest was unfounded; (iii) CR No. 170700, one allegation for unlawful entry was exonerated and one allegation for unlawful seizure of money was not sustained; (iv) CR No. 176802, one allegation for physical abuse and two allegations for verbal abuse were not sustained; (v) CR No. 197823, allegations of misconduct by ATF officers were unfounded; (vi) CR No. 200252, one allegation for planting evidence and one allegation for a verbal threat were not sustained; (vii) CR No. 202579, one allegation for false arrest and one allegation for a verbal threat were not sustained; (viii) CR No. 207077, one allegation for unlawful entry was not sustained; (ix) CR No. 209341, one allegation for monetary theft was not sustained; (x) CR No. 210841, one allegation for property theft was not sustained; (xi) CR No. 218243, one allegation for verbal threat was not sustained; (xii) CR No. 219667, one allegation for verbal abuse and one allegation for property theft were not sustained; (xiii) CR No. 223544, one allegation for unlawful search, one allegation for false arrest, and one allegation for property theft were not sustained; and

(xiv) CR No. 234251, one allegation for warrantless entry and one allegation warrantless search were not sustained. (Ex. 52, CR 152792, at RFC-Hernandez 003660-3661, 3665; Ex. 53, CR 154127, at RFC-Hernandez 003763-3764; Ex. 54, CR 170700, at RFC-Hernandez 004232, 4234, 4239; Ex. 55, CR 176802, at RFC-Hernandez 006827-6828; Ex. 56, CR 197823, at RFC-Hernandez 0012107-1208; Ex. 57, CR 200252, at RFC-Hernandez 007219-7220; Ex. 58, CR 202579, at RFC-Hernandez 004414-4415; Ex. 59, CR 207077, at RFC-Hernandez 004443-4444; Ex. 60, CR 209341, at RFC-Hernandez 007554-7555; Ex. 61, CR 210841, at RFC-Hernandez 007602-7603; Ex. 62, CR 218243, at RFC-Hernandez 004668-4669; Ex. 63, CR 219667, at RFC-Hernandez 004912-4913; Ex. 64, CR 223544, at RFC-Hernandez 008608-8609; Ex. 65, CR 234251, at RFC-Hernandez 005080-5082).

128.	Before Plaintiffs' arrest in 1997, Defendant DeGraff's non-sustained CRs include (i) CR No. 156444, one allegation for warrantless entry was exonerated; (ii) CR No. 165577, one allegation for false arrest was unfounded; (iii) CR No. 167758, one allegation for false arrest was unfounded; (iv) CR No. 176458, one allegation for excessive force was not sustained; (v) CR No. 195982, one allegation for failure to detect theft was not sustained; (vi) CR No. 196315, one allegation for verbal abuse was not sustained; (vii) CR No. 20935, one allegation for property theft and one allegation for property damage were not sustained; (viii) CR No. 213241, one allegation for warrantless search was unfounded and one allegation for failure to inventory and process property was not sustained; (ix) CR 218011; two allegations for verbal abuse were not sustained and one allegation for property theft was unfounded; and (x) CR No. 221234, one allegation for theft by failing to work an eight hour day was unfounded. (Ex. 66, CR 156444, at RFC-Hernandez 003789; Ex. 67, CR 165577, at RFC-Hernandez 004039; Ex. 68, CR 167758, at RFC-Hernandez 004135-4136; Ex. 69, CR 176458, at RFC-Hernandez 006784, 6787; Ex. 70, CR 195982, at RFC-

35

Hernandez 006947-6948; Ex. 71, CR 196315, at RFC-Hernandez 004293-4294; Ex. 72, CR 209035, at RFC-Hernandez 007483-7485; Ex. 73, CR 213241, at RFC-Hernandez 007654-7656; Ex. 74, CR 218011, at RFC-Hernandez 004532-4533; Ex. 75, CR 221234, at RFC-Hernandez 010093-10094, 10098).

