**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JUAN HERNANDEZ AND ROSENDO HERNANDEZ | ) | Case No. 23-cv-1737 |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Hon. Jeremy C. Daniel, |
| | ) | District Judge |
| *v.* | ) | |
| | ) | |
| REYNALDO GUEVARA, et al. | ) | Hon. Heather K. McShain, |
| | ) | Magistrate Judge |
| *Defendants.* | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |

**PLAINTIFFS' STATEMENT OF ADDITIONAL *MONELL* FACTS
IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Alyssa Martinez
**LOEVY & LOEVY**
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

## *MONELL* THEORIES

### POLICIES DID NOT MEANINGFULLY CHANGE OVER TIME

300.     The living Defendant officers in this case testified to having no knowledge of the requirements in the new Special Orders, to receiving no training on the Special Orders, or the obligation to preserve notes or disclose exculpatory information, and further testified to continuing to keep unofficial, personal notes that they destroyed or did not turn over. M.Ex. 1[1], (Biebel Dep. in *Iglesias*) at 96:25-97:4 (Biebel did not know if there were any CPD policies or practices regarding how soon investigative information needed be documented); 155:16-25 (Biebel did not know if the policy was to let detectives decide when to document information learned in an investigation); M.Ex. 2, (Miedzianowski Dep. in *Hernandez*) at 91:3-5 (admitting he would not take notes on GPRs); M.Ex. 3, (Bemis Dep. in *Hernandez*) at 168:16-169:11 (unable to recall what he did with notes at the end of the investigation, and did not give notes to detectives when asked to assist on homicide investigation as a gang team member); M.Ex. 4, Guevara Dep in *Reyes* at 50:12-21 (Guevara pleading the Fifth as to receiving training from the CPD on taking notes or having an understanding of policy about taking notes).

### REPORT OF PLAINTIFFS' RETAINED EXPERT THOMAS TIDERINGTON

301.     Plaintiffs' retained expert Thomas Tiderington identified specific examples of files where documents contained in the homicide files and missing from the criminal defense files were potentially exculpatory information of significant investigative value and should have been disclosed. The six examples for which he discussed at length the withheld investigative material that would have aided the defendant and therefore should have been disclosed under

---

1. The exhibits referenced in this filing can be found at the following docket entries: Dkt. 320, Dkt. 321, and Dkt. 322.

2

standard police procedures are the following: (1) RD # C687989 (Defendant Kim Mathis); (2) RD #Z475236 (Defendant Ardell Clemons); (3) RD #B442532 (Defendant Oscar Soto); (4) RD #B023979 (Leon Fields); (5) RD #A403252 (Defendant Guy Rainey); (6) RD #P272087 (Defendant Demetrius Johnson). In each, the police documents were withheld from the criminal defendant and were of potential exculpatory value. M.Ex. 5 (Tiderington Report) at 54-58; M.Ex. 6 (Tiderington Deposition in *Reyes*) at 601:11-603:8.

302. Tiderington reviewed the homicide files in the case of James Kluppelberg, and appended Mr. Brasfield's report in *Kluppelberg* to his expert report. In that case, Mr. Brasfield's expert report revealed that, of the investigative files produced to Brasfield (from 1983-1991), there were (1) repeated instances of not using official forms to ensure file integrity, including that there was a widespread practice of disregarding the use of Major Crime Worksheets, Investigative Case File Controls, Supervisory (Chain of Command) Reviews, Detective Division Personnel Forms, and Case Assignment Slips; (2) material information was repeatedly omitted from official police reports, including 100% of the case files reviewed being replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information regarding leads for other avenues of investigation, as well as names or descriptions of possible alternative suspects, additional witnesses, and possible alibi witnesses; (3) incomplete investigative files; (4) permanent retention files containing limited information; and (5) incomplete inventories or no indication that inventories were sent to Records Divisions. M.Ex. 5 (Tiderington Report) at 385-457 (Brasfield's Report in *Kluppelberg*).

303. During expert discovery, the Defendants disclosed five retained experts. Among them, the City disclosed a former prosecutor, Bernard Murray, to opine about criminal discovery in Cook County; Mr. Murray has never worked in a police department and concedes he is not

3

offering any opinions about whether the documentation and disclosure policies at issue are adequate or sound policies. M.Ex. 7 (Defendants' Rule 26(a)(2) Disclosures in *Hernandez*); M.Ex. 8 (Murray Dep. in Solache/Reyes) at 38:21-25 (only professional experience is as a prosecutor); 87:13-19, 107:18-109:19, 114:12-115:12; *see also* M.Ex. 9 (Murray Dep. in *Hernandez*) at 33:9-21 (agreeing he is not offering any opinions that he did not offer in past cases where this firm has represented the Plaintiff). The City also disclosed Jeffrey Noble to opine on policies and practices of the City of Chicago in rebuttal to Mr. Tiderington's report, and he admits that he is not providing any opinions in *Hernandez* that were not already provided in *Fields v. City of Chicago* and/or *Rivera v. City of Chicago et al.*, where federal juries in both cases entered verdicts for the plaintiffs and against the City, and judgments were entered against the City on the jury's verdicts, and that since *Rivera*, he has never offered an opinion that a policy or practice of the CPD is unreasonable. M.Ex. 9 (Noble Dep. in *Hernandez*) at 15:1-16:10, 48:13-17, 83:12-15; M.Ex. 10 (Rivera Judgment); M.Ex. 11 (Rivera Verdict); M.Ex. 12 (*Fields* Verdict Summary); M.Ex. 13 (*Fields* Judgment). The other three retained experts do not claim to opine on the City policies with regard to the documentation and preservation of information during homicide investigations.

## FABRICATING IDENTIFICATIONS

304. Since before the 1997 Gonzalez murder investigation, it was common knowledge in law enforcement that a large percentage of erroneous convictions were the result of incorrect or improper eyewitness identifications. As was generally known and accepted in law enforcement before 1997, a police accountability system that does not root out and address misconduct (including misconduct during lineup and photo array identification procedures), and instead simply relies on the investigating officers to police themselves without any supervision

4

or correction through the disciplinary system, leads to foreseeable abuses and additional misconduct (such as fabrications of eyewitness identifications), as well as a foreseeable risk of harm to Chicago citizens from wrongful convictions. *See generally* M.Ex. 14, Shane Report, at 82-119. In fact, even in 1967, the IACP was releasing training material for law enforcement about the failures in witness perception, writing that "Eye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts[.]" M.Ex. 15 (IACP Training Key #67, "Witness Perception," 1967).

305.    For example, in February of 1992, the International Association of Chiefs of Police (IACP) developed a Model Policy pertaining to Show-ups, Photographic Identifications, and Lineups. The 1992 IACP Model Policy cautioned law enforcement that "[w]ords or conduct of any type by officers that may suggest to the witness that the individual is or may be the perpetrator should be scrupulously avoided" to "minimize unjust accusations of innocent persons and to establish evidence that is reliable." M.Ex. 16 (1992 IACP Model Policy) at 1. The 1992 IACP Model Policy and a corresponding 1993 IACP Concepts and Issues Paper on Show-ups, Lineups and Photograph Identification placed law enforcement agencies on notice that failure to ensure scrupulous avoidance of suggestion could result in misidentifications, unjust accusations, and even convictions of innocent persons, while the actual culprit remained free, stating:

> "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result. Misidentifications by eyewitnesses are normally the result of a combination of factors."

> M.Ex. 17 (1993 Concept and Issues Paper) at 1-2.

306.    The 1993 White Paper accompanying the 1992 Model Policy explained the

5

primary reasons that eyewitness identifications were frequently unreliable: frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion M.Ex. 17 (1993 Concept and Issues Paper) at 1.

307. The 1992 IACP Model Policy (and 1993 White Paper) states that at least six photos, including the suspect, should be used in a photo array, and the filler photos should match the suspect in terms of age, height, weight, general appearance, sex, and race. The policy also emphasizes that efforts should be taken to ensure that the suspect's photo does not stand out, for instance, because it is a color photo in a series of black and white photos, or because it is a mugshot in a series of other snapshots. The policy says that only one witness should view a photo array at the same time, and that detectives should never make suggestive statements during the array procedure. The 1992 IACP standard on live lineups says that a live lineup should have four to six fillers who are the same race, sex, approximate height, weight, age, and physical description, and who are similarly clothed. It also says that witnesses should not be shown photographs of the suspect immediately before the lineup, and that detectives should "scrupulously avoid" doing anything that could suggest to the witness who the suspect is. M.Ex.16 (1992 IACP Model Policy) at 2.

308. The 1993 IACP Concepts and Issues Paper also notes that eyewitness identifications are often erroneous and eyewitnesses are easily influenced by law enforcement. By 1993, IACP was informing police departments that witnesses have a tendency to believe that the suspect is in a lineup, and will pick the person from the lineup who most closely resembles the perpetrator. IACP advised that "[i]t is even desirable to tell the witness that the perpetrator may not be among those in the lineup"; and suggested that detectives should not pressure tentative witnesses to make positive identifications. It also notes that if more than one witness

6

views the same lineup, the witnesses should be kept separate. It also says that witnesses should not be shown photographs of the suspect immediately before the lineup, and that detectives should "scrupulously avoid" doing anything that could suggest to the witness who the suspect is. M.Ex. 17 (1993 IACP Concepts and Issues Paper) at 2.

309. The 1993 IACP Concepts and Issues Paper quoted from the Supreme Court's 1967 decision in *United States v. Wade*, 388 U.S. 218 (1967), stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined." M.Ex. 17 (1993 IACP Concept and Issues Paper) at 1; see also M.Ex. 15 (IACP Training Key #67, "Witness Perception," 1967) (confirming that the weakness of eyewitness identification and description has "long been recognized by the courts[.]").

310. The City's Rule 30(b)(6) designee, Lt. Foster, established that the City understood this big-picture IACP guidance. For instance, Lt. Foster testified that "[detectives] could generate unduly suggestive photo arrays, which . . . definitely erodes their authenticity and their value." M.Ex. 18 (Foster Dep. in *Sierra*) at 282:23-283:7; *see also id*. at 55:12-18 (Foster providing binding testimony regarding City of Chicago's policies and practices from 1986 to 1998 related identification procedures). Foster also testified that it was understood by supervisory staff, including sergeants, lieutenants, and commanders of detectives that there were risks that an unduly suggestive photo array could lead to an identification that was not "authentic," and that noncompliance with proper procedure could result "in identification of the photographs being abused" or being quashed by a motion in court. *Id*. at 284:5-16, 286:6-287:10, 288:19-25.

### *Policies*

311. The City of Chicago's policy regarding lineup procedures, effective at the time of

the Gonzalez investigation, was General Order ("GO") 88-18. M.Ex. 19 (G.O. 88-18).

312.    Foster testified that homicide detectives' supervisors were aware that these policies applied to homicide detectives, and that the command staff, commanders, lieutenants, sergeants, and supervising homicide detectives knew why this policy existed, and if policies were not followed, it could result in false identifications or misidentifications. M.Ex. 18 (Foster Dep.) at 285:4-15, 287:8-10.

313.    A witness's identification of a filler can be highly exculpatory information. It is a greater indicator that a witness is unreliable, and therefore more exculpatory, than when a witness fails to make any identification at all in a lineup; this is because when an eyewitness looks at a lineup and identifies a filler, the eyewitness is saying (in effect) that the filler looks more like the culprit than does the suspect. M.Ex. 20 (Hickey Dep in Rivera) at 262:12:24; M.Ex. 21 (Steblay Rebuttal Report in *Iglesias*) at 19.

314.    Neither G.O. 88-18 nor any other policies in effect in 1997, during the Gonzalez investigation, governed the conduct for filler identifications or photographic lineups. M.Ex. 19 (G.O. 88-18) (no instructions for filler identifications, no instructions for photographic lineups); M.Ex. 18 (Foster Dep. in *Sierra*) at 201:1-20 (G.O. 88-18 references lineups, but not photo arrays, gang books or photo books), 242:13-243:5 (G.O. 88-18 was in place from 1988 to 1998), 243:6-25 (Special Order S06-02 went into effect after 1998, and was the first policy providing policy guidance as to the conduct of photo arrays), 303:11-15, 304:5-11, 307:5-11 (G.O. 88-18 was the only policy guidance about conducting or documenting live lineups from 1988 to 1998).

315.    Regarding live lineups, G.O. 88-18 required a report to be written for live lineups documenting the date, time, location of the lineup, police conducting, persons viewing, persons present, persons participating in lineup, all persons identified, the person photographing the

8

lineup, all comments of counsel for the arrestee, and any additional information or unusual circumstance occurring during the lineup. M.Ex. 19, G.O. 88-18, at 2.

