**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JUAN HERNANDEZ and ROSENDO HERNANDEZ, | ) | Case No. 23-cv-1737 |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| | ) | Hon. Jeremy C. Daniel, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, et al. | ) | Hon. Heather K. McShain, |
| | ) | Magistrate Judge |
| *Defendants.* | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |

**PLAINTIFFS' CONSOLIDATED RESPONSE
IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Alyssa Martinez
Meg Gould
Isaac Green
Justin Hill
Annalise Wagner
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................................................................ i

TABLE OF AUTHORITIES .................................................................................................... v

INTRODUCTION ................................................................................................................... 1

SUMMARY OF DISPUTED MATERIAL FACTS ................................................................ 6

I.      The Hernandez Brothers Are Innocent ....................................................................... 6

II.     Miedzianowski and Guevara Plot In Advance to Frame the Hernandez Brothers ............ 2

        A.      Miedzianowski, Guevara, and Other Police Officers Participate In A Criminal
                Drug Trafficking Conspiracy Within the Chicago Police Department.................. 2

        B.      Federal Authorities Investigate Miedzianowski and Guevara, and They Prosecute
                Miedzianowski and Other Officers and Civilians.............................................. 3

        C.      Miedzianowski and Guevara Plot In Advance to Frame Juan Hernandez In
                Furtherance of the Criminal Conspiracy............................................................ 4

III.    Jorge Gonzalez Is Killed on the Northwest Side of Chicago.......................................... 4

IV.     Police Respond to the Crime Scene and Interview Witnesses........................................ 5

V.      The Real Perpetrator Is William Vilaro ....................................................................... 5

VI.     Defendants Fabricate the Case Against the Hernandez Brothers in Four Days ................ 6

        A.      Defendants Fabricate An Anonymous Tip Implicating the Hernandez Brothers
                That Never Occurred......................................................................................... 6

        B.      Defendants Fabricate False Statements to Undermine Plaintiffs' Alibis............... 7

        C.      Defendants Manufacture Identifications Implicating the Hernandez Brothers ...... 7

VII.    Defendants Suppress Evidence Throughout Plaintiffs' Criminal Cases........................... 8

        A.      Miedzianowski and Guevara Suppress Evidence of Their Advance Plot to Frame
                Plaintiffs and Their Criminal Conspiracy ......................................................... 8

        B.      Defendants Suppress the Identity of the Real Perpetrator ..................................... 9

        C.      Defendants Suppress Exculpatory and Impeachment Evidence Relating to the
                Eyewitnesses .................................................................................................. 9

VIII.   Juan and Rosendo Hernandez Are Prosecuted and Convicted ...................................... 10

IX.     The City's Official Policies Caused Plaintiffs' Wrongful Convictions........................... 11

X.      The Hernandez Brothers Fight to Prove Their Innocence and Are Exonerated .............. 12

XI.     Guevara and Halvorsen Assert Their Fifth Amendment Right Not To Testify................ 12

ARGUMENT....................................................................................................................... 13

I.      Guevara's and Halvorsen's Fifth Amendment Assertions Doom Their Motions............. 13

II.     Summary Judgment Is Unavailable to the Defendant Officers ...................................... 18

i

A.    A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence.................................................. 19

    1. Miedzianowski and Guevara Suppressed Evidence of Their Advance Plot to Frame Plaintiffs and Their Criminal Conspiracy...................... 21

        a. Miedzianowski's Denials of Misconduct Must Be Rejected ... 22

        b. Guevara's Argument That Defendants Were Not Required To Disclose This Evidence Is Meritless ................................... 28

    2. Guevara, Halvorsen, and Biebel Suppressed the Real Perpetrator's Identity..................................................................................................34

    3. Defendants Suppressed Evidence Relating to Eyewitnesses ............... 36

        a. Defendants Suppressed Important Evidence Relating to Each of the Eyewitnesses ................................................................ 38

        b. The Court Should Reject Defendants' Arguments for Summary Judgment on Violante Suppression Theories...................... 39

            (1)   The Factual Arguments Lack Merit ........... 40

            (2)   The Reasonable Diligence Argument Lacks Merit................................................................ 40

            (3)   The No-Obligation-To-Disclose Argument Lacks Merit ........................................................ 43

            (4)   The Argument for Exclusion of Violante Evidence Lacks Merit ....................................... 44

B.    A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence .................................................................................................... 50

    1. Bemis, Guevara, DeGraff, and Halvorsen Fabricated the Anonymous Tip ........................................................................................................50

    2. Guevara, Halvorsen, and Biebel Fabricated Alibi Statements That They Attributed to Plaintiffs In A False Police Report ................................ 55

    3. Guevara, Halvorsen, Bemis, and Biebel Fabricated Eyewitness Identifications................................................................................... 57

        a. Ample Evidence Permits the Conclusion That Defendants Fabricated the Identifications.............................................. 57

        b. Defendants' Arguments for Summary Judgment Lack Merit.. 61

C.    This Court Need Not Decide Anything About Unduly Suggestive Identification Due Process Theories Because Plaintiffs Are Not Pursuing Those Theories....... 63

D.    Guevara and Bemis Are Not Entitled to Immunity ............................................. 65

E.    Bemis, DeGraff, and Biebel Are Not Entitled to Summary Judgment................. 67

F.    A Jury Must Decide Plaintiffs' Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims ................................................................... 70

    1. DeGraff, Biebel, and Miedzianowski Caused Plaintiffs Prosecutions . 70

    2. The Court Should Reject Defendants' Fabricated Probable Cause ...... 71

    3. Defendants Are Not Entitled to Qualified Immunity on the Fourth Amendment Claim ................................................................................ 75

G.    A Jury Must Decide Plaintiffs' Failure-To-Intervene Claims ............................. 77

H.    A Jury Must Decide Plaintiffs' Conspiracy Claims ............................................ 79

    1. Ample Evidence Supports the Conspiracy Claims Against Each Defendant ............................................................................................. 79

    2. Defendants' Arguments About Private Actors Lack Merit ................. 82

    3. The Intracorporate Conspiracy Doctrine Does Not Bar This Claim .... 83

    4. Defendants Do Not Have Qualified Immunity From §1983 Conspiracy ............................................................................................. 84

I.    A Jury Must Decide Plaintiffs' Intentional Infliction of Emotional Distress Claims ................................................................................................................ 85

J.    A Jury Must Decide Plaintiffs' Negligence Claim .............................................. 86

III.    Summary Judgment Is Unavailable to the City of Chicago ............................................. 87

A.    The City Fails to Move for Summary Judgment on Certain *Monell* Theories ..... 89

B.    The City Is Precluded from Relitigating Its Policy of Evidence Suppression ...... 93

C.    The City Cannot Challenge Plaintiffs' *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression .......... 93

D.    A Jury Must Decide the Widespread Practice Theories Regarding Suppressed Evidence, Fabrication of Identifications, and Failure to Train, Supervise, and Discipline Officers ........................................................................................... 93

    1. The City's Widespread Practice of Suppressing Evidence ................. 95

        a. Non-Expert Evidence Showing the Evidence Suppression Practice ...................................................................................... 95

        b. Expert Evidence Supporting the City's Evidence Suppression Practice ...................................................................................... 96

        c. The City's Arguments for Summary Judgment Lack Merit 98

    2. The City's Failure to Train, Supervise, and Discipline Officers ........ 100

        a. Non-Expert and Expert Evidence Supports This Theory ....... 101

        b. The City's Arguments for Summary Judgment Lack Merit ... 104

E.    A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications ............................................................... 106

1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications .................................................... 107

2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications ................................................................ 110

3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit .......................................... 115

4. The City's Other Summary Judgment Arguments Lack Merit .......... 118

IV.    The *Respondeat Superior* and Indemnification Claims Survive ................................... 120

CONCLUSION ................................................................................................. 120

## TABLE OF AUTHORITIES

**Cases**

*Adicke v. S.H. Kress & Co., 398 U.S. 144 (1970)* ............................................................ 15, 84, 94

*Alexander v. Casino Queen, Inc.*, 739 F.3d 972 (7th Cir. 2014) .................................................. 48

*Alexander v. United States,* 721 F.3d 418 (7th Cir. 2013)....................................................... 73, 75

*Allen v. Chicago Transit Auth.*, 317 F.3d 696 (7th Cir. 2003).................................................. 27, 62

*Allen v. McCurry*, 449 U.S. 90 (1980)........................................................................ 29

Anderer v. Jones, 342 F. Supp. 2d 799 (E.D. Wis. 2002)......................................................... 63, 75

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................................. 13

ane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors, 973 N.E.2d 880 (Ill. 2012) ........ 87

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)..................................................... 77, 86

*Banks v. Dretke*, 540 U.S. 668 (2004) ...................................................................... 40

*Baxter v. Palmigiano*, 425 U.S. 308 (1976)............................................................... 15, 16

*Beam v. IPCO Corp.*, 838 F.2d 242 (7th Cir. 1988)........................................................ 96

*Beaman v. Freesmeyer*, 183 N.E.3d 767 (Ill. 2021) ..................................................... 71

*Beck v. Ohio*, 379 U.S. 89 (1964) ........................................................................... 75

*Bishop v. White*, 2023 WL 35157 (N.D. Ill. Jan. 4, 2023)......................................................... 46

*Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025) ......................................................... 64, 65, 67

*Board of Comm'rs v. Brown*, 520 U.S. 397 (1997) ....................................................... 90

*Bonds v. Chicago*, 2018 WL 1316720 (N.D. Ill. Mar. 14, 2018) .............................................. 119

*Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001)............................................................. 41

*Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) ....................................................... 27

*Bryant v. Whalen*, 759 F. Supp. 410 (N.D. Ill. 1991) ................................................................ 73

v

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ................................................................ 54

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972) ................................................................... 79

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .................................................. 91, 92

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019) ....................................................... passim

*Canton v. Harris*, 489 U.S. 378 (1989) .......................................................................... 92

*Carmichael v. Village of Palatine,* 605 F.3d 451 (7th Cir. 2010) ...................... 81, 83, 92

*Carroll v. Lynch*, 698 F.3d 561 (7th Cir. 2012) ............................................................. 26

*Cartwright v. Chicago*, 450 Fed. App'x 539 (7th Cir. 2011) ......................................... 77

*Case v. Ahitow*, 301 F.3d 605 (7th Cir. 2002) ............................................................... 25

*Celotex v. Catrett*, 477 U.S. 317 (1986) .................................................................. 15, 37

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008) ....................................................... 77

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ..................................................... 120

*Collier v. Chicago*, 2015 WL 50814408, (N.D. Ill. Aug. 26, 2015) ............................... 73

*Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011) ........................................... 38, 58, 74

*Cruz v. Guevara*, No. 23 CV 4268, 2024 WL 4753672 (N.D. Ill. Nov. 12, 2024) ...... 34

*Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016) ............................................ 95, 100

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006) .............................................................. 92

*Dixon v. Cook County*, 819 F.3d 343 (7th Cir. 2016) .................................................... 95

*Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507 (7th Cir. 2010) ............ 88

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) .................................................... 20

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815 (7th Cir. 2016) ....... 15

*Escobedo v. Ram Shirdi*, 2013 WL 1787819 (N.D. Ill. Apr. 25, 2013) ......................... 24

*Evans v. City of Chicago*, 2006 WL 463041 (N.D. Ill. Jan. 6, 2006) ............................. 92

*Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) ................. 77

*Fields v. Chicago*, 2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ...................................................... 48

*Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017)............. 88, 89, 93

*Fields v. City of Chicago,* 981 F.3d 534 (7th Cir. 2020) ................................................... 88, 95, 96

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ....................................................... 21, 22, 30, 44

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ...................................................................... 75, 76, 87

*Fox v. Tomczak*, 2006 WL 1157466 (N.D. Ill. Apr. 26, 2006)...................................................... 87

*Franks v. Delaware*, 438 U.S. 154 (1978)............................................................................... 72, 75

*Gamble v. FCA US LLC*, 993 F.3d 534 (7th Cir. 2021) ................................................................ 48

*Garcia v. Chicago*, 2003 WL 1715621 (N.D. Ill. Mar. 20, 2003) ............................................. 105

*Geinosky v. Chicago*, 675 F.3d 743 (7th Cir. 2012) ..................................................................... 84

*Gerstein v. Pugh*, 420 U.S. 103 (1975)........................................................................................ 71

*Giglio v. United States*, 405 U.S. 150 (1972) ....................................................................... passim

*Gillespie v. Boudreau*, 805 F. Supp. 3d 892 (N.D. Ill. 2025) ...................................................... 79

*Glisson v. IDOC*, 849 F.3d 372 (7th Cir. 2017)........................................................... 90, 91, 92, 95

*Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019).. 120

*Goodvine v. Carr*, 761 F. App'x 598 (7th Cir. 2019) ................................................................... 45

*Goudy v. Cummings,* 922 F.3d 834 (7th Cir. 2019)................................................................. 36, 38

*Griman v. Makousky*, 76 F.3d 151 (7th Cir. 1996)...................................................................... 47

*Hampton v. Chicago*, 2017 WL 2985743 (N.D. Ill. July 13, 2017) ...................................... 42, 50

*Harris v. Chicago*, 2020 WL 7059445 (N.D. Ill. Dec. 2, 2020)................................................... 86

*Harris v. Chicago*, 266 F.3d 750 (7th Cir. 2001) ........................................................................ 16

*Henry v. Ramos*, 1997 WL 610781(N.D. Ill. Sept. 28, 1997)...................................................... 87

vii

*Hill v. Harvey*, 732 F. Supp. 3d 862 (N.D. Ill. 2024) .................................................................. 47

*Hillmann v. City of Chicago*, 834 F.3d 787 (7th Cir. 2016) ........................................................ 15

*Holland v. Chicago*, 643 F.3d 248 (7th Cir. 2011) ...................................................................... 20

*Hollins v. Milwaukee*, 574 F.3d 822 (7th Cir. 2009) ................................................................. 102

*Holloway v. City of Milwaukee,* 43 F.4th 760 (7th Cir. 2022)..................................................... 62

*Hudson v. City of Chicago*, No. 16-CV-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019).... 121

*Hunter v. Bryant,* 502 U.S. 224 (1991).......................................................................................... 77

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) .................................................................................. 54

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) .......................... 14

*In re Pansier*, 417 F. App'x 565 (7th Cir. 2011) .......................................................................... 14

*J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020)............................................. 90, 116, 118, 119

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)......................................................... 34

*Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995) .............................................................. 92

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ................................................................... 90, 92

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) .............................................. 31, 41, 43

*Johnson v. Baltimore Police Dep't*, 2022 WL 9976525 (D. Md. Oct. 14, 2022)......................... 46

*Johnson v. Chicago*, 2009 WL 1657547 (N.D. Ill. June 9, 2009) .............................................. 105

*Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988).................................................................. passim

*Jones v. Chicago*, 87 C 2536 (N.D. Ill.) ...................................................................................... 97

*Kadia v. Gonzales*, 501 F.3d 817 (7th Cir. 2007)........................................................................ 27

*Kailin v. Gurnee*, 77 F.4th 476 (7th Cir. 2023)............................................................. 23, 27, 82

*Kindle v. Harvey*, 2002 WL 230779 (N.D. Ill. Feb. 15, 2002) ................................................. 105

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) ........................................................... 91, 92, 100

*Kitchen v. Burge*, No. 10 C 4093, 2012 WL 346450 (N.D. Ill. Feb. 1, 2012)............................. 34

*Klipfel v. Gonzalez*, No. 94 C 6415, 2006 WL 1697009 (N.D. Ill. June 8, 2006)..................... 102

*Kluppelburg v. Burge*, No. 13-cv-3963 (N.D. Ill. Aug. 4, 2017)........................................... 43, 49

*Kuri v. City of Chicago*, 2017 WL 4882338 (N.D.Ill., 2017)...................................................... 73

*Kyles v. Whitley*, 514 U.S. 419 (1995)...................................................... 20, 22, 32, 36

*Lac du Flambeau Band v. Stop Treaty Abuse*, 991 F.2d 1249 (7th Cir. 1993)........................... 53

*LaPorta v. Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017) ........................................ 101, 120, 121

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011).................................................... 72, 75

*LiButti v. United States*, 178 F.3d 114 (2d Cir. 1999) .................................................. 15

*Liggins v. City of Chicago*, 2021 WL 2894167 (N.D. Ill. July 9, 2021)..................................... 85

*Logan v. Caterpillar*, 246 F.3d 912 (7th Cir. 2011) ....................................................... 71

*Logan v. Chicago*, 891 F.Supp.2d 897 (N.D. Ill. 2012)................................................... 17

*Malley v. Briggs,* 475 U.S. 335 (1986) .................................................................... 76, 77

*Manuel v. Joliet*, 580 U.S. 357 (2017)................................................................... 71, 78

*Marcinczyk v. Plewa*, 2012 WL 1429448 (N.D. Ill. Apr. 25, 2012).................................. 105, 106

*Maxwell v. Indianapolis*, 998 F.2d 431 (7th Cir. 1993)........................................... 73, 76

*McCottrell v. White*, 933 F.3d 651 (7th Cir. 2019)...................................................... 59

*McDonough v. Smith,* 139 S. Ct. 2149 (2019) ........................................................... 54

*Miller v. Pate*, 386 U.S. 1 (1967)...................................................................... 28

*Mitchum v. Foster*, 407 U.S. 225 (1972) ............................................................... 29

*Mooney v. Hollohan*, 294 U.S. 103 (1935).......................................................... 50, 53

*Moore v. Chicago*, 2011 WL 1231318 (N.D. Ill. 2011) ................................................ 87

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ................................................. 53

*Mwangangi v. Nielsen*, 48 F.4th 816 (7th Cir. 2022) .............................................................. 78, 79

*Myvett v. Heerdt*, 232 F. Supp. 3d 1005 (N.D. Ill. 2017) ........................................................ 73

*Napue v. Illinois*, 360 U.S. 264 (1959) .................................................................................. 20, 29

*National Acceptance v. Bathalter*, 705 F.2d 924 (7th Cir. 1983) ................................................. 17

*Nelson v. LaCrosse Cty.*, 301 F.3d 820 (7th Cir. 2002) .................................................................. 93

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) ........................................................................ 20

*Obrycka v. Chicago*, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012) ................................................. 105

*Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985) ................................................................................. 73

*Ott v. City of Milwaukee*, No. 09-C-870, 2015 WL 1219587 (E.D. Wis. Mar. 17, 2015)............ 50

*Padilla v. Chicago*, 2013 WL 1208567 (N.D. Ill. Mar. 26, 2013)................................................. 72

*Palmer v. Chicago*, 82 C 2349 (N.D. Ill.)...................................................................................... 97

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020)........................................................ 54, 55

*Pembaur v. Cincinnati*, 475 U.S. 469 (1986) ............................................................................... 90

*Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, 2023 WL 348320 (S.D. Ill. Jan. 20, 2023)... 87

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) .......................................................... 50, 57

*Pickett v. Dart*, 2014 WL 919673 (N.D. Ill. Mar. 10, 2014) ...................................................... 119

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002) ........................................................................ 80

*Pyle v. Kansas*, 317 U.S. 213 (1942) ............................................................................................. 29

*Rios v. Guevara*, No. 22 CV 3973, 2024 WL 5119954 (N.D. Ill. Dec. 16, 2024)............ 17, 63, 75

*Rivera v. Guevara,* 319 F. Supp. 3d 1004 (N.D. Ill. 2018).................................................. passim

*Rivera v. Guevara*, No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019) ........ 88, 89, 93

*S.E.C. v. Colello*, 139 F.3d 674 (9th Cir. 1998).......................................................................... 17

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015).......................................................... 32, 33, 43

x

*Shakman v. Cook County*, 920 F. Supp. 2d 881 (N.D. Ill. 2013) ................................................. 14

*Smith v. Burge*, 222 F. Supp. 3d 669 (N.D. Ill. 2016) ................................................................ 34

*Smith v. Cain*, 132 S. Ct. 627 (2012) ................................................................... 20, 21, 22

*Smith v. Northeastern Illinois University,* 388 F.3d 559 (7th Cir. 2004) ................... 40, 52, 67, 78

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) ................................. 92, 102, 105

*Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 300 F. Supp. 2d 606 (N.D. Ill. 2003) ................ 47

*Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 376 F.3d 664 (7th Cir. 2004) ............................. 47

*Standard Ins. v. VanLanduit*, 551 F.Supp.3d 854 (N.D. Ill. 2021) ................................................ 53

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) ........................................................................ 70

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998) ...................................................................... 92

*Sterk v. Redbox Automated Retail*, 770 F.3d 618 (7th Cir. 2014) ................................................ 15

*Stevenson v. Chicago*, No. 17 CV 4839, 2018 WL 1784142 (N.D. Ill. Apr. 13, 2018) ......... 87, 88

*Stinson v. Gauger* ................................................................................................................ 30, 31

*Sublett v. John Wiley & Sons*, 463 F.3d 731 (7th Cir. 2006) ............................................ 23, 51, 58

*Swanigan v. Chicago*, 775 F.3d 953 (7th Cir. 2015) ................................................................ 119

*Taylor v. Chicago*, 2021 WL 4401528  (N.D. Ill. Sept. 27, 2021) ................................................ 55

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) ................................................. 95, 119, 121

*Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994) ...................................................................... 93

*Thompson v. Chicago*, 722 F.3d 963 (7th Cir. 2013) ............................................................. 22, 59

*Thompson v. Clark*, 596 U.S. 36 (2022) .................................................................................. 71

*Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990) ...................................................................... 38

*Tolan v. Cotton*, 572 U.S. 650 (2014) ............................................................................... passim

*Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013) ...................................................................... 84

*United States v. Agurs*, 427 U.S. 97 (1976) ................................................................. 20

*United States v. Certain Real Prop. & Premises,* 55 F.3d 78 (2d Cir. 1995) .............................. 17

*United States v. Ferrell*, 816 F.3d 433 (7th Cir. 2015) .................................................... 49

*United States v. Rylander,* 460 U.S. 752 (1983) ............................................................ 16

*United States v. Taylor,* 975 F.2d 402 (7th Cir. 1992 ................................................. 16, 17

*Velez v. Chicago*, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023) .................................. 89, 105, 106

*Volland-Golden v. Chicago*, 89 F. Supp. 3d 983 (N.D. Ill. 2015) .................................................. 49

*Walden v. Chicago*, 755 F. Supp. 2d 942 (N.D. Ill. 2010) ................................................. 89

*Washington v. Boudreau*, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) ............................... passim

*Wearry v. Cain*, 577 U.S. 385 (2016) ................................................................. 20, 29, 36

*Whitaker v. Dempsey*, 144 F.4th 908 (7th Cir. 2025) ............................................... 59, 61

*Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012) ...................................................... passim

*Whren v. United States*, 517 U.S. 806 (1996) .................................................................. 76

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) ......................................................... 72

*Williams v. Florida*, 399 U.S. 78 (1970) ......................................................................... 17

*Wilson v. Chicago*, 707 F. Supp. 379 (N.D. Ill. 1989) ......................................................... 81

*Winskunas v. Birnbaum*, 23 F.3d 1264 (7th Cir. 1994) .................................................... 47

*Woods v. Chicago*, 234 F.3d 979 (7th Cir. 2000) ...................................................... 75

*Woodward v. Corr. Med. Servs*, 368 F.3d 917 (7th Cir. 2004) .......................................... 120, 121

*Wright* v. *Kelly*, No. 95–CV–0688H, 1998 WL 912026 (W.D.N.Y. Oct. 16, 1998) .................... 49

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) ................................................................. 79

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ...................................................................... 85

**Other Authorities**

Wright & Miller, Federal Practice & Procedure ............................................................... 14, 45, 92

**Rules**

Federal Rule of Civil Procedure 56 ....................................................................... 45

Federal Rule of Evidence 609 ............................................................................. 23

Federal Rule of Evidence 804 ............................................................................. 46

xiii

**INTRODUCTION**

Juan and Rosendo Hernandez were barely adults when Defendants wrongfully arrested and falsely implicated them in the 1997 murder of Jorge Gonzalez in Chicago. Plaintiffs had nothing to do with the crime, and they have been adjudicated and certified innocent by Illinois courts. No real evidence ever implicated them. No physical evidence or weapon ever connected them to the crime. Neither of them ever said anything suggesting they had been involved. On the contrary, both had solid alibis supported by multiple witnesses. In fact, Defendants knew the Hernandez Brothers were innocent all along. This case is unusual among wrongful conviction cases in an important respect: There is substantial evidence that Defendants planned in advance to frame Juan Hernandez for murder, when the Gonzalez shooting occurred they selected that crime as the one they would pin on the Hernandez Brothers, and they worked from there to manufacture evidence to implicate Plaintiffs in the crime.

In particular, for more than a decade before the Hernandez Brothers were framed, Defendant Joseph Miedzianowski, a corrupt Chicago Police gang crimes officer, operated a criminal narcotics conspiracy from within the Chicago Police Department, in which he and other officers used their badges to traffic narcotics, fix criminal cases, and commit murder, robbery, and other crimes. Defendant Reynaldo Guevara was one of many officers who participated in the conspiracy with Miedzianowski, and Guevara helped to frame targets of the conspiracy for crimes—to protect the conspiracy and to help it accomplish its goals. Guevara was a specialist in framing people, and he had a long pattern of fixing cases and fabricating false evidence to implicate innocent people in crimes they had not committed. Ultimately, Miedzianowski, Guevara, and other participants in the criminal conspiracy were investigated by federal authorities, Miedzianowski

1

and multiple Chicago Police officers were prosecuted and convicted, and Miedzianowski is now serving life in prison for his crimes.

In the weeks before Defendants pinned the Gonzalez murder on Plaintiffs, Miedzianowski came to believe that Juan Hernandez had stolen drugs from one of the conspiracy's safe houses, which Miedzianowski operated, and where Juan and friends lived. In retaliation for this perceived interference with their operation, Miedzianowski plotted with Guevara to frame Juan Hernandez, and he asked Guevara to carry out the frame job out. Fred Rock, who was a central player in the drug trafficking enterprise—and who was later the government's star witness in the criminal cases against Miedizanowski and other police—has testified under oath in this case and previously that he was present at multiple meetings where Miedzianowski and Guevara met and made their plan to frame Juan Hernandez, and his account is firmly corroborated by other testimony and evidence.

When Gonzalez was killed, Miedzianowski and Guevara put their preexisting plan to frame the Hernandez Brothers into action, deciding that they would implicate them in that crime, and Guevara carried out the plan by fabricating a false case with his investigative team, which included his partner Defendant Halvorsen, as well as Defendants Bemis, DeGraff, and Biebel. They did this even though they had evidence from the start that the crime had been committed by William "Will Kill" Vilaro, who was present at the scene on the night of the crime, drove a car that multiple witnesses saw fleeing the scene, and admitted his involvement to multiple witnesses. But Defendants pursued the Hernandez Brothers instead.

To be clear, construing the record for Plaintiffs and drawing inferences for them, the following facts cannot be disputed at summary judgment: Miedzianowski and Guevara arbitrarily plotted to frame Plaintiffs for a crime before the Gonzalez murder even occurred. Plaintiffs were completely innocent of that crime and had no connection to it. Defendants knew the identity of the

2

person who killed Gonzalez. Nonetheless, Defendants chose to implicate Plaintiffs instead of the real perpetrator. And because there was no evidence that could possibly implicate Plaintiffs, Defendants necessarily had to manufacture all of the evidence of their guilt out of whole cloth. Put simply, Plaintiffs' evidence in this civil case of Defendants' advance plot to frame them for a crime they had nothing to do with would permit a reasonable jury to conclude that Defendants *must have* knowingly fabricated all evidence implicating Plaintiffs, and Defendants' arguments otherwise have to wait for trial.

Additional evidence supports Plaintiffs' claims that Defendants fabricated the evidence against them. Bemis, DeGraff, Guevara, and Halvorsen made up an anonymous tip that in fact never occurred, saying that they came to suspect Plaintiffs initially because a caller had phoned the police station to say that the Hernandez Brothers had committed the shooting. Next, Guevara, Halvorsen, Bemis, and Biebel fabricated witness identifications of the Hernandez Brothers as the shooters. Although the eyewitnesses at the scene had not seen the perpetrators of the crime sufficiently to make an identification, and made that clear when they could provide hardly any or no description of the shooters when interviewed by detectives after the shooting, Defendants manufactured identifications of Plaintiffs from the eyewitnesses.

Moreover, when Defendants learned that Plaintiffs each had solid alibis for the time of the crime, Guevara, Halvorsen, and Biebel knowingly fabricated reports saying that Plaintiffs had given statements undermining their alibis, when Plaintiffs had not made any such statements. Defendants' fabricated statements attributed to Plaintiffs were used during the criminal case to destroy Plaintiffs' truthful alibis and to ensure Plaintiffs were convicted of the crime.

Based solely on the false evidence manufactured by Defendants, Juan and Rosendo Hernandez were convicted of murder in separate trials, and they were sentenced to 86 and 80 years

in prison, respectively. Throughout their criminal proceedings, the Hernandez Brothers maintained their innocence and testified in their own defense. But their testimony was no match for the false evidence manufactured by Defendants, which was introduced against them, in violation of their due process right to a fair trial.

But the constitutional violations extended beyond fabricated evidence. Defendants also violated Plaintiffs' right to due process by suppressing critical evidence that would have exonerated the Hernandez Brothers and would have impeached the key witnesses against them, including Defendants themselves. Miedzianowski and Guevara suppressed that they had plotted to frame Plaintiffs in advance, and they suppressed that their plot was in service of a criminal drug trafficking conspiracy they were operating within the Chicago Police Department. Defendants also suppressed evidence pointing to the real perpetrator of the crime, William "Will Kill" Vilaro. They suppressed all evidence that would have fatally undermined the testimony of the supposed eyewitnesses, including, *inter alia*, that Jesus Gonzalez had identified other perpetrators when he was initially shown photos, that Nancy Gonzalez had identified a filler witness in a lineup that included Juan Hernandez (severely undermining the reliability of her identification of Rosendo), and that Daniel Violante had told the detectives repeatedly that he did not see the shooters' faces and he could not make an identification.

The Hernandez Brothers each spent 25 years wrongfully imprisoned for crimes they did not commit. After a post-conviction hearing in July 2022, which featured testimony from numerous live witnesses, a Cook County judge vacated their convictions, concluded that they were factually innocent (an extremely rare finding in such cases), and apologized to them for their ordeal. In 2023, the State of Illinois granted Plaintiffs' certificates of innocence.

4

This is not a summary judgment case. Miedzianowski and Guevara plotted together in advance to frame the Hernandez Brothers in connection with a criminal narcotics conspiracy that was an unprecedented scandal in the Chicago Police Department. Moreover, Plaintiffs' convictions are two of approximately 50 wrongful murder convictions obtained by Guevara, his partner Halvorsen, and their colleagues at the Chicago Police Department's Area Five Detective Division. Plaintiffs are completely innocent and had strong alibis. There is compelling evidence of an outlandish plot to frame Plaintiffs and to violate their rights by fabricating and suppressing key evidence. Put simply, it would be difficult to find a civil rights case where the need for trial is more pronounced.

