# EXHIBIT 1

Guevara proclaims in his motion that there is no evidence "that Guevara was in fact a part of Miedzianowski's criminal conspiracy, or even investigated as potentially being a part of said conspiracy," GB-13-14, which is a problematic argument at summary judgment by a party who has pleaded the Fifth in response questions about his involvement in that conspiracy, as discussed below, infra Arg. §I. But the contention is obviously factually incorrect as well.

Miedzianowski and Guevara attempt to contest this particular fact in their motions—Miedzianowski makes it his marquee argument—highlighting that there is no express mention of the Hernandez Brothers in the federal materials produced in this case, and arguing that this means that Rock did not disclose the plot to frame them during the federal investigation. MB-4-5 GB-13-14. As explained in detail below, this attempt to impeach a collateral fact by omission at summary judgment is entirely improper; even if it was not, this fact has no bearing on summary judgment; and regardless Defendants' view of the facts is skewed and incomplete. See infra Arg. §II(A)(1)(a).

Juan's first criminal trial ended in a mistrial when it was revealed that his attorney, Richard Bueke, had previously represented Guevara. Bueke had been identified in the federal investigation of Miedzianowski as the attorney who had received a $20,000 payoff from a murder suspect to fix a criminal case that had been investigated by Guevara. SF ¶15, 92.

See also In re Pansier, 417 F. App'x 565, 568 (7th Cir. 2011) (holding that the Fifth Amendment cannot be invoked as "an obstructionist tactic, and thus a party that relies on the privilege as a discovery shield must establish that a truthful answer to an inquiry would have some tendency to subject the person being asked the question to criminal liability"); Shakman v. Cook County, 920 F. Supp. 2d 881, 887 (N.D. Ill. 2013) ("[T]he protection afforded by the Fifth Amendment is limited to instances in which the witness has reasonable cause to apprehend danger from a direct answer.").

1

So important is this inference that the Seventh Circuit in Hillmann granted a new trial because a witness who planned to assert the Fifth was excused from testifying, and the Court held that the witness should have been required to testify because "the jury is permitted to hear evidence of a witness's invocation of the privilege and may draw an adverse inference from it." 834 F.3d at 793 (emphasis added); see also Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 831 F.3d 815, 835 (7th Cir. 2016) ("The Fifth Amendment allows adverse inference instructions against parties in civil actions."); LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader").

Any other result would permit the party asserting the Fifth Amendment to obtain an unfair advantage—they would be using the privilege as a shield by avoiding the need to provide truthful evidence during discovery, and also as a sword by moving for summary judgment on the ground that the record lacks disputes of fact as a result of their non-participation—and the law does not allow such an approach. Harris v. Chicago, 266 F.3d 750, 754 (7th Cir. 2001) ("A defendant cannot have it both ways . . . . [He may not] testify in attack . . . and at the same time seek refuge behind the shield of the Fifth Amendment."); Chicago v. Reliable Truck Parts Co., Inc., 822 F. Supp. 1288, 1293 (N.D. Ill. 1993) ("[T]he City is correct in pointing out that in this civil case they cannot use the Fifth Amendment as both a sword and a shield.").

Based on a misunderstanding of Fifth Amendment law, some courts have required evidence in addition to a moving party's assertion of the Fifth before denying a moving party's motion for summary judgment. Rivera, 319 F.Supp.3d at 1039-40; Logan v. Chicago, 891 F.Supp.2d 897, 901 (N.D. Ill. 2012). These decisions are incorrect, and it is important to explain why. Consistent with the rule that a jury may, but need not, draw an inference that the truth would incriminate a party asserting the Fifth, the case law says that a civil judgment may not be entered against a party solely