129.     Before Plaintiffs' arrests in 1997, Defendant Bemis' non-sustained CRs include (i) CR No. 197960, two allegations for physical abuse were not sustained; (ii) CR No. 198039, one allegation for physical abuse was unfounded, two allegations for physical abuse were not sustained and one allegation for verbal abuse was not sustained; (iii) CR No. 199882, one allegation for destruction of property was not sustained; (iv) CR No. 200022, one allegation for failure to provide police service and one allegation for disrespect towards a citizen were not sustained; (v) CR No. 201319, one allegation for failure to provide police services was not sustained; (vi) CR No. 201376, one allegation for verbal abuse was not sustained; (vii) CR No. 202265, two allegations for physical abuse were not sustained; (viii) CR No. 203103, one allegation for monetary theft was not sustained; (ix) CR No. 203559, one allegation for physical abuse and one allegation for driving the complainant around for an hour before going to the station were not sustained; (x) CR. No. 206682, one allegation for monetary theft was not sustained; (xi) CR. No. 207428, one allegation for monetary and property theft was not sustained; (xii) CR No. 214060, one allegation for failure to provide police services was exonerated; (xiii) CR No. 218043, four allegations for physical abuse were unfounded; (xiv) CR No. 219054, two allegations for physical abuse were not sustained; (xv) CR No. 219652, two allegations of physical abuse were unfounded; (xvi) CR No. 220327, one allegation for physical abuse was not sustained; (xvii) CR No. 221489, one allegation for verbal abuse was unfounded; (xviii) CR No. 226885, one allegation for warrantless entry and one allegation for property theft were not sustained; (ixx) CR No. 227412, one allegation for verbal

abuse was not sustained; (xx) CR No. 228435, one allegation for physical abuse was not sustained; (xxi) CR No. 229816, one allegation for shooting complainants dogs was not sustained; (xxii) CR No. 232702, one allegation for unlawful search was not sustained; and (xxiii) CR No. 235012, one allegation for warrantless search and property damage was not sustained. (Ex. 76, CR 197960, at RFC-Hernandez 004305-4306; Ex. 77, CR 198039, at RFC-Hernandez 008296-8297; Ex. XX, CR 199882, at RFC-Hernandez 004341-4342; Ex. 79, CR 200022, at RFC-Hernandez 004365-4366; Ex. 80, CR 201319, at RFC-Hernandez 007256-7257; Ex. 81, CR 201376, at RFC-Hernandez 004389-4390; Ex. 82, CR 202265, at RFC-Hernandez 008457-8458; Ex. 83, CR 203103, at RFC-Hernandez 007351-7352; Ex. 84, CR 203559, at RFC-Hernandez 007391-7392; Ex. 85, CR 206682, at RFC-Hernandez 007442-7443; Ex. 86, CR 207428, at RFC-Hernandez 004478-4479; Ex. 87, CR 214060, at RFC-Hernandez 004500-4501; Ex. 88, CR 218043, at RFC-Hernandez 008525-8526; Ex. 89, CR 219054, at RFC-Hernandez 004701-4702; Ex. 90, CR 219652, at RFC-Hernandez 004880-4881; ; Ex. 91, CR 220327, at RFC-Hernandez 00709-7710; ; Ex. 92, CR 221489, at RFC-Hernandez 004990-4991; Ex. 93, CR 226885, at RFC-Hernandez 007756-7757; Ex. 94, CR 227412, at RFC-Hernandez 005009-5011; Ex. 95, CR 228435, at RFC-Hernandez 007810-7811; Ex. 96, CR 229816, at RFC-Hernandez 008676-8677; Ex. 97, CR 232702, at RFC-Hernandez 005037, 5039-5041; Ex. 98, CR 235012, at RFC-Hernandez 007855-7857).

130. Before Plaintiffs' arrests in 1997, Defendant Guevara's non-sustained CRs include (i) CR No. 124631, fourteen allegations for excessive force and verbal abuse were not sustained (12 allegations) and exonerated (2 allegations) (ii) CR No. 152612, two allegations for excessive force and threatening to shoot a dog were not sustained; (iii) CR No. 143475, allegations for a warrantless search and damaging property were not sustained; (iv) CR No. 168160, one allegation for a warrantless search was exonerated and one allegation for failure to identify as an officer not