316. G.O. 88-18 does not require blind administration of lineups. M.Ex. 19, G.O. 88-18.

317. G.O. 88-18 did not require documentation of the selection of a filler in a live lineup. M.Ex. 18, (Foster Dep.), at 244:1-13 (identifications only considered positive or negative identifications of suspects), 309:7-10 (under G.O. 88-18, "if the person identified in the lineup was a filler, that [designation] would not be documented."). Indeed, policies provided no guidance on what to report when a filler was selected. M.Ex. 20 (Hickey Dep. in Rivera), 264:11-265:19.

318. The City's Rule 30(b)(6) witnesses have variously testified that filler identifications were documented as negative identifications, M.Ex. 18 (Foster Dep.) at 244:9-13, and that filler identifications were not documented. M.Ex. 20 (Hickey Dep. in Rivera), 261:24-262:6, 264:11-265:19.

319. G.O. 88-18 contains no instruction regarding what was required before a supervisor approved a live lineup report. M.Ex. 19 (G.O. 88-18) at 1-3.

320. G.O. 88-18 contains no requirement to document the comments of what police conducting lineups said to witnesses or vice versa, and contains no requirement to document exculpatory or impeachment information arising from lineup procedures. M.Ex. 19 (G.O. 88-18) at 1-3.

321. Lt. Foster also testified that there was no policy against showing a single photo during a stranger identification procedure and that there was no policy against showing a witness a single photo before the witness views a live lineup. M.Ex. 18 (Foster Dep.) at 206, 207:24-

208:9 (agreeing that, as a matter of policy, there was no prohibition on single photos being shown, and no direction or instruction given to detectives that single photo identifications were prohibited), 267-68, 271-72.

322.    He also testified that CPD had no policies instructing detectives that once they obtained a positive identification from a photo array, they should not conduct an additional identification procedure with that witness, or that a subsequent live lineup identification is less reliable if the suspect is the only person who appears in both the photo array and live lineup. M.Ex. 18 (Foster Dep.) at 293:21-25, 294.

323.    Foster also testified that a photo array only required four fillers. M.Ex. 18 (Foster Dep.) at 197:1-22. The 1992 IACP model policy states that at least six photos, including the suspect (meaning five fillers), should be used in a photo array. M.Ex. 16 (1992 IACP Model Policy) at 1.

324.    Foster testified that there was no applicable policy ensuring that a suspect did not have restraints or other indications that they were a person in custody during the course of a lineup. M.Ex. 18 (Foster Dep.) at 316:3-10.

325.    In Rivera, the City was asked to identify a single file—from anywhere at any time—in which a lineup report reflected the identification of a filler. M.Ex. 22 (Doc. No. 64, Plaintiff's Motion to Compel Regarding Filler Lineups (describing the history of this issue and Rivera's discovery requests].) The City responded that it would identify such a file if it found it, and it never updated that response. M.Ex. 23 (City Supplemental Response to Plaintiff's First Interrogatories, Request No. 14, July 2013.)

326.    Foster agreed that a gang specialist could interview a witness and learn information pertinent to the homicide investigation outside the presence of any detective, and

10

there was no requirement that the gang specialists had to document that interview. M.Ex. 18 (Foster Dep.) at 319:19-323:4. Even if the gang specialist did document pertinent information the specialist acquired, there was no policy requiring that information to get to the Detective Division, or training on the issue. *Id*. at 332:11-20.

327.     Special Order S06-02 went into effect after 1998, and was the first policy providing policy guidance as to the conduct of photo arrays; it did not apply from 1986-1998. M.Ex. 18 (Foster Dep.) at 243:6-25. Foster was unaware of any other policy applying to the conduct of photo book procedures. *Id*. at 202:20-23.

### Dr. Nancy Steblay's Testimony

328.     Plaintiff disclosed Nancy Steblay as an expert in eyewitness identification, with specific expertise in eyewitness identification evidence collection procedures, memory, social-influence, decision-making, jury decision processes, and law enforcement eyewitness evidence procedures, in support of Plaintiff's Monell claim against the City of Chicago. M.Ex. 24, Plaintiffs' Rule 26(a)(2) Disclosures, at 1; M.Ex. 25 (Steblay Combined Report) at 1-2; see also CV attached to her Report. In addition to disclosing an initial report, Dr. Steblay disclosed a rebuttal report responding to opinions of defense expert Dr. Wixted, which incorporates an earlier rebuttal to Dr. Wixted (May 1, 2022) in the Velez case. M.Ex. 21 (Steblay Rebuttal in *Iglesias*, July 3, 2023); In this report, Dr. Steblay adopted in whole her expert reports disclosed in *Sierra v. Guevera*, et al. (dated 9/16/22), *Iglesias v. Guevara, et al.* (10/18/22), and *Johnson v. Guevara, et al.,* (3/1/23). M.Ex. 25 (Steblay Combined Report), 10/3/25 Cover Letter.

329.     Plaintiff retained Nancy K. Steblay, Ph.D., Professor Emeritus of Psychology at Augsburg University in Minneapolis, Minnesota, where she has been teaching and doing research on eyewitness topics since 1988. She is an expert on topics of social influence, memory,

11

decision-making, and jury decision processes, with specific expertise in eyewitness identification evidence collection procedures. She has authored over 45 publications, which involve a quantitative method called meta-analysis as well as the analysis of empirical data from the lab and from real witnesses to crime in the field. She has conducted workshops, information sessions, and lectures on eyewitness identification evidence to attorneys, prosecutors, police, and judges in the United States and Canada, and has worked with prosecutors, law enforcement, and other public officials and policy makers to help reform eyewitness identification procedures. She has served on the editorial boards of four major scientific journals that publish research on eyewitness identification. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*)[2] at 1; see also CV attached to her Report).

330. In Sierra, the City was required to produce 523 homicide files across a time period of five years (1991 – 1995) from Area Five. M.Ex. 26, (12/3/2019 Order Compelling Production, Sierra Dkt. 154); M.Ex. 27 (6/20/2020 Amended Joint Scheduling Order on Monell Discovery, Sierra Dkt. 195). Likewise, in *Bouto v. Guevara*, No. 19-c-2441, the City was required to produce Area Five homicide files from 1989 to 1993. M.Ex. 28 (8/3/20 Mem. Op. & Order on Pl.'s Mot. to Compel, Bouto Dkt. 153). Additionally, in *Reyes* and *Rodriguez*, the City was required to produce homicide files from 1995-1998. M.Ex. 29 (Dkts. 224, 384, *Reyes v. Guevara*, No. 18-c-1028 (1995-1998 Area Five homicide files ordered to be produced)); M.Ex. 30 (Dkt. 186, *Rodriguez*, 5/3/2022 Order Compelling Production, Rodriguez). Collectively, these files constituted the compelled homicide files for this time period that were provided to Dr. Steblay. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 3, 5; *see* M.Ex 162 (Iglesias Dkt. 167 at 1, 4 (allowing Plaintiff Iglesias to rely on homicide files over City's

---

2. Plaintiffs refer to Dr. Steblay's expert report in *Iglesias*, which begins at page 449 of her disclosed materials. Plaintiffs will use the page numbers within her disclosure for this case.

opposition)).

331.    Plaintiff's counsel compiled an Excel spreadsheet detailing the 2786 identification procedures (live lineups and photo arrays) reported in the 905 compelled Monell homicide files for the time period from 1989 to 1998 and provided it to Dr. Steblay, along with a description of the information coded. Dr. Steblay was provided access to all of the underlying files. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 3, 5. The dataset included a range of identification practices (e.g., showups, photo lineups, live lineups) and variations in lineup size, number of suspects in the lineup, and circumstances of the identification (e.g., prior relationship between suspect and eyewitness as strangers or non-strangers). M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 3.

332.    Dr. Steblay discussed with Plaintiffs' counsel how the coding for the files would be most efficient and effective for her analysis. Dr. Steblay was assured that the coding was reliable by taking the following steps:

> First, I ensured that the coding team was using objective and clear definitions for the coded variables. This was accomplished by referring to critical variables in earlier datasets (e.g., the Wells, et al., 2020 White Paper), and by documenting the definitions for the coded variables in the Excel spreadsheet. The primary variable of interest was the witness's decision as per three possible categories: suspect identification, filler identification, or non-identification. The current dataset also included suspect IDs that were tentative. These were defined as a witness's expression of "any degree of equivocation." Second, the coding was done by at least two independent coders, who then compared their work to catch discrepancies. The means to resolve discrepancies was clear. The variables coded in this current set are for the most part objective with no interpretation necessary. Still, a review between coders can catch errors that stem from an overlooked item in the file or mis-keyed data. When a variable involves the possibility of subjectivity or confusion (e.g., "Is there any evidence of equivocation such that this ID is *tentative* as opposed to positive?"), the comparison between coders will help to maintain consistency in the coded results. Third, the data analyst (me) will spot-check a subset of files in order to ascertain whether there is clear agreement and understanding between the coders and the analyst about each variable in the set. In addition, the data analyst (me)

13

will independently examine a randomly-selected subset of lineups (approximately 200) as a means to verify coding accuracy.

M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 6.

333.    Dr. Steblay concluded that her interrater agreement surpassed 98%. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 2-3. The strong interrater agreement gave Dr. Steblay confidence in the quality of the underlying data. M.Ex. 21 (Steblay Combined Report, Steblay Report in *Iglesias*) at 2-3; M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 5-6; M.Ex. 31 (Steblay 2/9/23 Dep.) at 225:21-226:15, 93:22-94:19, 241:11-241:18. The data coding process does not call for any subjective decision-making. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 2; M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 5-6; M.Ex. 31 (Steblay 2/9/23 Dep.) at 88:5 90-91:23.

334.    The data summary first released to Dr. Steblay in Sierra underwent ongoing quality control measures and was not finalized until it was re-released to Dr. Steblay in the Iglesias Data Summary, which covered all Area Five homicide files from 1989-1998, and was discussed and incorporated by Dr. Steblay in her rebuttal report. M.Ex. 31 (Steblay 2/10/23 Dep.) at 390:3-392:7; see also, e.g. M.Ex. 31 (Steblay 2/10/23 Dep.) at 407:12-407:24; M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 4-5, 21, 10-12 (incorporating M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 11-12); M.Ex. 31 (Steblay 2/10/23 Dep) at 390:3-392:7; M.Ex. 31 (Steblay 2/10/23 Dep.) at 407:12-407:24. The results of Dr. Steblay's analyses were highly consistent both before and after completion of the quality control process, finding abnormally high suspect identification rates and abnormally low filler identification rates. M.Ex. 31 (Steblay 2/10/23 Dep.) at 573:3-574:15; M.Ex. 31 (Steblay 2/10/23 Dep) at 527:4-527:8; M.Ex. 25 (Steblay Report in *Iglesias*) at 11-112 (incorporated by Dr.

14

Steblay in her *Sierra* rebuttal report), M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 4-5, 21, 10-12.

335. The *Sierra* and *Iglesias* datasets identified specific page references for each lineup procedure, and were shared with all parties. M.Ex. 32 (Sierra Data Summary); M.Ex. 33 (Iglesias Data Summary); *see also* Dkt. 294, 294-2, 294-8. The City also had the underlying homicide files. M.Exs. 26, 27. Defendants' expert responding to Dr. Steblay concedes that he does not challenge the data on which Dr. Steblay relies and has not identified any error in that data. Ex. 163 (Wixted Report), at 2; M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 4.

336. Dr. Steblay observed that, between 1989 and 1998 in the Chicago dataset, witnesses participating in Chicago identification procedures picked the police officer's suspect 75% of the time, made no identification 25% of the time, and selected a filler less than 1% of the time (in only nine instances in the entire dataset). Five percent of the lineup reports did not document the outcome of the lineup. Additionally, of the 2786 lineups, 23% of them included multiple suspects, and 20% concerned a repeat identification procedure with the same witness and suspect. Most lineups were smaller than six people in the procedure (58%). In 74% of identification procedures, the witness did not know the suspect, and in the remaining 26% of procedures the witnesses reported that the suspect was a familiar person at the time of the crime. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 3, 6-7.

337. In addition to making these observations, Steblay compared the results of the Chicago dataset with data reported in the 2020 White Paper, a peer-reviewed, consensus document signed by leading eyewitness scientists. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 2-3; M.Ex. 35 (2020 White Paper). The 2020 White Paper aggregated the

data from the eleven available peer-reviewed field studies reporting lineup outcome data and found the compilation valuable to illuminate the behavior of real eyewitnesses in the field. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 2-3; M.Ex. 35 (2020 White Paper) at 4-5. The field data reported in the 2020 White Paper reflects the outcomes of 6,734 lineups (both live and photo) conducted by police in actual cases across varied jurisdictions, including Northern California, San Diego, Houston, Tucson, Austin, Charlotte, and London, England. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 6-7; *see also* M.Ex. 35 (2020 White Paper) at 4-5. The data from the field studies is aggregated and compiled in Table 1 of Dr. Steblay's report. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 3. This data has been used independently in other published, peer-reviewed articles in multiple journals and at least one successful research grant. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 2; M.Ex. 35 (2020 White Paper) at 5.