In their four motions, Defendants raise many meritless arguments. The motion filed by Guevara is frivolous, considering he has asserted his Fifth Amendment right not to incriminate himself in response to all questions about his misconduct at issue in this case. The same is true for Halvorsen, who also pleaded the Fifth when asked whether he framed the Hernandez Brothers. Meanwhile, Miedzianowski's motion is nothing more than an express request that this Court disbelieve Plaintiffs' evidence and credit Miedzianowski's denials of misconduct instead, an approach that is flatly prohibited by the law governing summary judgment and that contradicts abundant facts in the record. Indeed, Defendants' arguments often raise issues that courts normally would encounter during cross examination of witnesses at trial—but these are not justifications for summary judgment, they are an indication that a trial is necessary. In total, Defendant' arguments lack merit and are made in the face of overwhelming evidence that the Defendant violated Plaintiffs' rights protected by the U.S. Constitution and Illinois law.

The individual Defendants are not solely to blame. Plaintiffs' ordeal was also caused by Chicago's official policies, which caused the suppression of evidence in homicide investigations

5

routinely, permitted police officers to fabricate identifications and to improperly document identification procedures, and encouraged untrained police officers to commit misconduct with impunity. The City moves for summary judgment on *Monell* theories that it has already lost repeatedly at trial and is therefore precluded from re-litigating, and it cannot create a genuine dispute of fact on others, as the Hernandez Brothers explain in their cross-motion. Dkt. 282. A huge volume of evidence supports Plaintiffs' *Monell* claims that the constitutional violations they suffered were caused by Chicago's policies. This Court should deny Defendants' motions.

## SUMMARY OF DISPUTED MATERIAL FACTS

Defendants impermissibly construe the evidence and draw inferences in their own favor, ignoring governing rules and Supreme Court precedents. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Plaintiffs summarize material facts here.[1] Properly viewing the record in Plaintiffs' favor, the following facts cannot be disputed.

### I.    The Hernandez Brothers Are Innocent

Plaintiffs are innocent and were uninvolved in the Gonzalez murder. No legitimate evidence ever connected either brother to the crime. No physical evidence ever linked them to the shooting. They never made any incriminating statement. Both had solid alibis. Both have always maintained their innocence. After a contested post-conviction hearing, a Cook County judge exonerated Plaintiffs, and in a rare move decided that they were actually innocent. They have been

---

[1] An extensive factual account is in Plaintiffs' Statement of Facts in Support of their Affirmative Motion for Summary Judgment ("AF," Dkt. 284), Plaintiffs' Statement of Additional Facts in Response to Defendants' Motions ("SF"), Plaintiffs' response to the Defendants' Joint facts ("RSOF-J ¶"), their response to Miedzianowski's facts ("RSOF-M"), and their response to the City's facts ("RSOF-City"). Guevara's brief (Dkt. 280) is cited "GB," Miedzianowski's brief (Dkt. 288) "MB," the Defendant Officers' (Dkt. 290) "OB," and the City's (Dkt. 292) "CB."

6

awarded certificates of innocence by the State of Illinois. Defendants cannot dispute the Hernandez Brothers' innocence at this stage of the case. SF¶¶1-6.

## II. Miedzianowski and Guevara Plot In Advance to Frame the Hernandez Brothers

It was not merely bad luck that the Hernandez Brothers were accused of a crime they had nothing to do with. Miedzianowski and Guevara plotted in advance to frame Juan Hernandez, to protect a narcotics trafficking conspiracy that operated out of the Chicago Police Department at the time, and in retaliation for Juan Hernandez's perceived interference in that conspiracy. Throughout the Hernandez Brothers' ordeal, Miedzianowski and Guevara suppressed their advance plot to frame Plaintiffs, they suppressed that they made that plan to protect their narcotics conspiracy, and they suppressed all evidence about the criminal narcotics conspiracy. SF¶¶18-22, 41, 122.

### A. Miedzianowski, Guevara, and Other Police Officers Participate In A Criminal Drug Trafficking Conspiracy Within the Chicago Police Department

Miedzianowski was at the center of a criminal drug enterprise operated within the Chicago Police Department for a decade or more, where he and other officers used their badges to traffic drugs, extort and rob drug dealers, and direct police resources to target individuals and to protect the conspiracy. In particular, Miedzianowski, other officer, and civilians conspiring with them orchestrated "geezos," in which they robbed drug dealers or drugs or money, often falsely reporting their activities, and sold drugs back onto the streets, using their positions as police officers to prevent detection. SF¶¶7-17.

Ample record evidence supports that Guevara was closely connected to Miedzianowski and participated in the drug conspiracy. Guevara was an associate of Miedzianowski in the enterprise, known to frequent the Mega Mall and other locations in the company of Miedzianowski

and other co-conspirators including Galligan, Woodall, Fred Rock, and Mohammed Omar. SF¶¶13-17.

Separate from their conduct in this case, Guevara and Miedzianowski committed crimes together as part of the conspiracy. Guevara was involved in efforts to cover up the murder of Eloy Garza, had a reputation for putting cases on people based on grudges, took bribes to get charges dropped against suspects in crimes, and was involved with Miedzianowski in collecting protection money from drug dealers. Guevara pleaded the Fifth when asked about his involvement with Miedzianowski, and his role fixing cases as part of the conspiracy. SF¶¶15-17, 32, 38, 41.

### B. Federal Authorities Investigate Miedzianowski and Guevara, and They Prosecute Miedzianowski and Other Officers and Civilians

For many years before Plaintiffs' wrongful convictions, the City of Chicago knew of Miedzianowski's misconduct, but did nothing to stop it. In fact, Chicago Police officials helped cover up his misconduct, and a few years after Plaintiffs' wrongful convictions, a federal jury held the City liable for violating the rights of two ATF agents who Miedzianowski had retaliated against for investigating his conspiracy. The City's support of Miedzianowski's malfeasance ultimately caused federal authorities to mount an investigation, which occurred at the same time Plaintiffs were being prosecuted. As part of that effort, Miedzianowski, Guevara, and many other Chicago Police officers and civilians were investigated for a wide array of crimes. SF¶¶33-38.

The investigation resulted in indictments and two related cases, *U.S. v. Miedzianowski*, No. 98 CR 923, and *U.S. v. Woodall*, No. 03 CR 64 (N.D. Ill.). Fred Rock was the government's star witness at Miedzianowski's trial. Miedzianowski and a number of other officers were convicted, and Miedzianowski is currently serving life. Although Guevara was not prosecuted, there is ample

evidence in the small part of the federal investigative files produced in this case that Guevara was investigated as part of the conspiracy. SF¶¶37-41.[2]

### C. Miedzianowski and Guevara Plot In Advance to Frame Juan Hernandez In Furtherance of the Criminal Conspiracy

Toward the end of the criminal conspiracy, Miedzianowski and Guevara plotted to frame Juan Hernandez for a crime he had not committed. They did this because Miedzianowski thought that Juan had ripped off one of the conspiracy's drug stash houses, and he enlisted Guevara in a plan to get revenge. In at least two separate meetings between Guevara and Miedzianowski detective and gang offices, in the presence of Fred Rock, Miedzianowski directed Guevara to put a case on Juan Hernandez. SF¶¶18-22. Within a few months of those conversations, Juan and Rosendo were arrested for the shooting of Jorge Gonzalez. SF¶¶22.

### III. Jorge Gonzalez Is Killed on the Northwest Side of Chicago

Just after 11 p.m. on June 27, 1997, Jorge Gonzalez and several friends and family were sitting on the porches in front of 2208 and 2212 N. Mobile. Daniel Violante, Jose Gonzalez, and Jesus Gonzalez were sitting on the stairs at 2212 N. Mobile, while Jorge Gonzalez, Nancy Gonzalez, Juan Carlos Cruz, and Maribel Arroyo were sitting at 2212 N. Mobile. SF¶¶42.

Three individuals approached from the South, indicating affiliation with the Maniac Latin Disciples, or MLDs—the same gang as several of the individuals sitting on the porches. One offender walked up to 2212 N. Mobile and exchanged words with Violante, while the other two offenders stood by 2208 N. Mobile. After Violante indicated affiliation with the MLDs, the

---

[2] Guevara proclaims in his motion that there is no evidence "that Guevara was in fact a part of Miedzianowski's criminal conspiracy, or even investigated as potentially being a part of said conspiracy," GB-13-14, which is a problematic argument at summary judgment by a party who has pleaded the Fifth in response questions about his involvement in that conspiracy, as discussed below, *infra* Arg. §I. But the contention is obviously factually incorrect as well.

4

offender facing him declared his affiliation with the Spanish Cobras, pulled out a gun and began shooting. Another offender standing in front of 2208 N. Mobile began shooting as well. All three offenders then fled the way they had come. They fled in a vehicle, and witnesses reported the sound of glass shattering and bottles being thrown at the vehicle. Jorge Gonzalez was killed, and Juan Carlos Cruz suffered a gunshot wound to his leg. The exchange of words lasted just a few seconds, and the entire interaction lasted less than a minute. SF¶¶43-46.

### IV. Police Respond to the Crime Scene and Interview Witnesses

Police arrived at the scene and interviewed several of the witnesses who had been on the porches. All of them were then interviewed by detectives that night. They could provide only vague descriptions of the shooters, such as their clothing and in some cases general descriptions of height and weight. The only distinguishing characteristic of the shooter that any of the witnesses could provide was that one of the shooters was bald. Initial attempts at trying to identify suspects from photobooks of known Spanish Cobras were unsuccessful. SF¶¶47-48

### V. The Real Perpetrator Is William Vilaro

The real perpetrator of the Gonzalez shooting was William "Will Kill" Vilaro, who matched the initial witness descriptions. He was affiliated with the Maniac Latin Disciples street gang. There was evidence the Gonzalez shooting was carried out by MLD gang members (which Plaintiffs were not) because Gonzalez had set up an unauthorized faction of the MLD gang. On the night of the shooting, Will Kill was driving near the scene of the crime in a large, 4-door, dark-colored vehicle, with a busted windshield, when he flagged down Nelson Pacheco and Desiree Bandomo. Will Kill was sweaty and nervous and had a gun. He said he had just killed an MLD at Mobile and Dickens, and that someone had thrown a bike at his car as he drove off. The type of car matched witness descriptions, as did the damages, which was caused by a bystander who

witnesses had seen throwing a bike at the car as it drove away. Later that night, Pacheco passed Will Kill's car, and it had been burned. Asked if he killed Gonzalez during his deposition in this case, Will Kill pleaded the Fifth. SF¶49-55.

### VI. Defendants Fabricate the Case Against the Hernandez Brothers in Four Days

Beginning on June 28, 1997, Defendants executed Guevara and Miedzianowski's plot to frame Plaintiffs, and four days later, on July 1, they had "solved" the crime and charged the Hernandez Brothers with the Gonzalez murder. Because Plaintiffs had not committed the crime, which Defendants knew, Defendants simply manufactured all evidence implicating the Hernandez Brothers. SF¶56-100.

### A. Defendants Fabricate An Anonymous Tip Implicating the Hernandez Brothers That Never Occurred

Because they had no evidence to connect the Hernandez Brothers to the Gonzalez shooting, Defendants needed to manufacture a reason Plaintiffs became the suspects. Plaintiffs had not been at the crime scene and none of the witnesses had seen them there. No other physical evidence implicated them. The only purported link connecting them to the crime was a supposed tip received by Bemis, who was a participant in Miedzianowski's criminal conspiracy, from an "unknown informant" who called the police station on the evening after the crime, June 28, to say that "Poochie" (Juan Hernandez) and "Junebug" (Rosendo Hernandez) had committed the killing. That tip was supposedly communicated by DeGraff to Guevara and Halvorsen the following day, on June 29, when they were first assigned to the case. But it was never documented by any office until the *end* of the investigation, after Plaintiffs were arrested, on July 1. All record evidence—including Bemis's own testimony—supports that this tip was fabricated by Defendants to connect Plaintiffs to the crime. SF¶¶56-59.

6

**B. Defendants Fabricate False Statements to Undermine Plaintiffs' Alibis**

Once they had implicated the Hernandez Brothers, Defendants immediately ran into a problem: Both brothers had solid alibis for the time of the shooting. But instead of investigating and validating the alibis, Guevara, Halvorsen, and Biebel knowingly fabricated alibi statements that they falsely attributed to Plaintiffs. In particular, when Guevara and Halvorsen questioned Plaintiffs about the Gonzalez shooting, they both truthfully denied their involvement, and they each accurately provided their alibis, which showed it was impossible they had committed the shooting. Juan had been at a restaurant with a friend and her daughter, preparing for the daughter's Quinceañera, at the time of the shooting, and his friend corroborated his alibi. Rosendo had been in a bowling alley with multiple friends, miles away from the crime scene when the crime occurred. In Defendants' fabricated account, however, Defendants claimed Plaintiffs had stated they were each home at the time of the crime. Plaintiffs had not given Defendants those statements. But Guevara, Halvorsen, and Biebel documented false accounts in a report. The manufactured statements created the opportunity for Plaintiffs to have committed the crime, and Defendants used the statements to undermine Plaintiffs' alibis during the criminal case. SF¶¶115-121.

**C. Defendants Manufacture Identifications Implicating the Hernandez Brothers**

Focused on framing Plaintiffs, Defendants fabricated a series of identifications from the young eyewitnesses despite the nearly impossible vantage presented by the circumstances of the crime and the inability of the eyewitnesses to provide anything more than vague descriptions when interviewed by detectives shortly after the crime. Despite this, and despite the eyewitnesses in some cases expressly telling them they did not see the shooters' faces or selecting fillers or other suspects, Defendants fabricated reports claiming to have obtained photo array and lineup identifications of Plaintiffs from Daniel Violante, Juan Carlos Cruz, and Jesus, Jose and Nancy

7

Gonzalez. When Plaintiffs' attorney Kent Brody tried to observe the lineup identification procedures to make sure they were done without influence, his request—routinely granted—was denied. SF¶¶47, 62-100; see also 101-114.

## VII. Defendants Suppress Evidence Throughout Plaintiffs' Criminal Cases

In addition to fabricating the evidence to implicate Plaintiffs, throughout Plaintiffs' criminal prosecutions and for years after, Defendants suppressed evidence that would have exonerated Plaintiffs, that would have fatally undermined the case against them, and that would have impeached the testimony of Defendants themselves and the testimony of eyewitnesses. Instead of disclosing this evidence, Defendants actively covered it up. SF¶¶122-125.

### A. Miedzianowski and Guevara Suppress Evidence of Their Advance Plot to Frame Plaintiffs and Their Criminal Conspiracy

Throughout Plaintiffs' criminal prosecutions, Miedzianowski and Guevara suppressed their advance plan to frame Juan Hernandez, they suppressed that they had made that plan in order to retaliate against Juan and to protect their criminal conspiracy, and they suppressed that they were engaged together in a criminal drug trafficking conspiracy. The suppression continues to this day, with Miedzianowski denying that he even knew the Hernandez Brothers and denying he engaged in any misconduct as a Chicago Police officer, and with Guevara pleading the Fifth in response to questions about the plot. Plaintiffs did not find out about this evidence until decades into their wrongful incarcerations. SF¶¶18-22, 25, 41, 122.

Fred Rock testified that as part of his extensive proffers to the federal government following his arrest, he told federal authorities that the Hernandez Brothers had been framed, but

8

no one acted upon that information.[3] After Rock pleaded guilty, and while he was in federal prison and the Hernandez Brothers were in state prison, Rock stayed quiet, out of fear of Miedzianowski, who threatened to kill prosecutors and witnesses in the case. When Rock was released from prison and deported, he found out that the Hernandez Brothers were still wrongfully imprisoned, worked to correct the injustice for personal reasons, contacted a common friend who connected him to Plaintiffs' post-conviction attorneys, and the Miedzianowski and Guevara plot finally came to light. SF¶¶23-25.

### B. Defendants Suppress the Identity of the Real Perpetrator

When Defendants decided to frame the Hernanez Brothers for the Gonzalez killing, they let the real killer run free. Evidence in the record demonstrates that Defendants learned during their investigation that Will Kill was involved in the crime. Defendants communicated to a felony review prosecutor who came to review charges during the investigation that "Willie" was involved in the crime. Will Kill was known to Defendants as Willy, and he pleaded the Fifth when asked whether detectives ever interviewed him about the crime. Defendants never disclosed Will Kill's involvement or their investigation into him to Plaintiffs during criminal proceedings. SF¶¶49-55.

### C. Defendants Suppress Exculpatory and Impeachment Evidence Relating to the Eyewitnesses

Defendants also suppressed all information about their interactions with eyewitnesses, any part of which would have impeached those witnesses. They suppressed that Daniel Violante had

---

[3] Miedzianowski and Guevara attempt to contest this particular fact in their motions—Miedzianowski makes it his marquee argument—highlighting that there is no express mention of the Hernandez Brothers in the federal materials produced in this case, and arguing that this means that Rock did not disclose the plot to frame them during the federal investigation. MB-4-5 GB-13-14. As explained in detail below, this attempt to impeach a collateral fact by omission at summary judgment is entirely improper; even if it was not, this fact has no bearing on summary judgment; and regardless Defendants' view of the facts is skewed and incomplete. See *infra* Arg. §II(A)(1)(a).

9

told Defendants repeatedly that it was too dark and it happened too fast to see the shooter's faces and he could not make an identification, and that he could not and did not make identifications in the photo array or lineup. They further suppressed the likely identifications of alternate suspects by Jesus Gonzalez, and the identification of filler witnesses (i.e., non-suspects) in a lineup that contained Juan Hernandez by Nancy Gonzalez, and an undocumented set of photos shown to Jose Gonzalez at the wake of his brother shortly before he was brought to the station to view a lineup. SF¶¶95-98.

\* \* \*

Throughout the criminal proceedings, Defendants hid all of this key evidence from prosecutors and defense attorneys. If disclosed, this evidence would have halted the criminal proceedings. It would have permitted Plaintiffs to show they had nothing to do with the crime and had been implicated by corrupt police as part of a revenge plot carried out in furtherance of a criminal conspiracy with the Chicago Police Department. Plaintiffs could have demonstrated conclusively that the eyewitnesses' identifications against them were manufactured. If their criminal cases had been tried, they could have fatally impeached every witness against them, including the Defendants and eyewitnesses who testified. SF¶¶95-98, 122-125.

## VIII.     Juan and Rosendo Hernandez Are Prosecuted and Convicted

Based only on Defendants' fabricated evidence, the Hernandez Brothers were charged and prosecuted. Throughout the criminal proceedings, Defendants suppressed the evidence just discussed so that Plaintiffs could not defend themselves. At the criminal trials, Plaintiffs each testified in their own defense, maintaining their innocence. But Guevara and Bemis took the stand as witnesses for the State and introduced the fabricated evidence discussed above, including the fabricated tip, the fabricated photo array and lineup identifications of the eyewitnesses, and the

false statements attributed to Plaintiffs during their interrogations to undermine their alibis. SF¶¶148-158. The Hernandez Brothers were convicted and sentenced to decades in prison. SF ¶2.[4]

### IX. The City's Official Policies Caused Plaintiffs' Wrongful Convictions

The suppression of evidence in Plaintiffs' case was the result of City policies, which led to widespread evidence suppression in homicide cases. AF¶¶2-40, 42-59, 70, 71, 73; SF¶¶301, 302, 400-422; RSOF-City¶¶ 12-14, 19-21, 35, 53. The City's policy of evidence suppression has been litigated and firmly established in many recent civil cases. Dkt. 282. Moreover, the City's official policies permitted officers to fabricate witness identifications, which caused false identifications to be used and to taint criminal proceedings, as in Plaintiffs' cases. SF ¶¶304-327, 334-357, 363-366, 367-375, 409-422, 423-427.

Compounding these problems, City policies left investigators untrained and without supervision or discipline, leading to historic misconduct in CPD ranks in the years leading up to the Gonzalez investigation, including the misconduct at the Area Five Detective Division and the gang crimes unit detailed above. SF¶¶300, 400-422; RSOF-City¶¶10, 12-16, 19-21, 80-84. Officers like Guevara, Halvorsen, and Miedzianowski were free to fabricate evidence, manipulate witnesses, suppress investigative information, frame innocent people with impunity, and commit crimes using their badges as cover. SF¶¶382-399, 423-428; RSOF-City ¶¶ 114, 116, 117, 120, 123. A code of silence prevented others from blowing the whistle. SF¶384, 389, 394, RSOF-City ¶¶ 3.

As a result, Guevara framed dozens of people for murder–51 convictions he engineered have been overturned, and he is widely recognized as a blight on the legal system. SF ¶¶ 426-427.

---

[4] Juan's first criminal trial ended in a mistrial when it was revealed that his attorney, Richard Bueke, had previously represented Guevara. Bueke had been identified in the federal investigation of Miedzianowski as the attorney who had received a $20,000 payoff from a murder suspect to fix a criminal case that had been investigated by Guevara. SF ¶15, 92.

Miedzianowski, Guevara, Bemis, and others participated in a narcotics conspiracy within the Chicago Police Department that resulted in one of the largest prosecutions of police officers in Chicago history. SF ¶¶ 7-17, 33-41, 425, 396. Defendants were able to use the power of the government to dismantle families and an entire community because the City did nothing to ensure its police officers conducted themselves according to law.

**X.  The Hernandez Brothers Fight to Prove Their Innocence and Are Exonerated**

Defendants' misconduct ripped the Hernandez Brothers from their family during the most formative years of their lives. During their decades spent wrongfully imprisoned, the Hernandez Brothers consistently maintained their innocence, and they fought to prove their innocence. In 2022, after 25 years in prison, they were exonerated following a contested evidentiary hearing, in which a number of key witnesses testified. A Cook County judge vacated their convictions, finding that they were actually innocent, and all charges were dismissed. A state court promptly granted Plaintiffs certificates of innocence the next year. SF¶¶5-6.

**XI. Guevara and Halvorsen Assert Their Fifth Amendment Right Not To Testify**

Although Guevara testified against Plaintiffs during their criminal trials, today he does not stand by his story. Instead, he asserts his Fifth Amendment right to avoid self-incrimination and to remain silent in response to questions about every material disputed fact discussed above. He has pleaded the Fifth about his participation in Miedzianowski's conspiracy and their plot to frame the Hernandez Brothers, fabricating the anonymous tip, fabricating identifications and false statements, fabricating police reports, testifying falsely under oath, and suppressing exculpatory and impeachment evidence. SF¶¶99-100, 121, 126, 161. Halvorsen also pleaded his Fifth Amendment rights in response to questions about his misconduct in this case. SF¶99.

12

**ARGUMENT**

This is not a summary judgment case. Although Defendants ignore the legal standard throughout their motions, this Court must examine the evidence in the light most favorable to Plaintiffs and draw all inferences in their favor. *Tolan*, 572 U.S. at 656-57. Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Plaintiffs' claims such that they are entitled to judgment as a matter of law. *Id.* Importantly, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The evidence, viewed in the light most favorable to Plaintiffs, demonstrates that Defendants suppressed a wide array of exculpatory and impeachment evidence and fabricated all of the evidence used to arrest, charge, prosecute and convict them of the Gonzalez murder. A similar volume of evidence supports Plaintiffs' claims that their wrongful convictions occurred because of the City's official policies. All material facts are disputed, Defendants' legal arguments lack merit, and this Court should deny the motions.

## I. Guevara's and Halvorsen's Fifth Amendment Assertions Doom Their Motions

Guevara's and Halvorsen's motions are frivolous given their assertion of their Fifth Amendment right to remain silent in response to questions about all material facts, and this Court should deny their motion without the need for further analysis. Guevara asserted the Fifth in response to hundreds of questions about his misconduct during the Gonzalez investigation and Plaintiffs' arrests, prosecution, and convictions, including each of the disputed material facts at issue here (e.g., the suppression of his and Miedzianowski's plot to frame Juan Hernandez in retaliation for interference in their ongoing narcotics conspiracy, suppression of essential evidence from eyewitnesses and fabrication of their identifications, fabrication of the supposed tip

implicating Plaintiffs and the false account of Plaintiffs' alibis, etc.). SF¶¶99-100, 121, 126, 161. Though Halvorsen's testimony was more limited, he too asserted the Fifth Amendment in response to questions about whether he framed the Hernandez Brothers. SF¶¶99. When the law governing summary judgment and the law governing assertions of the Fifth in civil cases are properly applied, a party who asserts the Fifth cannot obtain summary judgment before trial.

The law governing assertions of the Fifth in civil cases is straightforward. The first and most important rule is that a party in a civil case may *only* assert the Fifth in response to a question if they have a reasonable belief that a truthful answer would subject them to criminal prosecution. Parties are normally obligated to testify truthfully in response to proper questions. The Fifth Amendment provides a privilege against self-incrimination, and it permits a party to avoid truthfully answering questions and to opt for silence instead. But in a civil case the Fifth cannot be asserted merely to avoid participation. Instead, a party can assert the privilege only if they have a reasonable fear that a truthful answer to the question would subject them to criminal prosecution. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663-664 (7th Cir. 2002) (a witness does not have "carte blanche by virtue of the Fifth Amendment's self-incrimination clause to refuse to answer questions," but rather can only do so if a truthful answer has "some tendency to subject the person being asked the question to criminal liability").[5]

The second rule derives from the first: Because a party may only plead the Fifth when they have a reasonable fear that the truth would result in prosecution, a party's invocation of the Fifth

---

[5] See also *In re Pansier*, 417 F. App'x 565, 568 (7th Cir. 2011) (holding that the Fifth Amendment cannot be invoked as "an obstructionist tactic, and thus a party that relies on the privilege as a discovery shield must establish that a truthful answer to an inquiry would have some tendency to subject the person being asked the question to criminal liability"); *Shakman v. Cook County*, 920 F. Supp. 2d 881, 887 (N.D. Ill. 2013) ("[T]he protection afforded by the Fifth Amendment is limited to instances in which the witness has reasonable cause to apprehend danger from a direct answer.").

invites the logical inference that the party is asserting the Fifth because a truthful answer would be incriminating. Again, binding precedents command courts to instruct juries expressly at trial that they may draw this adverse inference. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Hillmann v. City of Chicago*, 834 F.3d 787, 793 (7th Cir. 2016) ("[T]he jury is permitted to hear evidence of a witness's invocation of the privilege and may draw an adverse inference from it.").[6]

Meanwhile, under Rule 56, the moving party must first satisfy an initial burden of production: Defendants must establish the absence of disputes of fact, by producing evidence negating an essential element, or by demonstrating that Plaintiffs cannot meet their burden at trial. *Adickes*, 398 U.S. at 157; *Sterk v. Redbox Automated Retail*, 770 F.3d 618, 627 (7th Cir. 2014). The movant "cannot sustain its burden merely by denying the allegations in the opponent's pleadings, or merely by asserting that the nonmovant lacks evidence to support its claim." 10A Wright & Miller §§2727 & 2727.1. If this burden of production is not met, the burden does not even shift to the non-moving parties, and summary judgment must be denied. *Adickes*, 398 U.S. at 160. If a moving party meets the burden of production, they then face a burden of persuasion: They must show no material fact is disputed to obtain a judgment before trial. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

---

[6] So important is this inference that the Seventh Circuit in *Hillmann* granted a new trial because a witness who planned to assert the Fifth was excused from testifying, and the Court held that the witness should have been required to testify because "the jury is permitted to *hear* evidence of a witness's invocation of the privilege and may draw an adverse inference from it." 834 F.3d at 793 (emphasis added); see also *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) ("The Fifth Amendment allows adverse inference instructions against parties in civil actions."); *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader").

Putting this law together, a moving party who asserts the Fifth about their own personal involvement in every material issue in a case cannot satisfy their initial burden of production because they can neither point to evidence negating an element nor establish that proof will be lacking at trial—they have asserted the privilege to avoid providing truthful testimony about their own material acts in the case. Moreover, a moving party asserting the Fifth has no hope of discharging the burden of persuasion to show that no material fact is disputed. As discussed, *at trial* an adverse inference *may* be drawn against a party who chooses to assert the Fifth in civil litigation, *Baxter*, 425 U.S. at 318; *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995), but *at summary judgment* Rule 56 instructs that such an inference *must* be drawn against the moving party, *Tolan*, 572 U.S. at 656-57. Here that means that the Court, in construing the evidence in Plaintiffs' favor, must infer that Guevara's and Halvorsen's truthful testimony on material facts would incriminate them, and they therefore cannot show the *absence* of material disputes of fact.[7]

The Seventh Circuit holds that an assertion of the Fifth does not "relieve a litigant in civil litigation of the need to establish elements on which he bears a burden of production or persuasion." *U.S. v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992); see also *U.S. v. Rylander*, 460 U.S. 752, 758 (1983). "A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence. . . . If this be seen as a 'price' on the assertion of the privilege,

---

[7] Any other result would permit the party asserting the Fifth Amendment to obtain an unfair advantage—they would be using the privilege as a shield by avoiding the need to provide truthful evidence during discovery, and also as a sword by moving for summary judgment on the ground that the record lacks disputes of fact as a result of their non-participation—and the law does not allow such an approach. *Harris v. Chicago*, 266 F.3d 750, 754 (7th Cir. 2001) ("A defendant cannot have it both ways . . . . [He may not] testify in attack . . . and at the same time seek refuge behind the shield of the Fifth Amendment."); *Chicago v. Reliable Truck Parts Co., Inc.*, 822 F. Supp. 1288, 1293 (N.D. Ill. 1993) ("[T]he City is correct in pointing out that in this civil case they cannot use the Fifth Amendment as both a sword and a shield.").

16

so be it." *Taylor*, 975 F.2d at 404; see also *Williams v. Florida*, 399 U.S. 78, 83-84, (1970) (forcing litigant to choose "between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination"). And "the claim of privilege will not prevent an adverse finding even at summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *U.S. v. Certain Real Prop.*, 55 F.3d 78, 83 (2d Cir. 1995).

"[A] district court has discretion in its response to a party's invocation of the Fifth," *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998), and it would be a sound exercise of discretion here to decide that Guevara's and Halvorsen's invocations of the Fifth mean they cannot satisfy their initial burden of production or their burden of persuasion, and that their motions should be denied for that reason alone. Guevara and Halvorsen cannot hide behind the Fifth Amendment, refuse to provide evidence about their misconduct because it would incriminate them, and then ask this Court for a judgment before trial on grounds that the evidentiary record is too thin.[8]

---

[8] Based on a misunderstanding of Fifth Amendment law, some courts have required evidence in addition to a moving party's assertion of the Fifth before denying a moving party's motion for summary judgment. *Rivera*, 319 F.Supp.3d at 1039-40; *Logan v. Chicago*, 891 F.Supp.2d 897, 901 (N.D. Ill. 2012). These decisions are incorrect, and it is important to explain why. Consistent with the rule that a jury may, but need not, draw an inference that the truth would incriminate a party asserting the Fifth, the case law says that a civil judgment may not be entered against a party solely because that party has asserted the Fifth. In particular, the Seventh Circuit has held that: (1) a judgment should not be entered on the pleadings against a party merely because that party asserts the Fifth, *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983); and (2) judgment should not be granted to a *moving* party at summary judgment merely because the *non-moving* party asserts the Fifth, *LaSalle Bank*, 54 F.3d at 390-91.