2

because that party has asserted the Fifth. In particular, the Seventh Circuit has held that: (1) a judgment should not be entered on the pleadings against a party merely because that party asserts the Fifth, National Acceptance v. Bathalter, 705 F.2d 924, 932 (7th Cir. 1983); and (2) judgment should not be granted to a moving party at summary judgment merely because the non-moving party asserts the Fifth, LaSalle Bank, 54 F.3d at 390-91. That rule by its own terms does not extend to this context, where there is no threat at all of a judgment being entered based on an assertion of the Fifth. The situation here is the converse of the cases just discussed: Plaintiffs here are not asking for a judgment against the Defendants asserting the Fifth—they are merely asking for Defendants' motion to be denied; and it is the moving party who is asserting the Fifth. No party has an absolute right to move for summary judgment, and denying a motion is obviously much different than entering a judgment. This Court made the point in Rios v. Guevara, No. 22 CV 3973, 2024 WL 5119954 (N.D. Ill. Dec. 16, 2024), when it said, "the Court is not deciding that the defendants are liable based solely on Guevara's invocation, only that a material fact dispute precludes summary judgment," id. at *14. Nor would it logically make sense to transform the rule that judgment cannot be entered against a party who takes the Fifth into a rule that this party is entitled to summary judgment unless there is some other evidence implicating that party in the misconduct alleged. That rule would be incredibly problematic for a number of reasons: First, it would turn the summary judgment standard on its head—the movant is required to show an absence of disputes of fact. Second, it would impermissibly reward a party who takes the Fifth, letting them place a burden on non-moving parties because of their own assertion of the Fifth and denial of discovery. Contra Certain Real Prop., 55 F.3d at 83. Third, it would be the equivalent of a rule that the jury at trial is barred from drawing an adverse inference from a defendant's assertion of the Fifth unless a fact had already been established by independent evidence. Such a rule would directly contradict the Supreme Court and Seventh Circuit case law discussed above, which require

3

a jury to hear a defendant assert the Fifth and require an instruction from the Court about the permissive inference that maybe drawn. Regardless, even if the Court were to adopt the position that more evidence beyond the adverse inference from the Fifth Amendment assertion is required, Plaintiffs more than satisfied that requirement. The independent evidence of Guevara's and Halvorsen's misconduct is substantial in the record, and they cannot show there is an absence of disputes for a jury to decide.

In various places in their motions, Defendants suggest that certain due process theories may not have been disclosed to them in discovery responses and that dismissal of those claims is justified as a result. E.g., OB-15; GB2-3, GB-9-10. These arguments are vague and do not discuss the purported theories that were not disclosed, see OB15, and often the argument follows directly after the Defendants making the argument have outlined Plaintiffs' particular theories, compare OB-15 (saying theories are not spelled out), with OB-14 (spelling out theories), which they could not do in their affirmative motions for summary judgment without good notice of the theories. Regardless, each and every due process theory that Plaintiffs pursue was included in discovery responses provided to Defendants in this case. SF¶¶171-172.

Miedzianowski strangely asserts that Plaintiffs' expert "has confirmed" that he played no role in Plaintiffs' prosecution. MB-12; see also MB-6-7. But Plaintiffs' expert Tiderington discusses Miedzianowski's role in framing the Hernandez Brothers at length. Ex. 30 at 28-29. Miedzianowski stresses that he is not listed in any of the police reports in the Gonzalez investigative file, MB-6-7, but that proves nothing—the theory is that he and Guevara plotted in advance to frame Plaintiffs, then suppressed the plot, and it would be extremely strange if officers involved in that sort of misconduct decided to document it in police reports.

Defendants are also wrong about the factual record. While there is no report in the federal materials produced that recounts a plot to frame the Hernandez Brothers, there are many facts in

4

those documents that corroborate Rock's account of Miedzianowski and Guevara's plot, including the development of evidence concerning bribery plots and frame-ups involving Guevara and Beuke, and investigation into the stash house at the heart of Miedzianowski's grudge. SF¶¶15, 23, 38. Moreover, Defendants' version of events ignores that Netols acknowledged, in response to Defendants' own questioning, that the documents produced in this case represent just a small fraction of the investigative materials generated during the federal investigation, SF¶26, so it is not clear that an omission in the documents produced in this case means the issue was never raised. In addition, although AUSA Netols testified that he did not recall being told about the Hernandez Brothers and would have investigated further if he had been told, he also testified that the Hernandez Brothers' names and nicknames sounded familiar to him from his investigation, and he acknowledged that he had been told about other frame jobs in the course of the investigation that he did not in fact investigate further. SF¶23. Moreover, AUSA Netols acknowledged that he had not been present at all of Rock's proffer sessions, SF¶26. It is an established principle that a jury is permitted at trial to believe part but not all of what a witness has to say. Kadia v. Gonzales, 501 F.3d 817, 821 (7th Cir. 2007) (faulting fact finder for "the discredited doctrine of falsus in uno, falsus in omnibus (false in one thing, false in all things), which Wigmore called 'primitive psychology'"); Allen v. Chicago Transit Auth., 317 F.3d 696, 703 (7th Cir. 2003) ("[T]here are cases, perhaps the majority, in which a witness's testimony is a compound of truth and falsity. Perjury is a circumstance to be weighed by the jury in determining a witness's credibility rather than a ground for removing the issue of credibility from the jury by treating the witness's entire testimony as unworthy of belief."); Branion v. Gramly, 855 F.2d 1256, 1263 (7th Cir. 1988) ("A trier of fact may disbelieve or reject any evidence; ... [s]elective disbelief, however, is an ordinary incident of trial[.]"). A reasonable jury could conclude that both Rock and AUSA Netols do not have complete, accurate testimony about their exchanges during the federal investigation decades