sustained; (v) CR No. 182519, one allegation for verbal abuse was not sustained; (vi) CR No. 195857 one allegation for forcing two individuals to pose for pictures was exonerated; (vii) CR No. 205257, five allegations for erratic driving, verbal abuse, excessive force (2 allegations), and driving while intoxicated were not sustained, and one allegation for excessive force was exonerated; (viii) CR No. 217624, one allegation for beating and threatening an individual was not sustained; (ix) CR No. 236739, one allegation for failing to provide medical treatment was not sustained. (Ex. 38, Defendant Officers' complaint histories, at RFC-Hernandez XX ; Ex. 99, CR File 124631, at NPSL 9127-32; Ex. 100, CR File 152612, at RFC-Solache/Reyes 33536-38, 33571; Ex. 101, CR File 143475, at NPSL 18864-66; Ex. 102, CR File 168160, at RFC-Hernandez 004190, 4195; Ex. 103, CR File 182519, at RFC-Hernandez 001328-1330; Ex. 104, CR File 195857, at RFC-Hernandez 001416-1417; Ex. 105, CR File 205257, at RFC-Hernandez 001430, 1437; Ex. 106, CR File 217624, at RFC-Hernandez 001547; Ex. 107, CR File 236739, at RFC-Hernandez 001733, 1736).

### PLAINTIFFS' EYEWITNESS ID EXPERT, DR. NANCY STEBLAY

131. Plaintiffs retained Nancy Steblay, Ph.D., to provide opinion testimony about eyewitness identification procedures related to Plaintiffs' *Monell* claim. (Ex. 108, Steblay Declaration in Hernandez Brothers).

132. For Steblay's analysis and opinions in this case, she adopted her "expert reports disclosed in *Sierra vs. Guevara, et al.*, (dated September 16, 2022), *Iglesias vs. Guevara, et al.* (dated October 18, 2022), and *Johnson v. Guevara, et al*. (dated March 1, 2023), including all of their data and attachments." [3]. (Ex. 108, Steblay Declaration in Hernandez Brothers). The

---

[3] Steblay's disclosure in Hernandez Brothers is 1,198 pages long and attaches 8 different disclosures from 8 different cases. For ease of reference, Defendant City cites only to the *Sierra* report and its page numbers within her disclosure in this case where the substance is substantially the same as the remaining reports.

attachments also included her report in *Velez* as well as a report she did not author in *Rivera*. (*Id.* at pp. 82-153, 338-431).

133.     According to Steblay, "The question of interest [for her report] was whether the rate at which eyewitnesses made suspect identifications is within numerical ranges that would be expected based on what we know about eyewitness lineup identifications.  If the Chicago rates are different, in what ways do they differ?  And, if they differ, what are the possible explanations for the differences."  (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* p. 2).

134.     The Datasets and coding upon which Steblay based her opinions were prepared by Plaintiffs' law firm.  Plaintiffs' counsel provided Dr. Steblay with Datasets in the form of an Excel spreadsheets.  Dr. Steblay's report states that the data pertained to information regarding witness identifications that were coded from investigation files and RD files corresponding to homicide investigations.  (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* p. 6; Ex. 109, Steblay Deposition (Part I) from Sierra/Iglesias/Bouto/Rodriguez dated 2/9/23, at 87:20-22; 91:11-12).   The identification outcomes recorded include positive identifications, tentative identifications, filler identifications and non-identifications. (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* p. 3).

135.     Plaintiffs' counsel also provided Dr. Steblay with additional datasets from four other lawsuits: *Bouto v. Guevara*, 19-CV-2441, where the files ranged from 1989 to 1993; *Sierra v. Guevara*, 18-CV-3029, where the files ranged from 1991 to 1995; *Rodriguez v. Guevara*, 18-CV-7951, where the files ranged from 1995 to 1998; and, *Rivera v. Guevara*, 12-CV-4428, where the files ranged from 1985 to 1991. (Ex. 102, Steblay Report in Iglesias, p. 12; Ex. 111, Appendix A to Gary Wells' Report from Rivera; Ex. 112, Steblay Report and Data from Bouto; Ex. 113,

Steblay Report and Data from Sierra; Ex. 114, Steblay Report and Data from Rodriguez). Steblay examined all the datasets she was provided "assuming that the data provided to me were reliable extractions from the case files, and subject to the discussion of reliability below," and she did not independently verify all the data in any of the datasets. (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* p. 6; Ex. 109, Steblay Deposition (Part I) from Sierra/Iglesias/Bouto/Rodriguez dated 2/9/23, at 97:23-98:15).

136.     A good, scientifically sound coding method "has a way of identifying [discrepancies]" for the same case file across different datasets. Steblay does not know how many discrepancies there were in the data that overlapped between Sierra, Rodriguez, Bouto, Iglesias, and Rivera Datasets. She was not provided any documentation of any discrepancies between the coders. She was only provided the final spreadsheets. Dr. Steblay does not know how many errors there are in the datasets. (Ex. 109, Steblay Deposition (Part I) from Sierra/Iglesias/Bouto/Rodriguez dated 2/9/23, at 261:2-262:11; Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 572:12-17; 574:16-575:21).