338. The 11 field studies comprising the Table I data "are from highly varied jurisdictions." M.Ex. 35 (2020 White Paper) at 5; M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 6. The studies "encompass ten cities of varying sizes and locations," and varying police practices among those cities. Steblay reports that the data from these samples show regularities in the pattern of eyewitness decisions, despite the police practice variations. She reports that "[d]ifferences in practices among the 11 field studies are a strength, not a weakness, of this dataset because they support generalizability of the eyewitness decision patterns across many practices. That is, we can expect these patterns from eyewitnesses across varied police practices." M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 6-7. She also explains that, because the studies show variability in eyewitness responses to lineups, an examination of the police practices can help explain the variability in that data. M.Ex. 21

16

(Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 7.

339. The eleven published field studies report the frequencies of lineup outcomes (suspect IDs, filler IDs, and non-identifications) for a total of 6,734 field lineups (including both photo and live lineups), each with a single suspect in the field lineup (no multiple-suspect lineups) making a first identification attempt. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 7. Dr. Steblay noted that three of the studies in Table 1 did not provide information about the relationship between witness and offender, and so her conservative assumption that all Table 1 data are stranger IDs was "favorable to the defense case," as the presence of unreported familiar-perpetrator identifications would potentially increase suspect ID rates in those three studies. Likewise, no study reported repeated identification tasks with the same witness and suspect, so her conservative assumption that all lineups in the field data were first identifications was favorable to the defense case as the presence of unreported repeated identifications would potentially inflate suspect ID rates. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 7. Double-blind (meaning using pristine procedures) lineup procedures were not required. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 7.

340. The aggregated field studies revealed that witnesses selected the police suspect 40.8% of the time, a known-innocent filler 23.7% of the time, and no one 35.5% of the time. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 3, 10; M.Ex. 35 (2020 White Paper) at 4-5.

341. To compare the Chicago dataset to the eleven field studies, Dr. Steblay removed lineups with benign, evidence-based components of police practice that might otherwise inflate the suspect identification rate. M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*)

at 9 (noting the field data involving eyewitnesses making first identification attempts of stranger-perpetrators from a single-suspect lineup).

342.    For instance, the Chicago lineups include non-stranger suspects, multiple-suspect lineups, and repeated identification procedures with the same witness viewing the same suspect, factors that could elevate suspect identification rates. Therefore, she screened out those three components of police practice prior to the comparison with the 11 field studies. M.Ex. 25 (Steblay Report) at 9-11. She describes this process in more detail in her Report. (*Id*. at 9-11, 13-20). First, Dr. Steblay excluded familiar-perpetrator lineups, where the witness knew the perpetrator, as such lineups have inflated suspect identification rates. M.Ex. 25 (Steblay Report) at 13-16, 3-4 & 9; M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 7. Dr. Steblay also excluded multiple-suspect lineups, and repeat lineups with the same witness and filler, as those were excluded in the field study data. *Id*. Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first viewing, single-suspect lineups (the "Comparison Subset"). M.Ex. 25 (Steblay Combined Report, Steblay Report in *Iglesias*) at 3-4 & 9.

343.    After removing lineups associated with the above police practice components, the total number of lineups included in the comparison subset was 1076. M.Ex. 25 (Steblay Report) at 4. When Dr. Steblay compared the Chicago lineup outcomes in the Comparison Subset with outcomes in the aggregation of the 11 field studies, she found as follows: in the aggregated 11 peer-reviewed studies, among the 6,734 attempts by eyewitnesses to identify the perpetrator from a lineup, only 41% identified the suspect, 24% identified a known-innocent filler, and 35% identified no one. In comparison, the Chicago lineups produced 70% suspect identifications, 0.09% filler picks, and 30% non-identifications, a significantly different pattern of outcomes.

18

M.Ex. 25 (Steblay Report) at 4, 10.

344.    To test the statistical significance of the findings, Dr. Steblay used a Chi-Square test to calculate a probability (called a p-value) that the two samples would yield the difference being observed based on mere chance. The results were statistically significant; the Chi-Square test yielded a p-value of less than 0.00001. Dr. Steblay opined that the difference between the field studies and Chicago's high suspect identification rate and low filler identification rate was therefore statistically significant, and that there was less than a 1 in 100,000 chance that the difference could be explained by chance. M.Ex. 25 (Steblay Report) at 10-11.

345.    At the time of her report in this case, Dr. Steblay had six additional Chicago Police Department lineup outcome datasets from legal cases: *Velez*, *Rivera v. City of Chicago, Sierra, Rodriguez, Bouto*, and a set from a FOIA study, in which Dr. Steblay personally managed the coding of the data. M.Ex. 25 (Steblay Report) at 12-13. In all three sets, the Chicago suspect identification rate (54-74%) is significantly higher than the aggregate field studies (41%). The suspect identification rate in the five cases, shown together, are as follows:

(2004-2005) 54% US (*FOIA*)
(1996-2001) 55% US (*Velez*)
(1985-1997) 55% US (*Rivera*)
(1991-1995) 74% US (*Sierra*)
(1995-1998) 70% US (*Rodriguez*)
(1989-1993) 73% US (*Bouto*)

M.Ex. 25 (Steblay Report) at 12-13; see also Velez Report, Rivera Report, Sierra Report, Rodriguez Report, Bouto Report, and FOIA Study (attached to Steblay's Report).

346.    Dr. Steblay then analyzed all evidence-based explanations for why Chicago has a dramatically lower filler identification rate and higher suspect identification rate than other jurisdictions: (a) familiar perpetrator identifications (where the witness knows the suspect); (b) multiple suspect lineups, including those with too few fillers; (c) repeated identification

19

procedures with the same suspect and witness, and instances in which police show the witness the suspect, in a photo or show-up, prior to the lineup; (d) steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly; (e) a failure to report filler identifications; and (f) biased lineup constructions where the suspect stands out. M.Ex. 25 (Steblay Report) at 12-20.

347. Dr. Steblay eliminated explanations (a), (b), and (c) from the Chicago database before it was compared to the field studies, and so these explanations could not explain the significantly higher suspect identification rate. M.Ex. 25 (Steblay Report) at 20.

348. Explanation (e)—that the City does not report filler identifications—is denied by the City and would violate its policy—and so that explanation can be eliminated. M.Ex. 19, (General Order 88-18) at 2; Dkt. 294 at PageID 23299. That leaves fabrication of identifications using the improper techniques identified in explanations (d) and (f) —steering and suggestion to witnesses and presenting lineups where the suspect stands out–as the remaining explanations for Chicago's radically high suspect identification rate.

349. Dr. Steblay confirms that CPD eyewitness filler picks cannot simply collapse into non-identifications in the CPD lineups. She describes that, even if all of the non-identifications were fillers, adjusting for that in the analysis "would not bring the CPD numbers into alignment with the 11 field studies—and there would be no non-IDs left." M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 18.

350. With that explanation removed, Dr. Steblay opined that the anomalous absence of filler picks in Chicago lineups reflects that "either filler picks are systematically not entered into the record or witnesses are being steered away from fillers (explicitly or implicitly), or both." M.Ex. 25 (Steblay Report) at 18. The City itself denies that filler picks were systematically

20

unrecorded. E.g., Dkt. 294 at PageID 23299. The City's own policy directly contradicts that filler picks were unrecorded, stating that "In no case will a lineup be conducted without a Supplemental Report being completed" M.Ex. 19 (General Order 88-18) at 2 (emphasis in original). This leaves systemic steering away from known-innocent fillers toward the police suspect as the remaining explanation for Chicago's absence of filler identifications.

351.    Regarding (f), lineup quality such that the suspect stands out, Dr. Steblay opined that it was a mechanism known to facilitate false positive identifications, and referenced her evaluation in a separate Chicago study that found a high bias rate. In that study, Dr. Steblay also relied on five subsets of field data from eight U.S. cities (Steblay & Wells, 2021), that she evaluated in order to study structural lineup bias in lineups. Dr. Steblay found that the highest bias rate (68%) occurred with a set of 59 Chicago live lineups conducted between 2004-2005. That is, in 68% of the Chicago lineups sampled, mock-witnesses—with no memory of a culprit—were able to identify the police suspect at a rate significantly higher than chance. M.Ex. 25 (Steblay Report) at 19, 20-22.

352.    Regarding (d), Dr. Steblay notes the occurrence of repeated-identification lineups in Chicago and that they present the danger of influencing a witness and a lack of protections for an innocent suspect. M.Ex. 25 (Steblay Report) at 14-17.

353.    The City's lineup outcomes are so anomalous that mere innocuous conduct cannot explain them. As Dr. Steblay notes, "[a]mong the 11 field studies, there were some with better practices and some with more problematic practices (such as non blind lineup administration)." M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 12. Yet "the CPD suspect ID rate [] is significantly higher than any of the 11 field studies." Id. (emphasis in original); see also *supra* at 6-7 (the idea that "eyewitnesses in CPD cases had the incredible memory strength

to find a guilty suspect in the lineup (70% of lineup decisions) and never make an affirmative error (<1% filler picks) . . . . defies what we know about eyewitness decisions—from the lab or the field"). Even in other jurisdictions that conducted non-blind lineups that permitted inadvertent suggestion, for example, their suspect and filler identification rates look different than Chicago's. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 12, 6.

354. Dr. Steblay performed an additional analysis of the association between Detective Guevara's presence in lineups and the rate of suspect identifications, and did not find a significantly different suspect identification rate than the lineups conducted by other Chicago officers in the data. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 20.

355. Dr. Steblay's rebuttal report concludes that there is no evidence that Chicago used evidence-based suspicion to place a suspect in a lineup. M.Ex. 21 (Steblay Combined Report, Steblay Rebuttal in *Iglesias*) at 16. It also refers to the 2020 White Paper, which states that there are no jurisdictions in the United States that have a policy to require independent evidence that a suspect committed the crime before placing him in the lineup, which includes Chicago. *Id*.

356. After Dr. Steblay wrote her report in *Sierra*, the City produced additional homicide files in *Bouto*, *Rodriguez*, and *Iglesias*:

> a. **Bouto**: Dr. Steblay's dataset in *Bouto* included 1335 eyewitness decision outcomes from Chicago police lineups in 457 homicide files, for the time period from 1989 to 1993. M.Ex. 36 (Steblay Report in *Bouto*) at 5. The comparison subset in *Bouto* included 540 Chicago lineups, after removing familiar-perpetrator lineups, multiple-suspect lineups, and repeated identification lineups from the dataset. *Id*. at 10. In this study, the suspect identification rate was 73%, compared to the field study average of 41%. *Id*. at 10-11. That revealed a statistically significant difference. *Id*. at 10-11. In the *Bouto* data, of the 1335 eyewitness decision outcomes in the full dataset, only one was a filler pick; and among the comparison subset, there were zero. *Id*. at 18. This revealed another statistically significant difference from the field studies, which

average 24% filler identifications. *Id.* at 18-19.

b. ***Rodriguez***: Dr. Steblay's dataset in *Rodriguez* included 1103 eyewitness decision outcomes from Chicago police lineups, for the time period from 1995 to 1998. M.Ex. 37 (Steblay Report in *Rodriguez*) at 3, 5. The comparison subset in *Rodriguez* included 403 Chicago lineups, after removing familiar-perpetrator lineups, multiple-suspect lineups, and repeated identification lineups from the dataset. *Id.* at 9-10. In this study, the suspect identification rate was 70%, compared to the field study average of 41%. *Id.* at 10-11. That revealed a statistically significant difference. *Id.* at 10-11. In the *Rodriguez* data, of the 1103 eyewitness decision outcomes in the full dataset, only four were filler picks; and among the comparison subset, there were zero. *Id.* at 18. This revealed another statistically significant difference from the field studies, which average 24% filler identifications. *Id.* at 18-19.

c. ***Iglesias***: Dr. Steblay's dataset in *Iglesias* included 2786 eyewitness decision outcomes from Chicago police lineups, for the time period from 1989 to 1998. M.Ex. 25, Steblay Combined Report, Steblay Report in *Iglesias*, at 5. The comparison subset in *Iglesias* included 1076 Chicago lineups, after removing familiar-perpetrator lineups, multiple-suspect lineups, and repeated identification lineups from the dataset. *Id.* at 9. In this study, the suspect identification rate was 70%, compared to the field study average of 41%. *Id.* at 10-11. That revealed a statistically significant difference. *Id.* at 10-11. In the *Iglesias* data, of the 2786 eyewitness decision outcomes in the full dataset, only nine were filler picks; and among the comparison subset, there was only one filler pick. *Id.* at 17. This revealed another statistically significant difference from the field studies, which average 24% filler identifications. *Id.* at 18.

357.    These rates were consistent across all cases. Indeed, after these productions, Dr. Steblay had seven data sets, all secured from legal cases: Velez (n = 523 for the comparison subset); Rivera v. City of Chicago (2016, n = 666); Sierra (n = 540); Bouto (n = 540), Rodriguez (n = 403), Iglesias (n = 1076) and a set from a FOIA lawsuit (discussed in Steblay, 2011, n = 359). M.Ex. 25 (Steblay Report) at 9, 12; M.Ex. 37 (Steblay Report in *Rodriguez*) at 4. In all sets, Dr. Steblay concluded that the Chicago suspect identification rate (54-74%) is statistically

23

significantly higher than the aggregate field studies (41%).