That rule by its own terms does not extend to this context, where there is no threat at all of a judgment being entered based on an assertion of the Fifth. The situation here is the converse of the cases just discussed: Plaintiffs here are not asking for a judgment against the Defendants asserting the Fifth—they are merely asking for Defendants' motion to be denied; and it is the *moving* party who is asserting the Fifth. No party has an absolute right to move for summary judgment, and denying a motion is obviously much different than entering a judgment. This Court made the point in *Rios v. Guevara*, No. 22 CV 3973, 2024 WL 5119954 (N.D. Ill. Dec. 16, 2024), when it said, "the Court is not deciding that the defendants are liable based solely on Guevara's invocation, only that a material fact dispute precludes summary judgment," *id.* at *14.

Nor would it logically make sense to transform the rule that judgment cannot be entered against a party who takes the Fifth into a rule that this party is entitled to summary judgment unless there is some other evidence implicating that party in the misconduct alleged. That rule would be incredibly problematic for a number of reasons: First, it would turn the summary judgment standard on its head—the movant is required to show an absence of disputes

17

## II. Summary Judgment Is Unavailable to the Defendant Officers

Examining the record in the light most favorable to Plaintiffs and drawing inferences in their favor, this Court should deny summary judgment on all claims on which Defendant Officers have moved. No material factual issues are undisputed. Instead, the facts are hotly contested and must be resolved by a jury. Moreover, Defendants' limited, purely legal arguments lack merit and contradict deeply established Supreme Court and Seventh Circuit cases.

Defendants move for summary judgment only on pieces of Plaintiffs' due process fair trial claims, forfeiting arguments for dismissal of theories and defendants, as described below, meaning that a trial will be required on the due process claims. Regardless, the evidence in the record firmly supports Plaintiffs' due process claims against all Defendants on two independent theories of liability—suppression of evidence and fabrication of evidence.

On suppression, Defendants do not address the disputes of fact that preclude summary judgment. Instead, they variously deny the existence of exculpatory and impeachment evidence, deny that they knew about that evidence, contend that even if they did know about it the law permitted them to suppress it, and that their suppressions did not impact Plaintiffs' criminal cases. Defendants' factual arguments are foreclosed by the factual record and the summary judgment

---

of fact. Second, it would impermissibly reward a party who takes the Fifth, letting them place a burden on non-moving parties because of their own assertion of the Fifth and denial of discovery. *Contra Certain Real Prop.*, 55 F.3d at 83. Third, it would be the equivalent of a rule that the jury at trial is *barred* from drawing an adverse inference from a defendant's assertion of the Fifth unless a fact had already been established by independent evidence. Such a rule would directly contradict the Supreme Court and Seventh Circuit case law discussed above, which require a jury to hear a defendant assert the Fifth and require an instruction from the Court about the permissive inference that maybe drawn.

Regardless, even if the Court were to adopt the position that more evidence beyond the adverse inference from the Fifth Amendment assertion is required, Plaintiffs more than satisfied that requirement. The independent evidence of Guevara's and Halvorsen's misconduct is substantial in the record, and they cannot show there is an absence of disputes for a jury to decide.

standards that apply, and their legal arguments contradict deeply established Supreme Court and Seventh Circuit precedents.

On fabrication, Defendants deny they fabricated evidence. For some evidence, they argue that their fabrications cannot violate due process because the fabricated evidence was not used in Plaintiffs' criminal proceedings, which is wrong on the facts and on the law. Defendants also argue that this Court should exclude from the record testimony that is compelling evidence of their misconduct. In total, Defendants get the law wrong, and they ignore disputes of fact that must be resolved at trial.

Finally, Defendant Officers' other arguments on Plaintiffs' Fourth Amendment illegal seizure claims and Illinois malicious prosecution claims, federal and state conspiracy claims, federal failure-to-intervene claims, state-law intentional infliction of emotional distress claims, and state-law negligence claims lack merit and depend on viewing facts in the light most favorable to Defendants, which this Court cannot do. The same is true of the interspersed arguments from Bemis, DeGraff, and Biebel that they were not involved in the misconduct at issue. Examining the record in the light most favorable to Plaintiffs, the Hernandez Brothers' claims must go to trial against the Defendant Officers on all theories.

### A. A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence

This Court should deny summary judgment on the Hernandez Brothers' evidence suppression due process theories. *Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense, "[a]nd police officers can be held liable under Brady and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); see also *Kyles v. Whitley*,

19

514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold evidence, causing wrongful convictions. *Whitlock v. Brueggmann*, 682 F.3d 567, 572 (7th Cir. 2012) ; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("*Newsome I*"); *Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court holds that "[e]vidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972) and *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); see also *Kyles*, 514 U.S. at 434.

The question whether suppressed evidence was material must be answered considering all of the suppressed evidence together in the aggregate, and not by assessing evidence piece by piece. *Wearry*, 577 U.S. at 394. Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976). A group of Defendants who each suppress different items of evidence that are collectively material are each liable for the resulting due process violation, even if one may have an argument that the item of evidence they suppressed was not alone material. *Goudy v. Cummings*, 922 F.3d 834, 843 (7th Cir. 2019) ("[A]ll defendants who can be shown to have suppressed evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received." (internal quotations and citations omitted)).

20

Importantly, it is firmly established that evidence that would impeach a key witness is material. *Giglio*, 405 U.S. at 153-54; see also *Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (*Newsome II*) (holding that "the details of how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred").

The criminal case against Plaintiffs could not have been thinner. There was no evidence implicating them other than evidence fabricated by Defendants. Any one of the pieces of exculpatory evidence suppressed by Defendants would have fatally undermined confidence in their prosecution and conviction. Any piece of it would have impeached key witnesses at trial—the Defendant Officers themselves and the eyewitnesses. When the suppressed evidence is considered collectively, there is no chance any Defendant is entitled to judgment on the suppression claims.[9]

### 1. Miedzianowski and Guevara Suppressed Evidence of Their Advance Plot to Frame Plaintiffs and Their Criminal Conspiracy

Miedzianowski and Guevara suppressed their advance plan to frame Juan Hernandez, they suppressed that they had made that plan in order to retaliate against Juan and to protect their

---

[9] In various places in their motions, Defendants suggest that certain due process theories may not have been disclosed to them in discovery responses and that dismissal of those claims is justified as a result. *E.g.*, OB-15; GB-2-3, GB-9-10. These arguments are vague and do not discuss the purported theories that were not disclosed, see OB-15, and often the argument follows directly after the Defendants making the argument have outlined Plaintiffs' particular theories, compare OB-15 (saying theories are not spelled out), with OB-14 (spelling out theories), which they could not do in their affirmative motions for summary judgment without good notice of the theories. Regardless, each and every due process theory that Plaintiffs pursue was included in discovery responses provided to Defendants in this case. SF¶¶171-172.

21

ongoing criminal conspiracy, and they suppressed that they were engaged together in a criminal drug trafficking conspiracy. *Supra* Facts §II. Evidence that investigating officers planned in advance to frame criminal defendants for an arbitrarily selected crime to protect a criminal narcotics conspiracy they were running out of the Chicago Police Department is exculpatory evidence that had to be disclosed in the criminal proceedings; it is impeachment evidence that would have fatally undermined the testimony of Guevara and Bemis and every other State's witness during Plaintiffs' criminal trials; and, according to deeply established law, it violated due process for Defendants to suppress this evidence. *Camm v. Faith*, 937 F.3d 1096, 1110 (7th Cir. 2019) (holding that evidence exposing a police officer's lie about their investigation is *Brady* material because it "would have eroded the jury's trust in . . . the lead case investigator"); *Thompson v. Chicago*, 722 F.3d 963, 972-73 (7th Cir. 2013) (holding that a criminal conspiracy among Chicago Police is *Brady* material as a matter of law); see also *Smith*, 565 U.S. at 75; *Kyles*, 514 U.S. at 441-42; *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio*, 405 U.S. at 154-55; *Goudy*, 922 F.3d at 842-43; *Fields I*, 672 F.3d at 517; *Newsome II*, 319 F.3d at 302-05.

Faced with this reality, Miedzianowski and Guevara make starkly different but equally meritless arguments for summary judgment. Miedzianowski simply contests the facts, arguing that no misconduct occurred. MB-3-11, 12, 15. At the same time, Guevara argues that even if they committed this misconduct, they were not required to disclose it. GB-9-13. Defendants' arguments for dismissal of this suppression theory before trial are abhorrent to federal law, and this Court should reject them without the need for deep analysis.

### a. Miedzianowski's Denials of Misconduct Must Be Rejected

It is no exaggeration to say that Miedzianowski's entire motion is an argument that this Court should weigh the evidence in his favor, draw inferences for him, and grant him summary

judgment on the ground that he did not commit the misconduct that Plaintiffs have evidence he committed. MB-3-11, 12, 15. While Miedzianowski incorporates other Defendants' legal arguments, on the due process claims he only denies his misconduct and attempts to cast doubt on Plaintiffs' evidence, asking this Court to make credibility determinations and to believe his story over Plaintiffs'. This is inappropriate: "Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied . . . . A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. . . . These credibility disputes are for fact finders to resolve." *Kailin v. Gurnee*, 77 F.4th 476, 483 (7th Cir. 2023). This Court can deny the Miedzianowski's motion on that ground alone. Moreover, when the Court examines Miedzianowski's motion it will see that he does not develop an argument about suppression of evidence at all, mentioning suppression only in passing in a three-page section of his motion that is about fabrication of evidence, MB-8-11, which forfeits the argument as well, *Sublett v. John Wiley & Sons*, 463 F.3d 731, 736 (7th Cir. 2006).

Nonetheless, contrary to Miedzianowski's view of the facts, there is ample evidence that Miedzianowski and Guevara plotted in advance to frame Plaintiffs in connection with their criminal drug trafficking conspiracy. *Supra* Facts §II. Fred Rock has sworn repeatedly under oath that he worked with Miedzianowski as part of his drug enterprise, that Guevara was part of that enterprise, that on multiple occasions in the presence of Rock that Miedzianowski directed Guevara to frame Juan Hernandez for a perceived slight related to the drug trade, and that shortly thereafter Juan and Rosendo were arrested and charged in the Gonzalez investigation. SF¶¶10-17, 18-22. Rock's testimony is corroborated by Jondalyn Fields, who lived with Rock at the time, and others. SF¶¶19, 23-25. And it is undisputed and obvious that Defendants never disclosed this

23

information—none of them argues this evidence was disclosed. *E.g.*, SF¶¶41 (Guevara pleading Fifth about it). Miedzianowski does not contend with any of this record evidence. Instead, he pretends it does not exist.

Digging slightly deeper into Miedzianowski's argument, he principally contends that he "was not involved in the investigation into, the arrest of, or the prosecution of, the Plaintiffs," and that this denial should be believed over other witnesses and evidence, including Fred Rock. MB-9-10; see also MB-12 (saying that "he played NO role in the arrest or prosecution of the plaintiffs" and denying that there is any evidence that he carried out his plot). Indeed, in his deposition, Miedzianowski not only denied that he ever planned to frame Juan Hernandez, but he continued to deny that he committed *any misconduct at all* during his time as a Chicago Police officer, which of course was his defense in his federal criminal case more than 20 years ago, where he asked a federal jury to believe his own denial of misconduct over Fred Rock's testimony. Miedzianowski lost the factual and credibility battle in that federal criminal case, and he should certainly lose the same battle at summary judgment in this civil case, where none of his self-serving views of the facts can be accepted. Miedzianowski's "summary judgment presentation reflects a kind of self-hypnosis that no lawyer can afford to practice in the summary judgment context—a view of the evidence through the lens of the Rule 56 movant rather than, as the Rule expressly mandates, that of the nonmovant." *Escobedo v. Ram Shirdi*, 2013 WL 1787819, at *4 (N.D. Ill. Apr. 25, 2013) (internal quotations omitted). As at his federal criminal trial, the evidence discussed above will give the jury in this civil case plenty of reason to disbelieve Miedzianowski's denials of

24

involvement in this case and to again believe Rock's testimony. *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002); Fed. R. Evid. 609.[10]

The balance of Miedzianowski's argument reads like a tepid cross-examination. He asserts that Rock's account of his and Guevara's criminal conspiracy and plot to frame Plaintiffs is "short on details," MB-15, but Rock's testimony is detailed and reliable—and corroborated—in all material respects, SF¶¶18-25. Miedzianowski also criticizes Rock for not knowing more about the particular crime that the Hernandez Brothers were ultimately convicted of, MB-15-16, but it makes perfect sense that Rock would not know the details—although he knew of the advance plot to frame Juan Hernandez, he was not himself a participant in the frame job; that was Guevara's job. *Id.* Miedzianowski also contends that Rock did not explain what Miedzianowski did to carry his plan to "get" or "frame" Juan Hernandez, MB-4, but Rock did explain exactly where he met with Miedzianowski and Guevara, the specific direction Miedzianowski gave to Guevara to frame Juan Hernandez, the specific motive (perceived robbery of stash house), and the temporal proximity of these meetings to Plaintiffs' arrests, SF¶¶18-22, and of course the only inference based on the substantial evidentiary record—which further also includes other plots by Guevara to frame individuals for murders based on perceived slights against Miedzianowski's and Guevara's drug business, SF¶¶15-16, 32—is that the threat was carried out by framing Plaintiffs for the Gonzalez murder. SF¶22.

---

[10] Miedzianowski strangely asserts that Plaintiffs' expert "has confirmed" that he played no role in Plaintiffs' prosecution. MB-12; see also MB-6-7. But Plaintiffs' expert Tiderington discusses Miedzianowski's role in framing the Hernandez Brothers at length. Ex. 30 at 28-29. Miedzianowski stresses that he is not listed in any of the police reports in the Gonzalez investigative file, MB-6-7, but that proves nothing—the theory is that he and Guevara plotted in advance to frame Plaintiffs, then suppressed the plot, and it would be extremely strange if officers involved in that sort of misconduct decided to document it in police reports.

Finally, Miedzianowski suggests that Rock should not be believed because, in Miedzianowski's view, Rock's testimony about the Hernandez plot came many decades after Plaintiffs were convicted. MB-4-5.[11] This assertion falls flat on its own terms—suppressed evidence often comes to light many years later, and it is still relied upon as viable *Brady* evidence. *E.g.*, *Wearry*, 577 U.S. at 391 (describing new evidence learned from witnesses years after a conviction that gave rise to a robust *Brady* claim).

But Defendants' view of the facts is contested on this point, too. Rock testified that as part of his extensive proffers to the federal government he told federal authorities that the Hernandez Brothers had been framed, but no one acted upon that information. SF¶23. Miedzianowski (and Guevara) debate whether this is true, arguing that Plaintiffs are not mentioned in any of the federal materials produced in this case, that AUSA Netols (who prosecuted Miedzianowski and others) testified Rock did not provide this information, and that as a result Rock should be disbelieved entirely. MB-4-5 GB-13-14. But even crediting Defendants' facts for a moment, whether Rock told federal authorities about the Hernandez Brothers during proffers concerning Miedzianowski's criminal prosecution is not relevant at summary judgment—what is important is Rock's corroborated account on the record in this civil case that Miedzianowski and Guevara in fact plotted to frame the Hernandez brothers in advance. In other words, the fact that Defendants contest it is immaterial. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (noting that "'irrelevant or unnecessary' factual disputes do not preclude summary judgment"); see also *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1016 (N.D. Ill. 2018). What Defendants are attempting to do is

---

[11] Astonishingly, in connection with this argument disbelieving Rock's testimony, Miedzianowski emphasizes that Rock is "a convicted felon," MB-4, which of course Miedzianowski is as well.

26

to impeach Rock by omission on a collateral issue, and in so doing to convince this Court to disbelieve Rock's entire story, which again is far from appropriate at summary judgment. *Kailin*, 77 F.4th at 483. Their impeachment by omission must wait until trial, and even there it will be weak cross-examination.[12]

The summary judgment record, properly construed for Plaintiffs contains ample evidence that Miedzianowski and Guevara plotted in advance to frame Juan Hernandez in service of their narcotics conspiracy and suppressed that evidence throughout Plaintiffs' criminal prosecutions. Were there any doubt, Guevara asserted his Fifth Amendment right to remain silent in response to all questions about this plot with Miedzianowski, SF¶¶41, which he could only do because truthful

---

[12] Defendants are also wrong about the factual record. While there is no report in the federal materials produced that recounts a plot to frame the Hernandez Brothers, there are many facts in those documents that corroborate Rock's account of Miedzianowski and Guevara's plot, including the development of evidence concerning bribery plots and frame-ups involving Guevara and Beuke, and investigation into the stash house at the heart of Miedzianowski's grudge. SF¶¶15, 23, 38. Moreover, Defendants' version of events ignores that Netols acknowledged, in response to Defendants' own questioning, that the documents produced in this case represent just a small fraction of the investigative materials generated during the federal investigation, SF¶26, so it is not clear that an omission in the documents produced in this case means the issue was never raised. In addition, although AUSA Netols testified that he did not recall being told about the Hernandez Brothers and would have investigated further if he had been told, he also testified that the Hernandez Brothers' names and nicknames sounded familiar to him from his investigation, and he acknowledged that he had been told about other frame jobs in the course of the investigation that he did not in fact investigate further. SF¶23. Moreover, AUSA Netols acknowledged that he had not been present at all of Rock's proffer sessions, SF¶26.

It is an established principle that a jury is permitted at trial to believe part but not all of what a witness has to say. *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (faulting fact finder for "the discredited doctrine of falsus in uno, falsus in omnibus (false in one thing, false in all things), which Wigmore called 'primitive psychology'"); *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003) ("[T]here are cases, perhaps the majority, in which a witness's testimony is a compound of truth and falsity. Perjury is a circumstance to be weighed by the jury in determining a witness's credibility rather than a ground for removing the issue of credibility from the jury by treating the witness's entire testimony as unworthy of belief."); *Branion v. Gramly*, 855 F.2d 1256, 1263 (7th Cir. 1988) ("A trier of fact may disbelieve or reject any evidence; ... [s]elective disbelief, however, is an ordinary incident of trial[.]"). A reasonable jury could conclude that *both* Rock and AUSA Netols do not have complete, accurate testimony about their exchanges during the federal investigation decades ago. At summary judgment, however, inferences must be drawn for Plaintiffs and not Defendants. Rock testifies that he provided the information to federal authorities, there is evidence that backs up Rock's account including the testimony of Jondalyn Fields, and Defendants are not entitled at this stage, based on their own view of the evidence, to impeach this small piece of Rock's story by omission.

answers in response to Rock's account would have incriminated him. *Supra* Arg. §I. Summary judgment cannot be granted by siding with Defendants' view of the facts.

### b. Guevara's Argument That Defendants Were Not Required To Disclose This Evidence Is Meritless

Next, Guevara contends that even if he and Miedzianowski plotted in advance to frame Plaintiffs in furtherance of their ongoing drug conspiracy, that was not information that they had to turn over to comply with due process. GB-10-14.[13] This Court should firmly reject that preposterous assertion, which is inconsistent with Supreme Court and Seventh Circuit case law, the text and purpose of §1983, and foundational due process principles.

Accepting Guevara's argument would render constitutionally permissible the very worst examples of police misconduct. According to Guevara, a police officer would be under no due process obligation to disclose that he paid a witness to provide a false statement implicating a criminal defendant, but *Bagley* held that evidence must be disclosed. 473 U.S. at 683-84. Or an officer could contaminate physical evidence found at a crime scene to connect a defendant falsely to a crime, and in Guevara's view there would be no obligation to disclose that misconduct, but *Miller v. Pate*, 386 U.S. 1, 7 (1967), held that due process requires disclosure of such misconduct. Or, as here, police could conspire to frame a person they choose to target in advance and then manufacture a case without having to disclose their plot in the criminal case, which *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942), held almost a century ago that would violate due process. Indeed, Congress's "main goal" in enacting §1983 was to prevent law enforcement authorities from using state courts to violate federal rights. *Allen v. McCurry*, 449 U.S. 90, 98 (1980); *Mitchum v. Foster*,

---

[13] Defendant Officers repeat the argument generally without developing it. OB-19.

28

407 U.S. 225, 240 (1972). Guevara's suggestion that such suppressions do not violate the Constitution is inconsistent with bedrock due process principles and §1983 liability established by the Supreme Court.

Two indisputable doctrinal principles further demonstrate why Guevara's argument cannot be right. First, it is established that police officers have a due process obligation to disclose exculpatory evidence including information that could be used to impeach government witnesses. "[I]mplicit in any concept of ordered liberty" is "[t]he principle that a State may not knowingly use false evidence . . . to obtain a tainted conviction." *Napue*, 360 U.S. at 269. This prohibition includes evidence that "goes only to the credibility of [a] witness," because the jury's evaluation "of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id.*; see also *Wearry*, 577 U.S. at 393 & n.8 (finding due process violation where criminal defendant was not informed of evidence of cooperating witness' corrupt motives even though those motives were "known only to police investigators and not to the prosecutor."); *Bagley*, 473 U.S. at 683 (reversing conviction where government failed to disclose evidence that would have allowed police witnesses to "be impeached on the basis of bias or interest resulting from inducements made by the Government"); *Giglio*, 405 U.S. at 155 (reversing conviction because "jury was entitled to know of" suppressed evidence undermining credibility of key prosecution witness); *Avery v. City of Milwaukee*, 847 F.3d 433, 443–44 (7th Cir. 2017) (holding that *Brady* requires police to disclose facts "that could help him *prove* that the informants' statements were false"). This includes information known to police that could be used impeach police later during trial. *Camm*, 937 F.3d at 1110 (holding that evidence

29

exposing a police officer's lie about their investigation is *Brady* material because it "would have eroded the jury's trust in . . . the lead case investigator").

There is no doubt that information about Guevara and Miedzianowski's corrupt motives, their advance plot to frame Juan Hernandez, and the fact that they planned to do so in service of an ongoing criminal conspiracy run out of the CPD would have been powerful impeachment evidence at Plaintiffs' trials, not only to impeach police officers who testified, including Guevara, but also other witnesses who implicated Plaintiffs. *Bagley*, 473 U.S. at 683–84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material as a matter of law).

Indeed, the Seventh Circuit has repeatedly endorsed exactly this theory of a *Brady* violation in recent years. Once against Glenn Lewellen, another corrupt Chicago police officer notorious for framing innocent people, *Ruiz-Cortez v. Chicago*, 931 F.3d 592, 601 (7th Cir. 2019) (en banc) (finding that Lewellen's failure "to disclose his corruption and criminal conduct" was a *Brady* violation because those facts "could have significantly impeached Lewellen's credibility when he acted as the key witness in Ruiz-Cortez's earlier criminal prosecution."), and a second time in *Thompson v. Chicago*, which held that a different criminal conspiracy among Chicago Police officers was *Brady* material that had to be disclosed consistent with due process, 722 F.3d at 972-73; see also *Stinson v. Gauger*, 868 F.3d 516, 524-25 (7th Cir. 2017) (*en banc*) (endorsing a *Brady* theory that police officers were required to disclose that they had conspired with others to manufacture a case against the plaintiff); *Anderson v. City of Rockford*, 932 F.3d 494, 508 (7th Cir. 2019) (finding *Brady* violation where "defendants failed to disclose the coercive tactics used to obtain [third-party witness' false inculpatory] statement."). Guevara's argument that he did not need to disclose Defendants' corrupt plot is flatly inconsistent with all of these cases.

30

Second, it is "unremarkably true that the government's *Brady* obligations exist independently of the format of the exculpatory material." *United States v. Hamzeh*, 2019 WL 5087939, at *12 (E.D. Wis. Oct. 10, 2019). Guevara suggests that because he and Miedzianowski didn't write down their plot to frame the Hernandez brothers, there was no *Brady* evidence to disclose it. But again established principles provide that *Brady* applies to evidence known to police but undocumented, which is why the Seventh Circuit holds that officers suppress evidence "*by not including it in their police reports* or otherwise disclosing it to the prosecutors or plaintiffs." *Anderson*, 932 F.3d at 505 (emphasis added). This point is so obvious it often goes without saying, but countless decisions treat unwritten information as subject to *Brady*. For example, recently the Seventh Circuit held in *Camm v. Faith* that the undocumented fact that officers did not actually run a DNA test that they said they ran was actionable under *Brady*, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "set up an argument that they were hiding crucial evidence because they thought it might undermine their case." 937 F.3d at 1110. Likewise in *Stinson v. Gauger*, the *en banc* Seventh Circuit found a police officer and forensic experts failed "to disclose, as required by *Brady*, [their] agreement" consummated over un-memorialized meetings, "to fabricate [inculpatory] opinion evidence." 868 F.3d at 525-28; see also *Avery*, 847 F.3d at 443 (treating as exculpatory evidence "detectives' failure to disclose the [unwritten] details of the pressure and inducements they brought to bear to extract false statements from" witnesses); *Jimenez v. City of Chicago*, 732 F.3d 710, 718 & n.5 (7th Cir. 2013) (finding various failures to document police's misconduct were viable *Brady* violations on which jury's verdict could rest); *Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 850 (N.D. Ill. 2023) (finding *Brady* violation from warning "prosecutors to avoid certain areas of inquiry that would have elicited exculpatory and impeaching evidence" during witness testimony).

31

While the government may not be required "to make notes of a witness's statements, it does not follow that the Government has no obligation to inform the accused of information that materially impeaches its witness." *United States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007). Thus, there is no logic to Guevara's assertion that he had no obligation to disclose information so long as he did not write it down.

In sum, the *Brady* rule is not a hyper-technical system of disclosure requirements. Instead, the Supreme Court has for decades made clear that due process imposes an affirmative duty on the government "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and then to disclose all of that exculpatory and impeachment information. *Kyles*, 514 U.S. at 432-38. This means that a police officer who testifies against a criminal defendant may not conceal his corrupt motives for investigating that defendant or his own misdeeds in the investigation. And when there is information about his corruption that he alone is privy to, he cannot escape §1983 liability simply by failing to memorialize that impeaching information in writing.

The Court should not be fooled by Guevara's string-cite of cases in his motion. GB-11-13. The Seventh Circuit has never disagreed with these well-established principles or immunized police officers from §1983 liability for suppressing evidence of their own misdeeds. Indeed, the Seventh Circuit could not take such a leap without contradicting the Supreme Court precedents just discussed. To be sure, the case that Guevara cites, *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), has language that could be misread, as some district courts have done, to upset the entire apple cart, but doing so would be a grave error.

*Saunders-El* is part of the line of Seventh Circuit cases that started with *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), which stand for the narrow proposition that police are not

32

required under *Brady* to disclose circumstances of an interrogation of a criminal defendant because the defendant was present for and knows the information about the interrogation himself. In *Gauger* and cases that follow it, "the criminal defendants were already aware of the impeaching facts," *Avery*, 847 F.3d at 443, as was true in *Saunders-El* as well. 778 F.3d at 558.

This is not a false confession case, and it is not a case in which Plaintiffs otherwise knew of Guevara and Miedzianowski's misconduct. On the contrary, their plot was suppressed until decades into their wrongful incarceration. In *Avery* (decided after *Saunders-El*), the Seventh Circuit clarified that *Gauger*'s rule *does not apply* where police are aware of exculpatory or impeachment evidence that the criminal defendant/civil plaintiff does not possess. 847 F.3d at 443-44. There, the Court confronted a situation where police fabricated witness statements to implicate a plaintiff at his criminal trial, causing his wrongful conviction. *Id.* Though the plaintiff all along knew those statements were false, the Court held that *Gauger* did not apply, and that the police had an obligation to disclose how they had manufactured the false witness statements and the tactics they had used to get the witnesses to adopt them. *Avery*, 847 F.3d at 443-44. Put simply, where the police know of evidence that the criminal defendant does not, including evidence that might impeach a third-party witness or a police officer who testifies falsely, that evidence must be turned over and *Gauger* does not apply, even though the defendant well knows that the evidence used against him is false. *Avery*, 847 F.3d at 443-44.

In the same vein, all other courts that have carefully studied the *Gauger* line of cases have concluded that *Brady* still requires police to disclose the true circumstances of their own misconduct when a criminal-defendant does not already know that information. *See, e.g.*, *Jackson v. City of Cleveland*, 925 F.3d 793, 824–25 (6th Cir. 2019); *Smith v. Burge*, 222 F. Supp. 3d 669, 680–81 (N.D. Ill. 2016) (St. Eve, J.) ("Courts in this district have concluded that similar allegations

33

state a *Brady* claim based on events that transpired outside of the interrogation room."); *Kitchen v. Burge*, No. 10 C 4093, 2012 WL 346450, at *4 (N.D. Ill. Feb. 1, 2012) (collecting cases); see also *Cruz v. Guevara*, 2024 WL 4753672, at *9 (N.D. Ill. Nov. 12, 2024). To the extent district courts have extended *Saunders-El* and the line of cases from which it arises beyond suppression of evidence already known to the criminal defendant, those decisions are contrary to a mountain of Supreme Court and Seventh Circuit precedent.

Here, as in *Avery* and these other cases that follow *Avery*'s rule—and quite unlike in *Saunders-El*—the Plaintiffs "did *not* know" about the misconduct Defendants engaged in to obtain the false evidence implicating them and to convict them. *Avery*, 847 F.3d at 443.[14] Nor could Plaintiffs have known about Guevara and Miedzianowski's shocking conspiracy and advance plot to frame them. Plaintiffs' suppression claims regarding must be tried.[15]

### 2. Guevara, Halvorsen, and Biebel Suppressed the Real Perpetrator's Identity

As Defendants executed the plot, Guevara, Halvorsen, and Biebel suppressed evidence that they knew at the time that Plaintiffs were charged that William "Will Kill" Vilaro was the actual perpetrator of the Gonzalez murder. *Supra* Facts §VII. The testimony in this case demonstrates that Willy was a person of interest to detectives in the investigation—which was what they called Vilaro—and even communicated to reviewing prosecutors at the time charges were being considered toward the end of the investigation. Plaintiffs do not contend that they have additional

---

[14] While somewhat beside the point, *Saunders-El* is doubly distinguishable because the defendant was acquitted and so, under then existing precedent, suffered no due process violation from the fabrication of evidence against him. 778 F.3d at 562 ("[I]t would be entirely incongruous for us to endorse Saunders–El's *Brady* theory, in light of our holding in *Alexander*" that "a police officer does not violate an acquitted defendant's due process rights when he fabricates evidence").