ago. At summary judgment, however, inferences must be drawn for Plaintiffs and not Defendants. Rock testifies that he provided the information to federal authorities, there is evidence that backs up Rock's account including the testimony of Jondalyn Fields, and Defendants are not entitled at this stage, based on their own view of the evidence, to impeach this small piece of Rock's story by omission.

While somewhat beside the point, Saunders-El is doubly distinguishable because the defendant was acquitted and so, under then existing precedent, suffered no due process violation from the fabrication of evidence against him. 778 F.3d at 562 ("[I]t would be entirely incongruous for us to endorse Saunders–El's Brady theory, in light of our holding in Alexander" that "a police officer does not violate an acquitted defendant's due process rights when he fabricates evidence").

It is also the law that courts at summary judgment need not weed through sub-theories and parse items of evidence giving rise to a fair trial due process claim, so long as it is established that there is a material dispute about whether a Defendant contributed to violating a plaintiff's right to a fair trial. Goudy, 922 F.3d at 844 (once established that a trial is required, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); Camm, 937 F.3d at 1108–09. So, once this Court decides Plaintiffs have shown a trial is required on any due process theory, it can move on to trial on Plaintiffs' due process claims without exploring all arguments made by Defendants.

Defendants point to evidence suggesting that Violante previously stated he had other motives for signing the 1988 affidavit, and that Plaintiffs' parents participated in an effort to get him to sign the affidavit. But as Juan Hernandez testified at length in his deposition, he was told by an MLD gang member that the witnesses at Mobile & Dickens had identified him because they were told who to choose. He passed that information along to his parents and got lawyers involved because he was desperate to prove his innocence. SF¶¶128-29. Moreover, Plaintiffs' mother

6

testified at length that she would never induce someone to lie—she believed at all times that the affidavits were true, and that they were being attained and exchanged through lawyers to get the truth out. SF¶127. On the advice of their attorney, Plaintiffs' parents took plea deals only because they were in poor health and already under enormous stress (due to the false accusations against their sons) and the pleas allowed them to receive a sentence of one-year supervision, RSOF-J at ¶ 82. And critically, the evidence today conclusively shows that Violante's 1998 affidavit was true all along; it was his statements at the original criminal trials that were not true.

Defendants' argument that the State's Attorney could have done more to impeach Violante is irrelevant as courts consider the motive and opportunity to cross-examine rather than "the extent of cross-examination at the former proceeding" in determining whether the exception is satisfied. United States v. Pizarro, 717 F.2d 336, 349 (7th Cir. 1983). Likewise, Defendants' contention that the State's Attorney "made little effort to determine which" Defendants Violante interacted with, OB-9, is frivolous. There would have been little point making more effort as Violante testified "that he does not recall what specific police officers he spoke to." RSOF-J¶139. Violante's interaction with Defendants is documented by Defendants themselves.

Although Bemis, DeGraff, and Halvorsen filed a single motion, the argument about the anonymous tip is mounted by Bemis only, not DeGraff or Halvorsen. OB-4-5. DeGraff and Halvorsen have therefore forfeited any argument for summary judgment on this theory, Sublett v. John Wiley & Sons, 463 F.3d 731, 736 (7th Cir. 2006), and it will be too late to raise them in reply. Costello, 651 F.3d at 635.