137.     Steblay spot-checked approximately two dozen case files, meaning she would look at a case to understand what the coders were putting in the spreadsheet (the Sierra Dataset). (Ex. 109, Steblay Dep (Part I) from Sierra/Iglesias/Bouto/Rodriguez dated 2/9/23, at 220:19-221:7; 222:22-223:1).

138.     Steblay did what she calls a "reliability analysis" on 195 random witness outcomes for lineups using the Sierra Dataset only that ranged from 1991-1995. (Ex. 109, Steblay Dep (Part I) from Sierra/Iglesias/Bouto/Rodriguez, at 220:20-221:7; 225:21-227:24; 233:19-234:6). Steblay testified that in her reliability analysis on the Sierra Dataset, she identified which lineup outcomes she needed to look at, went into the files of the cases in order to figure out if the outcome from the

Sierra Dataset was appropriately coded, and she found that 191 of 195 matched. (Ex. 109, Steblay Dep (Part I) from Sierra/Iglesias/Bouto/Rodriguez, at 225:21-226:13; 237:20-238:13). Steblay did not confirm the coding for the entire file when she performed her reliability analysis, rather she focused on reviewing materials of the particular lineup outcome that was randomly selected. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 562:10-563:13; 564:11-565:21).

139.    Steblay aggregated data collected from 11 published field studies that were conducted in the United States and United Kingdom and concluded that witnesses identify a suspect at an average of 40.8% of the time, identify fillers an average of 23.7% of the time, and make no pick an average of 35.5% of the time. (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* pp. 3, 25). The range of positive identification rate in the field studies is as low as 27% and as high as 58%. (Ex. 113, Steblay Report in Iglesias, p. 11; Ex. 116, Steblay Rebuttal Deposition from Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, at 55:22-56:1).

140.    Steblay compared the results of the single suspect stranger-perpetrator lineups in the CPD homicide files here to the average results from the 11 field studies, using a subset of the lineups from CPD homicide files for her comparison. (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* pp. 3-4).

141.    Steblay concluded that the CPD suspect identification rate for the *Iglesias* dataset, including lineups from 1989-1998 and the *Rodriguez* dataset including lineups from 1995-1998 was 70%. She concluded that the CPD suspect identification rate for the *Velez* dataset including lineups from 1996-2001 and the *Rivera* dataset including lineups from 1985-1997 was 55%. She determined that CPD's rate is significantly higher than the suspect identification rate averaged

from the field studies (41%), and that this difference could not be due to chance. (Ex. 117, Steblay Report in Johnson, p. 12).

142. A witness' ability to make an identification depends on the type of crime they witness, and Steblay does not know if the 11 field studies exclusively relied on homicide cases. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 545:14-21).

143. Steblay included tentative identifications in reaching the CPD suspect identification rate but does not know if the 11 published field studies included tentative identifications in the suspect identification rate. (Ex. 116, Steblay Rebuttal Deposition from Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, at 49:3-24; 52:3-17; 54:12-55:1).

144. The City's Rule 30(b) witness, Lieutenant Foster, testified that neither the CCSAO nor CPD considered tentative identifications as positive identifications. (Ex. 10, Foster 30(b)(6) Dep, at 244:22-245:25). Steblay does not know if the CCSAO used tentative identifications in prosecutions. (Ex. 109, Steblay Dep (Part I) from Sierra/Iglesias/Bouto/Rodriguez dated 2/9/23, at 209:23-210:6).

145. According to Steblay, the possible explanations for the increase in suspect identification rate are (a) familiar (non-stranger) perpetrator identifications; (b) lineup structure, including lineup size and multiple suspects; (c) first identification attempts vs. repeated procedures among single-suspect stranger-perpetrator lineups; (d) suggestion from line-up administrators; (e) fewer filler selections recorded; (f) lineup quality, and (g) the eyewitness has been shown a showup or single photo of the suspect prior to the lineup. (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra*, pp. 13-20).