(2004-2005) 54% (*FOIA*)
(1996-2001) 55% (*Velez*)
(1985-1997) 55% (*Rivera*)
(1991-1995) 74% (*Sierra*)
(1995-1998) 70% (*Rodriguez*)
(1989-1993) 73% (*Bouto*)
(1989-1998) 70% (*Iglesias*)

M.Ex. 25 (Steblay Report) at 12.

## SUPERVISION AND DISCIPLINE

### THE CITY'S CENTRALIZED SYSTEM FOR INVESTIGATING AND DISCIPLINING OFFICERS ACCUSED OF MISCONDUCT

358.    A CR File is initiated when a member of the community or someone within the Chicago Police Department ("CPD") reports alleged misconduct by a police officer. During the 1986-1998 timeframe, the Office of Professional Standards ("OPS") was responsible for generating and assigning a CR number to any complaint the Department received. M.Ex. 38 (Bird Dep) at 49:17-23; M.Ex. 39 (Moore Dep.) at 66:4-10; 67:17-68:8; 68:17-69:7; 70:3-70:6; M.Ex. 14, Shane Report at 22-26; M.Ex. 12 (Skahill Dep.) at 25:2-5 & 46:2-19. Depending on the nature of the officer's alleged misconduct, the CR File would be assigned to either OPS or the Internal Affairs Division ("IAD") for investigation. M.Ex. 38 (Bird Dep) at 31:4-6, 34:24-36:12; Ex. 10 (Moore Dep.) at 62:21-66:10; M.Ex. 40 (Skahill Dep.) at 46:2-19. At the conclusion of its investigation, OPS or IAD would reach one of four possible findings for each allegation against each accused officer: Sustained, Not Sustained, Exonerated, or Unfounded. M.Ex. 38 (Bird Dep) at 61:11-23. M.Ex. 39 (Moore Dep.) at 95:6-13; M.Ex. 40 (Skahill Dep.) at 58:23-60:6. The City's General Orders 93-3 and 08-01, regarding investigation of officer misconduct and discipline, applied to all officers regardless of their assignments and did not vary

24

by geographic area. M.Ex. 41 (General Order 93-3, City 068241); M.Ex. 42 (General Order 08-01 and Addenda, eff. 1/13/93). General Investigations were conducted by a central staff of investigators and cases were not assigned for investigation based on geographic area or precinct. M.Ex. 39 (Moore Dep.) at 67:17-68:8 & 71:10-73:15; M.Ex. 40 (Skahill Dep.) at 48:11-48:24.

359.    As it relates to supervision of CPD officers, in 1995, Superintendent Matt Rodriguez said that the Personnel Concerns Program was seriously flawed because: (1) it was so subjective; (2) it provided no standard patterns of unacceptable behaviors; and (3) the program failed to identify at-risk personnel before their behavior became unacceptable. M.Ex. 43 (Burke, T.W. (June 1995). *Predicting Police Misconduct With a Neural Network Program*. Law Enforcement Technology, 22(6), pp. 56-57).

## THE CITY'S NOTICE OF, AND FAILURE TO RESPOND TO, THE TORTURE COMMITTED BY JON BURGE AND HIS ACOLYTES

360.    An investigation convened by the Office of the Special Prosecutor concluded in 2006 with findings that Burge had committed aggravated battery, obstruction of justice and perjury and that several other officers had abused other individuals. The Special Prosecutor investigation further found that because Jon Burge was the Commander of Area 2 and Area 3 and it was known he could abuse suspects and witnesses and fabricate evidence with impunity, those who served under his command recognized that they, too, could engage in the same abusive conduct without consequence. The Special Prosecutor's Report concluded: "The evidence supports the conclusion that Superintendent Brzeczek was guilty of a 'dereliction of duty' and did not act in good faith in the investigation of the claim of Andrew Wilson. Despite the fact that Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson he kept that belief to himself for over twenty years. He also kept Burge in command at Area 2 and issued a letter of commendation to all of the detectives at Area 2."

The Special Prosecutor's report further concluded that, "[a]t the very least," then-Superintendent Brzeczek's non-delegable duty required him to have "removed Jon Burge from any investigative command" and "conducted a complete shake-up at Detective Area 2" upon being informed of injuries to Wilson. There is no evidence that the City responded to this report with any discipline or policy changes. Ex. 44 (Special Prosecutor's Report) at 17, 71-72 & 88; M.Ex. 14, Shane Report at 96-103.

361. In March 1990, two Chicago Police Department investigators in the Office of Professional Standards ("OPS") were assigned to investigate Andrew Wilson's allegations that Chicago Police Department commander Jon Burge had tortured him and fabricated evidence against him, as well as to "determine if there was systematic abuse at Area 2 during that period [1982] and if so, to determine the culpability, if any, of Area 2 Command Personnel," and an investigator sustained allegations against Burge and two other officers. M.Ex. 45 (John Conroy, *House of Screams*, Chicago Reader (Jan. 25, 1990), http://www.chicagoreader.com/chicago/house-of-screams/Content?oid=875107); M.Ex. 46 (Special Project Conclusion Report dated Nov. 2, 1990) at AR-L 150959-150983; M.Ex. 14, Shane Report, at 102-103.

362. In September 1990, OPS Investigator Michael Goldston completed a report of investigation into Burge's misconduct and found that command members actively participated in the torture and/or failed to stop it, writing, "In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beatings but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel

26

assigned to Area 2 engaged in methodical abuse." M.Ex. 47 (Goldston Report, Sept. 28, 1990 identifying 50 instances of torture at Area 2) at AR-L 150959-150983; M.Ex. 14, Shane Report, at 102-103. The City no longer disputes that Burge and others committed egregious acts of misconduct between 1972 and 1991; the City provided a formal apology via ordinance in 2015 to the victims of police torture between 1972 and 1991 by Burge and the officers under his command at Areas 2 and Area 3. *See* M.Ex. 48 (Substitute Resolution on Reparations for Burge Torture Victims, Chi. City Council (May 6, 2015), https://www.chicago.gov/content/dam/city/depts/dol/supp_info/Burge-Reparations-Information-Center/BurgeRESOLUTION.pdf).

363.    Investigator Goldston found that although fifty alleged victims had alleged beatings, torture, and other coercive actions designed to fabricate evidence—and twenty-six CRs had been filed—the City failed to sustain a single CR, even as they settled five separate lawsuits alleging such misconduct. M.Ex. 47 (Goldston Report, Sept. 28, 1990, Appendix F (Statistical Analysis), AR-L 150959-150983) at 1; M.Ex. 14, Shane Report, at 102-103.

364.    The City of Chicago had an established practice of beatings and other means of torture designed to fabricate evidence in the early 1980s: as early as 1987, it had been determined that Andrew Wilson was beaten into confessing by Jon Burge, and "both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis." *People v. Wilson*, 116 Ill.2d 29, 106 Ill.Dec. 771, 506 N.E.2d 571 (1987); *U.S. ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999).

365.    No other officers were fired for the dozens of cases of alleged torture during the Burge era, and only two others received any form of discipline. M.Ex. 49 (John Conroy, *Town*

27

*Without Pity*, Chi. Reader, Jan. 11, 1996, https://chicagoreader.com/news/town-without-pity/).

366. In 1982, Detective Peter Dignan and Sergeant John Byrne, who had been supervised by Jon Burge, beat and tortured Stanley Wrice to coerce a confession from him and fabricate evidence against him, an allegation that Wrice made in 1982 or 1983 in a motion to suppress his confession. *People v. Wrice*, 357 Ill. Dec. 33, 962 N.E.2d 934, 2012 IL 111860 (Ill. 2012).

**THE CITY HAD A PATTERN OF FABRICATING EVIDENCE AGAINST SUSPECTS AND WAS ON NOTICE OF SUCH ALLEGATIONS**

367. In 1987, the Illinois Appellate Court reversed the conviction of Melvin Jones for murder based on evidence that officers had fabricated an eyewitness identification against him. *See People v. Jones*, 157 Ill. App. 3d 1006, 1025-27 (1987); *see also, e.g.*, M.Ex. 50 (Chicago Sun Times, Burge tortured me, too, ex-suspect says, 1992 WLNR 5316085); M.Ex. 51 (Melvin Jones, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4176).

368. In 1988, the Seventh Circuit upheld a jury verdict in favor of George Jones, who was convicted after CPD detectives suppressed the victim's initial failure to identify him as the suspect and conducted a repeat photo identification procedure which was disclosed without any indication that it had been performed before; CPD subsequently disciplined the police whistleblower who brought the misconduct to light, but declined to discipline any of the detectives involved in the investigation. *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

369. In 1989, James Newsome, who had been wrongly convicted of murder, obtained a court order requiring the CPD to run unidentified fingerprints from the murder scene through its fingerprint identification system, and CPD officers hid the results for five years until in 1994 they revealed that the fingerprints matched another man convicted of murder, leading to

28

Newsome's conviction being overturned in 1994 and him subsequently being granted a pardon based on innocence in 1995. *See Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *2, 16 (N.D. Ill. Apr. 26, 2000); *see also* M.Ex. 52 (*Newsome v. James*, No. 96 C 7680, Dkt. 150, N.D. Ill. May 16, 2000) at 3-9; *See* M.Ex. 53 (Chicago Tribune, Lineup suit nets $15 million, 2001 WLNR 10747375); M.Ex. 54 (James Newsome, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3504); M.Ex. 14, Shane Report, at 94.

370. In 1993, CPD's head of Internal Affairs Richard Risley learned of serious allegations of criminal misconduct (including hiding evidence related to a homicide) and, instead of pursuing discipline, directly communicated with Miedzianowski about the allegations against him and provided him copies of witness statements and other reports that Miedzianowski was not authorized to have. M.Ex. 14, Shane Report, at 105.

371. In 1993 and 1994, Chicago police officers obtained several purported identifications of Vincent Goldstein as the robber of four grocery stores and arrested him; those identifications were proven false after Mr. Goldstein's alibi was established by his employer and another man confessed. M.Ex. 55 (Chicago Tribune, Wrong Guy Looked Right in Lineups, 1994 WLNR 4312248); M.Ex. 14, Shane Report, at 102.

372. Robert Brown was released after previously being convicted of murder, following his identification in a CPD lineup. M.Ex. 56 (Robert Brown, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3063).

373. In 1997, the convictions of Donald Reynolds and Billy Wardell were vacated based on DNA evidence. *See* M.Ex. 57 (Donald Reynolds, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3574); M.Ex. 14,

29

Shane Report, at 93.

374.    CPD sergeants, lieutenants, and commanders of detectives widely understood that false identifications could result if photo identification procedures weren't conducted properly, and understood that photo identification procedures could be abused if they were not done correctly. M.Ex. 18 (Foster Dep.) at 284.

375.    From 1986-1998, the Chicago Police Department conducted no audits into the City's witness identification procedures or practices or patterns of misconduct involving such procedures. M.Ex. 58 (30(b)(6) Deposition of Commander Denham) at 32.

**LOW RATES OF SUSTAINED COMPLAINTS AND DISCIPLINE PROVIDE EVIDENCE OF THE CITY OF CHICAGO'S PRACTICES AND CODE OF SILENCE: REPORT OF DR. JOHN SHANE**

376.    Dr. Shane is a tenured professor of criminal justice at the John Jay College of Criminal Justice. M.Ex. 14 (Shane Report) at 122. Earlier in his career, Dr. Shane served in the Newark Police Department (NPD). M.Ex. 59, Shane Dep, Day 1 at 20:22-23. Dr. Shane helped to draft, revise, and create new policies on virtually every aspect of the Newark Police Department, including drafting and revising policies around the NPD's early intervention system. *Id.* at 54:2-62:04; 64:14-68:05.

377.    Dr. Shane provided four opinions in relation to this case: (1) The Chicago Police Department did not have early intervention systems (EIS) that identified patterns of misconduct and prevented it from recurring; (2) The Chicago Police Department did not adequately investigate allegations of misconduct; (3) The failures of the Chicago Police Department's internal affairs function—including systematic investigative failures and a lack of discipline—contributed to a culture of impunity within the Chicago Police Department; and (4) Repeated high-profile scandals over several decades reflected a culture of impunity within the Chicago

30

Police Department. M.Ex. 14 (Shane Report) at 12-14.