[15] Guevara's claim of qualified immunity on this theory is discussed below, *infra* Arg. §II(D), but the cases cited here demonstrate the law is not unsettled.

proof that particular Defendants spoke to particular witnesses, but the combination of this reference to Willy from the detective team to prosecutors, plus the evidence implicating Will Kill from witnesses at the scene who were interviewed during the investigation, plus Vilaro's assertion of the Fifth when asked whether police interviewed him about the crime, plus Guevara's assertions of the Fifth about his plan to frame Plaintiffs despite evidence of their innocence, permits the inference at summary judgment that the detective Defendants—Guevara, Halvorsen, and Biebel—investigated Will Kill. PSOF ¶¶49-55.

Moreover, it is a perfectly permissible inference at this stage—given Plaintiffs' innocence, Defendants plot to frame them in advance, and the suppression and fabrication of evidence discussed throughout this response—that these Defendants suppressed what they knew about Will Kill. See, e.g., *Abdullahi v. Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (holding that it is permissible to decide that a jury might infer based on circumstantial evidence in the record, particularly in situations where the non-moving party lacks access to direct evidence). As in *Camm v. Faith*, a jury could see the evidence about Willy, in combination with other facts, as evidence that Defendants "were hiding crucial evidence because they thought it might undermine their case against [the plaintiff] by identifying an alternative suspect." 937 F.3d at 1110.

Defendants provide two arguments in response. First they contend they did not know information about Will Kill being the real killer. GB-10; OB-16. Defendants state, "There is no evidence that any notes, reports or other records pointing to alternative suspects were created." OB-15. But there *is* an evidentiary record, in the form of Plaintiff Rosendo's testimony that he was questioned about Willy by felony review prosecutors during the course of his interrogations at Area 5, before Plaintiffs were charged. Moreover, documents showing that the investigative team communicated the name Willy to felony review prosecutors means these three Defendants must

35

make the argument that they did not know about Will Kill to a jury. SF¶¶55. These Defendants worked on a three-person investigative team, briefed one another about developments, and all had access to the evidence in the case. SF¶¶159, 160, 164. They cannot claim that they lacked knowledge in those circumstances.

Second, Defendants argue that even if they knew this information, its suppression was not material to the criminal case. GB-10; OB-16. Long before Plaintiffs' convictions, the Supreme Court held that *all* exculpatory and impeachment information must be disclosed, not just some of it. *Giglio*, 405 U.S. 150. Suppressed evidence "qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry*, 577 U.S. at 392. A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* Under that standard, information implicating an alternative suspect is material as a matter of law. See *Kyles*, 514 U.S. at 441-42 (undisclosed contradictory statements by a key witness that pointed to alternative suspect were material); *Goudy*, 922 F.3d at 842-43 (videotape of lineup in which witnesses identified alternative suspect "alone [was] enough" for jury to find materiality); *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015) (evidence was material because it presented a viable alternative suspect); *Goudy v. Basinger*, 604 F.3d 394, 400–01 (7th Cir. 2010) (evidence inculpating another suspect was material, even when that evidence did not necessarily point to the defendant's innocence). Defendants are not entitled to summary judgment on this theory.

### 3.  Defendants Suppressed Evidence Relating to Eyewitnesses

Defendants also suppressed a wide array of material exculpatory and impeachment investigative information relating to the eyewitnesses to the crime who supposedly implicated

36

Plaintiffs. *Supra* Facts §VII. This suppressed evidence included statements from those witnesses that contradicted their identifications of Plaintiffs or that established that had not seen the perpetrators, as well as important evidence about Defendants' interactions with the witnesses and the tactics they used to obtain the identifications, and evidence about the identification procedures they conducted.

Before turning to particular items of suppressed evidence, it is important to observe that Defendants develop no real argument about whether a trial is needed on most of these eyewitness suppression theories. Defendant Officers devote just two pages of one motion to arguing for dismissal of Plaintiffs' claim that Defendants suppressed Violante's statements that he could not make an identification. OB-16-18. Otherwise, Defendants argue broadly for the exclusion of evidence relating to Violante, OB-5-12, but no Defendant develops any other argument that the suppressions of eyewitness information discussed below did not occur or were immaterial to Plaintiffs' criminal cases—Guevara devotes just one sentence on page 10 of his motion to these theories, GB-9-14 ("As to any statements given by Violante…"), Miedzianowski does not discuss them at all, MB-8-11, and other than the arguments just identified, Defendant Officers focus exclusively on the witness fabrication claims, OB-5-12.

Defendants have an obligation at summary judgment to show the Court how "there is an absence of evidence" on which a reasonable jury could find for Plaintiffs on *any* of their claims against *each* of them. *Celotex*, 477 U.S. at 325. Because Defendants do not make any argument about most of Plaintiffs' eyewitness evidence suppression theories discussed in this section, those theories must be tried. *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and

37

litigation is costly enough without requiring parties to respond to issues that have not been raised").

Any arguments Defendants might have made on these theories are now forfeited, and it will be too

late for Defendants to raise them in reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011).[16]

### a. Defendants Suppressed Important Evidence Relating to Each of the Eyewitnesses

Turning to the one argument Defendants preserved, Defendants are not entitled to summary

judgment on Plaintiffs' claims that they suppressed material and exculpatory evidence related to

Violante. Violante told Defendants repeatedly he did not see the shooters' faces because it was too

dark and happened too fast, and he could not make an identification, and that when Defendants

showed him photo arrays and live lineups he did not identify anyone. That exculpatory and

impeachment evidence was critically important to the criminal cases. But instead of disclosing that

information, Defendants did exactly the opposite—they covered it up, writing a report that said

falsely that Violante had made identifications of Plaintiffs without any trouble. SF¶¶63-66.

Separately, Defendants suppressed exculpatory evidence related to Nancy Gonzalez. She

told detectives that she recognized the shooter as someone she knew from Steinmetz High School,

but when she viewed a lineup containing Juan Hernandez—who had gone to Steinmetz and thus

was familiar to her—she did not recognize him as the shooter and instead identified someone else

in the lineup, after which Defendants told her she had identified the wrong person. Before that,

---

[16] It is also the law that courts at summary judgment need not weed through sub-theories and parse items of evidence giving rise to a fair trial due process claim, so long as it is established that there is a material dispute about whether a Defendant contributed to violating a plaintiff's right to a fair trial. *Goudy*, 922 F.3d at 844 (once established that a trial is required, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); *Camm*, 937 F.3d at 1108–09. So, once this Court decides Plaintiffs have shown a trial is required on any due process theory, it can move on to trial on Plaintiffs' due process claims without exploring all arguments made by Defendants.

when Nancy was shown a photo array, she identified two individuals, but only one was recorded. None of this was disclosed. SF¶¶87-90, 97.

Defendants suppressed exculpatory evidence related to Jesus Gonzalez, too. When he was shown photo books of Spanish Cobras, he identified two individuals. There is no record of who the two individuals were that he identified—Guevara and Halvorsen wrote false reports claiming he could not identify anyone. Given that Juan and Rosendo were known members of the Spanish Cobras, it is likely they were in the books. And so, the suppression of the positive identifications from those books supports the reasonable belief that Jesus had identified individuals other than Juan and Rosendo. SF¶¶48-49, 96

Finally, Defendants suppressed evidence that they showed Jose Gonzalez photos at the wake for his brother Jorge, a fact that Defendants did not document in the police file. Moreover, Defendants made no records of who was presented in those photos, and whether they included the Hernandez Brothers. All of this information was suppressed. SF¶¶95.

Other than Violante, Defendants do not address the suppression of evidence related to the identification procedures conducted with Nancy, Jesus or Jose, and such arguments are thus forfeited. *Costello*, 651 F.3d at 635.

### b. The Court Should Reject Defendants' Arguments for Summary Judgment on Violante Suppression Theories

As discussed above, Defendants only preserve arguments that summary judgment is warranted on Plaintiffs' theory that they suppressed Violante's statements that he did not see the shooters and could not make an identification. On that theory, they mount a number of arguments that those claims relating to Violante should not proceed. None has merit.

39

### (1) The Factual Arguments Lack Merit

First, Defendants assert in a sentence that they were not involved in suppressing Violante's statements, OB-17, an argument that is too undeveloped to justify summary judgment, *Smith*, 388 F.3d at 569, and which is contradicted by all of the record evidence document Defendants' interactions with Violante, SF¶¶63-67. (They also characterize his testimony as "waffling" in a sentence, OB.17 n.6, again undeveloped and merely a factual dispute.)

### (2) The Reasonable Diligence Argument Lacks Merit

Second, Defendants argue that Plaintiffs' attorneys could have discovered the suppressed Violante evidence themselves in advance of Plaintiffs' criminal trials. OB-17. That argument is meritless. Defendants first point to Violante's 1998 affidavit as evidence that Plaintiff possessed the exculpatory evidence. But as a factual matter, the 1998 affidavit *does not contain* the key facts suppressed by Defendants—that Violante told Defendants repeatedly that he did not see the shooters' faces and that he could not make an identification, and that when Defendants showed him photo arrays and live lineups he did not identify anyone. SF¶¶63-67, 125. If anything, then, the 1998 affidavit demonstrates that Plaintiffs' attorneys were diligently attempting to obtain the evidence that Defendants had suppressed, but they failed.

Importantly, they failed because Defendants did the *opposite* of disclose the Violante evidence: they wrote false reports and they testified falsely to ensure the evidence did not come to light. Where police officers take steps to actively suppress evidence by fabricating a false account, they cannot later contend that the evidence was disclosed or should have been discovered. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process"). Police officers who lie to perpetuate the suppression of evidence are liable under *Brady* solely on

40

that basis as well. *Camm*, 937 F.3d at 1110 (holding that a *Brady* claim may be based on "exposing the lie" of a police officer, which would have "eroded the jury's trust in both the prosecutor and the lead case investigator").

Even were that not the case, disputes of fact would preclude summary judgment. As in *Jimenez*, "[w]hat was available through reasonable diligence . . . is very much in dispute." 830 F. Supp. 2d at 446. The record demonstrates that defense attorneys tried to get everything they could about police interactions with eyewitness. They filed discovery requests and issued multiple subpoenas to get all of the investigative information available in the police files related to the investigation, and they expected and trusted that all such information was being disclosed to them. They interviewed the witnesses. They knew they needed information to impeach the eyewitnesses, but despite their best efforts they could not get it. PSOF ¶¶139-144. But the idea that attorneys should have divined the Violante evidence, even though that information is assiduously omitted from the police reports regarding the investigation, and even though there were fabricated reports negating the Violante suppressed evidence, SF¶67, is simply wrong both factually and legally.

Fundamentally, Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and the Seventh Circuit regards "as untenable a broad rule that any information possessed by *a defense witness* must be considered available to the defense for *Brady* purposes." *Id.* at 740, 743 (emphasis added). The Court observed that such defense witnesses "may be uncooperative or reluctant," it can be difficult to "extract all the favorable evidence a defense witness possesses," and "the defense may have forgotten or inadvertently omitted some important piece of evidence[.]" *Id.*

41

Importantly, this is the view of the Seventh Circuit in the case of a witness *controlled by the defense*. "These concerns have even more weight in a case, like this one, involving information possessed by a *prosecution* witness." *Hampton v. Chicago*, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

As Judge Kennelly observed in *Jimenez*, reasonable diligence would not be a tenable legal rule if courts determined that stories in the minds of prosecution witnesses were discoverable through the exercise of reasonable diligence:

> Defendants' argument seems to assume the existence of a Perry Mason-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

830 F. Supp. 2d at 444-45. And as Judge Dow observed in *Hampton*, in cases where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22.

Moreover, Defendants' position that Plaintiffs' attorneys could have discovered the Violante evidence they were suppressing is fundamentally inconsistent with Supreme Court cases. In *Strickler v. Greene*, 527 U.S. 263 (1999), the Court imposed a duty on the state to disclose material exculpatory or impeachment evidence, even when there has been no request for that evidence by the accused. Included in that is evidence that would impeach witnesses. *Giglio*, 405 U.S. 150. For these constitutional rules to have effect, any understanding of reasonable diligence

42

along the lines of the one that Defendants advance must be rejected. Defendants had an obligation under *Brady*, *Giglio*, and *Strickler* to disclose evidence about Violante even without an effort on the part of Plaintiffs and their attorneys to obtain that evidence. That constitutional obligation is in irreconcilable tension with Defendants' proposed legal rule that they were not required to turn over suppressed evidence about their interactions with Violante because there was some chance that Plaintiffs and their attorneys could have discovered it on their own. As Judge Kennelly put it in *Jimenez*, adopting Defendants' position "would effectively render *Brady* and its progeny, including *Giglio* . . . , a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez*, 830 F. Supp. 2d at 445; *accord Kluppelberg v. Burge*, No. 13 C 3963, Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017) (rejecting reasonable diligence defense and concluding that "defense counsel's diligence is irrelevant if the suppressed information was material"). Here there is no support for a conclusion that Plaintiffs' attorneys could have discovered what Defendants were hiding, particularly given Defendants' active efforts to suppress the evidence.

### (3) The No-Obligation-To-Disclose Argument Lacks Merit

Defendants also half-heartedly reprise the argument discussed above that due process did not require them to document and disclose their own misconduct, arguing that this means they were not required to disclose exculpatory and impeachment information they knew about key eyewitnesses. OB-17-18. For all of the reasons discussed already, this argument is utterly meritless, *supra* Arg. §II(A)(1)(b), and it seeks to elevate dictum from *Saunders-El* above the holdings of many more cases (recent and old) confirming that police officers who possess exculpatory or impeachment information about eyewitnesses and their identifications must be

43

disclosed under *Brady* and *Giglio*, see, *e.g.*, *Anderson*, 932 F.3d at 508 (7th Cir. 2019) (finding *Brady* violation where "defendants failed to disclose the coercive tactics used to obtain [third-party witness' false inculpatory] statement"); *Avery*, 847 F.3d at 443-44 (same); *Fields I*, 672 F.3d at 517 (A due process "violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."). As Judge Easterbrook wrote over two decades ago, in light of the suggestibility of eyewitnesses, "it is vital that evidence about how photo spreads, showups, and lineups are conducted be provided to defense counsel and the court" so that the defense "can probe whether manipulation occurred." *Newsome II*, 319 F.3d at 302-05 (holding that suppression of "the details of how [the police] induced the witnesses to finger Newsome" was basis of due process claim because often "the constitutional violation justifying an award of damages is not the conduct of the lineups but the concealment of evidence about them"). In fact, there may not be a more common application of due process disclosure rules than the impeachment of an eyewitness.

### (4) The Argument for Exclusion of Violante Evidence Lacks Merit

Finally, Defendants argue that all evidence relating to Violante should be excluded, calling it fraudulent and arguing that it is inadmissible. OB-6-9. This hail-mary argument gets the law and facts wrong again.

First, this Court at summary judgment must consider Violante's 2022 robust and credible post-conviction testimony, as well as his prior consistent statements in a 1998 affidavit. Defendants offer absolutely no evidence that Violante's 2022 testimony at Plaintiffs' post-conviction hearing was the result of anything but his own desire to clear his conscience for having contributed to Plaintiffs' wrongful convictions. At that hearing, Violante admitted that he did not see the faces of the individuals who murdered Gonzalez. SF¶¶63-64. He testified that he told this to the police and

44

that he repeatedly told them he could not identify anyone in the photo lineups he was shown. SF¶66. Violante reaffirmed his 1998 affidavit and said that he signed it voluntarily because he believed in his "gut" that the Plaintiffs did not murder Gonzalez. SF¶131. Violante and his girlfriend of seventeen years, Stephanie Haddrill, both testified that Violante frequently talked about how he was not able to identify the shooters and about his guilt that Plaintiffs were convicted. SF¶131, 64. Judge Rosado credited this testimony in throwing out Plaintiffs' convictions. SF¶131. Defendants' own assertion that this testimony is unreliable is nothing more than factual disputes, and Defendants cannot attempt to repackage these disputes as something that warrants a total exclusion of highly relevant evidence.

Defendants attempt to sweep away Violante's 2022 testimony based on accusations that Violante's motive for providing his 1998 affidavit was a quid pro quo with the family of a rival gang, though the evidence shows there was no such agreement. See RSOF-J ¶¶ 73, 78, 80. Defendants argue that these accusations—credibly contradicted in Violante's 2022 testimony regarding his motive for signing the affidavit—"irretrievably taint" this evidence and that, apparently as a sanction, this Court should refuse to consider Violante's testimony. OB-7. But they offer no legal authority that would support sanctioning the Plaintiffs by preventing them from relying on credible evidence. Each of Defendants' cited cases involves a situation where a court sanctioned a party for their own misconduct in procuring or submitting evidence that was (1) demonstrably false, (2) known to be false by the party who submitted it, and (3) obtained by that party through wrongful means. See, *e.g.*, *Goodvine v. Carr*, 761 F. App'x 598, 600 (7th Cir. 2019) (affirming dismissal where plaintiff tricked witness into signing false affidavit); *Bishop v. White*, 2023 WL 35157, at *11 (N.D. Ill. Jan. 4, 2023) (sanctioning plaintiff for paying witness to change testimony in a pending civil lawsuit); *Johnson v. Baltimore Police Dep't*, 2022 WL 9976525, at

45

*37 (D. Md. Oct. 14, 2022) (sanctioning plaintiff for his own conduct in obtaining false information from declarants and submitting affidavits "even though he would have known that it was false"). None of those conditions are present here. Defendants do not offer any theory—let alone evidence—as to how the Plaintiffs did anything sanctionable in relying on truthful evidence obtained by others.[17]

Defendants have at best identified fodder for cross-examination, not a justification for exclusion. *United States v. Chaparro*, 956 F.3d 462, 478 (7th Cir. 2020). The irony in Defendant's argument cannot go unremarked upon. Many judges in Cook County have found that Guevara and Halvorsen, in conspiracy with other Chicago Police Department officers, engaged in a widespread practice of intimidating witnesses, fabricating evidence, and testifying falsely against innocent people, including the Plaintiffs. SF¶¶425-426. It is beyond dispute that these Defendants have committed untold frauds on many courts, yet they (and their co-conspirators) are still permitted to tell their side of the story, including by relying on evidence they created through intimidation, coercion, or outright fabrication. It is rich that they seek to prevent the Plaintiffs—against whom there are no accusations of misconduct—from relying on Violante's sworn testimony based on allegations that Violante's motives for his prior, consistent, truthful statement were impure. If

---

[17] Defendants point to evidence suggesting that Violante previously stated he had other motives for signing the 1988 affidavit, and that Plaintiffs' parents participated in an effort to get him to sign the affidavit. But as Juan Hernandez testified at length in his deposition, he was told by an MLD gang member that the witnesses at Mobile & Dickens had identified him because they were told who to choose. He passed that information along to his parents and got lawyers involved because he was desperate to prove his innocence. SF¶¶128-29. Moreover, Plaintiffs' mother testified at length that she would never induce someone to lie—she believed at all times that the affidavits were true, and that they were being attained and exchanged through lawyers to get the truth out. SF¶127. On the advice of their attorney, Plaintiffs' parents took plea deals only because they were in poor health and already under enormous stress (due to the false accusations against their sons) and the pleas allowed them to receive a sentence of one-year supervision, RSOF-J at ¶ 82. And critically, the evidence today conclusively shows that Violante's 1998 affidavit was true all along; it was his statements at the original criminal trials that were not true.

anything, the Defendants should be prevented from relying on Violante's false trial testimony, which the evidence shows they fabricated.

Second, in arguing that Violante's prior testimony and sworn statements are inadmissible hearsay, Defendants put the cart before the horse. Violante "is likely to provide the same testimony if called to testify at trial. It is well settled that testimony given at the trial of a different case may be considered on summary judgment." *Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 300 F. Supp. 2d 606, 614 (N.D. Ill. 2003), *aff'd*, 376 F.3d 664 (7th Cir. 2004). Defendants themselves rely extensively on prior testimony in their statement of facts, including Violante's prior—now recanted—testimony. See, *e.g.*, RSOF-J ¶¶ 13, 16, 18-20, 110-131. In all likelihood, the substance of Violante's 2022 testimony will be presented through his live testimony at trial. Just because Violante did not appear for his scheduled deposition in this case does not establish that the substance of his statements "cannot be presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). Before this case goes to trial, Plaintiffs will use "reasonable diligence to get him to attend" by finding and serving Violante with a trial subpoena. *Griman v. Makousky*, 76 F.3d 151, 154 (7th Cir. 1996). If he is unwilling to comply with a properly served subpoena, the Court would have discretion to compel his attendance. *Hill v. Harvey*, 732 F. Supp. 3d 862, 881 (N.D. Ill. 2024).

Defendants offer no explanation why Violante's 2022 testimony (but not his 1999 and 2001 testimony) should be treated differently from all other sworn out-of-court statements, which are considered at summary judgment so long as they could be presented in an admissible form at trial. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994) ("Occasional statements in cases that the party opposing summary judgment must present admissible evidence, should be understood in this light, as referring to the content or substance, rather than the form, of the submission."). Prior

47

testimony, like "[a] deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible." *Gamble v. FCA US LLC*, 993 F.3d 534, 538–39 (7th Cir. 2021) (quoting 8A C. Wright, A. Miller, & R. Marcus, *Federal Practice & Procedure* § 2142 & n.19, at 634 (2010)). Violante's prior sworn testimony can be considered at summary judgment because it is "part of the record in the present case," "is based on personal knowledge and sets out facts that would be admissible at trial, and [Violante] is competent to testify on these matters." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014).

Third, contrary to Defendants' argument, the above discussion means that the Court need not decide at this stage whether Violante's 2022 testimony would fit within an exception to the rule against hearsay if Violante ends up unavailable for trial. That decision can wait for trial. In any event, Violante's 2022 testimony would be admissible either under Federal Rule of Evidence 804(b)(1) or 804(b)(3).

Violante's 2022 trial testimony is admissible under Rule 804(b)(1) because it was given at Plaintiffs' contested post-conviction hearing, where the key issue was whether the Plaintiffs were framed by the Defendants' fabrication of evidence, including Violante's identification. The Cook County State's Attorney, in opposing the vacatur of Plaintiffs' convictions, was "every bit as motivated to cross-examine [Violante] vigorously regarding his claims" that he had never seen the Plaintiffs and had told the officers he was unable to identify them "as the defendants are here." *Fields v. Chicago*, 2014 WL 477394, at *8 (N.D. Ill. Feb. 6, 2014) (finding Rule 801(b)(1) satisfied in analogous circumstances). The unreliability of the original witness identifications "was a significant part of the" basis for Plaintiffs' petition for post-conviction relief and the State's Attorney had a significant motive to undermine Violante's recantation and his testimony that he told officers all along that he had not been able to see the shooters' faces. *Id.* Where, as here, the

48

testimony concerns facts that are "seriously disputed," in both the proceeding where the original testimony was given and in the trial where the testimony would be introduced, "it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial." *Volland-Golden v. Chicago*, 89 F. Supp. 3d 983, 988 (N.D. Ill. 2015); *see also* Order on Motions In Limine at 4–5, *Kluppelburg v. Burge*, No. 13-cv-3963 (N.D. Ill. Aug. 4, 2017), ECF No. 635 ("The fact that the interests of the prosecutor and the defendants are distinct does not suggest that the motivation for developing testimony is dissimilar," and noting that the stakes in a criminal case are as high if not higher than in a civil case. *Id.* (citing *Wright* v. *Kelly*, No. 95–CV–0688H, 1998 WL 912026, at *6 (W.D.N.Y. Oct. 16, 1998)).[18]

Second, Violante's recantation of the testimony he gave at multiple trials subjected him to potential perjury charges and was, therefore, a statement against his penal interest under Rule 804(b)(3). Furthermore, "corroborating circumstances" such as Violante's girlfriend's confirmatory testimony and the Defendants' well-established pattern of fabricating identifications, "clearly suggest that the statement is trustworthy." *United States v. Ferrell*, 816 F.3d 433, 439 (7th Cir. 2015). Courts in this Circuit have found this exception applies in analogous circumstances. *See, e.g.*, *Whitlock*, 682 F.3d at 575 (noting that witness' "out-of-court statement[]" recanting his trial testimony "would be admissible . . . because his death makes him unavailable, and his

---

[18] Defendants' argument that the State's Attorney could have done more to impeach Violante is irrelevant as courts consider the motive and opportunity to cross-examine rather than "the extent of cross-examination at the former proceeding" in determining whether the exception is satisfied. *United States v. Pizarro*, 717 F.2d 336, 349 (7th Cir. 1983). Likewise, Defendants' contention that the State's Attorney "made little effort to determine which" Defendants Violante interacted with, OB-9, is frivolous. There would have been little point making more effort as Violante testified "that he does not recall what specific police officers he spoke to." RSOF-J¶139. Violante's interaction with Defendants is documented by Defendants themselves.

49

recantation is a statement that exposes him to perjury charges" (citations omitted)); *Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743, at *14 (N.D. Ill. July 13, 2017) (finding witness' partial recantation admissible as statement against interest because of potential perjury liability and corroboration by testimony about prior consistent statements); *Ott v. Milwaukee*, No. 09-C-870, 2015 WL 1219587, at *4 (E.D. Wis. Mar. 17, 2015) (similar). Defendants' arguments for excluding Violante's testimony should be rejected. A trial is necessary on these and all other suppression theories that Defendants do not challenge.

### B. A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence

A jury must also decide Plaintiffs' due process fabrication claims. The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery*, 847 F.3d at 439 (citing *Mooney v. Hollohan*, 294 U.S. 103, 112 (1935); *Whitlock*, 682 F.3d at 580). This due process theory is entirely distinct from the due process theory based on suppression of evidence, which Plaintiffs discussed above. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014). Plaintiffs pursue the following fabrication theories, each of which requires a trial.

#### 1. Bemis, Guevara, DeGraff, and Halvorsen Fabricated the Anonymous Tip

Only Bemis and Guevara argue that they are entitled to summary judgment on the fabricated anonymous tip, for three reasons that lack merit. OB-4-5; GB-3-4.[19] First, they again

---

[19] Although Bemis, DeGraff, and Halvorsen filed a single motion, the argument about the anonymous tip is mounted by Bemis only, not DeGraff or Halvorsen. OB-4-5. DeGraff and Halvorsen have therefore forfeited any argument for summary judgment on this theory, *Sublett v. John Wiley & Sons*, 463 F.3d 731, 736 (7th Cir. 2006), and it will be too late to raise them in reply. *Costello,* 651 F.3d at 635.

contest the facts. Bemis contends that it is true that he received the anonymous call implicating the Hernandez Brothers. OB-4. But that account requires the Court to believe Bemis and to construe the evidence in his favor, which the Court cannot do. Regardless Bemis's testimony was that he did not recall the events in question, as he concedes in his brief, *id.*, and not that he received a tip that he believed. Meanwhile, Guevara asserts that he did not receive the tip himself and had no idea that a tip received by other officers was false. GB-3. Again, Guevara's account requires the Court both to impermissibly accept his assertion of facts construed strictly in his own favor, and it also requires the Court to ignore entirely Guevara's assertion of the Fifth in response to questions about whether he fabricated the anonymous tip. SF¶100.

Construed for Plaintiffs, there is ample evidence that would permit the jury to decide the tip was fabricated so that Defendants would have a fake reason for Plaintiffs to be suspects in the Gonzalez murder in the first place. On June 28, the day after the shooting, Bemis, a patrol officer who participated in Miedizanowski's drug conspiracy,[20] purportedly received a call from "an unknown informant" saying that "Poochie" (Juan Hernandez) and "Junebug" (Rosendo Hernandez) had committed the Gonzalez killing. But the evidence construed for Plaintiffs shows that this call never occurred.[21] The supposed tip was first documented in a report written at the *end* of the investigation, on July 1, by Guevara and Halvorsen. In that July 1 report, Guevara and

---

[20] Bemis argues that he is not the "B-man" involved in Miedzanowski's enterprise, OB-19, but that is yet another factual dispute that will have to be submitted to a jury. Bemis says that it is uncontradicted that there is no evidence that he was associated with Miedzianowski, *id.*, but that is not true—Jondalyn Fields express implicated him, by his name Bemis and by the nickname B-Man, in the criminal conspiracy and as frequenting locations associated with the drug enterprise with many of the indicted co-conspirators. SF¶¶13, 166.

[21] There are no contemporaneous notes, reports, or any other documentation or recording of this supposed call. To this day, Defendants have never identified the supposed informant. Bemis likely was not present in the gang team office at the time the tip purportedly came in; he does not recall receiving such a call; he does know how Plaintiffs became suspects; and he doubts that he ever received it because it would be extremely unusual for him to receive a tip about the real killers in a murder case. SF¶¶58-59.

51

Halvorsen wrote that on June 29 they had learned from DeGraff that on June 28 Bemis had received the anonymous tip. That report was the same one that documented the other fabrications discussed.[22] When Guevara was asked if he fabricated this tip as a pretext to implicate the Hernandez Brothers, he pleaded the Fifth. SF¶100. A jury could easily conclude that the tip was made up, particular considering all of the other evidence of fabrications and suppressions discussed in this response.

Second, Bemis and Guevara each argue in one or two sentences that they did not know "with certainty" that the anonymous tip was false. OB-4. This cursory assertion is too undeveloped to justify summary judgment. *Smith*, 388 F.3d at 569. Moreover, it is curious that Bemis argues that he was unsure whether the tip was false, given that he says in the preceding paragraph that he has no memory of it. This is the reason that issues "involving . . . intent are usually not appropriate for summary judgment," *Lac du Flambeau Band v. Stop Treaty Abuse*, 991 F.2d 1249, 1258 (7th Cir. 1993), particularly so where "evaluating whether a party had an actual intent to deceive requires credibility determinations." *Standard Ins. v. VanLanduit*, 551 F.Supp.3d 854, 868 (N.D. Ill. 2021). That said, Plaintiffs' contention is not that Bemis or Guevara misunderstood that the tip was not true—the theory is that the anonymous call *never happened at* all and that these Defendants made it up. That disputed fact needs to be resolved by a jury, as discussed already.

---

[22] There is additional circumstantial evidence that the supposed anonymous tip was fabricated. Although the supposed tip came in on June 28, and then was communicated to Guevara on June 29, when he was assigned to the investigation, witness Nancy Gonzalez testified that she heard from Guevara on June 28 that there were already suspects in the case—before the supposed tip, and certainly before Guevara heard about the supposed tip. SF¶60.

Moreover, consistent with the made-up call and the plan to frame Juan and Rosendo, Bemis also detained and brought several men to Area 5, including Abraham Gutierrez, and tried to get them to name as perpetrators Poochie and June-Bug, the nicknames of Juan and Rosendo, respectively, which they did not do. Bemis basically admits as much. None of this is documented in the police files from the Gonzalez homicide investigation. SF¶61.