Bemis argues that he is not the "B-man" involved in Miedzanowski's enterprise, OB-19, but that is yet another factual dispute that will have to be submitted to a jury. Bemis says that it is uncontradicted that there is no evidence that he was associated with Miedzianowski, id., but that is not true—Jondalyn Fields express implicated him, by his name Bemis and by the nickname B-

7

Man, in the criminal conspiracy and as frequenting locations associated with the drug enterprise with many of the indicted co-conspirators. SF¶¶13, 166. 21 There are no contemporaneous notes, reports, or any other documentation or recording of this supposed call. To this day, Defendants have never identified the supposed informant. Bemis likely was not present in the gang team office at the time the tip purportedly came in; he does not recall receiving such a call; he does know how Plaintiffs became suspects; and he doubts that he ever received it because it would be extremely unusual for him to receive a tip about the real killers in a murder case. SF¶¶58-59.

There is additional circumstantial evidence that the supposed anonymous tip was fabricated. Although the supposed tip came in on June 28, and then was communicated to Guevara on June 29, when he was assigned to the investigation, witness Nancy Gonzalez testified that she heard from Guevara on June 28 that there were already suspects in the case—before the supposed tip, and certainly before Guevara heard about the supposed tip. SF¶60. Moreover, consistent with the made-up call and the plan to frame Juan and Rosendo, Bemis also detained and brought several men to Area 5, including Abraham Gutierrez, and tried to get them to name as perpetrators Poochie and June-Bug, the nicknames of Juan and Rosendo, respectively, which they did not do. Bemis basically admits as much. None of this is documented in the police files from the Gonzalez homicide investigation. SF¶61.

It is the use of false evidence to deprive an individual of liberty that violates the Constitution. This is true whatever form the initial fabricated evidence takes (e.g., a false report, a manufactured statement, a fabricated identification, invented forensic evidence, or scripted testimony), regardless of the stage of the criminal case at which the fabrication causes a liberty deprivation (e.g., warrant, filing of charges, bond determination, indictment, denial of a pretrial motion, conviction), and however the evidence comes to impact the criminal proceedings (e.g., introduced as an exhibit, offered as testimony, used to preclude other evidence from being used in

8

the criminal case, offered as a stipulation, or presented to a judge). This principle reflects the reality that most evidence in criminal cases is introduced at various phases via witness testimony, whatever form it initially took. That's why Whitlock emphasized the fabrication must simply "be used to deprive the defendant of her liberty in some way." 682 F.3d at 580.

The Supreme Court rejected Defendants' myopic view of a fabricated evidence claim in both Buckley v. Fitzsimmons, which approved a fabrication claim where physical evidence of a boot print was fabricated before trial and then introduced through the testimony of a witness at trial. 509 U.S. 259, 262-64 (1993), and more recently in McDonough v. Smith, where the Court recognized that a claim that falsified affidavits, witness coaching, and a bogus DNA analysis fabricated before trial violated the Constitution when that evidence was later introduced though witness testimony, 588 U.S. 109, 113 (2019). The Seventh Circuit has rejected Defendants' view repeatedly. See Anderson, 932 F.3d 494 (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); Avery, 847 F.3d at 441-42 (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony); Stinson, 868 F.3d at 528 (en banc) (due process violated when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); Whitlock, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police before trial is introduced at trial by an immune prosecutor).

Nor is there any merit to Defendants' argument that they did not know with certainty that the identifications they fabricated were false. See OB-11-12 (citing Coleman v. City of Peoria, 925 F.3d 336, 344 (7th Cir. 2019)) This case is unlike Coleman in that Plaintiffs are not relying on circumstantial evidence or chains of inferences to show the investigating officers knew the evidence they extracted from witnesses was false. This is an unusual case where there is both "a

9

smoking gun [and] an admission" showing knowledge of falsity. Gray v. City of Chicago, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022) (finding knowledge of falsity based on circumstantial evidence). The smoking gun is the evidence that Defendants had a premediated plan to frame the Plaintiffs. SF¶¶18-22. From this evidence, a jury could easily conclude that Defendants knew all the evidence they collected was false because that was their intent from the beginning. Additional evidence includes Defendants' knowledge that the Plaintiffs had alibis proving they did not commit the crime and knowledge that "Willy" was the likely murderer. The admission is that Guevara and Halverson invoked the Fifth Amendment when asked if they framed Plaintiffs, SF¶¶99-100. See Anderson v. City of Rockford, 932 F.3d 494, 511 (7th Cir. 2019) (finding knowledge of falsity based on defendant's invocation of Fifth Amendment).