146. Steblay is not opining that these factors necessarily resulted in the difference between the CPD identification rate and the averaged identification rate from the 11 field studies

she considered, but rather, that they are possible factors or "what [Steblay] thought might be reasons for the high suspect ID rate, familiar perps, multiple perps, repeated identifications[.]" As Steblay testified in her deposition on the same possible factors in *Velez v. City of Chicago*, 18-CV-8144, "What I'm reporting here is factors that might be associated with the greater suspect identifications in Chicago…so we have established that there are higher suspect ID rates in Chicago done in these other (inaudible) studies, and what I'm providing here are some of the reasons that that might be so," and "No. What I'm saying is, I'm offering information about each of those possible factors. And how they might play – for example, lineup size." (Ex. 116, Steblay Rebuttal Deposition from Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, at 69:20-24; 84:11-15; Ex. 118, Steblay Deposition from *Velez v. City of Chicago*, 18-CV-8144 dated 2/10/22, at 385:21-387:23).

147.    Steblay opines that factors (a) and (c) above are "confounds," which she described as: "A confound means that there are multiple explanations for an outcome, so that the exact explanation cannot be te[st]ed apart from the other." (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra*, pp. 13, 14-16; Ex. 115, Steblay Deposition (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 495:8-12).

148.    Steblay reported that the Iglesias Dataset had a lower suspect identification rate for the multiple suspect lineups (45%) than the lineups with only one suspect (66%). (Ex. 110, Steblay Report in Iglesias, p. 9).

149.     Steblay acknowledges that it is possible to correctly identify the suspect in a show-up. (Ex. 115, Steblay Deposition (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 498:12-18).

*Lineup structure*

150.     Scientific recommendations that the "minimum lineup size is six: one suspect plus five fillers" was not widely considered a "best practice" until the publication of the 2020 study entitled "Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence" published by Wells, G.L., et al., which is often referred to as the "2020 White Paper." (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* pp. 2-3, 13-14). The 2020 White Paper by Wells, et al. relied in part on previous National Institute of Justice research published in 2017 and 1999. *Id.*

151.     Steblay referred to and relied on the 1998 White Paper, a consensus document in the scientific community of eyewitness experts, and agreed that the 1998 White Paper provided no recommendation for the number of lineup fillers that should be in a lineup, and that the 1998 White Paper states, "Our formal recommendation regarding lineup structure does not state how many people should be in a lineup. The reason for this is because it would be arbitrary to pick a number." (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 464:8-466:20).

152.     Steblay does not know which police departments in the United States from 1989 to 1998 consistently used five fillers in every lineup and photo array, or which ones used one suspect in every lineup, which ones used repeated-identification procedures (lineups where a witness has first identified a suspect in a photo array or other format and then views an in-person lineup with that suspect), or if any police departments used blind lineups (lineups where neither the administrator of the lineup or the witness knew who the suspect was) as a matter of policy. (Ex.

44

115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 467:4-11; 479:15-19; 488:6-12; 506:11-22).

***Repeated identification procedures***

153.     Steblay agrees that repeated-identification procedures are allowed and sometimes required for eyewitness evidence in many jurisdictions in the United States and elsewhere, and that "once a suspect is in custody, additional photo or live identification evidence may be necessary for the prosecution to present at trial," and that the 1998 White Paper on recommended eyewitness identification procedures and the National Institute of Justice 1999 report titled "Eyewitness Evidence: A Guide for Law Enforcement" ("1999 NIJ Guide") that outlines the best practices for the selection of eyewitness evidence do not discuss repeated-identification procedures with the same suspect.  (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 492:22-494:13).

154.     Steblay agrees that repeated-identification procedures are allowed and sometimes required for eyewitness evidence in many jurisdictions in the United States and elsewhere, and that "once a suspect is in custody, additional photo or live identification evidence may be necessary for the prosecution to present at trial," and that the 1998 White Paper on recommended eyewitness identification procedures and the National Institute of Justice 1999 report titled "Eyewitness Evidence: A Guide for Law Enforcement" ("1999 NIJ Guide") that outlines the best practices for the selection of eyewitness evidence do not discuss repeated-identification procedures with the same suspect.  (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 492:22-494:13).

155.     When there are repeated identification attempts by the same witness, Steblay cannot determine "for any of those [attempts] whether the identification is based on the familiar face from the scene of the crime or the familiar face from the earlier identification attempt." (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 495:13-496:12).

156.     Steblay testified that she had no knowledge as to whether the Cook County States' Attorney's Office during 1989-1998 would request a witness view a physical lineup even if the witness had previously made an identification from a photo array. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 487:18-488:5). Nor did she know what U.S. cities during 1989 to 1998 used repeated identification attempts. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 488:6-10).