378.    Parts of Dr. Shane's opinions were based on findings he made from a data set of 13,554 allegations made against CPD officers. *See* M.Ex. 60 (Shane Data Set). The allegations in the data set came from Complaint Register (CR) files produced in the course of litigation pending against the City of Chicago and Defendant Reynaldo Guevara. Dr. Shane reviewed these CRs and created a "Codebook" describing how the CR files should be coded. M.Ex. 14 (Shane Report) at 29-30; M.Ex. 59 (Shane Dep, Day 1) 110:18-23. Plaintiff's counsel hired a team of attorneys to follow Dr. Shane's instructions and code each of the 1,663 CR files. M.Ex. 14 (Shane Report) at 29-30; M.Ex. 59 (Shane Dep, Day 1) 110:18-23. Dr. Shane held training sessions in which he instructed the attorneys how to follow his Codebook. M.Ex. 14 (Shane Report) at 30; M.Ex. 59 (Shane Dep, Day 1) at 110:18-112:04. Every CR file was then coded by one attorney, and the coding was reviewed by a separate attorney. M.Ex. 61 (Shane Dep Transcript Day 2) at 338:23-339:10. Finally, Dr. Shane ensured the accuracy of the coding by personally checking the coding of 59 of the CR files; he found no errors in this coding. M.Ex. 14 (Shane Report) at 31; M.Ex. 63 (Shane Rebuttal Report) at 2.

379.    The City's retained expert, Dr. Ian Adams, did not review the CR files used to create the data set. M.Ex. 62 (Ian Adams Dep.) at 129:21-130:03. Dr. Adams did not find any cells that were coded incorrectly. *Id*. at 178:21-180:08.

380.    In 1981, the U.S. Commission on Civil Rights recommended police departments to develop early intervention systems to identify officers "who are frequently the subject of complaints or who demonstrate identifiable patterns of inappropriate behavior." M.Ex. 14 (Shane Report) at 27.  By 1990, the International Association of Chiefs of Police had advised police departments to adopt early intervention systems. M.Ex. 14 (Shane Report) at 27. Other research

predated these reports as well. M.Ex. 14 (Shane Report) at 27.

381.    Industry leaders recommended that police departments adopt early intervention systems because they were effective at identifying patterns of problematic behavior and providing remedial training aimed at helping officers improve their performance. M.Ex. 14, (Shane Report) at 27-28. Indeed, Dr. Shane's own experiences aligned with the expectations of the industry leaders–he had observed early intervention systems be successful. M.Ex. 59 (Shane Dep, Day 1) at 195:21-196:15.

382.     For his first opinion, Dr. Shane opined that the design of CPD's early intervention system deviated from generally accepted police standards in several ways, including that (1) there was no trigger that *automatically* placed officers into an early intervention system– that placement was left up to investigators' and supervisors' discretion, M.Ex. 14 (Shane Report) at 32, (2) CPD's early intervention system took into account only the previous five years of sustained allegations, M.Ex. 14 (Shane Report) at 32-33, (3) supervisors were not invariably informed when their subordinates were accused of misconduct, M.Ex. 14 (Shane Report) at 33, (4)  CPD had no mechanism for determining which intervention techniques were successful, M.Ex. 14 (Shane Report), at 33-34, and (5) CPD did not use its early intervention systems to identify recurring patterns of investigatory misconduct across officers. M.Ex. 14 (Shane Report), at 34.

383.    For his second opinion, based on his review of the data set, *see* M.Ex. 60 (Shane Data Set). Dr. Shane found that CPD's internal affairs investigations deviated from generally accepted police standards in several ways, including (1) Dr. Shane observed that allegations in his data set were sustained at a rate lower than other comparable police departments; (2) unit-level supervisors were permitted to conduct investigations into serious misconduct rather than

internal affairs investigators; (3) investigators frequently failed to contact witnesses and victims of alleged police misconduct; (4) investigators failed to conduct other evidence-gathering activities that could prove or disprove allegations of misconduct; (5) subsequent litigation proved that many allegations that were "not sustained" were, actually, meritorious allegations; and (6) even when allegations were sustained, punishments given to officers were frequently reduced. M.Ex. 14 (Shane Report) at 51-82.

384. Dr. Shane opined that unit-level supervisors contributed to a code of silence forming within CPD by sustaining allegations of misconduct at a lower rate than internal affairs investigators. M.Ex. 14 (Shane Report) at 65-66.

385. Dr. Shane found that only 1.7% of allegations in his data set were sustained, which was less than the New York Police Department's sustained rate between 1998 to 2002 and Boston Police Department's sustained rate in 1999 and 2000. M.Ex. 14 (Shane Report) at 52-53.

386. Dr. Shane found that allegations of misconduct submitted by citizens were sustained at a lower rate than allegations of misconduct submitted by other police officers. M.Ex. 14 (Shane Report) at 56-61.

387. Dr. Shane found that investigations conducted by unit-level supervisors resulted in fewer sustained findings than investigations conducted by internal affairs. M.Ex. 14 (Shane Report) at 64-67. Dr. Shane opined that this was likely due to bias on behalf of the supervisors. *Id*. For example, allegations of misconduct against Defendant Reynaldo Guevara were investigated by his supervisor, Edward Mingey, despite the fact that Mingey had loaned Guevara money and co-signed on a car that Guevara had bought for his wife. *Id*, at 66.

388. Dr. Shane found that in 353 investigations in his data set, the investigators failed to contact witnesses despite the witness's identification being known. M.Ex. 14 (Shane Report)

at 67-68; M.Ex. 63 (Shane Rebuttal Report) at 3. Dr. Shane found there were 65 investigations where investigators failed to contact *both* the complainant and any witnesses. M.Ex. 14 (Shane Report) at 67.

389.    Dr. Shane found that officers failed to obtain a formal statement from accused officers in 704 out of 1,663 investigations, thereby failing to adhere to generally accepted police standards, and also contributing to a code of silence. M.Ex. 14 (Shane Report) at 69. Dr. Shane also found that investigators failed to obtain a formal statement from non-accused officers in 658 out of 1,663 investigations. M.Ex. 14 (Shane Report) at 69. Dr. Shane opined that failure to collect information from fellow officers contributed to a code of silence. M.Ex. 14 (Shane Report) at 69.

390.    Dr. Shane found that 148 allegations in his data set were initially "sustained" by investigators, but then later changed to "Not Sustained" or "Unfounded" by the Superintendent. M.Ex. 14 (Shane Report) at 80.

391.    Dr. Shane found that there were 96 allegations that were sustained, but the Superintendent reduced the punishment by either reducing the number of days of the punishment or changing a suspension to either a "reprimand" or "violation noted." M.Ex. 14 (Shane Report) at 81-82.

392.    For his third opinion, Dr. Shane opined that the failures in CPD's internal affairs (described in his first and second opinions) would contribute to a culture of impunity within CPD. M.Ex. 14 (Shane Report) at 82-91.

393.    Dr. Shane found that a deficient internal affairs system could contribute to a culture of impunity based on numerous sources, including published research, Department of Justice investigations, and materials provided by Plaintiff's counsel. M.Ex. 14 (Shane Report) at

34

82-91. Dr. Shane also based his finding on his own experience in internal affairs. M.Ex. 59 (Shane Dep, Day 1) at 103:11-24.

394. Dr. Shane found in his data set that citizens submitted 273 allegations of coercive interrogations, whereas other officers submitted zero such allegations, despite numerous subsequent investigations revealing that officers like Guevara had coerced false confessions. M.Ex. 14 (Shane Report) at 73-77, 88-90. Dr. Shane opined that the failure to report fellow officers contributed to a code of silence. *Id*. at 88-90.

395. For his fourth opinion, Dr. Shane opined that a culture of impunity was reflected in several high-profile scandals that took place within the CPD over decades preceding the incident at the center of this case. M.Ex. 14 (Shane Report) at 91-119.

396. Dr. Shane found that Joseph Miedzianowski and many of his CPD colleagues had been convicted of federal crimes for misconduct they committed while working as police officers. These crimes included distributing cocaine, supplying ammunition to gang members, and revealing the identities of undercover police officers. M.Ex. 14 (Shane Report) at 103-108.

397. Dr. Shane found that an internal affairs investigation into Miedzianowski resulted in a "Not Sustained" finding due to "lack of evidence," evincing many of the deficiencies that Dr. Shane had found existed in other investigations in his data set. M.Ex. 14 (Shane Report) at 104-105.

398. Dr. Shane found that there was no record of CPD disciplining Miedzianowski for his misconduct until after he was indicted by federal authorities. M.Ex. 14 (Shane Report) at 107.

399. Dr. Shane found that many of the deficiencies he had found in CPD's internal investigations had taken place in investigations into allegations of misconduct by Guevara. M.Ex. 14 (Shane Report) at 114-116.

## Widespread Lack of Training, Supervision, or Monitoring on Documentation Procedures and Identification Procedures

### *Documentation*

400.    Hickey testified that he had no knowledge whether, after the implementation of S.O. 83-1, there was anything done to survey or audit the implementation of the policy. M.Ex. 64 (Hickey *Fields* Dep.) at 43:1-4.

401.    Hickey himself admitted that he learned that unit detectives were reverting back to keeping their own files to take out on investigations after Special Order 83-1. M.Ex. 65 (Hickey *Kluppelberg* Dep,) at 321, 327

402.    The only training that happened after the 1983 changes was a "three-hour training" on note taking. M.Ex. 66 (Winstrom Dep.) at 146:25-147:4. He confirmed that the training did not cover supplementary reports, did not provide guidance to detectives about what they should consider relevant or not relevant information, and did not include instruction to detectives that they should document everything they learned during the investigation. M.Ex. 66 (Winstrom Dep.) at 148:14-149.

403.    Tiderington concluded that the one three-hour training session on the first iteration of the policy change, where CPD senior leaders already knew detectives were opposed to the change, was wholly insufficient to overcome a decades-long practice. M.Ex. 5 (Tiderington Report) at 54.

404.    30(b)(6) representative Winstrom confirmed that detectives who received that training would not have received that kind of in-service training on the policies again. M.Ex 66 (Winstrom Deposition in *Reyes*) at 151:11-16. In fact, he testified that he was not aware of any in-service training like that occurring after S.O. 86-3 was issued. M.Ex 66 (Winstrom Dep.) at

151:20-24. The only further training that did occur for the revised Special Orders, for those detectives who received the 3-hour training, was receiving the revised Order and having any changes in the order read aloud for five or seven straight days. *Id.* at 152:1-24. Yet S.O 86-3 was substantively identical to its previous iterations except for the addition of an auditing provision. Compare M.Ex 67 (Special Order 83-2) with; M.Ex 68 (Special Order 86-3); M.Ex 20 (Hickey Dep. in *Rivera*) at 100:9-101:12, 227, 245-47, 249.

405.    Hickey described the City's process of disclosing police records to prosecutors and criminal defendants as an "art form" of informal, on-the-job training, and could not think of any directives written to ensure proper disclosure of necessary information, including exculpatory information, in response to a subpoena request. M.Ex 20 (Hickey Dep. in *Rivera*) at 160:7-22, 161:10-163:24. Hickey confirmed there was no training on this after the 1983 three-hour training on S.O. 83-1. M.Ex 20 (Hickey Dep. in *Rivera*) at 185-87.

406.    Winstrom admitted that subpoena clerks would simply ready the subpoena and send a request for documents to whichever units they thought might have documents, and that they were not provided with any policies, directives, checklists, guidelines or training materials to guide their decision about where to obtain documents, nor were they given any forms or lists that identified all the repositories in which documents related to a homicide investigation might be found. M.Ex 66 (Winstrom Dep. in *Reyes*) at 189, 192-94; *see also* M.Ex 5 (Tiderington Report) at 53 (concluding that there were no checklists, procedures, or any other guidelines or guidance to assist subpoena responders in making sure they were requesting material from all the right repositories, or to check on the back end whether they got everything they should, or even formal training to set the proper expectations and practice).

407.    30(b)(6) representative Winstrom testified that he was not aware of any auditing

37

done to ensure that the investigative file was getting to the criminal justice system. M.Ex 66 (Winstrom Dep. in *Reyes*) at 208:20-209:2. He testified that he was not aware of an inspection where a court inspection group ever randomly checked a file to ensure that a subpoena was receiving all of the documents of the investigative file. *Id.* at 209:3-9. He testified that he was not aware of CPD conducting any audit or inspection to ensure that all documents related to homicide investigations were being produced in response to subpoenas for all homicide files, or that all documents that exist in different places within CPD were being gathered and produced in criminal investigations. *Id.* at 209:10-22.

408. Hickey and Winstrom admit, and Tiderington confirms through review of that testimony, that there was no discipline of detectives that did not comply with the Special Orders. M.Ex 65 (Hickey Dep. in *Kluppelberg)* 213:8-16; M.Ex 20 (Hickey Dep. in *Rivera*) at 187:6-10; M.Ex 66 (Winstrom Dep. in *Reyes*) at 209-210; M.Ex 5 (Tiderington Report) at 55. Further, Foster stated that no Special Orders in the Detective Division would apply to gang crime specialists. M.Ex 18 (Foster Dep.) at 99:7-25.

409. Foster stated that he was unaware of any training for detectives in the period from 1986 to 1998 with regard to their use of street sources or registered confidential informants in homicide investigations. M.Ex 18 at 112:11-19. There was also no training as to photo show-ups whatsoever. M.Ex 18 at 229:19-24.