Third, Bemis and Guevara argue that they cannot be liable for violating due process because the fabricated tip was not introduced at Plaintiffs' criminal trials and therefore was not material. OB-4-5. They are wrong on the law and the facts. On the law, Defendants imply they cannot be liable for a fabrication unless the particular item of evidence fabricated is admitted at the criminal trial in the same form in which it was fabricated. That misunderstands Supreme Court and Seventh Circuit law governing fabrication due process claims. An officer who fabricates evidence violates due process if their fabrication causes *any* deprivation of liberty. This rule was articulated by the Supreme Court starting a century ago in *Mooney v. Holohan*, 294 U.S. at 112-13, and it has been confirmed in a long line of cases, from *Jones v. Chicago*, 856 F.3d 985, 993 (7th Cir. 1988), to *Whitlock*, 682 F.3d at 580, to *Avery*, 847 F.3d at 439-40, to *Moran v. Calumet City*, 54 F.4th 483, 498 (7th Cir. 2022). As *Whitlock* put it, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process *if that evidence is later used to deprive the defendant of her liberty in some way*." 682 F.3d at 580.[23]

A huge number of precedents support the view that due process is violated when fabricated evidence causes a liberty deprivation at any stage of the criminal proceedings, even when the initial fabrication is not admitted in its original form in those proceedings. See, *e.g.*, *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were

---

[23] It is the *use* of false evidence to deprive an individual of *liberty* that violates the Constitution. This is true whatever form the initial fabricated evidence takes (*e.g.*, a false report, a manufactured statement, a fabricated identification, invented forensic evidence, or scripted testimony), regardless of the stage of the criminal case at which the fabrication causes a liberty deprivation (*e.g.*, warrant, filing of charges, bond determination, indictment, denial of a pretrial motion, conviction), and however the evidence comes to impact the criminal proceedings (*e.g.*, introduced as an exhibit, offered as testimony, used to preclude other evidence from being used in the criminal case, offered as a stipulation, or presented to a judge). This principle reflects the reality that most evidence in criminal cases is introduced at various phases via witness testimony, whatever form it initially took. That's why *Whitlock* emphasized the fabrication must simply "be used to deprive the defendant of her liberty *in some way*." 682 F.3d at 580.

introduced at the criminal trial in the form of oral testimony).[24] Fabricated evidence violates due process when it is admitted as evidence, when it comes in at trial through the testimony of police or witnesses, where it used to affect the outcome of the criminal case, or where it "furthered the prosecution" in any other way. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018). Accordingly, there is no support for Bemis and Guevara's position that they can be liable only if a particular item of fabricated evidence was actually introduced at trial in its original form.

On the facts, there are material disputes about whether the anonymous tip was used to deprive Plaintiffs of their liberty during the criminal proceedings. A trial is required to resolve these disputes. *Washington v. Boudreau*, 2022 WL 4599708, at *21 (N.D. Ill. Sept. 30, 2022) (where there are disputes about the effect of evidence on a criminal case, a trial is necessary). Guevara and Bemis contend that the tip was not used in the criminal case, but that is plainly false: Guevara testified at the criminal trials about having received the tip, based on which he said Plaintiffs became suspects. SF¶56, 148. This is enough to demonstrate that the tip violated Plaintiffs' due process rights. *Taylor v. Chicago*, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the report itself was not admitted into evidence, as the Court has previously noted, the contents of the fabricated report certainly were."). Moreover, the fake tip indisputably

---

[24] The Supreme Court rejected Defendants' myopic view of a fabricated evidence claim in both *Buckley v. Fitzsimmons*, which approved a fabrication claim where physical evidence of a boot print was fabricated before trial and then introduced through the testimony of a witness at trial. 509 U.S. 259, 262-64 (1993), and more recently in *McDonough v. Smith*, where the Court recognized that a claim that falsified affidavits, witness coaching, and a bogus DNA analysis fabricated before trial violated the Constitution when that evidence was later introduced though witness testimony, 588 U.S. 109, 113 (2019). The Seventh Circuit has rejected Defendants' view repeatedly. See *Anderson*, 932 F.3d 494 (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); *Avery*, 847 F.3d at 441-42 (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony); *Stinson*, 868 F.3d at 528 (*en banc*) (due process violated when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police before trial is introduced at trial by an immune prosecutor).

led to an arrest and detention without any probable cause, and it was used to get murder charges approved. SF¶¶56-59, 92. A jury must consider the claim that Defendants' pre-trial fabrication of a fake tip violated Plaintiffs' due process rights when that fabrication was used against Plaintiffs during their criminal proceedings.[25]

### 2. Guevara, Halvorsen, and Biebel Fabricated Alibi Statements That They Attributed to Plaintiffs In A False Police Report

Guevara, Halvorsen, and Biebel also knowingly fabricated alibi statements that they falsely attributed to Plaintiffs in a police report, which they used to undermine Plaintiffs' truthful and solid alibis, and to create the opportunity for Plaintiffs to have committed the Gonzalez shooting, and to undermine Plaintiffs' alibis through the criminal proceedings. This violated Plaintiffs' right to due process as well. *Avery*, 847 F.3d at 441-42 (due process violated when police fabricated confession of the plaintiff); see also *Patrick*, 974 F.3d at 835-36 (affirming a due process fabrication verdict against multiple defendants who fabricated a plaintiff's statement); *Anderson*, 932 F.3d at 511 (holding that summary judgment not available where police officer fabricated witness statements before trial).

When Guevara and Halvorsen questioned Plaintiffs about the Gonzalez shooting, they both truthfully denied their involvement in the crime, and they each accurately provided their alibis, which made it impossible that they had committed the shooting. Juan told them that until 1 a.m. on the night of the shooting, he had been at a restaurant assisting Rosa Solis and her daughter Sophia prepare for Sophia's Quinceañera, and he denied ever going to the location of the shooting. Solis corroborated Juan's account that night. Meanwhile, Rosendo told Guevara and Halvorsen

---

[25] Guevara's assertion that he is entitled to immunity on this due process theory is discussed below. See *infra* Arg. §II(D).

that he had been at Kraft Bowl, from 7:30 or 8 p.m. until midnight. Both Plaintiffs were with multiple other people far from the crime scene at the time of the crime. SF¶¶115-120.

Recognizing that these alibis were an immovable obstacle standing in the way of their plan to implicate Plaintiffs in the crime, Guevara and Halvorsen wrote a police report in which they fabricated a different story, which Biebel approved, which was a lie: The false report stated that Juan had not said anything about an alibi, that he had instead claimed that he never had left his house that night, and that Solis had said Juan had stopped by the restaurant only briefly. And they wrote that Rosendo had told them that he returned home from Kraft Bowl by 11 p.m., just before the Gonzalez shooting occurred. This fabricated account created the opportunity for Plaintiffs to have committed the crime. It was a knowing fabrication, as shown by the contradiction between what Plaintiffs actually said, and what Defendants falsely reported. SF¶115-120.

When Guevara was asked in this case if he fabricated the account to undermine Plaintiffs' solid alibis, he pleaded the Fifth. SF¶121. And recall that Halvorsen pleaded the Fifth on his efforts to frame the Hernandez Brothers as well. SF¶99. At the criminal case though, Guevara introduced his fabricated report and false account of Plaintiffs' statements through his own testimony. SF¶¶156-157.

Defendants' arguments for summary judgment on this theory are weak. First, Halvorsen contends a jury could not hold him liable because all he did is write the fabricated report. OB-12-13. Apparently his contention is that Guevara lied to him, he didn't know it, and he wrote down the lie in his report. That strained reading of the facts is one that completely ignores the summary judgment standard by drawing every inference in Halvorsen's favor.

Second, Defendants contend Plaintiffs cannot have a *Brady* claim based on their own alibis. OB-18. But Plaintiffs are not pursuing a suppression theory here, they intend to show that

56

Defendants fabricated a false account of their alibis, and that is an entirely independent claim. *Petty*, 754 F.3d at 421-24. The Court need not address this suppression argument, but if it did, all of the law from the suppression discussion above would apply.

Lastly, Defendants contend that these fabricated reports were not introduced at trial. OB-13; GB-7-9. As with the fabricated tip above, Defendants construe governing law too narrowly. *Supra* Arg. §II(B). Besides, they are again wrong on the facts: Guevara introduced the fabricated statements undermining the alibis through his own testimony at trial, SF ¶¶156-157, and so a jury can find Defendants liable for this fabrication as well. *Avery*, 847 F.3d at 441-42.

### 3. Guevara, Halvorsen, Bemis, and Biebel Fabricated Eyewitness Identifications

Finally, a jury could find that Guevara, Halvorsen, Bemis, and Biebel knowingly fabricated identifications from five eyewitnesses to implicate Plaintiffs in the Gonzalez murder.

#### a. Ample Evidence Permits the Conclusion That Defendants Fabricated the Identifications

It is critical to observe at the outset that there is sufficient evidence to require a jury trial about whether Defendants knowingly fabricated these witness identifications, even before one examines the particular evidence relating to each eyewitness. As discussed, there was a plot to frame Plaintiffs before the Gonzalez murder occurred. Plaintiffs were completely innocent of the crime and had no connection to it. Defendants knew the identity of the person who committed the crime, but chose to implicate Plaintiffs instead, and they suppressed the identity of the true perpetrator. Because there was no evidence implicating Plaintiffs, any evidence that implicated them necessarily had to be manufactured. Defendants made up an anonymous tip to make Plaintiffs suspects, and attributed false statements to them to undermine what Defendants knew were

Plaintiffs' solid alibis. In their motions, Defendants do not address any of these factual matters in connection with what they simply assert are legitimate eyewitness investigations.

Defendants cannot hope for summary judgment on Plaintiffs' claims that they fabricated eyewitness identifications in order to falsely implicate them in the Gonzalez murder, given that Defendants have failed to even address the fabricated origin of the investigation, and the necessity that the eyewitness identifications were in fact false. *Sublett*, 463 F.3d at 736 ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."). It will be too late for Defendants to raise these arguments in their reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply). A jury could rightly conclude, based on just those facts discussed so far, that Defendants must have fabricated the witness identifications.

But there is more. None of these witnesses saw Plaintiffs commit the crime, as a matter of fact, because Plaintiffs are innocent of the crime and were not at the crime scene. Plaintiffs' voluminous evidence on that point must be believed as a starting point at summary judgment. *Whitaker v. Dempsey*, 144 F.4th 908, 917 (7th Cir. 2025) ("When two witnesses disagree, deciding which person to believe requires assessing credibility and weighing conflicting evidence. It is axiomatic that district courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations . . . . We have reversed district courts time and again for relying on one party's version of disputed facts to grant summary judgment."). Put simply, construing the summary judgment record for Plaintiffs, Defendants cannot contend that the witnesses accurately identified Plaintiffs—there can be no dispute that the witnesses identified the wrong guys. The only question, then, is how did it happen that four witnesses who purportedly

58

viewed two different live lineups independently all picked Defendants' same chosen suspect in each of those lineups? There were six participants in each lineup, and so the odds of that selection happening by random chance are less than 1 in 1.6 million. (The odds that four witnesses pick the same specific person out of six randomly is 1/1,296, and the odds of it happening twice in a row in two identification procedures is 1/1,296 x 1/1,296 = 1/1,679,616.) Considering the evidence just discussed, along with those extreme odds, the only rational conclusion that this confluence of events permits, especially at this stage, is that Defendants manufactured the witnesses' identifications. See *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (discussing the power of circumstantial evidence); *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) ("[C]ircumstanial evidence is sufficient to establish guilt beyond a reasonable doubt in criminal cases, and deserves no less respect in civil matters."); *Thompson*, 722 F.3d at 974 (noting that circumstantial evidence may be powerful evidence of police misconduct).

But there is still even more evidence that these witness identifications were fabricated by Defendants. The jury could conclude that the witnesses did not see the faces of the perpetrators at all, based on the fact it was dark out; there was only a single street lamp providing light from behind the offenders (so they were backlit); there were three offenders, two shooters and two weapon, and a number of people on the porches reacting to the incident, all spreading attention across multiple stimuli; the entire event lasted less than a minute and multiple eyewitnesses described their opportunity to view faces as a few seconds; none of the eyewitnesses could provide a specific description or distinguishing features of the shooters; and indeed Defendants suppressed exactly that information when it was provided by Violante. SF¶¶62-86. The expert testimony adds to the conclusion that they could not have formed a memory of the perpetrators or reliably made an identification given the circumstances of the crime. SF¶¶101-114. The jury could conclude that

59

witnesses were shown Plaintiffs' photographs prior to documented identification procedures (Jose), made misidentifications or identified other suspects that were suppressed (Jose and Nancy), and simply refused to make identifications of Plaintiffs that were nevertheless documented as positive identifications by Guevara and Halvorsen (Violante). SF¶¶67, 87-90, 95-98. The jury could find that Defendants' refusal to allow Plaintiffs' attorney, Kent Brody, to observe the lineup procedures, despite routinely being allowed to do so in other investigations, is further evidence of fabrication. SF¶¶94. The jury could conclude that the witnesses' memories were cross-contaminated. SF¶105. All of this is additional evidence that leads inexorably to the conclusion that a jury must weigh all of the facts and make a determination about whether Defendants knowingly fabricated the witness identifications.

Finally, there is direct evidence on top all this mountain of circumstantial evidence that Defendants fabricated the identifications of Plaintiffs. First, Violante testified that he always told Defendants he did not see and could not identify the perpetrators, and that he did not select them from an identification procedure. SF¶63. Defendants' report saying that Violante did the opposite is therefore necessarily a fabrication. SF¶67. Last but certainly not least, faced with all of the evidence above, Guevara pleaded the Fifth when asked whether he knowingly fabricated each of the eyewitness identifications. SF¶100. As a result, this Court must draw an interference against Guevara that he did just that. *Supra* Arg. §I. The same is true of Halvorsen, the other detective directly involved in the identification procedures. SF¶¶91-93, 159-163 Defendants are not entitled to summary judgment based on this record. *Washington v. Boudreau*, 2022 WL 4599708, at *20 (N.D. Ill. Sept. 30, 2022) ("[W]hether Defendants merely coerced, and did not fabricate, evidence against Plaintiffs is ultimately a question of fact").

### b. Defendants' Arguments for Summary Judgment Lack Merit

Defendants' counterarguments lack merit. For the most part, they contend that they did not knowingly fabricate identifications, relying upon the very witness testimony from Plaintiffs' criminal trials that Defendants corrupted through their misconduct. E.g., OB-9-10. But Defendants cannot rely on the false testimony that they procured decades ago to argue for summary judgment now, for all of the reasons just discussed. Their arguments that they did nothing wrong or were uninvolved in the misconduct are again hotly disputed facts. *Washington*, 2022 WL 4599708, at *20.

Defendants stress in their motions that a number of witnesses have not "recanted," but that argument is misplaced for a number of reasons. First, a jury does not need to believe a witness's testimony over other evidence that contradicts that witness, *Rivera*, 319 F. Supp. 3d a, 1033 ("But the jury will be free to believe all, some, or none of [the eyewitness's] and the other witnesses' testimony" in another Guevara case."), and at summary judgment this Court's job is to decide whether there are disputes of fact, not whether one piece of evidence should trump another, *Whitaker*, 144 F.4th at 917 (7th Cir. 2025). Second, a jury is entitled to believe some parts of a witness's testimony and not others, *Allen*, 317 F.3d at 703 ("[T]here are cases, perhaps the majority, in which a witness's testimony is a compound of truth and falsity."), so Defendants cannot argue that if some of a witness's testimony favors Plaintiffs and some favors Defendants, then all of that testimony must be believed and that they are therefore entitled to judgment, *Rivera*, 319 F. Supp. 3d at 1033.

Third, there are plenty of reasons to doubt the veracity of the eyewitness testimony in this case (Plaintiffs' factual innocence, for one), and because inferences must be drawn for Plaintiffs it is necessary to treat that testimony as unreliable at summary judgment. *Captain v. ARS Nat. Servs.,*

*Inc.*, 636 F. Supp. 2d 791, 795 (S.D. Ind. 2009) (Hamilton J.,) (credibility questions may prevent summary judgment if "'the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown.'") (quoting *Cameron v. Frances Slocum Bank & Trust Co.,* 824 F.2d 570, 575 (7th Cir. 1987)).

Fourth, and fundamentally, it is worth asking the question what these witnesses would "recant" in the first place. They were children when Defendants manufactured their identifications, and the expert testimony in the record establishes that in almost all cases eyewitnesses who identify a suspect incorrectly—whether by police coercion or other means—come to believe strongly that the person they identified is the person who committed the crime, particularly where there is cross-contamination among a group of witnesses. PSOF¶¶105, 112, 114. Defendants' contention about witness certainty is one the Seventh Circuit has discounted at summary judgment, saying it is "too much of a leap at the summary-judgment stage" to decide as a matter of law that a witness identification was reliable where the witness confidently identified a suspect and testified that the identification was not influenced, given the problems of unconscious transference. *Holloway*, 43 F.4th at 766-67; see also SF¶¶105, 112, 114.

Some district courts have concluded that if an eyewitness testifies at a deposition that they still believe their identification was accurate, then summary judgment is warranted on a claim like this one. But those cases do not grapple with the principles just discussed, because typically they involve a situation where there is little to impeach the eyewitness account. Moreover, there is a big difference between a case where an officer has no reason to doubt an identification and relies on it, and one like this one, where there is evidence for the jury to conclude that the eyewitness identification was obtained by police misconduct. In the former case, the witness's testimony might be unassailable at summary judgment, but in latter case, the police officer cannot point to

62

evidence that was fabricated in the past, say the fabrication stands today, and then claim an entitlement to judgment before trial. See *Rios*, 2024 WL 5119954, at *13 ("A jury could conclude that a reasonably prudent officer would not think an identification he coerced constituted probable cause"); *Moorer v. Platt*, 2020 WL 814924, at *3 (N.D. Ill. Feb. 19, 2020); *Anderer v. Jones*, 342 F. Supp. 2d 799, 802 (E.D. Wis. 2002). Given the undeniable fact of Plaintiffs' innocence, all of the circumstantial and direct evidence above, the Defendants' pattern of convincingly fabricating witness identifications in a large array of other cases, Plaintiffs' expert opinion about why the identifications are unreliable, SF¶¶101-14, and the recognized "[p]sychological research . . . establish[ing] that the witness's faith is equally strong whether or not the identification is correct," *Newsome II*, 319 F.3d at 305, the witnesses' failures to recant their original identifications does not amount to reliable evidence that they were not fabricated in the first instance by the Defendants. A jury has to decide these claims.[26]

### C. This Court Need Not Decide Anything About Unduly Suggestive Identification Due Process Theories Because Plaintiffs Are Not Pursuing Those Theories

All Defendants move for summary judgment on the claim that Defendants used unduly suggestive identification procedures, arguing that such claims are foreclosed by *Blackmon v.*

---

[26] Nor is there any merit to Defendants' argument that they did not know with certainty that the identifications they fabricated were false. *See* OB-11-12 (citing *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019)) This case is unlike *Coleman* in that Plaintiffs are not relying on circumstantial evidence or chains of inferences to show the investigating officers knew the evidence they extracted from witnesses was false. This is an unusual case where there is both "a smoking gun [and] an admission" showing knowledge of falsity. *Gray v. City of Chicago*, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022) (finding knowledge of falsity based on circumstantial evidence). The smoking gun is the evidence that Defendants had a premeditated plan to frame the Plaintiffs. SF¶¶18-22. From this evidence, a jury could easily conclude that Defendants knew all the evidence they collected was false because that was their intent from the beginning. Additional evidence includes Defendants' knowledge that the Plaintiffs had alibis proving they did not commit the crime and knowledge that "Willy" was the likely murderer. The admission is that Guevara and Halverson invoked the Fifth Amendment when asked if they framed Plaintiffs, SF¶¶99-100. *See Anderson v. City of Rockford*, 932 F.3d 494, 511 (7th Cir. 2019) (finding knowledge of falsity based on defendant's invocation of Fifth Amendment).

*Jones*, 132 F.4th 522 (7th Cir. 2025). OB-13-14; GB-9; CB-20. This Court need not decide anything about that claim, however, because Plaintiffs agree that they will not attempt to hold Defendants liable at trial on a standalone suggestive identification theory.

Instead, Plaintiffs proceed only on the suppression and fabrication theories above, *supra* Arg. § II(A)-(B), which *Blackmon* does not affect. To be clear, *Blackmon* expressly reaffirmed that due process is violated, and qualified immunity is unavailable, when police officers coach a witness to identify a suspect and deceive a prosecutor about what the officers did, or when officers hide the true nature of identification procedures they have conducted, or when officers coerce a witness to testify falsely, or when officers knowingly manufacture identifications. 132 F.4th at 525-26. Citing a case from 1988, *Blackmon* holds that it has long been established that such allegations "justify awards of damages against the police." *Id.* at 526 (citing *Jones*, 856 F.2d 985). The Seventh Circuit observed "Blackmon makes allegations along these lines," that "[t]hese are serious charges and, if established, would entitle Blackmon to damages," and that the officers rightly had not asserted immunity from and had not appealed those theories. *Id.* at 526. Therefore, *Blackmon* firmly supports Plaintiffs' fabrication and suppression theories discussed above, including those concerning eyewitness identifications, and it reaffirms that Defendants are not entitled to qualified immunity on those theories.

Otherwise, *Blackmon*'s scope is exceedingly narrow, and understanding its narrow scope is important. Blackmon was wrongfully convicted of murder based on misidentifications of eyewitnesses, which were obtained by police misconduct. Blackmon advanced three due process theories: (1) that the defendants knowingly fabricated an eyewitness's identification; (2) that they suppressed material exculpatory and impeachment evidence related to eyewitness identifications; and (3) that they used unduly suggestive identification procedures to obtain witness identifications.

64

See generally *Blackmon v. Chicago*, 700 F. Supp. 3d 617 (N.D. Ill. 2023). The basis for theory (3) was that the plaintiff "was the only person [in the lineup] who wore his hair in braids—and both witnesses had described braids as one of the shooter's characteristics," which was apparent to the prosecutors, defense attorneys, and everyone else in the criminal justice system. *Blackmon*, 132 F.4th at 524. The defendants sought summary judgment on theory (3) alone, and that theory was the only issue on appeal. *Id.* at 646. The Seventh Circuit made the narrow scope of its decision crystal clear, saying the "appeal is limited to Blackmon's contention that an unduly suggestive photo array or lineup *by itself* entitles an accused to damages. And our answer—that it does not— is limited to that issue." *Blackmon*, 132 F.4th at 526. The Seventh Circuit held that officers do not violate due process *merely* by showing a witness a facially suggestive photo array. *Id.* at 524-26.

*Blackmon* thus stands for the narrow proposition that police are not liable when the plaintiff's claim is *only* that "an unduly suggestive photo array or lineup *by itself* entitles" them to damages. *Id.* at 525. However, it remains the law—and *Blackmon* reaffirms—that police are liable and do not have immunity when they fabricate an identification, manipulate witness identifications, coerce a witness to testify to a false identification, or suppress the true nature of identification procedures they have conducted. Plaintiffs' claims fall squarely in that category.[27]

### D. Guevara and Bemis Are Not Entitled to Immunity

Guevara and Bemis are the only officers who assert they are entitled to immunity from Plaintiffs' due process fabrication and suppression claims. In particular, Guevara says he is entitled to qualified immunity for fabricating the fake anonymous tip, GB-3, and Guevara and Bemis each argue they are entitled to testimonial immunity for testifying about the tip later, GB-3-4; OB-5.

---

[27] The Court also need not address Defendants' immunity argument relating to the suggestive identification due process theory, OB-13-14; GB-9, given that Plaintiffs are not pursuing the theory.

Guevara also asserts that he is entitled to qualified immunity for his suppressions of evidence relating to his plot with Miedzianowski. GB-14. This Court should reject the arguments for at least five reasons: First, these Defendants' arguments necessarily turn on the same fact disputes that require a trial on the merits, and the Court cannot grant immunity based on Defendants' view of the facts. *E.g.*, GB-3 (saying it was not established in 1997 "that an officer receiving a fabricated tip from another officer is a constitutional violation"); *Tolan*, 572 U.S. at 657 (holding that the summary judgment record must still be construed for the non-moving party when the question is whether the law was clearly established); *Stinson*, 868 F.3d at 523 (same). Second and relatedly, for all of the reasons explained at the outset, *supra* Arg. §I, Guevara cannot assert his Fifth Amendment right in response to all questions about his misconduct and then ask for immunity from suit. Third, Defendants' arguments for immunity are each a sentence or two long, which is far too undeveloped to justify granting a defendant immunity on a substantial due process claim. *Smith*, 388 F.3d at 569.

Fourth, the law governing Plaintiffs' fabrication and suppression claims was as clearly established as is possible at the time of Defendants' investigation in 1997. As *Blackmon* reaffirms, the Seventh Circuit has long recognized that §1983 due process claims may be brought against police who withhold evidence, causing wrongful convictions. 132 F.4th at 526 (citing *Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988)). The Seventh Circuit concluded in *Newsome I* that it was clearly established in 1979 and 1980 that police could not withhold investigative information from prosecutors, explaining that "[t]he *Brady* principle was announced in 1963, and we applied it in *Jones* to affirm a hefty award of damages against officers who withheld exculpatory information in 1981." 256 at 752-53. Moreover, the Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates

66

due process if that evidence is later used to deprive the defendant of [his] liberty in some way,'" *Avery*, 847 F.3d at 439 (quoting *Whitlock*, 682 F.3d at 580). *Whitlock,* in turn held that this right was clearly established at least a century ago, 682 F.3d at 585. See also *supra* Arg. §II(A)-(B) (discussing the established law governing these claims).

Fifth, these Defendants' testimonial immunity arguments do not shield them from liability from their pre-trial fabrications of evidence. To be precise, Guevara and Bemis make the same cursory argument that they are immunized from their own fabrication of a fake anonymous tip before trial because they later testified about that tip falsely at trial. GB-3-4; OB-5. The Seventh Circuit rejected precisely this argument in *Avery*, which recognized that evidence often comes in at trial through oral testimony, and categorically rejected the proposition that testimonial immunity shields a state actor for a pretrial act of fabrication. 847 F.3d at 441-42. The Court noted that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter." *Id. Avery* follows as long line of Supreme Court and Seventh Circuit cases, which have made clear for decades that pre-trial acts of evidence fabrication are not cloaked in immunity simply because those fabrications were later presented by way of oral testimony at trial. *See Rehberg v. Paulk*, 566 U.S. 356, 370 n.1 (2012). This Court should deny Defendants immunity on from Plaintiffs' due process claims.

### E. Bemis, DeGraff, and Biebel Are Not Entitled to Summary Judgment

Defendants Bemis, DeGraff, and Biebel make a separate argument that they are entitled to summary judgment because they were not sufficiently personally involved in misconduct during

the Gonzalez investigation. OB-22-24. But these Defendants were each involved in the misconduct described above. None of them is entitled to summary judgment.[28]

**Bemis** contends that that he was uninvolved in the investigation, but his whole argument in this section of the Defendant Officers' motion details the ways he *was involved in the investigation*, before simply asserting that his involvement is insufficient for liability to attach. OB-23-24. The argument can be rejected on its own terms, because it demonstrates involvement, not lack of involvement. Moreover, the argument that his involvement in the investigation is insufficient to require a trial again depends on Defendants' own view of the facts, which is impermissible at this stage. Contrary to Bemis's suggestion, evidence shows Bemis was part of the drug enterprise, was personally involved in fabricating the fake anonymous tip, rounded up Abe Gutierrez and others to meet Guevara and implicate Plaintiffs, in creating the initial photo array Guevara and Halvorsen used to implicate Plaintiffs, and participating in the lineups used to obtain false witness identifications. SF¶¶56-58, 61, 91-92, 124, 166-169.[29] That is enough to deny Bemis's separate request for summary judgment.

**DeGraff** argues that he had no involvement, but DeGraff was Bemis's sergeant in the gang unit, and is the person who communicated Bemis's made-up tip to Guevara, and gave Guevara the photos of Juan and Rosendo and ten others to create a photo array used to obtain identifications of

---

[28] It is peculiar that a subset of the Defendant Officers argue in a separate section of their motion that they are entitled to judgment on the ground that the record shows they were uninvolved in the misconduct. Of course, *each* of the Defendants must show that they undisputedly were not involved in misconduct to obtain summary judgment. The fact that a subset of the Defendant Officers argue separately that they were not involved in the constitutional violations asserted is tantamount to an admission that there is no hope of summary judgment for the others—Defendants Guevara, Halvorsen, and Miedzianowski.

[29] Bemis also argues that he was not the "B-Man" involved in Miedzianowski and Guevara's criminal conspiracy, and that the suggestion otherwise is a case of mistaken identity. OB-19. That is a factual dispute not subject to resolution on summary judgment. SF¶13 (citing evidence showing Bemis was involved in the drug conspiracy).

Juan and Rosendo. SF¶¶170. His failure to document the supposed anonymous call, or to ensure Bemis documented it or took steps to investigate its source and/or reliability, is additional circumstantial evidence of his knowledge that the tip was fabricated. SF¶59. Cumulatively, this evidence is more than sufficient for a jury to conclude that he was involved in the fabrication of the tip and the efforts to frame Plaintiffs.

Defendants argue that **Biebel** was simply a supervisor who signed reports and did not conduct the investigation. *E.g.*, OB-23. There are a number of problems with this argument. First, supervisors who approve police reports are not passive rubber stampers who sign whatever crosses their desks—they are in fact leaders of the team, responsible for oversight of investigative tasks and verification of results. SF¶¶164. They are kept fully abreast of the homicide investigation as it proceeds, including the results of any positive or negative lineup identification procedures, witness interviews and other developments; indeed, tracking the day-to-day progress of the investigation was one of their integral roles. *Id.* The record supports the conclusion at summary judgment that Biebel was involved in misconduct that occurred in the investigation he oversaw

In particular, Biebel signed off on the fabricated reports that Guevara and Halvorsen prepared, documenting every fabrication used to implicate Plaintiffs, including the lineup reports documenting the fabricated identifications, and the closing report documenting the fabricated anonymous tip, all of the photo array and lineup identifications (and suppression of the lack of identifications or identifications of others), and the false alibi statements. SF¶165.

Biebel acknowledged that as a supervisor, he remained involved and informed of what was going on during the investigation, and he took steps to understand what had occurred during the investigation to ensure reports were accurate. SF¶¶164. Accordingly, Plaintiff is entitled to the inference that Biebel learned about the fabrication and suppression that had occurred during the

69

course of the investigation, and nevertheless approved reports that he knew were fabricated, and that concealed exculpatory and impeaching evidence.[30] To the extent Defendants wish to contest these facts, they must do so at trial.

### F. A Jury Must Decide Plaintiffs' Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims

Plaintiffs also bring a § 1983 claim for illegal detention without probable cause, as well as a state-law claim for malicious prosecution. Defendant Officers treat these as a single claim, OB-19-23, but they are not. *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017), and *Thompson v. Clark*, 596 U.S. 36, 42 (2022), explain that the Supreme Court has long recognized a Fourth Amendment claim for illegal seizure pursuant to legal process where the detention is without probable cause. That claim, like all other Fourth Amendment claims, requires proof of a (1) a seizure, (2) without probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 114-16 (1975). By contrast, an Illinois malicious prosecution claim requires proof of (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th Cir. 2011).