It is peculiar that a subset of the Defendant Officers argue in a separate section of their motion that they are entitled to judgment on the ground that the record shows they were uninvolved in the misconduct. Of course, each of the Defendants must show that they undisputedly were not involved in misconduct to obtain summary judgment. The fact that a subset of the Defendant Officers argue separately that they were not involved in the constitutional violations asserted is tantamount to an admission that there is no hope of summary judgment for the others— Defendants Guevara, Halvorsen, and Miedzianowski. 29 Bemis also argues that he was not the "B-Man" involved in Miedzianowski and Guevara's criminal conspiracy, and that the suggestion otherwise is a case of mistaken identity. OB-19. That is a factual dispute not subject to resolution on summary judgment. SF¶13 (citing evidence showing Bemis was involved in the drug conspiracy).

Defendants contend that Biebel cannot be liable merely for his supervisory role. OB-23. Supervisors are liable under § 1983 "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." Steidl v. Fermon, 494 F.3d 623, 631-32 (7th Cir. 2007). As discussed

10

above, the summary judgment record supports the conclusion that Biebel directly participated in violating Plaintiffs' rights, and so reference to supervisory liability is not necessary. Nonetheless, the record would also permit a reasonable jury to conclude that the constitutional violations Plaintiffs suffered were caused by the deliberate indifference of Biebel. He was the direct supervisor of Guevara and Halvorsen, the detectives on the investigation, he had direct knowledge of their investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. SF¶164-165. His participation as a supervisor was essential to the scheme. Id. He is liable on that basis as well.

Defendants just assert that the identifications are legitimate or "untainted," without developing the argument. OB-20; GB-14. This argument is so factually devoid of explanation, that it deprives Plaintiffs of an ability to adequately respond and amounts to forfeiture. Costello, 651 F.3d at 635. Moreover, the two Defendant briefs making this argument say different things: Guevara contends that four identifications implicate both brothers, GB-14, but the other officers contend that four implicate Rosendo Hernadnez and three implicate Juan Hernandez, OB-20. Defendants cannot even get their own stories straight about which of their fabricated evidence implicates which Plaintiff. Regardless, Defendants' cursory account of the identifications ignores the evidence and draws all inferences impermissibly for Defendants, discussed at length above. SF ¶¶62-114. The identifications are anything but untainted, they are fabricated, Defendants suppressed all evidence that undermined them, and there is a huge dispute about whether they are remotely reliable.

In addition to the exculpatory and impeachment evidence that Defendants suppressed, supra Arg. §II(A)- (B), Defendants knew that Plaintiffs both had solid alibis corroborated by others, that no physical evidence connected them to the shooting, that they had not established any

11

connection between Plaintiffs and the getaway car, and that they had a credible—and in fact, a correct—lead pointing to William Vilaro. SF¶1, 3-4, 55.

Again, in this section of his brief Miedzianowski contends, construing the facts in his own favor, that "[i]t is undisputed that Miedzianowski was not present for any of the events that form the basis of Plaintiffs' underlying constitutional claims" and so could not intervene. MB-13. But when you plan with another officer to frame someone for a crime they did not commit in advance to protect an ongoing criminal conspiracy, and then you suppress all of the evidence that you have done so, it is galling to contend that you were uninvolved in the misconduct and could have done nothing to stop it. Miedzianowski is living in an alternate reality, and it is up to a jury to sort out what the truth is.

Again, in this section of his brief Miedzianowski contends, construing the facts in his own favor, that "[i]t is undisputed that Miedzianowski was not present for any of the events that form the basis of Plaintiffs' underlying constitutional claims" and so could not intervene. MB-13. But when you plan with another officer to frame someone for a crime they did not commit in advance to protect an ongoing criminal conspiracy, and then you suppress all of the evidence that you have done so, it is galling to contend that you were uninvolved in the misconduct and could have done nothing to stop it. Miedzianowski is living in an alternate reality, and it is up to a jury to sort out what the truth is.

The case Defendants cite, Turley v. Rednour, 729 F.3d 645, 649 & n.2 (7th Cir. 2013), does not even purport to say that §1983 conspiracy claims are barred when they do not involve a private actor defendant. Instead, in a footnote, the case says that there is no need to analyze a conspiracy claim against prison officials under §1985 (not §1983) independently of the underlying Eighth Amendment claim. It is impossible to read that decisions as restricting §1983 conspiracy claims in any way.