157.     Steblay testified that neither the 1999 NIJ report, or the 1998 White Paper on recommended eyewitness identification procedures, included a recommendation regarding repeated identification attempts. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 493:22-494-14).

### *Non-blind lineups*

158.     Steblay testified that the 1999 NIJ Guide was part of the Attorney General's technical working group and was "a very big deal at the time." Then-CPD Sergeant Paul Carroll and another CPD officer, Patricia Marshall, are listed as members of the NIJ working group. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 527:16-529:8).

159.     The 1999 NIJ Guide states that "Psychology researchers have noted that such influences could be avoided if "blind" identification procedures were employed (i.e., procedures conducted by investigators who do not know the identity of the actual suspect). However, blind

procedures, which are used in science to prevent inadvertent contamination of research results, may be impractical for some jurisdictions to implement. Blind procedures are not included in the Guide but are identified as a direction for future exploration and field testing." (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 507:6-8; 507:19-508:3). At the time of the 1998 White Paper, there was limited information as to how a lineup's administrator's knowledge of which lineup member was the suspect influenced witnesses' identifications. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 509:6-19).

160. Suggestive lineups from lineup administrators may be intentional or unintentional as suggestive behavior can occur outside the awareness of the administrator and the witness. (Ex. 115, Steblay Deposition (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 499:6-18; 504:10-19).

161. Steblay assumes that every lineup in the datasets was delivered to a witness by a police officer who knew which lineup member was the suspect and which were fillers because CPD did not have a policy to administer lineups in a blind fashion during the relevant time period, although she did not independently verify her assumption in any of the lineups from the Dataset. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 499:19-500:10; Ex. 116, Steblay Rebuttal Dep in Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, at 81:16-82:1). Steblay conceded that it is possible that some of the lineups in the datasets were conducted by detectives who did not know which participant was the suspect. (Ex. 116, Steblay Rebuttal Dep in Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, at 81:16-82:6).

162. It is possible for witnesses in a non-blind lineup (i.e., a lineup where the administrator knows the identity of the suspect) to make an identification based on their true

47

memory, and all suspect identifications in non-blind lineups are not inaccurate. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 513:8-14).

163.     Steblay was unable to assess in the *Sierra* Dataset whether lineup administrators (a) put more pressure on the witness to choose someone from the lineup, with pressure especially directed toward the suspect, (b) gave nonverbal clues to witnesses viewing lineups, or (c) were more likely to ask about the suspect rather than the filler, because there is no audio or video tape recordings of any of the dataset lineups. (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* pp. 16-17; Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 514:23-515:6; 516:2-13).

164.     Steblay does not know of any identification attempt from any of the lineups in the Sierra Dataset where a witness was steered either intentionally or unintentionally from a filler to a suspect. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 519:24-520:4). She testified that she "didn't look at the files in order to identify specific cases." (Ex. 116, Steblay Rebuttal Dep dated 11/9/23, at 156:17-19).

### *Fillers*

165.     Steblay opines that the near absence of filler identifications in the homicide cases within the Sierra Dataset is significantly different from the 11 field studies, which average 24% filler selections. (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* pp. 18-19).

166.     From 1986-1998, the CPD documented filler identifications as negative identifications. (Ex. 10, Foster 30(b)(6) Dep, at 244:1-13).

167.     Steblay determined that it is not possible that CPD's filler identifications were part of CPD identifications recorded as negative because mathematically there were not enough negative identifications in the Sierra Dataset to include both filler identifications and non-identifications categories.  (Ex. 110, Steblay Report in Iglesias p. 18-19; Ex. 116, Steblay Rebuttal Deposition from Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, at 140:23-142:8).   Steblay determined that there are not enough negative identifications in the Iglesias Dataset to include both non-identifications and filler identifications because there are too many positive identifications. (*Id.*).

168.     Steblay does not know what police departments from 1989-1998 recorded filler identifications as negative identifications.   (Ex.  115,  Steblay  Dep  (Part  II)  from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 520:12-19).

### Lineup Quality

169.     Steblay's analysis of CPD's lineup quality or suspect-bias was of 59 lineups that were conducted by CPD between 2004 and 2005.  She did not conduct that analysis with any data from the datasets she had been provided.  (Ex. 108, Steblay Declaration in Hernandez Brothers, Steblay Report in *Sierra,* pp. 19-20).