410. The City of Chicago did not produce any training policies or manuals regarding eyewitness identifications for the time period leading up to Iglesias's wrongful conviction. Instead, the only training materials provided are from 1996. M.Ex 18 (Foster Dep. in Iglesias) at 158:2-11, 279:18-280:7. The training was not provided to gang crime specialists nor does its content apply to gang book procedures. M.Ex 18 (Foster Dep. in *Iglesias*) at 161:1-4, 163:21-

164:1.

411.    When asked whether detectives were trained that they should document eyewitness descriptions of suspects, or whether they could choose not to do that, Winstrom testified "there[] [were] times that you would not document that." M.Ex 66 (Winstrom Dep. in *Reyes*) at 80:12-20.

412.    30(b)(6) representative Winstrom testified that detectives were "not necessarily" trained that any field interviews of a potential suspect should be documented. M.Ex 66 (Winstrom Dep. in *Reyes*) at 84:21-85:5.

413.    Gang specialists were not provided any training relative to their participation in homicide investigations in general. M.Ex 18 (Foster Dep. in *Sierra*) at 166:2-14, 168:1-8, 169:18-25.

414.    There was no policy or training for detectives or gang crime specialists about documenting gang book identifications, although both detectives and gang specialists used gang books during homicide investigations. M.Ex 18 (Foster Dep. in *Iglesias*) at 166:2-14, 168:1-8, 169:18-25; 192-93, 315-16, 194:5-11. Foster also testified that, from 1986-1998, detectives were not trained that there were any prohibitions on what they could say to a witness before a lineup procedure or a gang book showing, and the only training provided to detectives covered documenting positive identifications in live lineup procedures. M.Ex 18 (Foster Dep. in *Iglesias*) at 164:11-25, 166:2-14, 168:1-8, 169:18-25; 192-93, 203:4-6, 315-16. Yet the 1992 IACP Model Policy states that detectives should scrupulously avoid saying anything suggestive to the witness about who the suspect is. M.Ex 16 (1992 IACP Model Policy) at 1.

415.    The City's 30(b)(6) representative Commander Denham agreed that, in the time frame of 1986 to 1998, the IAD had the authority to conduct audits relating to misconduct during

39

eyewitness investigation procedures, but did not actually conduct any audits during that time frame. M.Ex 58 (Denham Dep. in *Sierra*) at 30:8-31:14, 32:4-8, and agreed that OPS had the authority to conduct audits into misconduct relating to eyewitness identifications from 1986 to 1998 but is not aware that OPS actually conducted any audits during this time frame. M.Ex 58 (Denham Dep. in *Sierra*) at 32:9-19.

416.    Commander Denham agreed that the Mayor, Superintendent, Chief of Internal Affairs, and the Chief or Administrator of OPS would have the authority to request an audit to find out whether there was a problem of misconduct among detectives or gang crime specialists in a particular area relating to eyewitness investigations, which would only be carried out by IAD, OPS, or the IG's office. M.Ex 58 (Denham Dep. in *Sierra*) at 38:12-39:15.

417.    Commander Denham conceded that he was not aware of any audits conducted between 1986 and 1998 by the CPD to evaluate whether G.O. 88-18 was being followed—including as to the requirement to complete a supplementary report when a lineup is conducted—or to determine whether G.O. 88-18 needed any policy changes. M.Ex 58 (Denham Dep. in *Sierra*) at 42:5-15, 50:51:1-10.

418.    Commander Denham agreed that the City of Chicago did not carry out any investigations or audits between 1986 to 1998 that evaluated whether detectives or gang specialists were properly documenting eyewitness identification procedures, whether detectives were unfairly influencing eyewitness identification procedures through improper suggestion, or whether gang crime specialists were engaging in any misconduct relating to eyewitness identification procedures. M.Ex 58 (Denham Dep. in *Sierra*) at 43:14-44:5, 44:6-19.

419.    Other than CR investigations between 1986 and 1998, Denham confirmed that the City of Chicago did not conduct any investigations or audits as to live-lineups, photo arrays, or

clothing lineups, or to evaluate the identification practices amongst a particular group of CPD detectives, or to identify any problems with the conduct of any eyewitness procedures. M.Ex 58 (Denham Dep. in *Sierra*) at 45:8-23, 47:2-7, 50:21-51:6.

420.    Denham was also unaware of any audits or investigations by the City after receiving information that a witness's lineup identification had been a false positive to determine whether it was caused by an officer's misconduct. M.Ex 58 (Denham Dep. in *Sierra*) at 47:8-48:4.

421.    Denham was unaware of any city investigations or audits that were prompted by individual CR investigations from 1986 to 1998 or by a court throwing out a conviction, or prompted by evidence in which a court found a problematic eyewitness identification, or that evaluated whether there were problems with supervision of eyewitness procedures, or that the city conducted any criminal investigations of CPD officers for misconduct in connection with eyewitness identifications in this timeframe. M.Ex 58 (Denham Dep. in *Sierra*) at 48:19-49:7, 49:16-20, 51:17-53:18.

422.    The City's 30(b)(6) representative Commander Moore stated that at no time between 1994 and 2002 timeframe did the City attempt to track the number of allegations of misconduct relating to lineups. M.Ex 39 (Moore Dep. in *Velez*) at 82:4-9. Nor did IAD take any corrective steps to monitor motions to suppress witness identifications in criminal court. M.Ex 39 (Moore Dep. in *Velez*) at 84:12-84:15. IAD did not receive notice when a motion to suppress a witness identification was granted, nor did it take any affirmative steps to find out when such motions were granted and CPD officers were found to have engaged in improper conduct in an identification procedure. M.Ex 39 (Moore Dep. in *Velez*) at 85:2-86:4.

**Notice of Guevara's Bad Acts**

423. Since at least 1982, the City had notice of the pattern of illegal misconduct of Detective Guevara, who has been involved in physical assaults and coercive manipulation of witnesses, suspects, victims, and defendants, primarily in the process of obtaining false statements, across multiple decades with impunity. See M.Ex 69 (Testimony, Medical Records, and OPS Complaint of Annie Turner) (in 1982, Guevara physically and verbally assaulting Annie Turner and receiving no discipline after complaint); M.Ex 70 (OPS Complaint of Almarie Lloyd, Testimony of Almarie & Job Lloyd, *Hunt v. Jaglowski*, 85 C 1976) (Guevara conducting warrantless search of Almarie Lloyd's locked home and receiving no discipline after complaint); *See* M.Ex 71 (Affidavit of Leshurn Hunt) (explaining that Guevara and others beat Leshurn Hunt until he confessed to murder); M.Ex 72 (Trial Transcript of *Hunt v. Jaglowski*, 85 C 1976) at AR-L 544934, 544946, 545016-19; M.Ex 73 (Letter from Leshurn Hunt to Eugene Hudson, Dated 2/28/86); M.Ex 74 (Testimony of Graciela Flores & Anna Flores, from Trial Transcript of *Hunt v. Jaglowski*, 85 C 1976) at AR-L 544684-544714 (Guevara physically assaulted Graciela Flores); M.Ex 75 (Affidavit of Reynaldo Munoz) (Guevara using threats and violence to attempt to coerce false identification from Munoz in 1985); M.Ex 76 (OPS Complaint of Rafael Garcia, CR #152902) (in 1986, Guevara beating Rafael Garcia, denying doing so, and then receiving only two days' suspension after the disciplinary body found Guevara had lied about incident and given false information to investigators); M.Ex 77 (Testimony of Daniel Pena, Armador Rivera, and Jamie Velez in *People v. Pena*, 86 CR 1458) (in 1986, Guevara coercing confession from Daniel Pena by beating him); M.Ex 78 (OPS Complaint and Testimony of Melvin Warren, *Hunt v. Jaglowski*, 85 C 1976) (in 1986, Guevara calling Melvin Warren a "n***** dog" and beating him, and only receiving a reprimand for calling a citizen a "n*****" instead of the City's initial

sustainment of Warren's allegations and five-day recommended suspension); M.Ex 79 (in 1989, Guevara coercing false confession from Victor Vera); M.Ex 80 (Affidavit of Virgilio Muniz) (in 1989, Guevara coercing Virgilio Muniz to falsely implicate Manuel Rivera); M.Ex 81 (Affidavit of Virgilio Calderon Muniz) (in 1989, Guevara threatening Virgilio Calderon Muniz (unrelated to the Virgilio Muniz) into falsely identifying Victor Vera); M.Ex 82 (Testimony of Wilfredo Rosario & Appellate Court Opinion, *People v. Arcos*, 91 CR 743)[3] (in 1991, Guevara coercing Wilfredo Rosario into falsely identifying Xavier Arcos);. M.Ex 83 (Testimony of William Dorsch, *People v. Serrano & Montanez*, 93 CR 1873) at JR-L 076819, JR-L 076824-48 (Dorsch testifying to Guevara bringing in two juveniles for a photo array, telling first juvenile that one suspect's photo was "him," and testifying that the juveniles admitted they had been paid to falsely claim that the suspect was the shooter); M.Ex 83 at JR-L 076888-90, JR-L 076906-09, JR-L 076928-32 (testifying that Dorsch's supervisors in the CPD knew about Guevara's misconduct in the case with the juveniles, but promoted Guevara instead of disciplining him); M.Ex 84 (Guevara Deposition from Jacques v. Rivera et al. 12-cv-004428) at 402-15 (Guevara taking the Fifth in regard to all allegations regarding Bill Dorsch's accusations); M.Ex 85 (Affidavit of David Rivera) In 1991, Guevara coercing David Rivera falsely confessing to murder); *See* M.Ex 86 (Affidavit of Daniel Rodriguez) (In 1991, Detective Guevara coercing false confession from Daniel Rodriguez); M.Ex 87 (Testimony of David Velazquez in People v. Velazquez, 91 CR 13938) (In 1991, Guevara physically coercing sixteen year-old David Velazquez into falsely identifying Daniel Rodriguez); M.Ex 88 (Suppression Hearing Testimony of Eleizar Cruzado, *People v. Cruzado*, 93 CR 24896) (In 1993, Guevara trying to coerce 15 year-old Eleizar Cruzado into implicating himself in a murder); M.Ex 89 (Affidavit of Adolfo

---

3. Mr. Arcos was convicted based on the false evidence, but the appellate court overturned his conviction based on a lack of evidence. *See People v. Arcos*, 228 Ill App. 3d 870, 876 (1st Dist. 1996)

Frias Munoz) (In 1993, Guevara using physical force and threats to coerce a false confession from Adolfo Frias-Munoz); M.Ex 90 (Affidavit of Adrian Duta) (In 1994, Guevara used violence to coerce a confession from Adrian Duta); M.Ex 91 (Deposition of Gloria Ortiz Bordoy, *Johnson v. Guevara*, 05 C 1042) (in 1995, Guevara and others coerced Gloria Ortiz Bordoy into falsely implicating Santos Flores); M.Ex 92 (Affidavit of Edwin Davila) (in 1995, Guevara arresting Edwin Davila, chaining him to the wall of interrogation room, telling Davila that Guevara was going to frame him for murder, and forcing Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter); M.Ex 93 (Deposition of Evelyn Diaz, *Johnson v. Guevara*, 05 C 1042) (in 1995, Guevara coercing Evelyn Diaz into falsely identifying Luis Serrano); M.Ex 94 (Testimony of Luis Figueroa, *People v. Diaz*, 95 CR 610901 & Supplemental Police Report) (In 1995, Guevara telling Luis Figueroa to falsely identify Angel Diaz); M.Ex 95 (Affidavit of Rodolfo Zaragoza) (in 1995, Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez); M.Ex 96 (Testimony of Robert Ruiz, *People v. Santiago & Santiago*, 97 CR 20973) (in 1997, Guevara coercing Robert Ruiz into falsely identifying Freddy and Concepcion Santiago as the murderers of Guevara's nephew); M.Ex 97 (Post-Conviction Petition in *People v. Gomez*, 97 CR 18961) (In 1997, Guevara falsely reporting that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not); M.Ex 98(Affidavit of Jed Stone) (In 1997, Guevara coercing false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room).