### 1. DeGraff, Biebel, and Miedzianowski Caused Plaintiffs Prosecutions

Only DeGraff, Biebel, and Miedzianowski contend they did not influence the criminal proceedings against Plaintiffs sufficiently to be held liable. OB-22; MB-11-13. In Illinois, liability

---

[30] Defendants contend that Biebel cannot be liable merely for his supervisory role. OB-23. Supervisors are liable under § 1983 "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). As discussed above, the summary judgment record supports the conclusion that Biebel directly participated in violating Plaintiffs' rights, and so reference to supervisory liability is not necessary. Nonetheless, the record would also permit a reasonable jury to conclude that the constitutional violations Plaintiffs suffered were caused by the deliberate indifference of Biebel. He was the direct supervisor of Guevara and Halvorsen, the detectives on the investigation, he had direct knowledge of their investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. SF¶164-165. His participation as a supervisor was essential to the scheme. *Id.* He is liable on that basis as well.

70

extends to all who played a "significant role" in causing the prosecution. *Beaman v. Freesmeyer*, 183 N.E.3d 767, 782 (Ill. 2021). Seventh Circuit law provides that "a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision," as all Defendants did here, including DeGraff, Biebel, and Miedzianowski. *Jones*, 856 F.2d at 994. Police who engage together in misconduct to deceive other actors in the criminal justice system are routinely found to have commenced and continued criminal prosecutions. *E.g.*, *Padilla v. Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013) (police who engage in misconduct cannot blame others involved in the prosecution). DeGraff and Biebel merely repeat their assertion that they were not involved in the investigation, OB-22, which should be rejected for the reasons discussed already, *supra* Arg. §II(E). Meanwhile, Miedzianowski crafted the plan with Guevara to frame the Hernandez Brothers in advance, to protect a narcotics conspiracy, and he concealed the plot and the underlying conspiracy. *Supra* Arg. §II(A)(1). He exerted enormous influence on the criminal case—in fact, he and Guevara were the reason it happened in the first place. The record properly construed in Plaintiffs' favor requires a trial to determine whether each Defendant caused Plaintiffs' prosecutions.

## 2. The Court Should Reject Defendants' Fabricated Probable Cause

Next, Defendant Officers argue they are entitled to judgment on the malicious prosecution claims because, in their view, there was probable cause to suspect Plaintiffs of shooting Gonzalez. OB-19-23; GB-14-16; MB-11-13. Defendants assert that they believed at the time that the eyewitness identifications were accurate, and they cite cases saying that probable cause can be based on eyewitness identifications. OB-20; GB-14-15. But the law is clear that Defendants cannot fabricate their own probable cause, and the facts construed for Plaintiffs show that they did just

71

that, and planned to do so in advance. Again, Defendants' argument otherwise is founded on utterly disputed facts and inapplicable case law

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). Knowingly fabricated evidence and false statements *never* support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing summary judgment where there was no probable cause absent purportedly fabricated or manipulated evidence); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). And police cannot manufacture their own probable cause. *Alexander*, 721 F.3d at 423 ("Knowingly false statements by the affiant cannot support a finding of probable cause, and as we read the complaint, that is all there was."); *Kuri*, 2017 WL 4882338, at *7 ("Defendants cannot manufacture their own probable cause by fabricating evidence"); *Myvett v. Heerdt*, 232 F. Supp. 3d 1005, 1027 (N.D. Ill. 2017); *Collier v. Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

Moreover, a court cannot decide probable cause at summary judgment "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); see also *Bryant v. Whalen*, 759 F. Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

As discussed at length, there is a huge difference of opinion about whether Defendants held an "honest and sound" suspicion that Plaintiffs killed Gonzalez. Viewed in Plaintiffs' favor, there is strong evidence that the Defendants plotted in advance to frame Plaintiffs for a random crime, knew that they did not commit that crime when the crime ultimately occurred, and then manufactured all evidence—the anonymous tip, statements undermining their alibis, and eyewitness identifications that Defendants now reply upon—in order to implicate Plaintiffs in that crime. *Supra* Arg. §II. Defendants also hid all of the evidence of their plot and all evidence demonstrating that Plaintiffs were innocent, that someone else committed the crime, that the eyewitness identifications were bogus, and that Defendants were conducting a crooked investigation. *Supra* Arg. §II.

Put differently, Defendants contend probable cause should be assessed as of the time that charges were filed. OB-20. Assuming that is true, Defendants submitted sworn arrest reports at the time that legal process was initiated in Plaintiffs' criminal cases, which had a field in which they were to record the evidence establishing probable cause for the murder charge. That field for both of the Hernandez Brothers' arrest reports say that probable cause was based on positive identifications by the eyewitnesses. SF¶145. No other evidence was identified. Perhaps recognizing this, Defendant Officers today list four identifications in their motions. But those identifications were fabricated, viewing the facts in Plaintiffs' favor. *Supra* Arg. §II(B)(3).[31]

---

[31] Defendants just assert that the identifications are legitimate or "untainted," without developing the argument. OB-20; GB-14. This argument is so factually devoid of explanation, that it deprives Plaintiffs of an ability to adequately respond and amounts to forfeiture. *Costello*, 651 F.3d at 635. Moreover, the two Defendant briefs making this argument say different things: Guevara contends that four identifications implicate both brothers, GB-14, but the other officers contend that four implicate Rosendo Hernadnez and three implicate Juan Hernandez, OB-20. Defendants cannot even get their own stories straight about which of their fabricated evidence implicates which Plaintiff. Regardless, Defendants' cursory account of the identifications ignores the evidence and draws all inferences impermissibly for Defendants, discussed at length above. SF ¶¶62-114. The identifications are anything but untainted,

73

There is nothing that the Defendants can point to that establishes probable cause independent of their own misconduct. Moreover, Defendants knew of all kinds of evidence that *undermined* probable cause.[32] Even if there were some evidence that tended to implicate Plaintiffs (which there was not), Defendants *actually knew* that the evidence implicating Plaintiffs was fake, because the investigation was never a real one, and was instead a frame job planned in advance and targeting Plaintiffs, as the evidence construed for Plaintiffs demonstrates. See *supra* §II(A)(1). And even if it were a close call about whether Defendants honestly suspected Plaintiffs (which it is not), Guevara and Halvorsen have pleaded the Fifth in response to questions about whether they manufactured the case against Plaintiffs. *Supra* Arg. §I.

Defendants' citation to cases about eyewitness identifications are inapposite here because, unlike those cases, Defendants cannot rely on identifications that they knew to be fabricated and that are therefore insufficient to establish probable cause. See *Rios*, 2024 WL 5119954, at *13 ("A jury could conclude that a reasonably prudent officer would not think an identification he coerced constituted probable cause"); *Moorer v. Platt,* 2020 WL 814924, at *3 (N.D. Ill. Feb. 19, 2020) (knowing an identification is unreliable would negate it as a basis for probable cause); *Anderer v. Jones,* 342 F. Supp. 2d 799, 802 (E.D. Wis. 2002) ("[T]he statement of one witness or victim is a sufficient basis for probable cause only where that witness is credible or the information is trustworthy.") (quoting *Woods v. Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)). Police officers cannot defend against a malicious prosecution case where the officers had obvious reasons to doubt

---

they are fabricated, Defendants suppressed all evidence that undermined them, and there is a huge dispute about whether they are remotely reliable.

[32] In addition to the exculpatory and impeachment evidence that Defendants suppressed, *supra* Arg. §II(A)-(B), Defendants knew that Plaintiffs both had solid alibis corroborated by others, that no physical evidence connected them to the shooting, that they had not established any connection between Plaintiffs and the getaway car, and that they had a credible—and in fact, a correct—lead pointing to William Vilaro. SF¶1, 3-4, 55.

the accuracy of reported information or failed to inform the prosecution of facts that he knew would undermine probable cause. *Franks*, 438 U.S. at 155-56; *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Alexander*, 721 F.3d at 423; *Lawson*, 637 F.3d at 704-05; *Fox v. Hayes*, 600 F.3d 819, 833-35 (7th Cir. 2010); *Jones*, 856 F.2d at 995.

Prosecutors relied solely on Defendants' false evidence to prosecute Plaintiffs. In that context, Defendants fabrications and suppressions are a but-for cause of Plaintiffs' prosecution, and a jury must decide the Fourth Amendment and malicious prosecution claims. *Washington v. Chicago*, 98 F.4th 860, 873 (7th Cir. 2024). Unlike the recent decision in *Lee v. Harris*, 127 F.4th 666, 673-74 (7th Cir. 2025), where there was no evidence that Defendants deceived judicial authorities or the grand jury, here the record is replete with that evidence of deception. As another court recently decided in another Guevara case with hotly disputed facts, *Reyes v. Guevara*, No. 18 C 1028 (N.D. Ill.), factual disputes mean that a jury must decide whether there was probable cause to suspect Plaintiffs of the Gonzalez murder.

### 3. Defendants Are Not Entitled to Qualified Immunity on the Fourth Amendment Claim

Finally, Defendant Officers are not entitled to qualified immunity on Plaintiffs' Fourth Amendment claim. OB-20-21; GB-15-16. They first assert they had "arguable probable cause," but the concept of arguable probable cause does not add any protection for Defendant Officers at this stage of the case. The Seventh Circuit holds that, in evaluating at summary judgment whether an officer is entitled to immunity from a Fourth Amendment claim, there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435-36 (7th Cir. 1993); *see also id.* ("The . . . officers attempt to draw a distinction by contending that the relevant inquiry is into 'arguable probable cause,' which

75

is another way of asking whether they had probable cause to think they had probable cause."). Indeed, the Supreme Court held unambiguously in *Malley v. Briggs* that an officer is not entitled to qualified immunity when a reasonable official in his position would have known that the facts did not establish probable cause. 475 U.S. 335, 345 (1986). The probable cause and arguable probable cause standards are objective, based on the facts known to the officer. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). The officer's subjective state of mind is irrelevant to this analysis. *Whren v. United States*, 517 U.S. 806, 812-13 (1996).

Just as a jury must decide whether Defendant Officers had probable cause to suspect Plaintiffs, it must decide whether a reasonable officer would have believed that there was probable cause, to the extent there is any difference. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (jury must make probable cause determination "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them"); *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *26 (N.D. Ill. Jan. 24, 2024) ("But whether the lineups provided [the officers] with arguable probable cause is also an issue of disputed fact, so the Court will not grant qualified immunity on this basis."). The Seventh Circuit has reversed grants of summary judgment where defendants did not establish conclusively that there was no fact issue on probable cause. *Cartwright v. Chicago*, 450 Fed. App'x 539, 540-42 (7th Cir. 2011). Finally, qualified immunity does not protect officers "who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (citation omitted).

In a paragraph, Defendants also assert that the law governing Plaintiffs' Fourth Amendment claim was not clearly established prior to 2022. OB-21. That is incorrect. Qualified immunity considers whether state actors were on notice that their *conduct* was unlawful according to established law, and not whether a particular *legal theory* is established in case law. *Armstrong*

76

*v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a remedy are settled. The qualified immunity defense focuses instead on whether the official defendant's conduct violated a clearly established constitutional right."). It was clearly established, as discussed already, that the fabrication and suppression of evidence was illegal in 1997. *Supra* Arg. §II(D). Moreover, it was established long before the Gonzalez investigation that officers who submit false evidence to secure charges violate the Fourth Amendment and are not entitled to immunity. *Malley v. Briggs*, 475 U.S. 335, 345 (1986). Lastly, the Supreme Court held recently that the right to be free of prosecution without probable cause has been established for decades. *Manuel v. City of Joliet*, 580 U.S. 357, 364-65 (2017). Defendant Officers are not entitled to qualified immunity on this claim.

### G. A Jury Must Decide Plaintiffs' Failure-To-Intervene Claims

Defendant Officers argue for summary judgment on the Hernandez Brothers' failure-to-intervene claim. OB-24-25; GB-16; MB-13. Defendants assert in a single sentence that they were not involved in any due process violations and so could not intervene. OB-24; MB-13. That argument is so cursory that it is forfeited, *Smith*, 388 F.3d at 569, and besides it lacks merit, *supra* Arg. §II(A)-(B). "Whether a bystander officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact[.]" *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022). The discussion of Plaintiffs' due process claims above demonstrates that a reasonable jury could find that each of these Defendants were direct participants in the effort to frame the Hernandez Brothers and that each had the opportunity to intervene to prevent the fabrications and ongoing suppressions of evidence that caused Plaintiffs' wrongful convictions and imprisonment. Indeed, Defendants each had decades to

intervene while Plaintiffs were languishing in prison and did nothing.[33] Their assertion otherwise depends on the Court drawing improper (and untenable) inferences in Defendants' favor.

Next, Defendants argue they are entitled to qualified immunity on the failure-to-intervene claim, saying that the duty of officers to intervene in this type of case was not clearly established in 1997. OB-24-25. This is wrong. As Judge Chang recently noted, "police officers have had a clearly established duty (at least in this circuit) to 'stop other officers' from violating constitutional rights since at least 1972." *Gillespie v. Boudreau*, 805 F. Supp. 3d 892, 898-99 (N.D. Ill. 2025). Defendants assert that *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972), did not clearly establish the law, but in a 1994 decision—before the misconduct at issue here—the Seventh Circuit called *Bryd* "the seminal case in this circuit on the duty of an officer to intervene to prevent summary punishment," *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994), and so Defendants' suggestion that they were not on notice of this duty is meritless.

Finally, Defendants argue that such a claim is not viable under §1983, a position they admit is incompatible with Seventh Circuit law. OB-25. As the Seventh Circuit reaffirmed in the case Defendants cite for the proposition that a failure-to-intervene claim is not viable, a defendant who has a realistic opportunity to step forward and prevent a fellow officer from violating the constitutional rights of another but who fails to do so is liable. *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022). Summary judgment is not appropriate on this claim.

---

[33] Again, in this section of his brief Miedzianowski contends, construing the facts in his own favor, that "[i]t is undisputed that Miedzianowski was not present for any of the events that form the basis of Plaintiffs' underlying constitutional claims" and so could not intervene. MB-13. But when you plan with another officer to frame someone for a crime they did not commit in advance to protect an ongoing criminal conspiracy, and then you suppress all of the evidence that you have done so, it is galling to contend that you were uninvolved in the misconduct and could have done nothing to stop it. Miedzianowski is living in an alternate reality, and it is up to a jury to sort out what the truth is.

### H.  A Jury Must Decide Plaintiffs' Conspiracy Claims

Defendant Officers argue for summary judgment on Plaintiffs' federal and state conspiracy claims. OB-25-29; GB-16-17; MB-13-16. To the extent Defendants argue that the conspiracy claims should be dismissed because the due process claims lack support, OB-25-26; GB-16; MB-14, that argument fails because the due process claims survive for all of the reasons discussed above, *supra* Arg. §II(A)-(B). To prove conspiracy, Plaintiffs must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979). "To be liable as a conspirator you must be a voluntary participant in a common venture," the Seventh Circuit has explained, "although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement," and so "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

### 1.  Ample Evidence Supports the Conspiracy Claims Against Each Defendant

Ample evidence permits the inference of an agreement, and Plaintiffs' conspiracy claims against these Defendant should be tried. The facts viewed in Plaintiffs' favor show that Guevara and Miedzianowski plotted in advance to frame Plaintiffs to protect their narcotics conspiracy. Guevara and the other Defendants then worked with one another, and with civilians, as part of a small team investigating the Gonzalez killing; they fabricated a tip to implicate Plaintiffs as the

suspects without any real evidence; and they worked from there to fabricate the rest of the evidence implicating Plaintiffs in the crime. Where evidence contradicted Defendants' case against Plaintiffs, it was altered or hidden, including evidence relating to the real perpetrator, and exculpatory and impeachment evidence learned from eyewitnesses. As discussed, Biebel had the other Defendants provide updates on the investigation as it proceeded. Defendants were involved in preparing reports full of fabrications, they signed each other's names to police reports, and they participated in Plaintiffs' arrests without probable cause. By the end of July 1, 1997, each of the Defendants had engaged in the agreement to fabricate evidence to frame Plaintiffs for a crime they had not committed, and to suppress evidence that demonstrated their innocence. Throughout the investigation and criminal proceedings, Defendants conspired with the eyewitnesses to provide false evidence implicating Plaintiffs in the crime. And at all times, Guevara and Miedzianowski suppressed that they had conspired to frame Plaintiffs before the crime even occurred. *Jones*, 856 F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad [the plaintiff].").

The Seventh Circuit has warned that "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Hampton*, 600 F.2d at 621; *Washington*, 2022 WL 4599708, at *23 (denying officers summary judgment on conspiracy claim there was a material dispute of fact as to whether they fabricated or withheld evidence); *Wilson v. Chicago*, 707 F. Supp. 379, 386 (N.D. Ill. 1989) ("Who actually was in the conspiracy, if one existed, its aims, and its extent are for the jury to decide."). Accordingly, the conspiracy claim must be tried.

80

Defendants' arguments otherwise are weak. They each baldly assert that there is no evidence of conspiracy, and those bare bones arguments are insufficient to shift the summary judgment burden, *Carmichael*, 605 F.3d at 460, and they are inconsistent with the admonition in *Hampton* above that a jury must decide that issue. Miedzianowski does nothing more than repeat his argument that the Court should disbelieve all of Plaintiffs' evidence of his plot with Guevara to frame the Hernandez Brothers, MB-15-16, which this Court should reject for all of the reasons already discussed. *Supra* Arg. §II(A)(1).[34] Meanwhile, Guevara asserts (in an argument that does not pass the straight-face test) that no jury could find that he took any overt act to deprive Plaintiffs of their constitutional rights, GB-16-17, which is plainly contradicted by all of the record evidence discussed above—Guevara was the lead detective and central actor in the conspiracy, orchestrating the plan and performing numerous of the overt acts along the way, see *supra* Facts §§II, VI, VII, VIII, and moreover Guevara pleaded the Fifth when asked if he conspired to frame the Hernandez Brothers and took steps to carry out that plan. SF¶¶99-100.

The remaining Defendant Officers assert they did not conspire with Guevara and Miedzianowski in their narcotics-trafficking conspiracy, and then they assert that no one saw any of them meet with *both* Guevara and Miedzianowski at once. OB-25-26. First, this argument acknowledges that Guevara and Miedzianowski conspired with one another, which should be fatal to Guevara's and Miedzianowski's arguments that they never conspired. Second, these Defendants depart from the premise that a conspiracy requires all members to get together to discuss their

---

[34] In this part of his motion, Miedzianowski actually sets out some of the evidence supporting Plaintiffs' claims, acknowledges that Plaintiffs "support the claims," but then argues about reasons that he does not think the evidence is credible. MB15-16. As discussed already, this is completely inappropriate at summary judgment, where the Court has to view the evidence for Plaintiffs, not Medizianowski, and the Court is prohibited from weighing the evidence of drawing the sort of credibility conclusions that Miedzianowski requests. *Kailin*, 77 F.4th at 483. Moreover, there is much more evidence of conspiracy than Miedzianowski acknowledges, as discussed already. *Supra* §II(A)(1).

agreement, which is expressly not the law. Decades ago, the Seventh Circuit explained in another wrongful conviction case that a conspiracy is established merely by showing that an officer is a "voluntary participant in a common venture," and the Court stressed that participants "need not have agreed on the details of the conspiratorial scheme *or even know who the other conspirators are*." *Jones*, 856 F.2d at 992 (emphasis added). Plaintiffs need not even show Defendants knew one another, and so Defendants' argument that they are not liable because they never met all together to discuss their scheme is foreclosed by Circuit precedent.

Moreover, these Defendants Officers do not even *attempt* an argument that there are no material disputes of fact about whether they conspired with Guevara, OB-26-27, which is Plaintiffs' theory as to these officers. In other words, these Defendants are asserting that they never made an agreement with *Miedzianowski*, but they do not address whether they made an agreement with *Guevara* as part of a small team investigating the Gonzalez murder to frame the Hernandez brothers and took steps to carry out that agreement out during the investigation, which is all that is required to prove a conspiracy claim. *Jones*, 856 F.2d at 992. Put simply, Plaintiffs contend that Miedzianowski and Guevara hatched a plan to manufacture a case against the Hernadez Brothers, and then Guevara and the other Defendant Offices fabricated that case together, as part of one scheme with a common objective. These Defendants do not even discuss their participation in an investigation with Guevara, forfeiting that argument as well. *Carmichael*, 605 F.3d at 460.

### 2. Defendants' Arguments About Private Actors Lack Merit

In a single paragraph based on a footnote in a prisoner screening case, Defendants next contend that §1983 conspiracy is not viable unless there is a private actor named as a defendant. OB-27. This is not the law, and no Seventh Circuit case requires that a private actor defendant be named before a conspiracy claim proceeds to trial under §1983. Exactly the opposite is true:

82

Seventh Circuit precedents have repeatedly approved §1983 conspiracy claims against a group of police officers, with no private actors involved. *Geinosky v. Chicago*, 675 F.3d 743, 749 (7th Cir. 2012); *Jones*, 856 F.2d at 992; *Bell*, 746 F.2d at 1253-61.[35] Moreover, Defendants suggestion that every member of a conspiracy must actually be named as a defendant for a claim to proceed is also wrong, given that §1983 conspiracy claims often involve both named defendant conspirators and also individuals not named as defendants. *Bell*, 746 F.2d at 1253-61 (describing a conspiracy between defendant officers and non-defendant officers). Finally, Plaintiffs do contend that Defendants conspired with private actors—the eyewitnesses—and so even if their legal arguments were not flawed, there is a factual dispute on this point as well.

### 3. The Intracorporate Conspiracy Doctrine Does Not Bar This Claim

Defendants next urge this Court to contradict Seventh Circuit precedents by holding that the so-called intracorporate conspiracy doctrine bars §1983 conspiracy claims against officers of a single police department. OB-27-28. This Court should reject the invitation. The Supreme Court and Seventh Circuit have held for more than 50 years that §1983 conspiracy claims can be pursued against members of a single law enforcement agency. See *Adickes*, 398 U.S. at 152 (concerning a conspiracy between police officers from one department and private citizens); *Geinosky*, 675 F.3d at 749 (reinstating a conspiracy claim against "several members of the same police unit [who] allegedly acted in the same inexplicable way against a plaintiff on many different occasions"); *Jones*, 856 F.2d at 992 (conspiracy among supervisory officers within the Chicago Police

---

[35] The case Defendants cite, *Turley v. Rednour*, 729 F.3d 645, 649 & n.2 (7th Cir. 2013), does not even purport to say that §1983 conspiracy claims are *barred* when they do not involve a private actor defendant. Instead, in a footnote, the case says that there is no need to analyze a conspiracy claim against prison officials under §1985 (not §1983) independently of the underlying Eighth Amendment claim. It is impossible to read that decisions as restricting §1983 conspiracy claims in any way.

83

Department); *Bell*, 746 F.2d at 1253-61 (upholding punitive damages for conspiracy among members of the Milwaukee Police Department). Those clear precedents permit exactly the §1983 conspiracy claim asserted here. Neither the Supreme Court nor the Seventh Circuit has ever applied the intracorporate conspiracy doctrine to §1983 claims, and so this Court should not either.[36] Moreover, the intracorporate conspiracy doctrine applies by its own terms only to conspiracies wholly among agents of a single entity, but here Plaintiffs' conspiracy claims include an agreement between Defendants and private individuals, and so the intra-corporate conspiracy doctrine would not apply, even if there were an argument for its application more generally.

### 4. Defendants Do Not Have Qualified Immunity From §1983 Conspiracy

The precedents just discussed establish that Plaintiff's §1983 conspiracy claims are actionable under clearly established Supreme Court and Seventh Circuit law, but Defendants still contend they are entitled to qualified immunity in light of the intracorporate conspiracy doctrine, emphasizing again that the Seventh Circuit has not decided if the doctrine applies to §1983 claims. OB-28-29. There are a number of problems with the argument. First, the Supreme Court and Seventh Circuit have approved of Plaintiffs' § 1983 conspiracy claims in the long line of cases just discussed, and so the law is clearly established for purposes of qualified immunity. Second, as discussed above, applying the intracorporate conspiracy doctrine to §1983 claims would contradict

---

[36] If the Court digs further into the legal analysis, importing the intracorporate conspiracy doctrine into §1983 would contradict other important precedents. The doctrine arose in the antitrust context and provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). It arose because the presumption for a conspiracy among agents of a single corporate entity is that the actions of employees are attributed to the corporate principal. But for § 1983 claims that presumption cannot apply because *Monell* holds that actions of municipal employees can never be imputed to their municipal employer. So, applying the doctrine to §1983 claims does not make sense. This is why "district courts have overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intracorporate conspiracy doctrine." *Liggins v. City of Chicago*, 2021 WL 2894167, at *5-*6 (N.D. Ill. July 9, 2021).

84

§1983 law. Third, the conspiracy at issue here involves private non-defendant co-conspirators, and so the intracorporate conspiracy doctrine would not apply by its own terms.

Fifth, the Supreme Court and Seventh Circuit have never applied the intracorporate conspiracy doctrine to §1983 claims, as Defendants acknowledge, and the fact that they have not done so does not *unsettle* established law. Instead, where the Supreme Court and Seventh Circuit have approved of a claim, and have never suggested that a potential defense from a different context has anything to do with that claim, that is clear evidence that the law is *established* not that it is *unsettled*. Arguing that someday something might happen to unsettle the law does not provide officers with immunity—if it did, any novel and as-of-yet unaccepted legal argument would be a basis to assert immunity.

Sixth, qualified immunity considers whether state actors were on notice that their *conduct* was unlawful according to established law, which it was, not whether prior cases gave notice of a *defense* to a civil claim. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."). Accordingly, "[r]ecent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases does not create an opening for qualified immunity on behalf of defendant officers." *Harris v. Chicago*, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020). Qualified immunity should be denied on this claim.

## I. A Jury Must Decide Plaintiffs' Intentional Infliction of Emotional Distress Claims

In two sentences, the individual Defendants assert Plaintiffs' IIED claims fail because they are not liable on the other claims, OB-29, an argument Plaintiffs have refuted, *supra* Arg. §II(A),

(B), (F), (H). As a result of Defendants' police misconduct, Plaintiffs spent decades in prison. ""For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). Conduct is "extreme and outrageous" when "a defendant abused a position of authority." *Id.* Plaintiffs' evidence fit this tort perfectly, and disputes of fact prevent summary judgment for these Defendants on this claim. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Fox v. Tomczak*, 2006 WL 1157466, at *6 (N.D. Ill. Apr. 26, 2006) (framing someone for murder easily suffices); *Moore v. Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

### J.  A Jury Must Decide Plaintiffs' Negligence Claim

In their final argument, Defendant Officers assert that Plaintiffs' Illinois negligence claim that they breached a duty to Plaintiffs and acted willfully and wantonly in so doing must be dismissed because, Defendants say, there is no separate tort of willful and wanton misconduct in Illinois. OB-30. "This argument is a non-starter," courts in this Circuit have recognized, "While there is no independent tort of willful and wanton conduct in Illinois, it is regarded as an aggravated form of negligence and can be pleaded as such by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as 'either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare.'" *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, 2023 WL 348320, at *4 (S.D. Ill. Jan. 20, 2023) (quoting *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012)); see also *Stevenson v. Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). Similarly, the Seventh Circuit has held: "Under Illinois law, a plaintiff pleading willful and wanton misconduct must establish the same

86

basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach. A willful and wanton claim has the additional requirement that the breach be not merely negligent, but with conscious disregard for the welfare of the plaintiff." *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010) (internal quotations and citations omitted). Plaintiffs' claim has been recognized by the Illinois Supreme Court and the Seventh Circuit, and Defendant Officers' argument to the contrary should be rejected.[37]

To succeed on this claim at trial, Plaintiffs must show that Defendant Officers owed them duty of care, breached this duty, that this breach caused Plaintiffs' injuries, and that Defendants either deliberately intended to harm Plaintiffs or consciously disregarded their welfare. *Stevenson v. Chicago*, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). For all the reasons set out above, there are genuine disputes of fact on each of these elements as to each Defendant. *Supra* §§II(A), (B), (F), (H).

III. **Summary Judgment Is Unavailable to the City of Chicago**

The City moves for summary judgment on *Monell* theories that are supported by ample evidence, which numerous courts have already decided are sufficient to survive summary judgment, on which juries have already found the City liable, after which judges have denied the City's post-trial motions, and the Seventh Circuit has affirmed. *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017), *aff'd*, 981 F.3d 534 (7th Cir. 2020); *Rivera v. Guevara*, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1067

---

[37] Particularly so given that federal pleading rules only require Plaintiffs to plead facts in their complaint, not legal theories. *Reeves v. Jewel Food Stores*, 759 F.3d 698, 701 (7th Cir. 2014). Plaintiffs pleaded the claim this way because Illinois law might provide a defense to public employees who act with negligence, requiring a heightened showing of "willful and wanton conduct." 745 ILCS 10/2-202.

(N.D. Ill. 2018); *Washington v. Boudreau*, No. 16 C 1970, 2022 WL 4599708, at *17 (N.D. Ill. Sept. 30, 2022). As in those cases, the City here fails to establish that summary judgment is appropriate on the same *Monell* theories.

Moreover, though Plaintiffs' *Monell* theories are supported by evidence other than expert opinions, the City's arguments focus almost exclusively on challenges to experts Plaintiffs have disclosed. Not only do those arguments ignore Plaintiffs' non-expert evidence, but the challenges the City raises to Plaintiffs' experts lack merit and have been rejected by many courts in this District, which have held that juries should consider the types of opinions the City seeks to exclude here. *E.g.*, *Fields*, 2017 WL 4553411, at *5; *Rivera*, 2019 WL 13249674, at *3; *Velez v. Chicago*, 2023 WL 6388231, at *24 (N.D. Ill. Sept. 30, 2023); *Washington*, 2022 WL 4599708, at *16-18; *Walden v. Chicago*, 755 F. Supp. 2d 942, 967-972 (N.D. Ill. 2010). Indeed, Plaintiffs' experts' opinions here are far more rigorous than those deemed admissible in other cases—their examinations of the City's policies and practices are likely the most comprehensive and careful analyses produced regarding the CPD practices in question. The City asks this Court to depart from these sound past court opinions and robust evidence and instead grant the City judgment in advance of trial. This Court should decline that invitation.

The Court should deny the City's motion for the following reasons: (1) the City does not even move for summary judgment on all *Monell* theories, meaning some must be tried; (2) the City is precluded from relitigating its policy of evidence suppression and cannot challenge Plaintiffs' claim that city policymakers promulgated deficient policies governing evidence disclosure; (3) Plaintiffs have marshalled overwhelming evidence–both expert and non-expert–in support of the City's widespread practices of suppressing evidence, fabricating witness identifications, and failing to train, supervise, and discipline its police officers; (4) the City's arguments regarding the

88

admissibility of expert opinions are without merit and do not entitle the City to summary judgment on any theory, as explained in Plaintiffs' separate responses to the City's *Daubert* motions, see Dkt. 325 (Tiderington); Dkt. 329 (Shane); Dkt. 326 (Steblay); and (5) the City's arguments that Plaintiffs rights were not violated and that City policies did not cause those violations if they occurred are meritless.