12

If the Court digs further into the legal analysis, importing the intracorporate conspiracy doctrine into §1983 would contradict other important precedents. The doctrine arose in the antitrust context and provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." Ziglar v. Abbasi, 137 S. Ct. 1843, 1867 (2017). It arose because the presumption for a conspiracy among agents of a single corporate entity is that the actions of employees are attributed to the corporate principal. But for § 1983 claims that presumption cannot apply because Monell holds that actions of municipal employees can never be imputed to their municipal employer. So, applying the doctrine to §1983 claims does not make sense. This is why "district courts have overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intracorporate conspiracy doctrine." Liggins v. City of Chicago, 2021 WL 2894167, at *5-*6 (N.D. Ill. July 9, 2021).

Particularly so given that federal pleading rules only require Plaintiffs to plead facts in their complaint, not legal theories. Reeves v. Jewel Food Stores, 759 F.3d 698, 701 (7th Cir. 2014). Plaintiffs pleaded the claim this way because Illinois law might provide a defense to public employees who act with negligence, requiring a heightened showing of "willful and wanton conduct." 745 ILCS 10/2-202.

The City's express policies authorized individual police to subjectively determine what investigative materials to maintain and turn over; they mandated a system of parallel investigative files for homicides; they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system; they did not cover gang crimes officers or other non-detective investigators; and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas. AF ¶¶ 1, 8, 10, 12, 31-40, 41-49, 50-59; SF ¶¶ 26-28; RSOF-City ¶¶ 12-16.

13

The City had no policies governing supervision of investigative file production; did not audit its written policies governing the production of investigative materials, which were promulgated after Jones and Palmer; and did not provide training on those policies, AF ¶¶ 23, 28-30, SF ¶¶ 300, 375, 400-422; RSOF-City ¶¶ 10, 12-14, 19-21; AF ¶¶14-40; Sornberger v. City of Knoxville, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed). 40 The City moves for summary judgment on Plaintiffs' Monell theory that the City failed to discipline police officers accused of misconduct generally, but it does not address the separate theories that the City did not provide adequate training, supervision, or discipline on particular subjects relating to homicide investigations. 41 With respect to its official policies governing eyewitness identification procedures, the City moves on Plaintiffs' widespread practice theory, CB-20-28, but it does not address their express policy/gap in policy theory, their theory regarding actions of final policymakers, or their theory that the City failed to train, supervise, or discipline on this subject.

To the extent that the City cites Plaintiffs' complaints in its motion, CB-1-2, the Court should disregard those citations. Not only were the claims explored in richer detail in discovery, as discussed, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. Streckenbach v. Vandensen, 868 F.3d 594, 596 (7th Cir. 2017). 43 At this point, the City's failure to address these theories at summary judgment should be fatal to its motion for summary judgment, considering that the City has faced (and has failed to address) precisely the same theories in at least a half dozen motions filed by Plaintiffs' counsel in other Guevara cases, including Fields, No. 10 C 1168, Dkt. 1184 (response to post-trial motion) at 12-25 (explaining these theories); Rivera, No. 12 C 4428, Dkt. 735 (response to post-trial motion) at 78-118 (explaining these theories); Sierra, No. 18 C 3029, Dkt. 520 (response to summary judgment) at

14

106-113 (explaining these theories); Johnson, No. 20 C 4156, Dkt. 341 (response to summary judgment) at 131-134 (explaining these theories); Iglesias, No. 19 C 6508, Dkt. 278 (response to summary judgment) at 4-7 (explaining these theories); Reyes, No. 18 C 1028, Dkt. 774 (response to summary judgment) at 7-9 (explaining these theories).44 Remarkably, in its summary judgment brief in Rivera, filed nearly a decade ago, the City made an argument that Mr. Rivera there had not pursued some of the Monell theories that Plaintiffs set out above, and Rivera there responded, as Plaintiffs assert here, that he had pursued those theories in discovery. No. 12 C 4428, Dkt. 321 at 50- 53. The Court ruled that those theories were in play at trial in Rivera. 319 F. Supp. 3d at 1056-59. For the City to suggest years later that these theories are not being pursued in a closely related case is truly incredible.

See also Daniel v. Cook County, 833 F.3d 728, 734 (7th Cir. 2016) (widespread practice established "by offering competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event)"); Dixon v. Cook County, 819 F.3d 343, 348-49 (7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); Thomas v. Cook County, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests).