170.     Steblay did not perform any analysis to determine whether the lineups in the datasets were biased.  (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 521:17-522:10).

### Limitations in Steblay's analysis

171.     Steblay did not evaluate whether any of the eyewitness identifications from the datasets were fabricated because "[t]here's no way to know that from my data set – the data set." (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 314:3-18).

172.     Steblay did not evaluate whether any of the eyewitness identifications from the datasets were based on eyewitness identifications that were false because there is no way to know the "ground truth" as there is no way to determine if those identifications were accurate or inaccurate, other than filler identifications.     (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 315:2-316:2).

173.     Steblay did not evaluate whether any of the eyewitness identifications from the datasets were based on whether the witness had been intentionally manipulated by the police because "that's not the purpose of my data analysis."  (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 316:3-9).

174.     Steblay did not evaluate whether any of the eyewitness identifications from the datasets were not based on the witness's true memory because "that's not the purpose of my data analysis."  (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 316:10-17).

175.     Steblay did not evaluate whether any of the eyewitness identifications from the datasets were based on mistaken identifications, other than filler identifications as it is impossible to know the "ground truth" of suspect identifications or no identifications. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 316:18-317:3).

176.     Steblay did not conduct any interviews of any of the participants of any of the lineups in the datasets or review any court transcripts or court materials or records related to any of the lineups in the datasets. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 317:6-13).

177.     Steblay did not review any criminal court records to determine if any of the lineups in the datasets were challenged as suggestive or violative of due process, or the outcome of any of

those challenges. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 317:6-13; 469:14-470:5).

178.     Steblay did not conduct any analysis of the files used in the datasets to determine the amount of evidence there was against the suspect(s) before they were placed in a lineup. (Ex. 116, Steblay Rebuttal Deposition from Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, at 146:23-147:2).

179.     Steblay has no understanding of the Cook County State's Attorney's Office felony review process from 1989-1998, nor any knowledge of instances where the CCSAO would request a physical lineup even after a positive identification was made in a photo array. (Ex. 115, Steblay Dep (Part II) from Sierra/Iglesias/Bouto/Rodriguez dated 2/10/23, at 487:18-488:5).

180.     The recommendations in the 2020 White Paper are the "best practices" for lineups based on the current research and describe "pristine conditions" for lineups. Dr. Steblay acknowledges that, even under pristine conditions, there is always a risk a witness will identify an innocent suspect. (Ex. 116, Steblay Rebuttal Dep dated 11/9/23, at 84:18-24; 136:14-17).

### DEFENDANTS' EYEWITNESS ID EXPERT, DR. JOHN WIXTED

181.     Defendants' retained John Wixted, Ph.D., to provide opinion testimony about eyewitness identification procedures related to Plaintiff's *Monell* claim in response to Steblay's letter attaching previous expert reports on the same topic. (Ex. 119, Wixted 2/9/26 Letter).

182.     For Wixted's analysis and opinions in this case, he adopted "in whole, [his] expert reports responding to Dr. Steblay's reports for multiple cases (Bouto, Sierra, Rodriguez, and Iglesias Guevara), dated April 3, 2023, *Johnson v. Guevara*, dated October 10, 2023, *Velez v. City of Chicago,* dated March 15, 2022 as well as *Rivera v. City of Chicago*, dated May 12, 2012, for use I the current case, *Hernandez, et al. v. Guevara, et al.*" (Ex. 119, Wixted 2/9/26 Letter).

51

183.     Wixted states that the 11 field studies used and relied upon by Steblay in her analysis is an unrepresentative statistical comparison to the CPD lineup data because (a) three of the field studies are from the United Kingdom ("UK"); (b) the UK police use lineup procedures unique to the UK (video lineups); (c) the UK field studies used eight or more fillers, which would result in lower suspect ID rates; (d) two of the U.S. field studies used sequential lineups where CPD only used simultaneous lineups.  (Ex. 120, Wixted Combined Report in Bouto, Sierra, Rodriguez and Iglesias ("Wixted Combined Report", pp. 2-3)).  Steblay testified that one of the field studies used entirely sequential lineup procedures, and two others used both simultaneous and sequential lineup procedures, while there were no sequential lineup procedures in the Dataset. (Ex. 116, Steblay Rebuttal Dep dated 11/9/23, at 107:3-10).  Steblay agrees that witnesses are less likely to identify anyone in a sequential lineup.  (Ex. 116, Steblay Rebuttal Dep dated 11/9/23, at 150:7-151:10).  The three U.S. field studies that have the lowest suspect identification rate used sequential lineups.  (Ex. 110, Steblay Report in Iglesias, p. 11 table; Ex. 116, Steblay Rebuttal Dep dated 11/9/23, at 107:3-7).