424.    Detective Guevara has refused to testify about his interactions with: Anna Flores, M.Ex 99 (Testimony of Reynaldo Guevara in People v. Serrano & Montanez, 93 CR 18173) at JR-L 077143, JR-L 077171-72; M.Ex 100 (Testimony of Reynaldo Guevara in *People v. Arturo*

44

*Reyes & Gabriel Solache*, 98 CR 12440) at JR-L 049883-85; Graciela Flores, M.Ex 99 at JR-L 077143, JR-L 077171-72, M.Ex 100 at JR-L 049883-84; David Velazquez, M.Ex 99 at JR-L 077143, JR-L 077168-71; M.Ex 100 at JR-L 049873-75; Efrain Sanchez, M.Ex 99 at JR-L 077144, JR-L 077172-73; Julio Sanchez, M.Ex 99 at JR-L 077144, JR-L 077173-74; Adolfo Frias Munoz, M.Ex 99 at JR-L 077144-45, JR-L 077174-75; M.Ex 100 at JR-L 049869-70; Jose Melendez, M.Ex 99 at JR-L 077145, JR-L 077177-79; M.Ex 100 at JR-L 049886, JR-L 049888, Gabriel Solache, M.Ex 99 at JR-L 077145-46; M.Ex 100 at JR-L 049861-64, Virgilio Muniz, M.Ex 99 at JR-L 077147, JR-L 077180; Luis Figueroa, M.Ex 99 at JR-L 077176; M.Ex 100 at JR-L 049890-92; Angel Diaz, M.Ex 99 at JR-L 077176-77; M.Ex 100 at JR-L 049891-92, JR-L 049894; Wilfredo Rosario, M.Ex 99 at JR-L 077181-82; Xavier Arcos, M.Ex 99 at JR-L 077182; M.Ex 100 at JR-L 049880-81; Gloria Ortiz Bordoy, M.Ex 99 at JR-L 077182-83; Robert Ruiz, M.Ex 99 at JR-L 077184, M.Ex 100 at JR-L 049877-79; Leshurn Hunt, M.Ex 100 at JR-L 049867-68; Adrian Duta, M.Ex 100 at JR-L 049868-69; Voytek Dembski, M.Ex 100 at JR-L 049871-72; Daniel Pena, M.Ex 100 at JR-L 049875-77; Annie Turner, M.Ex 100 at JR-L 049881-82; Thomas Sierra, M.Ex 100 at JR-L 049887-88; Juan Johnson, Jacques Rivera, Orlando Lopez, Jose Montanez, Armando Serrano, Timothy Rankins, Jorge Pacheco, Robert Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Ariel Gomez, Ricardo Rodriguez, Robert Bouto, Carl Richmond, Rey Lozada, Rosendo Ochoa, Hugo Rodriguez, Jacqueline Grande, Sam Perez, Salvador Ortiz, David Colon, Luis Serrano, Evelyn Diaz, Freddy and Concepcion Santiago, Ricardo Rodriguez, Aurelio Martinez, Demetrius Johnson, Gamalier Rivera, Antonio Diaz, Richardini Lopez, Maria Diaz, Antonio McDowell, Marilyn Mulero, David Gecht, Richard Kwil, Colleen Miller, Ruben Hernandez, Eruby Abrego, Ramon Torres, Isidro Quinonez, Julio Lugo, Bernard Turner, Melvin Warren, Rafael Garcia,

Jossie Martinez, Semara Johnson, Juan and Rosendo Hernandez, Edgar Perez, M.Ex 101

(Guevara Dep. in *Sierra*) at 13-18, 29-65, 66-121, 139-229; Francisco Vicente, M.Ex 99 at JR-L

077138-43, JR-L 077148-62; Geraldo Iglesias, M.Ex 99 at JR-L 077141, JR-L 077185-86; see

also M.Ex 102  (Guevara's Resp. to Pl. Reyes First Set of Inter.) at 1-6; M.Ex 103 (Guevara's

Resp. to Pl. Solache's First Set of Inter.) at 1-6.

425.     Other reports and investigations gave the City notice of the pattern of

illegal misconduct of Detective Guevara:

a.  In 1996, Defendant Guevara was accused of physically striking his
    stepdaughter in the face. Defendant Guevara again denied all allegations.
    Although the Command Channel Review and IAD concurred in a sustained
    finding and recommended three-day discipline in February 1996, Defendant
    Guevara only served a one-day suspension, and no Rule 14 violation was
    added despite finding that Guevara provided false information. M.Ex 104
    (CR No. 223928).

b.  In 1999, Defendant Guevara stating "fuck you" to Sergeant David Oravetz;
    engaged Sergeant Oravetz in an unjustified verbal altercation when Guevara
    threatened to kick Sergeant Oravetz's ass and pushed and poked Sergeant
    Oravetz in the chest; and failed to comply with a direct order to leave the
    district station—all when observed by several on-duty members of CPD.
    Throughout the OPS investigation, Guevara still denied all allegations against
    him despite the presence of others and the statements supporting the
    allegations. The allegations were sustained. Yet, even after the disciplinary
    history described above and the allegations at hand, a Police Commander still
    recommended reducing his recommended 30-day discipline by ten days,
    "considering the circumstances and his complementary and disciplinary
    history." In 2000, Guevara's discipline was reduced to 20 days, and he was
    compensated for 10 days of back pay for the suspension he had already
    served. No Rule 14 violation was added or sustained, despite Guevara making
    false statements during the investigation. M.Ex 105 (CR No. 251502).

c.  In 2001, The FBI authored a 302-page report detailing the criminal
    activity of Chicago Police Officer Joseph Miedzianowski and his
    associates, including Detective Guevara, in the 1980s and 1990s. The
    report explains that Guevara would apprehend drug and gun dealers and
    then allow them to "buy their way out of trouble." Guevara also took
    bribes to alter the results of lineups. Guevara, using an attorney as a
    conduit, would also receive cash in exchange for the dismissal of murder
    cases he investigated. See M.Ex 106 (FBI Report Dated June 23, 2001) at
    JR-L 02444-45. The report contained no indication that Guevara was
    questioned or that the IAD tried to find the people mentioned as having

46

cases that were fixed by Guevara. Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the report, as he has done in this case. M.Ex 84 (Guevara Deposition in *Rivera v. Guevara et al.,*) at 418-26; *see also* M.Ex 102 (Guevara's Resp. to Pl. Reyes' First Set of Inter.) at 1-6, M.Ex 103 (Guevara's Resp. to Pl. Solache's First Set of Int.) at 1-6.

d. ***Delgado Prompts Investigation:*** That same year, in 2001, a perjury investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Defendants Guevara and Halvorsen gave false testimony in 17 homicide cases ranging from 1984 to 1997, and requested that the State's Attorney's office also investigate the matter to determine possible misconduct on the part of the detectives. M.Ex 107 (CR Delgado Investigation) at RFC-Sierra 020108-09, 020114. The CPD Internal Affairs Division interviewed Delgado, who related that the 17 defendants convicted primarily on the false testimonies of Guevara and Halvorsen stated that "we're tired of busting you on petty crime and we're gonna get you. We'll bust you for murder." *Id.* at RCD-Sierra 020113. Delgado stated that in at least one case it was impossible for Guevara to obtain a detailed statement from the defendant due to Guevara's poor Spanish. *Id.* Yet the State's Attorney's office closed its separate investigation without providing a report on the complaint, and without reviewing 3 of the 17 cases. *Id.* at RFC-Sierra 020117-18, 020120. However, based on the closure of the case by the State's Attorney's office (without actually seeing that report) and the alleged "fruitless" attempts to contact witnesses regarding the complaint, the CPD closed the case with a finding of "Not Sustained" in 2002. *Id.* at 020109.

426. Despite notice of the misconduct, there continued a widespread failure to discipline, that resulted in wrongful convictions, including but not limited to the following:

a. ***Jacques Rivera:*** In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin, and falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. As a result of this misconduct, Rivera was convicted. In 2011, Rivera filed a post-conviction petition based on actual innocence and received an evidentiary hearing. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. M.Ex 108 (*Rivera* PC Hearing Tr. 5/23/11) at 58. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara

47

had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey. M.Ex 109 (Rivera COI); M.Ex 110 (Order Granting Rivera New Trial), at 2; M.Ex 111 (Rivera 6.12.18 Trial Tr.) at 1313:1-4; M.Ex 112 (Rivera Judgment).

b. ***Juan Johnson***: In 1989, Detective Guevara framed Juan Johnson for murder by coercing Samuel Perez into falsely implicating Johnson. To accomplish this feat, Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer. M.Ex 113 (Testimony of Samuel Perez, *People v. Johnson*, 89 CR 21806). Johnson filed his post-conviction petition in 1996, and appealed its denial in 2001—and in May 2002, the appellate court reversed the denial, vacated his convictions, and remanded for a new trial. At his new trial, Johnson was acquitted by a jury. He sued Guevara in *Johnson v. Guevara*, 05-C-1042, eventually obtaining a verdict against him for $21 million. M.Ex 114 (Jury Verdict in *Johnson v. Guevara*, 05 C 1042). Guevara has taken the Fifth in regard to all allegations regarding Juan Johnson. M.Ex 84 (Guevara Deposition in *Rivera*) at 398-402.

c. ***Johnny Flores:*** Johnny Flores was wrongfully convicted of a 1989 murder that he did not commit, a conviction attributable to the misconduct of Defendant Guevara, who fabricated an identification to inculpate Mr. Flores. In 2022, the State asked the Court to vacate his convictions and subsequently dismissed all charges against him. Flores now seeks justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. M.Ex 115 (Johnny Flores, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6397); M.Ex 116 (Amended Successive Post-Conviction Pet.) at 1-5; M.Ex 84 (Guevara Dep. in *Rivera*) at 445; *see also Flores v. Guevara, et al.,* Case No. 1:23-cv-01736.

d. ***Jaime Rios:*** In 1989, Rios was wrongfully arrested, charged, and convicted for a murder that he did not commit– a conviction that was ultimately dismissed after evidence was presented showing that a witness had been threatened by Defendant Guevara into implicating Rios. In 2022, the Cook County State's Attorney's Office agreed to dismiss his conviction; within days, he had obtained a certificate of innocence; and he has now filed a federal lawsuit against Defendant Guevara and the City of Chicago. M.Ex 117 (Jaime Rios, Nat'l Exoneration Registry, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6387).

e. ***Jose Maysonet***: In 1990, Defendant Guevara repeatedly beat Jose Maysonet until he confessed to a double homicide that rested solely on that coerced confession. In 2016, Maysonet's double murder conviction was vacated and he was granted a new trial. Over a year later, the Cook County State's Attorney dropped charges against Jose after five retired Chicago police officers, including Defendants Guevara, Halvorsen, and Mingey, invoked their Fifth

48

amendment right and refused to testify. M.Ex 118 (Megan Crepeau, Prosecutors Drop Murder Charges after 5 Ex-Chicago Cops Plan to Take the 5th, Chicago Tribune (Nov. 15, 2017), https://www.chicagotribune.com/2017/11/15/prosecutors-drop-murder-charges-after-5-ex-chicago-cops-plan-to-take-the-5th/). Another victim of this same string of misconduct as Maysonet, **Alfredo Gonzalez's** conviction for the same homicide was vacated in 2022, and both Maysonet and Gonzalez have filed lawsuits against the City of Chicago and Guevara seeking justice for their wrongful convictions. M.Ex 119 (Alfredo Gonzalez, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6382); see *Gonzalez v. Guevara*, et al., Case No. 22-cv-6496.

f. ***Demetrius Johnson***: In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos. *See* M.Ex 120 (Dysart Report in *Johnson*) at 3-5. Johnson was granted a certificate of innocence and has filed a lawsuit against Guevara and other officers for their misconduct. Guevara has invoked the Fifth Amendment regarding Johnson. *Id.* at 4; *see Johnson v. Guevara, et al.,* Case No. 1:20-cv-04156; M.Ex 101 (Guevera Dep. in *Sierra*).

g. ***David Lugo (Colon)***: In 1991, David Lugo was just 20 years old when he was framed for murder by Defendant Guevara and his fellow officers, when Defendant Guevara coerced Efrain and Julio Sanchez to pick David Colon out of a lineup, *See* M.Ex 121 (Affidavits of Efrain & Julio Sanchez, Police Reports from *People v. Colon*, 93 CR 23750). In 2022, his conviction was vacated. He has since filed a lawsuit against Guevara and other officers for their misconduct. M.Ex 122 (Order Vacating Conviction); *see Lugo v. Guevara, et al.*; M.Ex 101 (Guevera Dep. in *Sierra*).

h. ***Marilyn Mulero:*** Marilyn was wrongfully convicted of a 1992 double murder based on evidence fabricated by notoriously corrupt Chicago Police Defendants Guevara and Halvorsen. Marilyn was pressured to enter a guilty plea without a trial and was sentenced to death. In 2022, all charges against her were dropped. She has also filed suit against Defendants Guevara and Halvorsen. Guevara has invoked the Fifth Amendment regarding Mulero. M.Ex 123 (Michelle Gallardo, Marilyn Mulero sues Chicago, disgraced CPD detectives for allegedly framing her for murder, ABC News (July 25, 2023), https://abc7chicago.com/marilyn-mulero-reynaldo-guevara-chicago-police-misconduct-sued/13547189/); M.Ex 101 (Guevera Dep. in *Sierra*) at 181-186.

i. ***Madeline Mendoza***: Mendoza was arrested in 1992, and convicted in 1993, for a crime she did not commit, based on false statements obtained by Defendants Guevara and Halvorsen. In 2023, the prosecution agreed to vacate

49

Mendoza's conviction and the case was dismissed. M.Ex 124 (Madeline Mendoza, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6519).