Throughout its motion, the City impermissibly ignores evidence and construes the record in its own favor. When the record is properly construed for Plaintiffs, it is obvious the City's official policies and customs caused innocent civilians to be framed in homicide investigations where evidence was manufactured and suppressed, witness identifications were fabricated, and police officers were untrained and undisciplined, leaving them to violate the rights of countless individuals. Indeed, the pervasiveness of the police misconduct in this case—which involves both Guevara and Miedzianowski—is extreme. The City is responsible for that misconduct and the violations of Plaintiffs' rights, and it should not be permitted to sit on the sidelines at trial.

### A. The City Fails to Move for Summary Judgment on Certain *Monell* Theories

The City sets out only part of the law governing *Monell* claims. CB-2-4. Municipalities are liable if a violation of constitutional rights was caused by: (1) application of an express policy, including a deficient policy that reflects a municipal decision to omit needed policies, *J.K.J. v. Polk County*, 960 F.3d 367, 377-84 (7th Cir. 2020); *Glisson v. IDOC*, 849 F.3d 372, 379-81 (7th Cir. 2017); (2) a widespread practice that pervades to an extent where policymaker acquiescence is apparent, *id.* at 379; (3) actions taken by an official with policymaking authority, *Board of Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to indifference to the rights of individuals with whom officers come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492

(7th Cir. 2007). "The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation." *Glisson*, 849 F.3d at 379. "It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Id.*

The City's motion only addresses three of Plaintiffs' *widespread practice* theories regarding evidence suppression, CB-4-13, failure to discipline police officers, CB-13-20, and fabrication of witness identifications, CB-20-28, ignoring these *Monell* theories in the case:

- The CPD's express written policies governing the creation, maintenance, and production of investigative information were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in homicide cases, including in this case. AF ¶¶ 1-39, 41-59; RSOF-City ¶¶ 12-16, 31-32, 36, 48, 50, 53;[38] *see Glisson*, 849 F.3d at 379-80 (holding that a conscious municipal decision not to adopt or to omit needed policies creates liability under the express policy framework of *Monell*); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability). Plaintiffs have moved for summary judgment on this theory. Dkt. 282 at 19-25.
- City final policymakers, who were on notice of the problem of systemic suppression of investigative materials, chose not to adopt needed policies to ensure transmission of police investigative information in homicide cases, and in so doing made a decision that caused suppression of exculpatory materials in Plaintiffs' case. AF ¶¶ 1-13, 14-30; SF ¶¶ 300, 412; RSOF-City ¶¶8-14; *see Vodak v. Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (policymakers' decision about how to implement policy gives rise to liability when it violates constitutional rights); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"). Plaintiffs have moved for summary judgment on this theory as well. Dkt. 282 at 19-25.
- The City failed to adequately train, supervise, and discipline its police officers regarding documentation of investigative information, maintenance of investigative files, production of investigative materials to the criminal justice system, and the documentation of their

---

[38] The City's express policies authorized individual police to subjectively determine what investigative materials to maintain and turn over; they mandated a system of parallel investigative files for homicides; they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system; they did not cover gang crimes officers or other non-detective investigators; and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas. AF ¶¶ 1, 8, 10, 12, 31-40, 41-49, 50-59; SF ¶¶ 26-28; RSOF-City ¶¶ 12-16.

90

investigations, SF ¶¶ 300, 366-408; AF ¶¶ 22, 26, 27, 31-34; RSOF-City ¶¶ 14, 16, 31-32, 36, 48, 50, 53, 56;[39] *Canton v. Harris*, 489 U.S. 378, 390 (1989) (deliberate indifference if the "need for more or different training" was "obvious"); *Jenkins*, 487 F.3d at 492 (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact").[40]

- The Chicago Police Department's express written policies governing the conduct and documentation of identification procedures were deficient (or non-existent) and caused the fabrication of false identifications and inaccurate or non-documentation of eyewitness identification procedures. AF ¶1, SF ¶¶ 310-327, 410-424, 427; *e.g.*, *Glisson*, 849 F.3d at 379-80; *Calhoun*, 408 F.3d at 379-80.[41]

- The City's final policymakers, who were on notice of the problems of false identifications and inaccurate documentation of eyewitness identification procedures, chose not to adopt needed policies to ensure that accurate identification procedures were conducted and fairly reported at the time of the Gonzalez investigation. AF ¶1, SF ¶¶ 304-327, 343, 353, 356-357; *see also e.g.*, *Vodak*, 639 F.3d at 747-48; *King*, 680 F.3d at 1021; *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998).

- The City is liable for its failure to adequately train, supervise, and discipline its officers to properly conduct identification procedures and to accurately record the results of those identification procedures, AF ¶¶1, SF ¶¶300, 314-327, 410-423, 424; *see also, e.g.*, *Canton*, 489 U.S. at 390; *Jenkins*, 487 F.3d at 492.

- The City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence used in criminal cases, and the City failed to train, supervise, and discipline officers who fabricated evidence, which resulted in violations of due process and numerous wrongful convictions. AF ¶¶1, SF ¶¶ 343-344, 353, 356, 360-366, 367-375, 382-399, 415-423, 424-428; *e.g.*, *Jackson v. Marion County*, 66 F.3d 151, 156 (7th Cir. 1995); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006); *Evans v. City of Chicago*, 2006 WL 463041, at *13 (N.D. Ill. Jan. 6, 2006).

That the City has not moved on these theories means they must be tried. *Titran*, 893 F.2d

at 148; *Carmichael*, 605 F.3d at 460. Arguments the City might have made are forfeited, *Thompson*

---

[39] The City had no policies governing supervision of investigative file production; did not audit its written policies governing the production of investigative materials, which were promulgated after *Jones* and *Palmer*; and did not provide training on those policies, AF ¶¶ 23, 28-30, SF ¶¶ 300, 375, 400-422; RSOF-City ¶¶ 10, 12-14, 19-21; AF ¶¶14-40; *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed).

[40] The City moves for summary judgment on Plaintiffs' *Monell* theory that the City failed to discipline police officers accused of misconduct generally, but it does not address the separate theories that the City did not provide adequate training, supervision, or discipline on particular subjects relating to homicide investigations.

[41] With respect to its official policies governing eyewitness identification procedures, the City moves on Plaintiffs' widespread practice theory, CB-20-28, but it does not address their express policy/gap in policy theory, their theory regarding actions of final policymakers, or their theory that the City failed to train, supervise, or discipline on this subject.

91

*v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994), and cannot be raised now, *Nelson v. LaCrosse Cty.*, 301 F.3d 820, 836 (7th Cir. 2002).

To the extent the City states that Plaintiffs are not pursuing the above theories, that is without merit. These theories have been litigated exhaustively, Plaintiffs have explained them in detail in discovery, and they are discussed at length in expert reports. AF ¶1; RSOF ¶¶ 1-4;[42] SF ¶¶301, 302, 373-392, 397-398, 414. The City has faced multiple trials and cases involving these *Monell* theories in which it has briefed many of the theories and evidence just discussed.[43] The City cannot attempt to obtain summary judgment without addressing *Monell* theories that Plaintiffs pursue merely by mischaracterizing the nature of Plaintiffs' claims, as the City does on page 1 of its brief, and this Court should reject the City's attempt to do so. As the court decided in *Rivera*, 319 F. Supp. 3d at 1056-59, a trial is necessary on these unchallenged *Monell* theories.[44] Given the City's forfeiture of these issues, Plaintiffs do not address these theories further in this response.

---

[42] To the extent that the City cites Plaintiffs' complaints in its motion, CB-1-2, the Court should disregard those citations. Not only were the claims explored in richer detail in discovery, as discussed, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. *Streckenbach v. Vandensen*, 868 F.3d 594, 596 (7th Cir. 2017).

[43] At this point, the City's failure to address these theories at summary judgment should be fatal to its motion for summary judgment, considering that the City has faced (and has failed to address) precisely the same theories in at least a half dozen motions filed by Plaintiffs' counsel in other Guevara cases, including *Fields*, No. 10 C 1168, Dkt. 1184 (response to post-trial motion) at 12-25 (explaining these theories); *Rivera*, No. 12 C 4428, Dkt. 735 (response to post-trial motion) at 78-118 (explaining these theories); *Sierra*, No. 18 C 3029, Dkt. 520 (response to summary judgment) at 106-113 (explaining these theories); *Johnson*, No. 20 C 4156, Dkt. 341 (response to summary judgment) at 131-134 (explaining these theories); *Iglesias*, No. 19 C 6508, Dkt. 278 (response to summary judgment) at 4-7 (explaining these theories); *Reyes*, No. 18 C 1028, Dkt. 774 (response to summary judgment) at 7-9 (explaining these theories).

[44] Remarkably, in its summary judgment brief in *Rivera*, filed nearly a decade ago, the City made an argument that Mr. Rivera there had not pursued some of the *Monell* theories that Plaintiffs set out above, and Rivera there responded, as Plaintiffs assert here, that he had pursued those theories in discovery. No. 12 C 4428, Dkt. 321 at 50-53. The Court ruled that those theories were in play at trial in *Rivera*. 319 F. Supp. 3d at 1056-59. For the City to suggest years later that these theories are not being pursued in a closely related case is truly incredible.

### B. The City Is Precluded from Relitigating Its Policy of Evidence Suppression

As Plaintiffs explain in their previously filed motion for summary judgment against the City, this Court should grant summary judgment to Plaintiffs because the City is precluded from relitigating Plaintiffs' *Monell* theory that the City had an official policy of suppressing exculpatory evidence. Dkt. 282 at 4-10.

### C. The City Cannot Challenge Plaintiffs' *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression

Also discussed in Plaintiffs' motion, the City has no evidence to contest that City policymakers, on notice of the need for policies governing the maintenance and disclosure of evidence in homicide cases, promulgated facially deficient written policies, leading to the suppression of evidence. Dkt. 282 at 19-25. Moreover, as discussed, the City does not move on these theories, and thus has forfeited any argument for summary judgment. *See supra* §3.A, B.

### D. A Jury Must Decide the Widespread Practice Theories Regarding Suppressed Evidence, Fabrication of Identifications, and Failure to Train, Supervise, and Discipline Officers

Turning to those arguments the City has preserved, some preliminary points are important. First, the central premise of the City's motion is that *all* of Plaintiffs' *Monell* theories depend *entirely* on experts. CB-1, 4, 13, 22. That premise is incorrect, and the City ignores ample evidence unrelated to experts that would permit a reasonable jury to conclude that the City is liable on the widespread practice theories discussed below.[45] A party cannot assert that a claim is based entirely on a single item of evidence, ignore all other evidence, and ask a court to grant it summary judgment by attacking that single item. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970);

---

[45] Moreover, the City actually challenges only a small portion of Plaintiffs' experts' opinions in its motions, and so even if its false premise were correct, the City would not be entitled to summary judgment.

93

10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727. The City has forfeited any argument about non-expert evidence, which itself warrants denying its motion here.

Second, it is important to define what kind of pattern may prove a *Monell* widespread practice theory. The City wrongly suggests that a pattern of repeating *constitutional violations* is required. The Seventh Circuit called that view incorrect (when it affirmed a verdict against the City on the same evidence-suppression widespread practice theory at issue here) in *Fields* saying, "We have rejected that narrow interpretation of *Monell* liability." 981 F.3d at 562. Instead, as the *en banc* Court in *Glisson* reiterated, a *Monell* plaintiff need only show a repeated pattern of *behavior* that provided notice to the municipality of a *risk of harm*, not a pattern of *actual harms* to others. 849 F.3d at 381-82.[46]

So, Plaintiffs may show a repeating pattern of non-disclosure of investigative information in homicide cases that provided notice of the risk that *Brady* evidence would be suppressed in cases, but they need not show a repeating pattern of *Brady* due process violations. Or they may show a repeating pattern of fabricating identifications, providing notice of the risk that false identifications would taint criminal proceedings, without pointing to a set of completed due process fair trial violations. Or they may show a repeating pattern of failing to train, supervise, and discipline police officers, which gave notice of the risk that officers would violate civilians' rights. Plaintiffs point to evidence to establish each of these widespread patterns of behavior, and that is enough to defeat summary judgment. However, the record *also* includes evidence of repeating

---

[46] See also *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (widespread practice established "by offering competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event)"); *Dixon v. Cook County*, 819 F.3d 343, 348-49 (7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests).

constitutional violations caused by the City's widespread practices of evidence suppression, fabricating identifications, and failing to train, supervise, and discipline officers. SF ¶¶300, 367-375, 382-399, 425-426, 428; AF ¶¶11-13, 45-73. Even applying the City's incorrect standard, then, summary judgment should be denied.

### 1. The City's Widespread Practice of Suppressing Evidence

The City's argument for summary judgment on Plaintiffs' theory that the CPD had a widespread practice of suppressing evidence in homicide cases is frivolous. CB-4-13. Before summarizing the evidence, it bears emphasis again that the City lost this *Monell* theory at trial in both *Fields* and *Rivera*; its post-trial motions were denied; and the Seventh Circuit found in affirming the *Fields* verdict that the City's practice of evidence suppression was well established, policymakers were on notice of it, and there was evidence supporting the verdict against the City. *Fields*, 981 F.3d at 563. How can the City after all that argue that this theory cannot get past summary judgment? Worse yet, the City does not even *reference* the Seventh Circuit's *Fields* decision affirming the jury verdict on this same theory in its motion for summary judgment—and it continues to omit reference to that Seventh Circuit precedent, despite that Plaintiffs' counsel have pointed out in at least three prior Guevara cases that the City is ignoring binding authority— which is at odds with the City's duty of candor to this Court. *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir. 1988).

### a. Non-Expert Evidence Showing the Evidence Suppression Practice

Setting aside expert opinions, there is a mountain of evidence supporting Plaintiffs' claim that the City had a widespread practice of evidence suppression. *See* Dkt. 282 (Plaintiffs' Cross-Motion outlining evidence in extensive detail). That evidence includes:

95

- Notice to City policymakers in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.), and *Palmer v. Chicago*, 82 C 2349 (N.D. Ill.) of a citywide problem creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of investigative materials and violations of due process, AF ¶¶2–5, 8-13; RSOF-City ¶ 2.
- The City's concession, through its own Rule 30(b)(6) deponents, responses in discovery, and the City's own Inspector General that it had problems creating, maintaining, and producing investigative information, that those problems continued because of facial deficiencies in the City's Detective Division Special Orders 83-1, 83-2, and 86-3 imposed in response to the problem of evidence suppression, and the complete lack of changes or improvements in those written policies governing disclosure of investigative information after Special Order 86-3 and before Plaintiffs were convicted, AF ¶¶23, 31-42, 45; RSOF ¶¶ 12-14; SF ¶¶ 400-422;
- *Continued* suppression of evidence in numerous cases, including those of Nathson Fields and Jacques Rivera, in whose trials juries found that the CPD's pattern and practice of evidence suppression led to the failure to disclose evidence to Fields and Rivera ; as well as in the case of James Kluppelberg, where civil discovery revealed a newly-discovered file from the original investigation that contained numerous handwritten notes and memoranda with exculpatory information, RSOF ¶ 2; SF ¶¶ 302, 426; AF ¶¶ 45-48, 67-73.

Because of space limitations, Plaintiffs details the volume of evidence supporting this theory in various statements of fact. AF ¶¶ 2-39, 41-59; RSOF-City ¶¶ 7, 8, 10, 12-14, 31, 32, 36, 48, 53, 56, 67, 71; SF ¶¶ 301-302, 400-422. Even if this Court ignores the evidence from Plaintiffs' retained experts, this record evidence flatly precludes summary judgment on the evidence suppression widespread practice theory. Accordingly, the Court need not address the City's expert arguments or its *Daubert* motions to deny summary judgment on this theory.

### b. **Expert Evidence Supporting the City's Evidence Suppression Practice**

Expert opinion evidence also supports the *Monell* evidence suppression widespread practice theory. In particular, Mr. Tiderington, a police practices expert with more than 40 years' experience in law enforcement, opines that:

- The City's written policies did not solve the evidence suppression problem, because the policies (a) permitted the continued use of a decentralized, parallel file system in which investigative material was kept in and not gathered from different places, (b) failed to cover non-detective officers with significant investigative roles in homicide cases, like this one; (c) permitted detectives excessive discretion in documentation; (d) failed to ensure full

production of investigative files, including through the subpoena service unit. AF ¶¶ 14-30; SF ¶¶ 301-302, 406, 408; RSOF ¶¶ 10, 12-14, 19-21, 31.

- The Chicago Police Department's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders, AF¶¶ 50-59; SF ¶¶ 300, 402-403, 406; RSOF ¶¶14, 60, 63, 80, 84.

Further, the data analysis supporting Plaintiffs' theory is comprehensive and condemning. Plaintiffs in these and other cases alleging the same theories have examined thousands of Area 5 homicide files. AF ¶¶ 48-59, 61-63, 70-72. Tiderington completed an extensive review of investigative files for 344 different homicide investigations conducted by Area 5 detectives from 1995-1998 (up to and including Plaintiffs' wrongful prosecutions), based on which he opined that even the City's *deficient* Special Orders were consistently violated, and that the suppression of investigative information was widespread. AF ¶¶ 50. And Tiderington agreed that his opinions were consistent with those reached by police practices expert Michael Brasfield in *Rivera* and *Fields*, whose similar analyses with regard to 1985-1991 Area 5 investigative files and 1984-1989 Area 1 investigative files the City left unrebutted. See Dkt. 768; AF ¶¶51, 54, 55, 59, 61-63, 70-72. Here, Tiderington found, based on his review of 344 Area 5 investigative files, that there was *systematic* underproduction in Area 5 of key categories of investigative information:

- Detectives routinely took handwritten notes not on GPRs (46% of handwritten notes, with potentially exculpatory information, not on GPRs) and used to-from memos (28%), RSOF-City ¶ 13, AF ¶¶ 50, 54;
- They failed to consistently use or even *complete* inventory sheets (17% of total investigative files contained *no* inventory sheet, and 81% contained *incomplete* inventory sheets, while *96%* of permanent retention files lacked inventory sheets although required) RSOF-City ¶ 36, 53, AF ¶56; and
- They routinely failed to transcribe all relevant information from unofficial documents into official reports as required–leading to the result that nearly all of the criminal defense files were missing documents contained in the corresponding Chicago Police Department homicide files, RSOF-City ¶¶ 32, 48, 64; AF ¶¶ 55-58.

97

The mountain of non-expert evidence, the analysis and opinions of Tiderington, as well as the analysis and findings of the expert Mr. Brasfield upon whose expert reports, findings, and opinions Mr. Tiderington relied, demonstrate that the evidence suppression practice that prompted the 1980s Special Orders continued unabated after those orders. This evidence supports the *Monell* theory that the City was indifferent to a widespread practice of suppressing evidence in the relevant time frame. Summary judgment should be denied.

c. **The City's Arguments for Summary Judgment Lack Merit**

The City's arguments for summary judgment on this theory lack merit. First, the City argues Plaintiffs cannot show a widespread practice of evidence suppression caused the suppression of evidence in Plaintiffs' criminal cases. CB-9, 13. This argument is difficult to follow. To the extent the City suggests Plaintiffs have not shown a genuine dispute that material exculpatory or impeachment evidence was suppressed in Plaintiffs' criminal cases, that argument fails for the reasons the Defendant Officers' arguments for summary judgment on the evidence suppression theories failed. *Supra* Arg. §II(A). To the extent the City argues it did not have a widespread practice of suppressing the *particular kinds* of evidence in the *particular way* they were suppressed in Plaintiffs' criminal case, that argument depends on construing facts and inferences for the City, which is impermissible. Moreover, the argument interprets Seventh Circuit case law governing widespread practice claims too narrowly, and it also construes Plaintiffs' theory too narrowly.

Plaintiffs' theory is that the CPD had a widespread practice of suppressing evidence. AF¶1. In any given homicide case, the types of evidence suppressed, and the mechanisms of evidence

suppression, may vary.[47] See, *e.g.,* AF ¶¶3, 4, 48, 66; SF ¶¶366, 367, 425. Regardless of how any one suppression occurred, the fact that evidence was suppressed across homicide cases establishes an actionable widespread practice. In other words, *Monell* liability does not require Plaintiffs to show a widespread practice of suppressing the particular types of evidence that were ultimately suppressed in their cases in the precise way they were suppressed in his case. Instead, a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734; *see also King*, 680 F.3d at 1020-21. Plaintiffs have made such a showing.[48]

To the extent the City argues that Plaintiffs cannot show that the City's widespread practice of evidence suppression caused the suppression of evidence in their particular case, that causation question must be resolved by a jury. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *LaPorta v. Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017). If the jury believes that the evidence above establishes that the City had a widespread practice of evidence

---

[47] A variety of overlapping mechanisms caused the suppression of investigative information in Chicago homicide cases including: detectives were permitted to decide subjectively what evidence was documented in reports and in official files; there were no policies requiring the disclosure of evidence, governing what had to be kept in official files, or dictating how to respond to requests for investigative files; there were no policies governing non-detectives; there was a decentralized file system, which allowed for parallel files; the written policies that did exist were not followed; notes were not retained or included in files; and officers intentionally did not turn over to the criminal justice system material evidence they learned during their investigations. Different combinations of these mechanisms caused the suppression of different items of evidence in different homicide investigations during the relevant time period. Different mechanisms of suppression does not dilute that the City had a widespread practice of suppressing evidence in homicide investigations.

[48] To the extent that the City suggests that this case is distinguishable from all of the past cases where this *Monell* theory has survived summary judgment—*Johnson*, *Iglesias*, *Reyes*, and *Rivera*—because those cases involved the suppression of particular documents, CB-4-5, that is doubly incorrect: (1) those *Monell* decisions did not turn on a finding that a particular document had been suppressed, (2) the *Monell* theory is broader than the suppression of particular documents and encompasses all suppressed investigative information, as explained above.

99

suppression in homicide cases, it could easily decide that the practice caused the suppression of evidence in Plaintiffs' case.

Second, the City contends that Plaintiffs' *Monell* theory is based entirely on Mr. Tiderington's expert opinions, which it says do not establish a practice of suppressing exculpatory evidence. CB-10-13. The City is wrong on both points. By contending that only expert opinion evidence supports this *Monell* theory, the City ignores the huge volume of evidence, outlined above, which is unrelated to experts and is *alone* sufficient to create genuine disputes of material fact for trial. *Supra* § XIV(D)(1)(a). Again, this evidence justifies denying summary judgment, without any need for the Court to adjudicate Plaintiffs' reliance on expert testimony.

Moreover, even supposing Tiderington's report was the only evidence supporting this theory, the City's challenges to his expert opinions and methodology lack merit. CB-10-13. The City merely repeats arguments here that it makes in its *Daubert* motion. *Compare* CB-10-13, *with* Dkt. 293 at 5-9, 13-17, 20-24. Plaintiffs explain in response to that *Daubert* motion the reasons that this Court should reject the City's motion to limit Tiderington's testimony, see Dkt. 325, as many other courts have done, and those same arguments warrant rejecting the City's arguments about Tiderington that are repeated in the City's summary judgment motion.

### 2. The City's Failure to Train, Supervise, and Discipline Officers

A jury must also decide Plaintiffs' *Monell* theory that the City failed to train, supervise, and discipline its officers. CB-13-20. The City asserts again that this opinion is based on experts alone, CB 13-14, which again is incorrect. As explained below, there is ample record evidence that would permit a reasonable jury to decide that the City failed to train, supervise, and discipline its officers on a City-wide basis, condoned a code of silence that prevented police misconduct from coming to light, and failed to supervise or discipline bad actors, risking harm to civilians, and

100

resulting in repeated police misconduct on the part of officers like Guevara and Miedzianowski, who violated the rights of countless individuals.

A failure to train, supervise, or discipline leads to municipal liability when the failure amounts to deliberate indifference to the citizens whom officers encounter. *Harris*, 489 U.S. at 388; *Hollins v. Milwaukee*, 574 F.3d 822, 827 (7th Cir. 2009). Deliberate indifference exists if the "need for more or different" training, supervision, or discipline was "obvious." *Harris*, 489 U.S. at 390. Proof "can take the form of [](1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger*, 434 F.3d at 1029-30.

Taking a step back, it is stunning that the City would allow officers like Guevara and Miedzianowski to commit brutal misconduct in the CPD for decades, without taking any corrective action, and then years later claim entitlement to summary judgment on the theory that it adequately trained, supervised, and disciplined officers during the time that these officers operated with impunity. This is especially so given that many years ago the City lost a *Monell* case about whether it was the moving force behind Miedzianowski's misconduct, *Klipfel v. Gonzalez*, No. 94 C 6415, 2006 WL 1697009 (N.D. Ill. June 8, 2006). The City should not be able to escape accountability for some of the worst police misconduct in U.S. history, which was perpetuated because policymakers turned a blind eye, causing the violation of Plaintiffs' constitutional rights. A jury must resolve this claim.

### a. **Non-Expert and Expert Evidence Supports This Theory**

Plaintiffs set out the evidence that supports denying summary judgment on this theory below. This Court could easily deny summary judgment based on just part of that evidence. Indeed, Judge Kness recently took that approach when denying summary judgment to the City on this

theory in a similar case. *Washington*, 2022 WL 4599708, at *16-17. Even more so than the plaintiff in *Washington*, Plaintiffs here demonstrate through non-expert evidence that the City's failure to train, supervise, and discipline is supported by the following:

- Defendants' misconduct in this case, including their plot to frame the Plaintiffs, their fabrication of evidence and their failure to disclose evidence to prosecutors, Plaintiffs, or their attorneys, SF ¶¶ 56-100; RSOF-City ¶ 87
- The City's history (starting at latest in 1972 during the Burge era) of failing to discipline police officers for fabricating evidence and coercing confessions, despite the City's admitted awareness of the problem through official reports, 26 OPS and IAD investigations, and identification of at least 50 victims of misconduct; SF ¶¶358-364, 423-428;
- The continued fabrication and suppression of evidence following the Burge era, evident in allegations of such conduct in multiple individual cases, including of Melvin Jones, George Jones, Vincent Goldstein, James Newsome, multiple dozens of overturned convictions due to such misconduct, and Guevara's continued assertion of the Fifth Amendment when faced with questions and allegations of fabrication of evidence and coercing confessions, yet no discipline; SF ¶¶365-370, 423-427;
- CPD's head of Internal Affairs Richard Risley learned of serious allegations of criminal misconduct in the CPD and, instead of pursuing discipline, directly communicated with Miedzianowski about the allegations against him and provided him copies of witness statements and other reports that Miedzianowski was not authorized to have, SF ¶ 370;
- The lack of auditing of the City's identification procedures or practices or patterns of misconduct involving such procedures, as well as widespread understanding in the CPD that false identifications could result from improper photo identification procedures; RSOF-City ¶¶14, 18; SF ¶¶372-373, 407;
- The City's own Superintendent in 1995 said that CPD's early intervention system (which, if operating correctly, is meant to identify and remediate officers at risk of committing misconduct) was seriously flawed because (1) it was so subjective; (2) it provided no standard patterns of unacceptable behaviors; and (3) the program failed to identify at-risk personnel before their behavior became unacceptable. SF ¶ 359.

Expert evidence complements and highlights the egregiousness of the City's utter failure to respond meaningfully to their awareness of serious misconduct. Plaintiffs' expert Dr. Jon Shane identified several primary deficiencies with the CPD's supervisory and disciplinary systems, and opined the City failed to comport with accepted police practices from 1985 to 2001, including that:

- CPD's internal affairs systems had serious design deficiencies that prevented them from operating as intended. SF ¶382. For example, because supervisors and investigators had discretion whether to refer an officer to an early intervention

102

system, CPD officers were able to accumulate large numbers of misconduct complaints without receiving any remedial training. SF ¶382.

- CPD failed to investigate allegations of officer misconduct in conformance with generally accepted policing standards, or even in accordance with CPD's own stated policies. SF ¶383. Investigators frequently failed to conduct routine investigatory steps, such as contacting witnesses and complainants. SF ¶388.

- In more than 40% of the investigations in Dr. Shane's data set, investigators failed to obtain a formal statement from the accused officer. SF ¶389. In 39% of investigations, investigators failed to obtain a formal statement from non-accused officers. SF ¶389. This failure to obtain information from other officers contributed to a "code of silence" within CPD. SF ¶389.

- The code of silence was furthered by officers refusing to report misconduct by their fellow officers. In Dr. Shane's data set, there were 273 allegations of "coercive interrogations" submitted by citizens, but zero such allegations submitted by other officers. SF ¶394. Given the four dozen exonerations that have taken place in light of Defendant Guevara's misconduct, it is jarring that his fellow officers could turn a blind eye to such misconduct for so many years.

- CPD's deficient investigation techniques resulted in CPD sustaining fewer allegations of misconduct than comparable police departments. SF ¶¶383, 385.

- Even in the rare instances where allegations of misconduct were sustained against CPD officers, the punishments were routinely erased or reduced. SF ¶¶390, 391.

- The inability to hold officers accountable through internal affairs likely contributed to a culture of impunity taking hold within CPD. SF ¶¶392-394.