A variety of overlapping mechanisms caused the suppression of investigative information in Chicago homicide cases including: detectives were permitted to decide subjectively what evidence was documented in reports and in official files; there were no policies requiring the disclosure of evidence, governing what had to be kept in official files, or dictating how to respond to requests for investigative files; there were no policies governing nondetectives; there was a decentralized file system, which allowed for parallel files; the written policies that did exist were not followed; notes were not retained or included in files; and officers intentionally did not turn over to the criminal justice system material evidence they learned during their investigations.

15

Different combinations of these mechanisms caused the suppression of different items of evidence in different homicide investigations during the relevant time period. Different mechanisms of suppression does not dilute that the City had a widespread practice of suppressing evidence in homicide investigations. 48 To the extent that the City suggests that this case is distinguishable from all of the past cases where this Monell theory has survived summary judgment—Johnson, Iglesias, Reyes, and Rivera—because those cases involved the suppression of particular documents, CB-4-5, that is doubly incorrect: (1) those Monell decisions did not turn on a finding that a particular document had been suppressed, (2) the Monell theory is broader than the suppression of particular documents and encompasses all suppressed investigative information, as explained above.

See also, e.g., Velez, 2023 WL 6388231, at *25 ("A reasonable jury could find a widespread failure to investigate and to discipline caused the Chicago Officers to believe that their alleged misconduct would not be discovered and that, even if discovered, they would not face any effective disciplinary action resulting from such misconduct."); Obrycka v. Chicago, 2012 WL 601810, at *8 (N.D. Ill. Feb. 23, 2012) (denying summary judgment on code of silence claim where plaintiff submitted police practices expert that opined a code of silence existed and a statistical expert report "showing that the Chicago Police Department has statistically significantly lower rates than the national average of sustained rates for police misconduct complaints"); Marcinczyk v. Plewa, 2012 WL 1429448, at *3 (N.D. Ill. Apr. 25, 2012) (denying summary judgment where plaintiff's evidence of City's failure to investigate and discipline officers accused of misconduct included "documentary evidence indicating…that officers who have complaints lodged successfully against them are subject to only minimal discipline"); Johnson v. Chicago, 2009 WL 1657547, at *10 (N.D. Ill. June 9, 2009) (denying summary judgment where plaintiff had evidence that City paid lip service to known problem of failing to investigate and discipline rogue officers); Garcia v.

16

Chicago, 2003 WL 1715621, at *6-7 (N.D. Ill. Mar. 20, 2003) (denying summary judgment to City given evidence of indifference to a pattern of abuse by its officers where plaintiff had expert testimony and statistics on the sustained rates of misconduct investigations from 1999-2001); Kindle v. Harvey, 2002 WL 230779, at *4 (N.D. Ill. Feb. 15, 2002).

Since 1967, the International Association of Chiefs of Police Law Enforcement Policy Center (IACP) has provided training material for law enforcement about the failures in eyewitness identification, writing that "[e]yewitness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts" – including the Supreme Court that same year in United States v. Wade, 388 U.S. 218 (1967). SF ¶¶ 304, 308, 309. By at least 1992, the IACP was releasing papers and model policies that were premised on the inherent unreliability of eyewitness identification procedures. SF ¶¶304-309. As the IACP papers in 1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result. Misidentifications by eyewitnesses are normally the result of a combination of factors." SF ¶305. The papers explained the primary reasons that eyewitness identifications were frequently unreliable: frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion. SF ¶306. The 1993 White Paper accompanying the 1992 Model Policy quoted from the Supreme Court's 1967 decision in United States v. Wade, stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor- perhaps it is responsible for more such errors than all other factors combined." SF ¶309 (quoting Wade, 388 U.S. at 229). Thus, long before 1993, police departments have known about the problems with eyewitness identification procedures, and the need for rigorous safeguards to ensure such

procedures were being conducted in appropriate cases, and in the appropriate ways. PSOF ¶¶304-310.