184.     According to Wixted, if he assumes Steblay's comparison set of 11 field studies is representative of U.S. law enforcement agencies is proper, he opines that the possible explanations for the difference in suspect identification rate between CPD and the studies are that CPD could require more evidence of guilt before placing a suspect in a lineup than the 11 field studied police departments do, which would increase positive ID rate.  (Ex. 120, Wixted Combined Report, pp. 5, 7).

185.     Steblay's rebuttal report does not dispute that having more evidence of guilt before placing the suspect in a lineup could increase the rate of suspect identifications.  (Ex. 121, Steblay's Rebuttal Report in Iglesias, p. 16).  Steblay disagrees with Wixted that an evidence-based suspicion

standard is a possible explanation for a higher suspect ID rate because the CPD written policy regarding lineups did not include such a provision. (Ex. 116, Steblay Rebuttal Dep, 148:6-11). Steblay did not evaluate the CPD files to determine what evidence was developed against a suspect before the suspect was placed in a lineup. (Ex. 116, Steblay Rebuttal Dep., at 146:23-147:2).

186. Wixted opined that there is no "correct" suspect ID rate. Steblay agrees that the 2020 White Paper does not claim there should be a certain suspect identification rate. (Ex. 109, Steblay Deposition (Part I) from Sierra/Iglesias/Bouto/Rodriguez dated 2/9/23, at 213:14-16). She acknowledges that as more field studies are conducted, the average suspect identification rate could change. (Ex. 116, Steblay Rebuttal Dep dated 11/9/23, at 62:17-20).

187. Steblay acknowledged that two of the field studies with higher suspect identification rates included cases that were referred to the researchers from defense attorneys. (Ex. 116, Steblay Rebuttal Dep, at 83:3-84:17). Steblay testified that she would expect the rate of suspect identifications to be higher in those cases. (*Id.*). In Steblay's rebuttal report to Wixted in Velez, Steblay stated that "[o]ne could expect disproportionately high suspect IDs in referred consulting cases (lawyers contact the consultants because they were defending an identified suspect). This is important to know; any future field study should also take the sources of lineups that might inflate suspect ID rates." (Ex. 122, Steblay Rebuttal Report in Velez, p. 10).

### DEFENDANTS' *MONELL* EXPERT, DR. IAN ADAMS

188. Defendants retained Dr. Ian Adams to provide opinion testimony about the City's internal affairs practices related to Plaintiff's *Monell* claim in response to Dr. Shane's October 3, 2025, report. (Ex. 37, Dr. Ian Adams Report, 2/13/26, p. 1).

189. Dr. Adams reported that historical records demonstrate that early intervention systems ("EIS") were "nascent, experimental, and unproven" during 1985-2001, the period which

Dr. Shane evaluates. (*Id.* at pp. 27-28). The first in-depth investigation of EIS was conducted in 2001 and concluded that in 1999 only 27% of law enforcement agencies had an EIS, and only half of those were implemented since 1994. (*Id.* at p. 28; Ex. 123, Samuel Walker, Geoffrey P. Alpert & Dennis Jay Kenney, *Early Warning Systems: Responding to the Problem Police Officer* (2001)). Furthermore, only 56% of agencies with 500-999 sworn officers had or planned to have an EIS. (*Id.*).

190.    Dr. Adams concluded that if EIS worked as intended, officers would be flagged and counseled and should show improvement, however implementing an EIS with complaint-based indicators to identify at-risk officers does not necessarily reduce misconduct. (Ex. 37, Dr. Ian Adams Report, 2/13/26, pp. 29-30). Historical data shows that EIS has no significant effect on reducing citizen complaints because researchers have not agreed on "what warning signs to track, what thresholds to set, or whether the systems' predictions are accurate." (*Id.* at p. 28; Ex. 124, Samuel Walker, *Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide* (2003)).

Dated: April 6, 2026

Respectfully Submitted,
by: /s/ *Eileen E. Rosen*
Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Theresa Berousek Carney
Catherine M. Barber
Sabrina A. Scardamaglia
Lauren M. Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
erosen@rfclaw.com

54