j. ***Serrano & Montanez:*** In 1993, Detective Guevara used physical violence and inducements to coerce Francisco Vicente into falsely testifying against Armando Serrano, Jorge Pacheco, and Jose Montanez. See M.Ex 125 (Affidavit of Francisco Vicente) at ¶¶4-14. In that same investigation, Detective Guevara beat Timothy Rankins with a flashlight, threw him out of his chair, and placed him in a chokehold to induce a statement implicating Serrano and Montanez, causing Rankins to testify falsely against the men in the Grand Jury. M.Ex 126 (Testimony of Timothy Rankins in *People v. Serrano*, 93 CR 18173) at JR-L 02899-912. In 2004, Jose Montanez filed a post-conviction petition based on the recantation affidavit of the State's key witness Francisco Vicente, who provided a detailed statement describing how his false testimony was given as a result of threats, intimidation and physical abuse by Det. Reynaldo Guevara. *See* M.Ex 127 (Montanez PC Pet. 2004). Likewise, in 2005, Armando Serrano filed a post-conviction petition alleging actual innocence based on Vicente's affidavit and multitudes of other affidavits, transcripts, OPS complaints, and other supporting documentation, revealing that Guevara had engaged in a pattern and practice of coercing evidence through the use of threats, intimidation, lies, and physical abuse. M.Ex 128 (Serrano PC Pet.) at 1-2. The City of Chicago then determined that Montanez and Serrano were wrongfully convicted. *See* M.Ex 129 (Lassar Report Dated 3/3/15). In 2016, both men were exonerated and received certificates of innocence. M.Ex 132 (Certificates of Innocence for Jose Montanez and Armando Serrano). Guevara has taken the Fifth in regard to all allegations regarding Vicente, Rankins, Montanez, and Serrano. M.Ex 99 (Testimony of Reynaldo Guevara in *People v. Serrano & Montanez*, 93 CR 18173) at JR-L 077138-43, JR-L 077148-62.

k. ***Robert Bouto***: in 1993, Detective Guevara manipulated the results of the lineup in which Mr. Bouto was identified. Specifically, Detective Guevara allowed witnesses to see Mr. Bouto in the police station prior to the lineup, allowed them to view photographs Mr. Bouto and confer with one another before the lineup, and threatened a witness that Guevara would "put a case" on him if he did not cooperate. *See* M.Ex 130 (Affidavit of Rey Lozada) at ¶¶ 3-5, 6-11; M.Ex 131 (Affidavit of Carl Richmond) at ¶¶ 5, 7-9) (stating he was threatened to make an identification from Carl Richmond, with Det. Guevara saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends). Ultimately, the City of Chicago investigated Mr. Bouto's claims and concluded that Mr. Bouto is more likely than not innocent. *See* M.Ex 129 (Lassar Report dated 3/3/15) at JR-L 055738-39). Guevara has taken the Fifth in regard to all allegations regarding Bouto's case. M.Ex 84 (Guevara Deposition in *Rivera)* at 560.

l. ***Thomas Sierra***: In 1995, Defendant Guevara told Jose Melendez to falsely

50

identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote fabricated reports falsely saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting. Defendant Guevara invoked the fifth amendment when questioned about all aspects of Sierra's case. M.Ex 100 (Guevara Testimony in *Reyes/Solache)* at 34-35. The state finally dismissed charges against Mr. Sierra in 2019, and Mr. Sierra was granted a certificate of innocence in 2022. He spent over 22 years in prison due to Guevara's misconduct and is suing the City of Chicago and defendant officers, including Defendant Guevara, due to that misconduct. M.Ex 133 (COI Transcript) at 43, 53-73; M.Ex 134 (COI in Sierra); *see also* Sierra v. Guevara, et al., 1:18-cv-03029 (N.D.Ill).

m. ***Geraldo Iglesias***: In 1993, Geraldo Iglesias became yet another "victim of now-disgraced and former Detective Reynaldo Guevara's pattern and practice of misconduct and framing innocent persons" when he was wrongfully convicted of murder and sentenced to 35 years. The state finally dismissed charges against him in 2019, and Iglesias was granted a certificate of innocence in 2022. M.Ex 135 (COI Order) at 1.

n. ***Jose Cruz:*** In 1993, Cruz was arrested and ultimately wrongly convicted of a murder, based on fabricated and coerced statements caused by Defendant Guevara and other officers. In 2022, the prosecution agreed to vacate and dismiss his conviction. In 2023, he obtained a certificate of innocence, and filed a lawsuit against the City of Chicago, Defendant Guevara, and others for his wrongful conviction. M.Ex 136 (Jose Cruz, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?cas eid=6343).

o. ***Almodovar & Negron***: The City of Chicago has also determined that Roberto Almodovar was wrongfully convicted in another case investigated by Guevara in 1994. *See* M.Ex 137 (Lassar Report regarding Roberto Almodovar, Dated 2/9/15) at JR-L 042869, JR-L 042882. In that case, Guevara was alleged to have framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a lineup without any influence by Guevara. *See* M.Ex 138 (Affidavit of Melinda Power); M.Ex 139 (Post-Trial Testimony of Kennelly Saez in *People v. Negron*, 94 CR 24318). Almodovar, and his co-defendant William Negron, have both since been exonerated. *See* M.Ex 140 (Order Vacating Judgment and Sentence in *People v. Negron*, 94 CR 24318). Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron. M.Ex 84 (Guevara Deposition in *Rivera*) at 434-39; M.Ex 101 (Guevara Dep. in *Sierra)*.

p. ***Nelson Gonzalez:*** Nelson Gonzalez was framed with a 1994 murder, resulting from a fabricated identification conducted by Defendant Guevara. In 2022, Gonzalez's convictions were vacated and the case dismissed, and in 2023, he was granted a certificate of innocence. He has also filed suit against

51

Defendant Guevara, among others involved in his wrongful conviction. M.Ex 141 (Nelson Gonzalez, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6379).

q. **_Carlos Andino:_** In 1994, Defendants Guevara and Halvorsen, among other officers, manufactured false identifications that resulted in the wrongful arrest and conviction of Carlos Andino. In 2021, Andino filed for post-conviction relief, and in 2022, the Cook County State's Attorney's office agreed to vacate Andino's conviction. In 2023, he was awarded a certificate of innocence, and filed suit against Guevara and other officers to seek compensation for his wrongful conviction. M.Ex 142 (Carlos Andino, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6381).

r. **_Edwin Davila:_** In 1995, Davila was framed for murder by Defendant Guevara and his fellow corrupt officers based on fabricated identifications. In 2022, after spending over 24 years in prison for a crime he did not commit, all charges against Mr. Davila were dismissed. Davila now seeks justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. Guevara has invoked the Fifth Amendment regarding Davila. M.Ex 92 (Edwin Davila, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6507); _see also Davila v. Guevara, et al._ Case No. 1:23-cv-01739; M.Ex 101 (Guevera Dep. in _Sierra_).

s. **_Gamalier Rivera_:** In 1996, Gamalier Rivera was wrongfully arrested and convicted for murder resulting from fabricated identifications caused by Defendant Guevara and other officers. After years of seeking post-conviction relief, the state dismissed charges against him, and he was granted a certificate of innocence in 2022. Guevara has invoked the Fifth Amendment regarding Rivera. M.Ex 143 (Gamalier Rivera, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6398). Rivera has filed a lawsuit against Guevara and other officers for their misconduct. _See Rivera v. Guevara, et al.,_ Case. No. 1:23-cv-01743; M.Ex 101 (Guevara Dep. in _Sierra_).

t. **_Louis Robinson:_** Louis Robinson was wrongfully convicted of a 1996 drive-by shooting that killed Kelly Velez, based on coercive identification and fabricated evidence caused by Defendant Guevara. In 2023, his post-conviction petition was granted following an evidentiary hearing, and the State dismissed all charges. M.Ex 144 (Louis Robinson, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6639).

u. **_John Martinez_**: John Martinez was wrongfully convicted of a homicide due to falsified evidence, including fabricated identifications and coercive interrogations, caused by Defendant Guevara and other officers. In 2023, Martinez's conviction was vacated, and less than a month later, his case was

dismissed. In 2024, two others involved in this case – Thomas Kelly and Jose Tinajero – also had their wrongful convictions resulting from the same homicide dismissed based on Guevara's misconduct. Martinez has filed a lawsuit against the City of Chicago and Defendant Guevara, seeking justice for his wrongful conviction. M.Ex 145 (John Martinez, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6552). *See Martinez v. Guevara, et al.,* Case No. 1:23-cv-01741.

v. ***David Gecht and Richard Kwil:*** In 1999, David Gecht and Richard Kwil were both wrongfully convicted of a murder due to Defendants Guevara and Halvorsen's misconduct. During a single night, Defendants Guevara, Halvorsen, and other officers subjected both Gecht and Kwil to torturous investigations, breaking their wills and coercing them into signing false confessions. They also obtained a false confession from Ruben Hernandez, falsely implicating all three in the crime. In 2022, Gecht and Kwil's charges were dismissed, and both were granted certificates of innocence. M.Ex 146 (Gecht Court of Claims Order); M.Ex 147 (Kwil COI Order). The charges against Hernandez were also dismissed, and all three have pending lawsuits against Defendants Guevara—who has taken the Fifth regarding allegations against all three—and Halvorsen, among other officers, and the City of Chicago. *See Gecht v. Guevara, et al.*, Case No. 23-1742*; Kwil v. Guevara, et al.*, Case No. 23-cv-1742; *Hernandez v. Guevara, et al.*, Case No. 23-cv-15375; M.Ex 148 (Richard Kwil, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6581); M.Ex 101 (Guevara Dep. in *Sierra*).

w. ***Eruby Abrego and Jeremiah Cain:*** Eruby Abrego and Jeremiah Cain were wrongly convicted of the 1999 murder of Jose Garcia and aggravated battery of Julio Lugo, despite having nothing to do with the murder, due to the false identifications, falsified confessions obtained through torture, and other evidence manufactured by Defendants Guevara, Halvorsen, and others. In 2022, their wrongful convictions were vacated and the charges were dismissed. Both now seek justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. M.Ex 149 (Eruby Abrego, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid =6375); *see also Abrego v. Guevara, et al.,* Case No. 1:23-cv-01740*; Cain v. Guevara, et al.*, 1:23-cv-14282 (N.D. Ill.).

x. On February 29, 2024, seven men – Jayson Aguiar, who served 20 years, David Kruger, who served 14 years, Juan Molina, who served 12.5 years, Edwin Ortiz, who served 25 years, Oscar Soto, who served 3 years, Victor Vera, who served 19 years, and Tyrece Williams, who served 20 years–filed petitions seeking to reverse their decades-old convictions tied to disgraced former Chicago Police Detective Reynaldo Guevara. The men—who have completed their sentences and are out of custody—all claim their innocence. M.Ex 150 (Aguiar Pet.); M.Ex 151 (Kruger Pet.); M.Ex 152 (Molina Pet.); M.Ex 153 (Ortiz Pet.); M.Ex 154 (Soto Pet.); M.Ex 155 (Vera Pet.); M.Ex 156 (Williams Pet.).

Case: 1:23-cv-01737 Document #: 323 Filed: 05/06/26 Page 54 of 55 PageID #:52242

427. It was not until 2013 that the City first investigated Guevara, hiring Sidley Austin to conduct a review of a portion of his cases. When the reports were concluded in late 2014 and 2015, the reports found that Guevara had engaged in investigative misconduct including through improper identification procedures, falsifying reports, and physical abuse during interrogations. M.Ex 157 (Lassar Report regarding Solache and Reyes, dated 12/12/14); M.Ex 137 (Lassar Report on Almodovar, dated 2/9/15); M.Ex 158 (Lassar Report regarding Bouto, dated 3/3/15); M.Ex 129 (Lassar Report regarding Serrano and Montanez, dated 3/3/15).

428. The documented evidence of the Chicago Police Department's widespread practice using psychological and physical abuse to coerce confessions and fabricate false confessions includes at least 187 instances in Areas 2, 3, 4, and 5 of the Chicago Police Department Detective Division from 1972 until the early 2000s. M.Ex 159. This evidence is documented in sworn testimony and affidavits of 29 men who describe being physically abused and coerced to confess in Chicago police custody between 1987-1997, the Special Prosecutor's Report, the U.N. Committee Against Torture Report, the 2016 Police Accountability Task Force Report, the DOJ Pattern and Practice Report, and the 2007 statements of City officials discussing coerced confessions in Chicago police custody, as well as sworn testimony, court opinions, official reports, OPS complaints, civil lawsuits, newspaper articles, among other sources. *Id.*

RESPECTFULLY SUBMITTED,

**JUAN HERNANDEZ** and **ROSENDO HERNANDEZ**

By: /s/ Steve Art
*One of Plaintiffs' Attorneys*

54

Jon Loevy
Anand Swaminathan
Steve Art
Sean Starr
Alyssa Martinez
**LOEVY & LOEVY**
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

55