- There is perhaps no greater example as to how a deficient internal affairs system leads to a culture of impunity than Miedzianowski's criminal enterprise. CPD internal affairs had opened an investigation into Miedzianowski, but because the investigation was plagued by the same evidence-gathering deficiencies that Dr. Shane had found in his data set, the investigation into Miedzianowski ended in a "Not Sustained" finding due to "lack of evidence." SF ¶¶396-398. Miedzianowksi never faced any punishment until he was indicted on federal charges. *Id.*

This evidence is more than sufficient for a jury to conclude the City failed to train, supervise, and discipline officers, condoned a code of silence, and in so doing was deliberately indifferent to the risk that its officers would commit the types of misconduct at issue in this case. The City had notice of rampant misconduct starting with Burge, was indifferent to that misconduct in its non-response, and then continued to permit police officers to commit misconduct with impunity, as shown in the analysis of Chicago's disciplinary files and the repeated misconduct identified above, including Guevara and Miedzianowski specifically, through and past the time of

103

Plaintiffs' convictions. A reasonable jury could find the City's broken system encouraged Defendants to repeatedly commit misconduct, and in the case of Guevara, Halvorsen, and Miedzianowski to manufacture wrongful convictions of dozens of individuals. Despite this misconduct, the City had no meaningful response. The evidence set out above dramatically exceeds what many courts have decided requires a trial on this *Monell* theory. *Sornberger*, 434 F.3d at 1030; *Washington*, 2022 WL 4599708, at \*16-17.[49]

b. **The City's Arguments for Summary Judgment Lack Merit**

The City's only argument for summary judgment on this theory is smattering of challenges to Plaintiffs' expert, Dr. Shane, CB-13-20, which merely regurgitates the arguments that the City makes to exclude Shane in its *Daubert* motion. Dkt. 295. The City's criticisms of Shane's methodology and opinions are addressed fully in Plaintiffs' response to the City's motion to exclude Shane, which Plaintiffs fully incorporate here. Dkt. 329. As discussed, courts in this District have found the precise types of opinions criticized by the City here to be helpful to juries in cases concerning widespread practices of failing to discipline Chicago police officers. *Velez*, 2023 WL 6388231, at \*24 (finding Finnell's opinions helpful to the jury and relevant to the claim

---

[49] See also, *e.g.*, *Velez*, 2023 WL 6388231, at \*25 ("A reasonable jury could find a widespread failure to investigate and to discipline caused the Chicago Officers to believe that their alleged misconduct would not be discovered and that, even if discovered, they would not face any effective disciplinary action resulting from such misconduct."); *Obrycka v. Chicago*, 2012 WL 601810, at \*8 (N.D. Ill. Feb. 23, 2012) (denying summary judgment on code of silence claim where plaintiff submitted police practices expert that opined a code of silence existed and a statistical expert report "showing that the Chicago Police Department has statistically significantly lower rates than the national average of sustained rates for police misconduct complaints"); *Marcinczyk v. Plewa*, 2012 WL 1429448, at \*3 (N.D. Ill. Apr. 25, 2012) (denying summary judgment where plaintiff's evidence of City's failure to investigate and discipline officers accused of misconduct included "documentary evidence indicating…that officers who have complaints lodged successfully against them are subject to only minimal discipline"); *Johnson v. Chicago*, 2009 WL 1657547, at \*10 (N.D. Ill. June 9, 2009) (denying summary judgment where plaintiff had evidence that City paid lip service to known problem of failing to investigate and discipline rogue officers); *Garcia v. Chicago*, 2003 WL 1715621, at \*6-7 (N.D. Ill. Mar. 20, 2003) (denying summary judgment to City given evidence of indifference to a pattern of abuse by its officers where plaintiff had expert testimony and statistics on the sustained rates of misconduct investigations from 1999-2001); *Kindle v. Harvey*, 2002 WL 230779, at \*4 (N.D. Ill. Feb. 15, 2002).

based on failing to investigate and discipline police misconduct); *Washington*, 2022 WL 4599708 at *11 (concluding Plaintiff presented sufficient evidence for *Monell* claim based on expert opinion on deficiencies of investigations and discipline); *Marcinczyk v. Plewa*, No. 09 C 1997, 2012 WL 1429448, at *3-4 (N.D. Ill. Apr. 25, 2012) (concluding plaintiff presented sufficient evidence for Monell claim, including evidence indicating that "minuscule percentage of civil rights complaints are found to be meritorious after investigations and that officers who have complaints lodged successfully against them are subject to only minimal discipline").

At bottom, the City argues that its expert, Dr. Adams, is more reliable than Plaintiff's expert, Shane. But many of Adams' contentions are simply not true. As Shane explained in his report, early intervention systems were recommended by the International Association of Chiefs of Police in 1990, and other industry experts before then. SF¶380. Defendants also misrepresent Shane's opinion about the ability for early intervention systems to prevent misconduct—as he explained, industry experts recommended police departments to adopt early intervention systems *because* they were effective tools for providing officers with remedial training. SF¶¶380-381. Regardless of these misrepresentations, the City's arguments amount to a factual dispute between competing experts. The jury must decide which expert is right.

Shane's opinions about the efficacy of CPD's internal affairs are based on both qualitative and quantitative findings, and by focusing only on his quantitative findings, the City fails to address the deficiencies he identified in the design of CPD's internal affairs systems. As for the City's arguments about his data set, they are largely addressed in Plaintiff's response to the *Daubert* motion. Dkt. 329. Shane developed a reliable methodology upon which he formed his conclusions, SF ¶378, and the City is unable to point to a single cell within the data set that it contends was coded incorrectly, SF ¶379. Suffice to say: the City's arguments go only to the

105

weight of the evidence that the jury should give Shane's opinions. But the jury is entitled to hear his opinions on how CPD internal investigations departed from generally accepted police practices, and how those deviations led to swaths of misconduct being unaddressed. SF ¶¶377, 383, 392.

Finally, Shane did not opine that the City of Chicago *has* a culture of impunity. That is a final question that only the jury can answer. Rather, Shane opined that the failure to maintain effective internal affairs systems would *contribute* to creating a culture of impunity within CPD. SF ¶¶392-394. Shane based this opinion on numerous sources and his own experience in internal affairs. SF ¶393. The repeated, high-profile scandals that CPD leadership knew about and yet failed to remediate—including Miedzianowski's enterprise—is further evidence that internal affairs' failure to fix misconduct results in officers continuing their practice of committing misconduct. SF ¶¶395-399. In other words, the lack of effective internal affairs is a piece of evidence that Plaintiffs may stack in support of their claim that a culture of impunity existed.

### E. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications

Material disputes of fact also preclude summary judgment on Plaintiffs' theory that the City was indifferent to a widespread practice of Chicago police officers fabricating witness identifications and failing to adequately document identification procedures. In the nine-year period directly preceding the Gonzalez investigation, an examination of 2,786 identification procedures performed at Area Five between 1989 to 1998 demonstrates that Chicago police officers obtained identifications of their suspects in a staggering and unprecedented 75% of identification procedures that they performed and identified innocent fillers essentially never. SF ¶¶ 331, 336. These rates represent a dramatic and statistically significant departure from other jurisdictions, and a jury could decide they are explained by Chicago police knowingly

106

manufacturing positive identifications. In addition, Plaintiffs have amassed evidence of dozens of individual cases in which Chicago police fabricated identifications for use in criminal proceedings. Moreover, City policymakers promulgated deficient written policies, provided no training on proper identification procedures, took no steps to assess whether police identification procedures resulted in false identifications, and never disciplined officers who fabricated identifications. The City was indifferent to this widespread practice of fabricating and failing to document identifications and the risk it presented that false identifications would taint criminal proceedings, in violation of due process.

### 1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Again, contrary to the City's suggestion, this theory is not based solely on expert testimony. Plaintiffs offer evidence that long before the Gonzalez investigation it was common knowledge in law enforcement that a large portion of wrongful convictions were caused by improper eyewitness identification procedures. SF ¶¶304-310.[50] The City's Rule 30(b)(6) witness confirmed that the

---

[50] Since 1967, the International Association of Chiefs of Police Law Enforcement Policy Center (IACP) has provided training material for law enforcement about the failures in eyewitness identification, writing that "[e]ye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts" – including the Supreme Court that same year in *United States v. Wade*, 388 U.S. 218 (1967). SF ¶¶ 304, 308, 309. By at least 1992, the IACP was releasing papers and model policies that were premised on the inherent unreliability of eyewitness identification procedures. SF ¶¶304-309. As the IACP papers in 1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result. Misidentifications by eyewitnesses are normally the result of a combination of factors." SF ¶305. The papers explained the primary reasons that eyewitness identifications were frequently unreliable: frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion. SF ¶306. The 1993 White Paper accompanying the 1992 Model Policy quoted from the Supreme Court's 1967 decision in *United States v. Wade*, stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor- perhaps it is responsible for more such errors than all other factors combined." SF ¶309 (quoting *Wade*, 388 U.S. at 229). Thus, long before 1993, police departments have known about the problems with eyewitness identification procedures, and the need for rigorous safeguards to ensure such procedures were being conducted in appropriate cases, and in the appropriate ways. PSOF ¶¶304-310.

City had notice of model policies that cautioned law enforcement of the risk posed by improper identification procedures. SF ¶ 310.

Despite this notice, the City had no written policies whatsoever governing photo identification procedures. SF ¶ 314. With respect to live lineups, the City's written policy in effect required a report to be written for live lineups documenting the date, time, location of the lineup, police conducting, persons viewing, persons present, persons participating in lineup, all persons identified, the person photographing lineup, all comments of counsel for arrestees, and any additional information or unusual circumstance occurring during the lineup. SF ¶¶ 311, 315. The policy does not on its face explain what record must be made when suspects are *not* identified in a lineup. SF ¶¶ 317-318.[51] Nor does the policy on its face require reporting of what police conducting lineups said to witnesses or vice versa, or any other circumstances of the identification (other than what an officer considers relevant or unusual in their own discretion). SF ¶¶ 315, 320, 411, 414. Documentation of exculpatory or impeachment information arising from identification procedures was not required by the policy. SF ¶ 320. The policies did not explain what was required before a supervisor approved a lineup report. SF ¶ 319. There was no training to fill these gaps in policy. SF ¶¶ 409-414.

There was also no policy at all governing photo identification procedures. SF ¶314. No written policy required a report of photo identification procedures or required specific documentation about such a procedure. SF ¶314. No policy or training provided instruction on identifications made as part of gang book procedures—although both detectives and gang

---

[51] The City's Rule 30(b)(6) witnesses have variously testified that filler identifications were not documented, and that filler identifications were documented as negative identifications. SF ¶ 318.

specialists used gang books during homicide investigations—and gang specialists were not provided any training relative to their participation in homicide investigations in general. SF ¶¶413, 414. No policy prohibited showing a single photo of a suspect or suggesting to a witness who the suspect was during a photo array, or showing the witness a photo of the suspect prior to a live lineup, or repeating identification procedures with the same witnesses and suspects, or providing confirming statements about a suspect before or after an identification procedure. SF ¶¶320-322.

Moreover, the City had the ability to audit the conduct and accuracy of identification procedures, but it did not actually conduct any audits of these identification procedures from at least 1986 to 1998, long before and continuing through Plaintiffs' arrests. It did not track misconduct during identification procedures in any way. It did not ensure that it received notice or took steps to learn of situations where motions to suppress identifications generated by the Chicago Police Department were granted. SF ¶¶ 415-422.

In this absence of policy, training, supervision, and review, Chicago police officers fabricated identifications during identification procedures that were not properly documented. There is ample evidence in the record that the practice of fabricating identifications persisted citywide at the relevant time period.

Plaintiffs have identified multiple instances in which Guevara and his colleagues procured wrongful convictions and false charges using fabricated identifications, including but not limited to cases involving Robert Brown, Vincent Goldstein, James Newsome, Donald Reynolds, Billy Wardel, Reynaldo Munoz, Virgilio Calderon Muniz, Victor Vera, Xavier Arcos, Wilfredo Rosario, Daniel Rodriguez, David Velazquez, David Lugo (Colon), Santos Flores, Gloria Ortiz Bordoy, Edwin Davila, Luis Serrano, Evlyn Diaz, Angel Diaz, Luis Figueroa, Ricardo Rodriguez, Rodolfo

109

Zaragoza, Angel Gaya, Maria Rivera, Freddy and Concepcion Santiago, Robert Ruiz, Ariel Gomez, Ruth Antonetty, Jaime Rios, Demetrius Johnson, Robert Bouto, Roberto Almodovar, Thomas Sierra, Jose Melendez, William Negron, Nelson Gonzalez, Carlos Anindo, Gamalier Rivera, Louis Robinson, John Martinez, Eruby Abrego, Jeremiah Cain, Jacques Rivera, Orlando Lopez, Felix Valentin, Juan Johnson, Samuel Perez, Johnny Flores, Marilyn Mulero, Francisco Vicente, Armando Serrano, Jorge Pacheco, Jose Montanez, Gerardo Igelsias, and the Hernandez Brothers. SF ¶¶ 423, 425, 426.

### 2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Plaintiffs also present compelling expert evidence in support of this widespread practice theory. First, the City never introduced accountability systems that would identify and correct improper eyewitness identifications or manipulation of witnesses. SF ¶¶ 367-372, 374-375. And second, Plaintiffs' expert Dr. Nancy Steblay provides extremely strong evidence of the City's widespread practice of fabricating identifications during procedures that were not properly documented. Dr. Steblay is a leading expert on eyewitness identification. In this case (and other Guevara cases), Dr. Steblay conducted an exhaustive analysis of data obtained from 2,786 identification procedures (including live lineups and photo arrays) reported in Area Five homicide files produced by the City from the period of 1989 to 1998. SF ¶¶ 330-331; Dkt 326. Each lineup was coded using objective criteria to reflect information about each lineup including: the number of witnesses participating, the number of suspects, whether multiple suspects were included, the number of fillers, the total number of individuals in the lineup or array, whether the witnesses were previously familiar with the perpetrator, the total number of possible positive identifications (the

number of witnesses viewing the lineup multiplied by the number of suspects), and the number of reported positive, negative, and filler identifications in each procedure. SF ¶¶ 331-332[52]

The data were assembled in a spreadsheet, which contains many tens of thousands of coded variables, across nearly 2,800 lineup procedures. SF ¶¶ 331. Dr. Steblay participated in the design of the data summary, ensured that the variables were objective and clearly defined, and verified the data.[53] The data was shared with all parties, and Defendants have not identified any error in any of the data coded. SF ¶335[54] Indeed, Defendants' expert responding to Dr. Steblay concedes that he does not challenge the data on which Dr. Steblay relies and has not identified any error in that data. SF ¶335.

Dr. Steblay observed that between 1989 and 1998, witnesses participating in Chicago procedures picked the police officer's suspect a whopping 75% of the time, made no identification 25% of the time, and selected a filler less than 1% of the time (in only nine instances in the entire dataset). SF ¶336. Moreover, 23% of identification procedures included multiple suspects, and 20% concerned a repeat identification procedure with the same suspect and witness. SF ¶336. In

---

[52] The task of coding these data based on police reports "borders on the mechanical." *Rivera v. Guevara*, 319 F. Supp. 3d at 1067. Reading a police report and transferring to a spreadsheet what the report says about the criteria just mentioned does not call for any subjective decision making, as Dr. Steblay explains. SF ¶333.

[53] Dr. Steblay ensured that the coding team "was using objective and clear definitions for the coding variable." The coding was undertaken by at least two independent coders, who compared their work to catch discrepancies. The coding process did not call for any subject decision making. Dr. Steblay also conducted a robust reliability check, verifying approximately 200 lineups, randomly selected from the court-ordered homicide files produced in this case. She agreed with the coders in 98% of the instances, "strong interrater agreement" that gave her confidence in the quality of the underlying data. SF ¶¶ 332, 333.

[54] In Defendants' *Daubert* motion, Defendants make much of what they assert are errors in the coded data. Dkt. 310. As Plaintiffs explain in their response, the asserted errors reflect the ongoing quality control measures between Dr. Steblay's analysis in the earlier *Sierra* and *Iglesias* cases—other Guevara cases—and regardless are so few in number compared with the total set of coded data that they would have no effect on Dr. Steblay's analysis. Dkt. 326.

74% of identification procedures, the witness did not know the perpetrator prior to the crime, and in 26% the perpetrator was familiar to the witness. SF ¶336.

In addition to making these observations, Dr. Steblay compared the results of Chicago identification procedures to 11 major peer-reviewed field studies which report lineup outcome data for live and photo identification procedures conducted by police in actual cases across varied jurisdictions, including Northern California, San Diego, Houston, Tucson, Austin, Charlotte, and London, England. SF ¶337, 338. The 11 field studies report the frequencies of lineup outcomes—suspect/positive identifications, filler identifications, and non-identifications—for a total of 6,734 field lineups. SF ¶339. The aggregated field studies revealed that witnesses selected a suspect 40.8% of the time, a known-innocent filler 23.7% of the time, and no one 35.5% of the time. SF ¶340.[55]

Dr. Steblay then compared the Chicago comparison subset of data to the field studies. SF ¶¶341-343.[56] She observed that while in the field studies witnesses selected suspects 40.8% of the time, in the Chicago comparison subset, suspects were identified in 70% of lineups. SF ¶343. In field studies, witnesses identified no one 35.5% of the time, while in Chicago there was no identification in 30% of cases. SF ¶343. And in the field studies, witnesses picked a filler 23.7%

---

[55] The outcomes of each study are collected in Table 1 of Dr. Steblay's report. SF ¶337.

[56] To compare the Chicago data to the field data, Dr. Steblay had to make the two datasets as similar as possible. She determined the field data did not have lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, or lineups with repeated procedures. This determination was "favorable to the defense case" as the presence of unreported multiple-suspect lineups, familiar-suspect identifications, or repeated identifications would potentially inflate suspect ID rates. PSOF ¶427. Therefore, for the comparison, Dr. Steblay screened out from the Chicago data lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, and lineups that were repeated procedures with the same witness viewing the same suspect. In addition, removing these lineups from the Chicago data eliminated lineups more likely to obtain a suspect identification, reducing the suspect identification rate, and therefore giving the City the benefit of the doubt. Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first viewing, single-suspect lineups. SF ¶¶ 341, 342, 343.

112

of the time, while in Chicago that occurred not even *once*. SF ¶343. Dr. Steblay opined that the difference between the field studies and Chicago's high suspect identification rate and low filler identification rate was statistically significant, and that there was less than a 1 in 100,000 chance that the difference could be explained by chance. SF ¶344.[57]

Dr. Steblay then analyzed why Chicago has a dramatically higher suspect identification rate and lower filler identification rate than other jurisdictions. Her analysis shows that the only explanation is that suspect identifications are fabricated. SF ¶¶ 346-353. Dr. Steblay identified all possible explanations for the elevated suspect identification rate in Chicago: (a) familiar perpetrator identifications (where the witness knows the suspect); (b) multiple suspect lineups, including those with too few fillers; (c) repeated identification procedures with the same suspect and witness, and instances in which police show the witness the suspect, in a photo or show-up, prior to the line-up; (d) steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly; (e) a failure to report filler identifications; and (f) biased lineup constructions where the suspect stands out. SF ¶346.

Dr. Steblay eliminated explanations (a), (b) and (c) from the Chicago data that she compared to the field studies, as discussed above, and so those could not be the explanation for Chicago's significantly higher suspect identification rate, SF ¶347. Explanation (e)—that the City does not report filler identifications—is denied by the City and would violate its policies, and so that explanation can be eliminated.[58] That leaves fabrication of identifications using the improper

---

[57] These conclusions are consistent with Steblay's findings in other cases, and she has concluded that the Chicago suspect identification rate as found in *all* of those cases is statistically significantly higher than the aggregate field studies. SF ¶¶345, 356, 357.

[58] The theory here is that a total failure to record filler identifications *might* elevate the suspect identification rate because the set of filler identifications that one would expect to exist based on field studies is simply absent from the Chicago data. However, the City has contended that its police officers recorded filler identifications as non-

113

techniques identified in explanations (d) and (f)—steering and suggestion to witnesses and presenting lineups where the suspect stands out—as the only explanation for Chicago's radically high suspect identification rate. SF ¶348.

In sum, the Chicago Police Department's identification procedures between 1989 and 1998 resulted in suspect identifications approximately 75% of the time overall, and 70% of the time in Dr. Steblay's comparison dataset (and almost never filler identifications). SF ¶¶336, 343. This is a remarkably significant departure from the results of identification procedures everywhere else. SF ¶¶340, 343-345, 353. The only possible explanation for the rate is that Chicago police systematically fabricated identifications. This comprehensive analysis of all of the lineups conducted in all homicide investigations at Area Five in the relevant time period is confirmed by Plaintiffs' evidence of dozens of cases in which Guevara and others fabricated identifications for use in criminal proceedings. SF ¶¶423, 425, 426. Moreover, these fabricated identifications using suggestive techniques all occurred against the backdrop of City policymakers having notice of a serious risk of false identifications in identification procedures, but responding with deficient policies, training, and supervision on the subject of identification procedures. SF ¶¶ 310, 312, 316-327, 409-422. The jury in this case should hear that a careful analysis of Chicago's homicide files reveals that eyewitnesses in Chicago nearly always pick the police officer's suspect and never select an innocent filler, contrary to eyewitness science and eyewitness behavior everywhere else.

---

identifications. SF ¶318. That fact is disputed, both by the City's own Rule 30(b)(6) witness, its policies, and by Dr. Steblay. SF ¶¶317, 318, Dkt. 326 at 38 n.6. Moreover, recording filler identifications as non-identifications would itself present a risk of constitutional violations. *Rivera*, 319 F. Supp. 3d at 1067. Regardless, accepting the City's position for purposes of summary judgment only, not recording filler identifications is not the explanation for Chicago's elevated suspect identification rate.

114

Plaintiffs have offered far more than enough evidence to establish the City's widespread practice of fabricating identifications. That widespread practice presented the acute risk that fabricated identifications would be used in and would taint criminal proceedings, in violation of due process. "A city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *J.K.J.*, 960 F.3d at 378 (cleaned up). And Plaintiffs present evidence that, in fact, that risk came to pass, not only in their case, but also in many other homicide cases that were prosecuted based on fabricated identifications.

### 3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit

The City's remaining arguments for summary judgment on this theory lack merit. First, the City repeats the argument that *Blackmon* eliminated unduly suggestive identification claims as a standalone theory of liability. CB-20. But as explained above, Plaintiffs are not pursuing unduly suggestive identification claims; instead, they contend Defendants knowingly fabricated identifications and suppressed information about their interactions with eyewitnesses, which are claims expressly not affected by *Blackmon*. *Supra* §2(C). This corresponding *Monell* theory is in the same vein—the City was on notice of and indifferent to a pattern of fabricated identifications and failure to document identifications adequately—and so this *Monell*, too, is not affected by *Blackmon*. (Prior cases cited by Defendants dismissing this *Monell* claim, unlike this one, did pursue unduly suggestive identification theories because they were briefed before and decided after *Blackmon*.)

Second, the City contends that its policies and training governing identification procedures were sufficient to stop fabricated identifications. CB-21-22. But that is a theory that depends on

115

rejecting the evidence set out above in favor of a reading of the City's limited policies and training materials that draws unreasonable inferences for the City, which the Court cannot do. *Tolan*, 572 U.S. at 656. Moreover, the City's argument that its policies were sufficient to stop fabricated identifications runs headfirst into the evidence that those fabricated identifications occurred routinely across all cases, a finding that the City does not meaningfully challenge in this case.

Third, the City again deploys the argument that only expert opinions support this theory, CB-22, which again ignores the other record evidence discussed above. Then, the City goes on to attack Dr. Steblay's expert opinions in summary terms, contending that they do not establish a widespread practice, improperly rely on data prepared by Plaintiffs' attorneys, and do not identify particular cases in which identifications were fabricated. CB-22-24. These arguments are addressed in rich detail in Plaintiffs' response to the City's *Daubert* motion to exclude Dr. Steblay, which Plaintiffs incorporate here. Dkt. 326 at 11-23, 23-31, 33-44.[59]

Fourth, in a long passage the City takes issue with Dr. Steblay's discussion of the possible mechanisms that could cause the City's remarkably high suspect identification rate and absence of filler identifications. CB-24-28. To the extent that the City is challenging the reliability of Dr. Steblay's opinions, Plaintiffs have responded to these arguments in their *Daubert* response. Dkt. 326 at 11-23. Otherwise, the City merely disputes the conclusions that Dr. Steblay has reached, which is nothing more than an effort to contest the facts at summary judgment, which the City cannot do as the moving party.[60] The City's assertions about the relevance of Dr. Steblay's

---

[59] The City also asserts that Dr. Steblay did not provide a report specific to the case. CB-22. That is misleading. Dr. Steblay's report was disclosed in this case; it is the same as her report in disclosed in other Guevara cases and is based on the same data; and it makes sense that Dr. Steblay would issue the same report because her opinions pertain to the City's policies in the relevant timeframe, not anything about the facts of an individual case.

[60] The City's discussion misstates and mischaracterizes Dr. Steblay's opinions in every respect: The City complains that an expert presenting "possible explanations" for a phenomenon does not create a dispute of fact, CB-

116

opinions sets out what appears to be a weak cross-examination of Dr. Steblay for trial. Indeed, the whole section highlights disputes of fact, and there is no argument that the City has thereby established an *absence* of genuine disputes of material fact about whether Dr. Steblay's opinions support Plaintiffs' widespread practice theory.

Fifth, the City asserts in two paragraphs that Plaintiffs cannot proceed on this *Monell* theory because their evidence does not create a genuine dispute of material fact about whether the City was on notice and indifferent. CB-27-28. Not so. A persistent widespread pattern of behavior risking constitutional harm *is itself* notice to the municipality, *e.g.*, *J.K.J.*, 960 F.3d at 383, and the City's Rule 30(b)(6) witness admitted the City was on notice that if proper policies were not followed, it could result in false identifications. SF ¶¶ 310, 312. Yet the City did nothing to institute policies for photographic lineups, gang books, or photo books before Plaintiffs' prosecution, and did nothing at all to account for situations where identification procedures went wrong, or to address its high rate of suspect identifications, at any time, from long before Plaintiffs' prosecution to long after his conviction. SF ¶¶ 314-327, 409-422. That is enough to create a dispute of fact about the City's indifference. *J.K.J.*, 960 F.3d at 383. At the end of the day, all of the evidence in

---

24, which is both an inaccurate statement of what experts do and a misapprehension of Dr. Steblay's analysis, which identifies *all* possible explanations for the City's high suspect identification rate, and then explains why some of them cannot explain the high rate. The City also asserts that Plaintiffs cannot contend that factors such as familiar perpetrators, multiple suspect identifications, and repeated identification procedures with the same suspect and witness caused the City's high identification rate because Dr. Steblay excluded those factors from the lineup dataset. CB-24-25. But Plaintiffs *agree* that they were excluded, and the City does not seem to recognize that the exclusion of all of those lineups from the dataset reduced the City's suspect identification rate by only a couple of percentage points, and also eliminated the more benign explanations that the City might have offered to explain the data. In addition, the City says that Dr. Steblay cannot account for whether Chicago lineups were conducted by non-blind administrators, CB-25, leaving out that its policies never called for blind administration of lineups, SF ¶316, and leaving out that this factual dispute has no bearing on Dr. Steblay's testimony or conclusions. Finally, the City asserts that some of Dr. Steblay's proffered explanations for the high suspect identification rate are irrelevant to the case—for example the contention that Chicago did not record filler identifications. CB-26. As discussed above, Plaintiffs accept for purposes of summary judgment that this is not the explanation for the City's high suspect identification rate, but that has no effect on Plaintiffs' widespread practice theory.

117

the record firmly supports Plaintiffs' *Monell* theory that the City had a widespread practice of fabricating identifications. Disputes of fact preclude summary judgment for the City.

### 4. The City's Other Summary Judgment Arguments Lack Merit

The City advances two other meritless general arguments for summary judgment. First, the Court can disregard the City's argument that it cannot be liable if summary judgment is granted to the individual Defendants, CB-4, because (1) the individual Defendants do not move for summary judgment on all claims, and (2) they are not entitled to summary judgment, as explained above, *supra* Arg. §III. It is also incorrect that the City cannot be liable unless an individual Defendant is found liable. *Thomas*, 604 F.3d at 305 ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict"); see also *Swanigan v. Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, . . . a verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct *Monell* claim."). Judges in this district routinely hold that a municipal policy may cause a constitutional deprivation even if a particular officer is not liable. *Bonds v. Chicago*, 2018 WL 1316720, at *4-5 (N.D. Ill. Mar. 14, 2018); *Pickett v. Dart*, 2014 WL 919673 (N.D. Ill. Mar. 10, 2014). In the case of a theory of municipal liability that depends entirely on a particular officer's act of misconduct—*e.g.*, a municipal policy of using excessive force where there was no excessive force used by any officer, as in *Los Angeles v. Heller*, 475 U.S. 796, 798 (1986)—a *Monell* claim will fail if an individual defendant did not violate the Constitution. But that is not the case here. For example, a jury might find the City's practice of evidence suppression caused investigative information not to reach defense attorneys, even if no single individual Defendant is to blame.

Second, the City asserts incorrectly that there is no genuine dispute about whether the City's official policies caused the violations of Plaintiffs' constitutional rights. CB-28-29. A municipality's official policy "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs*, 368 F.3d 917, 927 (7th Cir. 2004). Where a plaintiff puts forth evidence of municipal action (or inaction) and deliberate indifference—here in the form of express policies, gaps in policies, widespread practices, final policymaker actions, and failures to train, supervise, and discipline—the question whether municipal policies and practices caused the plaintiff's constitutional injuries must be resolved by a jury, like most other causation questions. *Thomas*, 604 F.3d at 303 (jury must make a factual determination whether widespread practice caused constitutional harm); *LaPorta v. Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").

In this case, there is no distance between the risks of harm presented by the City's official policies and practices—evidence suppression, fabricated identifications, and untrained and unsupervised police officers—and the particular constitutional injuries that Plaintiffs suffered. A reasonable jury could conclude the City's policies caused the violations of Plaintiffs' constitutional rights, as many other courts have concluded in analogous circumstances. *Godinez v. Chicago*, 2019 WL 5597190, at *6 (N.D. Ill. Oct. 30, 2019) ("Plaintiff has pointed to a variety of evidence, in the form of the DOJ and PATF Reports, public officials' statements, expert testimony, other lawsuits, and evidence about CPD training and accountability that create a genuine issue of fact about the causal link between Godinez's death and CPD practices and the City's *Monell* liability. That is enough to survive summary judgment."); see also *Washington*, 2022 WL 4599708, at *18; *Hudson v. Chicago*, 2019 WL 1112260, at *7 (N.D. Ill. Mar. 11, 2019); *Thomas*, 604 F.3d at 303;

119

*Woodward*, 368 F.3d at 927; *LaPorta*, 277 F. Supp. 3d at 991. The City's arguments to the contrary, like Defendant Officers' arguments throughout their motion, "reflect[] a kind of self-hypnosis that no lawyer can afforded to practice in the summary judgment context— a view of the evidence through the lens of the Rule 56 movant rather than, as the Rule expressly mandates, that of the nonmovant[.]" *Escobedo*, 2013 WL 1787819, at \*4. This Court should reject the City's arguments that depend on viewing facts in the City's favor.

## IV. The *Respondeat Superior* and Indemnification Claims Survive

Last, because Plaintiffs' underlying claims survive, so do their derivative *respondeat superior* and indemnification claims, and summary judgment should be denied on those claims.

### CONCLUSION

For all of these reasons, Plaintiffs respectfully request that this Court deny Defendant Officers' motions for summary judgment. Plaintiffs are entitled to a trial against the City on all of their claims, except those on which Plaintiffs are entitled to judgment.

**May 6, 2026**                                          RESPECTFULLY SUBMITTED,

                                                         **JUAN & ROSENDO HERNANDEZ**

                                              By:        /s/ Steve Art

                                                         *One of Plaintiffs' Attorneys*
                                                         Jon Loevy
                                                         Anand Swaminathan
                                                         Steve Art
                                                         Rachel Brady
                                                         Sean Starr
                                                         Alyssa Martinez
                                                         Isaac Green
                                                         Justin Hill
                                                         Annalise Wagner
                                                         LOEVY & LOEVY
                                                         311 N. Aberdeen St.
                                                         Chicago, IL 60607