The task of coding these data based on police reports "borders on the mechanical." Rivera v. Guevara, 319 F. Supp. 3d at 1067. Reading a police report and transferring to a spreadsheet what the report says about the criteria just mentioned does not call for any subjective decision making, as Dr. Steblay explains. SF ¶333. 53 Dr. Steblay ensured that the coding team "was using objective and clear definitions for the coding variable." The coding was undertaken by at least two independent coders, who compared their work to catch discrepancies. The coding process did not call for any subject decision making. Dr. Steblay also conducted a robust reliability check, verifying approximately 200 lineups, randomly selected from the court-ordered homicide files produced in this case. She agreed with the coders in 98% of the instances, "strong interrater agreement" that gave her confidence in the quality of the underlying data. SF ¶¶ 332, 333. 54 In Defendants' Daubert motion, Defendants make much of what they assert are errors in the coded data. Dkt. 310. As Plaintiffs explain in their response, the asserted errors reflect the ongoing quality control measures between Dr. Steblay's analysis in the earlier Sierra and Iglesias cases—other Guevara cases—and regardless are so few in number compared with the total set of coded data that they would have no effect on Dr. Steblay's analysis. Dkt. 326.

To compare the Chicago data to the field data, Dr. Steblay had to make the two datasets as similar as possible. She determined the field data did not have lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, or lineups with repeated procedures. This determination was "favorable to the defense case" as the presence of unreported multiple-suspect lineups, familiar-suspect identifications, or repeated identifications would potentially inflate suspect ID rates. PSOF ¶427. Therefore, for the comparison, Dr. Steblay screened out from the Chicago data lineups in which witnesses were already familiar with the

18

perpetrator, multiple suspect lineups, and lineups that were repeated procedures with the same witness viewing the same suspect. In addition, removing these lineups from the Chicago data eliminated lineups more likely to obtain a suspect identification, reducing the suspect identification rate, and therefore giving the City the benefit of the doubt. Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first viewing, singlesuspect lineups. SF ¶¶ 341, 342, 343.

These conclusions are consistent with Steblay's findings in other cases, and she has concluded that the Chicago suspect identification rate as found in all of those cases is statistically significantly higher than the aggregate field studies. SF ¶¶345, 356, 357. 58 The theory here is that a total failure to record filler identifications might elevate the suspect identification rate because the set of filler identifications that one would expect to exist based on field studies is simply absent from the Chicago data. However, the City has contended that its police officers recorded filler identifications as non identifications. SF ¶318. That fact is disputed, both by the City's own Rule 30(b)(6) witness, its policies, and by Dr. Steblay. SF ¶¶317, 318, Dkt. 326 at 38 n.6. Moreover, recording filler identifications as non-identifications would itself present a risk of constitutional violations. Rivera, 319 F. Supp. 3d at 1067. Regardless, accepting the City's position for purposes of summary judgment only, not recording filler identifications is not the explanation for Chicago's elevated suspect identification rate.

The City also asserts that Dr. Steblay did not provide a report specific to the case. CB-22. That is misleading. Dr. Steblay's report was disclosed in this case; it is the same as her report in disclosed in other Guevara cases and is based on the same data; and it makes sense that Dr. Steblay would issue the same report because her opinions pertain to the City's policies in the relevant timeframe, not anything about the facts of an individual case. 60 The City's discussion misstates and mischaracterizes Dr. Steblay's opinions in every respect: The City complains that an expert

presenting "possible explanations" for a phenomenon does not create a dispute of fact, CB 24, which is both an inaccurate statement of what experts do and a misapprehension of Dr. Steblay's analysis, which identifies all possible explanations for the City's high suspect identification rate, and then explains why some of them cannot explain the high rate. The City also asserts that Plaintiffs cannot contend that factors such as familiar perpetrators, multiple suspect identifications, and repeated identification procedures with the same suspect and witness caused the City's high identification rate because Dr. Steblay excluded those factors from the lineup dataset. CB-24- 25. But Plaintiffs agree that they were excluded, and the City does not seem to recognize that the exclusion of all of those lineups from the dataset reduced the City's suspect identification rate by only a couple of percentage points, and also eliminated the more benign explanations that the City might have offered to explain the data. In addition, the City says that Dr. Steblay cannot account for whether Chicago lineups were conducted by non-blind administrators, CB25, leaving out that its policies never called for blind administration of lineups, SF ¶316, and leaving out that this factual dispute has no bearing on Dr. Steblay's testimony or conclusions. Finally, the City asserts that some of Dr. Steblay's proffered explanations for the high suspect identification rate are irrelevant to the case—for example the contention that Chicago did not record filler identifications. CB-26. As discussed above, Plaintiffs accept for purposes of summary judgment that this is not the explanation for the City's high suspect identification rate, but that has no effect on Plaintiffs' widespread practice theory.

20